✓ Priority
✓ Send
___ Clsd
✓ Enter
___ JS-5/JS-6
___ JS-2/JS-3

FILED
CLERK, U.S. DISTRICT COURT
MAR 21 2006
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT
MAR 22 2006
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOG CABIN REPUBLICANS, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA and DONALD H. RUMSFELD, <br><br> Defendants. | NO. CV 04-8425 GPS (Ex) <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE** |

DOCKETED ON CM
MAR 22 2006
BY ___ 001

Pending before this Court is Defendants United States of America and Secretary of Defense Donald H. Rumsfeld's ("Defendants") motion to dismiss pursuant Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. In the alternative, Defendants move to dismiss the action for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). After reviewing the parties' submissions, the Court deemed this matter appropriate for decision without oral argument pursuant to Local Rule 7-15 and vacated the hearing.

For the reasons stated herein, Defendants' motion to dismiss is hereby **GRANTED**. Plaintiff may file an Amended Complaint on or before April 28, 2006.

//

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d)

24

## I. BACKGROUND

This case involves the Log Cabin Republican's ("LCR") constitutional challenge to the United States' military's commonly known "don't ask/don't tell" policy (the "policy") concerning homosexual conduct.[1] LCR is a nonprofit organization associated with the Republican Party and dedicated principally to advancing the interests of the gay and lesbian community. LCR's membership allegedly includes gays and lesbians who served in the Armed Forces but who were separated from the service pursuant to the policy. Complaint ¶ 9. LCR further asserts that its membership includes gay and lesbian members who are currently serving in the Armed Forces and who are, therefore, subject to the policy and the Department of Defense regulations. *Id.* ¶ 10.

LCR avers that the policy violates three independent and fundamental protections afforded to all Americans by the United States Constitution: (1) the right to privacy under the Due Process clause of Fifth Amendment; (2) freedom of speech under the First Amendment; and (3) the right to equal protection under the Fifth Amendment. *Id.* ¶ 1.

LCR claims to have standing to bring suit on behalf of its gay and lesbian members who are currently serving in the Armed Forces as well as its gay and lesbian members who were discharged under the challenged statute, 10 U.S.C. § 654. Notably, the complaint does not identify any specific LCR member who was injured or will be injured by the policy. LCR claims that its individual members fear that challenging the constitutionality of the policy and the regulations and/or making public their own names will subject them to investigation and possible discharge under the policy and the implementing regulations. Compl. ¶ 11. Therefore, LCR purports to bring this action on behalf of certain unidentified members who serve, or have served, in the Armed Forces.

---

[1] This policy is codified in 10 U.S.C. § 654 as well as Department of Defense regulations and directives.

### "Don't Ask/Don't Tell" Statute, 10 U.S.C. § 654

In 1981, the Department of Defense ("DOD") formalized a policy of excluding gays and lesbians from service in the United States Armed Forces by implementing revised Department of Defense Directive 1332.14, which mandated the discharge of known homosexuals from the military. This policy included the conclusion that "[h]omosexuality is incompatible with military service." DOD Directive 1332.14, 32 C.F.R. pt. 41, App. A at 93 (1981) (herein the "old policy").

The current statute regarding military service by homosexuals is the result of extensive review by both Congress and the President of the Armed Forces' stance on homosexuals. This review began in January 1993 when President Clinton directed the Secretary of Defense to reexamine the DOD's policy then in force. Congress simultaneously conducted its own review of the issue of homosexual conduct in the Armed Forces. Both the Senate and the House held lengthy hearings, received testimony from military commanders, gay rights activists, experts in military personnel policy, and many interested civilians and service members. S. Rep. No 112, 103rd Cong., 1st Sess. 265-70 (1993). As part of its review, Congress examined the historical background of the military's policy, the role of unit cohesion in developing combat readiness, and the experience of foreign militaries with homosexual members. *Id.*

On July 19, 1993, the President announced (29 Weekly Comp. Pres. Doc. 1369 (1993)), and Congress enacted a new statute governing homosexual conduct in the Armed Forces. *See* National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 571, 107 Stat. 1670-73, codified at 10 U.S.C. § 654.

The statutory policy is grounded in a series of legislative findings, including that: (1) military life is fundamentally different from civilian life in that "the military society is characterized by its own laws, rules, customs and traditions, including numerous restrictions on personal behavior that would not be acceptable in civilian society," 10 U.S.C. § 654(a)(8)(B); (2) standards of conduct, including the Uniform Code of Military Justice, apply to a member of the service whether on or off base and whether on or off duty, *Id.* § 654(a)(10); (3) "the worldwide deployment of the United States military forces, the international responsibilities of the United States, and the potential for

the involvement of the armed forces in actual combat make it necessary for members of the armed forces to accept involuntarily living conditions and working conditions that are often spartan, primitive, and characterized by forced intimacy with little or no privacy," *Id.* § 654(a)(12); (4) "the prohibition against homosexual conduct is a longstanding element of military law that continues to be necessary in the unique circumstances of military service," *Id.* § 654(a)(13); and (5) "the presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." *Id.* § 654(a)(15).

The don't ask/don't tell policy differs from the old policy in that the statement "homosexuality is incompatible with military service" was eliminated. As a result, the military no longer asks recruits questions regarding their sexual orientation. "Also unlike the old regulatory policy, the regulations implementing the new policy stipulate that sexual orientation is considered a personal and private matter, and does not bar entry into service or continued service, unless manifested by homosexual conduct." *Holmes v. California Army Nat'l Guard*, 124 F.3d 1126, 1128 (9th Cir. 1997); DOD Directive 1332.30 at 2-1(C). However, as noted, Congress explained that "the prohibition against homosexual conduct...continues to be necessary in the unique circumstances of military service." 10 U.S.C. § 654(a)(13). Thus, the current policy mandates that a member of the Armed Forces be separated from service, or that a potential member be denied enlistment, if that member has "engaged in, attempted to engage in, or solicited another to engage in a homosexual act." *Id.* § 654(b)(1).

Separation or discharge for engaging in a homosexual act is not required if the member demonstrates that "(A) such conduct is a departure from the member's usual and customary behavior; (B) such conduct, under all circumstances, is unlikely to recur; (C) such conduct was not accomplished by use of force, coercion, or intimidation; (D) under the particular circumstances of the case, the member's continued presence in the armed forces is consistent with the interests

of the armed forces in proper discipline, good order, and morale; and (E) the member does not have a propensity to engage in homosexual acts." *Id.*

A member's statement that he or she is a homosexual, or words to that effect, gives rise to a rebuttable presumption that the member engages in, or is likely to engage in, homosexual acts. S. Rep. 112, at 293-94. Once a finding is made that a member has engaged in speech or behavior constituting "homosexual conduct," that member will be separated unless he or she demonstrates, by a preponderance of the evidence, that he or she "is not a person who engages in, attempts to engage in, or intends to engage in homosexual acts."[2] *Id.* § 654(b)(2).

DOD Directives

The DOD regulations are set forth in Directives and Instructions and implement the above statute by prescribing the procedures under which an officer or enlisted member may be separated from military service for homosexual conduct. DODD 1332.14 at E3. A1.1.8.1; DODI 1332.40 at E2.3. Such conduct is defined as "a homosexual act, a statement by the Service member that demonstrates a propensity or intent to engage in a homosexual act, or a homosexual marriage or attempted marriage." DODD 1332.14 at E3. A4.2.3; DODI 1332.40 at E1.1.12. The regulations explain that a "propensity to engage in homosexual acts [is] more than an abstract preference or desire to engage in homosexual acts, it indicates a likelihood that a person engages in or will engage in homosexual acts." DODD 1332.14 at E3A4:2.4.4; DODI 1332.40 at E1.1.17.

A statement indicating that a service member is a homosexual or bisexual creates a rebuttable presumption that the member engages in, attempts to engage in, or has the propensity to engage in homosexual conduct.[3] DODD 1332.14 at E3. A1.1.8.1.2.2; DODI 1332.40 at E2.3.

---

[2] "Homosexual act" means: (A) any bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires; and (B) any bodily contact which a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (A). *Id.* § 654(f)(3)

[3] A "statement that a member is a homosexual or bisexual, or words to that effect," means (1) language or behavior that (2) a reasonable person would believe (3) was intended to convey the statement (4) that a person engages in, attempts to engage in, or has a propensity or intent to

5

The service member is then given the opportunity, with the assistance of counsel, to prove that he or she does not engage in or have the propensity to engage in homosexual acts. *Id.* In determining whether the officer has successfully rebutted the presumption, the military may consider: (1) whether the officer has engaged in homosexual acts; (2) the officer's credibility; (3) testimony from others about the officer's past conduct, character, and credibility; (4) the nature and circumstances of the officer's statement; and (5) any other evidence relevant to whether the officer is likely to engage in homosexual acts.[4] *Id.*

The DOD Directives, however, draw a distinction between homosexual acts and mere sexual orientation. The Directives define "sexual orientation" as "[a]n abstract sexual preference for persons of a particular sex, as distinct from a propensity or intent to engage in sexual acts." DODD 1332.14 at E3. A4.2.5; DODI 1332.40 at E1.1.21. A service member's sexual orientation "is considered a personal and private matter, and is not a bar to continued service ... unless manifested by homosexual conduct." DODD 1332.14 at E3. A1.8.1.1; DODI 1332.40 at E2.3. Likewise, a service member's statement that he or she is a homosexual "is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts." *Id.*

## II.  LEGAL STANDARD

Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur Miller, Federal Practice and Procedure § 1356 (1990). The court must accept all material allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *NL Indus. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986); *see also Russell v. Landrieu*, 621 F.2d 1037, 1039 (9th Cir. 1980).

---

engage in homosexual acts. This may include statements such as "I am homosexual," "I am gay," "I am a lesbian," "I have a homosexual orientation," and the like. DODD 1332.30 at 8-1(B)(4)(b).

[4] The DOD Directives use the terms "member" and "officer" interchangeably.

A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or through extrinsic evidence. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Where jurisdiction is intertwined with the merits, the court must "assume[] the truth of the allegations in a complaint . . . unless controverted by undisputed facts in the record." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).

## III. DISCUSSION

Defendants move for dismissal on the following grounds: (1) Plaintiff lacks associational standing to sue; and (2) Plaintiff fails to state a legally cognizable claim in light of previous decisions upholding the military's authority to discharge service members for homosexual conduct. Before reaching the latter argument, the Court must determine whether the present case is justiciable.

### A. Standing

Standing is a threshold requirement in every federal case. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). The doctrine of standing focuses on the party seeking to invoke federal jurisdiction rather than the issue at stake in the litigation. *Fulani v. Bentsen*, 35 F.3d 49, 51 (2d Cir. 1994). In *Wrath*, the Supreme Court explained standing "is founded in concern about the proper - and properly limited role - of the courts in a democratic society." *Wrath*, 422 U.S. at 498. While standing includes purely prudential limitations, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992).

The Supreme Court "established that the irreducible constitutional minimum of standing constitutes three elements." *Lujan*, 504 U.S. at 561 (citations omitted). "First, the plaintiff must have suffered an injury in fact -- an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotations and citations omitted). Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of

the defendant, and not the result of some third party not before the court. *Id.* at 560-61. Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotations and citations omitted).

"The party seeking to invoke the jurisdiction of the court has the burden of alleging *specific facts* sufficient to satisfy these three elements." *Schmier v. United States Court of Appeals,* 279 F.3d 817, 821 (9th Cir. 2002) (emphasis added). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary,* 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991).

An organization may have standing to bring suit in either of two ways. The organization may file suit on its own behalf "to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth,* 422 U.S. at 511. Alternatively, in the absence of a direct injury to itself, an organization may have standing to bring suit in a representational capacity. The doctrine of associational standing allows an organization to assert the rights of its members provided it can satisfy the three part test set forth in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343-45, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977). To bring suit on behalf of its membership, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 343.

In the instant case, LCR does not claim any direct injury to itself; rather, it brings this suit as a purported representative for certain members allegedly injured or who might be injured by application of the policy and regulations at issue. Thus, in order to proceed with this action, LCR must satisfy the requirements for associational standing.

The instant motion to dismiss is predicated upon the first prong of the *Hunt* test and specifically LCR's failure to identify a member that would have standing to sue. P. & A. at pp. 8-10. It is well settled that a plaintiff invoking associational standing must allege facts sufficient to

show that "its members would otherwise have standing to sue in their own right[.]" *Hunt*, 432 U.S. at 343. As noted, in order to establish individual Article III standing, a plaintiff must show (1) an "injury in fact" that is concrete and particularized and actual or imminent; (2) that the injury is traceable to the challenged action of the defendant; and (3) that the injury is likely to be redressed by a favorable decision. *Lujan,* 504 U.S. at 560-61. Thus, LCR must first show that a member has suffered a particularized injury. The Supreme Court has defined "particularized" to mean "that the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1. In other words, a plaintiff must possess more than a mere interest in the litigation, but, rather, must show a concrete and particularized injury sufficient to give him or her a personal stake in the outcome of the case. *Id.*

Here, the complaint contains allegations of *possible* concrete and particularized injuries. For instance, LCR avers that its membership includes "gay and lesbian Americans who served in the United States Armed Forces but who were separated from the United States Armed Forces because of the Policy." Compl. ¶ 9. LCR further alleges that it has members who currently serve in the Armed Forces and, therefore, could be subject to the policy and the DOD regulations. *Id.* ¶ 10. However, as explained in greater detail below, such allegations are insufficient to establish that any of LCR's individual members have suffered or face concrete, particularized injuries.

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany,* 250 F. Supp. 2d 48 (N.D.N.Y. 2003), for example, the court held that an associational plaintiff was required to identify the member it purported to represent and make a showing that the member would have standing to sue in his or her own right. In that case, a neighborhood association brought suit against a city and its officials alleging various violations of federal regulations governing lead-based paint activities. *Id.* at 52. The association claimed to represent members residing in an area subject to federal law and regulations designed to protect public health from the serious risks associated with lead-based paint activities. *Id.* at 54. It alleged that certain members had been injured as a result of lead-based paint work performed on their homes. *Id.* However, the association declined to name any of its members and failed to allege that any specific member

had lead-based paint work performed on his or her home. *Id.* Rather, the complaint contained general allegations that plaintiff's members resided in the Lead Paint Abatement Program's target area and were injured by defendants' failure to comply with federal laws pertaining to lead paint. *Id.*

In granting a motion to dismiss, the *Arbor Hill* Court explained that plaintiff's failure to identify members prevented the court from determining individual standing. *Id.* at 56. While the court acknowledged that plaintiff sufficiently alleged concrete and particularized injuries, it found the general allegations which related to no specific member insufficient to establish an injury-in-fact. *Id.* Ultimately, the court concluded that by failing to identify its members, plaintiff did not meet its burden of demonstrating injury-in-fact on the pleadings. *Id.* at 57.

Similarly, in *National Alliance for the Mentally Ill v. Board of County Comm'rs*, 376 F.3d 1292 (11th Cir. 2004), the court held that the failure to identify an injured member prevented the organization from asserting associational standing. In that case, two mentally ill residents of St. John's mental health facility along with National Alliance for the Mentally Ill, St. John's Inc. ("NAMI-St. Johns"), and the National Alliance for the Mentally Ill, Florida, Inc.-Jacksonville ("NAMI-Jax") sued the Board of County Commissioners for its decision not to fund a mental health treatment facility. *Id.* at 1294. Plaintiffs alleged, *inter alia*, violations of the Fair Housing Act, the Americans with Disabilities Act and violation of their Fourteenth Amendment right to due process and equal protection.

The organizations claimed associational standing to bring suit on behalf of their members. *Id.* at 1296. However, the court found that both organizations failed to demonstrate that any of their members had standing to sue. *Id.* The court determined that neither of the individuals named in the action had been injured and, therefore, lacked standing to bring suit in their own right. The court explained that the organizations were "provided with information pertaining to persons who were eligible for treatment when it tendered discovery materials .... and could have used those materials to ascertain the identities of injured constituents but chose not to do so." *Id.* The court affirmed the district court's decision to dismiss for lack of standing, finding that the

organizations' "failure to identify an injured constituent prevented them from asserting associational standing." *Id., citing Arizonans for Official English v. Arizona*, 520 U.S. 43, 66, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997) ("An association has standing to sue or defend in such capacity, however, only if its members would have standing in their own right.").

In its opposition, LCR contends that it has adequately asserted associational standing. LCR takes the position that an association is not required to identify, by name or pseudonym, its individual members at the pleading stage. In support of this contention, LCR relies on *Doe v. Stincer*, 175 F.3d 879, 884-85 (11th Cir. 1999). In *Stincer*, an Advocacy Center brought suit on behalf of mentally ill patients alleging that the Americans with Disabilities Act preempted a Florida statute that blocked patient access to medical records. The Advocacy Center was a federally-authorized protection and advocacy system established under the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII"), 42 U.S.C. § 10801, and the Protection and Advocacy of Individual Rights Act ("PAIR"), 29 U.S.C. § 794e." *Id.* at 881. The text of PAMII expressly grants standing to protection and advocacy systems to pursue legal remedies to "ensure protection of individuals with mental illness." § 10805(a)(1)(B). *Id.* at 884. Nevertheless, the Attorney General argued that the Advocacy Center lacked standing under PAMII because it had not brought suit on behalf of a specific individual who had been denied records pursuant to Fla. Stat. Ann. § 395.3025(2).

The *Stincer* court disagreed and concluded that nothing in the language of PAMII required a protection and advocacy organization to name a specific individual in order to have standing to sue. *Id.* The court noted that the "very purpose of PAMII was to confer standing on protection and advocacy systems, such as the Advocacy Center, as representative bodies charged with the authority to protect and litigate the rights of individuals with mental illness." *Id.* The court further explained that "under Article III's established doctrines of representational standing, the [Eleventh] Circuit has never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought...." *Id., citing Church of Scientology v. Cazares*, 638 F.2d 1272, 1278 (5th Cir. 1981).

11

However, the court went on to explain that the Advocacy Center was, nevertheless, obligated to satisfy *Hunt's* first prong by "showing that one of its constituents otherwise had standing to sue to support" the claims asserted. *Id.* at 886. To make such a showing, the Advocacy Center relied upon a single affidavit from its director of PAMII programs. *Id.* at 887. The affidavit contained only two paragraphs relevant to the Center's standing. The first was the general allegation that many Floridians have attempted to obtain their medical records and have been denied access under Florida law. *Id.* The second was the averment that "on August 1, 1997, the Advocacy Center received a complaint from an individual that she had been denied access to her treatment records, as permitted by § 395.3025(2)." *Id.* The court found the affidavit insufficient to support the Center's standing because it did not contain "any evidence that any of the Advocacy Center's constituents [had] been denied access to mental health records based on the Florida statute at issue here." *Id.* Ultimately, the court vacated an injunction and remanded the case to the district court on the grounds that the Advocacy Center failed to allege "any of its clients suffered a concrete injury that [was] traceable to the challenged statute" and thus failed to establish standing.[5] *Id.* at 886.

LCR's reliance on *Stincer* is misplaced. First, *Stincer* dealt with associational standing predicated on the PAMII statute, which *specifically* conferred standing on advocacy centers in order to protect and litigate the rights of the mentally ill. *Id.* at 884. Here, LCR does not assert associational standing conferred by PAMII or any other statute. Second, while the *Stincer* court did not necessarily require the representative plaintiff to name a member, it did require a showing

---

[5] The Court acknowledges that *Stincer* involved a challenge to standing raised on summary judgment. Nevertheless, the Ninth Circuit has recognized that "Supreme Court decisions both preceding and following *Lujan* show that [the] injury element most assuredly remains the proper basis of a motion brought under Fed. R. Civ. P. 12(b)(6)." *Schmier*, 279 F.3d at 823. Dismissal at the pleading stage "is the preferred disposition of a standing question because 'the plaintiff's obligation to establish standing should not be passed to the defendant by the simple device of waiting for a summary judgment motion.'" *American Postal Workers Union v. United States Postal Service*, 861 F.2d 211, 213 (9th Cir. 1988), *quoting* 13A C. Wright, A. Miller, and E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3531.15, at 99 (1984).

that a member of the organization had standing to sue. *Id.* at 886. LCR, like the plaintiff in *Stincer*, has provided no evidence to suggest that any of its members have suffered injury sufficient to confer standing on the association.

In further support of its contention that an organization need not identify its members, LCR cites *Forum for Academic & Institutional Rights, Inc. v. Rumsfeld*, 291 F. Supp. 2d 269 (D.N.J., 2003), *rev'd on other grounds*, 390 F.3d 219 (3d Cir. 2004), *rev'd and remanded on other grounds*, — S.Ct. ----, 2006 U.S. LEXIS 2025 (Mar. 6, 2006). In that case, an association of law schools moved for a preliminary injunction against the enforcement of the Solomon Act, 10 U.S.C. § 983, arguing, *inter alia*, that it unconstitutionally conditioned federal funding on the restriction of academic freedom, free speech and freedom of expressive association. *Id.* at 274. The government filed a motion to dismiss for want of standing. At oral argument, plaintiff informed the court that it was prepared to file a Second Amended Complaint ("SAC") predicated upon new information that a law school member of the organization was willing to be publicly identified. *Id.* at 276. The court allowed the SAC which identified two members of the organization-Golden Gate University School of Law and the Faculty of Whittier Law School. *Id.*

The government then moved to dismiss the SAC arguing, among other things, that merely naming members is insufficient to demonstrate standing where (1) none of the factual allegations establish that the law schools, as part of larger universities, are entitled to bring suit on their own behalf and against the wishes of the parent institution; and (2) the parent institutions, not the law schools, have standing to decide whether or not to comply with the Solomon Amendment. *Id.* at 285. The court rejected these arguments recognizing that the Solomon Act "plainly affects law schools" and thus "any threatened injury from the statute would be to law schools." *Id.* at 286.

While the *Forum* court did not require plaintiff to name its law school members, it noted that "[e]ven if [plaintiff] were obligated to identify a member to establish associational standing, it has done so. Plaintiffs' Second Amended Complaint name[d] two members -Golden Gate University School of Law and the Faculty of Whittier Law School." *Id.* at 289. Moreover, the complaint contained detailed information regarding both Golden Gate's and Whittier's policies against the

use of its career service offices and facilities by discriminatory employers. *Id.* The complaint further alleged that both schools were "threatened by the DOD with a complete cutoff of federal funds if found out of compliance with the Solomon Amendment; and that, due to that threat, it suspended its policy with respect to the military." *Id.* The court concluded that such allegations concerning the Golden Gate University School of Law and Whittier Law School were "sufficient to establish that FAIR members [had] standing in their own right to bring [the] action."[6] *Id.*

Thus, LCR's reliance on the *Forum* case is misplaced. When faced with a motion to dismiss for lack of standing, the plaintiff in *Forum* filed an amended complaint which *specifically* identified two of its members. *Id.* at 276. Moreover, the complaint contained detailed allegations of injury, or potential injury, to the identified members. *Id.* at 289. In contrast, the instant pleading simply provides generalized averments and fails to sufficiently identify any member LCR purports to represent. Reply P. & A. at 4: 20-25.

Finally, LCR's reliance on *Associated Gen. Contrs., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401 (9th Cir. 1991), is equally unavailing. In that case, an organization of contractors challenged an ordinance which required the city to set aside designated percentages of its contracting budget for minority and female owned businesses. *Id.* at 1403. The Coalition for Economic Equity intervened and moved to dismiss on grounds that the organization lacked associational standing. The Coalition argued that the evidence indicating that the organization's

---

[6] The *Forum* court recognized that an associational plaintiff cannot rely upon "nebulous allegations regarding its members' identities and their connection to the relevant geographic area." *Id.*, quoting *United States v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992). In *United States v. AVX Corp.*, the First Circuit Court of Appeals held that an environmental organization's assertions of environmental injury were not specific enough to sustain a claim of associational standing and described the deficient pleading as follows:

> The averment has no substance: the members are unidentified; their places of abode are not stated; the extent and frequency of any individual use of the affected resources is left open to surmise. In short, the asserted injury is not anchored in any relevant particulars ... A barebones allegation, bereft of any vestige of a factual fleshing-out, is precisely the sort of speculative argumentation that cannot pass muster where standing is contested. *AVX Corp.*, 962 F. 2d at 117.

14

members suffered injury stemming from the ordinance was "limited to a declaration from one [] member stating that the ordinance ha[d] discouraged him from bidding on San Francisco contracts." *Id.* at 1406. The declaration also contained the more general assertion that the "ordinance could cause its members to lose contracts for which they [were] bidding." *Id.* The Coalition claimed that such assertions were insufficient to confer standing upon any of the organization's members and, therefore, upon the organization. However, the court found that "AGCC's members ha[d] firm intentions to bid for San Francisco city contracts" and were unable to do so as a result of the ordinance. *Id.* at 1407. Based on the record, which included a declaration from one of the plaintiff's members, the court concluded that the injuries asserted were sufficient to confer standing on the organization. *Id.*

Here, by contrast, LCR has submitted no declarations or other evidence from its members suggesting that they have suffered or will suffer an injury as a result of the policy. LCR fails to identify a single individual who is (1) an active member of the LCR; (2) has served or currently serves in the Armed Forces; and (3) has been injured by the policy. P. & A. at 11: 9-13. Indeed, nowhere in the complaint is there an allegation that any specific member of the LCR was discharged or otherwise harmed by the policy and regulations. Thus, while LCR has sufficiently alleged possible injuries related to the policy, it has not demonstrated that any of its individual members have suffered an injury-in-fact. Consequently, an individual standing analysis with respect to LCR's members cannot be performed by the Court. As the case stands now, the injury alleged is only hypothetical and conjectural and, therefore, insufficient to confer associational standing.

Having determined that LCR has failed to demonstrate that its members would have standing to sue in their own right, the Court need not reach the remaining two prongs of the associational standing test, i.e., the organization's purpose and individual member participation. *See Hunt*, 432 U.S. at 343.

//

//

B. <u>Confidentiality Concerns</u>

LCR maintains that it should not be compelled to disclose the identity of its members effected by the policy, claiming that its members are "fear[ful] that challenging the constitutionality of the Policy and the DOD Regulations, and/or making public their own names in such an action, will subject them to investigation and discharge...." Compl. ¶ 11. The Court recognizes that members currently serving in the military may have an interest in remaining anonymous in light of the presumptions that would attach if the members were identified as homosexuals. Nevertheless, the Court notes that there have been numerous challenges to the military's policy on homosexuality where individual servicemen and women have openly identified themselves as plaintiffs. For example, shortly after this case was filed, homosexual former members of the Army, Navy, Air Force, and Coast Guard brought suit in Massachusetts contending, as LCR does here, that the don't ask/don't tell policy and its implementing regulations are unconstitutional. Notably, all twelve plaintiffs consented to being named in the suit. *Thomas Cook et al. v. Donald H. Rumsfeld et al.*, No. 04-12546 (D. Mass.)

Similarly, in *Holmes*, 124 F.3d 1126, former members of the United States Navy and the California Army National Guard brought suit alleging that their discharges pursuant to the don't ask/don't tell policy were unconstitutional. Both plaintiffs in *Holmes* were identified by name. *Id.* In *Thomasson v. Perry*, 80 F.3d 915 (4th Cir. 1996), plaintiff Paul G. Thomasson, a Navy Lieutenant, declared his homosexuality and was honorably discharged under 10 U.S.C. § 654 and the corresponding regulations. Plaintiff filed action challenging the constitutional validity of his discharge. *Id.; see also Selland v. Perry*, 905 F.Supp 260 (D. Md. 1995) (same).

The first challenge to the don'task/don't tell policy came in *Able v. United States*, 88 F.3d 1280 (2d Cir. 1996). In that case, plaintiffs Lieutenant Colonel Jane Able, Petty Officer Robert Heigle, First Lieutenant Kenneth Osborn, Sergeant Steven Spencer, Lieutenant Richard von Wohld, and Seaman Werner Zehr brought suit alleging that the policy and the regulations were invalid under the First and Fifth Amendments. *Id.* at 1284. The plaintiffs were homosexuals serving in either the Armed Forces or the Coast Guard at the time of the suit. While "Jane Able"

was a pseudonym for a lesbian serving in the United States Army Reserves, the remaining five plaintiffs were all identified by name.

These cases demonstrate that here, as in other situations in the country's history, individuals who believe their Constitutional rights have been violated will step forward to legally challenge the perceived injustice despite the potential consequences of being identified in a lawsuit. Thus, the Court is not convinced that the threat of investigation or discharge justifies the failure to identify a member having standing to assert the claims presented in this action.[7]

In light of the above cases, and considering the Court's need to ensure a live controversy exists, LCR is ordered to identify, by name, at least one of its members injured by the subject policy if it wishes to proceed with this action. LCR is hereby permitted to file an Amended Complaint containing *specific facts* sufficient to show that at least one member would have standing to sue. In addition, a named member must submit a declaration establishing that he or she: (1) is an active member of the organization; (2) has served or currently serves in the Armed Forces; and (3) has been injured by the policy.

//
//
//
//
//
//
//
//
//

---

[7] The Court finds LCR's confidentiality argument even less persuasive considering the organization claims to represent members *already* separated or discharged from the Armed Forces pursuant to the policy. Compl. ¶ 9. As these members have already been separated from the military, it is difficult to understand an ongoing interest in remaining anonymous predicated upon the fear of either investigation or discharge.

## IV. CONCLUSION

For the forgoing reasons, the Court hereby **GRANTS** Defendants' motion to dismiss on the grounds that LCR lacks associational standing. LCR is permitted to file and serve an Amended Complaint in compliance with this order on or before April 28, 2006.

**IT IS SO ORDERED.**

Dated this 21st day of March, 2006.

HON. GEORGE P. SCHIAVELLI

UNITED STATES DISTRICT JUDGE