DAN WOODS (State Bar No. 78638)
PATRICK HUNNIUS (State Bar No. 174633)
EARLE MILLER (State Bar No. 116864)
AARON KAHN (State Bar No. 238505)
PATRICK HAGAN (State Bar No. 266237)
WHITE & CASE LLP
633 W. Fifth Street, Suite 1900
Los Angeles, CA  90071-2007
Telephone:  (213) 620-7700
Facsimile:   (213) 452-2329
Email:      dwoods@whitecase.com
Email:      phunnius@whitecase.com
Email:      emiller@whitecase.com
Email:      aakahn@whitecase.com
Email:      phagan@whitecase.com

Attorneys for Plaintiff
Log Cabin Republicans

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOG CABIN REPUBLICANS, a non-profit corporation,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>UNITED STATES OF AMERICA and ROBERT M. GATES, SECRETARY OF DEFENSE, in his official capacity,<br><br>　　　　　Defendants. | Case No.  CV04-8425 VAP (Ex)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Date:  April 26, 2010**<br>**Time:  2:00 p.m.**<br>**Place:  Courtroom of Judge Phillips** |

1

# **TABLE OF CONTENTS**

2

<u>**Page**</u>

3    I.      INTRODUCTION ........................................................................ 1

4    II.     BACKGROUND ......................................................................... 2

5           A.  Procedural History .......................................................... 2

6           B.  The Government's Motion ............................................... 3

7    III.    GOVERNING STANDARD ...................................................... 5

8    IV.     LOG CABIN HAS STANDING ................................................ 6

9    V.      THE COURT MUST DENY THE MOTION  ON THE DUE PROCESS
            CLAIM ....................................................................................... 9

10
            A.  Lawrence v. Texas Demands a Searching Constitutional Review ............ 9
11
            B.  Log Cabin May Maintain Its Substantive Due Process Claim ................ 12
12
            C.  The Rationality of a Statute is Not Frozen at Enactment ......................... 14
13
            D.  Genuine Issues of Material Fact Exist on the Due Process Claim ........... 17
14
            E.  The Motion Misstates Log Cabin's Experts' Testimony ......................... 19
15
     VI.     THE COURT MUST DENY THE MOTION  AS TO THE FIRST
16          AMENDMENT CLAIM ........................................................... 21

17   VII.    IF IT DOES NOT DENY THE MOTION, THE COURT SHOULD
            CONTINUE THE HEARING ................................................... 25
18
     VIII.   CONCLUSION ......................................................................... 25
19

20

21

22

23

24

25

26

27

28

- i -

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

## FEDERAL CASES

4

5
Bowers v. Hardwick,
   478 U.S. 186, 92 L. Ed. 2d 140, 106 S. Ct. 2841 (1986) ................................... 12

6
Buck v. Bell, 274 U.S. 200, 71 L. Ed. 1000, 47 S. Ct. 584 (1927) ........................ 14

7
City of Cleburne v. Cleburne Living Center,
   473 U.S 432, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985) .............................. 11, 12

8

9
E.E.O.C. v. Nevada Resort Ass'n,
   792 F.2d 882 (9th Cir. 1986) ..................................................................................6

10
Eisenstadt v. Baird,
   405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972) ..................................... 10

11

12
Federal Ins. Co. v. Burlington N. & Santa Fe Ry.,
   270 F. Supp. 2d 1183 (C.D. Cal. 2003)................................................................. 5

13
Friends of the Earth, Inc. v. Chevron Chem. Co.,
   129 F.3d 826 (5th Cir. 1997).................................................................................. 8

14

15
Gonzales v. Carhart,
   550 U.S. 124, 167 L. Ed. 2d 480, 127 S. Ct. 1610 (2007) ................................ 23

16
Hamdan v. Rumsfeld,
   548 U.S. 557, 165 L. Ed. 2d 723, 126 S. Ct. 2749 (2006) ................................ 13

17

18
Hamdi v. Rumsfeld,
   542 U.S. 507, 159 L. Ed. 2d 578, 124 S. Ct. 2633 (2004) ................................ 13

19
Holmes v. California Army National Guard,
   124 F.3d 1126 (9th Cir. 1997)............................................................................. 13

20

21
Howard v. U.S. Dep't of Defense,
   354 F.3d 1358 (Fed. Cir. 2004) ........................................................................... 16

22
Hunt v. Washington State Apple Adver. Comm'n,
   432 U.S. 333, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977) .......................................6

23

24
Ileto v. Glock, Inc.,
   565 F.3d 1126 (9th Cir. 2009) ............................................................................. 10

25
Lawrence v. Texas,
   539 U.S. 558, 156 L. Ed. 2d 508, 123 S. Ct. 2472 (2003) .................9, 10, 12, 15

26

27
Montalvo-Huertas v. Rivera-Cruz,
   885 F.2d 971 (1st Cir. 1989) ............................................................................... 15

28

Newton v. Thomason,
   22 F.3d 1455 (9th Cir. 1994) .......................................................... 14

Northwest Austin Mun. Util. Dist. No. 1 v. Holder,
   ___ U.S. ___, 174 L. Ed. 2d 140, 129 S. Ct. 2504 (2009) ............... 14

Palmore v. Sidoti,
   466 U.S. 429, 80 L. Ed. 2d 421, 104 S. Ct. 1879 (1984) .................. 12

Philips v. Perry,
   106 F.3d 1420 (9th Cir. 1997) ........................................................ 13

Pruitt v. Cheney,
   963 F.2d 1160 (9th Cir. 1992) .............................................. 11, 13, 14

Romer v. Evans,
   517 U.S 620, 134 L. Ed. 2d 855, 116 S. Ct. 1620 (1996) ........... 11, 12

Sierra Ass'n for Env't v. F.E.R.C.,
   744 F.2d 661 (9th Cir. 1984) ............................................................ 8

Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,
   502 U.S. 105, 116 L. Ed. 2d 476, 112 S. Ct. 501 (1991) .................. 22

Smart v. Ashcroft,
   401 F.3d 119 (2nd Cir. 2005) ..................................................... 15, 16

United States v. Jackson,
   84 F.3d 1154 (9th Cir. 1996) .......................................................... 15

Valley Forge Christian College v. Americans United for Separation of
   Church & State,
   454 U.S. 464, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982) ................... 24

Washington Legal Foundation v. Leavitt,
   477 F. Supp. 2d 202 (D.D.C. 2007) ................................................... 7

Western & Southern Life Ins. Co. v. State Board of Equalization,
   451 U.S. 648, 68 L. Ed. 2d 514, 101 S. Ct. 2070 (1981) ............. 16, 17

Witt v. Dep't of the Air Force,
   527 F. 3d 806 (9th Cir. 2008) .............................................. 1, 9, 10, 14

## FEDERAL STATUTES

10 U.S.C. § 654 ...................................................................................... 1

10 U.S.C. § 654(b)(2) ............................................................................ 22

- iii -

1

## **FEDERAL RULES**

2   Fed. R. Civ. P. 56(f)................................................................................. 25

3   Local Rule 11-6 ........................................................................................ 3

4   Local Rule 56-1 ........................................................................................ 3

5   Local Rule 56-2, 56-3 ............................................................................... 3

6

7

## **MISCELLANEOUS**

8   Lawrence v. State of Texas,
        41 S.W.3d 349 (Tex. App.-Houston [14th Dist.] 2001) ...................... 10

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LOSANGELES 858740 (2K)

# I.

## __INTRODUCTION__

This case involves constitutional law issues of national importance concerning the rights of homosexuals[1] to serve in the United States Armed Forces. At trial, plaintiff Log Cabin Republicans ("Log Cabin") will ask the Court to declare unconstitutional the government's "Don't Ask, Don't Tell" policy ("DADT"), including both the statute codified at 10 U.S.C. section 654 and its implementing regulations, and to enjoin further enforcement of DADT. Such a decision would put a halt to the irrational law that prevents open homosexuals from serving in any capacity in our Armed Forces, allows the investigation and discharge of patriotic servicemembers, and requires brave men and women fighting and dying for our country in wars in Iraq and Afghanistan to conceal the core of their identity.

While that decision may be momentous, the Court's decision on the government's motion for summary judgment should be easy because the government has not come close to meeting its burden of showing that no genuine issues of material fact exist. With respect to standing, the evidence shows that both Alex Nicholson and John Doe are members of Log Cabin who have been injured by DADT, despite what the government claims in its motion. With respect to the claim that the government is entitled to judgment on the due process claim as a matter of law, the Court has already rejected this argument by recognizing the significance of Lawrence v. Texas and denying the government's motion to dismiss last June. The Court should do so again, as the government has not cited any new authority or made any new arguments. With respect to the evidence on the due process claim, the government submits no facts in its separate statement, ignores admissions by the President, the Chairman of the Joint Chiefs of Staff, and the

---

[1]   As this Court did in its June 9, 2009 order, we use the term "homosexual" here and throughout this memorandum in its broad, inclusive sense, as in Witt v. Dep't of the Air Force, 527 F. 3d 806 (9th Cir. 2008).

Secretary of Defense, and ignores a mountain of evidence showing that no rational basis ever existed for DADT and certainly does not exist today. Similarly, the Court must deny the motion as to the First Amendment claim because genuine issues of material fact exist on that claim.

## II.

## BACKGROUND

### A.    Procedural History

Log Cabin initiated this action in 2004. The government moved to dismiss and, after a lengthy delay, Judge Schiavelli granted the motion with leave to amend as to standing and did not reach the constitutional law issues. Log Cabin amended its complaint in compliance with Judge Schiavelli's order, the government again moved to dismiss, another lengthy delay ensued, and Judge Schiavelli retired without deciding the motion. The case was then reassigned to this Court.

Following additional briefing and oral argument, on June 9, 2009, the Court granted the motion to dismiss as to Log Cabin's equal protection claim and a portion of its First Amendment claim and denied the motion to dismiss as to Log Cabin's due process claim and one prong of its First Amendment claim.

The Court then set a Rule 26(f) conference. In its portion of the joint Rule 26(f) report, the government argued that discovery was not necessary; Log Cabin disagreed. At the conference the parties argued their positions; the Court noted that it was "inclined to think that the topics that the plaintiff has set forth in terms of discovery, in terms of areas in which it wants to do discovery, seem appropriate." July 6, 2009 Transcript of Proceedings at 6:13-15. The Court took the matter under submission. Id. at 27:11-14.

On July 24, 2009, the Court ordered that "Plaintiff is entitled to conduct discovery in this case to develop the basis for its facial challenge." Dkt. No. 91. The Court also entered a scheduling order, setting a discovery cutoff date, pretrial dates, and a trial date of June 14, 2010. Dkt. No. 92. Discovery then commenced.

1   In October 2009, with written discovery pending to it, the government moved

2   to certify the Court's June 9 order for interlocutory appeal and to stay all

3   proceedings.  Log Cabin opposed the motion, it was argued on November 16, 2009,

4   and the Court denied the motion on November 24, 2009.  Dkt. No. 100.

5   On February 18, 2010, the Court convened a status conference to determine

6   the possible impact on the case of recent political developments.  The government

7   again requested a stay of the case or a continuance of the trial.  On March 4, 2010,

8   the Court issued an order declining to stay or continue the trial date.

9   On March 15, 2010, Magistrate Judge Eick heard argument on three

10   discovery motions filed by Log Cabin.  On the following day, he issued an order

11   granting all three motions in large part.  Dkt. No. 127.

12   Despite the government's efforts to avoid an adjudication of this case on its

13   merits, Log Cabin remains ready, willing, and able to meet this Court's pretrial

14   requirements and to commence trial on June 14.

15   **B.     The Government's Motion**

16   The motion consists of a notice of motion, a memorandum of points and

17   authorities, a proposed order, a document entitled "Defendants' Statement of

18   Uncontroverted Facts and Conclusions of Law [Proposed]", and an "Appendix" of

19   excerpts from four depositions and a few documents.  No declarations from any

20   witness were filed in support of the motion.[2]

21   The memorandum contains a section headed "The DADT Policy."  Motion at

22   _____

[2] The motion fails to comply with Local Rule 56-1.  That rule requires a statement
of uncontroverted facts to "set forth the material facts as to which the moving party
contends there is no genuine issue."  See also L.R. 56-2, 56-3.  The government
filed a document titled "Defendants' Statement of Uncontroverted Facts and
Conclusions of Law" but its text describes "Proposed Findings of Fact," akin to a
pretrial or trial filing.  It contains 12 proposed findings of fact regarding standing
and two proposed findings of fact regarding the First Amendment claim; on the due
process claim, it lists no purported uncontroverted facts.  It contains no reference to
the Belkin and Frank deposition excerpts cited in the memorandum.  The purported
"Conclusions of Law" amount to additional briefing in violation of the 25-page
limit of L.R. 11-6.

- 3 -

1   4:10-7:25.  After noting that Congress held lengthy hearings and conducted an

2   extensive review of DADT, the motion uses almost none of that information   It

3   repetitively cites Congress's conclusions, id. at 4:17-5:4, 5:12-6:1, 6:7-7:25, but

4   Congress's conclusions are not determinative.  See infra at 9-12.  This Court need

5   not abdicate its responsibilities and rubber-stamp Congress's conclusions; it must

6   review whether a rational basis exists for the conclusions.  For example, if

7   Congress were to conclude that women with blonde hair could not serve because it

8   found that they create sexual tension, the Court would not be obliged to accept such

9   an irrational decision.

10         The only testimony from the congressional hearings contained in the motion

11   is part of one sentence from Gen. Schwarzkopf's testimony about success "on the

12   battlefield," id. at 5:5-8, a partial sentence from Gen. Powell's about going "into

13   battle," id. at 5:8-12, and a footnote with ten lines of Gen. Powell's testimony.  Id.

14   at 6:16-25 and n.3.  The gist of the selected portion of Gen. Powell's testimony is

15   that unit cohesion requires excluding homosexuals from serving openly in our

16   armed forces to protect the privacy of heterosexuals and to minimize sexual tension,

17   particularly in combat.

18         No other evidence of any type is presented in the motion to support the

19   government's claim that summary judgment is warranted.  The government submits

20   no declaration from any military or government official that DADT was or is

21   necessary to achieve its ostensible purposes.  Nor has it submitted any expert

22   opinion testimony to that effect.  Nor has it submitted any report or study to that

23   effect.  The Court can only conclude that the government has no evidence to

24   support the constitutionality of DADT.

25         The motion also intentionally ignores many facts of which the government is

26   certainly aware.  It ignores the fact that Gen. Powell has changed his views on

27   DADT.  On February 3, 2010, Gen. Powell publicly stated:  "In the almost

28   seventeen years since the 'don't ask, don't tell' legislation was passed, attitudes and

- 4 -

1   circumstances have changed."  <u>See</u> Log Cabin's Appendix of Evidence ("LCR

2   App.") at 3094.  It also ignores admissions by the highest military officials in the

3   government, including President Obama's recent statements that DADT "doesn't

4   contribute to our national security" and "weakens our national security," and that

5   reversing DADT "is essential for our national security."  LCR App. at 1975-76,

6   1979.  The government also ignores admissions by Admiral Mullen, Chairman of

7   the Joint Chiefs of Staff, and Secretary of Defense Gates, that there is no evidence

8   showing that DADT is necessary for unit cohesion.

9              Sen. Collins:  We've heard today the concern that if don't

10             ask, don't tell is repealed, that it would affect unit

11             cohesiveness or morale.  Are you aware of any studies,

12             any evidence that suggests that repealing don't ask, don't

13             tell would undermine unit cohesion?

14             Adm. Mullen:  <u>I'm not</u>.

15  LCR App. at 1802.  Answering the same question, Secretary Gates said:  "I think I

16  would just underscore that … [P]art of what we need to do is address a number of

17  assertions that have been made for which we have <u>no basis in fact</u>."  (both

18  emphases added.)  LCR App. at 1803.  Most importantly, the motion ignores a

19  mountain of evidence showing that there was and is no rational basis for DADT.

20  At a minimum, the evidence cited in this brief and included in Log Cabin's

21  Statement of Genuine Issues shows that genuine issues of material fact exist.

22                                    **III.**

23                          <u>**GOVERNING STANDARD**</u>

24         This Court is well-acquainted with the standard governing motions for

25  summary judgment, including the moving party's burden and construing the

26  evidence in the light most favorable to the non-moving party.  <u>E.g.</u>, <u>Federal Ins. Co.</u>

27  <u>v. Burlington N. & Santa Fe Ry.</u>, 270 F. Supp. 2d 1183 (C.D. Cal. 2003).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IV.**

**LOG CABIN HAS STANDING**

An organization has standing to sue on behalf of its members if it satisfies the three conditions articulated in Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977):  (1) at least one member of the organization has standing, in his or her own right, to present the claim asserted; (2) the interests sought to be protected are germane to the organization's purpose; and (3) neither the claim asserted nor relief requested requires that the organization's members participate individually.  The government concedes that Log Cabin satisfies the second and third prongs of Hunt, challenges only the first, and claims Log Cabin has not established that any of its members have standing to challenge DADT.

The evidence is to the contrary.  Log Cabin has presented evidence that two of its members, including a former servicemember discharged pursuant to DADT (Alex Nicholson) and a current officer in the Army Reserves ("John Doe"), are members of Log Cabin and would have standing in their own right to challenge DADT's constitutionality.  Moreover, the Court need not conclude that both Mr. Nicholson and Lt. Col. Doe have standing.  "[T]he standing of a single member is sufficient to support organizational standing."  E.E.O.C. v. Nevada Resort Ass'n, 792 F.2d 882, 885-886 (9th Cir. 1986).[3]  If either of these Log Cabin members has standing, then Log Cabin "has standing to bring suit on behalf of current and former homosexual members of the armed forces."  June 9, 2009 Order Denying in Part and Granting in Part Motion to Dismiss ("June 9 Order") at 14 (emphasis added).

_____

[3]  This Court has already reached the same conclusion. June 9, 2009 Order Denying in Part and Granting in Part Motion to Dismiss at 13-14 ("[T]he declaration of one member of an association that he suffered a harm, coupled with the general assertions that other members would suffer similar harm, suffices to confer standing on an association.").

- 6 -

As to Mr. Nicholson, the government does not contest his individual standing to challenge DADT but claims that he is not "a bona fide or active member of LCR sufficient to confer organizational standing."  Motion at 9:10-12.  To the contrary: Mr. Nicholson is a member of Log Cabin today; he was a member in April 2006 when the First Amended Complaint was filed; and – contrary to the government's suggestion that Mr. Nicholson's membership in Log Cabin is "manufactured" for this case – Log Cabin has considered him to be a member from before the First Amended Complaint was filed on April 28, 2006 continuously through the present.  See SGI re Standing 8-10.[4]  In addition, the Georgia chapter of Log Cabin awarded Mr. Nicholson an honorary membership in 2006.[5]  Id. 10.  Log Cabin recognizes such "honorary members" as "Members" under its bylaws.[6]  Id. 8.

In short, Mr. Nicholson's membership in Log Cabin is indisputable.  As a result, the Court need not employ the associational standing test described in Washington Legal Foundation v. Leavitt, 477 F. Supp. 2d 202 (D.D.C. 2007), for an "organization with no formal members."  But even if Mr. Nicholson were not, strictly speaking, a member of Log Cabin under its bylaws, Log Cabin still has standing because Mr. Nicholson satisfies the "indicia of membership" in the organization, based on:  his long-standing self-identification as a Log Cabin member; his active involvement with the organization (including addressing the

---

[4] Log Cabin's Statement of Genuine Issues in Opposition to Motion for Summary Judgment, filed concurrently herewith, includes Log Cabin's response to the government's proposed findings of fact regarding Log Cabin's associational standing ("SGI re Standing") and regarding Log Cabin's First Amendment challenge ("SGI re 1st Am.").  It also includes additional genuine issues of fact to be adjudicated at trial ("SGI").

[5] Counsel for Log Cabin notified the government of Mr. Nicholson's longstanding honorary membership in an email dated March 25, 2010.  While portions of the email were quoted in footnote 5 of the government's brief, the government did not address or even mention the honorary membership.

[6] Terry Hamilton's testimony regarding the membership provisions of Log Cabin's bylaws was based on his recall of the bylaws and without reference to the bylaws themselves, which the government never requested be produced.

- 7 -

1  Log Cabin National Convention in 2006 and regularly attending meetings of the

2  Georgia chapter for nearly two years); and the organization's officers' belief that he

3  is and has continuously been a member.  SGI re Standing 9-10; see Friends of the

4  Earth, Inc. v. Chevron Chem. Co., 129 F.3d 826, 828-29  (5th Cir. 1997) ("failure

5  to comply with state and internal rules for identification of its members" should not

6  "overshadow the considerable activities of FOE with and for those persons its

7  officers and staff have consistently considered to be members" where, *inter alia*,

8  "members have voluntarily associated themselves with FOE," "testified in court

9  that they were members of FOE" and "suit clearly is within FOE's central purpose,

10  and thus within the scope of reasons that individuals joined the organization.");

11  Sierra Ass'n for Env't v. F.E.R.C., 744 F.2d 661, 662 (9th Cir. 1984) (corporation

12  that had been suspended and failed to take the steps necessary to preserve its

13  corporate status under state law maintained its representational standing).

14  Lt. Col. Doe, as he testified in his declaration (Dkt. No. 39) is a member of

15  Log Cabin and an officer in the United States Army Reserves who recently

16  completed a one-year tour of duty in Iraq.  SGI re Standing 12.  Lt. Col. Doe is a

17  member of Log Cabin and has been continuously since before this case was filed,

18  paying his initial membership dues in 2004.  Id. 11.

19  Lt. Col. Doe is also homosexual and subject to DADT.  He wishes he had the

20  "ability to exercise [his] constitutionally protected right to engage in private,

21  consensual homosexual conduct without intervention of the United States

22  government."  Id. 12.  Under DADT, he cannot do so without facing likely

23  separation proceedings.  Moreover, Lt. Col. Doe cannot identify himself in this

24  lawsuit for "fear that challenging the constitutionality of [DADT], and/or making

25  my own name or identity known in such an action, will subject me to investigation

26  and discharge pursuant to [DADT]."  Id.

27  Lt. Col. Doe's fear is well-founded.  Notwithstanding the President's call for

28  repeal, DADT is still in effect and discharges have not been stayed.  SGI 89-91.  Lt.

- 8 -

1   Col. Doe's Declaration alone likely constitutes evidence sufficient to support his

2   discharge (including under the March 2010 revisions to DADT).  See SGI 92.

3   Thus, the government's claim that Lt. Col. Doe lacks standing because he has not

4   "been discharged…by application of [DADT]" is nonsense, further evidenced by its

5   refusal to stipulate that it would not interfere with the benefits or status of members

6   identified by name in this suit.  First Amended Complaint, ¶ 22 n.3.

7       In sum, either Alex Nicholson or John Doe satisfy the first prong of the Hunt

8   test.[7]  Therefore, Log Cabin has standing to challenge DADT.

9                                  **V.**

10              **THE COURT MUST DENY THE MOTION**

11                 **ON THE DUE PROCESS CLAIM**

12      **A.    Lawrence v. Texas Demands a Searching Constitutional Review**

13      The government is incorrect that Log Cabin's challenge is governed by the

14   most deferential form of constitutional review.  Motion at 13:18-22.  Lawrence v.

15   Texas held that "[l]iberty presumes an autonomy of self that includes freedom of

16   thought, belief, expression, and certain intimate conduct."  539 U.S. 558, 562, 156

17   L. Ed. 2d 508, 123 S. Ct. 2472 (2003).  The Ninth Circuit, in Witt v. Dep't of Air

18   Force, 527 F.3d 806, 816 (9th Cir. 2008), made clear that Lawrence controls the

19   scrutiny applied to DADT and concluded it could not "reconcile what the Supreme

20   Court did in Lawrence with the minimal protections afforded by traditional rational

21   basis review."  Rather than picking through Lawrence to find talismanic language

22   of rational basis, intermediate or strict scrutiny, however, Witt simply realized that

23   it and other courts must follow what the Lawrence court "actually did."  Id.

24   (emphasis in original).

25   _____

26   [7] The government does not challenge Lt. Col. Doe's anonymity, and the Court has
     already recognized that it is appropriate to protect that anonymity.  "This is the

27   unusual case where nondisclosure of the party's identity is necessary … to protect a
     person from harassment, injury, ridicule, or personal embarrassment."  June 9 Order

28   at 13 (internal quotation omitted).

1    The Ninth Circuit recognized that the Supreme Court in <u>Lawrence</u>

2  investigated the extent of the liberty interest at stake, grounded its decision in cases

3  which applied heightened scrutiny,[8] and sought more than merely a hypothetical

4  state interest to justify the challenged law.  <u>Id.</u> at 816-17.  In sum, <u>Witt</u> held, the

5  Supreme Court applied a heightened level of scrutiny – "something more than

6  traditional rational basis review."  <u>Id.</u> at 817.[9]

7    Faced with Major Witt's as-applied challenge to DADT, the Ninth Circuit

8  defined the level of heightened scrutiny <u>Lawrence</u> demands in such cases.  <u>Id.</u> at

9  818-19.  But, as this Court previously recognized, <u>Witt</u> does not foreclose a facial

10  challenge to DADT.  June 9 Order at 15-17.[10]  It is simply silent on the issue.

11    It is also evident that <u>Lawrence</u> requires more than the most deferential form

12  of constitutional review here because <u>Lawrence</u> itself was a facial challenge.

13  <u>Lawrence</u> reviewed the Texas sodomy statute on its face, generally examining "the

14  validity of … making it a crime for two persons of the same sex to engage in certain

15  intimate sexual conduct." 539 U.S. at 562. The question was whether the statute was

16  unconstitutional as to any two persons, not just the two specific men involved.  The

17  lower court opinion in <u>Lawrence</u> confirms that that case was a facial challenge.[11]

18  ───────────────
[8] <u>Witt</u> noted <u>Lawrence</u>'s reliance on <u>Griswold v. Connecticut</u>, <u>Roe v. Wade</u>, <u>Carey

19  v. Population Servs. Int'l</u>, and <u>Planned Parenthood of Southeastern Pa. v. Casey</u>.
527 F.3d at 817.  <u>Lawrence</u> also reviewed <u>Eisenstadt v. Baird</u>, 405 U.S. 438, 31 L.

20  Ed. 2d 349, 92 S. Ct. 1029 (1972), in which heightened scrutiny also applied.  539
U.S. at 565.

21  [9] The government's argument to the contrary on the basis of <u>Ileto v. Glock, Inc.</u>,

22  565 F.3d 1126 (9th Cir. 2009) is unavailing.  Motion at 17:6-8.  First, <u>Ileto</u>
addresses <u>Lawrence</u> only in passing and with far less depth than <u>Witt</u>.  <u>See id.</u> at

23  1141.  Second, the plaintiffs in <u>Ileto</u> challenged an economic statute that preempts
certain civil claims against firearms manufacturers, not a statute that infringes on a

24  protected liberty interest.  <u>Id.</u> at 1131.  Finally, <u>Ileto</u>'s cursory examination of
<u>Lawrence</u> focused on its effect on equal protection, not substantive due process.  <u>Id.</u>

25  [10] The Court stated, "nothing in <u>Witt</u> bars Plaintiff from asserting a facial challenge

26  to DADT." June 9 Order at 16.  The government cites no authority to the contrary.
[11] "[B]ecause [the individuals] entered pleas of *nolo contendere*, the facts and

27  circumstances of the offense are not in the record. ….  Thus, the narrow issue
presented here is whether Section 21.06 is facially unconstitutional."  <u>Lawrence v.

28  State of Texas</u>, 41 S.W.3d 349, 350 (Tex. App.-Houston [14th Dist.] 2001).

- 10 -

1    Because <u>Lawrence</u> mandates a heightened level of scrutiny here, this Court

2    must analyze DADT under what the Ninth Circuit has termed "active rational

3    basis."  <u>See</u> <u>Pruitt v. Cheney</u>, 963 F.2d 1160, 1165-66 (9th Cir. 1992).  Several

4    cases illustrate the application of this standard.

5    First is <u>City of Cleburne v. Cleburne Living Center</u>, 473 U.S 432, 87 L. Ed.

6    2d 313, 105 S. Ct. 3249 (1985), from which the Ninth Circuit derived this

7    heightened level of rational basis scrutiny.  <u>See</u> <u>Pruitt</u>, 963 F.2d at 1165-66.

8    <u>Cleburne</u> requires examination of the government's actual – not hypothetical –

9    bases for the challenged legislation.  473 U.S. at 448-50.  This includes examining

10   the record and delving behind the government's stated justifications to determine

11   whether the legislation is based upon and furthers any such actual purpose or

12   whether its relationship to the "asserted goal is so attenuated as to render the

13   distinction arbitrary or irrational."  <u>Id.</u> at 446.

14   <u>Romer v. Evans</u> also employed a heightened rational basis review in

15   examining the constitutionality of Colorado's Amendment 2, which precluded the

16   state from enacting legislation designed to protect homosexuals from

17   discrimination.  514 U.S 620, 629, 134 L. Ed. 2d 855, 116 S. Ct. 1620 (1996).  The

18   Supreme Court found Amendment 2 unconstitutional because "its sheer breadth

19   [was] so discontinuous with the reasons offered for it that the amendment seems

20   inexplicable by anything but animus toward the class it affects."  <u>Id.</u> at 632.  <u>Romer</u>

21   requires that legislation must be "grounded in a sufficient factual context" for the

22   Court to ascertain some relationship between the legislation and its asserted

23   purposes.  <u>Id.</u> at 632-33.

24   Colorado claimed it enacted Amendment 2 to preserve its citizens' freedom

25   of association and to preserve resources to fight discrimination against other

26   groups.  <u>Id.</u> at 635.  The Court did not accept these rationales at face value.  Rather,

27   it examined the factual context of Amendment 2's enactment and determined its

28   actual purpose was to disadvantage a politically unpopular group.  <u>Id.</u> at 634-35.

- 11 -

1   Importantly, Romer, like Lawrence, applied this standard to a facial challenge.  See

2   id. at 643 (Scalia, J., dissenting) (identifying the challenge as facial).

3        These cases also dictate that, even in a facial challenge under rational basis

4   review, the government may not enact legislation based merely upon animosity to

5   those it would affect.  Romer, 517 U.S. at 634-35; Cleburne, 473 U.S. at 448.

6   "Private biases may be outside the reach of the law, but the law cannot, directly, or

7   indirectly, give them effect."  Cleburne, 473 U.S. at 448.  "The Constitution cannot

8   control such prejudices but neither can it tolerate them. … [T]he law cannot,

9   directly or indirectly," give effect to private biases.  Palmore v. Sidoti, 466 U.S.

10  429, 433, 80 L. Ed. 2d 421, 104 S. Ct. 1879 (1984).  "A bare desire to harm a

11  politically unpopular group cannot constitute a legitimate governmental interest."

12  Romer, 517 U.S. at 634 (emphasis in original) (citation and quotation omitted).

13       The Supreme Court in Lawrence employed the more searching review it

14  employed in Cleburne and Romer.[12]  The Court rejected Texas' proffered legitimate

15  governmental interest and held that restrictions on homosexuals' liberty interests

16  cannot be justified merely on the basis of society's moral preferences.  Id. at 571.

17  Its investigation of the stated rationale and its factual context was searching, even

18  including examination of foreign sources.  Id. at 572, 576-77.  Following Lawrence

19  and Witt, this heightened level of scrutiny is the test the Court must apply in

20  evaluating the constitutionality of DADT.

21       **B.    Log Cabin May Maintain Its Substantive Due Process Claim**

22       Despite this Court's earlier ruling that rejected the government's position

23  (June 9 Order at 14-18), the government rehashes the same arguments, using the

24  same authority, to argue that Log Cabin's substantive due process claim fails as a

25  matter of law.  Motion at 15:6-18:15.  On this point, the government relies heavily

26

27  [12] Indeed, Lawrence identified Romer as among the principal authorities that eroded
    the foundations of Bowers v. Hardwick, 478 U.S. 186, 92 L. Ed. 2d 140, 106 S. Ct.
28  2841 (1986). 539 U.S. at 574-76.

- 12 -

1   again on <u>Philips v. Perry</u>, 106 F.3d 1420 (9th Cir. 1997).  <u>Philips</u> is unavailing,

2   however, because its two core underpinnings have been compromised.

3          Most importantly, the rational basis standard applied in <u>Philips</u> predates

4   <u>Lawrence</u>.  Had <u>Philips</u> included a substantive due process challenge, its holding

5   would have been abrogated by <u>Witt</u>'s recognition that <u>Lawrence</u> controls the

6   analysis of DADT and requires "something more than traditional rational basis."

7   <u>See</u> <u>supra</u> at 9-10.  Indeed, this Court recognized this exact principle when it held

8   that <u>Lawrence</u> "dissolved" the foundation on which <u>Holmes v. California Army</u>

9   <u>National Guard</u>, 124 F.3d 1126 (9th Cir. 1997), rested.  June 9 Order at 18.

10          Second, the Supreme Court has refined the judicial deference afforded to

11   military-effectiveness rationales – a foundational basis of <u>Philips</u>.  <u>See</u> 106 F.3d at

12   1425, 1429.  Since that decision, the Supreme Court has upheld a constitutional

13   challenge to the government's policy of denying procedural due process to an

14   American citizen classified as an enemy combatant.  <u>Hamdi v. Rumsfeld</u>, 542 U.S.

15   507, 533, 159 L. Ed. 2d 578, 124 S. Ct. 2633 (2004).  It rejected the government's

16   argument that federal courts should only review that policy under a "very

17   deferential 'some evidence' standard" in light of the grave threat terrorism poses to

18   the Nation and the "dire impact" due process would have on the central functions of

19   war-making.  <u>Id.</u> at 527, 534.  In <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557, 588, 165 L.

20   Ed. 2d 723, 126 S. Ct. 2749 (2006), the Supreme Court likewise held that "the duty

21   rests on the courts, in time of war as well as in time of peace, to preserve

22   unimpaired the constitutional safeguards of civil liberty."

23          Military commanders are professionals but they are not a priestly caste

24   whose judgment is immune from oversight.  Civilian control of the military has

25   been a fundamental principle since the first days of the Republic, and the Ninth

26   Circuit has not hesitated to subject military-related legislation to a heightened

27   "active" rational basis review.  <u>Pruitt</u>, 963 F.2d at 1165-66.  <u>Pruitt</u> made clear that

28   courts of this circuit must scrutinize military rationales in the same manner

- 13 -

1   employed by the Supreme Court in <u>Cleburne</u>.  <u>Id.</u>  Indeed, "deference does not

2   mean abdication" and Congress cannot subvert the guarantees of the Due Process

3   Clause merely because it is legislating in the area of military affairs.  <u>Witt</u>, 527 F.3d

4   at 821.[13]

5   **C.    The Rationality of a Statute is Not Frozen at Enactment**

6          The government's position is that a statute "must be reviewed at the time of

7   enactment and is not subject to challenge on the ground of changed circumstances."

8   Motion at 19:13-20:8.  Once rational, always rational, the government contends.

9   Even if such an extreme position were necessary to avoid the supposed evil of

10  "periodic judicial review [of legislation] on the basis of changed circumstances,"

11  that supposed evil is a straw man put forth by the government, which should not

12  prevent this Court from scrutinizing DADT.  Furthermore, the government's "once

13  rational, always rational" contention is untrue: if legislation once considered to

14  have been enacted with a rational basis were forever immunized from review, the

15  nation would still, for example, have laws in place for forced sterilization.[14]  No

16  law, once found constitutional under rational-basis review, would ever be subject to

17  a second challenge, no matter how odious or irrational it later is seen to be.

18         More importantly, the government misstates the nature of the evidence

19  proffered by Log Cabin to demonstrate the irrationality of DADT.  Log Cabin does

20  not simply rely on "changed circumstances" to argue that DADT is

21  unconstitutional.  Changed circumstances are themselves relevant in evaluating the

22  continuing interpretation of a legislative enactment.  <u>See</u> <u>Northwest Austin Mun.</u>

23  <u>Util. Dist. No. 1 v. Holder</u>, ___ U.S. ___, 174 L. Ed. 2d 140, 129 S. Ct. 2504, 2512

24  (2009).  This is equally true in evaluating legislation under rational basis review:

25  ─────────────
    [13] The government, citing <u>Newton v. Thomason</u>, 22 F.3d 1455, 1460 (9th Cir.
26  1994), claims <u>Philips</u> remains binding Circuit precedent here.  Motion at 14:18-21.
    However, <u>Newton</u> expressly exempts circumstances in which intervening Supreme
27  Court authorities, such as <u>Lawrence</u>, <u>Hamdi</u>, and <u>Hamdan</u> exist.  22 F.3d at 1460.
    [14] <u>See</u>, <u>e.g.</u>, <u>Buck v. Bell</u>, 274 U.S. 200, 71 L. Ed. 1000, 47 S. Ct. 584 (1927), the
28  infamous "three generations of imbeciles are enough" case.

> Those who drew and ratified the Due Process Clauses …
> knew times can blind us to certain truths and later
> generations can see that laws once thought necessary and
> proper in fact serve only to oppress.  As the Constitution
> endures, persons in every generation can invoke its
> principles in their own search for greater freedom.

Lawrence, 539 U.S. at 578-79.

But even the government's position that the statute should be reviewed without consideration of changed circumstances does not preclude this Court from re-examining the rationality of the statute at the time based on evidence not previously presented or considered, such as the expert opinion testimony that Log Cabin proffers here.  Log Cabin intends to prove at trial the lack of a rational basis for DADT not simply by evidence of new or changed circumstances, such as polling data showing the lack of support for the policy both in the military and in the public at large, but also by extensive expert testimony explaining that there was no rational basis for Congress's original determination at the time of the enactment of DADT.  As shown in Log Cabin's Statement of Genuine Issues, it is not simply the "wisdom" of DADT that is lacking, but the very rational basis for the policy.

The cases the government cites to argue that the rationality of a statute must be evaluated as of the time of its enactment do not compel a different conclusion, because all of those cases involved a challenge to the rational basis of a statute solely based on intervening events – a bare "changed circumstances" argument.[15]

---

[15] United States v. Jackson, 84 F.3d 1154 (9th Cir. 1996), rejected an equal protection challenge to the 100:1 disparity in sentencing for crack versus powder cocaine possession that was based on a later Sentencing Commission recommendation that the disparity be eliminated – a recommendation that Congress specifically disapproved.  Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971 (1st Cir. 1989), denied a rational-basis attack on Puerto Rico's 1902-vintage Sunday closing law that relied on the later enactment of "numerous laws protective of workers' rights," which the challengers alleged undermined the original rationale for the law.  Smart v. Ashcroft, 401 F.3d 119 (2nd Cir. 2005), was an as-applied challenge to a

- 15 -

1   In none of the cases on which the government relies did those who challenged the

2   constitutionality of a statute do so on the basis of evidence that the statute, when

3   enacted, lacked a rational basis, or was motivated by unconstitutional animus.  Log

4   Cabin does so here, with ample evidence.  Log Cabin's experts' opinions show that,

5   even independent of later events, the DADT policy did not have a rational basis

6   when adopted and is therefore unconstitutional.  The experts' opinions may be

7   informed by post-enactment analysis, such as empirical studies of the actual effects

8   of DADT and whether these effects are congruent with its stated purpose, but they

9   do not arise only from new facts or changed circumstances since the enactment of

10  DADT.  Other events subsequent to the adoption of DADT – such as changed

11  military and public opinion, and the changed views of those who formerly

12  supported the policy like Gen. Powell – bolster the position that DADT is not

13  rationally designed to accomplish its stated purposes; but that does not vitiate Log

14  Cabin's independent showing that DADT had no rational basis for its enactment.

15       The government's own authority confirms that this Court must consider post-

16  enactment evidence of whether the challenged statute has furthered the proffered

17  governmental objectives, even under the most deferential "traditional rational

18  basis" scrutiny.  In Western & Southern Life Ins. Co. v. State Board of

19  Equalization, 451 U.S. 648, 68 L. Ed. 2d 514, 101 S. Ct. 2070 (1981) (cited at

20  Motion at 13:22-14:2), the Supreme Court examined evidence developed at trial

21  regarding the post-enactment effect of a challenged tax scheme to determine

22  whether the statue had produced the results that its advocates predicted would

23  occur.  Id. at 652, 673-74.  The post-enactment evidence included empirical studies

24  _____

25  deportation order imposed on an individual under a section of the Immigration and
    Nationality Act that had been repealed, but not with retroactive effect, id. at 122;

26  the court denied the petitioner's challenge and held that congressional
    reconsideration of a statute did not render it unconstitutional at enactment.  Id. at

27  123.  The court in Howard v. U.S. Dep't of Defense, 354 F.3d 1358 (Fed. Cir.
    2004), denied a challenge to the constitutionality of a statute based on Congress's

28  modification and partial repeal of the prohibition, for the same reason.  Id. at 1361.

- 16 -

1  and statistical data presented by authorities in this field.  Id. at 673-74.  Log Cabin

2  will present evidence of DADT's post-enactment effect to demonstrate that the law

3  and its regulations have furthered not one of the stated objectives.

4        The evidence presented by Log Cabin in its Statement of Genuine Issues,

5  including the reports of seven expert witnesses and the extensive scholarship and

6  documents cited therein, is amply sufficient to call for a trial of those issues and to

7  defeat this motion.  On this motion, Log Cabin does not have the burden to prove

8  the lack of rational basis for DADT, only to show evidence of genuine issues that

9  must be tried and fully determined.  Log Cabin has presented such evidence.

10      **D.    Genuine Issues of Material Fact Exist on the Due Process Claim**

11       In contrast to the government's scanty showing in the moving papers, Log

12  Cabin presents with this Opposition voluminous evidence in the form both of expert

13  opinion from seven distinguished academics, researchers, and scholars, and of

14  reports and documents from the government's own records.  That evidence shows

15  that DADT had no rational basis when enacted and continues to have no rational

16  basis today, and therefore violates the constitutional due process rights of United

17  States military servicemembers and Log Cabin's members.

18       Specifically, the evidence presented with this Opposition shows that:

19/20   • No objective studies, reports, or data, either pre- or post-enactment, support the rationality of DADT and its congruence to Congress's stated objectives (SGI 1-29, 141-158);

21/22/23  • At the time of the enactment of DADT, the only objective studies showed that DADT would not further unit cohesion and troop morale but those studies were either ignored by or hidden from Congress (SGI 30-39);

24      • Sexual orientation is not germane to military service; many homosexuals have served our country bravely (SGI 30-39);

25/26   • The enactment of DADT was motivated by animus, prejudice, hostility, ignorance, or fear of homosexuals (SGI 128-133);

27/28   • The enactment of DADT was based on the private biases of influential leaders about homosexuals rather than military judgment (SGI 128-133);

- 17 -

- DADT is applied more frequently in time of peace than in time of war; indeed, the military has knowingly deployed openly homosexual members to foreign theaters of combat (SGI 54-58);

- DADT has had a disproportionate impact on women (SGI 59-68);

- The privacy and sexual tension remarks by Gen. Powell did not apply to female service members (SGI 15);

- When DADT was enacted, some comparable foreign militaries, e.g., Canada, had already changed their policies to allow open service by homosexuals without any negative impact on unit cohesion, a factor ignored by Congress (SGI 40-53);

- Many comparable foreign countries' militaries have, both before and since the enactment of DADT, changed their policies to permit open service by homosexuals without any negative impact on unit cohesion (SGI 40-53);

- U.S. troops fight side-by-side with openly homosexual members of the armed forces of foreign militaries without any impact on unit cohesion and, in some instances, are commanded by openly homosexual officers from other countries (SGI 40-53);

- Service members in non-combat but critical occupations such as doctors, nurses, teachers, ophthalmologists, dentists, lawyers, linguists, translators, and others have been discharged under DADT (SGI 69-83);

- Open homosexuals are not allowed to serve in the armed forces but are allowed to work alongside our armed forces in the FBI, CIA, NSA, Department of Defense, private contracting firms performing military functions, and civilian paramilitary organizations such as police and fire departments.  Indeed, the Commander-in-Chief of the Armed Forces could be openly homosexual (SGI 84-86);

- DADT undermines military effectiveness, military readiness, and national security (SGI 87-113);

- DADT undermines unit cohesion (SGI 87-113);

- DADT undermines troop morale (SGI 87-113);

- DADT violates First Amendment rights (SGI 134-140);

- DADT impairs recruitment and retention in the military; indeed, the military currently has over 4,000 convicted felons in service while discharging a greater number of honest, patriotic homosexuals (SGI 114-127).

Considerations of space preclude a detailed elaboration here of the facts supporting each of these issues, but Log Cabin refers the Court to the items set forth in the accompanying Statement of Genuine Issues for the evidence.

- 18 -

1

### E.  The Motion Misstates Log Cabin's Experts' Testimony

2          Even the minimal evidence the government does attempt to present on the

3   due process issue is misleading.  It misstates the testimony of two of Log Cabin's

4   experts, Professors Nathaniel Frank and Aaron Belkin.  It claims that "LCR's own

5   experts acknowledged that Congress could rationally have considered the privacy

6   and sexual tension rationales in enacting the statute."  Motion at 20:19-21.  Nothing

7   could be further from the truth.

8          Professor Frank's opinion, expressed in his expert report, is that "the 'don't

9   ask, don't tell' policy was based on moral animus toward [homosexuals], and not

10  on empirical evidence or reasonable concerns about the impact that openly gay

11  service would have on unit cohesion and overall military effectiveness."[16]  His

12  report explains in detail the bases for his opinion, including an examination of the

13  historical records, conversations with military officials and experts who have

14  indicated that their own participation in helping craft the policy took moral and

15  personal concerns into consideration, and his opinion that three influential leaders

16  argued for DADT for personal, not military reasons.[17]  Professor Frank confirmed

17  these opinions during his deposition and the deposition excerpts quoted in the

18  motion do not show any belief on his part that Congress acted rationally.[18]

19  _____

[16]  Frank Decl., Ex. A at 2.

20  [17]  Id. at 2-6.

[18]  With respect to rationality, Professor Frank only said:  "Some people in the

21  military have a desire not to serve with gay people because they believe it is an

22  invasion of their privacy."  Frank Depo. at 46:25-47:4 (See LCR. App. at 0020-34).

He also said, in passages not quoted in the motion, that Gen. Powell argued for

23  DADT based on personal reasons and not on the basis of military necessity.  Id. at

111:7-19.  He explained that Gen. Powell's statements about privacy as a

24  justification to exclude homosexuals make no sense because Gen. Powell also has

said that service in the military means sacrificing privacy.  Id. at 111:20-112:21.

25  With respect to Gen. Powell, Professor Frank testified:  "When he draws a line in

26  the sand around gay people, that reflects a personal basis because it's inconsistent

with his acknowledgement that military service requires that privacy be sacrificed."

27  Id. at 112:22-113:6.  He also pointed out the inconsistency between Gen. Powell's

statements that "youngsters from different backgrounds must get along together

28  despite their individual preferences" and his testimony about DADT.  Id. at 114:4-

- 19 -

1    The government also distorts Professor Belkin's testimony.  It claims that he
2    testified that the privacy basis is rational in combat situations but omits the question
3    and answer immediately following the passage cited in the motion:

4         Q:  Well, is it your opinion that a policy would be
5              appropriate in, say, combat conditions but not in non-
6              combat conditions where accommodations permit
7              individual showers or more private accommodations?
8         A.  The research show that, <u>no</u>, a Don't Ask, Don't Tell
9              situation would <u>not</u> further heterosexual privacy in
10             combat situations where individual accommodations are
11             not possible.[19]

12   He then explained the bases of his opinion at length.[20]  The government also
13   misstates Professor Belkin's testimony about the Israeli military,[21] and his opinions
14   about Congress's supposed concern about sexual tension: he only testified that
15   people have sex in the military, including people of the same sex.  He added,
16   however, in passages ignored by the motion, that this has always been true, is built
17   into the DoD regulations, and would occur even if all gays were excluded from the
18   military.[22]  Professor Belkin testified as follows regarding privacy and animus:
19   "what was really motivating a lot of people who were formulating this policy was

20
21   22.  He also explained that gay men are just as uncomfortable undressing in front of
     others as heterosexual men and that gay males and straight males have not been
22   separated in schools, locker rooms, gyms, camps, and the like, so that the military is
     not different in that regard from traditional cultural expectations.  <u>Id.</u> at 115:11-
23   116:4; 117:8-118:6.  He concluded by testifying that "I believe that people's
     genuine discomfort in terms of the impact of known gays on their privacy does not
24   rise to the level of undercutting military effectiveness."  <u>Id.</u> at 193:1-12.
     [19]  Belkin Depo. at 35:12-20 (LCR App. at 0001-19) (emphasis added).
25   [20]  <u>Id.</u> at 35:21-38:24.
     [21]  Professor Belkin identified <u>one</u> case, in a study of the Israeli military's
26   successful reversal of its prior ban on openly gay service, where a heterosexual
27   soldier was allowed to live off base, possibly because of a privacy concern on his
     part.  <u>Id.</u> at 74:18-75:19.
28   [22]  <u>Id.</u> at 27:13-29:3; 43:7-46:24, 209:5-210:19.

- 20 -

1  moral animus.  But they knew they could not get away with a moral animus

2  argument in public so they needed other argumentation."[23]

3         Thus, it is false to say, as the government does, that "even LCR's own

4  experts acknowledge that Congress could rationally have credited the privacy and

5  sexual tension rationales when it passed Section 654."  Motion at 21:18-22:3.  The

6  opposite is true as to the opinions of Professors Frank and Belkin.[24]  Other experts,

7  whose opinions are not mentioned in the motion, also opine that the privacy and

8  sexual tension rationales are insufficient and pretextual justifications for DADT.[25]

9                                    **VI.**

10          **THE COURT MUST DENY THE MOTION**

11          **AS TO THE FIRST AMENDMENT CLAIM**

12         The very title of the statute and policy, "Don't Ask, Don't Tell," highlights

13  that DADT necessarily raises First Amendment freedom of expression concerns.

14  The circular nature of DADT only contributes to this.   DADT provides that

15  "Sexual orientation is considered a personal and private matter."[26]  At the same

16  time, homosexual "conduct" is grounds for separation.[27]  The policy is circular,

17  however, because it defines "conduct" to include "a statement by a member that

18  demonstrates a propensity or intent to engage in homosexual acts."[28]  Under the

---

20  [23] Id. at 170:8-13.
21  [24] Professors Belkin and Frank were "surprised" to read how the defendants mischaracterized their opinions in the moving papers.  Frank Decl., ¶¶ 5-8;  Belkin
22  Decl. ¶¶ 6-9.  There was also no need for the government to derisively describe Log Cabin's experts as "experts" in quotation marks, Motion at 20:9, especially as the
23  Defense Department itself has more than once described Dr. Frank's work as "thoughtful."  SGI 113.
24  [25] See MacCoun Declaration, Ex. A; Embser-Herbert Decl., Ex. A.
     [26] DoD Directive 1332.14 §E3.A1.1.8.1.1 (First Amended Complaint, Ex. A);
25  DoD Directive1332.30, at pp. 31-22 (id., Ex. B); DoD Directive 1304.26 §E1.2.8.1
26  (id., Ex. C).
     [27] DoD Directive 1332.14 §E3.A1.1.8.1.1; DoD Directive 1332.30, p. 31; DoD
27  Directive 1304.26 §E1.2.8.1.
     [28] DoD Directive 1332.14 §E3.A1.1.8.1.1.; DoD Directive 1332.20, pp. 31-32;
28  DoD Directive 1304.26 §E1.2.8.1.

regulations, the statement "I am a homosexual" is such a statement.[29]  In other words, the <u>fact</u> of one's status as a homosexual is supposedly not a basis for discharge but the <u>statement</u> of that permissible status is.  Not surprisingly, given this framework, the vast majority of discharges under DADT are for "statements", <u>not</u> conduct.[30]  This perverse framework led Admiral Mullen to inform the Senate on February 2, 2010 (SGI 88):

>            No matter how I look at this issue, I cannot escape being
>            troubled by the fact that we have in place a policy which
>            forces young men and women to lie about who they are in
>            order to defend their fellow citizens.

In its June 9 Order, the Court found that "[d]ischarge on the basis of statements not used as admissions of a propensity to engage in 'homosexual acts' would appear to be discharge on the basis of speech, rather than conduct, an impermissible basis."  June 9 Order at 22-23.  The government has not met its burden of showing that no genuine issue of material fact exists on this claim.  Moreover, laws that chill constitutionally protected speech, such as DADT, are presumptively invalid and must withstand the strictest constitutional scrutiny.  <u>See, e.g.</u>, <u>Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.</u>, 502 U.S. 105, 116, 118, 123, 116 L. Ed. 2d 476, 112 S. Ct. 501 (1991).

Mr. Nicholson said he was homosexual only after someone intercepted and read a personal letter from him to another man in Portuguese.[31]  He was confronted

---

[29]  10 U.S.C. §654(b)(2); DoD Directive 1332.14 §E3.A1.1.8.1.2.2; DoD Directive 1332.30 p. 32.  These statements create a rebuttable presumption that the member has a propensity or intent to engage in homosexual acts.  The opportunity to rebut the presumption is illusory for a homosexual, however, as the number of successful challenges is not statistically significant.  SGI 140.

[30]  According to the government's statistics, produced during discovery, from fiscal years 1997 to 2003, 670 of 770 discharges (87.0%) were for statements, as opposed to acts or conduct, and from fiscal years 2004 to 2008, 9,059 of 10,507 discharges (86.2%) were for statements.  SGI 139.

[31]  Nicholson Depo. at 66:4-71:14 (LCR App. at 0035-50).

1   with a choice: either face investigation of his personal life and a dishonorable

2   discharge and the loss of benefits, or tell the truth about who he is and preserve the

3   opportunity for an honorable discharge.[32]  He chose the latter option.

4         Lt. Col. John Doe has stated that DADT prevents him from communicating

5   the core of his emotions and identity to others.[33]  He is also unable to identify

6   himself publicly in this case as a member of Log Cabin or even to participate in this

7   opposition or testify at trial for fear he will be discharged.[34]  This government-

8   imposed restraint on Lt. Col. Doe's activities violates his First Amendment right to

9   petition the government.

10         Log Cabin contends that these members have legitimate First Amendment

11   claims under this Court's June 9 Order.  Even if they themselves do not, however,

12   this Court should still deny the motion as to Log Cabin's First Amendment claims.

13   This Court's June 9 Order did not require that either Mr. Nicholson or Lt. Col. Doe

14   personally suffer a First Amendment injury and prior orders by Judge Schiavelli did

15   not either.  Nor does the government cite any case so holding.

16         The government does not accurately cite the only two cases on which it relies

17   in this section of its motion.  It cites Gonzales v. Carhart, 550 U.S. 124, 168, 167 L.

18   Ed. 2d 480, 127 S. Ct. 1610 (2007), for the point that "facial challenges present an

19   inappropriate vehicle for challenging how a particular statute is applied."  Motion at

20   23:11-12.  The Supreme Court made no such general statement in that case.  It

21   stated the "latitude" given to facial challenges in the First Amendment context and

22   then ruled only that in the "circumstances" of that case an as-applied challenge was

23   the proper means to test the constitutionality of a statute.  Id. at 167.  The

24   "circumstances" of that case involved a partial-birth abortion statute; the Court

25   found that the nature of medical risks and medical complications to a mother were

26

27   [32] Id. at 82:22-84:11, 91:15-94:10.
     [33] Doe Decl., ¶ 7 (Dkt. No. 39).
28   [34] Id., ¶ 8.

- 23 -

1    important considerations favoring an as-applied challenge.

2        The government also cites <u>Valley Forge Christian College v. Americans</u>

3    <u>United for Separation of Church & State</u>, 454 U.S. 464, 476 n. 14, 70 L. Ed. 2d

4    700, 102 S. Ct. 752 (1982), for its claim that Log Cabin lacks associational standing

5    to bring its First Amendment claims because no member has a First Amendment

6    claim, as defined by this Court.  Motion at 25 n. 18.  Again, this case does not stand

7    for the broad proposition urged by the government.  <u>Valley Forge</u> involved a

8    challenge to a federal statute allowing the sale of surplus government property by a

9    non-profit group of "taxpayer members" whose alleged injury was the alleged

10   deprivation of the "fair and constitutional use of [their] tax dollar."  <u>Id</u>. at 469.

11   Taxpayer standing cases implicate a different analysis and are not applicable here.

12       The government also oversimplifies the facts pertinent to this issue.  It claims

13   that "the undisputed facts put forth by Log Cabin establish that service members

14   who state they are homosexual are discharged under the policy solely because such

15   statements establish the service members' propensity to engage in homosexual

16   acts," Motion at 24:21-25:1, but Log Cabin had not yet "put forth" any facts when

17   the government made this claim.  In opposition to the motion, Log Cabin <u>is</u>

18   presenting evidence supporting a First Amendment claim permitted by the Court.

19   For example, the government's training materials confirm that a servicemember

20   who advocates, in a public, off-base forum for repeal of DADT is subject to

21   discharge on that basis alone.  SGI 136.  In addition, one Log Cabin member was

22   discharged for criticizing a general's biased comments about homosexuals.  SGI

23   137.  Another servicemember was investigated for making the statement "I have a

24   profile on MySpace" or words to that effect.  SGI 137.

25       The facts concerning Mr. Nicholson, Lt. Col. Doe, and these other

26   servicemembers creates a genuine issue of material fact on this claim, precluding

27   summary judgment.

28

- 24 -

## VII.

## IF IT DOES NOT DENY THE MOTION, THE COURT
## SHOULD CONTINUE THE HEARING

If a party opposing a motion for summary judgment shows that it cannot present facts essential to justify its opposition, the Court may deny the motion, continue the hearing, or issue "any other just order." Fed. R. Civ. P. 56(f). As explained in paragraphs 71-78 of the Woods Declaration, the government's obstructionist discovery tactics have prevented Log Cabin from completing critical discovery. The government refused to produce a witness for a 30(b)(6) deposition, Log Cabin moved to compel, and Magistrate Judge Eick ordered the government to appear for a deposition on ten important topics on or before April 15, 2010. The deposition has not been conducted yet but is expected to be taken before the hearing on this motion. In addition, on March 16, 2010, Magistrate Judge Eick ordered the government to provide an unqualified response to three requests for admission, but the government asked this Court to review that order and the matter has not yet been decided. Also, Log Cabin is still reviewing over 55,000 pages of documents belatedly produced by the government in the past three weeks. If the Court does not deny the motion outright, Log Cabin requests that the Court continue the hearing to allow it to present the evidence obtained from this discovery.

## VIII.

## CONCLUSION

For the reasons shown in this memorandum and in the Statement of Genuine Issues, the Court must deny the motion for summary judgment.

Dated:    April 5, 2010          WHITE & CASE LLP

By: _Dan Woods_

Dan Woods
Attorneys for Plaintiff Log Cabin Republicans

- 25 -