# Appendix of Evidence in
# Support of Log Cabin Republican's
# Opposition to Defendants'
# Motion for Summary Judgment

## LCR Appendix Pages 201-300
## (Part 2 of 19)

1  through a reasonable and good faith search.

2  **DOCUMENT REQUEST NO. 6**:

3      All reports, research, or analysis reviewed by the Chairman of the Joint

4  Chiefs of Staff, the Secretary of Defense, the Chief of Staff of the Army, the Chief

5  of Naval Operations, the Chief of Staff of the Air Force, and the Commandant of

6  the Marine Corps or their advisors, not including legal counsel, regarding whether

7  to repeal DADT.

8  **RESPONSE**:  Defendants object to this request because it is not reasonably

9  calculated to lead to the discovery of admissible evidence; documents containing

10  reports, research, or analysis reviewed by military leaders regarding whether to

11  repeal DADT have no bearing on whether Congress had a rational basis for

12  enacting the Statute in 1993.  Defendants also object to this request to the extent it

13  calls for documents protected by the deliberative process privilege or any other

14  applicable privilege.  Moreover, this request is a further attempt by Plaintiff to use

15  the tools of civil discovery to affect the political process that has been initiated to

16  address issues related to the Policy; discovery of this type directly interferes with

17  the work of the political branches and is improper.  See United States v. Morgan,

18  313 U.S. 409, 422 (1941) (explaining that it is not the function of the court to

19  probe the mental processes of agency decision makers).

20      Subject to the general objections set forth above and the specific objections

21  set forth herein, Defendants intend to produce responsive documents identified

22  through a reasonable and good faith search.

23  **DOCUMENT REQUEST NO. 7**:

24      All reports, research, or analysis reviewed by an legal counsel to the

25  Chairman of the Joint Chiefs of Staff, the Secretary of Defense, the Chief of Staff

26  of the Army, the Chief of Naval Operations, the Chief of Staff of the airforce, and

27  the Commandant of the Marine Corps, regarding whether to repeal DADT.

28

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION
OF DOCUMENTS                -12-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

1    **RESPONSE:**   Defendants object to this request because it is not reasonably

2    calculated to lead to the discovery of admissible evidence; documents containing

3    reports, research, or analysis reviewed by legal counsel to military leaders

4    regarding whether to repeal DADT have no bearing on whether Congress had a

5    rational basis for enacting the Statute in 1993.  Defendants also object to this

6    request to the extent it calls for documents protected by the deliberative process

7    privilege, the attorney-client privilege, the attorney work product privilege, or any

8    other applicable privilege.  Moreover, this request is a further attempt by Plaintiff

9    to use the tools of civil discovery to affect the political process that has been

10    initiated to address issues related to the Policy; discovery of this type directly

11    interferes with the work of the political branches and is improper.  See United

12    States v. Morgan, 313 U.S. 409, 422 (1941) (explaining that it is not the function

13    of the court to probe the mental processes of agency decision makers).

14        Subject to the general objections set forth above and the specific objections

15    set forth herein, Defendants intend to produce responsive documents identified

16    through a reasonable and good faith search.

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION
OF DOCUMENTS                                    -13-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

1

2   Dated: March 4, 2010

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TONY WEST
Assistant Attorney General

GEORGE S. CARDONA
Acting United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

_____
PAUL G. FREEBORNE
W. SCOTT SIMPSON
RYAN B. PARKER
Trial Attorneys
U.S. Department of Justice,
Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W.
Room 6108
Washington, D.C. 20044
Telephone: (202) 353-0543
Facsimile: (202) 616-8202
E-Mail: paul.freeborne@usdoj.gov

*Counsel For Federal Defendants*

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION
OF DOCUMENTS                                    -14-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

LCR Appendix Page 0203

**PROOF OF SERVICE**

I hereby certify that I served DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS by electronic mail and regular mail upon the persons below on March 4, 2010:

Dan Woods
Patrick O. Hunnius
White & Case LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071-2007
Tel. (213) 620-7714

I declare under penalty of perjury that the above is true and correct.

Ryan B. Parker

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION
OF DOCUMENTS                                    -15-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

TONY WEST
Assistant Attorney General

GEORGE S. CARDONA
Acting United States Attorney

VINCENT M. GARVEY
PAUL G. FREEBORNE
W. SCOTT SIMPSON
RYAN B. PARKER
U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 353-0543
Facsimile: (202) 616-8202
E-Mail: paul.freeborne@ usdoj.gov

Attorneys for Defendants United States
of America and Secretary of Defense

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| LOG CABIN REPUBLICANS, | No. CV04-8425 VAP (Ex) |
| Plaintiff, | DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES |
| v. | |
| UNITED STATES OF AMERICA AND ROBERT GATES, Secretary of Defense, | |
| Defendants. | |

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES        -1-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

**LCR Appendix Page 0205**

1    Pursuant to Federal Rules of Civil Procedure 26 and 33, and subject to the

2  objections stated below, Defendants United States and Secretary Gates hereby

3  respond to Plaintiff's Second Set of Interrogatories for purposes of Merits

4  Discovery.

5    **GENERAL OBJECTIONS**

6    1.    Defendants object to Plaintiff's Second Set of Interrogatories to the

7  extent that Plaintiff seeks discovery to probe the motivations of the Legislative

8  and Executive Branches in passing statutes and promulgating regulations

9  implementing the law. Well-established Supreme Court precedent squarely

10 provides that inquiry into the subjective motives of members of Congress is a

11 "hazardous matter" and that courts will not strike down an otherwise constitutional

12 statute on the basis of an alleged illicit motive." United States v. O'Brien, 391

13 U.S. 367, 383-84 (1968); Board of Educ. of the Westside Community Schools v.

14 Mergens, 496 U.S. 226, 249 (1990) (in evaluating constitutionality of statute,

15 "what is relevant is the legislative *purpose* of the statute, not the possibly religious

16 *motives* of the legislators who enacted the law") (emphasis in original); Las Vegas

17 v. Foley, 747 F.2d 1294, 1298 (9th Cir. 1984) (same). The same is true of attempts

18 to probe the motivations of the Executive Branch. See, e.g., Village of Arlington

19 Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 268 n.18 (1977)

20 ("judicial inquiries into legislative or executive motivation represent a substantial

21 intrusion into the workings of other branches of government").

22    2.    Defendants object to Plaintiff's Interrogatories to the extent that they

23 are not reasonably calculated to lead to the discovery of admissible evidence.  The

24 Court has ruled that Plaintiff's challenge is governed by the rational basis standard

25 of review.   It is well understood that a legislative choice subject to the rational

26 basis test "is not subject to courtroom fact-finding." Federal Communications

27 Comm'n v. Beach Communications, 508 U.S. 307, 315 (1993) (quoting

28

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES          -2-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

**LCR Appendix Page 0206**

1  Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)).  Defendants
2  accordingly have "no obligation to produce evidence to sustain the rationality of a
3  statutory classification." Heller v. Doe, 509 U.S. 312, 320 (1993).  The analysis
4  instead  asks whether the legislature "rationally *could have believed*" that the
5  conditions of the statute would promote its objective.  Western and Southern Life
6  Insurance Co. v. State Bd. of Equalization of California, 451 U.S. 654, 671-72
7  (1981) (emphasis in original).

8      Rational basis review, moreover, "is not a license for courts to judge the
9  wisdom, fairness, or logic of legislative choices." Beach Communications, 508
10  U.S. at 313.  Rather, "those challenging the legislative judgment must convince
11  the court that the legislative facts on which the classification is apparently based
12  could not reasonably be conceived to be true by the governmental decisionmaker."
13  Vance v. Bradley, 440 U.S. 93, 111 (1979).  Although the Court has permitted
14  Plaintiff to pursue discovery, this is not the type of discovery plaintiff is entitled to
15  pursue; the congressional findings and legislative history underlying the statute
16  are "legislative fact[s]" subject to judicial notice and are not appropriate for
17  fact-finding or discovery.

18      3.    Defendants object to Plaintiff's Interrogatories to the extent that they
19  call for information concerning the "continued rationality" of the statute.
20  Classifications subject to rational basis review are not subject to challenge on the
21  ground of changed circumstances.  See, e.g., Montalvo-Huertas v. Rivera-Cruz,
22  885 F.2d 971, 977 (1st Cir. 1989) ("[E]valuating the continued need for, and
23  suitability of, legislation of this genre is exactly the kind of policy judgment that
24  the rational basis test was designed to preclude.").  Indeed, courts have found that
25  even where Congress has determined that a previous enactment is no longer
26  necessary, that finding does render the statute unconstitutional.  See Smart v.
27  Ashcroft, 401 F.3d 119, 123 (2d Cir. 2005) ("A congressional decision that a

28

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES          -3-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

LCR Appendix Page 0207

1    statute is unfair, outdated, and in need of improvement does not mean that the

2    statute when enacted was wholly irrational or, for purposes of rational basis

3    review, unconstitutional."); Howard v. U.S. Dept. of Defense, 354 F.3d 1358,

4    1361-62 (Fed. Cir. 2004) ("Congress acts based on judgments as to preferable

5    policy; the fact that Congress repeals or modifies particular legislation does not

6    reflect a judgment that the legislation, in its pre-amendment form, lacked rational

7    support."). Were it otherwise, all legislation subject to rational basis review –

8    even legislation authoritatively sustained as constitutional by the Supreme Court –

9    could potentially be subject to periodic judicial review on the basis of changed

10   circumstances, a prospect incompatible with these principles and the Supreme

11   Court's well known and repeated admonition that "a legislative choice is not

12   subject to courtroom factfinding and may be based on rational speculation

13   unsupported by evidence or empirical data." Heller, 509 U.S. at 320.

14        4.      Defendants object to any Interrogatory that calls for information

15   outside of the Department of Defense (the "DoD"). Courts in the Ninth Circuit

16   have applied the waiver of sovereign immunity found in the Administrative

17   Procedures Act ("APA"), 5 U.S.C. § 702, to Constitutional claims seeking

18   nonmonetary relief. See, e.g., The Presbyterian Church v. United States, 870 F.2d

19   518, 525 n. 9 ("This court has previously held that the 1976 amendment to § 702

20   waives sovereign immunity not only for suits brought under § 702 itself, but for

21   constitutional claims brought under the general federal-question jurisdiction

22   statute, 28 U.S.C. § 1331." (citations omitted)). Claims under Section 702, must

23   be the result of "agency action." Because the Department of Defense ("DOD"),

24   not Congress or any other governmental agency, is charged with administering 10

25   U.S.C. § 654 and the applicable regulations, discovery obligations do not reach

26   beyond that Department.

27        5.      Defendants object to Plaintiff's Interrogatories to the extent they seek

28

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES                -4-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

1  information protected by the work-product doctrine, Privacy Act, attorney-client

2  privilege, law enforcement privilege, deliberative process privilege, and any other

3  applicable privilege.

4      6.    Defendants object to the definitions and instructions generally to the

5  extent that they seek to impose obligations beyond those imposed by the Federal

6  Rules of Civil Procedure (Civil Rules) and the Local Rules for the Central District

7  of California.  Defendant will answer these interrogatories consistent with the

8  obligations imposed by the Civil Rules.

9      7.    Defendants reserve the right to amend, supplement, or alter these

10  objections and responses to the Interrogatories at any time.  The following

11  responses are based upon information currently known to Defendants, and

12  Defendants reserve the right to supplement or amend its responses should

13  additional or different information become available.

14      8.    Nothing contained in the following responses constitutes a waiver of

15  any applicable objection or privilege as to the requested discovery.

16              **INDIVIDUAL OBJECTIONS AND RESPONSES**

17  17.    Identify all persons, including by name; military branch, if applicable, and

18         rank, if applicable; who attended any meetings with Joint Chiefs of Staff

19         Chairman Admiral Mike Mullen, in January 2010 at which DADT was

20         discussed.

21  **RESPONSE:** Defendants incorporate the General Objections as if set forth fully

22  herein.  Defendants further object to this interrogatory because it is not reasonably

23  calculated to lead to the discovery of admissible evidence; information regarding

24  meetings attended by Admiral Mullen in January 2010 have no bearing on whether

25  Congress had a rational basis for enacting the Statute in 1993.  This interrogatory

26  is a further attempt by Plaintiff to use the tools of civil discovery to affect the

27  political process that has been initiated to address issues related to the Policy;

28  discovery of this type directly interferes with the work of the political branches

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES          -5-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. Box 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

1   and is improper. See United States v. Morgan, 313 U.S. 409, 422 (1941)

2   (explaining that it is not the function of the court to probe the mental processes of

3   agency decision makers).

4

5   Date: March 4, 2010                          TONY WEST
                                                 Assistant Attorney General
6
                                                 GEORGE S. CARDONA
7                                                Acting United States Attorney

8                                                VINCENT M. GARVEY
                                                 Deputy Branch Director
9
                                                 _Kyan Parke_
10                                               PAUL G. FREEBORNE
                                                 W. SCOTT SIMPSON
11                                               RYAN B. PARKER
                                                 Trial Attorney
12                                               U.S. Department of Justice,
                                                 Civil Division
13                                               Federal Programs Branch
14                                               20 Massachusetts Ave., N.W.
                                                 Room 6108
15                                               Washington, D.C.  20044
                                                 Telephone: (202) 353-0543
16                                               Facsimile:  (202) 616-8202
                                                 E-Mail:  paul.freeborne@usdoj.gov
17
18                                               *Counsel For Federal Defendants*

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES                -6-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

LCR Appendix Page 0210

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I hereby certify that I served DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES by electronic mail and regular mail upon the persons below on March 4, 2010:

Dan Woods
Patrick O. Hunnius
White & Case LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071-2007
Tel. (213) 620-7714

I declare under penalty of perjury that the above is true and correct.

_____
Ryan B. Parker

DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SECOND SET OF INTERROGATORIES

-7-

TONY WEST
Assistant Attorney General
ANDRE BIROTTE, Jr.
United States Attorney
VINCENT M. GARVEY
PAUL G. FREEBORNE
W. SCOTT SIMPSON
JOSHUA E. GARDNER
RYAN B. PARKER
U.S. Department of Justice
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 353-0543
Facsimile: (202) 616-8202
E-Mail: paul.freeborne@ usdoj.gov

Attorneys for Defendants United States
of America and Secretary of Defense

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| LOG CABIN REPUBLICANS, | No. CV04-8425 (VAP) (Ex) |
| Plaintiff, | |
| v. | DEFENDANTS' SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION |
| UNITED STATES OF AMERICA AND ROBERT GATES, Secretary of Defense, | |
| Defendants. | |

DEFENDANTS' SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION          -1-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

LCR Appendix Page 0212

1         Pursuant to Federal Rules of Civil Procedure 26 and 36, as directed by the

2    March 16, 2010 Order of the Magistrate Judge (Doc. 127), and pursuant to

3    agreement of counsel, Defendants hereby supplement their responses to Plaintiff's

4    requests for admission,[1] and for the purposes of this pending action only, state as

5    follows:

6    81.    Admit that Australia permits openly gay and lesbian service members to

7           enlist and serve in its armed forces.

8    **Response**:  Admit.

9    82.    Admit that Austria permits openly gay and lesbian service members to enlist

10          and serve in its armed forces.

11   **Response**:  Admit.

12   83.    Admit that Bahamas permits openly gay and lesbian service members to

13          enlist and serve in its armed forces.

14   **Response**:  Defendants can neither admit nor deny this request.  After reasonable

15   inquiry of the sources accessed in the normal course of business, the Department

16   of Defense is unable to determine the extent to which service members who

17   engage in homosexual conduct are able to serve in the armed forces of the

18   Bahamas.

19   84.    Admit that Belgium permits openly gay and lesbian service members to

20          enlist and serve in its armed forces.

21   **Response**:  Admit.

22   85.    Admit that the United Kingdom permits openly gay and lesbian service

23          members to enlist and serve in its armed forces.

24   **Response**:  Admit.

25

26   _____

27   [1]  Through these supplemental responses made pursuant to the Magistrate

28   Judge's Order, Defendants do not waive any of their objections.

DEFENDANTS' SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION    -2-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

86.    Admit that Canada permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

87.    Admit that the Czech Republic permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

88.    Admit that Denmark permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

89.    Admit that Estonia permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

90.    Admit that Finland permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

91.    Admit that France permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

92.    Admit that Ireland permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

93.    Admit that Israel permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

94.    Admit that Italy permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

DEFENDANTS' SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION    -3-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

LCR Appendix Page 0214

95.     Admit that Lithuania permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

96.     Admit that Luxembourg permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

97.     Admit that Netherlands permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

98.     Admit that New Zealand permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

99.     Admit that Norway permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

100.    Admit that Slovenia permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

101.    Admit that South Africa permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

102.    Admit that Spain permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

103.    Admit that Sweden permits openly gay and lesbian service members to enlist and serve in its armed forces.

**Response**:    Admit.

DEFENDANTS' SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION          -4-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

**LCR Appendix Page 0215**

1    104.   Admit that Switzerland permits openly gay and lesbian service members to

2            enlist and serve in its armed forces.

3    **Response**:   Admit.

4    105.   Admit that at least 24 countries allow openly gay and lesbian service

5            members of their respective armed forces to serve.

6    **Response**:   Admit as to the 23 countries referenced in Defendants' responses to

7    requests nos. 81-82, and 84-104.

8
     Date: March 26, 2010                    TONY WEST
9                                            Assistant Attorney General

10                                           ANDRÉ BIROTTE, Jr.
11                                           United States Attorney

12                                           VINCENT M. GARVEY
13                                           Deputy Branch Director

14                                           _____

15                                           PAUL G. FREEBORNE
                                             W. SCOTT SIMPSON
16                                           JOSHUA E. GARDNER
                                             RYAN B. PARKER
17                                           Trial Attorneys
                                             U.S. Department of Justice,
18                                           Civil Division
                                             Federal Programs Branch
19                                           20 Massachusetts Ave., N.W.
                                             Room 6108
20                                           Washington, D.C.  20001
                                             Telephone: (202) 353-0543
21                                           Facsimile:  (202) 616-8202
                                             E-Mail:  paul.freeborne@usdoj.gov

22                                           *Counsel For Federal Defendants*

23

24

25

26

27

28

DEFENDANTS' SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION            -5-

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. Box 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

LCR Appendix Page 0216

1
## **PROOF OF SERVICE**

2      I hereby certify that I served DEFENDANTS' SUPPLEMENTAL

3  RESPONSES TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

4  by electronic mail and regular mail upon the persons below on March 26, 2010:

5      Dan Woods
       Patrick O. Hunnius
6      White & Case LLP
       633 West Fifth Street, Suite 1900
7      Los Angeles, CA 90071-2007
       Tel. (213) 620-7714
8
       I declare under penalty of perjury that the above is true and correct.
9

10                                        _____

11                                        Paul G. Freeborne

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' SUPPLEMENTAL RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION

UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
P.O. BOX 883, BEN FRANKLIN STATION
WASHINGTON, D.C. 20044
(202) 353-0543

**LCR Appendix Page 0217**

FOR OFFICIAL USE ONLY

REPORT OF THE BOARD

APPOINTED TO PREPARE AND SUBMIT RECOMMENDATIONS

TO THE SECRETARY OF THE NAVY

FOR THE REVISION OF POLICIES, PROCEDURES AND DIRECTIVES

DEALING WITH HOMOSEXUALS

21 DECEMBER 1956 - 15 MARCH 1957

FOR OFFICIAL USE ONLY



DoD LA

**DEFENDANT'S EXHIBIT**
4
2·26·10

　
FOR OFFICIAL USE ONLY

INDEX

BOARD REPORT

Part I

  A. Introduction

    1. General.

    2. Objectives and terms of reference.

  B. Recent advances in knowledge concerning the problem of homosexuality

    1. Frequency of homosexual behavior in the general population.

    2. Fallacies concerning homosexuality.

    3. Understanding of the meaning of homosexual behavior.

    4. Treatment and rehabilitation of persons exhibiting homosexual behavior.

    5. Deficiencies of knowledge.

    6. Summary.

  C. Specific Items of Concern.

    1. One-time offenders.

    2. Voluntary confessions.

    3. Type of discharge.

    4. Treatment of so called Class III offender.

    5. Clinical evaluation.

    6. Review procedures.

    7. Responsibility to the civilian community.

    8. Screening of applicants.

    9. Treatment of women.

    10. Education and indoctrination

FOR OFFICIAL USE ONLY

DoD LA 7-10  049669

FOR OFFICIAL USE ONLY

          11.   Security implications.

          12.   Investigative procedures.

          13.   Deterrents.

          14.   Statistical analysis.

          15.   Policies in other government agencies.

          16.   Attitude and policies toward homosexuals representative of society at large.

          17.   Post-service adjustment.

    D.   SECNAV INSTRUCTION 1620.1

         1.   Differences in policies and procedures between Army, Navy and Air Force.

         2.   Deficiencies in subject Instruction.

         3.   Recommended changes.

    E.   Analyses of Navy Discharge Review Board and Board for Correction of Naval Records Instructions

         1.   Current instructions.

         2.   Deficiencies in guidance.

         3.   Recommended additional guidance.

    F.   Summary of Recommendations.


Enclosure (1) - Summary of testimony
       (2) - Listing of Material considered by the Board
       (3) - Preliminary statistical study
       (4) - Proposed revision of SECNAVINST 1620.1

Part II - Compilation of source material - Directives, instructions pamphlets, reports and record of verbatim testimony used by the Board during the course of the study.

Part III- Confidential Supplement

FOR OFFICIAL USE ONLY

DoD LA 7-10  049670

FOR OFFICIAL USE ONLY

PART I

A. Introduction

1. General

The Board was appointed by Secretary of the Navy precept dated 21 December 1956 (Part II, Appendix 1). The purpose of the Board was stated to be "to prepare and submit to the Secretary of the Navy recommendations for the revision of present Department of the Navy policies, procedures and directives dealing with homosexuals." The Board was directed to determine its own procedures and form of report and to be guided in the extent of the study by the comments in the enclosure to the precept. The Board was further authorized to call witnesses and, subject to the approval of the Secretary of the Navy, to employ civilian consultants. It was directed that the recommendations of the Board be submitted on or before 28 February 1957.

Pursuant to the above instructions the Board initiated a study of the problem, under the following general areas:

a. Background and development of present policies and instructions.

b. Current policies and procedures in force in the Military Departments and other government agencies.

c. Standards and methods used in implementation of the policies.

d. Determination of available knowledge and facts concerning homosexual behavior and treatment.

Accordingly, testimony from representatives of the medical and personnel branches of the Army and Air Force, selected civilian psychiatrists, representatives of the Chief of Naval Personnel, Commandant of the Marine Corps, Chief, Bureau of Medicine and Surgery, Director of Naval Intelligence, and representatives of the Chief of Industrial Relations and Civil Service Commission bearing on the problem was obtained and recorded. All witnesses were most cooperative and helpful. A list of witnesses and brief summary of the testimony is attached as enclosure (1). Copies of the verbatim testimony in each case are contained as appendices to Part II of the report.

Early in its deliberations the Board found that there was little reference or background information as to the deliberations and recommendations of previous boards studying this same subject. Therefore to Part II of this report is appended all the background information, documents, verbatim testimony, and analyses used by the Board during the course of the study. For convenience in handling, all confidential

FOR OFFICIAL USE ONLY

DoD LA 7-10  049671

R OFFICIAL USE ONLY

material has been segregated and forwarded as Part III to this report. Neither Part II nor Part III are necessary to a proper understanding of this report. However, it is recommended that Part II and Part III be made available as background material to any future Boards convened to consider this subject. (A copy is being retained in the Bureau of Naval Personnel for future reference.)

The Board noted that in the area of sexual perversion, only homosexuality is covered by specific directives, although other categories are equally violative of moral codes, laws and accepted standards of conduct. The Board believes that this special treatment may place an unwarranted emphasis on only one portion of the overall problem. It is therefore recommended that prior to the convening of future boards specifically to review policies and procedures with respect to homosexuals, consideration be given to extending the scope of the directive to cover all aspects of sexual perversion.

During the course of its study, the Board considered the specific items of concern referred to the Board by the Secretary of the Navy (enclosure to the precept) and developed other elements which were determined to have a bearing on the overall responsibilities assigned the Board. A discussion of these items is contained in Section C of this report.

A proposed revision of SECNAV Instruction 1620.1 is submitted as enclosure (4) for consideration of the Secretary. This revision incorporates in so far as practicable the recommendations developed in Sections C and D of this report.

The deficiencies in guidance and instructions to the Navy Discharge Review Board and Board for Correction of Naval Records are discussed in Section E. Proposed guidance to these Boards for consideration by the Secretary of the Navy is included in this section.

The Board has reviewed the majority of the current practices not covered in SECNAV Instruction 1620.1 and has not found any that would warrant change or Secretarial notice. Accordingly no recommendations are submitted on this aspect of the report.

2.  <u>Objectives and terms of reference.</u>

The Board took cognizance of the basic objectives as stated by the Secretary of the Navy in the enclosure to the precept, i.e.:

"The Navy's basic objectives in handling homosexual behavior are:

a.  To rid the Navy of habitual homosexuals,

b.  To provide a deterrent to homosexual activity by naval personnel not habitually homosexual, and

c.  To prevent evasion of military service by individuals falsely admitting homosexual acts or tendencies

FOR OFFICIAL USE ONLY

2

DoD LA 7-10  049672

FOR OFFICIAL USE ONLY

in order to maintain the discipline, moral standards and fighting efficiency of the naval service."

To this the Secretary added:

"Within this framework, the Navy must also be concerned with the preservation of the rights of the individual and his chance for rehabilitation as a useful military man or private citizen."

Cognizance was also taken of the expressed objective of the Department of Defense to implant and develop in members of the Armed Forces adherence to the highest standards of personal conduct.

A nice balance must be attained in changes of policy to ensure that public sensibilities are not offended in any attempt to promote a forward looking program in recognition of the advances in the knowledge of homosexual behavior and treatment, nor can there be any intimation that homosexual conduct is condoned. It is not considered to the best interest of the Military Departments to liberalize standards ahead of the civilian climate; thus in so far as practicable it is recommended that the Navy keep abreast of developments but not attempt to take a position of leadership.

Within these confines, the Board has attempted to reconcile the recommendations set forth in this report - i.e.,

to promote the highest discipline, moral integrity and standards of conduct within the naval service through a forthright, but just and equitable policy with respect to the individual.

B.  Recent Advances in Knowledge Concerning the Problem of Homosexuality

The term "recent advances" should not be interpreted to mean any startling and suddenly discovered new development. Advances in this field have been occasioned by a pulling together of data collected over the years, with reexamination of its meaning in the light of increasing knowledge in related social science fields. In the past ten years, there has been much more professional discussion of the problem of homosexuality, more attention paid to theoretical considerations of its development, and more therapeutic attempts made with different approaches. In addition, the statistical studies of Kinsey have provided revealing knowledge concerning the incidence of homosexual behavior. As a result of all of these factors, knowledge has been advanced in the following four general areas:

1.  Frequency of homosexual behavior in the general population.
2.  Fallacies concerning homosexuality.
3.  Understanding of the meaning of homosexual behavior.
4.  Treatment and rehabilitation of persons exhibiting homosexual behavior.

3

FOR OFFICIAL USE ONLY

DoD LA 7-10 049673

FOR OFFICIAL USE ONLY

1. Frequency of homosexual behavior in the general population.

Kinsey's study revealed to the general public a fact long accepted by psychiatrists, namely, that homosexual behavior in both males and females is much more common than has been generally believed. According to Kinsey, approximately 37.5% of nineteen year old American males have had one or more homosexual experiences. However, only about 4% of American males become exclusively homosexual in later life. This latter figure supports the psychiatric concept that homosexual behavior may occur as part of the normal maturing process without having special significance for the future. Although Kinsey's figures have been challenged, no other studies approaching that of Kinsey's in scientific value have been made, and there are other studies which tend to indicate that Kinsey's figures probably are essentially correct. For example, one British author has pointed out that, despite the fact that homosexuality at one time became rampant in certain British schools for boys, the graduates of these schools, almost without exception, later made a normal heterosexual adjustment; and the frequency of exclusively homosexual persons in the British population did not seem to rise measurably.

No accurate figures concerning the frequency of homosexual behavior in the naval service are available. The only statistics compiled to date are based on the number of homosexuals who are actually disclosed. However, there is some indication that the homosexuals disclosed represent only a very small proportion of homosexuals in the Navy, and that homosexual behavior by persons who are not exclusively homosexual is even more common. For example, of 119 exclusively homosexual persons examined by the psychiatrist of a Philadelphia Court, 52 had had active military service during World War II. Of these, only 2 were discharged for homosexuality, 5 were discharged for other reasons, and 45 served out their period of enlistment and were honorably discharged. The vast majority of these individuals served in the Army, and the figures can not be directly applied to the Navy. However, it seems quite likely that there are many more homosexuals serving out their enlistments and receiving honorable discharges than are being caught. Fry reported a detailed survey of 183 men known from prewar studies to be homosexual. Of these, 132 served during World War II. Only 14 were discharged (10 for conditions other than homosexual behavior), 118 serving from 1 to 5 years. Fifty-eight percent were officers. The cases were distributed evenly among Army, Navy, and Air Force. These reports coincide with the experience of psychiatrists who have treated homosexuals giving a history of having served a full enlistment in the military without being detected. No accurate estimate of such cases can be obtained at the present time. This information is urgently needed to give a statistical norm against which to weigh many other items.

2. Fallacies concerning homosexuality.

Many common misconceptions pertaining to homosexuality have become exaggerated and perpetuated over the years. As additional facts

4

FOR OFFICIAL USE ONLY

DoD LA 7-10  049674

FOR OFFICIAL USE ONLY

have been gathered in recent years, the fallacies inherent in these concepts are being demonstrated with increasing frequency. Some concepts still remain which can be seriously questioned, but not, at present, disproved.

It is now generally accepted that even exclusively homosexual persons cannot be identified solely through physical characteristics, overt behavior, patterns of interest, or mannerisms, although some do develop feminine characteristics. It can also be said that homosexuals are neither more or less talented than the general norm of the population. A sampling of exclusively homosexual persons will show roughly the same intelligence quotient, GCT, and educational distribution as does the general population. They may be married, as well as single, and are found in all occupations and professions.

Those who engage in homosexual behavior on occasions, but are not exclusively homosexual, are even less identifiable by any other characteristic of personality than are those who are exclusively homosexual. Since this group may constitute as much as a third of the general male population, it is apparent that they would have to exhibit essentially the same characteristics as the norm of that population. Homosexual behavior cannot be correlated with any other single personality trait, and can be understood in any given instance, only by a complete evaluation of the personality and of the environmental circumstances under which the homosexual behavior occurs. One homosexual act, or even a series of them, does not constitute homosexuality, and is of no value in predicting the future without the complete study mentioned. It cannot be said, as a generalization, that one or more instances of homosexual behavior makes an individual either more likely or less likely to participate in homosexual acts in the future. Each case must have complete individual study to determine the meaning of the homosexual behavior.

One concept which persists without visible supporting data, but which can not be disproved at this time because of the absence of data, is the idea that homosexual individuals and those who have indulged in homosexual behavior cannot acceptably serve in the military. As has been mentioned above, there have been many known instances of individuals who have served honorably and well, despite being exclusively homosexual. An Army witness before this Committee reported on 75 individuals who had reported themselves as having homosexual tendencies and who nonetheless were continued on duty. Of these, 50% gave very poor service and were discharged prior to the completion of their enlistment. These figures seem to indicate that homosexuals cannot effectively serve in the Army, but it must be remembered that this is a highly selected group. These individuals had reported themselves under category III of the Army directive, and had expressed a willingness to take an undesirable discharge to get out of the Army. Obviously, they were having adjustment difficulties which may or may not have had something to do with their homosexuality. From this study it can only be said that a homosexual cannot serve acceptably if his drives are so strong that he turns himself in and requests discharge.

FOR OFFICIAL USE ONLY

DoD LA 7-10  049675

FOR OFFICIAL USE ONLY

Another concept which continues without visible support is the concern felt over individuals professing homosexuality to avoid military service. Only rare cases of malingering of this sort have been reported, except in individuals who are under more serious charges. Psychiatrically, it seems more than likely that any individual who would malinger homosexuality to escape service is otherwise unsuited for service, and that careful study of a series of such cases, if they did occur, would indicate that the quality of service given was more of a liability than asset, even if the individual were retained.

A third concept which persists without sound basis in fact is the idea that homosexuals necessarily pose a security risk. It is difficult to determine just how this idea developed, but it seems that it first appeared in governmental directives in 1950, in the report of the Hoey Committee. This Committee, however, based its recommendation on "the opinions of those best qualified to know, namely, the intelligence agencies of the Government." However, no intelligence agency, as far as can be learned, adduced any factual data before that Committee with which to support these opinions. Isolated cases are mentioned, but to determine that a homosexual is more of a security risk than a non-homosexual, these instances would have to be measured against security breaks by non-homosexuals, and against the proper observance of security by homosexuals. It appears that a classical example from World War I of a homosexual affair between a German officer and Serbian officer which led to a security break is often cited. However, this single instance is not weighed against the activities of the famous Mata Hari of World War I, whose activities could not by any stretch of the imagination be called homosexual. During World War II, ONI investigated homosexuals as security risks, but this was apparently done only because the agency had no other authority to conduct such an investigation. There is considerable information which would indicate that other factors in the personality constitute the security risk rather than the factor of homosexuality alone. One such item, for example, would be feelings of inadequacy which drive a man to boast of the secrets he possesses. Such boasting might very well be done to any sexual partner, whether the partner be homosexual or heterosexual. Some intelligence officers consider a senior officer having illicit heterosexual relations with the wife of a junior officer or enlisted man much more of a security risk than the ordinary homosexual. The matter of indiscretion would appear to be of more importance than the question of the nature of any sexual activity. There is some information to indicate that at least some homosexuals are quite good security risks. As an example, eight enlisted men at one station were disclosed to be engaging in homosexual activities. All had Top Secret clearance and there was no evidence that any of them had broken security. Investigation in this area is urgently needed. Some feel that certain homosexuals might be better security risks than heterosexuals, and homosexuals have been used by some intelligence agencies to illicit information through their homosexual contacts. Obviously, in such a homosexual relationship, one homosexual was a good security risk and

6

FOR OFFICIAL USE ONLY

DoD LA 7-10  049676

FOR OFFICIAL USE ONLY

one a poor security risk. The homosexuality itself had no relationship
to the security classification. On the contrary, there is no factual
evidence to indicate that homosexuals do not present a serious security
problem. In view of the lack of statistical data to prove or disprove
this thesis, the Board believes that a factual study of the problem
should be conducted.

   3.   Understanding of the meaning of homosexual behavior.

        The concept of homosexuality as a clinical entity has been dis-
carded. Homosexual behavior now is considered symptomatic behavior,
the underlying disorders ranging from a personality disorder to a
psychosis, either fully developed or incipient. It may also occur as
a phase of psychosexual development without any gross disturbance of
personality.

        The most common psychosis underlying homosexual behavior is
schizophrenia. Where the disorder is fully developed, the homosexual
behavior is obviously only one of a multitude of symptoms and is
recognized as such, even by the layman. However, in the early stages
of schizophrenic illness, homosexual activity may be one of the first
signs of the disorder and antedate the appearance of further symptoms
by months. Some cases of schizophrenia reveal themselves as a
diagnosable psychotic process only after years of a schizophrenic
adjustment which includes homosexual behavior.

        Homosexual behavior may be symptomatic of a psychoneurosis and
occurs particularly frequently in obsessive compulsive reactions. In
this disorder, which in many instances is closely related to schizophrenic
psychopathology, obsessive thoughts about homosexuality and homosexual
"tendencies" are even more common than the homosexual behavior itself.
By the treatment of the psychoneurosis underlying the homosexual pre-
occupations, the latter disappear, and these individuals are fully fit
for military service. This is a particularly important category,
because the obsessive compulsive reaction occurs much more commonly
in officers than in enlisted men, and their salvage for service is of
considerable importance. It should be mentioned that, at the present
time, most of these individuals probably do not get into administrative
channels, because they seek psychiatric help for their obsessive rumina-
tions and other symptoms of the psychoneurosis.

        Homosexual behavior can occur as a symptom of organic brain
disease, whether this be cerebral arteriosclerosis or one of the other
degenerative brain diseases. It is now recognized that when homosexual
behavior appears for the first time (after adolescence) in an individual
over forty, first thought should be given to the presence of organic
brain disease as the underlying cause.

        Excluding those instances in which homosexual behavior occurs
as a manifestation of illness, as outlined above, it is now possible
to understand the meaning of homosexual behavior in other individuals.

7

FOR OFFICIAL USE ONLY

DoD LA 7-10  049677

FOR OFFICIAL USE ONLY

This has come about by the recent abandonment, by many psychiatrists and psychoanalysts, of the concept that there are constitutional defects or an inherent personality quality in those who exhibit homosexual behavior. Freud's concept that a certain portion of psychic energy was inherently bound in homosexual feelings has been greatly modified, and in operation almost discarded. Those who have been successful in the handling of homosexual problems have approached these problems from an interpersonal and adaptational point of view. Each of these theoretical constructs can be translated in the terms of the other, but for brevity only the adaptational theory of human behavior will be utilized here.

Basically, all behavior can be looked upon as the resultant of two forces, (1) the needs of the individual, and (2) the demands of society. Thus, an individual's behavior constitutes the means by which he adapts to his social environment, seeks to insure his survival, and gratifies his needs. To this struggle, the individual brings his assets, such as intelligence and training, and his liabilities, such as various emotional problems created during his early life development. Because of the customs and mores of our society, sexual behavior is perhaps the most delicately balanced area of adjustment and, hence, the one most likely to be disturbed in the adaptational process and by disturbances in interpersonal relations. Thus, as in any other behavioral disturbance, homosexual behavior can be seen to contain, not only the elements of sexual gratification, but also completely non-sexual elaborations which arise from unconscious problems in dependency, aggression, and competition. In these instances the proper focus of attention in treatment is on the underlying problem which has become incorporated in the sexual act. Through psychotherapy, resolution of the underlying problem causes the disappearance of the homosexual behavior. It must be pointed out that the basic emotional conflicts are out of the individual's awareness, and only the homosexual urges are felt by him.

Any behavior, to be understandable to the observer, must be defined in terms of motivational goals. Nowhere is this more true than in homosexual behavior. When the homosexual behavior has, as its motivational goal, orgastic satisfaction, the sexual component is primary, and it may be spoken of as "pure" homosexual behavior. This type of behavior may be seen in individuals, usually heterosexual, who are isolated from a heterosexual outlet for a long period of time, and whose sexual drives are high. This type of behavior occurs among prisoners confined over long periods of time, and was much more common at isolated stations during World War II than most people realize. It is important to note that there is little likelihood of such homosexual behavior recurring when heterosexual outlets are available. It is also important to note that this type of behavior can be diminished if other more socially acceptable outlets for psychic energy are provided, such as athletic activities and similar active pursuits.

Since the majority of cases in the Navy occur in civilian settings where a heterosexual outlet probably is available, many of these acts obviously have other motivational goals than orgastic

FOR OFFICIAL USE ONLY

8

DoD LA 7-10  049678

FOR OFFICIAL USE ONLY

satisfaction. In these, the sexual component is of secondary importance and the primary component arises out of the individual's efforts to adapt to the social structure and, at the same time, obtain gratification for his basic needs. Commonly involved are the very deep seated dependency needs which arise from early childhood. At a more superficial level are the needs for friendship and affection from other persons. At the most superficial level may be a very simple economic need, as was demonstrated in the days when the pay of enlisted men was quite low. On some occasions, men were known to participate passively in a homosexual act for money with which to purchase heterosexual relations. The basic forces underlying a homosexual act, therefore, can run the gamut of emotional problems, and the exact meaning of homosexual behavior must be determined by careful psychiatric evaluation in each instance if the case is to be properly handled.

The importance of basic conflicts over dependency cannot be overemphasized. Such conflicts are extremely common in the American population today. Dependency conflicts reach their peak of disturbance to adaptation in the late adolescent period. Since a large portion of the Navy falls in this age group, it is to be expected that much behavior of an antisocial type will occur in this age group as an acting out of the unconscious dependency problems. This acting out may produce disciplinary offenses, excessive alcoholism, or homosexual behavior. What factor determines the choice of symptom is not known at this time.

Aside from the adaptational struggle with dependency conflicts, the factor which is probably of greatest significance in homosexual behavior in the younger age group is immaturity. Immaturity, combined with adolescent experimentation, undoubtedly accounts for many cases in the group below age twenty. Just as the curiosity of youth may lead a youngster to become grossly inebriated in order to "see what it is like", he may also succumb to a homosexual advance. Homosexual behavior in these cases constitutes a phase of psychological development, rather than confirmed sexual deviancy. Such individuals may actually participate in several rather than a single homosexual act. However, the fact which distinguishes them from confirmed homosexuals is the psychological meaning of the activity. Experience has shown that when the homosexual behavior is not the primary source of sexual satisfaction, or symptomatic of a significant emotional disturbance, the individual normally will pass on to a heterosexual level of adjustment.

From the above, it may be seen that a combination of factors within and without the personality are necessary for the development of exclusively homosexual behavior. It would appear that fears concerning the future sexual adjustment of young men who have engaged in one or a series of homosexual acts may not be well grounded.

4. Treatment and rehabilitation of persons exhibiting homosexual behavior.

Increased understanding of the dynamics of homosexual behavior as outlined above, has improved treatment and rehabilitation techniques.

9

FOR OFFICIAL USE ONLY

DoD LA 7-10 049679

FOR OFFICIAL USE ONLY

Even the exclusively homosexual individual can now be treated and helped if he is well motivated for change. For the individual who is not exclusively homosexual, treatment of the homosexual behavior is as simple or as difficult as treatment of the underlying disorder. When homosexual behavior is a symptom of schizophrenia, treatment is difficult and the patient ordinarily is not suited for further military service. When the homosexual behavior is a manifestation of immaturity, treatment usually is quite simple and the individual in most instances can continue to do military duty. Between these two extremes lie all gradations of therapeutic difficulties. The obsessive compulsive reactions are difficult of treatment, but since they occur usually in people of good intelligence, successful results of treatment may be quite gratifying.

5. Deficiencies of Knowledge.

As additional information has accumulated about homosexual behavior, deficiencies in our knowledge have become spotlighted. Some of these have been mentioned in the discussion above.

At this time little is known about the physiological and physical conditions which may contribute to the development of homosexual behavior. Since this behavior can occur as a manifestation of a wide range of emotional disturbances, it would seem that the range of physiological and physical conditions may be equally as wide, hence, extremely difficult to identify.

The great unknown in psychiatry revolves around the choice of symptomatology. Since we know that essentially the same psychopathology can produce quite different behavior phenomena, the question must be raised as to how the given symptom is chosen. As long as the mechanism by which basic emotional problems produce homosexual behavior (rather than some other symptom) are not known, it is difficult if not impossible to take adequate preventive steps. It might be thought that ridding the Navy of exclusively homosexual personnel would answer this problem and to some extent, this may be true. However, it is to be noted that the majority of the offenses occur in civilian settings and many of these occur with civilian partners.

It has been suggested that adequate educational procedures would reduce homosexual behavior. While this suggestion appears logical on the surface, there is no data which specifically support it. To the contrary, in past experience with venereal disease, neither education nor disciplinary measures had any demonstrable effect on the venereal disease rate in the Navy.

The greatest deficiency in our present day knowledge is in the area of homosexuality in women. Very few women come for psychiatric treatment of homosexual problems, so that psychiatrists have gained little insight into female homosexual behavior. To date, it has been impossible to arrive at a satisfactory overall definition of a homosexual

FOR OFFICIAL USE ONLY

10

DoD LA 7-10  049680

FOR OFFICIAL USE ONLY

act in women.  For statistical purposes, Kinsey defines a homosexual act as one in which orgasm occurs.  However, many women never experience orgasm in either heterosexual or homosexual relations, and yet perform definite sexual acts.

It is possible for two women to be in a homosexual relationship with one or both of them not being aware of the relationship until it is disrupted.  This fact arises out of the common misconception that only genital activity represents sexual impulses.  Actually, in a continuing homosexual relationship, as in a heterosexual relationship, genital activity occupies only a minute portion of the relationship.  The major portion of any such relationship is the interchange of emotions and feelings.  The situation becomes somewhat clarified if the word sexual is dropped and the word homoeroticism used.  All individuals have some love and regard for members of the same sex.  This homoeroticism is the basis of fraternal organizations, women's clubs and similar activities.  It in no way implies genital activity.  The social structure permits a wider expression of homoeroticism between women than between men, and it is possible that this in itself lowers the incidence of genital homosexuality among women.

It is a phenomenon of our culture that from the time of birth a woman turns to another woman for comfort in times of loneliness or unhappiness.  A frightened little girl naturally climbs in bed with her mother.  If, at age 18, she again becomes lonely or frightened, what procedure is more natural than to seek the physical closeness of another woman?  The line between this seeking for closeness and actual homosexuality is thin and vaguely drawn.

6.  Summary.

With increased psychiatric interest in the problem of homosexuality, and with contributions from the social sciences, especially anthropology, additions to our information concerning homosexual behavior, over the past several years, can be outlined as follows:

a.  Homosexual behavior is much more frequent than has been generally believed.

b.  Many exclusively homosexual persons have served honorably in all branches of the military service without detection.

c.  Homosexual behavior cannot be correlated with any other characteristic or group of characteristics of the personality (intelligence, GCT, etc.).

d.  It cannot be said with any certainty, as a generalization, that one or more instances of homosexual behavior make an individual either more likely or less likely to participate in homosexual acts in the future.

11          FOR OFFICIAL USE ONLY

DoD LA 7-10  049681

FOR OFFICIAL USE ONLY

e.  Homosexual behavior, in any given instance, can be understood only by a complete evaluation of the personality and of the environmental circumstances under which the behavior occurs.

f.  The extent to which otherwise suitable personnel will malinger homosexuality to avoid military service, except in instances where more severe charges are pending, is questionable.

g.  From all information available to the Committee, it would appear that the concept that homosexuals necessarily pose a security risk is unsupported by adequate factual data.

h.  It seems probable that other factors in the personality influence the security risk as much as the homosexual behavior.

i.  The concept of homosexuality as a clinical entity has been discarded.

j.  Homosexual behavior is symptomatic behavior, which may occur as a phase of psychosexual maturing, or as a symptom of any one of a number of disorders, ranging from personality defects to major psychoses and organic brain disease.

k.  Since homosexual behavior is symptomatic, for medical purposes the only workable classification by which it can be categorized is a classification of the underlying disturbance.

l.  As a corrollary of the above, each class of the present directive contains all types of unrelated homosexual behavior.

m.  Homosexual behavior may be better understood if considered a manifestation of the individual's attempt to adapt to social pressures.

n.  Homosexual behavior more often than not has other motivational goals than orgastic satisfaction, and the basic forces underlying it run the gamut of emotional problems.

o.  The same type of emotional problem which results in homosexual behavior in one individual could result in other individuals in other types of disciplinary offenses, more serious emotional illness, or psychosomatic manifestations.

p.  In the younger age group, immaturity combined with adolescent experimentation is a highly significant factor in the development of homosexual behavior.

q.  In the immature, if homosexual behavior is not the primary source of satisfaction, or symptomatic of an emotional disturbance, the individual normally will pass on to a heterosexual level of adjustment.

12

FOR OFFICIAL USE ONLY

DoD LA 7-10  049682

FOR OFFICIAL USE ONLY

r. A combination of factors within and without the personality are necessary for the development of exclusively homosexual behavior.

s. Treatment of homosexual behavior is as simple or as difficult as treatment of the underlying disorder, which is the proper focus of therapeutic intervention.

t. Deficiencies in our knowledge exist in the entire field of homosexuality, particularly with reference to the areas of possible preventive action and homosexuality in women.

C. Specific Items of Concern.

The following comprises the analyses and recommendations of the Board with respect to the specific items of concern referred to the Board in the enclosure to the precept and certain other additional points of particular importance in connection with the revision of current policies and procedures:

1. One-Time Offenders

Should court-martial or administrative discharge be mandatory in all cases, or would reassignment and retention under some form of probation better serve the Navy and the individual in certain cases?

Discussion:

The problem of the so-called "one-time offender" is the most difficult one with which the Board has had to struggle. This category ranges all the way from the forcible sodomist under Class I, for whom general court-martial is now mandatory, to the pre-service seduction of the immature - and perhaps ignorant - adolescent. Perhaps the largest number of one-time offenders occurs in the in-between area - the in-service participant, who either through ignorance, curiosity or desire to experiment, or the influence of alcohol or corrupt associations, submits to, or participates in, a homosexual act. Further complications arise from the fact that this group is not necessarily restricted to the literal "one-timer", although the accuracy of this label diminishes rapidly with the number of incidents beyond one. Finally, in this broad category are some one-timers who are, in fact, true, confirmed, habitual homosexuals, to whom, despite the occurrence to date of only one in-service act, or no in-service act, homosexuality is a way of life.

With the Class I category of forcible offender, the Board has no difficulty. Such an offense is a serious breach of the criminal code, and general court-martial trial is normally indicated. In some rare instances, however, trial by general court-martial - as opposed to special court-martial - may not be in the best interest of the naval service, and reliance should be placed on the discretion of command as to the type of court-martial which, under all the circumstances of the

FOR OFFICIAL USE ONLY

13

DoD LA 7-10  049683

FOR OFFICIAL USE ONLY

individual case, is most appropriate. The Board realizes that some cases are not susceptible to court-martial, especially where children are involved and parents are unwilling to have them appear as witnesses. However, this offense is of such gravity that an affirmation of serious consequences is desirable.

In coming to grips with the problem of the non-forcible one-time offenders, the Board feels that categorization of these offenders into Classes II and III of the present directive is unrealistic, artificial and unhelpful. A far more useful approach in understanding the problem of the non-forcible, one-time offender is found in the classification of individuals in this group as either (a) habitual, confirmed, true homosexuals, to whom homosexuality is a way of life, and (b) all other offenders, that is, those who have committed a homosexual act or acts, but for whom the act is not habitual or symptomatic of a way of life. While this classification is oversimplified, and ignores some of the psychiatric niceties which may have to be dealt with in specific cases, it offers a practical, helpful starting point in the working out of a solution.

Adoption of the above grouping would facilitate disposition of individual cases. Psychiatric opinion is substantially unanimous to the effect that the confirmed "way of life" homosexual would require, at best, extended treatment for any possibility of cure, and the opinion of both line officer and psychiatrist is to the effect that such an individual is a liability to the naval service, and must be separated in all cases.

The Board recognizes the difficulties inherent in arriving at a diagnosis of confirmed "way of life" homosexuality in the individual case. This is primarily a psychiatric problem, and is dealt with as such elsewhere in this report. This diagnosis, however, is neither insuperable, nor as difficult as the current SECNAV Instruction makes it out to be. It can be accomplished by a thorough psychiatric evaluation, and this the Board recommends in all cases. Current procedures for a "psychiatric or medical evaluation" are inadequate in two respects: The patent inadequacy of a "medical evaluation" as opposed to evaluation by a full-fledged psychiatrist, and a failure to require of the examiner in all cases, a detailed, specific, standardized work-up. The Board has included a sample format for such an examination in its recommendations.

With regard to the non-confirmed offender who commits one or more homosexual acts, the Board has heard and taken into account, a great mass of testimony. The vast majority of this has been to the effect, in brief, that present procedures are too inflexible. Proceeding from this general assumption, the Board turned to current directives of the Army and Air Force on this phase of the subject.

The Army directive of January 1955 (currently being revised) provides that one-time offenders, whom psychiatry finds are not confirmed homosexuals, or who do not possess strong tendencies, shall normally be retained. In amplification of this policy, an Army witness

14                                    FOR OFFICIAL USE ONLY

DoD LA 7-10  049684

FOR OFFICIAL USE ONLY

stated, "Individuals who cannot be regarded as true and confirmed homo-
sexuals, but who have been involved in a single act as a result of
immaturity, curiosity, or intoxication......[whether minors or adults]
....when the psychiatric evaluation concludes that they are not con-
firmed homosexuals and do not possess strong homosexual tendencies, are
normally retained in the service."

The Air Force directive of July 1956 provides that exceptions
to the policy of separation "......to permit retention in the Service
are proper only when the offense was committed, proposed, or attempted
under the most unusual extenuating circumstances, when it is determined
that the member does not have homosexual tendencies, and when the
member's ability to perform military service has not been compromised.
Intoxication is not an extenuating circumstance." An Air Force witness
amplified:  "Cases involving immaturity and professed intoxication
require careful study and evaluation.  Evidence of one or two teen-age
acts may imply only youthful curiosity or can be a positive identifica-
tion of homosexual tendencies.  When only youthful curiosity is involved,
with no indication of an established pattern of homosexuality, closing
the case without further action is proper unless the individual's
ability to perform service has been compromised to the extent that separa-
tion for the convenience of the government is indicated.  Intoxication
has grown to be one of the most common excuses presented by personnel
confronted with evidence of homosexual acts or tendencies.  To accept
such explanations cannot alter the fact that such actions have undoubtedly
compromised the member's ability to continue to perform military service.
More than one such incident not only confirms the above but permits
positive classification....."  (This witness further stated that reten-
tions under this provision have been rare.)

Based on testimony of record, the practice of the other services,
and its own experience, the Board has little difficulty in reaching
the conclusion that mandatory discharge for all one-time, non-habitual
offenders is not in the best interest of the naval service.  Furthermore,
it militates against the basic principle, to which the Board subscribes
most emphatically, that each such case must receive individual considera-
tion.  The difficulty then is not whether ameliorating circumstances
should be taken into account, but what circumstances!  The Board agrees
that the circumstances of immaturity, of ignorance, and occasionally
of intoxication, and whether notoriety or other factors have destroyed
the offender's usefulness, are all worthy of consideration.  None of
these elements, however, necessarily requires a determination in favor
of the offender, and each element must be considered in the light of
the overall web of circumstances going to make up each individual case.

Overall evaluation by a board of officers continues to be the
most important procedural step in reaching a decision as to disposition
of the one-time, non-habitual offender.  The board of officers should
be permitted to take into account the foregoing elements as a part of
the whole picture surrounding each offense, in reaching its opinion
and recommendation as to disposition.  This Board believes that the

15.

FOR OFFICIAL USE ONLY

DoD LA 7-10  049685

FOR OFFICIAL USE ONLY

aforementioned mandatory psychiatric evaluation, arrived at prior to action by a board of officers, will be of invaluable assistance to the board in its deliberations.

As a final and most important element in assisting the board of officers in reaching a sound conclusion in each case, this Board feels that the opinions and recommendations of the particular commanding officer are of great significance, and it accordingly specifically urges adoption of language designed to encourage the commanding officer to express full and deliberate opinions and recommendations in each case, and of language directing the board to give due consideration to same.

This Board recognizes that considerations of public policy, morals, individual equity and the needs of the naval service all must be considered in drafting any instruction requiring boards of officers to consider the aforementioned circumstances. The vehicle by which this is to be accomplished is given more detailed consideration elsewhere in this report.

Individuals retained should have no probationary strings attached other than such as may be inherent in the knowledge that their previous offense is a matter of departmental record.

Assuming adoption of the foregoing procedures, many one-time offenders will continue to be separated from the service. It then becomes necessary next to consider the type of discharge that such a discharged individual should receive. Again the current directive appears to be too inflexible. The extent to which this inflexibility should be liberalized, is discussed under Item 3 below. To round out the discussion of the treatment of one-time offenders, however, the Board feels in summary that the undesirable discharge should not be mandatory, that overall evaluation by boards of officers as outlined above is of paramount importance, and that honorable type separations are warranted in certain situations.

Summary:

To summarize the opinions of the Board with respect to the "one-time offenders":

    a.  Present procedures for Class I are generally satisfactory.

    b.  Present classification of offenders in Classes II and III is unsatisfactory.

    c.  One-time offenders can be more helpfully grouped as (1) confirmed homosexuals and as (2) all others.

    d.  More reliance should be placed on psychiatric evaluation and commanding officer's evaluation of offenders.

    e.  Confirmed homosexuals must be separated in all cases.

FOR OFFICIAL USE ONLY

16

DoD LA 7-10  049686

FOR OFFICIAL USE ONLY

    f.  Those who are not confirmed homosexuals may be retained in specific cases as certain limited ameliorative circumstances warrant.

    g.  Type of discharge should depend on an overall evaluation by a board of officers.

Recommendations:

    The following recommendations are made with respect to one-time offenders:

    a.  A psychiatric evaluation should be mandatory in all active duty cases.

    b.  A commanding officer's evaluation should be mandatory in all active duty cases.

    c.  Class I offenders should continue normally to be tried by general court-martial.

    d.  Non-Class I offenders should be grouped generally as to whether they are, or are not, true, confirmed "way of life" homosexuals.

       (1) Confirmed homosexuals should be separated in all cases.

       (2) Disposition of others to be based on overall evaluations by boards of officers.

    e.  The type of discharge should not be inflexibly prescribed but should be based on findings and opinions of boards of officers.

    2.  Voluntary confessions.

    Do our present methods of handling the man who, without fear of subsequent disclosure, admits participation in a homosexual act, help or hinder the stamping out of homosexuality in the Navy?

Discussion:

    This question is deemed by the Board to be somewhat ambiguous and misleading.  The individual who voluntarily admits participation during the course of an official interview or interrogation to which he is a party, or the individual, who it is subsequently determined might have reason to believe he had been seen in the course of his activity, have been eliminated from consideration under this item. There is, however, record of cases in which individuals have reported homosexual acts, including purported homosexual assault on their person or seduction, to:

    a.  The Commanding Officer,

    b.  The Chaplain,

FOR OFFICIAL USE ONLY

DoD LA 7-10  049687

FOR OFFICIAL USE ONLY

c.  The Medical Officer,

which would never have been otherwise uncovered and which have resulted in undesirable or unsuitable discharges for the individual so reporting.

Pertinent to the problem is the fact that while under the Code of Military Justice (Paragraph 151, Manual for Courtmartial, U. S. 1951) chaplains have the right of privileged communications (where the communications are made as formal acts of religion or concerning a matter of conscience), such rights have not been extended to medical officers in the military services. Similarly the Board has information that seventeen (17) states of the Union do not recognize any privileged communication between a physician and his patient.

Lacking this right, medical officers have at times had to forgo any effort to treat or counsel individuals who have requested help, or have adopted subterfuges. The directive under question has been interpreted to require "all persons" to report to their commanding officer any information coming to their attention concerning homosexuality of any member of the service. Moreover under the strict letter of Article 31 of the Uniform Code of Military Justice, physicians are required to warn personnel of the fact that any statement they make can be used against them when assistance in homosexual problems is requested by patients. If followed literally, this would effectively end the usefulness of the psychiatrist in the case and recitation of the facts would probably cease at that point. It would be frustrating to the patient and may be detrimental to the service.

Medical officers in the Armed Forces have at times concealed homosexual tendencies or behavior under the guise of various psychiatric diagnoses in order to (a) treat the individual concerned or (b) to effect discharge without the stigma of homosexuality attached thereto.

It is the practice among many chaplains to advise individuals seeking assistance concerning homosexual problems to see the medical officer and/or to make a clean breast of the matter to the commanding officer. Such referral, of course, literally puts the physician "on the spot" with no alternative but to officially report the confidence.

Facts are not available to prove or disprove that the liability of an undesirable discharge does in fact discourage any voluntary confession or recourse to psychiatric assistance. The few cases on record would, however, seem to uphold the validity of this assertion.

It is the consensus of the Board that much can be done to encourage voluntary confessions without unduly jeopardizing the best interests of those within a particular class who confess to a homosexual act or to possessing homosexual tendencies. It is considered desirable to formulate a policy to encourage confessions that lead to the separation from the service of confirmed or habitual homosexuals with discharges under other than honorable conditions but that will

18

FOR OFFICIAL USE ONLY

DoD LA 7-10  049688

FOR OFFICIAL USE ONLY

at the same time distinguish the individual who has transgressed in a moment of weakness from the true pervert.

It is recommended that a policy be adopted whereby an individual, who, due to immaturity, ignorance, or occasionally intoxication, becomes a party to an isolated act and thereafter suffers regret, remorse, and repugnance, will be encouraged to confess such to his commanding officer, chaplain, or medical officer for the purpose of minimizing adverse consequences. The policy should provide that he who does confess this non-repetitive, isolated act, who makes a complete detailed statement may be retained in the naval service. The policy should further encourage confessions to homosexual tendencies.

An appropriate procedure would be as follows:

a. One admitting to an in-service act should be subjected to a thorough psychiatric evaluation to determine in so far as possible that he has in fact committed only this non-repetitive, isolated episode in the service and that in the estimation or opinion of the psychiatrist does not in fact possess homosexual tendencies. Individuals who meet the above criteria may be retained if their service record otherwise warrants. One who has committed such an isolated act, confessed, but who is diagnosed by the psychiatrist as possessing true homosexual tendencies, should be separated with the type discharge otherwise warranted by his service record.

b. He who confesses to possessing homosexual tendencies should be interviewed by a psychiatrist, or, pending the availability of a psychiatrist, by a medical officer, who should make a determination in so far as practicable whether the individual in fact does possess these tendencies to such a degree that his retention in the service is not warranted. This determination should be subject to the commanding officer's opinion and comment as to whether the individual is confessing to tendencies for the purpose of evading further military service or not. Separation will not be effected until a complete psychiatric evaluation has confirmed the existence of homosexual tendencies. One who is determined to have homosexual tendencies under these circumstances will normally be separated with a type of discharge of no lower character than unsuitable. However, one who is determined to have been a confirmed homosexual at the time he entered the service, having knowingly failed to disclose the fact upon such entry, may be discharged with an undesirable discharge.

c. These policy provisions should not apply to persons who are found to be Class I.

The Board noted with great concern that the medical officers of the Armed Services were circumscribed and handicapped in establishing proper physician-patient relationship in the treatment of cases which directly or indirectly involve homosexuality. This inhibition was imposed by specific directive or inferred by the doctors themselves from combinations of regulations of a general nature.

19

FOR OFFICIAL USE ONLY

DoD LA 7-10  049689

FOR OFFICIAL USE ONLY

Air Force Regulation 35-66, Section A-6 provides:

"It is the duty of every member to report to his commander any facts concerning overt acts of homosexuality by any member which may come to his attention for (sic) any homosexual acts or tendency. Any member who makes a false official statement for the purposes of initiating action to obtain a discharge under this regulation is subject to action under the appropriate Articles of the UCMJ."

Although not specifically set forth in SECNAV Instruction 1620.1, the substance of the above Air Force Regulation has been in fact inferred by Navy medical officers from a reading of paragraph 4 of that Instruction together with the provisions of Article 1216, U. S. Navy Regulations 1948.

The above referred to self-imposed restriction by Navy medical officers has resulted in a not-injurious practice of failure to report every instance of homosexual activity, knowledge of which was acquired through the physician-patient relationship.

The Board has considered numerous proposed procedures which would authorize the medical officer in specific types of cases to exercise his discretion with regard to placing information of a homosexual nature in official channels for routine processing. However, the Board has discarded as impracticable and fraught with insurmountable administrative difficulties all such procedures.

It is the considered opinion of the Board that the professional and military integrity of the medical officers must be relied upon to the fullest extent for the proper administration of any directives covering homosexuality, and that the practice heretofore considered by the Navy medical officers as not conforming to directives be tacitly recognized as permissible. Thus the medical officer will be in a position to continue exercising his professional discretion in determining whether information, obtained in the course of the physician-patient relationship, pertaining to acts or tendencies of a homosexual nature, are of such import as to necessitate his officially bringing them to the attention of the commanding officer of the patient involved.

Summary

a.  Current policies do not provide any concessions for voluntary confessions.

b.  Privileged communications are recognized for chaplains but not for medical officers.

c.  Current policies tend to discourage voluntary confessions.

d.  Medical officers are currently exercising discretion and judgment without the explicit sanction of written directives.

20

FOR OFFICIAL USE ONLY

DoD LA 7-10  049690

FOR OFFICIAL USE ONLY

Recommendations:

a.  To encourage voluntary confessions, a person voluntarily confessing a non-repetitive, isolated act under ameliorative circumstances should be:

(1) Considered for retention if psychiatric evaluation does not indicate homosexual tendencies.

(2) Separated if homosexual tendencies are present, but with the type of discharge warranted by his service record.

b.  The above policy not to apply to Class I persons.

c.  To encourage personnel to confess to homosexual tendencies, provide that if confirmed by psychiatric evaluation, and there is no evidence to indicate an attempt to evade military service, they will normally be separated with a type of discharge of no lower character than unsuitable.  However, one who is determined to have been a confirmed homosexual at the time he entered the service, having knowingly failed to disclose such fact may be discharged with an undesirable discharge.

d.  That no explicit statement or implication be made in published directives whether or not any obligation exists on the part of medical officers to make an official report concerning homosexual matters disclosed to them in confidence by a patient under treatment.  Thus the present practice, whereby it is left to the sound professional judgment of the medical officer, is tacitly recognized and accepted.

3.  Type of Discharge.

Do our rules on type of administrative discharge have a deterrent effect?  To what extent do they inhibit eventual rehabilitation?  Can they be liberalized in appropriate cases without disrupting discipline?

The preponderance of testimony before this Board has been to the effect that the type of discharge (most frequently the undesirable) currently given the homosexual offender, is little or no deterrent to commission of the offense.  The majority of witnesses (and the Board) agree, however, that there is no reliable means by which the deterrent effect, if any, of the type of discharge, can be accurately estimated.  There seems to be little reason to challenge the impression of "no-deterrent effect" with respect to the habitual, confirmed, "way of life" homosexual.  As to all others, however, a conclusion of no-deterrent effect may be on weaker grounds.

Whether or not the other than honorable discharge is a deterrent may be less important, however, than other considerations which argue for its continued use.  For example, a homosexual act is a sodomitcal

21

FOR OFFICIAL USE ONLY

DoD LA 7-10  049691

FOR OFFICIAL USE ONLY

act and may be punished under the Uniform Code of Military Justice by dishonorable discharge and confinement up to five years. Many states provide comparable penalties. This punishment is analogous to that authorized for other serious crimes under the Uniform Code of Military Justice; such as, desertion, grand larceny (over $50), forgery, house-breaking, perjury, and drug and postal offenses. Presumably over the years legislative opinion has been to the effect that severe punishment is necessary, if not entirely as a deterrent, then for some other good reasons, well founded in public policy, such as protection and preservation of morals. In this setting, the other than honorable discharge currently offered the non-forcible offender, does not appear to be excessive. Recognizing that at times criminal codes lag behind the sociological and cultural advancement of society in general, the Board has nevertheless been unable to ignore the fact that a homosexual act is a serious military and criminal offense, affirmed as such by an Act of Congress as recently as 1950. (Uniform Code of Military Justice.)

On the other hand, the ineffectiveness as a deterrent of the policy of court-martial and confinement for all homosexual offenders has already been illustrated. During the late 1930's and early 1940's this policy resulted in filling our places of confinement with long-term offenders. A more "enlightened" policy of substituting an other than honorable discharge for court-martial and confinement was adopted for the majority of non-forcible cases. No statistics exist from which it can be determined whether or not this "enlightment" resulted in an increased incidence of the offense. It is open to conjecture whether further "enlightenment" by complete elimination of the other than honorable discharge (undesirable) would result in an increase in the incidence of homosexual activity.

The Board found itself on firmer ground in reaching its conclusion that the type discharge awarded - again referring primarily to the Undesirable - was an inhibitor of social and economic rehabilitation in many cases. Again, thoroughgoing statistics are absent, but the impression is substantial that such a discharge limits the employment opportunities available to its holder, deprives him of certain benefits, generally interferes with his economic and social readjustment, and may actually aggravate the homosexual factors involved. Of course many of these offenders could have been court-martialed, in which case they probably would have received punitive discharges interfering at least as much as, and perhaps more, with rehabilitation than an administrative discharge under other than honorable conditions. It is to be noted that by recent Department of Defense Directive implemented by BUPERS Instruction 1900.2A, a code number designating the reason for discharge is now inserted on DD Form 214 (Report of Tranfer or Discharge) as information to intergovernment agencies.

While rehabilitation per se is not primarily a problem of the military, the Board recognized the obligation of the military departments

22

FOR OFFICIAL USE ONLY

DoD LA 7-10  049692

FOR OFFICIAL USE ONLY

to the country not to award a type of discharge more onerous than the paramount needs of the service require. The question then resolves itself into one of what types of administrative discharges are required by the needs of the service. Assuming the previous point as to which there may be some doubt, that is, that an other than honorable discharge is little or no deterrent to homosexual activity, the naval service must nevertheless preserve and protect moral standards and it cannot afford to condone standards of conduct which fall below moral standards of society in general. Merely to separate an offender in many cases may not be enough - an additional label may be necessary to indicate disapproval, and the type label should be indicative both of the degree of disapproval and the degree of misconduct. Thus there are rarely if ever grounds for discharging an in-service offender with an honorable discharge, and little need or excuse for discharging with an other than honorable discharge one whose sole transgression was a pre-service act of adolescence! Within these extreme limits various types of cases demand various treatments. In justice to both the service and the individual, inflexible rules should be avoided, and each case adjudged on its own merits.

Within the framework of these general comments, certain more specific points of agreement have been reached. The in-service offender, for example, whether he be confirmed or a "one-timer", has committed a serious breach of discipline (as distinguished from a breach of moral behavior), and discipline is a military concern of the first importance. Even when the offense is committed in a civilian environment, the military offender has become a potential disciplinary problem. Certainly he has become a weak link in the chain. He may be subjected to undue pressure to keep his offense a secret; he may offend again, more readily the second time; his behavior may become known, in which case he will be a target for abuse by some of his fellows, and for exploitation by others; he may become a liability to good morale and discipline in a variety of ways. While mere separation may be adequate to meet the requirements of good morale and discipline in one case, in others an unequivocal label of disapproval may be necessary. Hence the Board is of the opinion that the service must retain the power, in appropriate cases, to award a discharge under other than honorable conditions for the in-service offender.

Pre-service offenders present less of a hazard to discipline and morale, in most cases, than those who have offended while in uniform. Exception must be made for the confirmed, "way of life" homosexual. In each case, however, the needs of the service can adequately be met by a simple discharge, the specific type to be determined by consideration of all circumstances, including the offender's total record of service. Ordinarily, this will call for a general discharge (under honorable conditions), since only in the rarest of cases will the offender have a record sufficiently meritorious to warrant an honorable discharge under current regulations applicable to those two categories.

23

FOR OFFICIAL USE ONLY

DoD LA 7-10  049693

FOR OFFICIAL USE ONLY

Personnel who merely admit, profess or exhibit homosexual tendencies present a unique problem. When psychiatric evaluation confirms the tendency, separation with a type of discharge warranted by the individual's service record is appropriate both for the service and the individual. The unique situation arises from the fact that military service in this country is a statutory obligation - an obligation which not all servicemen enter into with equal enthusiasm. To those in whom the enthusiasm is lacking, the present power of the services to award a discharge under other than honorable conditions may be a deterrent to false confession of a homosexual act or homosexual tendencies to avoid service or to obtain a separation. The extent to which this power is a deterrent to false admissions is not readily ascertainable; however, depriving the service of this discharge power would be an open invitation to this type of malingerer, without at the same time serving any useful purpose, since the bona fide tendency case will be screened by the psychiatrist and issued an honorable type discharge anyway.

Summary:

a. The other than honorable discharge should not be mandatory for any class of offender.

b. Boards of officers, in reaching a conclusion as to type of discharge to be awarded should take into consideration the service person's overall service record, as well as all the circumstances in the individual's case.

c. The naval service must retain the power to award an other than honorable discharge in appropriate cases, no matter what the category, as a (1) deterrent, albeit an unmeasured one; (2) preserver and protector of moral standards; and (3) sound and necessary tool of administrative flexibility.

d. The needs of the service are such that ordinarily discharge under other than honorable conditions need be awarded only when the offender has committed an in-service act or acts.

Recommendations:

a. That no particular type of administrative discharge be made mandatory for any particular type of homosexual or homosexual behavior.

b. That the type of discharge should be based on the findings and opinions of a board of officers arrived at after consideration of the service person's overall record, as well as the circumstances of the individual case.

4. Treatment of so-called Class III Offender

Are our current procedures sound in light of present-day knowledge?

24

FOR OFFICIAL USE ONLY

DoD LA 7-10  049694

FOR OFFICIAL USE ONLY

Discussion:

Present directives define Class III as "those rare cases wherein personnel only exhibit, profess or admit homosexual tendencies and wherein there are no specific provable acts or offenses, or court-martial juris-diction does not exist."

The majority of all witnesses were in agreement that this clas-sification was a constant source of difficulty, unworkable from the viewpoint of the psychiatrists and too inflexible in administration at the command level.

The following specific defects were brought to the attention of the board:

a.  "exhibit......homosexual tendencies"...

It is generally accepted that even exclusively homosexual persons can not be identified solely through physical characteristics, overt behavior, patterns of interest or mannerisms.  On the other hand, some fully heterosexual persons exhibit mannerisms which could mislead the layman.

b.  "profess or admit homosexual tendencies"

It is difficult for even a trained and experienced psychia-trist to arrive at an accurate determination as to whether an individual is a homosexual solely on the statements of the patient.

c.  To exhibit, profess or admit homosexual tendencies is not an offense, any more than tendencies toward alcoholism for example, and where such tendencies are controlled during naval service, the individual should not be placed in a position of being separated with an undesirable discharge because of such tendencies.

d.  The number of cases where personnel professed such tendencies for the purpose of obtaining a discharge from military service, though not ascertainable with any degree of accuracy, is considered to be negligible.  The most frequent instances occur among those individuals already serving sentences for other offenses.

e.  The mandatory implications in the procedures for Class III offender tend to limit severely the commanding officer from exercising personal judgment in the disposition of these cases.

f.  There are few pure "tendency" cases of record.

g.  Until recently the Class III offender has in many cases received an undesirable discharge, considered by most witnesses before the board as a punishment unduly harsh and disproportionate.

25

FOR OFFICIAL USE ONLY

DoD LA 7-10  049695

FOR OFFICIAL USE ONLY

h. The administration of the procedures pertaining to Class III offender has directed the psychiatrists toward chronic prevarication in the preparation of medical reports upon those individuals seeking guidance for imagined or actual homosexual tendencies.

Summary

The Board is of the opinion that the policy for the disposition of the so-called Class III offender, as presently prescribed and interpreted, has resulted in cases of injustice by the awarding of undesirable discharges, a failure to receive the support of medical officers in the form of adequate clinical evaluations, the loss to the service of individuals that could have contributed valuable service, and the denial to the commander of that flexibility of administrative determination in cases of this type which he, with the full technical assistance of the psychiatrist, should be fully competent to exercise to the betterment of the service and the individual.

Recommendations:

a. That Class III as now defined be abolished.

b. That individuals formerly included in Class III be processed as in recommendation d under Item 1 above.

5. Clinical Evaluations

Discussion:

The present SECNAV Instruction pertaining to disposition of homosexuals provides for the medical examination of each member being considered under the purview of the directive. It is made quite clear in the Instruction that the primary purpose of the examination is to determine whether the member is psychotic. However, provision is also made for the examining medical officer, at the request of the command, to aid in determination of whether the member, in fact, has homosexual tendencies or has participated in homosexual activity. Beyond this, the present directive quite explicitly excludes consideration of the medical aspects of homosexuality either on a local or the dispositional level. In fact, it is not even necessary for the clinical evaluation to be conducted by a medical officer trained in psychiatry. Such a frame of reference cannot avoid discouraging a thorough psychiatric study of the individual, beyond a determination of whether he is psychotic.

In order to evaluate the adequacy, from a psychiatric standpoint, of reports being submitted under the current directive, a careful analysis has been made of a sample of 37 recent psychiatric evaluations utilized by the Bureau of Naval Personnel in processing cases of homosexuality. Each report has been rated as to its adequacy from an administrative standpoint. Over two-thirds of the examinations were

26

FOR OFFICIAL USE ONLY

DoD LA 7-10  049696

FOR OFFICIAL USE ONLY

conducted by trained psychiatrists; and from an administrative stand-point, 21 of the 37 reports were considered excellent or outstanding. However, it immediately becomes quite evident that there is a vast difference between the administrative and the medical concepts of adequacy in such consultations. For example, one evaluation, which was rated outstanding for dispositional purposes, is both unsatisfactory and meaningless as a psychiatric consultation. Only one report approaches adequacy in providing an understanding of the psychiatric aspects of the individual's behavior. At best, only 5 of the reports included material which would permit more than a superficial evaluation of the member's personality structure, a basic factor in any psychiatric consultation.

Very few of the reports in the sample contain any indication of the individual's developmental history or of his psychological relation-ships to members of his family and other persons during this period. Only an occasional report contains information as to the member's present behavioral status -- his adjustment in his daily vocational, social, and avocational pursuits. Information as to present mental status is usually confined to a summary statement that there is no evidence of psychosis. Far more serious is the fact that one evaluation, made by a senior medical officer not trained in psychiatry, contains a descrip-tion of behavioral signs which could be diagnostic of the early stages of schizophrenic psychosis. However, the report is not sufficiently comprehensive to permit a meaningful psychiatric evaluation of the obvious emotional disturbance, and it would appear that no further medical follow-up was made.

In short, the present written reports of psychiatric evaluation, as a whole, do not provide adequate information upon which to base decisions at the departmental level, if medical and sociological factors are to be considered in the disposition of cases involving homosexuality. First, there is insufficient clinical and historical information in the reports to permit an understanding of the individual and his behavior from a psychiatric viewpoint. Secondly, that informa-tion which is included usually consists of opinions, without the clinical evidence on which they are based, and a psychologically sterile recounting of details already available from the ONI investigation. This approach to the preparation of consultations omits the dynamic interpretative material which makes a report psychiatrically meaningful.

It is not surprising that the present reports of psychiatric evaluation are lacking in uniformity, scope, and detail as noted above. Medical officers not formally trained in psychiatry are seldom quali-fied to make an intensive evaluation of personality structure and dynamics. Moreover, they cannot reasonably be expected to recognize the more subtle indications of early psychosis. On the other hand, trained psychiatrists in the field frequently take the position that conducting and reporting a thorough study is not justified when their findings, other than those pertaining to competency, will not be considered in the disposition of the individual. There also is a

27

FOR OFFICIAL USE ONLY

DoD LA 7-10  049697

FOR OFFICIAL USE ONLY

considerable reluctance on the part of the psychiatrist to make a definitive statement, as he is so frequently requested to do, pertaining to whether the member being evaluated has actually participated in homosexual activity or will engage in such behavior at some time in the future. This reluctance becomes understandable when one considers that homosexuality is not a disease entity or an isolated condition but is only one of many possible symptoms of emotional disturbance or immaturity. Thus, in the face of denial by the individual, the psychiatrist is requested, in effect, to include information in his clinical evaluation which is impossible for him to provide with the professional techniques at his command.

In order to correct the present deficiencies in clinical evaluations and obtain a maximum contribution from psychiatry in dealing with the problem of homosexuality, it is necessary to revise the present philosophy of the directives pertaining to the classification and disposition of persons manifesting homosexual behavior.  The psychiatrist is now forced to approach the problem with an administrative orientation as to what constitutes homosexuality which, medically, is both inconsistent and incorrect.

A thorough psychiatric evaluation will contribute not only a basic understanding of the individual and the psychological factors motivating the behavior under investigation, but it will permit disposition of the case in a manner which is in the best interests both of the naval service and the individual.

In order to provide a meaningful evaluation of the individual, the psychiatric examination should cover each of the following areas:

    a.  <u>A comprehensive history of the present homosexual episode.</u>

This includes a description of the time, place, and duration of the incident(s).  A description of the other person involved (personal characteristics and previous homosexual experience) and his psychological relationship to the member being examined.  Investigation of the emotional factors involved in the incident and the psychological meaning of the contact.  For example, does this act represent adolescent curiosity, dependency on gang approval, prostitution, defense against loneliness, etc.  Did it occur when the individual was lonely, isolated, angry, brooding, following rejection, failure, closeness to marriage, etc. What is the effect of being caught?  What are the professed future plans regarding continuation of the behavior, desire for treatment, etc.?

    b.  <u>A comprehensive history of homosexual behavior.</u>

This is to present the total, current, cross-sectional clinical picture.  That is, the homosexual behavior will be viewed as part of a total pattern in which it may fit the category of psychosis, neurosis, personality disorder, or within the range of normal.  This history should emphasize the settings in which the homosexual behavior occurs, the purposes served, frequency, type, etc.

FOR OFFICIAL USE ONLY

28

DoD LA 7-10  049698

FOR OFFICIAL USE ONLY

c. Description of current behavioral status.

This section should include an evaluation of the individual's current work, social and interpersonal relationships, and his effectiveness in these areas. Also included are his attitudes toward his present duty status and the environmental situation in which he is living.

d. Description of personality structure and type.

The member's personality structure and type as seen in the interview, and as determined by psychological examination should be incorporated under this section. Is the individual immature, does he present evidence of a character disorder, personality defects or neurosis, etc.?

e. Development of family history.

This section is devoted to the character and personality of the parents and siblings; the influence and relationships with members of the family; and the attitudes of the parents -- particularly toward sexual education and activity.

f. Birth, growth and development.

Significant events surrounding birth and care in infancy and childhood. Early neurotic determinants (persistence of enuresis, temper tantrums, sleep and food disturbances); early childhood memories; toilet training, etc.

g. Pre-service school and occupational history.

Extent and duration of education; learning difficulties; relationships with teachers and students; nature of studies. The occupational history should include information as to nature of duties, relationships with employers and fellow-workers, frequency of job changes, reason for change, etc.

h. Military history.

In addition to reporting the chronological sequence of duty stations and advancement in rate, this section should include a qualitative evaluation of performance; relationships to peers, senior petty officers, and officers; disciplinary difficulty, etc.

i. Social and religious history.

Of particular importance here is type of activities the individual engages in and is interested in; types of people he gets along with, and doesn't get along with; friends and his relationships with friends (leader, follower, social isolate); difficulties with police

29

FOR OFFICIAL USE ONLY

DoD LA 7-10  049699

or juvenile authorities; when the individual left home and why.  Also, religious beliefs, amount of participation in organized worship, and degree to which the individual is guided by his religious beliefs.

    j.  <u>Comprehensive sexual-marital history</u>.

        Early sexual experiences; sexual instruction; onset of puberty and effect on the individual; types of sexual adjustment; heterosexual history; other sexual "deviations".  If married, type of person, overall adjustment to marriage; relationship to spouse at time of homosexual behavior, etc.

    k.  <u>Attitudes</u>.

        This section includes the individual's more general attitudes toward the Navy, sex, authority, his peers, and himself.

    l.  <u>Physical and neurological examination, including past medical history</u>.

        Routine physical and neurological examination with particular attention to the possibility of subtle organic changes in mature persons. Report of individual's past medical history.

    m.  <u>Mental status examination, including mental competence and sanity</u>.

        Appearance of the individual and his behavior during the examination.  A determination of appropriateness of emotional response; general mood tone; possible thought disturbance (confusion, blocking, retardation, delusions); level of intellectual functioning, and evidence of intellectual impairment; adequacy of judgment; evasiveness, etc. Specific statement as to mental competence and sanity.

    n.  <u>Summary of psychiatric examination and formulation of psychodynamics</u>.

        This section is concerned with integration of all the available psychiatric material to describe the individual as a person, his primary means of coping with the problems of daily living, important motivational influences, and the psychiatric significance of his homosexual behavior.

    o.  <u>Opinions and recommendations</u>.

        The psychiatrist's opinion, based on the above information, as the likelihood of a recurrence of the homosexual behavior and the possibility of further illness if retained in service.  (A recommendation also should be made as to appropriate disposition (return to duty, hospitalization, or separation).

30

DoD LA 7-10  049700

FOR OFFICIAL USE ONLY

Detailed reports of psychiatric and psychological examination, combined with other less technical information, will provide a wealth of research data which can be used to cope more effectively with factors which are conducive to homosexual activity. Thus, in addition to the psychiatric evaluation outlined above, information should be obtained from the member's service record, psychological tests, and questionnaires to be completed by both the individual and the psychiatrist. Such data can be collected at the time of examination and will provide background material for the actual psychiatric evaluation and at the same time permit research on homosexuality without complicating the operational program.

It is highly desirable that all reports of psychiatric examination be referred to the Bureau of Medicine and Surgery for review prior to the case being acted upon by a dispositional board. This will result in more uniformity in reporting and will permit the resolution of any inconsistencies prior to board action. Such a program of review also will provide a form of supervisory control to insure full medical compliance with the pertinent directive. No significant delay in the final disposition of cases is anticipated.

A careful clinical evaluation provides an unusually rich source of material for use in determining appropriate disposition of cases involving homosexuality. The clinical evaluation should not be the sole factor used; however, it should be given even weight with administrative factors in determining the general course of disposition to be followed (discharge, return to duty, etc.). Determination of the appropriateness of disciplinary action or the character of discharge, in cases where separation is appropriate, should be governed by the same administrative considerations as are presently being used in the case of members with psychiatric disorders which are manifested by symptoms other than homosexuality.

Summary

Present directives tend to discourage adequate psychiatric reports due to the relative inflexibility of disposition procedures, and emphasis upon categorizing individuals into homosexuals, psychotics, or malingerers. Psychiatrists tend to feel that a comprehensive report is without purpose and to no avail. Reports by non-psychiatric medical officers fail to provide sufficiently comprehensive material due to lack of specific training. A thorough, comprehensive psychiatric evaluation is needed to permit adequate review and consideration for proper disposition at a departmental level. An outline of adequate evaluation is provided and will be prepared by the psychiatrist in the field. This data will be collected by coded questionnaires to be completed by the individual and psychiatrist along with a written report from the psychiatrist. These reports should be referred to the Bureau of Medicine and Surgery for review prior to dispositional action. This data is extremely important to accumulate for research purposes and future clear guidance.

31

FOR OFFICIAL USE ONLY

DoD LA 7-10  049701

FOR OFFICIAL USE ONLY

Recommendations:

In connection with the clinical evaluation, it is recommended that:

a.  A detailed and comprehensive psychiatric examination be reported in each active duty case.

b.  Sufficient detailed information be collected at the time of the psychiatric examination to permit continuing research on homosexuality in the naval service.

c.  The general outline of the data to be collected at the time of psychiatric evaluation to be as follows:

(1) General background and identifying data (obtained from the service record and a questionnaire to be completed by the member concerned).

(2) Questionnaire to be completed by the examining psychiatrist.

(3) Comprehensive clinical evaluation covering the following areas:

(a) A comprehensive history of the present homosexual episode.

(b) A comprehensive history of homosexual behavior.

(c) Description of current behavioral status.

(d) Description of personality structure and type.

(e) Development of family history.

(f) Birth, growth and development.

(g) Pre-service school and occupational history.

(h) Military history.

(i) Social and religious history.

(j) Comprehensive sexual and marital history.

(k) Attitudes.

(l) Physical and neurological examination, including past medical history.

32

FOR OFFICIAL USE ONLY

DoD LA 7-10  049702

FOR OFFICIAL USE ONLY

(m) Mental status examination, including mental competence and sanity.

(n) Summary of psychiatric examination and formulation of psychodynamics.

(o) Opinions and recommendations.

d.  All examinations be conducted by medical officers trained in the specialty of psychiatry.

e.  All reports of clinical evaluations be reviewed by the Chief of the Bureau of Medicine and Surgery before the case is acted upon by a disposition board.  Procedures should provide for expeditious processing.

f.  The psychiatric evaluation be given equal weight with administrative factors in determining disposition of cases involving homosexuality.

6.  <u>Review procedures.  Are they appropriate?  Should a psychiatrist be added to the membership of Department review boards in all or certain cases?</u>

<u>Discussion:</u>

This discussion pertains to the Departmental review that is made in the Bureau of Naval Personnel and Headquarters, Marine Corps of cases involving homosexual activities by naval personnel.  The review of cases of discharged personnel by the Navy Discharge Review Board and the Board for Correction of Naval Records is not included in this discussion; but is treated hereinafter in the Board's report (Part I.E.).

Cases involving homosexual activities by naval personnel, active, inactive or retired, generally originate by voluntary confessions made to a chaplain, medical officer or commanding officer; reports by a third party witness that two or more individuals have engaged in homosexual activities; reports by the victims of unsolicited homosexual advances; confessions following investigations which implicate personnel other than the subjects of the investigation; Office of Naval Intelligence reports and reports received from the intelligence branches of other military services and Federal Governmental agencies; and convictions by civil authorities.

Upon receipt of information that an enlisted person on active duty in the naval service has engaged in homosexual activity, a commanding officer causes a complete investigation to be made.  This investigation may be conducted by trained investigators assigned to certain commands or to a greater extent, with the cooperation and assistance of Naval Intelligence agents located within the District or area.

33

FOR OFFICIAL USE ONLY

DoD LA 7-10  049703

FOR OFFICIAL USE ONLY

In all cases a commanding officer submits a report, including a recommendation as to disposition, to the Chief of Naval Personnel or Commandant of the Marine Corps. These reports include the results of the investigation and all other matters that may be of assistance to Departmental reviewing authorities; a signed statement from the person investigated, which statement is witnessed and attested; sample charges and specifications in appropriate cases; agreement to accept an undesirable discharge in lieu of trial by general court-martial; a statement of awareness in certain cases that an undesirable discharge may be awarded because of anti-moral or anti-social traits; psychiatric reports; and statements of witnesses, if any.

Cases involving officer personnel generally originate in the same manner as enlisted cases. Following investigation and determination by a commanding officer or superior officer in the chain of command that processing under SECNAV Instruction 1620.1 of 5 June 1953 is required, a report is submitted to the Chief of Naval Personnel or the Commandant of the Marine Corps. The report includes a statement from the officer investigated, signed, witnessed and attested; statements of witnesses, if any; psychiatric reports; sample charges and specifications in appropriate cases; a resignation for the good of the service and to escape trial by general court-martial (in Class II cases), or for the good of the service, (in Class III cases); and the recommendation of the commanding officer or superior officer as to disposition.

Upon receipt of a case in the Department, it is reviewed in the appropriate discipline or performance office in the Bureau of Naval Personnel or Headquarters, Marine Corps. This review is for the purpose of determining whether to return the case for further investigation or for trial by general court-martial. Upon determination that the case is complete in all respects, it is referred to a board of officers for findings, opinions and recommendations. Each case, except one involving trial by general court-martial, is referred to such a board. These boards are composed of three officers who are senior to the individual under consideration. The membership of the boards include at least one woman when a case of a woman is considered, and at least a majority of the members are reserve officers when the individual being considered is a reserve. All available information pertaining to the case is furnished the boards, including the report and recommendation submitted by the command, the duplicate service record in the case of enlisted persons, and the officer personnel records in the case of officers. Following study and evaluation, the boards may recommend anyone of the following actions and disposition:

a. Retain the individual.

b. Issue an enlisted person a discharge for the convenience of the Government, with the character of the discharge such as the service record warrants.

34

FOR OFFICIAL USE ONLY

DoD LA 7-10  049704

OR OFFICIAL USE ONLY

     c.  Discharge an enlisted person under honorable conditions for unsuitability.

     d.  Discharge an enlisted person as undesirable under other than honorable conditions.

     e.  Accept the resignation of an officer as submitted.

     f.  Accept the resignation of an officer in other form.

     g.  Return the case to the command for additional information.

     h.  Resolve the case by court-martial trial if guilt is in doubt.

     i.  Request permission from the Secretary of the Navy to try the person by court-martial.  (This recommendation is appropriate when a person has been tried and convicted in a civil court for homosexual acts.)

     Following board action, each case is reviewed by senior officers in the Bureau of Naval Personnel or Headquarters, Marine Corps.  Upon approval of the board action in enlisted cases, a letter is issued to the individual's commanding officer directing him to take the action as finally approved.  Officer cases are forwarded to the Secretary of the Navy for final action.  In the normal course of events the Secretary refers the case to the Judge Advocate General for additional review.  Upon approval by the Secretary of the Navy, appropriate SECNAV orders are forwarded to the officer concerned, via his commanding officer.

     In cases of inactive reserve officers the provisions of SECNAV Instruction 1900.2 are utilized in processing for administrative discharge.  Under this Instruction, the board of officers previously described convenes and the officer concerned is afforded an opportunity to appear if he desires.

     The Board's study of the Departmental review procedure discloses that it is fundamentally sound and adequate.  Difficulty has been experienced, however, because of inadequate psychiatric reports.  It is believed that more complete psychiatric reports will enable boards and reviewing authorities to better evaluate cases of persons being considered for disposition as homosexuals, will do much to detect those persons who may require additional psychiatric study and treatment, will assist reviewing authorities to better determine whether a person should be retained or discharged from the naval service, and, where appropriate, the character of the discharge to be awarded.

     The Board's study discloses that Departmental review boards are composed of senior Navy and Marine Corps officers of sufficiently broad and diversified experience to guarantee fair and just consideration of all factors involved.  Additionally, reviewing officers in the Bureau

35

FOR OFFICIAL USE ONLY

DoD LA 7-10  049705

FOR OFFICIAL USE ONLY

of Naval Personnel and Headquarters, Marine Corps, who review the recommendations of the boards, have had years of service experience and are qualified to render fair and just determinations, being ever mindful of the best interests of the naval service as well as those of the individual concerned.

A medical interpretation of the clinical evaluation should be made at departmental level. This may be handled either by having a psychiatrist attached to the disposition board or by review of the clinical evaluation in the Bureau of Medicine and Surgery, as recommended in paragraph C5 of "Clinical Evaluations" above.

In connection with the review of cases involving women, the Board finds that all reviewing authorities need some guidance, particularly as to what constitutes acts of homosexuality. It is believed, however, that furnishing copies of the report of this Board to disposition boards and improved clinical evaluations and medical recommendations will provide the necessary guidance.

Summary

a. Present Departmental review procedure is fundamentally sound and adequate, with the exception that there is no provision for medical review at the Departmental level.

b. It is not necessary that a psychiatrist be added to the membership of Departmental review boards, if Departmental medical review and recommendations are made available.

c. Some guidance is needed in connection with the review of cases involving homosexuality in women.

Recommendations:

a. Continue the present Departmental review procedure with the addition of review of the clinical evaluation and recommendations by the Chief of the Bureau of Medicine and Surgery.

b. Furnish for the guidance of disposition boards in the Bureau of Naval Personnel and Headquarters, Marine Corps copies of the report of this Board.

7. Responsibility to the Civilian Community.

What is the responsibility of the Navy, if any, to the community when discharging an habitual homosexual without punishment, treatment or identification as such?

Discussion:

It is the opinion of the Board, supported by testimony of witnesses appearing before it as well as statements of civilian law

36

FOR OFFICIAL USE ONLY

DoD LA 7-10 049706

FOR OFFICIAL USE ONLY

enforcement authorities that the Navy owes no responsibility to the civilian community with regard to homosexuals separated from the service excepting in cases of those falling within Class I who have exhibited vicious or dangerous tendencies or who have been involved in acts of perversion with minors.

In the words of Dr. Manfred S. Guttmacher, Chief Medical Officer of the Supreme Bench of Baltimore, "As far as the ordinary homosexual is concerned there appears to be nothing the service owes the community. Civilian authorities have a pretty high degree of tolerance with regard to the routine homosexual activity."

Recommendations:

a. The Chief of Naval Personnel and the Commandant of the Marine Corps, shall, only in cases wherein the homosexual has been determined to be a public menace or the offense for which he was separated involved children* report the case to the Federal Bureau of Investigation through normal channels for such action as may be necessary in the public interest.

*Attention is invited to the age limit of ten years proposed in the new model code.

8. Screening of applicants for enlistment.

Discussion:

There are three administrative procedures at the recruiting level which aid in the identification and rejection of a certain proportion of overt homosexuals who apply for enlistment or appointment in the naval service. However, these procedures, including police checks, background investigations when appropriate, and the routine enlistment physical examination, usually serve to eliminate only the more flagrant and exhibitionistic of the confirmed homosexuals.

It is possible that the proportion of homosexual applicants eliminated at the recruiting level might be slightly increased by making provision for an intensive psychiatric evaluation upon enlistment or appointment. However, past experience has indicated that psychiatric examination on the recruiting station level is of questionable validity in the identification of emotionally disturbed individuals and certainly would not be feasible in the naval service from the standpoint of the money and professional personnel required. Accordingly, it is doubtful if any modification of screening procedures at recruiting stations is indicated, providing the present procedures are carefully and thoroughly carried out.

Over a period of years, the Navy's program in preventive psychiatry has been developed and refined so as to overcome the limitations which are inherent in screening at the recruiting or induction station level. In fact, it is considered that the system of psychiatric screening now

FOR OFFICIAL USE ONLY

37

DoD LA 7-10  049707

FOR OFFICIAL USE ONLY

utilized at recruit training activities constitutes as adequate a program as can be developed at present for the detection of homosexuality in newly enlisted members. The fundamental premise of this program is that the intensive psychiatric screening must be conducted after the individual has actually entered the military environment. During the early period of training, many aspects of the individual's personality become apparent which are not readily discernible while he is still a member of the civilian community, to which he has made a psychological adjustment. This is particularly true in connection with homosexuality, inasmuch as exposure to an exclusively masculine group and close contact with shipmates in the course of daily living frequently makes the sexual conflict more apparent to both the individual concerned and the psychiatric examiner.

Broadly speaking, homosexuality is only one of a number of symptoms of emotional disturbance or personality disorder. While some persons display evidence of their emotional disturbance in such behavior as repeated AWOL's or excessive drinking, other persons may manifest evidence of the same type of psychiatric disorder through homosexual behavior. In addition, homosexuality also may be symptomatic of a number of basically different psychiatric disturbances. Therefore, in the face of denial by the individual, there are no specific criteria which will permit the psychiatrist to say that a given individual has fixated on the symptom of overt homosexuality. It is even more difficult to identify persons who will at some time in the future succumb to homosexual acts. Regardless of the time and effort spent in screening of this nature, so much depends on the particular set of circumstances surrounding the commission of homosexual acts, in the case of persons who are not confirmed homosexuals, that a more elaborate screening program on the enlistment level, with the few specific exceptions which are discussed below, would not be realistic. Support of this position is seen in the fact that cases are repeatedly encountered where members have successfully passed a rigorous screening for top secret clearance and later proved to be confirmed homosexuals. The exclusion from service of all persons who, on the basis of their personality structure, could conceivably engage in homosexual acts is totally unfeasible in view of the large proportion of the young adult male population which falls in this category.

At the present time, the Navy's preventive psychiatry program is so structured as to provide for the psychiatric screening of all new recruits at the three Naval Training Centers and two Marine Corps Recruit Depots. In addition, all newly appointed midshipmen at the Naval Academy receive a thorough neuropsychiatric evaluation. There are, however, several large programs where the newly enlisted or appointed members do not receive a specialized psychiatric examination. Notable among these are the Naval Reserve Officer Training Corps students in the college program, Officer Candidate Schools, Naval Aviation Cadets, and the organized reserve units.

38

FOR OFFICIAL USE ONLY

DoD LA 7-10  049708

FOR OFFICIAL USE ONLY

The lack of an adequate psychiatric screening program for members of reserve units is of particular significance in view of the size of the inactive reserve component. However, the development of a satisfactory program for screening of either Organized Reserve or NROTC Units constitutes an extremely complex problem. This is true for two reasons: first, there are insufficient qualified psychiatric personnel on active duty to conduct the necessary examinations, with the units being so widely scattered and the number of personnel attached to each organization so small. In addition, members in these two groups are still living in an essentially civilian environment and are not subjected to the stresses which might aid in bringing disqualifying homosexual tendencies or conflicts to the surface.

Present deficiencies in the screening of inactive reserve personnel can be corrected by modification of two aspects of the reserve program. First, screening of all newly enlisted reserve personnel should be accomplished during their first period of active duty for training. A second improvement in the screening of reserves could be made by providing billets in key organized units for psychiatrists and clinical psychologists. At the present time, there are no billets in the reserve program for these specialists, although a number of well-trained and experienced officers have indicated an interest in serving in a pay status. The establishment of two or three billets for psychiatrists and clinical psychologists in each of the larger metropolitan areas would be sufficient to provide for the routine screening of a large number of reserve units. Moreover, during a two week tour of active duty these officers could evaluate members of reserve units in more isolated areas. It is important that priority be given to the consideration of the establishment of psychiatric billets in those areas where reserve units are geographically isolated from naval medical activities with psychiatric facilities. This is a subject that could well be studied in connection with the Reserve Program.

It is understood that newly enlisted reserves are normally ordered to two weeks active duty for training at a recruit training activity, if they are not immediately ordered to active duty, within the first year. These personnel should be screened psychiatrically during the training period. The other reserves going immediately to active duty will get the normal psychiatric screening.

A neuropsychiatric screening program for the Officer Candidate School can be instituted if additional billets for psychiatrists and clinical psychologists are made available at the Naval Station, Newport, Rhode Island. To some extent, the lack of screening of Aviation Cadets by specialists in neuropsychiatry is compensated for by the extensive medical program conducted by flight surgeons, and no change in this program is recommended.

Summary:

Present psychiatric screening procedures appear to be adequate except in those areas covered by the recommendation below. More intensive

39

FOR OFFICIAL USE ONLY

DoD LA 7-10  049709

FOR OFFICIAL USE ONLY

screening procedures at the recruiting level would not be justified on the basis of the number of actual or potential homosexuals that would be excluded at that stage.

Recommendations:

In connection with the screening of applicants for enlistment and appointment, it is recommended that:

a.  No basic changes be made in screening procedures at the recruiting or training station levels; however, the present procedures should be carefully followed.

b.  A psychiatric examination should be instituted as part of the initial physical examination for Regular NROTC midshipmen and for contract NROTC students prior to entering the senior division.

c.  Consideration be given to establishing a limited number of pay status billets in organized reserve units for psychiatrists and clinical psychologists as part of the Naval Reserve Program.  This would permit the elimination of some of the homosexual individuals who are separated at present only after they have been ordered to active duty.

d.  Enlisted reserve personnel, not immediately ordered to extended active duty, be screened psychiatrically during the normal two weeks active duty for training period.

e.  Additional billets be established for two psychiatrists and one clinical psychologist at the Naval Station, Newport, Rhode Island, to permit the inauguration of a formal program for screening reserve officers entering the service through the Officer Candidate School Program.

9.  Should women be treated differently than men?

Discussion:

The consensus of most witnesses before the Board was to the effect that there should be no difference in the treatment of men or women homosexuals.  Present procedures in the Army, Air Force, and Navy indicate that there is now no dissimilarity in handling.

It is to be noted that the incidence rate of homosexual activity is much higher for the female than male as reflected in the statistics available to the Board.  This higher rate may result from:

a.  Closer supervision of women members of the service.

b.  Misinterpretation of certain normal female propensities as homosexual acts.

40

FOR OFFICIAL USE ONLY

DoD LA 7-10  049710

FOR OFFICIAL USE ONLY

c. Greater susceptibility of the female to such activity in the abnormal military setting,

d. Military service may be more attractive to females with latent homosexual tendencies.

This is in contradiction to the fact that homosexual activity in the female is difficult to detect.

Homosexual activity of female members of the military has appeared to be more disruptive of morale and discipline in the past than similar male activity.

Of concern, and interest to the Board, was the apparent need for a more definitive approach and analysis as to what constitutes homosexual activity among women as revealed by the testimony before the Board.

The mores of present day society accept the fact that women kiss and embrace each other on meeting and may live together and occupy the same bed without any connotation of homosexuality, under circumstances where similar acts on the part of males would be immediately branding.

The difference in the psychological and physiological make-up of the female, the greater need for emotional outlet, and currently socially accepted practices must be evaluated in any allegation as to homosexuality. Many acts which on occasion are in fact normal would in excess indicate homosexual tendencies.

It is considered impossible to provide a fixed and concise overall definition as to all that constitutes homosexual activity in the female. A general definition of a homosexual act is that conduct between two or more persons of the same sex committed or engaged in with the intent or for the purpose of sexual arousal or gratification. There can be homosexual activity without genital contact, although some authorities would define a homosexual act as one which produces orgasm. Primary reliance must, however, be placed on an overall appraisal of the individual's activity as to whether a pattern is set representing the habitual performance of persons homosexual in inclination.

Homosexual activity by women is harder to detect. Women are normally more secretive, are not as promiscuous, and are more seclusive than the male, whereas the male is not as selective either as to partner nor as to locale as the female.

Differences in interpretation of what constitutes homosexual activity is reflected in the differences in categorization between the Marine Corps on the one hand and the Navy on the other. Testimony shows that the majority of recent cases in the Marine Corps have been

41

FOR OFFICIAL USE ONLY

DoD LA 7-10 049711

FOR OFFICIAL USE ONLY

processed as Class III, with a convenience of the Government discharge, while in the Navy they have been processed as Class II with an undesirable discharge.

Summary:

a. Homosexual activity is harder to detect in the female.

b. Many acts normal to the female are indicative of homosexuality in the male.

c. Apparently, there are uncertainties in some quarters as to what constitutes homosexual activity in the female.

d. Consensus that there should be no difference in the handling of male or female homosexuals.

Recommendations

a. No attempt be made to differentiate between men and women in the Instruction with respect to procedures or disposition for homosexual activity.

b. Careful review be made of all allegations concerning homosexual activity of female members of the service to ensure that a pattern representative of homosexual conduct is present, as distinguished from normal socially accepted behavior.

10. Indoctrination and Education of Recruits on Homosexuality.

Discussion:

On 14 November 1952 the Secretary of the Navy instructed the Chief of Naval Personnel to establish procedures for implementing the program for the indoctrination of naval personnel at Naval Training Centers on the subject of homosexuality. On 4 December 1952 the Chief of Naval Personnel appointed a committee to implement the program. This committee is still functioning. A letter of 22 December 1952 from the Chief of Naval Personnel, Training Division, Bureau of Naval Personnel directed that the instructions on homosexuality be extended to include women. Current procedures provide that the instruction be a one-period, introductory, stereotyped lecture to be delivered to recruits, male and female, during recruit training by a team of officers namely, medical officer, chaplain, and a line officer. The general purpose is to acquaint the recruit with the existence of homosexuality and the bad effects that involvement would produce. Homosexuality as such is identified as a bad thing. Attempt is made to explain the nature of homosexuality. Suggestions are offered to instructors that they be calm, serious, and objective and that the subject be presented in plain language. Case histories are presented. Question of security

42

FOR OFFICIAL USE ONLY

DoD LA 7-10 049712

FOR OFFICIAL USE ONLY

risk is introduced, and the Navy's attitude is presented on the subject. (Sample lectures attached as Appendix 46, Part II.) The Board noted that no planned educational program exists beyond the recruit level.

Comments:

A description of the ongoing program as described above was presented to the Committee by Chaplain Garrett who felt that the program was quite satisfactory. He strongly suggested that the standard written text be continued at all activities since individual variations in the presented material were sometimes extreme and embarrassing in their results.

There is no present information available to indicate the degree of effectiveness of this educational program. There is no information to demonstrate that any harm has been produced or on the other hand that any direct benefit has occurred. While it seems reasonable to provide information in this area, some caution is required in over-presenting and over-emphasizing the material in so far as this tends to create a sense of undue importance or curiosity in this subject. Some of the Committee felt that this indoctrination should be aided and abetted by a prepared film on the subject of homosexuality. This would have the advantage of more professional skill and careful handling and uniform presentation. The Marine Corps recruits are not given a routine regular lecture on this specific subject.

Summary

In 1952 the Secretary of the Navy directed the Bureau of Naval Personnel to provide some instruction to recruits on the subject of homosexuality at the various training centers. This program has been implemented for the past four years. The presentation is divided between the medical officer, chaplain and line officer and various medical, ethical, and disciplinary aspects are presented. Evidence is inconclusive regarding the benefit or disadvantage of this presentation.

Recommendations:

a. That the present educational program continue as the responsibility of a committee appointed by the Chief of Naval Personnel.

b. That an effort be made to determine the effectiveness of the present educational program preliminary to instituting any changes therein.

11. Security implications of the homosexual.

Discussion:

Executive Order 10450 of 27 April 1953 provides that certain suitability factors be investigated to develop information as to whether

43

FOR OFFICIAL USE ONLY

DoD LA 7-10  049713

FOR OFFICIAL USE ONLY

the employment or retention in employment in the Federal service of the person is clearly consistent with the interests of the national security. Among these factors are:

"(iii) Any criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, habitual use of intoxicants to excess, drug addiction or sexual perversion.

(iv) An adjudication of insanity, or treatment for serious mental or neurological disorder without satisfactory evidence of cure.

(v) Any facts which furnish reason to believe that the individual may be subjected to coercion, influence, or pressure which may cause him to act contrary to the best interests of the national security."

Department of Defense Directive 5210.9 of 17 June 1956 and SECNAV Instruction 5521.6A of 31 January 1957 similarly make these suitability factors applicable under the Military Personnel Security Program, further providing that, unless other security factors are primarily involved, action toward separation will be instituted in these cases under other appropriate regulations and directives.

The Interim Report of the Subcommittee on Investigations of the Committee on Expenditures of the Senate, Senate Document 241, 81st Congress, 2nd Session 1950 (Part II, Appendix 24) reports an investigation into the employment by the Government of homosexuals and other sex perverts. The following quotes are pertinent to this problem:

"The subcommittee sincerely believes that persons afflicted with sexual desires which result in their engaging in overt acts of perversion should be considered as proper cases for medical and psychiatric treatment. However, sex perverts, like all other persons who by their overt acts violate moral codes and laws and the accepted standards of conduct, must be treated as transgressors and dealt with accordingly."

"Those charged with the responsibility of operating the agencies of Government must insist that Government employees meet acceptable standards of personal conduct. In the opinion of this subcommittee homosexuals and other sex perverts are not proper persons to be employed in Government for two reasons; first, they are generally unsuitable, and second, they constitute security risks."

"Overt acts of sex perversion, including acts of homosexuality, constitute a crime under our Federal, State, and municipal statutes and persons who commit such acts are law violators. Aside from criminality and immorality involved in sex perversion such behavior is so contrary to the normal accepted standards of social behavior that persons who engage in such activity are looked upon as outcasts by society generally."

44

FOR OFFICIAL USE ONLY

DoD LA 7-10  049714

FOR OFFICIAL USE ONLY

In continuation of unsuitability factors the subcommittee mentions:

a. Fact that perverts are frequently subject to blackmail.

b. Generally believed that overt acts of perversion indicate lack of emotional stability and weakens the moral fiber of an individual.

c. Presence in Government tends to have a corrosive effect on fellow employees.

d. Tendency to seek his own kind and gather perverts about him.

"The conclusion of the subcommittee that a homosexual or other sex pervert is a security risk is not based upon mere conjecture. That conclusion is predicated upon a careful review of the opinions of those best qualified to consider matters of security in Government, namely, the intelligence agencies of the Government. ---- All of these agencies are in complete agreement that sex perverts in Government constitute security risks."

The Subcommittee mentions the following among security factors:

a. Lack of emotional stability and weakness of moral fiber makes them susceptible to blandishments of espionage agents.

b. Tendency to congregate facilitates recruitment and clandestine relationships.

c. Susceptibility to blackmail.

"The subcommittee in pointing out the unsuitability of perverts for Government employment is not unaware of the fact that there are other patterns of human behavior which should be considered in passing upon the general suitability or security-risk status of Government employees. There is little doubt that habitual drunkards, persons who have engaged in criminal activities, and those who indulge in other types of infamous or scandalous personal conduct are also unsuitable for Government employment and constitute security risks. However, the subcommittee, in the present investigation, has properly confined itself to the problem of sex perverts."

Numerous cases were recited to the Board which represented examples of homosexuals involved in security infractions, some to the extent of espionage. Examples are discussed in the article by Richard and Gladys Harkness which appeared in September 1955 issue of Readers

45

FOR OFFICIAL USE ONLY

DoD LA 7-10  049715

FOR OFFICIAL USE ONLY

Digest (Part II, Appendix 51). On the other hand cases were brought to the attention of the Board where individuals seperated after long, honorable and faithful service have subsequently been uncovered as homosexuals.

Even on the basis that the Kinsey report exaggerates the percentage of those exclusively homosexual in nature to those having as much homosexual as heterosexual natures, there must be a large number of these categories in the service who have never been discovered and who will not be discovered prior to separation.

The Board was unable to uncover any statistical data to prove or disprove that homosexuals are in fact more of a security risk than those engaged in other unsocial or immoral activity. Even the number of cases of blackmail revealed as a result of past investigations, which were cited to the Board, is negligible.

The Board feels that it would be presumptuous to make contentions contrary to those expressed in the Congress and by Executive Order on the basis of information available to it.

The Board is in agreement that a homosexual is not necessarily more of a security risk, per se, than other transgressors of moral and criminal codes. Further the Board recognizes that the propensities and vulnerabilities associated with homosexual activity, as in the case of promiscuous heterosexual activity, do provide serious security implications.

<u>Summary</u>

a. Current Executive and Departmental security orders and instructions require investigation and elimination of sexual perverts, including homosexuals, from Government service and military service.

b. Sex perverts, including homosexuals, are not handled under security directives unless other security factors are primarily involved.

c. No statistical studies are available to indicate the percentage of homosexuals implicated in security violations compared to other malefactors.

d. Although it is not felt that homosexuality is more of a security problem than other types of concupiscence, the propensities and vulnerabilities of homosexuals do provide serious security implications.

e. If the Kinsey report is valid, there must be numerous homosexuals now in service who have not been discovered, and will not be discovered prior to separation. This does not necessarily imply an unacceptable security problem.

46

FOR OFFICIAL USE ONLY

DoD LA 7-10 049716

FOR OFFICIAL USE ONLY

Recommendations:

a.  A statistical study be initiated by the Director of Naval Intelligence in coordination with the Chief of Naval Personnel and Commandant of the Marine Corps to develop factual data on the incidence of security implications in homosexual cases as well as in categories involving other types of moral turpitude and criminal activity.  This study should be extended to other agencies of the Government if practicable.

b.  That cases involving homosexuality continue to be handled on other than security grounds, where practicable.

12.  Investigative procedures.

Discussion.

By SECNAV Instruction 5430.13A of 10 August 1954 the Director of Naval Intelligence is assigned investigative jurisdiction and responsibility within the Naval Establishment of, among others:

"Major violations of the Uniform Code of Military Justice, such as murder, manslaughter, rape, larceny, robbery, forgery, mayhem, sodomy, arson, mutiny, sedition, extortion, burglary, perjury, and certain conduct punishable under Articles 133 and 134 of this Code, such as smuggling, trafficking in narcotics, black-market activities, and violation of customs, postal and currency regulations."

In addition, SECNAV Instruction 5521.6A of 31 January 1957 requires that the Director of Naval Intelligence render investigative services, on request, in connection with the evaluation of suitability factors referred to in connection with the discussion of Executive Order 10450, item C11 above.

In implementation of the foregoing responsibilities with respect to sexual misconduct, and homosexuality in particular, the Director of Naval Intelligence issued ONI Instruction 5520.15B of 15 October 1956 as guidance to his investigative agencies.

It was revealed in the testimony that certain large naval stations have investigative personnel within the command.  In these, it is common practice to initiate the investigations without reference to the Director of Naval Intelligence; however, ONI is called in at certain stages of the investigation in many cases.

Representatives of the Director of Naval Intelligence explained in detail the procedures and policies in force in the Office of Naval Intelligence with respect to the conduct of investigations and interviews. The following are the highlights of the presentation:

47

FOR OFFICIAL USE ONLY

DoD LA 7-10  049717

FOR OFFICIAL USE ONLY

a.  Investigations in this area are initiated only by request of a command or other responsible authority, i.e., not on the initiative of the Director of Naval Intelligence or his representatives.

b.  In all investigations, interview is not attempted until all other pertinent investigative leads have been covered.

c.  In conducting an interview:

(1) The individual is first invariably warned of his rights under the Code of Military Justice.

(2) The individual is informed of the purposes of the interview but is not normally given the results of the investigation or identity of informants.  Sometimes fragmentary information is revealed to facilitate the interrogation.

(3) If a woman is involved, she is always offered the opportunity, which is rarely accepted, to have another woman present.

(4) Threats or use of force by interviewers are not tolerated.

(5) It is not normal procedure to ask individuals if they desire counsel prior to interrogation.

(6) The meaning of terms used are explained in order to preclude retraction of confession on grounds of lack of understanding.

A recommendation was made that, in some cases, in lieu of or prior to an ONI investigation, it might be better to have trained personnel men (Chief Petty Officers) interview persons suspected of homosexuality.  The psychiatric examination should not be given after a person has been interrogated for hours as, by that time, he is a disturbed person.

It is conceded that in many instances a preliminary investigation is essential in order to determine whether or not there is a case of merit on which to base a request for action by the Director of Naval Intelligence.  Such preliminary investigation should, however, not be used as a basis for failure to request the services of the Director of Naval Intelligence where the facts warrant.  Furthermore, due consideration must be given to the best interests of the service at large and the fact that many investigations have been compromised and nullified by local action and delay in requesting the services of trained investigators.

In this connection, it must be remembered that a psychiatric evaluation is only as good as the facts made available to the psychiatrist.  Therefore, the facts in the investigation should be made available to the psychiatrist making the evaluation.

48

FOR OFFICIAL USE ONLY

DoD LA 7-10  049718

FOR OFFICIAL USE ONLY

Summary:

a.    The Director of Naval Intelligence is by Secretary of the Navy directive assigned investigative jurisdiction and responsibility of certain major violations of the Uniform Code of Military Justice, including those categories covering sexual perversion and homosexuality.

b.    Certain naval stations have local investigative personnel.

c.    In so far as can be determined, responsible agencies of the Director of Naval Intelligence provide all the rights accorded by law and other instructions.

d.    The Director of Naval Intelligence initiates investigations only on request of responsible authority.

Recommendations:

a.    That no changes be made in procedures or methods currently employed by the Director of Naval Intelligence in investigations of homosexual offenses.

b.    That the investigative services of the Director of Naval Intelligence continue to be requested in accordance with the responsibilities assigned by the Secretary of the Navy whenever the information in the case warrants.

c.    That the facts from the investigation be made available to the psychiatrist evaluating the individual.

13.    Deterrents:

Are the judicial and administrative punitive deterrents provided by the military helpful in combating homosexuality?

Discussion:

The answer to this question can be in the affirmative providing one considers certain specific areas in which the offender may fall.

The Board found agreement among the witnesses that the threat of court-martial or administrative discharge had no deterrent effect upon the true homosexual. Nor would the Class I offender be long deterred by threat of court-martial. However, the possible experimenter, the immature and the "tendencies" man are to varying degrees, dependent upon the particular personality involved and the homosexual drive present, deterred by the fear of criminal or punitive administrative action.

We must consider that, unlike the minor punishments usually incurred for the non-forcible homosexual acts in civilian life, conviction by court-martial or administrative discharge for homosexual acts not only results in separation from the service but brings about a loss of rights normally available to veterans. In addition, social and

FOR OFFICIAL USE ONLY

49

DoD LA 7-10  049719

FOR OFFICIAL USE ONLY

economic readjustment, for the convicted or administratively discharged homosexual (undesirable type), upon re-entry to civilian life is difficult.

Discharge under other than honorable conditions for homosexual behavior is a necessary measure to curb the individual who, to avoid military service, is willing to be classified as this type of offender.

It is apparent to the Board that deterrents in the form of possible trial by court-martial or administrative discharge will, to an undetermined degree, be effective upon those individuals who have not adopted homosexuality as a "way of life". The Board has found no substitute for this punitive action which would in any sense be considered of value as a deterrent.

Summary:

a. Punitive action in the form of court-martial or administrative discharge is a deterrent to a substantial degree for most individuals.

b. This punitive action, in non-forcible cases, is more severe than in civilian life.

c. There is no plausible substitute which would produce an equal degree of deterrence.

Recommendations:

a. That provisions be retained for separating personnel for homosexual behavior by court-martial or unfavorable administrative discharge.

b. That there be no relaxation in the broad concept that the service cannot tolerate homosexual behavior.

c. That punishment, though varying in degree dependent upon the circumstances attendant in each case, will be meted out in cases of homosexual behavior.

d. That the consequences of unfavorable discharges be more forcefully and frequently brought to the attention of all personnel.

14. Statistical Analysis.

Discussion:

In order to determine the magnitude of the homosexual problem and whether emphasis should be placed on any particular aspect, the Board requested the Chief of Naval Personnel and Commandant of the Marine Corps to provide the latest available statistics concerning homosexuals.

50

FOR OFFICIAL USE ONLY

DoD LA 7-10 049720

FOR OFFICIAL USE ONLY

The Board was fortunate in that the Chief of Naval Personnel made available a detailed preliminary study of all enlisted cases coming to Departmental attention subsequent to July 1956. Although the study is not sufficiently broad to draw conclusions, the results are considered of sufficient interest to attach as enclosure (3) hereto.

In general the Board found that little if any effort has been expended in assembling statistical information for use in an overall analysis of the problem. In the military field, the Board was able to obtain statistics showing the number of cases, disposition and incidence rate for various years in the Army, Navy and Air Force and the preliminary study of some 476 cases from the Chief of Naval Personnel, referred to above. In so far as could be determined, the Kinsey Report contains the only valuable statistical study in the civilian field.

The following observations drawn from these statistics are of general interest:

a.  Enlisted personnel.  The percentage of active duty strength separated on homosexual charges does not vary radically from year to year.  For 1955 the percentage of active duty strength separated was .1938 for the Navy, .132 for the Air Force, .0832 for the Army; and .16 for the Marine Corps.

b.  Officer personnel - Navy.  There is somewhat more variation in the percentage of officers on active duty separated from year to year than in the case of enlisted personnel.  However the overall percentage rate of separations has been constant for the last three years. In 1956, the percentage duty strength separated was .068 active duty, .011 inactive duty and .025 overall.

c.  The Chief of Naval Personnel's preliminary study of a small sample of enlisted homosexual cases reviewed indicate:

(1) The majority of cases are in the group 18 to 20 years of age.

(2) The majority of individuals are in the first enlistment.

(3) A slightly higher percentage are in mental group II.

(4) 67.9% occur in civilian settings, while only 32.1% occur on ship or station.

(5) The greatest frequency occurred in those completing high school, but not entering college.

(6) The highest incidence in the group is from hospital rates, journalists, and Waves.

(7) The highest frequency is among those from small towns.

51

FOR OFFICIAL USE ONLY

DoD LA 7-10  049721

FOR OFFICIAL USE ONLY

(8) Individuals having a disrupted family background may show slightly more tendency to sexual aberration.

(9) The majority have had both pre-service and in-service homosexual experiences.

The Military Departments are in an excellent position to provide essential data in this field and the Board so recommends. The Board requested representatives of the Chief, Bureau of Medicine and Surgery to review the preliminary study underway by the Chief of Naval Personnel to determine additional factors that should be covered to ensure the maximum future value from a psychiatric point of view. Some of these factors are reviewed in Section C, Item 5 above. Complete recommendations will not be available, however, prior to the submission of this report.

Summary:

a. Percentage-wise the number of cases of homosexual behavior coming to administrative notice is small.

b. There are probably many homosexuals in the service that are never discovered.

c. Presently available statistics on homosexual behavior are not satisfactory.

d. The Military Departments can make a large contribution toward understanding the problem of homosexuality if the proper statistics are kept.

Recommendations:

a. That the Chief of Naval Personnel in coordination with the Chief of the Bureau of Medicine and Surgery continue the development of a statistical basis for study of the problem of homosexuality. The factors decided upon should be susceptible to IBM card reporting if practicable.

b. That when completed, a trial run be conducted to determine practicability.

c. That if the foregoing test sample is determined to be practicable, the collection and analysis of data be continued on a permanent basis.

d. That the Army and Air Force be advised in the premises and invited to participate in order to assemble a body of statistical data for future study.

52                    FOR OFFICIAL USE ONLY

DoD LA 7-10 049722

FOR OFFICIAL USE ONLY

15. Policies in other Government Agencies

   a. Civil Service Commission Policy

      Between 85-90% of all federal civilain employees are covered by Civil Service Regulations. For many years these regulations have listed "immoral, indecent or notoriously disgraceful conduct" (or similar general phraseology) as grounds for rejection for, or separation from, federal employment. Since 1950, homosexuality has been specifically listed as an "unsuitability" factor, barring employment.

      It is important to distinguish "suitability" standards which the Civil Service Commission attempts to enforce, and "security" standards which are enforced normally by the various hiring agencies under entirely different criteria. Aside from its investigative function, the Civil Service Commission makes suitability decisions for nearly all non-sensitive positions. Decisions involving sensitive positions are made by the hiring agency.

      Separations for unsuitability are ordinarily made under standard Civil Service procedures, NCPI 45 and 210 controlling. Nearly all cases of homosexuality or homosexual conduct are so handled. Rarely is a case involving homosexuality disposed of under NCPI 29, the Civil Service regulation concerning security.

      The vast majority of all federal agencies are covered by Civil Service Commission rules, including the Department of Defense. However, there are some notable exceptions, such as certain professional and policy-making employees in nearly every agency, and all, or nearly all, employees in certain intelligence or classified defense agencies. These excepted individuals and agencies are covered, however, by parallel regulations of their own, which in some instances are probably more strict than Civil Service "suitability" standards.

      About 2% of all Civil Service investigations result in rejection or separation for suitability reasons. There are no set figures on the number or percentage of these in which homosexuality or homosexual conduct was a factor; however, it is believed to be small. Several different suitability criteria could be involved, so it is difficult to make an accurate estimate.

      The Civil Service Commission judges each case involving allegations of homosexual conduct on an individual basis, realizing that one act does not necessarily indicate homosexuality. Thus it is possible for a one-time offender to be cleared for employment, suitability-wise. It is also possible for such a person to be rejected by a hiring agency for security reasons.

      The Civil Service Commission must make a determination of suitability within eighteen months after beginning of employment, or

53

FOR OFFICIAL USE ONLY

DoD LA 7-10  049723

FOR OFFICIAL USE ONLY

release jurisdiction to the hiring agency.  After eighteen months, full Civil Service procedures must be utilized in proceeding against an employee.

Little incidence of homosexuality comes to light among female employees.

The Civil Service Commission accepts job applications from individuals discharged from the service with other than honorable, and with dishonorable, discharges, provided at least a year has elapsed since discharge, (exception for treason, desertion in face of enemy, loss of citizenship type of case).  No figures available as to how many such dischargees have applied, or been accepted from application, but each case is considered on an individual basis, conduct since discharge being evaluated as well as conduct provoking the discharge.

Persons discharged by the Civil Service Commission are not permanently barred from further federal employment.  It is rather difficult for a homosexual to show rehabilitation, however.

    b.  Red Cross Policy.

As a matter of interest, the Board has been informed by the Security Division of the American Red Cross that individuals involved in homosexual conduct are summarily dismissed, no attempt being made to distinguish between habituals, one-time offenders, or mere tendency cases.

    c.  Veterans Administration Policy.

With respect to the according of certain rights and benefits to veterans, the Administration pursues the following policy:

(1) If the discharge is honorable or under honorable conditions, full rights are provided.

(2) If the discharge is undesirable or punitive, due to homosexual acts, it is usually considered to be a dishonorable and the holder is barred from any rights or privileges.

This policy is enforced rigidly.  19 Federal Register 6918 specifically provides that an undesirable discharge, whether or not to escape trial by general court-martial, will generally be considered to be dishonorable and a bar to benefits under the Servicemen's Readjustment Act, as amended.

    d.  U. S. Coast Guard

Within the Treasury Department, uniformed personnel of the Coast Guard are governed by a directive concerning homosexuality which,

54

FOR OFFICIAL USE ONLY

DoD LA 7-10  049724

FOR OFFICIAL USE ONLY

to a large extent, is a copy of the Navy Department Instruction on the same subject.

16. **Attitude and policies toward homosexuals representative of society at large.**

Discussion:

It is the belief of Board members based upon their own experience and the testimony presented to the Board during this inquiry, that present day society generally finds homosexual behavior unacceptable and individuals, who by their actions have become classified in their communities as homosexuals are persona non grata.

There is clear evidence that certain segments of society, such as the medical and legal professions, have been attempting to present deviate sexual intercourse as matter less serious in its criminal aspects than present statutory prohibitions portray them. The American Law Institute, in presenting for consideration by the various legislatures the "Model Penal Code" deals with all types of sexual offenses and has taken a more moderate approach both toward the offenses and the punishments to be awarded.

In varying degrees deviate sexuality has been regarded with intense aversion in nearly all times and civilizations, and subject to condemnation by religious interdict or severe secular punishment. Proposals to exclude from the criminal law all sexual practices not involving force, adult corruption of minors or public offense are based upon various grounds: No harm to the secular interest of the community is involved in atypical sex practice in private between consenting adult partners; this area of private morals is the distinctive concern of spiritual authorities and has been so recognized in a recent report by a group of Anglican clergy; as in the case of illicit heterosexual relations, existing law is substantially unenforced and the practicalities of police administration must be considered; existence of the criminal threat probably deters some people from seeking psychiatric or other assistance for these emotional problems.

In society at large this new approach toward sodomy and related offenses may well be necessary. However, the Board members, believing basically in a more enlightened approach to the problem of homosexual behavior, continue to recognize the necessity within the naval service to adhere to the policy of general non-acceptance of the homosexual offender as a member of its organization. Moreover, that punitive deterrents, though they may be less severe than heretofore, must be applied for the protection of the morale and integrity of the service as a whole.

Summary:

a. Homosexual behavior today is not to any measurable degree more acceptable to society at large than heretofore.

b. Certain segments of society (medical and legal) are attempting to formulate a less severe attitude in certain areas.

FOR OFFICIAL USE ONLY

DoD LA 7-10  049725

FOR OFFICIAL USE ONLY

  c.  The naval service should maintain a policy of non-acceptability of homosexual behavior.

  Recommendations:

  a.  Maintain in great part the present service approach to the problem of homosexual behavior.

  b.  Be alert to keep abreast of any widely accepted changes in the attitude of society at large toward the overall problem.

  c.  The service should not move ahead of civilian society nor attempt to set substantially different standards in attitude toward or action with respect to homosexual offenders.

  17.  Post-Service Adjustment.

  Discussion:

  The Director of Naval Intelligence was provided the identity of 37 individuals, selected as a statistically valid sample, who were discharged from the naval service during the late fall of 1955 under the provisions of SECNAV Instruction 1620.1 by reason of homosexual activity, with a request that appropriate discreet inquiries be made to determine each individual's post-service adjustment, on the points summarized hereinafter.  Thirty-six reports have been received, of which one is incomplete.  Analysis of these reports show the following:

  a.  Content of Sample.  The sample includes 2 CPO's, 3 PO1's, 1 PO2, 4 PO3's, 13 SN's and FN's, 12 SA's, FA's and AA's, and 1 Recruit.  The above includes one Wave SA.  One report is incomplete and one individual has disappeared.

  b.  Marital Status.  Nine (26%) were or have, since discharge, been married.  One of these has been divorced.  Five (14%) have one or more children.  The Wave is recently married.  Twenty-four (68%) are known to be single, although three or four of these are dating with prospects of marriage.

  c.  Domicile.  Those married are presumed to be maintaining a home.  Of twenty-four single men whose whereabouts is known, nine (37%) live with parents, five (21%) live with a parent, three live with relatives, two alone, and on five, there is no information.

  d.  Employment.  Of thirty-two on whom positive information was available, only two, both recently married young apprentices, one with one child, were reported unemployed.  The remaining thirty have been continuously, and in some cases, very adequately employed or occupied since discharge as follows:

56

FOR OFFICIAL USE ONLY

DoD LA 7-10  049726

FOR OFFICIAL USE ONLY

| | | | |
|---|---|---|---|
| Fathers Business............. | 2 | Guard (Burns Det. Agency)....... | 1 |
| Store Clerk.................. | 5 | Hospital Lab. Technician........ | 1 |
| Office Worker ............... | 3 | Technicians (Electrial and | |
| Student (Technical).......... | 1 | Electronic)........ | 2 |
| Industrial Worker........... | 4 | Ass't Funeral Director.......... | 1 |
| Truck Driver................. | 1 | Misc. (Waiter,Lifeguard,etc.)... | 3 |
| Route Salesman(Milk,Bakery).. | 2 | * Unemployed.................... | 2 |
| Laborer...................... | 4 | Unknown......................... | 4 |
| | | TOTAL........ | 36 |

*Both married.

     e.  Discreet inquiries of neighbors and employers elicited the
following concerning the current civilian reputation of the individual:

    (1) <u>Civilian Reputation.</u>

        General (credit, police, community) -

| | |
|---|---|
| Excellent................ | 1 |
| Very good................ | *6 |
| Good..................... | 16 |
| No derogatory info....... | 2 |
| Fair..................... | **4 |
| Poor..................... | 2 |
| Bad...................... | 1 |
| Terrible (sic)........... | 1 |
| Unknown.................. | 3 |
| TOTAL.......... | 36 |

    *  Includes one evaluated prior to man's arrest on
1/27/57 for sexually molesting a 15 year old boy.

    ** Includes two with juvenile and minor traffic viola-
tion records.

    (2) <u>Community Opinion on Cause of Discharge.</u>

| | |
|---|---|
| Honorable.................. | 3 |
| Medical, UHC.............. | 4 |
| Under honorable conditions. | 17 |
| Questionable discharge..... | 2 |
| Bad discharge............. | 1 |
| Unknown/no opinion......... | 9 |
| TOTAL.......... | 36 |

    (3) <u>Apparent Sexual Orientation, by Community Report.</u>

| | |
|---|---|
| Judged queer/odd........... | 3 |
| Judged positively normal... | 9 |
| No Opinion................. | 24 |
| TOTAL.......... | 36 |

57

FOR OFFICIAL USE ONLY

DoD LA 7-10  049727

FOR OFFICIAL USE ONLY

(4) Apparent homosexual orientation at time of undesirable discharge:

Unknown/uncertain............................ 9
Homosexual (admitted, long suspected,
    apparent from act).....................*18
Passive partner (1-2 known acts)............. 6
Homosexual beginner (admitted tendency,
    claimed limited experience).............** 3
                    TOTAL............. 36

  \*    Includes one UD striker, very successful civil adjustment.

  \*\*  Includes two senior petty officers.

    Summary:

        It is evident from the data contained herein that the fact of undesirable discharge under the provisions of SECNAV Instruction 1620.1 has had relatively little adverse effect on the post-service adjustment of these individuals. Of cases analyzed, at least 83% are regularly employed in civilian situations which compare favorably with the in-service status. 60% enjoy a general reputation in the community and as credit risks of good or better while nothing positively bad is known about another 16%. In fact, only 11% were characterized as having a poor or bad reputation. The community believed that 24 or 67% had been discharged honorably or under honorable conditions for some respectable reason and ventured no opinion on another 9 or 25%. Only 3 were considered to have gotten a bad discharge, of which 2 were presumed for homosexuality. One additional dischargee committed a homosexual offense while the survey was in progress. Study of the available records on the individual's homosexual orientation at the time of discharge indicates that at least half of those discharged were clearly admitted or long suspected and evident homosexuals in the accepted sense of the term. It is evident that in the absence of flagrant homosexual habits and attitudes, the civil community has little knowledge of or interest in sexual orientation of its members. The character of or reason for discharge from the naval service is a matter of little concern to employers in many lines of enterprise, even where the position involves some trust and responsibility.

D.  SECNAV Instruction 1620.1

    1.  Differences in policies and procedures between Army, Navy and Air Force Directives

        Policies and procedures with respect to homosexuals and homosexual acts within the three military departments are controlled, in general, by Department of Defense Memorandum of 11 October 1949. Hence

58

FOR OFFICIAL USE ONLY

DoD LA 7-10  049728

FOR OFFICIAL USE ONLY

variations in policy and procedure within the three departments are comparatively minor, and arise primarily in areas in which the Department of Defense directive is broadly phrased or silent. Such variations as are considered to be significant for the purpose of this study are outlined below.

a. General Policy Statements. Prompt separation of true, confirmed homosexuals is mandatory in each service. The Army directive provides, however, that "Individuals who cannot be regarded as true and confirmed homosexuals, but who have been involved in a single act as a result of immaturity, curiosity, or intoxication, when the psychiatric evaluation concludes that they are not confirmed homosexuals and do not possess strong homosexual tendencies, should normally be retained in the service." The Air Force directive provides that exceptions to permit retention in the service are proper only "when the offense was committed, proposed, or attempted under the most unusual extenuating circumstances, when it is determined that the member does not have homosexual tendencies, and when the member's ability to perform military service has not been compromised. Intoxication of itself is not considered an extenuating circumstance; this is particularly true when more than one act, proposal, or attempt is involved." The Navy directive makes no such distinction as quoted above in its statement of policy, and the Navy Instruction further provides that psychiatric opinion that a homosexual offender is not a "true homosexual" is immaterial.

b. Class I Definitions. No differences, except that the Army directive provides that a child is deemed to be a person under 16.

c. Class II Definitions. No basic differences, although the phraseology varies.

d. Class III Definitions. The differences in wording here are considerable. Air Force includes one who "habitually associates with individuals known to him to be homosexuals." Air Force further provides that pre-service acts will be considered in determining whether the member has homosexual tendencies or habitually associates with persons known to him to be homosexuals. Air Force also provides that when doubt exists as to whether Class II or Class III is the appropriate label, Class II will be used. Army provides that those who "merely profess" the tendency will normally be retained in service. There may be other differences in fact, not clearly revealed by the definitions in the various directives, which can be brought to light only by careful analysis of language used in other portions of the three directives, particularly the "disposition" paragraphs. Differences in language used is so great that differences in practice are probable.

e. Disposition of Class I Cases. Navy directives provide simply for mandatory trial by general court-martial. Army and Air Force except cases involving "major mental disorders", cases wherein successful prosecution is not deemed feasible, and those wherein (Air Force only) trial is not in the best interest of the service. These exceptions are then treated as Class II cases.

59

FOR OFFICIAL USE ONLY

DoD LA 7-10  049729

FOR OFFICIAL USE ONLY

f.  Disposition of Class II Cases.  Each service prescribes trial by general court-martial as an alternative to discharge under other than honorable conditions.  Officers are permitted to resign for the good of the service and to escape trial by court-martial in the Navy and Army; Air Force resignations are apparently tendered merely for the good of the service.  Army provides for board action if trial is not feasible.  So does Air Force.  In unusual cases, such board referrals might result in a type of discharge higher than undesirable.

g.  Disposition of Class III Cases.  Treatment of this category varies all the way from retention to separation under other than honorable conditions, dependent upon a wide variety of circumstances, and condensed analysis is not feasible.  The Navy directive is silent as to retention.

h.  Contents of Reports.  Substantially the same in each department, except that Air Force and Army require a statement that the individual has or has not availed himself of counsel.  Army lists various items to be included in psychiatric study.  Army requires also a waiver of board action statement when applicable, in reserve cases.

i.  Level of Final Action.  In Navy, final action is taken on the Departmental level.  In Army, final action is taken by the major commander for enlisted cases; officer cases are finally decided in the Department.  In Air Force, final action may be taken by "major air commanders," who have power to delegate final action to officers exercising general court-martial jurisdiction.

j.  Board Composition.  All require female and reserve representation in appropriate cases.  Air Force specifies "mature" officers, preferably field grade.

k.  Board Requirements.  Army and Air Force reservists may waive board action in certain cases.

l.  Notification to Respondent.  Air Force provides a copy of regulations and a detailed letter of notification to persons about to be processed.

m.  Representation before Board.  Army and Air Force provide counsel, which may be waived.

2.  Deficiencies in subject Instruction.  In general the testimony, and study of the problem, supports the following deficiencies in the current policy and procedures with respect to handling homosexuals:

a.  The classification is awkward and leads to confusion.  This is especially true in the case of the Class III definitions.  Without exception all the military witnesses recommended that consideration be given to eliminating this class from the directive.  This confusion has been evident in medical as well as personnel administrative channels.

FOR OFFICIAL USE ONLY

DoD LA 7-10  049730

FOR OFFICIAL USE ONLY

It is believed, however, that while a classification is necessary for purposes of personnel administration, it is meaningless and should be ignored for medical aspects of the problem.

b. The present directive is too rigid and inflexible. The disposition of personnel alleged to be homosexual or to have engaged in homosexual acts is rigid once they have been classified. Although the directive provides for study and disposition on an individual case basis, the results of implementation show an interpretation that little discretion is allowed in the final action.

c. The current directive places a negative emphasis on clinical evaluation of the individual and seeks in the main determinations, necessary in legal cases, of knowing right from wrong and ability to follow the right. Similarly the term psychosis in the current directive has been used in its legal sense, wherein originally it was intended to be interpreted in the medical sense. Testimony shows that some attention should be paid to the psycho-neurotic aspects of the case as well as the psychotic aspects.

d. There is inadequate emphasis in the current directive upon submission and review of the considered evaluation and recommendations of the commanding officer in the case. It is believed that the commanding officer, having closely observed the individual, is in the best position to evaluate future usefulness and effect on the service and command by possible retention.

e. The present directive fails to differentiate between the true homosexual and the individual who, although he has committed an isolated act, is in fact non-homosexual and can still provide useful service to the Navy.

f. There is no provision for medical review at the Departmental level.

Recommendation:

a. That deficiencies noted above be eliminated by revisions in the present directive, as accomplished in the proposed revised directive attached hereto as enclosure (4).

E. Analyses of Navy Discharge Review Board and Board for Correction of Naval Records Instructions.

1. Current instructions.

The Navy Discharge Review Board and the Board for Correction of Naval Records have no specific instructions relative to the review of cases of persons who were separated or discharged from the naval service because of homosexual activity. Administrative regulations and procedures governing the Navy Discharge Review Board provide, in

FOR OFFICIAL USE ONLY

DoD LA 7-10  049731

FOR OFFICIAL USE ONLY

pertinent part: "In order to warrant a change, correction, or modification of the original document evidencing separation from the naval service, it is incumbent on the petitioner to show to the satisfaction of the Board, or it must otherwise satisfactorily appear, that the original document was improper or inequitably issued under standards of naval law and discipline existing at the time of such original separation, or under such standards differing therefrom in the petitioner's favor which subsequent to his separation were made expressly retroactive to separation of the type and character had by the petitioner. The standards of naval law and discipline herein contemplated are those standards stated in statutes, regulations, bureau manuals, directives of the Department of the Navy, and other appropriate authority, together with interpretations thereof by the courts, the Attorney General, and the Judge Advocate General of the Navy." Additionally, the regulations provide that should the Discharge Review Board find in a particular case that there exist unusual circumstances which would require a retroactive application of revised discharge standards or a specific waiver of an applicable regulation in order to permit a change, correction, or modification essential to the achievement of a just and equitable result, the board may set forth the circumstances and incorporate in its decision a recommendation that the Secretary of the Navy authorize the retroactive application of revised discharge standards or of the specific waiver of the applicable regulation in question. Apart from the foregoing regulation, and the general guidance received from prior board decisions which have been approved by the Secretary of the Navy, the Discharge Review Board has no other guidance.

The regulations of the Board for Correction of Naval Records, as approved by the Secretary of Defense, provide that the function of the Board is to consider all applications properly before it for the purpose of determining the existence of an error or an injustice and to make appropriate recommendations to the Secretary of the Navy. The basic law which provided for the establishment of correction boards authorized the correction of any military or naval record where such action is necessary to correct an error or injustice, but no precise definition of error and injustice was made. In practice, determinations as to the existence or non-existence of error or injustice are based on the applicable law, regulations and policy existent at the time the alleged error or injustice occurred. The Board for Correction of Naval Records under date of 11 August 1954 received some Secretarial guidance as to the review of cases involving a punitive discharge issued pursuant to a sentence of a court-martial, but no guidance has been given relative to the review of cases involving administrative discharges. In all probability, guidance was not considered necessary as the Board for Correction of Naval Records reviews the circumstances attending the issuance of an administrative discharge only after the case has been reviewed and denied by the Discharge Review Board. Cases of persons administratively separated from the naval service because of homosexual activity comprise only a very small percentage of the cases reviewed by the Correction Board. In its review of such cases, the Correction Board has some guidance from prior board decisions which have been approved by the Secretary of the Navy.

FOR OFFICIAL USE ONLY

DoD LA 7-10  049732

FOR OFFICIAL USE ONLY

2.  Recommended additional guidance.

In connection with its study of the instructions of the Navy Discharge Review Board and the Board for Correction of Naval Records, this Board carefully reviewed the report of 8 August 1956 of the special board convened to prepare and submit to the Secretary of the Navy proposed revised regulations and procedures for the Navy Discharge Review Board.  The findings and recommendations contained in that report relative to the review of cases of persons discharged or separated from the naval service by reason of homosexual tendencies or behavior, in general are concurred in, but with modifications as will be noted below.

Inasmuch as the vast majority of cases reviewed by the Discharge Review Board and the Correction Board concern persons who were separated or discharged during or subsequent to World War II, the members and staffs of the Boards should be thoroughly familiar with the historical development of administrative procedures for the disposition of cases involving homosexuality from the pre-1940 period to the present time. In addition to determining the applicable law, regulation and policy that existed at the time the case in question was processed, and whether or not they were properly applied, each case should be decided on its individual merits.

With specific reference to cases of persons discharged pursuant to the provisions of the Secretarial letter of 1 January 1943, the Discharge Review and Correction Boards should first determine:  Not "Was this the habitual behavior of the individual concerned?", but "Was the behavior of the individual representative of the habitual performance of persons actually homosexual in their inclinations?" If the homosexual behavior did not fall into the pattern of performance of persons actually homosexual, consideration should be given to the propriety of having handled the case under the directive.  Additionally, in connection with the review of all cases of persons discharged or separated from the naval service because of homosexual behavior, this Board recommends that the Discharge Review and Correction Boards consider the following:

a.  Is there available to the Board a contemporaneous medical or psychiatric evaluation pertinent to the homosexuality?  Has a technical interpretation been provided to the Board?

b.  Was the homosexual behavior a manifestation of illness?

c.  Was this behavior that of an immature adolescent?

d.  When did the homosexual behavior take place with reference to date of entry into the service?

e.  How serious an offense was committed?  What was the impact of the offense upon other individuals or the naval service as a whole?

63

FOR OFFICIAL USE ONLY

DoD LA 7-10  049733

FOR OFFICIAL USE ONLY

f. Has a credible showing been made of fraud, deception, or coercion in the proceedings which led to discharge?

g. What has been the impact of the adverse discharge on the individual subsequent to his leaving the service?

h. What would be the impact on naval discipline and administration of improving the type or character of the discharge in this and other similar cases?

The answers to these questions should provide the Discharge Review and Correction Boards with a general guide toward a fair decision in any case involving homosexuality. An approach of this sort, on an individual-case basis, is in complete accord with the following statement of policy which was contained in the earlier directives and is clearly implied in the proposed directive:

"Each case needs careful, thorough, and individual study so that final treatment, action, or disposition will be in accordance with the latest accepted medical, sociological, and legal ideas, according to the particular category into which it falls."

F. Summary of Recommendations:

1. General Recommendations:

a. With respect to the "one-time offender":

(1) A psychiatric evaluation should be mandatory in all active duty cases.

(2) A commanding officer's evaluation should be mandatory in all active duty cases.

(3) Class I offenders should continue normally to be tried by general court-martial.

(4) Non-Class I offenders should be grouped generally as to whether they are, or are not, true, confirmed "way of life" homosexuals.

(a) Confirmed homosexuals should be separated in all cases.

(b) Disposition of others to be based on overall evaluations by boards of officers.

(5) The type of discharge should not be inflexibly prescribed but should be based on findings and opinions of boards of officers.

b. With respect to voluntary confessions:

64

FOR OFFICIAL USE ONLY

DoD LA 7-10  049734

FOR OFFICIAL USE ONLY

(1) To encourage voluntary confessions, a person voluntarily confessing a non-repetitive isolated act under ameliorative circumstances should be:

(a) Considered for retention if psychiatric evaluation does not indicate homosexual tendencies.

(b) Separated if homosexual tendencies are present, but with the type of discharge warranted by his service record.

(2) The above policy not to apply to Class I persons.

(3) To encourage personnel to confess to homosexual tendencies, provide that if confirmed by psychiatric evaluation, and there is no evidence to indicate an attempt to evade military service, they will normally be separated with a type of discharge of no lower character than unsuitable. However, one who is determined to have been a confirmed homosexual at the time he entered the service, having knowingly failed to disclose such fact, may be discharged with an undesirable discharge.

(4) That no explicit statement or implication be made in published directives whether or not any obligation exists on the part of medical officers to make an official report concerning homosexual matters disclosed to him in confidence by a patient under treatment. Thus the present practice, whereby it is left to the sound professional judgment of the medical officer, is tacitly recognized and accepted.

c. With respect to type of discharge:

(1) That no particular type of administrative discharge be made mandatory for any particular type of homosexual or homosexual behavior.

(2) That the type of discharge should be based on the findings and opinion of a board of officers, arrived at after consideration of the service person's overall record, as well as the circumstances of the individual case.

d. With respect to treatment of so-called Class III Offender:

(1) That Class III as now defined be abolished.

(2) That individuals formerly included in Class III be processed as a(4) above.

e. With respect to clinical evaluations:

(1) That a detailed and comprehensive psychiatric examination be reported in each active duty case.

65

FOR OFFICIAL USE ONLY

DoD LA 7-10  049735

FOR OFFICIAL USE ONLY

(4) That all examinations be conducted by medical officers trained in the specialty of psychiatry.

(5) That all reports of clinical evaluations be reviewed by the Chief of the Bureau of Medicine and Surgery before the case is acted upon by a disposition board.  Procedures should provide for expeditious processing.

(6) That the psychiatric evaluation be given equal weight with administrative factors in determining disposition of cases involving homosexuality.

f.  With respect to review procedures:

(1) Continue the present Departmental review procedures with the additional of review of the clinical evaluation and recommendations by the Chief of the Bureau of Medicine and Surgery.

(2) Furnish for the guidance of disposition boards in the Bureau of Naval Personnel and Headquarters, Marine Corps copies of the report of this Board.

g.  With respect to responsibility to the civilian community:

(1) That the Chief of Naval Personnel and the Commandant of the Marine Corps shall, only in cases wherein the homosexual has been determined to be a public menace or the offense for which he was separated involved children, report the case to the Federal Bureau of Investigation through normal channels for such action as may be necessary in the public interest.

h.  With respect to screening of applicants for enlistment and appointment:

(1) That no basic changes be made in screening procedures at the recruiting or training station levels; however, the present procedures should be carefully followed.

(2) That a psychiatric examination be instituted as part of the initial physical examination for regular NROTC midshipmen and for contract NROTC students prior to entering the senior division.

(3) That consideration be given to establishing a limited number of pay status billets in organized reserve units for psychiatrists and clinical psychologists as part of the Naval Reserve Program.  This would permit the elimination of some of the homosexual individuals who are separated at present only after they have been ordered to active duty.

(4) Enlisted reserve personnel, not immediately ordered to extended active duty, be screened psychiatrically during the normal two weeks active duty for training period.

FOR OFFICIAL USE ONLY

67

DoD LA 7-10  049737

FOR OFFICIAL USE ONLY

(5) Additional billets be established for two psychiatrists and one clinical psychologist at the Naval Station, Newport, Rhode Island, to permit the inauguration of a formal program for screening reserve officers entering the service through the OCS Program.

i.  With respect to treatment of women:

(1) That no attempt be made to differentiate between men and women in the Instruction with respect to procedures or disposition for homosexual activity.

(2) That careful review be made of all allegations concerning homosexual activity of female members of the service to ensure that a pattern representative of homosexual conduct is present, as distinguished from normal socially accepted behavior.

j.  With respect to indoctrination and education of recruits on homosexuality:

(1) That the present educational program continue as the responsibility of a committee appointed by the Chief of Naval Personnel.

(2) That an effort be made to determine the effectiveness of the present educational program preliminary to instituting any change therein.

k.  With respect to security implications of the homosexual:

(1) A statistical study be initiated by the Director of Naval Intelligence in coordination with the Chief of Naval Personnel and Commandant of the Marine Corps to develop factual data on the incidence of security implications in homosexual cases as well as in categories involving other types of moral turpitude and criminal activity.  This study should be extended to other agencies of the government if practicable.

(2) That cases involving homosexuality continue to be handled on other than security grounds, where practicable.

l.  With respect to investigative procedures:

(1) That no changes be made in procedures or methods currently employed by the Director of Naval Intelligence in investigations of homosexual offenses.

(2) That the investigative services of the Director of Naval Intelligence continue to be requested in accordance with the responsibilities assigned by the Secretary of the Navy whenever the information in the case warrants:

(3) That the facts from the investigation be made available to the psychiatrist evaluating the individual.

68

FOR OFFICIAL USE ONLY

DoD LA 7-10  049738

FOR OFFICIAL USE ONLY

m.  With respect to deterrents:

(1) That provisions be retained for separating personnel for homosexual behavior by court-martial or unfavorable administrative discharge.

(2) That there be no relaxation in the broad concept that the service cannot tolerate homosexual behavior.

(3) That punishment, though varying in degree dependent upon the circumstances attendant in each case, will be meted out in cases of homosexual behavior.

(4) That the consequences of unfavorable discharges be more forcefully and frequently brought to the attention of all personnel.

n.  With respect to statistical analyses:

(1) That the Chief of Naval Personnel in coordination with the Chief of the Bureau of Medicine and Surgery continue the development of a statistical basis for study of the problem of homosexuality. Factors decided upon should be susceptible to IBM card reporting, if practicable.

(2) That when completed, a trial run be conducted to determine practicability.

(3) That if the foregoing test sample is determined to be practicable, the collection and analyses of data be continued on a permanent basis.

(4) That the Army and Air Force be advised in the premises and invited to participate in order to assemble a body of statistical data for future study.

o.  With respect to attitude and policies representative of society at large toward homosexuality:

(1) Maintain in great part the present service approach to the problem of homosexual behavior.

(2) Be alert to keep abreast of any widely accepted changes in the attitude of society at large toward the overall problem.

(3) The service should not move ahead of civilian society nor attempt to set substantially different standards in attitude toward or actions with respect to homosexual offenders.

2.  The recommendations under paragraph 1 above, as applicable, have been substantially incorporated in the proposed revised directive

FOR OFFICIAL USE ONLY

DoD LA 7-10  049739

R OFFICIAL USE ONLY

attached hereto as enclosure (4). It is recommended that the comments of interested Bureaus and offices be obtained to the end of issuing enclosure (4) to supersede the current directive, SECNAV Instruction 1620.1.

3. It is recommended that if the report of this Board is approved, copies thereof, with particular reference to Section E, be made available to the Navy Discharge Review Board and Board for Correction of Naval Records for guidance.

FOR OFFICIAL USE ONLY

70

DoD LA 7-10  049740

FOR OFFICIAL USE ONLY

The Board having concluded its deliberations, respectfully submits
herewith its opinions, findings and recommendations, this 15th day of
March 1957.

S. H. CRITTENDEN, JR.
Captain, U. S. Navy
Chairman

GEORGE N. RAINES
Captain, MC, USN
Member

GEORGE A. SULLIVAN
Captain, USN
Member

C. E. HINSDALE
LTCOL, USMC
Member

CHARLES E. CURLEY
Member

71

FOR OFFICIAL USE ONLY

DoD LA 7-10  049741

# Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment

### National Defense Research Institute

# RAND



DEFENDANT'S
EXHIBIT

tabbies®

8

The research described in this report was sponsored by the Office of the Secretary of Defense under RAND's National Defense Research Institute, a federally funded research and development center supported by the Office of the Secretary of Defense and the Joint Staff, Contract No. MDA903-90-C-0004.

ISBN: 0-8330-1441-2

RAND is a nonprofit institution that seeks to improve public policy through research and analysis. Publications of RAND do not necessarily reflect the opinions or policies of the sponsors of RAND research.

RAND
Copyright © 1993

Published 1993 by RAND
1700 Main Street, P.O. Box 2138, Santa Monica, CA 90407-2138
To obtain information about RAND studies or to order documents,
call Distribution Services, (310) 393-0411, extension 6686

# Sexual Orientation and U.S. Military Personnel Policy: Options and Assessment

## National Defense Research Institute

MR-323-OSD

Prepared for the
Office of the Secretary of Defense

# RAND

# SEXUAL ORIENTATION AND U.S. MILITARY PERSONNEL POLICY: OPTIONS AND ASSESSMENT

## A National Defense Research Institute Study

Bernard D. Rostker
Scott A. Harris
*Study Group Directors*

Susan Adler                                    Joyce Peterson

*Research Librarian*                      *Communications Analyst*

### RAND Research Staff by Task

| *Foreign Military* | *Domestic Police and Fire Departments* | *Military Opinion* |
|---|---|---|
| **James P. Kahan** | | **Sandra H. Berry** |
| Erik-Jan Frinking | **Paul Koegel** | Jennifer A. Hawes-Dawson |
| C. Neil Fulcher | Brent Boultinghouse | C. Neil Fulcher |
| Lawrence M. Hanser | Scott A. Harris | Lawrence M. Hanser |
| Scott A. Harris | Joanna Zorn Heilbrunn | Paul Koegel |
| Paul Koegel | James P. Kahan | James P. Kahan |
| Bernard D. Rostker | Janet Lever | Samantha Ravich |
| John D. Winkler | Robert MacCoun | Peter Tiemeyer |
| | Peter Tiemeyer | Gail L. Zellman |
| | John D. Winkler | |
| | Gail L. Zellman | |

| *History* | *Public Opinion* | *Unit Cohesion and Performance* |
|---|---|---|
| **Steven Schlossman** | **Peter Tiemeyer** | **Robert MacCoun** |
| Timothy Haggarty | Samantha Ravich | Andrew Cornell |
| Tanjam Jacobson | Brent Boultinghouse | John D. Winkler |
| Ancella Livers | | |
| Sherie Mershon | | |

| *Sexual Behavior and Health-Related Issues* | *Implementation* | *Legal Issues* |
|---|---|---|
| **Janet Lever** | **Gail L. Zellman** | Peter D. Jacobson |
| **Mark A. Schuster** | Joanna Zorn Heilbrunn | Stephen A. Saltzburg |
| David E. Kanouse | Conrad Schmidt | |
| Raynard Kington | Carl H. Builder | |
| Mark Litwin | | |

| *Facilities Review* | *Recruitment and Retention* | *Research Methodology* |
|---|---|---|
| **Roger Brown** | John D. Winkler | **Carl H. Builder** |
| William Fedorochko, Jr. | | **James A. Dewar** |
| Marilyn L. Fisher | | |
| John F. Peterson | | |

### Reviewers

| | | |
|---|---|---|
| **Susan Hosek** | Richard Darilek | Lorraine M. McDonnell |
| Tora K. Bikson | Glenn A. Gotz | Bruce R. Orvis |
| Chris Bowie | Bryan Hallmark | Elizabeth S. Rolph |
| Samuel Bozette | Deborah R. Hensler | Michael Traynor |
| David S. C. Chu | Douglas Longshore | Susan F. Turner |

Task leaders are designated in bold type face

- iii -

**PREFACE**

This report documents the results of a study that was undertaken by RAND's National Defense Research Institute (NDRI) at the request of Secretary of Defense Les Aspin.  A Presidential Memorandum directed Secretary Aspin to submit the draft of an Executive Order "ending discrimination on the basis of sexual orientation in the Armed Forces" by July 15, 1993 (Memorandum for the Secretary of Defense, *Ending Discrimination on the Basis of Sexual Orientation in the Armed Forces*, January 29, 1993).  The Secretary of Defense asked RAND to provide information and analysis that would be useful in helping formulate the Executive Order.

The research documented in this report was completed and provided to the Secretary of Defense prior to the decisions announced by the Secretary and the President on July 19, 1993.

This report consists of an Executive Summary and an Overview that present the study's findings.  It also contains chapters on specific subjects and shorter appendices that expand on points covered in the Overview.  The Overview synthesizes the research and functions as a "road map" pointing the reader toward these additional discussions.

This study was conducted within NDRI's Defense Manpower Research Center by a multidisciplinary team of researchers drawn from a number of research departments at RAND.  NDRI is a federally funded research and development center sponsored by the Office of the Secretary of Defense and the Joint Staff.

The views expressed in this report are those of the research team and do not necessarily reflect the opinions or policies of the sponsors.

- v -

## CONTENTS

Preface..................................................... iii

Figures..................................................... xi

Tables..................................................... xiii

Executive Summary........................................... xvii

Section

1.  SEXUAL ORIENTATION AND U.S. MILITARY PERSONNEL POLICY:  POLICY
    OPTIONS AND ASSESSMENT--STUDY OVERVIEW ........................... 1
      Introduction.................................................. 1
        Study Approach ............................................. 2
        The "Not Germane"/Conduct-Based Policy ..................... 2
      U.S. Military Policy on Homosexuality and Sodomy.............. 3
        Homosexuality and the Military, 1916 to 1940 ............... 3
        World War II:  1941 to 1946 ............................... 4
        The Cold War Era:  1946 to 1956 ........................... 6
        The Military and Homosexuality in the 1960s and 1970s ...... 6
        The Recent Past:  1981 to 1991 ............................ 8
        Military Law:  Homosexuality and Sodomy ................... 9
      Review of Analogous Institutions and Experiences............. 10
        The Experience of Foreign Militaries ...................... 11
        The Experience of Domestic Fire and Police Departments .... 15
        The History of Racial Integration in the United States
          Military ................................................ 20
      Current American Attitudes Toward Homosexuals Serving........ 22
        Attitudes in the General Population ....................... 23
        Attitudes in the Military ................................. 24
      Issues of Concern:  Violence and AIDS....................... 27
        Violence .................................................. 27
        HIV Transmission and AIDS ................................. 28
      Understanding Unit Cohesion................................. 28
      Implications of the Research................................ 31
      A Policy That Ends Discrimination Based on Sexual
        Orientation ............................................... 32
        Legal Issues Regarding a "Not Germane"/Conduct-Based
          Policy .................................................. 36
      Implementation of a Policy That Ends Discrimination on the
        Basis of Sexual Orientation ............................... 38

2.  SEXUAL ORIENTATION AND SEXUAL BEHAVIOR....................... 41
      Approach to the Literature.................................. 41
      Prevalence of Homosexuality:  General Population and the
        Military .................................................. 43
        Homosexual Behavior in the General Population ............. 44
        Homosexual Behavior Among Military Personnel .............. 49
      Relationship Between Status and Conduct..................... 50
        Homosexual Behavior Among Self-Identified Heterosexuals ... 51

- vi -

Virginity and Celibacy Among Self-Identified Homosexuals .... 54
Summary/Conclusion ..................................... 56
Prevalence of Proscribed Behaviors by Sexual Orientation....... 56
Oral Sex Among Heterosexuals and Homosexuals ........ 57
Anal Sex Among Homosexuals and Heterosexuals ............. 60
Conclusions .................................................. 63

3.  ANALOGOUS EXPERIENCE OF FOREIGN MILITARY SERVICES................ 65
Introduction................................................ 65
Countries Visited ...................................... 65
Approach .............................................. 66
Focus ................................................. 68
The National Context...................................... 69
National and Military Statistics ...................... 69
Societal Attitudes Towards Homosexuality ................. 71
Foreign Militaries and Homosexuality ..................... 73
Canada ................................................ 74
France ................................................ 80
Germany ............................................... 83
Israel ................................................ 85
The Netherlands ....................................... 90
Norway ................................................ 95
United Kingdom ........................................ 99
An International Comparison............................... 101
Military Policy and Practice Reflect Societal Norms ........ 102
Homosexuals Serve--But Quietly--In All Militaries
Visited ............................................. 103
Problems Are Dealt With on a Case-by-Case Basis ........... 103
Change Has Not Been Disruptive ........................... 104

4.  ANALOGOUS EXPERIENCE OF DOMESTIC POLICE AND FIRE DEPARTMENTS.... 106
Introduction............................................... 106
How Instructive Is the Analogy?........................... 107
Issues the Analogy Can Illuminate ......................... 108
Foci and Methods of the Study............................. 109
Cities Visited ........................................ 109
Focus of Visits ....................................... 110
Methods ............................................... 112
Context and Variation in Non-Discrimination Policies.......... 114
The Municipal Climate ................................. 115
The Internal Climate Within Police and Fire Departments .... 116
Varieties of Non-Discrimination Policies .................. 119
Consequences of a Non-Discrimination Policy............... 120
The Experiences and Responses of Homosexuals .............. 121
The Responses and Concerns of Heterosexuals ............... 133
The Impact of Policy Change on the Institution ............ 141
The Implementation Process................................ 143
The Nature of the Policy .............................. 144
The Appropriate Emphasis in Implementing Non-
Discrimination Policies ............................. 145
The Critical Role of Leadership ........................... 147
Unintended Consequences of Special Class Status ........... 150
Training .............................................. 152

- vii -

The Self-Regulating Nature of the Implementation Process ... 153
Implications for Implementing Policies of Non-Discrimination.. 154

5.  POTENTIAL INSIGHTS FROM ANALOGOUS SITUATIONS:  INTEGRATING
    BLACKS INTO THE U.S. MILITARY ................................. 158
    Introduction.................................................. 158
       Limitations of the Analogy of Women in the Military ........ 158
       The Analogy of Racial Integration ......................... 159
    Implementing Racial Integration in the U.S. Military.......... 161
    The Crucial Role of Leadership................................ 161
       The Importance of Civilian Leadership ..................... 162
       Strong Military Leadership in Tandem with Strong Civilian
          Leadership ............................................. 165
       Forces Restraining Integration ............................ 170
    Racial Integration, Unit Cohesion, and Military
          Effectiveness .......................................... 171
       Unit Cohesion:  Evidence from World War II and Korea ....... 173
       Racial Integration and Military Effectiveness ............. 178
       Racial Turmoil and Military Effectiveness in the Vietnam
          Era .................................................... 180
    Attitudes Versus Behaviors During the Process of
          Integration:  Maintaining Civility Without Overturning
          Prejudice .............................................. 183
       Public Opinion During the Transition to Integration:
          From Highly Unfavorable to Moderately Unfavorable ........ 183
       Attitudes Versus Behaviors ................................ 185
       Despite Success, Problems Beneath the Surface ............. 186
    Implications for Allowing Acknowledged Homosexuals to Serve
          in the Military ........................................ 188

6.  RELEVANT PUBLIC OPINION....................................... 191
    Introduction................................................. 191
    Approach .................................................... 191
    Overall Views About Homosexuality............................ 192
       Demographic and Social Differences in Attitude ............ 194
       How Attitudes Vary by Religion, Political Alignment, and
          Region ................................................. 195
       How Attitudes Vary by Perceived Nature of Homosexuality .... 197
    Attitudes Toward the Civil Rights of Homosexuals............. 198
       Beliefs About Job and Housing Rights ...................... 198
       Beliefs About Legal Sanctions and Legal Rights ............ 199
       Beliefs About "Familial" Rights ........................... 201
    Public Attitudes About Homosexuals Serving in the Military.... 201
    Attitudes of Young Adults Regarding Homosexuality and
          Military Service ....................................... 204
    General Conclusions on Public Opinion........................ 207

7.  RELEVANT MILITARY OPINION..................................... 209
    Introduction................................................. 209
    Los Angeles Times Survey..................................... 210
       Limitations ............................................... 211
       Findings .................................................. 211
    Moskos/Miller Army Surveys................................... 214
       Limitations ............................................... 215

LCR Appendix Page 0299

- viii -

Findings and Conclusions ................................... 216
Conclusions from Both Surveys.............................. 219
Focus Groups Conducted by RAND............................. 221
    Method ................................................ 221
    What the Participants Told Us ......................... 224
    Discussion of Homosexuals in the Military ............. 230
    Conclusions from the Focus Groups ..................... 239
    Conclusions About Military Opinion .................... 240

8.  ISSUES OF CONCERN:  EFFECT OF ALLOWING HOMOSEXUALS TO SERVE IN
    THE MILITARY ON THE PREVALENCE OF HIV/AIDS .................. 242
    The Epidemiology of HIV/AIDS.............................. 242
        HIV/AIDS in the U.S. Population ..................... 243
        HIV/AIDS in the Military Population ................. 244
    The Military's HIV/AIDS Policy........................... 248
        Who Is Tested? ..................................... 248
        Accuracy of HIV Testing ............................ 250
        Procedures for Military Personnel Who Test HIV-Positive .... 253
    If Homosexuals Were Allowed to Serve, Would HIV Infection
        Increase in the Military? .......................... 254
        Estimating Transmission Rates ...................... 255
        Risk Factors for HIV Exposure in the Civilian Population ... 256
        Sexual Risk Behaviors for HIV-Exposure Among Military
            Personnel ...................................... 263
    Infection from Contact with HIV-Infected Blood............ 268
    Conclusions.............................................. 271

9.  ISSUES OF CONCERN:  ANTI-HOMOSEXUAL VIOLENCE.................. 272
    Overview of Data......................................... 273
        Data Sources and Limitations ....................... 273
    Summary of Literature on the Incidence of Anti-Homosexual
        Violence ........................................... 274
        Anti-Homosexual Violence in the Military ........... 275
        Underreporting of Violence ......................... 276
        Personal and Environmental Correlates of Anti-Homosexual
            Violence ....................................... 277
        The Perpetrators of Anti-Homosexual Violence ....... 278
        The Consequences of Anti-Homosexual Violence for the
            Victims ........................................ 278
    Anti-Homosexual Violence and the Formulation of Policy
        Regarding Homosexuals in the Military .............. 279
    Anti-Homosexual Violence and the Implementation of a Policy
        Regarding Homosexuals in the Military .............. 280
        A Clear Message of Zero Tolerance from the Leadership ...... 280
        Tracking the Incidence of Anti-Homosexual Violence ......... 281
        Ensuring Adequate Treatment and Disposition of Victims of
            Anti-Homosexual Violence ....................... 281
    Conclusions.............................................. 282

10. WHAT IS KNOWN ABOUT UNIT COHESION AND MILITARY PERFORMANCE..... 283
    Overview................................................. 283
        Assumptions and Focus of the Chapter ............... 284
        The Literature Review .............................. 284
        Key Issues in the Review ........................... 286