# Appendix of Evidence in

# Support of Log Cabin Republican's

# Opposition to Defendants'

# Motion for Summary Judgment

# LCR Appendix Pages 301-400

# (Part 3 of 19)

- ix -

Unit Cohesion and Its Effects on Performance................... 287
    What Is Cohesion? ............................................ 287
    What Effect Does Cohesion Have on Unit Performance? ........ 292
    Effects of Cohesion on Psychological Coping ................ 297
    Other Determinants of Military Performance ................ 298
What Factors Influence Social and Task Cohesion?.............. 299
    Propinquity and Group Membership .......................... 299
    Turnover and Turbulence ................................... 300
    Leadership ................................................ 302
    Group Size ................................................ 303
    Success Experiences ....................................... 303
    Shared Threat ............................................. 304
    Similarity/Homogeneity .................................... 306
How Would Allowing Acknowledged Homosexuals to Serve Affect
    Cohesion and Performance? ................................. 307
    Will Many Units Have Acknowledged Homosexuals as
      Members? ................................................ 308
    How Might the Presence of Acknowledged Homosexuals
      Influence Cohesion? ..................................... 312
    Will Contact with Acknowledged Homosexuals Influence
      Attitudes? .............................................. 317
    Will Negative Attitudes Toward Homosexuality Be Expressed
      Behaviorally? ........................................... 322
    Will Heterosexuals Obey an Openly Homosexual Leader? ...... 327
Conclusions................................................... 329

11.  SEXUAL ORIENTATION AND THE MILITARY:   SOME LEGAL
    CONSIDERATIONS ............................................. 332
    Introduction .............................................. 332
    The "Not Germane" Option................................... 332
      The Standard of Professional Conduct .................... 334
    Legal Background........................................... 335
      Legal and Legislative Trends Regarding Homosexuals ...... 336
      The Current Military Policy Regarding Homosexuals ....... 338
    General Legal Principles .................................. 339
      Deference to the Military ............................... 339
      Equal Protection and the Military ....................... 340
      Responding to the Prejudices of Others .................. 343
      Homosexuals in the Military:   Current State of the Law ... 344
    Legal Considerations for the Standard of Professional
      Conduct ................................................. 346
      Implementing the Standard of Professional Conduct ....... 346
      Background .............................................. 347
      The Standard's Specificity .............................. 348
      Pre-Notification ........................................ 349
      Equal Protection ........................................ 350
      Unequal Enforcement ..................................... 351
      On-Base/Off-Base Conduct ................................ 352
    Legal Issues Regarding the UCMJ............................ 353
      Rescind Enclosure 3H of DoDD 1332.14 Without Modifying
        the MCM ............................................... 354
      Changing the MCM ........................................ 358
    Other Legal Issues........................................ 363

- x -

What Privacy Rights Can Heterosexuals Assert? .............. 363
Accession and Reinstatement Rights for Previously
    Excluded or Discharged Homosexuals ...................... 364
    Benefits ............................................... 364
Conclusions ................................................ 366

12.  IMPLEMENTING POLICY CHANGE IN LARGE ORGANIZATIONS ............. 368
Introduction ................................................ 368
Implementation Context ...................................... 369
    Military Culture ....................................... 369
    The Policy Context ..................................... 371
Factors That Constrain and Support Policy Implementation ...... 372
    Policy Design .......................................... 373
    Implementation Process ................................. 375
    Local Context for Change ............................... 378
Implementing a Policy to End Discrimination ................... 380
    Design a Policy That Facilitates Implementation ........... 380
    Ensure Leadership Support at All Levels ................... 385
    Strengthen the Local Context for Change .................. 388
Conclusions ................................................. 392

13.  POTENTIAL EFFECTS ON MILITARY RECRUITMENT AND RETENTION ........ 395
Background .................................................. 395
Research on Enlistment and Reenlistment ....................... 397
    Research Framework ..................................... 397
    Research Findings ...................................... 398
Possible Effects of Removing the Ban ......................... 399
    Enlistments ............................................ 399
    Reenlistments .......................................... 403
Policy Implications ......................................... 405


Appendix

A.  ILLUSTRATIVE STANDARD OF PROFESSIONAL CONDUCT .................. 409

B.  LIVING AND PRIVACY CONDITIONS IN THE MILITARY SERVICE .......... 411

C.  LEGAL PROVISIONS CONCERNING SODOMY ............................ 418

D.  ATTITUDES ABOUT HOMOSEXUALITY AND MILITARY SERVICE IN CANADA,
    THE UNITED KINGDOM, AND THE UNITED STATES ..................... 420

E.  RELEVANT CANADIAN REGULATIONS ................................. 423

F.  RELEVANT DATA FROM SURVEYS .................................... 436

G.  *LOS ANGELES TIMES* POLL ...................................... 451

H.  1992 SOCIOLOGICAL SURVEY OF THE ARMY .......................... 457

I.  STATE RESTRICTIONS ON SODOMY .................................. 463

Bibliography .................................................. 465

- xi -

**FIGURES**

8-1.   Window Period for HIV Testing ............................. 253
10-1.  Effects of External Threats on Social and Task Cohesion .... 305
10-2.  Alternate Models of Cohesion in 5-Person Unit .............. 315
10-3.  Attitude-Behavior Link Is Indirect ........................ 324
B-1.   Scope of On-Site Visits ................................... 411
B-2.   DoD Minimum Standards of Acceptable Space and Privacy ...... 413
B-3.   Scope of Shipboard Visits ................................. 415
B-4.   Military Life Cycle Model ................................. 416

- xiii -

## TABLES

1-1.  Numbers and Percentages of Open Homosexuals in Selected Police and Fire Departments................................... 17

2-1.  Estimates of Homosexual Behavior From U.S. Probability Studies................................................ 47

3-1.  Categories of People Interviewed, by Country................. 67

3-2.  Selected National and Military Statistics.................... 70

3-3.  Civilian Laws Regarding Homosexuality........................ 72

4-1.  Cities Visited.............................................. 111

4-2.  Selected Demographic Information About Cities Visited....... 111

4-3.  Sources of Information, by City............................. 114

4-4.  Numbers and Percentages of Open Homosexuals in the Police and Fire Departments of Six Cities.......................... 123

6-1.  "Do you agree or disagree with the following statement: 'Homosexuality is incompatible with military service.'"..... 203

6-2.  "In order to deal with the issue of gays in the military, some people have proposed a plan called 'Don't Ask, Don't Tell.'  According to that plan, the military would no longer ask personnel whether or not they are homosexual. But if personnel reveal that they are homosexual, they would be discharged from the military.  Is that a plan you would support or oppose?".................................. 203

7-1.  Military Reenlistment Intentions With and Without Ban on Homosexuals................................................ 214

7-2.  Percentage Distributions for Agreement or Disagreement with Proposal That Homosexuals Be Allowed to Enter and Remain in the Military...................................... 216

7-3.  Proportion of Males and Females Preferring Each Type of Fellow Soldier............................................. 219

7-4.  Proportion of Males and Females Indicating They Strongly Agree or Agree with Each Statement......................... 220

8-1.  U.S. AIDS Diagnoses Reported During the Year Ending March 31, 1993................................................... 245

8-2.  HIV Positive Tests Among Active-Duty Personnel............. 245

8-3.  Rates of HIV Positivity Among People Who Had a Prior Negative Test, Army........................................ 246

8-4.  Department of Defense's HIV Testing Policy................. 249

8-5.  HIV-Positive Rate Among Civilian Applicants............... 249

- xiv -

8-6.   Number of Recent Sex Partners, Homosexual/Bisexual Men and the General Population, Los Angeles County, 1989-90........ 257

8-7.   Mean Frequencies of Vaginal Intercourse Among Heterosexuals and of Anal Intercourse Among Homosexual and Bisexual Men in Los Angeles County, 1989-90 by Type of Partner and Condom Use..................................... 261

10-1.  Estimated Prevalence of Acknowledged Homosexuals in Domestic Paramilitary Institutions Visited by RAND.......... 310

13-1.  Active Force Enlisted Accessions and the Prime Recruiting Market.................................................. 402

13-2.  Estimated Reenlistments by Reenlistment Intentions.......... 404

D-1.   Canadian, U.S., and British Support of Gay Rights in the Early 1980's............................................. 421

D-2.   "In your opinion, should homosexuals be allowed to adopt children or not?"...................................... 421

D-3.   Canada:  "Do you think homosexuals should or should not be employed in the following occupations..."

       U.S.:  "Do you think homosexuals should or should not be hired for each of the following occupations..."............ 422

D-4.   "Do you think that ... should be allowed to serve in the Canadian military or not?".............................. 422

F-1.   Description of the Various Surveys Cited in This Study...... 436

F-2.   "What about sexual relations between two adults of the same sex--do you think it is always wrong, almost always wrong, wrong only sometimes, or not wrong at all?".......... 438

F-3.   "Do you personally think that homosexual relationships between consenting adults is morally wrong, or is not a moral issue?"...................................... 438

F-4.   "Do you feel that homosexuality should be considered an acceptable alternative lifestyle, or not?"................. 438

F-5.   "What about sexual relations between two adults of the same sex--do you think it is always wrong, almost always wrong, wrong only sometimes, or not wrong at all?".......... 439

F-6.   "Do you feel that homosexuality should be considered an acceptable alternative lifestyle or not?" ................. 440

F-7.   "Would you say you agree a lot, agree a little, disagree a little, or disagree a lot... I could be friends with a gay person."................................................. 441

F-8.   "Do you think being homosexual is something people choose to be, or do you think it is something they cannot change?"................................................. 441

F-9.   "In general, do you think homosexuals should or should not have equal rights in terms of job opportunities?" .......... 442

- xv -

F-10.    "Do you think homosexuals should or should not be hired
         for each of the following occupations?" ................... 442

F-11.    "Would you permit or not permit your child to go play at
         the home of a friend who lives with a homosexual parent?" ... 442

F-12.    "Some time ago, the citizens of Miami voted to repeal a
         county ordinance that banned discrimination in employment
         and housing based on a person's sexual preferences. The
         ordinance essentially meant that someone who is homosexual
         could not be kept from holding a particular job or living
         in any type of housing simply because he or she is
         homosexual. Which of these statements best describes how
         you feel about the law and discrimination against
         homosexuals?" ............................................. 443

F-13.    "We can choose our friends, but we can't always choose the
         people we work closely with. Here is a list of some
         different types of people. For each one, would you tell
         me whether you would strongly object to working around
         them, or prefer not to work around them, or wouldn't mind
         working around them?" ..................................... 443

F-14.    "Do you think marriages between homosexual men or between
         homosexual women should be recognized as legal by the
         law?" ..................................................... 444

F-15.    "Do you think that homosexual couples should be legally
         permitted to adopt children?" ............................. 444

F-16.    "What about a .... Can this be a family?" ................. 444

F-17.    "Do you feel that family leave laws should or should not
         also apply to homosexual people who need to care for a
         seriously ill companion?" ................................. 445

F-18.    "In general, do you think that states should have the
         right to prohibit particular sexual practices conducted in
         private between consenting " ............................. 445

F-19.    "Do you think homosexual relations between consenting
         adults should or should not be legal?" .................... 445

F-20.    "Do you think that the laws which protect the civil rights
         of racial or religious minorities should be used to
         protect the rights of homosexuals?" ...................... 446

F-21.    "Should a federal law be passed protecting homosexuals
         from discrimination?" .................................... 446

F-22.    "Do you think homosexuals should or should not be able to
         serve in the armed forces?" .............................. 446

F-23.    "Do you favor or oppose permitting homosexuals to serve in
         the military?" ........................................... 446

F-24.    "Do you think people who join the military should be asked
         if they are homosexual, or not?" ......................... 447

- xvi -

F-25.   "Do you approve or disapprove of allowing openly homosexual men and women to serve in the armed forces of the United States?" ........................................ 447

F-26.   "Do you approve or disapprove of ending the ban on homosexuals from serving in the military?" ................ 447

F-27.   "Which is closer to your position on allowing gays and lesbians in the military?" ................................ 448

F-28.   "If the United States returned to a military draft, it would not be necessary to draft everyone of military age. That is, certain types of people could be exempted, even though they were otherwise qualified for service.   Should homosexuals be exempted?"

        "If a military draft were to become necessary, should young women be required to participate as well as young men, or not?" ................................................ 448

F-29.   "For each that I mention, please tell me if you agree or disagree...." ........................................... 448

F-30.   Proportion who "agree a lot" or "agree a little" to the statement "I could be friends with a gay person" by various characteristics.................................... 449

F-31.   Characteristics of those stating that they "definitely will" or "probably will" serve in the armed forces contrasted with those stating that they "probably won't" or "definitely won't"........................................ 450

I-1.    Current Status of Sodomy Restrictions, by State............ 464

- xvii -

## EXECUTIVE SUMMARY

### OVERVIEW

On January 29, 1993, President Clinton signed a Memorandum directing the Secretary of Defense to "submit . . . prior to July 15, 1993, a draft of an Executive Order ending discrimination on the basis of sexual orientation in determining who may serve in the Armed Forces." The Presidential Memorandum also directed that any recommendation by the Secretary should be one that could be "carried out in a manner that is practical and realistic, and consistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain."[1]

On April 1, 1993, the Secretary of Defense asked RAND to provide information and analysis that would be useful in helping formulate the required draft Executive Order. This Executive Summary briefly describes the approach and major conclusions of the study. It then summarizes the major findings that support that conclusion.

### Approach

An interdisciplinary team of researchers from RAND's National Defense Research Institute considered a wide range of topics potentially relevant to the issue of acknowledged homosexuals serving in the military. Staff members visited seven foreign countries and the police and fire departments in six American cities, seeking insights and lessons from analogous experiences of other organizations and institutions. The team considered the historical record, focusing on the integration of blacks and on the development of the current policy that prohibits homosexuals from serving in the military. It reviewed public opinion, including the views of current active-duty military personnel, and the scientific literature on group cohesion, sexuality, and related health issues. It examined a number of legal and enforcement issues, as well as the literature that deals with

---

[1]Memorandum for the Secretary of Defense, Ending Discrimination on the Basis of Sexual Orientation in the Armed Forces, January 29, 1993.

- xviii -

implementing change in large organizations.  The results of the team's research are detailed in the subsequent chapters of this report.

**The Policy Option**

    In light of this research, the team examined a range of potential policy options.  Most of the options were judged to be either inconsistent with the President's directive, internally contradictory, or both.  Only one policy option was found to be consistent with the findings of this research, with the criteria of the Presidential memorandum, and to be logically and internally consistent.  That policy would consider sexual orientation, by itself, as not germane to determining who may serve in the military.  The policy would establish clear standards of conduct for all military personnel, to be equally and strictly enforced, in order to maintain the military discipline necessary for effective operations.  The option requires no major changes in other military personnel policies and no change in current law.  The "not germane" option could be implemented without any changes to the administrative guidelines for prosecutions under the Uniform Code of Military Justice (UCMJ).  However, several considerations lead to the conclusion that the policy would be more legally defensible and less costly and cumbersome to implement if the guidelines were revised to exclude private sexual behavior between consenting adults.

**REVIEW OF ANALOGOUS INSTITUTIONS AND EXPERIENCES**

    To understand the possible effect of changing policy to permit homosexuals to serve and to examine how other institutions have implemented similar changes, members of the research team visited a number of foreign militaries and domestic police and fire departments.  None of these organizations is an exact model for the U.S. military, of course, but the comparisons can be instructive in assessing proposed changes in U.S. military personnel policy.  Besides these analogous institutions, analogous situations such as the experience of racial integration of the American military were also studied for potentially instructive insights.

- xix -

## The Experience of Foreign Militaries

Researchers visited Canada, France, Germany, Israel, the Netherlands, Norway, and the United Kingdom. With the exception of the United Kingdom, all of these countries permit known homosexuals to serve in some capacity in their Armed Forces. Several broad themes emerged from these visits, with potential implications for the situation facing the United States:

- In countries that allow homosexuals to serve, the number of openly homosexual service members is small and is believed to represent only a minority of homosexuals actually serving.
- Service members who acknowledged their homosexuality were appropriately circumspect in their behavior while in military situations; they did not call attention to themselves in ways that could make their service less pleasant or impede their careers.
- Few problems caused by the presence of homosexual service members were reported. Problems that did arise were generally resolved satisfactorily on a case-by-case basis. If a problem developed to the point that a unit might become dysfunctional, action was taken to remove the individual (homosexual or heterosexual) from the unit.

## The Experience of Domestic Fire and Police Departments

Unlike the foreign militaries, domestic police and fire departments function in the American cultural and societal context. Police and fire departments share a number of characteristics with the U.S. military that make them the closest domestic analog. They are hierarchically organized, with a well-defined chain of command. Members work together as teams. A substantial proportion of job time is spent training for short, intense periods of hazardous activity. An inherent feature of the job is putting one's life at risk. They are markedly different, however, in that only the military deploys its members on ships, or routinely engages in field exercises of extended length.

- xx -

Visits to police and fire departments in six cities (Chicago, Houston, Los Angeles, New York, San Diego, and Seattle) resulted in several key findings:

- Even where police and fire department policies prohibit discrimination based on sexual orientation, only a very small number of homosexuals acknowledge their orientation, particularly where the environment is perceived as hostile to homosexuals.
- Homosexuals who join police and fire departments evidently join for the same reasons that heterosexuals do.
- Acknowledged homosexuals are sensitive to the overall norms and customs of their organizations. They tend not to behave in ways that shock or offend, and they subscribe to the organization's values on working problems out informally and within the ranks.
- Anti-homosexual sentiment does not disappear. However, heterosexuals generally behave toward homosexuals more moderately than would have been predicted based on their stated attitudes toward homosexuals.
- AIDS is a serious concern of heterosexuals and not one that is quickly alleviated by education.
- Policies of non-discrimination against homosexuals in these departments have had no discernible effect on the ability of their departments to recruit or retain personnel.
- Implementation is most successful where the message is unambiguous, consistently delivered, and uniformly enforced. Leadership is critical in this regard.
- Training efforts that provide leaders with the information and skills needed to implement policy were essential. Sensitivity training for rank and file, however, tended to breed additional resentment and to be ineffective. Training that emphasized expected behavior, not attitudes, was judged most effective.

- xxi -

### The History of Racial Integration in the United States Military

The historical experience of including blacks in the military can also provide some insights concerning the military's ability, as an institution, to adapt to change.  These are the key insights:

- Starting as early as the final years of World War II and especially during the Korean War, integrated Army units were able to function effectively in all sorts of situations, even in the most demanding battlefield situations, and even if the individuals involved had not experienced prior social integration.
- It is possible to change how troops behave toward previously excluded (and despised) minority groups, even if underlying attitudes toward those minority groups change very little.
- Leadership matters for implementation--civilian and military leadership must be prepared to work together over a lengthy period to ensure effective implementation of controversial policies.  In some cases, civilian oversight of implementation may be necessary.

### PUBLIC AND MILITARY OPINION

How any option for ending the restriction on homosexual service will fare depends critically on its acceptance by the public and by the people serving in the U.S. military.  A review of various surveys indicates that U.S. public opinion is divided over this issue.  Until recently, roughly half of the population believed that homosexuals should not be allowed to serve.  However, a very recent poll indicates that the percentage who believe they should not be allowed to serve *under any conditions* has dropped to 21 percent.  It is worth noting this is far below the percentage (61 percent) who were against racial integration of the services at the time of President Truman's order to desegregate the military.

Military opinion is overwhelmingly against allowing homosexuals to serve.  In surveys and RAND-conducted focus groups, a minority of service members expressed indifference to or approval of the policy

- xxii -

change, and women were less opposed than men.  A few people in the focus groups believed that the military would be able to cope with the change, just as it coped with racial integration.  However, most service members of all ranks expressed opposition and concerns about the effects it would have on privacy, morale, and unit cohesion and about the probability of anti-homosexual violence and the increase of AIDS in the military.

To the extent that changes in policy resulted in changes in the number of acknowledged homosexuals in the military, the rate of anti-homosexual violence might change, since acknowledged homosexuals are more readily identified targets for such violence.  The experience of foreign militaries and police and fire departments suggests that if leaders make it quite clear that violence will not be tolerated and stern action will be taken, violence can be kept to a minimum.

As for concerns about AIDS, DoD's testing program for Human Immunodeficiency Virus (HIV) almost entirely prevents the entry of HIV-infected individuals into the military.  Therefore, the only way a change in policy permitting homosexuals to serve could significantly affect HIV infection rates in the military is by increasing the number of service members who are infected while serving.  If there were an increase, it would have little effect on military effectiveness.  All military personnel whose health is seriously affected by HIV are discharged.  Further, all service personnel must be tested before deployment and those who test positive cannot be deployed.  Given the accuracy of HIV testing, very few HIV-infected personnel would ever deploy or serve in combat, the military blood supply would remain safe, and there would be virtually no danger from contact with blood on the battlefield.

**UNDERSTANDING UNIT COHESION**

Concern about the effect that an acknowledged homosexual would have on "combat effectiveness and unit cohesion" has dominated the debate.  It also provides the basic rationale for the current policy that

- xxiii -

"Homosexuality is incompatible with military service."[2] Most military leaders who have spoken publicly on the issue in recent months argue that introduction of a known homosexual into a unit, no matter how discreet his or her behavior might be, would seriously undermine the cohesiveness of that unit. Unfortunately, the subject has not been studied specifically, and no controlled experiments or other research bear directly on this issue.

There is a large body of potentially related empirical research in the fields of industrial organization, social psychology, sports psychology, and group behavior, a significant amount of which was sponsored by the military. Other potentially relevant material can be found in the ethnographic and biographical military literature. The principal conclusion from an extensive review of this literature is a commonsense observation: It is not necessary to like people in order to work with them, so long as members share a commitment to the group's objectives. The literature also indicates the following:

- If some members of a unit cannot accept the presence of an acknowledged homosexual, the result will probably involve some degree of ostracism of the homosexual, rather than a complete breakdown of the unit. Whether this occurs will depend partly on the conduct, competence, and loyalty of the homosexual individual in question.

- Some heterosexuals might refuse to cooperate with known homosexuals. However, many factors will help to promote cohesion and performance even in the face of hostility toward homosexuals. First, research suggests that leaders play an important role in promoting and maintaining unit cohesion. Second, military roles, regulations, and norms all enhance the likelihood that heterosexuals will work cooperatively with homosexuals. Third, external threats enhance cohesion, provided that the group members are mutually threatened and

_____

[2]Department of Defense Directive 1332.14, *Enlisted Administrative Separations*, Enclosure 3H.

- xxiv -

there is the possibility that cooperative group action can
eliminate the danger.

Disruptive behavior or behavior that polarizes a unit or renders it
dysfunctional, whatever the cause of the behavior, can undermine
military effectiveness and should not be tolerated.  Although some
disruptions might result from having acknowledged homosexuals serving in
the military, the literature on cohesion does not provide a basis for
predicting the magnitude of the increase.  Senior military leaders have
stated that, in their professional judgment, the effects would be
substantial.  The experience of analogous organizations such as foreign
militaries and domestic police and fire departments suggests that any
increase is likely to be quite small.  Because the magnitude of the
problems cannot be predicted, military leaders must have tools available
to help them manage potential disruptions and to implement the policy
change successfully.

**A POLICY OPTION FOR ENDING DISCRIMINATION**

Based upon the research summarized above, a number of ways to
respond to the President's directive were identified.  A policy that
focuses on conduct and considers sexual orientation, by itself, as not
germane in determining who may serve was judged to meet the President's
criteria and to be most consistent with the research findings.  Such a
policy emphasizes actual conduct, not behavior presumed because of
sexual orientation, and holds all service members to the same standard
of professional conduct.  It requires tolerance and restraint to foster
the good of the group, but implies no endorsement of a "homosexual
lifestyle."

An illustrative *Standard of Professional Conduct* was designed as
part of the research project, with the overarching objective of
maintaining the order and discipline essential for an operationally
effective military organization.  Similar standards have been used
effectively in other organizations and foreign militaries and are
analogous to the "good order and discipline" and "conduct unbecoming"

- xxv -

provisions in military law that have been used effectively by the U.S. military for years.  Four features of this standard are central:

- A requirement that all members of the military services conduct themselves in ways that enhance good order and discipline. Such conduct includes showing respect and tolerance for others. While heterosexuals would be asked to tolerate the presence of known homosexuals, all personnel, including acknowledged homosexuals, must understand that the military environment is no place to advertise one's sexual orientation.
- A clear statement that inappropriate personal conduct could destroy order and discipline, and that individuals are expected to demonstrate the common sense and good judgment not to engage in such conduct.
- A list of categories of inappropriate conduct, including personal harassment (physical or verbal conduct toward others, based on race, gender, sexual orientation, or physical features), abuse of authority, displays of affection, and explicit discussions of sexual practices, experience, or desires.
- Application of these standards by leaders at every level of the chain of command, in a way that ensures that unit performance is maintained.

The conduct-based standard provides military leaders with the necessary frame of reference for judging individual behaviors, just as it provides individuals with clear guidelines.  Under this standard, behaviors that commanders judged inimical to effective functioning of the unit (i.e., that undermine task cohesion) would not be tolerated.

The "not germane"/conduct-based policy does not require extensive revisions to existing military rules and regulations or to personnel policy.  If sexual orientation is regarded as not germane in determining who may serve in the military, it is equally not germane to decisions on assignment, pay, military specialty, or benefits.  On issues such as recognizing homosexual marriages or conferring benefits on homosexual

- xxvi -

partners, there is no reason for the Department of Defense to change current policy or to become the "lead" federal agency in these areas.

Concerns about privacy are often cited by those who oppose permitting homosexuals to serve in the military. A survey of military facilities shows that in many newer military facilities there is greater privacy in showers and toilet areas today than was common twenty years ago. However, members of the military often find themselves in situations where very little personal privacy is available, such as aboard ships or on field maneuvers. In situations where physical privacy is impossible, standards of conduct to foster personal privacy have already been developed: Individuals act in ways that do not intrude upon and are not offensive to others. For this reason, a strong emphasis on professional conduct conducive to good order and discipline is the key to dealing with privacy issues as well. Freedom from personal harassment and uniform standards of conduct are the best guarantees of privacy.

If sexual orientation is regarded as not germane in determining who may serve, enclosure 3H of the DoD regulations concerning administrative separations (DoD Directive 1332.14) should be rescinded. The most problematic regulatory and legal scenario would be to end discrimination without revising portions of the Manual of Courts Martial (MCM) relating to Article 125 (Sodomy) of the Uniform Code of Military Justice (UCMJ).[3] They have historically been applied differentially to heterosexuals and homosexuals. Retaining them after rescinding Enclosure 3H would weaken the "orientation-neutral" principle of the "not germane" policy.

A practical approach to dealing with this issue would be to revise the MCM to prosecute only non-consenting sexual behavior or sexual acts

---

[3]From the perspective of a homosexual member of the armed services, the policy choice would have both positive and negative consequences. A positive outcome would be the ability to serve openly in the military. But a negative consequence could be that if 1332.14 is repealed without changing Article 125, the only way for the military to discharge a homosexual would be through an Article 125 prosecution. Under current policy many homosexuals are given administrative discharges and are not usually prosecuted under Article 125. By not removing or modifying Article 125, homosexuals would be at greater risk of an Article 125 prosecution.

- xxvii -

with a minor.[4]  No changes would be necessary in the sodomy article of
the UCMJ itself, because that code does not specify the sexual acts that
are illegal.  The definition of the offense is in the MCM, an
administrative document.

**IMPLEMENTATION ISSUES**

     The manner in which policy change is implemented could have a
decisive impact on whether these problems are managed with minimal
disruptions or undermine the effort to change.  Based on the research
conducted in this study, key elements of an implementation strategy can
be identified:

- The message of policy change must be clear and must be
  consistently communicated from the top.  Given the fact that
  senior leaders of the military are on record opposing any
  change, it will be necessary, if a change in policy is
  selected, that these and other leaders signal their acceptance
  of the change and their commitment to its successful
  implementation.  It must be clear to the troops that behavioral
  dissent from the policy will not be permitted.

- The option selected should be implemented immediately.  Any
  sense of experimentation or uncertainty invites those opposed
  to change to continue to resist and to seek to "prove" that the
  change will not work.

- Emphasis should be placed on behavior and conduct, not on
  teaching tolerance or sensitivity.  For those who believe that
  homosexuality is primarily a moral issue, efforts to teach
  tolerance would breed additional resentment.  Attitudes may
  change over time, but behavior must be consistent with the new
  policy from the first day.

- Leadership must send messages of reassurance to the force.  The
  military is currently undergoing a variety of other stressful
  experiences, e.g., declining budgets and the drawdown in the
  force.  In such an atmosphere, it is important to signal that

_____
[4]Appendix C contains an example of such a revision.

- xxviii -

the change in policy will not have markedly disruptive effects and that it is not intended as a challenge to traditional military values.  This climate of psychological safety is conducive to acceptance of the change.

- Leaders at all levels should be empowered to implement the policy, and some special training or assistance for leaders may be a useful device for ensuring that the change is understood and occurs rapidly.

- A monitoring process should be established to identify any problems early in the implementation process and address them immediately.

The option assessed here, a conduct-based set of standards applied under the premise that sexual orientation, as such, is "not germane" to military service, appears to meet the President's criteria and to be consistent with empirical research and historical experience.  By following this implementation strategy, the Department of Defense should be able to increase the probability that a policy that ends discrimination based on sexual orientation can be implemented in a practical and realistic manner and that the order, discipline, and individual behavior necessary to maintain cohesion and performance are more likely to be preserved.

- 1 -

### 1. SEXUAL ORIENTATION AND U.S. MILITARY PERSONNEL POLICY: POLICY OPTIONS AND ASSESSMENT

### STUDY OVERVIEW

#### INTRODUCTION

On January 29, 1993, President Clinton signed a Memorandum directing the Secretary of Defense to "submit . . . prior to July 15, 1993, a draft of an Executive Order ending discrimination on the basis of sexual orientation in determining who may serve in the Armed Forces." The Presidential Memorandum also directed that the recommendation by the Secretary be one that could be "carried out in a manner that is practical and realistic, and consistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain."[1] In issuing his directive, the President was acting on a campaign pledge to end the prohibition on homosexuals serving in the United States military. Changing policy to permit homosexuals to serve is controversial, and the change is opposed by many in the public and in Congress. The Chairman of the Joint Chiefs of Staff and other senior military leaders have indicated that they believe permitting known homosexuals to serve in the military would undermine unit cohesion and performance.

A series of Congressional hearings, held during the spring of 1993, revealed a broad range of opinion on the subject. Many senior military officials, such as retired Army General Norman Schwarzkopf, stated that they believed current policy banning homosexuals should remain unchanged. Other current and former members of the military supported permitting homosexuals to serve. Expert witnesses and social scientists voiced divided opinions on the issue.

The absence of a political consensus, in Congress or in the country as a whole, combined with divided expert opinion and conflicting views among military personnel, makes the search for an acceptable solution difficult. The Secretary of Defense subsequently asked RAND to provide

---

[1]Memorandum for the Secretary of Defense, Ending Discrimination on the Basis of Sexual Orientation in the Armed Forces, January 29, 1993.

- 2 -

information and analysis that would be useful in helping formulate the required draft Executive Order.

**Study Approach**

RAND's National Defense Research Institute initiated this effort on April 1, 1993. An interdisciplinary team of researchers considered a wide range of topics potentially relevant to the issue of acknowledged homosexuals serving in the military. Staff members visited military organizations in seven foreign countries and police and fire departments in six American cities, seeking insights and lessons from analogous experiences of other organizations and institutions. The team considered the historical record, focusing on the integration of African-Americans and on the development of the current policy that prohibits homosexuals from serving in the military. It reviewed public opinion data and the data concerning the views of current active-duty military personnel. It also reviewed the scientific literature on group cohesion, sexuality, and related health issues. It examined a number of legal and enforcement issues, as well as the literature that deals with implementing change in large organizations. This chapter brings together the results of the team's research, which is reported more fully in subsequent chapters of the report.

**The "Not Germane"/Conduct-Based Policy**

In light of this research, the team examined a range of potential policy options. Most of the options were judged to be inconsistent with the President's memorandum, internally contradictory, or both. Only one policy option was found to be consistent with the findings of this research and the criteria of the Presidential memorandum, and to be logically and internally consistent. That policy would consider sexual orientation, by itself, as not germane to determining who may serve in the military. The policy would establish clear standards of conduct for all military personnel, to be equally and strictly enforced, in order to maintain the military discipline necessary for effective operations. The option requires no major changes in other military personnel policies and no change in current law. The "not germane" option could

- 3 -

be implemented without any changes to the administrative guidelines for
prosecutions under the Uniform Code of Military Justice (UCMJ).
However, several considerations lead to the conclusion that the policy
would be more legally defensible and less costly and cumbersome to
implement if the guidelines were revised to exclude private sexual
behavior between consenting adults.  This policy option is described in
greater detail later in this overview.

Introducing a change of this type in the military requires careful
attention to implementation issues.  The prevailing attitudes of both
the leadership and many military personnel are hostile to any change.
Based on the historical experiences of adaptation to change in the
military and the research literature on change in large organizations,
several key elements of an implementation strategy are identified and
discussed.

This overview synthesizes the results of the RAND research and
functions as a "road map" to the chapters and appendixes that follow.
It begins with a review of the history of U.S. military policy toward
homosexuals and of the applicable provisions in DoD regulations and
military law that have restricted homosexuals from serving.

## U.S. MILITARY POLICY ON HOMOSEXUALITY AND SODOMY

Since World War I, homosexuals have been restricted from serving in
the Armed Forces of the United States through either personnel
regulations or the application of the sodomy provisions of military law.
Sodomy was defined as anal or oral sex between men or between a man and
a woman.  At the end of World War II, the legal definition was changed
to include sexual relations between women as well.

### Homosexuality and the Military, 1916 to 1940

Early attempts to regulate homosexual behaviors within the Armed
Forces were sporadic and inchoate.  The Articles of War of 1916 went
into effect on 1 March 1917.  As the first complete revision of military
law in over 100 years, this new codification was the first legal
document to address the incidence of sodomy within the military
population.  The first mention of sodomy in military law was in Article

- 4 -

93, which prohibited assault with the intent to commit sodomy.[2]  In their 1920 revision, the Articles of War included sodomy as a separate offense.[3]  This statute did not change until 1951.

Between the two World Wars, the military attempted to screen and exclude homosexuals from service by utilizing contemporary biological theories about the causes and manifestations of homosexuality.  In 1921, for example, the Army's "stigmata of degeneration" included men who appeared overly feminine, with sloping shoulders, broad hips, and an absence of secondary sex characteristics, including facial and body hair.  Also among the exclusion criteria was the degenerative characteristic of "sexual psychopathy," which included sexual relations between men.[4]

During the interwar period the military discharged homosexuals administratively more frequently than they formally court-martialed them, despite the official stance that sodomists had to be court-martialed under the Articles of War.  Individuals suspected of homosexual acts were released under a "Section VIII" discharge for unsuitability.  While in theory these could be honorable discharges, in cases of psychopathic behavior, the discharge was normally less-than-honorable, or "blue."

**World War II:  1941 to 1946**

In an attempt to rationalize policy concerning homosexuals in the months preceding America's entry into World War II, the Army Judge Advocate General tried to assess how existing policy was being applied in the field.  In the absence of aggravating factors, the Army removed

---

[2]The Manuals for Court-Martial, 1917, defined sodomy as anal penetration of a man or woman by a man; both parties involved were equally guilty of the offense.  In these regulations, penetration of the mouth did not constitute sodomy.  In the regulations that accompanied the revision of the Articles of War in 1920, however, The Manuals for Courts-Martial redefined sodomy as anal or oral copulation between men or between a man and a woman (Jeffrey S. Davis, "Military Policy Toward Homosexuals:  Scientific, Historical, and Legal Perspectives." *Military Law Review* 131, 1991, p. 73).

[3]Ibid. and Manual for Courts-Martial, United States, 1921, para. 443.

[4]Army Regulation 40-105, 1921.

- 5 -

most sodomists from service through administrative proceedings.  Court-martial was indicated, however, in those cases where force was employed, when minors were involved, or when the sexual partner was incapable of consent due to intoxication or other impairing condition.

During World War II, a lively debate took place among military authorities concerning the policies and practices regulating homosexual activity and the exclusion of homosexuals in the Armed Forces.  Within the Army alone, for example, there were twenty-four separate revisions of regulations concerning homosexuality between 1941 and 1945, compared with eleven revisions before the war and seventeen between the end of the war and the passage of the Uniform Code of Military Justice in 1950.  This debate had several causes.  First, there was widespread variance in the treatment of individual cases within the military.  Second, military authorities seemed increasingly willing to consult with and accept the recommendations of medical and psychiatric personnel with regard to homosexuals.  The American Psychiatric Association's Military Mobilization Committee helped develop the procedures that would be used to evaluate the more than 18 million men who would be examined for induction during the course of the war.  By the beginning of the war, Army and Navy Departments, along with Selective Service, had determined that overt homosexual behavior could be used to deny entry into the military.[5]

During World War II, the prewar practice of separating homosexuals from service through the use of the administrative discharge was continued and articulated as part of Army regulations.  By the end of the war, military policy concerning homosexuality had undergone several important changes.  First and most important, the "homosexual" had replaced the "sodomist" as the focal point of legal concern, although the criminal aspects of same-sex behaviors had been neither eliminated nor elucidated in any clear manner.  People who engaged in same-sex behaviors could be separated from the service through their resignation or by administrative discharge.  Even if no sexual activity had occurred, a growing body of policy supported the view that a homosexual

---

[5]Alan Bérubé, *Coming Out Under Fire:  The History of Gay Men and Women in World War Two*, New York:  The Free Press, 1990, pp. 10-18.

- 6 -

personality could readily be identified, and that such persons were to be barred from military service at induction or separated from the service upon discovery.

**The Cold War Era:  1946 to 1956**

Immediately after the war, in 1946, the Army liberalized policies toward homosexual personnel by increasing the likelihood of their receiving an honorable discharge (AR 615-360).  Attitudes shifted soon afterward, however, and, in 1948, the provision for honorable discharge was deleted.[6]  On October 11, 1949, the Department of Defense issued a memorandum that unified military policy toward homosexual behavior:

> Homosexual personnel, irrespective of sex, should not be permitted to serve in any branch of the Armed Services in any capacity, and prompt separation of known homosexuals from the Armed Forces be made mandatory.

The Eisenhower Administration, with the signing of Executive Order 10450 in 1953, codified "sexual perversion" as grounds for dismissal from federal jobs.  By some estimates, dismissals from federal employment increased tenfold.  In the military, the number of discharges for homosexuality remained about the same as it had been during World War II--roughly 2000 per year--but from the much smaller post-war force of 1.4 million.  The rate of discharge in the military, therefore, was also approximately ten times greater than it had been during the war.[7]

**The Military and Homosexuality in the 1960s and 1970s**

Within the military, the separation of homosexuals proceeded unchallenged throughout the late 1950s and early 1960s.  DoD policy was

---

[6]Those men and women with good service records, however, were to be separated from the service with a general, rather than a dishonorable, discharge.

[7]Unfortunately, there are no consistently reliable statistics of separations for homosexual behavior across the different branches of the Armed Services, nor are there any internally consistent statistics for any one service over the entire postwar time period.  While many analysts make the logical assumption that most separations for moral charges were indeed for homosexual behavior, unfortunately, medical, legal, and administrative statistics within the armed forces were not tabulated carefully enough to be certain.

- 7 -

revised in 1959, with the issuance of the first version of DoD Directive 1332.14 on the subject of Administrative Discharges.  Section VII.I of that directive indicated that among the reasons for discharge for "unfitness" was "sexual perversion," including homosexual acts and sodomy.  This remained the policy of the Department throughout the 1960s.  (When Directive 1332.14 was revised in 1975, the language was slightly altered to describe "homosexual acts or other aberrant sexual tendencies" as the grounds for determining unsuitability for military service--section G.3).

The 1965 DoD directive revised the regulations surrounding the separation of homosexual personnel.  Members facing a less-than-honorable discharge were allowed the chance to present their cases before administrative discharge boards and to be represented by counsel.  By liberalizing the rights of service members, the 1965 separation directives marked a turning point in the legal history of homosexuals in the services.  Before the 1965 directive, most service members accused of homosexuality cooperated without protest in order to protect others or to avoid more severe punishment.[8]  Inconsistency in the standards, in the documentation required, and in administrative procedures, however, led to a review during the Carter Administration of the policy and procedures for discharge.[9]

The results of the review were reflected in the new edition of DoD Directive 1332.14, issued on January 16, 1981.  In a memorandum accompanying the new directive, outgoing Deputy Secretary of Defense Graham Claytor, noting that his revision "contains no change in policy," explained that the enclosure on homosexuality (a new Enclosure 8 to the 1976 version of Directive 1332.14) had been completely revised.  The

---

[8]Colin J. Williams and Martin S. Weinberg, *Homosexuals in the Military:  A Study of Less Than Honorable Discharge*, New York:  Harper and Row, 1971, p. 102.  The procedures of interrogation are outlined on pp. 100-114.

[9]The directive was issued in response to numerous court challenges, such as *Matlovich v. Secretary of the Air Force*, 591 F.2d 852, D.C. Cir. 1978, questioning why some open homosexuals were discharged while others were retained.  The 1981 directive removed the military's discretion in deciding whether to retain an open homosexual, making such discharge mandatory.

- 8 -

purpose of the new enclosure was to make it clear that, based on an investigative finding that a person "engaged in, has attempted to engage in, or has solicited another to engage in a homosexual act," discharge was mandatory.

The revised enclosure in 1981 also for the first time stated that "Homosexuality is incompatible with military service" and provided the following explanation for the exclusion of homosexuals:

> The presence of such members [homosexuals] adversely affects the ability of the armed forces to maintain discipline, good order, and morale; to foster mutual trust and confidence among servicemembers; to insure the integrity of the system of rank and command; to facilitate assignment and worldwide deployment of servicemembers who frequently must live and work under close conditions affording minimal privacy; to recruit and retain members of the armed forces; to maintain the public acceptability of military service; and to prevent breaches of security.

The revision also affected policy on discharges by making it clear that homosexuality alone did not require a *misconduct* discharge. In the absence of other actions (such as violence), the discharge could be under honorable conditions. As promulgated by Deputy Secretary Claytor, DoD Directive 1332.14 and its provisions concerning homosexuality remained the policy governing enlisted separations until January 1993. (Directive 1332.14 was reissued in 1982 and the enclosure regulating homosexuality is now numbered 3H, but the language remained unchanged. Identical language in a separate directive governs officer personnel.)

**The Recent Past: 1981 to 1991**

The armed services' policies concerning the exclusion and separation of homosexual personnel came under increasing legal challenges after the new DoD polices went into effect in 1981: among the most publicized were *Secora v. Fox*, *Pruitt v. Cheney*, *Steffan v. Cheney* and *Watkins v. United States Army*. In each case, different aspects of the new regulations were contested in federal court.

Between 1980 and 1991, according to a report compiled by the General Accounting Office, there were 16,919 discharges for homosexuality within the Armed Services. These discharges comprised 1.7

- 9 -

percent of all involuntary discharges in the Department of Defense for this period.[10]  Like all involuntary separations during these years, the numbers of homosexual-related discharges peaked in 1982 and declined for the remainder of the decade.  On average, however, over 1,400 service personnel were separated for homosexuality per year.

**Military Law:  Homosexuality and Sodomy**

The sodomy provisions of the Uniform Code of Military Justice (UCMJ, Article 125) have also been used as the basis for removing homosexuals from the service.  Some have argued that a policy allowing homosexuals to serve would be inconsistent with this provision of military law.[11]  In fact, DoD Directive 1332.14 and Article 125 of the UCMJ do not use the same definition or standard, nor do they attempt to regulate precisely the same behaviors.  Directive 1332.14 defines a homosexual as one who engages in or desires to or intends to engage in homosexual acts.  These acts, in turn, are described as "bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires."

A review of the research on sexual behavior suggests that there are many people who call themselves heterosexual, and who are predominantly heterosexual in behavior, who also engage in homosexual acts.[12]  Some may experiment with homosexual behavior once or twice.  Others may occasionally act on their attraction to people of the same sex, even if they call themselves heterosexual.  Still others may recognize their attraction to others of the same gender, but they establish a heterosexual public persona and refrain from acting on these attractions or revealing their orientation to others.  Finally, there are people who consider themselves to be "homosexual" or "bisexual" who, for whatever

---

[10]United States General Accounting Office, *Defense Force Management:  DoD's Policy on Homosexuality*, GAO/NSIAD 92-98, Washington, D.C.:  U.S. Government Printing Office, June 1992. These figures are calculated from statistics in a supplement to the report, *Statistics Related to DoD's Policy on Homosexuality*, pp. 22-30.

[11]In the *Ben-Shalom* case the court moved toward equating status as a homosexual with conduct proscribed under Article 125.

[12]For a more complete discussion, see Chapter 2 on sexuality, as it pertains to the DoD directive and the UCMJ.

- 10 -

reasons (e.g., health concerns, religious convictions, or simply lack of opportunity), refrain from homosexual activities.

Article 125 of the Uniform Code of Military Justice states that a person engaging in "unnatural carnal copulation" with members of the same or opposite sex is guilty of sodomy. The UCMJ does not define what is meant by "unnatural" carnal copulation in statutory language. This definition is left to the explanation provided in the Manual for Courts Martial (MCM), where the proscribed behavior is defined as oral or anal sex (or sex with an animal). The distinctions between the two regulations governing the sexual behavior of military personnel can be summarized as follows: the DoD directive forbids virtually any type of homosexual conduct; the UCMJ forbids a narrower set of behaviors, regardless of whether they are performed by homosexuals or heterosexuals.

Under military law, the act itself is forbidden under all circumstances, regardless of the nature of the partners to the act. Consequently, heterosexual sodomy is proscribed as well as homosexual sodomy. Contemporary surveys indicate that oral sex, as defined and prohibited by the UCMJ/MCM, is widely practiced by both homosexuals and heterosexuals.[13]

## REVIEW OF ANALOGOUS INSTITUTIONS AND EXPERIENCES

To understand the possible effect of changing policy to permit homosexuals to serve and to examine how other institutions have implemented similar changes, members of the RAND team visited a number of foreign militaries and domestic police and fire departments. None of these organizations is an exact model for the U.S. military, of course, but the comparisons can be instructive for assessing proposed changes in U.S. military personnel policy. Besides these analogous institutions, analogous situations such as the experience of racial integration of the

---

[13]For example, the 1991 National Survey of Men, a nationally representative study of 3,321 males age 20 through 39 years of age (Billy et al., 1993) reports that 75 percent have performed and 79 percent have received oral sex. Among those currently married, the numbers were slightly higher. Similar results are reported for homosexual males, e.g., the Pittsburgh Men's Study (Silvestre et al., 1993; see bibliography for Chapter 2).

LCR Appendix Page 0330

- 11 -

American military were also studied for potentially instructive insights.

## The Experience of Foreign Militaries[14]

Policy toward homosexuals serving in the military varies widely among countries. Several countries were selected, representing the range of policies toward homosexuals from affirmative advocacy of homosexual rights (the Netherlands) to a ban on service similar to the current U.S. policy (United Kingdom). In addition, researchers visited Canada, France, Germany, Israel, and Norway. In each country researchers interviewed key government officials and, where possible, held discussions with other experts and observers. In some instances, the findings and conclusions reported here (and by the General Accounting Office in its June 1993 report) appear to be at variance with testimony before the Senate Armed Services Committee and with often-recited, commonly held opinion about foreign practices.[15] Every effort was made to elicit from the foreign governmental officials their explanation for these discrepancies.

Each of the militaries visited exists within and reflects its own society and culture, and policies vary accordingly. France, Germany, Israel, the Netherlands, and Norway have conscript forces. Norway essentially trains recruits to serve as a militia that can be mobilized for territorial defense should future situations require it. Norway also contributes forces to international peacekeeping missions. The Netherlands is changing policy to end conscription and will rely on a volunteer force in the future. Both Norway and the Netherlands follow a nondiscrimination policy with respect to homosexuals serving.

The French policy on homosexuals is not to have an official policy. Unofficially, the issue of homosexuality is dealt with in the general category of medical/psychological issues. Homosexual status is not

---

[14]See Chapter 3 for a more comprehensive treatment of foreign militaries.

[15]Concurrent with this inquiry, the General Accounting Office also sent teams to Canada, Israel, and Germany. Their findings are reported in *Homosexuals in the Military: Policies and Practices of Foreign Countries*, GAO/NSIAD-93-215, June 1993.

- 12 -

automatically disqualifying for conscription, but in practice
homosexuals are excused from service if they so desire.  Among the
career force, flagrant homosexual conduct can be the proximate but
unofficial cause for separation.  In general, the French approach is
that private sexual conduct is not relevant to performance of military
duties.

Israel, like these European countries, relies on conscription,
although in Israel's case the term of service is longer (36 months vs.
an average of 10 months in Europe).  Like Norway, the ethic in Israel is
that all should serve and everyone should remain available for
mobilization to defend the country, but Israel goes beyond that purely
military notion to include the use of military service as an instrument
of national socialization.  It is an obligation and a duty to serve in
the Israeli military, and the ethic is thus one of inclusion rather than
exclusion--the Israeli military will make every effort to permit
recruits to serve, accepting some who might otherwise be disqualified on
purely military grounds.

Israel has recently (June 11, 1993) reaffirmed its policy of
nondiscrimination, removed the requirement that homosexuals undergo a
mental examination, and no longer automatically prohibits them from
holding top-level security clearances.  Israeli officials directly
refuted the commonly made assertion that homosexual men are not
permitted to serve in combat units, or are treated like women and given
clerical jobs and allowed to live at home, stating that all such
decisions are made on a case-by-case basis.  The recently issued
standing order makes it clear that no automatic restrictions will apply
to homosexuals and that all members of the force will be judged by the
same criteria.  Because of the ethic of inclusion in the Israeli
military and the concept of citizen-soldier that guides Israeli service,
there is a well-developed system of support from counselors,
psychologists, and social workers to assist military leaders in dealing
with service members' problems of adjustment to military service.

Like the United States, Canada and the United Kingdom do not rely
on conscription.  Canada maintains a relatively small military that, in
addition to its NATO responsibilities, is oriented primarily toward the

- 13 -

role of international peacekeeper.  In late 1992, Canada's policy was changed to eliminate the ban on homosexuals serving in its military, following court rulings that prohibited discrimination on the basis of sexual orientation in all areas of federal jurisdiction.  The Canadian Forces then implemented a new policy that permitted acknowledged homosexuals to serve while prohibiting inappropriate sexual misconduct and personal harassment by all service members.[16]  This new policy received strong endorsement and support from the leadership of the Canadian Forces.  Thus far, the Canadian Forces report no detrimental effects resulting from the policy change.

The United Kingdom remains the only country of those visited to retain an absolute ban on homosexuals serving.  It is the only country visited that will conduct investigations of alleged homosexuality and will expel known homosexuals from the service.

In all of the countries visited, sodomy has been decriminalized in the civil law.  The military law then followed suit in all countries other than Britain, where the Queen's Regulations still forbid homosexual acts.  Even in Britain, however, the policy in practice is to expel homosexuals under provisions of a general administrative discharge, not to charge them with a violation of military law.

Like Britain, Germany will exclude known homosexuals from service. For homosexuals already in the military, German policy tends to be more variable.  Conscripts are likely to be expelled if discovered to be homosexual.  (Since Germany does not actively investigate these matters, discovery would almost always be associated with an actual incident of conduct, an adjustment problem, or a self-declaration.)  In the professional force, an individual who has served less than four years may be expelled, depending on other factors.  Individuals would not automatically be expelled if other factors indicated satisfactory performance on the job.  After four years of service, the individual almost certainly would *not* be separated, although it is very possible he would be transferred to a job that is not in a "leadership" position. In Germany these decisions, which are infrequent, are made on an

---

[16]The Canadian regulations on personal harassment, sexual misconduct, and sexual harassment are contained in Appendix E.

- 14 -

individual basis, and the outcome depends on a variety of factors. Indeed, the best summary characterization of German policy in this regard is the frequently heard explanation "it depends."

While it is generally accepted that homosexuals serve in all of the militaries examined for this study, few serve openly (and none, of course, can be open in the United Kingdom). RAND researchers were frequently told that if a meeting on this subject had not been requested by the visiting Americans, there would be no occasion to have a meeting to discuss the issue. Despite tolerance for homosexuality in the society and the decriminalization of homosexual acts, in none of these societies is homosexuality widely accepted by a majority of the population.[17] (The trend in society at large, however, is toward the expansion of legal rights of homosexuals.) In the Netherlands, easily the most tolerant and encouraging environment for homosexuals to serve, fewer than 1 percent of the men in the Dutch military identified themselves as "predominantly homosexual" on a questionnaire; 3.5 percent of women indicated that they were homosexual; and 4.8 percent of the men stated that they had had homosexual experiences at some time in their lives.

In four of the countries that have policies of complete nondiscrimination (Canada, Israel, the Netherlands, and Norway), no serious problems were reported concerning the presence of homosexuals in the force. While an occasional episode of ridicule or violence has occurred (reported mainly in Norway), these incidents have been sufficiently infrequent that no special measures were taken to prevent future incidents. In Canada, since the ban was lifted in 1992, no member of the Canadian Forces has declared himself or herself to be homosexual, and no incidents of violence against homosexuals or disruption in units have been reported. In the Netherlands, no serious problems have been reported. No effects on recruitment or retention were identified in these militaries.

Generally, the pattern in each of these organizations is to deal with homosexuals as individuals, treating any issues or difficulties

---

[17]See Appendix D for survey results concerning attitudes toward homosexuality in Canada, the United States, and the United Kingdom.

- 15 -

that arise on a case-by-case basis.  The Netherlands departs from this standard in providing sensitivity training for troops and making active efforts to ensure that homosexuals are integrated into the force.  The affirmative action policies and the special status thus accorded to homosexuals as a category distinguish policy in the Netherlands from that in the other countries examined.

None of the militaries studied for this report believe their effectiveness as an organization has been impaired or reduced as a result of the inclusion of homosexuals.  With the exception of the Netherlands, no special resources have been expended or programs created to deal with the presence of homosexuals.  The Dutch assessment of their own policy has led to the conclusion that the program of promoting open acceptance has not been as successful as they desired.  While each of these militaries has a different role to play in its social context, the key finding is that, in all cases where a decision has been made to include homosexuals in the force, the organization's leaders believe that the force's organizational performance is unaffected by that presence.

**The Experience of Domestic Fire and Police Departments[18]**

Unlike the foreign militaries, domestic police and fire departments function in the *American* cultural and societal context.  Police and fire departments share a number of characteristics with the U.S. military that make them the closest domestic analog.  They are hierarchically organized, with a well-defined chain of command.  Members work together as teams.  A substantial proportion of job time is spent training for short, intense periods of hazardous activity.  An inherent feature of the job is putting one's life at risk.  They are markedly different, however, in that only the military deploys its members on ships, or routinely engages in field exercises of extended length.  Police officers and firefighters return to their homes after periods on duty; they often train and work in smaller units than the military; and they

---

[18]See Chapter 4 for a more comprehensive treatment of selected domestic police and fire departments.

- 16 -

interact with the community at large to a much greater degree--indeed, as a central aspect of the job.

RAND researchers visited six U.S. cities that have policies of nondiscrimination in place:  Chicago, Houston, Los Angeles, New York, San Diego, and Seattle.  They focused on two main issues:  (1) What were the behavioral responses at the individual level of both homosexuals and heterosexuals to the presence on the force of homosexuals?  (2) What were the organizational strategies and polices put into place to implement the nondiscrimination policies?  Geographic distribution was sought, and cities with atypical cultural climates with respect to homosexuals (e.g., San Francisco) were excluded.  Cooperation from the local departments was generally good, although in Houston the police department and in Los Angeles the fire department declined to participate in the research effort.  In addition to review of relevant documents and newspaper articles, RAND researchers also interviewed high-ranking leaders, personnel and equal opportunity officers, trainers, unit commanders, recruiters, and counselors.  They also interviewed heterosexual rank-and-file members of the force and homosexual members, both alone and in groups ranging in size from three to twenty.

Based on the assessments of the experience in these six cities, it is possible to make some generalizations about the likely behaviors of homosexual members of the force.  Virtually all homosexuals who join police and fire departments conform to the norms and customs of the organization they are joining.  These individuals do not fit stereotypes that are inconsistent with the organization--those who join police departments, for example, wish to be "cops," not "homosexual cops." Homosexuals (male and female) declare their homosexuality gradually, and the numbers remain small (see Table 1-1), despite the existence of policies that codify their right to serve.

Many more homosexuals were known to each other and to their colleagues than were known to their departments.  Some of these individuals were members of confidential homosexual fraternal

- 17 -

Table 1-1

Numbers and Percentages of Open Homosexuals in Selected Police and Fire Departments

| Institution | City | Total Force Size | Number of Open Known Homosexuals | Estimated Prevalence |
|---|---|---|---|---|
| Police | Chicago | 12,209 | 7 | 0.06% |
| | Houston | 4,100 | 0 | 0.00% |
| | Los Angeles | 7,700 | 7 | 0.09% |
| | New York | 28,000 | ~100 | 0.36% |
| | San Diego | 1,300 | 4-5 | 0.25% |
| | Seattle | 1,300 | 2 | 0.15% |
| Fire | Chicago | 4,700 | 0 | 0.00% |
| | Houston | 2,900 | 0 | 0.00% |
| | Los Angeles | 3,200 | 0 | 0.00% |
| | New York | 11,300 | 0 | 0.00% |
| | San Diego[a] | 845 | 1 | 0.12% |
| | Seattle[a] | 975 | 5 | 0.51% |

[a] All openly homosexual firefighters in these cities were women.

organizations.  In one department, for instance, only seven individuals were known to the department, but more than forty belonged to a homosexual fraternal organization of department members.  Moreover, in every city, homosexual officers knew of other homosexual members of the force who had opted not to join such groups, either for fear of being identified as homosexual or for lack of interest.

The number who publicly acknowledge their homosexuality and the pace at which they do it are strongly influenced by the perceived tolerance or hostility of the organizational environment, both in terms of leadership policies and attitudes and in terms of the attitudes and behaviors of fellow members of the force.  Anti-homosexual attitudes are widespread within these organizations, and the process of making one's sexual orientation known is thus self-regulating to a large extent. Even in New York City, where the number of homosexuals on the force is highest and where the climate is generally more tolerant than in the other cities visited, fewer than half of the homosexuals belonging to the Gay Officers Action League are known to be homosexual by their supervisors or by the department.

- 18 -

Because of the general desire to conform to the norms of the organization and to "prove one's worth" as a member of the organization, homosexuals seldom engage in behaviors that challenge those norms or that are designed to shock or offend fellow members of the organization. Just as the process of making one's sexual orientation known is self-regulating, most other behaviors also conform to general expectations. Not a single case of an acknowledged homosexual male sexually harassing a heterosexual male was reported. Occasional hearsay reports, usually by commanding officers, were offered of homosexual women harassing heterosexual women, but these, too, were recognized as being rare, far less frequent than incidents of heterosexual men harassing women.

Heterosexual members of these departments often voice sentiments hostile to homosexuals. These opinions did not necessarily result in overtly hostile behavior. Some people reported that their opinion of homosexuals shifted after having served with them: Usually the homosexual officer had been known first in the role of policeman or policewoman, and only later as homosexual. Some instances of homosexual officers facing ostracism or being "framed" by fellow officers (e.g., planting false, incriminating evidence) were reported. While this was not a universal experience, it is not unheard of and concerns the leadership of the departments. Acknowledged homosexual members of the departments felt that they had generally been able to manage the hostility, especially if the decision to be open about their sexual orientation was their own. Those who had been exposed as homosexuals by others often experienced more difficulty.

Heterosexuals often voice a fear of AIDS, and the fear is often based on views that would not be supported by scientific data on the nature of the disease and the mechanisms for its transmission. Such attitudes have not been eliminated despite educational efforts regarding the disease. Notwithstanding the presence of concerns or fears over AIDS, no actual incidents where officers refused to work with or come to the aid of a homosexual colleague were reported to the research team.

Among heterosexuals there is widespread fear that homosexuals will be given special treatment or that efforts will be made to "educate" heterosexuals and change their attitudes toward homosexuals.

- 19 -

Sensitivity training, special programs for homosexuals, or elements of affirmative action aimed at homosexuals foster deep resentments among the heterosexual members of these departments.  Leaders emphasized the importance of controlling behaviors, not attitudes.  It is possible for heterosexuals to work with a homosexual, but to ask them to alter fundamental moral or religious beliefs about homosexuality is to ask too much.

The departments visited report that, overall, the effectiveness of the organization has not been diminished by the presence of homosexuals on the force.  Morale and discipline have been maintained, and recruitment and retention rates appear to be unaffected by the presence of known homosexuals in the department.  Very few formal complaints of harassment are lodged, due in part to the relative rarity of such events but due also to the strong norms in these organizations to work out problems at the unit level--good cops do not "rat" on their fellows, and good units do not expose their problems to outsiders.

In order for a nondiscrimination policy to be implemented effectively, leaders in these departments suggested that the message that a new policy was in place needed to be clear and simple, and it needed to be communicated and enforced consistently.  Since anti-homosexual attitudes are present among the rank and file and since sensitivity training and similar programs usually provoke resentment rather than tolerance, the emphasis on training is more successfully focused on leaders.  Strict standards of professional conduct and behavior are important.  Likewise, it was felt that education on the issues related to AIDS could be effective in helping to overcome some of the fears expressed by heterosexuals.

A final observation on implementation that applied to all departments studied is that the process of implementation unfolds gradually.  Homosexuals reveal their sexual orientation over time, in a process calibrated in part to the perceived readiness of the organization to tolerate open acknowledgment.  The organizational tolerance, in turn, evolves over time partially in response to the behavior of the members.  Because the number of open homosexuals remains small, both as a percentage of the total force and as a percentage of

- 20 -

the total number of homosexuals on the force, there is little need for
policies "regulating" the behavior of acknowledged homosexuals on the
force--the behaviors are self-regulating.  The self-regulating and
evolutionary nature of the process provides time for organizations to
adapt to members as well as for members to expand, in a gradual fashion,
the boundaries of the organization's tolerance.

**The History of Racial Integration in the United States Military**[19]

Our review of the military's experience with integrating blacks and
women shows that racial integration is the more applicable analogy:
women are still largely excluded from combat and, therefore, in a very
fundamental way, are treated as a special class.  The process of racial
integration, begun in the late 1940s, required many years of effort in
order to achieve the relatively successfully integrated fighting force
of today.  While a decision to permit homosexuals to serve is not
directly comparable to this historical example, racial integration can
serve as a source of potential insights into how the military as an
organization has adapted to changing policies on a controversial social
issue.  The lessons of this experience may prove valuable in devising a
practical and realistic implementation plan for changes in the future.

The main theme of those opposed to racial integration in the post-
war period centered on the fact that whites were hostile toward serving
with blacks.  This argument was often accompanied by rhetoric similar to
that surrounding the issue of homosexuals serving today.  Integration
was said to be inconsistent with prevailing societal norms and likely to
create tensions and disruptions in military units and to impair combat
effectiveness.  The effect on combat effectiveness was put to an early
test during the Korean War.  Spurred in part by critical manpower needs
and in part by a concern that the all-black units were not as combat-
capable as required in the theater, the Army fielded integrated units
for the fighting.  The actual experience of these units indicated that
the integrated units performed at a standard equal to the all-white
units (and much better than the all-black units).

---

[19]See Chapter 5 for a more detailed discussion.

- 21 -

The initial positive experiences in the wartime environment of Korea were followed by further rapid and complete integration of the Armed Forces by the mid-1950s. Until the early 1960s, the military seemed to be moving ahead of civilian society in progress toward integration. Black reenlistment rates were high, and many blacks perceived the military as providing opportunities in some ways more attractive than those provided by civilian society.

This veneer of racial harmony was shattered in the late 1960s. The civil rights movement and the rise in racial tensions throughout the country during the 1960s were reflected in the military. For example, difficulties experienced by black troops in finding off-base housing in certain areas of the country created a significant challenge for the Department of Defense. The Vietnam war added an additional layer of racial tension. Initially, blacks volunteered in disproportionately high rates for combat duty in Vietnam and performed effectively. But as many civil rights leaders began to be vocal in their opposition to the war, many also began to question whether the draft calls and the casualty rates were falling disproportionately on black Americans from the inner cities. Racial tensions and, ultimately, race riots broke out in all four services. The military was forced to recognize that much still remained to be done to achieve integration, and that the level of racial tensions threatened to interfere with mission accomplishment.

By the end of the Vietnam war a vigorous effort to improve the racial situation in the military had been launched. Aggressive support for equal opportunity accompanied the post-Vietnam drawdown and the development of the all-volunteer force (AVF). Renewed attention from senior leaders and vigorous efforts to enforce policies forbidding discrimination resulted in the integrated, all-volunteer force of today.

While these historical examples can be instructive, they are not directly comparable to the issue of known homosexuals serving in the military. For example, in contrast to the issue of sexual orientation, there were compelling operational reasons favoring integration of blacks into the military. During World War II, many military leaders had begun to recognize that operational effectiveness was impaired by continued

- 22 -

segregation in the force.  Thus, elements of the military itself began examining ways to utilize black troops more effectively.  In contrast, the argument for permitting homosexuals to serve is based on ending discrimination, not on compelling operational advantages.

Although a majority of Americans did not favor racial integration of the military in the late 1940s, public opinion changed over time  The wartime experience and the growing civil rights movement increased the pressure on the military to change.  This pressure was a constant and growing factor for change throughout the 1950s and 1960s.  Today, public opinion is more favorable to allowing homosexuals to serve than was public opinion favorable to racial integration of the military in the late 1940s.[20]

These distinctions must be kept in mind in evaluating the lessons suggested by the experience of racial integration of the military, but several points are nonetheless pertinent:  The experience of integrating the races in the military suggests that civilian and military leadership can effectively overcome the initial resistance to change and can minimize the worst fears of opponents about the damaging effects on unit performance.  Despite the presence of racial tensions, fighting performance did not suffer.  The experience also suggests that military adaptation to social change does not occur overnight, and that constant monitoring and a clear commitment from top leadership over a substantial period of time will be required.  The experience of racial integration also illustrates the length of time often required to put a change in policy into actual practice.  Further, the integration of the workplace and the ability to accomplish the mission at hand does not automatically translate into social integration.  Off-base and off-duty, blacks and whites customarily associate with members of their own race.

CURRENT AMERICAN ATTITUDES TOWARD HOMOSEXUALS SERVING

The historical lesson of racial integration clearly shows the importance of both general public opinion and the attitudes of service

---

[20]See Chapters 5 and 6 for more discussion of these public-opinion issues.

- 23 -

personnel toward homosexuality and toward homosexuals serving in the military.

### Attitudes in the General Population[21]

Currently, the American public is divided on the question of whether homosexuality is acceptable as a "lifestyle," with a majority believing that it is not acceptable.  Roughly 40 percent of Americans are willing to consider homosexuality as either not a moral issue or as an acceptable alternative lifestyle, a percentage that has remained relatively unchanged over the past decade.  If a slightly different question is asked, such as whether homosexuality is "wrong," nearly three-quarters of the American public answer affirmatively.  There is no trend toward greater acceptance of homosexuality discernible in these opinion data, either.  For the past two decades, 70-75 percent of the public has responded that homosexuality is wrong.

While a majority of the public cannot be said to approve of homosexuality or a homosexual "lifestyle," opinion toward the civil rights of homosexuals is more favorable.  Roughly 80 percent believe that homosexuals should not be discriminated against in the workplace (despite a personal preference of half the population not to have to work with a homosexual).  On other issues of homosexual rights, such as homosexual marriage or child rearing rights, only about one-third of the American public supports extending such rights to homosexual couples.

On the question of service in the military, the American public is again divided.  In a variety of polls, the percentage that favors lifting the ban on service varies from slightly more than 40 percent to slightly more than 50 percent.  In the most recent poll, the *Wall Street Journal*/NBC News poll, published June 11, 1993, only 21 percent of registered voters opposed allowing homosexuals to serve under any circumstances.  Thirty-eight percent favored service as long as sexual orientation was kept private, and 40 percent were in favor of homosexuals serving openly (but following the same rules of conduct as all military personnel while on base).  While the opinions on removing

---

[21]See Chapter 6 for a more detailed treatment of American public opinion.  Survey results are presented in Appendix F.

- 24 -

the restriction on homosexuals in the military more closely resemble opinions toward workplace and employment issues than opinions on "lifestyle" and morality, no strong consensus emerges from the data in favor of permitting homosexuals to serve.  The American public remains divided on this issue.

**Attitudes in the Military**[22]

The popular press and recent Congressional hearings have provided a window into the military perspective on ending discrimination on the basis of sexual orientation in the military.  Whether in opinion surveys or in group discussions the military members who have chosen to speak out on this subject have been overwhelmingly opposed to removing the restriction.  However, this opposition has not been universal.  Some military members have advocated allowing homosexuals to serve and some have expressed willingness to go along with whatever is decided, while some are strongly opposed to making any changes at all.  Some have predicted the demise of the military if the ban is lifted and others have expressed their belief that the military would adjust to this change, as it has adjusted to changes in the past.

Two sources of information on military opinion were consulted by the study team:  surveys and focus group interviews.  While neither source provides a statistically representative view, together, they provide a reasonably comprehensive picture of contemporary military opinion.

**Surveys**.  The two surveys of military opinion on this topic are by the *Los Angeles Times*, a survey of 2,346 enlisted men and women (E-1 through E-9) during February 11-16, 1993, and by Charles Moskos and Laura Miller, sociologists from Northwestern University.  While these surveys are limited in scope and use convenience sampling methods rather than probability sampling to select respondents, they provide a source of information about a diverse sampling of military members.

The survey results indicate that three-fourths of males and about half of females in the military are opposed to permitting homosexuals to serve.  A substantial minority of respondents in the *Los Angeles Times*

---

[22]See Chapter 7 for a more detailed discussion.

- 25 -

poll, about 16 percent of males and 35 percent of females, approved of removing the ban; and 17 percent of males and 44 percent of females participating in the Moskos and Miller survey approved of removing the ban.

Those opposing homosexuals in the *Los Angeles Times* poll indicated that they feared sharing quarters with homosexuals, that they viewed homosexuality as immoral and contrary to their religious beliefs, and that they were concerned that homosexuals contribute to the spread of AIDS.[23] An overwhelming majority expressed the opinion that homosexuals would be subject to violence if restrictions on them were removed. Those Army personnel responding to the Moskos and Miller survey indicated that, while homosexuals were not generally considered to be desirable unit members, an overwhelming majority of respondents (72 percent of males and 87 percent of females) felt that private sexual behavior was none of their business. Fewer, about 38 percent of males and 29 percent of females, felt that heterosexuals would be subject to sexual advances by homosexuals. The ban on homosexuals is not, however, the only important concern of military personnel. The *Los Angeles Times* survey found that while 48 percent rated removing the ban as the most important problem facing the military, 52 percent picked downsizing of the force; 66 percent felt that attention to removing the ban was "draining attention from other more important issues."

**Focus Groups.** RAND researchers also conducted 18 focus group discussions as part of this study. These focus groups provided a rich source of information on the diversity of military opinion and on how military members think about the issues and explain their views. Focus groups were conducted with Army, Air Force, and Marine participants at three California installations and with Army and Air Force participants from several installations near Frankfurt, Germany. The interview protocol used was designed to lead gradually into the topic of homosexuals in the military, in order to understand that issue in the larger context of opinion on other aspects of military life. To understand how conflict is managed in the military's working

---

[23]For a discussion of AIDS in the military see Chapter 8.

- 26 -

environment, questions were asked about how differences in race and gender might cause problems and how these problems were resolved.

While there was diversity in opinions, some common elements emerged. First, military members felt that they had dealt successfully with racial integration in the military and were proud of it. They seemed to feel that racial integration had strengthened the military's ability to perform its mission. They also seemed to deal well with the low-level interpersonal conflict that happens in the barracks and on the job. Soldiers viewed it philosophically as the price for diversity, which they seemed to value. Officers viewed dealing with it as part of the job they were trained to do and an area that provided considerable challenge.

Most acknowledged that the integration of women into the military was still causing problems, in part because it was incomplete. Still, most group participants viewed women as there to stay and were confident that problems would eventually be worked out to a tolerable degree.

When the issue turned to homosexuals in the military, focus group participants' level of confidence in their ability to cope dropped sharply. While some could view the change with equanimity, many had difficulty imagining the consequences and viewed the problem in stark terms. Concerns centered around fears of special treatment of homosexuals, fears that homosexuals will band together and discriminate against heterosexuals, fears of being subjected to unwelcome sexual advances, and fears about their families and themselves being confronted by evidence of a lifestyle they regard as immoral. These concerns were particularly strong against a backdrop of downsizing and cutbacks in military benefits. Many perceived their own opportunities to be shrinking and resented what they see as extending rights and benefits to an unworthy group that is using the military for political and social advantage. Many predicted violence against homosexuals would result; this was expressed both in the surveys and in the focus groups.

They were unable to see how the conflict management skills they had learned in response to other problems could apply to this new situation, although this was in direct opposition to the "can do" attitude they had articulated earlier in the group sessions. In

- 27 -

addition, while they had (for the most part) incorporated the presence of minorities and women into their image of the military, they had much more difficulty seeing how homosexuals could fit into that picture without changing it beyond recognition, compromising the military's ability to carry out an effective national defense.

**ISSUES OF CONCERN:  VIOLENCE AND AIDS**

Focus groups with active-duty personnel, surveys of military personnel, testimony at Congressional hearings, and media reports have raised concerns about anti-homosexual violence and the possibility that AIDS would increase among military personnel if acknowledged homosexuals are allowed to serve.

**Violence**[24]

The evidence on anti-homosexual violence is almost exclusively restricted to its occurrence in the civilian population and is of limited quality.  However, there is sufficient evidence to conclude that it occurs with some regularity in the civilian community.  It also occurs in the military under current policy, although there are no data on the relative frequency of that occurrence.  Experience in the civilian sector shows that there is a high rate of failure to report anti-homosexual violence.  The ban on allowing homosexuals to serve, with the significant penalties for discovery, provides a further disincentive  for victims to report anti-homosexual violence or threats of violence.

To the extent that changes in policy resulted in changes in the number of acknowledged homosexuals in the military, the rate of anti-homosexual violence might change, since acknowledged homosexuals are more readily identified targets for such violence.  The experience of racial integration in the U.S. military, foreign militaries, and domestic police and fire departments suggests that if leaders make it quite clear that violence will not be tolerated and stern action will be taken, violence can be kept to a minimum.

_____

[24]See Chapter 9 for a fuller discussion of anti-homosexual violence.

- 28 -

**HIV Transmission and AIDS**[25]

DoD's testing program for Human Immunodeficiency Virus (HIV) almost entirely prevents the entry of HIV-infected individuals into the military. Therefore, the only way a change in policy permitting homosexuals to serve could significantly affect HIV infection rates in the military is by increasing the number of service members who are infected while serving. It is not possible to predict whether there would be an increase, much less to estimate its magnitude. However, if there were an increase, it would have little effect on military effectiveness. All military personnel whose health is seriously affected by HIV are discharged. Further, all service personnel must be tested before deployment and those who test positive cannot be deployed. Given the accuracy of HIV testing, very few HIV-infected personnel would ever deploy or serve in combat, the military blood supply would remain safe, and there would be virtually no danger from contact with blood on the battlefield.

Regardless of whether homosexuals are permitted to serve, the military could experience higher HIV infection rates in the future. Available evidence on sexual risk behavior and rates of sexually transmitted diseases among all service personnel suggests the potential for increased HIV transmission under conditions that place personnel in greater contact with infected populations.

**UNDERSTANDING UNIT COHESION**[26]

Concern about the effect that an acknowledged homosexual would have on "combat effectiveness and unit cohesion" has dominated the debate. It also provides the basic rationale for the current policy that "Homosexuality is incompatible with military service."[27] Most military leaders who have spoken publicly on the issue in recent months argue that introduction of a known homosexual into a unit, no matter how discreet his or her behavior might be, would seriously undermine the

---

[25]Chapter 8 contains a more comprehensive discussion of health issues, risk behavior, and the military blood supply.
[26]See Chapter 10 for a more comprehensive treatment.
[27]Department of Defense Directive 1332.14, *Enlisted Administrative Separations*, Enclosure 3H.

- 29 -

cohesiveness of that unit.  Unfortunately, opinion on this issue is intuitive or based on anecdote.  There has been no systematic study of this subject, and no controlled experiments or other research bear directly on this issue.

There is a large body of potentially related empirical research in the fields of industrial organization, social psychology, sports psychology, and group behavior, a significant amount of which was sponsored by the military.  Other potentially relevant material can be found in the ethnographic and biographical military literature.  The principal conclusion from an extensive review of this literature is the commonsense observation that it is not necessary to like someone to work with him or her, *so long as members share a commitment to the group's objectives*.  This conclusion was also borne out in the review of racial integration in the military, as discussed above.

"Cohesion" is a concept with many definitions and sources.  While military researchers sometimes refer to "horizontal" cohesion, meaning the bonding of members of a group, and "vertical" cohesion, referring to the bonds between leader and members, these concepts are not widely used in the research literature.  Leadership is recognized as an important aspect of military performance (and can have an effect on cohesion), but "cohesion" is generally used to refer to the forces that bond individuals together as a group.  This notion of cohesion, in turn, can be generally divided into two important types:  social cohesion (intra-group attraction) and task cohesion (commitment to shared goals and objectives).  Cohesion can thus also be distinguished from other concepts such as morale, a concept more meaningfully applied to individual attitudes toward a larger group.

Research has shown that many factors can produce social and task cohesion.  Simply being assigned to the same unit predisposes the group members to at least a moderate level of cohesion.  Length of time together, a history of success experiences, and a sense of shared fate or interdependence all enhance a unit's cohesion.  Sharing similar traits or values enhances social cohesion, but it is not necessary for task cohesion, so long as the individuals share a commitment to the group's mission.

- 30 -

In general, research has identified a positive, though not strong, association between cohesion and performance.  However, the relationship between cohesion and performance is not a straightforward one.  First, the effect of successful performance on cohesion appears to be stronger than the effect of cohesion on successful performance.  Second, it appears that the positive association of performance and cohesion is almost entirely due to the influence of task cohesion, not social cohesion.  Indeed, excessive social cohesion sometimes interferes with the successful completion of the group's assigned mission.[28]

The lack of direct evidence makes it difficult to predict confidently the effect of the presence of a known homosexual on the performance of the group.  Sexual orientation is one dimension on which group members would be dissimilar, and this could reduce social cohesion.  Members would share other traits, however, and the precise effect of the presence of a known homosexual on social cohesion is uncertain.[29]  While the effect on social cohesion may be negative, the presence of a known homosexual is unlikely to undermine task cohesion, provided that the individual demonstrates competence and a commitment to the unit's mission.  Task cohesion, not social cohesion, appears to be what drives successful performance.

Given the high levels of hostility toward homosexuals present in the military ranks today, a range of responses is possible to the introduction of a known homosexual into the group, including ostracism.  At least initially, heterosexuals might be reluctant to cooperate or work with homosexuals.  However, the reduction in social cohesion would not necessarily lead to the breakdown of the unit.  In circumstances where disruptive behavior occurs or where standard leadership techniques are insufficient for preventing dysfunction in the unit, it may be necessary to provide additional resources to the unit leader, such as

---

[28]Examples where excessive social cohesion could undermine group performance include socializing among the workforce, "rate busting," groupthink, and mutinies.

[29]Acceptance of known homosexuals in police departments appears to be much greater, for example, if the individual is recognized as a "good cop," rather than a "gay cop."  See the discussion in Chapter 4 on this topic.

- 31 -

counseling support or expert assistance. It may also be necessary to remove individuals (heterosexual or homosexual) from units if their behavior continues to disrupt the unit.

**IMPLICATIONS OF THE RESEARCH**

Homosexuals serve in all of the foreign militaries and in each of the domestic police and fire departments visited by RAND researchers. They serve with varying degrees of openness, however, and in most of these organizations the number of homosexuals known to the organizations was estimated to be a small fraction of the total number of homosexual members. A variety of factors explain this, including the generally hostile attitudes of many heterosexuals toward homosexuals. In these circumstances, homosexuals tend not to advertise their sexual orientation but rather conform to the mores and norms of the organization in which they serve. These organizations found that incorporating homosexuals into the force created relatively few problems. They experienced virtually no loss of organizational effectiveness or impairment in performance. Few disruptive incidents or examples of outright hostility were reported. The inherent gradualism of the process of integration accounts in part for the absence of negative effect, as do some of the strategies adopted by the organizations for assuring successful implementation.

Among the strategies for achieving successful implementation of a nondiscrimination policy, those that signaled clear leadership support and insistence on maintaining high standards of professional behavior resulted in relatively few problems. In the opinion of most officials interviewed, the resistance of heterosexuals to the process was dealt with more effectively through leadership training (throughout all levels of the chain of command) than through affirmative action or sensitivity training for the rank and file. Dealing with potential cases of incompatibility or disruptive behavior--as they arose--was generally preferred over special class protections for homosexuals.

It is difficult to predict how including known homosexuals in the military would affect unit cohesion, but some resistance can be expected from heterosexuals, given the current state of opinion among service

- 32 -

personnel.  Research suggests that, at least in the short term, the possible negative effects on social cohesion would not necessarily have a negative effect on task performance or on unit effectiveness. Further, the research indicates that there would be sufficient time for military leadership to use the tools available to enforce discipline and foster task cohesion:  As discussed above, the process of integrating acknowledged homosexuals is gradual and self-regulating.  The experience of foreign militaries and domestic fire and police departments suggests that few homosexuals would acknowledge their orientation and that they would do so only when they felt the group context was tolerant.

The research conducted by RAND provides evidence that homosexuals can be successfully integrated into military and public security organizations.  It also revealed, however, that hostile opinion toward homosexuals is prevalent in the American military and that any effort to introduce a change in current policy must confront the challenges posed by this unique environment.  In developing a policy option consistent with the President's criteria (ending discrimination in a way that can be implemented practically and realistically), issues of implementation must, therefore, be examined carefully.  An option consistent with the findings of the research and satisfying those criteria is identified and assessed in the following section.  A discussion of implementation issues follows the description of the option.

### A POLICY THAT ENDS DISCRIMINATION BASED ON SEXUAL ORIENTATION

In light of this research, the team examined a range of potential policy options.  In the past and in foreign militaries, policies to end discrimination have generally taken one of two forms:

1.  Treat homosexuals as a protected class, with the special treatment or affirmative action such status implies, attempting to change majority attitudes to become more tolerant of the discriminated class.

2.  Consider homosexuals on an individual, case-by-case basis, using existing, universally applicable rules and regulations in making personnel decisions.

- 33 -

The first policy of treating homosexuals as a protected class characterizes the experience of integrating blacks in the American military and policies toward homosexuals followed by the Netherlands. A variety of factors suggest, however, that the second approach is likely to be more successful for the American military in this case. First, there is no legal requirement to provide protected class status to homosexuals at the present time. In fact, most courts, at both the state and federal level, have refused to recognize such status. Legislative change is not likely in the near term, and, in recent state and local elections, voters have either turned down or preempted such status. Second, the research reported here consistently suggests that such status, and the special treatment it implies, would clearly foster resentment and arouse hostility toward homosexuals in the very organizations that would be implementing a nondiscrimination policy. By drawing special attention to the issue of sexual orientation, such a policy would in effect place more emphasis on sexual orientation than the current exclusionary policy does. A policy that does not create special class status for homosexuals is likely to be received with less hostility and, therefore, to be easier to implement. Ultimately, however, a decision not to grant protected class status to homosexuals must rest on the ability of other, less drastic policies to end discrimination, the stated goal of the change in policy.

A policy based on the principle that sexual orientation is not germane to military service thus emerged as the most promising option for achieving the President's objectives. This option ends discrimination on the basis of sexual orientation while assuring the requirement that military order and discipline be maintained. It implies no endorsement of a "gay lifestyle," nor does it require any special accommodations to homosexuals, who would be considered as individuals, not as a special class of people. This policy incorporates strict standards of personal conduct, applicable to all members of the force and designed to remove matters of sexual orientation from the professional environment.

- 34 -

A policy based on these premises could be built around the following basic elements:

- A single, gender- and orientation-neutral standard of professional conduct.
- Strict rules governing personal and sexual harassment, designed to remove such actions from the professional environment.
- Elimination of prohibitions in DoD directives on private, consensual sexual behavior among adults, and adjustment of investigative and enforcement practices accordingly.
- No changes in other military rules and regulations.

An illustrative *Standard of Professional Conduct* was designed as part of the research project, with the overarching objective of maintaining the order and discipline essential for an operationally effective military organization.[30]  Similar standards have been used effectively in other organizations and foreign militaries[31] and are analogous to the "good order and discipline" and "conduct unbecoming" provisions in military law that have been used effectively by the U.S. military for years.  Four features of this standard are central:

- A requirement that all members of the military services conduct themselves in ways that enhance good order and discipline. Such conduct includes showing respect and tolerance for others. While heterosexuals are asked to tolerate the presence of known homosexuals, all personnel, including acknowledged homosexuals, must understand that the military environment is no place to advertise one's sexual identity or orientation.
- A clear statement that inappropriate personal conduct could destroy order and discipline, and that individuals are expected to demonstrate the common sense and good judgment not to engage in such conduct.

---

[30]Appendix A contains such a *Standard of Professional Conduct*.
[31]See Appendix E for the Canadian regulations.

- 35 -

- A list of categories of inappropriate conduct, including sexual harassment, fraternization, personal harassment (physical or verbal conduct toward others, based on race, gender, sexual orientation, or physical features), abuse of authority, displays of affection, and explicit discussions of sexual practices, experience, or desires.
- Application of these standards by leaders at every level of the chain of command, in a way that ensures that effective unit performance is maintained.

Strict standards of professional conduct and an environment free of personal harassment are critical to the successful implementation of this nondiscrimination option. The conduct-based standard provides military leaders with the necessary frame of reference for judging individual behaviors, just as it provides individuals with clear guidelines. Under this standard, behaviors that impeded the effective functioning of the unit (i.e., that undermine task cohesion) would not be tolerated.

The "not germane"/conduct-based policy does not require extensive revisions to existing military rules and regulations or to personnel policy. On issues such as recognizing homosexual marriages or conferring benefits on homosexual partners, there is no reason for the Department of Defense to change current policy or to become the "lead" federal agency in these areas.

Concerns about privacy are often cited by those who oppose permitting homosexuals to serve in the military. A survey of military facilities shows that in many newer military facilities there is greater privacy in showers and toilet areas today than was common twenty years ago.[32] However, members of the military often find themselves in situations where very little personal privacy is available, such as aboard ships or on field maneuvers. In situations where physical privacy is impossible, standards of conduct to foster personal privacy have already been developed: Individuals act in ways that do not

---

[32]Appendix B discusses the RAND survey of military facilities.

- 36 -

intrude upon and are not offensive to others.  For this reason, a strong emphasis on professional conduct conducive to good order and discipline is the key to dealing with privacy issues as well.  Freedom from personal harassment and uniform standards of conduct are the best guaranties of privacy.

**Legal Issues Regarding a "Not Germane"/Conduct-Based Policy**[33]

The legal implications of adopting and implementing the "not germane"/conduct-based policy were also examined.  This policy could be adopted and implemented by the President under his authority as Commander-in-Chief of the Armed Forces and would probably be upheld by the courts as an exercise of executive authority.  This policy, including implementing the *Standard of Professional Conduct* and revising the Manual for Courts Martial to exclude private, consensual sex between adults, is entirely legally defensible.

Implementing the illustrative *Standard of Professional Conduct* raises several potential issues from a legal perspective, however. First, is the standard itself sufficiently specific to withstand a void-for-vagueness challenge?  Second, how specific must a *Standard of Professional Conduct* be to provide adequate notice that certain behavior violates good order and discipline?  Third, would the code's lack of specific examples make it susceptible to challenges based on unequal enforcement in similar situations?  And fourth, if specific examples were to be included, would the standard be susceptible to an equal protection challenge?  For the reasons discussed below, we conclude that the *Standard of Professional Conduct* would likely be upheld against these potential challenges.  That is, the *Standard of Professional Conduct* as drafted would provide sufficient specificity to satisfy pre-notice requirements, but more specific provisions could also be sustained.

The Supreme Court has consistently upheld Articles 133 (conduct unbecoming an officer and a gentleman) and 134 of the UCMJ (the General Article, makes punishable ". . . all disorders and neglects to the

---

[33]See Chapter 11 for a more comprehensive discussion of the legal issues concerning such a standard.

- 37 -

prejudice of good order and discipline in the Armed Forces . . .")
against challenges that they were "void for vagueness" and hence
provided no notice of what would be punishable conduct.  Although the
court ruled that military law need not be as precise as civilian
criminal statutes, in most instances, adequate notice has been provided
by military custom, rules, and regulations.

Under the *Standard of Professional Conduct* it is inevitable that
the same behavior in different circumstances would be treated
differently.  Commanders would likely respond differently to certain
behavior and might view the consequences to morale and discipline of a
particular act differently.  Commanders would likely vary in how they
would weigh the time, place, circumstances, and purpose of an action
relative to its consequences.  Thus, some degree of differential
enforcement of the *Standard of Professional Conduct* should be expected,
but this alone would not render the standard unenforceable.  The result
of providing maximum discretion to commanders, which already exists
under Article 134, is that not all commanders treat the same situations
alike, a result also likely under the *Standard of Professional Conduct*.

As noted above, the time, place, circumstances, and consequences of
the conduct determine if an act would be punishable as disruptive
conduct.  The same standards would apply whether the conduct takes place
on or off base.  Thus, the *Standard of Professional Conduct* would be
applicable to behavior that is disruptive to morale or unit cohesion
regardless of where the behavior takes place.

If sexual orientation is regarded as not germane in determining who
may serve, Enclosure 3H of the DoD regulations concerning administrative
separations (DoD Directive 1332.14) should be rescinded.  The most
problematic regulatory and legal scenario would be to end discrimination
without revising portions of the Manual of Courts Martial (MCM) relating
to Article 125 (Sodomy) of the Uniform Code of Military Justice
(UCMJ).[34]   Those portions of the MCM have historically been applied

_____

[34]From the perspective of a homosexual member of the armed
services, the policy choice would have both positive and negative
consequences.  A positive outcome would be the ability to serve openly
in the military.  But a negative consequence could be that if 1332.14 is
repealed without changing Article 125, the only way for the military to

- 38 -

differentially to heterosexuals and homosexuals.  Retaining them after
rescinding Enclosure 3H would weaken the "orientation-neutral" principle
of the "not germane" policy.

A practical approach to dealing with this issue would be to revise
the MCM to prosecute only non-consensual sexual behavior or sexual acts
with a minor.[35]  No changes would be necessary in the sodomy article of
the UCMJ itself, because that code does not specify the sexual acts that
are illegal.  The definition of the offense is in the MCM, an
administrative document.

In sum, an option that regards sexual orientation as not germane to
military service, accompanied by the *Standard of Professional Conduct*
and revisions to administrative enforcement of Article 125, is legally
supportable.

**IMPLEMENTATION OF A POLICY THAT ENDS DISCRIMINATION ON THE BASIS OF
SEXUAL ORIENTATION[36]**

A policy for ending discrimination on the basis of sexual
orientation will present implementation problems that go beyond those
created by more usual structural or organizational changes.  Like the
racial integration, admitting acknowledged homosexuals represents a
*social* change that touches not only on deeply held social attitudes, but
on moral beliefs as well.  For many, it makes no difference if they come
into contact with a serving homosexual; just changing the policy alters
their perception of their organization in very fundamental ways.  For
these people, the primary issue is not unit cohesion, but morality.
Some may leave the organization.  For those who stay, the challenge will
be to implement the change in ways that preserve essential task cohesion
and organizational effectiveness.

---

discharge a homosexual would be through an Article 125 prosecution.
Under current policy many homosexuals are given administrative
discharges and are not usually prosecuted under Article 125.  By not
removing or modifying Article 125, homosexuals would be at greater risk
of an Article 125 prosecution.

[35]Appendix C contains an example of such a revision.

[36]See Chapter 12 for a more detailed discussion.  The research team
also examined the potential effects of a change in policy on recruitment
and retention.  These findings are discussed in Chapter 13.

**LCR Appendix Page 0358**

- 39 -

The manner in which policy change is implemented could have a decisive impact on whether these problems are managed with minimal disruptions or undermine the effort to change. Based on the research conducted in this study, key elements of an implementation strategy can be identified:

- The message of policy change must be clear and must be consistently communicated from the top. Given the fact that senior leaders of the military are on record as opposing any change, it will be necessary, if policy is changed, for these and other leaders to signal their acceptance of the change and their commitment to its successful implementation. It must be clear to the troops that behavioral dissent from the policy will not be permitted.

- The option selected should be implemented immediately. Any sense of experimentation or uncertainty invites those opposed to change to continue to resist it and to seek to "prove" that the change will not work.

- Emphasis should be placed on behavior and conduct, not on teaching tolerance or sensitivity. For those who believe that homosexuality is primarily a moral issue, such efforts would breed additional resentment. Attitudes may change over time, but behavior must be consistent with the new policy from the first day.

- Leadership must send messages of reassurance to the force. The military is currently undergoing a variety of other stressful experiences, e.g., declining budgets and the drawdown in the force. In such an atmosphere, it is important to signal that the change in policy will not have markedly disruptive effects and that it is not intended as a challenge to traditional military values. This climate of psychological safety is conducive to acceptance of the change.

- Leaders at all levels should be empowered to implement the policy, and some special training or assistance for leaders may

- 40 -

be a useful device for ensuring that the change is understood
and occurs rapidly.

- A monitoring process should be established to identify any
  problems early in the implementation process and to address
  them immediately.

The option assessed here, a conduct-based set of standards applied
under the premise that sexual orientation, as such, is "not germane" to
military service, appears to meet the President's criteria and to be
consistent with empirical research and historical experience.  By
following this implementation strategy, the Department of Defense should
be able to increase the probability that a policy that ends
discrimination based on sexual orientation can be implemented in a
practical and realistic manner and that the order, discipline, and
individual behavior necessary to maintain cohesion and performance are
more likely to be preserved.

- 41 -

## 2. SEXUAL ORIENTATION AND SEXUAL BEHAVIOR[1]

In discussions of a policy change allowing homosexuals to serve, some of the strongest expressed concerns have been that it would not only increase the number of homosexuals in the military, but implicitly condone sexual behaviors now proscribed under DoD Directive 1332.14 and Article 125 of the Uniform Code of Military Justice.  The purpose of this chapter is to look at what we know about the prevalence of homosexuality and the proscribed behaviors.  Specifically, we review the best available data to answer these questions:

- What is the prevalence of homosexual behavior in the general U.S. population and in the military?
- Are homosexual status (i.e., self-identified sexual orientation) and homosexual conduct (i.e., sexual behavior) synonymous?
- What is the prevalence of the proscribed sexual behaviors among male and female heterosexuals and homosexuals?

This chapter begins by discussing our approach to the relevant literature and then addresses these questions in turn.

### APPROACH TO THE LITERATURE

Before we start this review, the reader should be aware that literature on sexual attitudes, knowledge, and behavior is riddled with serious problems, most of them unlikely to be resolved in the near future, if ever.  Virtually all available data from the time of Dr. Alfred Kinsey's pioneering work (Kinsey et al., 1948, 1953) until the past few years are derived from nonprobability "convenience" samples that are not generalizable to the U.S. population as a whole.[2]  In the

---

[1] This chapter was prepared by Janet Lever and David E. Kanouse, who wish to acknowledge the considerable assistance of Robert MacCoun and Peter Tiemeyer.

[2] Convenience samples characterize most studies in both the sex research and epidemiology literatures.  Typically, samples are drawn

- 42 -

past few years, researchers have attempted to apply random probability sampling techniques to get more representative respondents, but these studies, too, have serious limitations.[3]

To date there is no completely accurate study of the prevalence and incidence of private sexual behaviors. Nevertheless, the data that have been collected do provide some useful information regarding the three questions posed above. Fortunately, for most of the issues we examine, the available information is adequate for a "ballpark" estimate, to establish a lower bound for the prevalence of particular behaviors, or to estimate the *relative* prevalence in different populations.

In light of the variable quality of the research, we concentrate on the best studies--those that provide the most objective empirical evidence available on issues relevant to this debate. These studies have been chosen using the following criteria:

- Sampling methods--probability sampling methods that will support generalizations to a population of interest are preferred to convenience samples.

- Specific, well-defined, objective measures of behavior--the interpretability of self-reports of sexual behavior requires that the questions be clear and well-defined so that respondents know what is being asked and researchers know what the response means.

- Quality of survey execution--use of appropriate procedures to safeguard privacy and to achieve adequate response rates.

---

from patients of STD (sexually transmitted disease) clinics, members of accessible organizations, persons who frequent public places for sexual contact, and volunteer respondents to magazine and other publicly announced surveys (Turner, Miller, and Moses, 1989). Contemporary researchers at the Kinsey Institute describe some of the other methodological shortcomings of sex research: small sample size, recruitment in one or just a few locales, and an overrepresentation of young, white, urban middle-class respondents (Reinisch et al.,1988).

[3]Limitations are a result of sampling error, non-response bias, and various sources of measurement error, including the respondent's skipping embarrassing questions, distortion of answers to fit a "socially desirable" image or to deny incriminating behavior, or simple failure of memory to provide the accurate response.

- 43 -

- Quality of documentation of results--key variables reported for subgroups as well as overall sample, univariate or multivariate relationships reported, evidence provided on the likely effects of nonresponse.
- Sample size--larger is better.
- Recency--although older studies may be as meritorious scientifically as recent ones, recent studies are more readily generalizable to today's policy context, all else being equal.

Wherever the available literature includes studies that vary on these dimensions, we based our conclusions on the studies judged best by these criteria. On some issues, however, we have used studies and noted their limitations and made caveats. We have omitted some pertinent studies when others better met our quality criteria.

## PREVALENCE OF HOMOSEXUALITY:  GENERAL POPULATION AND THE MILITARY

In some important respects, the prevalence of homosexual behavior in the general population has no direct bearing on policy regarding military service by homosexuals. If homosexuality is incompatible with military service, then it is incompatible regardless of how many people are excluded from serving by the restriction. Once consideration is given to ending the restriction, however, the prevalence of homosexual behavior gains relevance from a practical point of view: How many potential military personnel are we discussing? Furthermore, the prevalence of homosexual behavior in both the general population and the military will be important for assessing whether a policy change will cause an increase in sexual behaviors associated with health risks. Accordingly, we review what is currently known about this question.

All of the studies of the prevalence of homosexuality are affected to some degree by problems of underreporting. Homosexual behavior, especially in males, is highly stigmatized, and even the most credible assurance of anonymity may not persuade survey respondents to acknowledge behavior that they are accustomed to keeping secret. Consequently, stigmatized sexual behavior is probably more often underreported than overreported, and the magnitude of the underreporting

- 44 -

is unknown.[4]  Although much has been learned about survey research methods for obtaining useful data about sexual behavior, there are still many unanswered questions about the effectiveness of different approaches (Catania et al., 1990; Miller, Turner, and Moses, 1990, Chapter 6).

**Homosexual Behavior in the General Population**

Given these constraints, there is no definitive study establishing the exact proportion of men or women in the general population who have same-gender sex.  Instead, the proportion of men and women willing to acknowledge homosexual activity varies from survey to survey, no doubt reflecting the highly sensitive nature of questions on this topic and probably according to the methods used to assure confidentiality and elicit candid responses.

*Taken as a whole*, survey data indicate that roughly 2 to 8 percent of adult American males acknowledge having engaged in sexual acts with another man during adulthood.  The extent to which the actual percentage may be higher, because of underreporting, is not known.  For many men, long periods of time may elapse between such experiences.  Consequently, the percentage of men who report such acts during specified periods (e.g., during the last year) is typically smaller than the percentage who report any such contact as adults.  A majority of the men who report homosexual contacts have also had sex with women (Rogers and Turner, 1991).  Thus, the percentage of men who are *exclusively* homosexual in

---

[4]One of the few studies bearing on this was conducted by Clark and Tifft (1966), who used a polygraph to motivate respondents (45 college males) to correct misreports they may have made in a previously completed questionnaire.  They found that, although 22.5 percent of these men ultimately reported some male-male sexual contact when confronted with a lie detector, only 7.5 percent of these had done so in the initially completed questionnaire.  In addition to the 15 percent who changed their answers from denial to acknowledgement, 5 percent changed their answers from acknowledgement to denial when confronted with the lie detector.  Thus, the net change in the reported prevalence of male-male contact was an increase of 10 percent (from 12.5 percent to 22.5 percent), a substantially higher prevalence than would be estimated from the initial questionnaire alone.  Although it would be inappropriate to generalize from this small sample of college males to a broader population, the results illustrate that considerable underreporting of same-gender contact may occur in surveys.

- 45 -

their adult sexual behavior (those most likely to consider themselves to be homosexual) is much smaller than the percentage who ever have sex with other men.  We discuss this issue further under "Relationship Between Status and Conduct."

Data on the prevalence of female homosexuality are even more sparse than data for males, and where data have been collected, they are often unreported.[5]  However, what data there are suggest a prevalence lower than for males:  The estimates range from 1 to 6 percent, with variations among age groups and for marital status.

For many years, virtually the only data came from Kinsey et al. (1948, p. 651), who were the source for a widely cited figure of 10 percent.  In fact, this figure referred to the estimated proportion of the 5,300 men interviewed who were exclusively or predominantly homosexual--*for at least three years between the ages of 16 and 55*. They estimated the proportion who were exclusively homosexual throughout their lives to be much lower--4 percent.[6]

Kinsey et al. (1953) are often cited to the effect that the prevalence is lower among females than among males.  Such a conclusion requires comparable data for both genders, and, unfortunately, Kinsey did not report on female homosexual behavior using the same yardstick as was used for males.  For females, Kinsey (1953, pp. 473-474) reported that between 1 and 6 percent of unmarried and previously married females, but less than 1 percent of married females, were exclusively or predominantly homosexual--*in each of the years between 20 and 35 years of age*.  They did not report an aggregate percentage for females regardless of marital status.  But even if they had done so, the resulting percentage would not be comparable to the 10 percent for males because of differences in the age ranges and number of years required to qualify under the two definitions.

_____

[5]Data on female-female sexual contact were collected in some of the surveys reviewed in Table 2-1, but reports on those surveys may include only the male-male data because of the importance of this behavior in understanding and forecasting the future spread of HIV infection.

[6]The nature of Kinsey's sample may have affected the results:  Some of the male subjects were prisoners, and there is reason to believe that the incidence of homosexual behavior is higher in prisons, as discussed below.

- 46 -

More recent data from probability samples suggest that Kinsey's 10 percent figure for males is too high. But recent studies, summarized in Table 2-1, still do not converge on a single "correct" figure below that number. The prevalence estimates shown in Table 2-1 are not directly comparable to Kinsey's 10 percent figure. Rather, the statistics refer to all those who report any same-gender sexual contact either in adulthood or during a specified time period--a number likely to be considerably higher than the percentage who report being exclusively or predominantly homosexual. The National Survey of Men is the only study based on a probability sample that publishes a figure even roughly comparable to Kinsey's estimate that 4 percent of men are exclusively homosexual throughout their lifetime. Of the 3,321 men aged 20 to 39 surveyed, only 1 percent reported being exclusively homosexual in behavior in the prior ten years (Billy et al., 1993).[7] In their reanalysis of five probability studies (all presented in Table 2-1), Rogers and Turner (1991) report only 0.7 percent with exclusively male-male sexual contacts during adult life. Where estimates of female homosexual contact are available, they do not differ markedly from those found for males in one survey, and in the other, they are similar over the long time period, but considerably lower for the past year.

Table 2-1 clearly indicates the episodic or experimental nature of homosexual experiences for some people.[8] The shorter the time period investigated, the smaller the percentage of men and women who report same-gender sexual behavior. Besides time frame, differences in samples and data collection techniques in all likelihood also contribute to the variation in prevalence estimates. Estimates of homosexual activity are highest in the Research Triangle Institute study, which was conducted as a pilot test for a national seroprevalence study (Rogers and Turner, 1991). Its unusually high response rate (88 percent) may be a result of the cash incentive offered; in addition, it is possible that a higher

---

[7]The National Survey of Men received a lot of attention in the popular press where it was more commonly referred to both as the Battelle study and the Guttmacher study.

[8]Prevalence is also related to the time period investigated for heterosexual behavior.

- 47 -

Table 2-1

Estimates of Homosexual Behavior From U.S. Probability Studies

| Study | Sample Characteristics | Prevalence of Same-Gender Sexual Contact Male | Female | Methods of Data Collection | Response Rate |
|---|---|---|---|---|---|
| National Opinion Research Council, (NORC) 1970 (Fay et al. 1989) | 1450 men aged 21 and older | Since age 20 6.7% ----------------- Last year 1.6-2.0% | N/A N/A | SAQ following face-to-face interview | N/A |
| General Social Survey (GSS)[a] 1989-91 | 1564 men and 1963 women aged 18 and older ----------------- 1941 men and 2163 women aged 18 and older | Since age 18 5.0% ----------------- Last year 2.2% | 3.5% 0.7% | SAQ following face-to-face interview | 74%-78% (1988-1991) |
| Louis Harris & Associates, 1988 (Taylor, 1993) | 739 men 409 women aged 16 to 50 | Last 5 years 4.4% Last year 3.5% Last month 1.8% | 3.6% 2.9% 2.1% | SAQ following face-to-face interview; same sex interviewer | 67% |
| Research Triangle Institute (Rogers & Turner, 1991) | 660 male residents of Dallas County, Tx, aged 21-54 | Last 10 years 8.1% ----------------- Last year 4.6% | N/A N/A | SAQ | 88% |
| National Survey of Men (NSM-1) (Billy et al. 1993) | 3321 men aged 20-39 | Last 10 years 2.3% | N/A | Face-to-face interview; female interviewers | 70% |

Note: N/A = not available
      SAQ = Self administered questionnaire
      [a]Prevalence of male and female homosexuality calculated at RAND from General Social Surveys (Davis and Smith, 1991).

proportion of homosexual men agreed to participate because of the AIDS focus. In any case, its sample is composed of Dallas County, Texas, residents only. There is no reason to believe that the true prevalence for Dallas County mirrors that of the nation as a whole. Results from the National Survey of Men (NSM-1) indicate that male-male sexual activity is reported more frequently in urban than nonurban areas (Koray

- 48 -

Tanfer, personal communication, June 3, 1993).  An analysis of the other probability surveys listed in Table 2-1 also shows higher rates in cities (Rogers and Turner, 1991).

Estimates of homosexual activity are lowest in the NSM-1, but data collection proceeded differently from all other surveys presented in Table 2-1.  While the other surveys used a self-administered questionnaire for sensitive questions that was completed then delivered in a sealed envelope to the interviewer after a face-to-face interview, the NSM-1 was conducted only with face-to-face interviews.  Further, in contrast to the use of interviewers of both genders, or ones matched by gender to the respondent, the NSM-1 used all female interviewers for all male respondents.  These methodological variations may account for the low rate of reported homosexual behavior.

Finally, differences in prevalence estimates may be due to sampling and/or measurement error.  First, no sample perfectly represents the population from which it is drawn, so statistics are often reported using confidence intervals that estimate the likely range of variation due to sampling error.  Where confidence intervals are offered, there is much more overlap between study estimates.[9]  Second, estimates may be affected by low response rates.  Rates for the surveys shown in Table 2-1 ranged from 67 percent to 88 percent; while these are considered acceptable rates for in-person household surveys, they still imply that between one and three of every ten persons refused to participate.  There is no evidence to show whether persons with homosexual experience differ in their willingness to cooperate with survey researchers from those without homosexual experience.  However, as we discussed earlier, it is likely that many of those with homosexual experience who do participate in the survey do not acknowledge that experience; this underreporting is one component of "measurement error."  According to the president of Louis Harris and Associates, measurement error is a far

---

[9]For example, Research Triangle Insitute analysts estimate that there is a 95 percent probability that the "true" prevalence of Dallas men who engaged in homosexual conduct in the previous 12 months is between 1.4 percent and 7.8 percent.  This range is broad enough to include point estimates in two of the three years for which GSS data have been reported.

- 49 -

bigger problem than sampling error when there is a "socially desirable" answer in both surveys of behavior and attitudes (Taylor, 1993).[10]

The extent of measurement error is unknown. Researchers from NORC who reanalyzed the 1970 data in light of the 1988 GSS survey appropriately suggest that their estimates be viewed as "lower bounds on the prevalence of same-gender sex among men" (Fay et al., 1989, p.243).[11] Other scientists concur that estimates are lower-bounds of actual prevalence (Rogers and Turner, 1991). Nevertheless, the new probability studies indicate that the prevalence of predominantly and exclusively homosexual behavior in men today is lower than Kinsey's widely cited estimate of ten percent.

**Homosexual Behavior Among Military Personnel**

Few studies have asked military personnel about their sexual activities, and none have published data on the incidence of homosexual acts among those currently serving in the Armed Forces. The only available study from which an inference can be made, drawing on three national probability samples that included data on previous military status, suggests that the prevalence of same-gender sexual behavior by men who have served is at the high end of the range for the general population (Rogers and Turner, 1991). This behavior may or may not have occurred during their military service.[12]

Rogers and Turner report an analysis combining data from three probability samples of the U.S. population (combined n = 2,449 respondents) that examines the proportion of men aged 21 and older who reported same-gender sexual experience by various social and demographic characteristics, including military service. Among men with

---

[10]Humphrey Taylor was interviewed by the *New York Times* (Barringer, 1993) and asked to explain the difference between Harris and BSM-1's estimates for the prevalence of homosexual behaviors. In describing inaccurate measurement problems, he points out that church-going and tooth-brushing are as likely to be overreported as homosexual and drug-using behaviors are underreported.

[11]Presented in the first two rows of our Table 2-1.

[12]Data from probability surveys are available for men only; however, the same generalization can be made for women based on their higher separation rate for reasons of homosexuality in the U.S. military (GAO, 1992, p. 20).

- 50 -

military service, 7.6 percent reported same-gender sexual contact,
compared with 5.1 percent of other men. Military service was one of
only four *adult status* variables that showed a reliable statistical
relationship with reports of same-gender sex across the three surveys.[13]

RELATIONSHIP BETWEEN STATUS AND CONDUCT

Under current military policy, there is a "rebuttable presumption"
that homosexual status equals conduct: A soldier can be discharged
either for being homosexual or for engaging in a homosexual act.[14]   DoD
Directive 1332.14 states that homosexuality is incompatiable with
military service. A homosexual is defined as "a person, regardless of
sex, who engages in, desires to engage in, or intends to engage in
homosexual acts." As used in this section, a homosexual act "means
bodily contact, actively undertaken or passively permitted, between
members of the same sex for the purpose of satisfying sexual desires."

Simply put, DoD Directive 1332.14 prohibits *any* sexual contact
between same-gender partners; it is the partner, not the act, that is
proscribed. However, in applying DoD Directive 1332.14, the military
recognizes the distinction between a homosexual orientation that is
persistent and a single incident of homosexual conduct that is atypical
of the person's usual conduct. For example, if during an investigation
it is determined that a homosexual act was either a one-time
"experiment" or the result of intoxication, adverse action need not be
taken. Also, while the DoD definition includes those who desire and/or
intend to engage in homosexual acts, in practice, homosexual feelings
are unobservable and exceedingly difficult to recognize in the absence
of behavior and/or acknowledgment.

---

[13]The others were marital status (unmarried men were more likely to
report same-gender contact); current religious affiliation (those with
none were more likely to report same-gender contact); and size of city
or town of current residence (those in places of > 25,000 were more
likely to report same-gender contact). The only social background
variable associated with reports of same-gender contact was father's
education: Respondents with college-educated fathers were more likely
to report same-gender contact.

[14]See the discussion in the chapter on legal considerations.

- 51 -

In this section, we review studies of sexual behavior and/or identity to explore whether homosexual status and conduct are synonymous.  If the two are not the same, then a policy of excluding solely on the basis of status would exclude some who do not engage in sexual acts with same-gender partners while allowing others who do to serve.  In this chapter, we do not address the policy problems that this might pose, but merely the question of how many people might fit the broad DoD definition of homosexuals.  Further, this section has bearing on health-related concerns because it is conduct rather than status that poses potential health risks.

A review of available studies leads us to conclude that, while there is a strong correlation between status and conduct, they are not synonymous:

- A person who *does not* identify himself or herself as a homosexual may still engage in acts with someone of "the same sex for purposes of satisfying sexual desires" (in the language of the directive);
- A person who *does* identify himself or herself as a homosexual may refrain from engaging in homosexual acts.

**Homosexual Behavior Among Self-Identified Heterosexuals**

Kinsey and associates (1948) did not use "homosexual" or "heterosexual" as nouns characterizing people, but rather as adjectives characterizing acts.  In their landmark study, they created a seven-point scale--which came to be known as the "Kinsey scale"--to place individuals along a continuum ranging from exclusively heterosexual (0) to exclusively homosexual (6), according to his or her current or cumulative lifetime sexual experiences and sexual feelings.  All intermediate points indicated personal histories with a mixture of homosexual and heterosexual acts and/or feelings.  Kinsey et al.(1948, p.650) found that most of those who ever engaged in homosexual acts had engaged in a greater proportion of heterosexual acts.  In contemporary society, it appears that bisexuality is still more prevalent than exclusive homosexuality; the probability studies presented in the

- 52 -

previous section support the generalization that a majority of men who report male-male sexual contacts in adulthood also report female sexual partners in adulthood (Rogers and Turner, 1991, pp.505,509).

After analyzing the sex histories of 150 interview subjects who had both heterosexual and homosexual experience in adulthood, Blumstein and Schwartz (1976a:342; 1976b) concluded there may be "little coherent relationship between the amount and 'mix' of homosexual and heterosexual behavior in a person's biography and that person's choice to label himself or herself as bisexual, homosexual, or heterosexual."

The relationship between identity and behavior has not been well studied, because the available datasets have generally included measures of only behavior or identity, or have been based on very small and non-representative samples. One dataset that contained independent measures of behavior and identity on a large national sample of 56,600 men supports the conclusion that conduct and status are not synonymous (Lever et al., 1992). RAND researchers reanalyzed a 1982 readers' survey that appeared in *Playboy*. Obviously, readers of *Playboy* are not representative of all U.S. men; like other popular magazine surveys--and "convenience" (i.e. nonprobability) samples more generally--this survey cannot be used to estimate prevalence of sexual behaviors in the general population. However, a large and diverse dataset containing detailed questions on sexuality does provide some information on the relationship *between* various aspects of sexuality. Accordingly, researchers examined the 6,982 (or 12.5 percent) of men who reported adult sexual experiences with both men and women. Of these, 69 percent described themselves as "heterosexual," 29 percent as "bisexual," and 2 percent as "homosexual."[15] Even after allowing for likely overrepresentation of men at the heterosexual end of the Kinsey continuum, the result

_____

[15]Popular magazine respondents do not even necessarily represent the magazine's own readership. It is assumed that those who answer such surveys are those most interested in, and perhaps most comfortable with, the subject of sexuality. Furthermore, drawn from *Playboy* readers, this sample is likely to overrepresent the bisexual men who are on the heterosexual side of the Kinsey scale, in contrast to earlier empirical studies of bisexual men who, having been recruited from the homosexual community, are likely to overrepresent the homosexual side.

- 53 -

demonstrates that many men who have engaged in homosexual conduct do not consider themselves homosexual.

An epimediology study and a criminology study further illustrate the point that homosexual behavior does not occur only among people with homosexual identification. Epidemiologists (Doll et al., 1992) from the Centers for Disease Control studied 209 HIV-seropositive male blood donors who reported having had sex with both men and women since 1978. Because men who have had sex with men are asked to refrain from donating blood, one might expect this sampling method to overrepresent men who do not have a homosexual self-identification. Of these, 45 percent self-identified as homosexual, 30 percent as bisexual, and 25 percent as heterosexual.

Studies in criminology have found examples in prison of what social scientists term "situational homosexuality," i.e., self-identified heterosexuals engaging in homosexual behavior only in situations that preclude sex with women. Wooden and Parker (1982) is considered the most thorough treatment of the phenomenon of male-male sexual activity in a prison context. Through in-depth interviews, the researchers learned that the sexual aggressors consider themselves "heterosexual"; their targets are men they assume to be homosexual or younger heterosexual men who are not able to protect themselves. Most of the sexual aggressors claim no homosexual experience prior to prison, and those released claim to resume a life of exclusively heterosexual relations. Of the 200 men in Wooden and Parker's study who returned a questionnaire, 10 percent identified themselves as homosexual, 10 percent as bisexual, and the remaining 80 percent as heterosexual; over half (55 percent) of the heterosexual group reported having engaged in homosexual activity in prison.[16]  Although prison culture and populations have few parallels, these behavioral patterns offer another example of divergence between identity and behavior.

---

[16]The researchers distributed questionnaires to a random sample of 600 out of 2500 male prisoners in a medium-security prison; 200 returned completed questionnaires, a 33-percent response rate. Because of the low response rate, we do not offer findings as estimates of prevalence; however, they are instructive about the relationship between status and conduct.

LCR Appendix Page 0373

- 54 -

**Virginity and Celibacy Among Self-Identified Homosexuals**

Current military policy considers that a statement of homosexual orientation presumes homosexual behavior. Therefore, we examined various studies of whether people may have a sexual self-identification that incorporates attraction to others of the same sex without having acted on their homosexual feelings. We use as examples two probability studies--one a national sample of male adolescents and one a single-city study of homosexual and bisexual men--as well as an epidemiology report and a nonprobability survey of homosexual women.

In 1988, the Urban Institute conducted a nationally representative survey of adolescent males which included a self-administered questionnaire that contained sensitive items on sexual practices. Of the 1,095 males between ages 17 to 19, five percent labeled themselves "mostly heterosexual" or "bisexual," and 0.6 percent selected "mostly homosexual" or "100 percent homosexual" (8 percent answered "don't know" or left the item blank). Only 23 percent of those who acknowledged some same-sex attraction had ever engaged in sexual acts with another male-- i.e., roughly three-quarters were "virgins" with regard to homosexual sex.[17]

Very few studies of homosexual men are, like the Urban Institute study, based on a systematic sample screened from a random sample of the general population. One study used a systematic sample, but not from the general population. That study was conducted by RAND in 1989-1990 of 300 homosexual and bisexual men over age 18 who were concentrated in areas of Los Angeles County known to have significant numbers of homosexual men (Kanouse et al., 1991a). The sample included men who acknowledged having had sex with another man in the last ten years. Although this study overrepresents men living in homosexual neighborhoods relative to those living in other areas, the sample is in other respects apt to be much more representative of homosexual men

---

[17]These tabulations are taken from the National Survey of Adolescent Males (Sonenstein et al., 1991). The NSAM is a nationally representative survey of 15 to 19 year olds conducted in 1988 by the Urban Institute and Sociometrics Corporation. Because the survey oversampled black and Hispanic males, all tabulations have been adjusted by using appropriate case weights.

- 55 -

than, say, a sample of men attending an STD (sexually transmitted disease) clinic or men who belong to a homosexual organization.  In an anonymous telephone interview, homosexual and bisexual men in this study were asked detailed questions about their sexual risk behaviors.  About 13 percent of respondents reported having no sexual partner in the past 12 months.[18]

The population-based prevalence studies presented in Table 2-1 have also found evidence that for many men, homosexual activity tends to be episodic:  The proportion of men who report having engaged in homosexual acts during recent time periods is frequently much lower than the proportion who report having engaged in such acts during a longer time interval (Rogers and Turner, 1991).  Some of these men may be having sex with women during the times they are abstaining from sex with men.

In a study of 584 homosexual and bisexual men recruited in places in Pittsburgh likely to overrepresent sexually active men, 7.4 percent of one group and 9.1 percent of another had been celibate for the previous six months (Valdiserri et al., 1989).

Loulan (1988) distributed sex questionnaires at workshops, lectures, and women's bookstores as well as through ads in women's and homosexual newspapers throughout the U.S.; we assume that her sample overrepresents homosexual women who are "out" and part of the visible homosexual community.  Self-reported histories of the 1566 homosexual women who responded showed that 78 percent had been celibate for varying periods of time: the majority for under one year, but 35 percent for one to five years, and 8 percent for six years or more.

---

[18]For the sake of comparison, in their counterpart study of the general population of Los Angeles County, Kanouse et al.(1991b) found that roughly 12 percent of the sample had been sexually inactive for five years or more.  Of those in the general population who had a partner in the prior five years, 24 percent had no partner in the four weeks prior to the survey; of the homosexual and bisexual men who had a partner in the past year, 22 percent had none in the past four weeks (Kanouse et al., 1991a).  Another probability study of homosexual and bisexual men done in San Francisco shows a similarly high rate of sexual inactivity for a large minority of men (35 percent) when a short time frame is used, in this case, the past 30 days (Stall et al., 1992).

- 56 -

### Summary/Conclusion

Although the studies cited above focus on behavior and not motive or attitudes, we can tentatively suggest this summary: There are people who call themselves heterosexual, and who are predominantly heterosexual in behavior, who also engage in homosexual acts. Some may experiment with homosexual behavior once or twice. Others may occasionally act on their attraction to people of the same-sex, even if they call themselves heterosexual. Still others may recognize their attraction to others of the same gender, but they establish a heterosexual public persona and refrain from acting on these attractions or revealing their orientation to others. Finally, there are people who consider themselves to be "homosexual" or "bisexual" who, for whatever reasons (e.g., health concerns, religious convictions, or simply lack of opportunity), refrain from homosexual activities.

### PREVALENCE OF PROSCRIBED BEHAVIORS BY SEXUAL ORIENTATION

The sodomy provisions of the Uniform Code of Military Justice (UCMJ, Article 125) have been used as the basis for removing homosexuals from the service. Some have argued that a policy allowing homosexuals to serve would be inconsistent with this provision of military law; however, unlike DoD Directive 1332.14 which prohibits same-gender partners regardless of sex act, *Article 125 prohibits certain acts, regardless of gender of partner*. Article 125 of the UCMJ states that a person engaging in "unnatural carnal copulation" with members of the same or opposite sex is guilty of sodomy. That is, under military law sodomy is forbidden whether performed by heterosexuals or homosexuals. The Manual for Courts Martial (MCM) defines sodomy as oral or anal sex (or sex with an animal). In this section, we review what is known about these forbidden behaviors in the general population. There are no published data on these behaviors among military personnel.

A review of available studies leads us to conclude:

- Oral sex, as defined and prohibited by the UCMJ/MCM, is widely practiced by both male and female homosexuals and by heterosexuals.

- 57 -

- Although a sizeable minority of heterosexuals have experienced anal sex at least once, most of them do not repeat this sexual act or else practice it infrequently--the majority of heterosexuals have not experienced this sexual act.
- Although the prevalence of anal sex has decreased since the beginning of the AIDS epidemic, it is still a common sexual practice for many homosexual men.

**Oral Sex Among Heterosexuals and Homosexuals**

In contrast to reports of same-sex behavior, reports of oral-genital sex should be less distorted by the problem of underreporting described above. Although this is a very private behavior, most Americans evidently consider it a "normal" sexual variation. For example, 88 percent of men and 87 percent of women in a large (albeit unrepresentative) national sample rated oral sex as "very normal" or "all right," versus "unusual" or "kinky." Even 77 percent of those who described themselves as "very religious" held this view (Janus and Janus, 1993).[19]

The National Survey of Men (NSM-1, Billy et al., 1993), one of the probability samples described earlier, reports that of U.S. men between ages 20-39, 75 percent have performed and 79 percent have received oral sex. Among those currently married, 79 percent performed and 80 percent received it. Among the total sample, 32 percent of the men performed and 34 percent received oral sex within the last four weeks.

None of the other probability studies described in Table 2-1 provides data on the prevalence of oral sex for a representative U.S. sample; therefore, there are no comparable statistics collected from female respondents. Inasmuch as 98 percent of the NSM-1 respondents reported being exclusively heterosexual in the last ten years, we can infer that the prevalence estimates generated by the male respondents

---

[19]The Janus Report, based on 2,765 volunteer respondents, is not representative of the U.S. population. We do not use it to draw conclusions about prevalence of behaviors, but we do draw on its data about sexual attitudes. Few general population surveys or epidemiological studies measure attitudes toward particular sexual practices.

- 58 -

reflect female participation in oral sex acts, although this does not mean that the same percentages of women have ever experienced oral sex or would report having done so in the last four weeks.

Although there are no published data on the prevalence of oral sex in a military population, it seems reasonable to assume, based on general population estimates, that a majority of both married and unmarried military personnel engage in oral sexual activity, at least occasionally.

The RAND study described earlier is the only study that we could find that included data on both heterosexual and homosexual respondents from a random probability sample (Kanouse et al.,1991a, 1991b).  Based solely on Los Angeles County residents, it is not generalizable to the U.S. population.  RAND systematically sampled both homosexual and bisexual men and a random sample of the general adult male and female population in Los Angeles County; questions about AIDS-related knowledge, attitudes, beliefs, and behaviors were asked of both the general population sample and the homosexual/bisexual sample.[20]  Female homosexual respondents were not included, and we know of no probability-based study that reports on specific sexual practices of homosexual women.

Among homosexual men who had sex with another person in the past year (Kanouse et al., 1991a), the proportion engaging in oral sex during the four-week period preceding the survey was 55 percent.[21]   This proportion is about twice as large as the 26 percent of heterosexual men and women who report engaging in this behavior during the four-week period before the survey.

_____

[20]Data on some sexual practices, including both oral sex and anal sex, were derived from questions that are not exactly comparable. Figures for heterosexuals represent everyone who had been sexually active in the previous five years whereas those for homosexual men represent all those sexually active within the previous one year.

[21]Unpublished data combining oral sex with and without condoms. The 55 percent represented 70 percent of all respondents who were sexually active in the four-week period immediately before the survey (about two thirds of the sample).  If the period is extended to a year, the proportion increases to 78 percent of the sample, but the survey did not collect detailed information about the specific behaviors of respondents unless they had been sexually active in the past four weeks.

- 59 -

There is a second study that directly compares the practice of oral sex among heterosexual men and women with that of homosexual men and women.    Volunteers were recruited via media appeal in hundreds of locations across the country to participate in the American Couples study (Blumstein and Schwartz, 1983).    Although the study includes a large number of respondents from every region of the nation, and from rural as well as urban areas, it is limited because it is not based on a random sample.[22]  Nevertheless, it is considered a valuable source of data on sexual behavior because of the number of detailed questions (contained in a 38-page questionnaire) and its inclusion of homosexual as well as heterosexual respondents.    Both members of a couple had to agree to participate.    Among the 7,823 American couples were 3,656 married couples, 653 cohabiting heterosexual couples, 1,938 homosexual male and 1,576 homosexual female couples.    Even more sensitive and detailed data on a variety of topics, including sexual practices, were collected during in-depth interviews (over two hours) from a subsample of 360 homosexuals and 340 heterosexuals.

Questions about frequency of sexual relations were asked of the total sample.    Overall, homosexual women had far less sex than heterosexual and  male homosexual couples.    Homosexual men and heterosexual cohabitors had virtually identical sexual patterns on this item; couples together ten years or less had sex more frequently than married couples, but married couples had the most frequent sex of all those in relationships of longer than ten years.    The oral sex question was asked only of the subsample interviewed; we present these data primarily because there is virtually no other information on the sex

_____

[22]There are other large national convenience (i.e., nonrepresentative) samples that offer details on specific sex acts. Some of the largest, and most regionally diverse, are based on questionnaires that appeared inside mass circulation magazines.  One such survey is the *Redbook* Report of Female Sexuality (Tavris and Sadd, 1977), which had over 100,000 respondents.  The *Redbook* survey offers further evidence that oral sex is a common activity for heterosexuals in the United States:  91 percent had performed oral sex (85 percent more than once) and 93 percent had received oral sex (87 percent more than once).  Generally regarded as biased toward those most interested in sex, findings from this and other magazine surveys can be regarded as overestimates of sex activities.

- 60 -

practices of homosexual women.  Ninety-six percent of lesbian couples engaged in oral sex, although 19 percent of them reported such acts as "rare"; 99 percent of male homosexual couples have oral sex, although 10 percent report it as "rare." Among the heterosexual couples, over 90 percent engage in oral sex, although these practices are described as "rare" for almost 20 percent of couples. In other words, among the couples who participated in this study, oral sex was nearly universal as a sexual practice engaged in at least occasionally.

Because oral sex is not among the highest-risk sex activities for HIV transmission, the incidence of this practice is unmeasured or unreported in most of the recent epidemiology studies.[23]  One exception is the recent report of Silvestre and colleagues (1993) on the 1614 homosexual males in the Pittsburgh Men's Study, a site of the Multi-Center AIDS Cohort Study, which offers data on oral sex, regardless of condom use.  The senior author (in personal communication, June 1, 1993) reports that virtually all of the men engaged in oral sex with at least one partner in the previous two years.  He points out their bias, namely, that their recruitment strategy was to seek the most sexually active homosexual men.  Another report that includes incidence figures for this behavior regardless of condom use is Stempel and associates' (1992) VIIIth International AIDS Conference report on the cohort of 462 San Francisco men studied since 1984.  In 1990-91, 90 percent received and 85 percent performed oral sex.

**Anal Sex Among Homosexuals and Heterosexuals**

In contrast to reports of oral sex, reports of anal sex may share the same problem of underreporting described for same-gender sex.  In Janus and Janus (1993), 71 percent of men and 76 percent of women rated anal sex as "unusual" or "kinky."  These attitudes are in dramatic contrast to the same respondents' attitudes toward oral sex reported earlier, suggesting that anal sex is stigmatized behavior that is likely to be underreported.

---

[23]Where oral sex is included, it is typically reported as "unprotected" oral insertive or receptive, i.e., incidence of the activity done without the protection of a condom, thereby leading to underreporting incidence of oral sex, regardless of condom use.

- 61 -

The National Survey of Men (NSM-1) is the only probability study described in Table 2-1 that includes questions about the prevalence and incidence of anal sex (Billy et al., 1993).[24]  Reporting on U.S. men 20 to 39 years of age, 20 percent have ever engaged in anal intercourse. Almost all of the men surveyed were heterosexual.  However, the percentage who have done so recently is much smaller; 90 percent of those who had ever had anal sex had not engaged in this sex practice in the four weeks prior to the interview.  Younger men were less likely to have ever engaged in this sex practice:  only 13 percent of those aged 20-24 compared to 27 percent of those aged 35-39 who did so.  Almost half of the small group of men who ever had anal sex had only one partner, while one out of five had four or more partners.

The RAND study (Kanouse et al., 1991a;1991b) provides the only comparative data on prevalence of anal sex among heterosexuals and homosexual men.  In neighborhoods of Los Angeles County with large homosexual populations, a major epicenter of the AIDS epidemic, 34 percent of all homosexual/bisexual respondents who were sexually active in the year before the survey reported having engaged in anal sex with or without condoms during the four-week period immediately before the survey.  This is more than six times the proportion (5 percent) of heterosexual men and women throughout Los Angeles County who reported engaging in this behavior during a comparable period.[25]  Homosexual respondents who described themselves as married to another male or in a monogamous primary relationship with another male were much more likely to report engaging in anal sex (58 percent versus 27 percent of all other sexually active homosexual respondents).

---

[24]The Redbook Survey, as discussed in footnote 22, presents an overestimate of prevalence of sexual activities because of its sample bias.  Nevertheless, it is instructive that when the question is asked of women, the same pattern appears.  Of the 43 percent of women who said they had ever engaged in anal sex, half of them tried it only once. Only 2 percent of the entire sample described the frequency of anal sex as "often," while another 19 percent described the frequency as "occasionally" (Tavris and Sadd, 1977).

[25] The data presented here for homosexual/bisexual men differ from those presented in Kanouse et al. (1991a), in that they combine anal sex with and without a condom, which were considered separately in the published analyses.

- 62 -

Other reports over the past decade of the prevalence of anal intercourse among male homosexuals vary. For example, in the Pittsburgh Men's Study described above (Silvestre et al., 1993), 65 percent of homosexual men older than 22 reported anal receptive sex in the last two years, as did 81 percent of the men 22 years or less. Anal insertive sex is reported by 78.5 percent of the older and 90 percent of the younger men in the 1992 study (personal communication, A. J. Silvestre, June 16, 1993).[26]

In the American Couples Study (Blumstein and Schwartz, 1983), 30 percent of the male homosexual couples rarely or never engaged in anal sex, whereas 70 percent did so regularly. No comparable figures are offered for heterosexuals. These data are for couples only and do not reflect changes in behavior that have occurred as a result of the AIDS epidemic.

There is some evidence that the prevalence of anal intercourse is affected by perceived risk of AIDS. Becker and Joseph (1988) and Stall et al. (1988) have reviewed published reports of behavioral changes in response to the increasing threat of AIDS, including data from San Francisco, Chicago, New York City, and other large U.S. cities. In the Pittsburgh study cited above, the proportion who engaged in anal sex with at least half their partners declined from 45 percent in 1984 to 29 percent in 1988-1992.

There is also some evidence suggesting that the incidence of this behavior, known as a high-risk sexual activity for homosexual men, may be greater where there is low AIDS incidence (Turner et al., 1989).

Great caution is needed in interpreting such disparate prevalence findings and attempting to draw conclusions about average prevalence among all homosexual men. Data on homosexual men and women are necessarily based on samples of people who are willing to identify

---

[26]This age difference in prevalence of anal sex is noted again in a report (Stall et al., 1992) on 401 randomly selected homosexual men who were interviewed by telephone in San Francisco in 1989: of the total sample, 23 percent had had *unprotected* anal sex in the past year. Forty-four percent of those aged 18 to 29 reported having had unprotected anal intercourse in the past year, compared with 18 percent of those age 30 years and older. We discuss the health implications of this study further in the chapter on health issues.

- 63 -

themselves as homosexual in orientation and/or behavior.  Results from such samples cannot be taken as representative of the larger population that includes those unwilling to identify themselves.  Moreover, as noted below, patterns of behavior--particularly engaging in anal sex-- have undergone marked change in response to the AIDS epidemic.  This means that prevalence data gathered a few years ago would not represent current behavior patterns.  However, change has not been uniform across geographic areas, so that the amount of change observed in one place cannot be incautiously applied to estimate change elsewhere.

CONCLUSIONS

Because of the limitations of the data described at the outset of this chapter, we cannot offer precise answers to the questions framed in the introduction.  Fortunately, precision is not needed to draw out the implications of the data presented.  We briefly summarize our findings:

*What is the prevalence of homosexual behavior in the U.S. population?*

- The prevalence of predominantly or exclusively homosexual behavior in the U.S. population is undoubtedly higher than the 1 percent estimate from the recent National Survey of Men and probably much lower than Kinsey's widely cited estimate of ten percent.  Probability survey data indicate that roughly 2 to 8 percent of adult American males acknowledge having had sex with another man during adulthood.  Researchers cautiously report estimates as probable "lower-bounds" of true prevalence inasmuch as stigmatized behaviors are underreported.

- The percentage of men who are exclusively homosexual in their adult sexual behavior (those most likely to consider themselves homosexual) is much smaller than the percentage who have ever had sex with other men.

- Less is known about the prevalence of female homosexuality, but where data have been collected, estimates range from 1 to 6 percent who acknowledge having had sex with another woman during adulthood.

- 64 -

*Are homosexual status (i.e., self-identified sexual orientation) and homosexual conduct (i.e., sexual behaviors) synonymous?*

- While there is a strong correlation between status and conduct, they are not synonymous.

- A person who *does not* identify himself or herself as a homosexual may still engage in acts with someone of "the same sex for purposes of satisfying sexual desires" (in the language of DoD Directive 1332.14).

- A person who *does* identify himself or herself as a homosexual may refrain from engaging in homosexual acts. Exclusion from military service based on status alone would exclude some who do not engage in sexual acts with same-gender partners while allowing others who do to serve.

*What is the prevalence of sexual behaviors proscribed by the UCMJ/MCM (oral and anal sex) among male and female heterosexuals?*

- Oral sex, as defined and prohibited by the UCMJ/MCM, is widely practiced by both male and female homosexuals and by heterosexuals;

- Although a sizeable minority of heterosexuals have experienced anal sex at least once, most of them do not repeat this sexual act or else practice it infrequently--the majority of heterosexuals have not experienced this sexual act;

- Although the prevalence of anal sex has decreased since the beginning of the AIDS epidemic, it is still a common sex practice for many homosexual men.

- 65 -

### 3.  ANALOGOUS EXPERIENCE OF FOREIGN MILITARY SERVICES[1]

**INTRODUCTION**

To anticipate the consequences of various policy options regarding the service of homosexuals in the U.S. military, we examined the experience of seven countries that have modern military forces.  The U.S. military is--by virtue of its size, missions, force structure, and world-wide deployment--different from the militaries of all other nations; indeed, each nation's military is uniquely its own.  Moreover, each country's social milieu is unique, so that the context of its military and attitudes towards homosexuality will differ from that of the United States.  However, this uniqueness does not automatically invalidate the potential uses of a cross-national comparison:  Each country shares a concern for military effectiveness, the well-being of its service members, and minimizing stressors within the ranks.  Consequently, policy and implementation difficulties in other countries can serve as warning flags if the United States attempted similar strategies, and successes in other countries may provide guidelines for U.S. policy formulations.

**Countries Visited**

The countries we visited were:

- Canada
- France
- Germany
- Israel
- The Netherlands
- Norway
- United Kingdom

_____
[1]This chapter was prepared by James P. Kahan, C. Neil Fulcher, Lawrence M. Hanser, Scott A. Harris, Bernard D. Rostker, and John D. Winkler.  The authors wish to acknowledge the considerable assistance of Chris Bowie, Erik Frinking, Glenn Gotz, Susan Hosek, and Paul Koegel.

- 66 -

These countries represent the range of policy towards homosexuals, from affirmative advocacy of gay rights (the Netherlands) to a ban on service similar to current U.S. policy (United Kingdom).  In each country, there was a particular aspect of its military and policy towards homosexuals that merited examination.  As the nearest neighbor and the country in many ways most like the United States, Canada would, under any circumstances, be worth investigating; its salience was particularly heightened because it changed its policy from one of a ban to no restrictions in October 1992.  France was chosen because it officially has no policy, but we found that the military unofficially restricts the role that homosexuals may play in the Armed Forces. Germany is an ally with whom the United States conducts extensive combined exercises, and it has a policy that will admit homosexuals, under some circumstances, but restricts them.  Israel was chosen because of its extensive recent warfighting experience and an opinion expressed by some in the U.S. military that the Israeli Defense Force is the force most comparable to our own.  In addition, during the period of the study team's visit, Israel was preparing a change of policy.

Within NATO, the Netherlands and Norway presented as unrestrictive a policy as can be found among European nations.  The United Kingdom shares many cultural and military characteristics with the United States and, as mentioned above, does not permit open homosexuals to serve. Although other countries might also have been worth scrutiny (e.g., Australia, some Latin American allies), time restrictions dictated a stringent limit to travel.

**Approach**

Our research approach was severely constrained by the pressures of time; visits were contemplated, planned, and accomplished all in a span of four weeks.  In each country, we attempted to contact high level department/ministry of defense representatives in charge of personnel issues, military medical authorities, governmental officials (including members of parliament), representatives of homosexual groups, social scientists who had addressed the issue, and other knowledgeable people. The success of these attempts varied widely depending on the country.

- 67 -

Table 3-1 shows the types of people interviewed in each country.[2]
Because some of the interviews were granted on the basis of
confidentiality, we do not list specific names or job titles.  These
interviews form much of the basis of the findings below, and it should
be assumed, unless otherwise stated, that assertions in the text are
based on statements by at least two sources.

## Table 3-1
### Categories of People Interviewed, by Country

|                            | CAN | FRA | GER | ISR | NET | NOR | UK |
|----------------------------|-----|-----|-----|-----|-----|-----|-----|
| Uniformed military[a]      | x   | x   | x   | x   |     | x   | x  |
| Ministry of Defense[a]     | x   | x   | x   | x   | x   | x   | x  |
| Civilian experts[b]        | x   | x   |     |     | x   |     | x  |
| Members of Parliament      | x   |     |     |     | x   | x   | x  |
| Homosexuals                | x   |     |     |     |     | x   | x  |

[a]High-level people concerned with general policy, personnel,
conscription, and medical services.

[b]Political scientists, sociologists, lawyers, military journalists
familiar with societal attitudes and military policies regarding
homosexuals, among others.

To augment the information obtained from interviews, wherever
possible, we obtained documentation of official policy and regulations
regarding homosexuals serving in the military, as well as similar
material on related matters (such as women or minority service).  In
some instances, interviewees had prepared summary written materials for
us.  We also obtained newspaper stories and articles from professional

---

[2]In Canada, Germany, and Israel, interviews were largely with the
same people seen by the GAO team (United States General Accounting
Office, 1993).  In the United Kingdom, interviews were largely with the
same people seen by Senator Warner.  French government officials
informed us that they did not wish to provide information on this topic
(see also United States General Accounting Office, 1993); we nonetheless
were able to interview several authorities and obtain some documents.
While authorities in the Netherlands were willing to meet with us,
mutually convenient dates proved impossible to find; hence our
interviews were not formally arranged.  Visits with the Norwegian
military and ministry of defense were arranged through the U.S. Embassy
in Oslo; other interviews were arranged by us.  All interviews except
those with French interviewees were in English.

- 68 -

journals.[3]  The richest documentation was obtained in Canada and the Netherlands, where there is an official policy of nondiscrimination on the basis of sexual orientation and detailed guidance for implementing that policy.[4]  We also obtained data from the Netherlands on how well that implementation is proceeding.[5]

RAND has not been alone in visiting foreign countries to study the issue of homosexuals in the military.  Others' reports have been published in the form of a GAO report to Senator Warner (United States General Accounting Office, 1993), testimony before Congress (Moskos, 1993; Schwartzkopf, 1993; Segal, 1993; Stiehm, 1993; Warner, 1993), newspaper and television stories (e.g., *Army Times* Reporters, 1993; CBS News, 1993), and academic articles (e.g., Harris, 1991; Waaldijk, 1992).

Our approach differed from some of the others in concentrating on policymakers and people responsible for implementing policy, attempting to understand the problem from that (top-down) perspective.  Others spoke with ordinary soldiers and citizens, attempting to understand the (bottom-up) realities of everyday life.  These two approaches are complementary:  The bottom-up view provides insight into the depth of experience of people affected by policy while the top-down view presents the broader perspective across the entire organization.  When the two views are consistent, as is largely the case here, the reader can feel confident that the observations are representative.  When the observations reported here are inconsistent with those of others, we note that inconsistency and attempt, when possible, to resolve it.

**Focus**

For each of the countries visited, the primary focus was on the formal and informal policy regarding homosexuals serving in the

---

[3]Written materials having to do with military personnel are almost exclusively intended for internal consumption and hence are written in the language of the country and not translated into English.  In this chapter, translations of foreign text are our own unless otherwise indicated.
    [4]Dutch researchers at RAND's European-American Center for Policy Analysis, located in Delft, obtained extensive written materials on the Dutch policy and experience.  They also provided critiques of our findings and assisted in translations.
    [5]No other country visited had an implementation plan as such.

- 69 -

military, and--for those countries where homosexuals were known to serve--what issues and problems arose and how they were resolved.  In order to understand policy, issues, and problems, we also attempted to understand the more general attitude of each nation towards its military, overall national tolerance towards minority groups and people with atypical behavior, and, particularly, public attitudes towards homosexuals.  In countries where policy regarding homosexual service in the military had changed, we were interested in the general social environment regarding the change, the social dynamics leading to the change, and how the change was implemented.

**THE NATIONAL CONTEXT**

We begin with summary information comparing the United States with the countries studied, in terms of general demographics, military force, and various social attitudes.

**National and Military Statistics**

Table 3-2 presents some comparative statistics for the seven nations visited and the United States.  These statistics provide an idea of relative magnitudes.  The table clearly shows the great difference between the United States and the other countries, in terms of size, population, and gross national product.  In terms of the percentage of gross national product for the military, the United States is not atypical.  In keeping with its large population and economy and its status as a superpower, the military forces of the United States are a magnitude larger than those of any other countries examined.  The United States, Israel, and Canada are markedly higher in the percentage of the Armed Force who are female.

For the issue of homosexual service, a potentially important characteristic is the extent to which military forces are likely to be deployed in warfighting or for extended periods away from home in isolated circumstances.  In the past twenty years, four of the countries have seen military action:  the United States (Grenada, Panama, Persian Gulf), Israel (Middle East), the United Kingdom (Falkland Islands, Persian Gulf), and France (Chad).  As major powers, the United States, United Kingdom, and France have forces stationed around the world.

- 70 -

Although Canada and the Netherlands have small forces in Germany as part of NATO, the circumstances are such that many of the stresses of deployment are not present.  All of the countries except Germany and Israel contribute ground forces to United Nations or other coalitional peacekeeping deployments abroad.

Table 3-2

Selected National and Military Statistics

|  | CAN | FRA | GER | ISR | NET | NOR | UK | USA |
|---|---|---|---|---|---|---|---|---|
| Size (1000 km$^2$) | 9976 | 547 | 357 | 21 | 42 | 324 | 244 | 9159 |
| Population (millions) | 27 | 57 | 81 | 5 | 15 | 4 | 58 | 256 |
| GNP (billions of US$) | 517 | 874 | 164 | 46 | 222 | 74 | 858 | 5678 |
| % of GNP on military | 2% | 4% | 2% | 10% | 4% | 5% | 5% | 5% |
| Active military (thousands) | 87 | 453 | 476 | 141 | 101 | 33 | 300 | 2030 |
| % women | 11% | 4% | few[a] | ???[b] | 2% | 2% | 6% | 12% |
| % conscripts | zero | 50% | 43% | 78% | 45% | 70% | zero | zero |
| months conscription[c] | N/A | 10 | 12 | 36[d] | 12 | 12 | N/A | N/A |
| Warfighting in past 20 yrs. | no | yes | no | yes | no | no | yes | yes |
| Force projection deployment | no | yes | no | no | no | no | yes | yes |
| Peacekeeping deployment | yes | yes | no | no | yes | yes | yes | yes |

Sources: Department of Defence (1991); Europa (1992); Forsvars-departementet (1993); Ministère de là Défense (1992); World Almanac (1992); personal communications.

[a]Women do not serve in Germany except in medical or musical jobs.

[b]Israeli authorities would not release this information.  However, Israel has universal conscription to active duty and women must serve two years.

[c]This is the minimum tour of duty.  Conscripts volunteering for special services (e.g., for some countries the navy or for others deployment abroad) may have longer terms of service.  Israel and Norway have reserve service obligations beyond the period of active duty.

[d]The tabled figure is for males.  Israel also drafts females, who serve for 24 months.

Going beyond the data presented in Table 3-2, there are differences in the place of the military in the lives of the various countries' citizens.  Interviewees in Israel and Norway emphasized the image of the citizen-soldier, trained during the period of active duty for home defense and serving for an extended time in a national reserve able to mobilize quickly in times of need.  France, Germany, and the Netherlands

- 71 -

combine a cadre of professional soldiers with a conscript force that has a brief period of service.  However, the Netherlands plans to move to an all-volunteer force within the next five years.  The United States, United Kingdom, and Canada have all-volunteer forces and regard military service as a profession.

Seen in this context, the U.S. Armed Forces appear different in magnitude but not in nature from those of the other countries we examined.  Most of the countries we examined have had recent warfighting experience to some degree; although the United States has been involved in more actions than the other countries, the proportion of the force that participated in these actions is small.  While the United States has large numbers of service members deployed at sea or in foreign lands, most countries deploy some forces away from home and so must confront issues that arise from such postings.

**Societal Attitudes Towards Homosexuality[6]**

One indication of a society's attitudes towards homosexuality is its laws regarding homosexual status and behavior.  Table 3-3 presents four kinds of laws, moving from most to least accepting of homosexual orientation.  First is the recognition of a homosexual marriage.  Second is the recognition of non-legitimated relationships, including both homosexual and heterosexual couples.  Third is the presence of antidiscrimination laws that specifically mention sexual orientation.  Fourth is whether or not the country has sodomy statutes prohibiting homosexual behavior.

Norway is the only country examined that, in effect, recognizes homosexual marriage, and that recognition dates only from 16 April 1993.  The Norwegian law, which follows similar Danish legislation, permits civil registration of homosexual partnerships and is identical legally to marriage, except that the registration cannot be performed in a church and the couple cannot adopt children.

_____

[6]U.S. public attitudes toward homosexuality are discussed in Chapter 5.  Chapter 6 describes attitudes in the U.S. military.

- 72 -

Table 3-3

Civilian Laws Regarding Homosexuality

|  | CAN | FRA | GER | ISR | NET | NOR | UK | USA |
|---|---|---|---|---|---|---|---|---|
| Legal status for homosexual partnerships | no | no | no | no | no | yes | no | no[a] |
| Economic benefits for non-married couples | no | some | some | no | yes | yes | no | varies[b] |
| Nondiscrimination in employment | no | yes | no | no | yes | yes | no | varies[c] |
| Decriminalization of homosexual behavior | yes | yes | yes | yes | yes | yes | yes | 27 states |

Sources:  Clapham & Weiler (1992); Harris (1991); Likosky (1992); van der Veen & Dercksen (1992); Waaldijk (1992); personal communications.

[a]While some cities "recognize" partnerships, legal status must be conferred by State or Federal law.

[b]Some cities provide economic benefits; no States do.

[c]Some cities and some States have nondiscrimination laws.

Many countries provide some economic and inheritance benefits for partners who are not married to each other.  These benefits are well short of those available to legally married couples, except in the Netherlands, where these benefits are intended to provide informal recognition of homosexual partnerships.  The Norwegian domestic benefits are not addressed specifically towards homosexual couples, but rather to any people sharing a household (e.g., parents and adult children, siblings, or even unrelated persons).

While France, the Netherlands, and Norway have explicitly written laws prohibiting discrimination in employment on the basis of sexual orientation, most European countries follow the general nondiscrimination clauses of the European Convention on Human Rights and the International Covenant on Civil and Political Rights.  These clauses are considered to implicitly include sexual orientation, and case law, if not statute, in Germany and the United Kingdom, has been moving towards nondiscrimination.  All foreign countries examined and the majority of States (which include over 80 percent of the population of the country) no longer criminalize homosexual relations.

However, using only the legal status of homosexuals to characterize a national attitude would be a mistake.  American society differs from

- 73 -

many others in three aspects that are relevant to the issue at hand.
First, interviewees in all the countries noted that most people consider
homosexuality to be aberrant behavior.  However, except in Canada, the
UK, and the United States, acceptance or rejection of homosexuality is
not framed in terms of morality.  This means that the public framing of
the issue is different in the United States than in the European
countries visited.

Second, American cultural norms and attitudes tend to evolve
largely independent of other nations'.  Waaldijk and Clapham (1992) note
that as the European democracies slowly move towards greater and greater
interdependence, a cultural norm of toleration of differences appears to
be emerging.  The path towards this norm is, to be sure, not straight,
as recent events in Germany illustrate.  The norm is reflected in
European Community legislation and court decisions, which are typically
a step ahead of the member nations.

Third, the interviewees noted that the issue of open sexual
orientation ("coming out") is different in the United States than in
other countries.  Americans are more public with matters other nationals
consider private.  (One interviewee commented that, "Thirty minutes
after you meet an American, you know more about his private life than
you ever wanted to know.")  For many Europeans, the interviewees
emphasized, the discomfort with a person being openly homosexual is less
the homosexuality than the openness--in their view, a person's sexual
life should not be part of his or her public persona.  For example, in
France, there is far less stigma attached to a public official's being
homosexual or adulterous than there is in the United States.  Newspaper
reporters there (just as hungry for news as here) will not seek out
evidence of sexual misconduct, because the behavior is private.  If
somehow the fact emerges, people tend to shrug it off.  But if a person
makes the public aware of his or her homosexuality or adultery, then
there is disapproval--not of the behavior, but of making it public.

**Foreign Militaries and Homosexuality**

We present here a summary of the experiences of the foreign
countries we examined.  After a brief general description of the context

- 74 -

of the military and homosexuality within each country, we will discuss their official policies, actual practices, and experiences.

**Canada**

  **Context.**  The Canadian Force (CF) is an all-volunteer professional military, which until recently held that homosexuality was incompatible with military service.  In October 1992, however, the CF changed its policy to permit individuals to serve in the military without respect to sexual orientation.  Consequently, the CF developed approaches for implementing this change in policy.  Because of the great degree of similarity between Canada and the United States, the recent Canadian experience is particularly interesting, and may provide insights for how the U.S. Armed Forces could respond to a directive to end the restriction on homosexual service.

  **Public Attitudes.**  Although some consider Canada a liberal society,[7] for the past nine years it has been governed by a conservative party. Further, Canada's predominant culture reflects Tory attitudes that emphasize social conformity and deference to government and religious authority (Lipset, 1990).  Canadian beliefs and attitudes towards homosexuality fit into a common pattern that distinguishes between tolerable expressions of private and public behavior.  On one hand, Canada decriminalized sodomy between consenting adults in 1969, and Canadians express support for extending equality rights to homosexuals (Rayside & Bowler, 1988).  By a wide margin, Canadians support permitting homosexuals to serve in the CF.[8]  On the other hand, public opinion polls show strong moral condemnation of homosexuality and disapproval of public displays of affection between homosexuals and contacts between homosexuals and children (Bozinoff & MacIntosh, 1991; Rayside & Bowler, 1988).  (Appendix D presents a brief comparative

_____

  [7]Canadian political scientists interviewed noted that public opinion polls typically show Canadians to be 5 to 8 percentage points to the left of Americans.
  [8]In a Canadian Gallup Poll taken at the end of 1992, 66 percent of Canadians agreed that homosexuals should be allowed to serve in the military, while 25 percent disagreed (Bozinoff & Turcotte, 1992).  This was up from 60 percent in a 1988 Gallup Poll.

- 75 -

discussion of public opinion on relevant issues for Canada, the United Kingdom, and the United States.)

**Legal Developments.** With the notable exception of the issue of homosexuals in the military, Canadian and U.S. attitudes towards homosexuals differ more in degree than in kind.[9] However, Canada differs considerably from the United States in the constitutional and legal protections accorded to homosexuals. In 1982, Canada changed its Constitution to incorporate a due-process bill of rights, the Canadian Charter of Rights and Freedoms. Section 15 of the Charter, effective as of 1985, provided for individual rights and protection against discrimination based on characteristics of "race, national or ethnic origin, colour, religion, sex, age or mental or physical disability." Sexual orientation was not explicitly included. Subsequent court rulings, however, held for a broad and inclusive interpretation of Section 15, defining sexual orientation to be a prohibited basis for discrimination unless such could be "demonstrably justified in a free and democratic society" (Robertson, 1993). Other parliamentary and legal decisions addressing Canada's Human Rights Act resolved further that sexual orientation could not be grounds for discrimination in any area of federal jurisdiction (Boyer, 1985; Government of Canada, 1986; Robertson, 1993). Since a court ruling on August 6, 1992, the federal government has determined to explicitly recognize sexual orientation as a prohibited basis for discrimination throughout Canada.

**The Change in Military Policy.** These constitutional and legal developments, accompanied by a significant court challenge to existing military policy (described below), eventually reversed the CF's prohibition against homosexuals. Historically, the CF had found "people who commit sexually abnormal or homosexual acts" to be disruptive, and therefore excluded homosexuals from enrollment, and dismissed serving homosexuals upon discovery.[10]

---

[9]For example, in various public opinion polls taken in the early 1980s, 70 percent of Canadians, compared to 65 percent of Americans, express support for homosexual equality rights. At the same time, 69 percent of Canadians and 76 percent of Americans disapprove of sexual relations between same-sex individuals (Rayside and Bowler, 1988, p. 651).

- 76 -

This policy was reexamined as Section 15 of the Charter took effect.  In March 1986, the Chief of the Defence Staff (CDS) of the CF formed a Charter Task Force to determine how to accommodate the provisions of Section 15, covering issues with respect to employment of women, sexual orientation, mandatory retirement ages, physical and medical employment standards, and recognition of common-law relationships (Canadian Forces, 1986).  The Charter Task Force issued its Final Report in September, 1986.

With respect to sexual orientation, the Charter Task Force Report recommended that the exclusionary policy be maintained for homosexuals. It concluded that given the unique purpose and characteristics of Armed Forces, and negative attitudes and aversion toward homosexuals in Canadian society and the military, "the presence of homosexuals in the CF would be detrimental to cohesion and morale, discipline, leadership, recruiting, medical fitness, and the rights to privacy of other members."  Moreover, "the effect of the presence of homosexuals would be a serious decrease in operational effectiveness" (Canadian Forces, 1986, Part 4, p. 21).

The Final Report of the Charter Task Force was submitted to and accepted by the Minister of Defence.  Subsequently, a new Minister of Defence announced an intention to maintain the basic policy but make modest modifications.  The most significant of these was the adoption of an interim policy in January 1988 which permitted homosexuals to be retained in the service subject to career restrictions.  The policy prescribed that persons found to be homosexual were "frozen" with respect to transfers and promotions but not required (though encouraged) to leave the service.

However, pressures against the CF's policy on homosexuals continued to mount.  As legal rulings extended homosexuals' rights under the Charter and the Human Rights Act, litigation was mounted that directly challenged the military's policy and practices toward homosexuals.  The most notable of these cases was that of Michelle Douglas, an Air Command

---

[10]This policy is described in regulation CFAO 19-20, entitled "Homosexuality--Sexual Abnormality Investigation, Medical Examination and Disposal."

LCR Appendix Page 0396

- 77 -

lieutenant with an exemplary service record who had been charged with lesbianism, investigated, and had her security clearance revoked (with additional career restrictions). Douglas filed suit in 1989 asking for damages under the Charter of Rights and Freedoms. Newspaper accounts report that Douglas' case occasioned wide publicity and public sympathy (*Los Angeles Times*, 1992; *Army Times*, 1993).

The CF initially prepared to defend its policy using the Charter Task Force Final Report. It planned to argue that its restrictions on military service by homosexuals were a "reasonable limitation" under Section 1 of the Charter. In support of this, they prepared to offer evidence that the majority of service members were opposed to serving with homosexuals, and that the presence of homosexuals would be damaging to cohesion and morale and infringe on the privacy of heterosexuals.

In preparing its defense for the Douglas case, the CF determined that they could not meet the standard of proof for a Section 1 argument. Under previously established case law, it would be the military's burden to show substantial pressing interest to discriminate on the basis of sexual orientation, proportionality between infringement and rights affected, and minimum impairment of rights. The CF determined that the available evidence could not be developed into arguments that would meet these legal standards. Moreover, the CF leadership came to the conclusion that much of the evidence they were prepared to offer had little substantive merit as well.

On October 27, 1992, the CF agreed to settle Douglas' lawsuit. As part of the terms of settlement, the Federal Court of Canada declared CF policies restricting the service of homosexuals to be contrary to the Canadian Charter of Rights and Freedoms. In response, the CF announced its new policy governing homosexuals. In a news release of October 27, 1992, the CDF, General John de Chastelain, stated, "The Canadian Forces will comply fully with the Federal Court's decision. Canadians, regardless of their sexual orientation, will now be able to serve their country in the Canadian Forces without restriction" (National Defence Headquarters, 1992a).

The CDF took additional steps to announce, define, and implement their new policy, including the following:

- 78 -

- In a message entitled "homosexual conduct" disseminated throughout the Canadian Forces, General de Chastelain revoked CFAO 19-20 and all interim policies under that order, expressed his "full support" of the Federal Court of Canada decision, stated the unacceptability of "inappropriate sexual conduct by members of the forces, whether heterosexual or homosexual" as codified in a forthcoming order, and stated his expectation of support within the chain of command (National Defence Headquarters, 1992b).

- National Defense Headquarters issued a "Questions and Answers" sheet for immediate internal use by the CF, providing explanations for the change in policy (National Defence Headquarters, 1992a).[11]

- "Post-announcement action" issued by the Assistant Deputy Minister (Personnel) provided guidance to leaders to help "communicate the rationale for the change, encourage its acceptance, and respond to the personal concerns of CF members" (National Defence Headquarters, 1992c).  This announcement contained advice to leaders and additional "questions and answers" with respect to the policy.

- A Canadian Forces Personnel Newsletter was prepared and disseminated describing the CF's policy change regarding homosexuality (National Defence Headquarters, 1992d).

- A new regulation (CFAO 19-36) entitled "Sexual Misconduct" was issued in December 1992.  The regulation was intended to be used with an amended version of the regulation governing personal harassment (CFAO 19-39) to describe policies and procedures governing inappropriate sexual conduct. (Regulations CFAO 19-36 and CFAO 19-39 are reproduced in Appendix E.)

---

[11]For example, Q31: "Will such activities as dancing, hand holding, embracing between same/sex members be accepted at mess social functions?"  A31:  "Standards of conduct for homosexual members will be the same as those for heterosexual members.  Common sense and good judgment will be applied and required of all members."

- 79 -

**Effects of the Policy Change.**  Because the Canadian change in policy is fairly recent, some have argued that the effects are hard to judge (*Army Times*, 1993).  However, other accounts reveal no major problems resulting from the policy change.  According to these accounts, no disciplinary problems have occurred, no resignations explicitly over the change in policy have resulted, and nobody is "standing up and declaring their sexual preference" (*Los Angeles Times*, 1993).  These observations are buttressed by evidence collected in our visits to Canada.  According to CF officials, they have noticed no changes in behavior among their troops.  They say they know to date of no instances of people acknowledging or talking about their homosexual relationships, no fights or violent incidents, no resignations (despite previous threats to quit), no problems with recruitment, and no diminution of cohesion, morale, or organizational effectiveness.

CF officials suggest several reasons for the seemingly smooth integration of homosexuals into the Armed Forces.  First, the leadership recognized the inevitable need to change the policy, given Canadian legislation and national attitudes toward homosexuality.  The process was "evolutionary," and they had time to acculturate under their interim policy.

A second reason concerns the "conscious strategy" to treat the policy change as a leadership issue in its implementation stage.  The main priority was to ensure compliance with the order.  The next order of priority was to gain acceptance of the policy change so that no friction would occur.  Next, they decided that it was not possible or appropriate to attempt to change beliefs or attitudes.  Thus, there were no programs (e.g., educational or sensitivity training programs) concerning homosexuality.  Further, implementation was accomplished in a "low-key" manner, focusing on the internal audience of the military and without public pronouncements or statements.

Finally, CF officials emphasize the nature of the policy change.  In the words of a senior CF personnel official:

> The question has been asked, "what is our policy on gays and lesbians in the Canadian Forces?"  Our answer is, "we don't really have one."  We don't discriminate on the grounds of

- 80 -

sexual orientation, and we don't have any policies that specifically target gays or lesbians.  We do have policy on sexual misconduct; we also have an order on personal harassment.  In general, this establishes the same expectations for both groups; both straight and gay.  Service members can form personal relationships that are not restricted except where they threaten morale and cohesion.

**France**

**Context.**  Interviewees all expressed the opinion that the French population in general tolerates homosexuals, but does not welcome them. They saw homosexuals in France as quieter, less visible, and more tolerated than their American counterparts.  There is some segregation and denigration and a definite discomfort.  Urban and more educated citizens tend to be more tolerant.  People who live in rural areas do not know many homosexuals and far fewer militant ones.  When a homosexual shows visible differences, he or she would probably move to a large city, not so much because of persecution, but to find kindred others.  The more obvious a manifestation of homosexuality, the less well it is tolerated; but it is the obviousness more than the homosexuality that produces the intolerance.  The frontier at present is for acceptance of homosexuals; society no longer regards them as immoral, and they can be trusted in jobs where they were previously banned, such as public school teaching.

**Official Policy.**  The formal response one will obtain when a French official is asked about homosexuality in the French military is that "there is no policy and there is no problem."  In a legal sense, that is true.[12]  Homosexuality per se is not the basis for exclusion from conscription or voluntary military service, nor is sexual orientation a criterion for serving in any military capacity.  Interviewees readily named openly homosexual men who achieved fame throughout French history, in the military and government as well as in the arts.  The French navy

---

[12]Moskos (1993), in testimony before the Senate Armed Services Committee, stated that a person found to be homosexual is discharged from the military.  We, together with Moskos, investigated the discrepancy between his version of French policy and ours and found the source to be an infelicitous translation from French to English by French personnel that led to Moskos' misunderstanding.