# Appendix of Evidence in Support of Log Cabin Republican's Opposition to Defendants' Motion for Summary Judgment

## LCR Appendix Pages 501-600

## (Part 5 of 19)

- 181 -

convergence of two factors.  First, it became clear that although the formal, legal system of segregation had disappeared, many practices that had discriminatory effects--whether intentional or not--had survived. The much-publicized fact that the draft disproportionately affected blacks was only one example.  Others included discrimination in housing, in promotions, in the administration of military justice, and in the uneven distribution of blacks among and within the Armed Forces (for instance, the concentration of blacks in frontline combat positions).[57] Cumulatively, these practices may have had much the same kind of impact as formal segregation previously had:  they created an inequitable allocation of risks, rewards, and responsibilities among different racial groups.

Second, both blacks and whites displayed a heightened sensitivity to such inequities as a result of the extraordinary racial polarization that existed in American society at that time.  Members of both groups brought their experiences and interpretations of events in civilian life with them when they entered the military.  Many blacks were influenced by ideas that emphasized the importance of preserving a distinctive black culture and resisting white domination.  Many whites reacted sharply against these ideas.  A sort of voluntary segregation emerged within the Armed Forces, with both blacks and whites stressing the cohesion of their own groups and their hostility toward one another.  At the same time, blacks protested strongly against the organizational practices that continued to deny them equal opportunity.[58]

Even this heightened level of tension, however, did not interfere greatly with actual combat operations.  As in World War II, most of the racial violence during the Vietnam war took place not in frontline units but rather in rear areas, at bases within the United States and Europe (particularly in West Germany), and in civilian communities.  For all the fears expressed at the time about the potential impact of racial

---

[57]Foner, *Blacks and the Military*, pp. 201-204, 227-228; Nalty, *Strength for the Fight*, pp. 298, 328-331; Charles C. Moskos, Jr., *The American Enlisted Man*, New York, Russell Sage Foundation, 1970, pp. 115-116.

[58]Nalty, *Strength for the Fight*, pp. 303-306; Foner, *Blacks and the Military*, pp. 207-213.

- 182 -

tensions on military performance, task cohesion under conditions of combat does not appear to have been a serious problem.[59]

    In sum, the historical evidence concerning relationships among race, social cohesion, and task performance is complex, but it does suggest that it is possible to draw clear distinctions between social cohesion and task cohesion in military settings--a suggestion supported by the literature reviewed in the chapter on cohesion. Perhaps the best generalization is that while the implementation of racial integration could have been a major source of tension and difficulty in the military--given the strong racial prejudices of earlier eras--it was not necessarily so.  The emergence of racial animosities severe enough to impair military efficiency seems to have been erratic and contingent upon other circumstances--notably organizational practices that created systematic inequalities among racial groups, and cultural influences that promoted an unusual degree of group identity.  High levels of task cohesion among people of different races, particularly in combat situations, existed even at times when the very idea of interracial cooperation within military units was a novelty (as in the World War II experiments and in Korea) and even when considerable racial tension was present (as in Vietnam)  There is also evidence to suggest that social

---

[59]Nalty, *Strength for the Fight*, pp. 301-302.  Note, however, the caution expressed by scholars on this topic: "Impressions about race relations in Vietnam are largely anecdotal, since intergroup relations during that era were not subjected to the rigorous scrutiny that social scientists had applied to the World War II and Korean experiences. Accounts were often conflicting."  Martin Binkin, Mark Eitelberg, et al., *Blacks and the Military*, Washington, D.C., The Brookings Institution, 1972, pp. 36-37.  See also Lawrence M Baskir and William A. Strauss, *Chance and Circumstance:  The Draft, the War, and the Vietnam Generation*, New York, Vintage Books, 1978, pp. 137-138; Foner, *Blacks and the Military in American History*, p. 211; Thomas D. Boettcher, *Vietnam:  The Valor and the Sorrow*, Boston, Little, Brown, and Co., 1985, p. 401; Guenter Lewy, *America in Vietnam*, New York, Oxford University Press, 1978, p. 155; Byron G. Finman, Jonathan F. Borus, M. Duncan Stanton, "Black-White and American-Vietnamese Relations Among Soldiers in Vietnam," *Journal of Social Issues*, 31, 1975, p. 41; and "Report by the Special Subcommittee on Disciplinary Problems in the U.S. Navy of the Committee on Armed Services," House of Representatives, 92nd Congress, January 2, 1973, reprinted in MacGregor and Nalty (eds.), *Blacks in the United States Armed Forces, Basic Documents, Vol. XIII*, pp. 605-631.

- 183 -

cohesion could and did arise from equal participation in shared military tasks.

**ATTITUDES VERSUS BEHAVIORS DURING THE PROCESS OF INTEGRATION: MAINTAINING CIVILITY WITHOUT OVERTURNING PREJUDICE**

The process of integrating blacks into the military was lengthy and difficult, in part because it took place against a backdrop of public opinion that was generally hostile or indifferent.  The standards of equal treatment and discipline that the Armed Forces officially promoted often contrasted sharply with the views that most military personnel held about race relations.  While blacks themselves formed an active constituency in favor of broader black participation, and while some whites, including key civilian and military leaders, supported this position, major changes in military and racial policies were implemented without a favorable public consensus.

**Public Opinion During the Transition to Integration:  From Highly Unfavorable to Moderately Unfavorable**

In 1943, the federal government's Office of War Information conducted a survey on this subject.  It found that 90 percent of white civilians and 18 percent of black civilians favored segregation in the military.[60]  An Army study in that same year concluded that 88 percent of white soldiers and 38 percent of black soldiers believed that whites and blacks should be assigned to separate units.[61]  These results paralleled an earlier national poll, taken in 1942, which indicated that only 30 percent of whites approved of racially integrated schools and only 35 percent approved of racially integrated neighborhoods.[62]  Sentiment for maintaining segregation in major American institutions was thus very strong during World War II.

---

[60]Surveys Division, Bureau of Special Services, Office of War Information, *The Negroes' Role in the War*, Washington, D.C., 8 July 1948, reprinted in MacGregor and Nalty, *Blacks in the United States Armed Forces, Basic Documents, Vol. V*, p. 237.

[61]Research Branch, Special Service Division, United States Army, *Attitudes of the Negro Soldier*, cited in Lee, *Employment of Negro Troops*, p. 305.

[62]Herbert H. Hyman and Paul B. Sheatsley, "Attitudes Toward Desegregation," *Scientific American*, Vol. 195, No. 6, 1956, pp. 36-37.

- 184 -

In 1948, just one month before President Truman issued his executive order requiring racial integration in the Armed Forces, a Gallup poll revealed that although support for segregation had declined from the wartime level, it remained very high.  Sixty-three percent of American adults endorsed the separation of blacks and whites in the military, while only 26 percent favored integration.[63]  A survey of white Army enlisted personnel and officers in May 1949 indicated that 32 percent of white soldiers opposed any degree of racial integration in the Army, and 61 percent opposed integration if it meant that blacks and whites had to sleep in the same barracks and eat in the same mess halls. This 1949 survey did, however, find that 68 percent of the soldiers expressed tolerance for the idea of partial integration, in which blacks and whites worked together but did not share dormitory and mess facilities.  Apparently, some nuances had appeared in white attitudes; the major concerns among white soldiers seemed to be the prospects of intimate physical contact with blacks, not the presence of blacks per se.[64]

Even during the Korean War, when racial integration in the Air Force and the Navy was virtually complete and integration in the Army and the Marine Corps was well under way, considerable hostility to integration persisted.  The 1951 Project Clear study found that while large majorities of black soldiers favored integrated Army units, white soldiers had sharply divided opinions.  Of a sample of white enlisted men in the Korean Theater, 52 percent favored segregated units, while 46 percent believed that soldiers should be assigned to any unit regardless of race.  (Although 52 percent favored segregation, only 24 percent said they would object strongly to serving in a racially integrated platoon.)[65]  Many white officers and enlisted men who felt that integration had succeeded during combat in Korea expressed trepidation

_____

[63]Gallup Organization, Survey of 3000 Adults Based on Personal Interview, June 1948.
[64]Attitude Research Branch, Armed Forces Information and Education Division, *Morale Attitudes of Enlisted Men, May-June 1949*, reprinted in MacGregor and Nalty, eds., *Blacks in the United States Armed Forces, Basic Documents, Vol. XII*, pp. 145-149.
[65]Operations Research Office, *Utilization of Negro Manpower*, p. 200.

- 185 -

about extending that policy to the United States itself, where combat-
inspired cooperation would be absent and resistance from civilian
communities would become a factor.[66]  The Armed Forces implemented
integration plans amid this powerful, if gradually diminishing,
atmosphere of interracial suspicion and aversion.

**Attitudes Versus Behaviors**

During the desegregation process, a disjunction between attitudes
and behavior was clearly evident.  Maintaining civility in race
relations, not transforming racial prejudices, was the principal object
of implementation overseers.  Whites who had not previously worked with
blacks and had some degree of antipathy toward them were nevertheless
expected to display tolerance and cooperate as needed.  Blacks who
distrusted whites faced the same expectation.  The Armed Forces usually
managed this disjuncture between attitudes and expected behavior well
enough for day-to-day operations.  But the attitudes themselves
frequently resisted change, and civility did not mean the absence of
racial tensions and incidents.

However, unfavorable attitudes toward integration did not
necessarily translate into violent or obstructionist behavior.  The
Project Clear data suggested that military personnel were able to
separate their personal feelings from their conduct.  For instance,
reports on the process of integration in the Air Force during 1949 and
1950 indicated that--despite ominous predictions of "trouble"
beforehand--white airmen who resented blacks generally expressed that
resentment quietly and did not provoke serious incidents.[67]   Some of
the white Air Force officers whom the executive secretary of the Fahy
Committee interviewed in early 1950 said frankly that they disliked the
new policy and would have preferred to continue segregation, but they
also emphasized that integration was working well in practice and that
they were committed to enforcing it.[68]

---

[66]Operations Research Office, *Utilization of Negro Manpower*,
pp. 245-250.

[67]Nichols, *Breakthrough on the Color Front*, p. 102.

[68]"A First Report on the Racial Integration Program of the Air
Force," in MacGregor and Nalty, *Basic Documents, Vol. XII*, p. 43.

Evidence from Korea was similar.  The Project Clear researchers found that among white officers in Korea, practical military considerations such as personnel shortages outweighed unfavorable personal views of blacks, thus creating a willingness to incorporate black soldiers in white units.  White enlisted men similarly separated their concerns about military effectiveness from their uneasiness about integrating blacks.  Although many of these soldiers expressed discomfort and fear of possible trouble, they also cited the acute need for combat troops, and the probability that black troops would perform better in white units, as good reasons to accept integration.[69]  But this "testing" was relatively infrequent,[70] almost never led to disruptive events, and had little or no impact on unit performance.[71]

**Despite Success, Problems Beneath the Surface**

During the 1950s and 1960s, the Armed Forces gained a reputation for having significantly better race relations than most civilian institutions.  Contemporary accounts drew vivid contrasts between conditions on military bases, where there was a fairly high degree of formal equality and interaction between blacks and whites, and the strict segregation and interracial violence that existed in many nearby civilian communities.[72]  These accounts were accurate as far as they went, but they overlooked some persistent problems which indicated that disjunctures between attitudes and behaviors continued to exist just below the surface.

Racially grounded incidents of discrimination and harassment were never absent from the Armed Forces.  Such cases existed in official

---

[69]Operations Research Office, *Utilization of Negro Manpower*, pp. 204, 208.

[70]"A First Report on the Racial Integration Program of the Air Force," in MacGregor and Nalty, *Blacks in the United States Armed Forces, Basic Documents, Vol. XII*, p. 44; Operations Research Office, *Utilization of Negro Manpower*, pp. 215-224.

[71]Operations Research Office, *Utilization of Negro Manpower*, pp. 22, 376.

[72]Nichols, *Breakthrough on the Color Front*, pp. 143-165; U.S. Commission on Civil Rights, "The Negro in the Armed Forces," in MacGregor and Nalty, *Blacks in the United States Armed Forces, Basic Documents, Vol. XII*, p. 493; MacGregor, *Integration of the Armed Forces*, pp. 500, 540.

- 187 -

matters such as promotion decisions and disciplinary actions.  They occurred with greater frequency in regard to off-duty recreation and social activities such as dances and meetings of voluntary organizations.  In these activities, strong informal pressures for self-segregation existed among both blacks and whites, and tensions between the two groups became more evident.[73]  Many white service people reacted more strongly to the presence of blacks at social events--which suggested that blacks were claiming full social equality in all aspects of life--than they did to cooperation with blacks in the performance of military duties.

Overt expressions of racial hostility were still more likely off base, when military personnel interacted with each other and with civilians in communities that were not under military control.  From the beginning of World War II through the Vietnam era, off-base incidents of discrimination and violence--most frequently perpetrated by whites against blacks, but sometimes perpetrated by blacks against whites--in the United States and around the world created serious problems.  The military made little effort to address these problems until the initiatives of the Kennedy Administration in the early 1960s focused attention on them.  Even then, military officials did not consistently implement their responsibilities to monitor off-base activities.

The long-term persistence of interracial tensions, which gained public attention when race riots and other disturbances erupted at some military bases in the late 1960s, suggested both the sources and the limitations of the military's ability to manage conflicts between attitudes and expected behavior.  The need for cooperation on difficult and dangerous military tasks, particularly under combat conditions (as in Korea), usually induced military personnel to avoid or at least tone down expressions of racial animosity while on duty.  Such a shared experience may also have generated sufficient comradeship to reduce the animosity itself.  Military discipline, which applied pressure to avoid career-jeopardizing incidents, also affected behavior.

---

[73]Operations Research Office, *Utilization of Negro Manpower*, pp. 381-390; MacGregor, *Integration of the Armed Forces*, p. 456; Moskos, *The American Enlisted Man*, pp. 122-123, 125.

- 188 -

Yet when the pressures of work and discipline were relaxed, or at least were perceived as being relaxed (as was the case in many off-duty settings), hostile attitudes became more likely to affect behavior. And although shared experience could promote acceptance, it did not always do so. Many whites and blacks retained the racial views they had acquired in civilian life. Thus, the interracial mistrust that characterized American society as a whole continued to be manifest within the military long after the military had changed its official policies and practices.

IMPLICATIONS FOR ALLOWING ACKNOWLEDGED HOMOSEXUALS TO SERVE IN THE MILITARY

The experience of integrating the Armed Forces suggests that initial resistance to change can be overcome, but only through concerted civilian and military leadership, with strong vigilance and oversight from civilian authorities. This was true for racial integration in the late 1940s and early 1950s--even in the face of public and military opinion that may have been more strongly opposed than it is now to allowing acknowledged homosexuals to serve. It is also clear that the relative success of  racial integration required particular efforts and elements that, as other chapters suggest, would be required to formulate and implement the change regarding homosexual service:

- strong military and civilian leadership that agrees on the goals of the policy,
- clear signals from all leadership levels that compliance with the policy is a command responsibility and that no resistance will be tolerated,
- swift punishment for non-compliance, and
- a focus on changing behavior, not attitudes.

The services' response to racial integration also indicates that implementing a policy allowing acknowledged homosexuals to serve may be a lengthy process involving several years of organizational adaptation. The forces of tradition and culture and the natural inertia of large organizations work against rapid adaptation to social change. A clear

- 189 -

commitment from top leadership will be required over a substantial period of time.

With such commitment and strong leadership, racial integration did not "destroy" unit cohesion and military effectiveness, as so many opponents had argued it would.  Evidence from World War II, Korea, and Vietnam indicates that unit cohesion and military effectiveness did not necessarily depend on a sense of group identity arising from racial homogeneity.  In other words, people of different races did not have to like each other or change their attitudes about racial differences to get the job done.  Integrated units performed just as well as all-white units.  Further, there was no evidence that white soldiers refused to take orders from black officers or non-commissioned officers--a fear often expressed concerning homosexual leaders.  There were high levels of "task-oriented" cohesion even at times when the very idea of interracial cooperation within military units was a novelty (as in the World War II experiments and in Korea) and when racial tension was high (as in Vietnam).

It is important to note, however, that the primary objective of implementation was maintaining civility in race relations, not transforming racial prejudices.  The attitudes themselves frequently resisted change, but military personnel were generally able to separate personal feelings from conduct.  In some of the military focus groups conducted by RAND for this study, service personnel voiced sentiments which indicate that allowing homosexuals to serve might be handled in the same way:  As long as homosexual service people did their jobs effectively, and otherwise observed military standards of conduct,  most heterosexuals would treat them with civility.  (See the chapter on military opinion.)

Although there is evidence that working well together caused some improvement in interracial social cohesion, by and large, it has not strongly carried over into off-duty, off-base relations.  Many white service people reacted more negatively to the presence of blacks at social events than they did to cooperating with blacks in performing military duties.  Overt expressions of racial hostility were more likely off base and out from under military control.  Even in the absence of

- 190 -

hostility, off-base and off-duty, blacks and whites still customarily associate with members of their own race.  It seems unlikely that this would be different for relations between homosexual and heterosexual service people.

- 191 -

## 6.  RELEVANT PUBLIC OPINION[1]

### INTRODUCTION

Assessing how any option for removing the ban on homosexual service in the Armed Forces will fare depends critically on prevailing public and military opinion.  Trends in public attitudes affect the pace of and response to social policy changes.  For example, efforts to racially desegregate the military during the 1950s were, in part, a response to changing public attitudes and pressure from black leaders and civil rights organizations (Jaynes and Williams, 1989).  Further, desegregation in the military probably served to accelerate acceptance of desegregation in the broader society.

The purpose of this chapter is to examine public opinion about issues relevant to removing the ban on homosexual service in the Armed Forces.  In addition to opinion about removing the ban itself, we examine attitudes toward homosexuals and homosexuality, the rights of homosexuals, whether homosexuals should be allowed to serve in the military, and the attitudes of young men demographically similar to those who enlist in the Armed Forces.  Military opinion is addressed in the next chapter.

### Approach

In this chapter, we examine these issues using a variety of public opinion polls and social surveys.  Unless otherwise indicated, all the survey results we present are derived from nationally representative samples of the American adult population.  Most of the data are from general public opinion polls conducted by major polling organizations (Gallup, Roper, Yankelovich, CBS/*New York Times*, ABC/CNN, and *USA Today*).  Over the past fifteen years, many public opinion polls have sought to gauge attitudes toward homosexuality, and, more recently, the possibility of removing the ban on military service for homosexuals.

-----------

[1]This chapter was prepared by Peter E. Tiemeyer, who wishes to acknowledge the considerable assistance of Sandra Berry, Brent Boultinghouse, and Samantha Ravich.

- 192 -

Often, multiple polls have been conducted around the same date using roughly similar question wording.  In reporting results, we have chosen polls that are consistent with the general body of polling results. Where results diverge, we report the range in which they generally fall.

In addition to national opinion polls, we also present results compiled from three major social surveys:  the General Social Survey, conducted annually by the National Opinion Research Center; the 1988 National Survey of Adolescent Males, conducted by the Urban Institute; and the 1990 Monitoring the Future Survey, an annual study of the lifestyles and values of youth conducted by the Institute for Social Research at the University of Michigan.  Specific details of the surveys and polls used in this section are presented in Table F-1 in Appendix F.

This chapter is divided into four sections.  The first examines general attitudes of the public regarding homosexuality.  In addition to discussing various dimensions of the views of Americans as a whole, we examine differences in attitudes among various social and demographic groups.  The second section examines general beliefs regarding the civil rights of homosexuals in society as a whole.  The third section turns to public views of whether homosexuals should be allowed to serve in the military.  Finally, the fourth section focuses on the attitudes of young adults to discern how those likely to enlist might view a removal of the ban on homosexuals in the military.  The tables for this chapter appear in Appendix F.  All but Table F-1 show responses to a specific question or questions asked by particular polls.  The most relevant data from the tables are presented in the body of the text (where we reference tables for the reader's information).

OVERALL VIEWS ABOUT HOMOSEXUALITY

Measuring U.S. attitudes toward homosexuality is not a straightforward task.  As it does for other issues, response varies substantially depending on how question and response categories are worded and the context in which the questions are asked.  In the General Social Survey (GSS), respondents are asked whether they believe homosexuality to be "always wrong, almost always wrong, sometimes wrong, or not wrong."  The 1991 GSS finds that 75 percent of the adult

- 193 -

population believe that same-sex sexual relations are either "always wrong" or "almost always wrong."

Surveys using more narrowly worded or more qualified questions continue to show that a majority of Americans hold negative attitudes toward homosexuality, but the level of non-acceptance is lower than with the GSS question. For example, recent polls show that 54 percent of respondents believe that "homosexual relationships between consenting adults [are] morally wrong," and 50 to 57 percent believe that homosexuality should not "be considered an acceptable alternative lifestyle." However, 38 percent of the public believe that homosexuality should be considered acceptable and 39 percent say that homosexuality is not a moral issue (Tables F-3 and F-4).

Regardless of the question used, little change has been detected over time in the level of acceptance of homosexuality. The proportion responding "always wrong" to the GSS question has shown little variation over the past fifteen years, generally ranging from 70 to 75 percent (Table F-2). A similar stability is seen in the proportion who believe that homosexuality "should be considered an acceptable alternative lifestyle" in surveys over the past ten years (Table F-4).

Several reasons may explain the variability found under different question wording in acceptance of homosexuality. The GSS question is the most broadly stated, allowing several different interpretations. Respondents might interpret the question to mean "always wrong for me," "always wrong for everyone," or simply "wrong" by any standard the respondent chooses to apply. Further, because the possible responses to the GSS question are all worded in the negative (always wrong, almost always wrong, sometimes wrong, and not wrong), the more positive tone of the question "should homosexuality be considered an acceptable alternative lifestyle?" may elicit more positive responses. Individuals may also be less willing to characterize homosexuality by the more strident term of "morally wrong" rather than "always wrong." Further, individuals may respond more positively to the question regarding the morality of homosexuality because, in contrast to the other questions, it is asked in the context of "consenting adults."

- 194 -

The sensitive nature of the issue of homosexuality makes the assessment of attitudes complicated.  For highly charged issues, such as abortion, race, or homosexuality, responses to survey questions may be particularly sensitive to social norms (Dovidio and Fazio, 1992). Individuals may state opinions they believe to be socially acceptable even when their personal opinion is actually more accepting or less accepting.  Measuring attitudes on homosexuality may be further complicated if respondents fear that by expressing support for homosexuality, others will conclude that the respondent is homosexual. Thus, it is difficult to state the exact proportion who disapprove of homosexuality, as the level of disapproval varies according to the characterization posed by the survey question and the context in which the survey is conducted.

**Demographic and Social Differences in Attitude**

Attitudes toward homosexuality vary greatly by demographic and social background of respondents (Tables F-5 and F-6).  Despite the variation in overall acceptance of homosexuality observed using different questions, the levels of acceptance between various social and demographic groups remain relatively constant, regardless of the question asked.

Attitudes toward homosexuals are especially related to the respondent's educational achievement.  Among GSS respondents, the percentage who characterize homosexuality as "always wrong" is 45 percent for those who have post-baccalaureate education, and 89 percent for those who have less than a high school degree (Table F-5).[2]  Among college graduates, 52 percent consider homosexuality an acceptable lifestyle, while 32 percent of those with only secondary education consider it acceptable (Table F-6).  A survey of adolescent males shows

---

[2]Unless otherwise noted, all group differences reported in the text in answers to questions from the General Social Survey, the National Survey of Adolescent Males, and Monitoring the Future are statistically significant at the .05 level.  We do not have sufficient information to make similar judgments regarding the statistical significance of group differences shown in other public opinion polls.  Unless otherwise stated, all tabulations from the GSS presented in this section are taken from the 1988-1991 surveys.

- 195 -

a similar relationship between educational aspirations and acceptance of homosexuality among adolescent males (Table F-7). Among those who do not plan to go beyond high school, 28 percent agree ("a lot" or "a little") with the statement that they could be friends with a "gay person"; among those planning to complete graduate school, 49 percent agree.

Women are somewhat more accepting of homosexuality than men. While only 34 percent of males feel that homosexuality should be considered an acceptable alternative lifestyle, 42 percent of women are willing to accept homosexuality as an alternative lifestyle (Table F-6). Similarly, women are slightly less likely (74 percent) than men (78 percent) to consider homosexuality as "always wrong" (Table F-5).

Older individuals tend to be more negative toward homosexuality than younger individuals (Tables F-5 and F-6). For example, a 1992 Gallup poll shows that 46 percent of 18- to 29-year-olds consider homosexuality an acceptable alternative lifestyle, compared with 25 percent of those older than 65. However, it is impossible to say, using cross-sectional data such as opinion polls or the General Social Survey, whether the relationship between age and attitudes toward homosexuality reflects changes in attitude with age or changes in attitude between birth cohorts.

Acceptance of homosexuality also varies by ethnicity. A greater proportion of blacks (85 percent) characterize homosexuality as "always wrong" than do whites (75 percent) (Table F-5). However, non-white ethnic groups also appear less willing than whites to label homosexuality as an unacceptable alternative lifestyle (Table F-6).

**How Attitudes Vary by Religion, Political Alignment, and Region**

Attitudes toward homosexuality also vary by religious affiliation. More than 80 percent of those who identify themselves as Protestant consider homosexuality to be "always wrong," while 73 percent of Catholics and 29 percent of Jews characterize homosexuality as "always wrong" (Tables F-5 and F-6). Among the Protestant denominations, 66 to 88 percent of respondents believe that homosexuality is "always wrong,"

- 196 -

Baptists being the most negative.[3]  Eighty-nine percent of those who characterize themselves as "fundamentalist" and 92 percent of those who believe that the Bible is the "literal word of God" believe homosexuality to be "always wrong."

The diversity in attitudes toward homosexuality observed among members of different denominations can also be seen in the positions taken by the churches themselves.  The range of positions is as broad as the range of denominations, but they can be generally categorized under three groupings:  (1) those extending full acceptance to homosexual members, which may include performing or recognizing homosexual marriages, ordination of homosexual clergy, and inclusion of homosexual laity in other sacramental rights; (2) those extending compassion and inclusion to persons of homosexual orientation, but maintaining moral prohibitions on homosexual practices, as they fall outside the orthodox bounds of monogamous heterosexual marriage; and (3) those unable to find an acceptable accommodation of homosexual persons within their religious doctrines, and condemnatory of homosexual acts or partnerships as a "life-style."  The majority of denominations fall into the second category (Melton, 1991).

Attitudes toward homosexuality also vary by political ideology and party affiliation (Tables F-5 and F-6).  Those identifying themselves as conservatives or Republicans tend to have more negative attitudes toward homosexuality:  86 and 82 percent, respectively, believe that sexual relations between members of the same sex are "always wrong."  The figures are 78 percent for self-proclaimed moderates, 60 percent for liberals, 77 percent for Democrats, and 71 percent for independents.

Regionally, people in the South tend to have more negative attitudes toward homosexuality, while people in New England express less negative attitudes than people in other regions of the country (Tables F-5 and F-6).[4]

---

[3]The differences between Lutherans and Presbyterians, Lutherans and Episcopalians, and Methodists and other Protestants in the proportion believing homosexuality to be "always wrong" are not statistically significant at the .05 level.
[4]Differences in the proportion believing homosexuality to be "always wrong" are not statistically significant at the .05 level

- 197 -

## How Attitudes Vary by Perceived Nature of Homosexuality

A number of studies have shown a correlation between attitudes toward a group and beliefs about the group's distinguishing characteristic: that is, whether the attribute is volitional[5] (Rodin, et al., 1989; Weiner, Perry, and Magnusson, 1988; Whitley, 1990). Surveys bear this out: attitudes toward homosexuality vary most strikingly by whether individuals believe that homosexuality is chosen or immutable. According to a 1993 CBS/*New York Times* poll, there is a roughly even split between those who believe homosexuality is chosen (44 percent) and those who believe it is something homosexuals cannot change (43 percent) (Table F-8). Among those who consider homosexuality to be "something [people] cannot change," 57 percent say that homosexuality "should be considered as an acceptable lifestyle," while only 18 percent of those who believe homosexuality is "something people choose" accept homosexuality as an alternative lifestyle. When asked if "homosexual relations between adults are morally wrong," the answer was "yes" for 30 percent of those who see homosexuality as immutable and 78 percent for those who see it as a choice (Table F-8).

Respondents who believe homosexuality cannot be changed are also twice as likely (29 percent) to know that a close friend or family member is homosexual than are those who believe it to be a choice (16 percent). There may be some evidence to show that knowing a homosexual person positively affects an individual's attitudes toward homosexuality.[6] However, there is no way to establish the direction of

between the Middle Atlantic, East-North Central, West-North Central, South Atlantic and Mountain regions, between the East-South Central and West-South Central regions, and between the North-East and Pacific regions. All other regional contrasts are statistically significant.

[5]Hammer, et al. (1993) is the most recent example of a line of research that suggests a link between homosexuality and genetic or biological characteristics. For a review of other work on the origins of sexual orientation, see Byne and Parsons (1993).

[6]Evidence for this statement can be found in a poll by Steve Teichner for the *San Francisco Examiner* (Hatfield, 1989). Individuals stating that they knew someone who was homosexual were asked if knowing a homosexual person had affected their view of homosexuality. Nineteen percent answered that it had made their views more favorable to homosexuality, and 10 percent said less favorable. Few details are available on which to judge the quality of this poll, so we have chosen

- 198 -

causality.  Whether the formation of beliefs regarding the immutability
of homosexuality precedes or follows the formation of attitudes
regarding its acceptability is indeterminate.

**ATTITUDES TOWARD THE CIVIL RIGHTS OF HOMOSEXUALS**

    Although the majority have negative attitudes toward homosexuality,
Americans evidently separate these personal convictions from beliefs
about the civil rights of homosexuals.

**Beliefs About Job and Housing Rights**

    Nearly 80 percent agree with the statement that homosexuals should
have "equal rights in terms of job opportunities" (Table F-9).  But,
when asked whether homosexuals should be hired for a range of specific
occupations, the level of agreement varies.  People are less likely to
think that homosexuals "should . . . be hired" for occupations that
involve close, personal contact with others or that deal with children.
For example, 82 percent would be comfortable having homosexuals as sales
persons, but the percentage dropped to 41 percent when the consideration
was hiring homosexuals as teachers (Table F-10).  Similarly, only one-
third of the public would permit their children to play at the home of a
friend who lives with a homosexual parent (Table F-11).

    The more immediate the potential contact with homosexuals, the less
accepting the general public is toward gay rights.  Americans are less
accepting of statements affirming equal job *and housing* opportunities
for homosexuals than of statements affirming only equal job
opportunities.  While 79 percent agree with the statement "homosexuals
should have equal rights in terms of job opportunities," only 66 percent
agree with the statement "homosexuals should be guaranteed equal
treatment under the law in jobs and housing" (Table
F-12).  Further, only 45 percent state that they "wouldn't mind" working
around homosexuals, 27 percent would "prefer not to," and 25 percent
would "strongly object" (Table F-13).  For contrast, only slightly more

not to present the results in detail.  Whitely (1990) also finds a
positive correlation between degree of acquaintance with a homosexual
and acceptance of homosexuality in a convenience-based sample of Ball
State Univeristy undergraduate heterosexuals.

- 199 -

state that they "wouldn't mind" working around people who smoke cigarettes (51 percent) and considerably fewer state that they "wouldn't mind" working around people who use foul language (27 percent) (Table F-13).

**Beliefs About Legal Sanctions and Legal Rights**

Public opinion generally stands in opposition to government involvement in issues regarding sexual orientation; the observed level of opposition varies with the wording of survey questions and the context in which they are asked. A 1986 Gallup poll, taken shortly after the Supreme Court upheld a state law prohibiting consensual sodomy, found that only 18 percent of the respondents thought that "states should have the right to prohibit particular sexual practices conducted in private between consenting adult men and women," while 34 percent expressed support for the right of states to prohibit such practices between consenting adult homosexuals (Table F-18). A 1992 Gallup poll found that while 50 to 60 percent believe homosexuality to be "morally wrong" or "not an acceptable lifestyle," a smaller proportion, 44 percent, believe that consensual homosexual relations should be illegal (Table F-19).

While the 1992 poll shows a higher level of support for laws banning homosexual relations than the 1986 poll, this should not be construed as a sign of increasing public support for such laws. The context in which the 1986 question was asked probably led to a low response in support of such laws. The survey was taken immediately after a Supreme Court decision and the question regarding homosexual sexual acts followed a similar question regarding heterosexual sexual acts. The trend in response to similarly worded questions over the past 15 years shows a decrease in support for such laws since its peak in the mid-1980s.

The legislative trend has followed a similar pattern. Before 1961, all states banned non-procreative sexual behavior. Since then, sodomy

- 200 -

laws have been repealed by state legislatures or declared unconsti-
tutional by the courts in 26 states.[7]

As for legal rights of homosexuals, more individuals believe that
homosexuals should have equal housing and employment opportunities than
believe that the government should be involved in enforcing such
rights.[8]  While nearly 80 percent believe that homosexuals should have
equal job opportunities, only 48 percent believe that the laws
protecting the civil rights of minorities should be extended to
homosexuals (Table F-20), and only 37 percent believe that a federal law
should be passed protecting homosexuals from discrimination (Table
F-21).  The more direct the statement is in implying government
involvement in the enforcement of equal employment and housing
opportunities, the fewer the number of individuals who agree with the
statement.  Currently, eight states[9] and 122 municipalities have
executive orders or laws prohibiting discrimination on the basis of
sexual orientation.

Mirroring trends in public opinion, many religious denominations
also draw distinctions between their views on the acceptability of
homosexuality and civil rights protections for homosexuals.  Within the
church bodies, debate over these issues has involved discussions of the
decriminalization of homosexual practices between consenting adults,
discrimination in housing and employment, and inclusion of homosexuals
under hate-crimes legislation.  While most "main-line" denominations
have come out in favor of full civil rights for homosexuals, a few, in
particular the Southern Baptists, have come out strongly against
measures that would "secure legal, social or religious acceptance for

---

[7]The states that currently have no sodomy restriction are:  Alaska,
California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Indiana,
Iowa, Kentucky, Maine, Nebraska, New Hampshire, New Jersey, New Mexico,
New York, North Dakota, Ohio, Oregon, Pennsylvania, South Dakota,
Vermont, Washington, West Virginia, Wisconsin and Wyoming.
[8]A similar pattern is seen in attitudes toward racial equality;
more individuals support the concept of racial equality than support
governmental efforts to fight discrimination (Bobo, 1992; Burstein,
1985).
[9]The states with laws prohibiting discrimination on the basis of
sexual orientation are California, Connecticut, Hawaii, Massachusetts,
Minnesota, New Jersey, Vermont and Wisconsin.

- 201 -

homosexuality," or legitimize homosexuality as a normal behavior (Melton, 1991).

**Beliefs About "Familial" Rights**

Most Americans do not believe that formal recognition should be extended to homosexual unions.  Two recent polls by Yankelovich show that 65 percent believe that homosexual marriages *should not* be legal and 63 percent believe that homosexual couples *should not* be permitted to adopt children (Tables F-14 and F-15).  However, 27 percent believe such marriages should be "recognized as legal," and 29 percent think homosexual couples should have legal adoption rights.  According to a 1987 *USA Today* poll on family issues, 45 percent of the public are willing to apply the term "family" to an *unmarried heterosexual couple* living together, but only 33 percent are willing to apply that term to a *homosexual couple raising children* (Table F-16).  Despite these attitudes, of the 83 percent who favor a national family leave law, 72 percent believe that it should apply to homosexuals caring for a seriously ill companion (Table F-17).

**PUBLIC ATTITUDES ABOUT HOMOSEXUALS SERVING IN THE MILITARY**

Over the past year, polls have found that 40 to 60 percent of Americans support permitting homosexuals to serve in the Armed Forces (Tables F-10, F-22, and F-23).  As with many of the issues discussed above, the proportion supporting the rights of homosexuals to serve depends somewhat on the way the question is phrased.  When given a list of occupations and asked in which homosexuals should be permitted to be employed, 57 percent state that homosexuals should be permitted to be employed in the Armed Forces.  This is greater than the percentage who believe that homosexuals should be allowed to be doctors (53 percent), clergy (43 percent), high school and elementary school teachers (47 and 41 percent), or members of the President's Cabinet (54 percent), but less than the percentage who believe that homosexuals should be permitted to be sales persons (82 percent) (Table F-10).

A 1993 Gallup poll found that 53 percent answer positively to the question, "should homosexuals be able to serve in the Armed Forces?" (Table F-22).  An ABC News/*Washington Post* poll found a corresponding 53

- 202 -

percent believe that enlistees should not be asked about their sexual orientation (Table F-24).  However, support falls to between 40 and 45 percent when individuals are asked if openly homosexual persons should be allowed to serve (Table F-25).  Similarly, when asked if they "approve or disapprove of ending the ban on homosexuals serving in the military," 43 percent of the respondents approved (Table F-26).

A Gallup poll taken in July 1993 found the public evenly split over both a "don't ask, don't tell" policy and the question of whether homosexuality is incompatible with military service.  Forty-nine percent agree and 48 percent disagree with the statement "homosexuality is incompatible with military service (Table 6-1).  At the same time, 48 percent support and 49 percent oppose a policy under which individuals would not be asked about their sexual orientation but would continue to be removed from the military if they disclose their homosexuality. Those who believe homosexuality to be incompatible with military service are not the same individuals as those who oppose the "don't ask, don't tell" policy.  Most of those who believe homosexuality to be incompatible with military service support the "don't ask, don't tell" policy (61 percent), while most of those who reject the incompatibility between homosexuality and military service also reject the "don't ask, don't tell" policy (62 percent) (see Table 6-2).

In a June 1993 *Wall Street Journal*/NBC News poll (of registered voters) 79 percent of respondents expressed support for allowing homosexuals to serve under some policy.  Forty percent favor allowing homosexuals to serve openly, as long as they follow the same rules of conduct as other military personnel while they are on base.  An additional 38 percent favor allowing homosexuals to serve as long as they keep their homosexuality private (and think the military should not ask them about their orientation).  Only 21 percent are against allowing homosexuals to serve under any conditions (Table F-27).

Various church bodies and organizations associated with religious groups, most notably the Evangelical Lutheran Church in America and the American Jewish Committee, have taken a stance in favor of removing the ban against military service by homosexuals ("News:  Church leaders on

- 203 -

Table 6-1

"Do you agree or disagree with the following statement: 'Homosexuality is incompatible with military service.'" (Gallup, July 1993.  N = 1002)

| | |
|---|---|
| Agree | 48% |
| Disagree | 49% |
| No opinion | 3% |

Table 6-2

"In order to deal with the issue of gays in the military, some people have proposed a plan called 'Don't Ask, Don't Tell.' According to that plan, the military would no longer ask personnel whether or not they are homosexual.  But if personnel reveal that they are homosexual, they would be discharged from the military.  Is that a plan you would support or oppose?" (Gallup, July 1993.  N = 1002)

| | Support | Oppose | No Opinion |
|---|---|---|---|
| Total | 48% | 49% | 3% |
| Those who believe homosexuality is incompatible with military service | 61% | 36% | 3% |
| Those who do not believe homosexuality is incompatible with military service | 36% | 62% | 2% |

gay issue," 1993).  Herbert Chilstrom, Bishop of the Evangelical Lutheran Church in America (ELCA) compared the issue to the ordination of homosexuals.  In a recent letter to the President, Chilstrom stated that the ELCA does not ban homosexuals from becoming pastors, but instead relies on "a clear set of standards and expectations for all who are ordained.  We judge them by their behavior rather than on the basis of sexual orientation" (Chilstrom, 1993).  On the other hand, Southern Baptists have come out firmly against removing the ban.  Consistent with their opposition to extending civil rights to homosexuals, a recent statement by the Southern Baptist Christian Life Commission expressed opposition to removing the ban out of a concern for its effects on the military and because "lifting the ban will give approval and support to an immoral, harmful lifestyle" ("Baptists Call for Keeping Military Ban on Gays," 1993).

- 204 -

As a final note, public opinion on military service by homosexuals shifts substantially when military service is placed in the context of a duty rather than a right. If a military draft were reinstated, 78 percent believe that homosexuals should not be exempt. In contrast, only 50 percent feel that women should be drafted (Table F-28). This does not necessarily indicate support for the right of homosexuals to serve in the military; rather, the little support for exempting homosexuals from the draft may indicate a resistance to exempting homosexuals from the risk and responsibility of military service when others are required to serve.

ATTITUDES OF YOUNG ADULTS REGARDING HOMOSEXUALITY AND MILITARY SERVICE

Understanding the attitudes of young adults is particularly important in evaluating the concern that removing the ban will adversely affect recruitment. Nearly 60 percent of all new recruits in 1991 were 19 or younger, and 92 percent were under age 25 (OASD, 1992:18). Examining the attitudes of young adults is also worthwhile because nearly half of all service members (45.5 percent) in 1991 were under the age of 25 and more than two-thirds (68 percent) were under the age of 30 (OASD, 1992:51).

As stated previously, young adults tend to view homosexuality less negatively than older adults do. A 1986 *USA Today* poll of college students found that 44 percent believe homosexuality is immoral, while a corresponding 1986 ABC News/*Washington Post* poll showed that 66 percent of all adults believe homosexuality to be immoral.[10] A large majority of college students believe that sexual preference is one's own business (79 percent) and feel that homosexuals are entitled to the same protection against discrimination as other minority groups (74 percent) (Table 29).

A sign that college students are not supportive of the ban on homosexuals in the military is found in the actions of numerous colleges and universities in considering the elimination of ROTC programs from campuses until the ban is removed. While few universities have

_____
[10]More recently, a 1992 Yankelovich poll found that 54 percent of the adult population believes that homosexuality is immoral (Table F-3).

- 205 -

terminated ROTC programs, opposition to the ban has taken the form of official statements by university representatives and student government organizations; withdrawal of university credits for ROTC courses and withdrawal of faculty status for ROTC instructors; bans against on-campus recruiting activities by Department of Defense personnel; and scheduled phase-outs of existing ROTC programs, barring changes in current policy.

College students are a select group of young adults.  We expect college students to be more accepting of homosexuality than non-college students because of the strong relationship between educational aspirations/attainment and more positive attitudes toward homosexuality. Ninety-eight percent of the officer accessions and 99 percent of active-duty officers in 1991 held at least a bachelor's degree (OASD, 1992:69). If the available data on attitudes of college students are at all representative of recent officer accessions, they would suggest that young officers may be less condemning of homosexuality than their enlisted counterparts.  As leaders in the Armed Forces, the attitudes of young officers toward homosexuality will play a critical role in the success of any change in the policy banning homosexuals from serving in the military.  However, while nearly 20 percent of the total active force in 1991 held at least a bachelor's degree (OASD, 1992), the prime recruiting pool for the military is among high school graduates who are not in college; only 3 percent of enlisted accessions in 1991 had college experience (OASD, 1992:20).

A more representative picture of the attitudes of young males can be developed using the National Survey of Adolescent Males (NSAM). Unfortunately, the NSAM does not contain questions on attitudes toward homosexuality, comparable to those available from national surveys of adults.  The NSAM does, however, ask respondents their level of agreement with the statement "I could be friends with a gay person." Table F-30 presents the proportion agreeing with this statement by varying personal characteristics.  Overall, 40 percent of adolescent males agreed, "a lot" or "a little," that they could be friends with a homosexual person.  The same general patterns seen in the adult population of acceptance of homosexuals among different social and

- 206 -

demographic groups also hold for adolescent males.  Agreement that one could be friends with a homosexual person was lower among blacks (30 percent), Baptists (32 percent), people from the South (35 percent), people from rural areas (32 percent), and those having lower educational aspirations (28 percent) (Tables F-30 and F-7).[11]

No survey of young adults asks questions on both attitudes toward homosexuality and intentions for military service.  However, using data from the Monitoring the Future study, we can compare intentions to enlist among a sample of high school seniors with those background factors shown above to be associated with negative attitudes toward homosexuality.  In Table F-31, we see that among high school seniors, intentions to enlist are positively correlated with being black, male, from the South, and Baptist.  Those with intentions of enlisting also have somewhat lower educational aspirations.[12]  Those who actually enlist appear to also have somewhat lower socioeconomic backgrounds than their peers (OASD, 1992:45-46).  These characteristics are all correlated with less tolerance toward homosexuality.  On the other hand, those with intentions to serve in the military are not disproportionately conservative or Republican, do not appear to be particularly more religious, and are representatively dispersed between rural and urban areas.

We must be cautious in inferring the attitudes of young adults who plan to enlist from the attitudes of adults in those demographic groups overrepresented among those planning to enlist.  More negative attitudes toward homosexuality among all adults sharing a background characteristic does not necessarily mean that those young adults who

---

[11]The differences between regions and religious backgrounds in the proportion who could be friends with a homosexual person observed in the NSAM are generally not statistically significant.  We report them here because they are consistent with differences observed in other surveys reported in this chapter.

[12]The relationship between propensity to enlist and educational aspirations is reversed among high school graduates not in college. Non-student high school graduates who expect to receive more education are more likely to enlist than those who do not expect to receive more education (Hosek, Peterson, and Eden, 1986).  Overall, those who enlist have lower educational aspirations than high school seniors but higher educational aspirations than non-student high school graduates.

- 207 -

share this background characteristic and plan to enlist are also more negative.  This exercise can only hint at what the attitudes might be among those intending to enlist.

Further, those with intentions to enlist are not the same as those who actually enlist.  A substantial portion of those who enlist initially express negative intentions to enlist (Orvis, 1982).  Even among those expressing a similar intention to enlist, either negative or positive, differences exist in the probability of actually enlisting. Among high school students expressing similar intentions of enlisting, those from lower socioeconomic groups, blacks, and those not on a college track are more likely to carry through with their intentions (Orvis and Gahart, 1985).  These characteristics are also correlated with lower acceptance of homosexuality.

Accepting these caveats, we expect those with intentions to enlist and those who do enlist to be somewhat more negative toward homosexuality.  The primary differences between those who enlist or intend to enlist and their peers are race, gender, and educational aspirations.  Differences in educational aspirations are particularly important as they provide the most substantial variation in attitudes toward homosexuals.  However, with regard to many other characteristics observed to be associated with substantial variation in attitudes on homosexuality among the adult population, those who plan to enlist appear remarkably similar to their peers.

GENERAL CONCLUSIONS ON PUBLIC OPINION

We draw three conclusions from this review of the available public opinion data:

1.  The majority of Americans disapprove of homosexuality.  It is difficult to state the exact proportion who disapprove of homosexuality, as the level of disapproval varies according to the characterization posed by the survey question.  An overwhelming proportion believe sexual relationships between two adults of the same sex are "always wrong," but only a narrow majority believe homosexuality is immoral and that it should not be considered an acceptable alternative lifestyle.

- 208 -

2.  Many individuals separate their personal convictions about
homosexuality from their beliefs about the civil rights of homosexuals.
A clear majority of Americans believe that, in the abstract, homosexuals
should have equal rights in terms of job and housing opportunities; but
support for equal employment rights weakens slightly for positions in
which an individual might have close, personal interaction.

3.  Public attitudes on whether homosexuals should be permitted to
serve in the military are generally consistent with public attitudes
about the civil rights of homosexuals.  The general public is more
accepting of having homosexuals employed as sales persons than having
homosexuals serve in the Armed Forces, but less accepting of having
homosexuals employed as doctors, clergy, teachers, or members of the
President's Cabinet.  Roughly half of the population believe that
enlistees should not be asked about their sexual orientation and that
homosexuals should be allowed to serve in the military; but, similar to
the social distance from homosexuals that some wish to maintain in the
larger society, a portion of those believing homosexuals should be
allowed to serve also appear uncomfortable with having openly homosexual
service members.  However, roughly the same proportion support allowing
openly homosexual persons to serve as support a "don't ask, don't tell"
policy, just as many of those who reject the argument that homosexuality
is incompatible with military service also reject the "don't ask, don't
tell" policy.

- 209 -

## 7. RELEVANT MILITARY OPINION[1]

**INTRODUCTION**

The popular press and recent Senate hearings have provided a window into the military perspective on maintaining or removing the ban on homosexuals in the military.  They have led to the same impression--"the military," from top brass to new recruits, is overwhelmingly opposed to allowing homosexuals to serve.  While many do feel this way, opposition is not universal.  Some military members have advocated removing the ban, others have expressed willingness to go along with whatever is decided, while others are strongly opposed to making any change at all. Some have predicted the demise of the military if the ban is removed, while others have expressed the belief that the military would adjust to this change, as it has adjusted to changes in the past.

In this chapter we discuss findings about the views of military members on removing the ban, based on two sources of information: opinion surveys carried out by the *Los Angeles Times* and by sociologists Charles Moskos and Laura Miller of Northwestern University and the results of group discussions with military members carried out by RAND staff in the United States and in Germany.

It is important to note that these sources do not provide a statistically representative view of the opinions and concerns of military members about removing the ban:  The surveys we cite here are the only ones we found that asked members of the military their opinions on the subject.[2]  However, these surveys are limited in scope, use

---

[1]This chapter was prepared by Sandra H. Berry, Jennifer A. Hawes-Dawson, and James P. Kahan, with the assistance of Neil Fulcher, Larry Hanser, Joanna Zorn Heilbrunn, Peter Jacobson, Raynard Kington, Paul Koegel, Janet Lever, Samantha Ravich, Peter Tiemeyer, and Gail Zellman.  The authors also wish to acknowledge the considerable assistance of the reviewers of this chapter, Deborah Hensler, Susan Hosek, and Tora Bikson.

[2]Because of restrictions on access to military members and the need to use information provided by the services or the Department of Defense for sampling, very few surveys of military members are carried out without the cooperation of the military.  We contacted the in-house survey research groups at each of the military services and at the

- 210 -

convenience sampling methods rather than probability sampling to select respondents, and, in some cases, include questions that are poorly worded and unclear. Thus, the results may be biased in important ways. RAND's group discussions included only a small number of people and participants were not randomly selected. Therefore, it is not appropriate to use the survey or focus group results to quantify military opinion in any rigorous way. Rather, the results should be viewed as indicating the general directions and range of opinions and attitudes of military personnel. The remainder of this chapter discusses results from both data sources, first the survey results and then the focus group results.

***LOS ANGELES TIMES* SURVEY**

The *Los Angeles Times* surveyed 2,346 enlisted men and women (E-1 through E-9) during February 11-16, 1993.[3] These respondents were obtained outside 38 military facilities in the continental U.S., including U.S. Army, Navy, Marine Corps, and Air Force bases. The sampling method can be characterized as a variation on the "mall intercept" approach.[4] Potential respondents were approached by interviewers at off-base commercial and residential sites and asked to fill out an anonymous and confidential survey. (The specific topic of the survey was not mentioned by the interviewer.) Quota methods were used to ensure selection of appropriate numbers of males and females; blacks, whites, and Latinos; and age groups. Results were subsequently

---

Department of Defense and verified that they had not conducted any surveys on the topic of removing the ban on homosexuals in the military, in part, due to a ban on such research by the Department of Defense. This ban on research has been recently lifted. We also conducted computerized searches of the social science literature to identify any published studies not carried out under the auspices of the military and found none.

[3]A more detailed description of the methodology for this survey and the list of questions asked are included as Appendix G.

[4]This is a common market research technique that involves interviewers approaching potential respondents in a public place, such as a shopping mall, and inviting them to participate in an interview. There is a strong self-selection bias inherent in this method--people with a strong interest in stating their views, especially about very controversial topics, are most likely to respond positively to the invitation.

- 211 -

weighted to reflect distributions by branch of service, gender, race, age, education, and marital status, as reported by the Department of Defense.  The actual sample included 728 personnel from the Army, 591 from the Navy, 488 from the Marine Corps, and 539 from the Air Force. No data on statistical significance were provided.

## Limitations

As the *Times* notes, this kind of poll has certain limitations: only persons who were present at the off-base interviewing sites could be interviewed and the opinions of those who were not asked or who declined to participate may differ from those who were interviewed.  There is no way to evaluate the magnitude or direction of bias that may have been introduced by the use of these methods.  Response rates would be difficult to interpret in the context of the mall intercept method and were not provided by the *Times*.

Nevertheless, the strength of these results is the fact that they include an appreciable number of enlisted personnel obtained at a variety of locations.  Further, while the questionnaire is a structured way of gathering information and the quality of results is determined, in part, by the quality of the questions, a self-administered survey does allow respondents a measure of privacy in expressing their views that is not present in other forums for expressing opinion.

## Findings

**Background of Participants.**  Most respondents indicated that they were religious (64 percent)(Item G-27),[5] secure in their finances (67 percent)(Item G-26), and middle-of-the-road in political matters (52 percent).  About 25 percent rated themselves as politically conservative and 21 percent rated themselves as liberal (Item G-29).[6]

---

[5]The items noted in parentheses in this chapter are identified by the letter of the appendix in which they are listed.  The letters G and H do not appear on the actual entries in Appendixes G and H.

[6]In the 1991 National Opinion Research Center General Social Survey of U.S. adults, 93 percent of respondents expressed a religious preference and 52 percent indicated they had a strong or somewhat strong religious preference.  Twenty-nine percent of respondents characterized themselves as liberal, 40 percent as moderate, and 32 percent as conservative.

- 212 -

Overall, 74 percent rated themselves as satisfied with life in the military today (Item G-7) and 61 percent felt the military had fulfilled the commitments it made to them (Item G-12). But 65 percent were concerned that current Administration proposals for downsizing the military were "going too far in a still dangerous world" (Item G-10) and 60 percent were worried about the effect of downsizing on themselves and their careers (Item G-11). Only 43 percent rated as adequate the programs and services for helping "victims of downsizing" get going in civilian life (Item G-13), and 47 percent were confident they could get a secure, well-paying civilian job in a relatively short time if they left the service in the next few months (Item G-14).

On other issues concerning the military, 58 percent overall approved of women taking combat roles, including 55 percent of males and 79 percent of females (Item G-15). Forty-five percent felt that sexual harassment was an important issue in the military (44 percent of males and 55 percent of females)(Item G-25).

**Views on Removing the Ban.** Overall, only 18 percent expressed approval of removing the ban on homosexuals in the Armed Forces (4 percent approved strongly and 14 percent approved somewhat) while 74 percent disapproved (59 percent strongly and 15 percent somewhat). Eight percent said "don't know." This is in sharp contrast to the 40-50 percent of the public who believed the ban should be removed (Item G-17). (See the chapter on public opinion.)

More males disapproved of removing the ban than females (76 vs. 55 percent), more combat personnel disapproved than noncombat personnel (80 vs. 69 percent), and more whites and Latinos disapproved than blacks (78 percent, 76 percent, and 64 percent, respectively). The services differed somewhat in their level of disapproval; 74 percent for the Army, 69 percent for the Navy, 86 percent for the Marines, and 74 percent for the Air Force.

**Reasons for Opinions About Removing the Ban.** Respondents were asked to check off two reasons for their view about removing the ban from a list of possible reasons printed on the questionnaire. Different lists of reasons were supplied for those who did and did not support removing the ban. Of the 18 percent who *approved*, 58 percent cited

- 213 -

discrimination as one of the two main reasons, 23 percent said it was not important to them that homosexuals be banned, 19 percent said homosexuals were no different than heterosexuals, and 2 percent said there were already homosexuals in the military (Item G-18).

Of the 74 percent who *disapproved*, 63 percent opposed sharing quarters and facilities with homosexuals, 40 percent said homosexuality was immoral, 28 percent cited contribution to the spread of AIDS, and 21 percent said it was against their religious views. Fifteen percent felt that homosexuals were less reliable in a combat situation, and a total of 9 percent of respondents chose all other reasons, such as morale, causing conflict, cost of facilities, threats of violence, and wanting equal rights as married persons (Item G-19).

Both those who favored and those who opposed removing the ban were asked how concerned they were personally about the possible impact of permitting homosexuals to serve in the military. Most indicated they were worried--36 percent very worried, and 32 percent somewhat worried. However, 18 percent indicated they were not too worried and 10 percent were not worried at all. Overall, males were more likely to express worry than females (70 percent very or somewhat worried for males vs. 51 percent for females)(Item G-20). Marines were more likely to express worry than the other services--77 percent for the Marines vs. 67 percent for the Army, 65 percent for the Navy, and 70 percent for the Air Force.

They were also asked how likely it would be that homosexuals would be subjected to violence if allowed to serve. Most (81 percent) said violence would be likely. Fifty-five percent said it would be very likely and 26 percent somewhat likely (Item G-22). Respondents in the Marine Corps were most likely to predict violence; 91 percent indicated it was very or somewhat likely, compared with 78 percent for the Army, 84 percent for the Navy, and 78 percent for the Air Force. (The issue of violence related to removing the ban is discussed in Appendix J.)

Overall, 19 percent said they were currently serving with someone they believed was a homosexual (18 percent of men and 29 percent of women)(Item G-24). This figure differed by branch of service: 16 percent for the Army, 28 percent for the Navy, 10 percent for the Marines, and 18 percent for the Air Force.

- 214 -

**Potential Effect on Reenlistment.**  Table 7-1 shows the potential effects on predicted enlistment decisions of removing the ban on homosexuals.  Whether or not the ban is in place, only 28 percent report definitely ruling out reenlistment.  With the ban in place, of the 72 percent who remain, 29 percent say they definitely *will* reenlist, 34 *may* reenlist, and 9 percent *don't know*.  If the ban is removed, another 10 percent indicate that they will definitely *not* reenlist, and, of the 62 percent who remain, 44 percent say they will still consider reenlisting and 18 percent say they don't know (Items G-16 and G-21).[7]

Table 7-1

Military Reenlistment Intentions With and Without Ban on Homosexuals
(percentages)

|  | If Ban Remains | | | If Ban Is Removed | | | Will Not Re-enlist No Matter What |
|---|---|---|---|---|---|---|---|
|  | Definitely Will Re-enlist | May Re-enlist | Don't Know | Will Consider Reen-listing | Will Not Re-enlist | Don't Know | |
| Army | 31 | 35 | 11 | 46 | 11 | 20 | 23 |
| Navy | 24 | 31 | 8 | 37 | 10 | 16 | 37 |
| Marines | 18 | 31 | 13 | 30 | 15 | 17 | 38 |
| Air Force | 35 | 37 | 8 | 54 | 9 | 18 | 20 |
| Total | 29 | 34 | 9 | 44 | 10 | 18 | 28 |

Source:  *Los Angeles Times* Poll, Study #307--United States Military Survey, March 1, 1993.

MOSKOS/MILLER ARMY SURVEYS

Between February 1992 and December 1992, Charles Moskos and Laura Miller, sociologists from Northwestern University, surveyed a total of 2,804 enlisted personnel and officers from six Army bases in the continental United States and one overseas base (Somalia) to collect survey data on the attitudes of Army personnel about women in combat and

_____

[7]Reenlistment intentions have been found to be strongly related to actual behavior, although not perfectly predictive of it.  The results described here are discussed as part of a broader view of recruitment and retention in the chapter on that subject.

- 215 -

race relations.  As part of this survey respondents were asked a question about homosexuals in the military.[8]  The sample was stratified to ensure selection of appropriate numbers of combat and noncombat personnel from a variety of military units and occupational specialties. Quota methods were used to select appropriate numbers of males and females, enlisted and officers, and blacks, whites, and other races. Women were oversampled so that the survey sample would yield roughly equal numbers of females and males.  Efforts were also made to sample military members who had Persian Gulf experience as well as those who did not.  The actual sample included 1,420 males and 1,384 females. Response or refusal rates would be difficult to interpret in this context and were not provided.

Potential survey respondents were selected by Army personnel at each site and invited to attend a group survey session, which was typically held in a large auditorium or testing room.  Each participant was asked to complete an anonymous self-administered survey and to return it directly to Laura Miller, who conducted each survey session. The survey, conducted in December 1992, with 471 males and 470 females at two posts, used the single attitudinal item plus an expanded series of questions about homosexuals in the military.[9]  We report results from these surveys below.  No data on statistical significance were provided.

**Limitations**

There are several limitations to the Moskos/Miller Army survey data.  First, like the *Los Angeles Times* Survey, the Moskos/Miller Army surveys relied on convenience sampling methods, rather than strict probability sampling to select respondents and did not weight the results.  Therefore, it is not possible to generalize their findings to the entire Army military population.  Second, the surveys were conducted at a small number of Army sites, so there is very limited geographical representation in the survey sample.  Third, the sample did not include

---

[8]The question was, "How do you feel about the proposal that gays and lesbians should be allowed to enter and remain in the military?" Response categories were Strongly Agree, Agree, Disagree, Strongly Disagree, and Not Sure.

[9]The wording of these items is contained in Appendix H.

- 216 -

senior officers; only grades 0-3 and below were invited to participate in the survey.  Despite these limitations, the Army survey data provide useful insights concerning the opinions and concerns of the survey participants about lifting the ban.  As the authors note, the Army surveys (as well as the *Los Angeles Times* Survey) "will be useful not so much for percentages per se, but to ascertain how [the views of] various subgroups will affect policy implementation" (Memo from Charles Moskos to Bernard Rostker, "Discussion Points on DOD Policy Options Regarding Gays and Lesbians," dated May 7, 1993).

**Findings and Conclusions**

　　**Views on Removing the Ban.**  As shown in Table 7-2, 76 percent of males and 43 percent of females disagreed with the proposal that homosexuals should be allowed to enter and remain in the military, while 17 percent of males and 44 percent of females agreed with that proposal. Proportions were similar across surveyed bases (Item H-11b).  These results are generally consistent with the results in the *Los Angeles Times* survey, except the women in the Moskos survey were more positive about homosexuals in the military than were those in the *Los Angeles Times* survey.

Table 7-2

Percentage Distributions for Agreement or Disagreement with Proposal That Homosexuals Be Allowed to Enter and Remain in the Military

|  | Males | Females |
|---|---|---|
| Agree Strongly | 6 | 17 |
| Agree | 11 | 27 |
| Not Sure | 7 | 12 |
| Disagree | 12 | 14 |
| Disagree Strongly | 64 | 29 |
| Total | 100 | 100 |
| Number in sample | 1420 | 1384 |

　Source:  Miller, May 1993.
　Note:  Recalculations of overall percentages based on individual percentages and sample sizes reported by military post.  Typographical error in the published tables in  Miller (May 1993) corrected per telephone conversation with Laura Miller.

- 217 -

In their December 1992 survey, Moskos and Miller asked more detailed questions of a group of 941 officers and enlisted personnel. When compared with the Army as a whole, the respondents largely reflected the makeup of the Army in terms of gender and race, but slightly overrepresented lower rank enlisted personnel and underrepresented officers (O1-O3). In this portion of the group, 18 percent of women and 9 percent of men indicated that they personally knew a male in their company who was homosexual (Item H-32) and 14 percent of men and 27 percent of women indicated they knew a woman in their company who was lesbian (Item H-33). Those who thought they knew someone in their unit was homosexual were *more favorable* toward allowing homosexuals to serve in the military than those who did not. Among men, 22 percent who knew someone in their unit was homosexual were favorable, compared with 16 percent of those who did not know someone in their unit who was homosexual. For females, the comparable figures were 52 percent vs. 40 percent (Table 13 in Miller, 1993). Miller reports that 6 percent of men and 17 percent of women indicated that they felt that a soldier of the same sex had made a sexual advance toward them; however, the question she asked does not specify whether this advance was welcome or not welcome to the recipient, nor does it specify the nature of the advance, which could range from a joke to a physical assault (Item H-34).[10]

---

[10]The problems with this item point to the difficulties of measuring the extent to which any sexual harassment, let alone same-gender sexual harassment, occurs in the military context. However, two studies based on large stratified random samples of military personnel have reported information on same-gender sexual harassment. The first, a 1988 survey of over 20,000 active duty members from all four services and the Coast Guard focused on sexual harasssment at work and was reported by Melanie Martindale (1990). The second, a 1989 survey of over 5,600 active duty Navy personnel that focused on sexual harassment while on duty and while off duty but on base or ship, was reported by Amy Culbertson, et. al. (1992).

Martindale reported that 17 percent of males and 64 percent of females experienced sexual harassment (described in the survey not as "sexual harassment" per se but as "uninvited and unwanted sexual attention received at work") from someone (male or female) in the year prior to the survey; 17 percent of females and 3 percent of males indicated they had experienced harassment that was of a "serious" form, i.e., pressure for sexual favors or attempted or actual rape or sexual

- 218 -

**Views on Homosexuals as Fellow Soldiers.**  When presented with a forced choice between being in a foxhole or working on their normal job with either an opposite-sex soldier or a same-sex homosexual soldier (as shown in Table 7-3) most males indicated they would prefer to be with a female than a homosexual male fellow soldier, whether in a normal work situation or in combat.  In contrast, a majority of females indicated no preference, and a large minority would prefer to have males as fellow soldiers.  A very small proportion would prefer to be with a same sex homosexual soldier, a smaller proportion than those who volunteered a preference for being alone, given the other alternatives presented.

**General Views on Homosexuals in the Military.**  Miller (May, 1993) reports the results of a series of agree/disagree items on attitudes toward homosexuality and homosexuals in the military (Item H-37a-1). Table 7-4 summarizes the results, showing the proportion of males and females who indicated they agreed or strongly agreed with each statement.  The results clearly indicate high levels of discomfort with

---

assault.  Other less serious harassing behaviors included a range from whistles, calls, jokes, etc., to touching and cornering the victim. Gender of the perpetrator was asked only for the *single instance of sexual harassment during the previous year that had affected the respondent the most*; 16 percent of females and 8 percent of males reported that a serious form of harassment was part of this instance of harassment.  Unfortunately, the only data provided by the authors on the gender of the perpetrator by gender of the victim include the entire range of behaviors from most to least serious:  One percent of females and 30 percent of males indicated that this harassment was perpetrated by one or more persons of the same gender as the victim of the harassment, but Martindale cautions that these incidents do not necessarily refer to homosexual events.  The survey collected no data on the sexual orientation of perpetrators.

The conclusion, based on Martindale's cross-service data, that while females are much more likely to be the victims of sexual harassment than males, female-to-female harassment is much less common than male-to-male harassment, is also supported by the Culbertson, et al. report on Navy personnel, although this report uses a more restrictive definition of sexual harassment and finds correspondingly lower rates of reported experiences of sexual harassment.

Same-gender sexual harassment fits the same pattern in the civilian workplace.  Over 20,000 federal employees were surveyed in 1980 by the U.S. Merit Systems Protection Board.  Only 3 percent of women reported they had been harassed by other women, in contrast to 22 percent of male victims reporting harassment by one or more men.  Gender of perpetrator was not included as a question on the MSPB's 1987 survey.

- 219 -

the prospect of working or living with homosexuals and that, in this population of soldiers, males were much less accepting than females of homosexuals, along most dimensions.  However, an overwhelming majority

Table 7-3

Proportion of Males and Females Preferring Each Type of Fellow Soldier

|  | In a Foxhole | | On Current Job | |
|---|---|---|---|---|
| Prefer To Work With: | Men | Women | Men | Women |
| Opposite sex | 51 | 42 | 69 | 39 |
| Doesn't matter | 27 | 56 | 21 | 57 |
| Same sex homosexual | 5 | 2 | 2 | 1 |
| Prefer to be alone | 17 | 1 | 9 | 3 |

NOTE:  Based on interviews with 471 males and 470 females reported by Laura Miller, May 1993.

of soldiers (72 percent of males and 87 percent of females) agreed that the private behavior of others was not their concern, while fewer, 38 percent of males and 29 percent of females, indicated that they expected homosexual soldiers to attempt to seduce other soldiers.  About a quarter of the males and half the females felt that sensitivity classes would be useful to promote acceptance of homosexuals in the military.

CONCLUSIONS FROM BOTH SURVEYS

The surveys we reviewed found that the opinions of a large majority of enlisted military personnel are against allowing homosexuals to serve.  Women hold less unfavorable views about it than males. Unfavorable opinions appear to be mainly related both to fears about having direct contact with homosexuals in facilities and quarters and to disapproval of homosexuals on moral and religious grounds.  A minority in the *Los Angeles Times* survey expressed concern with the process of removing the ban, such as conflict, violence, and financial cost, although most predicted that violence against homosexuals would occur. Only 15 percent of respondents to the *Los Angeles Times* survey expressed

- 220 -

direct concern about the job performance of homosexuals, indicating concerns that they are not as reliable in combat situations. The Moskos/Miller survey of Army personnel indicated that while homosexuals were not generally considered to be desirable unit members, most survey

Table 7-4

Proportion of Males and Females Indicating They Strongly Agree
or Agree with Each Statement

|  | Males | Females |
|---|---|---|
| a. I would feel uncomfortable if there were some homosexuals in my unit. | 76% | 35% |
| b. I would feel uncomfortable having to share my room with a homosexual. | 90% | 62% |
| c. Homosexual males make me more uncomfortable than lesbians. | 75% | 9% |
| d. What people do in their private sex lives is no business of mine. | 72% | 87% |
| e. Allowing openly homosexual soldiers in the Army would cause some problems, but we could manage. | 33% | 53% |
| f. Allowing openly homosexual soldiers in the Army would be very disruptive of discipline. | 75% | 49% |
| g. Homosexuality is abnormal and perverted. | 73% | 43% |
| h. It is all right for homosexuals to be in the Army as long as I know who they are. | 25% | 32% |
| i. Openly homosexual soldiers will try to seduce straight soldiers. | 38% | 29% |
| j. Allowing homosexuals in the Army will increase soldiers' acceptance of gays and lesbians. | 26% | 39% |
| k. We need sensitivity courses on accepting homosexuals in the Army. | 24% | 48% |
| l. In the event of a draft, homosexuals should be drafted the same as heterosexual men. | 40% | 65% |

Note:  Compiled from Tables 8 and 9 in Miller, 1993.

- 221 -

respondents felt that private sexual behavior was none of their business and less than 40 percent of males and 30 percent of females felt that heterosexuals would be subject to sexual advances by homosexuals. Other survey results indicate that number would probably be much lower.

However, in the *Los Angeles Times* survey findings, the ban on homosexuals was not the only concern of military members. When asked to indicate the two top problems facing the U.S. military today, before any specific topics were discussed in detail, 52 percent picked troop cuts and downsizing vs. 48 percent who picked lifting the ban on homosexuals (Item G-8). When asked toward the end of the questionnaire if the issue of permitting homosexuals in the military was "getting the attention it deserved," only 23 percent felt it was, while 66 percent felt it was "draining attention from other more important issues facing the military" (Item G-23).

## FOCUS GROUPS CONDUCTED BY RAND

As part of our attempt to understand the beliefs and attitudes of service members, we conducted 18 focus groups in the United States and Germany. Focus groups were carried out with Army, Air Force, and Marine participants at three California installations and with Army and Air Force participants from several installations within driving distance of Frankfurt, Germany.[11]

### Method

Separate groups were conducted for officers,[12] non-commissioned officers (NCOs),[13] and enlisted personnel.[14] To the extent possible each group was varied with respect to gender, race, and service occupation.

---

[11]Although no focus groups were conducted with Navy personnel, project staff visited naval bases and talked informally with personnel there.
[12]Almost all were Second Lieutenants, First Lieutenants, Captains and Majors.
[13]Included Sergeants through Sergeant Majors in the Marine Corps and the Army and Staff Sergeants through Chief Master Sergeants in the Air Force.
[14]Included Privates through Lance Corporals in the Marine Corps, Privates through Privates First Class in the Army, and Airman Basic through Airman First Class in the Air Force.

- 222 -

Each group had between 7 and 11 participants; most groups had 9 or 10. The method of choosing participants varied considerably depending on the particular installation visited. At one site, volunteers were solicited by the local military command to tell the researchers how they felt about allowing homosexuals to serve. At another site, participants were selected randomly from a computer file of unit personnel. For most sites, the officer in charge chose several work groups and asked them to provide two or three people each. Thus, we can make no claim for the representativeness of the focus group participants.

Although we requested that prospective participants not be told in advance that the focus groups were about allowing homosexuals to serve, virtually all participants appeared to know the topic of conversation. A few participants (from the installation that solicited volunteers) brought written statements of their positions; others mentioned at the end of the session that they had discussed the matter with their peers before attending. However, very few participants mentioned homosexuals or the restrictions before the project staff introduced the topic.

All focus groups were conducted in a meeting room on post, with only project staff (usually including males and females) and participants in attendance. Permission was obtained from participants to take detailed notes of the sessions, on condition that no statements would be identifiable with the individual or units in attendance. Other than these notes, the groups were not recorded in any way. Focus group leaders (usually two leaders in each group and one note-taker) used a written protocol to guide the discussion, although the participants often departed from the protocol in bringing up and discussing issues that concerned them. Each session lasted about an hour and a half.

The protocol was designed to lead gradually into the topic of homosexuals in the military, in order to understand that issue in the larger context of military life. Therefore, we began by asking participants to comment on their living and working conditions, focusing on rules and expectations for behavior, how well people got along, reasons for conflicts that arose, and how conflicts were resolved. Focus group leaders probed for the roles leaders (both NCOs and officers) played in resolving conflicts. They then turned to a

- 223 -

consideration of what factors led to effective performance in work groups and how cohesion was fostered in work groups, probing to explore how important it was to like and socialize with co-workers. During these context-setting discussions (which took half to three-quarters of the session), we asked questions to see whether and how differences in race and gender and other characteristics could cause problems and how these problems were resolved.

The topic of homosexuals in the military was introduced with reference to the proposed removal of the ban, and reaction was elicited in light of the previous topics of living conditions, working conditions, and the causes and resolutions of conflict. We asked an introductory question about whether participants personally knew any homosexuals who were currently serving at their installations. For those who did know any such service members, the focus group leader asked whether the sexual orientation of these individuals was widely known, and how these individuals were treated within the unit. This led to a discussion about the participants' beliefs and attitudes regarding homosexuals, their service in the military, and the appropriateness of the ban. Finally, we asked what advice participants would give military leaders in the event that homosexuals were allowed to serve.

We present our findings as much as possible in the words of the focus group participants. However, we have edited these words to remove any identification of participants by gender, rank, or branch of service, unless such identification is critical to understanding the context of the opinion. Since we are dealing with a small, nonrepresentative sample of service members, we consider the views expressed as descriptive of the range of opinion among service members and of how they formulate the issues of the military experience of everyday life, working groups, racial and gender differences, and homosexuals; we do not attempt to quantify responses. It is also important to realize that people sometimes have reasons for taking positions in groups that may not completely reflect their individual views or strengths of opinion about the issue. For example, some people may be more concerned with maintaining social solidarity with other members of the group who feel more strongly about the issue than they do

- 224 -

(Allport, 1958) or they may simply need to express their own self-concept by exaggerating their position (Herek, 1987).

**What the Participants Told Us**

   **Living and Working Conditions.**  Not surprisingly, participants had a range of complaints about their living and working conditions. Complaints about living conditions included poor quality of physical facilities in terms of heating, lighting, noise, maintenance, etc., as well as lack of privacy.  Lack of privacy in barracks housing included being subjected to inspections and unit rules as well as having roommates and lack of choice in roommates.  Lack of privacy in married housing included the need to share common spaces with other couples and families as well as noise and cleanliness.  Many participants living in barracks expressed a desire to live off post, while others lived off post only because of a shortage of housing on post and resented the expense involved.  In units where people both worked and roomed together, participants expressed a sense of feeling trapped and unable to escape from normal stresses of life in the military;  this was especially true at remote posts.  For example one soldier commented:  "I get away from [installation] every chance I get.  I don't like my roommate;  he's a slob...We have nothing in common, don't like the same kind of music, don't have the same opinions, he's a Democrat, I'm a Republican."  When asked if they worked together as well, he commented further:  "Yes, we work together.  My attitude is "work is work," but I don't want to deal with the military when I'm off work."  Another soldier commented:  "Contrary to what they tell you, it's not like a civilian job because of the restrictions they put on you.  You can't go beyond 75 miles from base; in a civilian job people don't come in and check your home every night."

   On the other hand, they recognized that living and working together made sense in terms of having the same daily schedules and feeling some trust that belongings were secure in the barracks.

   *First participant:*  You try and keep a platoon together.  Nine out of ten who work together get along, so the rooming situation is fine...Problems can arise if you put in a cook who has to get up at three or four in the morning.

- 225 -

*Second participant:* In addition to rooming people who work together, one reason for keeping the group together is also security of personal items. There's less likely to be theft of personal belongings.

Rules in living quarters appeared to be quite varied and were set according to the branch of service, the particular installation, and sometimes the platoon or unit customs. Thus, some military members were allowed to have liquor in their rooms and others were not. Some were allowed to have opposite sex visitors in private, whether the visitors were constantly escorted or not; others could have them only if visitors were constantly escorted; and others not at all or only on special occasions.

Rules about music and decorations also varied, although most indicated that understood standards did exist in their units and were enforced by unit commanders.

One exchange between participants in an NCO group went as follows:

*Leader:* What happens if one roommate has very conservative values and another wants to hang soft-core porn on the wall?

*First participant:* If they are both roommates, if it bothers one then the other has to take it down.

*Second participant:* I take another route. Regulations allow soft-core porn. So, if regulations allow it, then the two must work out an agreement. I can't ask someone to remove something allowed by regulations.

*First participant:* You have to go by the regulations, but you have latitude within them. People have different leadership styles, but whatever the commander says, goes.

*Third participant:* Regulations are clear cut, but 'leadership' is using the discretion that is given to you. You can use the discretion wrong, but you're earning your pay by using the discretion.

Complaints about working conditions centered on long hours and, to some degree, inequities in work assignments between military and civilian staff and between males and females, as well as lack of appropriate recognition. Many commented on the arbitrary quality of

- 226 -

work assignments, with their work schedules dependent on the desire for advancement of the officer in charge and on his or her willingness to make decisions. For example: "The work situation ain't that bad, but you don't get off until 7(PM) when you're finished [with your work] at 4:30(PM). The chain of command is scared to make decisions."

In contrast, most commented positively on the atmosphere of teamwork in work groups and the professional, goal-oriented quality of military tasks, "When you're at work, you're talking about your work. You don't talk about your personal life." They felt that working together built mutual respect and appreciation for each others' strengths and weaknesses as well as an ability to cooperate and get jobs done: "You get proficient at what you're doing and you get into a rhythm and become close, tight knit, and you get it done. The [military] is always testing you, but you become a unit with pride and camaraderie in your unit."

**Conflict in Living and Work Groups.** Sources of conflict in living quarters and work assignments included clean vs. messy people, religious, racial, and political differences, alcohol use and abuse, and tastes in music and leisure activities. These conflicts were expressed in a variety of ways and sometimes resulted in violence. While most indicated they were encouraged to work conflicts out among the parties directly involved, they also cited instances of intervention by unit commanders and other officers to resolve such conflicts, especially if violence was involved. As one participant described it, "There's all sorts of process over only a few punches. MPs (military police) get involved. Then your time, money, and ability to get away is taken away." The same soldier related this story:

> I came in and hung a Confederate flag in a room with two black
> roommates. I was told it was racist by an officer, but I
> viewed it as being the same as the black image stuff my
> roommates had hung, African flags and stuff...I fought taking
> it down. It went really far up in the chain of command. My
> roommates were not the ones mainly objecting, the officer was.

Options for dealing with such conflicts included both putting the people involved together in their quarters and on their work assignments

- 227 -

in an effort to force them to come to terms with each other, as well as changing room and work assignments to accommodate irreconcilable differences. Repeated involvement in such conflicts was considered grounds for questioning fitness for military service. "If you can't get your job done, you'll be in trouble. If you can't work with people, you'll be in trouble."

Enlisted personnel indicated that such conflicts were commonplace, and officers indicated that they spent considerable time and thought on such problems. However, neither group seemed particularly surprised or concerned about such conflict, seemingly expecting it in heterogeneous groups like the military. One commented: "The problems in the military are no different than in the rest of society, it's just that there's more daily contact between diverse persons, which causes more conflict."

In fact, many mentioned exposure to different kinds of people as a positive feature of military service. "I come from a small town in Oklahoma. Everyone is the same: white Baptist. They've never had to deal with blacks, Mexicans, Chinese...The (military) has changed my conception of these people." Another commented, "Ten years ago I would never have worked for a black person, now I've got no problem with it."

**Racial Conflict.** Most participants acknowledged the existence of racial tension in the military while expressing a belief in zero tolerance for expressing such conflict. "In living together a soldier can complain about what another does, but not who he is." Several NCOs commented in response to the leader's question about how they handled racial conflicts: "You change the attitude, don't accommodate, make attitude adjustments...You make it plain you will not tolerate it and he needs to live with it and adjust to it." Racial comments or other kinds of discrimination were not regarded as acceptable. "What you do is stop it. Directly tell them to stop and it is unacceptable."

Living and working together were regarded as helpful to the development of better relations: "A lot of it stems from not knowing what the other guy is all about. Contact breaks that down," and, "It's all about respect. When you develop a team, they develop a respect that transcends race. Team members look beyond race. Utopia is teamwork. Once you get out of that, it breaks down back at the garrison when

- 228 -

they're not at work." While participants expressed few problems working with people of different races (unless there was a language difference), many indicated that they did not socialize with people of other races after working hours. One man in a mixed-race marriage commented that he had experienced no problems because of this in the military, although he had in civilian settings.

The importance of leadership in dealing with conflict was strongly emphasized. "Leadership tells you what is black and what is white, so you know what the line is and so you know when you cross the line." "They have to know that the standard is there and if it is violated it will be enforced and that the person will not be retaliated against for reporting violations of that standard." Leadership training was cited as a major factor in the ability to foster teamwork and cohesion, "We prep leaders extensively before they assume control of individuals. All get training for technical, management, and communication skills." "Plus you make mistakes and learn from mistakes, discuss the situation with your peers; someone has gone through it and will share with you."

**Gender Conflict.** While most participants felt comfortable with the issue of race in the military, this was not true of gender. While an NCO group first asserted that: "We treat them like another soldier, if they don't do the job they're out," both men and women at various levels described differences in degree of acceptance and the need to prove themselves, difficulties in perceived ability to do their work, and inequities in work assignments. One woman commented: "Women out in the field are the ones trying to prove themselves, either they feel like they've got to prove something or they are being forced to prove something." While some men commented that women could not carry their weight and got easier assignments as a result, others observed that women were more dependable and mature and that they could be trusted to complete assignments with less supervision. One male NCO commented: "There are some [who can do the job], but in general, women cannot handle it physically." However, another male NCO observed, "Females mature quicker, they ask smarter questions, learn quicker, are more coordinated, and listen more." Some commented that day-to-day relationships were more difficult with women compared with men, "I have

- 229 -

no problem working with women until they start crying on the job," and "You get crybaby men as much as a woman, but you can always yell at a guy.  Your hands are tied in dealing with women because of the threat of harassment.  Men can be pulled from the desk if necessary, but not women.  Women get cushier jobs."

Some officers commented that difficulties arose in combat situations when women were technically eligible for assignments, but senior officers were not willing to give them such assignments due to the possibility of their being killed or captured.  This causes serious problems for the men, the women, and the unit commander involved.  One male NCO related this experience:

> In Saudi Arabia, mixing sexes caused severe problems in teamwork, motivation, and discipline.  Male soldiers were competing for the attention of females in the company.  In situations with two females in a crew, you were limited in where you could deploy the team. Given two female drivers and two male drivers and a mission to send a team into a hostile situation, you had to send the males, because the view of the leadership is not to put women in a dangerous situation.  It causes problems with how males then view the situation and the women...(Women) could have handled it, but no top leader wants to have the first female combat casualty on his hands.

In addition, there was discussion of the disruption in units caused by the men being attracted to the women, whether or not their feelings were returned, and by relationships between men and women if they developed within a work group.  One commented: "It's too dangerous for women to be out on the line.  Say you go to war and a woman rips her pants.  The man next to her is not going to be concentrating on his job because he is going to be concentrating on looking through the hole in her pants."  Women commented on the difficulties they had handling unwanted advances and the experience of being accused of homosexuality if they refused a male advance.  One male sergeant summed up his views about women in the military:  "When all is said and done, they cost more than they're worth.  The divisiveness, sexuality things--headaches that come with it."

- 230 -

**Discussion of Homosexuals in the Military**

Raising the issue of homosexuals in the military brought a variety of reactions. In some groups, it provoked a very strong reaction ("Hiroshima" one group called it) and a heated discussion. In other groups, the discussion did not increase markedly in intensity. Participants in a few groups were unanimous in their condemnation of homosexuals in the military, while participants in most groups varied in the direction and intensity of their views.

**Personal Experience with Homosexuals in the Military.** In almost every group, one or more participants were able to relate stories about known or strongly suspected homosexuals they had encountered in the military. Although some concerned tragedies, such as deaths from AIDS or lovers' quarrels that ended in violence, or the personal discomfort the participant felt when the homosexual was around, others concerned homosexuals who were viewed as good soldiers.

**Beliefs About Personal Contact with Homosexuals.** Great discomfort was expressed about sharing quarters and facilities with acknowledged homosexuals, even by some people who were tolerant of homosexuals in general. Many viewed homosexuals as unable to control their sexual urges and unable to distinguish between those who would and would not welcome an advance. For example, "It's OK working with them before they come out or are caught, but I'm afraid to be in the showers with them afterwards. I felt like I was being stared at in the shower by someone who had come out." Or, "I'd be afraid to be in a foxhole with a gay person. I don't trust them. I'd be afraid that if I looked the other way, he'd do something" and "I'm worried that when I'm holding up a piece of armament, someone might come over and grab me." Some felt it would be a problem only in extreme situations, "What happens if we are deployed for an exceptionally long time? Sexual urges will cause problems at the worst possible time. A soldier shouldn't have to be watching his back for more than a bullet." Still others mentioned the effects of alcohol, "I knew a case where a person got drunk and fondled someone at a party" and "I took a report on a case where a kid was thrown off the third deck and didn't want to report why. He said he tripped and fell. He had gotten drunk and made a pass at his partner."

- 231 -

Others expressed concern about their own ability to deal with exposure to homosexual sexuality in ways that are considered acceptable for heterosexuality, for example, "I went into a room [in the barracks] and found a guy with a girl.  I told them they had an hour and walked away.  It would screw up my mind if I went into a room and it was a man with another man."  Still others mentioned their beliefs that homosexual promiscuity would increase the risk of disease, "Homosexuality is promiscuous by definition, so [it] increases the problem of disease."

In contrast, others were more relaxed.  For example, "Homosexuals don't try to convert you or rape you" and "A gay person knows a gay person.  They're not going to hit on non-gays."  Another reported that he and his fiancee engaged in recreational activities with a homosexual military couple.  A third stated, "I could work with a homosexual--no problem.  It's his behavior I have problems with.  I'd have problems with either a hetero or homosexual roommate having 'mates' over.  A good soldier, NCO, or worker, who doesn't try to influence people, based on that behavior, I have no problem."  And a third participant once lived with his family off post where "the apartment I lived in had 8 or 10 gays.  I seem to have learned that gays are OK.  Before having lived with them I would have been real upset, but now I believe differently." Another commented, "I don't mind gays in the military, but I don't want to live with them.  Not in the same room, but next door is OK."

**Impact of Homosexuals on Performance of the Military Mission.** There was a diversity of opinion about how homosexuals would affect military performance.  While some made statements like "Readiness will go to shit in a few years," other participants mentioned homosexuals they knew  who had been excellent soldiers.  When faced with a "forced choice" of whether they would choose a homosexual or a drug addict to perform a critical task with, virtually all chose the homosexual, reasoning that they could rely on that person for consistent performance.  However, knowledge of a homosexual's sexual orientation was widely thought to be disruptive; in general, known homosexuals would not enjoy the trust and respect of their fellow soldiers and would, therefore, be unable to function effectively: "You could know someone who's a great worker and you find out they are gay and you lose a lot of

- 232 -

respect for the person.  You have to respect someone to get along on the job."  Or "As long as people don't know about [a person's homosexuality], performance is the issue.  If it's known, performance isn't the issue" and "[It] affects my job because I couldn't trust gays...I'd be watching him rather than my job...I'll kill him."

Part of the problem apparently lies in the unwillingness to follow orders given by known homosexuals:  "I worked with a homosexual and not one man would do what he said.  It's different in the civilian world, but in the military, given the way we live and have to rely on people the way we do, this is not the place for it"[15] and "Where are our rights?  I can't quit [and] I can't be loyal if he's my Sergeant Major." However, another took exception to the often heard statement that "There is no way an officer can be good and gay."   Still another noted that in Desert Shield, there was a specialist "who spoke seven languages. Everybody thought he was a gay, but he had the respect of his peers." Another commented on service members suspected to be homosexual, "We don't pick on them.  They are soldiers.  I don't think it will change much if they do their jobs."

Specific concerns were mentioned about combat effectiveness, including concerns about the safety of homosexuals:  "If we go to combat and I'm in a position with a known gay who is wounded, I will not put my hands on his blood--he will die"; and about their own safety:  "If the person next to you gets shot, you don't want to worry about whether they have AIDS."  Favoritism, an issue that arises with heterosexual relationships and non-sexual relationships as well, was a concern:  "The problem is having several homosexuals on a team and they're looking out for each other and favoring each other.  This adds a new concern about cross-rank relationships" and "Look at the [name of ship].  On this ship there are homosexuals and lesbians to the extent that they have their own little groups.  There is a major problem there with safety, efficiency, low morale, and reverse discrimination.  Don't talk to senior officers or senior enlisted.  Talk with junior sailors who have

---

[15]This is a problem experienced by women as well: "Female soldiers have trouble getting male soldiers to follow their orders.  Imagine what would happen if a soldier was gay."

- 233 -

to live and work in this environment.  It's a bad situation."  At the extreme was the fear, "I'm concerned that two guys will be in a Bradley [troop carrier] during a lull in a battle.  When you need to count on them, they'll be having sex."

**Religion, Morality, and the Image of the Military.**  One of the areas that generated very emotional discussion among some participants was the importance of military image and tradition, "The minute they step off the bus, they are handed a value system that they must adopt while they are part of the team.  If you can't hang with that system, time to get back on the bus.  Got people [in the military] who have lived with that system."  The military image is both macho, "We're the ones who go in and kick ass," and morally upright, "The military is one of the most respected institutions in the country because of the morality of the service."  Many people say they selected the military as a career for exactly that reason, "[I] came into the military because I didn't like how the corporate world worked.  [I] want to be in a society with integrity to raise children" and "We work for high ideals.  If we didn't, we'd get out and find a good-paying job."

Some participants articulated their strong religious objections to homosexuality as a troubling feature of lifting the ban: "[Homosexuality] is not humanly acceptable, it's unnatural, it's against the Bible," or "God made man and God made woman.  Homosexual activity is immoral," and "It's a lifestyle; being a woman or a black is not a lifestyle.  You can't tell me to accept a gay because that's a moral issue."

Participants were concerned that the image of the military would change if homosexuals were openly admitted, "People want their children to join the military because of what it stands for.  If the military now becomes the social test for homosexuality, parents will be less willing to let their children join [and] the proportion of homosexuals in the force will increase disproportionately.  [The military] will be viewed as a safe haven [for homosexuals]."  Another participant observed, "I have a hard time thinking about the image of a military where two gay guys can be out sunbathing.  What am I going to tell my son if he sees this and asks if it is OK?" and "No one will want to join the [military].  Morale will go down.  We join because of the image,

- 234 -

because we do the job right, are macho."  Even those who may not feel as
strongly themselves urged us not to discount the importance of these
views:  "The hyper-religious make up a significant part of the military
today and they don't support homosexuality."

Other participants commented that military life was a reflection of
the real world already, "Kids are already exposed to gays," and "[My
kids ask about the] single parent living with a live-in next door."
Others reiterated the theme brought up in discussions about race:  In
the military, one experiences life beyond one's narrower upbringing.

A different minority of participants strongly favored lifting the
ban because they found nothing morally objectionable to homosexual
behavior.  One respondent chose not to report two homosexuals observed
in bed together "because I didn't think it should be anybody else's
business."  Another said, "If they're being discreet and they're doing
the job, then I don't do anything."

A variation on the religious/morality theme was that of the
illegality of homosexual behavior.  Many participants agreed with such
statements as "There is no place in the military for homosexuals";
"Homosexuality is sexual misconduct"; and "How can you let them in when
it's illegal?"  Others, though, noted with irony that "It's all right
for a male soldier to commit adultery.  Homosexual sexuality is
similarly illegal, but supervisors don't treat it the same."

Some advocates of the ban believed that the issue was not that
homosexuals were interested in military service, but that removing the
ban was part of a broader homosexual political agenda:  "This is a gay
rights movement, they want to put it in your face.  They want to come in
so they can say they can come in," and "We're pawns, they want the
military to accept it so they can get the rest of the country to accept
it."  These participants believed that the military was being forced to
undertake something that civilians were unwilling to do, "We're the
experimental testing ground," and "This is about symbolism. The
population will listen to us; they will say this is not right."

**Choice vs. Determinism of Sexual Orientation.**  Participants were
divided as to whether they believed that sexual orientation was a choice
or determined.  On the one hand was "Gays have a choice and they choose

- 235 -

to be gay.  It's a discipline thing."  Another continued this line of
thought, "It's a matter of self-discipline.  If you cannot exercise
self-discipline, how can you exercise unit discipline?"  On the other
hand was the belief, "If you're born to be gay, you're going to be gay"
or the participant who recalled a service member who, upon being
dismissed, stated that if he could change his orientation, he would.
Whether one believed that homosexuals were homosexual by choice appeared
to be only partially related to advocacy of the ban.  While some
participants stated that if homosexuality were shown to be biologically
determined, their opposition to allowing homosexuals to serve would
soften; others thought it would make no difference in how they felt.
But a number did not see choice vs. determinism as a relevant issue:
"The [military] discriminates on a number of characteristics, like drug
use or being overweight.  Discrimination on this basis is allowed, so
the military should be allowed to discriminate on sexual orientation."

    **Effect of Allowing Homosexuals to Serve.**  There was a lot of
confusion and disagreement about how much change would occur and what
removing the ban would entail.  Many participants feared the
establishment of homosexuals as a protected class within the military,
with minimum quotas for promotions and command slots and enlistment
preferences or protected occupations:  "What about promotions?  Then we
will have quotas for gays!"  A variation on this theme was resentment of
the potential financial costs of lifting the ban, including "How much
money [will be spent] investigating deaths of homosexuals killed by
friendly fire?" and other issues, "medical, processing complaints,
sensitivity training ... at what added value?  They add no value to the
military."

    On a different level, some participants were troubled by the
logical inconsistency between allowing homosexuals to be in the
military, but not allowing them to be honest about it even though it
would cause problems, "I don't understand how you can accept gays
without accepting their behavior.  When a soldier is accepting an award,
he should be able to bring his significant other, but it would shock the
room."  Another remarked, "At the age at which the [soldiers] are here,

- 236 -

they will act on their sexual impulses.  Saying it's OK to be gay but
not act on it is absurd."

Most believed that allowing homosexuals to serve would bring about
a period of disruption and turmoil; there was considerable variation in
prediction of the extent and duration.  At one extreme, "We will do it,
but it will destroy us.  Our morale is already low now."  Others
believed that the military would solve this problem as it has solved
others.  Drawing a specific analogy between anti-homosexual feeling and
racism, one participant said, "Racists are still in the service.  We
just find ways to deal with them.  As long as people have prejudices,
then you'll have victimization.  [But] it's a melting pot; the service
overcomes most prejudices well."  Another participant said, "There will
be lots of untenable situations, but we'll drive on."  Another stated
that "This will be a natural evolution."

Many cited the likelihood of violence against homosexuals.  "It
will be healthier for gays if they don't say anything.  It will just be
pain and heartache for gays," and "It's hurting them more than helping
them by removing the ban, because they're going to get hurt.
Personally, if they leave me alone it's OK.  But it's already happening
that when they come out they get beaten up."  As one participant put it,
"No sane gay person would come out--he would get slipped overboard."
And in its extreme form, "Just give them a 'blanket party'[16] over and
over until they leave.  The drill instructor will not tell you to do it-
-but you will clean up your own.  It's not what should happen, but it
will happen."[17]

Many participants felt that allowing homosexuals to serve would not
result in a flood of homosexuals declaring their orientation.  Fear of
violence, noted above, was one reason.  But others offered up opinions
that homosexuals would wait and assess the climate before venturing
forth, and that many would not declare themselves for fear of disrupting
their career advancement, even if there were no official sanctions:

---

[16]A blanket party is a form of collective violence undertaken by a
group of service members to teach an individual to conform.  A blanket
is thrown over the individual and he is beaten or worse.
   [17]See Appendix J for a discussion of violence related to removing
the ban.

- 237 -

"Those that are gay and have served have accepted [military] values. They know that if they come out it would cause problems," and "It's not going to be a mass of people coming out of the closet. It's not going to happen." Many said that they would be able to cope with the change if homosexuality were not flaunted and if they did not have to change their basic views. "Just don't parade it; I don't parade my heterosexuality," and "I will take action to keep law and discipline but I will not become a party to sanctioning that behavior."

Some participants feared that allowing homosexuals to serve would introduce a number of minor but inconvenient changes in military life. A number mentioned that having homosexuals around would introduce restrictions on conversational freedom that they already experienced from having women in their groups: "You'll have to watch what you say"; "I'd be worried about being drawn up for calling someone a fag at work"; "Females change the interaction and so will homosexuals. Before, we are a band of brothers. It will be different." Others wondered about the inequity of having male partners allowed in barracks when female partners were not.

A minority of respondents believed that allowing homosexuals to serve would significantly affect recruitment and retention. "If I had known, it would have affected my choice. Letting someone in who molests farm animals is next." When asked how he would handle the removal of the ban, one participant stated, "I can't. You'll get my resignation papers." Another predicted mass resignations but said he would stay, "We will all vote with our feet. It is a breach of our contract. I will stay, but we should be given the opportunity to leave."

Just as in the *Los Angeles Times* poll, many respondents believed that the ban on homosexuals was less important an issue to the military than the drawdown in force or reductions in benefits. But for many, the homosexual issue multiplied the intensity of feeling. "We've had drawdowns before, but this is different. Congress is perceived as hostile to the Armed Force, the President has made it clear we're third class citizens, and now they're attacking basic support systems that kept the military solid--retirement, health, commissary systems. Now military people are saying loyalty only goes so far." Or, "The military

- 238 -

feels like they've gotten no respect from Clinton; some respect would be appreciated."

Many acknowledged that the adjustment process had already begun; they were already grappling with their own feelings about homosexuals in the military. One described his views: "I'm a Southern Baptist and the Bible says people can't be gay. If you can prove these people are just people, maybe I can accept them, maybe I can't. I'm not saying 'don't put gays in the military,' just don't make it so big a thing." Another cited awareness of how homosexuals function in other arenas: "Analogies can be drawn to battlefield situations in police and emergency squads with blood and all. It boils down to a moral issue. And it will affect the cohesion of the unit. Personally, fairness is the issue for me, but personal feelings aside, I believe cohesion will be hurt. I believe the military will adjust; it has an incredible ability to adapt." Others just took a wait-and-see attitude while urging caution: "I can't say whether I'll have a problem with gays in the military until it happens. It's like learning to jump out of a plane. Wouldn't you rather take your first jumps at lower heights and build up to big heights?"

**Advice on Implementing a Policy that Allows Homosexuals to Serve.** A substantial proportion of the participants believed that the military would accomplish the mission if asked to accomplish the President's directive. They urged that it be done in a direct way: "If they're going to bring them in, go all the way. Don't put limits on their deployment and we'll grin and bear it." Or, "Treat everybody as humans." Others counseled minimizing the importance of the change: "Tread softly, don't make it a big issue ... Don't do it like, 'Here, bam!'" Others acknowledged that the presence of homosexuals who were already serving would make it easier to accept the change: "There have always been gays in the military; they're just like others. Some work out, some don't. If he performs, no one cares. Cross the line and he has to go."

Participants saw the need for strong leadership to achieve the change. This included training the trainers and clarifying harassment regulations. The participants who were equal opportunity officers saw

- 239 -

an increase in their workload and strongly felt the need for guidance from above.

A number of participants mentioned the need for loopholes to assist the adjustment process. These ranged from ability to choose roommates to an escape clause allowing people who are uncomfortable with the change to leave the service.

**Conclusions from the Focus Groups**

While there was a lot of diversity in opinions, some common elements emerged. First, the military members we talked with felt that they had dealt successfully with racial integration in the military and were proud of it. They seemed to feel that racial integration had strengthened the military's ability to perform its mission. They also seemed to deal well with the low-level interpersonal conflict that happens in the barracks and on the job. Soldiers viewed it philosophically as the price for diversity, which they seemed to value. Officers viewed dealing with it as part of the job they were trained to do and an area that provided considerable challenge.

Most acknowledged that the integration of women into the military was still causing problems, in part because it was incomplete. Males were uncertain about what could and should be expected of military women and reluctant to give them a full measure of respect. The interpersonal problems relating to women in the military were viewed as more complicated and difficult than those relating solely to conflicts among male soldiers. Female soldiers felt they had problems being accepted, especially if their MOS[18] strayed from more traditional female roles. Still, most group participants viewed women as there to stay and were confident that problems would eventually be worked out to a tolerable degree.

When the issue turned to homosexuals in the military, our group participants' level of confidence in their ability to cope dropped sharply. While some could view the change with equanimity, many had difficulty imagining the consequences and viewed the problem in stark terms (e.g., "Hiroshima"). They apparently could not see how the

_____

[18]Military Occupation Specialty.

- 240 -

conflict management skills they had learned in response to other problems would apply to this new situation (although this was in direct opposition to the "can do" attitude they had articulated earlier in the group sessions), and there was widespread agreement that violence against homosexuals in the military was occurring already and would increase if the restriction were lifted. In addition, while they had (for the most part) incorporated the presence of minorities and women into their image of the military, they had much more difficulty seeing how homosexuals could fit in without changing the military beyond recognition and compromising its ability to carry out an effective national defense.

They also saw allowing homosexuals to serve in the context of the larger problem of post-Cold War downsizing of the military and the reductions in career opportunities and benefits it entails. They viewed themselves as stressed and under-appreciated, with this change as one more piece of evidence that the civilian world neither understood nor respected their importance.

**Conclusions About Military Opinion**

All the evidence indicates that a substantial majority of males in the military are very much opposed to letting homosexuals serve. Females in the military appear to be less opposed, although there are many who are also strongly opposed. While some of those who are opposed are merely uncomfortable about the prospect of being around people they know are homosexual, especially in quarters and facilities, others are openly hostile toward homosexuals. Many say that they expect military effectiveness to deteriorate in the short term due to the inclusion of known homosexuals in work groups and over the longer term due to changes in traditional patterns of enlistment and reenlistment in the military.

Concerns about removing the ban center around fears of special treatment of homosexuals, fears that homosexuals will band together and discriminate against heterosexuals, fears of being subjected to unwelcome sexual advances, and fears about their families and themselves being confronted with evidence of a lifestyle they regard as immoral.

- 241 -

Many predict that violence against homosexuals will occur if they are allowed to serve.

The concerns expressed by both soldiers and officers are particularly strong against a backdrop of change in the military, including downsizing and cutbacks in military benefits.  Many perceive their own opportunities to be shrinking and resent what they see as extending rights and benefits to an unworthy group that is using the military for political and social advantage.

These concerns would have to be dealt with as part of a policy that ended discrimination based on sexual orientation.  Based on the experiences discussed in the context of racial and gender integration in the military, this could best be done through strong leadership, equitable treatment, and clearly articulated expectations for behavior, combined with little tolerance for deviation from expected behavior. Reinforcement of the military's ability to adapt to change and to perform even in adverse circumstances would also be useful.

- 242 -

## 8.  ISSUES OF CONCERN:  EFFECT OF ALLOWING HOMOSEXUALS TO SERVE IN THE MILITARY ON THE PREVALENCE OF HIV/AIDS[1]

Focus groups with active-duty personnel (see the chapter on military opinion), surveys of military personnel, testimony at Congressional hearings, and media reports have raised the concern that allowing known homosexuals to serve in the military would increase the prevalence of Human Immunodeficiency Virus (HIV) in the military and compromise the military blood supply.  To assess this possibility, this chapter addresses the following questions relevant to HIV/AIDS in the military and the likely effects of allowing homosexuals to serve:

1.  What is the epidemiology of HIV/AIDS in civilian and military populations?
2.  What is the Department of Defense's (DoD's) HIV/AIDS policy?
3.  Would there be an increase of HIV infection in the military?
4.  Would active-duty personnel become infected from contact with HIV-infected blood?

### THE EPIDEMIOLOGY OF HIV/AIDS

HIV infection is difficult to contract.  The virus must pass from the blood, semen, or other bodily fluid of an infected person into the body of another.  Even then, it will not necessarily cause an infection.[2]  In the United States, the disease has been most frequently diagnosed in men who have had sex with men and in injection drug users who are exposed to blood when sharing needles and syringes.  HIV has also spread by transfusion of blood products, especially to hemophiliacs.  Since the mid-1980s, however, blood has been screened for HIV, and so transfusion has become an atypical mode of transmission.  Mothers can pass it to their newborns, either before birth or during breastfeeding.  The virus is also transmitted through heterosexual

[1]This chapter was prepared by Mark A. Schuster and David E. Kanouse.
[2]HIV actually refers to a family of viruses, of which the two major strains are HIV-1 and HIV-2.  HIV-2 is rare in the United States.  In this chapter, we use the term HIV to refer to HIV-1.

- 243 -

sexual activity, which is the major route of transmission worldwide. It appears to pass more easily from a man to a woman than vice versa, and the presence of other sexually transmitted diseases (STDs) may increase the likelihood of transmission (Ward and Drotman, 1992).[3]

People are typically not diagnosed with AIDS until years after they become infected with HIV; the median incubation period (the point at which 50 percent have developed AIDS) is between eight and 11 years after initial infection (Ward and Drotman, 1992). Therefore, shifts in trends for new HIV infections will not be reflected in AIDS diagnoses for at least several years, if not a decade or more. Unfortunately, it is difficult to track new infections because many people do not get tested for HIV, and most states do not report positive HIV tests to the Centers for Disease Control and Prevention (CDC).[4]

**HIV/AIDS in the U.S. Population**

Over a quarter of a million people in the United States have been diagnosed with AIDS,[5] and probably over a million are infected with HIV (including those who have not yet developed AIDS). AIDS has been much more prevalent among men than women, and among blacks and Hispanics than whites. The 30- to 39-year-old age group has had the largest number of people diagnosed with AIDS (CDC, 1993). In 1990, AIDS was the second leading cause of death among men aged 25 to 44 years old, and the sixth among women in the same age group (Selik et al., 1993). The percentage

_____

[3]Despite some continuing concern over infection through casual contact with an HIV-infected person, the virus is not transmitted in this way. An Army study (Chesney et al., 1992) showed that many personnel were uninformed or misinformed about activities that have no or very low risk, such as shaking hands or being coughed on. This pattern of knowledge is consistent with studies of the civilian population and, among military personnel, continues despite high levels of general knowledge about HIV, including the ways it is most likely to be transmitted, the meaning of a negative test, and the fact that someone who is HIV-positive can look healthy.

[4]A comparison of HIV tests to AIDS diagnoses in states that report both to the CDC reinforces the trends already seen in AIDS data: heterosexual sexual activity is accounting for a growing percentage of new infections and an increasing percentage of new infections are among women and blacks (Fleming et al., 1993.)

[5]Eight million people are believed to have AIDS worldwide.

- 244 -

of cases diagnosed in the United States each year is growing among
women, blacks, and Hispanics.

   We do not know the prevalence in the United States of AIDS among
people in each of the major exposure-risk groups, the most important of
which currently are men who have had sex with men (including homosexual
men[6]) and injection drug users.  We know that homosexual men account for
many AIDS diagnoses, but we do not know what percentage of homosexual
men have AIDS, because we do not know how many homosexual men there are
in the United States.  Nor do we know how many injection drug users
there are in the United States.

   What we do know is the fraction of people with AIDS who belong to
each of these risk groups.  Table 8-1 shows the distribution of AIDS
cases reported during the year ending March 31, 1993, by risk group.  A
comparison of these data with similar data for calendar year 1986
indicates that the demographics of the HIV-infected and AIDS populations
are changing.  Over this period, the percentage of annual AIDS diagnoses
made in men who have had sex with men declined from 65 percent to 49
percent,[7] while the percentage who contracted it from heterosexual sex
rose from 1.5 percent to 9 percent.[8]  Among people aged 20 to 24, many
of whom probably became infected as teenagers, the fraction in 1992-1993
whose exposure was through heterosexual sex was even higher--16 percent.
In this group, 45 percent of diagnoses were in men who have had sex with
men.

**HIV/AIDS in the Military Population**

   By the end of 1992, data from the Office of the Assistant Secretary
of Defense for Health Affairs (OASD/HA) show that a total of 8,621
active-duty personnel had tested positive for HIV (Table 8-2).  When DoD
first began its testing program, active-duty personnel had never been

------

   [6]See the chapter on sexual orientation and behavior for a
discussion of the difference between homosexual orientation and conduct.
   [7]An additional 5 percent of AIDS diagnoses were made during the
year ending March 31, 1993 in men who have had sex with men and have
been injection drug users.
   [8]1986 data supplied by CDC, and CDC (1993).

- 245 -

Table 8-1

U.S. AIDS Diagnoses Reported During the Year Ending
March 31, 1993

|  | All Ages (71,196) | 20-24 yrs (2,428) |
|---|---|---|
| Men who have sex with men | 49% | 45% |
| Injection drug use | 24% | 15% |
| Men who have sex with men and inject drugs | 5% | 6% |
| Hemophilia/coag disorder | 1% | 4% |
| Heterosexual contact | 9% | 16% |
| Blood transfusion | 1% | 1% |
| Child who has mother with/at risk for HIV | 1% | -- |
| Other/undetermined | 9% | 12% |

Source: CDC, 1993.

Table 8-2

HIV Positive Tests Among Active-duty Personnel[a]

|  | Army | Navy | Marine Corps | Air Force | Total |
|---|---|---|---|---|---|
| 1985 (Oct-Dec) | 164 | 138 | 12 | 31 | 345 |
| 1986 | 1,127 | 1,269 | 157 | 300 | 2,853 |
| 1987 | 851 | 621 | 66 | 451 | 1,989 |
| 1988 | 375 | 448 | 67 | 168 | 1,058 |
| 1989 | 297 | 243 | 45 | 134 | 719 |
| 1990 | 280 | 244 | 51 | 77 | 652 |
| 1991 | 220 | 214 | 42 | 74 | 550 |
| 1992 | 137 | 216 | 32 | 70 | 455 |
| Total | 3,451 | 3,393 | 472 | 1,305 | 8,621 |

Source: OASD/HA.
[a]Reported as of February 8, 1993.

tested before, so people who tested positive included those who had ever
seroconverted,[9] whether before or after entering the service.
Therefore, the number of personnel found to be HIV-positive during the
first few years was much higher than in subsequent years, reflecting the
extended period of exposure before testing.  After several years,
however, virtually all personnel had been tested at least once, either
upon accession or while on active duty, so the annual incidence of HIV-

---

[9]Seroconvert means that the person is infected with HIV and that
the blood contains antibodies to HIV that can be detected by the
standard HIV test.

- 246 -

positive tests now indicates people who have seroconverted relatively recently. The number of people who test positive for HIV has been decreasing in all services, and totaled only 455 in 1992.

The Army makes available the most comprehensive HIV data of the services. To facilitate a more accurate comparison of annual data, it reports HIV seroconversion rates for people with a prior negative test, and it reports these rates in terms of person-years.[10] The Army finds a pattern generally similar to that of the military as a whole. Rates dropped significantly from 1985-1987 to 1987-1988, and have leveled off since (Table 8-3). Though the Navy has a higher rate of HIV per person-year, it has also reported a similar decline (Garland et al., 1992).

Table 8-3

Rates of HIV Positivity Among People Who Had a
Prior Negative Test, Army

| | |
|---|---|
| Nov 85 - Oct 87 | .43/1000 person-years |
| Nov 87 - Oct 88 | .29/1000 person-years |
| Nov 88 - Oct 89 | .23/1000 person-years |
| Nov 89 - Oct 90 | .24/1000 person-years |
| Nov 90 - Oct 91 | .27/1000 person-years |
| Nov 91 - Oct 92 | .25/1000 person-years |

Source: Renzullo et al., 1993.

As of August 1989, of 6,269 personnel who had been on active duty when they tested HIV-positive in the military screening program, 2,069 remained on active duty. The rest had retired, separated, or died. As of October 22, 1992, there were 1,722 people in the military who had tested positive for HIV.[11] Thus, the size of the HIV-infected active-duty population is declining, indicating that the number of HIV-infected

---

[10]The Army estimates the actual date of seroconversion as the midpoint date between the most recent negative test and the positive test. Person-years is a reporting technique that takes into account the amount of time between two tests. Thus, someone who has a positive test two years after a negative test contributes two person-years; a positive test six months after a negative test contributes half a person-year. This method controls for the variation in the frequency with which people are tested (McNeil et al., 1991).

[11]Data provided by OASD/HA.

- 247 -

service members who leave the military each year is larger than the
annual number who test HIV-positive.

DoD does not routinely collect the behavioral risk factor data on
HIV-positive personnel needed to compare risk factors in the military
and civilian populations. In one Army study, interviews were conducted
with 127 men who had seroconverted and 123 uninfected control subjects
(Levin et al., 1992). All participants were asked about behaviors
during the six months prior to the test. Among the seroconverters, 13
percent said they had had sex with men only, 30 percent with men and
women, 55 percent with women only, and 2 percent were injection drug
users who had had sex with women only. The controls had all had sex
with women only; 3 percent also had injected drugs. That study should
be interpreted with caution because it is a small sample and people may
underreport behaviors that the military bans (even when the data do not
identify the individuals studied). Since the controls were matched for
age, race, rank, length of service, and exposure interval, they do not
represent the whole population of uninfected Army personnel.
Interpreting these findings is difficult. If the prevalence of
homosexuality and bisexuality in the military is in the range of
estimates for the civilian population, the results imply that HIV
prevalence in the military is higher among homosexual and bisexual men
than among heterosexual men--though the difference may be smaller in the
military. Therefore, the results also point to the possibility that
other risk factors, including heterosexual sex, may account for a
relatively larger proportion of HIV in the military than they do in the
civilian population.

The only data available on HIV-infected personnel describe basic
demographics, and the Army again provides the most detailed data. Over
the seven years of testing through 1992, new seroconversions within the
Army were significantly associated with gender, race/ethnicity, age, and
marital status. As in the civilian population, males had a higher rate
than females, though the difference in the Army was less pronounced.
While rates among male soldiers declined over the seven years, rates for
female soldiers have remained stable. Rates among blacks have been
three to five times higher than among whites, though all racial

- 248 -

categories have experienced declines over time (Renzullo et al., 1993).
Data from the Navy and Air Force also show higher rates among blacks
than whites (Garland et al., 1992; Lucey et al., 1991).  While HIV rates
declined in the 20-34 year old age group, they did not decline among
people under age 20 or over age 34.  Black personnel under age 20 have
been experiencing increasing rates each year; during 1992, the
seroconversion rate for black teenagers was seven times the rate for
white teenagers.  Personnel who were unmarried were more likely to
seroconvert than those who were married (Renzullo et al., 1993).
Finally, occupational data through 1989 show that personnel in
administrative and medical fields had the highest rates, while the
fields with the lowest rates were combat arms, aviation, intelligence,
military police, and mechanical maintenance (Withers et al., 1992).

**THE MILITARY'S HIV/AIDS POLICY**

The DoD relies on its testing program to prevent the entry of HIV-
infected personnel, identify those who become infected while serving,
and screen personnel for deployment.  HIV testing, which is highly
accurate, allows DoD to effectively limit the spread of HIV.

**Who Is Tested?**

DoD's policies for HIV testing are summarized in Table 8-4.  All
civilian applicants are tested before accession at a Military Entrance
Processing Station (MEPS) or other initial point of entry to military
service.  Applicants for the delayed enlistment program are retested if
180 days have elapsed between the initial test and arrival at the entry
point.  Candidates for commissioning as officers are screened during
their preappointment and/or precontracting physical examination and
again as part of the commissioning physical examination.  People who are
HIV-positive are denied entry.

HIV infection among civilian applicants to the military has
declined annually since the inception of the screening program in 1985,
when 1.58-1.60 out of 1,000 applicants tested HIV-positive.  (See Table
8-5.)  In 1992, the rate had fallen to 0.44/1000.  This decline may
partly reflect self-selection on the part of applicants.  Those who know

- 249 -

or suspect they are HIV-positive have an incentive not to apply, or, if
they have not been tested, to seek anonymous or private testing first.

Table 8-4

Department of Defense's HIV Testing Policy

| Type of Personnel | Testing Policy |
|---|---|
| Civilian applicants | • All are tested before accession. |
| Active duty | • Routine testing--Every 1-5 years, depending on service, age, occupation (usually with routine physical exams). <br> • Deployment--Must have negative test within 6 months. In practice, many are retested shortly before leaving the country. <br> • Targeted testing--For personnel seeking care at prenatal and STD clinics, and drug and alcohol programs, and for health care workers. |
| Reserves | • Tested with routine physical examinations, which vary in frequency depending on service, age, and occupation. |

Source: Department of Defense (1991) and information supplied by
the Office of the Surgeon General in the Air Force, Army, Navy, and
OASD/HA, April and May, 1993.

Table 8-5

HIV-Positive Rate Among Civilian Applicants

|  | Rate per 1,000 Applicants |
|---|---|
| Oct 1985 - Dec 1985 | 1.58 |
| Jan 1986 - Dec 1986 | 1.60 |
| Jan 1987 - Dec 1987 | 1.41 |
| Jan 1988 - Dec 1988 | 1.11 |
| Jan 1989 - Dec 1989 | 1.04 |
| Jan 1990 - Dec 1990 | 0.80 |
| Jan 1991 - Dec 1991 | 0.73 |
| Jan 1992 - Dec 1992 | 0.44 |

Source:  Walter Reed Army Institute of Research.

Teenage applicants (under 20 years old) tested between October 1985
and March 1989 had a higher probability of testing HIV-positive if they
lived in a densely populated county and in a metropolitan area with a

- 250 -

high incidence of AIDS.  Rates were similar for male (0.35/1000) and female (0.32/1000) teenage applicants and higher for blacks (1.00/1000) than for Hispanics (0.29/1000) and whites (0.17/1000).  The infection rate among applicants may be increasing in some teenage groups, such as black females, and declining in others, such as white males (Burke et al., 1990; Withers et al., 1992).

The DoD also periodically tests all personnel once they are on active duty, usually with physical examinations.  The interval between routine tests varies from one to five years, depending on service, age, and occupation.  The average time between tests for a soldier on active duty in the Army is about 16 months (Renzullo et al., 1993), and analysis of those who have had long intervals between tests does not reveal a greater likelihood of a positive test (Withers et al., 1992).  In addition, all personnel must have a documented negative test within the six months prior to deployment or change in overseas assignment.  Units about to deploy sometimes retest everyone rather than track down the date of each individual's last test.  Some select military populations undergo additional testing, including patients at STD clinics, entrants to drug and alcohol rehabilitation programs, patients at prenatal clinics, and health care workers.

Applicants for Reserve components are screened during regular entry physical examinations or in officer preappointment programs.  Those who must be appointed to enlist or must meet accession physical fitness standards to enlist are not eligible if HIV-positive.  Testing is also done in the Reserves with routine physical examinations.  Department of Defense civilian employees are tested as necessary to comply with host-nation screening requirements.

**Accuracy of HIV Testing**

DoD uses a standard procedure for HIV testing.  Blood is first tested with an EIA,[12] which if positive, is repeated up to two more times (to decrease the chance of a false positive test, discussed below).  If one of these repeat tests is positive, another test, the

---

[12]The EIA is an enzyme immunoassay.  It is also known as an ELISA, an enzyme-linked immunosorbent assay.

- 251 -

Western Blot,[13] is performed, and if it is positive as well, the person is said to be HIV-positive (infected with HIV).  If the Western Blot is indeterminate, supplemental tests are conducted.  When a person's blood is found to be HIV-positive, the entire sequence is repeated on a new blood sample.  The military services contract most of their HIV testing with outside laboratories, which undergo semiannual quality assurance inspections.[14]

Testing for HIV is exceptionally accurate.  The percentage of HIV-positive tests in people who are truly infected with HIV and the percentage of HIV-negative tests in people who are truly not infected with HIV are both greater than 99.8 percent for the EIA and 99.6 percent for the Western Blot.  The rates of false positives (positive test results on people who are not infected) and false negatives (negative test results on people who are infected) are correspondingly low.  In a population in which one person in 1000 is infected with HIV, there will be 32 false positives per million tests (George and Schochetman, 1992).  Burke et al. (1988) found even fewer false positives--about seven per million--in a study of a subpopulation of civilian applicants to the Armed Forces with a very low prevalence of HIV (i.e., a group more likely than most to have a high false positive rate).  The percentage of false positives is particularly low in the military, not only because of the accuracy of the tests and the sequential testing procedure, but also because of tight quality control, verification of positive test results with a second blood sample, and the use of conservative criteria for interpreting Western Blots.

False negatives are also low.  These can occur for technical reasons (e.g., the laboratory performed the test incorrectly) or for

---

[13]The Western Blot is an immunoelectrophoresis test.  The sequence of EIA and Western Blot tests is also referred to in the singular as the "HIV test."

[14]Currently, Damon Clinical Laboratories conducts HIV testing for the Army, Army Reserve, and the Accessions (MEPS) HIV screening programs.  It uses Genetic Systems HIV-1 EIA for initial screening, an Organon-Technika EIA for repeat testing of blood reactive on the initial test, and a Cambridge Biotech Western Blot (information supplied by the Office of the Army Surgeon General); the Air Force and Navy use Abbott EIA. (Information supplied by the Office of the Surgeon General in the Army, Air Force, and Navy.)

- 252 -

biologic reasons (e.g., an infected person is not producing antibody to the virus).  The former is rare: In a population in which one person in 1000 is infected with HIV, there will be eight false negatives per million due to technical error (George and Schochetman, 1992).[15]  False negatives due to biologic reasons are most likely to occur because of the "window" period (Period A in Fig. 8-1):  When a person becomes *infected* with HIV, he or she is not immediately *infectious* (able to spread the disease to another person) and will not yet test positive on standard HIV tests.  After a time, the person does become infectious but will still not test positive.  Subsequently, the EIA will detect that the person is HIV-infected, and that person will be said to have seroconverted.[16]  The CDC estimates that about 50 percent of people seroconvert (Period A) within 2.1 months of becoming infected, and 95 percent seroconvert by 5.8 months (Horsburgh et al., 1989; Longini and Horsburgh, 1989); the length of the window may be shorter now due to more refined testing methods.

  While the length of the window period (Period A) is pertinent to screening out infected applicants, blood banks are concerned with the time between becoming infectious and testing positive (Period B), the period during which blood could transmit the disease but would not test positive.  The CDC estimates that this period averages eight days for the current version of the EIA, which was released last year[17] (Petersen et al., 1993).

---

[15]The proportions of false positives and negatives depend on the proportion of people in a population who are truly infected.  As a disease becomes more and more rare in a population, the false positives increase and the false negatives decrease.  As we will discuss below, military applicants have an HIV infection rate of 0.44 per 1000, which is lower than the one per 1000 used to calculate false positives and negatives here.  Therefore, the expected proportion of false negatives would actually be fewer than eight per million, and the expected proportion of false positives would be somewhat higher than the calculated proportion.  Nevertheless, as described in the text, the military's false positive rate was found to be even lower than calculated.

[16]Technically, seroconversion means the blood has produced antibodies to HIV, which the EIA can detect.

[17]The current EIA is the third generation of the test.  Period B was estimated to average 28 days for the first generation EIA and 22 days for the second generation.  The third generation thus provides a

- 253 -



Figure 8-1—Window Period for HIV Testing

## Procedures for Military Personnel Who Test HIV-Positive[18]

HIV-positive active-duty personnel receive an extensive initial medical evaluation and follow-up exams at least once a year. The military conducts contact tracing for beneficiaries of military health care and investigates blood donations to the military blood program. It also coordinates tracing with civilian public health authorities and blood banks, as allowed by law.

HIV-positive personnel continue to serve until they are no longer physically fit to do so, at which time they are retired or separated. They may be reassigned to protect the health and safety of themselves or others, and they can be transferred to nondeployable units or positions, because they cannot serve overseas. They may also be separated at their own request, subject to approval.

---

significant drop in the already low risk of infectious blood not being detected at a blood bank.

[18]Information on procedures supplied by OASD/HA and Office of the Army Surgeon General (AFEB), and abstracted from Department of Defense (1991).

- 254 -

Personnel in the Reserves (not on extended active duty) who are HIV-positive must obtain a medical evaluation from a civilian physician. They are not eligible for extended active duty (duty for more than 30 days), with limited exceptions. Policy for retirement or separation is the same as for active-duty personnel.

An HIV-positive test result may not be used as an independent basis for any adverse administrative or disciplinary action, including punitive actions, under the Uniform Code of Military Justice. However, it may be used for actions based on certain types of claims (e.g., when the infected person has disregarded preventive medicine counseling or orders, and in a criminal prosecution against an HIV-positive person who committed a rape after being informed of the HIV test result). Epidemiologic information collected from HIV-positive people (e.g., sexual behavior, drug use) cannot be officially used against them.

## IF HOMOSEXUALS WERE ALLOWED TO SERVE, WOULD HIV INFECTION INCREASE IN THE MILITARY?

Given the current policy of testing all military applicants and the accuracy of the test, allowing homosexuals to serve would not lead to an increase in the number of HIV-infected military accessions. Only recently infected people who were still in the window period (during which the HIV test is negative) would not be screened out. The absolute number of applicants who would be missed would be small compared to the total number of people annually found to be HIV-positive among active-duty personnel.[19]

---

[19] We do not have the information needed for a precise estimate of the number of HIV-infected applicants who would not be identified by the test. A rough calculation suggests that even a doubling in the number of applicants who are tested during the window period would have a modest impact on the total number of HIV-infected people in the Armed Forces. In 1992, 154 applicants tested HIV-positive. Assume that for HIV-positive applicants the average length of time from infection to application for military service is 18 months, and that one-sixth of them are in the window period during which the infection would not be detected. In this case, 31 HIV-positive applicants would be undetected by the test. Since 455 active duty personnel tested positive for HIV in 1992, a doubling of HIV-infected applicants in the window period would increase their estimated percentage of this total from about 7 percent to 14 percent.

- 255 -

DoD's major concern is therefore to minimize the number of personnel who become infected once they are in the military.  It is not possible to accurately estimate the likely effects on HIV infection rates among military personnel of allowing homosexuals to serve.  The available evidence is too meager to conclude whether there would be a change, and if so, how substantial it would be.  However, there are some generalizations that can be made from looking at sexual behavior in the civilian population, as well as from what is known about sexual behavior in the military.

**Estimating Transmission Rates**

The rate at which HIV infection will spread through sexual contact in a population depends both on biological factors such as infectiousness (i.e., the probability of transmission when there is sexual contact of a specified type between an infected person and an uninfected person) and on several factors that typically vary over time and across populations.  Among the most important of these are:

- The proportion of persons in the population who are infected and patterns of sexual conduct between uninfected and infected individuals;
- Rates of sexual contact and new partner acquisition;
- Specific behaviors engaged in (high risk versus low risk);
- Use of condoms.

Models of the incidence of HIV transmission over time as a function of these factors show that uncertainty about the population parameters for even one factor can introduce great uncertainty about predicted incidence, even if good information is available about the other factors.  More specifically, to predict the change in HIV transmission in the military if the policy regarding service by homosexuals changes requires information on: (1) how many more homosexual men and women would enter the military with a change in policy; (2) how they would behave in terms of the factors listed above; and (3) how many who would

- 256 -

have joined anyway (or who are already in) would change their sexual behavior if the ban were removed, and in what ways.

Unfortunately, little information is available on the number of homosexual men or women in current military populations, or on their sexual behavior.[20] Extrapolation from data on civilian populations is problematic for several reasons, including large variability in results from one region to another and the absence of any basis for assuming that homosexuals who choose to enter military service are similar to those who choose to participate in civilian studies, which are thought not to be representative even of the entire civilian homosexual population.

**Risk Factors for HIV Exposure in the Civilian Population**

The civilian studies referenced below do support some general observations that may be relevant here. First, homosexual women in the civilian population are at much lower risk of becoming infected with HIV than are heterosexual women and men and homosexual men, and there is no reason to think homosexual women in the military would have any higher risk. Therefore, any increase in the proportion of homosexual women would be expected to reduce, rather than increase, the incidence of HIV infection in the military. Second, it appears that, on average, homosexual men in the civilian population have a higher risk than heterosexual men of becoming infected with HIV as a result of their greater risk on three of the factors listed above, moderated somewhat by their lower risk on a fourth factor. There are three factors placing them at higher risk within the civilian population: (1) they are more likely to encounter infected partners; (2) they are more likely to engage in sexual activities that efficiently transmit HIV (receptive anal intercourse versus insertive vaginal intercourse); and (3) they appear to be more likely than heterosexual men to have more partners.[21] The factor reducing their risk is that they are more likely than

---

[20]The only data available describe lifetime behavior of ex-military personnel.

[21]Another shortcoming of the studies is the lack of a definition for the word "partner," which leads to ambiguity in the interpretation of the results.

- 257 -

heterosexual men (and women) to use condoms.  We discuss what is known
about these factors in the civilian population, in turn.

**Number of Partners.**  The selected populations of homosexual men
that have been studied have more partners on average than heterosexual
men have, both in the short term and over a lifetime.  RAND's anonymous
telephone interview of a probability sample of homosexual and bisexual
men in selected areas of Los Angeles County (Kanouse et al., 1991a)
elicited information about the number of *recent* partners (in the last
four weeks) for all respondents who indicated at least some sexual
activity *in the past year*.  A similar question was asked in a study
conducted concurrently of the general adult population throughout Los
Angeles County (Kanouse et al, 1991b), except that in the latter survey,
the question was asked of all respondents who had been sexually active
*in the past five years*.

Table 8-6

Number of Recent Sex Partners, Homosexual/Bisexual Men
and the General Population, Los Angeles County, 1989-90

| Number of Recent Sex Partners in Last 4 weeks | Percentage Distribution by Number of Partners | |
|---|---|---|
| | Homosexual/ Bisexual Men | General Adult Population |
| None | 32.3 | 33.4 |
| One | 47.7 | 63.3 |
| Two | 12.7 | 2.0 |
| Three or more | 7.3 | 1.3 |
| Total | 100.0 | 100.0 |

Sources:  Kanouse et al. (1991a, 1991b).

As Table 8-6 shows, homosexual and bisexual men are much more
likely than others in the general adult population to report having two
or more recent partners (20 percent versus 3.3 percent).  The table
shows that homosexual and bisexual men in Los Angeles County were about
as likely as other adults to report having no recent partners and almost
half of them had been monogamous during the past four weeks.

These data are especially useful because they are derived from
probability samples from a well-defined area, the data were collected

- 258 -

recently enough to reflect any behavioral changes resulting from the AIDS epidemic, and the parallel surveys make possible a comparison of the same behavior in homosexual and bisexual men and the general population in the same metropolitan area at the same time. Limitations of these data include the limited geographic scope and the short window period in which partner counts were obtained. The data do not control for differences other than sexual orientation that may be related to number of partners, and as we discussed above, we do not know how respondents defined "sex partner."

Obtaining good data on the distribution of the number of sex partners over extended periods of time is more difficult, for several reasons. First, the ability of respondents to report accurate counts for longer periods of time is more questionable. Second, data from shorter periods cannot be extrapolated at the individual level into longer-term distributions because rates of partner acquisition cannot be assumed to be constant. Third, the cumulative distribution of lifetime number of partners has clearly changed as a result of the AIDS epidemic, especially in homosexual men (Turner, Miller, and Moses, 1989, pp. 134-136), and there may be other period and/or cohort effects as well. For that reason, the cumulated number of partners of those whose sexually active careers began before AIDS offers a dubious basis for projecting the cumulative number of partners that will be attained by men in more recent cohorts.

Studies of sexually active homosexual men conducted in the last few years have shown a substantial decrease in high-risk sexual behavior since early in the AIDS epidemic. For example, an epidemiological study of HIV among homosexual and bisexual men in Pittsburgh (the Pittsburgh Men's Study) found that the behavior of men who joined the study from 1988 to 1992 differed substantially from that of men who had joined in 1984 through 1985. In the youngest age category of men under the age of 22, the proportion who reported more than 25 partners in the last six months declined from 9.9 percent in 1984-1985 to 2.2 percent in 1988-1992.[22] The proportion of men in this age group who engaged in mutual

_____
[22]Information supplied by Anthony Silvestre, June 1, 1993.

- 259 -

masturbation (an activity with no risk of HIV transmission) with at least half of their partners increased from 42 percent in 1984 to 80 percent in 1988-1992, while the proportion who engaged in anal receptive intercourse (the sex activity with the highest risk of HIV transmission) with at least half their partners declined from 45 percent in 1984 to 29 percent in 1988-1992 (Silvestre et al., 1993).  The proportion who reported more than 1000 lifetime partners declined from 1.6 percent to 0 percent for men under age 22 and from 6.7 percent to 3.1 percent among men aged 22 or older.[23]  Other studies have shown substantial reductions in numbers of sex partners of homosexual men in Chicago (Joseph et al., 1987), New York (Martin, 1987), and San Francisco (Winkelstein et al., 1987) during the mid-1980s.[24]

     **Condom Use.**  A second dimension of sexual behavior affecting the risk that sexual activity will result in transmission of HIV is the use of condoms.  Stall et al. (1988) review 12 published and unpublished studies of behavioral risk reduction among homosexual and bisexual men in the United States during the period 1978 through 1987, some showing dramatic changes in sexual behavior.  For example, the CDC (1987), reporting on a prospective cohort (group) of homosexual clients of STD clinics in San Francisco, found that the rate of engaging in receptive anal intercourse with nonsteady partners without condoms declined by a factor of 27 between 1978 and 1985.  Martin (1987) found that the

--------

[23]Information supplied by Anthony Silvestre, June 1, 1993.
     [24]The numbers reported here are lower than the numbers reported in Congressional testimony on March 29, 1993, which were drawn from Bell and Weinberg (1978).  Dr. Weinberg, in a letter to Senator Nunn, states that:  "Our work was drawn from a study in San Francisco in the late 1960's and early 1970's, where there was an "underground" in which a great deal of sexual experimentation and freedom -- straight and gay -- was the norm.  The plural in the title *Homosexualities,* and the sub-title, *A Study of Diversity Among Men and Women,* mirror our aim:  to show that homosexuals are as diverse in their social, psychological, and sexual profiles as heterosexuals are.  We purposely tried to find the most extreme sexual patterns we could find.  Of necessity, then, the study group was not broad-based either geographically or demographically; it was a snapshot of a particular study group, and could not purport to portray all homosexuals, then or now.  As we stated in the preface to our book, a representative sample was 'not our interest' and 'We cannot stress too much that ours is not a representative sample.'"

- 260 -

percentage of episodes of receptive anal intercourse that were protected
by condom use among a sample of homosexual men in New York increased
from 2 percent in 1980-1981 to 19 percent in 1984-1985; subsequent
follow-up showed further increases to 60 percent in 1986, and 71 percent
in 1987 (Martin et al., 1989).  Lesser changes were found in the
Multicenter AIDS Cohort Study, a large nonrepresentative (convenience)
sample of self-identified homosexual men in Pittsburgh, Chicago,
Baltimore, and Los Angeles (Fox et al, 1987).

     Despite these reductions in risky behavior, some studies have found
that many homosexual men continue to practice unsafe sex.  Anal
intercourse without condoms appears to be more prevalent among younger
homosexual men.  Stall et al. (1992) report that among 401 homosexual
men interviewed by telephone in San Francisco in 1989, 44 percent of
those 18 to 29 years old reported having had anal intercourse without
condoms in the past year, compared with 18 percent of those age 30 years
and older.  A similar age difference has been found in the Pittsburgh
Men's Study, described earlier.  It is not clear whether the more risky
behavior of younger men reflects maturational differences (an age
effect) or an increase in risky behavior among those coming of age more
recently (a cohort effect).

     Estimating rates of condom use has proved to be a more difficult
research task than estimating the incidence of vaginal or anal
intercourse, because condom use tends to vary across situations and over
time.  People are more likely to use a condom when they engage in sex
with a non-steady partner rather than with a regular partner.  In
comparing the frequencies of condom use by homosexual men and
heterosexual men, it is useful to take this into account.
Unfortunately, studies that measure condom use report results in various
ways, making comparison across studies difficult.  Some report only on
the proportion of the study sample who always or never use condoms,
without attempting to quantify the behavior of the (often much larger)
subgroup that uses condoms inconsistently; others combine condom use
with other "safer sex" behaviors, or report only on the incidence of use
or nonuse without giving both.

- 261 -

Among the few studies that estimate actual frequency of condom use and that provide somewhat comparable measures for homosexual/bisexual men and for heterosexual men and women are RAND's parallel surveys of homosexual and bisexual men and the general adult population in Los Angeles County, described above (Kanouse et al., 1991a, 1991b).  Table 8-7 shows the average frequencies of vaginal intercourse (for

Table 8-7

**Mean Frequencies of Vaginal Intercourse Among Heterosexuals and of Anal Intercourse Among Homosexual and Bisexual Men in Los Angeles County, 1989-90 by Type of Partner and Condom Use**

| Type of Partner | No. of Respondents | Mean No. of Times (4 weeks) | Percent With Condom | Percent Without Condom |
|---|---|---|---|---|
| *Heterosexual Men and Women (Vaginal Sex):* | | | | |
| Married | 520 | 5.3 | 13 | 87 |
| In other primary relationship | | | | |
|   Exclusive | 186 | 7.0 | 24 | 76 |
|   Not exclusive | 55 | 8.1 | 46 | 54 |
| Neither married nor in primary relationship | 176 | 1.6 | 48 | 52 |
| *Homosexual and Bisexual Men (Anal Sex):* | | | | |
| Married or in primary relationship with a woman | 34 | 0.9 | 45 | 55 |
| "Married" to a man | 13 | 6.3 | 50 | 50 |
| In other primary relationship with a man | | | | |
|   Exclusive | 49 | 4.6 | 51 | 49 |
|   Not exclusive | 28 | 5.5 | 40 | 60 |
| Neither married nor in primary relationship | 134 | 0.5 | 81 | 19 |

Sources: Kanouse et al. (1991a, 1991b).
Note:  Frequencies are for a four-week period before the interview. Means and percentages in the top panel are calculated for all heterosexual men and women who reported having been sexually active in the past five years and who indicated the frequency of vaginal intercourse both with and without condoms during the four-week period; means and percentages in the bottom panel are calculated for all homosexual/bisexual men who reported having been sexually active in the past year (bottom panel).

- 262 -

heterosexuals) and anal intercourse (for homosexual and bisexual men) reported by respondents for the four-week window period immediately before the survey, according to type of partner and whether a condom was used. Heterosexuals who were unmarried but in an exclusive primary relationship reported using condoms for vaginal intercourse 24 percent of the time, whereas homosexual and bisexual men in such relationships reported doing so 51 percent of the time. Similarly, heterosexuals who were not married or in primary relationships reported using condoms 48 percent of the time, compared with 81 percent for homosexual or bisexual men.

Trocki and Leigh (1991) report on a mail survey conducted in 1987 of 844 randomly selected adults aged 18 to 76 who responded to a survey mailed to 3,600 households drawn from a directory of the city and county of San Francisco. Part of their analysis focused on the practice of "safe sex," defined as condom use in vaginal or anal intercourse or engaging in sex that does not involve penetration--in encounters with new or occasional partners. Altogether, 241 respondents reported on a total of 336 events in such encounters. In 93 events reported by heterosexual men, safe sex was practiced 29 percent of the time; in 132 events reported by homosexual/bisexual men, safe sex was practiced 80 percent of the time. Results were the same when analyzed by respondent rather than by event. The investigators did not report on what proportion of the events were classified as "safe sex" by virtue of condom use as opposed to lack of penetration, but the differences by sexual orientation are nonetheless striking.

In the Pittsburgh Men's Study described earlier, 32 percent of homosexual men younger than age 22 and 31 percent of men aged 22 and older who engaged in anal intercourse reported that between 1988 and 1992 they used condoms "all the time" when doing so.[25] Data reported by Catania et al. (1992) permit us to compare these percentages with the percentages of sexually active heterosexual adults within the highest risk groups who reported using condoms all the time for vaginal intercourse. Of 803 respondents with multiple partners, 17 percent said

---

[25]Information supplied by A. J. Silvestre, June 16, 1993.

- 263 -

they used condoms all the time; of 229 respondents with a risky partner,[26] 13 percent said they used condoms all the time.  This comparison is especially pertinent because it involves sexually active people in both groups who may have reason to be concerned about HIV transmission.[27]

As the above sampling of studies indicates, condom use is far from universal in any group, including homosexual and bisexual men.  However, it seems clear from the literature that in the current post-AIDS era, homosexual and bisexual men--or at least those who perceive themselves as such--are more likely to use condoms in high-risk sexual activity than are heterosexuals.  We now turn to what is known about sexual risk behaviors for HIV exposure among military personnel.

**Sexual Risk Behaviors for HIV-Exposure Among Military Personnel**

There is no evidence on the extent to which the generalizations from civilian studies of select samples of homosexual men hold for the sexual behavior of all homosexual men or of homosexual men in the

------

[26]Respondents with a risky partner were those with a primary sexual partner, defined as the person the respondent had sex with most frequently in the past year, who had at least one of the following risk factors:  positive for HIV infection, intravenous drug use in the past five years, nonmonogamous, transfusion recipient, or hemophiliac.

[27]Seibt and colleagues (1991) report results of a study indicating that sexual identity may have an important influence on condom use by men who have sex with other men.  These researchers gave a self-administered questionnaire to 229 men visiting Dallas County Health Department clinics for anonymous HIV testing and counseling between January and June 1991 who reported ever having had anal sex with a man. Of 25 men who identified themselves as straight, 64 percent said they never used a condom, compared with only 16 percent of the 204 men who identified themselves as homosexual or bisexual.  Mean scores on a five-point scale for frequency of condom use also differed dramatically (0.9 for those who identified themselves as straight, 2.7 for those who identified themselves as homosexual or bisexual, where 0 = "never", 1 = "almost never," 2 = "sometimes," 3 = "almost always," 4 = "always").  Although this sample is small and hardly representative, these results offer an important reminder that those who perceive themselves to be homosexual may have much different patterns of behavior from those who engage in same-gender sexual activity but perceive themselves as straight.  Since the former are undoubtedly more heavily represented than the latter in studies of gay and bisexual men, caution is needed in generalizing from these studies to the entire population of men who engage in sex with other men.

- 264 -

military.  It is possible that military contexts impose constraints on choices of sexual partners or types of sexual activity that have substantial effects on HIV transmission risk (e.g., an increase in tendency to choose partners from the screened active-duty force, which would tend to reduce risk by reducing the likelihood of encountering an infected partner).  Allowing homosexuals to serve could also lead to a change in other behaviors that influence HIV transmission (e.g., transmission could increase if homosexual men engaged in more risky sex if it no longer carried a risk of separation from military service, or transmission could decrease due to a greater willingness to acknowledge homosexuality to health care providers and counselors, who could advise on ways to reduce risk).

To place the risk from changing the policy toward homosexuals in context, we reviewed the evidence regarding sexual behavior and risk of military personnel.  There are very few sources of data on the sexual behavior of military personnel.  By far the best is the 1991 Army-Wide HIV/AIDS Survey.  This study used a two-stage random probability sample of over 18,000 active-duty personnel at 31 installations in the United States and Europe who completed anonymous, self-administered questionnaires.[28]  The preliminary findings that have been made public are not weighted and are thus not necessarily representative of the entire active-duty force.

The study focused on sexual activities that serve as major routes of HIV transmission and on related risk factors, such as number of partners, likelihood of HIV-infection in partners, and history of STDs.[29]  During the year prior to the survey, 7.6 percent of respondents reported 10 or more sexual partners (Temoshok et al., 1992).  The

_____

[28]The survey had a 95 percent response rate among Army personnel present for duty, which equaled 74 percent of personnel assigned to the sampling units.

[29]Survey respondents, in general, tend to underreport information that could have negative social or professional consequences, so significant effort was made to assure respondents that their answers would remain anonymous.  Items at the end of the survey asked respondents how much faith they had in the guarantee of anonymity and how honestly they answered the questions.  Only 7.5 percent strongly disbelieved the survey was anonymous; about 90 percent said they answered sensitive questions honestly.

- 265 -

average number of sexual partners was four per person over the prior
year and 28 per person over one's lifetime (calculated from data
provided in Rundell et al., 1992).  The average number of lifetime
partners was higher than that found in representative national samples
of the civilian adult population.  Smith (1991), for example, found that
the average number of partners reported since age 18 is 12 for men and 3
for women.  The Army and civilian studies have two significant
differences, which act in opposite directions.  The Army has a younger
population that has had fewer years to accumulate partners, whereas the
Smith study excluded partners before age 18.

Although the mean number of partners reported by Army personnel may
exceed the civilian mean, the National Survey of Men (Billy et al.,
1993) showed that a sizable subgroup of men in the civilian population
also had many partners (20 or more lifetime partners for vaginal
intercourse); this subgroup ranged from 16 percent of 20- to 24-year-old
men to 27 percent of 35- to 39-year-old men.

Number of partners is not the only factor influencing one's risk.
The probability that those partners are infected and the likelihood that
particular sexual acts will transmit HIV are also important.  Unweighted
data from the 1991 Army-Wide HIV/AIDS Survey showed that during the
prior year 34 percent reported having one or more "one-night stands" (40
percent of them never used condoms with these partners), 6 percent had
sex with one or more prostitutes (25 percent never used condoms with
them), and 7 percent had sex with "anonymous" partners (24 percent never
used condoms with them) (Temoshok et al., 1992).

We found no data on sexual behavior for the Air Force.  The limited
data for the Marines show a higher level of sexual activity with
prostitutes during deployments to Korea and Thailand.  In a survey of
four units deployed in the Western Pacific (WestPac), 43, 48, 69, and 84
percent reported contact with prostitutes.[30]  In one deployment, 66
percent agreed or strongly agreed that "having sex with 'bar girls'
[prostitutes] is a normal part of the WestPac experience" (Hanson, 1991

---

[30]The 69 percent figure is from a deployment that included Army
personnel along with Marines.  Clarification of published data provided
in personal communication by author.

- 266 -

and 1992). These survey findings cannot be generalized to behavior outside of a WestPac deployment.

STD rates provide a more tangible indication of sexual risk. Many STDs are transmitted through the same routes as HIV, and infection with some STDs (e.g., chancroid) makes it easier to become infected with HIV.

Accurate rates of STDs among active-duty personnel are not readily available. STDs treated by the military medical system are not always reported, either because of non-uniform reporting procedures or because of an effort to protect patients' privacy. Those STDs that are reported do not include STDs that are treated off-base. Overseas data suffer less from this bias than domestic data because there are fewer opportunities to seek health care off-base.

Despite the underreporting, available STD statistics are still informative. In the Army in 1987 (the most recent year for which every month's reports were provided), there were 15,785 new cases of gonorrhea (17.9 cases/1000 personnel) and 36,247 new cases of all STDs (42.5 cases/1000 personnel).[31]

These rates are well above the national average (3.2/1000 in 1987 (CDC, 1992)), but it is important to keep in mind that the demographic mix of the Armed Forces is different from that of the general civilian population. Many military personnel are in their late teens and early twenties, and this age group has the highest STD rates in the United States (e.g., the highest national gonorrhea rates are for ages 20 to 24: 15.6/1000 for males and 12.0/1000 for females in 1987). Blacks also have much higher STD rates than other racial groups (e.g., for gonorrhea, 20.0/1000 vs. 0.9/1000 for whites and 2.3/1000 for Hispanics in 1987),[32] but it is not known whether blacks in the Armed Forces contribute disproportionately to the military's high STD rates. To assess the potential importance of the differences in demographic mix

---

[31]Office of the Army Surgeon General. These rates consist of the number of reported cases of disease in the year divided by the number of personnel in the Army. Therefore, if the same person contracts gonorrhea three times in one year, he or she will contribute three cases to the rate.

[32]Data on 1987 gonorrhea rates by demographic group supplied by CDC.

- 267 -

between the two populations, we adjusted the civilian gonorrhea rates to reflect the age, race, and gender mix of the Army.  The adjusted civilian rate, 15.4/1000, was comparable to the military rate.[33]

Some individual bases have studied STDs among their personnel. STDs were tracked at Ft. Bragg over seven years.  Gonorrhea and non-gonococcal urethritis rates have declined while syphilis rates have increased, producing an overall decrease in STD rates.  (This trend matches national civilian trends.)  However, the downward trend for gonorrhea was reported as either not seen or not sustained for young married persons (17-21 years old) and young black males.  Syphilis increased in black males and females and white males, with the authors reporting a pattern suggestive of heterosexual transmission in both races (Magruder et al., 1992).

The most comprehensive military data on STDs come from self-reports, because these cover all STDs, regardless of site of treatment. Unweighted data from the 1991 Army-Wide HIV/AIDS Survey show that 14.5 percent reported at least one STD in the prior two years.  The likelihood was greater in younger, black, female, unmarried, and enlisted (versus officer) respondents.  Factors associated with having an STD (over the past year) included the absence of a regular sexual partner; higher mean number of total sexual partners, one-night stands, prostitutes, anonymous partners, and new sexual partners; fewer condoms purchased or received; number of drugs used; and (over the past two years) sexual partners in U.S. cities or in countries with high AIDS prevalence.  Mean number of lifetime sexual partners was also higher in the group with STDs (Rundell et al., 1992).[34]

_____
[33]We calculated the adjusted rate with 1990 gonorrhea data, which was the latest year available in cross-tabulated form by age, race, and gender.  National gonorrhea rates have been dropping annually, which is important to keep in mind when comparing the 1987 Army and 1990 civilian rates.  From 1987 to 1990, the national rate fell 14 percent (calculated from data in CDC, 1992).

[34]Because survey respondents in general tend to underreport embarrassing information such as STDs, the data probably provide a lower bound estimate of the true percentage of people who have STDs in the Army.  People also underreport when they do not know that their disease is sexually transmitted (e.g., men who have non-gonococcal urethritis

- 268 -

STD rates are not available in as much detail for the other services. For Marine and Navy WestPac deployments, STD rates at times exceed 10 percent, and, as recently as 1990, some larger units have had rates as high as 40 percent for a six-month deployment. With aggressive condom distribution and health education, some units' STD rates have come down to less than 2 percent during a one-month deployment. For example, despite the high rates of contact with prostitutes in the four WestPac units discussed above, the majority of personnel reported condom use with each contact, and STD rates were relatively low.[35] Nevertheless, because of the reportedly high rates of HIV among prostitutes in Asian countries, such as Thailand (Weniger et al., 1991), the statistics on prostitution, the fact that not all personnel used condoms, and the high STD rates for other deployments raise particular concern about spread of HIV to deployed personnel.

The military population's current behavioral risk profile as well as the data on STDs indicate that many are engaging in sexual behaviors that could transmit HIV if their partners were infected. So far, HIV rates may not be higher because HIV is not as endemic in the populations in which active-duty personnel are having sex. However, if the virus spreads further, military personnel will be at greater risk of contracting HIV unless they use condoms or change their sexual practices. Regardless of whether the policy of excluding homosexuals from military service is continued, DoD's educational and testing programs are the most certain methods for preventing high-risk sexual behavior, monitoring HIV prevalence, and identifying HIV-positive personnel in future years.

**INFECTION FROM CONTACT WITH HIV-INFECTED BLOOD**

The military blood supply is well protected against HIV. All blood undergoes complete HIV screening and is discarded even if it has only one positive EIA test. As discussed earlier, a person is diagnosed with HIV only after two positive EIAs and one positive Western Blot. Thus,

---

sometimes seek medical care for pain, get treatment, and do not understand how they contracted it).

[35]Hanson (1990, 1991) and information supplied by author.

- 269 -

by requiring only one positive EIA, the blood program discards many units of uninfected blood to guarantee that it eliminates as much infected blood as possible. About 0.4 percent of blood donations in 1991 tested positive on the first EIA and were therefore discarded. Only 2 percent of these, or 0.008 percent of all the donated blood turned out to be actually positive after complete EIA and Western Blot testing.[36] This rate is comparable to the 1990 rate of 0.005 percent at American Red Cross blood banks (CDC, 1991). About 85 percent of the more than 275,000 total units collected in 1991 were donated by active-duty personnel. Blood donation is voluntary, and potential donors are told not to donate if they meet any of a list of exclusion criteria (e.g., people who have had hepatitis A, B, or C, who have colds, as well as men who have sex with men). Donors who consequently refrain do not have to tell which of the exclusion criteria they have met. If someone who meets an exclusion criterion donates blood anyway (e.g., due to social pressure), he or she has the opportunity to check off a confidential form that says not to use the donated blood for transfusion purposes. While it may never be possible to eliminate all social pressure to hide an exclusion criterion, permitting homosexuals to serve in the military should only make men who have had sex with men more likely to defer or at least check off the confidential form. In addition, blood is screened for other diseases, such as syphilis and hepatitis A, B, and C. All testing and handling procedures follow standards set by the American Association of Blood Banks and the regulations of the Food and Drug Administration.[37]

One of the most frequently expressed concerns about allowing homosexuals to serve has been the risk of exposure to HIV-infected blood through battlefield transfusion. Battlefield blood collections are rare, since the military is able to bring adequate supplies of properly screened and treated blood or blood substitutes from the United States to battlefield sites. However, when necessary, battlefield collections

---

[36]Of the 211,258 units that were tested in-house by the Armed Services Blood Program Office (ASBPO), 17 were positive.
[37]Information about the military blood supply and battlefield collections was provided by the Director of the ASBPO, April 26 and May 27, 1993.

LCR Appendix Page 0589

- 270 -

are taken only from volunteers among active-duty personnel, and the same exclusion criteria apply as for regular blood donations. Since all deployed personnel have had a negative HIV-test in the six months prior to deployment, the probability of a battlefield donation from an infected person is very low.

Moreover, transfusion of battlefield collections is done only in emergency situations, generally when transfusion is necessary to save a person's life. Recipients of battlefield collections are therefore much more likely to die from the illness or injury than from any disease acquired as a result of the transfusion. During Desert Storm, about 2000 total units were transfused[38] and reports indicate five people received blood from battlefield collections. Blood from such collections is sent back to the United States for testing, whenever possible. None has been HIV-positive.

Another concern is exposure to blood from wounded service members. Especially if the period of combat is of short duration, predeployment testing will make the risk of this exposure low. However, in the unlikely event that a service member is exposed to blood from someone who is wounded and HIV-infected, his or her risk of contracting HIV infection would depend on the type of exposure. Blood on an area of the uninfected service member's skin that had no or only superficial cuts would not usually transmit the virus. Getting some blood in the eye would present a larger risk. A medic going from one wounded service member to the next with infected blood on his or her hands could also spread HIV. It is not possible to estimate this risk with much precision; however, to reiterate, the screening program should prevent HIV-infected people from deploying.

While testing minimizes initial infection rates in the forces that are deployed, it does not prevent infection with HIV once overseas-- especially on long deployments. Evidence of potentially high-risk sexual behavior among all military personnel, discussed earlier, raises concerns about the risk of transmission among personnel deployed to parts of the world where HIV is common.

---

[38]The exact number of units transfused is not known because records are incomplete for Operations Desert Shield/Storm.

- 271 -

**CONCLUSIONS**

DoD's HIV testing program almost entirely prevents the entry of HIV-infected persons into the military.  Therefore, the only way a change in policy permitting homosexuals to serve could significantly affect HIV infection rates in the military is by increasing the number of service members who are infected while serving.  It is not possible to predict whether there would be an increase, much less estimate its magnitude.  If an increase in HIV infection rates were to occur, there would be little influence on military effectiveness.  All military personnel whose health is seriously affected by HIV are discharged. Given the accuracy of HIV testing, very few HIV-infected personnel would ever deploy or serve in combat, and the military blood supply would remain safe.

Regardless of whether homosexuals are permitted to serve, the military could experience higher HIV infection rates in the future. Available evidence on sexual risk behavior and rates of sexually transmitted diseases among all personnel suggests the potential for increased HIV transmission under conditions that place personnel in greater contact with infected populations.

- 272 -

## 9.  ISSUES OF CONCERN:  ANTI-HOMOSEXUAL VIOLENCE[1]

Many military personnel have predicted anti-homosexual violence in the military if homosexuals are permitted to serve.  The *Los Angeles Times* survey of 2,346 enlisted personnel found that over 80 percent believed that removing the restriction would result in violence against homosexuals.  In the Marines, the percentage was 90 percent.[2]  In the focus groups conducted for this report, violence was frequently mentioned as a possible consequence.  Perhaps the most dramatic statement about the risk of anti-homosexual violence was in the testimony of Marine Corps Colonel Frederick Peck before the Senate Armed Services Committee on May 11, 1993, when he stated that one of the primary reasons he would not want his homosexual son to join the Marines was the threat of violence.  According to Colonel Peck,

> I would be very fearful that his life would be in jeopardy from his own troops . . . .  Fratricide is something that exists out there, and there are people who would put my son's life at risk in our own armed forces.

Furthermore, over the past six months, the media have extensively covered specific episodes of anti-homosexual violence in the military, and its occurrence has been cited as evidence of the extent of anti-homosexual bias in the military.  The most publicized recent case was the murder of Seaman Allen Schindler, who was beaten to death by shipmates on October 27, 1992, in Sasebo, Japan (Sterngold, 1993).  It now appears that this case was at least partly motivated by anti-homosexual prejudice.

This chapter briefly reviews the literature on anti-homosexual violence as it relates to the likelihood of such violence if homosexuals are allowed to serve openly.  The scientific evidence on anti-homosexual violence is almost exclusively restricted to its occurrence in the civilian population and is of limited quality.  However, there is

---

[1]This chapter was prepared by Raynard S. Kington.
[2]See the chapter on military opinion.

- 273 -

sufficient evidence to conclude that anti-homosexual violence occurs with some regularity in the civilian community.  It clearly occurs in the military under the current policy, although there are no data on the relative frequency of its occurrence.  We conclude that the evidence does not allow us to make any firm predictions about the likelihood of increased anti-homosexual violence if homosexuals were allowed to serve. We close with a discussion of implementation issues as they relate to the potential for anti-homosexual violence.

**OVERVIEW OF DATA**

Over the last fifteen years, the homosexual community, law enforcement agencies, and researchers have focused increasing attention on the problem of anti-homosexual violence (Herek, 1989; Reiss and Roth, 1993).  Efforts to address such violence during the 1970s and 1980s resulted in the inclusion of anti-homosexual violence in the Federal Hate Crime Statistics Act of 1990, which mandated the Federal Bureau of Investigation to collect and publish annual statistics on crimes motivated by prejudice.  In addition, over twenty states now have laws that mandate monitoring or penalties for bias crimes involving sexual orientation (NGLTF, 1992).

**Data Sources and Limitations**

Numerous methodological problems limit the quality of the data on the incidence and correlates of anti-homosexual violence. First, under-reporting of such violence to official agencies is believed to be widespread, as is generally true for most violent crimes (U.S. Department of Justice, 1992).  Thus, the best available data on incidence rates for anti-homosexual violence (excluding homicides) are from community surveys rather than from official agencies.

Second, community surveys that have included questions on violence have used convenience samples accessed largely through homosexual organizations, publications, and events.  Because homosexuals are not readily identifiable, it is impossible to secure a non-self-reported probability sample of this population for any purpose (Herek, 1989).  The use of convenience samples raises questions about the generalizability of the data to the homosexual community at-large and to the military.

- 274 -

Third, the wording of survey questions may affect estimates of incidence rates.  For example, many surveys asked the respondents to report violent crimes that occurred "because of sexual orientation" (e.g., Comstock, 1989; Gross, Aurand, Addessa, et al., 1992; "Results of a Poll," 1989).  Ideally, identifying a crime as being a bias crime requires an understanding of the motivations of the perpetrators.  Criteria have been developed that improve the ability to identify violence that is likely to be related to sexual orientation (e.g., Finn and McNeil, 1988;  NGLTF, 1993), but these criteria are not explicitly stated in surveys. Therefore, there may be variations across individuals and surveys in attribution of violence to anti-homosexual bias.

**SUMMARY OF LITERATURE ON THE INCIDENCE OF ANTI-HOMOSEXUAL VIOLENCE**

Two recent books have comprehensively reviewed the literature on such violence (Comstock, 1991; Herek and Berrill, 1992).[3]  These books reviewed over thirty studies of varying quality that have included information on anti-homosexual violence over the last twenty years.[4]  An ideal data set for understanding rates of violence against homosexuals would include a geographically diverse probability sample of respondents; information on the respondents' sexual orientation and all other important sociodemographic variables that are related to violence risk; and accurate data on all interpersonal violence experienced by the respondent.  No available data set meets all of these criteria.  The best available data come from surveys of convenience samples of self-identified homosexuals, which include information on interpersonal violence.

The Philadelphia Gay and Lesbian Task Force has published several of the most widely cited studies of incidence rates of violence against homosexuals.  Its most recent 1991-1992 survey of 2,652 homosexuals in

---

[3]The chapters in the Herek and Berril book were based on articles from a special September 1990 issue of the *Journal of Interpersonal Violence*.

[4]Many of the studies were not readily available for primary review (e.g., many are in the form of unpublished manuscripts or reports by local homosexual organizations).  The most widely cited and most recent reports and those published in scholarly journals were reviewed for this report.

- 275 -

Pennsylvania found that, in the Philadelphia sub-sample (N = 1,413), 3 percent of the women and 9 percent of the men reported at least one episode over a 12-month period of physical anti-homosexual violence, including being punched, hit, or assaulted with a weapon (Gross, Aurand, and Addessa, et al., 1993). In 1992, two other local advocacy groups conducted surveys of homosexuals. The Los Angeles Gay and Lesbian Community Services Center surveyed 914 individuals who were participants in a gay and lesbian pride festival in the Los Angeles metropolitan area. Twenty-eight percent of the respondents reported being assaulted or physically abused over the preceding twelve months because of their orientation (Anti-Violence Project, 1992). The Lesbian and Gay Community Association in Jacksonville, Florida, surveyed 507 homosexuals in 1992, and 38 percent reported being the victim of "gay-bashing" over a 12-month period (as reported in NGLTF, 1992).

In a national telephone survey of 400 male and female homosexuals for the *San Francisco Examiner* in 1989, Teichner found that 7 percent reported physical abuse or assault because of being homosexual, over a 12-month period ("Results of a Poll," 1989). Comstock and Berrill reviewed a much larger number of studies of the general homosexual population, most of which reported lifetime rates of anti-homosexual violence (Comstock, 1991; Berrill, 1990). In these reviews, the majority of the lifetime rates for physical violence were between 10 and 30 percent.

A number of studies have been restricted to university populations. At Yale, Pennsylvania State University, and Rutgers, approximately 5 percent of homosexual students reported anti-homosexual physical violence, including being punched, hit, kicked, or beaten, in their college careers (D'Augelli, 1989; Yale, as reported in Berrill, 1990; Rutgers, as reported in Berrill, 1990). A study at the University of Massachusetts estimated a rate of 21 percent of homosexual students suffering physical confrontation or assault, compared with 5 percent for the total student body (Yeskel, 1985).

**Anti-Homosexual Violence in the Military**

We found no scientific literature (population surveys or case series) specifically addressing anti-homosexual violence in the

- 276 -

military.  The only data are case reports from the media and material
collected by various advocacy groups.  The case reports of anti-
homosexual violence in the military often involve military personnel
accused of attacking civilians (e.g., see "Military Incidents" in NGLTF,
1993).  During the military focus groups conducted for this report
several examples of anti-homosexual violence involving military
personnel attacking other military personnel were described (see the
chapter on military opinion).  The case reports, including several cases
that have received wide media coverage and cases reported to groups such
as the National Gay and Lesbian Task Force, are the best available
information on the occurrence of anti-homosexual violence now in the
military, but there are no data on its relative rate of occurrence.

**Underreporting of Violence**

    One consistent finding in the literature is that the vast majority
of anti-homosexual attacks are not reported to law enforcement agencies.
In the Comstock study, 73 percent of those experiencing anti-homosexual
violence did not report it (1989).  In D'Augelli, 94 percent did not
report cases to authorities (1989).  In the Pennsylvania study, 60 to 70
percent did not report cases (Gross, Aurand, and Addessa, et al., 1992).
In Anderson (1982), 90 percent of the assault victims did not report.
In the general population, 50 percent of violent personal crimes are not
reported to the police (U.S. Department of Justice, 1992). In its first
year of reporting bias crimes, the F.B.I. reported only 422 anti-
homosexual or anti-bisexual crimes in 1991 (Sessions, 1991), while in
the same year the National Gay and Lesbian Task Force reported 1,001
anti-homosexual episodes, in only five cities, that met F.B.I. criteria
as bias crimes (NGLTF, 1992).

    The reasons for not reporting anti-homosexual violence often differ
from the reasons for not reporting violent crimes in the general
population.  For example, in the Comstock study, 67 percent did not
report because of previous anti-homosexual experience with police or
perceived police anti-homosexual attitudes, and 40 percent because of
the risk of having sexual orientation made public (1989).  In the
general population, the most common reason for failure to report crimes

- 277 -

of violence involving a stranger was that the offender was unsuccessful (U.S. Department of Justice, 1992).  The current restriction on homosexual service in the military creates significant costs for exposure of homosexual status.  This may contribute to the dearth of data on the occurrence of anti-homosexual violence in the military as long as the ban remains.  However, it should be noted again that even in the civilian population most victims of anti-homosexual violence do not report the incidents to authorities.

**Personal and Environmental Correlates of Anti-Homosexual Violence**

Although the best available data on anti-homosexual violence are restricted to the civilian population, the evidence on the personal characteristics and environmental factors associated with the occurrence of such violence provides some insight into its possible occurrence in the military setting if homosexuals were allowed to serve.  Most prominently, the surveys of homosexuals almost uniformly demonstrate a higher rate of physical victimization among males (see reviews in Comstock, 1991; Berrill, 1990).  The pattern of higher rates for males is consistent with the general literature on the risk of being a victim of violent crime (except for forcible rapes and partner assaults) (Reiss and Roth, 1993).  The evidence regarding other risk factors, such as race, is more difficult to interpret.

In predicting the likelihood of anti-homosexual violence, of particular note are two studies that have suggested other personal characteristics of homosexual men that may affect the likelihood of being a victim.  In a survey of 1,556 homosexual men in the Chicago area, Harry found that those who identified themselves as being effeminate were more likely to have experienced violence (Harry, 1982).  Effeminate men may be more easily identified as fitting the stereotype for homosexuals.  Harry also reported finding that those homosexuals who had mostly homosexual friends and those who were more open about their orientation were more likely to have experienced violence.  Thirty-one percent of homosexual males who agreed or strongly agreed that "It is important to me to 'be out' to straight people I know" had experienced anti-homosexual violence versus 21 percent for other respondents (Harry,

- 278 -

1990).  (These results are referred to in Harry [1990] as being described in an unpublished manuscript, which was not available for primary review.)

These results suggest that some forms of anti-homosexual violence may be less likely in the military setting, given the strong culture in the military against effeminate behavior in men, and the likelihood that few individuals would announce their homosexuality, even if policy prohibiting their service were changed.

In terms of where violence occurs, it appears most frequent in identifiably homosexual public gathering places (see summaries in Comstock, 1991; Berrill, 1990).  Presumably, the high rates reflect at least partly the ease in identifying homosexuals in these settings.

**The Perpetrators of Anti-Homosexual Violence**

There is only sparse evidence about what kinds of people engage in anti-homosexual violence.  Most data come from descriptions of perpetrators in homosexual surveys.  Reviews of available data by Berrill (1990) and Comstock (1991) conclude that the perpetrators of anti-homosexual violence tend to be young males, who often act in groups.  In general, bias crimes are usually committed by persons not known to the victim.  In the general U.S. population, 58 percent of violent crimes involve strangers (U.S. Department of Justice, 1992), while in one study of anti-homosexual violence more than 90 percent of the crimes involved strangers (as reported in Bohn [1984], from anunpublished thesis).

**The Consequences of Anti-Homosexual Violence for the Victims**

Although there is a growing literature on the psychological consequences of being a victim of violence (e.g., Sales, Baum, and Shore, 1984), little is known specifically about the consequences for victims of anti-homosexual violence.  Psychologists have speculated that the sense of vulnerability and self-blame that may normally follow victimization may be heightened among victims of anti-homosexual violence (Garnets, Herek, and Levy, 1990).  Furthermore, homosexuals who are not "out" may face the prospect of "double disclosure"--that they are homosexual and that they have been victimized (Garnets, Herek, and Levy, 1990).  In response to the unique consequences faced by victims of

- 279 -

anti-homosexual violence and the perception that law enforcement and social services agencies have been unresponsive to their needs, several homosexual victim support programs have been developed across the nation, such as the New York City Gay and Lesbian Anti-Violence Project (Wertheimer, 1990) and the Horizons Anti-Violence Project in Chicago (NGLTF, 1993).

**ANTI-HOMOSEXUAL VIOLENCE AND THE FORMULATION OF POLICY REGARDING HOMOSEXUALS IN THE MILITARY**

The social science literature on anti-homosexual violence addresses, almost exclusively, its occurrence in the civilian population, and generally the data are of limited quality. The available data are of limited usefulness in predicting the risk of violence as a result of changes in the military's policies with regard to homosexuals, but they provide some important insights about the phenomenon. Although there are no population-level data on the incidence of anti-homosexual violence in the military, case reports suggest that it does occur in the military under the current policy.

To the extent that changes in policy result in changes in the number of homosexuals in the military or in the behavior of those who are already there (e.g., more openly homosexual soldiers, who are more readily identified targets for violence), there is the potential for a change in the rate of anti-homosexual violence. However, the evidence that homosexual soldiers will conform to usual military standards of behavior and that few will publicly acknowledge their homosexuality suggests that the occurrence of anti-homosexual violence of the type usually encountered in the civilian community (i.e., strangers attacking easily identified homosexuals) may be limited. However, it is possible that homosexuals in the military would be attacked by other military personnel who are not strangers. This type of anti-homosexual violence is even less well described in the social science literature. However, the military setting, with its hierarchical culture and its broad control of many aspects of soldiers' lives and behavior, may provide opportunities to prevent anti-homosexual interpersonal violence that are not as feasible in the civilian world.

- 280 -

The high rate of failure to report incidents to official agencies is especially relevant to this policy discussion.  Although in the general population the reporting rate for crimes of violence is low, the reasons for non-reporting distinguish anti-homosexual crimes.  Reasons frequently cited by homosexual victims for failure to report are the fear that he or she will be victimized again by the officials, so-called secondary victimization (Herek and Berrill, 1990), fear of public disclosure, and the belief that nothing will be done with the information once it is reported (e.g., Comstock, 1989).  In the military, the presence of a ban on homosexuals, with significant penalties for discovery, provides a strong incentive not to report anti-homosexual violence or personal threats of violence to officials.  If the incidents are not reported, there will be no opportunity to identify and punish perpetrators and possibly prevent future incidents.  Even those incidents of violence that result in injuries severe enough to lead to contact with a health care provider (e.g., a physician in an emergency room) are unlikely to be identified as the result of anti-homosexual violence, if the victims do not identify it as such.  In addition to limiting the opportunity to punish perpetrators, the victim's fear of being identified as homosexual may lead to delays in seeking necessary treatment for injuries.

## ANTI-HOMOSEXUAL VIOLENCE AND THE IMPLEMENTATION OF A POLICY REGARDING HOMOSEXUALS IN THE MILITARY

### A Clear Message of Zero Tolerance from the Leadership

The occurrence of anti-homosexual violence in the military under any policy regarding homosexuals is at least partly a reflection of military leadership.  As discussed in the chapter on implementation, one of the most important factors in effecting a change in policy and minimizing negative consequences such as anti-homosexual violence is a clear message from leadership of zero tolerance for such violence and an assurance that those convicted of committing it will be severely penalized.  However, given the likelihood that many homosexuals will continue to keep their orientation quiet, there may still be strong incentives not to report incidents or threats under any policy.  Any policy that includes penalties for revealing one's homosexual status may