# Appendix of Evidence in

# Support of Log Cabin Republican's

# Opposition to Defendants'

# Motion for Summary Judgment

## LCR Appendix Pages 601-700

## (Part 6 of 19)

- 281 -

further discourage reporting.  A message of "zero tolerance" may have limited effect if it is clear that most incidents will never come to the attention of leadership.  The message must be coupled with a message that leadership will monitor the occurrence of anti-homosexual violence through some form of a tracking system.

**Tracking the Incidence of Anti-Homosexual Violence**

A range of options is available for monitoring the occurrence of anti-homosexual violence.  The F.B.I. system developed as a result of the Federal Hate Crimes Statistics Act of 1990 is one model based on official reports.  Another form might follow models used for tracking communicable diseases and child abuse, by mandating health care personnel to report cases.  The most severe cases of anti-homosexual violence will result in contact with a health professional even if the individual initially does not wish to be identified as homosexual. Health care providers are a common contact point for victims of violence (e.g., in emergency rooms) and can be used to identify cases.  However, in order to play this identifier role, they require additional training, which may be integrated into existing military programs to identify military personnel and their families at risk for domestic violence (e.g., McNelis and Awalt, 1986).  The American Medical Association also has developed educational materials aimed at identifying domestic, child, and elder abuse that might be used as a model (AMA, 1992).  The military might also consider a program of anonymous reporting to obtain data for rates.

**Ensuring Adequate Treatment and Disposition of Victims of Anti-Homosexual Violence**

Victims of anti-homosexual violence suffer from significant physical and psychological sequelae resulting from the violence and might also be at risk for additional violence.  For example, failure to identify cases might lead to a victim's being maintained in a setting in which he or she is at risk of further victimization.  The military should make every effort to ensure that victims receive the appropriate care to minimize the negative consequences of the injuries, by developing guidelines for health personnel and commanders in responding

- 282 -

to potential cases.  Specifically, the military should develop
guidelines so that when soldiers who are, or are believed to be, victims
of anti-homosexual violence are released from health care facilities and
other protected settings, care will be taken to avoid sending them into
situations where they are at risk of being further victimized.

CONCLUSIONS

The evidence on anti-homosexual violence is almost exclusively
restricted to its occurrence in the civilian population and is of
limited quality.  However, there is sufficient evidence to conclude that
it occurs with some regularity in the civilian community.  It also
occurs in the military under current policy, although there are no data
on the relative frequency of that occurrence.  Experience in the
civilian sector shows that there is a high rate of failure to report
anti-homosexual violence.  The ban on allowing homosexuals to serve,
with the significant penalties for discovery, provides a further
disincentive for victims to report anti-homosexual violence.

To the extent that changes in policy resulted in changes in the
number of acknowledged homosexuals in the military, the rate of anti-
homosexual violence might change, since acknowledged homosexuals are
more readily identified targets for such violence.  The experience of
foreign militaries and police and fire departments suggests that if
leaders make it quite clear that violence will not be tolerated and
stern action will be taken, violence can be kept to a minimum.

- 283 -

## 10.  WHAT IS KNOWN ABOUT UNIT COHESION AND MILITARY PERFORMANCE[1]

### OVERVIEW

President Clinton's memorandum of January 29, 1993, directed the Secretary of Defense to draft an Executive order that would end discrimination on the basis of sexual orientation in the military "in a manner that is practical, realistic, and consistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain."[2]  At present, there is no scientific evidence regarding the effects of acknowledged homosexuals on a unit's cohesion and combat effectiveness.  Thus, any attempt to predict the consequences of allowing them to serve in the U.S. military is necessarily speculative.

During the Senate Armed Services Committee hearings on the topic in March-June 1993, there was a division of opinion among military social scientists as to the likely effects of lifting the ban.  Retired Colonel William Darryl Henderson, (former Commander of the Army Research Institute), Dr. David Marlowe (Chief of Military Psychiatry at Walter Reed Army Institute of Research), and Professor Charles Moskos (Department of Sociology, Northwestern University) predicted that the presence of acknowledged homosexuals would significantly disrupt unit cohesion.  Others, including Dr. Lawrence Korb (Brookings Institution), Professor David Segal (Department of Sociology, University of Maryland), and Professor Judith Steihm (Department of Political Science, Florida International University), disagreed.

It is important to recognize at the outset that the military's concern about cohesion and unit functioning is not new.  Cohesion is not now--and probably never has been--uniformly high (e.g., Griffith, 1989; Henderson, 1985, 1990; Manning and Ingraham, 1983; Scull, 1990; Siebold and Kelly, 1988a), and the military intervenes whenever a unit becomes

---

[1]This chapter was prepared by Robert MacCoun.  John D. Winkler, Andrew Cornell, and Susan Adler assisted in the background research. Bryan Hallmark, Susan Hosek, and Bruce Orvis provided constructive reviews.
[2]Memorandum for the Secretary of Defense, Ending Discrimination on the Basis of Sexual Orientation in the Armed Forces, January 29, 1993.

- 284 -

seriously dysfunctional for any reason.  Because of this longstanding concern, there is a fairly sizeable research literature on unit cohesion--its nature and its correlates.  This chapter provides a critical review of this research literature and its implications for the current policy debate.

**Assumptions and Focus of the Chapter**

To narrow the focus, the analysis in this chapter is premised upon three assumptions that appear to be widely shared by both sides of the current policy debate:

- There is no scientific evidence, and no compelling reason to believe, that homosexuals are inherently less capable of performing military tasks than are heterosexuals.
- There is considerable evidence that homosexuals already serve in the U.S. military, and always have, albeit most have not openly acknowledged their status, or have acknowledged it only to some colleagues.  Thus, concerns about cohesion pertain to acknowledged homosexual status, not sexual orientation per se, and to how an individual's acknowledged homosexuality would affect the group.
- If allowed to serve, homosexuals in the military would be held to standards of conduct, appearance, demeanor, and performance at least as stringent as the standards for heterosexuals.

Given these assumptions, the central question of the chapter is:

*What effect will the presence of acknowledged homosexuals have on the cohesion and performance of a given military unit?*

**The Literature Review**

The literature reviewed in this chapter was identified by an extensive search of the research base, including computerized literature searches in *Psychological Abstracts* and *Defense Technical Information Center* (DTIC).  The review covers almost 50 years of scientific research

LCR Appendix Page 0604

- 285 -

published by military, academic, and industrial-organizational researchers, supplemented by conversations with a variety of experts. The research was conducted in a variety of settings and examines a variety of different types of groups: military units, sports teams, industrial work groups, and participants in laboratory experiments.  It should be noted that military agencies have funded a large share of the academic laboratory research on small group performance; indeed, much of the academic literature was stimulated by military research questions.

Over 185 research articles and books were consulted, including studies by the Army Research Institute, the Walter Reed Army Institute of Research, and other military sources; experimental studies of small group behavior; research on sports teams and industrial-organizational workgroups; and theoretical and empirical analyses of stereotyping, intergroup contact, and attitudes and their relationship to behavior. In addition, many of the nation's leading experts on these topics were consulted.  A complete list of references and interviewees is contained in the Bibliography at the end of this report.

A few caveats regarding relevant research are in order.  First, anecdotes and impressionistic statements are a powerful source of hypotheses about unit cohesion, but by themselves they cannot provide scientific evidence as to the validity of those hypotheses (Garvey and DiIulio, 1993).  Anecdotal information is difficult to verify, can be distorted by memory loss or other factors, cannot determine cause-and-effect relationships, and may provide an unrepresentative sample of the phenomenon in question (Nisbett and Ross, 1980).  In this chapter, anecdotal or impressionistic information is cited only as a source of hypotheses, or as a means of illustrating certain phenomena established by more systematic empirical research.

Second, as in most social research, there tends to be a tradeoff in the cohesion literature between the scientific rigor of a study and its generalizability to combat and other "real-world" settings. Fortunately, there appears to be considerable convergence between the findings of laboratory and field studies on group cohesion and its effects, although known discrepancies are identified in the chapter. However, even the military field studies generally only simulate actual

- 286 -

combat conditions.  Thus, existing research on the cohesion-performance relationship is most readily generalizable to noncombat conditions, which characterize the situation of most military units, most of the time.  The likely effects of the stresses of combat on cohesion and performance are discussed later in the chapter.

**Key Issues in the Review**

    To address the central question of how the presence of acknowledged homosexuals may affect unit cohesion, the chapter addresses the following concepts and issues:

- The cohesion concept:  the ways in which cohesion has been defined and measured, the effects of cohesion on performance and coping under stress, and the factors that promote or hinder cohesion.  A key finding from this review is that there are multiple types of cohesion, with different consequences for performance.

- What these principles of unit cohesion imply about the consequences of allowing acknowledged homosexuals to serve in the military.  This examination indicates that some types of cohesion are more likely to be affected than others, and this has important implications for military performance.

- The likely prevalence of acknowledged homosexuals in military units.  This has important implications for the scale of the phenomenon, the ways in which cohesion might be affected, and the likelihood of contact with acknowledged homosexuals.

- The conditions of intergroup contact that can bring about a reduction in hostility and stereotyping and the extent to which these conditions are likely to be met in the military.

- Factors that may enhance or deter behavioral expressions of negative attitudes.

- Concerns about whether heterosexuals will obey an acknowledged homosexual leader.

- 287 -

## UNIT COHESION AND ITS EFFECTS ON PERFORMANCE

### What Is Cohesion?[3]

Some military researchers (e.g., Marlowe, 1979; Siebold and Kelly, 1988a) draw a distinction between *horizontal cohesion*--the bonding among members of a unit--and *vertical cohesion*--the bonding between unit members and their leaders.  While this distinction is useful, it can become somewhat cumbersome when each type of cohesion is further subdivided.  Thus, this chapter will use the term "cohesion" to refer to horizontal cohesion, and the terms "leadership" and "followership" to refer to downward and upward vertical cohesion, respectively.

**Defining Cohesion.**  The most popular definition of group cohesion was offered by Leon Festinger in 1950.  Festinger defined cohesion quite broadly as "the resultant of all the forces acting on all the members to remain in the group" (p. 274).  Festinger's definition grew out of his study of the cohesion of voluntarily formed social groups.  As a result, it seems overinclusive in the military context, since military personnel have only a limited role in choosing their unit memberships.

Others have defined cohesion more narrowly by emphasizing the quality of the relationships among group members:  "...that group property which is inferred from the number and strength of mutual positive attitudes among the members of a group" (Lott and Lott, 1965, p. 259), "...members' positive valuation of the group and their motivation to continue to belong to it" (Janis, 1983, p. 4), or "...a positive expressive relationship among two or more actors" (Etzioni, 1975, p. 280).

Understandably, military definitions tend to define cohesion in the context of the combat mission; for example:

- "...we define military cohesion as the bonding together of members of a unit or organization in such a way as to sustain

---

[3]The terms "cohesion" and "cohesiveness" are used interchangeably in the research literature.  Since the former term is more common in military parlance we will use it except when directly quoting authors who use the latter term.

- 288 -

their will and commitment to each other, their unit, and the
mission" (Johns et al., 1984, p. ix);

- "...cohesion exists in a unit when the primary day-to-day goals
  of the individual soldier, of the small group with which he
  identifies, and of unit leaders, are congruent--with each
  giving his primary loyalty to the group so that it trains and
  fights as a unit with all members willing to risk death and
  achieve a common objective" (Henderson, 1985, p. 4);

- "Unit cohesion [is the] result of controlled, interactive
  forces that lead to solidarity within military units, directing
  the soldiers toward common goals with an express commitment to
  one another and to the unit as a whole" (*Dictionary of United
  States Army Terms*, 1986, p. 174, quoted in Oliver, 1990a, p.
  4);

- "...cohesion is a unit or group state varying in the extent to
  which the mechanisms of social control maintain a structured
  pattern of positive social relationships (bonds) between unit
  members, individually and collectively, necessary to achieve
  the unit or group's purpose" (Siebold and Kelly, 1988a, p. 1).

**Measuring Cohesion.**  Many authors have commented on the
difficulties of translating definitions of cohesion into scientifically
useful measurements (e.g., Beeber and Schmitt, 1986; Carron, 1982;
Carron, Widmeyer, and Brawley, 1985; Cartwright, 1968; Hogg, 1992;
Mudrack, 1989a, 1989b; Oliver, 1990a; Stein, 1976).  Although cohesion
might seem inherently "intangible," some investigators have been able to
develop measures of cohesion that have adequate reliability--that is,
consistency over time and across questionnaire items (e.g., Carron et
al., 1985; Siebold and Kelly, 1988a; Yukelson, Weinberg, and Jackson,
1984).  A more persistent problem involves the frequent failure to
distinguish a variety of concepts that are often listed as aspects of
cohesion,[4] including:

_____

[4]In the jargon of psychometrics, this is the problem of *construct
validity* (Campbell and Fiske, 1959; Nunnally, 1978)--do the instruments
actually measure the abstract construct we want to measure, no more and

- 289 -

- morale
- esprit de corps
- motivation
- satisfaction
- mutual friendship, caring, interpersonal attraction
- shared goals, teamwork, coordination
- group pride, group prestige, group status

Some writers use the terms "morale" and "cohesion" interchangeably in the military literature, but others distinguish morale from cohesion in two ways. First, while cohesion is generally viewed as a characteristic of small groups (see Mullen and Copper, 1993; Siebold and Kelly, 1988a), some view morale as a characteristic of individuals as well as groups (e.g., Gal and Manning, 1987; Gross, 1954; Ingraham and Manning, 1981, cited in Bartone, 1989, p. 4). Second, morale is generally viewed as a more general, diffuse, and inclusive concept than cohesion; morale is thought to reflect the general level of motivation and satisfaction among members of a group or organization (Bartone, 1989; Motowidlo and Borman, 1978). Indeed, "morale" is sometimes used as a catch-all term: "Apparently any mental state which bears on a soldier's performance reflects his morale, anything at all in his environment can affect his morale, and any aspect of his performance indicates quality of his morale" (Motowidlo et al., 1976, p. 49, cited in Gal and Manning, 1987). Although scientific measures of morale have been developed (e.g., Motowidlo and Borman, 1978), it is sometimes

---

no less? It is particularly difficult to establish the construct validity of hypothetical attributes of groups, rather than individuals (see Longley and Pruitt, 1980; Park, 1990). For example, although cohesion is defined as a characteristic of groups, it is frequently measured by averaging together the relationships among individuals. As is shown below, this practice can obscure important differences in the *pattern* of cohesion, because it does not take into account the variability in ratings across members (Carron, Widmeyer, and Brawley, 1985; Cartwright, 1969; Evans and Jarvis, 1980; Oliver, 1990a). On the other hand, some direct measures of the perceived cohesion of the group as a whole--e.g., how well does the group "work together to get the job done?"--inadvertently tap both cohesion and performance, thereby exaggerating their intercorrelation.

- 290 -

difficult to empirically distinguish morale from cohesion (e.g., Gal and Manning, 1987). Another term, "esprit de corps," is sometimes used synonymously with either morale or cohesion, but cohesion is clearly the preferred term among most military and non-military researchers.

**Social Cohesion vs. Task Cohesion.** As we shall see, using the same term--cohesion--to refer to concepts like "mutual friendship," "caring," and "interpersonal attraction," on the one hand, and "shared goals," "teamwork," and "coordination," on the other, accounts for a great deal of confusion about the effects of cohesion on group performance. In the early years of cohesion research, Festinger (1950), Back (1951) and Gross and Martin (1952) each noted the possibility that there are different *types* of group cohesion. Although some authors acknowledged this idea throughout the 1960s and 1970s (Davis, 1969; Mikalachki, 1969; Shaw, 1976; Steiner, 1972), most research either focused exclusively on personal attraction (e.g., Lott and Lott, 1965), or else haphazardly mixed measures of different types of cohesion, leaving the literature in a fairly chaotic state (see Cartwright, 1968; Hogg, 1992; Mudrack, 1989a; Shaw, 1976).

This situation began to change in the 1980s, with a renewed recognition of the need to distinguish different types of cohesion. The most common distinction is between two types of cohesion that can be labeled "social cohesion" and "task cohesion" (see Carron, 1982; Carron, Widmeyer, and Brawley, 1985; Davis, 1969; Griffith, 1988; Mikalachki, 1969; Mudrack, 1989; Mullen and Copper, 1993; Siebold and Kelly, 1988a, 1988b; Tziner, 1982a, 1982b; Yoest and Tremble, 1985; Yukelson, Weinberg, and Jackson, 1984; Zaccaro and Lowe, 1988; Zaccaro and McCoy, 1988):[5]

------

[5]Mullen and Copper (1993) use the terms "interpersonal attraction" and "commitment to task." Siebold and Kelly (1988a) use the terms "affective bonding" and "instrumental bonding." Tziner (1982) uses the terms "socio-emotional cohesiveness" and "task-oriented (instrumental) cohesiveness." Yoest and Tremble (1985) use the terms "interpersonal closeness" and "quality of work relationships." Yukelson, Weinberg, and Jackson (1984) distinguish "attraction to the group" from two aspects of task cohesion: "quality of teamwork" and "unity of purpose." Zaccaro and Lowe (1988) use the terms "interpersonal cohesiveness" and "task-based cohesiveness." This proliferation of terms has added to the confusion in the literature; on the other hand, it indicates that

- 291 -

- *Social cohesion* refers to the nature and quality of the emotional bonds of friendship, liking, caring, and closeness among group members. A group is socially cohesive to the extent that its members like each other, prefer to spend their social time together, enjoy each other's company, and feel emotionally close to one another.

- *Task cohesion* refers to the shared commitment among members to achieving a goal that requires the collective efforts of the group. A group with high task cohesion is composed of members who share a common goal and who are motivated to coordinate their efforts as a team to achieve that goal.

This general distinction is supported by both experimental and correlation evidence (Anthony et al., 1993; Back, 1951; Carron et al., 1985; Griffith, 1988; David Marlowe, personal communication, April 6, 1993; Mullen and Copper, 1993; Mullen et al., in press; Siebold and Kelly, 1988a; Yoest and Tremble, 1985; Yukelson, Weinberg, and Jackson, 1984; Zaccaro and Lowe, 1988, Zaccaro and McCoy, 1988).[6] Note that the military definitions listed above tend to emphasize task cohesion.

A number of researchers have distinguished a third type of cohesion, variously called "group pride," "group prestige," or "group status" (e.g., Back, 1951; Festinger, 1950; Mullen and Copper, 1993). However, there is relatively little research on this factor, and it appears to involve aspects of both social and task cohesion. For example, Tziner (1982a) suggested that group pride appears to be another manifestation of task cohesion, while Yukelson, Weinberg, and Jackson (1984) found considerable overlap between group pride and social cohesion.[7]

---

several different research teams have more or less independently recognized the need for this distinction.

[6] In Siebold and Kelly's (1988b) Platoon Cohesion Index (PCI), affective and instrumental social cohesion loaded on a single factor, but the PCI includes only two items to assess each construct, providing very low resolution. Siebold and Kelly's (1988a) analysis of their more complete 79-item Combat Platoon Cohesion Questionnaire (CPCQ) found a clear distinction between the affective and instrumental dimensions of horizontal cohesion.

[7] Another possibility, suggested by social identity theory, is that group pride is an antecedent of social and task cohesion, rather than a

- 292 -

**What Effect Does Cohesion Have on Unit Performance?**

Over the years, many reviewers struggled to make sense of the conflicting results across studies of the cohesion-performance relationship, in part because the relevance of the social-task distinction was not fully appreciated (Carron and Chelladurai, 1981; Greene, 1989; Lott and Lott, 1965; Mudrack, 1989b; Shaw, 1976; Stogdill, 1972). While many studies reported a positive association, others were unable to detect a relationship, and cohesion and performance were even negatively correlated in some studies. Some clarity has been provided by recent applications of meta-analytic methods for statistically aggregating results across independent studies.

Meta-analyses by Oliver (1988, 1990b), Evans and Dion (1991), and Mullen and Copper (1993), using overlapping collections of studies, all indicate that, overall, there appears to be a modest positive relationship between cohesion and performance, although as we shall see, the effect varies with different types of cohesion. Oliver's (1990b) meta-analysis at the Army Research Institute included 14 field studies of existing working groups; she reported an average correlation[8] of .32. Evans and Dion's (1991) meta-analysis included 16 studies, with an average correlation of .36. The most complete meta-analysis was conducted by Brian Mullen and Carolyn Copper (1993) of Syracuse University, under contract to the Army Research Institute. Mullen and Copper identified 49 studies containing 66 separate estimates of the cohesion-performance link, with an average correlation of .25.

**Moderating Factors.** The Mullen and Copper meta-analysis provides a detailed examination of a number of variables that appear to *moderate* the cohesion-performance relationship--that is, the conditions under

---

component (see Tajfel and Turner, 1979; also see Hogg, 1992; Mackie and Goethals, 1987).

[8]The most common measure of correlation is the Pearson correlation coefficient, $r$. A correlation of $r = +1.00$ indicates a perfect positive relationship between two variables, a correlation of $r = -1.00$ indicates a perfect negative relationship (i.e., one variable decreases with an increase in the other variable), and a correlation of $r = 0.00$ indicates the complete absence of a relationship between the two variables. In the behavioral sciences, $r = .10$ is generally considered a "small" correlation, $r = .30$ is considered a "medium" correlation, and $r = .50$ is considered a "large" correlation (Cohen, 1988, pp. 79-80).

- 293 -

which it is stronger or weaker.  For example, the association is strongest for sports teams ($r = .54$, $n = 8$ tests), significantly weaker for military units ($r = .23$, $n = 10$ tests) and other real work groups ($r = .20$, $n = 13$ tests), and weakest for artificial groups ($r = .16$, $n = 12$ tests).  The cohesion-performance relationship was not associated with the degree to which the task required high levels of interaction among members; according to the authors, "this argues against the notion that cohesiveness impacts upon performance by enhancing coordination and 'lubricating' the group as a social system" (p. 28).

Janis (1983, p. 248) suggested that "the duality of cohesiveness may explain some of the inconsistencies in research results on group effectiveness."  This argument is supported by the Mullen and Copper (1993) meta-analysis.  For each correlational study, they coded (with perfect interrater reliability) the proportion of questionnaire items tapping social cohesion ("interpersonal attraction"), task cohesion ("commitment to task"), and group pride.  For experimental studies, four judges each rated the manipulations of cohesion with respect to the three types of cohesion.  Because these three dimensions of cohesion were correlated,[9] Mullen and Copper (1993) computed residual measures of social cohesion, task cohesion, and group pride, partialling out their shared variance.  These analyses indicated that only task cohesion was independently associated with performance; social cohesion and group pride were not correlated with performance after statistically controlling for task cohesion.

Thus, Mullen and Copper's analysis suggests that *it is task cohesion, not social cohesion or group pride, that drives group performance*.  The association of task cohesion with performance is entirely consistent with the results of hundreds of studies in the industrial-organizational psychology literature on the crucial role of goal setting for productivity (see Locke and Latham, 1990).

**Reciprocal Effects.**  Of course, finding a correlation between cohesion and performance need not imply that cohesion *causes*

---

[9]Positively correlated ($r = .49$) for experimental studies; negatively correlated ($r = -.34$) for correlational studies.  Mullen and Copper suggest that the negative correlation might be artifactual.

LCR Appendix Page 0613

- 294 -

performance:  It could simply reflect the causal influence of performance on cohesion (Oliver, 1990a).  In fact, there is considerable evidence that successful performance is a powerful factor in *promoting* group cohesion.  Military training experts have long utilized this phenomenon by providing opportunities for group success experiences during training exercises.  According to Davis (1969, p. 79), "it is often said about real-life groups that there is nothing like success to increase morale or group spirit.  A near universal finding is that cohesiveness generally increases with success."

Using adjusted cross-lagged panel analysis techniques, Mullen and Copper (1993) meta-analyzed data from seven different correlational studies that assessed both cohesion and performance at multiple time periods.  The results suggest that "while cohesiveness may indeed lead the group to perform better, the tendency for the group to experience greater cohesiveness after successful performance may be even stronger" (p. 32).  This conclusion is bolstered by experimental studies that have increased group cohesion by providing groups with success feedback (see Lott and Lott, 1965, pp. 277-278).  Unfortunately, the existing literature does not examine reciprocal effects separately by social vs. task cohesion.

**Deleterious Effects of Cohesion**.  Intuition suggests that people who like each other should be able to work together more effectively than people who do not.  Thus, the lack of an independent effect of social cohesion in experimental studies, and the negative effect of social cohesion among correlational studies, may seem somewhat counterintuitive.  Actually, it has long been recognized that social cohesion has complex and sometimes deleterious effects on various aspects of group performance.  Both military (Driskell, Hogan, and Salas, 1987; Kahan et al., 1985; Manning, 1985; Tziner and Vardi, 1982; Wesbrook, 1980) and non-military (Davis, 1969; Janis, 1983; Lott and Lott, 1965; Stogdill, 1972) research reviews have noted this phenomenon.  For example, in the military context, Adams (1953; also Roby, cited in Mudrack, 1989b) found no association between a measure of group harmony and performance by bomber crews; Tziner and Vardi (1982) found no association between a measure of social cohesion and the performance

- 295 -

effectiveness of Israeli tank crews;[10] and McGrath (1962) found zero to negative correlations between measures of the quality of social relationships and the quality of performance in experimentally composed 3-person ROTC rifle teams.

Janis (1983) argued that under some conditions, high social cohesion actually undermines the effectiveness of group decision-making processes, promoting a state of 'groupthink'. According to Janis, the probability of groupthink is stronger "when high cohesiveness is based primarily on the rewards of being in a pleasant 'clubby' atmosphere or of gaining prestige from being a member of an elite group than when it is based primarily on the opportunity to function competently on work tasks with effective co-workers" (p. 247). A recent meta-analysis of nine studies of groupthink (Mullen et al., in press) supported the prediction that social cohesion promotes groupthink; interestingly, task cohesion appeared to prevent it from occurring.

High social cohesion can also result in excessive socializing that interferes with task performance (see review by Lott and Lott, 1965; Zaccaro and Lowe, 1988). Davis (1969, p. 79) noted that the "pleasure from interaction itself, in cohesive groups, sometimes exceeds the task-specific motivation, and greater energy is devoted to interpersonal relations than to overcoming the task obstacles. Hence performance suffers." According to Steiner (1972, p. 126), "people who flock together because they find one another attractive may or may not be inclined to work hard on a joint task. Perhaps they will be content merely to savor the joys of intimate companionship, or be reluctant to mix business with pleasure. Sociability does not necessarily breed productivity."

To argue that high social cohesion sometimes undermines performance should not be taken to imply that low social cohesion is actually desirable; it isn't. Janis (1983, p. 248) proposes that "for most groups, optimal functioning in decision-making tasks may prove to be at

_____

[10]Tziner and Vardi (1982) did find an interaction of social cohesion and leadership style on performance, such that relations-oriented leadership enhanced performance in low cohesion groups. See discussion of leadership, below.

- 296 -

a *moderate* level of cohesiveness" [emphasis added].  The same principle seems likely to be true for other types of tasks.

Several authors have argued that the relationship between cohesion and productivity is moderated by the goal adopted by the group (Bass, 1981; Berkowitz, 1954; Davis, 1969; Greene, 1989; Mudrack, 1989b; Schachter et al., 1951; Shaw, 1976; Stogdill, 1972).  According to Shaw (1976, p. 205), "the problem often is that groups do not set the same goals for themselves that outside agencies...set for them.  Hence a cohesive group may achieve its own goals, but be relatively unproductive with regard to the goals of the researcher."  Describing one such example, Shaw (1976) noted that "the more cohesive groups set social activity as their goal, and they apparently achieved this goal!"  Davis (1969, p. 79) argued that "... [an] increase in cohesiveness results in an increase in pressures to uniformity.  If uniformity of response can be achieved more easily on a wrong or low-quality response, overall performance will decline while satisfactory interpersonal relations may be preserved."  According to Bion (quoted in Beeber and Schmitt, 1986), "a highly cohesive group will successfully complete whatever goals are inherent to its culture without regard for the desirability of the goals to the superstructure surrounding the group."  Two early cohesion experiments (Berkowitz, 1954; Schachter et al., 1951) demonstrated this process by experimentally varying groups' cohesion levels and performance standards; they found a positive cohesion-performance effect when groups operated under high performance standards, but a negative effect when groups operated under low performance standards.

In the field of organizational behavior, a common example of this phenomenon is *rate-busting*--an agreement among workers, either tacitly or explicitly, to maintain low levels of performance (see Bass, 1981; Janis, 1983; Seashore, 1954; Stogdill, 1972).  In the military context, there are many more serious examples involving drug use, insubordination, or mutiny (Ingraham, 1984; Marlowe, personal communication, April 6, 1993; Savage and Gabriel, 1976; Wesbrook, 1980).  Ingraham (1984) describes the "anti-Army norm" that was prevalent in barracks life during his research in the 1970s.  He suggests that a shared disdain for the organization might have actually bound units

- 297 -

together socially.  High cohesion can even create some problems in elite, high-performance units.  Manning (1985, p. 15) notes that among the "minuses of unit cohesion" in the U.S. Army's Special Forces "A-team" is the fact that "the ability of the teams to operate as independent units leads to strong resentment of attempts at control by higher headquarters as well as other failures to recognize them as special."

**Effects of Cohesion on Psychological Coping**

According to Marlowe (1979, p. 47), "while cohesion and morale do not correlate with technical performance...they do correlate with military performance in the sense of affectively maintaining the organized group at its tasks even in the face of the severe stresses of battle."  Marlowe's conclusion about technical performance was perhaps too pessimistic; as we have seen, task cohesion does indeed appear to promote technical performance, although the effect is modest.  Marlowe's assertion of a cohesion-coping association is echoed by many other military scholars (Henderson, 1985; Marshall, 1947; Shils and Janowitz, 1948), although it is often based on battlefield recollections and anecdotes.[11]

A number of empirical studies (see Griffith, 1989; Manning and Fullerton, 1988; Marlowe, 1979, 1993 testimony before the Senate Armed Services Committee) report a positive correlation between unit cohesion and psychological coping, although the different types of cohesion have not been distinguished.  This correlation has been interpreted as a causal influence of cohesion on coping.  Clinical and social psychologists have hypothesized that supportive social relations provide a "buffer" for those coping with traumatic life events (see Marlowe, 1979), although recent research suggests that such effects might be attributable to aspects of social networks other than social support, per se (Coyne and Downey, 1991; House et al., 1988).  At present, the

---

[11]An anecdote by Kirkland (1987, p. 14) suggests one way in which high cohesion might impair coping; he reports that members of highly cohesive units have asked, "We are so close, if one of us is killed in combat, will the unit fall apart?"

- 298 -

correlation between unit cohesion and coping is open to plausible alternative explanations. Researchers have not established the extent to which the correlation reflects the influence of psychological coping skills on cohesion, or the joint effect on both coping and cohesion of other factors, such as superior logistical support, ideological commitment, or strong unit leadership. One such factor might be stress itself; as we shall see, there is evidence that under some conditions, shared threats promote cohesion. Thus, while it seems quite plausible that cohesion might enhance coping under stress, further research is needed to establish a causal relationship, and to assess which type of cohesion is most relevant.

**Other Determinants of Military Performance**

Whatever the beneficial effects of cohesion, it is important to bear in mind that even task cohesion generally accounts for only a small portion of the total variance in performance. Moreover, there is only limited empirical research on cohesion and military performance under actual combat conditions (see Garvey and DiIulio, 1993; Sarkesian, 1980). Even if the results of combat exercises generalize to actual combat, it is clear that a variety of non-psychological factors are crucial to battlefield performance, and can be decisive: supplies and logistical support, the quality and quantity of information, the weather, geographical constraints, and pure dumb luck (see Sarkesian, 1980). As Moskos (in Henderson, 1985, p. xv) puts it:

> In assessing who wins wars and why, it is easy to overweigh any one factor and neglect others. Broad factors such as objectives and strategies, weapons and materials, technology, numbers of soldiers, and the human element must all be considered in determining who wins and why. ...Single-cause explanations must be avoided: they claim too much for one factor at the expense of others.

Henderson (1985, 1990) and others have spoken eloquently of the crucial role of "the human element" in combat effectiveness, but they clearly recognize that cohesion, while important, is only one aspect of that element. A group's likelihood of success also hinges on the characteristics of its members—their individual ability levels (e.g.,

- 299 -

Henderson, 1990; Kahan et al., 1985; Shaw, 1976; Steiner, 1972) and individual motivation levels (e.g., Kerr, 1983; Kerr and MacCoun, 1984, 1985b; Locke and Latham, 1990; Sheppard, 1993).  And of course, the human element also includes the cohesion, abilities, and motivation of the opponent (Henderson, 1985).

An example of the importance of individual motivation is provided by a recent Army Research Institute study of 22 platoons in two light infantry battalions undergoing training at the Joint Readiness Training Center (JRTC) at Fort Chaffee, Arizona (*ARI Newsletter*, June 1992, Vol. 9, pp. 1-4).  Prior to training, the soldiers completed a detailed questionnaire that assessed group factors, including platoon cohesion and pride in the platoon, but also a number of individual factors, including motivation to do well at JRTC, job satisfaction, job motivation, and bonding with leaders.  The strongest predictors of JRTC performance, which was assessed by trained observers, were the quality of leadership and three individual-level factors:  JRTC motivation, job motivation, and job satisfaction.

## WHAT FACTORS INFLUENCE SOCIAL AND TASK COHESION?

Before introducing the issue of homosexuality, it is useful to summarize what is and is not known about the antecedents of cohesion. There is a sizeable research literature on the factors that promote cohesion (see reviews by Berscheid, 1985; Hogg, 1992; Lott and Lott, 1965; Summers et al., 1988).  Unfortunately, many of the studies focus exclusively on social cohesion, or else fail to distinguish social from task cohesion, so the antecedents of social cohesion are somewhat better understood than those of task cohesion.

### Propinquity and Group Membership

Based on his ethnographic research on Army barracks life, Ingraham (1984, p. 58) argued that "by far the most potent determinant of social choice [of friends] was the company of assignment."  This conclusion is amply supported by the research literature on social relationships.  The role of *propinquity*--the simple fact of spatial and temporal proximity-- in forming relationships seems so obvious that it is easy to overlook. In the electronic age, being in the same place at the same time may no

- 300 -

longer be a necessary condition for a relationship to evolve, but it greatly enhances that probability (Berscheid, 1985; Lott and Lott, 1965). Despite the adage that "familiarity breeds contempt," controlled experiments indicate that, everything else being equal, *mere exposure* to a person or an object increases liking for that object upon subsequent contact (Zajonc, 1968; Berscheid, 1985). Of course, in social encounters, everything else is rarely equal, particularly when the person in question has disliked attributes. This point will be discussed in more detail later in the chapter.

Moreover, there is a pervasive tendency to evaluate and treat one's own group members more favorably than members of other groups, which social scientists call *the ingroup bias.* Many different explanations for this bias have been offered, invoking historical, economic, political, and even biological factors (see Austen and Worchel, 1979). However, even in the absence of these factors, research indicates that *mere group membership*--e.g., randomly assigning individuals to ad-hoc groups--is sufficient to create an ingroup bias (see Brewer, 1979; Gaertner et al., 1993; Tajfel and Turner, 1979; Wilder, 1986).

Thus, the simple fact that individuals are assigned to a unit together predisposes them to social cohesion, although not necessarily to task cohesion. The military has long recognized the effect of salient group membership on bonding among members:

> Symbols that indicate common membership in an organization reinforce shared experiences. Shoulder patches, unit colors, campaign streamers, review ceremonies, and even informal symbols such as scarves serve this important function and should be supported as long as they are used in an appropriate manner. (*Leadership and Command at Senior Levels*, Department of the Army, 1987, p. 64)

Whether members sustain a sense of cohesion will depend on what happens to them during their time together, as discussed below.

**Turnover and Turbulence**

In the 1970s, the Army grew increasingly concerned that its individual replacement system created too much "turbulence" in combat units, undermining their cohesion (see Henderson, 1985, 1990; Manning,

- 301 -

in Ingraham, 1984; Scull, 1990). In essence, the argument was that unit cohesion was continually disrupted when individuals joined or left the unit in a constant, haphazard fashion. As a response, in 1981 the Army adopted a new Unit Manning System; its key component was called COHORT (Cohesion, Operational Readiness, and Training). In COHORT divisions, first-term soldiers were trained together as a group, and then assigned as a group to infantry, armor, and artillery companies; they were kept together for three-year cycles. Although COHORT stabilized first-termer turbulence, it did not stabilize NCO or officer turbulence, so units often saw several changes in leadership during a 3-year cycle.

Although the COHORT intervention was thought to hold great promise, by 1990 it had largely been abandoned as a failure. There are a number of published analyses of the COHORT experience (Griffith, 1989; Henderson, 1990; Kirkland et al., 1987; Scull, 1990). While there is some evidence that unit-replacement units were indeed more cohesive than individual-replacement units (Griffith, 1989), WRAIR field evaluations conducted in 1985 and 1986 documented a significant drop in both horizontal and vertical cohesion for some COHORT units relative to non-COHORT units (see Henderson, 1990; Scull, 1990).[12] However, COHORT's unit-replacement system was implemented in tandem with the creation of a new light infantry concept for the 7th Infantry Division, which became a rapid deployment force expected to achieve high combat effectiveness standards with minimal support in terms of equipment and personnel. The decline in vertical and horizontal cohesion in COHORT units was much steeper for light infantry units than for other COHORT units (Henderson, 1990; Scull, 1990). Thus, some of the problems attributed to COHORT may be at least in part attributable to the light infantry program. However, the effect of turbulence on performance in non-COHORT military units may be somewhat weaker than was originally believed (see Dropp, 1989; Eaton and Neff, 1978; Kahan et al., 1985). If so, the expectations for COHORT might have been unrealistically high.

_____

[12]Recall that vertical cohesion refers to the bonding between leaders and their subordinates.

- 302 -

Some believe that COHORT was poorly implemented, plagued by serious leadership problems, and a unit replacement process that proved difficult to administrate.  According to Henderson (1990):

> A concluding one-sentence summation of the preceding eight chapters could read "The mediocre to average unit performance and the discouragingly low numbers of combat troops that characterize today's Army are a direct result of deeply rooted organizational inefficiencies that are apparent in the Army's manpower, personnel, and training (MPT) organization and policies." (p. 145)

Scull (1990) concludes that:

> The idea that stability is the single most important factor in creating a well-bonded unit is suspect.  In light of the above discussion, the traditional view persists that cohesion among soldiers remains primarily the by-product of good leadership combined with important, fulfilling work.

**Leadership**

As seen in Scull's (1990) quote, military analysts have identified the quality of leadership as a key factor in determining whether units are cohesive (e.g., Henderson, 1985, 1990; Kirkland et al., 1987; Manning and Ingraham, 1983; Siebold and Kelly, 1988a, 1988b).  This hypothesis is supported by research in non-military organizations as well (e.g., Bass, 1981; Hollander, 1985; Locke and Latham, 1990).  Researchers have identified two key dimensions of leadership (see Bass, 1981; Hollander, 1985):  *Relations-oriented* leadership involves active attempts to provide a warm, supportive, caring environment for workers; *task-oriented* leadership emphasizes the importance of goal achievement and the steps needed to accomplish it.  These styles are not mutually exclusive, and good leaders can exhibit either style depending on the circumstances.  Both styles of leadership have been shown to promote group cohesion in military and other settings (see Bass, 1981, pp. 379, 433).  One might expect relations-oriented leadership to promote social cohesion, and task-oriented leadership to promote task cohesion, but unfortunately, most studies of the leadership-cohesion relationship have

- 303 -

not distinguished the two forms of cohesion, so this hypothesis has not been tested systematically.  There is some evidence that leadership styles moderate the effects of cohesion on performance, such that highly relations-oriented leadership promotes high performance in low cohesion groups (Schriesheim, 1980; Tziner and Vardi, 1982; but see Yoest and Tremble, 1985).

**Group Size**

Group cohesion is inversely related to group size (see reviews by Hogg, 1992; Mullen and Copper, 1993; Siebold and Kelly, 1988a; Steiner, 1972).  According to Marlowe, "only 40 to 50 people are in a soldier's universe," roughly his or her platoon, and perhaps a few others from the same company (personal communication, April 6, 1993).  Thus, "only teams, squads, platoons, and companies possess cohesion" (Marlowe, 1979, p. 50).  Siebold and Kelly (1988a) suggested that the platoon is the optimal size for measuring cohesion.  Savage and Gabriel (1976, p. 364) argue that "in conflict, the unit of cohesion tends to be the squad."[13]

The fact that cohesion declines with group size suggests that larger groups should have weaker cohesion-performance correlations. Mullen and Copper (1993) report that the relationship between cohesion and performance grows weaker as a group's size increases, although the effect was only statistically significant in correlational studies, which have examined a larger range of group sizes.

**Success Experiences**

In addition to the importance of leadership, what happens to groups during their time together obviously matters a great deal.  As reviewed above, there is considerable evidence that successful performance experiences promote cohesion; indeed, the effect of performance on cohesion appears to be stronger than the effect of cohesion on performance (e.g., Bakeman and Helmreich, 1975; Mullen and Copper, 1993;

------

[13]Unit sizes and labels vary within and across the military services.  In the U.S. Army, companies vary from 50 to 200 members, platoons range from 15 to 40 members, squads generally have about 10 members, and teams and crews can range from 4 to 9 members.  The exact size of a unit will depend on its function (armored, mechanized, airborne, etc.) and whether it is fully manned.

- 304 -

Williams and Hacker, 1982).[14]  There is direct evidence that success can promote social cohesion (see Lott and Lott, 1965), but there is little direct evidence regarding the effect of performance on task cohesion. Given that the cohesion-performance correlation is largely attributable to task cohesion, it seems likely that success also promotes task cohesion.  Success experiences reward the group for teamwork and the coordination of effort.

**Shared Threat**

Dating back at least to the turn of the century (Sumner, 1906), many have hypothesized that *external threat* promotes group cohesion. Henderson (1990, p. 124) is skeptical of this notion:  "It is a great American myth that cohesion will occur the moment we go into battle." But many studies suggest that indeed, external threats can enhance cohesion, although the effect is by no means universal (see Dion, 1979; Hogg, 1992; Schachter, 1959; Sherif et al., 1961; Stein, 1976).

Figure 10-1 is an attempt to make sense of the conflicting findings regarding threat and cohesion, adapted from a discussion by Stein (1976) with some modifications.  The figure depicts a series of moderating conditions that determine what effect threat will have on cohesion.  If individuals anticipate a threat, their response will depend on a number of conditions.  First, are the individuals *mutually threatened*?  If not, there will be no enhancement of cohesion.  If individuals are mutally threatened, their response will depend on whether they perceive *the possibility of a collective response* that will eliminate the danger. Given a shared threat and an interdependent task with a feasible solution, research demonstrates that both social and task cohesion will be enhanced (see Johnson et al., 1981; Johnson, Johnson, and Maruyama, 1984; Miller and Davidson-Podgorny, 1987; Sherif et al., 1961; Slavin, 1985; Stephan, 1985).  However, psychological research demonstrates that

---

[14]Under special conditions, groups actually become more cohesive after a failure experience (Davis, 1969; Lott and Lott, 1965; Turner et al., 1984).  This only appears to occur when the failure signals an external threat (see below), or when the blame for the failure is shared equally, resulting in cognitive dissonance reduction (Festinger et al., 1956).

- 305 -

anxiety promotes affiliation or social cohesion even when no collective instrumental response is available--a "misery loves company" effect (Schachter, 1959; Berscheid, 1985). But this affiliative effect seems unlikely when threat or scarcity encourages intragroup competition or a conflict between personal and group interests (Hamblin, cited in Stein, 1976).



Figure 10-1—Effects of External Threats on Social and Task Cohesion

Stein argues that threat will promote cohesion only where some cohesion (task or social) already exists--in pre-existing groups. But while the pre-existence of a group undoubtedly enhances the promotion of cohesion, Stein's own review and other sources (e.g., Miller and Brewer, 1984; Miller and Davidson-Podgorny, 1987; Stephan, 1985; Tajfel and Turner, 1979; Wesbrook, 1980) indicate that it is not a necessary condition, everything else being equal, it appears that strangers can develop social and task cohesion amidst conflict when the conditions in Figure 10-1 are met. Moreover, Sherif's classic studies (Sherif et al., 1961) demonstrated that in the face of a superordinate threat and goal, even hostile groups can merge together to form a cohesive whole.

- 306 -

This social cohesion may sometimes be temporary. Moskos (quoted in Marlowe, 1979; cf. Williams, 1989) has suggested that earlier scholars failed to appreciate the extent to which the bonding in combat situations is "instrumental and self-serving," a temporary and situational adaptation to danger. He writes that "in most cases, nothing more is heard from a soldier after he leaves the unit. Once a soldier's personal situation undergoes a dramatic change--going home--he makes little or no effort to keep in contact with his old squad. Perhaps even more revealing, those still in the combat area seldom attempt to initiate mail contact with a former squad member. The rupture of communication is mutual despite protestations of lifelong friendship during the shared combat period." Thus much of what appears to be social cohesion on the battlefield may have more to do with task cohesion and/or tacit psychological contracts--I'll cover you if you'll cover me--than with the instrinsic likeability of one's comrades. This point will be addressed in more detail later in the chapter.

**Similarity/Homogeneity**

The conventional wisdom tells us that "birds of a feather flock together," but also that "opposites attract." Which is more accurate? The evidence clearly supports the former over the latter; there is well-established positive association between interpersonal liking and similarity with respect to attitudes, interests, and values (Lott and Lott, 1965; Berscheid, 1985). A meta-analysis of 17 studies comprising 25 separate estimates (Anthony et al., 1993) yielded an average similarity-cohesion correlation of .24. However, the effect appears to be significantly weaker in enduring groups--e.g., military units, sports teams, work groups--than in temporary, artificially-created laboratory groups. The size of the similarity-cohesion correlation decreases with group size, and with the percentage of males to females in the group. The similarity-cohesion effect is largely due to social cohesion in artificial groups, but similarity was actually inversely related to social cohesion--albeit weakly--in the studies of real groups in the Alexander et al. analysis, for reasons that are not clear. In an important observation, Alexander et al. report that similarity of

- 307 -

attitudes and values appears unrelated to task cohesion in either type of group.[15]

Thus, similarity does not appear to influence task cohesion, the type of cohesion that influences group performance. This is consistent with the research on the effects of group homogeneity on productivity (Kahan et al., 1985; Steiner, 1972; Shaw, 1976). On one hand, heterogeneity can breed social tension, and due to its effects on social cohesion, homogeneity "sometimes has adverse effects on task motivation, particularly when work activities are extended over long periods of time" (Steiner, 1972, p. 127). On the other hand, heterogeneity can enhance the quality of group problem-solving and decision-making (Hoffman and Maier, 1967; Janis, 1983), and it broadens the group's collective array of skills and knowledge. Because of these conflicting tendencies, heterogeneity has no net effect on performance.

## HOW WOULD ALLOWING ACKNOWLEDGED HOMOSEXUALS TO SERVE AFFECT COHESION AND PERFORMANCE?

As we have documented in the chapter on military opinion, negative attitudes toward homosexuality and homosexuals are quite prevalent among current military personnel, particularly among males. This understandably raises concerns about how the presence of acknowledged homosexuals would affect unit cohesion and performance. However, it should be reiterated that *no systematic empirical research has been conducted on the effect of acknowledged homosexuals on unit cohesion or unit performance.* Thus, the analysis in this section is necessarily speculative. Five questions are addressed:

- Will many units have acknowledged homosexuals as members?
- How might the presence of an acknowledged homosexual influence task and social cohesion?
- Will contact with acknowledged homosexuals influence attitudes toward homosexuality?

---

[15]Of course, task cohesion is directly determined by similarity of a different sort: sharing a commitment to the group's goals and objectives.

LCR Appendix Page 0627

- 308 -

- Will negative attitudes toward homosexuality be expressed behaviorally?
- Will heterosexuals obey an acknowledged homosexual leader?

**Will Many Units Have Acknowledged Homosexuals as Members?**

In evaluating concerns about unit cohesion, it would be useful to know what percentage of units of a given size will actually have an acknowledged homosexual. This question cannot be answered with scientific precision. Relevant data are scarce and there are many unknowns. For example, the prevalence of homosexuality in the population at large is still very much in dispute. There is little reliable information on whether the prevalence of homosexuality in the military differs appreciably--in either direction--from the population at large.

The scientific literature on prevalence estimation for homosexuality in the general population is reviewed in "Sexual Orientation, Sexual Behavior, and the Epidemiology of Sexually Transmitted Diseases" (to be published). Suffice it to say here that almost all experts agree that the prevalence of homosexual behavior in the adult population falls somewhere in the 1 percent to 10 percent range (Rogers and Turner, 1991). However, it appears that many of those who engage in homosexual behavior also engage in heterosexual behavior, and may not consider themselves to be homosexual; if so, the prevalence of individuals with a homosexual self-identity--whether overt or covert--is probably nearer to the low end than the high end of that range. Little is known about the prevalence of homosexual self-identity among military personnel (see Harry, 1984).

How might ending discrimination based on sexual orientation affect the prevalence of homosexuality in the military? It is conceivable that this prevalence might increase somewhat, but it seems implausible that it would significantly exceed the prevalence of homosexuality in the general population, particularly given the current level of hostility

- 309 -

toward homosexuality expressed by many military personnel.[16]  Thus, the prevalence of a homosexual orientation among U.S. military personnel seems likely to fall somewhere in the 1 percent to 5 percent range. Homosexuals are and will probably remain a much smaller statistical minority than most ethnic and racial minorities in the military.

However, as noted in the chapter opening, many of the concerns raised in the policy debate involve not the prevalence of homosexuality in the U.S. military, but *the prevalence of individuals who openly acknowledge a homosexual orientation*.  In reality, the "openness" of one's sexual orientation is not a dichotomous variable but a continuous variable.  Thus, some homosexuals might be open only to close friends. Such situations are less germane to the concerns raised by supporters of the ban.  For them, an operational definition of "openness" would seem to be "acknowledged by the individual, known by a majority of the individual's colleagues and by supervisors."

Given this definition, it is useful to examine the experiences of domestic paramilitary institutions that have adopted non-discrimination policies, reviewed in the chapter on U.S. police and fire departments. As stated in that chapter, these institutions differ from the military in many ways, and are by no means completely analogous.  As seen in Table 10-1, the institutions we visited report that between 0 percent and 0.51 percent of their total membership consist of acknowledged homosexuals, with a mean prevalence of 0.12 percent, a median prevalence of 0.03 percent, and an upper quartile of 0.19 percent.[17]  Thus, the experiences of these institutions suggest that *acknowledged homosexuals are likely to be quite rare in the military*, at least in the foreseeable future.  This has several implications.  First, recall that group

---

[16]This is an aggregate statement; even if lesbians are overrepresented (Harry, 1984), males constitute about 90 percent of the active forces.

[17]With the exception of the Houston Police Department and the Los Angeles Fire Department, these statistics were obtained in interviews with representatives of the institutions and were verified when possible by homosexual members of the institutions (some of whom were unacknowledged).  The numbers were sufficiently small that respondents could often list the individuals by name.

LCR Appendix Page 0629

- 310 -

Table 10-1

Estimated Prevalence of Acknowledged Homosexuals in Domestic
Paramilitary Institutions Visited by RAND

| Institution | Location | Year Policy Changed | Total Force Size | Number of Acknowledged Homosexuals | Prevalence of Acknowledged Homosexuals |
|---|---|---|---|---|---|
| Police | Chicago | 1988 | 12,209 | 7 | 0.06% |
| | Houston[a] | N/A | 4,100 | 0 | 0.00% |
| | Los Angeles | 1979 | 7,700 | 7 | 0.09% |
| | New York[b,c] | 1979 | 28,000 | approx. 100 | 0.36% |
| | San Diego[c] | 1990 | 1,300 | 4 or 5 | 0.25% |
| | Seattle[d] | 1980 | 1,300 | 0 | 0.00% |
| Fire | Chicago | 1988 | 4,700 | 0 | 0.00% |
| | Houston[a] | N/A | 2,900 | 0 | 0.00% |
| | Los Angeles | 1979 | 3,136 | 0 | 0.00% |
| | New York | 1979 | 11,300 | 0 | 0.00% |
| | San Diego[e] | 1990 | 845 | 1 | 0.12% |
| | Seattle[e] | 1980 | 975 | 5 | 0.51% |
| Mean | | | | | 0.12% |
| Median | | | | | 0.03% |

[a]See the chapter on racial integration for the history of relevant policies in Houston.

[b]Acknowledged homosexual officers are actively recruited for community policing in heavily homosexual neighborhoods.

[c]We were unable to get a precise count of acknowledged homosexuals.

[d]We were told there was an acknowledged homosexual in the Seattle Police Department, but after our visit, the *Seattle Times* reported his resignation ("Gay Officer Quits, Cites Harassment," Kate Shatzkin, May 30, 1993, p. A1).

[e]The only acknowledged homosexual firefighters in the cities we visited were lesbians.

cohesion is mostly relevant at the level of platoons (16-40 members) and smaller units, like five-person teams or crews. It appears that relatively few of these units will actually have one or more acknowledged homosexuals, and units with two or more acknowledged homosexuals will be quite rare, at least in the foreseeable future.[18]

---

[18]For example, if the prevalence of open homosexuals in the military were to match the mean prevalence in the domestic institutions we studied, then given random distribution across units, fewer than 5 percent of 40-person platoons and fewer than 1 percent of 5-person crews and teams would be expected to have an open homosexual; just a small fraction of a percent of platoons would have two or more open homosexuals. If homosexuals are clustered rather than randomly

LCR Appendix Page 0630

- 311 -

This will limit the aggregate effects on unit cohesion, although the potential impact on any given unit must be taken seriously.  A second implication is that acknowledged homosexuals may be somewhat isolated, creating a potential for ostracism.  A third implication is that most heterosexuals in the military will have relatively little contact with acknowledged homosexuals.  These implications are addressed in more detail in subsequent sections.

Why have paramilitary institutions encountered so few acknowledged homosexuals among their ranks, despite the adoption of explicit non-discrimination policies?  As in the military, many individuals in these organizations hold negative attitudes toward homosexuality.  "Coming out," even in an officially non-discriminatory atmosphere, is a risky choice; homosexuals can face hostility from some colleagues, unequal treatment from some supervisors, and even the possibility of physical violence.[19]  In the military focus groups discussed in the chapter on military opinion, both homosexual and heterosexual military personnel predicted that few homosexuals would come out; two comments from heterosexuals were:

> Those that are gay and have served have accepted [military] values.  They know that if they come out it would cause problems.

> It's not going to be a mass of people coming out of the closet.  It's not going to happen.

There was also general agreement on this point at the Senate Armed Services Committee Hearings (March 31, 1993).

It would appear that homosexuals are generally unwilling to acknowledge their sexual orientation unless the local climate appears to be tolerant.  As an environment becomes more tolerant, homosexuals may become more willing to disclose their orientation, but that same level

---

distributed, for any given aggregate prevalence rate, even fewer units will have an open homosexual.

[19]One might argue that a homosexual individual is more likely to come out in an environment where there is already an open homosexual individual.  However, this possibility is constrained by the facts that (1) the prevalence of homosexuals is already low, and (2) the high frequency of turnover and transfers mean that homosexuals cannot count on locally favorable conditions to last.

- 312 -

of tolerance suggests that their openness will pose less of a threat to
the quality of working relationships.

**How Might the Presence of Acknowledged Homosexuals Influence Cohesion?**

Although there is no direct scientific evidence about the effects
of acknowledged homosexuals on unit cohesion the established principles
of cohesion suggest that if there is an effect, it is most likely to
involve social cohesion rather than task cohesion. As explained above,
similarity of social attitudes and beliefs is not associated with task
cohesion, although it is sometimes associated with social cohesion.
Task cohesion involves similarity, but of a different sort; it is found
when individuals share a commitment to the group's purpose and
objectives. There seems little reason to expect acknowledged
homosexuality to influence this commitment, at least not directly. The
values of homosexuals in the military have not been systematically
compared to those of heterosexual personnel. However, historical
anecdotes and RAND's interviews suggest that homosexuals who serve in
the military are committed to the military's core values, which
Henderson (1990, p. 108) lists as "fighting skill, professional
teamwork, physical stamina, self-discipline, duty (selfless service),
and loyalty to unit." This notion was accepted by most witnesses
during the recent Senate hearings, and it seems likely, since
homosexuals in the military are a self-selected group who enter despite
numerous obstacles and personal and professional risks.

Thus, if the presence of acknowledged homosexuals has an effect, it
is most likely to be on *social* cohesion. Recall that social cohesion
involves the emotional bonds of friendship, liking, caring, and
closeness among group members. As documented in the chapter on military
opinion, many military members express negative attitudes toward
homosexuality, and it is likely that many will continue to do so, at
least in the immediate future. Thus, if a unit had one or more
acknowledged homosexuals, and one or more heterosexuals who disliked
homosexuality, a reduction in social cohesion would be likely.

As we have seen, it is task cohesion rather than social cohesion
that has a direct influence on performance. This suggests that it is

- 313 -

not always necessary for co-workers to like each other, or desire to socialize together, to perform effectively as a team; indeed Steiner (1972) notes that "...it is apparent that people sometimes prefer to work with nonfriends" (p. 127). According to Steiner (1972, p. 161):

> Work groups sometimes persist in the face of adversity even though members have little affection for one another, and industrial psychologists often obtain low or even zero correlations between inter-member esteem and measures of the success with which groups cope with their environments.

There are many examples of this phenomenon in the sports literature; notorious examples include the 1973-1975 Oakland A's and the 1977-1978 New York Yankees. Aronson (1976, p. 193) describes how black and white coal miners in West Virginia "developed a pattern of living that consisted of total and complete integration while they were under the ground, and total and complete segregation while they were above the ground." Many military observers (e.g., Ingraham, 1984) have noted a similar tendency of black and white soldiers to socialize separately, despite working together effectively. In one of our focus groups, we were told:

> It's all about respect. When you develop a team, they develop a respect that transcends race. Team members look beyond race. Utopia is team work. Once you get out of that, it breaks down back at the garrison when they're not at work.

However, there may be conditions under which a reduction in social cohesion brings about a reduction in task cohesion. There appear to be few invariants in the research literature on small group performance; factors that have one effect under certain task conditions can have a very different effect under others (McGrath, 1984). For certain types of tasks, some minimal level of social cohesion might be necessary for the group to accomplish its task (Driskell et al., 1987; Janis, 1983; Zaccaro and McCoy, 1988). One might expect this to be less of a concern in *additive* tasks--where the group's performance is the sum of individual performances, and more of a concern in *disjunctive* and *conjunctive* tasks--where the group's performance is determined by the

- 314 -

most able member or the "weakest link," respectively (Kerr, 1983; Kerr and MacCoun, 1985b; Steiner, 1972; Zaccaro and Lowe, 1988; Zaccaro and McCoy, 1988).  However, Mullen and Copper's (1993) meta-analysis did not support this prediction; they found no differences in the strength of the cohesion-performance effect for tasks with high vs. low interactive requirements.  But one can imagine circumstances in which a group has so little social cohesion that task performance becomes impossible, with potentially disastrous consequences for the group.

Thus, much may depend on how social cohesion is affected.  Figure 10-2 presents four qualitative types of social cohesion in a five-person crew or team, where individual *E* has revealed his or her homosexual orientation.  Social cohesion involves the pairwise bonds among these individuals.[20]  Strictly speaking, there should be two directional bonds for each pair of individuals, but the figure depicts only one, for simplicity.  Similarly, in reality, these bonds vary continuously in strength, but Figure 10-2 treats them dichotomously for simplicity.  It assumes that if either individual rejects the other, the pairwise bond is broken; this is a pessimistic assumption that provides an upper bound on the loss of cohesion.  Under these assumptions, Figure 10-2a depicts a group in which social cohesion has not been disrupted.  Figure 10-2b depicts the "complete breakdown" of social cohesion--a state of anarchy.  A less extreme version would depict a significant weakening in each bond.  In either case, this would imply that *E's* acknowledgment of homosexuality would actually affect the bonds of friendship among *heterosexuals* in the unit; e.g., *A* would like *C* less because *E* is a homosexual.  Again, we have no direct evidence, but this scenario seems unlikely in most instances.

Figure 10-2c seems somewhat more plausible.  In this scenario, the crew is split into factions; members *A*, *B*, and *C* are hostile to the homosexual, while *D* befriends the homosexual.[21]  This is conceivable,

_____

[20]Task cohesion and group pride would be depicted differently, with group members bonded to each other indirectly through a common node depicting "group goals" or "group identity," respectively.

[21]This is the situation discussed by General H. Norman Schwarzkopf during his testimoney before the Senate Armed Services Committee on May, 11, 1993. General Schwarzkopf noted that, "the introduction of an open

- 315 -



Figure 10-2—Alternate Models of Cohesion in Five-Person Unit
Note:  Node E depicts an acknowledged homosexual; links depict positive bonds between individuals.

but only if *D* is willing to sacrifice his relationships with the others in the process.  *D* may be more likely to weaken his bonds with everyone rather than take sides with *E* alone.  Of course, *D* may also be a homosexual; statistically this will be quite rare in five-person crews, but it may happen.

homosexual into a small unit immediately polarizes that unit and destroys the very bond that is so important for the unit's survival in time of war.  For what ever reason, the organization is divided into a majority who oppose, a small minority who approve, and other groups who either do not care or just wish the problem would go away."

- 316 -

If there is any breakdown in social cohesion, Figure 10-2d would
appear to be more likely than 2b or 2c. This is the case of complete or
partial ostracism.[22] Social psychological research (Levine, 1989;
Schachter, 1951) indicates that opinion deviates in small groups
initially receive intense attention as the group attempts to pressure
the individual to conform to the group. That research may not be
directly applicable; it involved individuals expressing views directly
in opposition to the majority view on a group-judgment task, whereas
homosexuals deviate from the majority's sexual orientation rather than
the group's views regarding task accomplishment. Nevertheless, the
individual's sexual orientation may create fears of "stigma by
association"--a concern that the group's reputation will be tarnished
(Mackie and Goethals, 1987; Sigelman et al., 1991). Thus, the group is
likely to put intense pressure on the homosexual individual to conform
to other group norms--conduct, appearance, performance, values,
opinions, and attitudes.[23] Statistically small minorities--in
particular, lone minorities--have disproportionately little ability to
resist social influence (e.g., Kerr and MacCoun, 1985a; Latané and Wolf,
1981; Mullen, 1983; Tanford and Penrod, 1984). When the relevant unit
shifts from the five-person crew to the 40-person platoon or 200-plus
company, the majority pressures may be even greater.[24]

If the group fails, they may react by partially or completely
ostracizing the individual. Because ostracism provides the others with
a common enemy, the strengths of the bonds among the heterosexuals might

_____

[22]David Marlowe also predicted that ostracism was the most likely
scenario during his conversation with us on April 6, 1993. Similarly,
in our discussions with the Head of the Department of Mental Health of
the Israel Defense Forces (May 4, 1993) this point was also noted:
"Homosexuals can become scapegoats if their manifestations of homosexual
behavior cause them to be rejected or ostracized from the group. This
is not just because of homosexuality, but for any social adjustment
problem or personality problem which do not allow him to adapt to the
group. ... (However), if there were no disfunctionality in the unit, he
(the homosexual) would not currently be removed from the unit."

[23]As discussed earlier, these same conformity pressures are likely
to keep most homosexuals "in the closet," at least within the group.

[24]However, majority influence will reach an asymptote due to
diminishing marginal social influence, and possibly, social or physical
distance (Latané and Wolf, 1981; Tanford and Penrod, 1984).

- 317 -

actually increase; in a large enough group, the result might be a net increase in social cohesion for the group as a whole.[25]  That is not to suggest that ostracism is in any way an acceptable state of affairs. Ostracism has a cruel and potentially dangerous effect on the ostracized individual, and it can seriously hinder the unit's performance if ostracism is maintained at the expense of the unit's mission.  Thus, ostracism cannot be tolerated.  When cases do occur--as sometimes happens today for reasons other than sexual orientation--the military actively intervenes through informal conflict resolution, or if necessary, reassignment or disciplinary action.

The likelihood of complete ostracism will depend on what actually happens during contact between heterosexuals and acknowledged homosexuals.  The effect on performance will depend on whether the individuals refuse to cooperate with each other to accomplish the group's mission.  These issues are addressed in the next two sections.

**Will Contact with Acknowledged Homosexuals Influence Attitudes?**

As discussed earlier, everything else being equal, the mere fact of propinquity and group membership predisposes members to social cohesion. However, everything else is not equal if one member is an acknowledged homosexual and the others have hostile attitudes toward homosexuality. This creates the possibility of divisiveness in the group--an "Us vs. Them" phenomenon.

Research on social categorization processes (e.g., Brewer, 1979; Gaertner et al., 1993; Messick and Mackie, 1989; Ostrom and Sedikides, 1992; Tajfel and Turner, 1979; Wilder, 1986) suggests that whenever there are salient boundaries between social groups, three effects generally occur.  First, there is the *ingroup bias* described above: people evaluate their *own* group members more favorably, simply because they are ingroup members.  Second, there is a *between-group contrast effect*, such that individuals exaggerate the extent to which members of the ingroup differ from members of the outgroup.  Third, there is an

---

[25]This underscores the point made in footnote 4 that averaging across individual ratings of other members can obscure important qualitative differences in patterns of cohesion.

- 318 -

*outgroup homogeneity effect,* such that individuals exaggerate the extent
to which members of the outgroup "are all alike."

The ingroup bias effect is a pro-ingroup effect, but not
necessarily an anti-outgroup effect (Brewer, 1979); in other words, it
reflects special favorability toward fellow ingroup members, not special
hostility toward the outgroup.  Thus, the mere fact that group
boundaries exist appears to be necessary, but not sufficient, for
hostility toward outgroups (Struch and Schwartz, 1989).  Other factors
account for the level of hostility in attitudes toward homosexuality.
As reviewed in the chapter on public opinion, and elsewhere (e.g.,
Britton, 1990; Herek, 1991, 1992), attitudes toward homosexuality are
complex.  They can have several different origins, including one's
socialization, religious beliefs, conformity to a peer group, and media
influences.  And they can serve several different psychological
functions:  the evaluative function of summarizing one's experiences and
expectations, the conformist function of emphasizing one's unity with
other heterosexuals, the value-expressive function of broadcasting one's
own values or identity, or the defensive function of reducing anxiety
about one's own sexuality.

The salience of group boundaries is very fluid.  Each of us belongs
to many different social categories--our gender, our race, our age
group, our nationality and region, our religion, our profession, our
political party, and so on.  Psychologists have demonstrated at least
three ways to disrupt the potentially divisive influence of salient
intergroup boundaries (see Fiske and Neuberg, 1990; Gaertner et al.,
1989, 1990, 1993; Hewstone, Islam, and Judd, 1993; Miller and Brewer,
1984; Wilder, 1986).  The first approach is *decategorization:*  break
down the ingroup-outgroup boundary by emphasizing the many features that
differentiate members of the same groups; e.g., the fact that all
homosexuals are not alike.  The second approach is *cross-categorization:*
emphasize the many ways in which individuals who differ on one
dimension--e.g., sexual orientation--share memberships on other
dimensions--e.g., you and I like sports but he doesn't, but he and I
like rock music and you don't.  The third approach is *recategorization:*

- 319 -

emphasize a common superordinate identity that unites all the individuals--e.g., we are all Rangers.

Decategorization can be effective because between-group contrast and outgroup homogeneity are generally sustained by a lack of information about the diversity of characteristics in the outgroup (Fiske and Neuberg, 1990; Miller and Brewer, 1984; Stephan, 1985). In the case of homosexuality, this is enhanced by stereotyped media portrayals that give the impression that all homosexuals are flamboyant, effeminate, promiscuous, or abrasive. Thus, actual contact with homosexuals--or any outgroup--holds the potential for weakening stereotypes and thereby reducing intergroup hostilities.

Does contact with homosexuals enhance the favorability of attitudes toward homosexuality? Sometimes, but not always. There is fairly limited research on this question. There is evidence (see the chapters on public and military opinion; Whitley, 1990) that those who know homosexuals have less negative attitudes towards homosexuals. This may be an indication that positive interactions with homosexuals break down stereotypes. But it also seems likely that homosexuals are more likely to acknowledge their sexual orientation to those with more favorable attitudes.

Research on the effects of intergroup contact indicates that mere contact, per se, is often insufficient to improve intergroup relations. According to Allport (1954, p. 281):

> Prejudice...may be reduced by equal status contact between majority and minority groups in the pursuit of common goals. The effect is greatly enhanced if this contact is sanctioned by institutional supports...and if it is of a sort that leads to the perception of common interests and common humanity between members of the two groups.

There is now a large body of research supporting Allport's analysis of the conditions under which intergroup contact brings about a reduction in hostilities (e.g., Miller and Brewer, 1984; Stephan, 1985, 1987). For example, there is considerable evidence that cooperative learning interventions can bring about a reduction in interracial hostilities; these interventions assign students to mixed-racial or

- 320 -

ethnic groups that must pursue common goals which can only be achieved through cooperative efforts (Johnson and Johnson, 1989; Miller and Davidson-Podgorny, 1987; Slavin, 1985).

Some of the conditions that promote harmonious intergroup contact may be difficult to achieve.  Research indicates that contact is more likely to be effective when interaction takes place among a mix of equal numbers of members of each social group (e.g., Miller and Davidson-Podgorney, 1987).  In initial encounters with members of an outgroup, our tendency is to assimilate them into our stereotype unless their behavior is greatly discrepant from our expectations (see Fiske and Neuberg, 1990).  It generally takes extensive exposure to a diversity of members of the outgroup before assimilation becomes impossible and our stereotypes begin to break down (see Jones et al., 1984, pp. 315-318).  But the very low prevalence of acknowledged homosexuality will limit this possibility.  Because open homosexuals will be relatively rare, it may be difficult for many heterosexuals to achieve a "critical mass" of intergroup contact.  Moreover, minority solo status in a group tends to heighten the salience of the intergroup boundary (Taylor and Fiske, 1978).  Thus, some conditions may promote a perpetuation of stereotypes.

But other conditions for effective intergroup contact are naturally met in the military context.  Although *decategorization* might be difficult to achieve, the military actively encourages *recategorization*.  The military naturally strives to diminish the salience of individuating characteristics and enhance the salience of the superordinate group identity.  As David Marlowe put it in his testimony to the Senate Armed Services Committee (March 31, 1993):

> If the individual insists upon being treated first and foremost in terms of a different primary identity, as happened in Vietnam in terms of drug-using, as has happened in any number of cases, then I think we have a problem.

The military goes to great lengths to remind unit members of their superordinate identities:  American, Service Member, Unit Member.  This is emphasized and reemphasized throughout the military socialization process, and it is reinforced by the use of uniforms and insignia.  The

- 321 -

superordinate identity is even more salient when units are stationed abroad.  The military also strives to decouple social status--based on race, ethnicity, and socioeconomic factors--from military status; e.g., through the use of standardized aptitude testing and rigorous performance criteria.

According to Hollander (1958, 1985), group members must first earn *idiosyncracy credits* in the eyes of their colleagues before the group will tolerate innovations or deviations from group norms or culture.  To earn these credits, members must first (1) demonstrate their competence in pursuing the group's tasks, and (2) demonstrate their loyalty to the group and its culture--i.e., their allegiance to the group's superordinate identity.  Interestingly, research on social stigmas (Goffman, 1963; Jones et al., 1984; Luhtanen, 1993) indicates that many stigmatized individuals intuitively understand these principles.  In order to normalize their relations with non-stigmatized others, they often feel compelled to go to great lengths to establish competence and loyalty "above and beyond."  "Invisible" stigmas like homosexuality provide an advantage in this regard; invisibly stigmatized individuals can establish their competence and loyalty before revealing the stigma.

The sense of superordinate identity is particulary salient in combat settings, where there is a bright psychological line dividing the unit from the enemy.  As discussed earlier, the presence of a shared threat and a common enemy enhances task and social cohesion.  Thus, when members of a military group belong to different social groups, combat conditions can reduce intragroup tensions.[26]  Brophy (1945-1946) provided early evidence for this hypothesis in his study of white seamen during the Second World War.  He found that prejudice against blacks was inversely associated with the number of voyages taken with blacks, and that "...those who have not been under enemy fire are significantly more prejudiced than those who have been subjected to enemy action" (p. 461). He concluded that "it would appear that many of our respondents could not afford the luxury of an anti-Negro prejudice while at sea" (p. 466).

---

[26]As depicted in Figure 10-1, the exception is when individual and group interests conflict, as when group members compete with each other for scarce resources.

- 322 -

A key factor in effective intergroup contact is institutional support, communicated by leaders at all levels (Allport, 1954; Stephan, 1985). This is within the military's control, and is promoted by the the military's clear chains of command. Allport's analysis of desegregation experiences suggests that military leadership must demonstrate through their words and their actions that intolerant behaviors are categorically unacceptable (also see the chapter on organizational change). Chapter 4 suggests that the integration of blacks into the military was greatly facilitated once military leaders aggressively implemented the policy change.

**Will Negative Attitudes Toward Homosexuality Be Expressed Behaviorally?**

The widespread expression of negative attitudes toward homosexuality among heterosexual military personnel has raised concerns about how they will behave if they find themselves working with an acknowledged homosexual. Thus, there are predictions of soldiers refusing to work, bunk, or shower with homosexuals, and of widespread outbreaks of violence against homosexuals. But there is little reason to believe that negative attitudes toward homosexuality are automatically translated into destructive behaviors (see the chapters on domestic police and fire departments and on foreign military experiences). The effect of attitudes toward social groups on behavior is known to be indirect, complex, and for most people, fairly weak (Ajzen and Fishbein, 1980; Campbell, 1963; Eagly and Chaiken, 1993; Fishbein and Ajzen, 1975; LaPiere, 1934; Stephan, 1985; Wicker, 1969).[27]

For many years, researchers simply assumed that social attitudes were a major determinant of behavior. An early indication that this might not be the case was provided by LaPiere (1934). LaPiere traveled across the United States with a Chinese couple, and found that of approximately 250 hotels and restaurants, only one refused to serve the couple. LaPiere then informally surveyed the proprietors of these institutions to ask if their establishments accepted members of the

_____
[27]This also implies that people who express positive attitudes toward a social group might behave more negatively; see Devine et al. (1991).

- 323 -

Chinese race; out of the 128 replies he received, over 90 percent said that they did not.  Stephan (1985, p. 627) cites several replications of this finding involving discrepancies between anti-black prejudice and behaviors toward blacks.  In light of these and other findings, Wicker (1969) argued that attitudes have little or no association with behavior; across his review of over 40 studies, the attitude-behavior correlation was generally in the 0.10-0.20 range, and rarely greater than 0.30.

Since Wicker's study (1969), there has been considerable research on ways in which attitudes actually do influence behavior (see Ajzen and Fishbein, 1980; Eagly and Chaiken, 1993; Fishbein and Ajzen, 1975).  Figure 10-3 summarizes some of the key findings of this literature; it is adapted from Ajzen and Fishbein's (1980) theory of reasoned action and Ajzen's (1991) theory of planned behavior, with modifications suggested by others (e.g., Cialdini et al., 1991; Eagly and Chaiken, 1993; Triandis, 1977).  According to a recent chapter in *The Annual Review of Psychology* (Olson and Zanna, 1993, p. 131), this general approach "remains the dominant theoretical framework in the attitude-behavior literature"; it has received enormous empirical support (see Eagley and Chaiken, 1993), and it plays a central role in applied psychology, consumer research, and organizational behavior.

Figure 10-3 illustrates a number of important points about the relationship between *attitudes toward subjects*--in this case, attitudes toward homosexuals--and behavior.  First, the relationship between attitudes toward subjects or objects and actual behaviors is quite indirect.  A negative attitude toward homosexuality will only influence behavior via its influence on *attitudes toward acts*; i.e., the attitude toward working with this homosexual, the attitude toward sleeping in the same barracks or tent as this homosexual, the attitude toward showering in the same room as this homosexual, and the attitudes toward verbally or physically harassing this homosexual.  Moreover, attitudes toward homosexuality are only partial determinants of attitudes toward these acts; the latter are also determined by their *perceived consequences*.  For example, the attitude toward refusing to work with a homosexual is likely to be influenced by the perceived *benefits* of that action (I'll

LCR Appendix Page 0643

- 324 -



Figure 10-3—Attitude-Behavior Link Is Indirect
Note:  arrows depict causal relationships.

avoid having to be around someone I don't like; others will know that I'm not homosexual; etc.), but also the perceived *costs* (we won't get the job done; I'll interfere with the unit's mission; I may end up in an unpleasant confrontation with the homosexual person; I may have to endure disciplinary actions by my superiors).  As one soldier said in a focus group, "if you can't get your job done, you'll be in trouble.  If you can't work with people, you'll be in trouble."

Moreover, the attitude toward the act is itself only indirectly related to behavior through its influence on *the intention to engage in the act*.  Intentions are influenced by attitudes, but intentions have other important determinants.  For example, our intentions to engage in a behavior are heavily influenced by our perceptions of the social norms of the people around us.  There are two types of social norms, *injunctive norms* and *descriptive norms* (Cialdini et al., 1991). Injunctive norms refer to our beliefs about what we think others want us to do--whether they will approve or disapprove of our behavior.  For

LCR Appendix Page 0644

- 325 -

example, in deciding whether to refuse to work with a homosexual, I may anticipate the approval of my heterosexual buddies, but the disapproval of my supervisor. Descriptive norms refer to what we actually see others doing in similar situations. Thus, if I see my heterosexual peers working with the homosexual soldier, I will be more inclined to work with him too; alternatively, if I see a plurality of them refusing to work with him, I may be more inclined to join them.

Intentions are also influenced by *self-efficacy* (Ajzen, 1991; Bandura, 1982), the perceived capability of performing the act. Self-efficacy is partly a personal disposition, but it also reflects immediate environmental constraints--e.g., limited resources or opportunities. In many situations, it may be quite difficult to refuse contact with a homosexual: If I don't ride with this guy, how am I going to get there? If I refuse to sleep next to him, where am I going to sleep?

Finally, *behavior* itself is only partly intentional. Like intentions, behaviors are also constrained by the resources and opportunities afforded by the immediate environment. And our behaviors in many situations reflect well-learned *habits* that we engage in with little or no conscious reflection. Norms and habits often combine to provide us with familiar "scripts" for how to behave in a given situation, and it can be very difficult to force ourselves to deviate from those scripts (Abelson, 1981). Thus it is often the case that the best predictor of behavior is the behavior of the actor in similar situations in the past (see Eagly and Chaiken, 1993; Triandis, 1977). For example, in work situations, most of us have a well-learned and rehearsed script which inclines us to cooperate with co-workers; it is "the path of least resistance." Organizational role theorists have shown that occupational roles and norms largely constrain both work-related and social behaviors in organizational settings (Pfeffer, 1985). In this sense, the military is a heavily scripted environment.

The principles depicted in Figure 10-3 help to explain why the effect of diffuse attitudes toward objects or social groups often has only weak effects on behavior. This is not to say that negative attitudes toward homosexuality will never be expressed behaviorally;

- 326 -

history clearly suggests otherwise.  But Figure 10-3 indicates that there are many factors that mitigate against serious behavioral expressions of anti-homosexual attitudes.  It is important to reflect that the military has considerable influence over many of those mitigating factors--the consequences of the action, the injunctive and descriptive norms, the environmental constraints, habits and scripts-- through its leadership, its regulations, its standard operating procedures, and its training and socialization process.  If military leaders set and enforce clear standards for acceptable and unacceptable conduct, compliance is likely to be high.  It will not be universal, however, and some individuals will test their leaders' resolve to enforce compliance.  Leaders who display ambivalence about enforcement can probably anticipate further problems.

Because of their compliance, many individuals may find themselves in a state of "cognitive dissonance"--a conflict between their attitudes and their conduct.  According to Festinger's (1957) well-supported theory of cognitive dissonance (see Eagly and Chaiken's 1993 review), this state of dissonance is unpleasant, and people generally resolve it by either changing their attitudes or changing their behavior.  When an individual with negative attitudes toward homosexuality finds himself cooperating with acknowledged homosexuals, there are a number of ways to resolve the sense of dissonance he may feel:

1.  Verbally harass the homosexual co-worker.
2.  Do his job poorly ("passive aggression").
3.  Ostentatiously broadcast his own values (e.g., heterosexuality, machismo, religiousity, conservatism).
4.  Justify his behavior by invoking the costs of refusal (my sergeant would kill me).
5.  Justify his behavior by invoking descriptive norms (everybody else is working with him, too).
6.  Justify his behavior by invoking his sense of duty, professionalism, and the need for task cohesion.
7.  Change his attitude by adjusting his attitude toward working with homosexuals.

LCR Appendix Page 0646

- 327 -

The unit leader can help the reluctant heterosexual resolve this sense of dissonance in a manner that is in keeping with unit discipline and unit performance.  It must be clearly communicated that route 1 (harassment) and route 2 (passive aggression) are unacceptable and will not be tolerated.  Route 3 (symbolic displays of identity) can be tolerated within the limits outlined in personal conduct regulations (see the chapter on legal issues and the chapter on change in large organizations).  Route 4 (punishment avoidance) may be expedient, but in the long run, route 5 (conformity) and route 6 (duty and professionalism) seem more desirable.  The research evidence (reviewed by Eagly and Chaiken, 1993) suggests that route 7 (attitude change) may frequently occur, but it should be emphasized that the goal of compliance is to establish unit discipline, cohesion, and effectiveness. Tolerance of homosexuality will promote those goals, but tolerance need not require moral or religious acceptance.

**Will Heterosexuals Obey an Openly Homosexual Leader?**

Earlier, it was suggested that if social cohesion is adversely affected, it is most likely to be through a process of partial or complete ostracism.  What if the ostracized individual is the group's leader?  Will heterosexual soldiers respect an acknowledged homosexual, and comply with his or her orders?  This is the question of "followership," or upward vertical cohesion.  In one of the focus groups, one person said "I worked with a homosexual and not one man would do what he said."  On the other hand, there is anecdotal evidence that known homosexuals have served in leadership positions in the military with no deleterious effects.  The organizational literature on leadership provides some hints as to when known homosexuals are likely to be effective leaders.

French and Raven (cited in French, 1959) distinguish several different forms of social power:  *Reward power, coercive power, expert power, information power, legitimate power* (the leader's right to a position of authority), and *referent power* (influence through subordinates' identification with the leader).  Although military leaders generally have more reward, coercive, information, legitimate, and expert

- 328 -

power than their subordinates, it is costly and difficult for the leader to rely solely on these forms of power; ideally, the leader should rely heavily on referent power to motivate the team (see Henderson, 1985). One path to referent power is through expert power. Bass (1981) cites evidence that the esteem with which leaders are held is reliably associated with the group's performance. Of course, to some extent this correlation may reflect the common influence of leader ability on both esteem and group performance. According to Bass (1981, pp. 161-163):

> A leader's influence is more strongly associated with one's sociometrically rated value or ability than one's sociometrically determined popularity or visibility. ...Whereas being liked, being visible, and being popular may still be of some importance to one's influence in play situations, competence and value are of most importance to influence in task situations.

This is consistent with Hollander's (1958, 1985) *idiosyncracy credit* model of acceptable deviance in organizations, reviewed earlier. Recall that Hollander has demonstrated that group members must demonstrate their competence and their loyalty to the group before it will accept deviations from group norms. Homosexuals in leadership roles may have an advantage over other homosexuals in this regard because subordinates will tend to assume that a leader is competent and loyal until proven otherwise (Bass, 1981). But a homosexual leader is likely to be held to higher informal standards of conduct and competence than other leaders, at least in the current attitudinal climate.

Military leaders obviously benefit from being liked, but it may not be necessary to get the job done. According to Bass (1981, p. 209):

> Lyndon Johnson wanted every American to love him, but Harry Truman opined that "if you can't stand the heat, stay out of the kitchen!" National leaders must settle for less than universal affection. They must be willing to be unloved...No leader can be successful if not prepared to be rejected.

Military leaders also get considerable mileage out of pure legitimate power; many subordinates will obey a homosexual leader simply because of a strong sense of duty and allegiance to the military role,

- 329 -

regardless of their attitude toward the leader's personal traits.[28]
Ultimately, then, much may depend on the behavior of the next leader up
the chain of command; if the homosexual leader is treated with respect
from above, he is more likely to be treated with respect from below.

If the relationship between a leader and a unit becomes completely
dysfunctional, it may be necessary to replace the leader.  According to
a 1988 Army Research Institute report (Siebold and Kelly, 1988a, p. 27):

> Very high or very low [vertical] cohesion seldom lasts for
> long periods because the leaders causing either get
> reassigned, perhaps more quickly than their peers.
> Replacement leaders are, on the average, average.  Therefore,
> while there are differences in cohesion among a set of
> platoons at any given time, they tend to be within a band set
> by the general command climate and post procedures and
> conditions.

In addition to reassigning leaders, there are many other
interventions that can be used to restore unit functioning to an
acceptable level, including informal conflict resolution; additional
training; the reassignment of members to new units, new tasks, or new
bunks; or even disciplinary action.  To reinforce this intervention
process, if homosexuals were allowed to serve, formal steps should be
taken to systematically monitor the cohesion and functioning of those
units with acknowledged homosexuals to ensure that any problems can be
identified and managed in a prompt and constructive fashion.  This
monitoring should be conducted in an unobstrusive manner to avoid
calling undue attention to the homosexual's presence or implying special
treatment.

CONCLUSIONS

The analysis in this chapter suggests that concerns about the
potential effect of permitting homosexuals to serve in the military are
not groundless, but the problems do not appear insurmountable, and there
is ample reason to believe that heterosexual and homosexual military

---

[28]See Kelman and Hamilton's (1989) analysis of rule, role, and
value orientations toward compliance with authority.

- 330 -

personnel can work together effectively.  This review of the literature suggests the following conclusions:

- There is no direct scientific evidence regarding the effects of the presence of acknowledged homosexuals on unit cohesion or unit performance.

- There are at least two types of cohesion.  *Task cohesion* has a modest but reliable influence on performance; *social cohesion* does not have an independent effect after controlling for task cohesion.  Under some conditions, high social cohesion is actually detrimental to unit performance; moderate social cohesion appears most beneficial.  Research indicates that it is not necessary to like someone to work with them, so long as members share a commitment to the group's objectives.

- The presence of acknowledged homosexuals may bring about a reduction in social cohesion, although it seems less likely to undermine task cohesion.  If there is a reduction in social cohesion, it will probably involve some degree of ostracism of the homosexual, rather than a complete breakdown of the unit.  Whether this occurs will depend in part on the conduct, competence, and loyalty of the homosexual individual in question.  If ostracism does occur, it can have potentially dangerous consequences for the individual and the group, and must be dealt with promptly by leaders.

- It is possible that some heterosexuals will refuse to cooperate with known homosexuals.  However, many factors will help to promote cohesion and performance even in the face of hostility toward homosexuals.  First, research suggests that leaders play an important role in promoting and maintaining unit cohesion.  Second, military norms, roles, regulations, and disciplinary options each enhance the likelihood that heterosexuals will work cooperatively with homosexuals.  Third, external threats enhance both social and task cohesion, provided that the group members are mutually threatened and there is the possibility that cooperative group action can eliminate the danger.

- 331 -

- Homosexual leaders will need to earn the respect of their
  subordinates by proving their competence and their loyalty to
  traditional military values.  In the absence of that respect,
  homosexuals will need to rely on other forms of power, which
  will hinder but not prevent effective leadership.  The behavior
  of the next leader up the chain of command will be critical; if
  the homosexual is supported from above, he or she is more
  likely to be respected from below.
- Open homosexual military personnel are likely to be rare, at
  least in the foreseeable future.  Homosexuals in the military
  will be under enormous informal pressure to "stay in the
  closet," even without any explicit requirement to do so.  As a
  result, only a small minority of units platoon-sized or smaller
  are likely to have acknowledged homosexuals as members.  This
  low prevalence will help to limit the potential frequency of
  conflicts, although it will also limit the opportunities for
  the kind of positive social interaction that overcomes
  stereotypes and improves intergroup relations.
- The military should not, and does not, tolerate seriously
  dysfunctional units.  Military leaders can and always have
  intervened whenever a unit has been identified as
  dysfunctional.  Careful monitoring of units with acknowledged
  homosexuals will ensure that any problems can be identified and
  managed in a prompt and constructive fashion.  It should be
  clearly communicated at all levels that disruptive behavior by
  anyone, whether heterosexual or homosexual, will not be
  tolerated.

- 332 -

## 11. SEXUAL ORIENTATION AND THE MILITARY: SOME LEGAL CONSIDERATIONS[1]

### INTRODUCTION

On January 29, 1993, President Clinton directed the Secretary of Defense to draft an "Executive order ending discrimination on the basis of sexual orientation in determining who may serve in the Armed Forces of the United States."[2]  The President also directed that there be a "study . . . on how this revision in policy would be carried out in a manner that is practical and realistic."  On April 1, 1993, the Secretary of Defense asked RAND to provide information and analysis that would be useful in helping formulate the required draft Executive Order.

This chapter examines the legal issues involved in adopting and implementing such a non-discrimination policy.  We first provide a brief overview of a non-discrimination policy that is based on our empirical research.  We then consider the legal background, including legal and legislative trends regarding homosexuals and the current military policy toward homosexuals.  We turn next to a discussion of general legal principles that are important for understanding how the courts have approached military cases, cases involving gay rights, and challenges to the ban on homosexuals in the military.  Finally, we analyze the legal issues raised by the non-discrimination option, including those raised by the *Standard of Professional Conduct*, Article 125, and specific personnel-related issues.

### THE "NOT GERMANE" OPTION

In light of the empirical research, the RAND team examined a range of potential policy options.  Most of the options were judged as either inconsistent with the President's directive or internally contradictory.

---

[1]This chapter was prepared by Peter D. Jacobson, who wishes to acknowledge the outstanding advice and counsel that Stephen A. Saltzburg provided throughout this project as RAND's outside legal consultant.

[2]Memorandum from the President to the Secretary of Defense:  "Ending Discrimination on the Basis of Sexual Orientation in the Armed Forces," January 29, 1993.

LCR Appendix Page 0652

- 333 -

Only one policy option was found to be consistent with our research, with the directive, and within itself. That policy would consider sexual orientation, by itself, as "not germane" to determining who may serve in the military and would establish clear, strictly enforced standards of conduct for all military personnel. This single standard of conduct would be neutral regarding gender and sexual orientation. Decisions on military accession and retention would be based on individual qualifications and behavior, not on a person's category. Homosexuals would not be treated as a separate class under this option.

Enclosure 3H of DoD Directive 1332.14 would be rescinded. To ensure that the "not germane" option would be implemented in a manner that minimizes any disruption to military morale and unit cohesion, DoD should adopt a *Standard of Professional Conduct* that would guide interpersonal behavior once the ban on acknowledged homosexuality was removed. Appendix A contains an illustrative standard.

Consistent with the "not germane" option and to guarantee that there cannot be unequal enforcement of the sodomy laws, the DoD should also modify sections of the *Manual for Courts-Martial* (MCM) pertaining to Article 125 of the *Uniform Code of Military Justice* (UCMJ) to exclude private sexual behavior between consenting adults. However, this is not strictly necessary to implement the "not germane" option, as discussed below.

The "not germane" option could be adopted by the President under his authority as Commander-in-Chief of the Armed Forces. If challenged (and it is not clear who would have standing to challenge the policy, short of Congressional legislation), it would most likely be upheld as an exercise of executive authority, supported by a principled and rational determination of public policy. We conclude, as detailed below, that this option, including the *Standard of Professional Conduct* and the changes in the MCM, could be adopted as policy without being overturned by the courts. To be sure, legal issues would not be eliminated by this policy, but there does not appear to be an insurmountable legal hurdle. By and large, ending the restriction on homosexuals in the military is a policy choice, not a legal matter.

- 334 -

The *Standard of Professional Conduct*

The *Standard of Professional Conduct* would be the centerpiece of the "not germane" option.  For the military to function optimally, individual differences must not be permitted to disrupt operational effectiveness or combat readiness.  Therefore, the primary purpose of the standard would be to prohibit any member of the Armed Forces from calling attention to individual differences (such as sexual orientation) that could reasonably be expected to undermine unit cohesion or military effectiveness.  By clarifying the conduct that would be expected of all members once homosexuals were permitted by law to serve in the military, the *Standard of Professional Conduct* would be designed to minimize any disruption to good order and discipline.

The *Standard of Professional Conduct* stresses that each individual must show respect for the sensibilities of others and practice tolerance toward other members.  Inappropriate conduct is also to be avoided. Inappropriate conduct is defined as "behavior directed at or offensive to another individual or a group that goes beyond the bounds of good judgment and common sense and that a reasonable person ought to have known would be unwelcome."  To expand that concept, we describe categories of inappropriate personal conduct, including inappropriate displays of affection, which are defined as "expressions of a personal relationship that would generally be viewed as unseemly or provocative in the context at hand," and the explicit discussion of sexual practices, experiences, or desires directed at those who might object to or be offended by such discussions.

These standards of conduct would discourage behavior that would call attention to individual differences and would state that every individual must behave in ways that promote group cohesion and operational effectiveness by respecting the sensibilities of other group members.  To take displays of affection as an example, the common sense and good judgment to refrain from conduct generally viewed as inappropriate or disruptive would be expected of all military members. We also expect that standards of conduct prohibiting personal and sexual harassment and fraternization would apply without regard to sexual

- 335 -

orientation.  Most problems would be resolved in the same way such problems are resolved now, through command-level intervention.

The categories of inappropriate displays of affection and explicit discussions of sexual exploits are as inappropriate to military service as are sexual harassment, fraternization, personal harassment, or abuse of authority.  Each of these categories is inherently disruptive to good order and discipline and cannot be tolerated in the military.  Whether any particular act would violate this standard would be a function of the act's consequences and the time, place, circumstances, and purpose under which the behavior occurred.

**LEGAL BACKGROUND**

For the past two decades, the courts, no less than society, have been engaged in determining the extent to which the Constitution of the United States protects homosexuals against discrimination.  As discussed below, so far, homosexual advocates have had only limited success in the courts.  Despite some notable court victories that we discuss below, particularly in adoption and family law, there is no discernible trend toward judicial recognition of homosexuality as a protected class.  In particular, the Supreme Court's decision in *Bowers v. Hardwick*,[3] upholding the constitutionality of Georgia's sodomy statute, has been central to the political discussion of gay rights and has been a major legal barrier to the judicial expansion of gay rights. Thus, state laws and practices that treat homosexuals differently from heterosexuals have generally been upheld as long as states can show a rational basis for the differential treatment.[4]  Since the majority culture tends to view homosexuality with anything from indifference to outright hostility, it is not surprising that courts have generally deferred to the state in challenges by homosexuals.  From the perspective of gay rights activists, however, the trend is probably viewed more propitiously. Starting from virtually no recognition twenty years ago, the victories on adoption and family matters presage greater judicial success in the

_____
[3]478 U.S. 186 (1986).
[4]Appendix I contains a table that identifies which states currently have laws prohibiting sodomy.

- 336 -

future.  This judicial success, coupled with generally limited legislative success, suggests that the courts will continue to be a primary battleground in society's struggle over gay rights and homosexual behavior.

For the military, this means that its policies regarding accession and retention of homosexuals must be decided within the context of how the courts will respond to homosexual challenges to enter or remain in the military.  The intense public scrutiny of the recent Senate hearings on homosexual service in the military ensures that the courts will be called upon to review whatever decision the Administration makes. Before a final decision is made on allowing homosexuals to serve, it is crucial to assess how the courts might respond to the option chosen. While no one can predict with any certainty how courts will rule on a particular option, we can certainly anticipate the types of legal issues likely to be raised by any particular option.

Aside from the political and policy questions regarding the current ban on homosexuals in the military, several underlying legal issues have been raised by both proponents and opponents of the ban.  First, and most important, will the courts overturn the ban (as a violation of the due process clause of the 5th Amendment, insofar as it incorporates the equal protection clause of the 14th Amendment), regardless of any policy changes by the military?  Second, what restrictions could legally be placed on homosexuals if the ban were removed?  And third, if the ban were removed, what privacy rights might be asserted by heterosexuals? The answers to these questions depend on an analysis of recent trends in the law and whether homosexuals will be treated as a protected class for purposes of equal protection, a concept we discuss in greater detail below.

**Legal and Legislative Trends Regarding Homosexuals**

As suggested above, recent trends regarding the protection of homosexuals from disparate treatment are mixed.[5]  In areas such as

---

[5]For an exhaustive review of trends in legislation and case law, see Editors of the Harvard Law Review, "Developments in the Law:  Sexual Orientation and the Law," *Harvard Law Review,* Vol. 102, 1989, pp.  1508-1671.  For an excellent, and more recent compendium, see Rubenstein,

- 339 -

heterosexuals.  Allegations of unequal treatment notwithstanding, available data on prosecutions under Article 125 show that both heterosexuals and homosexuals have been prosecuted for sodomy.  However, the reach of Article 125 goes beyond that captured in the prosecution statistics.[11]  As a practical matter, most homosexuals facing an Article 125 charge are given the option of an administrative discharge (based on honorable conditions) instead of standing trial.  There is currently no exclusion in the MCM pertaining to Article 125 for private, consensual sex between adults.

## GENERAL LEGAL PRINCIPLES

As indicated by the lengthy testimony presented at Senator Nunn's hearings by several legal scholars, there are numerous legal issues presented by reconsidering the ban that could be discussed in this chapter.[12]  Because this discussion is limited to the "not germane" option, the range of legal issues is narrowed somewhat.  Nevertheless, it is important to discuss some general legal principles pertaining to homosexuals in the military before considering the legal implications of this option.

### Deference to the Military

Perhaps one of the strongest doctrines in the law is that the courts generally defer to the military on matters relating to military service, organization, and personnel.  As the U.S. Supreme Court stated in *Rostker v. Goldberg*,[13] "Judicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged."  This broad deference has a long history that is premised on the understanding that military service is fundamentally different from civilian life.  It is thus generally accepted that persons entering

---

[11]Burrelli, 1993, p. 10.
[12]For excellent discussions of the broad range of potential legal issues, see the testimony by Stephen A. Saltzburg and David A. Schlueter, and David F. Burrelli, presented to the Senate Armed Services Committee Hearings, March 1993.
[13]453 U.S. 57, 70 (1981).

- 340 -

the military give up certain constitutional rights and have fewer privacy expectations than in civilian life.

Given that premise, the courts are reluctant to second-guess the needs of the military based largely on principles derived from and applicable to civilian society.  Policies determined by the military and for the military are generally treated with great deference, even when the restrictions would otherwise be unconstitutional within a civilian context.  In *Goldman v. Weinberger*,[14] for example, the court refused to uphold a challenge by an Orthodox Jew to a restriction that prohibited him from wearing a yarmulke when in uniform.  Despite the fact that in a civilian setting such a restriction would violate the First Amendment, the court held that the needs of the military for good order and discipline, as well as sameness of appearance, superseded Goldman's right to wear what was admittedly an unobtrusive skull cap.  It is also interesting to note that Congress subsequently enacted specific legislation to overturn the *Goldman* decision.

As a general principle, therefore, any policy option considered by the Secretary starts with what amounts to a presumption of constitutional validity.  In effect, this allows the military great discretion in accession and retention policies (the issues of most interest to us right now), including setting the conditions under which individuals may enter and serve in the military.  Consequently, courts have upheld restrictions as to age, height, weight, single parentage, previous drug use or criminal conviction, and the like, that might not survive scrutiny under civilian circumstances.  That is, the military may set conditions that discriminate against various groups.  Those challenging military rules and policies have the burden of proving that the rule or regulation does not serve a rational military interest.  As numerous court cases have shown, that is a difficult burden to overcome.

**Equal Protection and the Military**

One way to overcome the burden of deference to the military is to challenge the regulation as a violation of equal protection of the laws based on membership in a protected class, such as a racial minority.

---

[14]475 U.S. 503 (1981).

- 341 -

Being recognized as a protected class is important because of the level of scrutiny that the courts will therefore apply to a governmental rule or regulation.

To shorten what would otherwise be a lengthy discussion of a somewhat convoluted area of jurisprudence, equal protection applies if the regulation contravenes a fundamental right, such as the right to privacy, or if the group subject to disparate treatment constitutes a protected class. If homosexual sodomy were to be considered as a fundamental right of privacy, laws making such behavior a criminal offense would be unconstitutional. But in *Bowers v. Hardwick*,[15] the U.S. Supreme Court held that homosexual sodomy does not constitute a fundamental right, and so upheld laws making sodomy a criminal offense.

Technically, because *Bowers* was a due process challenge, some scholars have argued that the result does not preclude a finding that homosexuals should be treated as a suspect class for an equal protection challenge.[16] Most courts, however, have held that homosexuals cannot be a protected class when such an important activity as sexual conduct can be treated as a criminal offense. It is important to add that even if *Bowers* were to be overturned, this would not definitively answer the question of whether open homosexuals could serve in the military, though it might undermine the policy reasons for retaining the ban. The issue of what kinds of homosexual conduct are disruptive and can be subject to sanctions would remain. In the *Goldman* case, for instance, Goldman could not be punished for being Jewish but could be punished for wearing a yarmulke in violation of the regulations.

As an alternative to reliance on fundamental rights, homosexuals can use the equal protection laws to challenge the validity of the ban. Over time, courts have developed three levels for judging a governmental regulation's validity under the equal protection laws. First, strict scrutiny will be applied to classifications, such as race, that are inherently suspect. Any regulation of a suspect class must serve a

---

[15]478 U.S. 186 (1986).

[16]See, e.g., Sunstein, Cass R., "Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection," *University of Chicago Law Review*, Vol. 55, 1988, pp. 1161-1179.

- 342 -

compelling state interest and be narrowly tailored to meet that interest.  Very few regulations can survive this test.[17]  Second, intermediate or heightened scrutiny will be applied to classifications, such as gender, that are usually invalid but for which some justification can be presented.  Under heightened scrutiny, any regulation must be substantially related to an important governmental interest.  Third, where no suspect class is determined, the regulation will be reviewed on a rational basis test.  This test presumes the validity of governmental regulation as long as the classification is rationally related to a legitimate state interest.  Under passive rational basis, courts generally rubber stamp the regulation, most typically economic and social legislation, so long as it serves any reasonable state interest.  Under active rational basis, an emerging doctrine, courts will require additional justification for any restrictions.  Just what level of proof is required to satisfy active rational basis is not clear at this point.

So far, federal courts have not treated homosexuals as a suspect class for equal protection, although some state courts have provided such protection under the state constitution.[18]  Thus, challenges to the validity of military policies by homosexuals will be decided on the rational basis test.  In the past, passive rational basis has been applied when considering deference to the military.  Recently, some lower federal courts have begun to apply active rational basis to military cases.  If that trend continues, the continued sustainability of the ban will depend on what level of justification is needed to satisfy the active rational basis test.  In this regard, if the ban is maintained or if certain restrictions against homosexuals in the

---

[17]Becoming a protected class, however, is easier said than done. Courts have applied three principal criteria to determine whether a particular class should be protected under the equal protection laws: (1) history of discrimination against a discrete group; (2) classification based on immutable or distinguishing characteristics; and (3) lack of political power.  No Federal appellate court has held that homosexuals meet these criteria, although courts differ on which aspects are not satisfied.

[18]See, e.g., *Baehr v. Director of the Department of Health*, Hawaii, Supreme Court of Hawaii, No. 91-1394, 1993.

LCR Appendix Page 0660

- 343 -

military are imposed, the Congressional hearings and the RAND findings
might play an important role in determining how courts respond to the
military's justification for its policies toward homosexuals.  The
extensive empirical work provided for the Secretary could form the basis
both for any restrictions imposed against homosexuals and for defining a
coherent rationale that can be defended in court.

**Responding to the Prejudices of Others**

Two relatively recent Supreme Court cases, *Palmore v. Sidoti*[19] and
*City of Cleburne v. Cleburne Living Center, Inc.*,[20] have held that
private biases and potential injuries resulting from those prejudices
are insufficient grounds for policy determinations.  As the court stated
in the *Palmore* case (at p. 433):  "The Constitution cannot control such
prejudices but neither can it tolerate them.  Private biases may be
outside the reach of the law, but the law cannot, directly or
indirectly, give them effect."  At this point, it is uncertain how this
principle will be applied in the context of a homosexual challenge to
certain restrictive military policies.

The reality of military cases such as *Goldman v. Weinberger* is that
the military can regulate what members do or say precisely because
certain actions are likely to disrupt morale and undermine unit
cohesiveness.  No one could ban wearing a yarmulke in civilian life;
yet, it could be banned in the military as emphasizing individual
differences over group identity.  And the *Palmore* and *Cleburne* cases may
have little bearing on military regulations that rest upon a judgment
that certain behaviors are immoral.

Even so, the 9th Circuit, in *Pruitt v. Cheney*,[21] required the
government to prove on the record that Pruitt's discharge did not rest
on the prejudice and bias of other soldiers against homosexuals.  The
court specifically stated that the military's justification would be

---

[19]466 U.S. 429 (1984).  This was a racial discrimination case, so
it might not be broadly applied.
[20]473 U.S. 432 (1985).  This was a zoning regulation, and was
applied to a particular set of facts.
[21]963 F.2d 1160 (9th Cir. 1991).

- 344 -

examined in light of the *Palmore* and *Cleburne* cases.[22]  In the context of an active rational basis analysis, a court might use the *Palmore* principle to negate previously accepted reasons or justifications for adopting a particular restriction.  As a result, military policy made on the basis that some people are uncomfortable with homosexuals might not survive a *Palmore/Cleburne* challenge, absent an independent rationale.

**Homosexuals in the Military:  Current State of the Law**

Given the above legal principles, it is not surprising that most challenges by homosexuals to the military ban have been unsuccessful. Except for cases brought in the 9th Circuit Court of Appeals, few challenges have succeeded.  And no successful District Court case has survived a Circuit Court of Appeals decision outside of the 9th Circuit.[23]  No appellate court, even in the 9th Circuit, where the ban has been under sustained attack, has ruled that restricting homosexual conduct is unconstitutional or has accepted an equal protection challenge.  Two cases now on appeal,[24] one in the 9th Circuit and another in the D.C. Circuit, present clear equal protection challenges to the ban, which these courts must confront.

A typical case is *Dronenburg v. Zech*,[25] where the D.C. Circuit held that the Navy's policy of mandatory discharge for homosexual conduct did not violate the equal protection laws or the soldier's right to privacy. Most significantly, the court stated that any change in the ban should be made by elected officials, not by the courts.  Taking basically a passive rational basis approach, the court added that (at p. 1398): "The effects of homosexual conduct within a naval or military unit are almost certain to be harmful to morale and discipline.  The Navy is not required to produce social science data or the results of controlled

---

[22]A sustained attack on restrictive military policies against homosexuals based on *Palmore* and *Cleburne* is being waged in *Steffan v. Aspin*, now before the D.C. Circuit Court of Appeals (Brief of Plaintiff-Appellant Joseph C. Steffan, May 1993).

[23]See, for example, *Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989); *Goldman v. Weinberger*, 475 U.S. 503 (1981); and, *Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir. 1991).

[24]*Meinhold v. U.S. Department of Defense*, 808 F. Supp. 1455 (C.D.Cal. 1993), and *Steffan v. Cheney*, 780 F.Supp. 1 (D.D.C. 1991).

[25]741 F.2d 1388 (D.C. Cir. 1984).

- 345 -

experiments to prove what common sense and common experience demonstrate."

To date, homosexuals have not had much success in using other constitutional provisions to challenge the ban.  For instance, First Amendment challenges to the ban on status have also failed.  Although courts have held that soldiers may discuss homosexuality, read homosexual materials, and even advocate a change in policy, the courts have held that there is no right of expression in the military to state "I'm gay," no right of free association to join homosexual organizations, and no right just to be homosexual.[26]  These cases were decided in the context of a ban on open homosexuality.  Under the "not germane" option, the circumstances and consequences of the action would determine the outcome.

What may be changing, however, is the standard of review for justifying the military's ban on homosexuals.  At least in the 9th Circuit, the standard has already shifted to an active rational basis analysis.  Relying on *Pruitt v. Cheney*, the District Court, in *Meinhold v. U.S. Department of Defense*, explicitly rejected deference to military judgment as a rationale for discharging homosexuals.  If followed in other cases, this would subject the ban or other restrictions against homosexuals to greater judicial scrutiny by forcing the military to justify any restrictions.

Despite the current state of the law, there are now some lower court decisions and some powerful dissents, including Justice Blackmun's dissent in *Bowers v. Hardwick* and Judge Norris's dissent in *Watkins v. U.S. Army*,[27] that could provide a roadmap for overturning the ban.  As shown in the Hawaii Supreme Court's recent decision to treat homosexuals as a suspect class (and therefore a protected class) under the state's constitution, the litigation context is dynamic.[28]  With the projected appointment of more liberal judges during the Clinton Administration, restrictions against homosexuals may be overturned.  But even if the

---

[26]See, e.g., *Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989), and *Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir. 1991).

[27]875 F.2d 699 (9th Cir. 1989).

[28]*Baehr v. Director of the Department of Health, Hawaii*, Supreme Court of Hawaii, No. 91-1394, 1993.

- 346 -

judiciary becomes more rigorous in applying equal protection for homosexuals in civilian cases, the question still remains how far judges will go in scrutinizing military regulations. Thus, while the courts may eventually overturn the ban, it is unlikely to occur in the short term.

**LEGAL CONSIDERATIONS FOR THE *STANDARD OF PROFESSIONAL CONDUCT***

If the "not germane" option were adopted, including the rescission of 1332.14, the revisions to the MCM, and implementing the *Standard of Professional Conduct*, we anticipate few legal challenges. By no means do we expect that adopting the "not germane" option would eliminate litigation, only that the litigation would most likely revolve around challenges to punishment of individual behavior rather than, as is now the case, challenges to the ban itself or to significant categorical restrictions. None of these potential legal challenges appears to be a threat to successful implementation of this option. In this section, we analyze the legal implications of adopting the *Standard of Professional Conduct*.

**Implementing the *Standard of Professional Conduct***

The *Standard of Professional Conduct*, as discussed above, would set forth the behavior that would be expected within the military once open homosexuality was permitted. For most issues involving interpersonal relationships, military custom would likely determine what behavior is considered punishable. The two situations that would most likely create problems under the *Standard of Professional Conduct* are same-sex hand-holding and dancing, both because there is nothing in military custom to guide behavior and because our interviews suggest that these are among the homosexual acts considered most provocative. If the *Standard of Professional Conduct* were overinclusive, by specifying that same-sex hand-holding and dancing are prohibited, it would create the risk that an equal protection challenge would succeed (especially if homosexuals were treated as a protected class) or that a double standard would be codified. If the standard were underinclusive, an action against certain behavior might be overturned as a denial of due process based on inadequate pre-notification that the behavior is covered by the code.

- 347 -

From a legal perspective, therefore, implementing the *Standard of Professional Conduct* raises several potential issues. First, is the standard itself sufficiently specific to withstand a void-for-vagueness challenge? Second, how specific must a *Standard of Professional Conduct* be to provide adequate notice that certain behavior violates good order and discipline? Third, would the code's lack of specific examples make it susceptible to challenges based on unequal enforcement of similar situations? And fourth, if specific examples were to be included, would the standard be susceptible to an equal protection challenge? For the reasons discussed below, we conclude that the *Standard of Professional Conduct* would likely be upheld against these potential challenges. That is, the *Standard of Professional Conduct* as drafted would provide sufficient specificity to satisfy pre-notice requirements, but that more specific provisions could also be sustained.

**Background**

By way of background, in *Parker v. Levy*,[29] the Supreme Court upheld Articles 133 and 134 of the UCMJ against challenges that they were "void for vagueness" and hence provided no notice of what would be punishable conduct. Article 133 proscribes conduct unbecoming an officer and a gentleman, while Article 134, the General Article, makes punishable "all disorders and neglects to the prejudice of good order and discipline in the Armed Forces . . . ." Although the court ruled that military law need not be as precise as civilian criminal statutes, an accused must still be on notice that the particular conduct at issue would be punishable under the UCMJ. In most instances, adequate notice will be provided by military custom, rules, and regulations. Other courts have noted that while Article 134 is not a catchall for punishing any improper act, there is no requirement that an Article 134 action must rest on an existing order, rule, or regulation.[30] According to Professor Schlueter, "As a result of this approach, only in a few cases have military defendants been able to establish that they were

---

[29]417 U.S. 733 (1974).
[30]*U.S. v. Guerrero*, 31 M.J. 692, 695 (NMCMR 1990), citing *U.S. v. Sadinsky*, 14 U.S.C.M.A. 563, 34 C.M.R. 343 (1964).

- 348 -

reasonably unaware that their conduct might subject them to prosecution."[31]

The military courts have established criteria for determining whether a particular action gives rise to an Article 134 offense. For the most part, the emphasis in the UCMJ is on the consequences of the behavior, particularly conduct that is prejudicial to good order and discipline, rather than on the act itself.[32] To determine if the particular conduct might be prejudicial to good order and discipline, the courts consider four elements: (1) the time, (2) the place, (3) the circumstances, and (4) the purpose of the activity.[33] In reviewing a conviction for cross-dressing, which was not specified as a violation of Article 134, the Court of Military Appeals, in *U.S. v. Guerrero*,[34] held that the context of the action, rather than the action itself, rendered the cross-dressing punishable, even in the absence of specific notice. The court stated that the time, place, circumstances, and purpose of the action form the basis for determining whether the conduct is prejudicial to good order and discipline. Thus, cross-dressing in private would be treated differently from cross-dressing in public. Despite the lack of specific notice, the court decided that cross-dressing in front of another soldier (even in private) violated good order and discipline. A dissenting judge (*Guerrero* was a 2-1 decision) stated that the conduct was too indirect to the military's interest to justify a guilty verdict.

**The Standard's Specificity**

It follows from the above discussion that the standard itself should easily withstand any legal challenge to its specificity. If this standard is vulnerable to a void-for-vagueness challenge, the same could be said for the status of military custom, similar codes on sexual harassment and fraternization, and indeed, for UCMJ Articles 133 and 134. That vulnerability is unlikely.

----

[31]See the discussion in Schlueter, David A., *Military Criminal Justice: Practice and Procedure*, pp. 346-348.
[32]See, e.g., Article 134, Par. 60b.
[33]*U.S. v. Guerrero,*, 33 M.J. 295, 298 (CMA 1991).
[34]33 M.J. 295, 298 (CMA 1991).

- 349 -

**Pre-Notification**

Applying the *Guerrero* reasoning to the issue of pre-notification for sanctioning unspecified conduct, such as same-sex hand-holding and dancing, it would appear that the draft *Standard of Professional Conduct* would provide sufficient notice to withstand a due process challenge. For one thing, such public behavior could constitute reasonably direct and palpable prejudice to good order and discipline as required in the Explanation to Article 134. For another, it is hard to imagine a situation involving same-sex hand-holding or dancing while in uniform that would not constitute provocative behavior as stated in the *Standard of Professional Conduct*. An analogous situation might be flying a Confederate flag in a unit with a substantial number of black soldiers, an action that is not specifically covered in Article 134. It seems likely that a court would determine that this action is disruptive of good order and discipline and that current standards of conduct would be sufficient notice that the activity would be punishable under Article 134.

The question of pre-notification for same-sex hand-holding and dancing is a close call and could easily go either way, as the 2-1 decision in *Guerrero* suggests. Consistent with the "not germane" option and the *Standard of Professional Conduct,* the risk of non-notification is outweighed by the conceptual approach that commanders should deal with potential disruptions on an individual basis. A central tenet of this option is the military's ability to deal with individuals and individual situations within the command structure and the many informal ways the military conveys to its members what is acceptable conduct. Rules governing every situation cannot be specified. The *Standard of Professional Conduct* would rely on military leaders to effectively apply the standards of conduct.

The Secretary, however, might decide that the disruptive effects of same-sex hand-holding and dancing would be so palpable as to outweigh the risk of establishing a double standard or of being subject to an equal protection challenge. To take a more cautious approach, the Secretary might want to specify the offending behaviors. If so, the *Standard of Professional Conduct* should specify that the behavior (same-

- 350 -

sex hand-holding and dancing) is equivalent to disorderly conduct, an Article 134 violation that carries a lesser punishment than other Article 134 violations.[35] But as noted, the risk of overspecification is that courts would be presented with an easier target for a disparate treatment analysis.

**Equal Protection**

Should the Secretary opt for greater specificity of certain behaviors that the military considers to be most provocative (namely, public same-sex hand-holding and dancing while in uniform), an equal protection challenge is likely. If homosexuals were to be a protected class, it could be difficult to sustain the resulting differential treatment. In that case, same-sex rules might be struck down as a sham designed to restrict conduct by homosexuals that is permitted for heterosexuals. But if homosexuals were not a protected class, deference to the military suggests that same-sex policies could survive legal scrutiny, as long as the military articulated a justification designed to protect morale and cohesion. Under an active rational basis standard, the military could sustain the disparate treatment as long as "the prejudice or the discrediting nature of the conduct is legitimately focused toward good order and discipline . . . and is not solely the result of the personal fears, phobias, biases, or prejudices of the witnesses."[36] Although this, too, would be a close call, a rationale for the policy based on a narrowly defined set of behaviors could withstand an equal protection challenge.

An alternative might be to provide guidance to commanders in the form of questions and answers regarding how the standard might be applied to certain specific behavior without codifying the military's response. In this way, maximum flexibility would remain with the command structure to enforce the code, while providing minimum exposure to an equal protection challenge to the *Standard of Professional Conduct* itself.

---

[35]This was the recommendation of the lower court in *U.S. v. Guerrero,* 31 M.J. 692, 696 (NMCMR 1990).

[36]*U.S. v. Guerrero,* 33 M.J. 295, 298 (CMA 1991).

- 351 -

**Unequal Enforcement**

Under the *Standard of Professional Conduct*, the circumstances and consequences of an act would form the basis of a possible violation. Over time, we anticipate that military custom would evolve to resolve most of these occurrences in a consistent manner. Until then, it is inevitable that the same behavior in different circumstances would be treated differently. Commanders would likely differ in how they might respond to certain behavior, and might view the consequences to morale and discipline of a particular act differently from other commanders. And commanders would likely vary in how they would weigh the time, place, circumstances, and purpose of an action relative to its consequences. For example, the statement of "I'm gay" might be acceptable in one context but inherently disruptive in another.[37] Thus, some degree of differential enforcement of the *Standard of Professional Conduct* should be expected, but this alone would not render the standard unenforceable.

In general, it is not easy to sustain a challenge to unequal enforcement of the law. Not only is prosecutorial discretion often a deterrent to such a challenge, but it is very difficult to prove that conduct that is otherwise punishable is being unequally enforced. It might be easier to sustain an unequal enforcement challenge to a general ban on something like same-sex hand-holding that is enforced only against acknowledged homosexuals (and ignored when done by heterosexuals) than to punishment for the consequences of an individual act. Nevertheless, homosexuals have not had great success in unequal enforcement challenges to sodomy statutes that apply equally to both heterosexuals and homosexuals. Perhaps more important, the standard adopted by the *Guerrero* court explicitly recognizes that differential enforcement of the current military policies is inevitable because the consequences of an act will be viewed differently under varying circumstances.

---

[37]A civilian analogue would be to consider shouting the word fire. In a crowded theater, the consequences are so disruptive that courts have sanctioned such behavior. But the same word shouted in a park would be treated very differently. The circumstances and consequences of the behavior determine the outcome.

- 352 -

When comparing the *Standard of Professional Conduct* to existing military custom, codes, and regulations, it is difficult to see why this should present any greater likelihood of differential enforcement than does any other military policy.  It should be no more or less vulnerable than existing military codes to an unequal enforcement challenge.  For example, applying Article 134 is inherently situation-specific, in the same way that the *Standard of Professional Conduct* would be.  The military is granted great deference to monitor and enforce its standards of conduct according to military needs.  The result of providing maximum discretion to commanders under Article 134 is that not all commanders treat the same situations alike, a result we would also expect under the *Standard of Professional Conduct*.

By way of example, there might be some homosexuals whose imperative is to test the limits of the standards.  Suppose, for instance, a homosexual soldier appeared at the General's house with a same-sex partner, or insisted on "in your face" behavior toward those not tolerant of homosexuality.  Both could be considered violations of the standards of conduct, subjecting the offending soldier to reprimand or punitive action.  For the most part, such disruptions would be handled at the command level, and a commander would determine whether the consequences of such an action would justify appropriate sanctions.  Different commanders could well reach disparate conclusions depending on how they viewed the circumstances and consequences.

As another example, stating "I'm gay" to draw attention to oneself would clearly be an irritant that might justify command intervention.  But suppose the behavior continued despite warnings to stop.  Under the *Standard of Professional Conduct*, the soldier would be expected to stop once warned by the commander.  If the conduct continued, the commander could determine whether it had adverse consequences to good order and discipline under the circumstances.

**On-Base/Off-Base Conduct**

As noted above, the time, place, circumstances, and consequences of the conduct determine if an act would be punishable as disruptive

- 353 -

conduct.  The same logic would apply whether the conduct takes place on or off base.  Thus, the *Standard of Professional Conduct* would be applicable to behavior that is disruptive to morale or unit cohesion regardless of where the behavior takes place.  In *Solorio v. United States*,[38] the court held that a member of the Armed Services can be disciplined for off-base conduct without the necessity of showing a service connection.  This does not require the military to discipline off-base behavior, but it is a recognition that off-base behavior can have a disruptive effect on military morale.

Where the conduct occurs, its context as well as its consequences, would be important in determining what could be considered as provocative.  For example, same-sex hand-holding on-base would most likely be considered as an inappropriate display of affection, and hence provocative, while the same behavior off-base and out of uniform would probably not be disruptive of morale and unit cohesion.  But conduct such as sexual harassment and abuse of authority would violate the *Standard of Professional Conduct* regardless of where the offense occurred.

**LEGAL ISSUES REGARDING THE UCMJ**

The "not germane" option requires the rescission of Enclosure 3H of DoDD 1332.14, but it could be implemented without altering provisions of the MCM relating to Article 125 of the UCMJ.  However, it would be necessary to resolve difficult legal issues regarding the distinction between status and conduct.

In this section, we analyze the legal consequences of both policy alternatives--changing the MCM and leaving it unchanged.  We also analyze each legal issue based on whether homosexuals would be treated as a protected class or as individuals.  Even though few courts have held so far that homosexuals are a protected class, as discussed above, the possibility remains that courts may decide that homosexuals should be a protected class.

_____

[38]483 U.S. 435 (1987).

- 354 -

**Rescind Enclosure 3H of DoDD 1332.14 Without Modifying the MCM**

Ending the ban without revising MCM provisions pertaining to Article 125 would be problematic.[39] As a point of departure, if the courts decide to treat homosexuals as a protected class, a restriction like this would probably not survive close scrutiny, given that sodomy statutes are rarely enforced against heterosexuals. Even short of that protection, it would likely be under sustained attack.

Though perhaps difficult to defend, we expect that for the reasons discussed below, the courts would nevertheless uphold the status-conduct distinction as a rational policy choice. However, the courts might rule that once acknowledged homosexual status was permitted in the military, an absolute ban on sexual conduct could not be maintained. Thus, an understanding of how the courts might approach the status-conduct distinction is important in the context of the Secretary's decision.

At issue is whether the policy choice to distinguish between status and a particular form of sexual conduct would be a rational one based on military considerations, and hence acceptable under the deference to the military principle, or whether the distinction could not be defended as a rational means of achieving a policy goal. The legal argument against its constitutionality would be that the premise of the distinction, that status is separable from conduct, is internally inconsistent and unsustainable. When confronted directly by that contradiction, courts would rule that once status is acknowledged, a ban on conduct violates equal protection.[40]

---

[39] From the perspective of a homosexual member of the Armed Services, rescinding Enclosure 3H of 1332.14 without changing the provisions would have both positive and negative consequences. A positive outcome would be the ability to serve openly in the military. But a negative consequence could be that the only way for the military to discharge a homosexual would be through an Article 125 prosecution. Under current policy, many homosexuals are given administrative discharges and are not prosecuted under Article 125. Not modifying the MCM provisions would put homosexuals at greater risk of an Article 125 prosecution.

[40] Arguably, the 9th Circuit is the appellate court most likely to seize on these arguments to overturn the ban altogether. As noted above, some judges on the 9th Circuit would like to overturn the ban even if the military makes no policy changes. But even Judge Norris's dissent in *Watkins,* one of the strongest statements opposing the

- 355 -

To the best of our knowledge, there are no cases holding that policies based on the status-conduct distinction are unconstitutional, and there are cases explicitly rejecting this position as applied to homosexuals.[41]  While numerous courts discuss the salience of the distinction, no court has ruled that recognizing homosexual status requires equating status with conduct, or that recognizing status requires a change in policy regarding conduct.  And some courts[42] have ordered the reinstatement of acknowledged homosexuals without questioning the ban on homosexual conduct.  In most areas of the law, what is prohibited is certain conduct, not the status of the actor.  For the argument equating status and conduct to be tenable, a court must equate status with conduct as a matter of law, something that few courts have done in the past.[43]

Nevertheless, there is language in the *Ben-Shalom* case suggesting that the distinction between status and conduct defies common sense. The court stated explicitly on page 464 that: "Plaintiff's lesbian acknowledgment, if not an admission of its practice, at least can rationally and reasonably be viewed as reliable evidence of a desire and propensity to engage in homosexual conduct. . . .  [I]t is compelling evidence that plaintiff has in the past and is likely to again engage in

---

military's ban on homosexuals, focuses on sexual orientation, without making the connection to conduct presumed by this argument.

[41]See, e.g., *Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir. 1991) and *Meinhold v. U.S. Department of Defense*, 808 F.Supp. 1455 (C.D.Cal. 1993).  In *Steffan v. Cheney*, 920 F.2d. 74, 76 (n.*) (D.C. Cir. 1990), the court rejected the government's argument that Steffan's sexual orientation created a rebuttable presumption that he had committed homosexual acts.  See also, *Jacobson v. U.S.*, 112 S.Ct. 1535, 1541, 1542 (1992), where the court stated that, "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition. . . .  Furthermore, a person's inclinations and 'fantasies . . . are his own and beyond the reach of government . . . .'"

[42]See, e.g., *Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989).

[43]The argument that status is equivalent to conduct is further undermined by DoD Directive 1332.14, which itself distinguishes between conduct and status.  Under this Directive, a person committing homosexual acts may still be retained in the military if these acts were a departure from usual and customary behavior.

- 356 -

such conduct . . . . The Army need not shut its eyes to the practical realities of this situation . . . ."

Although primarily a First Amendment case, the *Ben-Shalom* court also ruled on the plaintiff's equal protection argument. The lower court viewed Army Regulation (AR) 140-111, banning reenlistment for homosexuals, as a classification based entirely on sexual orientation (status). The lower court then decided that homosexuals constituted a protected class, and ruled that the ban on status was unconstitutional. To be valid, the lower court ruled, the regulation must be targeted at sexual conduct, not just sexual orientation.

On appeal, the 7th Circuit ruled that the ban on status could remain because the admission of status is tantamount to an admission of conduct. Since the court determined that status amounted to conduct, the regulation's ban on conduct could be enforced. The court ruled that the regulation was constitutional because the Army did not need to ignore the connections between status and conduct. Thus, the court based its ruling on the prohibited conduct, regardless of whether status is banned.

Even though the court rejected the distinction between status and conduct, the court upheld the ban on conduct. As a result, there would not appear to be a conflict between the court's holding and implementing the "not germane" option without revising the MCM provisions pertaining to Article 125. Just because this option acknowledges status does not mean that a court will therefore rule that the military cannot continue to ban sodomy where the military chooses as a policy not to equate status with conduct.[44] The acknowledgment of sexual orientation need not have an effect on how the military enforces its ban on sodomy. More importantly, the "not germane" option explicitly eliminates the definition of homosexuality that equates homosexual tendencies with homosexual behavior.

Although this means that the tension between the "not germane" option and Article 125 is not unconstitutional, it does not mean that the tension disappears. To see why, imagine the tension between Article

---

[44]In an analogous situation, courts have held that the status of drug addiction does not imply illicit drug use, absent actual conduct.

- 357 -

125 and the "not germane" option in a heterosexual context.  Given that most married heterosexual couples engage in oral sex,[45] an act prohibited by Article 125/MCM, should they be presumed to be in violation of Article 125 simply because of their marital status?  If the answer is no, the argument that status alone constitutes a violation of Article 125, and hence mandates the unconstitutionality of this option, must fail.

There are three additional reasons for this conclusion.  First, the *Ben-Shalom* court was not confronted by the specific question raised above.  What it ruled on was whether the Army was required to target sexual conduct in order to sustain the ban on both status and conduct, not whether the Army could, as a matter of policy, permit status while prohibiting certain sexual conduct.  The military can legitimately determine that disruption to good order and discipline emanates from sodomy, and that restricting sexual conduct rather than status is a legitimate policy objective.

Second, as noted above, the weight of the cases is that policy choices made by the military will be given great deference by the courts.  As long as the policies are not irrational, courts are likely to defer to military judgment.[46]  At one point (p. 461), the *Ben-Shalom* court stated flatly:  "If a change of Army policy is to be made, we should leave it to those more familiar with military matters than are judges not selected on the basis of military knowledge."  Even if the distinction between status and conduct is artificial, the "not germane" option would start with the presumption of validity based on deference to the military.  This remains a difficult standard to overcome.

Third, the lower court applied a heightened scrutiny analysis after holding that homosexuals constituted a suspect class.  As discussed above, relatively few courts have so held, and the appellate court in *Ben-Shalom* explicitly rejected this finding.  As a result, a homosexual

---

[45]See the chapter on sexual orientation and sexual behavior for findings on this topic.

[46]For instance, in *Beller v. Middendorf*, 632 F.2d 788, 812 (9th Cir. 1980), the court upheld the Navy's rule requiring discharge based on any homosexual conduct, despite stating that the rule is "perhaps broader than necessary to accomplish some of its goals."

- 358 -

challenge to the "not germane" option would still, at most, be judged under an active rational basis test.  The use of the rational basis test, when combined with traditional deference to military policy, suggests that the military should be able to defend its policy choice of acknowledging status while prohibiting sodomy, especially if it treated heterosexual sodomy in a similar manner.

**Changing the MCM**

Even though it would be constitutionally viable to rescind Enclosure 3H of DoDD 1332.14 without modifying the MCM provisions in question, the situation could possibly undermine the orientation-neutral principle of the "not germane" policy.  Several considerations suggest that it would be better to modify the MCM provisions pertaining to Article 125.

Once the principle that sexual orientation is not germane to military service has been accepted, the fact that some members of the military have private, consensual sex with members of the opposite sex while other military members have private, consensual sex with members of the same sex would also not be germane.  In other words, it would be difficult to understand the argument for punishing private sexual acts once the military had determined that sexual orientation was not germane to military service.[47]

In addition, historically, state sodomy statutes have been widely perceived as being the legal basis to exclude or punish homosexuality (see, e.g., *Bowers v. Hardwick*, dissenting opinion by Justice Blackmun).  Even where the statutes are sex-orientation neutral, they have not been enforced equally against homosexual and heterosexual behavior.  In the military, there are indications that Article 125 has been used differentially for homosexuals and heterosexuals.[48]  To understand how,

---

[47]As an example of this difficulty, suppose that acknowledged homosexuality was acceptable, but any homosexual conduct was unacceptable.  In some cases, the distinction between telling (probably protected conduct) and doing (prohibited conduct) becomes very difficult to determine.  Suppose, for example, a soldier states that he has engaged in anal sex while a member of the armed forces.  Is this telling or doing?  Is this grounds for an investigation?  For discharge?

[48]Burrelli, 1993.

- 359 -

it is important to recognize that DoDD 1332.14 and Article 125 have been used together in the past.  Threats to homosexuals of prosecutions under Article 125 have been used to elicit confessions of homosexuality and then acceptance of administrative discharges under DoDD 1332.14.  Thus, retaining Article 125 and the present relevant provisions of the MCM, after rescinding Enclosure 3H of DoDD 1332.14, would make the consequences of unequal enforcement more serious:  Homosexuals who practice oral or anal sex would be exposed to the risk of court-martial proceedings without the availability of an administrative discharge as an option.

An approach to dealing with the conceptual tension that eliminates all possibilities of unequal enforcement is to modify the MCM so that it permits private sexual behavior between consenting adults.[49]  Together with the rescission of Enclosure 3H of DoDD 1332.14, this would be the most straightforward way of eliminating a link between status and conduct.

Although the President may not redefine the elements of a crime, the President has considerable discretion as commander-in-chief in promulgating the MCM, specifying rules for courts-martial, and determining maximum and non-judicial punishments.[50]  Neither the phrase *unnatural carnal copulation* nor the term *sodomy* is defined in the UCMJ. In the current MCM, these concepts are defined by the Executive Branch through the Elements of the criminal charge and the Explanation of the punitive article.  One or two minor revisions to the Elements and Explanation accompanying Article 125 would achieve the goals of the "not germane" option.  For example, the current Elements read as follows:

   b.  Elements.

   (1) That the accused engaged in unnatural carnal copulation with a certain other person or with an animal.

_____

[49]See Appendix C.
[50]Schlueter, David A., *Military Criminal Justice:  Practice and Procedure*, 2nd edition, Charlottesville, VA:  The Michie Co., 1987, pp. 5-6.  See also, "The 1984 Manual for Courts-Martial:  Significant Changes and Potential Issues," Department of the Army Pamphlet 27-50-139, in *The Army Lawyer*, July 1984, pp. 1-58, and *U.S. v. Curtis*, 32 M.J. 252 (CMA 1991).

- 360 -

[Note:  Add either or both of the following elements, if applicable]
(2) That the act was done with a child under the age of 16.
(3) That the act was done by force and without the consent of the other person.

If element (3) were moved above the Note and renumbered as (2), to read as shown below, the effect would be to exclude private, consensual heterosexual and homosexual oral and anal sex between adults:

(1) That the accused engaged in unnatural carnal copulation with a certain other person or with an animal; and,
(2) That the act was done by force and without the consent of the other person.
[Note:  Add the following element, if applicable]
(3) That the act was done with a child under the age of 16.

(Similar behavior in public could be punished under several other punitive articles, including Articles 133 and 134.  In fact, a recommendation could be included in the MCM to make it clear that carnal copulation in public ought to be prohibited for both homosexual and heterosexual behavior.)[51]

A second possible revision would be to add the phrase "non-consenting adult" in the Explanation, where appropriate, to indicate that private, consensual sex between adults would be excluded from the phrase "unnatural carnal copulation."  Or, preferably, both revisions could be made simultaneously, for the sake of consistency.

Given the inherent authority of the Executive Branch to define the Elements and the Explanation, it seems clear that the President has the legal authority to make these revisions.  This is not to suggest that Congress might not attempt to override the Administration by codifying the current Elements and Explanation into the statute.  It is simply to suggest a legal means of avoiding the potential tension between Article 125 and homosexuals serving openly in the military.

_____

[51]Indeed, we anticipate that the standards of conduct adopted would make it clear that those who oppose such behavior would not be forced to witness it or to be reminded that some of their fellow soldiers desired to engage in such behavior.  Conduct that calls attention to sexual activity would be inherently inappropriate.

- 361 -

A legal objection to these revisions might be that they actually constitute a change in the elements of the crime of sodomy, and thus rest with the legislature, not the executive.[52]  We think this argument fails on several grounds.  First, there is no change to the crime of sodomy--the revision is a procedural one that specifies who will be subject to prosecution.  This change lies well within the leeway ordinarily accorded for prosecutorial discretion.  Second, the MCM already permits the military to add the Element of nonconsent to the crime as a matter of command discretion for targeting criminal charges or investigations.  The revision simply makes it an Element of the criminal charge in all instances.  Third, the military made similar changes when the MCM was revised in 1984.  For instance, the 1984 MCM revised Articles 124 and 128 to require specific intent to injure rather than general intent, despite case law to the contrary.  Under Article 93, the MCM added sexual harassment to the Explanation of the crime.  And certain offenses were dropped altogether from Article 134 because "they were so little used that the drafters decided they did not require attention in the Manual."[53]  As a practical matter, the only way to challenge the revisions would be through an act of Congress, which would not be necessary if Congress were to accept the "not germane" option.

Another potential legal problem that might emerge if the MCM were revised to exclude private sexual conduct between consenting adults is with the enforcement of state law.  Some 23 states still treat sodomy as a crime, and if enforced at all, the law is most likely to be enforced against homosexuals.  A member of the military may well be prosecuted for committing sodomy in violation of state law.  Clearly, the state has

---

[52]As noted below, even if a court were to rule that the proposed revisions were unlawful, the President has ample authority to determine what the punishment should be for an Article 125 violation.  The President could specify that nonjudicial punishment is appropriate for sodomy between consenting adults, thus avoiding a threatened discharge.  This approach, however, still makes the conduct impermissible and may well have other adverse effects.

[53]*The 1984 Manual for Courts-Martial:  Significant Changes and Potential Issues,* Department of the Army Pamphlet 27-50-139, in *The Army Lawyer,* July 1984, p. 37.  In reality, sodomy prosecutions against consenting adults are already rare, used mainly as leverage to convince homosexuals to accept an administrative discharge.

- 362 -

a right to prosecute the case.  For our purposes, the question is whether the soldier should also be discharged for conduct bringing discredit to the Armed Forces.  Presumably, this should be handled in the same manner that other violations of state law are handled.  If similar state law violations result in discharge, this should be no exception.  If similar violations are treated with less severity, so should this.  In either case, this is not a compelling argument for retaining the relevant provisions of the MCM in their present form, especially since the general trend in state law is to repeal sodomy statutes as applied to consenting adults.

Assuming that political realities preclude the above revisions, there are several other regulatory means available to *encourage* equal enforcement of Article 125.  As a matter of even-handed regulatory and enforcement policy, the "not germane" option would stress that Article 125 should be equally applicable to heterosexuals and homosexuals, with appropriate investigatory guidelines.  The President could also redefine the punishment for sodomy between consenting adults to be a nonjudicial punishment.  This would avoid the threat of discharge now hanging over a homosexual member of the military, but it would not, in and of itself, eliminate the possibility of investigations.  Therefore, investigative guidelines and enforcement priorities should indicate that private, consensual sex between adults would be a low enforcement priority.[54]  As commander-in-chief, the President, through the MCM, can state that, as a matter of prosecutorial discretion, cases involving private, consensual behavior will not be prosecuted.[55]

--------

[54]Given the evidence of contemporary sexual behavior that the overwhelming majority of heterosexuals and homosexuals engage in some form of proscribed sexual conduct (primarily oral sex), *rigorous* enforcement of Article 125 would certainly have an adverse effect on the military.  Thus, there are serious questions as to whether Article 125 can be enforced fairly.  Furthermore, if the trend toward the elimination or overturning of sodomy statutes continues, it may be difficult to sustain Article 125 in its current form.

[55]One reason for not prosecuting these cases is to avoid giving a spurned lover, either homosexual or heterosexual, a bargaining chip to hurt the other party.  Such matters are best left out of the criminal justice system.  In short, a policy of practical and realistic equal enforcement suggests that private, consensual sexual behavior between adults should not be prosecuted.

- 363 -

OTHER LEGAL ISSUES

**What Privacy Rights Can Heterosexuals Assert?**

An important policy consideration is to balance the privacy rights of members of the military who object to homosexuality with the principle that sexual orientation is not germane to military service. Through flexible command policy, privacy concerns could be alleviated by ensuring freedom from personal and sexual harassment and maximizing flexibility in sleeping and bathroom facilities, where feasible. As a legal matter, however, there appear to be few ways in which a heterosexual could assert a privacy right sufficient to bar adoption of the "not germane" option.[56]

For one thing, it is generally understood that a soldier yields full privacy rights upon entering the military. For another, courts would be likely to balance individual privacy rights with the opportunities of others to serve in the military. Courts may well rule in an individual case that the assertion of a privacy right is sufficiently compelling to justify rescinding the contract between the soldier and the military (that is, to allow an early discharge). And an individual commander might attempt to accommodate an individual soldier who had deep moral objections against rooming with a homosexual. But courts would be unlikely to override the military's policy choice to allow homosexuals to serve based on heterosexual soldiers' privacy rights. This would be especially true if courts were to treat homosexuals as a protected class.

Just as important, granting a privacy right to heterosexuals who object to serving with homosexuals must be justified on grounds other than private biases or prejudices against homosexuals. As discussed above, the *Palmore* and *Cleburne* cases send a strong message that

---

[56]For example, a heterosexual might assert a privacy right against sharing intimate quarters with homosexuals. To take this argument seriously as a constitutional matter, courts would be required to consider a range of public accommodations for heterosexual privacy where homosexuals and heterosexuals have long interacted, such as in public schools (which students are required to attend), public recreation facilities, and the like. No one has seriously suggested requiring such actions. In these situations, society is concerned with certain offensive behaviors, not sexual orientation.

- 364 -

policies based on private biases will not be sanctioned by the courts. Thus, it might be difficult to construct a general heterosexual privacy right that satisfies the *Palmore/Cleburne* test.

**Accession and Reinstatement Rights for Previously Excluded or Discharged Homosexuals**

Once the "not germane" policy was implemented, some previously discharged homosexuals might seek reinstatement while others previously excluded might seek to enlist.  Some might also seek damages for their military rejection or discharge.  For several reasons, it is unlikely that these challenges would be successful.

First, the "not germane" policy would be explicitly prospective. Courts would be likely to allow the military to look to the future without providing a remedy to those affected by the ban.  In fact, the Supreme Court has granted Congress great leeway to make laws prospective, without providing remedies for those harmed by previous policies.  Second, courts would be likely to allow the military considerable flexibility in implementing the new policy.  Congress has authority under the Constitution to set the terms and conditions of military service; its agreement or acquiescence with this option would be a strong statement to the courts that prior actions based on the ban should be disregarded.  Third, the ban was legally valid at the time of discharge or enlistment rejection.  Fourth, numerous legal procedural bars, such as statutes of limitation, failure to exhaust remedies, and *res judicata*, might be barriers to any individual action for reinstatement or damages.

**Benefits**

The "not germane" option would not alter current policies regarding benefits for non-married cohabitants.  We anticipate that benefits policies and standards would remain consistent throughout the federal government.  Under this option, homosexual marriages would not be recognized, and same-sex cohabitants would be treated like heterosexual cohabitants.

Sooner or later, these policies would likely be challenged.  Since no state currently recognizes homosexual marriages, the challenge is

- 365 -

likely to be later rather than sooner.  But the Supreme Court of Hawaii recently ruled that the state must justify its ban on same-sex marriages.[57]  By treating homosexuals as a protected class, the court set a high standard for the state to meet.  If the Hawaii (or any other state) law banning same-sex marriages is declared unconstitutional, or if a state voluntarily decides to approve same-sex marriages, at some point a homosexual soldier will get married in that state and request benefits for the partner.

Under current policy, however, military benefits are set by federal law, which now defines spouses as married partners of the opposite sex. In this example, the homosexual soldier married legally in Hawaii might bring an equal protection challenge to the federal definition of *spouse*. As long as homosexuals are not a protected class, the question is whether the federal statute defining spouses as married partners of the opposite sex serves a rational governmental interest.  Although the federal government does not generally seek to regulate marriage, relegating it primarily to the states, the federal government does have an interest in determining who qualifies for certain federal benefits and the basis on which those benefits are to be distributed.  If many states begin to recognize homosexual marriages, it becomes harder to defend the federal policy.  But if only one state or a few states do so, the federal policy would remain well within the mainstream (it would not be irrational), and thus would be defensible as promoting societal and familial stability.[58]

Even if a court were to determine that the definition as applied in a civilian context did not fulfill a legitimate governmental interest, it does not follow that a court would make a similar determination regarding military benefits.  For example, under current policy, homosexuals are not dismissed from the civilian federal government based on status, while they are dismissed from the military based on status alone.  And some benefits, such as on-base living arrangements, may be

_____

[57]*Baehr v. Director of the Department of Health, Hawaii,* Supreme Court of Hawaii, No. 91-1394, 1993.
[58]See, e.g., the discussion in Editors of the Harvard Law Review, "Developments in the Law:  Sexual Orientation and the Law," *Harvard Law Review,* Vol. 102, 1989, pp. 1508-1671, at pp. 1603-1628.

- 366 -

inherently disruptive to morale so that deference to the military would permit the military to withhold such benefits.

If homosexuals become a protected class, the denial of benefits to a legally married homosexual couple may not survive a constitutional challenge.  In that case, the issue would be whether the government has a compelling or substantial interest in limiting certain benefits, such as on-base same-sex housing, to justify the differential treatment.  As we have seen, that is a difficult standard to meet.

CONCLUSIONS

To a certain extent, the threat of legal action, either to overturn the ban or to undermine any policy shift regarding accession and retention of homosexuals in the military, is a red herring.  Legal issues would need to be addressed, and implementation of the "not germane" option would not be without legal challenges.  But the fundamental issue of whether to end the military's ban on homosexuals is a policy choice, not a legal imperative.

The "not germane" policy option is entirely defensible from a legal perspective.  As a compromise policy position, adopting this option without revising the relevant provisions of the MCM would also be legally defensible.  Although such a compromise may be difficult to sustain administratively, courts are likely to defer to the military's policy choice.

Besides these general conclusions concerning the legal viability of the "not germane" option, our specific legal conclusions include the following:

- There is no reason to expect that the courts will overturn the current ban on homosexuals in the near future.  Court rulings on homosexuals in the civilian sector do not suggest that such a result is imminent.
- Courts generally defer to the military on a broad range of issues.  The fact that courts have been reluctant to treat homosexuals as a protected class makes it even more difficult

- 367 -

to overturn the ban based on violation of the equal protection laws.

- Legal and legislative trends regarding gay rights are mixed. No appellate federal court has ruled that homosexuals should be treated as a protected class for purposes of the equal protection laws.

- However, there has been some movement in the courts from a passive to an active rational basis test that might at least compel the military to provide a more persuasive justification for continuing the ban. If the active rational basis becomes the standard, prejudice against homosexuals would not be sufficient grounds for sustaining the ban.

- If the "not germane" policy were adopted, it should be accompanied by a change in the provisions of the MCM pertaining to Article 125. This could be accomplished at the President's discretion. Absent this change, the "not germane" option would still be legally valid. Courts are likely to defer to the military's policy choice if it wants to make a distinction between status and conduct.

- The *Standard of Professional Conduct* is sufficiently specified to withstand a legal challenge of being void-for-vagueness. The *Standard of Professional Conduct* could also survive legal scrutiny if more specific examples of prohibited conduct were added.

- Other potential legal challenges, such as those based on the assertion of heterosexual privacy rights, are also without merit.

- 368 -

## 12.  IMPLEMENTING POLICY CHANGE IN LARGE ORGANIZATIONS[1]

### INTRODUCTION

Whatever its form or content, any new policy that would allow acknowledged homosexuals to serve in the U.S. military would have to be implemented in an organization that, like most organizations, resists changes in those structures, policies, and practices that have contributed to their past success.  Even though military organizations are accustomed to rapid changes in technology and battle threats, they are usually highly averse to *social* changes--that is, changes in their traditions, customs, and culture (Builder, 1989).

In the case of allowing acknowledged homosexuals to serve in the military, the resistance to change touches not only on deeply held attitudes but, for a large portion of the military, on moral beliefs as well.  For many, it makes no difference if a service member ever comes in contact with an acknowledged homosexual:  The change in policy itself alters their perception of *their* organization in a fundamental way. (See the chapter on military opinion.)

This chapter considers how such a policy might be effectively implemented, in light of institutional culture, the current policy context, and what the literature tells us about implementing policy change in large organizations.  To do so, the chapter first describes the implementation context, including the military culture and the current policy context.  Then, it reviews factors that constrain and support policy implementation, including policy design, features of the implementation process, and the local context for change.  Drawing upon this literature review, the chapter ends with a discussion of how the Armed Forces might most successfully implement a new policy concerning homosexuals.

---

[1]This chapter was prepared by Gail L. Zellman, Joanna Zorn Heilbrunn, Conrad Schmidt, and Carl Builder.

- 369 -

## IMPLEMENTATION CONTEXT

Implementation as an area of study was born of a need to understand why policy changes imposed from the top often did not find their way to the bottom of large organizations, or if they did, why they resided there in substantially altered form. Moreover, organizations tend to overwhelm innovations, emerging unchanged from processes whose goal was explicitly to change them. These findings challenged the assumptions that organizational change is a relatively straightforward process with predictable outcomes.

The literature on the implementation of innovations in large organizations focuses heavily on the introduction of technological or organizational change (e.g., O'Toole, 1989; Langbein and Kerwin, 1985; Prottas, 1984; Wilms, 1982; Zetka, 1991; and Walsh, 1991). To some extent, all change follows the same process. But social change, which inherently involves much more deeply held attitudes about race, religion, sexuality, or values, brings added complexity to the change process. Externally imposed social change challenges an organization and its leadership to create a blueprint for change that considers the institutional culture and incorporates useful implementation theory principles, a large measure of leadership, an understanding of the extent to which previous experience applies, and a keen awareness of the fears and limits of those at the bottom, on whom the success of policy implementation ultimately depends.

## Military Culture

The military is viewed organizationally as a hierarchical, rule-driven institution. However, it is also an institution with a strong culture and sense of itself in relation to the external social and political environment. This cultural sense is sufficiently strong that policies that seem at odds with it may meet considerable resistance, from the top to the bottom of the hierarchy.

The American military is a web of organizational and participant cultures at many different levels, and including a participant culture comprising the attitudes and values of the individuals who serve. Military subcultures have been described by Builder (1989), who notes

- 370 -

that military organizations and their suborganizations (Army, Air Force, Navy, and Marines) have distinctive cultures that have a significant effect on the way the organizations operate and react in a variety of situations. Despite this variability across and within services, on balance, the military can be described as an organization that is based on a formal, hierarchical, and rule-driven structure, which values efficiency, predictability, and stability in operations. This structure is supported and reinforced by organizational and participant cultures that are conservative, rooted in history and tradition, based on group loyalty and conformity, and oriented toward obedience to superiors. Any policy change must take place in that military environment. Many observers have noted that, to the extent that a conservative military organization values predictability and stability, it is implicitly averse to change and explicitly averse to change dictated from outside the organization (e.g., Builder, 1989).

Militaries have always seen themselves somewhat apart from the larger societies that support them and that they are constituted to protect. Part of the separateness stems from the military mission and its burdens. But the American military has, during the Cold War, by its rapid rotation of people through assignments and posts and by its substantial forward presence overseas, enhanced that separateness and fostered a separate military family and society.

The demographic gap between the American military and the rest of society has been closing during the last decade with increasing numbers of two-career families and the decline of the "officer's wife" as an occupation. Nevertheless, many of the values of military families still reflect those of small towns and of several decades past, which may reflect the selective enlistment inherent in the all-volunteer force. For many of the more senior military people now in leadership positions, there remains a legacy of the hostility between the American military and the rest of society that reached a peak during the war in Vietnam. For those people, the imposing of unwelcomed aspects of American society on the military--often referred to as "social experimentation"--evokes familiar and hostile feelings. (See the chapter on military opinion for more discussion of these issues.)

- 371 -

## The Policy Context

The military has seemed particularly averse to removing the restriction on homosexuals because that policy threatens its cultural values and because it is externally imposed. Many people have argued that it was similarly averse to racial integration and the admission of women. However, five factors make the integration of homosexuals particularly problematic.[2]

First, a majority of military personnel, and a sizable portion of the general public, feel that homosexuality is immoral. For many, allowing homosexuals to serve would put the military in the position of appearing to condone a homosexual lifestyle.

Second, the debate is occurring in a context characterized by drawdowns and uncertainty. In response to the end of the Cold War, the military's role and mission are being widely questioned. Reduced military budgets have created considerable anxiety among military personnel. Many believe that with base closings, drawdowns, and reductions in benefits, the military has violated the psychological contract between the organization and its members (Rousseau, 1989). The resulting anger and resentment have made members disinclined to tolerate additional threats to military culture in the form of allowing homosexuals to serve.

Third, the policy debate is occurring in a context where norms of deference are significantly eroded. This lack of deference serves to restrain support for new policies and, ultimately, for change. Military members and leaders appear to feel little constrained to withhold criticism of the Commander in Chief or his policies.[3] Their outspoken opposition to permitting homosexuals to serve is a cause for concern because it sends the message that the new policy is bad for the military

---

[2]These five factors clearly emerged in focus groups that were conducted by study staff at military bases in the United States and Germany. (For a description, see the chapter on military opinion.)

[3]A recent speech by Air Force Major General Harold N. Campbell in which he referred to President Clinton as "draft-dodging," "pot-smoking," "womanizing," and "gay-loving" is a particularly egregious example of the fraying of these norms. His subsequent dismissal was meant to send a strong signal that such flagrant violations of deference norms will not be tolerated.

LCR Appendix Page 0689

- 372 -

and would have no support among top military leaders.  Nevertheless, norms of obedience remain and some observers argue that they would carry the day.[4]

Fourth, the current budgetary context may restrain change if implementation planning fails to take it into account.  Since budgets are not growing, all new programs are viewed as coming at the expense of old and sometimes cherished ones.  We can expect that the more the integration process costs, the more it would be resented.

Fifth, there is no sense that the change would serve any legitimate need of the military.  Objections that the policy is not based on need are reinforced by the sense among many military members that even the President is not committed to the change.  Rather, they believe that his support simply reflects commitments made during the Presidential campaign in exchange for electoral support.  (See the chapter on military opinion for more detail on these attitudes.)

Although military structure and culture and key features of the policy context are unique to the problems of implementing a policy to allow homosexuals to serve, every implementation process is to some degree unique.  Consequently, empirical findings and general principles derived from studies of policy implementation and organizational change offer lessons for implementing such a policy.  These literatures and the lessons they offer are described below.

## FACTORS THAT CONSTRAIN AND SUPPORT POLICY IMPLEMENTATION

Implementation itself is best defined as "the carrying out of a basic policy decision, usually incorporated in a statute but which can also take the form of important executive orders or court decisions. Ideally, that decision identifies the problem(s) to be addressed, stipulates the objective(s) to be pursued, and in a variety of ways, 'structures' the implementation process" (Mazmanian and Sabatier, 1983, p. 20).  Policy analysts often divide the change process into two

---

[4]Indeed, on June 10 in a speech at Harvard University, the Chairman of the Joint Chiefs of Staff, General Colin Powell, said of a new policy toward homosexuals' military service, "The President has given us clear direction. . . .  Whatever is decided, I can assure you that the decision will be faithfully executed to the very best of our ability."

- 373 -

phases:  adoption and implementation.  The adoption phase begins with
the formulation of a new policy proposal and ends when that proposal is
formally encoded in a law, regulation, or directive.  The implementation
phase begins with the formal adoption of the policy and continues at
some level as long as the policy remains in effect (e.g., Weimer and
Vining, 1992).

Those who study implementation generally agree that three
categories of variables contribute most significantly to policy change,
despite variations in how they are described:  policy design, the nature
of the implementation process, and the local organizational context in
which the policy is implemented (e.g., Mazmanian and Sabatier, 1983;
Goggin, 1987).  Each of these components is discussed in turn.

**Policy Design**

The design of a new policy and its expression in a policy
instrument can substantially affect both the implementation process and
the extent to which the policy's original objectives are met in
practice.  Those policy design components that bear most on outcomes
include characteristics of the change required and the nature of the
policy instrument.

**Characteristics of the Required Change.**  Some changes are
inherently more complex than others.  For example, a law whose goal is
to reduce highway fatalities by lowering the speed limit contains within
itself all the information necessary to enable individuals to comply
(McDonnell and Elmore, 1987).  In contrast, a court order to create
equal educational opportunity is less clear-cut.  Individuals must not
only read and understand the equality standard but must create a plan
that translates the goal into required behaviors, a more complex task
that may fail because of unwillingness to comply or, more likely, some
failure of capacity to do so (McDonnell and Elmore, 1987).

A policy's successful implementation also derives from the validity
of the causal theory that underlies it.  Every major reform contains, at
least implicitly, a causal theory linking prescribed actions or inter-
ventions to policy objectives.  Indeed, one of the major contributions
of implementation analysis is its emphasis on seeking to build an

LCR Appendix Page 0691

- 374 -

overall theory for obtaining desired organizational changes (Mazmanian and Sabatier, 1981).  To the degree that there is consensus about the validity of the theory (that is, that most agree that by carrying out the intervention, attainment of policy objectives is likely), policy implementation is facilitated (Mazmanian and Sabatier, 1983).

Another key characteristic of the required change is the scope of change required.  Scope can be measured in terms of the size of the target group, the percentage of the population affected, or the extent of behavior change required.  In general, policies that require less change, in terms of numbers and extent, are easier to implement (Mazmanian and Sabatier, 1983).

**Nature of the Policy Instrument.**  McDonnell and Elmore (1987) describe four generic classes of policy instruments:  (1) mandates, which are rules governing the actions of individuals and agencies, intended to produce compliance; (2) inducements, the transfer of funds to individuals or agencies in return for certain agreed-upon actions; (3) capacity-building, the transfer of funds for investment in material, intellectual, or human resources; and (4) system-changing, the transfer of official authority among individuals and agencies to change the system through which public goals and services are delivered.

The choice of instrument structures affects the implementation process to a significant degree.  Expected outcomes, costs, and the extent of oversight all vary by type of policy instrument.  For example, while mandates seek uniform but minimal compliance, inducements are designed to produce substantial variability in outcomes because there is often a variety of ways to achieve high performance.  Mandates require a strong focus on coercion and compliance monitoring, while the implementation of inducements requires oversight but no coercion (McDonnell and Elmore, 1987).

**Implementation Guidance.**  Implementation guidance is built into some policies, e.g., a reduced speed limit, as noted above.  In other cases, guidance is less inherent in the policy, but may be built in in several forms.  Among the most important ways to do so are by clearly ranking policy objectives and by stipulating decision rules for implementing agencies.

LCR Appendix Page 0692

- 375 -

A clear ranking of policy objectives is indispensable for program evaluation and for directing the actions of implementing officials. Statements about objectives may also be used as a resource for groups that support the policy objectives. Formal decision rules of implementing agencies, e.g., the stipulation in a statute of the level of support required for a specific action (e.g., two-thirds majority of a specified commission required for a license to be issued), reduce ambiguity and increase the likelihood that a mandate will be carried out as intended (Mazmanian and Sabatier, 1983).

**Implementation Process**

Implementation researchers (e.g., Elmore, 1978, 1980; Goggin, 1987; McLaughlin, 1987, 1990; Mazmanian and Sabatier, 1983) view the process through which a new policy is implemented as a key contributor to understanding organizational change. From the implementation perspective, any analysis of policy choices or the effects of policy on organizations matters little if implementation is poorly understood.

What emerged from the early implementation studies was a sense that while change was not straightforward, the implementation process could be understood and ultimately managed. Several key notions emerged (McLaughlin, 1990). First, changing practice through policy is a difficult undertaking. Second, policymakers cannot mandate what matters--capacity and will at the lower levels of the organization where the policy must find a home. Third, by focusing on policy implementation, certain processes and rules could be brought to bear that would increase the likelihood that policy would find its way, relatively unscathed, into practice (Mazmanian and Sabatier, 1981).

These notions suggest an implementation process structured around pressure and support. Pressure, argues McLaughlin (1987), focuses attention on the new policy and increases the likelihood of compliance; support is necessary to enable implementation. Such support may include adequate financial resources, a system of rewards that recognize compliance efforts, and room for bottom-level input into the process.

**Pressure.** Studies of efforts to reform education practice in classrooms revealed that myriad factors intervene between the passage of

- 376 -

a statute or the signing of an order that affect, often profoundly, the likelihood that the new policy will be recognizable at the lowest levels. In these systems, the key factors were at the bottom of the organization, among what Weatherley and Lipsky (1977) called "street-level bureaucrats." Here, a sense of ownership of the innovation, some adaptation of the policy to fit local circumstances, and a perception that the policy was tractable and the change would be both do-able and useful for staff and clients (Mazmanian and Sabatier, 1983) were key determinants of how pervasive the change would be and of the implementation's fidelity to the policy's original intent.

These studies viewed top-down implementation as "the noble lie" that persisted because of the perceived lack of other alternatives (Elmore, 1980). Early implementation studies provided some. For example, Elmore (1980) suggests that while formal authority *is* top-down, many organizations have, as well, a bottom-up system of informal authority or culture. To implement change in such organizations, it is important to find the correct mix of hierarchical control and subordinate discretion (Elmore, 1978). Often, this mix represents a tradeoff between efficiency and flexibility (Elmore, 1980).

But for the most part, the programs examined by early implementation researchers were inducements--policies that seek to achieve their goals by transferring money or authority to an individual or agency in return for something of value (McDonnell and Elmore, 1987). Most often, the agencies given the new funds were loosely coupled educational organizations. Given the nature of the policy instrument and the types of agencies pursuing change, considerable variability in outcomes was expected, and little pressure was necessary or applied.

In some contrast, any policy change with regard to homosexuals serving in the military will be presented in the form of a mandate. The implementation of a mandate involves different dynamics, although the considerable discretion accorded lower-level military leaders argues that the lessons of implementation in loosely coupled educational agencies can be brought to bear as well.

- 377 -

Research on regulatory policy has demonstrated that targets of mandates incur costs from complying or from avoiding compliance. The choice they make to comply with the mandate or attempt to avoid doing so is based on the perceived costs of each alternative. Targets decide whether or not to comply by calculating two kinds of costs: (1) the likelihood that the policy will be strictly enforced and compliance failures will be detected and (2) the severity of sanctions for noncompliance. If enforcement is strict and sanction costs are high, compliance is more likely (McDonnell and Elmore, 1987).[5]

To increase the likelihood of compliance with a mandate, the implementation plan must include enforcement mechanisms and sanctions that lead targets to assess the costs of noncompliance as high, and thus increase the likelihood that they will choose compliance. Such a plan is likely to create an adversarial relationship between initiators and targets, particularly when targets do not support policy goals (McDonnell and Elmore, 1987).

**Support.** Along with pressure to comply, policy mandates should provide support for implementation. Key aspects of support are a system of rewards that recognize compliance efforts, and room for bottom-level input into the process.

A set of rewards for any movement that supports implementation of the policy is key. The goal of these rewards is for individuals to perceive that their own self-interest lies in supporting the change. Such beliefs represent the energizing force for successful implementation of change (Mazmanian and Sabatier, 1983; Levin and Ferman, 1986).

Mazmanian and Sabatier (1983) note the importance of committed implementors as driving forces for policy change. Conversely, leaders uncommitted to a new policy may restrain change efforts. Indeed, they suggest that the inability of policymakers or organizational leaders to

---

[5]Targets essentially employ an expectancy value calculation in making these decisions. Such calculations are a key component of models such as the Health Belief Model (Janz and Becker, 1984; Rosenstock, Stecher, and Becker, 1988) that seek to predict the likelihood that an individual will undertake a particular preventive measure, such as contraceptive use (e.g., Eisen and Zellman, 1992).

- 378 -

choose implementors is a major factor in implementation failures.  If implementors cannot be replaced, and often they cannot, the leader's job is to change the perceptions of the implementors concerning the likely outcomes of the new policy.  If implementors come to view the new policy as consistent with their own self-interest (Mazmanian and Sabatier, 1983) and with organizational culture (Schein, 1987), they will be far more likely to support the new policy and act in ways that enhance its implementation.

**Local Context for Change**

To achieve successful implementation of any policy, the change process has to be both understood and carefully managed.  When an organization's culture appears inconsistent with a new policy, leaders must attempt to create driving forces by drawing on aspects of the existing culture that are compatible (Allaire and Firsirotu, 1985; Schein, 1987).  This requires a clear understanding of the organizational culture (Allaire and Firsirotu, 1985), the perceived self-interest of participants (Mazmanian and Sabatier, 1983), and the extent to which the change is likely to be perceived as consistent with both.  It also requires that efforts be made to present the change, and the change process, as fair.  Procedural fairness has been found to increase compliance with the ultimate outcome of a decision process. Tyler and Lind (1992) report that fairness judgments make compliance more likely even when the final decision or new policy is perceived to be incompatible with individual beliefs or self-interest.[6]

A new policy is most likely to *clash* with organizational or participant culture when it is imposed from the outside, a common occurrence in government agencies.  In such cases, the new policy may

_____

[6]A key goal of the implementation process is to promote perceptions of procedural fairness.  Tyler and Lind (1992) identify four factors that promote such perceptions.  These include *voice*, a belief that one's views can be expressed freely and are being considered, *even if the decision has already been made* (Lind, 1993); *trust*, a belief that the decisionmaker is *trying* to be fair; *standing*, a belief that one has been treated respectfully by policymakers; and *neutrality*, a belief that those making policy are driven by facts rather than emotions or opinion (Tyler and Lind, 1992; Tyler, 1989; Lind, 1993).

- 379 -

reflect the demands of constituencies outside the implementing organization, for example, the Supreme Court's requirement that local school districts desegregate.  Or it may be based on research findings or opinions that the organization could be accomplishing its goals more effectively.  For example, the Military Child Care Act of 1989, which promulgated new, more structured standards for child development programs on military installations, reflected Congressional concerns about the military's ability to deliver adequate amounts of high-quality, developmentally appropriate child care.  But whatever its source, the very fact that the change is imposed from the outside creates significant challenges to successful implementation.

An externally imposed policy may be resisted as well because of perceived *inconsistency* with organizational or participant culture.  Most commonly, a new policy threatens the premium put on history and learning from experience in the organization (Schein, 1987; Levitt and March, 1988).  In some cases, such policy changes are perceived to threaten the organization's very survival.  The policy can also threaten deeply held beliefs concerning organizational autonomy, a key feature in the widespread resistance of school districts to desegregation orders.  A new policy can also threaten the *participant* culture.  School desegregation posed such a threat to many school personnel in the Deep South, who were personally offended by the idea of integrated education.

Change may be inconsistent with organizational *structure* as well as culture.  Allaire and Firsirotu (1985) note that innovations that depend on a particular organizational structure are likely to fail if those structures do not exist in the organization.  For example, it would be futile, they argue, to exhort the employees of a regulated monopoly offering a public service and requiring large capital investments to manage with a lean staff and simple form.  Or a top-down structure like the military's may make mutual adaptation between an innovation and the smallest units problematic.  Such organizations trade adaptability for efficiency and increased likelihood that the change will spread throughout the system (Ledford, Mohrman, Mohrman, and Lawler, 1989).

A key finding of implementation studies is that change is best accepted and institutionalized when at least some people within the

- 380 -

organization perceive the need for the change and are persuaded that it is good for the organization and for themselves. Much of the literature on large-scale organizational change focuses on change arising from organizational need, such as declining market share or reduced profits (e.g., Mohrman et al., 1989; Kanter, 1983).

Change imposed from without lacks these built-in advantages. The process of change must be much more carefully planned and managed if widespread implementation that is consistent with policy goals and processes is to occur. Even when policy, culture, and structure are consistent, implementation is far from assured. The natural conservatizing forces at work in most organizations tend to resist change. People often have to be persuaded that the new policy will not be harmful to the organization or to themselves and may even result in gains.

## IMPLEMENTING A POLICY TO END DISCRIMINATION

How might the Armed Forces implement a policy that is based on clear standards of conduct, strictly enforced, and that considers sexual orientation, by itself, as "not germane" to determining who may serve in the military? The nature of military organizations and our knowledge about the implementation process suggest a number of actions that can facilitate the implementation of such a policy. These actions are discussed below.

### Design a Policy That Facilitates Implementation

It is very important to convey a new policy that ends discrimination as simply as possible and to impose the minimum of changes on personnel (Levin and Ferman, 1986). Further, the policy should be decided upon and implemented as quickly as possible and should include both pressure and support for change.

**Make the Policy Simple**. Military experience with blacks and women argues for a simple policy under which homosexuals are treated no differently in terms of work assignments, living situations, or promotability. Indeed, the documented capabilities of homosexuals to perform all military tasks enable the policy to be simple.

- 381 -

In contrast, the policy message about women has been complex.  This complexity has resulted in continuing strong doubts about the capability and appropriateness of women to perform certain tasks, which are evident in military member attitudes and in rules that constrain women's full military participation.  (See the chapter on military opinion for additional information.)  Combined with separate living accommodations that often are viewed as plusher (largely because the small numbers of women lower ratios for toilets, etc.), these rules keep gender highly salient.  Lower training standards, better assignments (to safer, non-combat jobs), and better accommodations have continued to feed resentments among men.  These problems in integrating women argue for equal treatment of homosexuals.  They should be assigned to serve in all positions and at all levels, according to their skills; those who serve with them will be expected to treat them equally as well.[7]

**Act Quickly.**  Lessons from the implementation literature suggest that the new policy regarding homosexuals in the military should be decided upon and implemented as quickly as possible, for three reasons.  First, the waiting period is one in which military personnel are unsure, and therefore anxious about, what the final outcome will be and how it will affect their personal military experiences.  The change in policy will not appreciably affect the vast majority of heterosexuals, who will not be working or living with an open homosexual.  (See the chapter on cohesion for a discussion of the probabilities of there being acknowledged homosexuals in groups of varying sizes.)  Once they discover that nothing has changed for them, they will feel more comfortable and the issue will be less disruptive generally.  That

---

[7]It has been suggested that, given the need for a smaller force, those who would find it abhorrent to serve with open homosexuals should be given an option to leave.  This will, by implication, make those who stay more committed to the new policy because they chose to serve under the new policy.  However, such a policy departure creates two problems that could impede implementation.  First, an escape policy signals that the policy is abhorrent, which contradicts any messages of leadership support.  Second, those who leave for other reasons but claim they left because of moral objections to homosexuals may swell the ranks of those who appear to object to the policy.

- 382 -

outcome, however, will require that instances of open homosexuality not be allowed to result in serious, rumor-inspiring conflicts.

Second, any waiting period also permits restraining forces to consolidate.  Until the policy is decided upon and implementation has begun, those opposed will feel free to speak out against it, increasing the perceived strength of military objections.

Third, fast and pervasive change will signal commitment to the policy.  Any incremental changes would likely be viewed as experimental; commitment to the new policy would therefore be weakened (Lawler, 1989). In addition, phased-in implementation might allow enemies of the new policy to intentionally create problems to prove the policy unworkable.

**Convey the Change in Terms Compatible with Military Culture.**  To the extent possible, the policy should be conveyed in terms compatible with military culture.  For example, leadership should focus on the organizational culture of hierarchy and obedience and minimize discussion of the inconsistency between the new policy and a very conservative participant culture.  Leaders can become role models by conforming behaviorally to the new policy because the President is the Commander in Chief, who must be obeyed.  Other consistencies between successful implementation of the policy and organizational culture can also be stressed.  For example, the military sees itself as a strong organization with a "can-do" attitude.  Military culture stresses the dominance of mission over individual preferences and characteristics. Such successful submersion of more visible differences such as race can be pointed to as an example of the military's ability to keep its collective eye on the prize.  And the military's norms of inclusion and equality can be brought to bear as well.

**Build in Sanctions and Enforcement Mechanisms.**  Any new policy about homosexuals will come in the form of a mandate.  Consequently, compliance is the goal.  To increase the likelihood of compliance, sanctions and enforcement mechanisms must be established.

Key to promoting compliance is the adoption or revision of a code of professional behavior that clarifies the criteria for behavioral compliance.  The code must include some general principles and general behavioral criteria and some language that explicitly makes people