**Appendix of Evidence in**

**Support of Log Cabin Republican's**

**Opposition to Defendants'**

**Motion for Summary Judgment**


**LCR Appendix Pages 701-800**

**(Part 7 of 19)**

- 383 -

responsible for exercising discretion in determining whether behaviors not explicitly included in the code of conduct are acceptable (Burke, 1990).[8] The code should explicitly recognize the need to respect the feelings and concerns of others in defining acceptable and unacceptable behaviors.

Although the military's strong hierarchical control might suggest to some that policy can be successfully implemented with only limited discretion (Burke, 1990), providing some degree of discretion to the smallest unit in terms of how to bring about behavior change captures an important tenet of the implementation perspective. Lawler (1989) suggests that subunits be given a "conceptual box" that defines the boundaries of acceptable behavior within which unit members can work. In addition, awarding discretion is consistent with the military's informal operations, where much discretion is practiced (Watman, 1993). Indeed, the military mission order, a widely used way of directing subordinates, builds in considerable lower-level discretion. Such discretion increases individual and unit commitment to the change.

The code of professional conduct must also describe the sanctions for behavioral noncompliance. These sanctions essentially define accountability and thus set parameters around leader discretion. Too much discretion concerning sanctions risks the possibility that uncommitted leaders will send a signal that inappropriate behavior will be tolerated.

The enforcement system must be made explicit (Elmore, 1978). Organization members must understand that their behavior will be observed and noted and that actions inconsistent with the code of behavior will be called to the attention of higher-ups and dealt with according to the explicit sanction policy. But military experience in the area of sexual harassment demonstrates that a code of professional

---

[8]Exercise of discretion in support of a new policy requires strong leadership and unambiguous signals that the policy is to be carried out. Otherwise, leadership discretion may serve to undermine policy implementation. For example, "the atmosphere created by Reagan appointees who headed the EPA discouraged civil servants from serious enforcement of social environmental laws. They were encouraged to use their discretion to reduce the scope of effective enforcement" (Palumbo and Calista, 1990, p. 8).

- 384 -

conduct *by itself* is not enough to ensure change when the change is inconsistent with organizational culture.

From the point of view of those with expertise in sexual harassment, the military has set in place the appropriate policies and structures to minimize the problem.[9]  Yet, there is substantial evidence that sexual harassment remains a serious problem in the military even after the formal adoption of a code of behavior.[10]  The high incidence of sexual harassment reported in military surveys suggests that those expected to comply with sexual harassment policies have concluded that noncompliance is unlikely to be detected, and if detected, is unlikely to result in severe sanctions.  Information from the field supports this conclusion.  Many sexual harassment complaints are apparently ignored.  If they come to light, those who choose to ignore them are rarely sanctioned, which sends a signal that the policy need not be taken seriously.  Indeed, in many cases, it is the complainant who suffers (Gilberd, 1992).

What the military's experience with sexual harassment demonstrates is that a code of professional conduct alone cannot bring change.  Rather, it is just one part of an intensive implementation effort if change is to occur.  The behavioral compliance expected in response to

---

[9]According to the Defense Manpower Data Center (DMDC), "each service requires every officer and enlisted member to be trained in the prevention of sexual harassment at initial service entry points, and periodically thereafter. . . .  [E]ach service policy clearly states that the prevention of sexual harassment is a principal responsibility of the chain-of-command.  All service members must be cognizant of the policy and enforce the standards required by the policy. . . .  Service members who have sexual harassment complaints are encouraged to use the chain-of-command.  Equal opportunity/Human Relations Advisors, Chaplains, Inspector General, and Judge Advocate General are recommended as alternate channels. . . .  [E]ach service's policy refers commanders to a number of specific articles in the UCMJ when considering punishment for sexual harassment offenders" (Martindale, 1990, pp. iv-v).

[10]A 1988 Defense Manpower Data Center survey of 20,250 randomly selected personnel (response rate = 60 percent) revealed that 64 percent of female and 17 percent of the male personnel experienced at least one form of sexual harassment while at work in the year before the survey; 15 percent of female and 2 percent of male respondents reported one of the most serious forms, pressure for sexual favors; and 5 percent of female and 1 percent of male respondents reported the most severe form, actual or attempted rape or sexual assault.

- 385 -

mandates cannot be assumed.  Strong monitoring and sanctioning must occur for targets to conclude that compliance is worth the effort. Steps that the Navy has taken since 1989 identify ways to reinforce a code of professional conduct.  In particular, since 1992, the Navy has reinforced its zero-tolerance policy toward sexual harassment with a mandatory processing for separation policy following either the first substantiated incident of aggravated sexual harassment or the repeated occurrence of less serious incidents of sexual harassment (Culbertson et al., 1992).

**Ensure Leadership Support at All Levels**

    Military leaders can and must become a major driving force for change.  They take on this role when they are perceived to be supportive of the change and to be concerned that it be successfully implemented. Such a stance is sometimes difficult to achieve, especially when the new policy has been criticized by these same leaders early in the implementation process, when debate was occurring about the policy's value and form.  Ideally, leaders' early criticisms are acknowledged and responded to during the policy formulation process in a way that enables them to emerge from the debate appearing convinced of the value and importance of the new policy.  Such beliefs present leaders as committed to the change and consequently eager to see it implemented (Allaire and Firsirotu, 1985).

    If lower-level commanders and troops do not believe that their superiors support the policy, they will have little motivation to abide by it.  At the very top, the President must reaffirm his commitment to the new policy in language consistent with cultural norms of inclusion and equality for all.  If senior military leaders do not believe in the change, efforts must be made to present leaders as *behaviorally* committed to the policy (even if they remain attitudinally opposed).

    Such behavioral commitment requires that leaders send a strong, consistent signal of support for the new policy.  Lack of attitudinal support makes behavioral signaling all the more important.  Such signaling must include strict adherence to an existing or new code of professional conduct, with public sanctioning of personnel at all levels

- 386 -

who fail to comply with it.  It must also include smaller actions, such as allocation of time to the new policy and keeping the change before members through video or other messages such as talks at lunches and meetings (Peters, 1978).  This message of support must include a message of continuing involvement by high-level leadership.  The assignment of a high-ranking individual with direct access to top management to oversee the implementation process conveys the message that this policy is to be enforced at all levels.

While top-down change is the norm in military organizations, the lessons of implementation research that implementing change is a problem of the smallest unit should be heeded.  Indeed, it is particularly important to convey an understanding of what matters at the bottom of the organization to the top so that members feel heard.  It is important, as well, to convince leaders at all levels, including the bottom, that it is in their own and the organization's interest to work to support the new policy.  Their effective involvement depends on six key efforts:  (1) signaling the military's commitment to the new policy; (2) convincing them that active monitoring and support for the new policy will be noticed and rewarded; (3) stressing the importance of reducing anxieties and creating a sense of perceived fairness for members; (4) training them to be good implementors; (5) empowering them to use their discretion within clear constraints; and (6) providing guidance.

**Signaling Commitment.**  Lower-level leaders are the key to enforcement efforts at the bottom of the military hierarchy.  Unless the seriousness of the military's commitment to the policy is effectively conveyed to them, they will exhibit great variability in their enforcement efforts.  Treatment of the same issue can be expected to differ considerably from base to base, and unit to unit, in the absence of a strong message of conformity from superior officers.

**Identifying Rewards.**  The enforcement system must be made explicit (Elmore, 1978).  Leaders must be persuaded that their enforcement of the new policy will be monitored by those above them and that their behavioral support of the new policy will be rewarded.  This will encourage leaders to believe that successful implementation of the new

- 387 -

policy accords with their own self-interest, a key aspect of leadership (Levin and Ferman, 1986).

These rewards should hold at all levels of the military and should be explicit.  For example, unit leaders should know that they will be judged in part on the ability of unit members to work effectively together.  For example, units would be considered well-led when members comfortably absorb newcomers.  This evaluation will positively affect both group members and their leader.  However, writers on procedural justice (e.g., Tyler and Lind, 1992) present cautions about the limits of outcome incentives to ensure compliance.  They stress that another, compatible route to compliance lies in an implementation process that gives group members voice, conveys the impression of fairness and concern for individuals' rights, and describes the final policy as based on fact and egalitarian concerns.

Communication upward about compliance failures should be actively encouraged (Dalziel and Schoonover, 1988).  Since "snitching" violates a tenet of military culture that only good news should be communicated, it is important to both redefine "snitching" as important, valued professional behavior and to set up monitoring procedures so that people are *asked* about problems, for example, through regular implementation surveys (e.g., Gottlieb et al., 1992).

Leaders must also understand that failure to actively support the new policy will be noticed and sanctioned.  Military members must be held to high standards of conduct with regard to abiding by and enforcing the new policy.  Any officer who violates the behavioral guidelines associated with the new policy should be dealt with severely.  This message--that the military takes the new policy seriously--will quickly be conveyed to those lower down and contribute to behavioral compliance.

Moreover, breaches of policy by subordinates will be viewed as leadership failures.  This two-pronged approach makes every leader responsible for the behavior of those below.  More generally, commanders must be responsible for morale and behavior within their units, including all incidents of discrimination.  It must be made clear to them that if they permit an environment in which homosexuals can be

- 388 -

discriminated against or harassed, it will have an effect on their likelihood of promotion.  Failure to pursue instances of unacceptable behavior should, in itself, be considered a leadership failure.  This latter point is key:  Perceptions about what happens when these responsibilities are ignored can drive or derail implementation (Davidson, 1993).

The implementation leader must clarify the complaint process and, with the monitoring group, ensure that complaints are actively addressed.  Moreover, efforts should be made to simplify the complaint process.  The Army Equal Opportunity Office (EOO) is currently implementing two promising approaches:  (1) a hot line that provides procedural information on filing EO complaints, and (2) a complaint form that can be reproduced easily on a photocopier (Clement, 1993).

**Strengthen the Local Context for Change**

Change will be facilitated by leaders who are trained and motivated to address and solve implementation problems.  A new organizational structure should be helpful as well in enabling implementation and change.  Finally, monitoring criteria should be developed and widely communicated.

**Increase Leadership Capacity.**  A key task of leaders at all levels is to minimize subordinates' anxieties and create a sense of procedural justice for them.  Reduced worry and feelings of justice are enhanced when leaders are prepared to absorb the anxiety of change, including challenges and anger, when leaders demonstrate dedication and commitment to the organization as a whole, and when leaders encourage members to express their anxieties and concerns and when they acknowledge these concerns (Schein, 1987; Tyler and Lind, 1992).

Leaders should also act to enhance feelings of efficacy by conveying their beliefs that personnel are capable of implementing the change and conforming to behavioral expectations.  The critical distinction between behavior change and attitude change should be emphasized, with a clear message that the organization will limit its concern exclusively to behavior.

- 389 -

Leadership capacity will be enhanced by several means, including training, support for the use of discretion, and guidance.

**Conduct Training.** Training of leaders should be designed to create "fixers"--people who both care about successful implementation and have the skills necessary to anticipate and identify implementation problems and to make adjustments to improve the implementation process (Bardach, 1980; Levin and Ferman, 1986).

It should be noted that "fixer training" is distinctly different from sensitivity training. Fixer training is practical and meshes well with the strictly behavioral approach to implementation most likely to yield success. In contrast, sensitivity training attempts attitude change and is widely scorned by military personnel. Bringing in sensitivity trainers who are perceived to be very costly in a context of drawdown is as likely to increase resistance and anger as it is to reduce it.

**Encourage Use of Discretion.** Becoming a good "fixer" implies the possibility of action. Leaders at all levels must be accorded sufficient discretion so that they can act to correct implementation problems. But, as noted above, this discretion must be bounded by behavioral monitoring and strict enforcement of a code of professional conduct. Such a code is discussed in the chapter on legal issues and in Appendix A, which presents a code that would be appropriate for the "not germane" option.

**Provide Guidance.** Any code of professional conduct, no matter how prescriptive, cannot hope to identify all potential problem areas. A new code of professional conduct that describes behavioral principles and goals will identify few. Yet lower-level leaders need guidance. Therefore, codes should be supplemented with active guidance in the form of "question and answer" documents, which should be widely disseminated. These questions and answers could also include information about sexual behavior and health issues.

**Create a Monitoring Structure.** In the implementation literature, there is much debate about the desirability of creating a new organizational structure to lead and monitor implementation. Much depends on where such structures are located in the organization. If

- 390 -

central to the organization, and if led by a person with considerable formal authority who has the ear of top management, such structures can be effective (Schein, 1987). They create a place where complaints may be lodged outside the chain of command; their presence conveys organizational commitment to the change; and, if properly staffed, they can become expert at dealing with problems that arise. However, such structures are sometimes used to divert implementation concerns from key leaders and to "ghetto-ize" the new policy. In these cases, such structures send a signal of nonsupport from top managers that is likely to undermine successful implementation. Moreover, in the current climate of downsizing, the creation of apparently costly new structures is likely to be resented.

Instead, monitoring should be carried out by using the chain of command. Monitoring would begin among low-level leaders who are close to and can convey the views and behavioral problems of those who work under them. They should report on a periodic basis to their superiors up the chain and should be provided incentives, as described above, to report in a timely manner about incipient problems so that they can be remedied before they become serious. Such reporting up the chain will depend upon the development of clear reporting instruments and on creating among leaders up and down the chain a sense that accurate information about implementation problems is valued and that failures of leadership reside in refusals to comply, not in compliance difficulties.

This process should be supported by a small group in each service charged with overseeing implementation of the new policy. The group may comprise people already responsible for other similar policies, e.g., sexual harassment and racial integration.[11]

Kilmann (1989) suggests that a shadow track--a group of 5-15 people representing all levels of a large organization, which meets regularly to monitor the implementation process and develop ways to improve it--is a good idea in very large organizations. In this case, a shadow track might receive reports from all levels as well as conduct its own monitoring process, e.g., personnel surveys.

_____

[11]Training for these overseers may strengthen their efforts in these other areas as well.

- 391 -

**Develop Monitoring Criteria.** Few homosexuals are likely to reveal their sexual orientation even if a policy that allows them to do so openly is mandated. Consequently, monitoring criteria used to assess the progress of more visible groups, e.g., blacks and women, cannot be used. Numbers of promotions, distribution across pay grades, and other measures of a group's progress that depend on the ability to detect group numbers are not feasible.

However, it is possible and important to monitor other outcomes of the implementation process. These outcomes should include key areas of concern, including incidents of violence, numbers of open homosexuals who serve, and measures of unit performance.

Monitoring efforts should include assessments of performance reports, the conduct of implementation surveys, and analysis of the nature and disposition of complaints. Monitors should examine written documents for their signaling messages; analyze surveys of military member attitudes; track the incidence of violence, harassment, and exclusion, and the incidence of sanctioning; and track numbers of homosexuals who disclose their orientation or whose orientation is revealed by others, and numbers of military members who leave the service because of the new policy or its implications.

A set of objective measures of unit performance must be devised. These measures should, to the extent possible, build on current efforts (e.g., National Training Center performance) and be supplemented by policy-specific measures (e.g., number of harassment complaints filed, number of instances of violence or abuse directed toward open or suspected homosexuals).

To the extent possible, monitoring measures should depend on existing, ongoing assessments. Unfortunately, however, ongoing assessment measures are not as available or as appropriate as those charged with monitoring of the new policy might hope. Measures of key military outcomes--readiness and cohesion--are flawed. Surveys of member attitudes are conducted too infrequently to be of much value.

The military does employ some measures of cohesion, although none are used on an ongoing basis. Such measures might be adapted for use in monitoring of the new policy. Such adaptation would, however, require

- 392 -

careful research, thought, and development.  (See the chapter on cohesion for detail on these measures.)

Surveys of member attitudes toward the new policy and experiences with it could be a valuable monitoring device.  However, the approximately five-year intervals between DoD personnel surveys (which survey about 5 percent of active-duty military members, spouses, and members of the reserves) limit the surveys' value.  Tracking of attitude change with this survey is difficult because of the many secular changes during the long intersurvey period.  A monthly survey effort that included a much smaller percentage of the population would, in contrast, be extremely valuable for tracking attitudes.  A set of questions focused on the implementation of the new policy toward homosexuals would allow the monitoring group to examine key issues, e.g., behavioral compliance, reporting behaviors, and for commanders, the extent to which implementation of the policy coincided with other duties (Gottlieb et al., 1992).  The opportunity to track implementation over time through a mix of unchanging attitudinal and changing implementation questions would be invaluable.

**CONCLUSIONS**

Despite widespread antagonism within the military to a policy that would end discrimination on the basis of sexual orientation, lessons from organization theory, implementation research, procedural justice theory, and the military's own experiences with blacks (see the chapter on racial integration) suggest that a new policy could be successfully implemented.  Success depends on understanding the military as a large organization with a unique culture, on a carefully developed and actively monitored implementation plan, and on a sense of the importance of perceived fairness in the development of the policy and in its implementation.

To date, the implementation context has not supported a new policy that would allow homosexuals to serve.  Widespread views both within and outside the military that homosexuality is immoral translate into concerns that removing the ban would appear to condone a homosexual lifestyle.  Drawdowns, base closings, and reductions in benefits have

- 393 -

created considerable anxiety among military members and have fueled
widespread beliefs that the military has violated its psychological
contract between the organization and its members. The resulting anger
and resentment have made members even less inclined to tolerate new
threats to military culture. The policy debate surrounding such a
policy change is occurring in a context in which norms of deference are
significantly eroded. Consequently, highly placed military leaders have
actively criticized the proposed policy.

   In addition, a number of other factors restrain change. These
include the fact that the policy will be externally imposed, which will
increase the likelihood that it will be perceived as inconsistent with
organizational and participant cultures. *The military's uneven
experience in fully integrating another sexual outsider group, women,
will be used to bolster resistance.* Perceptions that the policy is
going forward for reasons other than the direct needs of the military
contribute to a feeling that the policy is unfair to those serving.

   These factors make change harder and must be considered in
designing a plan for implementing the new policy. To promote change,
planners should:

   • Convey the policy as simply as possible and build in supports
     for change. The most important support for change is a code of
     professional conduct that clarifies the criteria for behavioral
     compliance and stresses universal responsibility for respecting
     the feelings and sensitivities of others. In addition, high-
     level individuals should be designated as responsible for
     successful implementation.
   • To the extent possible, convey the change in terms compatible
     with military culture. These terms might include a focus on
     the submersion of individual preferences, the obligation to
     follow orders, and the military's "can-do" attitude.
   • Stress behavioral compliance and create sanctions for
     compliance failures. Policy messages should make clear that
     leaders are responsible for their own behavior and for the

- 394 -

behavior of their subordinates.  Communication upward about
compliance failures should be encouraged.

- Create a change process that allows members to voice their
views and concerns and to know that these have been heard, even
if they do not agree with the ultimate policy.  The change
should make clear that leaders have developed the policy and
the implementation plan in a fair manner.

- Ensure top leadership support, at least behaviorally.  Set in
place the means through which top leadership can send signals
of support for the new policy, including continuing involvement
in implementation, and frequent messages about the
implementation process.

- Involve leaders at all levels.  Even in a top-down
organization, implementation remains a problem of the smallest
unit.  Leaders at all levels must come to see that successful
implementation is in their self-interest, and their ability to
lead will be assessed in part by their own compliance with the
new policy and the compliance of those under their command.
They must also be provided with training designed to make them
successful implementors.  Such training should include practice
in identifying threats to implementation, guidelines for
behavior, and sufficient discretion so that they can begin to
feel some ownership for the change.

- Set up monitoring mechanisms, including oversight committees,
that will assess the implementation process.  Monitoring
efforts should capture as many aspects of the change as
possible.

## 13. POTENTIAL EFFECTS ON MILITARY RECRUITMENT AND RETENTION[1]

This chapter describes research on the determinants of enlistment and reenlistment to military service and discusses possible effects of removing current restrictions on service by homosexuals.  Research findings provide little direct evidence of possible changes in enlistments and reenlistments among prospective or current service members.  Survey data point to declines in reenlistment intentions if the restrictions are removed, but research suggests that actual outcomes will be determined by a number of considerations, of which individuals' economic and educational status are particularly prominent.  We conclude that precise effects on enlistment and reenlistment behavior will depend on the nature of the policy and its relative importance for an individual's enlistment or reenlistment decision.  However, should enlistments or reenlistments decline, options exist for minimizing adverse effects, e.g., by expanding recruitment and/or removing incentives which encourage current service personnel to leave as the military reduces in size.

### BACKGROUND

A key principle of military force management is to attract and retain competent personnel to assure readiness and operational effectiveness.  Military personnel policy seeks, in general, to obtain high-quality personnel in meeting goals for new members.  Among enlisted personnel, recruit quality is gauged as the proportion of high school graduates and the fraction scoring in the upper half of the Armed Forces Qualification Test (AFQT).  Youth who hold these attributes in combination define the "prime recruiting market" and are especially prized by the military (Verdugo and Berliant, 1989).  High standards also govern acceptance to the officer corps.  The services require that most officer candidates obtain at minimum a four-year college or

---

[1]This chapter was prepared by John D. Winkler, who would like to acknowledge the considerable assistance of Glenn Gotz, Susan Hosek, Bruce Orvis, and Peter Tiemeyer.

- 396 -

university degree.  In addition, they consider other criteria such as grades, scores on aptitude tests, participation in extracurricular activities, and evidence of leadership abilities (Office of the Assistant Secretary of Defense, 1992).

Military personnel policy further seeks to retain and promote its best-performing personnel to meet its occupational requirements at advancing skill levels.  For example, officer personnel management seeks to "provide career opportunity that would attract and retain the numbers of high-caliber officers needed" and "maintain a high-quality, numerically sufficient officer corps" (Rostker et al., 1993).  Enlisted force management similarly seeks to encourage, reward, and promote high performing personnel (Buddin et al., 1992).  Thus the military also seeks to minimize unwanted attrition; i.e., avoid separations of desired personnel during an enlistment term or at reenlistment, with attendant loss of investment in military recruitment and training.

The possibility that military service could be opened to acknowledged homosexuals has raised fears that recruitment and retention could be adversely affected (Army Times, 1993).  The military expends considerable resources in the form of advertising, educational benefits, and enlistment and reenlistment bonuses to attract and retain desired personnel.  If personnel whom the services wish to retain choose to leave military service over this issue, readiness could be compromised, force management could be complicated, and the costs of replacing these losses could be considerable.  Further, it could be difficult and costly to meet recruiting targets if large numbers of otherwise interested young people, particularly in the prime recruiting market, failed to consider military service because of objections to serving and living with homosexuals.[2]

---

[2]In fact, the military is already experiencing a relative decline in the quality of military recruits.  As recently reported by OASD (FM&P), 94 percent of active force enlisted accessions in the first half of FY93 were high school graduates, compared to 99 percent in the previous year.  Accessions scoring in the top half of the AFQT distribution have fallen to 70 percent from 77 percent, and the share of recruits with both attributes has fallen to 65 percent from 76 percent a year earlier.  The decline was most severe for the Army, which accounts for the largest number of recruits.

- 397 -

Actual effects on enlistments and reenlistments, however, are unknowable as a new policy regarding homosexuals has not yet been formulated or implemented. Hence, any predictions are inherently speculative. Discussion can be informed and available data interpreted, however, by more general consideration of the reasons that people choose to enlist and reenlist in the military. The following discussion summarizes key findings from this literature and assesses their implications in light of current issues and trends affecting military manpower policy.

**RESEARCH ON ENLISTMENT AND REENLISTMENT**

An extensive body of research, much of it conducted at RAND, has examined the determinants of enlistments and reenlistments in the all-volunteer force. One set of studies has examined the reasons why young persons join the military (e.g., Barnes et al., 1991; Benedict, 1990; Hosek and Peterson, 1985, 1986, 1990; Orvis and Gahart, 1990; Orvis, Gahart, and Ludwig, 1992). A second body of research has examined policies and factors governing retention and attrition of military personnel (e.g., Buddin, 1984; 1988; Chow and Polich, 1980; Stolzenberg and Winkler, 1983). These studies provide a common research framework and specific findings relevant to the issue at hand.

**Research Framework**

Much of this research examines joining and leaving the military as a choice that an individual makes among alternative courses of action. For example, Hosek and Peterson (1990) characterize the decision to enlist as an evaluation of military service against further education, civilian employment, marriage and family (particularly for women), or a combination of these. Buddin (1984) considers attrition as a job separation in which employers and employees make rational decisions to part company to enhance their respective well-being, considering economic and non-economic benefits. Stolzenberg and Winkler (1983) describe a two-step process by which people choose voluntarily to leave one job to take another. They suggest that people first determine how satisfied they are with their current job on an absolute basis. As they become dissatisfied with their current job, they initiate a search for

LCR Appendix Page 0715

- 398 -

alternatives.  The framework presumes that people leave their current job only when they find a more attractive alternative.

These frameworks have been used in a number of studies examining enlistment and reenlistment intentions and behavior.  Specific factors examined vary from study to study, depending on population, data, research objectives, and research methods.  Altogether, the studies provide information on effects of demographic and socioeconomic characteristics, individual differences (e.g., in aptitude and education), attitudes and values, and measures external to the individual such as unemployment rates, civilian and military pay, and the effort made to recruit the individual.

## Research Findings

**Determinants of Enlistments and Reenlistments**.  Studies examining military enlistees typically point to the importance of economic and educational variables in guiding individuals' decisions.  For example, Hosek and Peterson (1983, 1986, 1990) find that enlistment probabilities of men and women are strongly related to wage rates and employment status and experience (work-related variables); learning proficiency, ability to finance further education, parental influence (education-related variables), and expectations for further education.  These findings have been replicated in studies of applicants to military service (Orvis and Gahart, 1985; Orvis, Gahart, and Ludwig, 1992).  These latter studies show, however, that attitudinal variables also have a substantial effect on the probability of enlistment.  These include social support for enlisting and perceived advantages (job security) of military service.

Research examining determinants of reenlistments also emphasizes the importance of economic and educational considerations.  Chow and Polich (1980), for example, found that first-term reenlistment rates are strongly influenced by compensation-related variables (e.g., pay, bonuses, and allowances) more so than other factors under policy control.  Hosek, Antel, and Peterson (1989) found that first-term service members who expected more education (e.g., through training or the use of educational benefits) were more likely to remain in the

LCR Appendix Page 0716

- 399 -

service after 36 months.  Drawing on a large number of research studies, Stolzenberg and Winkler (1983) point to compensation levels, perceptions of job security, and satisfaction with military life as major determinants of voluntary terminations from military service.

**Intentions and Behavior**.  The research literature also provides empirical estimates of the predictive value of stated intentions to enlist and reenlist.  These findings will be useful in evaluating the available data addressing effects on enlistment and reenlistment of listing the ban on homosexuals. Statements of intention are generally highly predictive of behavior.  Chow and Polich (1980) calculated actual first-term reenlistment rates according to service members' stated probability that they would reenlist.  These results indicate that of members who state their probability of reenlistment to lie between 0.9 and 1.0, the "true" reenlistment rate is 0.89 within one year.  The actual reenlistment rate is 0.05 for members who state their probability of reenlistment to lie between 0.0 and 0.1.

Although intentions predict behavior, they do not fully account for the variety of factors that influence one's eventual decision.  Some people who initially state positive intentions will fail to follow through; some who state negative intentions will change their mind and join or reenlist.  In fact, 46 percent of male enlistees initially express negative intentions (Orvis, Gahart, and Ludwig, 1992). Intentions are more predictive when they are strongly held and proximal to the behavior.  They predict behavior less well when people are unsure of their intentions.  Moreover, people who are unsure of their intentions seem most sensitive to external events or changes in policy which lead them to raise or lower their intentions.

**POSSIBLE EFFECTS OF REMOVING THE BAN**

The research results described above help frame the issue of how enlistments and reenlistments could be affected by removing the restrictions on homosexuals serving in the military.

**Enlistments**

First, this literature reminds us that under ordinary circumstances, decisions to join the military are strongly influenced by

- 400 -

educational and employment-related considerations.  Many people choose
to join because the military offers employment prospects superior to
what they could obtain in civilian life.  Others join to receive
training or obtain educational benefits.  In fact, these are the
"primary" reasons people offer for joining the military in the first
place (Center for Human Resource Research, 1991).

The research also reminds us, however, that while employment and
educational considerations are important, they are not the sole
determinants of enlistment decisions.  For seniors in high school who
contemplate service in the military, decisions to enlist are also
subject to the influence of parents, teachers, and peers.  Decisions to
serve are also affected by the individual's motives and attitudes for
enlisting; for example, to develop self-confidence and potential, or
have an experience of which one can be proud (Barnes et al., 1991;
Benedict, 1990; Orvis and Gahart, 1985).  Enlistments could be adversely
affected to the extent that social support, motives, and attitudes
supporting military service decrease as a consequence of removing the
restriction on homosexuals and as other factors remain equal.  The
extent of attitude change would further depend, however, on the specific
policy implemented and the relative importance of this issue to
potential enlistees or those who influence their decisions.[3]

Unfortunately, there are no current data which address directly how
enlistment in the U.S. Armed Forces could be affected if the restriction

_____

[3]Available research does not permit the relative effects of
economic and non-economic factors to be easily compared, as these
factors are often studied separately and relate to each other in complex
ways (e.g., attitudes and social support for military service may
themselves be influenced by economic and educational considerations).
Few studies simultaneously examine a full complement of economic,
educational, and attitudinal variables.  Those which do (e.g., Orvis and
Gahart, 1990) find strong effects for all.  Orvis and Gahart (1990)
predict, for example, that enlistment rates among high school seniors
who have taken the written test to qualify for military service would
increase by 8 percentage points as parents' support for military service
becomes more favorable at each point on a five-point scale.  At the same
time, enlistment rates are predicted to increase by 4 percentage points
for each $1000 of annual assistance needed for college.  There is no way
to infer how lifting the ban would affect support for military service,
however.

- 401 -

on homosexuals were removed.[4]  Some analogous evidence comes from the experience of foreign nations with volunteer militaries who have lifted their bans on homosexuals serving in the military (Canada and Australia).  Prior to lifting their ban, the Canadian Forces conducted a survey of their members.  The results indicated that the presence of homosexuals would have precluded many currently serving personnel from enlisting and would "decrease the appeal of a service career" (Canadian Forces, 1986).  However, according to our research (described in other sections of this report), and as stated by a well-known Canadian military sociologist (Pinch, quoted in Segal, 1993), there is no evidence of adverse effects on enlistments and reenlistments since homosexuals were permitted to serve in the Canadian Forces.  Lifting the ban also had "very little or no impact" on the Australian Armed Forces (Wilson, 1993).

Enlistments to the U.S. military will depend on the response of the youth population to lifting the ban on homosexuals, but the extent of any "adverse" impact will also depend on the military's need for recruits.  If recruiting becomes more difficult, more effort and resources will be required to meet recruiting requirements. Requirements, however, have fallen considerably during the drawdown (Table 13-1).

In the latter half of the 1980s, the military services recruited on the order of 300,000 enlisted personnel per year, which represented approximately 20 percent of prime market males.[5]  Accessions began to decline in 1990 and now stand at approximately 200,000 enlisted personnel per year, or approximately 16 percent of prime market males. Moreover, the supply of prime market males hits its "trough" in 1994

---

[4]There are some survey data which indicate how youth in the recruiting market feel about the issue of homosexuality, but these data cannot be used to assess the potential impact of policy changes on enlistment intentions and decisions.  See the chapters on military and public opinion for further discussion of this point.

[5]Prime market males are used as a reference category for examining changes in recruiting requirements.  Accessions draw on a larger population, including females, persons or age 21-35, and persons who lack a high school degree or whose AFQT scores fall in the lower half of the AFQT distribution, with certain restrictions.

- 402 -

after falling for a number of years and is expected to increase thereafter.  Furthermore, although the quality of recruits has fallen from its peak levels of recent years, current quality compares well to

Table 13-1

Active Force Enlisted Accessions and the Prime Recruiting Market

| Fiscal Year | Total DoD Enlisted Accessions[a] | Estimates of Male Youth in Prime Market[b] | Accessions as Percentage of Prime Market Males |
|---|---|---|---|
| 1985 | 316,676 | 1,556,000 | 20.4 |
| 1986 | 333,550 | 1,493,000 | 22.3 |
| 1987 | 316,826 | 1,456,000 | 21.8 |
| 1988 | 286,763 | 1,495,000 | 19.2 |
| 1989 | 293,896 | 1,445,000 | 20.3 |
| 1990 | 232,306 | 1,391,000 | 16.7 |
| 1991 | 206,617 | 1,328,000 | 15.6 |
| 1992 | 202,752 | 1,288,000 | 15.7 |
| 1993 | 203,334 (est.) | 1,218,000 | 16.7 |
| 1994 | 188,119 (est.) | 1,214,000 | 15.5 |
| 1995 | 195,200 (est.) | 1,226,000 | 15.9 |

[a]Accession figures are for prior-service and non-prior-service enlisted personnel as provided by the Office of the Assistant Secretary of Defense (Force Management and Personnel), May 1993.

[b]Estimates of prime market males of age 17-21 who are not in college from Verdugo and Berliant, 1989, pp. 3-4.

levels achieved during the late 1980s and still surpasses quality requirements established before Congress in 1985.[6]

Hence any fall-off in enlistments that might occur due to removing the restriction occurs in the context of a smaller need for recruits in absolute numbers and in relation to the youth population than has been the case in recent years.  Moreover, based on historical behavior, enlistment intentions would have to fall considerably to produce even a modest decline in estimated enlistments (Orvis, Gahart, and Ludwig, 1982).

A modest decline in enlistments, should one occur, would still leave a recruiting pool that lies within the services' historical recruiting capability.  Recruiting could be more difficult in the future as the economy improves or if interest in military careers declines.

---

[6]Data supplied by the Office of the Assistant Secretary of Defense (Force Management and Personnel), May 1993.

- 403 -

However, the services should be able to meet recruiting targets at acceptable levels of quality, given sufficient recruiting resources and effort and barring a catastrophic decline in the number of applicants to military service.

**Reenlistments**

Research on retention and voluntary terminations reinforces the importance of employment and education-related considerations as key for guiding service members decisions to stay or leave.  Findings also point to the influential role that perceptions of job security and military life can play.  Lifting the restriction on homosexuals could cause some service members to become dissatisfied with military life.  The research, however, does not indicate when one set of considerations will override the others.  Further, the research findings suggest that job dissatisfaction (e.g., as may concern service with homosexuals) is not sufficient for determining whether service members will leave.  Employees quit if they perceive a more satisfying alternative.  Thus service members would leave if they believe they can avoid contact with homosexuals or obtain superior educational, training, or employment prospects outside the military, depending on the weight they may give to these considerations.

In fact, there is some evidence that some members of the military service might leave the service if the ban on homosexuals in the armed forces were lifted.  As discussed elsewhere in this report, the *Los Angeles Times* survey of 2,346 enlisted men and women found that 10 percent of respondents say that they would "definitely not reenlist" if the restriction on homosexuals is lifted, above and beyond the 28 percent who say they do not plan to reenlist anyway.  This 10 percent seemingly represents a shift from people who say that "if current policy and your own plans remain the same," they would "definitely" reenlist, "probably" reenlist, or "don't know."[7]

---

[7]The results differ somewhat across military service, sex, race, age, pay grade and years of service.  The most negative responses (i.e., negative intentions to reenlist if the ban is lifted) are found among the most junior personnel (youngest, in lower pay grades, with fewest years of service).

- 404 -

Using these statements of reenlistment intention from the *Los Angeles Times* survey and empirical estimates of the relationships between first-term reenlistment intentions and reenlistment rates (Chow and Polich, 1980), we can estimate changes in reenlistment rates that could occur if the ban is lifted (Table 13-2).

**Table 13-2**

**Estimated Reenlistments by Reenlistment Intentions**

|  |  | If ban remains | | If ban is lifted | |
|---|---|---|---|---|---|
| Verbal category of reenlistment intention | Reenlistment probability by reenlistment intention[a] | Percent agreeing | Reenlistees per 100 service personnel | Percent agreeing | Reenlistees per 100 service personnel |
| Definitely no | 0.05 | 28 | 1.4 | 38 | 1.9 |
| Possibly/Don't know | 0.50 | 43 | 21.5 | 37 | 18.5 |
| Definitely yes | 0.89 | 29 | 25.8 | 25 | 22.2 |
| Total |  | 100 | 48.7 | 100 | 42.6 |

NOTE:  Reenlistment probabilities are empirical estimates of first-term reenlistments from Chow and Polich (1980, p. 11).

Table 13-2 suggests that if the ban remains, where 28 percent of respondents state they will "definitely not" reenlist, the reenlistment rate would be expected to be low but not zero among this group (1.4 per hundred).  The estimated reenlistment rate across the entire *Los Angeles Times* sample is 48.7 per hundred if the ban were kept in place.[8]  If the ban were lifted, an additional ten percent of respondents "change their minds" and state they will "definitely not" reenlist.  For the purpose of this analysis, we assume this "shift" occurs proportionately from the

---

[8]This estimate provides a benchmark for estimating changes in reenlistment rates based on *Los Angeles Times* survey results.  As it is based on probabilities of reenlistments at the first term and does not make these probabilities conditional on completing term of service, it is likely to underestimate actual reenlistment rates, especially for more senior personnel.  According to figures provided by the office of the Assistant Secretary of Defense (Force Management and Personnel), the reenlistment rate for first-term personnel was 51 percent in FY92.  The reenlistment rate for career personnel was 86 percent, with an overall reenlistment rate of 70 percent in FY92.

- 405 -

"definitely yes" and "possibly/don't know" categories.  If so, the overall reenlistment rate for the sample would now be estimated at 42.6 per hundred.  Thus, based on responses to the Los Angeles Times survey, we might expect reenlistments could decline by approximately six persons per 100.[9]  In relative terms, this would decrease the reenlistment rate by 12.5 percent.

## POLICY IMPLICATIONS

The foregoing discussion indicates no empirical basis for fearing a loss in enlistments if homosexuals are permitted to serve in the military.  At the same time, except for the experience of foreign volunteer militaries, no firm evidence exists demonstrating that enlistments would be unaffected by removing the restriction.  Research points to the importance of education and employment-related considerations on enlistment decisions.  But these decisions are also subject to influence by policy changes as these may impinge on enlistee's attitudes, motives, and social support for military service. For these reasons, specific effects on enlistments of lifting the ban are unknowable in advance and are likely to depend on how the specific policy to be adopted is understood and accepted by the public and how the potential supply of enlistees changes in relation to recruiting requirements and resources.

We draw a similar conclusion in assessing the possible effects of removing the restriction on retention.  Under ordinary circumstances, reenlistment decisions are guided by members' perceptions of compensation, job security, and quality of life, as evaluated against alternatives outside the military.  How service members perceive military life is the area where the military's policy toward homosexuals would be most relevant.  Hence, effects on retention should depend on whether members who are contemplating reenlistment perceive positive, negative, or neutral implications of the policy change for military

---

[9]To be less conservative, we could assume that members who "change their minds" are drawn exclusively from the "possibly/don't know" category.  In this case the expected rate of reenlistment falls to 44.7 per hundred, a decrease of 4 reenlistments per hundred from baseline levels (a decline of 8.2 percent in reenlistments in relative terms).

- 406 -

life, other things being equal.  This will depend on the specific policy
and how it is explained and managed by the military leadership.

These arguments imply that circumstances could exist under which
the ban on homosexuals could be lifted with little or no adverse
consequences for recruitment and retention.  This could occur if policy
were changed and implemented in ways that maintain support for military
service in the recruiting market and convince currently-serving
personnel who are otherwise undecided about further service that
military life will not be adversely affected.  In such circumstances,
customary employment and education-related considerations should
continue to strongly influence individuals' decisions to enlist and
reenlist.

These are not customary times, however.  Military members now state
strong opposition to serving with homosexuals.  Moreover, the current
drawdown of military personnel complicates individuals' decisionmaking
and military personnel management.  Prudent planning must consider the
possibility of adverse impacts, e.g., that reenlistment rates could fall
by 8 to 13 percent if the restriction is removed.

A key point is that any decrease in reenlistments, should it
materialize, is likely to be limited in duration.  Service members who
object to the policy change may resign when policy is changed, or they
may fail to reenlist upon completion of their current term of service.
From that point on, however, individuals who reenlist do so in
recognition of the military's policy toward homosexuals.  At that point,
traditional considerations governing these decisions should again
prevail.[10]

Moreover, even if a decline of this magnitude occurs for
reenlistments (or recruitment, for that matter), the resulting force
size generally falls within lower end strengths anticipated under the
drawdown.  Active duty end strength is expected to decline by 6.4
percent from 1.73 million to 1.62 million from 1993 through 1994 (U.S.

---

[10]It can be argued, however, that reenlistment rates could remain
at a lower level if removing the ban lowers the attractiveness of a
service career, and larger percentages of post-ban cohorts enter with
the intention of leaving once they are trained or have earned
educational benefits.

- 407 -

Budget, 1994).  Further reductions in end strength are likely in
subsequent years, and deeper cuts in personnel may occur than currently
planned.  The military services are now employing a variety of
mechanisms to shrink the force, including reduced accessions, early
releases and retirements, and separation incentives and bonuses.
Current Defense Department plans call for accomplishing the drawdown in
part with 22,000 early releases, 14,000 early retirements, 2,000 RIFs,
and 47,000 separations using incentives and bonuses in fiscal years
1993-1994 (Office of the Assistant Secretary of Defense, 1993).

The current drawdown of military personnel is already serving to
lower reenlistment rates from recent levels.  In fact a change in policy
regarding homosexuals could provide an opportunity to accommodate some
individuals who wish to leave.  Hence if reenlistments rates were to
drop further because homosexuals were allowed to serve in the military,
effects of lower reenlistment rates could be at least partially offset
by expanding accessions, suspending the use of early releases and
retirements, and withdrawing incentives for service members to leave.
These actions would not completely solve the problems of losses of
desired personnel, as those who fail to reenlist are disproportionately
more junior than those the services wish to induce to leave.
Differential and undesired losses could be concentrated in selected
year-groups or occupational specialties.  Moreover, expanding accessions
could require additional resources, e.g., enhanced educational benefits,
bonuses, advertising, and recruiting effort.  These measures, however,
could help mitigate adverse effects on enlistments and reenlistments
should these materialize.

- 409 -

## Appendix A

### ILLUSTRATIVE STANDARD OF PROFESSIONAL CONDUCT

1.  Members of the military services shall comport themselves in ways that enhance good discipline and operational effectiveness.  Toward that end, each individual has a responsibility to

(a) practice tolerance toward others, and

(b) show respect for the sensibilities of others.

2.  Inappropriate personal conduct is behavior directed at or offensive to another individual or a group that goes beyond the bounds of good judgment and common sense and that a reasonable person ought to have known would be unwelcome.  Such behavior is contrary to good order and discipline.  It creates a negative atmosphere that undermines the integrity of the workplace, reduces productivity and morale, and destroys professionalism.

3.  Categories of inappropriate personal conduct include, but are not limited to, sexual harassment, fraternization, personal harassment, abuse of authority, inappropriate displays of affection, and inappropriate discussion of sexuality.  The first two of these are addressed in existing regulations; this policy statement pertains to the last four.

Personal harassment is inappropriate physical or verbal conduct toward others based on personal characteristics, such as race, gender, sexual orientation, or physical features.

Abuse of authority is inappropriate use of authority to injure another individual based on personal characteristics, such as race, gender, sexual orientation, or physical features.

Inappropriate displays of affection are those expressions of a personal relationship that would generally be viewed as unseemly or provocative under the circumstances.

Explicit discussions of sexual practices, experience or desires are generally inappropriate when directed at persons known to be offended by such discussions or when continued over the objection of persons who are offended by such discussions.

- 410 -

    4.  Leaders at every level of the chain of command are responsible for ensuring that their subordinates are aware of and comply with these standards.

- 411 -

Appendix B

LIVING AND PRIVACY CONDITIONS IN THE MILITARY SERVICE

As an integral part of the study effort, a RAND research team conducted on-site visits of installations and the academies of the four military services and the United States Coast Guard. The purpose of these visits was to obtain a first hand representative sample of existing living and privacy conditions. The term "privacy" as used here, means: "the quality or state of being apart from company or observation," or more directly, "freedom from unauthorized intrusion." The research effort was focused solely on the physical accommodations that currently exist in the military services and did not examine the impact of policies on living and privacy or their enforcement.

---

**Privacy Conditions in the Military**
**Scope of On-site Visits**

NDRI

- **Visits to 19 Installations of the 5 Services in 11 States:**

| US Army (4) | US Navy (6) | US Air Force (5) |
|---|---|---|
| Ft Bragg, NC | NB Norfolk, VA | Pope AFB, NC |
| Ft Jackson, SC | NAS Norfolk, VA | Charleston AFB, SC |
| Ft Indiantown Gap, PA | NB Charleston, SC | Andrews AFB, MD |
| USMA West Point, NY | NB Kings Bay, GA | Keesler AFB, MS |
| | NAS Pensacola, FL | USAFA Colorado Springs, CO |
| | USNA Annapolis, MD | |

| US Marine Corps (2) | US Coast Guard (2) |
|---|---|
| Camp Lejuene, NC | CGSB Portsmouth, VA |
| MCB Quantico, VA | USCGA New London, CN |

RAND

Figure B-1—Scope of On-Site Visits

In coordination with the Office of the Assistant Secretary of Defense for Force Management and Personnel and the five services,

- 412 -

installations were selected for on-site visits that would provide a fair representation of the existing living and privacy facilities. As shown in Figure B-1, nineteen different major installations, including the four service academies, were selected and visited over a four-week period from mid-April to mid-May. To accommodate time constraints, the majority of these installations were located in eleven states primarily in the East and Gulf Coast areas.

At each installation, the team collected comprehensive and detailed information on the specific facilities, such as blueprints of each structure and ship/vessel visited and general population and accommodation capacity data for each installation and building that was visited. Moreover, to document the actual state of existing living and privacy conditions, a videotape and still photographs of each facility and site visited were also taken. A condensed video and still picture record has been provided separately, and the complete videotape and all photography have been archived and are available at RAND.

The specific sites visited included the full spectrum of living conditions currently used by active and reserve component service members of both genders in the full range of environments. The environments covered transient and permanent party status; all types of units, combat through support; initial entry and basic training for enlisted and officer personnel; and garrison, field training and deployment aboard ships. These conditions, and hence one's privacy, vary considerably, but are primarily a function of the following five determinants:

- Public laws and DoD regulations
- A service member's rank, grade, or position
- The unit's or organization's mission
- Service doctrine, tactics, and traditions
- Physical, structural, and operational constraints

Figure B-2 summarizes the current DoD authorizations for living space and personal hygiene facilities that determine the level of privacy provided a service member. Coast Guard authorizations are

- 413 -

equivalent to DoD.  For example, the authorizations and actual practices
provide the following:

- Initial entry facilities for recruits or basic trainees in
  grade E-1 are authorized at 72 square feet of living space per
  service member in an open bay area with a central bathroom.
  All services follow these guidelines and generally billet
  between 10 to 50 people per open bay room.  Open bays and
  central bathrooms within each service are segregated by gender
  with no significant differences in the separated facilities.
  These initial living conditions provide a service member
  little, if any, privacy and are primarily intended to
  accommodate closely supervised group activities associated with
  initial acclimation to the rigors and unique demands associated
  with military service life.

| Privacy Conditions in the Military DoD Minimum Standards of Acceptable Space and Privacy | | |
|---|---|---|
| Grade | Transient Personnel | Permanent Party Personnel |
| E-1 recruits and trainees | 72 sq ft, open bay with central bath | Same as Transients of the same grade and status |
| E-1 thru E-4 | 90 sq ft, four max. per room unless open bay, central bath | Same as Transients of the same grade |
| E-5 and E-6 | 135 sq ft with room and bath shared with no more than one other | Same as Transients of the same grade |
| E-7 thru E-9 | Same as below | 270 sq ft private room with private bath |
| 0-1, 0-2, W-1 thru W-4 | Same as below | 250 sq ft private room with private bath |
| 0-3 thru 0-10 and civilians | 250 sq ft private room with bath shared with not more than one other | 400 sq ft private suite (living room and bedroom) with private bath |
| [DOD 4165.63-M, June 1988] | | RAND |

Figure B-2—DoD Minimum Standards of Acceptable Space and Privacy

- 414 -

- Follow-on enlisted advanced individual and skill training and officer candidate school facilities in all the services, except the Air Force, continue this practice. The Air Force uses smaller two- or three-person rooms with central bathrooms for its follow-on training.

- Subsequent assignments in permanent party status bachelor facilities with increasing seniority and promotions result in changes to the living space authorizations and privacy conditions. Middle grade enlisted bachelors permanently assigned to a unit ashore, for example, are authorized larger living space, and hence improved privacy. Permanent party senior non-commissioned officers assigned to a shore unit are authorized for and generally receive private rooms and baths. Officers, depending on grade, and DoD civilians receive authorizations for the largest and most private living space. It should be noted, however, that bachelors of any specific grade in a transient status are not usually authorized for the same conditions as permanent party people. Further, it was noted during the on-site visits that transient quarters are in limited quantities, especially for non-commissioned officers, officers, and DoD civilians. Those that do exist are often sub-standard, meaning the facilities are below the authorized levels of living space, privacy conditions or both.

- In operational or field training environments, the living space afforded a service member is very austere and seldom supports individual privacy, particularly on naval vessels. The research team visited a full range of naval and Coast Guard vessels as shown in Figure B-3. While shipboard, naval crews are typically billeted in curtain-enclosed Northampton bunks stacked three high, with 18-21 inches of vertical separation between each bunk, and with solid partitions separating the bunks in adjoining stacks. The conditions afforded embarked Marines are less accommodating with only partially curtained bunks stacked up to four high and with few partial partitions between adjoining bunks in each stack. The crews of attack

- 415 -

| Privacy Conditions in the Military |
|---|
| Visited Sixteen Different Class Naval Vessels |

NDRI

### On-board Ships

#### US Navy Ships (12)

CVN USS J F Kennedy
DD   USS Briscoe
FFG USS Taylor
SSN USS Phoenix
SSBN USS Pennsylvania
MCM USS Patriot
DD Tender USS Puget Sound
LSD USS Tortuga
LST USS Fairfax County
ASR USS Orlotan
AE   USS Mount Baker
APL Barge Warrior

#### USCG Vessels (4)

Cutter USCGC Bear
Bouy Tender USCGS Cowslip
Patrol Boat USCGS Aquidneck
Sail Bark USCGS Eagle

RAND

Figure B-3—Scope of Shipboard Visits

submarines are provided bunks densely packed in very tight arrangements which are even more austere.  Similarly, field environments require rustic living and the use of temporary facilities and tentage for living and hygiene facilities.  This also results in crowded conditions and a loss of personal privacy.

- At service academies, students are provided living space similar to college dormitories with two to four people per room, fewer depending upon seniority, and various forms of central bathrooms.

In summary, changes in DoD living space and privacy authorizations have significantly improved living and privacy conditions since the end of World War II.  The numerous remaining World War II temporary wooden structures that are still in use, often for reserve component and ROTC annual training, provide ample evidence to support the extent of these

- 416 -

improvements.  However, it was also readily apparent from the on-site
visits that privacy conditions in many existing facilities are the
result of older building designs and standards that do not meet today's
needs.  Many of these older facilities could have much improved privacy
within the existing space with what appears to be only modest
investments; for example, the addition of partitions and curtains to
provide individual stalls in common showers.  Other privacy improvements
that could be made seemed to be well known to responsible officials at
each installation but are not required by DoD regulations and are not
currently resourced.

The simplified military life cycle model shown in Figure B-4
illustrates some of the dynamics involved, and the impact of DoD living
space guidelines on service members.  The research established a general
pattern for living space and privacy conditions, and hence one's freedom
from observation and unauthorized intrusion, that begins with initial
entry training, where service members are required to live in very close



Figure B-4—Military Life Cycle Model

- 417 -

proximity to each other and have little or no privacy in personal hygiene facilities. Conditions improve with assignment to permanent party status and increasing seniority, responsibility, and promotion. However, operational missions and duty environments may change during an assignment or incident to a subsequent assignment to limit living accommodations and privacy with little regard for rank or seniority. Finally, DoD generally authorizes a lower standard of living space and privacy for service members in transient status and deployed personnel aboard ship or in other operational environments. Retention and use of substandard facilities, such as those found in temporary World War II buildings, which are below current authorized living spaces, continue as an apparent economy measure, but result in added deprivation to service members, particularly reservists.

The research fully substantiates the premise that military service members are required to live in close proximity in environments that provide little privacy. Living in open bays during initial training, in close and densely packed berthing aboard ships, or in field operational environments is not conducive to nor supportive of an individual's privacy or modesty. The constraints of physical dimensions and priorities for weapons and seaworthiness limit the potential for improved living conditions aboard many ships. However, in some of the other environments existing living and privacy conditions can be improved.

- 418 -

## Appendix C

### LEGAL PROVISIONS CONCERNING SODOMY

**CURRENT VERSION**

**Statute: Uniform Code of Military Justice: Article 125:**

"(a) Any person subject to this chapter who engages in unnatural carnal copulation with another person of the same or opposite sex or with an animal is guilty of sodomy.  Penetration, however slight, is sufficient to complete the offense.

(b)  Any person found guilty of sodomy shall be punished as a court-martial may direct."

**From the Manual for Courts Martial:**

b.  Elements.

(1) That the accused engaged in unnatural carnal copulation with a certain other person or with an animal.

[Note:  Add either or both of the following elements, if applicable]

(2) That the act was done with a child under the age of 16.

(3) That the act was done by force and without the consent of the other person.

c.  Explanation.  It is unnatural carnal copulation for a person to take into that person's mouth or anus the sexual organ of another person or of an animal; or to place that person's sexual organ in the mouth or anus of another person or of an animal; or to have carnal copulation in any opening of the body, except the sexual parts, with another person; or to have carnal copulation with an animal.

**ILLUSTRATIVE REVISED VERSION**

**Statute UCMJ Article 125:**

<u>No change to current statute</u>

- 419 -

**Changed Provision of the Manual for Courts Martial:**

    b.  Elements.

     (1) That the accused engaged in [unnatural] carnal copulation with a certain other person or with an animal; and

    (2) That the act was done by force and without the consent of the other person.

    [Note:  Add the following element, if applicable]

    (3) That the act was done with a child under the age of 16.

    c.  Explanation.  It is unnatural carnal copulation for a person to take into that person's mouth or anus the sexual organ of another non-consenting adult or of an animal; or to place that person's sexual organ in the mouth or anus of another non-consenting adult  or of an animal; or to have carnal copulation in any opening of the body, except the sexual parts, with another non-consenting adult; or to have carnal copulation with an animal.

    This revision limits "unnatural" to non-consenting acts between adults and to either consensual or non-consensual acts with children under 16.  Neither Article 125 nor prior editions of the Manual for Courts Martial defined "unnatural."  Instead the definitional role was left to the military judiciary.  In this revision the President fills the definitional gap and provides clear guidance to commanders and military judges as to the precise scope of Article 125.

- 420 -

Appendix D

ATTITUDES ABOUT HOMOSEXUALITY AND MILITARY SERVICE IN CANADA,
THE UNITED KINGDOM, AND THE UNITED STATES


An examination of the views of citizens in other countries about homosexuality and the role of gays in the military may help in assessing American public opinion on these issues, although few countries conduct opinion polls to the same extent as the United States. Two countries for which some polling data are available are Canada and Britain, and they provide an interesting contrast. Britain currently bars homosexuals from serving in the military. Canada, on the other hand, has recently changed its policy to permit homosexuals to serve in the military.

In both countries, attitudes regarding homosexuality appear similar to those in the United States, but somewhat more accepting. Canadian and British citizens have historically been slightly less willing than Americans to classify homosexual relations as wrong, and have been slightly more supportive of equal rights for homosexuals than Americans are (Rayside and Bowler, 1988); see Table D-1. More recently, a 1991 Gallup poll found that only 27 percent of Canadians believe homosexuals should be allowed to adopt children, a nearly identical proportion as that in the United States (Table D-2). (See Chapter 5 on U.S. public opinion for a full discussion of U.S. attitudes toward homosexuality, homosexuals, and their service in the military.)

But like Americans, Canadian and British citizens appear to separate their personal convictions on homosexuality from their beliefs regarding the rights of homosexuals. By the early 1980's, 70 percent of Canadian and 73 percent of British citizens expressed support for equal rights in terms of job opportunities; the corresponding proportion of Americans expressing support in the early 1980's was 65 percent (Rayside and Bowler, 1988; see Table D-1). As with Americans, Canadians express less acceptance of equal opportunities for homosexuals in occupations where either they or their children might have close, personal contact. A 1988 Gallup Canada poll shows fewer Canadians to be accepting of

- 421 -

homosexual clergy, teachers, and doctors than of homosexual salespersons
(Table D-3). The acceptance levels among Canadians of homosexuals in
each of these occupations are nearly identical to acceptance levels
among Americans.

### Table D-1

### Canadian, U.S., and British Support of Gay Rights in the Early 1980's

|  | Canada | U.S. | U.K. |
|---|---|---|---|
| Suppport for gay equality rights | 70% (1980/85) | 65%[a] (1983) | 73%[b] (1979) |
| Homosexual relations thought wrong | 69% (1980) | 76%[c] (1980) | 69%[d] (1985) |

SOURCE: Rayside and Bowler (1988:651).

[a]*Newsweek-Gallup* poll in *Newsweek*, Aug 8, 1983: "In general, do you
think homosexuals should have equal rights in terms of job
opportunities?"

[b]Gallup poll, in *The International Gallup Polls*, 1979:266: "As you
know, there has been considerable discussion in the news lately
regarding the rights of homosexual men and women. In general, do you
think homosexuals should or should not have equal rights in terms of job
opportunities?"

[c]National Opinion Research Center poll, in *Index to International
Public Opinion*, 1979-80:228: "What about sexual relations between two
adults of the same sex--do you think it is always wrong, almost always
wrong, wrong only sometimes, or not wrong at all?"

[d]Jowell et al. (1986:152): "What about sexual relations between two
adults of the same sex? What would your opinion be? Always wrong,
mostly wrong, sometimes wrong, rarely wrong, not wrong at all, don't
know/no answer."

### Table D-2

"In your opinion, should homosexuals be
allowed to adopt children or not?"
(Gallup Canada. July, 1991. Sample of
Canadian adults, N = 1043)

| | |
|---|---|
| Yes | 27% |
| No | 65 |
| Don't know | 8 |

- 422 -

Canadians appear to be somewhat more accepting of permitting homosexuals to serve in the military. The 1988 Gallup Canada poll, prior to the change in policy permitting homosexuals to serve, found 60 percent supportive of allowing homosexuals to be members of the Armed Forces (Table D.3). A recent poll, taken shortly after the change in policy, found two thirds of Canadians supportive of allowing homosexuals to serve (Table D.4).

Table D-3

Canada: "Do you think homosexuals should or should not be employed in the following occupations..."
(Gallup Canada. April, 1988. Sample of Canadian adults, N = 1041)

U.S.: "Do you think homosexuals should or should not be hired for each of the following occupations..."
(Gallup. March, 1987. Sample of American adults, N = 1015)

| Proportion who answered should be in occupation | Canada | United States |
|---|---|---|
| Salesperson | 72% | 72% |
| Armed Forces | 60 | 55 |
| Doctor | 52 | 49 |
| Clergy | 44 | 42 |
| Junior school teacher[a] | 45 | 33 |

[a]In the United States, the category was elementary school teacher.

Table D-4

"Do you think that ... should be allowed to serve in the Canadian military or not?"
(Gallup Canada. November, 1992. Sample of Canadian adults, N = 1006)

| | Gay Men | Lesbians |
|---|---|---|
| Yes | 67% | 66% |
| No | 26 | 26 |
| Don't know | 8 | 8 |

– 423 –

Appendix E

RELEVANT CANADIAN REGULATIONS

CFAO 19–36                                                                OAFC 19–36

## SEXUAL MISCONDUCT

### PURPOSE

1. This order prescribes the Canadian Forces (CF) career policy and procedures applicable to cases of sexual misconduct.

### RELATED ORDERS

2. This order should be read in conjunction with:

    a. QR&O 19.61 (Certificate of Conviction);

    b. CFAO 4-13 (Unusual Incidents);

    c. CFAO 19-38 (Personal Relationships);

    d. CFAO 19-39 (Personal Harassment);

    e. CFAO 34-25 (Psychoneurotic and Personality Disorders - Medical Examination and Disposal); and

    f. CFAO 114-3 (Conduct of Officers & WOs - Notification to NDHQ).

### DEFINITIONS

3. In this order, "sexual misconduct" means an act which has a sexual purpose or is of a sexual or indecent nature and which, subject to paragraph 4, constitutes an offence under the Criminal Code or the Code of Service Discipline.

**Note** - Examples of sexual misconduct dealt with under the provisions of this order would include, but are not limited to, sexual activity between consenting adults under prohibited circumstances, sexual abuse of a child, incest, sexual assault, aggravated sexual assault, indecent exposure and bestiality.

## INCONDUITES À CARACTÈRE SEXUEL

### OBJET

1. La présente ordonnance énonce la ligne de conduite en matière de carrière et les procédures des Forces canadiennes (FC) applicables aux cas d'inconduites à caractère sexuel.

### ORDONNANCES CONNEXES

2. La présente ordonnance doit être lu en tenant compte des ordonnances suivantes :

    a. ORFC 19.61 (Certificats de condamnation);

    b. OAFC 4-13 (Incidents inusités);

    c. OAFC 19-38 (Relations personnelles);

    d. OAFC 19-39 (Le harcèlement);

    e. OAFC 34-25 (Troubles psychonévrotiques et troubles de personnalité: examen médical et mesures prévues concernant ces cas);

    f. OAFC 114-3 (Conduite des officiers et des adjudants - avis au QGDN).

### DÉFINITIONS

3. Dans la présente ordonnance, «inconduite à caractère sexuel» s'entend d'un acte dont l'objet est sexuel ou qui est à caractère sexuel ou indécent et qui, sous réserve du paragraphe 4, constitue une infraction sous le régime du Code criminel ou du code de discipline militaire.

**Nota** - Des exemples d'inconduite à caractère sexuel dont fait état cette ordonnance pourraient inclure, notamment des activités à caractère sexuel entre adultes consentants dans des circonstances prohibées, l'abus sexuel sur des enfants, l'inceste, l'agression sexuelle, l'agression sexuelle grave, l'exhibitionnisme et la bestialité.

LCR Appendix Page 0741

– 424 –

CFAO 19–36

OAFC 19–36

## SEXUAL HARASSMENT

4.   Where conduct is alleged that could constitute sexual harassment but not an offence under the Criminal Code (e.g. lewd comments), it shall be dealt with pursuant to CFAO 19-39 (Personal Harassment).   Where conduct is alleged that could be both a Criminal Code offence and sexual harassment (e.g. a pat on the behind), the applicable order will depend on the way in which the military authority responsible for taking action decides to treat the matter.   If, based on the complaint or other information, the authority determines that the matter is sufficiently serious that a charge for a Criminal Code offence is a reasonable possibility upon the completion of an investigation, this order shall be applied until the investigation is completed.   If the investigation does not provide sufficient evidence to support a charge for a Criminal Code offence but does support a finding of sexual harassment, the post-investigation procedures for harassment in CFAO 19-39 shall be applied.   Otherwise, this order shall continue to apply.

5.   Prior to making a determination that the evidence is not sufficient to support a charge under the Criminal Code, the military authority concerned should consult with the unit legal adviser. If doubt exists as to whether civilian authorities will be laying a charge under the Criminal Code, the legal adviser shall obtain the information from the civil authorities and inform the responsible military authority of the decision.   In order to ensure that there is a minimal delay in dealing with the matter, these consultations are to be completed on a priority basis.

## POLICY

6.   It is CF policy that sexual misconduct, and sexual harassment that is dealt with under CFAO 19-39, is unacceptable and will not be tolerated. A CF member who has engaged in sexual misconduct is liable to disciplinary and administrative action, including release if appropriate.   An applicant for enrolment who has engaged in sexual misconduct may be refused enrolment.

## HARCÈLEMENT SEXUEL

4.   Lorsque l'on soutient que la conduite reprochée pourrait constituer du harcèlement sexuel mais non une infraction au Code criminel (c'est-à-dire des commentaires impudiques), celle-ci devrait être traitée conformément à l'OAFC 19-39 (Le harcèlement). Lorsque l'on soutient que la conduite pourrait être une infraction au Code criminel et du harcèlement sexuel (c'est-à-dire une petite tape sur le derrière), l'ordonnance applicable dépendra de quelle manière l'autorité militaire chargée du cas décidera de la traiter. Si, en se fondant sur la plainte ou sur d'autres informations, l'autorité décide que le cas est suffisamment sérieux pour qu'il soit raisonnablement possible de porter une accusation en vertu du Code criminel à l'issue de l'enquête, cette ordonnance doit être appliquée jusqu'à ce que l'enquête soit complétée. Si l'enquête ne fait pas suffisamment ressortir d'éléments de preuve pour supporter une accusation sous le Code criminel mais démontre du harcèlement sexuel, les procédures après enquête portant sur le harcèlement qui sont prévues à l'OAFC 19-39 s'appliquent.   Dans le cas contraire, cette ordonnance doit continuer à être appliquée.

5.   Avant de déterminer qu'une preuve n'est pas suffisante pour supporter une accusation en vertu du Code criminel, l'autorité militaire concernée devrait demander l'avis du conseiller juridique de l'unité. S'il y a des doutes quant à savoir si les autorités civiles porteront des accusations en vertu du Code criminel, le conseiller juridique devrait s'enquérir auprès des autorités civiles de la décision d'en porter ou non et en informer l'autorité militaire responsable du cas.   De manière à s'assurer que le délai entourant ces consultations soit le plus court possible, celles-ci seront faites de façon prioritaire.

## POLITIQUE

6.   La politique des FC prescrit que les inconduites à caractère sexuel ainsi que le harcèlement sexuel dont il est question dans l'OAFC 19-39, sont inacceptables et ne seront aucunement tolérées.   Tout militaire qui commet une inconduite à caractère sexuel est passible de mesures disciplinaires et administratives, y compris de libération, si cela s'avère nécessaire.   Un candidat qui fait une demande d'enrôlement peut être refusé pour le motif qu'il a commis une inconduite à caractère sexuel.

LCR Appendix Page 0742

- 425 -

CFAO 19-36                                       OAFC 19-36

## INVESTIGATION

7. Where an allegation is made that a CF member has engaged in sexual misconduct, the commanding officer (CO) shall ensure that an investigation is conducted into the allegation as soon as practicable. The type of investigation will depend on the nature of the alleged sexual misconduct. Where the allegation concerns a possible offence under the Criminal Code, the matter should be referred to the Military Police for a determination of which police force, military or civilian, should conduct the investigation. Where the allegation concerns a possible offence contrary to the Code of Service Discipline, the investigation may consist of an informal investigation, a summary investigation, a board of inquiry or a military police investigation, as appropriate under the circumstances. If a police investigation is conducted, nothing precludes the conduct of an informal investigation, a summary investigation, or a board of inquiry to resolve issues not covered by the police investigation. If there is doubt as to the most suitable type of investigation, the advice of the unit legal advisor should be sought.

8. Where the investigation supports the allegation of sexual misconduct, the CO shall consult with a medical officer on the need for a medical examination in accordance with CFAO 34-25. He shall record the results of that consultation and refer the member against whom the allegation is made for an examination if recommended.

## DISCIPLINARY ACTION

9. On completion of the investigation required in paragraph 7, the CO shall take such disciplinary action, if any, as is considered appropriate.

## ADMINISTRATIVE ACTION

10. When sexual activities take place in circumstances where they are contrary to the Code of Service Discipline, they constitute sexual misconduct even if they are otherwise lawful (e.g. sexual activity between consenting adults that takes place in a location where such actions are prohibited by CF orders). Cases of this nature shall be handled at the unit level unless the CO considers them to be sufficiently serious that release may be warranted.

## ENQUÊTE

7. Si l'on impute à un militaire des FC la perpétration d'une inconduite à caractère sexuel, le commandant doit s'assurer qu'une enquête est menée sur cette allégation dans 'es meilleurs délais. Le genre d'enquête pourra varier selon le type d'inconduites à caractère sexuel reproché. Si l'imputation de cette inconduite a trait à une infraction probablement commise en contravention avec le Code criminel, l'affaire devrait être rapportée à la Police militaire pour que celle-ci détermine lequel des corps policiers - militaire ou civil - devrait mener l'enquête. Si l'imputation a trait à une infraction possiblement commise en contravention avec le code de discipline militaire, l'enquête peut, selon que cela s'avère indiqué suivant les circonstances, prendre la forme d'une enquête menée de façon informelle, d'une enquête sommaire, d'une commission d'enquête ou une d'enquête de la Police militaire. Si une enquête policière est menée, il n'y a rien qui empêche de faire tenir simultanément une enquête menée de façon informelle, une enquête sommaire ou une commission d'enquête si celle-ci a pour mandat de résoudre des questions qui ne sont pas couvertes par l'enquête policière. S'il y a un doute sur le type d'enquête le plus approprié, on devrait demander l'avis du conseiller juridique de l'unité.

8. Lorsque l'enquête supporte l'inconduite à caractère sexuel reprochée, le commandant devrait consulter le médecin militaire pour décider de la nécessité d'un examen médical selon l'OAFC 34-25. Il devrait noter les résultats de cette consultation et faire subir au membre un examen si cela s'avère indiqué.

## MESURES DISCIPLINAIRES

9. À la fin de l'enquête prescrite par le paragraphe 7, le commandant est tenu de prendre, si nécessaire, les mesures disciplinaires qu'il juge indiquées.

## MESURES ADMINISTRATIVES

10. Lorsque des activités sexuelles surviennent dans des circonstances qui sont en contravention avec le code de discipline militaire, elles constituent de l'inconduite à caractère sexuel même si elles sont par ailleurs légales (c'est-à-dire l'activité sexuelle entre adultes consentants survenant dans un endroit où de tels actes sont interdits aux termes des ordres des FC). Les cas de ce genre doivent être traités au niveau de l'unité à moins que le commandant ne les considère suffisamment sérieux pour justifier la libération.

Ch 26/92                                      Mod. 26/92

- 426 -

11. In cases not handled at the unit level under paragraph 10, the CO shall consider the results of the investigation and all other relevant factors. Where the CO is satisfied that the member has engaged in sexual misconduct, the CO shall:

   a. decide whether to recommend to NDHQ that the member is retained in or released from the CF; and

   b. if the decision is to recommend release, prepare and deliver a Notice of Intent to Recommend Release in all cases regardless of rank and years of service.

12. In those cases not handled at the unit level under paragraph 10, the CO shall not place the member on Counselling and Probation or Report of Shortcomings, give the member a reproof, or take any other administrative action that might interfere with the proper determination of the question of release until the decision with respect to release or retention has been made by NDHQ. This does not prevent the member from being suspended from duty under QR&O 19.75 where appropriate.

**REPORTING**

13. An allegation of sexual misconduct by a member may qualify as an unusual incident for the purposes of CFAO 4-13 and may require special reporting under that order. In addition, where proceedings under the Code of Service Discipline have been commenced against an officer, CWO, MWO or WO, there is a special reporting requirement contained in CFAO 114-3.

14. In those cases not handled at the unit level under paragraph 10, the CO shall report the alleged sexual misconduct to NDHQ/Director General Personnel Careers Officers (DGPCO) or Director General Personnel Careers Other Ranks (DGPCOR), as appropriate. This report, and all subsequent reports required by this order, (except for police investigation reports which are handled independently and made available at each level within the chain of command), shall be forwarded through the chain of command.

11. Dans les cas qui ne sont pas traités au niveau de l'unité conformément au paragraphe 10, le commandant doit considérer les résultats de l'enquête et tout autre facteur pertinent. Si le commandant est d'avis que le militaire a commis une inconduite à caractère sexuel, il doit :

   a. décider s'il recommande au QGDN le maintien du militaire dans les FC ou la libération de celui-ci;

   b. s'il décide de recommander la libération, préparer et remettre un avis d'intention de recommander la libération, et ce dans tous les cas, quel que soit le grade et le nombre d'années de service.

12. Dans les cas qui ne sont pas traités au niveau de l'unité conformément au paragraphe 10, le commandant ne doit pas placer le membre en mise en garde et surveillance ou faire un rapport d'insuffisance à son sujet, ni lui adresser un reproche, ni prendre des mesures administratives qui pourraient entraver la détermination adéquate de la question de la libération avant que le QGDN n'ait pris la décision de libérer le militaire des FC ou de le maintenir dans celles-ci. Cela n'empêche toutefois pas, dans les cas jugés appropriés, de suspendre le militaire de ses fonctions en vertu de l'article 19.75 des ORFC.

**RAPPORT**

13. Une allégation d'inconduite à caractère sexuel à l'égard d'un militaire peut, pour l'application de l'OAFC 4-13, être qualifiée d'incident inusité et nécessiter un rapport spécial aux termes de cette ordonnance. De plus, si des procédures sous le code de discipline militaire ont été prises contre un officier, un adjudant-chef, un adjudant-maître ou un adjudant, il faut le rapporter en suivant la procédure de l'OAFC 114-3.

14. Dans les cas qui ne sont pas traités au niveau de l'unité conformément au paragraphe 10, le commandant doit rapporter l'inconduite à caractère sexuel reprochée au QGDN/Directeur général - Carrières militaires (Officiers) (DGCMO) ou au Directeur général - Carrières militaires (Personnel non officier) (DGCMP), selon le cas. Ce rapport et tout autre rapport ultérieur exigés par la présente ordonnance (sauf les rapports d'enquête policière, lesquels sont traités séparément et disponibles à chacun des niveaux de la chaîne de commandement) doivent être acheminés par la chaîne de commandement.

LCR Appendix Page 0744

– 427 –

CFAO 19–36

OAFC 19–36

15. In order to treat fairly the victim of sexual misconduct and the member against whom an allegation is made, it is essential that the reports under paragraph 14 be handled expeditiously and with respect for individual privacy. Therefore, all levels in the chain of command are to treat these reports as priority matters for onward transmission in the shortest possible time and with access controlled on a strict need-to-know basis.

16. The report made pursuant to paragraph 14 shall include:

    a. all available investigation reports, other than police reports, relating to the allegation of sexual misconduct;

    b. where applicable, a statement identifying any relevant police reports;

    c. a summary prepared by a medical authority of the findings of a report prepared under paragraph 8, if any, or confirmation that a medical examination was not required;

    d. a recommendation as to whether the member should be retained in or released from the CF with any information supporting that recommendation and any additional recommendations;

    e. where applicable, a copy of the Notice of Intent to Recommend Release;

    f. where a Notice of Intent to Recommend Release has been given, a copy of the information and representations, if any, provided by the member with respect to the alleged sexual misconduct or the recommendation for release; and

    g. a statement as to whether a charge has been, or is likely to be, laid under the Criminal Code or Code of Service Discipline with respect to the sexual misconduct.

17. On completion of any disciplinary action the CO shall forward a report to NDHQ/DGPCO or DGPCOR, as appropriate, containing:

    a. the charge report or charge sheet;

    b. a summary of the evidence presented;

15. Afin que toute victime d'une inconduite à caractère sexuel et que le militaire faisant l'objet du rapport soient traités correctement, il est essentiel que les rapports visés par le paragraphe 14 soit traités promptement tout en respectant la vie privée des personnes en cause. Par conséquent, tous les niveaux d'autorité de la chaîne de commandement doivent traiter ces rapports comme des sujets prioritaires pour qu'ils puissent être acheminés dans les plus brefs délais tout en s'assurant que leur accès en soit strictement réservé à ceux qui doivent en prendre connaissance.

16. Le rapport fait aux termes du paragraphe 14 doit comprendre les documents et renseignements suivants :

    a. tous les rapports d'enquête disponibles relatifs à l'allégation d'inconduite à caractère sexuel, sauf ceux d'enquêtes policières;

    b. une déclaration identifiant tout rapport d'enquête policière pertinent, le cas échéant;

    c. un résumé, préparé par une autorité médicale, des conclusions du rapport confectionné aux termes du paragraphe 8, le cas échéant, ou la confirmation qu'un examen médical n'était pas requis;

    d. la recommandation appuyant la libération ou le maintien du militaire dans les FC ainsi que tout renseignement ou document appuyant cette recommandation ou toute recommandation additionnelle;

    e. une copie de l'avis d'intention de recommander la libération, le cas échéant;

    f. dans le cas où un avis d'intention de recommander la libération du militaire a été donné, une copie des renseignements et de l'argumentation fournis par le militaire à l'égard de sa présumée inconduite à caractère sexuel ou de la recommandation en vue d'obtenir sa libération;

    g. une déclaration à l'effet qu'une accusation a été portée ou est susceptible de l'être en vertu du Code criminel ou du code de discipline militaire relativement à l'inconduite à caractère sexuel.

17. Lorsque les mesures disciplinaires sont terminées, le commandant doit acheminer un rapport au QGDN/ DGCMO ou DGCMP, selon le cas, qui inclut les documents ou renseignements suivants :

    a. le procès-verbal d'accusation ou l'acte d'accusation;

    b. un résumé de la preuve qui a été présentée;

Ch 26/92

Mod. 26/92

- 428 -

CFAO 19–36

OAFC 19–36

c.  the finding with respect to the charge or charges;

d.  the sentence imposed, if any; and

e.  the member's conduct sheet.

18. On the completion of any proceedings under the Criminal Code the CO shall forward a report to NDHQ/DGPCO or DGPCOR, as appropriate, containing the results of the civil court proceedings, including any certificate of conviction.

c.  le verdict rendu à l'égard de l'accusation ou des accusations;

d.  le cas échéant, la sentence qui a été infligée;

e.  la fiche de conduite du militaire.

18. À la fin de toute procédure prise sous le régime du Code criminel, le commandant doit acheminer un rapport au QGDN/DGCMO ou DGCMP, selon le cas, qui comprend les résultats des procédures devant la cour civile ainsi qu'un certificat de condamnation.

## NDHQ REVIEW

19. A Career Review Board (CRB) shall be established at NDHQ to review cases of sexual misconduct. Representatives of DGPCO and DGPCOR shall be included in the membership of this board.

20. Upon receiving a report under paragraph 14, the CRB shall determine whether there is sufficient information upon which to base a recommendation. The CRB shall obtain any further information that may be required prior to considering its recommendation.

21. Where the CRB is satisfied that it has sufficient information upon which to make a recommendation, it may determine its recommendation and take further action in accordance with this order, whether or not action under the Criminal Code or Code of Service Discipline has been concluded. The propriety of the CRB proceeding in circumstances where such action has not been completed will be a matter for the board to determine based on the circumstances of the particular case.

22. If the CRB is satisfied that the evidence establishes that the member has engaged in sexual misconduct, the CRB will normally recommend the release of the member to the approving authority. In deciding whether the recommendation should be for retention or release, the CRB shall consider the following factors:

a.  the nature of the sexual misconduct;

b.  where there is a victim, the impact of the sexual misconduct on the victim if such information is available;

c.  the service record of the member;

d.  the summary of evidence and findings of any service tribunal;

## EXAMEN PAR LE QGDN

19. Un Comité de révision des carrières (CRC) est constitué au QGDN pour examiner les cas d'inconduites à caractère sexuel. Sont inclus à titre de membres de ce comité, les représentants du DGCMO et du DGCMP.

20. Sur réception d'un rapport visé par le paragraphe 14, le CRC doit décider s'il détient suffisamment de renseignements sur lesquels il peut fonder sa recommandation. Le CRC doit obtenir tout autre information qui peut être nécessaire avant de considérer la recommandation qu'il fera.

21. Lorsque le CRC est d'avis qu'il détient suffisamment de renseignements lui permettant de faire une recommandation, il peut décider de la faire et prendre toute autre mesure en conformité avec la présente ordonnance, peu importe si les mesures prises en vertu du Code criminel ou du code de discipline militaire sont terminées. L'opportunité pour le CRC de procéder dans des circonstances où de telles mesures ne sont pas terminées est une question que doit déterminer le comité selon les circonstances de l'affaire.

22. Si le CRC est d'avis que la preuve établit la commission d'une inconduite à caractère sexuel à l'égard du militaire, le CRC recommandera normalement la libération du militaire à l'autorité approbatrice. Pour décider s'il devrait faire une recommandation appuyant la libération du militaire des FC ou le maintien du militaire dans celles-ci, le CRC doit considérer les facteurs suivants :

a.  le genre d'inconduite à caractère sexuel;

b.  s'il y a une victime, les conséquences de l'inconduite à caractère sexuel sur la victime si de tels renseignements sont disponibles;

c.  l'état de service du militaire;

d.  le résumé de la preuve et les verdicts de tout tribunal militaire;

Ch 26/92

Mod. 26/92

- 429 -

CFAO 19–36                                                                OAFC 19–36

e. any certificate of conviction or other available information relating to a civilian trial;

f. the results of the medical assessment, if any;

g. the recommendation of the CO and the officer commanding the command;

h. the information and representations provided by the member, if any; and

i. such other factors as the CRB may determine to be relevant.

23. Where the CRB determines that the recommendation is to retain the member without the need for further representations by the member, that recommendation shall be forwarded to the approving authority for a decision. Unless otherwise directed, the approving authority for officers is DGPCO and for non-commissioned members is DGPCOR. Where the CRB decides to recommend retention despite finding that the member has engaged in sexual misconduct, it shall provide reasons why release would not be appropriate as well as recommendations as to what other administrative action should be taken. If the approving authority concurs with the recommendation, the officer commanding the command and the CO shall be informed of the decision and of the administrative conditions applicable to the retention, if any.

24. Where the approving authority does not concur with a recommendation for retention under paragraph 23, that authority shall:

a. if the CO has recommended the member's release and the member has not objected to that recommendation, initiate action to have the member released; and

b. in any other case, refer the matter to the CRB for action in accordance with paragraphs 25 to 28.

25. Where the CRB determines that it may recommend release of the member, it shall provide the member with all the available information upon which it will be basing its decision, subject to lawful exemptions, and inform the member that he may make any desired representations in writing through the CO within 14 days of the receipt of the CRB's information.

e. tout certificat de condamnation ou tout autre renseignement disponible relatif au procès civil;

f. les résultats de l'évaluation médicale, s'il y a lieu;

g. la recommandation du commandant et de l'officier commandant le commandement;

h. les renseignements et l'argumentation fournis par le militaire, s'il y a lieu;

i. tout autre facteur que le CRC détermine pertinent à cette fin.

23. Lorsque le CRC décide de recommander le maintien du militaire dans les FC sans que d'autres argumentations du militaire soient nécessaires, cette recommandation doit être acheminée à l'autorité approbatrice pour qu'elle rende sa décision. A moins d'instruction contraire, DGCMO est l'autorité approbatrice pour les officiers et DGCMP est celle des militaires du rang. Dans le cas où le CRC décide de recommander le maintien du militaire dans les FC en dépit du fait qu'elle reconnaît que le membre a commis une inconduite à caractère sexuel, le comité doit motiver sa décision en précisant les motifs pour lesquels la libération ne serait pas indiquée de même que ses recommandations quant aux mesures administratives qui devraient être prises. Si l'autorité approbatrice est d'accord avec la recommandation qui lui a été faite, l'officier commandant le commandement et le commandant doivent être informés de la décision et, le cas échéant, de toute condition administrative applicable au maintien du militaire dans les FC.

24. Lorsque l'autorité approbatrice n'est pas d'accord avec la recommandation de maintien du militaire dans les FC en vertu du paragraphe 23, elle doit :

a. si le commandant a recommandé la libération du militaire et que ce dernier ne s'est pas opposé à celle-ci, prendre les mesures pour que le militaire soit libéré;

b. dans tout autre cas, renvoyer l'affaire au CRC pour décision en conformité avec les paragraphes 25 à 28.

25. Lorsque le CRC décide qu'il est en mesure de recommander la libération du militaire, il est fourni au militaire, sous réserve de toute exemption légale, tous les renseignements disponibles sur lesquels le CRC fondera sa décision, et on l'avise qu'il peut, s'il le désire, présenter toute argumentation en la remettant par écrit en passant par son commandant dans les 14 jours suivants la réception des renseignements du CRC.

LCR Appendix Page 0747

- 430 -

26. The CRB may extend the 14 day time limit for response where it is informed by the CO that the member is unable to meet the time limit for a valid reason such as duty requirements or illness.

27. On receipt of the representations of the member provided pursuant to paragraph 25, or on being informed by the CO that the member has not provided any further written representations, the CRB shall determine its recommendation based upon all the information before it.

28. The CO and the member shall be informed, through the chain of command, of the decision by the approving authority, the reasons for that decision, and any further action to be taken.

**APPLICANTS FOR ENROLMENT OR RE-ENROLMENT**

29. Where information is received during the recruiting procedure that an applicant for enrolment or re-enrolment has engaged in sexual misconduct, the enrolling authority shall not normally enrol the applicant. In cases where the enrolling authority considers that this general policy should not be applied, the enrolling authority shall refer the matter to NDHQ/Director General Recruiting, Education and Training for direction.

26. Le CRC peut prolonger le délai de réponse de 14 jours s'il est avisé par le commandant du militaire que celui-ci ne peut satisfaire au délai prescrit pour un motif valable tel que les conditions de service ou la maladie.

27. Sur réception de l'argumentation du militaire fournie aux termes du paragraphe 25, ou en ayant été informé par le commandant du militaire que le militaire n'a pas remis d'argumentation écrite, le CRC doit faire sa recommandation en se fondant sur tous les renseignements qu'on lui a remis.

28. Le commandant et le militaire doivent être avisés, par le biais de la chaîne de commandement, de la décision de l'autorité approbatrice, des motifs appuyant celle-ci ainsi que toute autre mesure à prendre.

**CANDIDATS À L'ENRÔLEMENT ET AU RÉENRÔLEMENT**

29. Lorsque des renseignements sont reçus pendant la procédure d'enrôlement selon lesquels un candidat à l'enrôlement ou au réenrôlement a commis une inconduite à caractère sexuel, l'autorité compétente en matière d'enrôlement ne doit normalement pas enrôler cette personne. Dans les cas où l'autorité compétente juge que cette politique générale ne devrait pas être suivie, elle doit renvoyer l'affaire au QGDN/Directeur général - Recrutement, éducation et instruction et obtenir à cet égard des instructions.

(C)                                    1605-19-36 (DGPP)

Issued 1992-12-18

(C)                                    1605-19-36 (DGPP)

Publiée 1992-12-18

**INDEX**

Discipline
Harassment
Medical
Release

**INDEX**

Discipline
Harcèlement
Libération
Service de santé

LCR Appendix Page 0748

– 431 –

CFAO 19–39

OAFC 19–39

## PERSONAL HARASSMENT

### PURPOSE

1.   This order prescribes the Canadian Forces (CF) policy on personal harassment.

### DEFINITIONS

2.   In this order:

**personal harassment**
   means improper behaviour by an individual that is directed at or is offensive to another individual; that is based on personal characteristics including, for example, race, religion, sex, sexual orientation, physical characteristics, or mannerisms; and that a reasonable person ought to have known would be unwelcome;

**sexual harassment**
   is a type of personal harassment that has a sexual purpose or is of a sexual nature including, but not limited to, touching, leering, lascivious remarks and the display of pornographic material; and

**abuse of authority**
   means the misuse of authority to undermine, sabotage, or otherwise interfere with the career of another individual including, but not limited to, intimidation, threats, blackmail, coercion, or unfairness in the distribution of work assignments, in the provision of training or promotional opportunities« in the completion of performance evaluations, or in the provision of references.

### GENERAL

3.   Personal harassment in any form is an insidious practice that erodes mutual trust and confidence, conditions that are important to military operational effectiveness.  Personal harassment, including sexual harassment, destroys individual dignity, lowers morale and breaks down unit cohesiveness.

4.   Leaders at every level must be knowledgeable about and sensitive to the many forms that personal harassment can take.  It may involve unwarranted comments, gestures, physical contact, or the display of offensive material.  It may

## LE HARCÈLEMENT

### OBJET

1.   La présente ordonnance prescrit la politique des Forces canadiennes (FC) sur le harcèlement.

### DÉFINITIONS

2.   Dans la présente ordonnance, l'expression:

**abus de pouvoir**
   désigne le fait d'abuser de son autorité pour miner, saboter ou entraver la carrière d'une autre personne, par le recours notamment à l'intimidation, aux menaces, au chantage et à la contrainte; il peut se manifester, entre autres, au moment de répartir les tâches, d'offrir un programme de formation, de recommander l'avancement, d'évaluer le rendement ou de fournir des références.

**avances sexuelles importunes**
   désigne tout harcèlement dont l'objet ou la nature est d'ordre sexuel, ce qui comprend, sans toutefois s'y limiter, les attouchements, les regards concupiscents, les remarques lascives et l'étalage de matériel pornographique;

**harcèlement**
   désigne les comportements suivants : tout comportement déplacé, choquant ou injurieux, d'une personne à l'endroit d'une autre; tout comportement discriminatoire fondé sur des caractéristiques personnelles telles la race, la religion, le sexe, l'orientation sexuelle, les traits physiques ou particuliers; tout comportement dont l'importunité n'aurait pas dû échapper à son auteur;

### GÉNÉRALITÉS

3.   Toute forme de harcèlement constitue une pratique insidieuse qui mine la confiance réciproque, condition importante pour assurer l'efficacité des opérations militaires.  Le harcèlement, y compris les avances sexuelles importunes, prive la personne de sa dignité, démoralise les membres du groupe et sape la cohésion de l'unité.

4.   Les chefs à tous les niveaux doivent se sensibiliser au fait que le harcèlement peut prendre différentes formes.  Il peut s'agir de remarques, de gestes ou de contacts physiques déplacés, ou encore de l'étalage de matériel choquant.  Le harcèlement peut survenir

Ch 6/93

Mod. 6/93

– 432 –

CFAO 19–39

occur as a single event or it may involve a continuing series of incidents. It may involve the abuse of authority or position or it may involve relations among peers. Sexual harassment, as a specific type of personal harassment, can victimize both men and women.

5.   The enforcement of high standards for training and work performance does not constitute personal harassment provided that the standards are not arbitrary and are uniformly applied.

POLICY

6.   No member of the CF shall subject any other member or any other person with whom the member works to any type of personal harassment including sexual harassment.

COMPLAINTS

7.   Commanding officers shall ensure that members of the CF and DND civilian employees who lodge a complaint in good faith are aware that this action will not in any way jeopardize or penalize their future service or employment opportunities.

8.   Any member who believes that he or she is the victim of personal harassment should immediately report the matter to the member's direct superior. If the direct superior is the alleged offender, the complaint shall be made to the next superior in the chain of command.

9.   If a member brings a complaint to a direct superior and if, after 14 days, the member has not received an interim reply and believes that the complaint has not been satisfactorily resolved, the member should then bring the complaint to the next superior in the chain of command.

ACTION FOLLOWING A COMPLAINT

10.  Where a military superior receives a complaint of harassment from a civilian employee who is a member of the Public Service, the complaint shall be investigated in accordance with CPAO 7.18. If a military superior receives a complaint from a civilian employee who is not a member of the Public Service (eg, an NPF employee) but who is covered by a collective agreement or other agreement that specifies a procedure for investigating harassment complaints, the complaint shall be investigated in accordance with that agreement. In all

OAFC 19–39

une seule fois, comme il peut se manifester par une série d'incidents reliés. Il peut être question d'abuser de son pouvoir ou de son poste, comme il peut s'agir de rapports entre pairs. Les avances sexuelles importunes, en tant que harcèlement d'un type particulier, peuvent brimer aussi bien les hommes que les femmes.

5.   La mise en application de normes d'instruction et de travail rigoureuses n'équivaut pas à du harcèlement, pourvu qu'elles ne soient pas arbitraires et qu'elles soient appliquées uniformément.

POLITIQUE

6.   Il n'est pas question qu'un militaire des FC harcèle un autre militaire ou toute autre personne qui travaille en sa compagnie, de quelque façon que ce soit, par des avances sexuelles importunes ou autrement.

PLAINTES

7.   Les commandants d'unité doivent veiller à ce que tout militaire des FC ou tout employé civil qui porte plainte en toute bonne foi ne se verra pas pénaliser dans ces chances d'avancement militaire ou professionnel.

8.   Tout militaire qui se croit victime de harcèlement a intérêt à en informer son supérieur immédiat dans les meilleurs délais. Si c'est le supérieur immédiat qui est le présumé contrevenant, l'intéressé portera plainte au palier suivant dans la chaîne de commandement.

9.   Tout militaire qui n'a pas reçu de réponse provisoire 14 jours après avoir porté plainte auprès de son supérieur immédiat et qui juge qu'on ne lui a pas rendu justice, devrait s'adresser au palier supérieur dans la chaîne de commandement.

MESURES À PRENDRE SUR RÉCEPTION D'UNE PLAINTE

10.  Lorsqu'un superviseur militaire reçoit une plainte portant sur une question de harcèlement à l'endroit d'un employé civil travaillant pour la Fonction publique, il y donnera suite en se reportant à l'OAPC 7.18. Lorsqu'un superviseur militaire reçoit le même genre de plainte touchant cette fois un employé civil qui, bien que n'étant pas à l'emploi de la Fonction publique (e.g. un employé des fonds non publics (FNP)], est protégé par une convention collective ou par toute autre convention spécifiant la marche à suivre en cas de harcèlement, il faudra que le superviseur se conforme à la convention en

Ch 6/93

Mod. 6/93

– 433 –

other cases, whether the complainant is civilian or military, the investigation shall be conducted in accordance with this order.

11. Where a military superior receives a complaint of personal harassment, the complaint shall be investigated promptly and thoroughly. Complaints will deal with matters of varying complexity and will take varying lengths of time to resolve; however, no complaint shall remain in the possession of any military superior for longer that 14 days without the complainant being given an interim reply or being advised of the resolution of the complaint.

12. If the alleged offender is superior to or equal in rank to the member receiving the complaint, the complaint shall be referred through the chain of command to an officer superior to the alleged offender and that officer shall be responsible for taking action in accordance with this order. When military authorities refer the matter to the superior officer in such cases, the alleged offender shall be bypassed if the alleged offender would otherwise be in the chain of command.

13. The type of investigation that is conducted will depend on the seriousness of the alleged harassment and may involve an informal investigation, a summary investigation or a board of inquiry. During the investigation or a board of inquiry. During the investigation of a complaint the investigator or board of inquiry shall:

   a. interview both the complainant and the alleged offender as soon as possible;

   b. interview any witnesses;

   c. document the situation accurately and completely;

   d. state an opinion as to the validity of the complaint;

   e. make recommendations to the authority who ordered the investigation or convened the board of inquiry;

   f. conduct the investigation with the utmost confidentiality and sensitivity; and

   g. caution persons who are questioned not to discuss the case with members or employees.

question pour régler le litige. Dans tous les autres cas, peu importe que le plaignant soit militaire ou civil, il faudra mener l'enquête en suivant la présente ordonnance.

11. Lorsqu'un superviseur reçoit une plainte portant sur une question de harcèlement, il lui faudra mener une enquête rapide et approfondie. Comme la nature et la complexité de chaque plainte peuvent varier, le temps à consacrer à chacune variera également. Il faut cependant que dans les quatorze jours suivant la réception de la plainte, le superviseur en question réponde, ne serait-ce qu'à titre provisoire, ou fasse part de sa décision à la partie plaignante.

12. Dans le cas d'un présumé coupable détenant le même grade ou un grade plus élevé que la personne saisie de la plainte, il faudra respecter la chaîne de commandement et transmettre la plainte à un officier ayant un grade supérieur à celui de l'accusé; ce sera cet officier-là qui prendra des mesures conformes aux prescriptions de la présente ordonnance. Si dans ce dernier cas, l'officier représentant le palier suivant dans la chaîne de commandement est l'intimé, les autorités militaires éviteront de lui soumettre la question en litige pour passer directement à l'échelon qui lui est supérieur.

13. Le type d'enquête que l'on institue dépend de la gravité du harcèlement présumé : il peut s'agir d'une enquête ordinaire, d'une enquête sommaire, ou d'un commission d'enquête. Pendant l'instruction du cas, l'enquêteur ou la commission d'enquête devra :

   a. interroger dès que possible le plaignant et l'intimé;

   b. interroger les témoins;

   c. établir un dossier exact et complet de la situation;

   d. émettre son opinion quant au bien-fondé de la plainte;

   e. faire des recommandations aux instances ayant institué l'enquête ou convoqué la commission d'enquête;

   f. instruire le cas en toute discrétion et en respectant le caractère délicat du dossier;

   g. et avertir les personnes interrogées de ne pas parler du cas à des militaires ou à des employés.

LCR Appendix Page 0751

- 434 -

CFAO 19–39

OAFC 19–39

14. On completion of the investigation, appropriate disciplinary action or administrative action, or both, will be taken as required. If the person who ordered the investigation is not a person having jurisdiction over the alleged offender for administrative or disciplinary action, the investigation report shall be referred to the appropriate authority having jurisdiction if it is considered that further administrative or disciplinary action would be warranted.

15. Where a complaint of personal harassment has been substantiated, the military superior should consider the following factors in assessing the relative seriousness of the harassment:

    a. the nature of the harassment, ie, verbal or physical;

    b. the degree of aggressiveness and physical contact in the harassment;

    c. the period of time over which the harassment took place;

    d. the frequency of the harassment;

    e. the vulnerability of the victim;

    f. the psychological impact of the harassment upon the victim; and

    g. the impact on the victim's career.

16. It is the responsibility of all persons involved in the processing of a complaint to ensure that a complainant who lays a complaint in good faith is neither penalized nor suffers any prejudice as a result of making the complaint. Correspondence pertaining to a complaint shall not be placed on the complainant's personal files nor shall it be made available to career boards at any level. Such correspondence shall be treated in a confidential manner and shall bear an appropriate designation in accordance with the Privacy Act.

## SEXUAL ASSAULT

17. Where the complaint alleges sexual harassment and such harassment may also constitute a sexual assault under the Criminal Code, the Military Police should be requested to conduct an investigation in addition to the investigation conducted pursuant to this order. If doubt exists as to whether the available information indicates a sexual assault may have been committed, the advice of the unit legal adviser should be sought.

14. À l'issue de l'enquête, on prendra les mesures disciplinaires et administratives qui s'imposent. Si la personne ayant ordonné l'enquête n'est pas habilitée à soumettre l'intimé à des mesures administratives ou disciplinaires, le rapport d'enquête sera soumis à l'autorité compétente dans la mesure où il appert que d'autres mesures administratives ou disciplinaires s'imposeraient.

15. Dans le cas où la plainte pour cause de harcèlement s'avère fondée, le supérieur militaire évaluera la gravité relative de la chose en se basant sur les facteurs suivants :

    a. la nature du harcèlement : i.e. s'agit-il de mots ou de gestes?;

    b. la part d'agressivité et de contact physique dans l'affaire;

    c. la durée du harcèlement;

    d. la fréquence du harcèlement;

    e. la vulnérabilité de la victime;

    f. l'effet psychologique du harcèlement sur la victime;

    g. et ses répercussions sur la carrière de la victime.

16. Il revient à tous les intervenants dans le dossier de veiller à ce que le fait de déposer une plainte en toute bonne foi ne porte pas préjudice à son auteur. Tout le courrier relatif à la plainte ne sera pas versé au dossier du plaignant, ni mis à la disposition de comités d'avancement professionnel, quels qu'ils soient. Le courrier restera confidentiel et portera la cote de sécurité conforme à la Loi sur la protection des renseignements personnels.

## VIOLENCES SEXUELLES

17. Quand le plaignant se prétend victime d'avances sexuelles importunes qui pourraient faire l'objet d'une poursuite au criminel pour violences sexuelles, il faudrait demander à la police militaire de mener sa propre enquête, parallèlement à l'enquête déjà prévue par la présente ordonnance. S'il n'est pas évident d'après les renseignements obtenus qu'il peut s'agir de violences sexuelles, il convient d'en référer au conseiller juridique de l'unité.

Ch 6/93

Mod. 6/93

- 435 -

CFAO 19–39

OAFC 19–39

### OTHER REDRESS PROCEDURES

18. Nothing in this order precludes a member from seeking redress of grievance in accordance with the procedures contained in QR&Os 19.26 and 19.27. Where an application for redress of grievance has already been submitted with respect to the alleged harassment, the provisions of this order should be used as guidance for the investigation of the grievance but the matter shall be dealt with in accordance with the grievance procedures rather than being considered a complaint pursuant to this CFAO.

### AUTRES RECOURS

18. Il n'y a rien dans la présente ordonnance qui empêche un militaire de se prévaloir des articles 19.26 et 19.27 des ORFC pour réclamer la réparation d'une injustice. Si le harcèlement présumé fait déjà l'objet d'un grief, les dispositions de la présente devraient servir à orienter l'instruction du cas; il faudra cependant traiter le cas comme un redressement de grief plutôt que comme une plainte déposée en vertu de la présente OAFC et suivre la procédure en conséquence.

|(C)                    1605-19-39 (DGPP)

Issued 1988-12-09

(C)                    1605-19-39 (DGPP)|

Publiée 1988-12-09

**INDEX**

Harassment

**INDEX**

Harcèlement

LCR Appendix Page 0753

- 436 -

Appendix F

RELEVANT DATA FROM SURVEYS

Table F-1

Description of the Various Surveys Cited in This Study

1. *General Social Survey* (GSS) - The GSS is conducted annually by the National Opinion Research Center at the University of Chicago. Each year the GSS contains a new nationally representative sample of about 1,500 noninstitutionalized adults. Unless otherwise indicated, the results presented here are taken from a merging of the 1988 through 1991 GSS surveys.

2. *National Survey of Adolescent Males* (NSAM) - The NSAM was a 1988 nationally representative survey of 1,880 noninstitutionalized, never-married 15 to 19 year old males conducted by Sociometrics Corporation for researchers at the Urban Institute.

3. *Monitoring the Future* (MTF) - The MTF is an annual study of the lifestyles and values of youth. All results presented here are taken from the 1991 survey, which contained a nationally representative sample of 15,676 high school seniors.

4. *Gallup Organization Public Opinion Polls* - Gallup polls are nationally representative telephone polls of the noninstitutionalized adult population. The table below presents the survey dates and their sample sizes.

| | |
|---|---|
| July 9-11, 1993 | 1002 |
| January 29-31, 1993 | 1001 |
| January 28-29, 1993 | 774 |
| June, 1992 | 1002 |
| April, 1992 | 1222 |
| July, 1991 | 610 |
| July, 1986 | 611 |
| July, 1983 | 767 |
| June, 1982 | 1531 |

5. *CBS News/New York Times Public Opinion Polls* - CBS/NYT polls are nationally representative telephone polls of the noninstitutionalized adult population. The table below presents the survey dates and their sample sizes.

| | |
|---|---|
| February, 1993 | 1154 |
| January, 1993 | 1179 |
| August, 1992 | 656 |

- 437 -

6. *Yankelovich/Clancy/Shulman Public Opinion Polls* - Yankelovich polls are nationally representative telephone polls of the noninstitutionalized adult population. The table below presents the survey dates and their sample sizes.

January, 1993 .............. 1800
August, 1992 .............. 1250
May, 1992 .................. 1250

7. *Roper Organization Opinion Polls* - Roper polls are nationally representative in-person polls of the noninstitutionalized adult population. The table below presents the survey dates and their sample sizes.

July, 1987 .................. 1997
January, 1987 .............. 1997

8. *USA Today 1987 Family Poll* - The USA Today Family Poll was conducted by the Gordon S. Black Corporation for USA Today in March of 1987. The sample was nationally representative of noninstitutionalized adults. The total sample size was 803.

9. *Los Angeles Times Opinion Polls* - The Los Angeles Times polls are nationally representative telephone polls of the noninstitutionalized adult population. The table below presents the survey dates and their sample sizes.

January, 1993 .............. 1733
February, 1993 ............. 1273

10. *ABC News/Washington Post Opinion Polls* - The ABC News polls are nationally representative telephone polls of the noninstitutionalized adult population. The table below presents the survey dates and their sample sizes.

January, 1993 .............. 549
February, 1991 ............. 1008
March, 1986 ................ 1148

11. *USA Today 1986 College Study Poll* - The USA Today College Study Poll was conducted by the Gordon S. Black Corporation for USA Today in February, 1986. The sample was representative of college students. The total sample size was 990.

12. *Wall Street Journal/NBC News Poll* - This is a nationwide telephone poll weighted to be representative of the population of registered voters. The poll was conducted June 5-June 8, 1993, and the sample size was 1502.

- 438 -

Table F-2

"What about sexual relations between two adults of the same sex--do you think it is always wrong, almost always wrong, wrong only sometimes, or not wrong at all?"
(GSS. 1973-1991)

| Year | Always Wrong | Almost Always Wrong | Some-Times Wrong | Not Wrong | Other | Don't Know | N |
|------|------|------|------|------|------|------|------|
| 1973 | 70.3% | 6.3% | 7.3% | 10.6% | 2.1% | 3.3% | 1497 |
| 1974 | 67.0 | 4.8 | 7.5 | 12.3 | 3.4 | 4.9 | 1484 |
| 1976 | 67.1 | 5.9 | 7.5 | 15.3 | --- | 4.2 | 1488 |
| 1977 | 68.6 | 5.5 | 7.2 | 14.2 | --- | 4.5 | 1522 |
| 1980 | 69.9 | 5.7 | 5.8 | 13.9 | --- | 4.6 | 1465 |
| 1982 | 70.3 | 5.1 | 6.3 | 14.1 | --- | 4.1 | 1497 |
| 1984 | 73.0 | 4.8 | 7.2 | 13.8 | --- | 3.7 | 1466 |
| 1985 | 74.8 | 3.9 | 6.8 | 11.9 | --- | 3.1 | 1531 |
| 1987 | 74.8 | 4.1 | 6.6 | 11.9 | --- | 2.6 | 1450 |
| 1988 | 74.0 | 4.5 | 5.4 | 12.3 | --- | 3.7 | 973 |
| 1989 | 70.7 | 3.9 | 5.7 | 15.0 | --- | 4.8 | 1029 |
| 1990 | 72.6 | 4.6 | 5.8 | 12.2 | --- | 4.8 | 916 |
| 1991 | 70.9 | 3.9 | 4.2 | 15.0 | --- | 6.1 | 986 |

Table F-3

"Do you personally think that homosexual relationships between consenting adults is morally wrong, or is not a moral issue?"
(Yankelovich/Clancy/Shulman. May, 1992. N = 1250)

| | |
|------|------|
| Morally wrong | 54% |
| Not a moral issue | 39 |
| Not sure | 7 |

Table F-4

"Do you feel that homosexuality should be considered an acceptable alternative lifestyle, or not?"

| Year | Acceptable | Not Acceptable | No Opinion | N |
|------|------|------|------|------|
| 1992, August[a] | 38% | 50% | 12% | 656 |
| 1992, June[b] | 38 | 57 | 5 | 1002 |
| 1989[b] | 35 | 54 | 11 | |
| 1983[b] | 32 | 58 | 10 | 767 |
| 1982[b] | 34 | 51 | 15 | 1531 |

[a]CBS/New York Times
[b]Gallup

- 439 -

**Table F-5**

"What about sexual relations between two adults of the same sex--do you think it is always wrong, almost always wrong, wrong only sometimes, or not wrong at all?"

(GSS. 1988-1991. N = 5907)

| Proportion answering "always wrong" Overall population = 76% | | | |
|---|---|---|---|
| **Sex** | | **Race** | |
| Male | 79% | White | 75% |
| Female | 74 | Black | 85 |
| | | Other | 80 |
| **Age** | | | |
| 24 to 26 | 71 | **Political Affiliation/Ideology** | |
| 27 to 29 | 68 | Democrat | 77% |
| 30 to 33 | 69 | Independent | 71 |
| 34 to 36 | 74 | Republican | 82 |
| 37 to 39 | 65 | | |
| 40 to 45 | 72 | Liberal | 60 |
| 46 to 55 | 79 | Moderate | 78 |
| 56 or older | 86 | Conservative | 86 |
| **Education Attainment** | | **Veteran Status** | |
| Less Than High School | 89 | Veteran | 81 |
| High School Degree | 79 | Non-Veteran | 76 |
| College Degree | 61 | | |
| Graduate Degree | 45 | **Region** | |
| | | New England | 57 |
| **Religious Affiliation** | | Middle Atlantic | 75 |
| Protestant | 82 | East-North Central | 76 |
| Catholic | 73 | West-North Central | 78 |
| Jewish | 29 | South Atlantic | 78 |
| None | 47 | East-South Central | 94 |
| | | West-South Central | 91 |
| **Protestant Denomination** | | Mountain | 75 |
| Baptist | 88 | Pacific | 64 |
| Methodist | 81 | | |
| Presbyterian | 73 | **Urban/Rural** | |
| Lutheran | 72 | Central city of 12 largest SMSAs | 71 |
| Episcopalian | 61 | Central city of other SMSA | 69 |
| Other Protestant | 84 | Suburb of 12 Largest SMSAs | 67 |
| | | Suburb of Other SMSA | 70 |
| **Fundamentalism of Religion** | | Other Urban | 81 |
| Fundamentalist | 89 | Rural | 89 |
| Moderate | 74 | | |
| Liberal | 63 | | |
| **Interpretation of the Bible** | | | |
| Actual Word | 93 | | |
| Inspired Word | 73 | | |
| Ancient Book | 52 | | |

LCR Appendix Page 0757

- 440 -

Table F-6

"Do you feel that homosexuality should be considered an acceptable
alternative lifestyle or not?"  (Gallup.  June, 1992.  N = 1002)

|  | Acceptable | Not Acceptable | No Opinion |
|---|---|---|---|
| National | 38% | 57% | 5% |
| **Sex** | | | |
| Male | 34 | 63 | 3 |
| Female | 42 | 52 | 6 |
| **Age** | | | |
| 18 to 29 | 46 | 51 | 3 |
| 30 to 49 | 42 | 55 | 3 |
| 50 to 64 | 31 | 62 | 7 |
| 65 or older | 25 | 65 | 10 |
| **Region** | | | |
| East | 39 | 56 | 5 |
| Midwest | 41 | 54 | 5 |
| South | 34 | 61 | 5 |
| West | 40 | 56 | 4 |
| **Race** | | | |
| White | 37 | 58 | 5 |
| Non-White | 47 | 48 | 5 |
| **Education** | | | |
| College graduate | 52 | 43 | 5 |
| Some college | 39 | 57 | 4 |
| No college | 32 | 63 | 5 |
| **Political Affiliation/Ideology** | | | |
| Republican | 24 | 70 | 6 |
| Democrat | 45 | 51 | 4 |
| Independent | 44 | 51 | 5 |
| Liberal | 56 | 40 | 4 |
| Moderate | 43 | 53 | 4 |
| Conservative | 24 | 72 | 4 |
| **Income** | | | |
| $50,000 & over | 45 | 52 | 3 |
| $30,000 to $49,999 | 38 | 58 | 4 |
| $20,000 to $29,999 | 41 | 56 | 3 |
| Under $20,000 | 37 | 59 | 4 |
| **Religion** | | | |
| Protestant | 31 | 63 | 6 |
| Catholic | 44 | 53 | 4 |

- 441 -

Table F-7

"Would you say you agree a lot, agree a little, disagree a little, or
disagree a lot... I could be friends with a gay person."
(NSAM. 1988. Sample of male 15-19 year olds, N=1880)

| Highest grade you think you will complete | Agree a lot | Agree a little | Disagree a little | Disagree a lot |
|---|---|---|---|---|
| 12 or fewer years or GED | 10% | 18% | 13% | 58% |
| 1 or more years vocational | 3 | 12 | 30 | 55 |
| 1 to 3 years of college | 6 | 38 | 22 | 34 |
| 4 years of college | 13 | 28 | 21 | 37 |
| Graduate school | 17 | 32 | 23 | 28 |

Table F-8

"Do you think being homosexual is something people choose to be, or do
you think it is something they cannot change?"
(CBS/NYT. February, 1993, N = 1154)

| | |
|---|---|
| Choose to be gay | 44% |
| Can't change | 43 |
| Don't know | 13 |

| | Total adults | Those who say homosexuality... | |
|---|---|---|---|
| | | Is a choice | Cannot be changed |
| Say homosexuality should be considered an acceptable alternative life style | 36% | 18% | 57% |
| Say homosexual relations between adults are morally wrong | 55 | 78 | 30 |
| Say homosexual relations between consenting adults should be legal | 46 | 32 | 62 |
| Say homosexuals should have equal rights in terms of job opportunities | 78 | 69 | 90 |
| Say it is necessary to pass laws to make sure homosexuals have equal rights | 42 | 30 | 58 |
| Favor permitting homosexuals to serve in the military | 43 | 32 | 54 |
| Would permit their child to play at the home of a friend who lives with a homosexual parent | 34 | 21 | 50 |
| Have a close friend or family member who is gay or lesbian | 22 | 16 | 29 |

- 442 -

### Table F-9

"In general, do you think homosexuals should or should not have equal rights in terms of job opportunities?" (CBS/NYT.  January, 1993.  N = 1179)

| | |
|---|---|
| Should | 79% |
| Should not | 16 |
| Don't know/No answer | 5 |

### Table F-10

"Do you think homosexuals should or should not be hired for each of the following occupations?" (Gallup.  June, 1992.  N = 1002)

| Occupation | Should | Should Not | Depends |
|---|---|---|---|
| Salespersons | 82% | 13% | 3% |
| Armed Forces | 57 | 37 | 2 |
| President's Cabinet | 54 | 39 | 3 |
| Doctors | 53 | 42 | 2 |
| High school teachers | 47 | 49 | 2 |
| Clergy | 43 | 50 | 2 |
| Elementary school teachers | 41 | 54 | 3 |

### Table F-11

"Would you permit or not permit your child to go play at the home of a friend who lives with a homosexual parent?" (CBS/NYT.  February, 1993.  N = 1154)

| | |
|---|---|
| Permit | 34% |
| Not permit | 58 |
| Don't know/No answer | 8 |

- 443 -

## Table F-12

"Some time ago, the citizens of Miami voted to repeal a county ordinance that banned discrimination in employment and housing based on a person's sexual preferences.  The ordinance essentially meant that someone who is homosexual could not be kept from holding a particular job or living in any type of housing simply because he or she is homosexual.  Which of these statements best describes how you feel about the law and discrimination against homosexuals?"  (Roper.  July, 1987.  N = 1997)

| | |
|---|---|
| Homosexuals should be guaranteed equal treatment under the law in jobs and housing | 65% |
| It should be legal to keep people out of jobs and housing if they are homosexual | 23 |
| Don't know | 12 |

## Table F-13

"We can choose our friends, but we can't always choose the people we work closely with.  Here is a list of some different types of people.  For each one, would you tell me whether you would strongly object to working around them, or prefer not to work around them, or wouldn't mind working around them?"  (Roper.  January, 1987.  N = 1997)

| People who... | Strongly Object | Prefer Not To | Wouldn't Mind | Don't Know |
|---|---|---|---|---|
| are homosexual | 25 | 27 | 45 | 3 |
| are mentally handicapped | 2 | 16 | 78 | 4 |
| smoke cigarettes | 19 | 29 | 51 | 1 |
| use foul language | 31 | 41 | 27 | 1 |
| have AIDS | 34 | 33 | 26 | 7 |
| get high on alcohol or drugs during the workday | 60 | 30 | 8 | 2 |

- 444 -

Table F-14

"Do you think marriages between homosexual men or between homosexual women should be recognized as legal by the law?"  (Yankelovich. January, 1993.  N = 1800)

| | |
|---|---|
| Yes | 27% |
| No | 65% |
| Not sure | 8 |

Table F-15

"Do you think that homosexual couples should be legally permitted to adopt children?"  (Yankelovich. August, 1992.  N = 1250)

| | |
|---|---|
| Yes | 29% |
| No | 63 |
| Not sure | 8 |

Table F-16

"What about a .... Can this be a family?" (USA Today.  March 1993. N = 803)

| | Homosexual Couple Raising Children | Unmarried Couple Living Together |
|---|---|---|
| Yes | 33% | 45% |
| No | 61 | 52 |
| Don't Know | 6 | 3 |

- 445 -

Table F-17

"Do you feel that family leave laws should or should not also apply to homosexual people who need to care for a seriously ill companion?" Asked of the 83% who favor a national family leave law.  (Gallup. April, 1992.  N = 1222)

|  | Of Those Who Favor a National Leave Law | Of Total Population |
|---|---|---|
| Yes, should apply | 72% | 60% |
| No, should not | 24 | 20 |
| Don't know/Refused | 4 | 3 |
| Don't favor national leave law | --- | 17 |

Table F-18

"In general, do you think that states should have the right to prohibit particular sexual practices conducted in private between consenting..." (Gallup.  July, 1986.  N = 611)

|  | Adult Men and Women | Adult Homosexuals |
|---|---|---|
| Yes | 18% | 34% |
| No | 74 | 57 |
| Don't know | 8 | 9 |

Table F-19

"Do you think homosexual relations between consenting adults should or should not be legal?" (Gallup.  June, 1992.  N = 1002)

| Legal | 49% |
|---|---|
| Not legal | 44 |
| Don't know/Refused | 8 |

- 446 -

### Table F-20

"Do you think that the laws which protect the civil rights of racial or religious minorities should be used to protect the rights of homosexuals?" (Yankelovich. January, 1993. N = 1800)

| | |
|---|---|
| Yes | 48% |
| No | 43 |
| Not sure | 9 |

### Table F-21

"Should a federal law be passed protecting homosexuals from discrimination?" (CBS/NYT. July, 1988. N = 1177)

| | |
|---|---|
| Yes | 37% |
| No | 48 |
| Don't know/No answer | 15 |

### Table F-22

"Do you think homosexuals should or should not be able to serve in the armed forces?" (Gallup. January 28-29, 1993. N = 774)

| | |
|---|---|
| Should | 53% |
| Should not | 42 |
| Don't know/Refused | 5 |

### Table F-23

"Do you favor or oppose permitting homosexuals to serve in the military?" (CBS/NYT. January, 1993. N = 1179)

| | |
|---|---|
| Favor | 42% |
| Oppose | 48 |
| Don't know/No answer | 10 |

- 447 -

Table F-24

"Do you think people who join the military should be asked if they are homosexual, or not?" (ABC/*Washington Post*. January, 1993. N = 549)

| | |
|---|---|
| Yes, should be asked | 44% |
| No, should not be asked | 53 |
| Don't know/No opinion | 3 |

Table F-25

"Do you approve or disapprove of allowing openly homosexual men and women to serve in the armed forces of the United States?" (*Los Angeles Times*. January and February, 1993.)

| | January, 1993 N = 1733 | February, 1993 N = 1273 |
|---|---|---|
| Approve strongly | 22% | 19% |
| Approve somewhat | 23 | 21 |
| Disapprove somewhat | 8 | 9 |
| Disapprove strongly | 39 | 45 |
| Don't know/Not sure | 8 | 5 |
| Refused | --- | 1 |

Table F-26

"Do you approve or disapprove of ending the ban on homosexuals from serving in the military?" (Gallup. January 29-31, 1993. N = 1001)

| | |
|---|---|
| Very strongly approve | 29% |
| Not so strongly approve | 14 |
| Very strongly disapprove | 39 |
| Not so strongly disapprove | 11 |
| No opinion | 7 |

- 448 -

### Table F-27

"Which is closer to your position on allowing gays and lesbians in the military?" (WSJ/NBC. Sample of registered voters, N = 1502)

| | |
|---|---|
| Should not be allowed to serve under any conditions | 21% |
| Should be allowed to serve as long as they keep their homosexuality private, and the miltary should not ask them about sexual orientation | 38% |
| Should be allowed to serve openly, as long as they follow the same rules of conduct as other military personnel while they are on base | 40% |

### Table F-28

"If the United States returned to a military draft, it would not be necessary to draft everyone of military age. That is, certain types of people could be exempted, even though they were otherwise qualified for service. Should homosexuals be exempted?" (GSS. 1982. N = 1860)

"If a military draft were to become necessary, should young women be required to participate as well as young men, or not?" (Gallup. July, 1991. N = 610)

| | Homosexuals | Women |
|---|---|---|
| Draft | 77% | 50% |
| Don't Draft | 16 | 47 |
| Don't know/No opinion | 6 | 3 |

### Table F-29

"For each that I mention, please tell me if you agree or disagree...." (*USA Today*. February 1986. Sample of college students, N=990)

| | Agree | Disagree | Don't Know | Refused |
|---|---|---|---|---|
| Homosexuality is immoral | 44.2% | 49.6% | 5.6% | 0.6% |
| Sexual preference is someone's own business | 78.7 | 19.4 | 1.4 | 0.5 |
| Homosexuals are entitled to the same protection against discrimination as any other minority group | 74.3 | 23.1 | 2.1 | 0.4 |

- 449 -

Table F-30

Proportion who "agree a lot" or "agree a little" to the statement "I could be friends with a gay person" by various characteristics.  (NSAM. 1988. Sample of male 15-19 year olds,  N=1880)

Race
  Black                                     31%
  White                                     39
  Hispanic                                  45
  Other                                     72

Importance of Religion
  Very important                            41
  Fairly important                          36
  Fairly unimportant                        36
  Not important at all                      61

Frequency of Service Attendance
  Once a week or more                       39
  1 to 3 times per month                    36
  Less than once per month                  42
  Never                                     41

Religious Affiliation
  Baptist                                   32
  Lutheran                                  34
  Methodist                                 46
  Presbyterian                              68
  Episcopalian                              39
  Roman Catholic                            40
  Later Day Saints                          39
  Jewish                                    68
  None                                      45

Rural/Urban
  Urban, 1,000,000+                         44
  Urban, 250,000-999,000                    47
  Urban, 50,000-249,999                     37
  Urban, 0-49,999                           47
  Other                                     32

Region
  North East                                46
  South                                     35
  Midwest                                   38
  West                                      44

- 450 -

### Table F-31

Characteristics of those stating that they "definitely will" or "probably will" serve in the armed forces contrasted with those stating that they "probably won't" or "definitely won't". (MTF. 1991. Sample of high school seniors N = 15676)

| Characteristic | Won't Serve | Will Serve | Characteristic | Won't Serve | Will Serve |
|---|---|---|---|---|---|
| **Sex** | | | **Denomination** | | |
| Male | 47% | 76% | Baptist | 18% | 29 |
| Female | 53 | 24 | Churches of Christ | 6 | 8 |
| | | | Episcopal | 1 | 1 |
| **Race** | | | Lutheran | 5 | 3 |
| White | 92 | 68 | Methodist | 7 | 7 |
| Black | 8 | 32 | Presbyterian | 3 | 2 |
| | | | Roman Catholic | 28 | 22 |
| **Region** | | | Jewish | 2 | 1 |
| North East | 22 | 17 | Latter Day Saints | 7 | 6 |
| North Central | 29 | 24 | Other | 7 | 7 |
| South | 31 | 45 | None | 15 | 14 |
| West | 19 | 14 | | | |
| | | | **Religious Service Attendance** | | |
| **Where Grew Up** | | | Never | 14 | 14 |
| On a farm | 6 | 0 | Rarely | 39 | 43 |
| In the country, not farm | 14 | 19 | Once or twice a month | 16 | 15 |
| Small city or town | 32 | 32 | About once a week | 31 | 28 |
| Medium-sized city | 10 | 12 | | | |
| Suburb of medium city | 9 | 6 | **Plan to Attend 2-year College** | | |
| Large city | 9 | 11 | Definitely won't | 49 | 31 |
| Suburb of large city | 9 | 7 | Probably won't | 25 | 26 |
| Very large city | 6 | 8 | Probably will | 25 | 31 |
| Suburb of very large city | 5 | 4 | Definitely will | 2 | 12 |
| | | | | | |
| **Political Party** | | | **Plan to Attend a 4-year College** | | |
| Strongly Republican | 11 | 14 | Definitely won't | 15 | 19 |
| Mildly Republican | 18 | 15 | Probably won't | 13 | 22 |
| Mildly Democrat | 11 | 09 | Probably will | 21 | 28 |
| Strongly Democrat | 8 | 12 | Definitely will | 51 | 30 |
| Independent | 25 | 24 | | | |
| Don't know | 23 | 22 | **Plan to attend graduate school** | | |
| | | | Definitely won't | 23 | 32 |
| **Political Ideology** | | | Probably won't | 30 | 33 |
| Very conservative | 3 | 7 | Probably will | 31 | 25 |
| Conservative | 14 | 14 | Definitely will | 16 | 11 |
| Moderate | 29 | 28 | | | |
| Liberal | 16 | 13 | | | |
| Very liberal | 4 | 4 | | | |
| Radical | 2 | 4 | | | |
| None of above/Don't know | 31 | 29 | | | |

**LCR Appendix Page 0768**

- 451 -

## Appendix G

*LOS ANGELES TIMES* POLL

STUDY #307--United States Military Survey

**Methodology**

   The Times Poll interviewed 2,346 enlisted personnel, on active duty, in the U.S. Army, Navy, Marine Corps, and Air Force outside of 38 military bases in the continental United States and Hawaii, from February 11 through 16. Respondents were approached by Times interviewers at off-base commercial sites and residence housing and asked to fill out a written questionnaire confidentially and anonymously. Each respondent then placed the complete survey in a sealed envelope for return to The Times. Quota methods were utilized to ensure proper representation of service people within service branch by sex, race, and age. The sample was additionally weighted slightly to conform with Department of Defense demographic information for enlistee age, education, and marital status. By branch, the sample includes 728 personnel from the Army, 591 from the Navy, 488 from the Marine Corps and 539 from the Air Force. Results for the total sample of enlistees are adjusted so that each branch of service is represented in its proper proportion.

   List of Questions

7.  Overall, how would you rate your feelings about life in the military today? Are you:

|                      | Male | Female |
|----------------------|------|--------|
| Very satisfied       | 24   | 29     |
| Somewhat satisfied   | 50   | 49     |
| Somewhat dissatisfied| 17   | 15     |
| Very dissatisfied    | 7    | 6      |
| Don't know           | 2    | 1      |

- 452 -

8. What are the top two problems facing the U.S. Military today?

| | Male | Female |
|---|---|---|
| Troop cuts/downsizing | 52 | 53 |
| Possible lifting of ban on homosexuals | 50 | 32 |
| Low morale | 28 | 35 |
| Few opportunities for advancement | 19 | 26 |
| Race relations | 9 | 13 |
| Poor civilian leadership/ no policy direction | 6 | 4 |
| Poor equipment | 6 | 3 |
| Relations between men and women in service | 4 | 19 |
| Pay/benefits | 3 | 1 |
| Poor military leaders | - | - |
| Other | 2 | - |
| Don't know | 2 | - |

10. Do you think the Clinton administration proposals for downsizing the U.S. military:

| | Male | Female |
|---|---|---|
| Are necessary given the end of the Cold War | 13 | 18 |
| Go too far in a still dangerous world | 66 | 59 |
| Don't know | 21 | 23 |

11. How worried are you personally about the possible effects of the proposed downsizing of the armed forces on you and your career? Are you:

| | Male | Female |
|---|---|---|
| Very worried | 20 | 17 |
| Somewhat worried | 40 | 45 |
| Not too worried | 24 | 24 |
| Not worried at all | 14 | 10 |
| Don't know | 3 | 4 |

12. Has the military generally fulfilled the commitments it made to you when you enlisted or has it disappointed you?

| | Male | Female |
|---|---|---|
| Fulfilled commitment | 60 | 67 |
| Disappointed me | 29 | 23 |
| Don't know | 11 | 10 |

- 453 -

13. How would you rate the programs and services available to help
victims of downsizing get going in civilian life?  Would you rate
those programs as:

|  | Male | Female |
|---|---|---|
| Excellent | 7 | 4 |
| Adequate | 37 | 36 |
| Inadequate | 26 | 28 |
| Very poor | 11 | 11 |
| Don't know | 20 | 21 |

14. If you had to leave the service in the next few months, how
confident are you that you could get a well-paying secure civilian
job in a relatively short time?

|  | Male | Female |
|---|---|---|
| Very confident | 17 | 15 |
| Somewhat confident | 29 | 33 |
| Somewhat doubtful | 26 | 26 |
| Very doubtful | 24 | 23 |
| Don't know | 4 | 3 |

15. How do you feel about allowing women to take combat roles in the
U.S. armed forces?  Do you:

|  | Male | Female |
|---|---|---|
| Approve strongly | 25 | 39 |
| Approve somewhat | 30 | 40 |
| Disapprove somewhat | 19 | 7 |
| Disapprove strongly | 22 | 12 |
| Don't know | 4 | 2 |

16. If current policy and your own plans remain the same, when your
term is up will you:

|  | Male | Female |
|---|---|---|
| Definitely reenlist | 28 | 32 |
| Possibly reenlist | 34 | 34 |
| Not reenlist | 28 | 28 |
| Don't know | 10 | 6 |

- 454 -

17. How do you feel about lifting the ban on homosexuals in the armed forces of the United States?  Do you:

|  | Male | Female |
|---|---|---|
| Approve strongly | 4 | 8 |
| Approve somewhat | 12 | 27 |
| Disapprove somewhat | 13 | 27 |
| Disapprove strongly | 63 | 28 |
| Don't know | 8 | 10 |

(IF APPROVE OF LIFTING THE BAN)

18. What are the two main reasons you approve of lifting the ban on homosexuals?  (Check up to two answers, or write in your own answers on the lines below.)

|  | Male | Female |
|---|---|---|
| It's discrimination to ban them | 56 | 61 |
| It's not important to me | 24 | 17 |
| Homosexuals are no different from heterosexuals | 19 | 24 |
| Homosexuals already in military | 2 | 1 |
| Other | 3 | 1 |
| Don't know | 4 | - |

(IF DISAPPROVE OF LIFTING BAN)

19. What are the two main reasons you disapprove of lifting the ban on homosexuals?  (Check up to two answers.)

|  | Male | Female |
|---|---|---|
| Oppose sharing facilities/quarters with them | 64 | 55 |
| It is immoral | 41 | 29 |
| Contribute to the spread of AIDS | 26 | 45 |
| It is against my religious views | 19 | 34 |
| They are not as reliable in a combat situation | 16 | 7 |
| Morale | 3 | 2 |
| Cause conflict | 2 | 1 |
| Threat of violence | 1 | 3 |
| Cost of facilities | 1 | - |
| Other | 2 | 3 |
| Don't know | 1 | 1 |

- 455 -

20. How worried are you personally about the possible impact of permitting homosexuals into the military?  Are you:

|  | Male | Female |
|---|---|---|
| Very worried | 38 | 17 |
| Somewhat worried | 32 | 35 |
| Not too worried | 17 | 25 |
| Not worried at all | 9 | 14 |
| Don't know | 4 | 9 |

21. If the ban is lifted on homosexuals in the military, would you definitely not reenlist on account of that issue alone, or would you consider reenlisting anyway?

|  | Male | Female |
|---|---|---|
| Not reenlisting under current policy | 28 | 28 |
| Not reenlisting if gay ban is lifted | 11 | 5 |
| Will consider reenlisting | 43 | 49 |
| Don't know | 18 | 18 |

22. If the ban is lifted on homosexuals in the military, how likely is it that they will be subjected to physical violence from others in the service?  Is that:

|  | Male | Female |
|---|---|---|
| Very likely | 57 | 41 |
| Somewhat likely | 26 | 29 |
| Not too likely | 7 | 10 |
| Not at all likely | 2 | 3 |
| Don't know | 8 | 17 |

23. Do you think the issue of permitting homosexuals in the military is:

|  | Male | Female |
|---|---|---|
| Getting the attention it deserves | 23 | 23 |
| Draining attention from other more important issues facing the military | 67 | 64 |
| Don't know | 10 | 13 |

- 456 -

24. Are you currently serving with someone who you believe is homosexual?

|  | Male | Female |
|---|---|---|
| Yes | 18 | 29 |
| No | 55 | 45 |
| Don't know | 27 | 26 |

25. How serious a problem is sexual harassment in the armed forces?  Is it:

|  | Male | Female |
|---|---|---|
| Very serious | 16 | 26 |
| Somewhat serious | 27 | 29 |
| Not too serious | 33 | 27 |
| Not serious at all | 16 | 11 |
| Don't know | 8 | 7 |

26. Would you rate your personal finances as:

|  | Male | Female |
|---|---|---|
| Very secure | 14 | 12 |
| Somewhat secure | 53 | 59 |
| Somewhat shaky | 24 | 21 |
| Very shaky | 7 | 6 |
| Don't know | 2 | 2 |

27. Would you describe yourself as:

|  | Male | Female |
|---|---|---|
| Very religious | 10 | 21 |
| Somewhat religious | 52 | 59 |
| Not too religious | 25 | 14 |
| Not religious at all | 10 | 4 |
| Don't know | 3 | 2 |

29. In most political matters, do you consider yourself:

|  | Male | Female |
|---|---|---|
| Liberal | 21 | 24 |
| Middle-of-the-road | 53 | 48 |
| Conservative | 24 | 26 |
| Don't know | 2 | 2 |

- 457 -

## Appendix H

### 1992 SOCIOLOGICAL SURVEY OF THE ARMY

**Methodology**

Charles Moskos and Laura Miller, sociologists from Northwestern University, surveyed a total of 2,804 enlisted personnel and officers, on active duty, at six Army bases in the continental United States and one overseas base (Somalia) between February 1992 and December 1992. This survey (entitled the 1992 Sociological Survey of the Army) was designed to collect survey data on the attitudes of active duty Army personnel about women in combat and race relations. However, the survey did include a single attitudinal question to solicit military members' views about homosexuals serving in the military. At each Army base, a stratified sample of military members was selected to ensure a good mix of combat and noncombat personnel from diverse military occupational specialties and different types of units. Quota methods were utilized to select appropriate numbers of males and females, enlisted and officers, and blacks, whites, and other races. Women were oversampled so that equal numbers of females and males would be surveyed. Efforts were also made to sample military members who had Persian Gulf experience as well as those who did not participate in Operation Desert Shield/Storm. The actual sample included 1,420 males and 1,384 females.

Using quota sampling guidelines provided by Moskos and Miller, Army personnel at each site selected potential survey respondents and invited them to attend a group survey session which was typically held in a large auditorium or testing room. Each participant was asked to complete an anonymous self-administered survey and to return it directly to Laura Miller, who conducted each survey session. The most recent survey, which was conducted in December 1992 with 471 males and 470 females at two Army posts, used the single attitudinal item plus an expanded series of questions about homosexuals in the military.

The actual wording of the questions from the 1992 Sociological Survey of the Army and the percentage distributions are reported below.

- 458 -

**Single Attitudinal Question About Homosexuals in the Military**

11. Indicate below which view comes closest to your own with regard to the following item:[1]

    b.  Lesbians/gays should be allowed to enter and remain in the military.

| | Male | Female |
|---|---|---|
| Strongly agree | 6 | 17 |
| Agree | 11 | 27 |
| Disagree | 12 | 14 |
| Strongly disagree | 64 | 29 |
| Not sure | 7 | 12 |

**Expanded Series of Questions About Homosexuals in the Military**

32. Do you personally know any men in your company who are gay?

| | Male | Female |
|---|---|---|
| Yes | 9 | 18 |
| No | 74 | 66 |
| Not sure | 18 | 16 |

33. Do you personally know any women in your company who are lesbian?

| | Male | Female |
|---|---|---|
| Yes | 14 | 27 |
| No | 60 | 54 |
| Not sure | 16 | 19 |

34. Has a soldier of the same sex ever made a sexual advance toward you?

| | Male | Female |
|---|---|---|
| Yes | 6 | 17 |
| No | 93 | 81 |
| Not sure | 2 | 2 |

---

[1]This attitudinal measure about homosexuals in the military was included in a series of agree/disagree items on attitudes toward women in combat.

- 459 -

35A.  FOR MALES ONLY:  If you were in a foxhole in combat and had to choose whether to fight along side a female soldier or a gay male soldier, which would you choose?

|  | (Males Only) |
|---|---|
| Female soldier | 51 |
| It doesn't matter | 27 |
| Gay male soldier | 5 |
| I would rather fight alone | 17 |

35B.  FOR FEMALES ONLY:  If you were in a foxhole in combat and had to choose whether to fight along side a male soldier or a gay female soldier, which would you choose?

|  | (Females Only) |
|---|---|
| Male soldier | 42 |
| It doesn't matter | 56 |
| Gay female soldier | 2 |
| I would rather fight alone | 1 |

36A.  FOR MALES ONLY:  In your present job, if you had to choose whether to work along side a female soldier or a gay male soldier, which would you choose?

|  | (Males Only) |
|---|---|
| Female soldier | 69 |
| It doesn't matter | 21 |
| Gay male soldier | 2 |
| I would rather work alone | 9 |

36B.  FOR FEMALES ONLY:  In your present job, if you had to choose whether to work along side a male soldier or a gay female soldier, which would you choose?

|  | (Females Only) |
|---|---|
| Male soldier | 39 |
| It doesn't matter | 57 |
| Gay female soldier | 1 |
| I would rather fight alone | 3 |

- 460 -

37. Indicate below which view comes closest to your own with regard to the following items about gays and lesbians and the Army:

a. I would feel uncomfortable if there were some homosexuals in my unit.

|  | Male | Female |
|---|---|---|
| Strongly agree | 56 | 18 |
| Agree | 20 | 17 |
| Disagree | 17 | 37 |
| Strongly disagree | 3 | 22 |
| Not sure | 5 | 7 |

b. I would feel uncomfortable having to share my room with a homosexual.

|  | Male | Female |
|---|---|---|
| Strongly agree | 77 | 41 |
| Agree | 13 | 21 |
| Disagree | 5 | 19 |
| Strongly disagree | 3 | 13 |
| Not sure | 3 | 6 |

c. Gay males make me more uncomfortable than lesbians.

|  | Male | Female |
|---|---|---|
| Strongly agree | 48 | 4 |
| Agree | 27 | 5 |
| Disagree | 14 | 55 |
| Strongly disagree | 3 | 25 |
| Not sure | 7 | 10 |

d. What people do in their private sex lives is no business of mine.

|  | Male | Female |
|---|---|---|
| Strongly agree | 35 | 53 |
| Agree | 37 | 34 |
| Disagree | 15 | 7 |
| Strongly disagree | 10 | 5 |
| Not sure | 3 | 2 |

e. Allowing openly gay and lesbian soldiers in the Army would cause some problems, but we could manage.

|  | Male | Female |
|---|---|---|
| Strongly agree | 9 | 11 |
| Agree | 24 | 42 |
| Disagree | 28 | 20 |
| Strongly disagree | 34 | 20 |
| Not sure | 5 | 7 |

- 461 -

f.  Allowing openly gay and lesbian soldiers in the Army would be
    very disruptive of discipline.

|                   | Male | Female |
|-------------------|------|--------|
| Strongly agree    | 52   | 27     |
| Agree             | 23   | 22     |
| Disagree          | 14   | 31     |
| Strongly disagree | 5    | 12     |
| Not sure          | 7    | 8      |

g.  Homosexuality is abnormal and perverted.

|                   | Male | Female |
|-------------------|------|--------|
| Strongly agree    | 48   | 21     |
| Agree             | 25   | 22     |
| Disagree          | 13   | 28     |
| Strongly disagree | 4    | 18     |
| Not sure          | 9    | 11     |

h.  It is all right for gays and lesbians to be in the Army as long
    as I don't know who they are.

|                   | Male | Female |
|-------------------|------|--------|
| Strongly agree    | 6    | 7      |
| Agree             | 19   | 25     |
| Disagree          | 33   | 39     |
| Strongly disagree | 33   | 20     |
| Not sure          | 8    | 9      |

i.  Openly gay and lesbian soldiers will try to seduce straight
    soldiers.

|                   | Male | Female |
|-------------------|------|--------|
| Strongly agree    | 14   | 10     |
| Agree             | 24   | 19     |
| Disagree          | 28   | 31     |
| Strongly disagree | 9    | 21     |
| Not sure          | 25   | 20     |

j.  Allowing gays and lesbian in the Army will increase soldiers'
    acceptance of gays and lesbians.

|                   | Male | Female |
|-------------------|------|--------|
| Strongly agree    | 7    | 9      |
| Agree             | 19   | 30     |
| Disagree          | 28   | 24     |
| Strongly disagree | 31   | 16     |
| Not sure          | 14   | 22     |

- 462 -

k. We need sensitivity courses on accepting gays and lesbians in the Army.

|  | Male | Female |
|---|---|---|
| Strongly agree | 8 | 14 |
| Agree | 16 | 34 |
| Disagree | 24 | 23 |
| Strongly disagree | 42 | 20 |
| Not sure | 10 | 9 |

l. In the event of a draft, gays should be drafted the same as straight men.

|  | Male | Female |
|---|---|---|
| Strongly agree | 20 | 39 |
| Agree | 20 | 26 |
| Disagree | 18 | 11 |
| Strongly disagree | 33 | 10 |
| Not sure | 10 | 15 |

- 463 -

Appendix I

STATE RESTRICTIONS ON SODOMY


As of 1961, all states had bans on non-procreative sex. Subsequently, sodomy laws in many states have been repealed by the legislatures or ruled unconstitutional in court challenges.  Table I-1 shows which states currently have or do not have sodomy restrictions.

Eight states have enacted laws prohibiting discrimination on the basis of sexual orientation:

    California
    Connecticut
    Hawaii
    Massachusetts
    Minnesota
    New Jersey
    Vermont
    Wisconsin

- 464 -

## Table I-1

### Current Status of Sodomy Restrictions, by State

| Sodomy Restrictions | No Sodomy Restrictions |
|---|---|
| Alabama | Alaska |
| Arizona | California |
| Arkansas* | Colorado |
| Florida | Connecticut |
| Georgia | Delaware |
| Idaho | Hawaii |
| Kansas* | Illinois |
| Louisiana[a] | Indiana |
| Maryland | Iowa |
| Massachusetts** | Kentucky |
| Michigan[b] | Maine |
| Minnesota** | Nebraska |
| Mississippi | Nevada |
| Missouri* | New Hampshire |
| Montana* | New Jersey |
| North Carolina | New Mexico |
| Oklahoma* | New York |
| Rhode Island | North Dakota |
| South Carolina | Ohio |
| Tennessee* | Oregon |
| Texas[c] | Pennsylvania |
| Utah | South Dakota |
| Virginia | Vermont |
| | Washington |
| | Washington, D.C. |
| | West Virginia |
| | Wisconsin |
| | Wyoming |

SOURCES: *American Civil Liberties Union Handbook: The Rights of Lesbians and Gay Men* (Third Edition: 1992).  Personal communications: Mr. Thomas F. Coleman, Executive Director, Spectrum Institute, Los Angeles, CA; Mr. Jon Davidson, ACLU, Los Angeles Office; Professor Arthur Leonard, New York Law School, New York, NY; Mr. William B. Rubenstein, ACLU New York Office.

[a]Louisiana's sodomy law was recently struck down in trial court (*State v. Baxley*) on the grounds that it violated the state constitution's guarantee to the right of privacy.  The state is appealing the decision.

[b]Michigan's sodomy law (felony) was ruled unconstitutional as applied to private consensual adult behavior (*Michigan Organization for Human Rights v. Kelley,* No. 88-815820).  The decision by the state's attorney general, a named defendant in the case, not to appeal left in question the broader precedential application of the ruling.  Since no appeal was taken, the ruling may only apply to Wayne County where it was issued.

[c]Texas' sodomy statute (misdemeanor) is currently under review by the state supreme court in a declaratory relief action (*Morales v. State of Texas,* D-2393) where lower courts ruled the statute unconstitutional.  In a later case involving both declaratory and injunctive relief actions (*England v. City of Dallas*), the state supreme court has failed to grant review to an appeals court ruling that the sodomy statute was unconstitutional on privacy grounds.  The Texas legislature reaffirmed the state's constitutional ban on same-sex sodomy in its most recent session.

\* Restriction applies to same-gender sex only.

\*\* Sodomy laws remain in force, but states ban discrimination on the basis of sexual orientation.

- 465 -

# BIBLIOGRAPHY

**BIBLIOGRAPHY FOR CHAPTER 1**

Army Regulation 40-105, 1921.

*Ben-Shalom v. Marsh,* 881 F.2d 454 (7th Cir. 1989).

Bérubé, Alan, *Coming Out Under Fire: The History of Gay Men and Women in World War Two,* New York: The Free Press, 1990, pp. 10-18.

Davis, Jeffrey S. "Military Policy Toward Homosexuals: Scientific, Historical, and Legal Perspectives." *Military Law Review* 131 (1991): 55-108.

Department of Defense Directive 1332.14, *Enlisted Administrative Separations,* Enclosure 3H.

*Homosexuals in the Military: Policies and Practices of Foreign Countries,* GAO/NSIAD-93-215, June 1993.

Manual for Courts-Martial, United States, 1921.

The Manuals for Court-Martial, 1917.

*Matlovich v. Secretary of the Air Force,* 591 F.2d 852, D.C. Cir. 1978.

Memorandum for the Secretary of Defense, Ending Discrimination on the Basis of Sexual Orientation in the Armed Forces, January 29, 1993.

U.S. General Accounting Office, "Defense Force Management: DoD's Policy on Homosexuality" and the report's supplement, "Statistics Related to DoD's Policy on Homosexuality."

*Wall Street Journal*/NBC News poll, June 11, 1993.

Williams, Colin J., and Martin S. Weinberg, *Homosexuals in the Military: A Study of Less Than Honorable Discharge,* New York: Harper and Row, 1971, p. 102.


**BIBLIOGRAPHY FOR CHAPTER 2**

Barringer, Felicity, "Polling on Sexual Issues Has Its Drawbacks," *The New York Times,* April 25, 1993, Section 1, p. 23.

- 466 -

Becker, Marshall H., and Jill Joseph, "AIDS and Behavioral Change to Reduce Risk: A Review," *American Journal of Public Health,* Vol. 78, No. 4, 1988, pp. 394-410.

Blumstein, P. W., and P. Schwartz, "Bisexuality in Men," *Urban Life,* Vol. 5, 1976a, pp. 339-358.

Blumstein, P. W., and P. Schwartz, "Bisexuality: Some Social Psychological Issues," Journal of Social Issues, Vol. 33, 1976b, pp.30-45.

Blumstein, P. W., and P. Schwartz, *American Couples: Money, Work, and Sex,* New York: Wm. Morrow and Co., 1983.

Billy, John O. G., Koray Tanfer, William R. Grady, and Daniel H. Klepinger, "The Sexual Behavior of Men in the U.S.," *Family Planning Perspectives,* Vol. 25, No. 2, March/April 1993, pp. 52-60.

Catania, Joseph A., David R. Gibson, Dale D. Chitwood, and Thomas J. Coates, "Methodological Problems in AIDS Behavioral Research: Influences on Measurement Error and Participation Bias in Studies of Sexual Behavior," *Psychological Bulletin,* 1990, Vol. 108, No. 3, pp. 339-362.

Clark, J. P., and L. L. Tifft, "Polygraph and Interview Validation of Self-Reported Deviant Behavior," *American Sociological Review,* Vol. 31, pp. 516-523.

Davis, James Allan, and Tom W. Smith, "General Social Surveys, 1972-1991," <machine readable data file>/Principal Investigator, James A. Davis; Director and Co-Principal Investigator, Tom W. Smith; sponsored by National Science Foundation. NORC ed. Chicago: National Opinion Research Center (Producer); Storrs, CT: The Roper Center for Public Opinion Research, University of Connecticut (distributor), 1991.

Doll, Lynda S., Lyle R. Petersen, Carol R. White, Eric S. Johnson, John W. Ward, and The Blood Donor Study Group, "Homosexually and Nonhomosexually Identified Men Who Have Sex with Men: A Behavioral Comparison," *The Journal of Sex Research,* 1992, Vol. 29, No. 1, pp. 1-14.

Fay, R. E., C. F. Turner, A. D. Klassen, and J. H. Gagnon, "Prevalence and Patterns of Same-Gender Sexual Contact Among Men," *Science,* Vol. 234, January 1989.

General Accounting Office, "Defense Force Management: DOD's Policy on Homosexuality," Washington, D.C., June 1992, p. 20.

Janus, S. S. and C. L. Janus, *The Janus Report on Sexual Behavior,* New York: John Wiley and Sons, 1993.

- 467 -

Jones, C. C., H. Waskin, B. Gerety, B. J. Skipper, H. F. Hull, and G. J. Mertz, "Persistence of High-Risk Sexual Activity among Homosexual Men in an Area of Low Incidence of the Acquired Immunodeficiency Syndrome," *Sexually Transmitted Diseases,* Vol. 14, April-June 1987, pp. 79-82.

Kanouse, David E., Sandra H. Berry, E. Michael Gorman, Elizabeth M. Yano, and Sally Carson, *Response to the AIDS Epidemic:  A Survey of Homosexual and Bisexual Men in Los Angeles County,* Santa Monica, Calif.: RAND, R-4031-LACH, 1991a.

Kanouse, David E., Sandra H. Berry, E. Michael Gorman, Elizabeth M. Yano, Sally Carson, and Allan Abrahamse, *AIDS-Related Knowledge, Attitudes, Beliefs, and Behaviors in Los Angeles County,* Santa Monica, Calif.: RAND, R-4054-LACH, 1991b.

Kinsey, Alfred C., Wardell B. Pomeroy, and Clyde E. Martin, *Sexual Behavior in the Human Male,* Philadelphia: W. B. Saunders, 1948.

Kinsey, Alfred C., Wardell B. Pomeroy, Clyde E. Martin, and Paul H. Gebhard, *Sexual Behavior in the Human Female,* Philadelphia: W. B. Saunders, 1953.

Lever, Janet, David E. Kanouse, William H. Rogers, Sally Carson, and Rosanna Hertz, "Behavior Patterns and Sexual Identity of Bisexual Males," *The Journal of Sex Research,* Vol. 29, No. 2, 1992, pp. 141-167.

Loulan, JoAnn, "R 1566 Lesbians and the Clinical Applications," *Women and Therapy,* Vol. 7, No. 2-3, 1988, pp. 221-234.

Miller, Heather G., Charles F. Turner, Lincoln E. Moses (eds.), *AIDS: The Second Decade,* The National Research Council, Washington D.C.: National Academy Press, 1990.

Reinisch, J. M., S. A. Sanders, and M. Ziemba-Davis, "The Study of Sexual Behavior in Relation to the Transmission of Human Immunodeficiency Virus: Caveats and Recommendations," *American Psychologist,* Vol. 93, 1988, pp. 921-927.

Rogers, Susan M., and Charles F. Turner, "Male-Male Sexual Contact in the U.S.A.: Findings from Five Sample Surveys, 1970-1990," *The Journal of Sex Research,* Vol. 28, No. 4, 1991, pp. 491-519.

Silvestre, Anthony J., Lawrence A. Kingsley, Patricia Wehman, Ryan Dappen, Monto Ho, and Charles R. Rinaldo, "Changes in HIV Rates and Sexual Behavior among Homosexual Men, 1984 to 1988/92," *American Journal of Public Health,* Vol. 83, No. 4, pp. 578-580.

Sonenstein, F., J. Pleck, L. Ku, and C. Calhoun, "1988 National Survey of Adolescent Males" (Data Set G6, Crutchfield, J. and Card, J. J., Archivists) <machine-readable data file and documentation>.

- 468 -

Washington, D.C.: The Urban Institute (Producer); Los Altos, CA: Sociometrics Corporation, Data Archive on Adolescent Pregnancy and Prevention (Producer and Distributor), 1991.

Stall, Ron, D. Barrett, L. Bye, J. Catania, C. Frutchey, J. Henne, G. Lemp, and J. Paul, "A Comparison of Younger and Older Gay Men's HIV Risk-Taking Behaviors: The Communication Technologies 1989 Cross-Sectional Survey," *Journal of Acquired Immune Deficiency Syndromes,* Vol. 5, 1992, pp. 682-687.

Stall, R. D., T. J. Coates, and C. Hoff, "Behavioral Risk Reduction for HIV Infection Among Gay and Bisexual Men," *American Psychologist,* Vol. 43, No. 11, pp. 878-885.

Stempel, R., M. Gorman, S. Shibowski, and A. Moss, "Changes in Sexual Practices and Drug Use Among Gay Men in San Francisco," Published abstract PoC4095, VIIIth International Conference on AIDS, Amsterdam, The Netherlands, 1992.

Tavris, Carol and Susan Sadd, *The Redbook Report on Female Sexuality,* New York: Delacorte, 1977.

Taylor, Humphrey, "The Harris Poll 1993 #20," April 26, 1993.

Turner, Charles F., Heather G. Miller, and Lincoln E. Moses (Eds.), *AIDS, Sexual Behavior, and Intravenous Drug Use,* Washington, D.C.: National Academy Press, 1989.

Valdiserri, R. O., et al., "AIDS Prevention in Homosexual and Bisexual Men: Results of a Randomized Trial Evaluating Two Risk Reduction Interventions," *AIDS,* Vol 3, 1989, pp. 21-26.

Wooden, Wayne S., and Jay Parker, *Men Behind Bars: Sexual Exploitation in Prison,* New York: Plenum Press, 1982.


BIBLIOGRAPHY FOR CHAPTER 3

American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders: DSM-III-R,* 3rd ed., rev. Washington, D.C.: American Psychiatric Association, 1987.

*Army Times* Reporters. "No Easy Answers." *Army Times,* 11 January 1993, pp. 11-28. [Also appeared on the same day in *Air Force Times* and *Navy Times.*]

ter Beek, A. L. "Standpunt naar aanleiding van het onderzoek naar de positie van homoseksualen in de krijgsmacht" [Position in view of the research on the position of homosexuals in the military], Letter from the Minister of Defense to Parliament, 4 mei 1993.

- 469 -

Begeleidingscommissie bij het onderzoek naar de positie van homoseksuelen in de krijgsmacht [Advisory committee for the research on the position of homosexuals in the military] (the Netherlands). *Beleidsadvies naar aanleiding van het onderzoek Homoseksualiteit en Krijgsmacht* [Policy recommendations resulting from the Homosexuality and the Military Research Project]. Mimeographed document transmitted from the Ministry of Defense to Parliament, November 1992.

Boyer, J. P. *Equality for All: Report of the Parliamentary Committee on Equality Rights,* House of Commons (Canada), October 1985.

Bozinoff, L., and P. MacIntosh. "Society Regarded as More Accepting of Homosexuals," The Gallup Report (Canada), September 25, 1991.

Bozinoff, L., and A. Turcotte, "Majority Believe Homosexuals Should Be Allowed in Military," The Gallup Report (Canada), December 10, 1992.

Canadian Forces. *Charter Task Force: Final Report,* Ottawa, September 1986.

CBS News. "Macho, Tough, and Gay," Segment of *Sixty Minutes,* broadcast 25 April 1993.

Clapham, A., and J. H. H. Weiler. "Lesbians and Gay Men in the European Community Legal Order." In Waaldijk & Clapham, 1992, pp. 7-70.

Coudurier, H. "L'Amerique de Bill Clinton (4): La grogne des militaires" [Bill Clinton's America: Military grumblings]. *Le Télégramme,* 23 avril 1993, p. 8.

Department of Defence (Canada). *Defence.* Ottawa: Minister of Supply and Services Canada, 1991.

Doniol, G. (pseud.). "Clinton, ses armées, ses gays, et nous" [Clinton, his military, his gays, and us]. *Liberation,* 28 avril 1993, (new series No. 3713), p. 6.

*The Europa World Year Book 1992.* London: Europa Publications Ltd., 1992.

Forsvarsdepartementet (Norway). *Fakta Om Forsvaret 1993* [Facts About Defense Forces 1993]. Oslo: Emil Moestue A/S, 1993.

Government of Canada, *Toward Equality,* Department of Justice Canada, Communications and Public Affairs, 1986.

Harris, S. E. "Military Policies Regarding Homosexual Behavior: An International Survey." *Journal of Homosexuality,* Vol. 24, 1991, pp. 67-74.

Her Majesty's Armed Forces (United Kingdom). *The Armed Forces: Your Rights and Responsibilities.* London: H. M. Stationers, no date.

- 470 -

Holm, H. J. "Homofili, diskriminering og diagnoser" [Homophilia, discrimination and diagnosis]. *Fokus På Familien*, Vol. 5, No. 1, 1977, pp. 1-3.

Israeli Defense Forces, [Service of Homosexuals in the IDF--Current Policy and Proposed Amendments]. (translated by Colonel Siegel, IDF), Tel-Aviv, no date.

Joustra, W., "Nederland vindt homoseksuelen in krigjsmacht vanzelfsprekend" [The Netherlands takes homosexuals in the military for granted]. *De Volkskrant*, 21 juli 1993.

Jowell, Roger, et al., *British Social Attitudes: The 1986 Report*, Aldershot, England: Gower, 1986.

Ketting, E., and K. Soesbeek (eds.). *Homoseksualiteit & Krijgsmacht* [Homosexuality and the Military]. Delft, the Netherlands: Eburon, 1992.

The Knesset [Israeli Parliament], [Penal Code: Acts of Sodomy, 1977, amended 1988 and 1990], Jerusalem, 1990. (translated by Israeli Defense Forces).

The Knesset [Israeli Parliament], [Equal Opportunity Employment Act, 1988, amended 1 March 1992], Jerusalem, 1992. (translated by Israeli Defense Forces).

Kringlen, E. "Homofili--psykopatologi eller normalvariant" [Homophilia-- psychopathology or normal variation]. *Fokus På Familien*, Vol. 5, No. 1, 1977, pp. 4-13.

de Laclos, C. *Les liaisons dangereuses* [Dangerous Connections]. Paris: Éditions Galimard, 1780/1958.

Lijphart, A. *The Pillars of Society*, New York: Academic Press, 1970.

Likosky, S. *Coming Out: An Anthology of International Gay and Lesbian Writings*. New York: Pantheon Books, 1992.

Lipset, S. M. *Continental Divide*, New York: Routledge, 1990.

Los Angeles Times, "Canada Far Ahead of U.S. in Recognizing Gay Rights," December 29, 1992, p. A1.

Los Angeles Times, "Disruption Rare as Gays Have Been Integrated," January 30, 1993, p. A1.

Ministère de la Défense (France). "Considerations générales sur l'aptitude psychiatrique" [General considerations for psychiatric fitness]. [*Manual of Medical Fitness for National Service*], Articles 419-443, 1989, pp. 123-128. Paris: Ministère de la Défense.

- 471 -

Ministère de la Défense (France).  *Service National: Chiffres Année 1991* [National Service: Numbers for 1991].  Paris:  Les Ateliers Réunis, 1992.

Moskos, C. C.  Testimony Before the United States Senate Committee on Armed Services, Washington, D.C., 29 April 1993.

National Defence Forces (Canada).  "Change to CF Sexual Orientation Policy," News Release, October 27, 1992 (a).

National Defence Forces (Canada).  "Homosexual Conduct," Message CDS 182, October 27, 1992 (b).

National Defence Forces (Canada).  "Revocation of CF Sexual Orientation Policy:  Post-Announcement Action," Circular 1745-42-7(ADM(Per)), October 27, 1992 (c).

National Defence Forces (Canada).  "CF Changes Policy on Homosexuality," Personnel Newsletter Issue 6/92, 1992 (d).

Parks, M. "Israeli Armed Forces Ban Discrimination Against Gay Rights." *Los Angeles Times*, 12 June 1993.

Rayside, D., and S. Bowler.  "Public Opinion and Gay Rights," *Canadian Review of Sociology and Anthropology*, Vol. 25(4), 1988, pp. 649-660.

Robertson, J. R.  *Sexual Orientation and Legal Rights, Current Issue Review 92-1E*, Library of Parliament, Research Branch, 12 March 1993.

Schmidt, N.  "Lesbiske ble kjærester på brakka" [Lesbian Sweethearts in the Barracks].  *VG*, 1 juni 1992, p. 8.

Schwartzkopf, H. N.  Testimony Before the United States Senate Committee on Armed Services, Washington, D.C., 11 May 1993.

Segal, D. R.  Testimony Before the United States Senate Committee on Armed Services, Washington, D.C., 29 April 1993.

Select Committee on the Armed Forces Bill (United Kingdom).  *Minutes of Evidence Taken Before the Select Committee on the Armed Forces Bill.* London:  H. M. Stationers, 1991, pp. 47-48, 87-88, 95-100, 167-171, 176-177.

Stichting Homosexualiteit en Krijgsmacht (the Netherlands).  *Algemeen Beleidsplan* [Overall Policy Plan].  Unpublished document, February 1987.

Stiehm, J. H.  Testimony Before the United States Senate Committee on Armed Services, Washington, D.C., 29 April 1993.

Stoppelenburg, P., T. Mandemaker, S. Serail, and H. Ubachs.  *Geweld in de Krijgsmacht* [Violence in the Military].  Tilburg, the Netherlands:

- 472 -

Institute for Social Scientific Research of the Catholic University of Brabant, 1990.

Tromp, T. H. J.  "Geweld en sexualiteit in de krijgsmacht, een problem?" [Violence and sexuality in the military:  A problem?].  *Krijgsmacht & Mattschappij*, Vol. 8, Spring 1986, pp. 5-9.

Tweede Kamer der Staten-Generaal [Second Chamber of Parliament] (the Netherlands).  "Vaststelling van de begroting van de uitgaven en de ontvangsten van hoofdstuk X (Ministerie van Defensie) voor het jaar 1992" [Determination of the budget of expenditures and income for Chapter X (Ministry of Defense) for 1992], *Tweede Kamer, vergaderjaar 1991-1992*, 22300X, No. 53, 4 februari 1992.

United States General Accounting Office.  *Homosexuals in the Military: Policies and Practices of Foreign Countries*.  Washington, D.C.:  GAO, GAO/NSIAD-93-215, June 1993.

van der Veen, E., and A. Dercksen.  "The Social Situation in the Member States."  In Waaldijk & Clapham (eds.), *Homosexuality:  A European Community Issue*, Dordrecht, the Netherlands:  Martinus Nijhoff, 1992, pp. 131-162.

van Weerd, A.  "Als je er maar niet mee te koop loopt" [You must keep it to yourself].  *Krijgsmacht & Mattschappij*, Vol. 15, No. 1, februari 1993, pp. 19-22.

van Zessen, G.  *Sociaal wetenschappelijk Aidsonderzoek.  Identiteit en vormgeving.  De homoseksuele identiteitsontwikkeling van 282 mannen.* [Social scientific AIDS research.  Identity and design.  The development of homosexual identity in 282 men]  Utrecht, the Netherlands:  Interfacultaire Werkgroep Homostudies, Rijksuniversiteit Utrecht, 1988.

Waaldijk, K.  "The Legal Situation in the Member States."  In Waaldijk & Clapham (eds.), *Homosexuality:  A European Community Issue*, Dordrecht, the Netherlands:  Martinus Nijhoff, 1992, pp. 71-130.

Waaldijk, K., and A. Clapham (eds.).  *Homosexuality:  A European Community Issue*.  Dordrecht, the Netherlands:  Martinus Nijhoff, 1992.

Warner, J. W.  Testimony Before the United States Senate Committee on Armed Services, Washington, D.C., 29 April 1993.

*The World Almanac and Book of Facts 1993*.  New York:  World Almanac, 1992.

**BIBLIOGRAPHY FOR CHAPTER 5**

Allen, Ann E.  *The WAC Mission:  The Testing Time from Korea to Vietnam*.  Ph.D. Thesis, University of South Carolina, 1986.

- 473 -

Andrews, Adolphus, Chief of the Navy Bureau of Navigation, letter to A. C. MacNeal, President of the Chicago Branch of the NAACP, 19 Sept. 1935, quoted in Frederick S. Harrod, *Manning the New Navy*, Westport, CT, Greenwood Press, 1978, p. 62.

Attitude Research Branch, Armed Forces Information and Education Division, *Morale Attitudes of Enlisted Men, May-June 1949*, reprinted in MacGregor and Nalty, eds., *Blacks in the United States Armed Forces, Basic Documents, Vol. XII*, pp. 145-149.

Aynes, Edith A. *From Nightingale to Eagle: An Army Nurse's History*. Englewood Cliffs, N.J.: Prentice-Hall Inc., 1973.

Baskir, Lawrence M., and William A. Strauss. *Chance and Circumstance: The Draft, the War, and the Vietnam Generation*. New York: Vintage Books, 1978.

Bayer, Ronald. *Homosexuality and American Psychiatry: The Politics of Diagnosis*. New York: Basic Books, 1981.

Benecke, Michelle M., and Kirstin S. Dodge. "Military Women in Nontraditional Job Fields: Casualties of the Armed Forces' War on Homosexuals." *Harvard Women's Law Journal* 13 (1990): 215-250.

Bérubé, Alan, and John D'Emilio. "The Military and Lesbians During the McCarthy Years." *Signs: Journal of Women in Culture and Society* 9 (1984): 759-775.

Bérubé, Alan. *Coming Out Under Fire: The History of Gay Men and Women in World War Two*. New York: The Free Press, 1990.

Binkin, Martin, and Shirley J. Bach. *Women and the Military*. Washington, D.C.: The Brookings Institution, 1977.

Binkin, Martin, Mark Eitelberg, et al., *Blacks and the Military*, Washington, D.C., The Brookings Institution, 1972, pp. 36-37

Boettcher, Thomas D. *Vietnam: The Valor and the Sorrow*. Boston: Little, Brown, and Co., 1985.

Blair, Clay. *The Forgotten War*. New York: Times Books, 1987.

Bogart, Leo, ed. *Project Clear: Social Research and the Desegregation of the United States Army*. New Brunswick, New Jersey: Transaction Books, 1991.

Bureau of Naval Personnel, "The Negro in the Navy," in MacGregor and Nalty, eds., *Blacks in the United States Armed Forces, Basic Documents, Vol. VI*, pp. 385-387

- 474 -

Chauncey, George, Jr.  "Christian Brotherhood or Sexual Perversion? Homosexual Identities and the Construction of Sexual Boundaries in the World War I Era."  *Journal of Social History* 19 (1985): 189-212.

Chauncey, George, Jr.  "From Sexual Inversion to Homosexuality: Medicine and the Changing Conceptualization of Female Deviance." *Salmagundi* 58-59 (1982-1983): 114-146.

Cory, Donald Webster [Edwin Sagarin, pseud.].  *The Homosexual in America*.  New York:  Greenburg, 1951.

Dalfiume, Richard M.  *Desegregation of the U.S. Armed Forces*.  Columbia, Missouri:  University of Missouri Press, 1969.

Danfield, L.E. (Assistant Chief of Naval Personnel).  Memorandum to Commander in Chief, United States Fleet and Chief of Naval Operations, July 4, 1944.  Reprinted in MacGregor, Morris J., and Bernard C. Nalty, eds.  *Blacks in the United States Armed Forces, Basic Documents*, Vol. VI, p. 246.

Davis, Jeffrey S.  "Military Policy Toward Homosexuals:  Scientific, Historical, and Legal Perspectives."  *Military Law Review* 131 (1991): 55-108.

Davis, Patricia Lee.  *Uncle Sam's Lesbians: Power, Empowerment, and the Military Experience*.  Master's Thesis, Old Dominion University, 1991.

D'Emilio, John, and Estelle Freedman.  *Intimate Matters:  A History of Sexuality in America*.  New York:  Harper & Row, 1988.

D'Emilio, John.  *Sexual Politics, Sexual Communities:  The Making of a Homosexual Minority in the United States, 1940-1970*.  Chicago: University of Chicago Press, 1983.

Duberman, Martin.  *Stonewall*.  New York:  Dutton, 1993.

Duberman, Martin Bauml, Martha Vicinus, and George Chauncey, Jr., eds. *Hidden from History:  Reclaiming the Gay and Lesbian Past*.  New York: New American Library, 1989.

Edwards, Idwal, "Remarks on Major Personnel Problems Presented to USAF Commanders' Conference Headquarters, USAF," 12 April 1949, reprinted in MacGregor and Nalty, eds., *Blacks in the United States Armed Forces, Basic Documents, Vol. VIII*, p. 26.

Faderman, Lillian.  *Odd Girls and Twilight Lovers:  A History of Lesbian Life in Twentieth-Century America*.  New York:  Penguin Books Ltd., 1991.

Finman, Byron G., Jonathan F. Borus, and M. Duncan Stanton.  "Black-White and American-Vietnamese Relations Among Soldiers in Vietnam." *Journal of Social Issues* 31 (1975): 41.

- 475 -

Foner, Jack D. *Blacks and the Military in American History*. New York: Praeger, 1974.

Forrestal, James (Secretary of the Navy). Memorandum to President Roosevelt, May 20, 1944. Reprinted in Nalty, Bernard C., and Morris J. MacGregor, eds. *Blacks in the Military: Essential Documents*. Wilmington, Delaware: Scholarly Resources Inc., 1981, p. 154.

Gallup Organization, Survey of 3000 Adults Based on Personal Interview, June 1948.

Gerrasi, John. *The Boys of Boise: Furor, Vice and Folly in an American City*. New York: Collier, 1968.

Gibson, E. Lawrence. *Get Off My Ship, Ensign Berg vs. The U.S. Navy*. New York: Avon Books, 1976.

Gibson, Truman K., Jr., memorandum to the Assistant Secretary of War, 23 Aug. 1943, reprinted in MacGregor and Nalty, eds., *Blacks in the United States Armed Forces, Basic Documents, Vol. V*, pp. 273-279

Goldman, Nancy. "The Changing Role of Women in the Armed Forces." *American Journal of Sociology* 78 (January 1973): 892-911.

Gropman, Alan M. *The Air Force Integrates 1945-1964*. Washington, D.C.: Office of Air Force History, 1978.

Hall, E.T. "Race Prejudice and Negro-White Relations in the Army." *American Journal of Sociology* 52 (1947): 408-409.

Harrod, Frederick S. *Manning the New Navy*. Westport, Connecticut: Greenwood Press, 1978.

Hartmann, Susan M. *The Home Front and Beyond: American Women in the 1940s*. Boston: Twayne Publishers, 1982.

Herdt, Gilbert, ed. *Gay Culture in America: Essays from the Field*. Boston: Beacon Press, 1992.

Historical Section, Bureau of Naval Personnel. *The Negro in the Navy*. Washington, D.C.: Department of the Navy, 1947. Reprinted in MacGregor, Morris J., and Bernard C. Nalty, eds. *Blacks in the United States Armed Forces, Basic Documents, Vol. VI*. Wilmington, Delaware: Scholarly Resources Inc., 1977, pp. 327-328.

Holm, Jeanne (Retired USAF Major General). *Women in the Military: An Unfinished Revolution*, rev. ed. Novato, California: Presidio, 1992.

Hyman, Herbert H., and Paul B. Sheatsley, "Attitudes Toward Desegregation," *Scientific American*, Vol. 195, No. 6, 1956, pp. 36-37.

- 476 -

Jacobs, Randall, Chief of Naval Personnel, memorandum to service
    commands, 13 April 1945, reprinted in MacGregor and Nalty, eds., *Blacks
    in the United States Armed Forces, Basic Documents, Vol. VI*, p. 268.

Karst, Kenneth L.  "The Pursuit of Manhood and the Desegregation of the
    Armed Forces."  *UCLA Law Review* 38 (1991): 499-581.

Katz, Jonathan.  *Gay American History: Lesbians and Gay Men in the USA.*
    New York:  Thomas Y. Crowell Co., 1976.

Kenworthy, E. W., memorandum to Charles Fahy, 30 May 1949, reprinted in
    MacGregor and Nalty, eds., *Blacks in the United States Armed Forces,
    Basic Documents, Vol. XI*, p. 1264.

Lee, John C. H., draft directive, 26 Dec. 1944, reprinted in MacGregor
    and Nalty, eds., *Blacks in the United States Armed Forces, Basic
    Documents, Vol. V*, Wilmington, DE, Scholarly Resources Inc., 1977, p.
    98; memorandum to commanders in the Communication Zone, European
    Theater of Operations, reprinted in MacGregor and Nalty, eds., *Blacks
    in the United States Armed Forces, Basic Documents, Vol. V*, p. 99;
    Lee, *Employment of Negro Troops*, pp. 688-705.

Lee, Ulysses.  *United States Army in World War II:  Special Studies,
    Employment of Negro Troops.*  Washington, D.C.:  Office of the Chief of
    Military History, United States Army, 1966.

Lewy, Guenter.  *America in Vietnam.*  New York:  Oxford University Press,
    1978.

MacGregor, Morris J.  *Integration of the Armed Forces 1940-1965.*
    Washington, D.C.:  Office of Military History, 1985.

MacGregor, Morris J., and Bernard C. Nalty, eds.  *Blacks in the United
    States Armed Forces, Basic Documents*, Vols. V, VI, VIII, IX-XI, XI,
    XII.  Wilmington, Delaware:  Scholarly Resources Inc., 1977.

Marotta, Toby.  *The Politics of Homosexuality.*  Boston:  Houghton
    Mifflin, 1981.

Marshall, Kathryn.  *In the Combat Zone:  An Oral History of American
    Women in Vietnam, 1966-1975.*  Boston:  Little, Brown, and Co., 1987.

Meyer, Leisa D.  *Creating G.I. Jane:  The Women's Army Corps During
    World War II.*  Ph.D. Thesis, University of Wisconsin, Madison, 1993.

Morden, Bettie J.  *The Women's Army Corps, 1945-1978.*  Washington, D.C.:
    Center of Military History, United States Army, 1990.

Moskos, Charles C.  *The American Enlisted Man.*  New York:  Russell Sage
    Foundation, 1970.

**LCR Appendix Page 0794**

- 477 -

Motley, Mary Penick, ed. *The Invisible Soldier*. Detroit: Wayne State University Press, 1975.

Murphy, Lawrence R. *Perverts by Official Order: The Campaign Against Homosexuals by the United States Navy*. New York: The Haworth Press, 1988.

Nalty, Bernard C. *Strength for the Fight*. New York: The Free Press, 1986.

Nelson, Dennis D. *The Integration of the Negro into the U.S. Navy*. 1951. Reprint. New York: Octagon Books, 1982.

Nichols, Lee. *Breakthrough on the Color Front*. New York: Random House, 1954.

Operations Research Office, Johns Hopkins University. *Utilization of Negro Manpower*. Chevy Chase, Maryland: Johns Hopkins University, 1954.

Osur, Alan M. *Blacks in the Army Air Forces During World War II*. Washington, D.C.: Office of Air Force History, 1977.

Ray, Marcus H., letter to Truman K. Gibson, 14 May 1945, reprinted in Lee, *Employment of Negro Troops*, pp. 588-589.

"Report by the Special Subcommittee on Disciplinary Problems in the U.S. Navy of the Committee on Armed Services," House of Representatives, 92nd Congress, January 2, 1973, reprinted in MacGregor and Nalty (eds.), *Blacks in the United States Armed Forces, Basic Documents, Vol. XIII*, pp. 605-631.

Rivera, Rhonda. "Our Straight-laced Judges: The Legal Position of Homosexual Persons in the United States." *Hastings Law Journal* 30 (March 1979): 841-848.

Roberts, Mary M. *American Nursing: History and Interpretation*. New York: MacMillan Company, 1954.

Rustad, Michael. *Women in Khaki: The American Enlisted Woman*. New York: Praeger Publishers, 1982.

Shilts, Randy. *Conduct Unbecoming: Gays and Lesbians in the U.S. Military, Vietnam to the Persian Gulf*. New York: St. Martin's Press, 1993.

Shilts, Randy. *The Mayor of Castro Street: The Life and Times of Harvey Milk*. New York: St. Martin's Press, 1982.

Stiehm, Judith Hicks. "Managing the Military's Homosexual Exclusion Policy: Text and Subtext." *University of Miami Law Review* 46 (1992): 685-710.

Stiehm, Judith Hicks. *Arms and the Enlisted Woman*. Philadelphia: Temple University Press, 1989.

- 478 -

Surveys Division, Bureau of Special Services, Office of War Information, *The Negroes' Role in the War*, Washington, D.C., 8 July 1948, reprinted in MacGregor and Nalty, *Blacks in the United States Armed Forces, Basic Documents, Vol. V*, p. 237.

Treadwell, Mattie E. *The United States Army in World War II: Special Studies: The Women's Army Corps*. Washington, D.C.: Office of Chief of Military History, Department of the Army, 1953.

Truman, Harry S. Text of Executive Order 9981, July 26, 1948.

United States Commission on Civil Rights. "The Negro in the Armed Forces." *Civil Rights '63* (30 September 1963). Reprinted in MacGregor, Morris J., and Bernard C. Nalty, eds. *Blacks in the United States Armed Forces, Basic Documents*, Vol. XII. Wilmington, Delaware: Scholarly Resources, Inc., 1977.

Westbrook, Robert B. "'I Want a Girl, Just Like the Girl that Married Harry James': American Women and the Problem of Political Obligation in World War II." *American Quarterly* 42 (December 1990): 587-614.

Williams, Colin J., and Martin S. Weinberg. *Homosexuals in the Military: A Study of Less than Honorable Discharge*. New York: Harper & Row, 1971.


**BIBLIOGRAPHY FOR CHAPTER 6**

"Baptists Call for Keeping Military Ban on Gays." *The Los Angeles Times*. June 5, 1993. p. B4.

Bobo, Lawrence. "Antipoverty Policy, Affirmative Action and Racial Attitudes." Institute for Research on Poverty, Conference Paper from *Poverty and Public Policy: What Do We Know? What Should We Do?* held May 28-30 at the University of Wisconsin, Madison. 1992.

Burstein, Paul. *Discrimination, Jobs, and Politics*. Chicago: University of Chicago Press. 1985.

Byne, William, and Bruce Parsons, "Human Sexual Orientation: The Biologic Theories Reappraised," *Archives of General Psychiatry*, Vol. 50, 1993, pp. 228-239.

Chilstrom, Herbert. Letter to President Clinton. February 2, 1993.

Dovidio, John F., and Russell H. Fazio. "New Technologies for the Direct and Indirect Assessment of Attitudes." In *Questions About Questions*, Judith M. Tanur, ed. New York: Russell Sage. 1992.

- 479 -

Hamer, Dean H., S. Hu, V. L. Magnuson, N. Hu, and A. M. L. Pattatucci, "A Linkage Between DNA Markers on the X Chromosome and Male Sexual Orientation," *Science*, Vol. 261, July 16, 1993, pp. 321-327.

Hatfield, Larry. "New Poll: How U.S. Views Gays." *The San Francisco Examiner*. June 5, 1989. pp. A19-A21.

Hosek, James R., Christine E. Peterson, and Rick A. Eden. *Educational Expectations and Enlistment Decisions*. RAND, R-3350-FMP, 1986.

Jaynes, Gerald David, and Robin Williams, Jr. (eds.), *A Common Destiny: Blacks and American Society*, Committee on the Status of Black Americans, Commission on Behavioral and Social Sciences and Education. Washington, D.C.: National Academy Press. 1989.

Melton, J. Gordon. *The Churches Speak on Homosexuality: Official Statements from Religious Bodies and Ecumenical Organizations*. Detroit: Gale Research Inc, 1991.

"News: Church Leaders on Gay Issue." *Christian Century*, March 3, 1993, p. 233.

OASD, Office of the Assistant Secretary of Defense, Department of Defense. "Population Representation in the Military Service." October, 1992.

Orvis, Bruce. *Forecasting Enlistment Actions from Intention Information: Validity and Improvement*. Santa Monica, CA: RAND, N-1954-MRAL, 1982.

Orvis, Bruce, and Martin T. Gahart. *Relationship of Enlistment Intention and Market Survey Information to Enlistment in Active Duty Military Service*. Santa Monica, CA: RAND, N-2292-MIL, 1985.

Rodin, Miriam, Judy Price, Francisco Sanchez and Sharel McElligot. "Derogation, Exclusion, and Unfair Treatment of Persons with Social Flaws." *Personality and Social Psychology Bulletin*. Vol. 15, No. 3, 1989, pp. 439-451.

Weiner, Bernard, Raymond Perry, and Jamie Magnusson. "An Attributional Analysis of Reactions to Stigmas." *Journal of Personality and Social Psychology*. Vol. 55, No. 5, 1988, pp. 738-748.

Whitley, Bernard E. "The Relationship of Heterosexuals' Attributions for the Causes of Homosexuality to Attitudes Toward Lesbians and Gay Men." *Personality and Social Psychology Bulletin*. Vol. 16, No. 2, 1990, pp. 369-377.

- 480 -

**BIBLIOGRAPHY FOR CHAPTER 7**

Allport, Gordon W., *The Nature of Prejudice,* Addison-Wesley Publishing Company, Inc., 1954, 1958.

Culbertson, Amy, Paul Rosenfeld, Stephanie Booth-Kewley, and Paul Magnusson. "Assessment of Sexual Harassment in the Navy: Results of the 1989 Navy-wide Survey," NPRDC-TR-92-11, Navy Personnel Research and Development Center, San Diego, CA, March 1992.

Herek, Gregory M., "Can Functions Be Measured? A New Perspective on the Functional Approach to Attitudes," *Social Psychology Quarterly,* Vol. 50, No. 4, 1987, pp. 285-303.

*Los Angeles Times,* "Los Angeles Times Poll #307--United States Military Survey," March 1993.

Martindale, Melanie, "Sexual Harassment in the Military: 1988," Defense Manpower Data Center, September 1990.

Miller, Laura, "Moskos/Miller 1992 Sociological Survey of the Army, Report to the RAND Corporation on Soldier Attitudes Toward Gays and Lesbians in the Military," Northwestern University, May 1993.

Moskos, Charles, "Discussion Points on DoD Policy Options Regarding Gays and Lesbians," memorandum to Dr. Bernard Rostker dated May 7, 1993.

Office of Merit Systems Review and Studies, *Sexual Harassment in the Federal Workplace: Is It a Problem?* U.S. Merit Systems Protection Board, Washington, D.C., March 1981.


**BIBLIOGRAPHY FOR CHAPTER 8**

Air Force, Department of, "Policy on Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus (HIV)," Department Memo 89-62, June 1, 1989 (mimeo).

Allard, R., "HIV Seroconversion in the U.S. Army," *New England Journal of Medicine,* 321(21):1477-1478, 1989. [letter re: McNeil et al.]

*Amsus Newsletter,* "HIV 'Top Cause' of DoD Mortality," March 1989.

Arday, D. R., J. F. Brundage, L. I. Gardner, M. Goldenbaum, F. Wann, and S. Wright, "The Effect of Human Immunodeficiency Virus Type 1 Antibody Status on Military Applicant Aptitude Test Scores," *American Journal of Epidemiology,* 133(12):1210-1219, 1991.

Armed Services Blood Program Office, "Information about the Armed Services Blood Program," 12/12/92 (mimeo).

- 481 -

Army, Department of, "Identification, Surveillance, and Administration of Personnel Infected with Human Immunodeficiency Virus (HIV)," Department Memo AR-600-110, May 22, 1989 (mimeo).

Barnette, R., "HIV: People--Discovering Life," *All Hands*, Sept. 1., 1990.

Bell, A., and M. Weinberg, *Homosexualities: A Study of Diversity Among Men and Women*, New York: Simon and Schuster, 1978.

Billy, John O., K. Tanfer, W. R. Grady, and D. H. Klepinger, "The Sexual Behavior of Men in the U.S.," *Family Planning Perspectives*, 25(2):52-60, 1993.

Blake, S., M., L. Temoshok, J. Rundell, E. Sharp, R. Ledsky, C. Coyle, and C. Johnson, "Transmission Potential in HIV+ Individuals: Demographic, Attitudinal, and Behavioral Factors," *International Conference on AIDS*, PoC 4337, 8(2):C301, 1992 (abstract).

Brundage, J. F., D. S. Burke, L. I. Gardner, J. G. McNeil, M. Goldenbaum, R. Visintine, R. R. Redfield, M. Peterson, and R. N. Miller, "Tracking the Spread of the HIV Infection Epidemic among Young Adults in the United States: Results of the First Four Years of Screening among Civilian Applicants for U.S. Military Service," *Journal of Acquired Immune Deficiency Syndromes*, 3:1168-1180, 1990.

Burke, D. S., E. C. Tramont, "AIDS/HIV in the U.S. Military," technical report distributed by Defense Technical Information Center, April 1992.

Burke, D. S., J. F. Brundage, M. Goldenbaum, L. I. Gardner, M. Peterson, R. Visintine, and R. R. Redfield, Walter Reed Retrovirus Research Group, "Human Immunodeficiency Virus Infections in Teenagers: Seroprevalence among Applicants for US Military Service," *Journal of the American Medical Association*, 263(15):2074-2077, 1990.

Burke, D. S., "HIV: The U.S. Military Experience," *Proceedings of the Annual Meeting of the Medical Section*, American Council on Life Sciences, 1990.

Burke, D. S., J. F. Brundage, R. R. Redfield, J. J. Damato, C. A. Schable, P. Putman, R. Visintine, and H. I. Kim, "Measurement of the False Positive Rate in a Screening Program for Human Immunodeficiency Virus Infections," *New England Journal of Medicine*, 319(15):961-964, 1988.

Burrelli, D. F., "HIV-1/AIDS and U.S. Military Manpower Policy," *Armed Forces & Society*, 18(4):452-475, 1992.

Catania, Joseph A., Thomas J. Coates, Ron Stall, Heather Turner, John Peterson, Norman Hearst, M. Margaret Dolcini, Estie Hudes, John Gagnon, James Wiley, and Robert Groves, "Prevalence of AIDS-Related

LCR Appendix Page 0799

- 482 -

Risk Factors and Condom Use in the United States," *Science,* 1992, Vol. 258, pp. 1101-1106.

Centers for Disease Control, *HIV/AIDS Surveillance Report*, Vol. 5., No. 1, May 1993.

Centers for Disease Control, "Self-Reported Changes in Sexual Behaviors among Homosexual and Bisexual Men from the San Francisco City Clinic Cohort," *Morbidity and Mortality Weekly*, 36(12):187-190, 1987.

Centers for Disease Control, "Update: Serologic Testing for HIV-1 Antibody--United States, 1988 and 1989," *Morbidity and Mortality Weekly*, 39(22):380-383, June 8, 1990.

Centers for Disease Control and Prevention, "Update: Serologic Testing for Antibody to Human Immunodeficiency Virus," *Morbidity and Mortality Weekly*, 36(52):833-845, January 8, 1988.

Centers for Disease Control, *National HIV Serosurveillance Summary: Results through 1990*, Vol. 2, Atlanta, GA, 1991.

Centers for Disease Control, *Sexually Transmitted Disease Surveillance*, July 1992.

Chesney, M. A., J. M. Taylor, and D. B. Chambers, *Evaluation of the U.S. Army's AIDS Education Program: Final Report*, 1992.

Cowan, D. N., J. F. Brundage, R. S. Pomerantz, L. I. Gardner, R. N. Miller, and F. Wann, "HIV Infection among Members of the Army Reserve Components Residing in New York City," *New York State Journal of Medicine*, 91:479-482, 1991.

Cowan, D. N., J. F. Brundage, R. S. Pomerantz, R. N. Miller, and D. S. Burke, "HIV Infection among Members of the U.S. Army Reserve Components with Medical and Health Occupations," *Journal of the American Medical Association*, 265(21):2826-2830, 1991.

Cowan, D. N., R. S. Pomerantz, Z. F. Wann, M. Goldenbaum, J. F. Brundage, R. Miller, D. S. Burke, and C. A. Carroll, Walter Reed Retrovirus Research Group, "Human Immunodeficiency Virus Infection among Members of the Reserve Components of the US Army: Prevalence, Incidence, and Demographic Characteristics," *Journal of Infectious Diseases*, 162:827-836, 1990.

Daniell, F. D., R. R. Skelly, S. Friedman, D. Slifer, G. Anderson, S. McLean, and L. Johnson, "HIV Preventive Medicine Services and Public Health Interventions: The Bethesda Experience," *Military Medicine*, 155:1-27, 1990.

Dannenberg, A. L., "Mortality among 1862 HIV-Antibody-Positive Civilian Applicants for Military Service: Preliminary Results," *New England Journal of Medicine*, 321(18):1267, 1989.