# Appendix of Evidence in

# Support of Log Cabin Republican's

# Opposition to Defendants'

# Motion for Summary Judgment

## LCR Appendix Pages 901-1000

## (Part 9 of 19)

Chapter 1
Background

directives defined the terms "homosexual" and "homosexual act";
standardized the services' procedures for processing homosexual cases;
and clarified the specific actions for which a person would be
separated—homosexual acts (including attempt and solicitation),
admissions of homosexuality, and homosexual marriages. Further, the
directives precluded retention of homosexuals except in limited
extenuating circumstances. "Extenuating circumstances" involved cases in
which homosexual activity was unlikely to recur and was shown to be, for
example, an act motivated by youthful curiosity or performed under
intoxication or in response to pressure from a superior. The directives also
afforded the right to appeal all separations for homosexuality. Finally,
under the 1982 directive, homosexuals are no longer processed for
separation by reason of unsatisfactory performance or
misconduct—instead they are processed under the category
"homosexuality." Almost 95 percent receive an honorable or a general
discharge.

## Appeals Processes Uphold DOD's Policy

Current DOD regulations afford the right to appeal homosexual separations
through processes within the military adjudication system. Service
members may also pursue redress in the civil court system.

### Military Avenue of Appeal

According to DOD regulations and DOD officials, a service member who is
alleged to be or who admits to being homosexual is notified in writing by
the appropriate command that he or she is being considered for discharge.
At such time, the service member is afforded the opportunity under the
military adjudication system to have the case heard before an
Administrative Board, where the individual is represented by an appointed
military counsel, military counsel of the respondent's own choice, or
civilian counsel retained at the service member's own expense.

If the Board finds the service member is not a homosexual on the basis of
the facts provided and recommends retention, the service member is
normally retained. If the Board finds that the allegation is supported by the
preponderance of the evidence, the service member is normally processed
for discharge. The service member may petition the respective Board for
Correction of Military/Naval Records, which reviews the case on the basis
of possible error. If the Correction Board finds no error or injustice in the
decision made by the Administrative Board, then the decision to discharge
stands.

LCR Appendix Page 0901

**Chapter 1**
**Background**

If the service member wishes to appeal further, he or she may file suit in a civil court, at which time all expenses, including attorney fees, are incurred by the individual because he or she is no longer in the military.

## Civil Courts' Appeals Jurisdiction

A service member separated from service under DOD's policy may seek review by a federal court as to whether the discharge was proper. The member may file an action in a federal district court if the member's complaint presents a federal question or if the member seeks a declaratory judgment. In addition, under the Tucker Act, the district courts and the U.S. Claims Court have concurrent jurisdiction over actions filed by service members seeking monetary relief not exceeding $10,000. The Claims Court has exclusive jurisdiction if the amount claimed exceeds $10,000. Further, reviews of administrative decisions by the armed services that have resulted in discharges also may be sought under the Administrative Procedure Act. The act permits courts to set aside action by a military review board that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or when it is claimed that a review board's decision was "unsupported by substantial evidence."

## Objectives, Scope, and Methodology

We obtained statistics on the composition of the active forces and on service members discharged for homosexuality between fiscal years 1980 and 1990 by branch of service, race, gender, rank, and occupational code. We obtained statistics on the composition of the active military force, discharges for homosexuality, years of service/pay grades, and occupational categories from DOD's Defense Manpower Data Center. Where possible, we analyzed costs associated with the implementation of DOD's policy. Because DOD does not routinely maintain such cost data, our cost analysis is very limited. DOD was able to provide only information on the cost of recruiting and training dischargees' replacements. We also obtained pay grade and years-of-service data for those personnel discharged for homosexuality between fiscal years 1980 and 1990. In a separately issued supplement to this report entitled Defense Force Management: Statistics Related to DOD's Policy on Homosexuality (GAO/NSIAD-92-98S), we present these statistics in full.

We were not able to calculate the original investment cost of training and compensation, the cost of investigating alleged or actual homosexual cases, or the cost of out-processing servicemen and women who had been identified as homosexuals. According to DOD officials, there were relatively few service members who had been discharged from service academy and

**Chapter 1**
**Background**

Reserve Officer Training Corps programs on the grounds of homosexuality, and only a few had been asked to repay educational costs paid by the military.

In a 1984 letter to some Members of Congress, we addressed some of the matters discussed in this report. At that time, we provided a breakout of the numbers of service members discharged for homosexuality by branch of service, race, gender, rank, and career occupation and some costs associated with the implementation of DOD's policy of excluding homosexuals.[3] In this 1992 report, we were also asked to evaluate available evidence used by DOD to support its rationale for implementing the policy.

To determine what evidence exists to support DOD's rationale for its homosexual exclusion policy, we asked DOD to identify any research studies that had been conducted or commissioned and any reports or drafts that had been written to examine the rationale and premises underlying the existing policy. We reviewed the documents so identified. We interviewed officials from the Department of Defense, the Air Force, the Army, the Navy, and the Marine Corps to obtain their views on the origin, the rationale, and the implementation of the policy. We also interviewed officials from the Personnel Security Research and Education Center, the U.S. Army Criminal Investigative Division Command, the Air Force Office of Special Investigations, and the Naval Investigative Service.

To obtain information on the status and results of research in the area of homosexuality in the general population, we met with official representatives of the national professional associations with cognizance of and expertise in this area. These organizations included the American Psychiatric Association and the American Psychological Association. We obtained position papers from each, discussed the understanding and interpretation of the research available on homosexuality, and obtained their views on DOD's policy. GAO's Design, Methodology, and Technical Assistance Group (DMTAG) assisted us in developing our strategy for selecting these organizations and accompanied us on several of the significant meetings.

We also obtained copies of national polls on the public's changing attitudes toward homosexuality in general and homosexuality in the military and discussed the results with polling experts and representatives.

---

[3]B-216657, Oct. 11, 1984.

**LCR Appendix Page 0903**

**Chapter 1**
**Background**

We also contacted embassy officials of U.S. allies and solicited their current policies governing homosexuals serving in their armed forces (see app. II).

Finally, we selected and visited eight police and fire departments in four U.S. cities where the employment of homosexuals is not prohibited and obtained the officials' views on their policies and experiences (see app. III). While these organizations are not comparable to the U.S. military in all ways, we believe that these organizations have attributes that are similar to those of military units. For example, their members work closely together; sleep in close quarters; use the same restroom facilities; maintain trust, confidence, discipline, and morale; and respect the system of rank and command.

We conducted our review between September 1990 and May 1992 in accordance with generally accepted government auditing standards.

LCR Appendix Page 0904

Chapter 2
# DOD's Separations of Homosexuals

DOD-wide statistics show that 16,919 servicemen and women were discharged under the separation category of homosexuality between fiscal years 1980 and 1990—an average of about 1,500 annually, or about 1.6 percent of the average number of involuntary discharges. Most of these personnel were enlisted, men, and white. According to DOD officials, personnel separated under this category might have been identified in a number of ways, including self-admission, allegations leading to investigations, and being caught in compromising situations. DOD and service officials acknowledged that the numbers we cite do not reflect the total number of homosexual military personnel separated because homosexuals could also have been separated under other categories such as misconduct.

The costs associated with the administration of homosexual discharges, which involve a separation process and may include investigation, are not tracked by DOD or the services. However, calculations using DOD-provided average costs for the recruiting and initial training of enlisted and officer personnel suggest a replacement cost of approximately $27 million for those personnel separated for homosexuality in 1990—if these individuals were replaced on a one-for-one basis.

## Discharge Criteria

DOD's policy states that homosexuality is incompatible with military service because the presence of persons who engage in or demonstrate a propensity to engage in homosexual conduct seriously impairs the accomplishment of the military mission. Accordingly, identification as a homosexual is the only criterion that needs to be met to discharge a person under this separation category—no specific determination of an individual's negative impact on the military mission is needed prior to separation.

Historically, contested discharges for homosexuality have been upheld both in the military administrative review process and in the civilian court system. This has been true even in cases involving personnel with exemplary service records, such as the following:

- An Army sergeant, whose commanding officer said he was "one of our most respected and trusted soldiers," was expelled after 14 years of service including tours in Vietnam and Korea.
- An Air Force sergeant, the recipient of a Bronze Star and a Purple Heart, was expelled after 12 years of service including a tour of duty in Vietnam.

**Chapter 2**
**DOD's Separations of Homosexuals**

- A Naval Academy midshipman, ranked at the top of his class, was expelled 6 weeks prior to graduation.
- The promotion of a captain with 15 years' service in the Army Reserve was suspended. She was subsequently expelled from the military.
- A Navy petty officer who had served 9 years as a linguist and cryptographer with a top secret clearance was discharged.
- An Army Reserve sergeant who had enlisted for a 3-year term and who was the only female in her drill sergeant training course was acknowledged by her superiors as a fine candidate for drill sergeant school, a capable soldier, and an excellent instructor. She was subsequently discharged one year short of her initial enlistment period.

In commenting on a draft of this report, DOD stated that of necessity, it creates categories to manage military personnel and guide accession and retention decisions. Categories include those mandated by law, such as age and citizenship (for officers), and those mandated by regulation, such as height and weight limits, physical and mental standards, single parenthood,[1] and homosexuality. DOD commented that each regulatory category is predicated on the professional military judgment of DOD leaders that creating that category contributes to overall combat effectiveness. Accordingly, DOD separates individuals in selected categories, such as homosexuals, regardless of their individual performance records.

## Analysis of Discharges for Homosexuality

We summarized DOD's data on discharges and separations for homosexuality during fiscal years 1980 through 1990 by service, race/ethnicity, gender, and rank. Our analysis showed that some groups have consistently been discharged at a rate higher than their representation either DOD-wide or in their respective services. Our analysis of discharge data is discussed below. In a separately issued supplement to this report entitled Defense Force Management: Statistics Related to DOD's Policy on Homosexuality (GAO/NSIAD-92-98S), we present this analysis in full.

## Discharges by Service

The Navy, representing 27 percent of the active force during this period, accounted for 51 percent (8,638 cases) of the total number of discharges for homosexuality. While the Army represented 37 percent of the active force, it accounted for 25 percent (4,235 cases) of all discharges for homosexuality. The Air Force, representing 27 percent of the active force,

---

[1]Under current regulations, a single parent may not enter the military services; however, individuals who become single parents while in service are allowed to stay.

LCR Appendix Page 0906

Chapter 2
DOD's Separations of Homosexuals

accounted for 18 percent (2,993 cases) of all these discharges. The Marine Corps represented 9 percent of the active force and 6 percent (1,053 cases) of the total number of these discharges. The Marine Corps, the smallest service, also had the fewest discharges overall. (See fig. 2.1.)

**Figure 2.1: Discharges for Homosexuality by Service**



DOD-wide, the total number of reported discharges for homosexuality dropped 47 percent between fiscal years 1980 and 1990 (see fig. 2.2). Some DOD officials said that there may be various reasons for the trend, including, but not limited to (1) the flexibility available to local commanders to administratively handle situations involving homosexuality without bringing in an investigative agency and to select an alternative separation category other than homosexuality; (2) the likelihood that officers are given the option of resigning, which eliminates the investigative process and the homosexual categorization; and (3) the apparent softening of the general public's attitude toward homosexuality.

LCR Appendix Page 0907

Chapter 2
DOD's Separations of Homosexuals

**Figure 2.2: DOD-Wide Number of Homosexuals Discharged**



On the basis of DOD's comments, we compared the total number of involuntary separations for the period with the number of separations for homosexuality. We found that as the total number of involuntary separations decreased, so did the total number of separations for homosexuality. For example, the total number of involuntary separations peaked in 1982 at slightly over 108,000 actions and dropped almost 36 percent by 1990. Separations for homosexuality also peaked in 1982 at almost 2,000 cases and dropped 47 percent by 1990. We were unable to determine why this correlation had occurred.

## Discharges by Race

We summarized DOD's race/ethnicity categories into three basic groups: white, black, and "other." In each branch of the military, whites were discharged for homosexuality at a rate consistently higher than their rate of representation. DOD-wide, from fiscal years 1980 through 1990, white men and women constituted 83 percent (14,125 cases) of all personnel discharged for homosexuality while making up about 72 percent of all personnel serving (see fig. 2.3). Conversely, black men and women accounted for 13 percent (2,204 cases) of all discharges while they represented 20 percent of the total serving. The "other" category made up 4 percent (590 cases), while representing 8 percent of the active force.

LCR Appendix Page 0908

Chapter 2
DOD's Separations of Homosexuals

**Figure 2.3: Average Percentage of Whites Serving Compared With Average Percentage of Whites Discharged for Homosexuality**



Serving

Dischrged

## Discharges by Gender

In each branch of the military services, women were discharged for homosexuality at a rate consistently higher than their rate of representation (see fig. 2.4). DOD-wide, from fiscal years 1980 through 1990, women constituted 23 percent of all discharges for homosexuality (3,900 cases), contrasted with their representation as just 10 percent of all military personnel. While women in all the services were discharged for homosexuality at a rate consistently ranging two to three times higher than their rate of representation, this pattern was most noticeable in the Marine Corps, where the discharge rate was almost six times their rate of representation. Women constituted 28 percent of all discharges for homosexuality (303 cases) in the Marine Corps, but only 5 percent of all personnel serving. Conversely, DOD-wide men represented 77 percent of all discharges for homosexuality and 90 percent of all military personnel.

LCR Appendix Page 0909

Chapter 2
DOD's Separations of Homosexuals



**Figure 2.4: Average Percentage of Women Serving Compared With Average Percentage of Women Discharged for Homosexuality**



## Discharges by Race and Gender

In each military service, white women were discharged for homosexuality at a rate consistently higher than their rate of representation (see fig. 2.5). DOD-wide, from fiscal years 1980 through 1990, white women constituted 20 percent (3,421 cases) of those discharged for homosexuality, while they represented just 6 percent of all personnel serving. The disproportionate discharge rate of white women was evident in all of the services, but most noticeable in the Marine Corps. Marine Corps women constituted 24 percent of such discharges, while they represented just 3 percent of the personnel serving. Conversely, white men represented 63 percent (10,704 cases) of such discharges and 66 percent of all serving. The percentages for other groups were as follows: black men, 11 percent of those discharged and 17 percent of those serving; black women, 2 percent of those discharged and 3 percent of those serving; "other" men, 3 percent of those discharged and 7 percent of those serving; and "other" women, 1 percent of those discharged and 1 percent of those serving.

LCR Appendix Page 0910

Chapter 2
DOD's Separations of Homosexuals

**Figure 2.5: Average Percentage of White Women Serving Compared With Average Percentage of White Women Discharged for Homosexuality**



## Discharges by Rank

Enlisted personnel have been discharged for homosexuality at a rate consistently higher than their rate of representation (see fig. 2.6). Their rate of discharge is also higher than that of officers. DOD-wide, from fiscal years 1980 through 1990, enlisted personnel constituted 99 percent of those discharged for homosexuality, while making up 86 percent of all personnel serving, a difference of 13 percent. Conversely, officers represented 1 percent of such separations and 14 percent of all serving.

LCR Appendix Page 0911

Chapter 2
DOD's Separations of Homosexuals

Figure 2.6: Average Percentage of Enlisted Personnel Serving Compared With Average Percentage of Enlisted Personnel Discharged for Homosexuality



Serving
Discharged

## Discharges by Occupational Code

DOD categorizes its military personnel (both officers and enlisted personnel) under 10 broad occupational area codes.[2] The officer and enlisted codes are similar but not identical. DOD-wide, about 50 percent of all enlisted personnel who served during the 11-year period we reviewed were employed in the three job categories of Electrical/Mechanical Equipment Repairers (20.2 percent); Infantry, Guncrews, Seamanship Specialist (14.7 percent); and Functional Support and Administration Personnel (15.7 percent). These three categories accounted for approximately 36 percent of the discharges for homosexuality during the period. We noted no obvious, sizable disparities in terms of discharge rates and representation in the occupational categories. However, almost 24 percent of the discharges for homosexuality came from the "Nonoccupational" category, while only about 9 percent of the personnel belonged to that category.

[2] One of these categories, "Nonoccupational," is used to designate individuals such as patients, students, prisoners, and trainees and is not an actual occupation field.

LCR Appendix Page 0912

Chapter 2
DOD's Separations of Homosexuals

## Investigations of Homosexual Behavior

There are three criminal investigative agencies within DOD: the Army's Criminal Investigation Command, the Air Force's Office of Special Investigations, and the Naval Investigative Service. These organizations investigate specific allegations of criminal activity. Certain sex-related crimes, such as sodomy, may entail either homosexual or heterosexual behavior. We reviewed data provided by each of the services on investigations involving homosexuality. Consistent and reliable information on these cases was not available from the three investigative agencies before 1986, and most did not maintain data by the categories of race, gender, rank, or occupational code. While the Naval Investigative Service did maintain data by gender, it has only maintained data by race since 1986. Accordingly, for consistency, our analysis covers fiscal years 1986 through 1990. For this period, DOD investigative agencies experienced a total investigative caseload of about 186,000. Of these, 3,663, an average of approximately 730 per year, were investigations related primarily to homosexuality. However, this figure may be understated because each DOD investigative agency has its own policies and procedures governing investigations of criminal activity involving homosexuality and its own coding process. For example, while the Army and the Air Force use a specific code for categorizing investigations of homosexuality, the Navy does not. Navy investigations of homosexuality are categorized under the same offense code as sodomy and indecent assault. Additionally, investigations of homosexuality that are administratively handled at the local command level may not be reported or recorded in the system as such. Commanders have this flexibility.

Figure 2.7 shows that for fiscal years 1986 through 1990, the Navy conducted 68 percent of all DOD-wide investigations of homosexuality. The Air Force conducted 26 percent, and the Army 6 percent. Our analysis also shows that, while overall investigative budgets appear to be increasing, the number of investigations involving homosexuality appears to be decreasing. The number of investigations of homosexuality throughout the services dropped from 907 to 472, a decline of 48 percent.

Although DOD officials could not explain this decline, some officials speculated various reasons for it. For example, one investigative agency official stated that it could be due in part to the shift in responsibility for homosexuality cases from investigative agencies to the military police or the provost marshall. Other officials stated that it could be due to the advent of a higher caliber all-volunteer force and a new focus on large, time-consuming procurement fraud cases.

LCR Appendix Page 0913

Chapter 2
DOD's Separations of Homosexuals

**Figure 2.7: DOD-Wide Investigations of Homosexuality**



Office of Special Investigations (Air Force)

**6%**
Criminal Investigative Division (Army)

26%

Naval Investigative Service (Navy and Marines)

Note: Percentages have been rounded to the nearest whole number.

In commenting on a draft of this report, DOD stated that the statistics from the Naval Investigative Service reflect investigations of both heterosexual and homosexual sodomy/indecent sexual acts. We agree. However, we were told there are a limited number of such cases. Accordingly, we believe that figure 2.7 and the discussion of investigations in this section fairly represent the activity in this area.

## Cost of Expulsions

The costs of administering DOD's exclusion policy were not available because DOD does not routinely maintain records of such costs. While DOD criminal investigative agency officials provided us with figures reflecting total investigative budgets, they stated that records of costs related to carrying out individual investigations or discharges were not maintained and that such costs could not be reliably extrapolated. According to DOD officials, the only costs that were readily identifiable were those for recruiting and providing initial training to personnel replacing troops discharged for homosexuality. For fiscal year 1990, these estimated costs were $28,226 for each enlisted individual and $120,772 for each officer.

LCR Appendix Page 0914

The total cost of replacing personnel discharged for homosexuality, however, would need to include factors such as out-processing and court costs.

LCR Appendix Page 0915

Chapter 3

# Support for DOD's Policy on Homosexuality

According to DOD, its policy "is based solely upon concerns about homosexuality itself"—that is, the concerns about the effect of homosexuality on factors such as discipline, good order, and morale. Those concerns led to the professional military judgment that the exclusionary policy promotes overall combat effectiveness. Therefore, DOD has not conducted specific research to develop empirical evidence supporting the overall validity of the premises and rationale underlying its current policy on homosexuality.

Efforts to examine the security risk issue have concluded that available data does not substantiate that homosexuals pose a security risk. In addition, professional psychiatric, psychological, sociological associations and other experts familiar with the research conducted on homosexuality in general disagree with the basic rationale behind DOD's policy.

## DOD's Position

Defense officials stated that DOD's policy is not based on scientific or empirical data, but rather on the considered judgment of military professionals and civilian policymakers serving in various leadership positions throughout DOD and the services. The policy is based on the conviction that homosexual service behavior is incompatible with military service in that it interferes with maintaining good order, discipline, and morale. DOD officials do not contend that homosexuals cannot or do not perform as well on the job as heterosexuals; in fact, in some cases commanders have noted that homosexuals are extremely good performers. For example, an interesting opinion regarding homosexuality was expressed in a recent message from the Commander of the Naval Surface Fleet, Atlantic. The message stated:

Experience has shown that the stereotypical female homosexual in the Navy is more aggressive than her male counterpart, intimidating those women who might turn her in to the chain of command. As a result, the ability to obtain credible evidence during an investigation of female homosexuality is often stymied, and all that remains are unsubstantiated rumors leading to accusations of a "witch-hunt" as investigations unsuccessfully search for evidence. Experience has also shown that the stereotypical female homosexual in the Navy is hardworking, career-oriented, willing to put in long hours on the job and among the command's top professionals. As such, allegations that this woman is a homosexual, particularly if made by a young and junior female sailor with no track record, may be dismissed out of hand or pursued half-heartedly.

Defense officials contend that DOD and the services understand the elements critical to ensuring the proper emotional bonding of personnel in military units. In addition, these officials state that a major factor that must be considered when examining the exclusion policy is the lack of

**LCR Appendix Page 0916**

acceptance of homosexuals in general and of homosexuals in the military in particular. According to these officials, homosexuality is not an acceptable behavior in society's eyes, and military policy should reflect this standard. DOD policy officials stated that the courts have consistently upheld DOD's position and that the agency has no intention of changing existing policy.

To examine the evidence or rationale DOD has for its policy, we reviewed documents related to its 1982 policy revision. This was the last time DOD revised and clarified the policy. It appears that the main purpose of that revision was to ensure more consistent application of the policy—not a review of the validity of the underlying rationale. For example, in a January 16, 1981, memorandum to the service Secretaries and the Chairman of the Joint Chiefs of Staff, the Deputy Secretary of Defense stated:

> The revision contains no change in policy. It reaffirms that homosexuality is incompatible with military service. In order to provide workable policies and procedures for all the military departments, however, and to provide the strongest possible basis for supporting these policies and procedures in court, it is important that applicable provisions be both clear and uniform.
>
> [Text omitted.]
>
> I have personally worked on this problem from time to time during most of the four years I have served in the Department. I firmly believe that the most important aspect of our policy is the ability to keep homosexuals out of the service and to separate them promptly in the event they are in fact enlisted or commissioned.

## Judicial Consideration of DOD's Policy

The courts have consistently upheld DOD's policy on homosexuality as constitutional under a rational basis standard of review. Under this standard, the government is only required to establish that regulations implementing the policy are rationally related to legitimate governmental interests. According to DOD, the courts have not required scientific evidence to support DOD's policy. The courts, giving special deference to military judgments, have accepted as legitimate governmental interests such military objectives as good order, morale, and discipline, without requiring the government to produce scientific evidence to support the policy. In more limited contexts, a few federal courts have cautioned DOD on nonconstitutional grounds concerning application of the policy. For example, it has been held that the government must afford a member facing discharge under military regulations that contain an exception to the policy a reasoned explanation as to why that member does not come within

the exception, including a fact-sensitive inquiry into the member's particular circumstances. Also, one federal court has held that the Army could not deny a service member's reenlistment under its regulations when the service, with full knowledge of the member's homosexuality, has repeatedly permitted the member to reenlist in the past. Appendix I lists examples of homosexual expulsions for which performance was not an issue.

## Studies Initiated by DOD and the Services Do Not Address the Policy's Rationale

DOD and the services identified two major efforts completed in the last 35 years that dealt with homosexuality. These efforts included the Navy's 1957 "Crittenden Report" and a 1988 draft of a report by the Personnel Security Research and Education Center (PERSEREC), which was initiated in 1986. Basically, the Crittenden Report was undertaken to look at the Navy's procedures and standards in processing homosexuals out of the military. The PERSEREC study was undertaken specifically to examine the security risk associated with civilian personnel who were homosexuals. Despite the specific objectives of these studies, both addressed issues concerning the overall suitability of homosexuals to serve in the armed forces.

### Navy Crittenden Report

The Report of the Board Appointed to Prepare and Submit Recommendations to the Secretary of the Navy for the Revision of Policies, Procedures and Directives Dealing with Homosexuals was submitted to the Secretary of the Navy on March 15, 1957. This document is informally called the "Crittenden Report," after the Board's Chairman, who was appointed in 1956 to examine various issues surrounding the Navy's policies, procedures, and directives governing homosexuals, including security risk implications. Although at the time of the study there was increased knowledge of homosexual behavior and treatment, specific questions had been raised on which the Board was specifically asked to make recommendations. The Board's recommendations were to address issues involving one-time offenders, voluntary confessions, types of discharge, treatment of offenders, clinical evaluations, review procedures, responsibility to the civilian community, the screening of applicants for enlistment, the treatment of women, and related administrative practices. The Board was not asked to examine the validity of the rationale underlying the policy. However, it contained considerable information regarding the status of research and homosexuality in the Navy.

LCR Appendix Page 0918

The Board, comprised of several members from the U.S. Navy and the U.S. Marine Corps, reported its findings and recommendations to the Secretary of the Navy in a three-part document, which did not question the underlying DOD policy on homosexuality, but concluded in part, the following:

> The Board was unable to uncover any statistical data to prove or disprove that homosexuals are in fact more of a security risk than those engaged in other unsocial or immoral activity. Even the number of cases of blackmail revealed as a result of past investigations, which were cited to the Board, is negligible.

[Text omitted.]

> The Board is in agreement that a homosexual is not necessarily more of a security risk, per se, than other transgressors of moral and criminal codes. Further the Board recognizes that the propensities and vulnerabilities associated with homosexual activity, as in the case of promiscuous heterosexual activity, do provide serious security implications.

The report further stated that: "Isolated cases are mentioned, but to determine that a homosexual is more of a security risk than a non-homosexual, these instances would have to be measured against security breaks by non-homosexuals, and against the proper observance of security by homosexuals."

The report further explained that:

> There is considerable information which would indicate that other factors in the personality constitute the security risk rather than the factor of homosexuality alone. One such item, for example, would be feelings of inadequacy which drive a man to boast of the secrets he possesses. Such boasting might very well be done to any sexual partner, whether the partner be homosexual or heterosexual. Some intelligence officers consider a senior officer having illicit heterosexual relations with the wife of a junior officer or enlisted man is much more of a security risk than the ordinary homosexual.

The report also stated that, although there are some homosexuals who have adjustment difficulties in coping with military life, the difficulties may or may not be due to their homosexuality. According to the report, there have been many documented instances of individuals who have reported themselves as having homosexual tendencies and who nonetheless have continued on duty and served honorably and well.

## Research on Personnel Security by PERSEREC

An effort to examine the correlation between homosexuality and security risk violations by civilian employees was undertaken by the Defense Personnel Security Research and Education Center at the direction of the Deputy Under Secretary of Defense for Security Policy. PERSEREC, established in 1986, is a DOD research, analytical, and educational facility whose missions are to (1) perform personnel security research and analysis for DOD and (2) furnish educational assistance, instruction, and advice on personnel security research to DOD components. PERSEREC now operates under the guidance of the Assistant Secretary of Defense (Command, Control, Communications and Intelligence) in Washington, D.C., and is based in Monterey, California.

In 1986, PERSEREC was tasked with validating and reporting on existing criteria for granting civilian personnel security clearances and with developing more objective, uniform, and valid adjudication standards. For example, PERSEREC was to clarity relationships between risk and various personal characteristics, including sexual orientation.

In December 1988, PERSEREC completed a draft report entitled Nonconforming Sexual Orientations and Military Suitability. Although it did not address the results of the 1957 Crittenden report, it echoed the security observations of that report.

The PERSEREC draft report revealed no evidence that homosexuality is related to security risk violations or that sexual orientation affects an individual's suitability for military service. In fact, the report stated that the development of ethnology as an area of study has made possible more precise examination of the influence of biological factors on the formation of sexual orientation. In addition to including data supporting a biological cause for homosexuality, the authors stated that they had examined recent and contemporary studies that led to the inference that homosexual men and women as a group are not different from heterosexual men and women in regard to their adjustment or job performance. The report also made the following comments regarding DOD's policy on homosexuals in the military:

The intensity of prejudice against homosexuals may be of the same order as the prejudice against blacks in 1948, when the military was ordered to integrate.[1]

---

[1] Presidential Executive Order 9981, July 26, 1948.

LCR Appendix Page 0920

The order to integrate blacks was first met with stout resistance by traditionalists in the military establishment. Dire consequences were predicted for maintaining discipline, building group morale, and achieving military organizational goals. None of these predictions of doom has come true.

Although the draft report did not specifically address the integration of women in the military, it stated that it would be possible to set out as a hypothesis and test directly and indirectly the question of whether the presence of men or women identified as nonconforming in sexual orientation actually influences such features of military life as discipline, group morale, and integrity.[2] Direct testing would involve integrating men who identify themselves as holding nonconforming sexual attitudes with men who do not so identify themselves. The same design could be used for women.

The report also stated that:

Social science specialists helped develop programs for combating racial discrimination, so that now the military services are leaders in providing equal opportunity for black men and women. It would be wise to consider applying the experience of the past 40 years to the integration of homosexuals.

Although the PERSEREC draft was submitted in late 1988, it was rejected by DOD because it went beyond the requested scope, which was to determine security risk implications, and, instead, addressed the suitability of homosexuals serving in the military. The study was not finalized until September 1991, and the report was revised at least three times at DOD's direction in order to focus on its assigned task.

The following quotes were extracted from PERSEREC's draft 1988 report:

During the period 1981-1987, 4,914 men were separated from the Army and the Air Force on the grounds of homosexuality. Of these, 40 percent of the Army sample and 50 percent of the Air Force sample held Secret or Top Secret security clearances. It is reasonable to suppose that background investigations had yielded no information that would indicate that the subjects were security risks . . . .

[Text omitted.]

The argument goes that they would be candidates for blackmail if a foreign agent learned that they were homosexuals. This argument is somewhat blunted when we remind ourselves

[2]In 1948 Congress acknowledged the quality and value of the contribution women made in World War II and passed the Women's Armed Services Integration Act of 1948.

**Chapter 3**
**Support for DOD's Policy on Homosexuality**

that blackmail is also an option for foreign agents who acquire knowledge about heterosexual men and women secretly engaged in adultery. Also, decriminalizing homosexual behavior has done much to decrease the danger of blackmail.

Studies of homosexual veterans make clear that having a same gender or an opposite-gender orientation is unrelated to job performance in the same way as is being left- or right-handed.

In its conclusions and recommendations, the 1988 draft report stated that the time was ripe for DOD to engage in empirical research to test the hypothesis that men and women of atypical sexual orientation can function with heterosexuals appropriately in military units. The report further suggested that DOD use a general framework for developing research programs and that the findings of such research could be employed by DOD policymakers as they continue their efforts to improve the effectiveness of recruitment, selection, and training programs.

Although the scope of the finalized version of the PERSEREC report, dated September 1991, was narrower than earlier versions (that is, it addressed only the civilian personnel security issue), it contained much of the same basic information included in the 1988 version. For example, the 1991 report stated:

Few data have been put forward to support the belief that being homosexual predisposes a person to unreliability, disloyalty, or untrustworthiness. Scores of studies have made clear that large individual differences in moral beliefs are to be found among heterosexuals and homosexuals. It is invalid to generalize from sexual orientation to trustworthiness. Life styles of homosexuals are as varied as the life styles of heterosexuals.

The conclusions and recommendations of the 1991 report were considerably narrower than those included in the 1988 version. For example, the 1991 report concluded and recommended the following:

Homosexuals have been targets of discriminatory policies. The residues of earlier constructions of homosexuality (sin, crime, or illness) may influence personnel security specialists to treat homosexuals as a morally suspect class. Given that homosexuals (like heterosexuals) are a diverse group, fairness and personnel efficiency require a case-by-case policy. The current case-by-case policy is appropriate to the task of determining eligibility for security clearance. However, the implementation of the policy needs to be examined in light of the fact that investigators, adjudicators, and other personnel security specialists are drawn from the general population, and large segments of the population continue to view homosexuality as sin, crime, or illness, constructions that might bias eligibility decisions. The work of investigators and adjudicators should be monitored to ensure that practice follows policy.

**LCR Appendix Page 0922**

According to the Deputy Director for Personnel Security, the recommendation is not for DOD to take any new actions but reinforces what DOD is already doing—which is looking at each situation on a case-by-case basis. DOD has several initiatives ongoing that address the report's recommendations. For example, DOD has had a 2-week adjudication course in place since 1988 to teach and encourage adjudicators to put their own personal prejudices and biases aside when making adjudication decisions not only for homosexuals but for anyone involved in trying to obtain a security clearance. DOD has also devised a 2-week advanced course for adjudicators that will focus on promoting uniformity and consistency in the application of DOD's adjudication standards. According to the Deputy Director of Personnel Security, this course was to be offered to the adjudicators sometime in May 1992. In addition, on the basis of PERSEREC's review of DOD's adjudication standards, DOD is revising its standards to improve their specificity and clarity.

In commenting on a draft of this report, DOD disagreed with our observation that the Crittenden and the PERSEREC reports did not support DOD's policy. DOD explained that, as GAO had stated, the Crittenden study looked at the Navy's procedures and standards in separating homosexuals. According to DOD, its premise that homosexuality is incompatible with military service was the foundation for the study, and the report did not question that premise.

We do not disagree with DOD regarding the purpose and objective of the Crittenden report and did not suggest that this effort questioned the underlying premise to DOD's policy. However, we did find that the study contained considerable information and data that raise questions about the policy. For example, with regard to security risk, the report stated, "A third concept which persists without sound basis in fact is the idea that homosexuals necessarily pose a security risk." In addition, the report made the following summary statements: (1) homosexual behavior is much more frequent than has been generally believed; (2) many exclusively homosexual persons have served honorably in all branches of the military service without detection; (3) homosexual behavior cannot be correlated with any other characteristic or group of characteristics of the personality; and (4) the concept of homosexuality as a clinical diagnosis has been discarded.

DOD further commented that the PERSEREC draft report was misdirected. PERSEREC was tasked with studying the correlation, if any, between homosexuality and security risks for DOD civilian employees and

LCR Appendix Page 0923

**Chapter 3**
**Support for DOD's Policy on Homosexuality**

government contractors. The purpose of the study was to help the
Department assess homosexuality as a factor in adjudicating security
clearances for civilian and contractor employees. The study was never
commissioned to address the homosexual exclusion policy—an entirely
separate and broader issue based on uniquely military concerns. DOD also
commented that the draft report's authors had not discussed the draft with
knowledgeable DOD officials, and as a result, they had misunderstood the
policy and its basis (that is, DOD's belief concerning the effects on morale,
discipline, and so on of allowing homosexuals to serve in the military). DOD
said that therefore the subsequent analysis was flawed. Further, DOD
emphasized that the opinions expressed in the report did not reflect those
of the Department and, thus, should not be considered as authoritative.

We recognize that the PERSEREC study went beyond its directed task.
However, we believe that DOD should not discount the information
obtained and presented because such data was not authorized as part of
the original task. The PERSEREC draft did, in fact, address homosexuality in
the context of its effects on morale and discipline in the services.

## Recent DOD Statements Indicate Security Risk Is No Longer a Major Concern

In testimony delivered on July 31, 1991, the Secretary of Defense, in
defending DOD's policy, made the following remarks:

> I have inherited a policy that has been in the department now for many years that does focus
> specifically upon the military and military service and is based upon the proposition that a
> gay lifestyle is incompatible with military service. That is the policy. I think there have been
> times in the past when it has been generated on the notion that somehow there was a
> security risk involved, although I must say I think that is a bit of an old chestnut. The
> question turns more upon the need of the department to maintain the combat-effectiveness
> of our military units and that our sole mission in life is to be prepared to fight and to win
> wars. And that based upon that, the department over the years, specifically the military
> services, have pursued a policy that said that certain kinds of individuals in our society are
> not, do not serve in those combat units.

In a statement before the House Budget Committee in February 1992, the
Chairman of the Joint Chiefs of Staff said that he agreed with the Secretary
of Defense. He said that the ban on homosexuals serving in the military is
not based on a security argument but on his judgment and the judgment of
the service chiefs that homosexual behavior is inconsistent with
maintaining good order and discipline. He stated that it is difficult in a
military setting, where there is no privacy and where you do not get a
choice of where you live, to introduce a group of individuals—who are
proud, brave, loyal, good Americans but favor a homosexual life-style—and
put them in with a group of heterosexuals who would prefer not to have a

**LCR Appendix Page 0924**

person of the same sex find them sexually attractive, put them in close proximity, and ask them to share the most private of their facilities together—the bedroom in the barracks, the latrines, and the showers.

## Scientific Evaluations of Homosexuality

Scientific and medical studies disagree with the military's long-standing policy holding that homosexuality is incompatible with military service. During the course of our review, we met with representatives from the American Psychiatric Association and the American Psychological Association, as well as other mental health professionals, and were told that these organizations do not support DOD's exclusion of homosexuals. These organizations, through various steps, are trying to convince DOD to change its policy to improve the mental health and functioning of its members and to help end the discrimination that they believe can lead to psychological distress and psychiatric disorder. These steps include (1) dialogues between gay and lesbian groups and the military; (2) the banning of military advertising and recruiting either at association meetings or in association publications; and (3) the protesting of military training programs, such as Reserve Officer Training Corps programs, on university and college campuses.

The concept of homosexual orientation as a mental disorder was formally rejected by the psychiatric profession about 20 years ago. In 1973, the American Psychiatric Association removed homosexuality from the list of mental illnesses after psychiatric, psychological, medical, and scientific evidence showed that it could not be considered a mental illness or a personality or psychopathological disorder. The Association's 1973 position on homosexuality and homosexuals in the military was that "homosexuality per se implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." Furthermore, rejecting the conception of homosexual orientation as a pathology has been supported by psychology and social work.

The American Psychological Association's resolution of January 1975 supported the position taken in 1973 by the American Psychiatric Association by also opposing the exclusion and dismissal of persons from the armed services on the basis of sexual orientation. Further, the American Psychological Association asserted that (1) no burden of proof of judgment, capacity, or reliability should be placed on homosexuals that is greater than that imposed on any other persons within the armed services and (2) homosexuals should be granted the same protection from discrimination as other minorities are granted. According to DOD officials,

**Chapter 3**
**Support for DOD's Policy on Homosexuality**

they agree with the conclusions of these organizations in stating that homosexuality is no longer to be considered indicative of any mental or physical disorder.

According to those we interviewed and position papers provided by the organizations we visited, current research supports the idea that homosexuality can no longer be viewed as "abnormal" if a significant minority of the population engage in it at some time in their adult lives.[3] Instead, homosexuality is now considered by many social scientists and researchers (1) to be a normal variation in the spectrum of human sexual behavior and (2) not pathological or indicative of any mental illness or impairment in functioning. Many social scientists and researchers now believe that discrimination against homosexuals leads to unhealthy behavior and attitudes on both sides. Further, many experts believe that the military's policy is unsupported, unfair, and counterproductive; has no validity according to current scientific research and opinions; and appears to be based on the same type of prejudicial suppositions that were used to discriminate against blacks and women before these policies were changed.

Over the years, many studies have documented homosexuals' mental health and their level of functioning. Some experts have looked at homosexuals in the military and found that many performed well despite the nonaccepting attitude of the services. Experts believe that when homosexuals experience a higher incidence of depression or drug abuse, they may do so in part because they are unable to integrate their sexuality because of homophobia,[4] both internal and external. Many experts believe that DOD's exclusion policy perpetuates this homophobia and leads to further discrimination against homosexuals, which in turn leads to an atmosphere not conducive to their mental health or that of those prejudiced against them. These experts believe that attitudes can be altered by allowing open communication and the sharing of ideas between the two groups. If a more tolerant attitude were enforced, it would lead to the better functioning of all.

---

[3] Surveys of human sexuality conducted by the Kinsey Institute in the 1940s and 1950s, though their samples of patients were flawed, demonstrated that homosexual behavior was much more prevalent than expected. These surveys suggested that 5 to 10 percent of the general adult population could be considered predominantly homosexual and that approximately one-third had engaged in such behavior sometime in adulthood.

[4] A common term used to connote an inexplicable fear of homosexuality.

**LCR Appendix Page 0926**

**Chapter 3**
**Support for DOD's Policy on Homosexuality**

DOD partially agreed with our statement that scientific and medical studies disagree with the long-standing military policy that holds that homosexuality is incompatible with military service. DOD stated that the American Psychological Association and the American Psychiatric Association have written to DOD expressing their disagreement with its exclusion policy, but neither has addressed the issue of overall combat effectiveness. According to DOD, these groups focus on homosexuals in the general population and the relationship between homosexuality and the mental health of the individual.

As discussed in this report, many individuals discharged under DOD's exclusion policy have exemplary records and have held important positions within their units. Additionally, the research cited by groups that disagree with DOD's policy includes studies looking at veterans of military service who have served honorably.

LCR Appendix Page 0927

Chapter 4
# Public Attitudes and Other Views

We obtained information about the general U.S. population's attitudes toward homosexuality through nationwide polls; we also contacted representatives of other nations to determine how their policies were similar to or different from DOD's. Finally, we contacted police and fire departments in several major U.S. cities where policies of nondiscrimination against sexual preference have been established.

## Changes in Public Perceptions

Information from three national polls shows a shift in society's thinking on homosexuality. National polls conducted in the mid-1980s showed an increasing intolerance of homosexuality at a time when the fear of contracting Acquired Immune Deficiency Syndrome (AIDS) was at its highest point among the general public. But new surveys show that this trend is reversing. In October 1989, a Gallup poll found that the tolerance of homosexuality was on the rise among the public. The results of the poll show that from a sample of 1,227 adults, aged 18 and older, almost half (47 percent) believed that homosexual relations between consenting adults should be legal, up from one-third (33 percent) who felt that way in 1987. Seven in 10 (71 percent) felt that homosexuals should have equal job opportunities, compared to 6 in 10 (59 percent) in 1982. In 1989, just over one-third (36 percent) believed that homosexual relations should not be legal, whereas more than half opposed legalization in 1987 (55 percent). The results of another Gallup poll conducted in March 1991, shown in table 4.1, show a change in the trend of public opinion on the hiring of homosexuals in various job categories.

**Table 4.1: Percentage of the Public Who Believed That Homosexuals Should Be Hired for Various Jobs**

Figures in percentages

| Job category | 1977 | 1982 | 1985 | 1987 | 1989 | 1991 |
|---|---|---|---|---|---|---|
| Salesperson | 68 | 70 | 71 | 72 | 79 | 89 |
| Armed forces member | 51 | 52 | 55 | 55 | 60 | 69 |
| Doctor | 44 | 50 | 52 | 49 | 44 | 54 |
| Clergy member | 36 | 38 | 41 | 42 | 44 | 54 |
| Elementary school teacher | 27 | 32 | 36 | 33 | 42 | 52 |
| High school teacher | a | a | a | a | 47 | 60 |

[a]The poll did not address this category between 1977 and 1987.
Source: National Gallup Poll, Mar. 25-27, 1991.

A national poll conducted in April 1991 by Penn and Schoen Associates, Inc., for the Human Rights Campaign Fund on "Public Attitudes Towards Homosexuals and Their Place in the Military" further supports the fact that

LCR Appendix Page 0928

Chapter 4
Public Attitudes and Other Views

the public's attitude towards homosexuals' serving in the military has changed. According to this poll, 81 percent of Americans believed that homosexuals should not be discharged from military service solely because of their sexual orientation. Fourteen percent believed homosexuals should be discharged.

## Other Nations' Policies

In the course of our work, we obtained information on the policies of 17 other nations, predominantly U.S. allies and North Atlantic Treaty Organization countries, on homosexuals' serving in their armed forces. (See app. II for a listing of these countries.) These nations had various, sometimes diametrically opposed approaches to and legislation affecting the presence of homosexuals in their armed forces. The attitudes ranged from the view held by the United States to less strict ones in other countries. Some, in fact, do not view homosexuality as a legal or a military issue. Four of the 17, or 24 percent, had policies that specifically exclude homosexuals from serving in the armed forces. Four of the remaining 13 restricted homosexuals' duties or relieved them from duty for disruptive behavior. Seven of the 17, or 41 percent, had no written policy addressing homosexuality. Two of the 17, or 12 percent, stated that during the recruiting process, the question regarding the individual's sexual orientation was not asked.

The Canadian Forces has also had a long-standing policy of excluding homosexuals. The Canadian policy on homosexuality was reviewed in detail in 1986 as part of a wider review by a special task force of a number of personnel policies. The task force's recommendation was to maintain the policy of not accepting declared homosexuals into the Canadian Forces. That recommendation was accepted in early 1987. However, the policy on homosexuality has been under review almost continuously since that time.[1]

Over the past few years, the Canadian Forces' policy has changed in that its focus has changed from targeting "homosexual propensity" to targeting "homosexual activity." On an interim basis, pending the completion of the present policy review, members who engage in homosexual acts are offered the opportunity to be discharged. If they refuse, they may complete their terms of service under career restrictions, including no promotions, no postings elsewhere, and no further career training. Discharged

---

[1] Currently, there are five court challenges to the Canadian Forces' policy on homosexuality. None of these had come to trial by March 11, 1992.

LCR Appendix Page 0929

members are given the equivalent of what is an honorable discharge in the United States.

The British Defense Force, like the U.S. military, is an all-volunteer force and is opposed to having homosexuals serve in the military. British Defense Force officials recently told us that the British Defense Force does not knowingly accept homosexuals. However, for homosexuals identified while in service, Britain provides a system of warnings, meaning that an individual who admits to his or her homosexuality need not be automatically discharged, but rather can be reminded of the military's disapproval of homosexual activity, warned against any misconduct, and perhaps counseled. A British embassy official told us that the issue of homosexuals' serving in the British military had been raised in Parliament, but there was no mention of changing the policy.

The policies of Denmark, France, Belgium, Italy, and Finland specifically state that individuals whose homosexuality interferes with their ability to effectively perform required duties are to be discharged. They are discharged only after medical diagnoses have been provided and medical decisions of fitness have been rendered by physicians.

## Selected Police/Fire Department Policies

All but one of the eight police and fire departments we visited in four cities had written policies dictating nondiscrimination on the basis of sexual preference or allowing the employment of homosexuals. Many of these policies dated as far back as the mid-1970s. None of the officials we interviewed from these departments viewed homosexuality as an issue; most believed that the key element in their hiring practices was to hire based on previous job performance—not on an individual's sexual orientation. Several of the department officials saw the inclusion of homosexuals as having a positive impact on management-personnel relations.

Both police and fire department officials stated that the elements of unit/team cohesiveness, discipline and good order, morale, trust and confidence, and a system of command rank and respect are important to their overall mission.

Police and fire department officials who have admitted homosexuals into their departments stated that homosexuals and heterosexuals appear to have acceptable working relationships. This may be due partly to the fact that all of the departments we visited had developed and put in place

sensitivity, diversity, and/or cultural awareness training programs. While most department officials did not identify major problems involving homosexuality, a few pinpointed isolated cases indirectly involving homosexuals. In these cases, the issues focused not on the person's homosexuality, but on his or her religious beliefs and/or job performance.

In terms of security breaches, most police and fire department officials stated that, while some assignments are considered confidential or secret in nature, most department officials believed that homosexuals, whether "closeted or admitted," were no more subject to breaches of security or blackmail than heterosexuals.

Most of the police and fire departments with policies endorsed by the city mayors and department chiefs target their recruiting to gay and lesbian communities as well as to the communities of blacks, Hispanics, and Asians. In fact, some departments have gay and lesbian liaisons, councils, task forces, and/or a gay officers' action league to assist the department in its recruiting efforts and in maintaining or bringing about equality and balance throughout the department. Additionally, some fire and police department officials stated that the public seems to view their open policies as positive moves in that they break down barriers in society. These officials cited the advances made in race relations as evidence that attitudes can be changed. Some other officials stated that they believe exclusionary policies based on sexual orientation are counterproductive and only create further stress.

LCR Appendix Page 0931

Chapter 5

# Conclusions and Agency Comments

## Conclusions

For more than 50 years, DOD and its predecessors have excluded homosexuals from military service. This policy is based on the belief that the presence of homosexuals seriously impairs the accomplishment of the military mission. Because this policy is based on military judgment, it is difficult to challenge. The courts have routinely accepted DOD's judgment on the policy in cases brought by discharged homosexuals. DOD has stated that its policy is not based on scientific or sociological analysis. Studies of the security risk issue have refuted DOD's position, but there are other bases for the policy that may not lend themselves to conclusive analysis.

On May 19, 1992, H.R. 5208, a bill to prohibit discrimination by the armed forces on the basis of sexual orientation was introduced. While we are making no recommendations in this report, we believe this report should assist the Congress in deliberating legislative initiatives relative to changing DOD's policy, which excludes homosexuals from serving in the U.S. armed forces. In deliberations, Congress could consider the following factors:

- Since DOD last revised the policy in 1982, public attitudes toward homosexuals have been changing, and its own PERSEREC draft report disclosed considerable information that raised questions about the policy.
- Several allied countries allow homosexuals into the military or are reassessing their policies on homosexuals; many U.S. police and fire departments have also accepted homosexuals into their ranks and have generally not reported adverse impacts.
- Recent congressional testimonies by the Secretary of Defense and the Chairman of the Joint Chiefs of Staff indicate that the concern over homosexuals' being security risks, which was once a significant basis for the policy, is no longer a major concern.
- There are many avenues for discharging military personnel, including homosexuals, who have behavior problems; changing the policy to permit homosexuals to remain in the military would not entail condoning inappropriate behavior.
- A careful look at the policy may reveal a middle ground similar to what some other countries have taken, discouraging homosexuals from joining the military but not automatically discharging those who are already in it.

LCR Appendix Page 0932

Chapter 5
Conclusions and Agency Comments

## Agency Comments

In commenting on a draft of this report, DOD agreed or partially agreed with some findings and did not agree with others.

DOD said that its homosexual exclusion policy is not based on any belief that homosexuality is a mental disorder, nor is it based solely on security concerns. DOD said that we correctly note that the DOD policy is based on military judgment and that scientific or sociological analyses are unlikely to affect its policy of excluding homosexuals from the military. DOD said that the courts consistently have found that the military interests underlying the policy—good order, discipline, and morale—were substantial and that military concern about homosexuality has a basis in fact.

DOD said that we erred in stating that the two cited reports did not support DOD's policy. DOD said that the Crittenden Report clearly supported the policy and that the PERSEREC draft misstated the policy. That is, DOD said that the PERSEREC draft did not address the issues of morale, discipline, and so on, and, therefore, its "analysis" was flawed.

DOD correctly states that the Crittenden report did not question the premise of DOD's exclusionary policy - - that homosexuality is incompatible with military service - - and our report points this out. However, the report that was issued in 1957 stated that (1) many homosexuals have served honorably in all branches of the military and (2) the concept that homosexuals pose a security risk is unsupported. It also noted that, while there were not accurate figures concerning the frequency of homosexual behavior in the Navy, indications were that the number of homosexuals disclosed represented only a very small proportion of those in the Navy.

With regard to the PERSEREC draft, we recognize that this study went beyond its directed task. However, we believe that the information presented should not be discounted by DOD solely for that reason.

In a draft of this report, we suggested that individual Members of Congress may wish to direct the Secretary of Defense to reconsider the basis for DOD's prohibition. Because legislation has since been introduced on this matter, we have deleted this suggestion.

LCR Appendix Page 0933

GAO/NSIAD-92-98 DOD's Policy on Homosexuality

LCR Appendix Page 0934

Appendix I

# Examples of Expulsions for Which Performance Was Not an Issue

## Matlovich v. Secretary of the Air Force

Former Technical Sergeant Leonard P. Matlovich was a 12-year Air Force veteran who had served a tour of duty in Vietnam and had received a Bronze Star and a Purple Heart. Matlovich informed the Secretary of the Air Force in writing of his belief that his sexual preferences were homosexual, although he did not believe these preferences would in any way interfere with his Air Force duties. Under an Air Force regulation that bars homosexuals except in exceptional situations, he was administratively processed for separation after admitting his sexual orientation and his engagement in homosexual activity. Subsequently, Matlovich was honorably discharged. On the day before his discharge, Matlovich filed suit with the United States District Court for the District of Columbia Circuit, seeking a temporary restraining order against his discharge and an injunction and declaratory relief against the Air Force on the grounds that its policy was unconstitutional. The District Court ruled in favor of the Air Force, stating that, although there had been times when, due to extenuating circumstances, the Air Force had retained persons who had engaged in homosexual acts, there was no need to consider this case an exception (exceptions have been granted to only one-time offenders). The United States Court of Appeals for the District of Columbia (591 F.2d 852 (D.C. Cir. 1978)) held that it was unable to determine from the record why the Air Force had not retained Matlovich under the "unusual circumstances" exception to the general policy and remanded the case to the district court. The appeals court instructed the Air Force to either promulgate advance written rules or directives, or formulated criteria; or to establish the standards for the policy through case-by-case decision-making and apply those standards to Matlovich's case. The case was subsequently dismissed on December 16, 1980, pursuant to a court-approved monetary settlement between Matlovich and the Air Force.

## Secora v. Fox

Former Technical Sergeant Claude E. Secora was a 16-year active duty veteran in the United States Air Force serving as a computer operator. He was the recipient of the Air Force Commendation medal and the National Defense medal. Secora was administratively processed for separation in 1978 under an honorable discharge on the grounds that he had violated the same Air Force regulation challenged in the Matlovich case. Secora filed suit in the United States District Court for the Southern District of Ohio on the grounds that the Air Force regulation was unconstitutional and that it had denied him equal protection.

A federal magistrate, upon declining to address the constitutional issues, relied on the Matlovich decision in finding that the Air Force had not

complied with its own regulations in discharging Secora because it had failed to put forth its reasons for not retaining him under the "unusual circumstances" exception to the general policy of discharging officers who engage in homosexual activity. The District Court agreed with the magistrate and ruled that Secora was entitled to a reasoned explanation with respect to the regulation as to why he did not come within the "unusual circumstances" exception (747 F. Supp. 406 (S.D. Ohio 1989)). The court held that such an explanation required a fact-sensitive inquiry into Secora's particular circumstances, especially since he was facing discharge notwithstanding a 16-year, unblemished service record. The court ruled that the Air Force must show cause why Secora did not meet the Air Force's rule of exception to its policy if there was no current pattern of homosexuality and Secora's ability to perform military service had not been compromised. Both parties have moved for summary judgment in the District Court, where the case is currently pending.

## Watkins v. United States Army

Former Staff Sergeant Perry Watkins was a 14-year active duty veteran in the United States Army, who had served tours in Vietnam and Korea. He had been completely candid about his homosexuality from the start of his Army career and had been allowed to reenlist on three occasions (in 1971, 1974, and 1979), with the Army's full knowledge of his homosexuality. The record indicates that in all respects Watkins was an outstanding soldier. He became, in the words of his commanding officer, "one of our most respected and trusted soldiers." This official stated that "from daily personal contact I can attest to the outstanding professional attitude, integrity, and suitability for assignment within the Personnel Reliability Program, of SP5 Watkins." While Watkins' case was making its way through eventual appeals in the federal courts, the Army rated his performance and professionalism. He received 85 out of 85 possible points, including perfect scores for the categories "earns respect," "integrity," "loyalty," "moral courage," "self-discipline," "military appearance," "demonstrates initiative," "performs under pressure," "attains results," "displays sound judgment," "communicates effectively," "develops subordinates," "demonstrates technical skills," and "physical fitness."

In 1982, Watkins filed suit in the United States District Court for the Western District of Washington challenging revocation of his security clearance and seeking to prevent his discharge from the Army under an Army regulation that mandated the discharge of all homosexuals regardless of merit. The District Court enjoined the Army from discharging

Watkins based on his admission of homosexuality. After the Army subsequently denied Watkins' reenlistment under a regulation making homosexuality a nonwaivable disqualification for reenlistment, the court held that the Army was estopped from relying on this regulation. After certain procedural maneuvers by the parties between the United States Court of Appeals for the Ninth Circuit (721 F.2d 687 (9th Cir. 1983)) and the District Court, a panel of the appeals court held that the reenlistment regulations violated the constitutional guarantee of equal protection because they discriminated against persons of homosexual orientation and were not necessary to promote a legitimate compelling governmental interest (847 F.2d 1329, 1352-1353, (9th Cir. 1988)).

The full appeals court, declining to rule on the constitutional issue, held the Army to be estopped from barring Watkins' reenlistment solely on the basis of his acknowledged homosexuality (875 F.2d 699 (9th Cir. 1989)). The appeals court reasoned that Watkins had been completely candid about his homosexuality from the start of his career, and the Army, with full knowledge of this fact, had continued to reenlist him despite its long-standing policy to the contrary. In weighing the injustice to Watkins against the possible damage to the public interest, the court noted that Watkins, after having relied on the Army's 14-year approval of his service, had been injured by the loss of his career, whereas harm to the public interest from his reenlistment was nonexistent since he had demonstrated he was an excellent soldier. In 1990, the United States Supreme Court denied the Army's petition to review the case (875 F.2d 699 (9th Cir. 1989) cert. denied, —U.S. —, 111 S. Ct. 384, 112 L. Ed. 2d 395 (1990)), and Watkins and the Army subsequently agreed to settle. Watkins was promoted to the rank of sergeant first class effective June 1, 1992, and voluntarily retired. He received back pay and allowances with offsets from civilian pay earned for the period between his 1984 discharge and his retirement date.

## Pruitt v. Cheney

Former Captain Dusty Pruitt was a 15-year active and reserve veteran in the United States Army who was separated from the Army Reserve under an honorable discharge for homosexuality on July 19, 1986. Pruitt served in the Army between 1971 and 1975. After leaving active service to seek ordination as a methodist minister, Pruitt remained an officer in the U.S. Army Reserve. On May 25, 1982, Pruitt was notified of her selection for promotion to the rank of major effective February 6, 1983. Pruitt's outstanding record in both active and reserve service is undisputed.

Pruitt, who had no record of allegations of prohibited homosexual conduct, openly admitted in an interview published in the Los Angeles Times on January 27, 1982, that she was a homosexual. The Army, as a result of the article, suspended her promotion to major pending an investigation that ultimately resulted in her being discharged from the reserves based on an Army regulation providing for the discharge of a person who "desires to engage in, or intends to engage in, homosexual acts." On the basis of her written admission of homosexuality to her commanding officer, an administrative board concluded that separation of Pruitt was warranted, and she was discharged from the reserve effective July 9, 1986. Pruitt filed suit in 1987 in the United States District Court for the Central District of California (See Pruitt v. Weinberger, 659 F. Supp. 625 (C.D. Cal. 1987)) alleging that Army regulations had violated her first amendment rights because they called for punishment solely on the basis of her assertion of her status rather than any conduct in which she had engaged. The District Court dismissed Pruitt's action for failure to state a first amendment claim, reasoning that acknowledgment of her homosexuality was simply an admission that she fell within a class of people whose presence the Army deemed incompatible with its expressed goals, and it was not for the court to question the wisdom of the Army's policy. A three-judge panel of the United States Court of Appeals for the Ninth Circuit (943 F.2d 989 (9th Cir. 1991)) agreed with the District Court that Pruitt had failed to state a first amendment claim. The appeals court further held that Pruitt's case stated an equal protection claim—that she had been discharged based on her mere status as a homosexual without evidence that she had engaged in homosexual conduct while on duty or had performed poorly as an officer—which should have been heard by the District Court. The appeals court held that Pruitt should have been allowed to present evidence to support her equal protection allegations and that the Army should have been required to establish on the record that its regulation had a rational basis. Accordingly, the appeals court reversed the dismissal of Pruitt's action and remanded the case to the District Court to determine whether the Army's discrimination against Pruitt was rationally related to a permissible governmental purpose.

The Army has asked for reconsideration of the decision by the full appeals court, contending that Pruitt had not properly raised the equal protection claim in the District Court. The Army's request is currently pending before the appeals court, and the decision on rehearing is pending before the District Court.

LCR Appendix Page 0938

Appendix I
Examples of Expulsions for Which
Performance Was Not an Issue

## Steffan v. Cheney

Former midshipman Joseph C. Steffan was a 4-year student at the United States Naval Academy who was administratively processed for separation 6 weeks prior to graduating at the top of his class and after admitting he was homosexual. Although he was not charged with any homosexual conduct, he resigned on April 1, 1987, and was honorably discharged. On December 22, 1987, he filed suit in the United States District Court for the District of Columbia challenging DOD's policy of excluding homosexuals from active service, alleging that his separation violated his constitutional rights of free speech and association, due process, and equal protection. He sought reinstatement, a bachelor of science degree, and a commission as an ensign.

During the discovery phase of his case, Steffan refused to answer a deposition question asking whether he had engaged in homosexual activities while at the Academy or since departing on the grounds that the question was irrelevant and violated his fifth amendment privilege against self-incrimination.

In November 1989, the District Court (733 F. Supp. 121 (D.D.C. 1989)) dismissed Steffan's suit as a sanction for failure to cooperate in discovery regarding his homosexual activities. The court reasoned that Steffan could not refuse to answer on the grounds of irrelevance since the Navy had the right to refuse his reinstatement for homosexual conduct, and his request for reinstatement raised the issue of whether he was qualified for such relief. Moreover, the court stated that the Navy was entitled to information necessary to defend itself against Steffan's claims to such relief. In addition, the court reasoned that since Steffan had raised the issue of homosexual conduct by seeking reinstatement, he could not use the fifth amendment as a shield to frustrate the Navy's right to prepare a defense.

The United States Court of Appeals for the District of Columbia (920 F.2d 74 (D.C. Cir. 1990)) reversed and remanded to the District Court, holding that the discovery sanction was improper because Steffan's discharge was based solely on the grounds of his admission that he was homosexual; his request for relief on those grounds did not put into issue the question of whether he had engaged in homosexual conduct, unless such conduct was a basis for his separation. On December 9, 1991, the District Court (Cir. No. 88-3669-OG, D.D.C.) upheld the right of the Navy to expel Steffan from the Naval Academy, holding that the military's ban on homosexuals was justifiable on military grounds as well as a reasonable step toward protection against the spread of Acquired Immune Deficiency

LCR Appendix Page 0939

Syndrome in the armed forces. Steffan's attorneys have indicated that they will appeal the District Court's decision in the near future.

## Dronenburg v. Zech

Former petty officer James L. Dronenburg was a 27-year-old, 9-year veteran who had served in the Navy as a linguist and cryptographer with a top secret clearance. He had maintained an unblemished service record and earned many citations praising his job performance. During a Navy investigation and an administrative discharge hearing concerning allegations of homosexual conduct, Dronenburg acknowledged that he was a homosexual and that he had repeatedly engaged in homosexual conduct with a 19-year-old seaman recruit in the Navy barracks. On April 21, 1981, Dronenburg was honorably discharged for violating regulations implementing a Navy policy of mandatory discharge for homosexual conduct.

On April 20, 1981, Dronenburg filed suit in federal district court challenging the Navy's policy as unconstitutional on the grounds that it violated his right of privacy and right of equal protection of the laws. The district court granted summary judgment for the Navy, and Dronenburg appealed to the United States Court of Appeals for the District of Columbia. A three-judge panel of the Appeals Court (741 F. 2d 1388 (D.C. Cir. 1984)), concluding that it found no constitutional right to engage in homosexual conduct, applied the rational basis standard in reviewing Dronenburg's constitutional challenges to the Navy's regulation. In applying that standard, the court held that the Navy's policy did not violate Dronenburg's rights of privacy or equal protection because the policy is a rational means of achieving legitimate state interests such as discipline, good order, and morale. In so holding, the court noted the following:

The effects of homosexual conduct within a naval or military unit are almost certain to be harmful to morale and discipline. The Navy is not required to produce social science data or the results of controlled experiments to prove what common sense and common experience demonstrate... 741 F.2d at 1398. [Underscoring supplied.]

A rehearing on the case before a full panel of the appeals court was denied (746 F.2d 1579 (D.C. Cir. 1984)).

LCR Appendix Page 0940

## Ben-Shalom v. Marsh

Former Army Reserve Sergeant Miriam Ben-Shalom originally enlisted in the Army Reserve in 1974 for a 3-year period, serving as a drill instructor. She apparently was the only woman in her drill sergeant training school course and was acknowledged to be a fine candidate for drill sergeant school, a capable soldier, and an excellent instructor. Ben-Shalom publicly acknowledged her homosexuality at various times during her enlistment: in conversations with fellow reservists, in an interview with her division newspaper, and while teaching drill sergeant candidate class. During an investigation of the matter and at an administrative discharge hearing, there was never any evidence that she had engaged in homosexual conduct. On December 1, 1976, she was honorably discharged under an Army regulation that permitted discharge for any soldier who "evidenced homosexual tendencies, desire or interest, but is without homosexual acts." Ben-Shalom filed suit in the United States District Court for the Eastern District of Wisconsin seeking reinstatement on the basis that her discharge under the regulation had violated her constitutional rights of free speech and privacy and equal protection of the laws. The District Court (489 F. Supp. 964 (E.D. Wisc. 1989)) held the regulation to be constitutionally overboard and a violation of Ben-Shalom's right of privacy. The equal protection claim was denied because the court found she could not establish either a constitutionally protected "property" or "liberty" interest under the fifth amendment. The court ordered her to be reinstated for the remainder of her enlistment term.

Following additional court actions concerning enforcement of the reinstatement order, the Army eventually reinstated Ben-Shalom for her original enlistment term, which was extended by court order due to the protracted litigation.

While serving her original enlistment term, Ben-Shalom, again admitting her homosexuality, sought and was denied reenlistment for another 6-year term. She was denied reenlistment on April 7, 1988, under a new, reworded Army regulation making the status of homosexuality a "nonreviewable morale and administrative" disqualification. On May 3, 1988, Ben-Shalom filed suit in the United States District Court for the Eastern District of Wisconsin, claiming that the new regulation violated the first amendment because it chilled her right to freedom of speech since she would no longer be able to make statements regarding her sexual orientation. She also claimed the regulation violated her fifth amendment right to equal protection of the laws because the regulation was not necessary to achieving a compelling state interest or, alternatively, failed to rationally further a legitimate, articulated state purpose. The district court (702 F.

**Appendix I**
**Examples of Expulsions for Which**
**Performance Was Not an Issue**

Supp. 1372 (E.D. Wisc. 1989)) agreed with Ben-Shalom, holding that the regulation unreasonably chilled her right to freedom of speech and did not further a compelling state interest in violation of equal protection principles. The United States Court of Appeals for the Seventh Circuit reversed (881 F. 2d 454 (7th Cir. 1989)). The Appeals Court ruled that the regulation did not prohibit speech per se, but prohibited the homosexuality that Ben-Shalom's speech merely identified. The court reasoned that when speech and nonspeech elements are combined in the same course of conduct, limitations on speech are permissible when there is a sufficiently important governmental interest in regulating the nonspeech element. Regarding the due process claim, the court ruled that the deferential rational basis standard of review was applicable and that the regulation met this standard because it promoted a legitimate government interest. In 1990, the United States Supreme Court denied Ben-Shalom's petition to review the case (881 F.2d 454 (7th Cir. 1989), cert. denied, — U.S. —, 110 S. Ct. 1296, 108 L. Ed. 2d 473 (1990)).

LCR Appendix Page 0942

# Other Nations' Policies Regarding Homosexuals in the Military

| Country | Specifically exclude | Allow |
|---|---|---|
| Austria | | X |
| Belguim[a] | | X |
| Canada | X | |
| Denmark | | X |
| Finland[a] | | X |
| France[a] | | X |
| Germany[a] | | X |
| Italy | | X |
| Japan | | X |
| Luxembourg | | X |
| Netherlands | | X |
| New Zealand | X | |
| Norway | | X |
| Portugal | X | |
| Spain | | X |
| Sweden | | X |
| United Kingdom[b] | X | |
| United States[b] | X | |

[a]Although these countries allow homosexuals to serve in their armed forces, they place certain restrictions on homosexuals. These restrictions include (1) limiting their access to confidential documents; (2) excluding them from certain tasks, such as officer and recruiting training; (3) excluding them from leadership roles; and (4) relieving them from duty if the behavior becomes disturbing to other service members.

[b]These countries specifically ask during the recruiting process if the individual has homosexual tendencies in an effort to prevent homosexuals from entering.

LCR Appendix Page 0943

Appendix III

# List of Organizations Visited by GAO

International Association of Chiefs of Police
110 North Glebe Road, Suite 200
Arlington, Virginia 22201

International Association of Fire Chiefs
1329 18th Street, N.W.
Washington, D.C. 20036

District of Columbia Police Department
Room 5080
300 Indiana Avenue, N.W.
Washington, D.C. 20001

District of Columbia Fire Department
Suite 201
1923 Vermont Avenue, N.W.
Washington, D.C. 20001

New York City Police Department
1 Police Plaza
New York City, New York 10038

New York City Fire Department
250 Livingston Street
Brooklyn, New York 11202-5884

San Francisco Police Department
Hall of Justice, Room 525
850 Bryant Street
San Francisco, California 94102

San Francisco Fire Department
260 Golden Gate Avenue
San Francisco, California 94102

Seattle Fire Department
301 Second Avenue South
Seattle, Washington 98104

United States Capitol Police
119 D Street, N.E.
Washington, D.C. 20510

LCR Appendix Page 0944

Appendix IV

# Comments From the Department of Defense

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



ASSISTANT SECRETARY OF DEFENSE

WASHINGTON, D.C. 20301-4000

APR 17 1992

FORCE MANAGEMENT
AND PERSONNEL

Mr. Frank C. Conahan
Assistant Comptroller General
National Security and International
    Affairs Division
U.S. General Accounting Office
Washington, D.C.  20548

Dear Mr. Conahan:

This is the Department of Defense (DoD) response to the General Accounting Office (GAO) draft report entitled--"DEFENSE FORCE MANAGEMENT:  DoD's Policy on Homosexuals in the Military," dated March 9, 1992 (GAO Code 391137/OSD Case 8983).  The draft report addresses the basis for the DoD policy, describes the procedures, analyzes separation and cost statistics, and reviews various studies, public opinions polls, and policies of other nations.

The report makes no recommendations, but does suggest that Members of the Congress may wish to urge the DoD to reexamine the basis for the policy and determine whether the policy could be revised to better serve Military needs.  The Department agrees or partially agrees with some findings, does not agree with other findings, and disagrees with the matter for congressional consideration.

The GAO correctly notes that the DoD policy is based upon Military judgment.  In fact, the DoD policy is based upon a series of carefully considered, professional Military judgments and almost 50 years of experience by a succession of civilian and Military leaders.  The GAO also appropriately emphasizes that Military judgments about overall combat effectiveness are inherently subjective in nature, and that scientific or sociological analyses are unlikely to ever be dispositive.

An important issue not addressed by the draft report is the distinction between the DoD homosexual exclusion policy and the broader social policy question of homosexuality in American Society.  Many citizens view homosexuality as a religious or moral issue; others see it as one of civil rights.  There are many aspects to what is very vomplex and controversial issue.

Page 56

LCR Appendix Page 0945

The DoD homosexual exclusion policy is however, like other
Military personnel policies, based on what contributes to
overall combat effectiveness.  The GAO addresses both the social
policy and the combat effectiveness issues without distinguish-
ing between them.

   The draft report may also be misleading in another respect.
The DoD policy is not based on any belief that homosexuality is
a mental disorder, nor is it based solely on security concerns.
Rather, the DoD policy is based on concerns about the effects
that homosexuality, that is sexual desire or behavior directed
toward a member of one's own sex, has in the Military environ-
ment.  It continues to be the Department of Defense policy that
the presence in the Military environment of persons who engage
in homosexual conduct or who, by their statements, demonstrate a
propensity to engage in homosexual conduct, seriously impairs
the accomplishment of the Military mission.

   Finally, the draft report minimizes the importance of years
of litigation before the Federal courts.  Numerous decisions
have established a virtually unanimous body of law affirming the
constitutionality of the Military homosexual exclusion policy.
Those cases all required a determination by the judicial branch
that the DoD policy is rationally related to legitimate Govern-
mental interests.  The courts consistently have found that the
Military interests underlying the policy--good order, discipline
and morale--were substantial and that the Military concern about
homosexuality has a basis in fact.  The GAO, however, devotes
less than a page to that significant body of law.

   The detailed DoD comments on the report findings and matter
for congressional consideration are provided in the enclosure.
Thank you for providing the opportunity to comment on the draft
report.

                              Sincerely,

                              *Christopher Jehn*

                              Christopher Jehn

Enclosure:
As stated

LCR Appendix Page 0946

GAO DRAFT REPORT - DATED MARCH 9, 1992
(GAO CODE 391137) OSD CASE 8983

"DEFENSE FORCE MANAGEMENT:  DOD'S POLICY ON
HOMOSEXUALS IN THE MILITARY"

DEPARTMENT OF DEFENSE COMMENTS

* * * * *

FINDINGS

<u>FINDING A</u>:  <u>The Origin of Military Policy on Homosexual Orientation</u>.  The GAO reported that the current Military policy on homosexual orientation is a direct descendent of the policy adopted during the mobilization for World War II. The GAO explained that, at that time, Service policies were grounded both on prevailing sodomy statutes and on the psychiatric belief that homosexuality was a mental disorder. The GAO reported that, according to the DoD, the following definition of homosexuality is used by the Military Services today:

"A homosexual means a person, regardless of sex,
who engages in, desires to engage in, or intends
to engage in homosexual acts...A homosexual act
means bodily contact, actively undertaken or pas-
sively permitted, between members of the same
sex for the purpose of satisfying sexual desires."

The GAO speculated that if the composition of the Military Services mirrors the general U.S. population, the number of homosexuals in the Military is between 5 percent and 10 percent--or 100,000 to 200,000 personnel.

The GAO observed that, under current DoD guidance, homo-sexuality has been determined to be incompatible with Military Service.  The GAO noted that the DoD policy was revised in 1982 and in 1986 (1) to establish uniform policies and procedures for all the Military Services, and (2) to provide a stronger basis for defending the policies and procedures in the courts.  The GAO reported that the DoD directive precludes retention of an indivi-dual determined to be homosexual, except in very limited extenuating circumstances.  The GAO also noted that the directive also affords the right to appeal all separations due to homosexuality.  In addition, the GAO observed that, under the 1982 directive, homosexuals are no longer pro-cessed for separation by reason of unsuitability or

LCR Appendix Page 0947

Now on p.10.

misconduct--instead, they are processed under the category "homosexuality" and, therefore, may receive an honorable or a general discharge.  The GAO also reported that a Service member, separated from Service under DoD policy may seek review by a Federal court as to whether the discharge was proper.  (pp. 17-22/GAO Draft Report)

**DOD COMMENTS**:  Partially concur.  While it is true that the DoD has had an exclusionary policy on homosexuals serving in the Military since World War II, the GAO never clearly states that the DoD no longer bases its policy on any belief that homosexuality is a mental disorder.  Stating that the current policy is a direct descendent of the World War II policy--which the GAO states was based, in part, on the belief that homosexuality was a mental disorder--could mislead readers into concluding that the current DoD policy is based on similar concerns. The GAO emphasis (later in the report) on studies by the American Psychiatric Association and the American Psychological Association reinforce such a misconception.  It is important that it be made clear that the current DoD policy is not based upon any considerations of mental disorders among homosexuals.

The DoD policy is based solely upon concerns about homosexuality itself--that is, sexual desire or behavior directed toward a member of one's own sex.  The policy stems from the unique require-ments of the Military environment and the effect of such conduct on the ten separate concerns that underlie the policy.  Those underlying concerns led to the professional Military judgement that the exclusionary policy promotes overall combat effectiveness.  Some of those concerns, such as discipline, good order, and morale are so important they justify the policy by themselves.  Other concerns, such as security, are of relatively lesser significance.

There are three critical factors underlying the DoD exclu-sionary policy on homosexuals that need to be recognized.  First, the DoD policy is the result of the considered professional Military judgement based on years of experi-ence, of civilian and Military leaders of the Department of Defense.  Second, the policy is a matter of professional Military judgement, not scientific or sociological analysis.  Third, the DoD policy is based solely on what contributes to overall combat effectiveness (i.e., accomplishment of the Military mission).

Based on surveys of the adult population of the United States by the Kinsey Institute in the 1940s and 1950s, the GAO speculates that 5 to 10 percent of Military personnel

LCR Appendix Page 0948

are homosexual.  However, at the same time, the GAO asserts
that the Kinsey "samples of patients were flawed."  It is
not clear what predictive value or relevance surveys of the
general public 40 or 50 years ago have to today's Military.
The GAO also cites unnamed researchers for the proposition
that the composition of the Military likely mirrors American
society with respect to the number of homosexuals in the
Military.  The GAO fails to point out, however, the obvious
differences--(1) the initial screening out of homosexuals
during the enlistment/appointment process, (2) the limiting
effect of the exclusion policy itself, and (3) the lack of
acceptance of homosexuality in the Military environment.

In addition, the GAO does not put the discharges due to
homosexuality in perspective.  Such discharges make up less
than one-third of 1 per cent of all discharges in any year,
with fewer than one out of every 1,500 Military personnel
discharged because of homosexuality.

Concerning Military administrative discharges, it needs to
be recognized that the process is a complex one.  For
example, Service Members may seek judicial review of pending
adminis-trative discharge actions while still on active
duty.  Also, administrative boards do not make "innocent" or
"guilty" determinations--they are not criminal courts.  In
addition, enlisted Service Members may be  separated even
though a Board recommends retention.  On the other hand,
Service members may be retained even if a board recommends
separa-tion, if the discharge authority makes certain
findings.  Also, Service Members do not appeal
administrative separation decisions to Boards for the
Correction of Military/ Naval Records or Discharge Review
Boards.  Instead, they petition those boards for relief--
which is a separate administrative process.

**FINDING B:  <u>DoD Separation of Homosexuals (Management
by Category)</u>.**  The GAO reported the DoD policy states
categorically that homosexuality is incompatible with
Military Service because the presence of persons who engage
in, or demonstrate a propensity to engage in, homosexual
conduct seriously impairs the accomplishment of the Military
mission.  The GAO explained, therefore, identification as a
homosexual is the only criterion that needs to be met to
discharge a person under that separation category--no speci-
fic determination of an individual's negative impact on the
Military mission is needed prior to separation.  The GAO
found, for example, that in some cases Service members
have been expelled for homosexuality despite their exemplary
service records.

LCR Appendix Page 0949

The GAO further reported that, when individuals have con-
tested those decisions, discharges for homosexuality have
been upheld both in the Military administrative review
process and in the civilian court system.  The GAO found
that to be so even in cases involving personnel with
exemplary Service records.

The GAO found that, between FY 1980 and 1990, 16,919 U.S.
servicemen and women were discharged under the separation
category of homosexuality--an average of about 1,500 annu-
ally.  The GAO reported that (1) most were enlisted,
(2) most were men, and (3) most were white.  The GAO noted
that the cited statistics may be understated because they do
not include separations under categories such as misconduct,
personality/behavior disorder, and unfit/unsuitable--which
also could include homosexuals.  (pp. 26-28/GAO Draft
Report)

Now on p. 16.

**DOD COMMENTS:**  Partially concur.  The GAO is describing
a concept that is vital to the management of the Military
Services--i.e., management by category.  That concept is
not, however, discussed and, thus, the statements in the
report could be interpreted to imply that the GAO is
questioning the propriety of the management of Military
personnel by category.

Of necessity, the DoD creates categories to guide accession
and retention decisions.  Categories include those mandated
by law, such as age and citizenship (for officers), as well
as those mandated by regulation--such as height and weight
limits, physical and mental standards, and single
parenthood.  Each regulatory category is predicated on the
professional Military judgement of DoD leaders that creating
the category contributes to overall combat effectiveness.

The DoD exclusion policy on homosexuals serving in the
Military clearly states that, because homosexual conduct
in the Military environment adversely affects overall combat
effectiveness, homosexuality is incompatible with Military
Service.  Thus, the DoD discharges homosexuals  regardless
of their individual performance records.  The GAO is, there-
fore, correct in stating that, in some cases, Service
Members have been separated for homosexuality despite
having exemplary performance records.

The statistics cited by the GAO accurately reflect the
number of Military personnel discharged under the DoD
separation code of homosexuality.  The figures are not,
however, understated.  Any statement that the DoD considers

LCR Appendix Page 0950

them to be understated is inaccurate.  Rather, it is the
DoD position that the separation code of homosexuality
does not include all homosexuals who are separated from
the Military.

Homosexual Military personnel whose sexuality is not known
may be separated administratively for various reasons, like
any other Service Member.  For example, if they have a
medical problem, they may be separated for medical reasons;
if their Military performance is bad they may be separated
for unsatisfactory/substandard performance; and if they
complete their obligated service, they may be separated or
retired for that reason.

**FINDING C:  Discharges By Service.**  The GAO found that the
Navy, representing 27 percent of the active force during
the period from FY 1980 through FY 1990, accounted for
51 percent of the total number of discharges (8,638 cases).
The GAO observed that, while the Army represented 37 per-
cent of the active force, it accounted for 25 percent of
all homosexual discharges (4,230 cases), and the Air Force,
representing 27 percent of the active force, accounted
for 18 percent (2,993 cases).  The GAO reported that the
Marine Corps, however, represented 9 percent of the active
force and only 6 percent of the total number of discharges
(1,053 cases).

The GAO speculated that, while the total number of reported
homosexual discharges DOD-wide dropped 47 percent between
FY 1980 and FY 1990, the trend is probably not an accurate
representation of the level of discharges associated with
homosexual activity.  The GAO explained that local command-
ers have the flexibility to handle situations involving
homosexuality administratively (without bringing in an
investigative agency) and to select an alternative separa-
tion category to homosexuality for discharging personnel.
The GAO also pointed out that few officers are separated
under the homosexuality category, because officers are more
likely to be given the option of resigning--which eliminates
the investigative process and the homosexual categorization.
(pp. 28-30/GAO Draft Report)

**DOD COMMENTS:**  Concur.  The GAO discharge statistics are
correct.  Concerning the Navy, due to the Navy life at sea
during extended deployments, identification of homosexuals
may well occur more often than in the other Services.  The
DoD, therefore, draws no conclusions.

Now on p. 18.

LCR Appendix Page 0951

Appendix IV
Comments From the Department of Defense

The GAO also correctly states there has been a 47 percent decline in the number of discharges under the homosexuality separation code, but then speculates that the decline is probably not an accurate representation of the level of discharges associated with homosexual activity.  It is emphasized that the alternative separation categories available today are the same as they have been for 10 years and the option of officer resignation is the same now as it has been for 10 years--there has been no change in DoD or Service policy in either area since 1981.    Further, the 47 percent decline in administrative separations by reason of homosexuality reflects only cases where there was no criminal activity, or where the command decided that whatever criminal activity was present did not warrant court-martial.

It should be noted that the GAO also reviewed statistics from the Service criminal investigative agencies (see Finding I).  Those statistics reflect cases where there were allegations of serious criminal activity.  Of interest, the GAO reported that there also was a similar decline in cases involving homosexuality investigated by the criminal investigative agencies--a 48 percent decrease in only five years (1986-1990).

**FINDING D:  Discharges By Race.**  The GAO reported that, in each branch of the Military, whites were discharged for homosexuality at a rate consistently higher than their rate of representation.  The GAO found that DoD-wide, for the period from FY 1980 through FY 1990, white men and women constituted 83 percent (14,125 cases) of all personnel discharged for homosexuality, while only making up about 72 percent of all personnel serving.  The GAO observed that, conversely, black men and women accounted for only 13 percent (2,204 cases) of all discharges versus 20 percent of the total serving in the Military.  (p. 31/GAO Draft Report)

**DOD COMMENTS:**  Concur.

**FINDING E:  Discharges By Gender.**  The GAO reported that, in each branch of the Military Services, women were discharged for homosexuality at a rate consistently higher than their rate of representation.  The GAO found that DoD-wide, from FY 1980 through FY 1990, women constituted 23 percent of homosexual discharges (3,900 cases), as contrasted with their representation as just 10 percent of all Military personnel.  The GAO observed that, while women in

Now on p. 19.

LCR Appendix Page 0952

Appendix IV
Comments From the Department of Defense

all the Services were discharged for homosexuality at a rate consistently ranging two to three times higher than their rate of representation, that pattern was most notice-able in the Marine Corps, where the discharge rate for women was almost six times their rate of representation. The GAO found that women constituted 28 percent of all homosexual discharges (303 cases) in the Marine Corps, but only 5 percent of all personnel serving. The GAO noted that, conversely, on a DOD-wide basis, men represented 77 percent of discharges for homosexuality and 90 percent of all Military personnel. (p. 32/GAO Draft Report)

Now on p. 20.

**DOD COMMENT:** Concur. The GAO statistics are correct, but could be misinterpreted. In a force as small as the Marine Corps, where women make up an even smaller percentage of the force, changes of even a few discharges more or less will greatly affect the percentages. In addition, the sample size used (i.e., Women Marines discharged due to homosexu-altiy) is so small that any conclusions based on such a small sample size would be questionable. For example, in FY 1990, the Marine Corps discharged only ten women due to homosexuality.

**FINDING F: Discharges By Race and Gender.** The GAO reported that, in each Military Service, white women were discharged for homosexuality at a rate consistently higher than their rate of representation. The GAO found that DOD-wide, for the period from FY 1980 through FY 1990, white women consti-tuted 20 percent of those discharged for homosexuality (3,421 cases), while they represented just 6 percent of all personnel serving. The GAO observed that the dispro-portionate discharge rate of white women was evident in all of the Services, but was most noticeable in the Marine Corps. The GAO noted that Marine Corps women constituted 24 percent of such discharges, while they represented just 3 percent of the personnel serving. The GAO found, con-versely, white men represented 63 percent (10,704 cases) of such discharges and 66 percent of all serving. (p. 33/GAO Draft Report)

Now on p. 21.

**DOD COMMENTS:** Concur. See DoD response to Finding E.

**FINDING G: Discharges By Rank.** The GAO reported that enlisted personnel have been discharged for homosexuality at a rate consistently higher than their rate of represen-tation. The GAO noted, however, that their overall rate of discharge is also higher than that of officers. The GAO found that DoD-wide, for the period from FY 1980 through

FY 1990, enlisted personnel constituted 99 percent of those discharged for homosexuality, while making up 86 percent of all personnel serving in the Military--a difference of 13 percent.  The GAO observed that, conversely, officers represented only 1 percent of such separations and 14 percent of all those serving in the Military Services. (p. 34/GAO Draft Report)

Now on p. 22.

**DOD COMMENTS:**  Concur.

**FINDING H:  Discharges By Occupational Code.**  The GAO reported that DOD-wide, about 50 percent of all enlisted personnel, who served during the 11-year period it reviewed, were employed in the three job categories of (1) Electrical/ Mechanical Equipment Repairer, (2) Infantry, Guncrews, Seamanship, and Functional Support, and (3) Administration. The GAO found that those three job categories accounted for approximately 36 percent of the homosexual discharges during the period.  The GAO also found, however, that almost 24 percent of the homosexual discharges came from the "Nonoccupational" category (which includes patients, prisoners, and students), while only about 9 percent of the overall Military personnel belonged to that category. The GAO concluded that those personnel may have been re-categorized from other categories prior to their discharge or had been identified as homosexuals while incarcerated or in training.  (p. 35/GAO Draft Report)

Now on p. 23.

**DOD COMMENTS:**  Partially Concur.  Although the statistics are correct, the DoD conclusion regarding the non-occupational catetoy is speculation.

**FINDING I:  Investigations of Homosexuality.**  The GAO reported that there are three Military criminal investigative agencies within the DoD--(1) the Army Criminal Investigation Division, (2) the Air Force Office of Special Investigations, and (3) the Naval Investigative Service. The GAO noted that, when requested, those agencies investigate allegations of homosexuality and any associated charges of criminal activity involving force, assault, and battery.  The GAO found that consistent and reliable information on investigations of homosexuality was not available from the three investigative agencies before 1986, and most did not maintain data by the categories of race, gender, rank, or occupational code.  The GAO reported that, since FY 1986, the DoD investigative agencies experienced a total investigative caseload of about 186,000, of which 3,663 (an average of approximately 730 per year)

LCR Appendix Page 0954

were investigations related to homosexuality.  The GAO
explained, however, that the figure may be understated
because each DoD investigative agency has its own policies
and procedures governing investigations of homosexuality
and its own coding process.  The GAO reported, for example,
that Navy investigations of homosexuality are categorized
under the same offense code as sodomy and indecent assault,
and investigations of homosexuality that are handled
administratively at the local command level may not be
reported or recorded in the system as such.

The GAO reported that, for FY 1986 through FY 1990, the Navy
conducted 68 percent of all DoD-wide investigations of
homosexuality, the Air Force conducted 26 percent, and the
Army conducted 6 percent.  The GAO found that, while overall
investigative budgets appear to be increasing, the number
of investigations of homosexuality appears to be decreasing.
The GAO explained that the number of investigations of homo-
sexuality throughout the Services dropped from 907 to 472--
a decline of 48 percent.  The GAO reported that DoD offi-
cials speculated the drop could, in part, be due (1) to the
shift in responsibility for homosexuality cases from inves-
tigative agencies to the Military police or the provost
marshall, (2) to the advent of a higher caliber all-volun-
teer force, and (3) to a new focus.  (pp. 35-38/GAO Draft
Report)

Now on p. 24.

__DOD COMMENTS__:  Partially concur.  There are no criminal
investigations of "homosexuality," per se.  The Military
criminal investigative agencies only investigate specific
allegations of criminal activity.  Certain sex-related
crimes, such as sodomy, may encompass either homosexual
or heterosexual behavior.

In addition, the statistics provided by the three Service
criminal investigative agencies (and tabulated at Appendix
IV of the report) are not comparable.  The numbers for the
Air Force Office of Special Investigations reflect sex
crimes involving homosexual behavior.  The Army Criminal
Investigations Command numbers reflect only those criminal
investigations involving homosexual behavior on file in the
central-ized Crime Records Center index, not all
investigations involving homosexual behavior.  However, the
Naval Investi-gative Service numbers reflect both
heterosexual and homo-sexual sodomy/indecent sexual acts
cases.  The Naval Investigative Services statistics in
appendix IV are, therefore, inaccurately labeled as
"homosexual."

The error in the Naval Investigative Service statistics means the GAO statement that there were 3,663 (1986-1990) investigations related to homosexuality by the three criminal investigative agencies is not valid (see report figure 2.7 and the related analysis). In addition, the statement that the Naval Investigative Service conducted 68 percent of the investigations also is not valid.

The report notes that the number of criminal investigations involving homosexual behavior declined by 48 percent during the 1986-1990 period. As noted above, this figure includes heterosexual behavior reported by the Naval Investigative Service. However, looking solely at the Office of Special Investigations and the Criminal Investigations Command statistics, a similar drop is apparent.

**FINDING J:** **Cost of Expulsion.** The GAO reported that the costs of administering the DoD exclusion policy were not available because the DoD does not maintain records on such costs on a routine basis. The GAO noted that the only costs that were readily identifiable were the costs of replacing troops discharged for homosexuality. The GAO estimated that, during FY 1990, those costs totaled about $27 million. The GAO reported that other costs were not known--such as (1) the cost of original training and compensation, (2) the cost of out-processing, (3) the cost of court actions, and (4) the costs of dismissing cadets from training programs . (p. 38/GAO Draft Report)

Now on p. 25.

**DOD COMMENT:** Nonconcur. Each year the Department of Defense separates about 300,000 Service members, approximately 100,000 of whom are separated for force management reasons. Homosexuals make up less than one-third of 1 percent of that total.

In estimating the cost, the GAO apparently assumed that none of those separated for homosexuality would be lost through normal attrition or for force management reasons. There also was no recognition that approximately one-half the enlisted force does not serve beyond the initial enlistment. The GAO cost estimate is, therefore, well in excess of what reasonably could be projected under normal circumstances.

Moreover, for the past 4 years the DoD has been required to reduce the Military force from 2.17 million in 1987 to 1.64 million by the end of FY 1995. Therefore, if the 1,000 personnel discharged annually during that period by reason of homosexuality had not been discharged, the DoD

Appendix IV
Comments From the Department of Defense

would have had to either discharge 1,000 other personnel
or reduce accessions by 1,000.  Thus, there was no replace-
ment cost during that period and there will be none for
some time in the future.

**FINDING K:  Support for the DoD Policy on Homosexuality.**
The GAO reported that, except for undertaking efforts to
analyze the security risk associated with homosexuals, the
DOD has conducted or commissioned only limited research to
develop empirical evidence supporting the validity of the
premises and rationale for its current policy on homo-
sexuality.  The GAO noted the DoD efforts to examine the
security risk issue have concluded that there is no factual
data to substantiate that specific premise.  The GAO also
pointed out that the professional psychiatric, psycho-
logical, and sociological associations and other experts
familiar with the research conducted on homosexuality in
the general population tend to disagree with the basic
rationale underlying the DOD policy.

The GAO concluded that the DOD policy is not based on
scientific or empirical data, but rather on the considered
judgment of Military professionals, who know what it takes
to field an effective fighting force to protect the vital
interests of the nation.  The GAO observed, however, that
such judgment is primarily anecdotal in nature and based
on the opinions and experiences of individuals in various
leadership positions throughout the DoD and the Services.
The GAO found that the policy is based on the conviction
that homosexual behavior is incompatible with Military
Service in that it interferes with maintaining good order,
discipline, and morale.

The GAO observed that the DoD and the Services understand
the elements critical to ensuring the proper emotional
bonding of personnel in Military units.  The GAO reported
that, according to DoD officials, homosexuality is not an
acceptable behavior in the eyes of society, and Military
policy should reflect that standard.  The GAO reported
that the courts have consistently upheld the DoD position
on homosexuality.  The GAO concluded that the Department
has no intention of changing its existing policy.
(pp. 39-41/ GAO Draft Report)

**DOD COMMENT:**  Partially concur.  The responses to Findings M
and O address the DoD studies and other expert opinion
mentioned by the GAO.

Now on p. 27.

LCR Appendix Page 0957

The DoD is concerned the GAO statement that the professional Military judgement underlying the exclusionary policy on homosexuals is "primarily anecdotal" in nature could be interpreted to imply professional Military judgement is not a valid basis for Military personnel policies. It is important to emphasize the DoD depends upon the professional judgement of Government officials to make many and various important decisions that are not capable of being determined authoritatively by scientific means or proven by studies. The Military homosexual exclusion policy is one of those types of decisions.

**FINDING L: Judicial Consideration of DoD Policy.** The GAO reported that the courts consistently have upheld the DoD policy as constitutional under a rational basis standard of review. The GAO explained that, under the standard, the Government is only required to establish that regulations implementing the policy are rationally related to legitimate Governmental interests. The GAO observed that the courts, in giving special deference to Military judgments, have accepted as legitimate Governmental interests such Military objectives as good order, morale, and discipline--without requiring the Government to produce scientific evidence to support the policy. (pp. 42/GAO Draft Report)

Now on p. 28.

**DOD COMMENT:** Concur. Federal courts have upheld the Military homosexual exclusion policy and accepted its rational relationship to legitimate Military purposes. In fact, since the current DoD policy on homosexuality became effective in 1982, every court that has ruled finally on the issue has upheld the homosexual exclusion policy.

In consistently upholding the DoD policy, the courts have not required scientific evidence to support the DoD policy because the Military constitutes a specialized community, governed by a separate discipline from that of the civilian community. The courts consider the complex, subtle, and professional decisions as to the composition, training, equipping, and control of a Military force to be a matters of professional Military judgement.

**FINDING M: Studies Initiated By the DoD and the Services Do Not Support the Policy.** The GAO reported that the DOD and the Military Services could identify only two major studies initiated by the DOD and the Services about homosexuality in the Military--(1) the Navy 1957 "Crittenden Report" and (2) the Personnel Security Research and Education Center efforts, which were initiated in 1986.

LCR Appendix Page 0958

The GAO found that the Crittenden Report was unable to
uncover any statistical data to prove or disprove that
homosexuals are more of a security risk than those engaged
in other unsocial or immoral activity.  The GAO noted that
even the number of cases of blackmail revealed as a result
of past investigations, which were cited to the Board,
was negligible.  The GAO observed the Crittenden Report
determined that a homosexual is not necessarily more of
a security risk, per se, than other transgressors of moral
and criminal codes.  The GAO noted that the report further
determined that the propensities and vulnerabilities asso-
ciated with homosexual activity, as in the case of promis-
cuous heterosexual activity, do provide serious security
implications.

The GAO further reported that more recent efforts involving
the examination of the correlation between homosexuality and
security risk violations were undertaken by the Defense
Personnel Security Research and Education Center at the
direction of the Deputy Under Secretary of Defense for
Security Policy.  The GAO reported that the initial product
from the center, entitled, <u>Nonconforming Sexual Orientation
and Military Suitability</u>, was completed in December 1988,
and echoed the findings of the Crittenden report.  The GAO
stated that the report revealed no evidence that homosexu-
ality is related to security risk violations or that sexual
orientation affected the suitability of an individual for
Military Service.  The GAO noted that the report concluded
that the development of ethnology as an area of study has
made possible more precise examination of the influence of
biological factors on the formation of sexual orientation.

The GAO reported that, although completed in late 1988, the
report was not finalized until September 1991--because of
delays associated with the extensive review and revision
it underwent.  The GAO found that, although the scope of
the finalized version of the report, dated September 1991,
was more narrow (that is, it only addressed the security
issue), it contained the same basic information included
in the 1988 version.  The GAO observed that the 1991
report stated:

    "Few data have been put forward to support
    the belief that being homosexual predisposes
    a person to unreliability, disloyalty, or
    untrustworthiness."

The GAO noted that the conclusions and recommendations
of the 1991 report were considerably narrower than those
included in the 1988 version.  (pp. 43-53/GAO Draft Report)

Now on p. 29.

LCR Appendix Page 0959

Appendix IV
Comments From the Department of Defense

DOD COMMENTS: Nonconcur. The GAO errs in stating that
the two cited reports do not support the DoD policy. The
Crittenden report clearly supports the policy. The Person-
nel Security Research and Education Center "report" (a 1988
draft of a study that was never completed) misstated the
DoD policy; thus, its "analysis" was flawed. The completed
Personnel Security Research and Education Center report,
published in 1991, addressed only civilian security clear-
ance policy and had nothing to do with the Military homo-
sexual exclusion policy.

As stated, the Crittenden study was to look at the Navy
procedures and standards in separating homosexuals. The
premise that homosexuality is incompatible with Military
Service was the foundation for the study, and the report
did not question that premise.

The other "DoD study" that was addressed in the GAO report
relates to a misdirected draft prepared by researchers for
the Personnel Security Research and Education Center. The
Center was tasked with studying the nexus, if any, between
homosexuality and security clearances for DoD civilian
employees and Government contractors. The purpose of the
study was to help the Department assess homosexuality as a
factor in adjudicating security clearances for civilian and
contractor employees. It was never commissioned to address
the homosexual exclusion policy--an entirely separate and
broader issue based on uniquely Military concerns.

Notwithstanding its charge, in 1988, the Personnel Security
Research and Education Center submitted a draft entitled--
Nonconforming Sexual Orientation and Military Suitability.
That draft document represented an abandonment of the
tasking that had been given to the Center--instead, focusing
on the Military homosexual exclusion policy. The authors of
the draft did not discuss their research with those in the
DoD most knowledgeable about the policy. As a result, they
misunderstood the policy and its basis, and their subsequent
"analysis" was flawed. The opinions expressed in the draft
document were solely those of the authors, and did not and
do not reflect those of the Department of Defense. It is,
therefore, not accurate to refer to the Personnel Security
Research and Education Center 1988 draft as a DoD report,
or to consider its tentative findings, as they relate to the
Military homosexual exclusion policy, to be authoritative.

FINDING N: Recent DoD Statements Indicate Security Risk Is
No Longer A Concern. The GAO reported that recent testimony

LCR Appendix Page 0960

by the Secretary of Defense indicated that there have been times in the past when the incompatibility of the gay lifestyle with Military service was based on a security risk notion. The GAO reported that the Secretary indicated it now is more a matter of the need of the Department to maintain the combat-effectiveness of the Military units-- and, for that reason, the DoD has continued to pursue a policy that states certain kinds of individuals in our society do not serve in those combat units.

The GAO further reported that the Chairman of the Joint Chiefs of Staff, in a February 1992 statement before the House Budget Committee, expressed agreement with the Secretary of Defense. The GAO observed the Chairman indicated that the ban is not justified by the onetime DoD contention that homosexuals pose a greater security risk--but, instead, is based on the premise that homosexual behavior is inconsistent with maintaining good order and discipline. The GAO noted that the Chairman indicated that it is difficult, in a Military setting where there is no privacy, to introduce a group of individuals--who are proud, brave, loyal, good Americans but favor a homosexual life-style--to a group of heterosexuals, who would prefer not to have a person of the same sex find them sexually attractive. (pp. 53-54/GAO Draft Report)

Now on p. 35.

**DOD COMMENT:** Partially concur. Both the Secretary of Defense and the Chairman, Joint Chiefs of Staff, have stated that the Military homosexual exclusion policy is not based solely on security considerations. In the case of Military personnel other factors, such as good order and discipline, unit cohesion, and morale are much more important factors. For DoD civilian employees, homosexuality, per se, is not grounds for denial of employment or security clearances. It is, however, a relevant factor in a determination of whether a person should be entrusted with classified information. Its significance must be determined on a case-by-case basis, in light of the particular circumstances involved.

**FINDING Q: Scientific Evaluations of Homosexuality.** The GAO reported that scientific and medical studies tend to disagree with the long-standing Military policy, which holds that homosexuals are incompatible with Military service. The GAO noted that the American Psychiatric Association and the American Psychological Association, as well as other mental health professionals, do not support the DoD exclusion. The GAO noted that those organizations are trying to convince the Military to change the DoD policy to improve the mental health and functioning of its members

LCR Appendix Page 0961

and to help end the discrimination that they believe can lead to psychological distress and psychiatric disorder. The GAO observed that those organizations have taken steps, including (1) supporting dialogue between gay and lesbian groups and the Military, (2) banning of Military advertising and recruiting either at association meetings or in association publications, and (3) protesting Military training programs on university and college campuses, such as the Reserve Officer Training Corps programs.

The GAO reported that current research tends to support the idea that homosexuality can no longer be viewed as abnormal, if a significant minority of the population engage in it at some time in their adult lives.  The GAO further reported that many experts believe that the Military policy (1) is unsupported, unfair, and counterproductive, (2)  has no validity according to current scientific research and opinions, and (3) appears to be based on the same type of prejudicial suppositions that were used to discriminate against blacks and women before those policies were changed. The GAO explained many experts also believe the DoD exclusion policy perpetuates discrimination against homosexuals, which leads to an atmosphere that is not conducive to the mental health of both the homosexual individual and those prejudiced against them.  (pp. 54-57/GAO Draft Report)

Now on p. 36.

**DOD COMMENT:**  Partially concur.  The American Psychological Association and the American Psychiatric Association have written to the DoD expressing their disagreement with the DoD policy, but neither addressed the issue of overall combat effectiveness.  As the GAO noted, instead, both groups focused on those arguments with which the DoD simply takes no position because they are not the basis for the exclusionary policy--i.e., that homosexuality is not a mental disorder and/or that homosexuality, per se, implies no impairment in judgement, stability, reliability, or general social or vocational capability.

In short, both groups, as well as many other social science experts, look at the Military homosexual exclusion policy from a social policy perspective.  They focus on homosexuals in the general population and the relationships between homosexuality and the mental health of the individual. The DoD, on the other hand, looks at the policy solely from a Military, overall combat effectiveness standpoint, and draws no conclusion about the broader social issue.

**FINDING P:  Public Attitudes and Other Views.**  The GAO reported that recent national polls have shown a shift in

LCR Appendix Page 0962

society thinking on homosexuality. The GAO noted that previous national polls, conducted in the mid-1980s, showed an increasing intolerance of homosexuality at a time when the fear of contracting Acquired Immune Deficiency Syndrome (AIDS) was at its highest point among the general public, but new surveys show that the trend is reversing. The GAO reported that one national poll shows that the public attitude toward homosexuals serving in the Military has changed. The GAO observed that 81 percent of Americans believe that homosexuals should not be discharged from Military Service because of their sexual orientation, while 14 percent believed they should. (pp. 58-60/GAO Draft Report)

Now on p. 39.

**DOD COMMENT:** Partially concur. The GAO summarizes three public opinion polls, but does not include them in the report. Therefore, it is difficult to make specific comments. However, other information from the public, and from within the DoD, also is of interest.

See comment 1.

The DoD receives many letters concerning its exclusion policy on homosexuals. In the past, the DoD heard mainly from those opposed to the policy. More recently, however, that has not been the case. Mail from the public now is running more than 2 to 1 in support of the policy.

See comment 2.

Moreover, a recent Navy study concluded that, despite the apparent increase in society's acceptance of homosexuals, there was virtually no support among Navy women and men at all levels, and at every site visited, to change the current Navy homosexual exclusion policy. The study noted that, although many young people entering the Navy today view the homosexual life style as a legitimate choice, experience with the exceptionally close living and working environment in the Navy tends to convince many of the junior personnel homosexuality cannot be tolerated among Navy members.

See comment 3.

**FINDING Q:    Other Nation Policies.** The GAO reported that different nations have various, sometimes diametrically opposed, approaches to (and legislation affecting the presence of) homosexuals in their armed forces—and some do not view homosexuality as a legal or a Military issue. The GAO found, for example, that among 18 country policies it reviewed, five had policies specifically excluding homosexuals from serving in the armed forces, while seven had no written policy addressing homosexuality. The GAO noted that some countries, such as Australia, Canada, and Britain, have very strict policies and procedures. The GAO noted, however, that the current Australian policy is

LCR Appendix Page 0963

Now on p. 40.

being reviewed and may be updated to balance the Military requirements against human rights (privacy, freedom, and so on). The GAO reported that the Canadian Defense Force also has had a long standing policy of not accepting declared homosexuals into the Canadian Defense Forces. The GAO reported that the British Defense Force, like the U.S. Military, is an all-volunteer force and is opposed to having homosexuals serve in the Military. The GAO noted that the British Defense Force does not knowingly accept homosexuals. (pp. 59-63/GAO Draft Report)

**DOD COMMENT:** Concur. Military personnel policies in the United States are, however, based upon the unique factors in our nation that go into the overall combat effectiveness equation. Thus, while policies in other nations may be of interest, they can never be dispositive. The U.S. must make its own policies based upon what is best for the national security.

**FINDING B: Police/Fire Department Policies.** The GAO reported that all but one of the eight police and fire departments (in four cities) it visited had written policies dictating nondiscrimination on the basis of sexual preference or allowing the employment of homosexuals. The GAO noted that many of the policies dated as far back as the 1970s. The GAO reported that none of the officials it interviewed viewed homosexuality as an issue. The GAO reported that, in terms of security breaches, most police and fire department officials stated that, while some assignments are considered confidential or secret in nature, most department officials believed that homosexuals, whether "closeted" or admitted, were no more subject to breaches of security or blackmail than heterosexuals. The GAO pointed out that most of the police and fire departments with policies endorsed by the city mayors and department chiefs target their recruiting to gay and lesbian communities, as well as to the communities of blacks, Hispanics and Asians. (pp. 63-65/GAO Draft Report)

Now on p. 41.

**DOD COMMENT:** Partially concur. While not disputing the information relating to police and fire departments, the DoD is concerned about possible comparisons with the Military Services. Although there are some organizational similarities between police or fire departments and the armed forces, there are also some very fundamental differences. The mission and related training, deployments, work environment, authority of the commander over subordinates, living conditions, and lack of personal privacy combine to make any such comparison misleading.

**FINDING 8:  Overall GAO Conclusions.**  The GAO reported that, for more than 50 years, the DoD and its predecessors have had a policy of excluding homosexuals from Military Service, based on the belief that the presence of homosexuals seriously impairs the accomplishment of the Military mission. The GAO noted that, because the policy is based largely on Military judgment, it is difficult to challenge--and the courts have routinely accepted the DoD judgment.  The GAO concluded, however, that the DoD policy is not based on scientific or sociological analysis.  The GAO further concluded it is unlikely that any such analysis could prove conclusively the policy is right or wrong.  The GAO pointed out that, although studies of the security risk issue have tended to refute the DoD position, there are other bases for the policy that do not lend themselves to conclusive analysis.  Recognizing that more study alone cannot solve the problem, the GAO nonetheless concluded that it may be appropriate for the DoD to take a new look at its policy.

The GAO reported that its conclusion is based on the following factors:

-   since the DOD last examined the policy in 1982, public attitudes toward homosexuals have been changing, and DoD studies have raised questions about the policy;

-   several National Atlantic Treaty Organization countries allow homosexuals into the Military or are reassessing their policies on homosexuals;

-   many U.S police and fire departments have accepted homosexuals into their ranks and have not reported any adverse impacts;

-   recent congressional testimony by the Secretary of Defense and the Chairman of the Joint Chiefs of Staff indicate that the concern over homosexuals being security risks, which was once a significant basis for the policy, is no longer a serious issue;

-   there are many avenues for discharging Military personnel, including homosexuals, who have behavior problems and changing the policy to permit homosexuals to remain in the Military would not entail condoning inappropriate behavior; and

LCR Appendix Page 0965

Now on p. 43.

> – a careful look at the policy may reveal a middle ground similar to what some other countries have taken--for example, discouraging homosexuals from joining the Military but not automatically discharging those who are in.  (pp. 66-67/GAO Draft Report)

**DOD COMMENTS**: Nonconcur.  Each of the factors appearing in the overall conclusion section has been addressed separately in other findings.  There is no new information presented that would lead the DoD to consider changing the Military homosexual exclusion policy.

* * * * *

### MATTER FOR CONGRESSIONAL CONSIDERATION

**SUGGESTION**:  Because (1) it has been ten years since the DOD last examined its policy and regulations, (2) public attitudes toward homosexuality are changing, (3) formal DOD studies of the issue have challenged the [security] basis for its policy, and (4) DOD officials have stated that the Department will not change its policy unless it is mandated to do so by the Congress--the GAO suggested that Members of the Congress consider directing the DOD to reexamine the basis for the policy and determine whether the policy could be revised to better serve Military needs. (p. 68/GAO Draft Report)

**DOD COMMENT**:  Nonconcur.  The DoD continually reviews all Military personnel policies as the situation warrants, and the Military homosexual exclusion policy is no exception.  There is no new information in the GAO report related to overall combat effectiveness that would cause the DoD to change that policy.

* * * * *

### RECOMMENDATIONS TO THE DEPARTMENT OF DEFENSE

NONE.

LCR Appendix Page 0966

Appendix IV
Comments From the Department of Defense

The following are GAO's comments on DOD's letter dated April 17, 1992.

## GAO Comments

1. We believe that we have included sufficient evidence in the report to establish a clear trend toward increasing support for permitting homosexuals in the work place. Table 4.1 shows an increasingly more positive attitude on an identically worded opinion question that was administered six different times over 14 years to the same population by the same survey organization.

2. Tabulations of self-initiated letters are not valuable when, as in this case, stronger evidence is available in the form of more technically sound, public opinion poll evidence.

3. The information that DOD provides about its own "recent Navy study" is not sufficient to determine the value of the study. For example, DOD does not provide information about the sample design, the reliability of the opinion measurement process, the actual questions asked of personnel, or steps, if any, that were taken to ensure confidentiality for those who were critical of existing policies.

LCR Appendix Page 0967

Appendix V

# Major Contributors to This Report

| | |
|---|---|
| **National Security and International Affairs Division, Washington, D.C.** | Foy Wicker, Assistant Director<br>Irene A. Robertson, Evaluator-in-Charge<br>Casey Barrs, Evaluator<br>Marilyn C. Mauch, Assistant Director<br>James Fields, Social Science Analyst<br>Harvey Finberg, Computer Systems Analyst |

LCR Appendix Page 0968

**Ordering Information**

The first copy of each GAO report is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20877

Orders may also be placed by calling (202) 275-6241.

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100

United States General Accounting Office

# GAO

Report to the Honorable
John W. Warner, U.S. Senate

June 1993

# HOMOSEXUALS IN THE MILITARY

## Policies and Practices of Foreign Countries





149440

Printed copies of this document will be available shortly.

GAO/NSIAD-93-215

OS7487/149440



DEFENDANT'S EXHIBIT
7



United States
General Accounting Office
Washington, D.C. 20548

National Security and
International Affairs Division

B-253590

June 25, 1993

The Honorable John W. Warner
United States Senate

Dear Senator Warner:

In response to your request, we performed a review of the policies concerning homosexuals in the militaries of 25 foreign countries, and a more in-depth review of both the policies and practices in four of these countries. The four countries—Canada, Germany, Israel, and Sweden—allow homosexuals to serve in the military. For these four countries, we gathered detailed information on their military policies, including the evolution of these policies; compared the military policies to civilian laws; determined whether the practices of the armed services are consistent with their policies; and discussed the experiences each country has had concerning homosexuals in the military.

The Canadian, German, Israeli, and Swedish military policies and practices regarding homosexuals developed as the result of circumstances unique to each country. Factors such as the rights of homosexuals, societal attitudes towards homosexuals, and the military's role in society appear to have had an impact on each nation's experiences. Various officials we interviewed said that their country's experiences cannot necessarily be reproduced by another country; however, insights can be gained from their experiences.

## Scope and Methodology

To obtain information on a broad range of foreign countries' laws, policies, and regulations governing the military service of homosexuals, we initially selected a sample of 29 countries which had active duty force levels over 50,000 in 1991. Four of the 29 countries did not wish to be included in this review or considered the issue too sensitive to address. For the remaining 25 countries, we obtained an official position on their laws, policies, and regulations concerning homosexuals in the armed services either through the U.S. embassies and foreign government officials in the respective countries or from the countries' embassies in Washington, D.C. We also held discussions with some of the countries' embassy officials to clarify their laws, policies, and regulations.

For our detailed review, we selected Canada, Germany, Israel, and Sweden because these countries allowed homosexuals to serve in the military and met certain criteria regarding their cultural heritage, the size of their

B-255590

armed forces, and their recent combat or deployment experience. In addition, we attempted to include countries which represented a range of attitudes concerning homosexuality.

Our work in the four countries included discussions with mid- and senior-level military and government officials, former active duty military personnel, members of the reserve forces, representatives of veterans and homosexual advocacy groups, and academic experts. These groups provided a broad range of views concerning the treatment of homosexuals in the military. We also intended to talk to active duty officers and enlisted personnel at military headquarters and field units. However, of the four countries, only Sweden permitted us to interview active duty unit personnel. Nevertheless, our discussions with numerous other knowledgeable civilians and military personnel, representing a wide spectrum of opinions, gave us no indication that unit personnel would have provided a different perspective.

Appendix I discusses our scope and methodology in more detail. Appendix II describes the military policies concerning homosexuals for 21 of the 25 countries in our sample, including related information on the practices of some of the countries. Appendixes III through VI discuss the results of our in-depth review for the remaining four countries—Canada, Germany, Israel, and Sweden.

## Background

Congress is currently debating the President's proposal to lift the ban on homosexuals in the U.S. armed forces. As part of this debate, Congress has expressed an interest in foreign countries' military policies and experiences concerning homosexuals.

The 25 countries included in our review represent a wide range of cultures, religions, forms of government, and geographic locations. The four countries selected for our more detailed review—Canada, Germany, Israel, and Sweden—generally reflect Western cultural values yet still provide a range of ethnic diversity. Germany and Sweden have ethnically homogeneous populations. Israel's population is diverse, with immigrants from all over the world. The largest ethnic groups in Canada are people with British or French backgrounds, or some combination of the two. However, almost one-third of the population has other ethnic backgrounds.

GAO/NSIAD-93-215 Homosexuals in the Military

**LCR Appendix Page 0975**

B-253590

Each of the four countries reviewed in detail has active armed forces that exceed 50,000 military personnel and has been involved recently in regional conflicts, United Nations peacekeeping missions, or both. Of the countries selected, only Canada has an all-volunteer military force. Germany's military consists of 57 percent volunteer forces, and the remaining 43 percent are conscripted.[1] Israel's and Sweden's forces primarily consist of conscripted military personnel, although they do maintain a small volunteer corps. All four countries allow women to serve in some capacity. Canada is the least restrictive in this regard, allowing women to serve in combat and non-combat roles; Germany is the most restrictive, allowing women to serve in only the medical and music corps.

Policies permitting homosexuals to serve in the military in these countries have been in place for a period of time ranging from 8 months in Canada to 45 years in Israel.

## Results in Brief

While many countries have no specific law or military regulation on homosexuals serving in the military, of the 25 countries in our sample, 11 have policies that do not permit homosexuals to serve in the military, and 11 have policies that do. Three of the countries do not have any laws, regulations, or policies that address this issue and did not provide information regarding homosexuals serving in the military. Other variables may affect the service of homosexuals in the military. For example, most countries set standards of conduct applicable to all military personnel. Also, some countries place restrictions on known homosexuals who serve.

Of the four countries we reviewed in more detail, Canada, Israel, and Sweden have policies of not discriminating against homosexuals in the military. Germany imposes restrictions on homosexual volunteers. In all four countries, military policies concerning homosexuals developed over time, reflecting changes in civilian law and societal attitudes toward homosexuals. Most military officials and advocacy group representatives said that the countries' practices toward homosexuals in the armed services were consistent with military policies.

Military officials in all four countries said that the presence of homosexuals in the military is not an issue and has not created problems in the functioning of military units. A key factor, they said, was that homosexuals are reluctant to openly admit their sexual orientation for a variety of reasons. For example, (1) sexuality is considered to be a private

---

[1]Conscription is the requirement for a person to enroll for compulsory service in the armed forces.

GAO/NSIAD-93-215 Homosexuals in the Military

LCR Appendix Page 0976

B-253590

matter, (2) homosexuals fear discrimination or negative reactions from their peers or superiors if they reveal their sexual orientation, and (3) homosexuals do not see any advantage to openly identifying their homosexuality. Military officials from Canada, Israel, and Sweden said that, on the basis of their experience, the inclusion of homosexuals in the military is not a problem and has not adversely affected unit readiness, effectiveness, cohesion, or morale. In Germany, military officials told us that problems associated with homosexual military personnel are dealt with on a case-by-case basis and their service is restricted if necessary.

## Policies Concerning the Military Service of Homosexuals in 25 Foreign Countries

Table 1 shows which countries do not permit homosexuals to serve and which do permit homosexuals to serve. The table also provides information on whether the country's military force consists of all volunteers, mostly conscripts, or some other combination of volunteers and conscripts. Volunteer forces generally are the source of career military personnel.

LCR Appendix Page 0977

B-253590

## Table 1: Policies Concerning Military Service of Homosexuals in Foreign Countries

| Country | Size of active force | Primary source of personnel | Policy allows homosexuals to serve[a] | Applicable laws, regulations, policies, and/or restrictions |
|---|---|---|---|---|
| Australia | 68,000 | All-volunteer | Yes | Military policy changed in Nov. 1992. |
| Belgium | 85,000 | Both[b] | Yes | No specific law/military reg. |
| Brazil | 297,000 | Both | No | No specific law/military reg. |
| Canada | 78,000 | All-volunteer | Yes | Prohibition lifted in October 1992. |
| Chile | 92,000 | Both | No | Civilian law applies. |
| Colombia | 134,000 | Both | No | Military code applies. |
| France | 453,000 | Both | Yes | No specific law/military reg. |
| Germany | 476,000 | Conscript Volunteer | Yes No | Civilian laws changed in 1969. |
| Greece | 159,000 | Conscript | No | Military reg. applies. |
| Hungary | 87,000 | Both | No | No specific law/military reg. Restrictions apply to volunteers. |
| Israel | 141,000 | Conscript | Yes | Military regulation on restrictions revoked in May 1993. |
| Italy | 361,000 | Conscript | No | Codified into law in 1985. |
| Japan | 246,000 | All-volunteer | c | No specific law/military reg. |
| Peru | 105,000 | Conscript | No | No specific law/military reg. on acceptance. Military code applies regarding discharge. |
| Poland | 305,000 | Conscript | d | No specific law/military reg. |
| Portugal | 62,000 | Both | Yes | Military laws modified in 1989. |
| Republic of Korea | 600,000 | Both | Yes | Military law applies. |
| Romania | 201,000 | Conscript | No | Civilian law applies. |
| South Africa | 72,000 | Both | d | No specific law/military reg. |
| Spain | 257,000 | Both | Yes | Civilian laws revised in 1985. |
| Sweden | 53,000 | Conscript | Yes | Civilian law/military policy. |
| The Netherlands | 92,000 | Both | Yes | No specific law/military reg. Military policy revised in 1974. |
| Turkey | 579,000 | Conscript | No | Military law applies. |
| United Kingdom | 300,000 | All-volunteer | No | Military law applies. |
| Venezuela | 75,000 | Both | No | Military law applies. |

Note: Appendix II provides additional information concerning these military policies.

[a]When no specific law or regulation applies, the countries' officials informed us of the policy.

[b]The Belgium military is currently transitioning to an all-volunteer force.

[c]Japanese officials indicated the issue is handled on a case-by-case basis.

[d]Officials did not provide detailed information to enable us to make this determination.

GAO/NSIAD-93-215 Homosexuals in the Military

LCR Appendix Page 0978

B-353590

## Military Policies Concerning Homosexuals Have Evolved

In all four countries, military policies concerning homosexuals have developed over time. These policy changes were usually preceded by changes in civilian laws, reflecting the attitudes of the society at large. As society showed increased acceptance of homosexuals, the military tended to follow.

Canada has modified its military policy over the past 7 years to remove all restrictions on homosexuals. In 1986, the Canadian Forces began to reevaluate its policy of excluding homosexuals from the military. The review was prompted by the adoption of the equal rights provision of the country's new constitution. During this review, the military instituted an interim policy in 1988 that allowed homosexuals to serve, but with restrictions. In 1992, a court ruled that the military's policy concerning homosexuals was unconstitutional, and the military revoked its policy and removed all restrictions on homosexuals.

Germany's military policy has been modified over the past 24 years, although it does not grant homosexuals total equal rights. The German armed forces began permitting homosexuals to serve in 1969, when the penal code was revised to decriminalize homosexual acts[2] for males ages 21 and over. In 1987, Germany's Federal Administrative Court ruled that homosexual orientation alone was not sufficient grounds for revoking security clearances, and the military has since changed its policy accordingly. In 1990, this same German court found that the German military is justified in not allowing homosexuals to serve in leadership or educational positions.

Israel has no constitution or bill of rights; however, a number of basic laws, together, serve that purpose. The Israeli military has allowed homosexuals to serve since the country was founded in 1948. Under a 1983 military regulation, however, homosexuals were prohibited from serving in intelligence positions requiring top security clearances. The regulation also required identified homosexuals to undergo a psychological examination to determine their ability to serve. However, we were told that in practice these policies were never formally implemented. Recently, Israeli society has become more accepting of homosexuality and has increasingly recognized homosexual rights. Homosexual acts were decriminalized in 1988, and discrimination against homosexuals in the workplace was outlawed in 1992. In May 1993, the military adopted a policy that no restrictions will be placed on the

---

[2]Homosexual acts are defined differently depending on the country, but generally refer to sexual acts between same gender partners.

GAO/NSIAD-93-215 Homosexuals in the Military

LCR Appendix Page 0979

B-253590

recruitment, assignment, or promotion of homosexuals due to their sexual inclination.

Sweden modified its military policies over a period of 11 years before arriving at the current policy of not discriminating against homosexuals. The military had automatically exempted homosexuals from military service until 1976. In 1979, when the National Board of Health and Welfare removed homosexuality from its Classification of Illnesses Handbook, the military stopped considering homosexuality as an illness. The military, however, continued to annotate the file records of homosexual individuals. This practice was halted in 1984 when a Parliamentary commission concluded that homosexuality must not disqualify an individual from serving in the armed forces. In 1987, Sweden passed its law prohibiting discrimination against homosexuals. The law also applies to the armed forces.

## No Apparent Inconsistency Between Military Policies and Actual Practices Toward Homosexuals

Discussions with numerous government officials, private groups, and individuals indicated that military practices in Canada, Germany, Israel, and Sweden were consistent with military policies concerning homosexuals. In Canada and Sweden, military officials and others said the armed forces comply with their policies. Homosexual rights groups in Canada were satisfied with the military's policies and practices. While one homosexual rights group in Sweden believed that despite the military's anti-discrimination policy, homosexual officers may be denied career opportunities, the group could provide no supporting evidence. The other major Swedish homosexual rights group we interviewed did not believe homosexuals were discriminated against in the military.

German military officials said they deal with homosexuals on a case-by-case basis, in accordance with the flexibility provided under their policies. How each case is handled, they said, hinges on such factors as whether the individual is a conscript or volunteer, the individual's rank and time in service, and whether the individual exhibits homosexual orientation or engages in homosexual behavior. Depending on the circumstances, a homosexual soldier may not be punished at all, may be restricted from certain assignments, or may be disciplined in some other way. In practice, according to German military officials,

- homosexuals may serve as conscripts in the military if medical personnel determine during the induction screening that the individual's sexual

LCR Appendix Page 0980

B-253590

professional reputation and gained the respect of coworkers, the person may feel more comfortable in revealing his or her sexual orientation to them. In Israel, for example, we talked to a number of reserve military personnel who said that on active duty they served openly as homosexuals, still received promotions, and were not restricted in their assignments.

## Foreign Militaries Report No Adverse Effect Because Presence of Homosexuals Is Not an Issue

Military officials in Canada, Germany, Israel, and Sweden said that the presence of homosexuals has not created problems in the military because homosexuality is not an issue in the military or in society at large. We were told that a key reason the presence of homosexuals is not an issue in these countries' militaries is that few homosexual military personnel openly identify their sexual orientation, as discussed earlier. For example, a 1984 report on homosexuality by Sweden's Parliament stated that "the silence surrounding homosexuals and homosexuality is virtually total." Swedish military personnel at all levels agreed that this silence is pervasive in the military.

Military officials from each country said that, on the basis of their experience, the inclusion of homosexuals in their militaries has not adversely affected unit readiness, effectiveness, cohesion, or morale. For example, Israeli officials said that homosexuals have performed as well as heterosexuals and have served successfully in all branches of the military since 1948. In Canada, where problems in these areas were predicted, military officials said none had materialized since the revocation of the policy banning homosexuals. They attributed the lack of problems to the military leadership's support of the new policy and the military's ability to keep a low profile on the issue. German military officials said that their policies prevent problems because they allow for flexibility in dealing with homosexual individuals, and their service is restricted if necessary.

LCR Appendix Page 0981

B-253590

We are sending copies of this report to the Chairmen of the Senate and House Committees on Armed Services, to the Secretary of Defense, and to the Secretary of State. We will also make copies available to others on request.

This report was prepared under the direction of Mark E. Gebicke, Director, Military Operations and Capabilities Issues, who may be reached on (202) 512-5140 if you or your staff have any questions. Other major contributors to this report are listed in appendix VII.

Sincerely yours,

Frank C. Conahan
Assistant Comptroller General

LCR Appendix Page 0982

# Contents

| Letter | | 1 |
|---|---|---|

| **Appendix I**<br>Objectives, Scope,<br>and Methodology | | 14 |

| **Appendix II**<br>Foreign Countries'<br>Policies on<br>Homosexuals in the<br>Military | | 19 |

| **Appendix III**<br>Canada | | 27 |

| **Appendix IV**<br>Germany | | 33 |

| **Appendix V**<br>Israel | | 38 |

| **Appendix VI**<br>Sweden | | 44 |

| **Appendix VII**<br>Major Contributors to<br>This Report | | 51 |

| **Table** | Table 1: Policies Concerning Military Service of Homosexuals in Foreign Countries | 5 |

| **Figures** | Figure III.1: Development of Civilian and Military Policies in Canada | 27 |

LCR Appendix Page 0983

Contents

Figure IV.1: Development of Civilian and Military Policies in Germany    33
Figure V.1: Development of Civilian and Military Policies in Israel    38
Figure VI.1: Development of Civilian and Military Policies in Sweden    44

**Abbreviations**

| | |
|---|---|
| DND | Department of National Defence |
| HIV | human immunodeficiency virus |
| IDF | Israeli Defense Force |

LCR Appendix Page 0984

Appendix I
# Objectives, Scope, and Methodology

At the request of Senator John W. Warner, we performed a review of the policies concerning homosexuals in the militaries of 25 foreign countries, and a more in-depth review of the policies and practices in four of these countries to obtain a perspective of their experiences.

To obtain information on a broad range of foreign countries' laws, policies, and regulations governing the military service of homosexuals, we initially selected a sample of 29 countries which had active duty force levels over 50,000 in 1991. Four of the 29 countries did not wish to be included in this review or considered the issue too sensitive to address. For the remaining 25 countries, we obtained official information on their laws, policies, and regulations concerning homosexuals in the armed forces either through the U.S. embassies in the countries or from the countries' embassies in Washington, D.C. We also held discussions with some of the countries' embassy officials to clarify their laws, policies, and regulations.

In selecting the countries for a more detailed review of policies and practices, we attempted to capture a range of attitudes toward homosexuality. Other criteria we used included: (1) predominance of Western cultural values; (2) military forces exceeding 50,000; and (3) recent military combat and/or deployment experience (for example, participation in the Persian Gulf War, regional conflicts, or United Nations peacekeeping missions). On the basis of these criteria, we selected Canada, Germany, Israel, Sweden, and France. During the initial phases of our review, French government officials informed us that they did not wish to provide us information on this topic. As a result, we excluded France from the in-depth phase of this review.

We gathered detailed information on the military policies of Canada, Germany, Israel, and Sweden, including the evolution of these policies; compared the military policies to civilian laws; and determined whether the practices of the armed services are consistent with their policies. However, we did not attempt to describe the circumstances surrounding the development of these laws and policies. In addition, we discussed the experiences each country has had concerning homosexuals in the military with military personnel, veterans and homosexual advocacy group representatives, academics, and U.S. embassy personnel.

Canada, Germany, and Israel did not permit us to interview active duty unit personnel. They provided the following reasons:

- Canadian officials cited the recent change in policy and their intent to keep a low profile on the issue. They believed that the military leadership would have more flexibility in implementing this policy if the issue remained low-key.
- Germany's chief of protocol said that "an official visit to units would serve no purpose."
- Israeli officials said our presence could be a disruption and preferred to maintain a low profile on this issue. Israeli officials felt that homosexuals were not an issue in the military and wanted it to remain that way.

To obtain a list of credible government and military officials, homosexual and veterans advocacy groups, and academic sources to interview in each foreign country, we contacted

- the countries' Auditors General;
- U.S. government agencies, professional societies, and individual experts in a variety of fields, including the Congressional Research Service; the Army Research Institute; Walter Reed Army Hospital; the American Psychiatric Association; the American Sociological Society; the American Psychological Association; the American Ethnological Association; the American Anthropological Association; Lawrence Korb, a military analyst at the Brookings Institute; Charles Moskos, a military sociologist at Northwestern University; and Lieutenant General (Ret.) Bernard Trainor, Director of the National Security Program at Harvard University;
- public opinion polling experts, including World Association for Public Opinion Research, the Gallup Organization, and Roper Institute;
- U.S. veterans associations, including the American Legion, Veterans of Foreign Wars, Association of the United States Army, Noncommissioned Officers Association, Retired Officers Association, the Military Coalition, and the Air Force Association; and
- U.S. homosexual advocacy groups, including the Human Rights Campaign Fund, Campaign for Military Service, Military Freedom Initiative, International Gay and Lesbian Human Rights Commission, International Lesbian and Gay Association, National Gay and Lesbian Task Force, the Gay and Lesbian Foreign Service Association, and Federal Gay, Lesbian, and Bisexual Employees.

After we obtained a list of contacts for each country, we supplied the list to the respective U.S. embassy to verify the contacts' credibility within the country.

Specifically, we interviewed the following sources in each country:

| | |
|---|---|
| **Canada** | In Canada, we interviewed officials from the U.S. embassy; the Department of National Defence's Personnel Policy Division; the Department of Justice's Human Rights Law Section; Canadian Human Rights Commission; the only open homosexual member of Parliament; a member of Parliament who belongs to the Progressive Conservative Party and is opposed to the new policy; the Canadian Auditor General; Statistics Canada, which tabulates government data; the Conference of Defence Associations, a veterans umbrella group, consisting of 22 organizations; Pink Triangle Services, a local homosexual advocacy group; and Equality for Gays and Lesbians Everywhere, the only national homosexual advocacy group. We also interviewed a cultural anthropologist from Criterion Research Corporation; Michelle Douglas, a former military officer whose court case forced the military to change its policy; a political scientist from the University of Toronto who specializes in homosexual rights; a political scientist from the University of Toronto who specializes in polling data; a representative from Gallup Canada, Inc.; and a military sociologist under contract to the U.S. Army Research Institute to analyze the impact of Canada's new policy on homosexuals.<br><br>In Washington, D.C., we interviewed the former Canadian Chief of the Defence Staff, the key military official responsible for implementing the court's decision to allow homosexuals to serve in the military. |
| **Germany** | In Germany, we interviewed representatives from the U.S. embassy; the Ministry of Defense's personnel, health, and legal divisions; the Department of the Navy; the Bundestag (the German Parliament); the Ministry of Justice; the Deutscher Bundeswehr Verband e.V., an association representing the views of active duty and retired members of the armed forces; the Catholic and Protestant churches; and the Schwulenverband in Deutschland and the Bundesverband Homosexualität, two homosexual advocacy groups in Germany. We also interviewed a professor conducting research for the U.S. Army Research Institute on Germany's military policy regarding homosexuals and a University of Frankfurt sexologist who is an expert on German sexuality and sociological trends. |
| **Israel** | In Israel, we interviewed officials from the U.S. embassy and the Israeli Defense Forces, including the Chief of Security, who was responsible for drafting the military's new regulation on homosexuals, and the head of the Mental Health Department; a member of the Israeli Knesset (equivalent to |

the U.S. Congress) who has held public hearings on homosexuality in Israel; officials from the Society for the Protection of Personal Rights, the leading homosexual rights group in Israel; an attorney of the Association for Civil Rights in Israel, the country's primary civil rights group; the Director of the Israeli Institute for Military Studies, who was a former Chief Psychologist of the Israeli Defense Forces and is a specialist on cohesion and battlefield stress; the President of the Israel Psychological Association, the only body of professional psychologists in Israel; a pollster frequently used by the U.S. embassy; and a sociologist at the Jerusalem-based Israel Institute of Applied Social Research. Several Israelis we spoke with were either retired military officers or still in the reserves. In addition, we confidentially interviewed 11 homosexual and heterosexual reserve corps and retired Israeli Defense Forces military personnel to obtain first-hand information on their experience.

We attempted to identify organizations that oppose homosexuals in the Israeli military, but were told by several sources, including U.S. embassy officials, that there were none.

## Sweden

In Sweden, we interviewed officials from the U.S. embassy and the Swedish Defense Personnel Division of the Joint Defense Staff and the National Services Administration Enrollment Office and Medical Board; senior military officers, 15 active duty unit-level officers and 27 conscripts at Air Force, Army, and Navy facilities; a member of Parliament from the Liberal Party who chairs the Parliamentary Commission on Registered Partnerships and is the former Director of the National Board of Health and Welfare; a member of Parliament from the Moderate Party who is the Vice-Chair of the Human Resource Council of the Swedish Defense; a member of Parliament from the Christian Democrat Party who opposes passage of legislation permitting registered partnerships; and an official from the Office of the Ombudsman Against Ethnic Discrimination. We also interviewed the President and other representatives of the Swedish Federation for Gay and Lesbian Rights, the most prominent advocacy group for gays, lesbians, and bisexuals; the President of Gay Moderaterna, an independent gay conservative organization that works both domestically and internationally to achieve equal rights for homosexuals; a social researcher with the Institute for Social Policy and the Department of Social Work of the University of Gothenburg; the Director of the Swedish Institute for Sexual Research; the Chairman and the Project Officer of the Central Council of Conscripts, whose members are elected by their peers to represent the conscripts before the Swedish Defense

Force; and the President of Noah's Ark-Red Cross Foundation, founded to work with the prevention of HIV disease and to support those who are HIV-infected.

Officials from the homosexual advocacy groups and the U.S. embassy were unable to identify any organizations that were opposed to the admission of homosexuals into the military. In addition, the homosexual advocacy groups were unable to locate retired or active duty homosexual military personnel who were willing to meet with us.

We conducted our review from March to May 1993 in accordance with generally accepted government auditing standards. We discussed the results of our review with U.S. officials at the Departments of State and Defense.

Appendix II

# Foreign Countries' Policies on Homosexuals in the Military

| Australia | Although the Australian Defence Force did not have an official ban on admittance of homosexuals into the military (upon entry, recruits were not questioned about their sexual orientation), a 1986 military policy provided guidance to commanding officers in handling cases where a member of the armed forces was identified as homosexual. Under this policy, when a soldier declared his or her homosexuality or was found to be homosexual, the soldier was discreetly asked to resign and usually complied. Otherwise, the service would initiate actions to terminate the individual's military career. |

In November 1992, the Australian government ended this policy of prohibiting homosexuals from serving in the military. The new military policy on unacceptable sexual behavior applies to all service members regardless of sexual orientation. The policy states that the passage of human rights legislation, in particular the Sex Discrimination Act and the Human Rights and Equal Opportunity Commission Act, necessitated the development of a policy on unacceptable sexual behavior.

An embassy official told us that Australia does not have laws prohibiting sodomy that would have conflicted with implementing the new policy. Implementation of the new policy is the responsibility of individual commanders. We were told that command briefings were held throughout the chain of command to implement the new policy. Implementation is monitored routinely through the chain of command.

An Australian official stated that although it is too early to assess the results of the revised policy, no reported changes have occurred in the number of persons declaring his or her sexual preference or the number of recruits being inducted. Effects on unit cohesiveness have not yet been fully determined. However, early indications are that the new policy has had little or no adverse impact.

| Belgium | Belgium has no laws or regulations regarding the service of homosexuals into the military. Embassy officials stated that in practice homosexuality does not constitute grounds for exclusion or dismissal from the Belgian armed forces unless there is evidence of a psychopathic disorder such as sexual perversion. During recruitment, the military does not ask an individual's sexual orientation. If homosexuality is discovered after enlistment, however, commanders may restrict the individual's duty assignments. For instance, limitations may be placed on the person's access to classified information, or the person may be excluded from |

certain tasks or units. In addition, we were told improper sexual conduct among members of the armed forces is not tolerated.

**Brazil**

Although Brazilian law does not contain any specific reference to homosexuality, Brazilian embassy officials informed us that homosexuals who exhibit behavior which degrades the appropriate military decorum and military honor are barred from military service. Moreover, the Statute of the Military governs a pattern of behavior to be adhered to by all personnel while they are on and off duty. An individual found guilty of engaging in libidinous acts, including homosexual acts, while on duty or on base is considered to be in violation of the penal code and subject to punishment, including possible discharge.

**Canada**

Detailed information on Canadian policies and practices regarding homosexuals serving in the military is presented in appendix III.

**Chile**

The Chilean constitution does not specifically refer to sexual conduct or activities contrary to moral principles. However, article 365 of the civilian penal code declares sodomy a crime against family order and public morality punishable by imprisonment. Because sodomy is a crime under the civilian penal code, neither the code of military justice nor the internal regulations of the various armed services deal with this subject. Nonetheless, there exists a long-standing military policy that persons found to have "some kind of abnormal conduct or deviance, such as homosexuality, alcoholism, drug addiction . . .," are rejected for military service.

**Colombia**

Known homosexuals are excluded from serving in the Colombian military. Article 184 of Colombia's Code of Disciplinary Action for the Military Forces describes offenses against military honor, which is understood to be a combination of moral and professional qualities. Among the offenses identified in the disciplinary code is "to associate oneself with or maintain obvious relations with persons that have a previous criminal record or are considered criminals of whatever category or are antisocial like drug addicts, homosexuals, prostitutes, or pimps." Engaging in homosexual acts is considered to be an offense against military honor.

## France

The French government informed us that there are no specific laws, regulations, or written policies which deal specifically with homosexuals serving in the French military. Officials did not provide additional information on homosexuals serving in their military. However, in 1992, we reported that although homosexuals serve in the French armed forces, certain restrictions may apply to an individual's duty assignments.[1]

## Germany

Detailed information on German policies and practices regarding homosexuals serving in the military is presented in appendix IV.

## Greece

According to military regulation, known homosexuals are barred from serving in the Greek armed forces. Upon initial screening, potential recruits are asked a series of questions to determine their suitability for service in the military. If an individual is found to have "psychosexual disorders," the term used for homosexuality, the recruit is considered unfit for service. After 2 years, the individual must return to the induction center for another evaluation. At that time, following a final screening, if an individual is still considered to be homosexual, the individual's military obligation is complete. Military personnel, including both officers and enlisted personnel, found to be engaging in homosexual acts while on active duty are discharged from the service on grounds of a "psychological disorder."

## Hungary

Although Hungary has no specific laws on the acceptance of homosexuals into the armed forces, the Hungarian Ministry of Defense provided information that stated military personnel discovered to be homosexual may be discharged from the Hungarian Defense Forces. A conscript who claims to be a homosexual during the induction screening process is referred for a psychiatric evaluation. If the medical personnel declare an individual to be homosexual, that person is not considered qualified and receives an exemption.

If conscripts, who serve only 1 year, do not acknowledge their homosexuality during the induction screening process but are later discovered to be a homosexual, no effort is made to remove them from the military unless some other law is violated. In contrast, officers who are discovered to be homosexual are subject to dismissal. At least one officer was dismissed under this policy.

---

[1]Defense Force Management: DOD's Policy on Homosexuality (GAO/NSIAD-92-98, June 12, 1992).

Appendix II
Foreign Countries' Policies on Homosexuals
in the Military

| | |
|---|---|
| **Israel** | Detailed information on Israeli policies and practices regarding homosexuals serving in the military is presented in appendix V. |
| **Italy** | Current law prohibits homosexuals from serving in the Italian armed services. Individuals who declare their homosexuality during the draft enrollment process, or whose pre-induction psychological interview indicates homosexuality, whether acknowledged by the conscript or not, are barred from entering military service. If a soldier's homosexuality is discovered after enrollment, the soldier is administratively declared unfit for service and discharged. |
| **Japan** | No written regulations or policies exist regarding service of homosexuals in the Japanese Defense Force. However, Japanese embassy officials said the lack of any written regulations or policies does not necessarily constitute acceptance of homosexuality in the military. On the contrary, within the overall Japanese society, homosexuality is a subject which is not openly discussed. Known homosexuals might not be selected to enter the military, according to Japanese government officials, and persons found engaging in homosexual activities while in the military could be reassigned. |
| **Peru** | Although Peru's military code does not specifically prohibit homosexuals from joining the armed services, military recruiters routinely reject those they suspect of being homosexual. In addition, under article 269 of the Military Code of Justice, officers found to have committed homosexual acts are to be discharged, while enlisted personnel are subject to discharge and a prison term. If the officer's offense includes violence, threats, or abuse of authority, or involves any other type of coercion, then the officer is also subject to a prison term. |
| **Poland** | Poland does not have any special laws, regulations, or policies regarding homosexuals in the armed services. |
| **Portugal** | Following the revision of military service laws in 1989, there no longer exists any regulation that prohibits homosexuals from serving in the Portuguese armed services. As a result, homosexuals are theoretically permitted to serve without any career restrictions or discrimination. |

However, homosexuals who show signs of mental illness during the induction screening process may be excluded, according to Portuguese military officials.

## Republic of Korea

Although Korea does not have specific laws on homosexuality, there are military and civilian laws governing sodomy and other sexual activities. Article 92 of the Korean Military Criminal Law prohibits certain sexual activity between soldiers, regardless of consent and regardless of whether the sexual activity is between two men, two women, or a man and a woman. If found in violation, persons are expelled from military service and are subject to a prison term. In contrast, civilian laws (articles 298, 299, and 245) which govern indecent sexual acts by force, sexual exploitation, and sexual acts in public apply only if no consensual agreement exists between the two people involved.

Recruits are not asked about their sexual orientation upon entry into service. An embassy official said it is a constitutional obligation for all healthy, able-bodied men to serve their country for a period of 2-1/2 years. Conscripts who declare their homosexuality are still required to serve. However, a commanding officer who knows of a conscript's sexual orientation may limit the soldier's duty assignments.

## Romania

Under Romania's civil penal code, the practice of homosexuality is illegal. Homosexual acts in the military are punishable with a 1-to 5-year prison term. Further, if a member of the armed services declares that he is a practicing homosexual or is accused of engaging in homosexual acts, a trial is held to determine whether the civilian penal code had been violated. U.S. Department of State officials stated that because of the legal hurdles and complications, homosexuality is considered a non-issue in Romania's military.

## South Africa

According to the South African Defence Force, there are no written laws, regulations, or policies regarding the service of homosexuals in the military.

## Spain

Prior to the 1985 revision of civilian law to decriminalize homosexual activities, persons who committed improper sexual behavior would have been subject to a maximum penalty of a 6-year prison term. The Spanish

Appendix II
Foreign Countries' Policies on Homosexuals
in the Military

government no longer considers being homosexual a crime, but certain sexual behaviors are still subject to prosecution, according to current civilian laws. Sexual behavior which is subject to prosecution includes indecent exposure, engaging in sexual activities with minors or with mentally incapacitated persons, or any type of non-consensual sexual activities. Civilian laws apply to the behavior of both homosexuals and heterosexuals.

## Sweden

Detailed information on Swedish policies and practices regarding homosexuals serving in the military is presented in appendix VI.

## The Netherlands

Article 1 of the Constitution of the Netherlands prohibits discrimination on the basis of religion, convictions about life, political affiliation, race, sex, or on any other grounds. According to embassy officials, this includes sexual orientation. Other Dutch legislation elaborates on this principle. As a result, government policy, including military policy, explicitly prohibits unequal treatment based on the knowledge of an individual's sexual orientation. Individuals are to be judged on the basis of performance and conduct. Only when improper sexual behavior, heterosexual or homosexual, interferes with the proper performance of duties and discipline is action to be taken on the basis of Dutch military criminal and disciplinary law.

Upon entering military service, an individual is not asked questions relating to sexual orientation. If the individual discloses a homosexual orientation, this information is not recorded in the individual's files. Dutch officials told us that they do not consider it relevant to a soldier's ability to carry out his or her duties. For this reason, the number of homosexuals in the Dutch armed forces is not recorded. However, a September 1992 study by the Netherlands Institute for Social and Sexological Research showed that 0.9 percent of male military personnel and 3.5 percent of female military personnel regard themselves as homosexual.

A goal of the Dutch Ministry of Defence's policy is to actively create such conditions within the armed forces that every employee is able to function optimally. With regard to homosexuals, this involves enhancing their acceptance and integration in the armed forces. In 1991, the Ministry of Defence (1) initiated a policy that made awareness of homosexuality a subject of initial training and education programs for new recruits, (2) expanded the expertise of social workers in dealing with

LCR Appendix Page 0995

homosexuality-related problems, and (3) expanded general information programs within the armed forces on the subject of the nondiscrimination policy of the Ministry of Defence. Furthermore, the Advisory and Coordination Committee on Homosexuals in the Armed Forces advises the Minister of Defence on subjects pertaining to homosexuality. Participating on this committee are representatives of the armed forces and the Directorate-General of Personnel.

Despite these efforts, the Ministry of Defence acknowledges that the goal of full integration has not been reached. While explicit discrimination has become rare, heterosexuals still tend to keep homosexual colleagues at a distance, thereby excluding them from the atmosphere of comradeship that is of importance for cohesion within military units. Homosexuals continue to keep their sexual orientation private to avoid adverse reactions from colleagues.

Dutch military officials have emphasized that acceptance of homosexuals within the military, while not complete, has reached a point that their presence rarely becomes an issue. Naval commanders have noted that homosexuals and heterosexuals on board ship are subject to the same standard of conduct, namely, that sexual contact of any kind is not permitted. Where this standard is not upheld, disciplinary action, usually a transfer of one or both individuals, is taken.

## Turkey

The Turkish armed forces prohibits known homosexuals from serving. Homosexuality is regarded as immoral behavior, and military personnel discovered to be homosexuals are discharged from duty on charges of indecency, according to an article of the military penal code. The individual does not face further prosecution once this has occurred.

Traditional moral values governing Turkish social life do not tolerate homosexuality. The armed services view homosexuality as indecent behavior that degrades the honor, dignity, and credibility of the military.

## United Kingdom

Under section 1 of the Sexual Offenses Act of 1967, an act of buggery or gross indecency between two, but no more, consenting males over age 21 in private ceased to be a criminal offense in the civil sector. However, such an act remains an offense under the service discipline acts—the Naval Discipline Act 1957, the Army Act 1955, and the Air Force Act 1955. Homosexuals committing such offenses are therefore excluded from

Appendix II
Foreign Countries' Policies on Homosexuals
in the Military

service in the United Kingdom's armed forces. (Lesbians are similarly excluded, although lesbianism is not, and never has been, a criminal offense in the United Kingdom.)

The service discipline acts are reviewed every 5 years. During the last review in 1991, the House of Commons Select Committee on the Armed Forces Bill recommended, and the Ministry of Defence accepted, that homosexual acts which are legal in civilian law should not constitute an offense under military law. Therefore, a member of the armed forces found to engage in a legal homosexual act will not be prosecuted under military law, but will be administratively discharged. However, a service member could still be prosecuted under military law if it is found that the act disgraced or discredited military decorum.

Upon entry into the British armed forces, the individual is provided a pamphlet entitled "The Armed Forces, Your Rights and Responsibilities." The pamphlet clearly states that homosexuality and homosexual behavior are not compatible with service life. Further, it states that if a person engages in homosexual acts, he or she may not be prosecuted under service law, depending upon the circumstances, but the person will be dismissed.

From approximately 1986 to 1991, 9 servicemen were dismissed from the Navy, 22 from the Army, and 8 from the Royal Air Force following conviction for an offense involving homosexual activity. Another 296 servicemen were discharged as a result of administrative action—no formal disciplinary charges were brought against them.

## Venezuela

Regarding service of homosexuals in the military, Venezuelan officials responded, "The Military Legislation of the Venezuelan Armed Forces is clear and it does not admit homosexuals in the military."

Appendix III

# Canada

Canada has only recently revoked its policy prohibiting homosexuals from serving in the military. While it is too early to predict the long-term consequences of lifting the ban, the military did not experience any problems in the first 6 months since the new policy took effect in October 1992, according to Canadian officials and others we interviewed. Department of National Defence (DND) officials believe the Canadian Forces has made a smooth transition in implementing the new policy because of the military leadership's active support and enforcement of the policy and because of steps taken to keep it a low-profile issue. In addition, the Canadian people had already acknowledged the rights of homosexuals in civilian law and perceived the change as bringing military policy in line with civilian laws. Figure III.1 summarizes the development of civilian and military policies concerning homosexuals.

**Figure III.1: Development of Civilian and Military Policies in Canada**

GAO/NSIAD-93-215 Homosexuals in the Military

## Background

According to the 1991 census, Canada has a population of approximately 27 million. The largest ethnic groups are people with British or French backgrounds, or some combination of the two. However, almost one-third of the population has other ethnic backgrounds. The majority of Canadians are either Roman Catholic or Protestant. While most Canadians report a religious affiliation, a much smaller proportion regularly attends church.

The Canadian Forces, an all-volunteer military force, consists of approximately 77,800 active forces and 33,700 reserves. Men constitute 86 percent of the force and women 14 percent. Women are permitted to serve in combat and noncombat positions. Military personnel can be assigned to one of the many military bases throughout the country and therefore do not necessarily serve close to their homes.

According to a Department of National Defence document, Canadian Forces are committed to 16 peacekeeping operations and 4 related operations. These operations involve the deployment of Canadian Forces personnel to a wide variety of countries, such as Cambodia, Cyprus, El Salvador, India, Jordan, Korea, Lebanon, Somali, and the former Yugoslavia.

## Canadian Law Prohibits Discrimination on the Basis of Sexual Orientation

Canadians believe that equality is one of their basic values, and this belief is reflected in their constitution and legislation. Canada's laws provide protection of equality rights and prohibit discrimination on the basis of sexual orientation. Homosexual rights have developed over time, marked by the following key events:

- In August 1969, the Canadian government revised the criminal code to decriminalize sodomy.
- In August 1977, Parliament passed the Canadian Human Rights Act, which states that "race, national or ethnic origin, colour, religion, age, sex, marital status, family status, disability and conviction for which a pardon has been granted are prohibited grounds of discrimination." The act does not specifically address sexual orientation.
- In December 1977, Quebec's provincial legislature added sexual orientation to its list of illegal grounds for discrimination in its Charter of Human Rights. Quebec thus became the first Canadian jurisdiction—federal, provincial, or municipal—to explicitly prohibit discrimination based on sexual orientation.

GAO/NSIAD-93-215 Homosexuals in the Military

LCR Appendix Page 0999

- In April 1982, Canada adopted the Charter of Rights and Freedoms as part of the country's constitution. Section 15, the equality rights provision of the Charter, went into effect in 1985.[1] The provision states: "Every individual is equal before and under the law and has the right to the equal protection and benefit of the law without discrimination and, in particular, without discrimination based on race, national or ethnic origin, colour, religion, sex, age or mental or physical disability." Like the Canadian Human Rights Act, section 15 does not specifically address sexual orientation.
- In February 1989, the Supreme Court of Canada ruled that section 15 was to be interpreted broadly, and that analogous grounds or other characteristics that form the basis for discriminating against a group or individual will be entitled to protection under the provision. In the few cases that have dealt with the issue, most courts have ruled that sexual orientation is an illegal basis for discrimination.
- In May 1990, the Federal Court of Appeal acknowledged in a court case that "it is the position of the Attorney General of Canada that sexual orientation is a ground covered by section 15 of the Charter [of Rights and Freedoms]."
- In August 1992, the Court of Appeal for Ontario determined that the Canadian Human Rights Act should be interpreted to include sexual orientation as an illegal basis of discrimination. As of May 1993, the Department of Justice was sponsoring a bill that would amend the act to include sexual orientation as an illegal basis of discrimination.

Although sexual orientation is an illegal basis for discrimination, Canada does not officially recognize homosexual marriages and adoptions, and does not recognize partner benefits for homosexual couples. However, as a result of the Ontario Court of Appeal decision, Department of Justice officials said that new court cases have been brought forward which challenge the government's stance on partner benefits.

## Homosexuals Recently Allowed to Serve in the Military

Until recently, the Canadian Forces prohibited homosexuals from serving in the military. Its former policy stated: "Service policy does not allow homosexual members or members with a sexual abnormality to be retained in the Canadian Forces." The policy also required military personnel to report to their superiors other soldiers whom they suspected or discovered were homosexual. DND began to reevaluate its policy in 1986, and the policy was amended in 1988. In 1992, the Federal Court of Canada

---

[1]Parliament authorized the 3-year delay to allow governments time to bring their laws in line with the Charter.