# Appendix of Evidence in

# Support of Log Cabin Republican's

# Opposition to Defendants'

# Motion for Summary Judgment

# LCR Appendix Pages 1001-1100

# (Part 10 of 19)

Appendix III
Canada

declared that the Canadian Forces' policies restricting the service of homosexuals were contrary to the Charter of Rights and Freedoms. As a result, the Canadian Forces revoked its policies and removed all restrictions on homosexuals. Civilian anti-discrimination laws now apply to the military. DND officials said they are also revising related policies, including those concerning inappropriate sexual conduct, personal relationships, and harassment. According to these officials, the standards of conduct for homosexual members will be identical to those for heterosexual members.

According to DND officials, the Canadian Forces does not recognize homosexual marriages or extend partner benefits to homosexual couples. DND officials plan to make no changes to this policy until the civilian government resolves these issues.

## Series of Events Led to the Lifting of the Ban on Homosexuals

Soon after section 15 of the Charter of Rights and Freedoms went into effect, a DND official said that a number of service members filed discrimination lawsuits against the Canadian Forces. In 1986, DND began to reexamine its exclusionary policy on homosexuals, initiating a series of steps that led to the revocation of the policy.

In February 1986, the Canadian Forces removed the requirement that military personnel report a suspected or known homosexual member of the Canadian Forces to their commanding officer. In January 1988, as DND continued to review its ban on homosexuals, it created an interim policy. The interim policy stated that

administrative action might be taken to release a member of the Canadian Forces who acknowledges that he or she is a homosexual and the member concerned does not object to being released. If the member did not agree to be released he or she would be retained with career restrictions which, . . . would have meant [he or] she was ineligible for promotion, for conversion of [his or] her existing terms of service, for posting outside the geographic area, for transfer to the reserve force or for any further qualification courses or training except that required to carry out restricted employment.

In their policy review, DND officials confronted a number of concerns that had been raised about homosexuals serving in the military. These concerns fell into the following areas: security, health, unit cohesion and morale, privacy, recruitment, and discipline. The officials said that they were unable to justify continuing the ban on the basis of any of these concerns. For example:

Appendix III
Canada

- Concerns had been raised that homosexuals presented a security risk because they could be blackmailed on the basis of their sexual orientation. DND determined that homosexuals are not considered to be a greater security risk than heterosexuals. A DND official said that security classifications are now made on a case-by-case basis and that no assumptions are made about an individual's security risk based on sexual orientation.
- Another argument for the ban was that the presence of homosexuals would disrupt unit cohesion and morale. DND officials said that they could not find compelling statistical evidence or research data to support this view, which they felt was needed because the courts do not defer to military expertise or opinion.

On the basis of the policy review, the military's senior leadership concluded that the policy excluding homosexuals should change. In 1991, DND attempted to administratively revoke the policy, but a group from the Progressive Conservative Party of Parliament blocked the proposal.

On October 27, 1992, a Canadian court ruled in favor of a former military officer, a homosexual, who had claimed in a lawsuit that the Canadian Forces discriminated in discharging her on the basis of her sexual orientation. The court stated that the "[Canadian Forces'] policy and any interim policies that have evolved regarding service of homosexuals in the Canadian Armed Forces are contrary to the Charter [of Rights and Freedoms]." That same day, the Canadian Forces' Chief of the Defence Staff issued a statement supporting the court's decision.

## Officials Said Practices Comply With New Policy

In accordance with the new policy, the Canadian Forces does not take any action when a soldier declares his or her sexual orientation, DND officials said. They also said no restrictions, such as limitations in assignments and promotion opportunities, are placed on the individual.

## No Near-Term Problems Reported

We discussed the new policy with the only open homosexual member of Parliament; a member of the Progressive Conservative Party who disagrees with the new policy; two homosexual advocacy groups, one of which is the only national organization for homosexuals; a veteran's umbrella group consisting of 22 individual veterans organizations; the Canadian Human Rights Commission; the Department of Justice; as well as DND. All but the Progressive Conservative Party member favor the new policy, and all said they had received no reports of problems associated with it. Mass resignations, lower recruitment, morale and cohesiveness

LCR Appendix Page 1002

problems, gay bashing incidents, and more open displays of homosexual behavior—the major problems that had been predicted—have not materialized, DND officials said. In addition, DND and the Canadian Human Rights Commission stated that no active duty members have brought the Canadian Forces to court for discrimination based on sexual orientation since the policy changed.

DND officials told us that they considered implementing the new policy in three phases. First, DND is obtaining compliance with the new policy, and second, DND is promoting acceptance of the policy. DND has not yet attempted the third phase, which is to change the attitudes of military personnel toward homosexuals. Homosexual advocacy groups stated that training was needed to change attitudes.

DND officials and representatives of homosexual advocacy groups said the greatest advantage to the new policy is that homosexuals no longer have to fear being discovered and forced out of the military. They also believe, however, that many homosexuals will not openly express their sexual orientation because they will see no advantage gained in doing so. A representative of a homosexual advocacy group said that because the military is a conservative organization, it attracts conservative homosexuals who would be less likely to be open about their sexual orientation. DND officials said that the new policy has not caused homosexual military personnel to "come out of the closet" in mass numbers.

## Significant Factors in the Canadian Experience

DND officials said the military leadership's public support for the new policy and its unified front were significant factors in making a smooth transition to the new policy. DND also has been able to keep a low profile on the issue. The press corps, for example, has been required to submit all questions relating to the policy to DND's public affairs office.

The cultural and legal aspects of the issue also played a pivotal role in Canada. Canadians' believe that equality is one of their basic values, and it is reflected in their laws. Legislation and court rulings concerning discrimination on the basis of sexual orientation provided a legal impetus for lifting the ban.

**Appendix IV**

# Germany

Germany's policy has permitted homosexuals to serve in the military as conscripts since 1969; however, homosexual volunteers are subject to restrictions during their military careers. While these policies are opposed by homosexual rights groups as discriminatory, they have been upheld by German courts. Military officials acknowledged that homosexual soldiers are discriminated against, but said the policies are effective because they allow for flexibility and deal with homosexual individuals on a case-by-case basis. The officials also said there have been few problems involving homosexual soldiers and characterized the issue of homosexuals in the military as a "non-issue." Figure IV.1 summarizes the development of civilian and military policies concerning homosexuals.

**Figure IV.1: Development of Civilian and Military Policies in Germany**

| German penal code amended to decriminalize homosexual acts for consenting males age 21 and over | | | | German penal code proposal which would eliminate reference to sexual orientation |
|---|---|---|---|---|
| 1969 | 1973 | | | 1993 |
| | German penal code amended to decriminalize homosexual acts for consenting males age 18 and over | | | |

Development of Military Policies:

| Military began accepting homosexual males age 21 and over | | Courts ruled that homosexual orientation is not sufficient grounds for security clearance revocation | Courts ruled that military is justified in not allowing homosexuals to serve in leadership or educational positions | |
|---|---|---|---|---|
| 1969 | | 1987 | 1990 | 1993 |

## Background

Germany has a population of approximately 80 million, with ethnic Germans constituting 93 percent. Most Germans are either Catholic or Protestant, and the Churches play an important role in German society.

The German armed forces have about 476,300 service members on active duty and 1 million in the reserves. Women are allowed to serve only in the medical and music corps. Fifty-seven percent of the forces are volunteer, and the remaining 43 percent are conscripts. Conscripts are called up at age 19 and are required to serve 12 months. An individual's military service obligation may be deferred for educational reasons. In addition, conscientious objectors may fulfill their obligation in alternative civilian service. Military officials said they try to accommodate conscripts by housing them in areas close to their homes.

The German military is a home-based defense force with no recent combat experience. Military deployment overseas is limited because operations outside of North Atlantic Treaty Organization countries are restricted by the constitution; however, certain noncombat activities are allowed. As of March 1993, Germany has supported five noncombat missions outside Germany, including a recent peacekeeping mission to Bosnia.

## Civilian Law Provides No Specific Rights or Protection to Homosexuals

The German constitution provides for basic civil rights and equality of all people, and Germany has relaxed its restrictions on homosexuals over the last 24 years. However, homosexuals have no expressed rights or protection under German law. In 1969, the civilian penal code was amended to no longer consider homosexual relations among males over age 20 as criminal behavior. In 1973, the law was modified to reduce the age of consent to 18. The law is expected to be changed in 1993 to eliminate specific references to homosexuality.

The changes in the penal code appear to reflect a slow change in German attitudes toward homosexuals. Studies have shown that Germans have become gradually more accepting of homosexuality, although a portion of the population still does not accept homosexuals. Older and more religious Germans living in rural areas tend to be less tolerant of homosexuals than younger, less religious Germans living in urban areas, according to these studies.

GAO/NSIAD-93-215 Homosexuals in the Military

## Military Policies Toward Homosexuals Are Restrictive

Germany began to permit homosexuals to serve in the military after homosexual behavior was decriminalized in 1969. Military policy, however, makes a distinction between service as a volunteer and service as a conscript. If a volunteer is discovered to be homosexual during the induction process, he will not be inducted into the military. Military officials said homosexuals are not accepted as volunteers because it is assumed volunteers will eventually rise to leadership positions. According to these officials, homosexuals in leadership positions would undermine military order and discipline.

Similarly, if volunteers are identified as homosexual during their military service, they are usually removed from assignments involving leadership, training, and educational tasks, according to military officials. If a volunteer has served for only a short period of time (within the first 4 years of service), he may be discharged from service. Additional disciplinary actions may include demotion, ban from promotions, and a reduction in salary. These measures are taken, an official said, to prevent negative acts against the homosexual soldier, such as rejection, provocation, or ridicule, and to prevent breakdowns in discipline.

Homosexuals may serve as conscripts as long as their sexual orientation does not prevent them from living and working in the military environment. During the medical induction examination, examining physicians do not routinely ask conscripts about their sexual orientation, but they may do so if they suspect the conscript is homosexual on the basis of his dress, mannerisms, or statements he makes about his social and sexual activity. Once a conscript is identified as homosexual, he may be required to undergo a separate psychological evaluation. The physicians make this decision on a case-by-case basis, and the decision usually turns on the frequency of homosexual conduct.

If the psychological evaluation indicates that the homosexual would have problems integrating himself into a military environment, the individual will be released from his military obligation. The results of the exam and the reasons for dismissal are kept confidential.

German military policies tend to treat homosexual behavior more harshly than homosexual orientation. Under the military code of conduct, soldiers may be discharged for engaging in homosexual activity, such as acts conducted while on duty and acts involving superiors and their

subordinates.[1] The code of conduct states that a discharge for such acts is justified when they indicate the individual lacks suitability for service in the military or his presence would imperil military order or harm the reputation of the armed services.

A senior military official said that until 1987, the armed forces had a policy of withdrawing security clearances from individuals found to have a homosexual orientation because these individuals were believed to be vulnerable to compromise by foreign intelligence agents. However, Germany's Federal Administrative Court ruled in 1987 that a homosexual orientation alone was not a sufficient reason to remove an individual's security clearance. The armed forces changed its policy to reflect this decision. In November 1990, the Federal Administrative Court found that the German military is justified in not allowing homosexuals to serve in leadership or educational positions.

## Officials Said Practices Are Flexible

Military officials said their practices concerning homosexuals generally are consistent with existing policies and that actions taken against homosexual soldiers vary depending on the individual involved and the circumstances surrounding each case. Military officials also said that disciplinary actions are also influenced by the rank of the soldier and his time in service. Since German military policies allow flexibility with regard to homosexuals, their cases tend to be dealt with on a case-by-case basis, according to officials.

German homosexual advocacy groups believe the military's policies and practices are discriminatory because they sanction disciplinary actions against a homosexual soldier regardless of the soldier's qualifications or skills. As a result of these policies, homosexual rights advocates state that the percentage of homosexuals in the military is lower than that in the general population. The military does not maintain its own statistics. In addition, these homosexual rights advocates said that professional soldiers are reluctant to acknowledge their homosexuality because doing so would effectively end their career.

Germany's Federal Administrative Court has upheld the military's policies regarding homosexuals. Nevertheless, if the current policy is not changed by the military or the German parliament in 1993, homosexual advocacy groups plan to present their case before the German Supreme Court.

---

[1]Heterosexual military personnel engaging in sexual acts while on duty will be subject to disciplinary proceedings.

GAO/NSIAD-93-215 Homosexuals in the Military

Appendix IV
Germany

## Officials Reported Few Problems Involving Homosexuals

Military officials, characterizing the issue of homosexuals in the armed forces as a "non-issue," said there have been few incidents involving homosexuals. Official documents indicate that 63 disciplinary court proceedings charging soldiers with homosexual behavior were convened between 1981 and 1992.

## Significant Factors in the German Experience

German military officials acknowledge that homosexual soldiers are discriminated against, but believe that their policies and practices toward homosexuals have been effective for several reasons.

First, the policies allow for flexibility, and incidents involving homosexuals are dealt with on a case-by-case basis. A variety of disciplinary actions may be taken, ranging from no response to immediate removal from service.

Second, the German military focuses on behavior, not orientation. Individuals who are disruptive are separated from the military.

Finally, the regulations controlling the conduct of German soldiers are strict and clear.

GAO/NSIAD-93-215 Homosexuals in the Military

LCR Appendix Page 1008

Appendix V

# Israel

Homosexuals have been permitted to serve in the Israeli Defense Forces since the state was founded in 1948. There are no restrictions or limitations concerning the promotion potential of homosexuals, and no special effort is made to identify homosexuals while in the service. Government officials and others we interviewed said homosexuals have served without problems, and their presence has never been an issue. Generally, homosexual soldiers tend to keep their sexual orientation to themselves until they are well established in their units. Figure V.1 summarizes the development of civilian and military policies concerning homosexuals.

**Figure V.1: Development of Civilian and Military Policies in Israel**

| | | Knesset hearings held to review homosexual rights in Israel |
|---|---|---|
| State of Israel established | Sodomy decriminalized | |
| 1948 | 1988 | 1992    1993 |
| | | Labor law amended to prohibit discrimination against homosexuals |

Development of Military Policies:

| | | Knesset hearings prompted IDF to review homosexual policy (February) |
|---|---|---|
| Homosexuals allowed to serve in military | | |
| 1948 | 1983 | 1993 |
| | Homosexuals restricted from serving in intelligence positions | IDF lifted 1983 restrictions on homosexuals (May) |

## Background

Israel has a population of approximately 5.2 million.[1] Although 82 percent are Jewish, the society is diverse, with immigrants coming from all over the world. Israelis vary widely in their cultural, economic, and educational

---

[1]This figure includes Jews living in the occupied territories of the West Bank, East Jerusalem, the Gaza Strip, and the Golan Heights. The estimated 2.1 million Arabs and other ethnic groups living in these areas are not included in this figure because they are not considered Israeli citizens.

GAO/NSIAD-93-215 Homosexuals in the Military

**LCR Appendix Page 1009**

backgrounds, as well as their views toward religion and sexuality, but most remain bonded by their mutual religion (Judaism), their pride in the state, and the perception that the state provides the only means of ensuring their safety.

The Israeli Defense Forces has an estimated 141,000 people on active duty and 504,000 in the reserves. Service is based on universal conscription of men and women, who become eligible for service at age 18. Arabs and Bedouins are not required to serve but may volunteer. Also exempted from mandatory service are married and pregnant women and people with severe physical or psychological handicaps. Ultra-Orthodox Jews generally do not serve. Males are required to serve on active duty for 3 years, with reserve obligations of 30 to 60 days a year until they reach their mid-50s. Women must serve on active duty for 2 years, with reserve obligations until age 24. Generally, Israeli soldiers spend a minimal amount of time away from their homes.

We were told by various sources that the military is a very important part of Israeli society. Military service is often considered to be a precondition to a successful career because military service influences the networks and associations used later in life. Since nearly everyone is required to serve in the armed forces, establishing a military record is important. People with medical or psychological problems often try to hide their problems in order to serve.

The Israeli Defense Forces have been involved in perpetual regional conflicts involving the West Bank and Gaza Strip resulting from the 1987 Palestinian uprising. According to Defense officials, Israel is in a constant state of alert due to its close proximity to Arab countries.

## Israeli Law Is Supportive of Homosexual Rights

According to various sources, Israel in recent years has become more accepting of homosexuality, and this is reflected in recent changes in law. Israelis have traditionally held negative views toward homosexuals because Judaism condemns homosexuality. But due to Western influences, more homosexuals are revealing their sexual orientation. According to recent studies by Israeli and U.S. sociologists, Jews in Israel view homosexual rights more favorably than Americans. We were told by U.S. embassy officials that an active homosexual community now exists in Tel Aviv. Nevertheless, most homosexuals still do not reveal their sexual orientation until later in life due to fears of negative parental and societal reactions.

While Israel has no constitution or provisions similar to the U.S. Bill of Rights, the Declaration of the Establishment of the State of Israel includes language that guarantees freedom from discrimination on the basis of sex, race, or religion. Israel's laws regarding citizen rights, including homosexual rights, are still evolving and are gradually becoming more specific. In the absence of a Bill of Rights or similar legal provisions, Israel has relied on the courts to safeguard civil rights and liberties.

Israel has increasingly recognized homosexual rights. For example, Israel decriminalized sodomy in 1988. Further, in 1992, Israel amended its labor law to prohibit discrimination against homosexuals in the workplace. According to the amendment, employers cannot discriminate against employees and job seekers due to a person's "sexual inclination." The amendment covers all conditions of employment, including hiring, working conditions, promotion, training, and dismissal.

In February 1993, the Knesset's subcommittee dealing with homosexual rights hosted a conference to draw attention to homosexual equality before the law.[2] According to the subcommittee's chairperson, the subcommittee is working to obtain full equal rights for homosexuals, and is developing legislation to establish partnership rights for homosexual couples. Currently, homosexual marriages are not recognized, and homosexual partners do not have spousal rights.

## Homosexuals Permitted to Serve in the Military Without Limitations

Under Israeli military policy, homosexuality is not a reason for deferment or discharge. Until recently, the military policy restricted homosexuals from serving in intelligence positions; however, this policy was not followed in practice. Currently, no special effort is made to identify homosexuals, and the military places no restrictions concerning the promotion potential of homosexuals. Further, military regulations on sexual behavior state that sexual activity is not to take place in the barracks (males and females live in the same barracks); the regulations make no distinction between heterosexuals and homosexuals. Any problems related to homosexuals are to be handled through normal channels, such as the unit psychologist.

During our in-country review, Israel officially had a military policy that placed certain limitations on the assignment of homosexuals. The regulation, established in 1983, stated that the assignments of homosexuals would be limited because their sexual orientation could

---

[2]The Knesset is the Israeli equivalent of the U.S. Congress.

prove to be a security hazard. According to the regulation, under no circumstances shall a homosexual soldier serve in a position requiring a top secret security clearance in the intelligence community.

Military officials said that conscripts are not asked about their sexual orientation during induction. However, those who identified themselves as homosexual were required under the 1983 regulation to undergo additional psychological testing. The tests were intended to determine whether (1) the individual's inclination could prove to be a security hazard or (2) the individual had the mental fortitude and maturity to withstand the pressure of serving in the defense forces.

On May 18, 1993, Israel adopted a new military policy concerning homosexuals. This policy states that no restrictions shall be placed on the recruitment, assignment, or promotion of homosexual soldiers and civilians due to their sexual inclination. This policy was implemented after we had conducted our in-country review.

## Practices Agree With New Policy

Even though Israel's military policy toward homosexuals is new, our review shows that its practices are more consistent with the new policy than with the 1983 regulation. According to active and reserve military officials, the 1983 regulation prohibiting the assignment of homosexuals to intelligence positions requiring top secret clearance was never formally implemented. According to these officials, homosexuals were found to be capable of doing their jobs without problems, and therefore it did not make sense to enforce this regulation. Homosexual soldiers, we were told, have served and are currently serving in intelligence positions. For example, we spoke with a number of reservists and retired military personnel who stated that while on active duty they served openly as homosexuals, still received promotions, and were not restricted in their assignments. However, a former colonel in Israeli intelligence testified at the February 1993 conference hosted by the Knesset subcommittee dealing with homosexual issues that he was summarily dismissed from his unit when his homosexual orientation became known in 1983.

According to military officials, the Knesset's conference prompted the Israeli Defense Forces to reevaluate its written policy toward homosexuals. As a result of this conference, the Israeli Defense Forces drafted and adopted its new policy.

Representatives of the leading homosexual and civil rights organizations in Israel said they are satisfied with the military's practices toward homosexuals. They told us that being homosexual has no bearing on an individual's military career and that homosexual soldiers are judged on their merits like any other soldier. Other than the case involving the former colonel stated above, neither organization was aware of any cases in which a homosexual's career had been harmed because of the individual's sexual orientation.

## Israel Has Experienced Few Problems Related to the Presence of Homosexuals in the Military

Military officials believe the Israeli Defense Forces has been very effective in including homosexuals in military service, and they knew of few problems associated with their presence. This was confirmed by representatives of Israeli homosexual and civil rights groups, openly homosexual reservists, and retired soldiers who told us they were openly homosexual during their active duty and reserve service.

Any problems concerning homosexuals that have arisen, officials said, generally involve a homosexual's inability to cope in the military environment. Some military officials believe that homosexuals tend to have more adjustment problems than heterosexuals and that this was one justification for the former policy requiring additional psychological testing of homosexuals.

However, military officials responsible for security and mental health said homosexuals adjusted to military life as well as heterosexuals. These officials noted that most heterosexual soldiers can control their sexual urges when they are living in mixed-sex quarters, and the same is true of homosexual soldiers. Security officials said homosexuals can hold security clearances without posing an unnecessary security risk.

Military officials said most conscripts do not declare their sexual orientation during mandatory service. We were told that most homosexual soldiers are not certain of their sexual orientation at the time of their conscription (usually age 18). Furthermore, those who are certain they are homosexual prefer not to reveal their sexual orientation while on active duty. According to homosexual advocacy groups, homosexual soldiers who openly declare their sexual orientation generally wait until their mid-20s or later when they are established in their units and are judged on their individual merits.

LCR Appendix Page 1013

**Appendix V**
**Israel**

The military has not studied how the inclusion of homosexuals in the military affects unit readiness, effectiveness, cohesion, or morale, but officials told us that, based on their experience, the inclusion of homosexuals has not had an adverse impact on these areas. They also said homosexual soldiers performed as well as heterosexuals.

The Israeli Defense Forces does not provide any educational or training courses dealing with homosexuals to unit personnel. Military officials see no need for training because there are few problems related to the presence of homosexuals.

## Significant Factors in the Israeli Experience

Israeli officials cited several factors that may account for Israel's lack of problems in integrating homosexuals in the military.

First, the Israeli military has allowed homosexuals to serve for 45 years, ever since the country was created. Hence, most people do not have strong feelings about homosexuals' presence in the military. Moreover, homosexuals and homosexual rights in general are not issues which are at the forefront of public debate.

Second, military service is highly regarded in Israel, and deferments are not viewed favorably.

Third, homosexuals have served creditably in the defense forces and have not hurt their units' morale, cohesion, readiness, or capability, based on the experiences of military officials.

Fourth, universal conscription in Israel results in a military force that reflects the diversity of Jewish society. Military personnel accept this diversity, and homosexuals are viewed as just another subgroup.

Finally, in peacetime, Israeli soldiers spend a minimal amount of time away from their homes and thus are not isolated from their private lives.

Appendix VI

# Sweden

Sweden's military has experienced few problems since it began formally allowing homosexuals to serve in the military in 1976. Military officials believe they have been effective in integrating homosexuals, and military officials as well as unit-level officers and conscripted personnel agree with the current policy allowing homosexuals to serve in the military. However, most homosexuals keep their sexual orientation to themselves, and there was a perception among those we interviewed that openly homosexual members of the military might face subtle discrimination, harassment, or other negative treatment from their peers. Figure VI.1 summarizes the development of civilian and military policies concerning homosexuals.

**Figure VI.1: Development of Civilian and Military Policies in Sweden**

| Homosexuality decriminalized | Parliament established commission to study homosexuality | | Parliamentary commission concluded homosexuals should not be discriminated against | Anti-discrimination law enacted concerning treatment of homosexuals | |
|---|---|---|---|---|---|
| 1944 | 1978 | 1979 | 1984 | 1987 | 1993 |
| | Age of consent for homosexuals changed to 15, the age of consent for heterosexuals | National Board of Health and Welfare no longer classified homosexuality as an illness | | Cohabitation law provides certain partner rights | |

Development of Military Policies:

| | Homosexuals no longer automatically exempted from serving in armed forces | | Parliamentary commission stated that homosexuality must not disqualify an individual from serving in the armed forces | Anti-discrimination law also applies to military | |
|---|---|---|---|---|---|
| 1944 | 1976 | 1979 | 1984 | 1987 | 1993 |
| | | Military no longer diagnosed homosexuality as an illness | Supreme Commander issues policy statement, military no longer asks conscripts if they are homosexual or maintains records of homosexuals | | |

## Background

Sweden has a population of about 8.6 million, with the vast majority being ethnic Swedes. Approximately 95 percent of the population belong to the Church of Sweden (Lutheran); however, only a small percentage are active in the church.

GAO/NSIAD-93-215 Homosexuals in the Military

The Swedish military forces have approximately 53,000 active duty personnel. In the event of war, Sweden can call up a total of 850,000 troops. Women may serve in the military, but only as officers. About 225 women are currently in the armed forces.

Sweden has universal conscription of men between the ages of 18 and 47. Most young men enroll for military service at age 18 or 19 and start their service within 3 years of enrollment. After completing active duty, the men periodically receive refresher training to maintain their military skills and serve in the reserves until age 47. Swedish conscripts serve only a short time—5 to 17 months—and are permitted frequent visits home.

Military officials and others said most young men consider military service an obligation and want to fulfill their military duty. However, it has become easier to obtain an exemption from military service, and there is less stigma attached to not completing military service than in previous generations. In addition, for the first time, Sweden's current defense budget is not sufficient to conscript all available young men. As a result, about 6,000 of the eligible conscripts will not be required to serve this year.

Currently, Swedish soldiers are serving with United Nations peacekeeping forces in Lebanon, Korea, Cyprus, Angola, Kuwait, Central America, Kashmir, Cambodia, Croatia, and the Middle East.

## Swedish Law Prohibits Discrimination Against Homosexuals

Sweden has historically been a strong advocate of human rights, as demonstrated by its role as a "safe haven" for individuals denied human rights in their home countries. The basic rights and freedoms of Swedish citizens are guaranteed by the Instrument of Government, Sweden's constitution. Some rights are absolute, while others can be restricted by Parliament. Homosexuality is not a specifically protected right, but discrimination against homosexuals is prohibited by a 1987 law and is a criminal offense under the Swedish penal code. Sweden has no laws that restrict sexual behavior or prohibit sexual acts between consenting adults.

While homosexual rights are protected, the issue generally is not discussed in Swedish society because sexuality is considered a private matter. In 1984, a parliamentary commission on homosexuality found that "the silence surrounding homosexuals and homosexuality is virtually total." On the basis of our discussions with numerous individuals, we found that this silence is still pervasive in Swedish society. The

overwhelming sentiment is that homosexuals should have equal rights, but that their sexual preferences should be kept to themselves.

Sweden began to ease restrictions on homosexuals in 1944, when it decriminalized homosexuality under the penal code, but most changes in homosexual rights have occurred within the last 15 years. In 1978, the age of consent for homosexuals was changed to 15 to coincide with the age of consent for heterosexuals. In 1979, the National Board of Health and Welfare removed homosexuality from the Classification of Illnesses Handbook.

In 1978, Parliament established a commission to study homosexuality in Swedish society. In its 1984 report, the commission concluded, "The only certain difference between homosexuals and heterosexuals is that homosexuals are emotionally attracted to persons of the same sex. In light of this background, it is obvious that homosexuals should not be discriminated against." This report, Swedish officials said, led to passage of the 1987 anti-discrimination and cohabitation laws providing rights and protection to homosexuals. The anti-discrimination law makes it a criminal offense for commercial establishments to refuse services to homosexuals or for individuals to make derogatory remarks based on a person's homosexuality. The cohabitation law provides each cohabiting individual the right to half of the jointly-owned home and household goods when cohabitation ceases.

At the time of our review in April 1993, two other issues concerning homosexuals were under review in Parliament. The first was a proposal to establish registered partnerships, which would provide homosexual couples basically the same rights as heterosexual couples, but would not include the right to adopt children. If one partner were to die, for instance, the surviving partner would be able to receive insurance, pension, and inheritance benefits. The second issue was a proposal to include homosexuals as a protected category under the Act to Counteract Ethnic Discrimination. Officials we interviewed anticipate parliamentary approval of the registered partnership legislation and inclusion of homosexuals under the act by the spring of 1994.

LCR Appendix Page 1017

# Homosexuals Permitted to Serve in the Military With No Restrictions

Under Swedish military policy, homosexuals are permitted to serve in the Swedish armed forces. The current policy, established in 1984, states that since homosexuality is increasingly accepted by society, it is not a reason, by itself, for treating an individual differently in the military.

Prior to 1976, a medical diagnosis of homosexuality during the enrollment process was supposed to result in an automatic exemption from military service. According to Swedish Defense officials, however, this exemption was not strictly imposed, as most enrollment officers treated homosexuality on a case-by-case basis. In 1976, the Manual for Medical Personnel in the Armed Forces was revised to eliminate the automatic exemption for homosexuals. And in 1979, when the National Board of Health and Welfare removed homosexuality from the Classification of Illnesses Handbook, the military no longer diagnosed homosexuality as an illness. However, the military continued to maintain records of those individuals identified as homosexuals. This practice was halted in 1984, the same year that the commission on homosexuality issued its report stating that homosexuality must not disqualify an individual from serving in the armed forces.

Also in 1984, the Supreme Commander of the Swedish Defense issued a policy statement on homosexuals in the military. This policy, which is currently in effect, states that what is essential is the individual's ability to cope with his or her sexuality. If an individual has reached the level of maturity where homosexuality is an accepted or controlled part of his or her personality, there is no basis for treating this individual differently than others in the armed forces.

Under the current policy, as part of the routine psychological interview during enrollment, conscripts are asked if they have any problems that would interfere with their ability to fulfill military service, but they are not specifically asked if they are homosexual. They have the liberty and opportunity to disclose their homosexuality but are not pressured to do so. Individuals who believe they will have problems due to their homosexuality may be excused from their military obligation. If they choose to complete their military service, no record is kept of their homosexuality. There are no additional steps or follow-up tests required if conscripts declare their homosexuality.

Sweden's 1987 anti-discrimination law, which prohibits discrimination against homosexuals, also applies to the military. No separate military policies address assignments or promotions for homosexuals.

## Practices Appear to Be Consistent With Policy

Our discussions with military personnel indicated that military practices are consistent with the policy on homosexuals. Senior officials and unit personnel told us that the armed forces do not make an effort to identify homosexuals, do not discriminate against homosexuals in the enrollment process, and do not formally place restrictions on the assignment and promotion of homosexuals.

Representatives of two homosexual advocacy groups said they are satisfied with the current policy of accepting homosexuals into the military, but the groups had differing opinions about discrimination in the military's promotion and assignment processes. Representatives of the Swedish Federation for Gay and Lesbian Rights believe that, despite the military's policy, homosexual officers may be denied career opportunities or promotions. However, they could provide no supporting evidence. The President of the Gay Conservatives of Sweden did not believe homosexuals were discriminated against in the military.

## Few Problems Concerning Homosexuals Have Occurred

Sweden has not studied the impact of admitting homosexuals into the armed forces, but military officials said few problems concerning homosexuals have occurred. For instance, the officials said that the inclusion of homosexuals had not adversely affected unit readiness, effectiveness, cohesion, or morale. Most of the unit personnel we interviewed agreed with the Swedish policy of admitting homosexuals, and few of these personnel knew of any problems concerning homosexuals. We frequently heard the comment that the important issue was whether the person could do the job.

Representatives of Parliament's Human Resource Council of the Swedish Defense and the Central Council of Conscripts[1] told us that homosexuality is not an issue in the military. The Human Resource Council makes several visits a year to various military installations to discuss personnel issues with military officials, unit-level officers, and conscripts. The Vice-Chair told us that in her 12 years on the council, homosexuality has never been raised as an issue. Likewise, the Chairman of the Central Council of Conscripts said issues related to homosexuality have never been raised to the organization.

Military personnel and others know of few open homosexuals in the military. For example, of the 42 unit personnel we interviewed, only 3

---

[1]The Central Council of Conscripts of Sweden is a group of conscripts elected by their peers to represent their interests in dealings with the Swedish Defense Force.

GAO/NSIAD-93-215 Homosexuals in the Military

knew for sure that they had served in the military with a homosexual. Ten other unit personnel "suspected" that certain unit personnel may have been homosexual. Further, the four commanders at Air Force, Army, and Navy facilities we visited did not know of any homosexuals among the approximately 2,400 conscripts they commanded. A psychologist said that, at most, 10 conscripts a year disclose that they are homosexual during enrollment, out of approximately 12,000 conscripts that are processed through that enrollment office.[2]

Many military officials believe that openly homosexual individuals could experience some adverse impact on their careers. For example, the officials discussed two cases where homosexual officers had been reassigned. In one case, they said, the officer's homosexuality was believed to present a security risk. In the other case, the officer "was exerting his homosexuality in a bad way." Further, military officials and unit personnel said openly homosexual individuals could face harassment and other negative treatment from their peers, and possibly subtle discrimination in the assignment and promotion process. Some military personnel and others said that when individuals choose to be open about their homosexuality, they tend to reveal their sexual orientation to those in their immediate unit that they know well and trust.

## Significant Factors in the Swedish Experience

A significant factor in Sweden's ability to integrate homosexuals may be the private nature of sexuality in Sweden and the virtual silence surrounding homosexuality. We were told that few homosexuals in the armed forces are open about their sexual orientation, but that those who are could face harassment from peers and subtle discrimination.

Three other factors may contribute to Sweden's success in integrating homosexuals into the military.

First, Swedish conscripts serve only a short time—5 to 17 months—and are permitted frequent visits home. Thus, they are not isolated from their private lives for long periods.

Second, Sweden's strong commitment to human rights is reflected in civilian as well as military policies regarding homosexuals.

---

[2]This is one of six enrollment offices in Sweden.

Appendix VI
Sweden

Finally, many homosexual conscripts at the age of 18 or 19 may not yet be fully aware of their sexuality or homosexual tendencies and therefore tend not to make their sexual orientation publicly known.

LCR Appendix Page 1021

Appendix VII

# Major Contributors to This Report

| | |
|---|---|
| **National Security and International Affairs Division, Washington, D.C.** | Norman J. Rabkin, Associate Director<br>Foy Wicker, Assistant Director<br>Brenda S. Farrell, Evaluator-in-Charge<br>M. Elizabeth Guran, Evaluator-in-Charge<br>Keith N. Burnham, Evaluator<br>Janine M. Cantin, Evaluator<br>Michael T. Nolan, Evaluator<br>Thomas W. Gosling, Editor |
| **European Office** | Thomas J. Howard, Assistant Director<br>Patrick A. Dickriede, Site Senior<br>Paul M. Aussendorf, Senior Evaluator<br>Stephen M. Lord, Senior Evaluator<br>Danny C. Schreck, Senior Evaluator<br>David M. Bruno, Evaluator<br>Peter J. Bylsma, Evaluator<br>Kevin B. Perkins, Evaluator<br>Pamela J. Timmerman, Evaluator |

LCR Appendix Page 1022

**Ordering Information**

The first copy of each GAO report and testimony is free. Additional copies are $2 each. Orders should be sent to the following address, accompanied by a check or money order made out to the Superintendent of Documents, when necessary. Orders for 100 or more copies to be mailed to a single address are discounted 25 percent.

Orders by mail:

U.S. General Accounting Office
P.O. Box 6015
Gaithersburg, MD 20884-6015

or visit:

Room 1000
700 4th St. NW (corner of 4th and G Sts. NW)
U.S. General Accounting Office
Washington, DC

Orders may also be placed by calling (202) 512-6000 or by using fax number (301) 258-4066.

United States
General Accounting Office
Washington, D.C. 20548

Official Business
Penalty for Private Use $300

First-Class Mail
Postage & Fees Paid
GAO
Permit No. G100

United States Government Accountability Office

# GAO

## Report to Congressional Requesters

February 2005

# MILITARY PERSONNEL

## Financial Costs and Loss of Critical Skills Due to DOD's Homosexual Conduct Policy Cannot Be Completely Estimated



**G A O**
Accountability ★ Integrity ★ Reliability

GAO-05-299



DEFENDANT'S
EXHIBIT
9
2/26/10

**LCR Appendix Page 1025**



**G A O**

Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-05-299, a report to congressional requesters

**February 2005**

## MILITARY PERSONNEL

# Financial Costs and Loss of Critical Skills Due to DOD's Homosexual Conduct Policy Cannot Be Completely Estimated

## Why GAO Did This Study

From the passage of the homosexual conduct policy statute, in fiscal year 1994, through fiscal year 2003 the military services separated about 9,500 servicemembers for homosexual conduct. This represents about 0.40 percent of the 2.37 million members separated for all reasons during this period. Questions have been raised about the costs of separating servicemembers for homosexual conduct. Also, in the post-September 11th environment, there has been concern about the separation of servicemembers with critical occupations or important foreign language skills in, for example, Arabic.

GAO was asked to determine (1) the military services' annual financial costs from fiscal year 1994 through fiscal year 2003 for certain activities associated with administering the Department of Defense's (DOD) policy on homosexual conduct—e.g., the recruitment and training of servicemembers to replace those separated under the homosexual conduct statute—and (2) the extent to which the policy has resulted in the separation of servicemembers with critical occupations and important foreign language skills.

GAO provided DOD with a draft of this report for comment, and DOD provided additional information on separations for homosexual conduct compared with other unprogrammed separations.

www.gao.gov/cgi-bin/getrpt?GAO-05-299.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Derek Stewart at (202) 512-5559 or stewartd@gao.gov.

## What GAO Found

The total costs of DOD's homosexual conduct policy cannot be estimated because DOD does not collect relevant cost data on inquiries and investigations, counseling and pastoral care, separation functions, and discharge reviews. However, DOD does collect data on recruitment and training costs for the force overall. Using these data, GAO estimated that, over the 10-year period, it could have cost DOD about $95 million in constant fiscal year 2004 dollars to recruit replacements for servicemembers separated under the policy. Also, the Navy, Air Force, and Army estimated that the cost to train replacements for separated servicemembers by occupation was approximately $48.8 million, $16.6 million, and $29.7 million, respectively.

Approximately 757 (8 percent) of the 9,488 servicemembers separated for homosexual conduct held critical occupations, identified by DOD as those occupations worthy of selective reenlistment bonuses. GAO analyzed and selected the top 10 most critical occupations for each year from fiscal year 1994 through fiscal year 2003. About 59 percent of the servicemembers with critical occupations who were separated for homosexual conduct were separated within 2.5 years of service. The typical military service contract is for 4 years of service. Also, 322 (3 percent) of separated servicemembers had some skills in an important foreign language such as Arabic, Farsi, or Korean. A total of 98 servicemembers had completed training in an important language at DOD's Defense Language Institute and received a proficiency score; 63 percent of such servicemembers had proficiency scores that were at or below the midpoint on DOD's language proficiency scales for listening, reading, or speaking. Students can graduate from the basic program with proficiencies somewhat below the midpoint of this scale.

**Number of Separations of Active Duty Servicemembers for Homosexual Conduct by Fiscal Year and Military Service**

| Fiscal year | Army | Air Force | Marines | Navy | Total[a] |
|---|---|---|---|---|---|
| 1994 | 136 | 185 | 36 | 258 | 615 |
| 1995 | 184 | 235 | 69 | 269 | 757 |
| 1996 | 199 | 284 | 60 | 315 | 858 |
| 1997 | 197 | 309 | 78 | 413 | 997 |
| 1998 | 310 | 414 | 76 | 345 | 1,145 |
| 1999 | 271 | 352 | 97 | 313 | 1,033 |
| 2000 | 574 | 177 | 104 | 358 | 1,213 |
| 2001 | 626 | 190 | 111 | 290 | 1,217 |
| 2002 | 432 | 125 | 105 | 222 | 884 |
| 2003 | 378 | 142 | 62 | 187 | 769 |
| Total | 3,307 | 2,413 | 798 | 2,970 | 9,488 |
| Percent | 35 | 25 | 8 | 31 | 99 |

Sources: Defense Manpower Data Center (data); GAO (analysis).

[a]Percents do not equal 100 because of rounding.

_____ **United States Government Accountability Office**

# Contents

## Letter

| | |
|---|---|
| | 1 |
| Results in Brief | 3 |
| Background | 5 |
| Costs of Certain Activities Associated with DOD's Homosexual Conduct Policy Can Be Estimated | 12 |
| Servicemembers with Critical Occupations and/or Important Language Skills Have Been Separated for Homosexual Conduct | 16 |
| Agency Comments and Our Evaluation | 23 |

## Appendixes

| | | |
|---|---|---|
| Appendix I: | Scope and Methodology | 25 |
| Appendix II: | Financial Cost Estimate Tables | 29 |
| Appendix III: | Critical Occupation Data Tables | 31 |
| Appendix IV: | Comments from the Department of Defense | 42 |

## Tables

| | | |
|---|---|---|
| Table 1: | Number of Separations of Active Duty Servicemembers for Homosexual Conduct by Fiscal Year and Military Service | 8 |
| Table 2: | Number of Servicemembers Separated for Homosexual Conduct with Some Proficiency in an "Important Foreign Language," Fiscal Years 1994 through 2003 | 21 |
| Table 3: | Estimated Average Annual Recruiting Cost by Military Service and DOD, Fiscal Years 1994 through 2003 | 29 |
| Table 4: | Total Estimated Recruiting Costs to Replace Enlisted Personnel Separated for Homosexual Conduct, Fiscal Years 1994 through 2003 | 30 |
| Table 5: | Individuals Separated for Homosexual Conduct during Selected Intervals, Fiscal Years 1994 through 2003 | 31 |
| Table 6: | Individuals with Critical Occupations Separated for Homosexual Conduct during Selected Intervals, Fiscal Years 1994 through 2003 | 32 |
| Table 7: | Individuals with Intelligence-Related Occupations Separated for Homosexual Conduct during Selected Intervals, Fiscal Years 1994 through 2003 | 33 |
| Table 8: | Individuals with Training in Important Languages Separated for Homosexual Conduct during Selected Intervals, Fiscal Years 1994 through 2003 | 34 |
| Table 9: | Sample of Critical Occupations | 35 |

LCR Appendix Page 1027

Contents

| | |
|---|---|
| Table 10: Sample of Intelligence-Related Occupations | 37 |
| Table 11: Languages Spoken by and Proficiency Levels for Individuals Separated for Homosexual Conduct from Fiscal Year 1994 through Fiscal Year 2003 Who Were Trained in a Language at the Defense Language Institute | 39 |
| Table 12: Languages Spoken by and Proficiency Levels for Individuals Separated for Homosexual Conduct from Fiscal Year 1994 through Fiscal Year 2003, as Reported through Service Personnel Files | 40 |

## Figures

| | | |
|---|---|---|
| Figure 1: | Separations for Homosexual Conduct by Race, Fiscal Years 1994 through 2003 | 9 |
| Figure 2: | Separations for Homosexual Conduct by Gender, Fiscal Years 1994 through 2003 | 10 |
| Figure 3: | Separations under DOD's Homosexual Conduct Policy by Reason, Fiscal Years 1994 through 2003 | 11 |
| Figure 4: | Average Annual Recruiting Cost Estimate by Military Service and DOD, Fiscal Years 1994 through 2003 | 13 |
| Figure 5: | Estimated Recruiting Costs to Replace Enlisted Personnel Separated for Homosexual Conduct, Fiscal Years 1994 through 2003 | 14 |
| Figure 6: | Distribution of the Amount of Time Served by Individuals with Critical Occupations prior to Separation for Homosexual Conduct, Fiscal Years 1994 through 2003 | 19 |
| Figure 7: | Distribution of the Amount of Time Served by Individuals with Intelligence-Related Occupations prior to Separation for Homosexual Conduct, Fiscal Years 1994 through 2003 | 20 |
| Figure 8: | Distribution of the Amount of Time Served by Individuals Trained in Important Languages prior to Separation for Homosexual Conduct, Fiscal Years 1994 through 2003 | 22 |

**Abbreviations**

| | |
|---|---|
| DOD | Department of Defense |
| FY | fiscal year |
| GAO | Government Accountability Office |

LCR Appendix Page 1028

Contents

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, D.C. 20548**

February 23, 2005

Congressional Requesters

In 1993 Congress enacted a homosexual conduct policy statute which declared that the "presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability."[1] During the 10 years following this declaration, the military services separated about 9,500 servicemembers for homosexual conduct under the statute. This represents about 0.40 percent of the 2.37 million members separated for all reasons during this period. In the post-September 11th environment, questions have been raised about the financial costs associated with the Department of Defense's (DOD) policy on homosexual conduct,[2] especially in light of concerns about the shortage of personnel with skills in critical occupations and foreign language training.

You asked us to determine (1) the military services' annual financial costs for certain activities associated with administering DOD's policy on homosexual conduct—the recruitment and training of servicemembers to replace those separated under the homosexual conduct statute, inquiries and investigations of homosexuality cases, counseling and pastoral care for affected individuals, separation functions, and discharge reviews—and (2) the extent to which the policy has resulted in the separation of servicemembers with critical occupations and important foreign language skills.

To identify various types of costs associated with the policy on homosexual conduct, we interviewed officials from a variety of DOD and service offices, including the Office of the Under Secretary of Defense for Personnel and Readiness, DOD's Office of Accession Policy; and offices in the military services responsible for budget, criminal investigation, chaplaincy, separation, and discharge review. The Air Force, Army, and

---

[1] 10 U.S.C. § 654(a)(15).

[2] The homosexual conduct policy statute is implemented through DOD Directives 1332.14 (enlisted administrative separations); 1332.40 (separation of regular and reserve commissioned officers); and 1304.26, which specifies qualification standards for enlistment, appointment, and induction.

LCR Appendix Page 1030

Navy provided data on training costs by occupation. While we requested the same training-cost data inputs, each of the services used their own methods to calculate the reported training-cost estimates.

To address the extent to which the homosexual conduct policy statute has resulted in the separation of enlisted servicemembers with "critical" occupations, we adopted the military services' definition of a "critical" occupation as an occupation that was part of the selective reenlistment bonus program. The selective reenlistment bonus program for enlisted military personnel is DOD's primary tool for addressing short-term retention problems in critical occupations by providing servicemembers who reenlisted following the expiration of their service contracts with up to $60,000.[3] We collected and analyzed this information for fiscal years 1994 through 2003. Because intelligence occupations, as a group, have enduring importance for the military that is independent from their periodic inclusion in the selective reenlistment bonus program, we identified servicemembers separated under the homosexual conduct policy statute who had such occupations. We defined the knowledge of a foreign language as "important" if it was related to (1) an occupation included in the selective reenlistment bonus program or (2) a language identified by combatant commanders and the Joint Staff as a deficiency in their periodic readiness assessments. We also analyzed separated members' occupations and foreign language skills by their length of service. The Defense Manpower Data Center (Data Center) provided information on occupations, foreign language skills, and the length of service of separated servicemembers.

The principal limitation of our analysis is that, for privacy reasons, we did not review separated servicemembers' personnel records, including training histories, which have implications for estimating training costs. For example, from data provided by the Data Center, we matched separated servicemembers to specific occupations, but we cannot state whether such individuals completed all of the training associated with their occupations. Much of our analysis depended on the quality of information that the services provided the Data Center with and the steps that the Data Center took to ensure the accuracy and completeness of the data. According to Data Center officials, since 1998, the Data Center has made a

---

[3] We last reported on selective reenlistment bonuses in GAO, *DOD Needs More Effective Controls to Assess the Progress of the Selective Reenlistment Bonus Program*, GAO-04-86 (Washington, D.C.: Nov. 13, 2003).

special effort to ensure that the services provide accurate information about the number of servicemembers separated for homosexual conduct.

Although we did not validate the budget/financial systems used to produce the cost estimates used in this report, we determined that the estimates were sufficiently reliable for the purpose of this report. We assessed reliability by (1) reviewing existing information about the data and the systems that produced them and (2) interviewing agency officials knowledgeable about the data and the manner in which they were collected. We conducted our review from August 2004 through February 2005 in accordance with generally accepted government auditing standards. A detailed description of our scope and methodology is presented in appendix I.

## Results in Brief

The total costs of DOD's homosexual conduct policy cannot be estimated because DOD does not collect relevant cost data on inquiries and investigations, counseling and pastoral care, separation functions, and discharge reviews. DOD does collect data on recruitment and training costs for the force overall. Using these data, we estimated that it would have cost DOD about $95 million in constant fiscal year 2004 dollars from fiscal year 1994 through fiscal year 2003 to recruit replacements for enlisted servicemembers separated for homosexual conduct.[4] DOD does calculate cost estimates related to recruiting enlisted personnel, which we applied in broad terms, for servicemembers separated under the homosexual conduct policy statute as a replacement cost. We calculated that the estimated average annual cost to recruit an enlisted servicemember over the 10-year period to be about $10,500.[5] Most of the services were able to estimate total training costs—recruit (or basic) training and occupation-specific training.

---

[4] We are not suggesting by this cost estimate that the services specifically recruit one-for-one replacements of servicemembers who have been separated for homosexual conduct.

[5] This figure is in constant fiscal year 2004 dollars. DOD compiles the basis of this cost estimate pursuant to DOD Instruction 1304.8 as part of its military personnel procurement resources report to Congress. It is constructed by averaging the DOD estimated recruiting costs for each year over the period. The annual DOD recruiting cost figure is calculated as a weighted average of the services' recruiting costs.

GAO-05-299 Military Personnel

The estimated training costs for the occupations performed by Navy members separated for homosexual conduct from fiscal year 1994 through fiscal year 2003 was about $48.8 million ($18,000 per member).[6] The comparable Air Force cost estimate was $16.6 million ($7,400 per member).[7] The Army estimated that the training cost of the occupations performed by Army members separated for homosexual conduct over the 10-year period was about $29.7 million ($6,400 per member).[8] The Marine Corps was not able to estimate occupation-related training costs. However, other types of costs such as those related to inquiries and investigations of cases, counseling and pastoral care, separation functions, and discharge reviews are not estimable because DOD does not collect data necessary to develop such estimates.

The military services separated 9,488 members[9] pursuant to the homosexual conduct policy statute from fiscal year 1994 through fiscal year 2003, some of whom were in critical occupations or had important foreign language skills. Seven hundred fifty-seven (about 8 percent) of these separated servicemembers held critical occupations[10] ("voice interceptor," "data processing technician," or "interpreter/translator"), as defined by the services. About 59 percent of the members with critical occupations who were separated for homosexual conduct were separated during their first 2.5 years of service, which is about 1.5 years before the expiration of the initial service contract of most enlistees. Such contracts are typically 4 years. Also, 322 members (about 3 percent) had some skills in an important foreign language such

---

[6] The per-member cost estimates in parentheses are a weighted average of separated servicemembers' occupations for which we have data (for the Navy, this is 2,706 of 2,970 members). The weighted average is computed by multiplying the occupational training costs for each occupation by the proportion of total students and summing the products. By doing this, the occupations with the most students are weighted the most in computing the average.

[7] We have data for 2,241 of 2,413 Air Force members.

[8] We have data for 3,339 of 3,348 Army members.

[9] Of the 9,488 servicemembers considered in our analysis, 136 were officers.

[10] The occupations most frequently cited for selective reenlistment bonuses are in appendix III.

LCR Appendix Page 1033

as Arabic, Farsi, and Korean.[11] A total of 98 members separated under the homosexual conduct policy statute completed language training at the Defense Language Institute and received a proficiency rating; 62 members, or 63 percent, were at or below the midpoint on DOD's listening, reading, or speaking proficiency scales.[12]

In commenting on a draft of this report, the Under Secretary of Defense (Personnel and Readiness) provided information on separations for homosexual conduct compared with other unprogrammed separations from fiscal year 1994 through fiscal year 2003.

# Background

## Homosexuality and the Military

The prohibition against homosexual conduct is a long-standing element of military law.[13] But in January 1993, President Clinton sought to fulfill a campaign promise to "lift the ban" on homosexuals serving in the military. This led to the policy familiarly known as "don't ask, don't tell." In exchange for the military services' silence ("don't ask") about a person's homosexuality prior to induction, gay and lesbian servicemembers, as a condition of continued service, would have to agree to silence ("don't tell") about this aspect of their life. Failure to maintain silence can result in

---

[11] Servicemembers with critical occupations and important foreign language skills are not necessarily mutually exclusive groups because some critical occupations such as cryptologic linguists and interrogators require a foreign language skill. Thus a servicemember could be included in both the critical occupations and important foreign languages groups.

[12] To assess language proficiencies, DOD uses an 11-point scale. DOD describes the midpoint on this scale as "limited working proficiency plus." According to the Defense Language Institute, students can graduate from the basic program with proficiencies somewhat below the midpoint of this scale. For foreign-language-related issues in the federal government, see GAO, *Foreign Languages: Human Capital Approach Needed to Correct Staffing and Proficiency Shortfalls*, GAO-02-375 (Washington, D.C.: Jan. 31, 2002). We stated in this report that in fiscal year 2001, the Army had a 25 percent shortfall in cryptologic linguists and a 13 percent shortfall in human intelligence collectors in several key languages taken as a whole.

[13] 10 U.S.C. § 654(a)(13).

separation from the military.[14] In November 1993, Congress passed the homosexual conduct policy statute and stated that the military's suspension of questioning should remain in effect unless the Secretary of Defense considers reinstatement of questioning necessary to effectuate the policy set out in the statute.[15] The statute also sets out the findings of Congress in addition to the homosexual conduct policy. Included in the findings section is a description of the differences between military and civilian life, which forms a rationale for the institution of the policy.

Military life is fundamentally different from civilian life in that the extraordinary responsibilities of the armed forces, the unique conditions of military service, and critical role of unit cohesion, require that the military community, while subject to civilian control, exist as a specialized society [which] is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society.[16]

In short, Congress indicated that because of the unique nature of military life, the military services may need to treat individuals who engage in homosexual acts, as defined by the statute, differently than they would be treated in civilian society.

## Separations for Homosexual Conduct during 1994-2003 Period

According to our analysis of the information provided by the Defense Manpower Data Center, 9,488 servicemembers were separated for homosexual conduct from fiscal year 1994 through fiscal year 2003.[17] This figure represents servicemembers who were on active duty at the time of their separation, including members of the Reserves who were on active duty for 31 or more consecutive days. According to a Data Center official,

---

[14] 10 U.S.C. § 654(b) and DOD Directive 1304.26, *Qualification Standards for Enlistment, Appointment and Induction* (Mar. 4, 1994). For a discussion of issues associated with the "don't ask, don't tell" policy, see Congressional Research Service, *Homosexuals and U.S. Military Policy: Current Issues* (Mar. 17, 1999).

[15] Pub. L. No. 103-160, § 571(b)-(d), (10 U.S.C § 654, notes).

[16] 10 U.S.C. § 654(a)(8).

[17] In commenting on a draft of this report, the Under Secretary of Defense (Personnel and Readiness) stated that 9,501 servicemembers were separated for homosexual conduct from fiscal year 1994 through fiscal year 2003. (See appendix IV.) According to the Servicemembers Legal Defense Network, 9,682 servicemembers were separated for homosexual conduct during the same period. The Network reports information on these separations at www.sldn.org.

LCR Appendix Page 1035

118 reservists (other than those who served on active duty) were separated for homosexual conduct from fiscal year 1993 through fiscal year 2003. Because these separated reservists represent a small number of total separations under the homosexual conduct policy statute, we did not include them in our analysis. This exclusion is consistent with DOD's reporting practice in this area, which reports only active duty personnel separated for homosexual conduct. The figure also does not include servicemembers who were in the Army National Guard, the Air National Guard, or the Coast Guard. According to a Data Center official, the official tracking of separations for homosexual conduct began in 1997 at which time it was decided to include only the members of the Air Force, Army, Marines, and Navy on active duty. The data also do not include servicemembers who, for example, were separated for a "pattern of misconduct," which could include several reasons for separation, including homosexual conduct.

The Data Center also provided data on the characterization of service at separation for service members separated for homosexual conduct from fiscal year 1994 through fiscal year 2003. For "characterized" separations (5,763 servicemembers), DOD granted "honorable" separations to 4,710 servicemembers (82 percent); "general (under honorable conditions)" separations to 766 (13 percent); and "under other than honorable conditions" separations to 287 servicemembers (5 percent). DOD also granted "uncharacterized," or entry-level separations to 3,304 servicemembers who were separated for homosexual conduct during this 10-year period. The Data Center also classified as "bad conduct," the separation of four servicemembers, which is a type of punitive separation applicable to enlisted personnel only. (See *Manual for Courts Martial*, Rule 1003(b)(8).) The Data Center did not have characterization-of-service data for 417 servicemembers who were separated for homosexual conduct during this 10-year period.

Table 1 and figures 1 and 2 show the number of separations by military service, race, and gender, respectively, from fiscal year 1994 through fiscal year 2003.

LCR Appendix Page 1036

**Table 1: Number of Separations of Active Duty Servicemembers for Homosexual Conduct by Fiscal Year and Military Service**

| Fiscal year | Army | Air Force | Marines | Navy | Total[a] |
|---|---|---|---|---|---|
| 1994 | 136 | 185 | 36 | 258 | 615 |
| 1995 | 184 | 235 | 69 | 269 | 757 |
| 1996 | 199 | 284 | 60 | 315 | 858 |
| 1997 | 197 | 309 | 78 | 413 | 997 |
| 1998 | 310 | 414 | 76 | 345 | 1,145 |
| 1999 | 271 | 352 | 97 | 313 | 1,033 |
| 2000 | 574 | 177 | 104 | 358 | 1,213 |
| 2001 | 626 | 190 | 111 | 290 | 1,217 |
| 2002 | 432 | 125 | 105 | 222 | 884 |
| 2003 | 378 | 142 | 62 | 187 | 769 |
| Total | 3,307 | 2,413 | 798 | 2,970 | 9,488 |
| Percent | 35 | 25 | 8 | 31 | 99 |

Sources: Defense Manpower Data Center (data); GAO (data).

[a]Percents do not equal 100 because of rounding.

**LCR Appendix Page 1037**

**Figure 1: Separations for Homosexual Conduct by Race, Fiscal Years 1994 through 2003**



Sources: Defense Manpower Data Center (data); GAO (analysis).

**LCR Appendix Page 1038**

**Figure 2:  Separations for Homosexual Conduct by Gender, Fiscal Years 1994 through 2003**



Sources: Defense Manpower Data Center (data); GAO (analysis).

Note: Gender information was not available for 15 of the 9,488 servicemembers separated for homosexual conduct during this period.

The homosexual conduct policy statute states three reasons for separation, namely, that a servicemember has (1) "engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts…;" (2) "stated that he or she is a homosexual or bisexual, or words to that effect…;" or (3) "married or attempted to marry a person known to be of the same biological sex." In addition, the statute provides mitigating factors that may prevent separation in cases arising under the first two categories.[18] Figure 3 shows the distribution of separations by these three reasons from fiscal year 1994 through fiscal year 2003.

---

[18] 10 U.S.C. § 654(b).

LCR Appendix Page 1039

**Figure 3: Separations under DOD's Homosexual Conduct Policy by Reason, Fiscal Years 1994 through 2003**



**1%**
Married or attempted to marry a person known to be of the same biological sex (57)

**16%**
Engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts (1,520)

**83%**
Stated that he or she is a homosexual, bisexual, or words to that effect (7,900)

Sources: Defense Manpower Data Center (data); GAO (analysis).

Note: The figure displays information on 9,477—rather than all 9,488 servicemembers separated for homosexual conduct during the 10-year period—because the statutory reason for separation was missing for 11 former servicemembers.

---

**Previous GAO Report on Costs Associated with DOD's Homosexual Conduct Policy**

In 1992 GAO reviewed DOD's policy on homosexuality, including the costs associated with replacing personnel separated under the policy and the cost of investigating allegations of homosexuality.[19] We concluded that "DOD does not maintain records of the costs associated with administering its policy [on homosexuality]; nor does it record the costs of investigating alleged cases of homosexuality. Accordingly, our analysis was limited to estimates of the costs of recruiting and training individuals to replace personnel discharged for homosexuality."

We also noted that the total cost of replacing personnel discharged for homosexuality would need to include other factors such as out-processing and court costs.

---

[19] See GAO, *Defense Force Management: DOD's Policy on Homosexuality*, GAO/NSIAD-92-98 (Washington, D.C.: June 12, 1992).

**LCR Appendix Page 1040**

The cost data in this report and the 1992 report are not comparable because, at the time of the 1992 review, we did not include the estimated training costs for the occupations of servicemembers who were separated for homosexual conduct.

## Costs of Certain Activities Associated with DOD's Homosexual Conduct Policy Can Be Estimated

Though the total costs associated with DOD's homosexual conduct policy cannot be determined because neither DOD nor the services collect relevant cost data, some costs can be estimated. For example, DOD does collect estimates of the costs to recruit enlisted servicemembers, a portion of which can be associated with DOD's homosexual conduct policy. In addition, upon our request, the services were able to calculate the estimated costs associated with the training of personnel by occupation. However, DOD was unable to estimate the costs associated with other activities related to DOD's homosexual conduct policy, namely, those related to investigations and commanders' inquiries, counseling and pastoral care, and the processing and review of separations.

### DOD Collects Data Related to Recruitment Costs

While not specific to individuals discharged for homosexual conduct or other reasons, DOD does collect data related to the cost to recruit servicemembers. Collected data related to DOD's annual average recruiting cost estimate for enlisted servicemembers are shown in figure 4. Taken together, available data show that the average annual recruiting cost estimate for enlisted personnel from fiscal year 1994 through fiscal year 2003 was about $10,500 per member in constant fiscal year 2004 dollars.[20]

---

[20] This figure is an average of DOD's reported cost per recruit. Each of the services annually reports recruiting costs to DOD that are weighted by the size of the force to determine an average cost per recruit. DOD's reports on recruiting do not include the cost per recruit for officers and medical personnel.

LCR Appendix Page 1041

**Figure 4:  Average Annual Recruiting Cost Estimate by Military Service and DOD, Fiscal Years 1994 through 2003**



Source: DOD.

Note: All figures are in constant fiscal year 2004 dollars. Tabular data related to cost in this and other figures are in appendix II.

The total estimated cost to recruit potential replacements for the 9,352 enlisted servicemembers separated under DOD's homosexual conduct policy during the 10-year period[21] was about $95 million in constant fiscal year 2004 dollars. (See table 4 in appendix II.) Estimated recruiting costs by military service are shown in figure 5.

---

[21] Of the 9,488 servicemembers considered in our analysis, 136 were officers, and recruitment costs per officer were not available.

LCR Appendix Page 1042

**Figure 5: Estimated Recruiting Costs to Replace Enlisted Personnel Separated for Homosexual Conduct, Fiscal Years 1994 through 2003**



Dollars in thousands

Fiscal year

- Air Force
- Marine Corps
- Navy
- Army

Sources: DOD (data); GAO (analysis).

Note: All figures are in constant fiscal year 2004 dollars.

## Most Military Services Can Compute Estimates of Costs to Train Personnel

With the exception of the Marine Corps, the services were able to compute cost estimates to train members, by occupation, upon our request. We asked the military services to provide total and per-capita training-cost estimates of the occupations performed by servicemembers who were separated under the homosexual conduct policy statute for fiscal years 1994 through 2003. These figures include estimates of all training costs related to selected occupations, including recruit training. The Navy estimated that the total training cost for the 10-year period was $48.8 million and the estimated per-capita cost was about $18,000. The comparable total estimated cost for the Air Force was $16.6 million, and

LCR Appendix Page 1043

the per-capita cost estimate was $7,400. The Army estimated that the training cost for selected Army occupations for the 10-year period was about $29.7 million. The estimated average training cost of these occupations was about $6,400 per member.

| Other Types of Costs Associated with the Homosexual Conduct Policy Cannot Be Estimated | We also examined the availability of other cost-estimate data associated with homosexual conduct, including investigations and inquiries, counseling and pastoral care, processing separations from military service, and the review of such separations by service boards. For these cost categories, we found that relevant data (for example, a system that records the time spent on specific tasks for specific reasons) are not collected, and, as a result, these types of costs cannot be estimated. |

**Investigations and Commanders' Inquiries**

Investigative cost estimates were not available for our inquiry because DOD law enforcement organizations do not generally investigate adult private consensual sexual misconduct as a matter of investigative priority and because of resource limitations. As the Navy notes in a policy statement on this subject, "if there is no victim, there is virtually no circumstance where the [criminal investigative service] will investigate sexual misconduct." Sexual misconduct cases under these circumstances are referred to commanders for appropriate disposition. And because commanders do not record the time they spend on sexual misconduct inquiries, it is not possible to estimate the cost of conducting them.

**Counseling and Pastoral Care**

The estimated cost of counseling services, including pastoral care provided through the chaplains corps, is also not determinable. Servicemembers separated for homosexual conduct are not required to seek counseling. Army and Navy chaplains, for example, record the types of tasks they perform—religious ministry, outreach, or pastoral care—but they are not required to compute the time they spend performing these activities. Consequently, it is not possible to estimate the cost of conducting such tasks. Furthermore, chaplains are not required to differentiate "pastoral care" in their task reports by topics covered such as homosexual conduct or sexual harassment.

**Processing Separations from Military Service**

The estimated cost of separating servicemembers also cannot be determined. Separation procedures are handled by salaried employees who work in the personnel offices of various military installations and who have multiple responsibilities other than coordinating a servicemember's

**LCR Appendix Page 1044**

separation from the military. They too do not compute their time spent on the various activities they perform.

**Review of Separations by Service Boards**

Servicemembers who have been separated for homosexual conduct have occasionally requested service discharge review boards to review whether their separations were properly granted. The estimated costs associated with this activity also cannot be determined. Officials associated with such boards told us that they are not required to compute the estimated cost of reviewing servicemembers' requests and that they do not record the number of reviews associated with DOD's homosexual conduct policy. But service discharge review board officials were able to identify for us at least 119 reviews associated with homosexual conduct (the Army, 72 reviews, fiscal years 1993-2003; Navy, 24 reviews, and Marines, 11 reviews, fiscal years 2000-2003; and Air Force, 12 reviews, fiscal years 2001-3). The service discharge boards conducted about 33,200 reviews during these same time periods.

# Servicemembers with Critical Occupations and/or Important Language Skills Have Been Separated for Homosexual Conduct

From fiscal year 1994 through fiscal year 2003, the military services separated members who had some training in critical occupations and/or important foreign languages pursuant to the homosexual conduct policy statute. Most servicemembers who had such occupations were separated during their first 2.5 years of service. Also, DOD separated servicemembers who had some language skills in Arabic, Chinese, Farsi, and Korean. Relatively few of these separated servicemembers had proficiency scores in listening to, reading, or speaking these four languages that were above the midpoint on DOD's language proficiency scales, although students can graduate from the basic program with proficiencies somewhat below the midpoint of this scale.

**Most Separated Servicemembers Who Had Critical Occupations Were Separated during Their First 2.5 Years of Service**

Servicemembers with critical occupations were separated for homosexual conduct from fiscal year 1994 through fiscal year 2003. Examples of critical occupations, as defined by the military services, include "voice interceptor," "data processing technician," and "interpreter/translator." The occupations most frequently cited as "critical," that is, eligible for selective reenlistment bonuses are listed in appendix III. (See table 9.) We found that 757 (about 8 percent) of the 9,488 servicemembers discharged for homosexual conduct during this time period held critical occupations.

LCR Appendix Page 1045

Before new recruits are sent to recruit training, they are required to take an enlistment oath and sign a contract to serve one of the military services for a specified period of time, generally from 2 to 6 years and typically for 4 years. Consequently, a separation within 1.5 years is well before the end of a typical service contract for enlisted personnel. By comparison, we reported in 1998 that for fiscal years 1982 through 1993, about 32 percent of all enlistees were separated during their first term of service: 11 percent of enlistees were separated during their first 6 months (versus about 30 percent of servicemembers who were separated for homosexual conduct during their first 6 months) and about 21 percent of all enlistees from their 7th through 48th month.[23]

Next, we analyzed the length of service for 755 servicemembers separated for homosexual conduct who had critical occupations.[24] The separation rate for this group was lower than for the total population separated for homosexual conduct. Generally, 267 servicemembers (about 35 percent) were separated within about 1.5 years of service, and 443 servicemembers (about 59 percent) were separated within about 2.5 years of service. Figure 6 shows the separation rate of servicemembers who had critical occupations by various time periods.

---

[23] GAO, *Military Attrition: Better Data, Coupled With Policy Changes, Could Help the Services Reduce Early Separations*, GAO/NSIAD-98-213 (Washington, D.C., Sept. 15, 1998).

[24] The Data Center has length-of-service data for 755 of the 757 separated servicemembers who held critical occupations.

LCR Appendix Page 1046

Figure 6:  Distribution of the Amount of Time Served by Individuals with Critical Occupations prior to Separation for Homosexual Conduct, Fiscal Years 1994 through 2003



**3%**
Period 1: Separated within 3 months of military service (recruit training)

**4%**
Period 2: Separated within 3 to 6 months of military service (advanced individual training)

Period 3: Separated within 6 months to 1.5 years of military service

Period 4: Separated within 1.5 to 2.5 years of military service

Period 5: Separated after more than 2.5 years of service

Sources: Defense Manpower Data Center (data); GAO (analysis).

We identified servicemembers separated under the homosexual conduct policy statute who had intelligence-related occupations (a partial list of these occupations is in appendix III, table 10); not all of these occupations were related to the selective reenlistment bonus program. We identified 730 separated servicemembers who held intelligence-related occupations from fiscal year 1994 through fiscal year 2003. The separation rate is similar to the separation rate of servicemembers who held occupations that were related to a selective reenlistment bonus: 274 of these servicemembers (about 38 percent) were separated within about 1.5 years of service, and 450 servicemembers (about 62 percent) were separated within about 2.5 years of service. Figure 7 shows the separation rate of servicemembers with intelligence-related occupations by various time periods.

**LCR Appendix Page 1047**

Figure 7:  Distribution of the Amount of Time Served by Individuals with Intelligence-Related Occupations prior to Separation for Homosexual Conduct, Fiscal Years 1994 through 2003



4%
Period 1: Separated within 3 months of military service (recruit training)

4%
Period 2: Separated within 3 to 6 months of military service (advanced individual training)

29% — Period 3: Separated within 6 months to 1.5 years of military service

62%

24% — Period 4: Separated within 1.5 to 2.5 years of military service

Period 5: Separated after more than 2.5 years of service

38%

Source: Defense Manpower Data Center (data); GAO (analysis).

Note: Parts may not sum to equal cumulative percents because of rounding. (See appendix III for frequency counts.)

## Some Servicemembers with Training in Important Languages Were Separated for Homosexual Conduct

DOD separated several hundred members with training in important foreign languages. During fiscal years 1994 through 2003, DOD separated 322 servicemembers for homosexual conduct who had some skills in a foreign language that DOD had considered to be especially important. A total of 209 separated servicemembers attended the Defense Language Institute for training in one of these important languages. Ninety-eight of these 209 completed training and received a proficiency rating, and 62 members (63 percent of the 98) had proficiency scores at or below the midpoint on DOD's language proficiency scales for listening, reading, or speaking. To assess listening, reading, and speaking proficiencies, DOD uses an 11-point scale. DOD describes the midpoint as "limited working proficiency, plus." According to the Defense Language Institute, in order to graduate from the basic language program, students are expected to achieve at least a "limited working proficiency" in listening and reading and

an "elementary proficiency, plus" in speaking a foreign language. Both of these levels are below the midpoint on DOD's proficiency scale. Table 2 shows the number of servicemembers separated for homosexual conduct who had some skill in an important foreign language.

**Table 2: Number of Servicemembers Separated for Homosexual Conduct with Some Proficiency in an "Important Foreign Language," Fiscal Years 1994 through 2003**

| Language | Number of separated servicemembers | | Number of students with listening proficiency[a] | | Number of students with reading proficiency[a] | | Number of students with speaking proficiency[a] | |
|---|---|---|---|---|---|---|---|---|
| | Who attended Defense Language Institute | Language Institute students with proficiency scores | Below midpoint | Above midpoint | Below midpoint | Above midpoint | Below midpoint | Above midpoint |
| Arabic | 54 | 20 | 10 (50) | 5 (25) | 8 (40) | 7 (35) | 20 (100) | 0 (0) |
| Chinese | 20 | 6 | 1 (17) | 0 (0) | 0 (0) | 5 (83) | 4 (67) | 1 (17) |
| Farsi | 9 | 2 | 2 (100) | 0 (0) | 1 (50) | 1 (50) | 2 (100) | 0 (0) |
| Korean | 50 | 25 | 21 (84) | 2 (8) | 17 (68) | 1 (4) | 24 (96) | 0 (0) |
| Russian | 42 | 25 | 11 (44) | 8 (32) | 5 (20) | 9 (36) | 19 (76) | 4 (16) |
| Serbo-Croatian | 8 | 4 | 2 (50) | 1 (25) | 1 (25) | 0 (0) | 3 (75) | 1 (25) |
| Spanish | 24 | 15 | 5 (33) | 5 (33) | 1 (7) | 5 (33) | 12 (80) | 1 (7) |
| Vietnamese | 2 | 1 | 1 (100) | 0 (0) | 0 (0) | 1 (100) | 1 (100) | 0 (0) |
| Total number | 209 | 98 | 53 | 21 | 33 | 29 | 85 | 7 |
| Percent | 100 | 47 | 54 | 24 | 34 | 30 | 87 | 7 |

Sources: Defense Manpower Data Center (data); GAO (analysis).

Notes:

1. "Important" foreign languages are those for which servicemembers are eligible to receive selective reenlistment bonuses or those identified as "deficiencies" by combatant commanders and the Joint Staff in their periodic readiness assessments.

2. The table does not include the number and percentage of students with scores at the midpoint but includes such information only for students below or above the midpoint.

[a]Percentages in parentheses. The Data Center has length-of-service data for 205 of the separated servicemembers who received training in an important foreign language.

We analyzed the length of service for the 205 separated servicemembers who had received training in an important foreign language at the Defense Language Institute. Figure 8 shows the separation rate for these

LCR Appendix Page 1049

servicemembers. About 131 (64 percent) were separated within about 2.5 years of service.

**Figure 8: Distribution of the Amount of Time Served by Individuals Trained in Important Languages prior to Separation for Homosexual Conduct, Fiscal Years 1994 through 2003**



**1%**
Period 2: Separated within 3 to 6 months of military service (advanced individual training)

**30%** ● Period 3: Separated within 6 months to 1.5 years of military service

**33%** ● Period 4: Separated within 1.5 to 2.5 years of military service

**64%**

Period 5: Separated after more than 2.5 years of service

Sources: Defense Manpower Data Center (data); GAO (analysis).

Note: No servicemember with training in critical languages was separated for homosexual conduct in Period 1, the first 3 months of military service, which generally corresponds to recruit training.

We further analyzed the occupations of the 54 separated servicemembers who received training in Arabic at the Defense Language Institute. We were able to match 42 (about 78 percent) with an occupation that utilizes a foreign language, many in intelligence-related occupations such as "cryptologic linguist" or "communications interceptor." However, these 42 members might have had limited experience in their occupation because 36 servicemembers (about 86 percent of the 42) were listed as "helpers" or "apprentices," or had the lowest skill level associated with the occupation.

LCR Appendix Page 1050

## Agency Comments and Our Evaluation

In commenting on a draft of this report, the Under Secretary of Defense (Personnel and Readiness) provided information on separations for homosexual conduct compared with other unprogrammed separations from fiscal year 1994 through fiscal year 2003. DOD also provided technical changes, which we made where appropriate. The department's written comments are incorporated in their entirety in appendix IV.

Unless you publicly announce its contents earlier, we plan no further distribution of this report until 3 days from its issue date. At the time, we will send copies of this report to the Secretary of Defense; the Secretaries of the Army, the Air Force, and the Navy; the Commandant of the Marine Corps, the Director of the Office of Management and Budget; and interested congressional committees. We will also make copies available to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

Please contact me on (202) 512-5559 (Stewartd@gao.gov) or George Poindexter, Assistant Director, on (202) 512-7213 (Poindexterg@gao.gov), if you or your staff have any questions concerning this report. Major contributors to this report were Lisa Brown, Alissa Czyz, Joe Faley, Nicole Gore, Catherine Humphries, Tom Mills, Charles Perdue, and Jen Popovic.

*Derek B. Stewart*

Derek B. Stewart, Director
Defense Capabilities and Management

LCR Appendix Page 1051

*List of Congressional Requesters*

The Honorable Martin T. Meehan
Ranking Minority Member
  Subcommittee on Terrorism,
Unconventional Threats and Capabilities
Committee on Armed Services
House of Representatives

The Honorable Neil Abercrombie
Ranking Minority Member
Subcommittee on Tactical Air and Land Forces
Committee on Armed Services
House of Representatives

The Honorable Tom Allen
The Honorable Robert Andrews
The Honorable Tammy Baldwin
The Honorable Danny Davis
The Honorable Susan A. Davis
The Honorable Diana DeGette
The Honorable William Delahunt
The Honorable Eliot Engel
The Honorable Barney Frank
The Honorable Sheila Jackson-Lee
The Honorable James R. Langevin
The Honorable Carolyn Maloney
The Honorable George Miller
The Honorable Jim Moran
The Honorable Jerrold Nadler
The Honorable Eleanor Holmes Norton
The Honorable Christopher Shays
The Honorable Adam Smith
The Honorable Pete Stark
The Honorable Lynn Woolsey
House of Representatives

**LCR Appendix Page 1052**

Appendix I

# Scope and Methodology

To conduct our work, we interviewed individuals at a variety of Department of Defense (DOD) and service offices, including the office of the Under Secretary of Defense for Personnel and Readiness; DOD's Office of Accession Policy; DOD's Defense Manpower Data Center; and offices in the military services responsible for budget, investigation, chaplaincy, separation, and discharge review.

To determine the estimated financial costs associated with DOD's homosexual conduct policy, we obtained information on the estimated costs to recruit enlisted personnel from fiscal year 1994 through fiscal year 2003 from DOD's Office of Accession Policy. DOD includes this information in the Military Personnel Procurement Resources Report. DOD calculates recruiting cost per enlisted member by dividing a military service's total expenditures for recruiting enlisted personnel by the service's total number of accessions. Recruiting expenditures include, but are not limited to, the costs associated with recruiting personnel, enlistment bonuses, advertising, communications, recruiting support, and recruiting command resources. We computed an average of the reported figures for fiscal years 1994 through 2003. DOD does not include per-capita recruiting costs associated with commissioned officers in its procurement resources report.

We also requested that each of the four military services provide estimated training cost information for occupations performed by enlisted servicemembers who were separated for homosexual conduct from fiscal year 1994 through fiscal year 2003. In order to provide total estimated training costs, we asked the services to provide estimates of both fixed and variable costs[1] associated with each occupation. Estimated occupation-related training costs include, but are not limited to, military and civilian pay for instructors, operations and maintenance, student transportation, ammunition, supplies, and flying costs (if any). We reviewed the services' general methodology for developing training-cost estimates and found

---

[1] Total costs are the total costs of producing any given level of output. Total cost can be divided in two parts: fixed costs and variable costs. Fixed costs are those that do not vary with output. All costs that vary directly with output are variable costs.

LCR Appendix Page 1053

them acceptable. We used weighted averages[2] to estimate the average per-member occupational training costs for the Air Force, Army, and Navy. The Marine Corps was unable to provide this information. Additionally, we excluded from our analysis the training costs associated with medical and health-care-related occupations because the services could not reasonably estimate them. Service officials told us that the length of training and other factors necessary to achieve a health-care-related proficiency varies widely, as do the costs associated with them.

To assess the extent to which DOD separated members with critical occupations or important foreign language skills, we obtained occupation- and foreign-language-related data (for fiscal years 1994-2003) on servicemembers separated for homosexual conduct from the Defense Manpower Data Center's Active Duty Personnel Transaction File, which is a compilation of data provided by each of the military services. Our analysis was limited to active duty personnel and did not include 118 reservists who were separated for homosexual conduct because they represent a small number of total separations under the homosexual conduct policy statute. This is consistent with DOD's reporting practice in this area. The department reports only active duty personnel separated for homosexual conduct. The Data Center provided information on an individual's branch of service, occupation, rank, length of time in service, and language skills.

With respect to the occupational data, we adopted the military services' definition of a "critical" occupation as an occupation that was part of the selective reenlistment bonus program. The selective reenlistment bonus program for enlisted military personnel is DOD's primary tool for addressing short-term retention problems in critical occupations by providing servicemembers who reenlist following the expiration of their service contracts with up to $60,000. The Army, Marines, and Navy list their 10 most critical occupations in their annual budget justifications. The Air Force, however, does not prioritize its critical occupations in its budget justification. The services determine reenlistment bonus amounts by multiplying (1) a servicemember's current monthly basic pay by

---

[2] In calculating a weighted average, each value is multiplied by its "weight," and this product is summed for all values. The "weight" is derived as a proportion of the total. With respect to a service's occupational training costs, the costs of training for an occupation (the value) would be multiplied by that occupation's weight (that occupation's proportion of total servicemembers for all occupations). This product would be summed for all occupations to calculate a service's weighted average of occupational training costs.

(2) the member's number of additional years of obligated service by (3) a bonus multiple that can range from 0.5 to 15. For the Air Force, we used this bonus multiple to determine a list of the 10 most critical occupations for each year from fiscal year 1994 through fiscal year 2003; the Air Force occupations with the 10 largest bonus multipliers in a specific year were deemed by us to be the most critical. For example, in 1 year we included Air Traffic Control in the list of the top 10 Air Force occupations because it had a bonus multiplier of 7, which is the largest multiplier that the Air Force used from fiscal year 1994 through fiscal year 2003. In contrast, Pararescue, and all other occupations that had a bonus multiplier of 5 for that year, were not included on our list of most critical Air Force occupations. This is because there were at least 10 Air Force occupations whose bonus multipliers were 5.5, 6, or 7. Note that, in other years, depending on the bonus multipliers for all jobs, Pararescue could be included as an occupation on the "top ten" list.

To assess the extent to which DOD separated individuals for homosexual conduct in intelligence-related occupations, we compiled a list of service-level occupation titles that could be categorized as "intelligence-related" by their relationship to DOD's occupational codes. DOD occupation codes are a way of organizing service-level occupations into general categories. Each separated servicemember whose occupation matched an intelligence-related DOD occupational code was considered to have an intelligence-related occupation.

Finally, with respect to separations for homosexual conduct of individuals with important language skills, we identified separated servicemembers with foreign language skills using language data drawn from the Defense Manpower Data Center. The Data Center provided two types of language data. The first type addresses the language skills of servicemembers who attended the Defense Language Institute's Foreign Language Center. Language proficiency data for these students are based on the Defense Language Proficiency Test score they received when tested at the completion of their course of study. The other type of language data in the active duty file is information reported to the Data Center by the services. The language proficiency data in this file are based on multiple sources—from servicemembers themselves or from the official Defense Language Institute proficiency test.

Although we did not validate the budget/financial systems and processes used to calculate the cost estimates used in this report, we determined that the estimates were sufficiently reliable for the purpose of this report. As

**Appendix I**
**Scope and Methodology**

previously discussed, we assessed the reliability of these data by (1) reviewing existing information about the data and the systems that produced them and (2) interviewing agency officials knowledgeable about the data to determine the steps taken to ensure the accuracy and completeness of the data.

We assessed the reliability of the Defense Manpower Data Center's Active Duty Military Personnel Transaction file by (1) performing electronic testing of the required data elements, (2) reviewing existing information about the data and the system that produced them, and (3) interviewing agency officials knowledgeable about the data. We determined that the data were sufficiently reliable for the purpose of this report. We conducted our review from August 2004 through February 2005 in accordance with generally accepted government auditing standards.

**LCR Appendix Page 1056**

Appendix II

# Financial Cost Estimate Tables

## Estimated Cost of Recruiting Servicemembers Separated for Homosexual Conduct

Table 4 shows that the total estimated cost to recruit potential replacements for enlisted servicemembers separated for homosexual conduct from fiscal year 1994 through fiscal year 2003 was about $95 million. To compute this cost, we multiplied the number of servicemembers as shown in table 1 (less the number of officers) by the data in table 3 for each service and each year. For example, we multiplied the number of Army members who were separated for homosexual conduct in fiscal year 1994—136—from table 1 by the Army's average annual recruiting cost for fiscal year 1994 ($9,597) from table 3 in order to compute $1.305 million in table 4. The sum of these calculations for the 10-year period is about $95 million in constant fiscal year 2004 dollars.

**Table 3: Estimated Average Annual Recruiting Cost by Military Service and DOD, Fiscal Years 1994 through 2003**

Constant FY 2004 dollars

| Service | Fiscal year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| Army | $9,597 | $11,053 | $10,460 | $11,547 | $13,059 | $14,278 | $14,078 | $15,509 | $16,200 | $16,536 |
| Navy | 6,937 | 8,214 | 8,573 | 8,466 | 8,803 | 10,124 | 10,162 | 11,221 | 13,121 | 13,394 |
| Marine Corps | 7,362 | 5,732 | 6,595 | 6,313 | 6,560 | 8,208 | 8,353 | 8,831 | 8,453 | 9,356 |
| Air Force | 4,832 | 4,805 | 4,873 | 5,306 | 5,126 | 6,636 | 8,244 | 9,928 | 9,934 | 9,376 |
| DOD | 8,315 | 8,953 | 7,606 | 9,519 | 8,928 | 10,134 | 10,913 | 12,906 | 13,715 | 14,206 |

Source: DOD.

GAO-05-299 Military Personnel

**LCR Appendix Page 1057**

Appendix II
Financial Cost Estimate Tables

**Table 4: Total Estimated Recruiting Costs to Replace Enlisted Personnel Separated for Homosexual Conduct, Fiscal Years 1994 through 2003**

Dollars in thousands

| Fiscal year | Army | Air Force | Marines | Navy | Total |
|---|---|---|---|---|---|
| 1994 | $1,305 | $879 | $265 | $1,755 | $4,204 |
| 1995 | 2,023 | 1,086 | 395 | 2,152 | 5,656 |
| 1996 | 2,040 | 1,345 | 389 | 2,632 | 6,406 |
| 1997 | 2,263 | 1,613 | 492 | 3,446 | 7,814 |
| 1998 | 4,035 | 2,097 | 499 | 2,958 | 9,589 |
| 1999 | 3,855 | 2,289 | 788 | 3,159 | 10,091 |
| 2000 | 8,110 | 1,443 | 860 | 3,587 | 14,000 |
| 2001 | 9,585 | 1,807 | 980 | 3,221 | 15,593 |
| 2002 | 6,638 | 1,192 | 879 | 2,860 | 11,569 |
| 2003 | 6,091 | 1,322 | 580 | 2,478 | 10,471 |
| Total | $45,945 | $15,073 | $6,127 | $28,248 | $95,393 |
| Percent | 48 | 16 | 6 | 30 | 100 |

Sources: Defense Manpower Data Center (data); GAO (analysis).

Note: All figures are in constant fiscal year 2004 dollars.

GAO-05-299 Military Personnel

**LCR Appendix Page 1058**

Appendix III

# Critical Occupation Data Tables

## Length of Service of Servicemembers Who Were Separated for Homosexual Conduct

Most servicemembers separated for homosexual conduct were separated within 1.5 years of entering military service (approximately periods 1-3 in table 5). The first and second periods on the table correspond to different phases of enlisted personnel training: recruit training (Period 1) and advanced individual training (Period 2), when a servicemember is initially trained in an occupation. The exact number of days in each period varies by service.[1]

**Table 5: Individuals Separated for Homosexual Conduct during Selected Intervals, Fiscal Years 1994 through 2003**

| | Number | | | | | |
|---|---|---|---|---|---|---|
| Service | Period 1: recruit training | Period 2: advanced individual training | Period 3: next 365 days | Period 4: next 365 days | Period 5: subsequent periods | Total |
| Marine Corps | 153 | 76 | 289 | 123 | 139 | **780** |
| Army | 583 | 407 | 918 | 522 | 811 | **3,241** |
| Navy | 47 | 260 | 1,154 | 568 | 886 | **2,915** |
| Air Force | 964 | 294 | 301 | 245 | 499 | **2,303** |
| **Total number** | **1,747** | **1,037** | **2,662** | **1,458** | **2,335** | **9,239** |
| Percent | 19 | 11 | 29 | 16 | 25 | 100 |

| | Percent[a] | | | | | |
|---|---|---|---|---|---|---|
| Service | Period 1: recruit training | Period 2: advanced individual training | Period 3: next 365 days | Period 4: next 365 days | Period 5: subsequent periods | |
| Marine Corps | 20 | 10 | 37 | 16 | 18 | **101** |
| Army | 18 | 13 | 28 | 16 | 25 | **100** |
| Navy | 2 | 9 | 40 | 19 | 30 | **100** |
| Air Force | 42 | 13 | 13 | 12 | 22 | **102** |

Sources: Defense Manpower Data Center (data); GAO (analysis).

Note: The Data Center has length-of-service data for 9,239 of the 9,488 servicemembers who were separated for homosexual conduct during the 10-year period.

[a]Percents may not add to 100 because of rounding.

[1] Period 1, recruit training, includes the following intervals for each of the services: Marines, 0 to 84 days; Army, 0 to 63 days; Navy, 0 to 56 days; and Air Force, 0 to 42 days. Period 2, the average time for advanced individual training (100 days), includes the following intervals for each of the services: Marines, 85 to 185 days; Army, 64 to 164 days; Navy, 57 to 157 days; and Air Force, 43 to 143 days. Period 3 spans 1 year from the end of the advanced individual training period, and period 4 spans 1 year from the end of period 3. Period 5 includes all subsequent time periods.

**LCR Appendix Page 1059**

Appendix III
Critical Occupation Data Tables

## Length of Service of Separated Servicemembers Who Had Critical Occupations

Most servicemembers separated for homosexual conduct who had critical occupations were separated within 2.5 years of entering the military. Two and a half years corresponds approximately to the end of the 4th period in table 6.

Table 6:  Individuals with Critical Occupations Separated for Homosexual Conduct during Selected Intervals, Fiscal Years 1994 through 2003

| Service | Number | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Period 1: recruit training | Period 2: advanced individual training | Period 3: next 365 days | Period 4: next 365 days | Period 5: subsequent periods | Total |
| Marine Corps | 0 | 1 | 0 | 0 | 3 | 4 |
| Army | 21 | 19 | 47 | 38 | 39 | 164 |
| Navy | 0 | 1 | 135 | 102 | 207 | 445 |
| Air Force | 0 | 9 | 34 | 36 | 63 | 142 |
| Total number | 21 | 30 | 216 | 176 | 312 | 755 |
| Percent | 3 | 4 | 29 | 23 | 41 | 100 |
| Service | Percent[a] | | | | | |
| | Period 1: recruit training | Period 2: advanced individual training | Period 3: next 365 days | Period 4: next 365 days | Period 5: subsequent periods | |
| Marine Corps | 0 | 25 | 0 | 0 | 75 | 100 |
| Army | 13 | 12 | 29 | 23 | 24 | 101 |
| Navy | 0 | <1 | 30 | 23 | 47 | 101 |
| Air Force | 0 | 6 | 24 | 25 | 44 | 99 |

Sources:  Defense Manpower Data Center (data); GAO (analysis).

[a]Percents may not add to 100 because of rounding.

LCR Appendix Page 1060

Appendix III
Critical Occupation Data Tables

## Length of Service of Separated Servicemembers Who Had Intelligence-Related Occupations

Most servicemembers who had intelligence-related occupations were separated for homosexual conduct within approximately 2.5 years of entering military service. Two and a half years corresponds approximately to the end of the 4th period as shown in table 7.

Table 7: Individuals with Intelligence-Related Occupations Separated for Homosexual Conduct during Selected Intervals, Fiscal Years 1994 through 2003

| Service | Number | | | | | |
| | Period 1: recruit training | Period 2: advanced individual training | Period 3: next 365 days | Period 4: next 365 days | Period 5: subsequent periods | Total |
|---|---|---|---|---|---|---|
| Marine Corps | 0 | 0 | 14 | 14 | 20 | 48 |
| Army | 32 | 23 | 84 | 49 | 62 | 250 |
| Navy | 0 | 1 | 84 | 74 | 129 | 288 |
| Air Force | 0 | 3 | 33 | 39 | 69 | 144 |
| Total number | 32 | 27 | 215 | 176 | 280 | 730 |
| Percent | 4 | 4 | 29 | 24 | 38 | 100[a] |

| Service | Percent[a] | | | | | |
| | Period 1: recruit training | Period 2: advanced individual training | Period 3: next 365 days | Period 4: next 365 days | Period 5: subsequent periods | |
|---|---|---|---|---|---|---|
| Marine Corps | 0 | 0 | 29 | 29 | 42 | 100 |
| Army | 13 | 9 | 34 | 20 | 25 | 101 |
| Navy | 0 | <1 | 29 | 26 | 45 | 101 |
| Air Force | 0 | 2 | 23 | 27 | 48 | 100 |

Sources: Defense Manpower Data Center (data); GAO (analysis).

[a]Percents may not add to 100 due to rounding.

LCR Appendix Page 1061

Appendix III
Critical Occupation Data Tables

## Length of Service of Separated Servicemembers Who Had Important Foreign Language Skills

The same pattern is true for servicemembers separated for homosexual conduct who were trained in an important language. Most servicemembers were separated by the end of the 4th period—or approximately 2.5 years after entering military service—as shown in table 8.

**Table 8: Individuals with Training in Important Languages Separated for Homosexual Conduct during Selected Intervals, Fiscal Years 1994 through 2003**

| Service | Number | | | | | |
|---|---|---|---|---|---|---|
| | Period 1: recruit training | Period 2: advanced individual training | Period 3: next 365 days | Period 4: next 365 days | Period 5: subsequent periods | Total |
| Marine Corps | 0 | 0 | 1 | 3 | 2 | 6 |
| Army | 0 | 0 | 23 | 28 | 28 | 79 |
| Navy | 0 | 0 | 14 | 9 | 12 | 35 |
| Air Force | 0 | 2 | 24 | 27 | 32 | 85 |
| **Total number** | **0** | **2** | **62** | **67** | **74** | **205** |
| Percent | 0 | 1 | 30 | 33 | 36 | 100 |

| Service | Percent[a] | | | | | |
|---|---|---|---|---|---|---|
| | Period 1: recruit training | Period 2: advanced individual training | Period 3: next 365 days | Period 4: next 365 days | Period 5: subsequent periods | |
| Marine Corps | 0 | 0 | 17 | 50 | 33 | 100 |
| Army | 0 | 0 | 29 | 35 | 35 | 99 |
| Navy | 0 | 0 | 40 | 26 | 34 | 100 |
| Air Force | 0 | 2 | 28 | 32 | 38 | 100 |

Sources: Defense Manpower Data Center (data); GAO (analysis).

[a]Percents may not add to 100 because of rounding.

LCR Appendix Page 1062

Appendix III
Critical Occupation Data Tables

## Occupations Most Frequently Cited for Selective Reenlistment Bonuses

A sample of occupations eligible to receive a selective reenlistment bonus is shown in table 9. Because each service's designation of critical occupations changes annually, the column on the far right of the table shows the number of times from fiscal year 1994 through fiscal year 2003 that an occupation appeared on the military services' "top ten" list of critical occupations.

**Table 9: Sample of Critical Occupations**

| Service | Most frequently cited occupations receiving selective reenlistment bonuses, FY 1994-2003 | Total number of years in which the occupation received a selective reenlistment bonus |
|---|---|---|
| Army | Automatic Test Equipment Operator | 4 |
| | Engineer Tracked Vehicle Crewman | 4 |
| | Noncommunications Interceptor/Analyst | 4 |
| | Special Forces Communications Sergeant | 4 |
| | Voice Interceptor (Persian/Vietnamese) | 4 |
| | Aircraft Pneudraulics Repairer | 3 |
| | Broadcast Journalist | 3 |
| | Diver | 3 |
| | Explosive Ordinance Disposal Specialist | 3 |
| | Interrogator (Chinese/Korean) | 3 |
| | OH-58D Helicopter Repairer | 3 |
| | Petroleum Supply Specialist | 3 |
| | Psychological Operations Specialist | 3 |
| | Radar Repair | 3 |
| | Satellite Communications Systems Operator-Maintainer | 3 |
| | Signal Intelligence Analyst (Chinese/Korean) | 3 |
| Navy | Aviation Structural Mechanic (Equipment) | 4 |
| | Aviation Structural Mechanic (Structural) | 4 |
| | Cryptologic Technician (Technical) | 4 |
| | Data Processing Technician | 4 |
| | Electrician's Mate (Nuclear Field) | 4 |
| | Fire Control Technician | 4 |
| | Machinist's Mate (Nuclear Field) | 4 |
| | Mineman | 4 |
| | Missile Technician | 4 |
| | Operations Specialist | 4 |

LCR Appendix Page 1063

Appendix III
Critical Occupation Data Tables

*(Continued From Previous Page)*

| Service | Most frequently cited occupations receiving selective reenlistment bonuses, FY 1994-2003 | Total number of years in which the occupation received a selective reenlistment bonus |
|---------|---------|---------|
| **Air Force** | Combat Controller | 10 |
| | Air Traffic Control | 8 |
| | Communication Computer System Programmer | 8 |
| | Far East Crypto Linguist | 8 |
| | Mid East Crypto Linguist | 8 |
| | Pararescue | 8 |
| | Slavic Crypto Linguist | 8 |
| | Communication Computer System Control | 6 |
| | Electronics Signals Intelligence Exploitation | 6 |
| | Interpreter/Translator | 6 |
| **Marines** | Aircraft Flight Engineer, KC-130 | 8 |
| | Electronic Switching Equipment Technician | 6 |
| | Ground Mobile Forces Satellite Communications Technician | 5 |
| | Air Command and Control Electronics Operator | 4 |
| | Computer Technician | 4 |
| | Consolidated Automatic Support System Technician | 4 |
| | Cryptologic Linguist, Arabic | 4 |
| | Surface Air Defense Systems Acquisition Technician | 4 |
| | Technical Controller | 4 |
| | Aircraft Navigation Systems Technician Identification Friend or Foe/Radar/Tactical Air Navigation | 3 |
| | Computer System Technician, Honeywell Data Processing System 6 | 3 |
| | Counterintelligence Marine | 3 |
| | Cryptologic Linguist, Korean | 3 |
| | Cryptologic Linguist, Spanish | 3 |
| | Field Artillery Radar Operator | 3 |
| | Interrogation-Translation Specialist | 3 |
| | Marine Air Ground Task Force Plans/Operations Specialist | 3 |
| | Nonappropriated Funds Audit Technician | 3 |
| | Radio Technician | 3 |
| | Test Measurement and Diagnostic Equipment Technician | 3 |
| | Weather Forecaster | 3 |

Sources: Service-submitted budget justification (data); GAO (analysis).

LCR Appendix Page 1064

Appendix III
Critical Occupation Data Tables

*(Continued From Previous Page)*

| Service | Occupation |
|---------|-----------|
| **Marine Corps** | Air Command and Control Electronics Operator |
| | Airborne Radio Operator/Loadmaster |
| | Counterintelligence Marine |
| | Cryptologic Linguist, Arabic |
| | Cryptologic Linguist, Korean |
| | Cryptologic Linguist, Persian, Semitic |
| | Cryptologic Linguist, Spanish |
| | Fleet Satellite Communications Terminal Operator |
| | High Frequency Communication Central Operator |
| | Imagery Interpretation Specialist |
| | Intelligence Specialist |
| | Interrogation-Translation Specialist |
| | Non-Morse Intercept Operator/Analyst |
| **Navy** | Air Traffic Controller |
| | Aviation Antisubmarine Warfare Operator |
| | Cryptologic Technician (Collection) |
| | Cryptologic Technician (Interpretative) |
| | Cryptologic Technician (Technical) |
| | Electronic Warfare Technician |
| | Operations Specialist |
| | Radioman, Surface Warfare |

Sources: DOD (data); GAO (analysis).

Tables 11 and 12 describe characteristics of the language speakers in the population of those separated for homosexual conduct from fiscal year 1994 through fiscal year 2003, as reported by the Data Center. The table lists the median proficiency level for all speakers of each language. DOD's language proficiency scale includes 11 possible values, ranging from 00 to as high as 50.[2] In tables 11 and 12, the median proficiency is the middle value if all proficiency scores for students in that language are placed in numerical order.

[2] DOD's language proficiency scale is as follows: 00—no proficiency; 06—memorized proficiency; 10—elementary proficiency; 16—elementary proficiency, plus; 20—limited working proficiency; 26—limited working proficiency, plus; 30—general professional proficiency, plus; 36—general professional proficiency plus; 40—advanced professional proficiency; 46—advanced professional proficiency, plus; and 50—functionally native proficiency.

GAO-05-299 Military Personnel

LCR Appendix Page 1065

Appendix III
Critical Occupation Data Tables

Two tables are provided rather than one because the service-provided data set contains an unknown mixture of self-assessed and Defense Language Proficiency Test data. For the language institute-trained population of language speakers, however, all proficiency data resulted from tests. Note the high percentages of service members in both groups without a reported proficiency score; individuals with no data available are included as those without any recorded proficiency in speaking, listening, or reading. This means that the Data Center did not have any information from any source on the servicemembers' ability to use their reported language.

**Table 11: Languages Spoken by and Proficiency Levels for Individuals Separated for Homosexual Conduct from Fiscal Year 1994 through Fiscal Year 2003 Who Were Trained in a Language at the Defense Language Institute**

| Language | Total number of servicemembers | Median proficiency | Number (and percent) of reported servicemembers with no proficiency data available |
|---|---|---|---|
| Arabic, Modern Standard | 54 | 20 | 34 (63) |
| Chinese, Mandarin | 20 | 26 | 14 (70) |
| French | 3 | 26 | 0 |
| German | 1 | 20 | 0 |
| Hebrew | 2 | N/A | 1 (50) |
| Korean | 50 | 20 | 25 (50) |
| Persian, Iranian (includes Farsi) | 9 | 20 | 7 (78) |
| Russian | 42 | 26 | 17 (40) |
| Serbo-Croatian | 8 | 26 | 4 (50) |
| Spanish | 24 | 26 | 8 (35) |
| Tagalog | 1 | 26 | 0 |
| Vietnamese, Hanoi | 2 | 20 | 1 (50) |
| **Total** | **216** | | **111 (51)** |

Sources: Defense Manpower Data Center (data); GAO (analysis).

Note: N/A = not available.

**LCR Appendix Page 1066**

Appendix III
Critical Occupation Data Tables

**Table 12: Languages Spoken by and Proficiency Levels for Individuals Separated for Homosexual Conduct from Fiscal Year 1994 through Fiscal Year 2003, as Reported through Service Personnel Files**

| Language | Total number of servicemembers | Median proficiency | Number (and percent) of reported servicemembers with no proficiency[a] | Number (and percent) of reported servicemembers with no proficiency data available[a] |
|---|---|---|---|---|
| Achinese | 2 | 0 | 2 (100) | 0 |
| Amashi | 1 | 0 | 1 (100) | 0 |
| Arabic, Modern Standard | 5 | 20 | 1 (20) | 2 (40) |
| Chinese, Cantonese | 2 | 30 | 1 (50) | 1 (50) |
| Chinese, Mandarin | 2 | N/A | 1 (50) | 2 (100) |
| Danish | 1 | N/A | 0 | 1 (100) |
| French | 13 | 26 | 5 (38) | 4 (31) |
| German | 10 | 16 | 5 (50) | 2 (20) |
| German, Bavarian | 1 | 0 | 1 (100) | 0 |
| Haitian, Creole | 1 | 50 | 0 | 0 |
| Hungarian | 2 | 26 | 0 | 2 (100) |
| Indonesian | 1 | 30 | 0 | 0 |
| Italian | 5 | 50 | 1 (20) | 1 (20) |
| Japanese | 1 | 10 | 0 | 0 |
| Korean | 5 | 20 | 0 | 2 (40) |
| Old High German | 1 | 10 | 0 | 0 |
| Persian, Iranian (includes Farsi) | 1 | 20 | 1(100) | 1 (100) |
| Polish | 1 | N/A | 1 (100) | 0 |
| Portuguese, Brazilian | 1 | N/A | 0 | 1 (100) |
| Russian | 9 | N/A | 1 (11) | 3 (33) |
| Serbo-Croatian | 3 | 20 | 0 | 0 |
| Spanish | 50 | 20 | 18 (36) | 30 (60) |
| Spanish, American | 59 | 30 | 6 (10) | 4 (7) |
| Spanish, Castilian | 2 | 20 | 0 | 0 |
| Spanish, Creole | 1 | 30 | 0 | 0 |

GAO-05-299 Military Personnel

**LCR Appendix Page 1067**

Appendix III
Critical Occupation Data Tables

*(Continued From Previous Page)*

| Language | Total number of servicemembers | Median proficiency | Number (and percent) of reported servicemembers with no proficiency[a] | Number (and percent) of reported servicemembers with no proficiency data available[a] |
|---|---|---|---|---|
| Tagalog | 8 | 50 | 1 (12) | 1 (12) |
| Urdu | 1 | 50 | 0 | 0 |
| Vietnamese, Central | 1 | 50 | 0 | 0 |
| **Total** | **190** | | **46 (35)** | **57 (30)** |

Sources: Defense Manpower Data Center (data); GAO (analysis).

Note: N/A = not available

[a]Individuals received three separate proficiency scores: one in reading, one in listening, and one in speaking. If any one of these three scores indicated that the individual was tested but had no proficiency, the individual is counted in the "no proficiency" column. Likewise, if one of the three scores was not available, the individual is listed in the "no data available" column.

GAO-05-299 Military Personnel

LCR Appendix Page 1068

Appendix IV

# Comments from the Department of Defense



**UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000



PERSONNEL AND
READINESS

FEB 7 2005

Mr. Derek Stewart
Director, Defense Capabilities and Management
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. Stewart:

This is the Department of Defense (DoD) response to the GAO draft report, 'MILITARY PERSONNEL:  Financial Cost and Loss of Critical Skills Due to DoD's Homosexual Conduct Policy Cannot be Completely Estimated,' dated January 26, 2005 (GAO Code 350496/GAO-05-299)." Thank you for the opportunity to comment on the GAO draft.

As you have noted in your report, the discharges due to the DoD Homosexual Conduct Policy that implements Federal statute represent only about 0.37 percent of the members separated for all reasons during this period.  We believe it is important to recognize the low discharge rate under this policy and, for comparison purposes, provide the following chart comparing discharges under this policy with other unprogrammed separations for this period.

| Separation Reason | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Homosexuality* | *616* | *757* | *858* | *997* | *1145* | *1034* | *1212* | *1227* | *885* | *770* | *9501* |
| Pregnancy | 3137 | 2885 | 2647 | 2356 | 2609 | 2840 | 2759 | 2434 | 2136 | 2643 | 26446 |
| Weight Standards | 4033 | 5061 | 4782 | 4436 | 4309 | 3458 | 2558 | 2238 | 2524 | 3114 | 36513 |
| Serious Offenses | 5592 | 4934 | 4859 | 4377 | 3476 | 3103 | 2805 | 2535 | 2741 | 3756 | 38178 |
| Parenthood | 1690 | 1817 | 2088 | 1872 | 2102 | 2702 | 2345 | 1785 | 1768 | 2358 | 20527 |
| Drug Offenses/Use | 5240 | 5347 | 5368 | 5822 | 5269 | 5298 | 5439 | 6656 | 7524 | 7135 | 59098 |

I have attached technical comments on the content of the report.  Please note that the number of discharges you identify by year does not match the official Department of Defense number maintained by the Defense Manpower Data Center that was provided in the course of your review.  A copy of our official numbers is also attached.



Page 42

GAO-05-299 Military Personnel

The Department of Defense seeks to implement the Federal statute concerning homosexual conduct in the military in a fair manner, treating every service member with dignity and respect.  Thank you again for the opportunity to review your report.

David S. C. Chu

Attachments:
As stated

2

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| Order by Mail or Phone | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice: (202) 512-6000<br>　　　　　　　　　　 TDD:  (202) 512-2537<br>　　　　　　　　　　 Fax:   (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER

United States
Government Accountability Office
Washington, D.C. 20548-0001

Official Business
Penalty for Private Use $300

Address Service Requested

Presorted Standard
Postage & Fees Paid
GAO
Permit No. GI00



**ZOGBY INTERNATIONAL**

**Opinions of Military Personnel on Sexual Minorities in the Military**

Submitted to:
Aaron Belkin, Director
Michael D. Palm Center

Submitted by:
**Zogby International**
John Zogby, President and CEO
John Bruce, Vice President and Systems Administrator
Rebecca Wittman, Vice President and Managing Editor

Sam Rodgers, Writer

December, 2006

© 2006 Zogby International



DEFENDANT'S
EXHIBIT
tabbies®
11
2·26·10

## Table Of Contents

| Subject | Page |
|---|---|
| I. Methodology and Sample Characteristics | 2 |
| II. Executive Summary | 5 |
| III. Narrative Analysis | 8 |

**Tables**

| | |
|---|---|
| 1. Intra-Unit Leadership And Cooperation | 12 |
| 2. Impact Of Gay/Lesbian Presence On Unit Morale | 17 |
| 3. Assumed Impact Of Gay/Lesbian Presence On Unit Morale | 18 |
| 4. Arguments For Keeping Gays/Lesbians From Serving | 23 |
| 5. Arguments For Allowing Gays/Lesbians To Serve | 24 |

**LCR Appendix Page 1074**

## I. Methodology and Sample Characteristics

**Methodology**

Zogby International conducted online interviews of 545 U.S. Military Personnel who have served in Iraq and Afghanistan (or in combat support roles directly supporting those operations), from a purchased list of U.S. Military Personnel. The online poll ran from 10/24/06 through 10/26/06. The margin of error is +/- 4.3 percentage points. Margins of error are higher in sub-groups. Slight weights were added to age and race to more accurately reflect the population. Data used in weighting was obtained from official Department of Defense (DOD) resources.

The panel used for this survey is composed of over 1 million members and correlates closely with the U.S. population on all key profiles. The panel uses a double opt-in format through an invitation only method. Panelists are sourced through a variety of commercial enterprises and all recruitment methodologies fully comply with CASRO guidelines. Each panelist is defined by over 400 variables, therefore making the panel highly segmented and fully representative of the US and military population.

| Sample Characteristics | Frequency | Valid Percent* |
|---|---|---|
| Sample size | 545 | 100 |
| East | 69 | 13 |
| South | 223 | 43 |
| Central/Great Lakes | 101 | 20 |
| West | 123 | 24 |
| Did not answer state | 29 | -- |
| Veteran | 88 | 16 |
| Active | 353 | 65 |
| Reserve/Guard, mobilized | 35 | 6 |
| Reserve/Guard, non-mobilized | 69 | 13 |
| Air Force | 160 | 29 |
| Army | 251 | 46 |
| Marines | 35 | 7 |
| Navy | 92 | 17 |
| Coast Guard | 5 | 1 |
| 18-29 | 296 | 55 |
| 30-49 | 221 | 41 |
| 50-64 | 22 | 4 |
| Did not answer age | 6 | -- |
| White | 375 | 73 |
| Black/African American | 62 | 12 |
| Spanish/Hispanic/Latino | 47 | 9 |
| American Indian/Alaska Native | 5 | 1 |
| Asian | 13 | 3 |
| Hawaiian/Pacific Islander | 5 | 1 |
| Other/Mixed | 10 | 2 |
| Did not answer race | 28 | -- |
| Baptist | 85 | 17 |
| Church of Christ | 22 | 4 |
| Episcopal | 6 | 1 |

LCR Appendix Page 1076

| Sample Characteristics (continued) | Frequency | Valid Percent* |
|---|---|---|
| Jewish | 6 | 1 |
| Lutheran | 35 | 7 |
| Methodist | 26 | 5 |
| Mormon | 6 | 1 |
| Muslim | 5 | 1 |
| Pentecostal | 16 | 3 |
| Presbyterian | 11 | 2 |
| Roman Catholic | 148 | 29 |
| Seventh Day Adventist | 1 | 0 |
| Atheist/Realist/Humanist | 17 | 4 |
| Other/no affiliation | 120 | 24 |
| Did not answer religion | 36 | -- |
| Democratic | 101 | 21 |
| Republican | 241 | 51 |
| Independent/Minor party | 103 | 22 |
| Not sure of party | 32 | 7 |
| Did not answer party | 68 | -- |
| Male | 451 | 85 |
| Female | 80 | 15 |
| Did not answer gender | 15 | -- |

\* **Numbers have been rounded to the nearest percent and might not total 100.**

**LCR Appendix Page 1077**

## II. Executive Summary

This survey of current and recent military service personnel who have served in Iraq or Afghanistan (or in combat support roles directly supporting those operations) sought to explore the issue of sexual minorities in the United States military, specifically within the context of three key areas – the size and characteristics of the gay and lesbian population in the military, the views of service personnel regarding the subject, and finally, the impact of gays and lesbians on the military.

### Population Within Service Unit

By interviewing military personnel who have served in Iraq or Afghanistan (both those who have served and are serving currently), we were able to capture a snapshot of the current military environment with respect to this issue. Our survey included respondents from all service branches as well as Active Duty Personnel, Veterans and Reservists. The sample also included combat and non-combat units as well as enlisted men and officers.

The overall attitude of these service members was optimistic. Large majorities report being well-trained, well-equipped and battle ready. Additionally, most respondents believe that their leadership (both Non-Commissioned Officers and Commissioned Officers) was excellent and they report feeling a high level of teamwork exists within their unit.

Regarding the presence of gays and lesbians in their units, a near majority (45%) states that they *suspect* a member of their unit is homosexual. Roughly one-third (31%) does not suspect a member of their unit. Higher rates of suspicion were found among Reservists (60%), Navy Personnel (59%) and Females (56%). The lowest rates were found among Air Force Personnel (38%) and Officers (33%). When asked how many unit members they suspected, two-thirds of respondents (68%) said less than three.

Respondents were also asked if the *knew* of any members within their unit who were gay or lesbian. Here, less than one quarter (23%) said they were definitely aware. Of those who were, three-in-five (59%) report having been directly told by the individual. When asked how many they *knew* within their unit, the vast majority (75%) reported knowing two or less. A majority (55%) also notes that the presence of gays and lesbians is well-known within their unit.

### Opinions On Homosexuality

Asked whether they agree that gays and lesbians should be allowed to serve in the military, respondents were closely split with a plurality (37%) disagreeing with the idea, and 26 percent agreeing they should be allowed.

Of those agreeing with their inclusion, certain demographic groups represented higher than average support. Among those were Independents, African-Americans, Women, those aged 25-34, and Women. These subgroups were largely more supportive of gays and lesbians in every question, with Democrats and Hispanics also frequently representing more open views toward gays in the military.

Within military subgroups, veterans and those having served less than 4 years were also more likely to support the idea of inclusion within the military, while Active Duty Personnel, Officers, and those having served 15 or more years were less likely to agree. There was slight variance among service branches, and this variance has been noted where applicable.

Three-quarters of those surveyed stated that they felt comfortable around gays and lesbians and four-in-five (78%) noted that they would join the military regardless of their open inclusion. Additionally, a majority (52%) reports having received some form of anti-gay harassment training, with Air Force personnel representing the highest level of training (62%) and the Marine Corps the lowest (34%).

## Perceived Impact

Of those who were certain that a member of their unit was gay or lesbian, two-thirds did not believe that their presence created an impact on either their personal morale (66%) or the morale of their unit (64%). Approximately one-quarter of that group believed there to be a negative impact to both.

In contrast, of those who do not suspect the presence of gays or lesbians within their unit, only half (49%) perceive no impact on personal morale, and only less than one-third (26%) feel there would be no impact on their unit's morale. Regarding their unit's morale, a majority of this group (58%) believes if there were gays or lesbians within their unit, there would be a negative impact.

Given a set of arguments both for and against allowing gays in the military, respondents were asked to choose those that were the strongest. The most widely selected arguments for keeping gays and lesbians from serving centered on the threat of their presence undermining the unit (40%) or the threat of harm befalling them (28%).

When given the arguments in support of allowing their inclusion, the two most selected arguments were the irrelevance of sexual orientation to job performance (39%) and the morality of discriminating based on sexual orientation (30%). Additionally, one-in-five respondents (21%) believed there to be no strong arguments for the exclusion of homosexuals, while one-in-five (19%) believe there to be no strong arguments in their favor.

Overall, this survey paints a mixed picture for the future of gays and lesbians in the military.  While overwhelming majorities of those responding display tolerance and understanding of the rights and issues involved in the argument, there are still large obstacles that must be overcome.

LCR Appendix Page 1081

### III. Narrative Analysis

*1. What is your current status?*

| | |
|---|---|
| Active | 65% |
| Veteran | 16 |
| Reserve/Guard, non-mobilized | 13 |
| Reserve/Guard, mobilized | 6 |

A majority of those surveyed (65%) indicated that they were currently classified as Active Duty. Almost one-in-five (19%) identified themselves as being in the Reserves – 13 percent non-mobilized, 6 percent mobilized. The reaming 16 percent noted their status as Veterans.

*2. In which branch of the military do you serve? (**Vets: In which branch of the military did you serve?**)*

| | |
|---|---|
| Army | 46% |
| Air Force | 29 |
| Navy | 17 |
| Marines | 7 |
| Coast Guard | 1 |

Respondents serving (or having served) in the Army composed almost half (46%) of the sample size. Three-in-ten (29%) noted their service in the Air Force, with another 17 percent affiliated or having been affiliated with the Navy. The remaining respondents were either members of the Marines (7%) or the Coast Guard (1%).

*3. (**Veterans only**) How many years ago did you leave the service?*

| | |
|---|---|
| One | 35% |
| Two | 24 |
| Three | 17 |
| Four | 6 |
| Five | 19 |

More than two-in-three veteran respondents (59%) stated that they had left the military within the past two years. The remaining 42 percent left within the past five years. All took part in operations in either Iraq and/or Afghanistan or were involved in combat support operations related to those two operations.

*4. How many years have you served in the U.S. military? (Vets: How many years did you serve in the U.S. military?)*

| | |
|---|---|
| Less than four | 11% |
| Four | 9 |
| Five | 12 |
| Six | 8 |
| 7 to 10 | 20 |
| 11 to 20 | 27 |
| 21 to 30 | 12 |

Roughly one-third (32%) of those surveyed have (or did) serve 5 or fewer years. More than a quarter served between either 6 to 10 years (28%) or between 11 to 20 years (27%). Little more than one-in-ten (12%) served longer than 20 years.

*5. What is or was the highest grade you achieved?*

| | |
|---|---|
| E2 – E9 | 66% |
| O1 – O8 | 31 |
| W1 – W5 | 3 |

Nearly two thirds of respondents (66%) achieved their highest rank as an enlisted man/woman. An additional third (31%) reached their highest rank as an officer, with the remaining 3 percent identifying themselves as warrant officers.

*The following are questions about your current unit. If you just arrived at a new unit, please answer for your last unit. (Vets: First we'd like to ask some questions about the last unit you served in.)*

*6. Is your unit a combat, combat-support, or combat service support unit? (Vets: Was the last unit in which you served a combat, combat-support, or combat service support unit?)*

| | |
|---|---|
| Combat | 29% |
| Combat support | 32 |
| Combat service support | 18 |
| Other | 19 |
| Not sure | 2 |

Nearly equivalent numbers of respondents were currently in (or had last been in) combat units (29%) and combat support units (32%). A slightly smaller number, one-in-five (18%), listed their current or last unit as a designated combat service support unit.

LCR Appendix Page 1083

The remaining respondents were either in units under another designation (19%) or were unsure about their unit's designation (2%).

Among service branches, more than one-third of respondents from the Navy (39%) and the Army (34%) classified their units as combat units. A little fewer than one-in-five of those surveyed (19%) from both the Air Force and the Marines listed themselves as part of combat units. Air Force members were more likely to be part of units designated as combat support (39%) than under any other designation. Similarly, respondents from the Marine Corps were most likely to be in combat service support designated units (42%) than in any other such designated unit.

*7. How would you rate your unit's level of training for its wartime mission? (**Vets: How would you rate your unit's level of training for its wartime mission? If it varied, think generally about the last year you served in it.**)*

| | | | |
|---|---|---|---|
| Very well trained | 43% | **Above Average** | **83%** |
| Well trained | 39 | | |
| Adequately trained | 13 | | |
| Poorly trained | 3 | | |
| Very poorly trained | 1 | **Below Average** | **4** |
| Not sure | 1 | | |

The overwhelming majority of survey respondents (83%) rate their current or former unit as well or very well trained. Only one-in-twenty (4%) list their unit as being poorly or very poorly trained for their wartime mission.

When viewed by service branches, some disparities emerge. Among Air Force and Marine respondents, nine-in-ten (89 and 90 percent, respectively) rate their unit as having above adequate training. On the other hand, four-in-five (80%) of Army and Navy respondents each lists their units as above average.

The only subgroup that presents a below average rating above 5 percent are Reservists, whose net below average rating is 8 percent. Across Veterans, Active Duty Personnel, Enlisted men and Officers, these ratings hold within the sample error.

LCR Appendix Page 1084

*8. How would you rate the equipment your unit has for its wartime mission?* **(Vets: How would you rate the equipment your unit had for its wartime mission? Consider overall the last year you served.)**

| | | | |
|---|---|---|---|
| Very well equipped | 23% | **Above Average** | **62%** |
| Well equipped | 39 | | |
| Adequately equipped | 28 | | |
| Poorly equipped | 7 | | |
| Very poorly equipped | 2 | **Below Average** | **9** |
| Not sure | 1 | | |

Three-out-of-five survey respondents (62%) rated their unit's equipment as well equipped (39%) or very well equipped (23%). Less than one-in-ten (9%) rated their equipment for their wartime mission as below average. The remaining respondents either stated that their unit was adequately equipped (28%) or were uncertain (1%).

Within the service branches, respondents from the Air Force rated their unit's equipment readiness the highest (76%), while members of Army gave their unit's the lowest rating (53%). Approximately three-in-five respondents in both the Navy (61%) and the Marine Corps (62%) designated their units as having an above average equipment readiness.

Only the Army and Navy had below average ratings – 13 and 12 percent, respectively. Among other significant subgroups, the highest above average rating emerged from officers (73%), while the highest below average rating came from reservists (17%).

*9. How would you rate the readiness of your unit for its wartime mission?* **(Vets: How would you rate the readiness of your last unit for its wartime mission? Again, think generally about the last year you served.)**

| | | | |
|---|---|---|---|
| Very High | 40% | **Above Average** | **79%** |
| High | 39 | | |
| Medium | 17 | | |
| Low | 3 | | |
| Very Low | 1 | **Below Average** | **4** |
| Not sure | 1 | | |

Three-in-four respondents (79%) rated their unit's overall readiness as above average, with only 4 percent designating their unit as below average. Members of three service branches – the Navy, Air Force and Marine Corps – rated their readiness higher than the overall above average rating, with 82 percent, 86 percent and 90 percent respectively. Slightly less than three quarters of Army respondents (73%) rated their units the same.

Among other sub groups, only Officers (85%) and Active Duty Personnel (82%) gave their units higher ratings than the overall average. The overall results held across all other subgroups.

*10 – 12. Do you agree or disagree with the following statements?*

**Table 1. Intra-unit Leadership and Cooperation**

| | Agree | | | Neutral | Disagree | | | Not sure |
|---|---|---|---|---|---|---|---|---|
| | Overall | Strongly agree | Agree | | Overall | Disagree | Strongly Disagree | |
| The NCOs in my unit are good leaders. (Vets: The NCOs in my last unit were good leaders.) | **85** | 36 | 49 | 11 | **3** | 3 | <1 | 1 |
| There is a lot of teamwork and cooperation in my unit. (Vets: There was a lot of teamwork and cooperation in my unit.) | **82** | 32 | 50 | 12 | **6** | 5 | 1 | 1 |
| The officers in my unit are good leaders. (Vets: The officers in my last unit were good leaders.) | **72** | 25 | 47 | 19 | **8** | 6 | 2 | 1 |

Both Non-Commissioned Officers (NCOs) and Commissioned Officers received high marks for leadership. NCOs did fare better in the overall ratings, as more than four-in-five respondents (85%) agreed that their NCOs were good leaders. Among Marine Corps respondents, agreement reached almost complete unanimity (95%), while among Army service members that rate dropped to 82 percent.

When asked about their officers, more than two-in-three (72%) agreed that they were good leaders. Navy members were far less likely to believe that their officers were good leaders, as just over half (58%) agreed with that statement. Again, Marine Corps respondents gave their officers the highest vote of confidence among service groups, with almost all (93%) agreeing their officers were good leaders.

Four-in-five survey respondents (82%) agreed with the statement that there is a lot of teamwork and cooperation in their unit. Four subgroups had higher agreement rates with the statement – Active Duty Personnel (86%), Officers (87%), the Air Force (88%) and the Marine Corps (92%). All other subgroups were within the sampling error.

*13. Do you agree or disagree with allowing gays and lesbians to serve openly in the military?*

| | | | |
|---|---|---|---|
| Strongly Agree | 9% | **Agree** | **26%** |
| Agree | 17 | | |
| Neutral | 32 | | |
| Disagree | 16 | | |
| Strongly Disagree | 21 | **Disagree** | **37** |
| Not sure | 5 | | |

Slightly more than one-in-three respondents (37%) disagree that gays should be allowed to serve openly in the military, while almost three-in-ten (28%) believe they should. Of those remaining, an almost equivalent amount holds a neutral opinion (32%), while just 5 percent are unsure.

Along political lines, Democrats and Independents/Moderates (Independents) are far more likely to agree with the statement. One-in-three Democrats (35%) and Independents (36%) hold this opinion, while only one-in-five Republicans (22%) holds the same. One-quarter of Democrats (28%) disagreed with the statement, while Independents (41%) held close to the overall average, and almost half of Republicans (45%) expressed their disagreement.

A further divide was present along racial lines, as Whites (26%) and Hispanics (26%) held to the average agreement rate, while more than a third of African-Americans (37%) agreed. Only one-in-five Hispanics (17%) and a quarter of African-Americans (28%) disagreed with the statement, but among Whites the rate rose to more than two-in-four (43%).

There also exists a gender divide with women far more likely than men to express agreement with the idea of gays and lesbians in the military. Four-in-nine women (44%) believe gays and lesbians should be allowed to serve, while more than a quarter of women (27%) disagree. Among men, the rates are almost reciprocal with a quarter of men (24%) expressing agreement and two-in-five (40%) voicing their disapproval.

The only remaining non-military subgroup results to display significant findings were the disapproval rates among Baptists (41%), those between the age 35-54 (46%), and those living in both the Central/Great Lakes (45%) and Western U.S. (48%). Among Easterners, the rates were highly favorable toward the statement with more than two-in-five (39%) agreeing and less than one-in-five (15%) disagreeing.

Within military subgroups, the highest agreement rates were found among Veterans (35%) and those having served less than four years (37%). The lowest acceptance rates were among Active Duty Personnel (23%), officers (23%), those serving between 10 and 14 years (22%) and those serving more than 20 (19%). Active Duty Personnel were also among those with the highest disapproval rates (39%), as were those

serving between 15 and 19 years (40%), those serving more than 20 (49%), and officers (47%).

Among the service branches, the Army had the lowest agreement rate – less than a quarter (23%) – as compared with the Marine Corps (25%), The Air Force (29%) and the Navy (31%). The highest disapproval ratings were found amongst the Air Force (40%) and the Army (37%), followed closely by the Navy (33%) and the Marine Corps (32%).

*14. In your unit, are there people you suspect are gay or lesbian, but don't know for sure? (Vets: In your last unit, were there people you suspected were gay or lesbian, but didn't know for sure?)*

| | |
|---|---|
| Yes | 45% |
| No | 31 |
| Not Sure | 25 |

Almost half of all service members (45%) stated that they suspect there are members of their unit who are gay or lesbian. Three-in-ten (31%) said they did not suspect a unit member, while a quarter of all respondents (25%) said they were unsure.

Females were much more likely than males to suspect a member of their unit, with nearly three-in-five females (56%) believing a member of their unit to be gay or lesbian, while little more than two-in-five (43%) males held the same belief.

Three-in-five Reservists (60%) and more than half of all Veterans (54%) responded that they suspected a member of their unit, as opposed to approximately two-in-five (38%) active duty personnel. Higher than average rates were also found among Enlisted men (50%), Marines (51%) and Navy Personnel (59%). Roughly two-in-five members of the Air Force (38%) and the Army (43%) suspected members of their unit, as did only one-third (33%) of officers.

*15. (Asked only of those who suspect gays/lesbians in their unit.) How many people do you suspect are gay or lesbian? (Vets: How many people did you suspect were gay or lesbian?)*

| | |
|---|---|
| One | 13% |
| Two | 26 |
| Three | 29 |
| Four | 12 |
| Five | 12 |
| Six or More | 9 |

Of those who responded that they suspect a member of their unit is gay or lesbian, respondents were asked how many individuals they suspected.   Two-thirds of respondents (68%) said they suspected three or fewer individuals in their unit were gay or lesbian.  A little more than one-third (39%) suspected two or fewer unit members.  The remaining third (32%) suspected that four or more members of their unit were gay or lesbian.  These numbers held across all military subgroups.

*16. Do you know for certain that someone is gay or lesbian in your unit? (Vets: In your last unit, did you know for certain that someone was gay or lesbian?)*

| | |
|---|---|
| Yes | 23% |
| No | 61 |
| Not sure | 17 |

Sixty-one percent of respondents surveyed stated that they were certain that a member of their unit was not gay or lesbian, as compared to 23 percent who were certain. Among women, nearly three-in-ten (29%) expressed certainty that a member of their unit was gay or lesbian. Only one-in-five males (22%) had the same degree of confidence.

When compared among service branches, those in the Navy were the most likely to be certain regarding the presence of gays and lesbians in their unit.  Thirty-one percent of Navy personnel responded as such, while a quarter of Marines (26%) and those in the Army (25%) had the same level of certainty.  Members of the Air Force were the least likely to be certain of a unit member's homosexuality, with only 13 percent holding this view.  Enlisted men were more than twice as likely as officers to know for certain, with more than a quarter (27%) noting this, as opposed to the 12 percent of officers.

**(Questions 17-21 were asked only of those who know for certain that someone in their unit is gay/lesbian.)**

*17. How many people do you know for certain are gay or lesbian? (Vets: How many people did you know for certain were gay or lesbian?)*

| | |
|---|---|
| One | 37% |
| Two | 38 |
| Three | 14 |
| Four | 3 |
| Five | 2 |
| Six or More | 5 |

Three quarters of respondents (75%) who were certain about the presence of gays or lesbians within their unit knew of two or less people.  Fourteen percent were aware of three members, while a further 10 percent knew of four or more.  Among males, more

LCR Appendix Page 1089

than two-in-five (42%) were aware of only one individual. Females, on the other hand, were less likely to know of just one individual (17%), but much more likely to know of the presence of four or more (37%). Only 4 percent of males were aware of four or more within their unit.

*18. How do you know for certain? (Vets: How did you know for certain?) (Choose all that apply.)*

| | |
|---|---|
| The individual told me | 59% |
| Somebody else told me about the person | 32 |
| I could tell by the person's speech, behavior, or appearance | 25 |
| I observed the person being romantic with someone of the same sex | 24 |
| I observed the person attending a gay club, bar, parade, political activity, etc. | 8 |
| Other | 12 |
| Not sure | 3 |

A majority of those who know about a unit member being gay or lesbian (59%) report as to having been made aware by the individual themselves. Additionally, a third (32%) say that they were told by another person. One quarter also report their certainty as being based either on the person's behavior (25%) and/or having observed the person engaged in homosexually romantic activity (24%).

When broken down by gender, women were more likely than men to have been told by the individual (74 percent to 55 percent). Men, on the other hand, were twice as likely than women to have been told by another individual (36 percent to 17 percent). Enlisted men were also twice as likely as officers to have been told by the individual themselves (63% to 30%).

*19. Is the presence of gays or lesbians in the unit well-known by others? (Vets: Was the presence of gays or lesbians in the unit well-known by others?)*

| | |
|---|---|
| Yes | 55% |
| No | 25 |
| Not sure | 21 |

More than half (55%) of those knowing with certainty about the presence of gays or lesbians within their unit state that such a presence is well known by others. More than a quarter (25%) claim that the presence is not well-known. Between males and females, males are more likely to agree that the presence of gays and lesbians within the unit is well known (56%), while less than half of women (47%) report the same. The overall averages hold constant across all other subgroups.

*20. How does the presence of gays or lesbians in your unit impact your personal morale?*
***(Vets: How did the presence of gays or lesbians in your last unit impact your personal morale?)***
*21. How does the presence of gays or lesbians in your unit impact your unit's overall morale? (Vets: How did the presence of gays or lesbians in your last unit impact your unit's overall morale?) (All responses skip to 24)*

**Table 2. Impact of Gay/Lesbian Presence on Unit Morale**

|  | Personal morale | Unit's morale |
|---|---|---|
| Very negative impact | 8 | 8 |
| Somewhat negative impact | 20 | 19 |
| **Negative** | **28** | **27** |
| **No impact** | **66** | **64** |
| Somewhat positive impact | 1 | 1 |
| Very positive impact | 4 | 2 |
| **Positive** | **6** | **3** |
| Not sure | 1 | 6 |

When those who were certain of the presence of gays or lesbians within their unit were asked what impact this presence had on both their personal morale and their unit's morale, responses were consistent across the board. Roughly one quarter of all respondents said that the presence of gays or lesbians had a negative impact on either their personal morale (28%) or their unit's morale (27%). The overwhelming majority of respondents stated their belief that the presence of gays or lesbians had little or no impact on either. Less than one out of every ten respondents noted a positive impact with personal morale (6%) or their unit's morale (3%).

Men were twice as likely as women to view gays and lesbians within their unit as having a negative impact on personal morale. Three-in-ten men (31%) voiced this opinion, while only one-in-ten women (14%) did the same. Eleven percent of women noted a positive impact created by gays and lesbians, as compared to 4 percent of men. Among other subgroups, the only significant variation was found with Active Duty Personnel, of whom more than a third (36%) listed a negative impact on personal morale created by gays and lesbians within the unit.

Opinions regarding the impact on the unit's morale were even more consistent. Here, the only significant variations were found among women – 10 percent of whom believe in a positive impact of unit morale. This is starkly contrasted by the 1 percent of men who hold the same belief. Among Active Duty Personnel, negative impact rating is also higher than average, with one-third (33%) believing it to have a negative impact.

**LCR Appendix Page 1091**

*(Questions 22-23 were asked only of those who do not know for certain that someone in their unit is gay/lesbian.)*

*22. How do you think the presence of gays or lesbians in your unit would impact your personal morale?*
*23. How do you think the presence of gays or lesbians would impact the overall morale of your current unit? (Vets: How do you think the presence of gays or lesbians would impact the overall morale of your last unit?)*

### Table 3. Assumed Impact of Gay/Lesbian Presence on Unit Morale

|  | Personal morale | Unit's morale |
|---|---|---|
| Very negative impact | 9 | 15 |
| Somewhat negative impact | 29 | 43 |
| **Negative** | **38** | **58** |
| **No impact** | **49** | **26** |
| Somewhat positive impact | 1 | -- |
| Very positive impact | 2 | 2 |
| **Positive** | **2** | **2** |
| Not sure | 11 | 14 |

Respondents who had previously stated that they were not certain about the presence of gays or lesbians within their unit were asked about the hypothetical impact if such a presence existed. The result was a higher negative impact rating than is seen among respondents who are certain of gays or lesbians in their units.

More than one-third (38%) of these individuals believe there would be a negative impact on personal morale, and more than half (58%) believe such presence would have a negative impact on the unit's morale. The percentage of those voicing the opinion that the presence of gays or lesbians would have no impact fell significantly from the percentages of those who are certain of gays or lesbians in their units, as did the percentage of those perceiving a positive impact.

Across the gender divide, men again saw the presence of gays and lesbians as having a more negative impact, with more than two-in-five (42%) holding this opinion regarding personal morale, and more than three-in-five (62%) regarding the unit's morale. Only one-in-five women (22%) believed gays and lesbians in their unit would have a negative impact on their own morale, while twice that number (45%) believe in a negative impact for the unit.

Older respondents were also more likely to perceive a negative impact – the highest such rating coming from those between the ages of 35 to 54, as 46 percent believe in a negative impact on personal morale and two thirds (68%) in a negative impact on the unit.

For impact on personal morale among military subgroups, the lowest negative ratings emerged among those having served less than four years (27%) and between 10 and 14 years (29%), and those in the Navy (29%). In contrast the highest negative ratings emerged from those having served between 15-19 years (43%) or more than 20 years (49%), Officers (42%), and those in the Marine Corps (43%). All subgroup positive ratings were well within the sampling error.

The negative impact of gays and lesbians regarding unit morale also presented several significant subgroup variations. Among the service branches, personnel in the Navy (51%) and Air Force (54%) have the lowest negative opinion, while the Army (61%) and the Marine Corps (69%) have the highest.

The data also shows that the longer one serves in the military, the more likely they are to believe in a negative impact. Such ratings were lowest among those serving less than 4 years (50%) and highest among those serving either between 15 and 19 years (63%) or more than 20 (68%). Two-thirds of officers (66%) also held a negative opinion, compared to 53 percent of enlisted men. Still, net negative impact ratings were above 50 percent for every subgroup.

*24. Personally, how comfortable are you in the presence of gays and lesbians?*

| | | | |
|---|---|---|---|
| Very Comfortable | 29% | **Comfortable** | **73%** |
| Somewhat Comfortable | 44 | | |
| Somewhat Uncomfortable | 15 | **Uncomfortable** | **19** |
| Very Uncomfortable | 5 | | |
| Not Sure | 8 | | |

When asked whether they were comfortable in the presence of gays and lesbians, three-quarters (73%) of those surveyed said they were either somewhat comfortable (44%) or very comfortable (29%). Less than one-in-five (19%) stated that were uncomfortable, and of that group, only 4 percent identified themselves as being very uncomfortable.

Comfort rates were consistent across both Democrats (73%) and Republicans (72%), but spiked among Independents (81%). Among Independents, very comfortable rates were the highest of any subgroup, with more than one third (37%) stating their high degree of comfort with gays and lesbians. The highest discomfort rate was found amongst Republicans – nearly a quarter of whom (24%) held this opinion.

Females were also more likely to express comfort among gays and lesbians, as nearly nine-in-ten (88%) held this opinion, as compared to seven-in-ten males (71%). Males were three times more likely to be uncomfortable (22%) than were women (6%).

Among other subgroups, African-Americans (71%), Catholics (78%) and those between the ages of 25-34 (75%) displayed the highest rates of comfort. Baptists (26%) and those between the ages of 18 and 24 (24%) presented the highest discomfort rates.

Within military subgroups, Veterans (81%) were more likely than Active Duty Personnel (70%) to be comfortable in the presence of gays and lesbians. Also, more than four-in-five (85%) of those who have served between 10 and 14 years expressed being comfortable, while two-thirds (66%) of those having served more than 20 years feel the same.

Additionally, roughly four-in-five members of the Navy (79%) and Marine Corps (82%) stated that they felt comfortable around gays and lesbians – the highest rates among the service branches. This compared with less than three quarters of Air Force members (73%) and Army members (69%). Air Force personnel displayed the highest discomfort rate (23%) of any service branch.

*25. In your current unit, how often do you take showers privately, such as in a single-stall shower rather than an open group shower?* **(Vets: During the last year of your military service, how often did you take showers privately, such as in a single-stall shower rather than an open group shower)**

| | |
|---|---|
| Almost Always Privately | 49% |
| Usually Privately | 22 |
| About Half and Half | 17 |
| Usually Group Showers | 5 |
| Always or Almost Always Group Showers | 3 |
| Not sure | 4 |

Just less than half of all respondents (49%) stated that they almost always shower privately. An additional fifth (23%) note that they usually shower privately, which aggregates to nearly three quarters (71%) of service personal surveyed who at the minimum usually shower privately. A further 17 percent shower privately approximately half the time, leaving only 8 percent who usually or almost always shower in groups.

Women were more likely than men to shower privately, with three-fifths (61%) responding that they almost always shower privately and at least three quarters (78%) who usually do so. Less than half of all men (47%) said they always shower privately, and more than two-thirds (70%) at least usually do so.

Among the service branches, those in the Navy (88%) and Air Force (79%) were most likely to at least usually shower privately. Within the Navy, almost two-thirds (64%) noted that they almost always shower privately – the highest such rate. Roughly three-in-five Army personnel (60%) and Marine Corps members (63%) report at least usually showering privately. Only 37 percent of Army personnel said that they always shower privately – the lowest such rate.

*26. Which of the following were important in your decision to join the military?* **(Choose all that apply.)**

| | |
|---|---|
| Duty/service to the country | 78% |
| Benefits (such as retirement, health care) | 62 |
| Funds for college or vocational school | 54 |
| Job skills/experience for a civilian job | 51 |
| Military values/ethics | 50 |
| Interesting/meaningful work | 44 |
| Challenges of military life (such as mental, physical) | 39 |
| Salary/cash bonuses | 35 |
| Family tradition of military service | 28 |
| Knowing that gays are not allowed to serve openly | 2 |
| Other/None of the above | 6 |
| Not sure | 1 |

Asked to choose which reasons were most important in their decision to join the military, an overwhelming majority of respondents (78%) stated that their decision was a product of a sense of duty and a desire to serve their country. Approximately three-in-five said that their reason for joining was either for non-wage benefits (62%) or for funds for college tuition (54%).

Half noted their reasons as being either for military values (50%), Job skills and experience (51%) or for interesting and meaningful work (44%). Only 2 percent noted that the inability of gays to serve in the military was a reason behind their decision to serve.

*27. Would you have still joined the military if gays and lesbians were allowed to serve openly?*

| | | | |
|---|---|---|---|
| Definitely Yes | 42% | Yes | 78% |
| Probably Yes | 35 | | |
| Probably Not | 7 | No | 10 |
| Definitely Not | 3 | | |
| Not Sure | 13 | | |

Four-out-of-five respondents (78%) report that they would have joined the military, regardless of whether gays and lesbians would be allowed to serve. One-in-ten (10%) would not have joined if gays and lesbians were allowed to serve openly. Thirteen percent of respondents remain uncertain about their decision to this hypothetical.

**LCR Appendix Page 1095**

Eighty-nine percent of female respondents report they would have joined the military regardless of the presence of gays and lesbians, as compared to 77 percent of their male counterparts who hold the same opinion. All other subgroups' responses remained within the sampling error, including all military subgroups.

*Do you agree or disagree with the following statement?*

*28. Compared with my peers, I consider myself more tolerant on the issue of homosexuals in the military.* **(Vets: Compared with the peers I served with, I considered myself more tolerant on the issue of homosexuals in the military.)**

| | | | | |
|---|---|---|---|---|
| Strongly Agree | 16% | **Agree** | **52%** | |
| Agree | 36 | | | |
| Neutral | 31 | | | |
| Disagree | 8 | | | |
| Strongly Disagree | 3 | **Disagree** | **11** | |
| Not sure | 7 | | | |

A majority of respondents (52%) believes they are more tolerant than their peers on the issue of homosexuals in the military. Only one-in-ten (11%) feels they are less tolerant, with 31% claiming neutrality on the issue.

Several subgroups present significantly higher than average agreement rates, including Democrats (69%), Independents (62%), Females (68%), Hispanics (64%) and African-Americans (55%). Conversely, male respondents and Republicans were less likely to agree that they were more tolerant than their peers, with 50 percent and 46 percent, respectively, holding that opinion.

Within military subgroups, Veterans (62%), those having served less than 4 years (62%), Marine Corps members (78%) and Navy personnel (61%) were more likely to agree that they were more tolerant than their peers. The lowest rates of agreement were found among Active Duty Personnel (29%), those serving between 5 and 9 years (42%), Air Force Personnel (48%) and Army Personnel (48%).

LCR Appendix Page 1096

*29. What are the strongest arguments for keeping gays from openly serving in the military?* **(Please choose up to three of the most convincing options below)**

### Table 4. Arguments for Keeping Gays/Lesbians from Serving

|  | % |
|---|---|
| Open gays and lesbians would undermine unit cohesion | 40 |
| Open gays and lesbians would get beat up or abused | 28 |
| Straights would not respect gay or lesbian leaders | 26 |
| Homosexuality violates religious / moral beliefs | 25 |
| Straights should not have to share foxholes, showers, etc. with open gays and lesbians | 22 |
| Open gays and lesbians would be more likely to pursue one another than they do now | 7 |
| Gays and lesbians would increase the spread of HIV/AIDS | 6 |
| Open gays and lesbians would be more likely to pursue straights | 5 |
| More gays and lesbians would join or remain in the military | 3 |
| Gays and lesbians cannot perform their military jobs as well as heterosexuals | <1 |
| Other reason | 9 |
| There are no strong arguments for keeping gays from serving openly | 21 |
| Not sure | 14 |

When asked to identify which are the strongest reasons for keeping gays and lesbians from serving openly in the military, the top two responses were concern for unit cohesion (40%) and for the individuals themselves (28%). The next tier of responses, each being selected by approximately one fourth of respondents, pertained to concern over the violation of moral or religious beliefs (25%), lack of respect for gay or lesbian leaders (26%), and a concern over sharing personal space (22%).

An almost equivalent number (21%) stated they believed there were no strong arguments for keeping gays and lesbians from serving openly.

LCR Appendix Page 1097

*30. What are the strongest arguments for allowing gays and lesbians to serve openly in the military?* **(Please choose up to three of the most convincing options below)**

**Table 5. Arguments for Allowing Gays/Lesbians to Serve**

|  | % |
|---|---|
| Sexual orientation has nothing to do with job performance | 36 |
| It is wrong to discriminate based on sexual orientation | 30 |
| During wartime, the armed forces need every qualified service member regardless of sexual orientation | 25 |
| Discharging service members for being gay is a waste of recruiting, education and training dollars | 22 |
| Gays already make valuable contributions to the military | 17 |
| No one should be able to avoid a service obligation by claiming to be gay | 11 |
| No one should be forced to lie about who they are as a condition of military service | 11 |
| The government should not pry into people's private lives | 11 |
| Discharging service members for being gay undermines military readiness | 7 |
| Other reason | 2 |
| There are no strong arguments for allowing gays and lesbians to serve openly | 19 |
| Not sure | 13 |

Given potential arguments for allowing gays and lesbians to serve in the military, the two most frequently selected options were that sexual orientation has no impact on job performance (36%) and the ethical concern for discriminating based on sexual orientation (30%).

The next three most selected options involved the implications for service, especially during wartime. Respondents noted that in a state of war, the military needs access to every qualified individual (25%), discharging based on sexual orientation is a waste of resources (22%) and that individuals gays already make valuable contributions to the military (17%). Nearly one-in-five (19%) of respondents stated that they believe there are no strong arguments for allowing gays and lesbians to serve openly in the military.

LCR Appendix Page 1098

*31. Have you had training on the prevention of anti-gay harassment in the past three years? (Vets: During the last three years of your military service, did you have any training on the prevention of anti-gay harassment?)*

| Yes | 52% |
|-----|-----|
| No | 37 |
| Not sure | 11 |

A majority of those surveyed (52%) report having received anti-gay harassment training within the past three years.  Approximately one-third (37%) say they have not received such training, while one-in-ten (11%) is not sure.

Within military subgroups, Active Personnel were more likely than Veterans to have received such training – 56 percent compared to 44 percent.  Also, 64 percent of those having served 15 to 19 years report having received training, while less than half of those having served less than 4 years (47%) or between 5 and 9 years (48%) report the same.

Among the service branches, the Air Force had the highest percentage of respondents having received training (62%), while those in the Army (51%), Navy (44%) and Marine Corps (34%) reported far lower levels of anti-gay harassment training.

LCR Appendix Page 1099

# Homosexuality and the Israel Defense Forces: Did Lifting the Gay Ban Undermine Military Performance?

AARON BELKIN AND MELISSA LEVITT

As the number of countries that permit gay and lesbian soldiers to serve in the armed forces has grown over the past two decades, it has become increasingly important to determine whether official decisions to include homosexual service members in the military lead to changes in organizational performance. Although most NATO countries as well as a handful of other nations allow gay and lesbian soldiers to serve, there has been little empirical analysis of whether the decision to lift a gay ban influences the armed forces' ability to pursue their missions. Theoretical studies have addressed this topic, but there has been no in-depth empirical work on the actual consequences of a decision to lift a gay ban.[1]

Israel is a case in point. A few scholars conducted careful studies in the immediate aftermath of Israel's 1993 decision to abolish restrictions on gay and lesbian soldiers. However, the long-term impact of the new policy was not immediately apparent and even the most thorough of these early analyses is only eight pages long.[2] Our rationale for consid-

AARON BELKIN is an assistant professor in the political science department at the University of California, Santa Barbara, and Director of the Center for the Study of Sexual Minorities in the Military. His research interests include gays in the military, civil-military relations, and social science methodology. He is co-editor of *Counterfactual Thought Experiments in World Politics*, published by Princeton University Press in 1996. *Address for correspondence*: Dr. Aaron Belkin, Department of Political Science, University of California, Santa Barbara, CA 93106-9420. E-mail: belkin@SSCF.UCSB.EDU

MELISSA LEVITT is an adjunct professor of political science at San Francisco State University. Her research interests include Israeli politics, survey research methods, and immigration policy. In addition to her scholarly work, Ms. Levitt has conducted research for both private and public organizations, including the Center for Urban Research in New York.

ARMED FORCES & SOCIETY, Vol. 27, No. 4, Summer 2001, pp. 541–565.



DEFENDANT'S EXHIBIT
13
2-26-10