# Appendix of Evidence in

# Support of Log Cabin Republican's

# Opposition to Defendants'

# Motion for Summary Judgment

# LCR Appendix Pages 1101-1200

# (Part 11 of 19)

ering more recent evidence, accumulated in the eight years since Israel lifted its gay ban, is that with its history of over half a century of continuous military engagement, the Israel Defense Forces (IDF) are considered to be one of the premiere fighting forces in the world. The Israeli case thus affords an opportunity to examine the impact of lifting a gay ban in a high-stakes security context. After discussing the histori-cal evolution of Israel's homosexual personnel policy, we examine whether its decision to abolish restrictions on gay and lesbian soldiers influenced military performance, readiness, cohesion, or morale. Fi-nally, we ask if lessons from the Israeli case may be relevant for determining whether lifting the American gay ban would undermine the effectiveness of the U.S. armed forces. Our findings are that Israel's decision to lift its ban had no impact on performance and that, despite differences between the two cases, lessons from the Israeli experience are relevant for determining what would happen if the U.S. Congress and Pentagon lifted the American gay ban.

### Historical Context

The Israel Defense Forces play a central role in the daily life and identity of the Israeli people.[3] Since its founding in 1948, Israel has fought five major wars, conducted numerous major operations against hostile neighbors, and supplied an army of occupation in the West Bank and Gaza for more than 30 years. The wide-ranging and extensive nature of these operations has provided the IDF with nearly unparalleled combat experience. Israelis rely on a strong military to ensure their safety as citizens and as a nation, and the IDF has been central to the Israeli sense of mission concerning the renewal of the Jewish homeland. Although the prestige of the IDF has declined somewhat in recent years and although it no longer plays as prominent a role in the nation-building process as it once did, the IDF remains an important institution in Israeli life and the boundaries between civilian and military culture "remain porous or, according to some views, virtually nonexistent."[4]

The IDF acts as an important agent of socialization for Israelis as well. Military service is mandatory for Jewish men and women at the age of 18, and it provides a common experience for young Israelis entering adulthood. Men serve for three years and women for just under two years. While women do not serve in combat and primarily occupy support roles, in recent years they have gained greater access to a range of opportunities such as that of elite fighter pilot training. Once Israelis complete active duty, men remain in the reserves until they are 55 and

Belkin and Levitt                                                          543

women serve in the reserves until they marry or turn 24. Because Israel is home to a large number of immigrants and includes people with diverse cultural, religious, and socioeconomic backgrounds, the IDF still embraces the ideals of a melting pot for many Israeli groups.[5]

The Israeli military never has formally prohibited service by homosexuals. Because of the personnel demands of a nation continuously at war, the IDF generally has pursued an officially inclusive conscription policy. Before 1980, however, known homosexuals usually were discharged. In 1983, the IDF for the first time officially spelled out regulations relating to homosexuality in the Manpower Division Standing Order K31-11-01, "Service of Homosexuals in the IDF." The regulation stated that homosexuals would not be limited in their positions or discharged from service solely because of their sexual orientation. It did, however, prohibit sexual minorities from serving in top secret and intelligence positions. The order required officers to refer suspected homosexuals to a mental health evaluation center to determine whether they were security risks and maintained sufficient "mental strength and maturity" for military service. Based upon the results of the evaluation, the Field Security Department could decide to do nothing, terminate the soldier's service, limit his or her deployment, or conduct an extensive security investigation. The IDF did not maintain regulations that were specific to homosexual behavior because military codes prohibited all sexual activity, whether homosexual or heterosexual, on military bases, as well as sexual relationships between officers and their subordinates.[6]

In 1993, the IDF faced mounting opposition to its restrictive policy in the wake of the Knesset's first hearings on homosexual issues. Professor Uzi Even, chairman of Tel Aviv University's Chemistry Department, created a public sensation when he testified that he had been stripped of his rank of officer and barred from sensitive IDF research in the 1980s because of his sexual orientation. Even conducted highly classified military research for 15 years and was open about his sexual orientation and therefore not at-risk for blackmail when the IDF revoked his security clearance.[7] His testimony "created a public storm—against the military and for Even."[8] In response, the IDF issued a statement declaring that it did not discriminate against gays and lesbians and did not prohibit homosexuals as a group from sensitive assignments. Prime Minister Rabin declared, "I don't see any reason to discriminate against homosexuals," and called for a military committee to explore the matter.[9]

The military committee then drafted amendments to the 1983 order that officially "recogniz[ed] that homosexuals are entitled to serve in the

Armed Forces & Society/Summer 2001

military as are others" and declared that sexual minorities would be judged fit for service "according to the criteria in force for all candidates for security service."[10] The amendments also shifted the assumption of security risk away from sexual minorities as a group. As a rule, placement or advancement of sexual minorities in the military would not be restricted. Cases where a possible security risk existed were to be handled on an individual basis. According to official policy, gay and lesbian soldiers were to be treated the same as their heterosexual peers.

### Effect of IDF Inclusion of Sexual Minorities

In order to determine whether Israel's decision to lift its gay ban undermined military performance, cohesion, readiness, or morale, we gathered information systematically from six different types of publicly available Hebrew and English language sources including (1) all published scholarly books and journal articles on the topic; (2) interviews of all known experts on the issue of gays in the Israeli military (listed in Appendix 1) from the Defense Ministry, the IDF, Israeli and American universities and civil rights organizations (n=35); (3) all newspaper articles and wire service dispatches relating to homosexual service in the IDF stored in the Lexis/Nexis Middle East database (1985-2000; n= 24); (4) all articles on Hebrew University's Internet collection of newspaper and magazine stories concerning sexual minorities (1993-2000; n=199); (5) fourteen Israeli web sites related to gay and lesbian issues; (6) government documents that included transcripts of Knesset hearings and military orders relevant to homosexual service in the IDF. Although our footnotes do not list citations to most of these sources, we examined all of them and included the most relevant references in the article. Certainly it is possible that we missed some evidence, although we tried to ensure that our universe of sources was comprehensive. For example, we asked interview subjects repeatedly to suggest additional experts from different sectors and we contacted all suggested individuals.

In our search for published evidence in English and in Hebrew we were unable to find any data indicating that lifting the gay ban undermined Israeli military performance, cohesion, readiness, or morale. In addition, none of the 35 experts we interviewed could recount any indication that the lifting of the gay ban compromised military effectiveness. The comments of Professor Stuart Cohen, a professor and senior research fellow at the Center for Strategic Studies at Bar-Ilan University, who has written extensively on the Israeli military, were typical of

Belkin and Levitt                                                     545

our findings: "As far as I have been able to tell, homosexuals do not constitute an issue [with respect to] unit cohesion in the IDF. In fact, the entire subject is very marginal indeed as far as this military is concerned."[11] In a recent interview for ABC news, Israeli Brigadier-General Oded Ben commented that Israelis show "a great tolerance" with respect to homosexual soldiers in the military.[12] Scholars, officials, NGO observers, and service members interviewed for this report echoed the theme of tolerance put forward by the brigadier-general. When asked if she had experienced any problems because of her sexual orientation, for example, a female soldier who served between 1993 and 1996 stated: "I was quite amazed to find out that people either thought that my sexual orientation was 'cool' or were indifferent to it."[13] Amir Fink, the co-author of *Independence Park: The Lives of Gay Men in Israel*, argues that the IDF policy changes, among larger societal changes, have resulted in a more open attitude in the military: "I believe that … after the 1993 change in regulations there are more soldiers who are aware of the fact that there are gays in the unit and [that] they should treat them decently."[14]

In an October 1999 article on sexual minorities in the military entitled, "Coming Out of the Kitbag," the IDF newspaper *Ba'machne* includes comments from seventeen heterosexual soldiers about their attitudes about having a gay commander.[15] While the responses do not constitute a representative sample of heterosexual IDF personnel, they are consistent with the results of our interviews and literature searches. Two of the seventeen soldiers (12%) interviewed for the *Ba'machne* article felt that serving under a homosexual commander would constitute a problem for them. One soldier explained that "The truth is it would be a bit strange for me. Not that I am primitive or homophobic, but among my friends there aren't any gays. I would try to get used to the idea and if I did not succeed I would request a transfer. I do not think that gays are less good, but it would be a bit difficult or strange for me." The rest of the respondents stated that the sexual orientation of their commanding officer would not make a difference to them. Ayah provides one example of this attitude: "I respect gays a lot. There is no problem with their service in the Army. It is none of my business if my commanding officer is gay. If he has already decided to participate this does not have to interfere with work…"

While the question posed about working under a gay commander did not address the issue of showering together specifically, 12 of the respondents brought up this issue as well. Three soldiers expressed some concern about showering with a homosexual soldier, although

Armed Forces & Society/Summer 2001

they stated that in general they did not have a problem with gay soldiers. Second Lieutenant Gal in Human Resources explained his feelings: "I don't have anything against homosexuals in the army. They're citizens of Israel like you and me. The sexual orientation of the workers around me doesn't interest me. It does interest me if his output suffers from it, maybe if it bothers him and he needs help. I wouldn't shower with him. There are cubicles here at [the officer's training base]." Eight of the respondents stated that they have no problems showering with sexual minorities. Dima, an officer, expressed the prevailing view of the respondents who brought up the issue: "They're citizens of the state, like all the other citizens. I think that even if they have a different sexual orientation, that doesn't have anything to do with hateful feelings. I don't have a problem showering with [homosexuals]. It seems to me that it wouldn't be a problem."

No statistics have been collected on the number of incidents of harassment of known homosexual soldiers in the IDF. In 1993, in the wake of the changes in IDF policies toward homosexuals, the Knesset empanelled a committee to investigate complaints of harassment. Uzi Even, who was involved in the review, stated that none of the cases had their roots in anti-gay bias.[16] Brigadier-General Uri Shoham, the military's judge advocate general, reported recently that harassment because of sexual orientation is very rare and that he could remember few, if any, cases. He further stated that that he had never had to deal with harassment against gay troops in his career as a military lawyer. Because individual commanders generally handle harassment, however, Shoham's lack of knowledge of such cases does not mean that problems have not occurred.[17] For example, a female officer presently in the IDF told us that she experienced general acceptance from most of her superiors and peers. She said that "In the unit I serve in I have heard of no discrimination (in either direction) toward gays." She added, however, that "[r]umors (usually from the news) do show the existence of some such problems in 'closed units' ([w]here one lives on base)."[18]

Walzer uncovered two cases of harassment of homosexual soldiers in the IDF. In one, a female former soldier recounted in 1997 how the male officers on her base tried to sleep with female soldiers: "The thing was that any girl who refused got a reputation as a lesbian. And the way it was portrayed was very dirty. It's true that none of them were lesbians, but the response to them was so harsh that I didn't dare say anything."[19] Even though her commander eventually dealt with the problem, the humiliating treatment convinced her to keep silent about her own sexual orientation. When told of the two examples of harassment, Brigadier-

Belkin and Levitt                                                                        547

General Shoham replied that if they were the only cases that had come to light, the military's policy could be considered quite successful. In light of his research, Walzer believes that vicious harassment of sexual minorities in the IDF is rare.

The IDF does not conduct any special education or sensitivity training related to sexual orientation issues. In contrast, the Israeli military provides training on sexual abuse of women and harassment of new immigrants and Mizrachim, Israelis of North African or Middle Eastern origin.[20] One board member of Agudaht Zechuyot Ha-ezrach, Israel's primary gay-rights group, expressed overall approval of the military's policies toward sexual minorities but other scholars and representatives of gay rights groups have declared that the IDF could do more to address the concerns of sexual minorities in the military and that many soldiers are not aware of official policy.[21]

The findings that emerged from our interviews and literature searches are consistent with brief reports on the IDF prepared by the U.S. General Accounting Office (GAO) and the RAND corporation in the immediate aftermath of Israel's 1993 decision to abolish restrictions on gay and lesbian soldiers.[22] In interviews with embassy and IDF officials, active and reserve military personnel, scholars, a member of the Knesset, and personnel from the leading homosexual rights and civil rights groups in Israel, RAND and GAO researchers found that Israel's long-standing informal inclusion of homosexuals in the military had neither created internal problems nor jeopardized combat units. Officials interviewed for the GAO report stated that homosexual soldiers performed as well as heterosexual soldiers. Based on the officials' experience, homosexual soldiers had not adversely affected "unit readiness, effectiveness, cohesion, or morale."[23] Security personnel noted that homosexual soldiers were able to hold security clearances without posing an unnecessary security risk. Gal, the director of the Israeli Institute for Military Studies, affirmed the findings of the GAO and RAND studies: "According to military reports, [homosexuals'] presence, whether openly or clandestinely, has not impaired the morale, cohesion, readiness, or security of any unit. Perhaps the best indication of this overall perspective is the relative smoothness with which the most recent June 1993 repeal of the remaining restrictions on homosexuals was received within the IDF and in Israeli society as a whole."[24]

In the context of a country continuously at war, lack of service is considered suspect. Unrestricted participation in the military by sexual minorities therefore serves to bolster the core Israeli value of common defense of the nation rather than to threaten military cohesion or morale.

When asked if he had heard any suggestion by military officials that known homosexuals affected operational effectiveness, combat readiness, or unit cohesion, a board member of the homosexual-rights groups Agudaht Zechuyot Ha-ezrach responded: "No, I have never heard any such nonsense."[25]

## Relevance to the American Case

The issue of gays in the military has been hotly contested in the United States in recent years. When President Bill Clinton attempted to force the Pentagon to allow known gays and lesbians to serve in the military at the beginning of his administration, Congress reacted by including new statutory guidelines for homosexual service members in the National Defense Authorization Act for Fiscal Year 1994. According to the compromise referred to as "Don't Ask, Don't Tell" that was embodied in Congressional law as well as Pentagon implementing regulations, known homosexuals are not allowed to serve in the U.S. armed forces. The unit cohesion rationale, the official justification for the new policy, is that if known gays and lesbians were allowed to serve, unit cohesion, performance, readiness, and morale would decline.[26]

During Congressional hearings that culminated in the passage of "Don't Ask, Don't Tell," and on numerous occasions since that time, scholars and experts debated whether the experiences of foreign militaries might confirm or falsify the plausibility of the unit cohesion rationale.[27] Experts who advocate allowing known gays and lesbians in the U.S. armed forces often claim that foreign military experiences prove that performance does not decline after the lifting of a gay ban. Critics often respond that foreign experiences are irrelevant to the American case and that they do not show that the U.S. military would remain effective if the gay ban were lifted.

As for Israel, experts (mostly U.S.) have raised three arguments to bolster their claim that the evidence from the IDF is irrelevant for determining whether the U.S. military would remain effective if the gay ban were lifted. First, they have argued that even though Israel lifted all restrictions on homosexuals in 1993, no known gay and lesbian soldiers have served in combat or intelligence units of the IDF. Second, they say that large organizational and cultural differences distinguish the American and Israeli cases. Third, they claim that gay and lesbian soldiers receive special treatment in the IDF. We agree or partially agree with all of these arguments. Our interpretation of the findings, however, differs from those of experts who claim that foreign military experiences are

Belkin and Levitt                                                                    549

irrelevant. While no single case study can show decisively what would happen if the U.S. changed its policy, lessons from the Israeli experience seem to us to be relevant for determining what would happen if the U.S. Congress and Pentagon lifted the American gay ban. In particular, we believe that the Israeli experience lends some weight to the claim that American military effectiveness would not decline if known homosexuals were allowed to serve.

*Known Gay and Lesbian Soldiers in Combat and Intelligence Units of the IDF*

According to Professor Charles Moskos, one of the principal architects of "Don't Ask, Don't Tell," there are no known gay and lesbian soldiers in combat or intelligence units of the IDF. During testimony before the Senate Armed Services Committee in 1993, Moskos stated that known gay soldiers were not assigned to elite combat units, did not work for intelligence units, and did not hold command positions in any branch.[28] In later work, Moskos reaffirmed that "gays are excluded from elite combat units, and most sleep at their own homes rather than in barracks."[29] During two recent appearances on *National Public Radio*, Moskos said that there are no known gay soldiers in combat or intelligence units of the IDF.[30]

Our findings indicate that he is partially correct. As is true with many militaries, a distinction must be made between official IDF policy concerning sexual minorities and the realities of informal IDF practices and culture. Like the rest of Israeli society, the IDF was until recently an environment in which sexual minorities were largely invisible. Prior to the lifting of the ban in 1993, the vast majority of gay and lesbian soldiers kept their sexual orientation private, due to fears of both official sanctions and ostracism from fellow soldiers.[31] Lesbian and gay soldiers often preferred to wait until reserve service to be more open about their sexual identity, since the atmosphere was less restrictive and more conducive to a separate personal life. Rafi Niv, a journalist who writes on gay issues, confirmed in 1993 that "Most gay soldiers I know are in the closet."[32]

Even before Israel lifted its gay ban in 1993, however, some known gay and lesbian soldiers did serve in the IDF and some were promoted through the ranks and served in positions requiring top security clearances. In 1993, for example, an Israeli military attaché assigned to the embassy in Washington, DC, declared that Israel did not have a blanket ban on homosexuals for top-secret positions.[33] Gal reported in 1994 that

550                                                          Armed Forces & Society/Summer 2001

prior to the lifting of the ban, much latitude normally was given when a seasoned soldier was suddenly discovered to be a homosexual. He said that homosexual soldiers did in fact serve openly in units with top security clearances and that soldiers who excelled were unlikely to be removed once their sexual orientation was revealed. According to Gal, "Commanding officers, even in highly classified intelligence units, who had homosexual soldiers who performed satisfactorily under their command refrained from enforcing [the ban on homosexuals in sensitive units]."[34]

All available evidence suggests that the IDF continues to be a place where many homosexual soldiers choose not to disclose their sexual orientation. As more gay Israelis have grown comfortable about expressing their orientation in recent years, however, greater openness has been found in the military as well.[35] A woman who decided to bring her partner to one of her base's social events in 1997 explains that "the decision was preceded by consultations with my professional commander....He recommended to me quite warmly not to hide my sexual orientation and promised to support me professionally if there were any problems following my revelation."[36] A June 2000 Israeli television broadcast that was sanctioned by the IDF featured homosexual active-duty and reserve soldiers discussing their experiences of being gay in the military.[37] Walzer found that military personnel generally reported positive responses to their coming out and in 1997 he spotted a soldier in uniform at a gay pride march. When asked if appearing in uniform could cause problems with military officials, the soldier replied: "No, not at all. I can come here in uniform. The military command is accepting of [gay and lesbian soldiers]."[38] An officer interviewed for this report had no problems rising through the ranks as an open lesbian. When asked how overall attitudes had changed since the 1993 policy change, the major replied: "I have felt a change for the better, mainly in the attitude of security officers, but not as big a change (because not as big a change was needed) as it seems by the change in army regulations."[39] While no official statistics exist on the number of known gay and lesbian soldiers in the IDF today, these and other sources indicate growing openness.

Even though we agree that most homosexuals in IDF combat and intelligence units do not acknowledge their sexual orientation to peers, it is also true that some known gays do serve in such units. Indeed, some IDF combat and intelligence units have developed a reputation as particularly welcoming to gay and lesbian soldiers; some have even developed a gay culture. Ro'ei, a tank corps soldier, reported in 1999

Belkin and Levitt                                                        551

that "I have not had any problems being gay. On the contrary, in my base we had a large gay contingent. You would come to the base, and you know one other gay person, who knows another gay person, etc....In my basic training, people knew that I was gay and it was enough that there was one homophobe in my unit....After that, I had nothing to be afraid of. People come out of the closet while they are civilians, why could I not do it during the army? Sometimes, it's even easier because you are protected from society. You don't have friends from the same town so you can be more open in the army."[40]

Kaplan and Ben-Ari conducted in-depth interviews with 21 self-identified gay IDF combat soldiers and found that five of them (23.8%) were known to be homosexual by at least one other member in their combat unit.[41] If we estimate conservatively that two percent of Israel's 130,000 active duty land forces are gay, and if we extrapolate based on Kaplan's finding that 23.8 percent of gay combat soldiers are known by at least one peer to be homosexual, then we can estimate that 2,600 active duty IDF foot soldiers are gay and that 619 of them are known by at least one member of their unit to be homosexual.[42] Even if this informal estimate is wildly exaggerated, recall that opponents of lifting the ban claim that no known gays serve in combat and intelligence units in Israel. Even in combat and intelligence units with known gay soldiers, however, we found *no* evidence of a deterioration in cohesion, performance, readiness, or morale. Generals, ministry officials, scholars, and NGO observers all have claimed that their presence has not eroded cohesion, performance, readiness, or morale.

Those who believe that low disclosure rates underscore the irrelevance of foreign military experiences assume that if the American ban were lifted, many gays and lesbians would reveal their sexual orientation. This assumption seems highly questionable. A considerable amount of evidence suggests that gay and lesbian soldiers in the U.S. and in Israel are driven by the same factor: they reveal their sexual orientation only when safe to do so. With regard to Israel, Fink confirmed the impression of numerous experts who we interviewed: "... I think it really depends on the unit and on the commanders in the specific unit. In some units it will be really a piece of cake to come out and people [will find] it something that makes their unit more diverse, more interesting....There are other units in which especially a commander can be a conservative or homophobic and not help the gay soldier to be part of the unit...."[43]

The same calculus motivates Americans. For example, a study of American police departments that allow open homosexuals to serve

552                                                        Armed Forces & Society/Summer 2001

identified seven known gays in the Chicago Police Department and approximately 100 in the New York Police Department.[44] Several different factors may account for the variation in disclosure rates but scholars who have compared organizations believe that much if not most of the variance reflects the fact that safety is the primary determinant of Americans' decisions to reveal sexual orientation. Since safety varies from organization to organization depending on whether leaders express clear messages in support of integration, disclosure rates vary as well. Koegel claims that "Perhaps one of the most salient factors that influences whether homosexual police officers or firefighters make their sexual orientation known to their departments is their perception of the climate...[T]he more hostile the environment, the less likely it was that people publicly acknowledged their homosexuality."[45] Similar variance can be found in the U.S. military, and a recent study found that while 21.2 percent of naval officers know a gay sailor, only 4.1 percent of Marine officers know a gay Marine.[46] It seems likely to us that this difference results from the fact that it is safer to reveal one's homosexuality in the U.S. Navy than in the Marines. Indeed, at least one study has found the U.S. Navy to be more tolerant toward homosexuals than the Marines.[47]

To summarize our response to the first argument, known homosexuals do not undermine cohesion and performance in Israeli combat and intelligence units. And, the fact that many gay Israeli soldiers choose not to reveal their orientation does not indicate that the Israeli experience is irrelevant for determining what would happen if the U.S. lifted its gay ban. On the contrary, the evidence shows that both Israelis and Americans come out of the closet only when it is safe to do so. Scholars who believe that many American gays and lesbians would reveal their sexual orientation if the ban were lifted need to answer two questions. First, if American culture or the American gay rights movement are primary determinants of disclosure rates, then why have so few homosexuals revealed their sexual orientation in some U.S. police and fire departments that allow known gays to serve? And second, why do the majority of gay Israeli soldiers decline to reveal their sexual orientation despite the recent emergence of an Israeli gay rights movement that includes widely-attended pride parades and civic and human rights organizations? Even the Pentagon's own studies have found that gay and lesbian soldiers are as committed to national security, patriotism, and military effectiveness as their heterosexual peers.[48] To suggest that they would reveal their sexual orientation when doing so would undermine their personal safety or the effectiveness of their units seems to contradict the available evidence.

### Special Treatment

Experts who claim that foreign experiences are irrelevant for determining if lifting the gay ban would undermine American military performance argue that although many nations allow homosexuals to serve in their armed forces, gay soldiers receive special treatment in these cases. Even if the decision to allow known homosexuals to serve does not harm the military, the special treatment that gays and lesbians receive can undermine cohesion, performance, readiness, and morale. In the case of Israel, for example, Moskos has noted that while it is true that gays are expected to fulfill their military obligation, it is also true that they receive, de facto, special treatment. For example, gay soldiers are assigned to "open" bases, allowing them to commute to and from home and to sleep at their own homes rather than in barracks.[49]

Similar to the argument about the absence of known gays and lesbians in combat and intelligence units, we have found that Moskos's claim about special treatment is partially correct. Some evidence suggests that prior to the 1993 decision, the IDF treated homosexual and heterosexual soldiers equally in many cases. For example, Gal noted that "aside from a few exceptions, "homosexuality has almost no bearing on an individual's military career."[50] Colonel Ron Levy, a former head of the IDF mental health system, insisted that homosexuals were not discriminated against by the military as a group.[51]

However, other data confirm that treatment of gays and lesbians was not always equitable before the 1993 regulatory changes. Gal Uchovsky, a journalist who analyzed IDF treatment of gays and lesbians, stated that "It's a question of who you are and where you serve."[52] An openly gay reservist for an intelligence unit who had access to top-secret material told one journalist that everyone knew that he and several other of the unit's members were gay. "It's not an issue," he said. But he added after a pause, "in my unit."[53] Ilan Sheinfeld, a reserve tank crew member, reported that security officers reduced his security ranking and allegedly bugged his phone, although they did let up after he was transferred to another job. Sheinfeld declared that "One hand doesn't know what the other is doing."[54]

No quantitative data are available on whether sexual minorities continue to face increased scrutiny for promotions and sensitive positions. Publicly, the IDF insists that homosexual soldiers are screened for positions according to the same standards as heterosexual soldiers. For example, Brigadier-General Shoham, the judge advocate general, stated in 1998 that the IDF accords equal rights and duties to gay and lesbian

554                                                        Armed Forces & Society/Summer 2001

soldiers. The commander in charge of draftees also reported in 1999 that "we are not interested in the sexual orientation of the soldiers."[55] In support of these claims, a board member of Israel's primary gay rights organization who was interviewed for this report knew of no cases in which a soldier had been denied benefits, promotions, or assignments because of his or her sexual orientation.[56] A review of newspaper articles and web sites related to lesbian and gay issues in Israel also uncovered no stories of soldiers who were denied promotions because of their sexual orientation.

Even though available information suggests that official treatment of sexual minorities has become more equitable since the 1993 removal of homosexual restrictions, however, it seems clear that sexual minorities do not always enjoy equal rights and that they continue to be viewed with an increased level of scrutiny by some commanders. Official differentiation still exists, if perhaps in a more muted form. For example, the IDF negotiated the first settlement providing survivor benefits to a same-sex partner in 1997. However, the same-sex survivor received less than the full monetary compensation usually given to war widows and widowers. While there are no rules against promoting gays and lesbians, a clinical psychiatrist stated that soldiers in her care still "suspect that if they come out, they won't get a good position."[57] Kaplan and Ben-Ari conclude that "The new policy has only partly percolated into practice. Similar to what has been found among other nations of NATO, full integration has tended to lag behind policy changes."[58]

Despite the lack of perfectly equal treatment in all cases, several important qualifications should be noted. To begin, we found that unequal treatment is rare and that most Israeli gay and lesbian soldiers are treated like their heterosexual peers most of the time.[59] Gay soldiers are assigned to open as well as closed bases and most cases of unequal treatment that we found consisted of local attempts to resolve problems flexibly rather than systematic extensions of special rights. For example, some *heterosexual* soldiers are allowed to live off-base or to change units if they are having trouble with their group. And, some commanders allow *heterosexual* soldiers to shower privately. When gay soldiers encounter hostility from others in their units, the issue tends to be handled as a discrete situation rather than the symptom of a systemic problem. Most importantly, we have not found any evidence to show that differential treatment has undermined performance, cohesion, readiness, or morale. Indeed, most of the experts who confirmed that Israel's decision to lift its gay ban did not undermine performance, cohesion, readiness, or morale also confirmed that the treatment of gays and

Belkin and Levitt                                                                 555

lesbians has not been perfectly equitable in all cases. Despite their awareness that this is true, all experts agreed that lifting the gay ban did not undermine military effectiveness.

*Organizational and Cultural Differences*

A third argument that experts have invoked to show that foreign military experiences are irrelevant for determining whether lifting the gay ban would undermine American military performance is that important organizational and cultural differences distinguish the United States from other countries that allow known homosexuals to serve. More specifically, they argue that the U.S. military is a unique institution that cannot be equated with foreign armed forces. In addition, unlike most other countries, the United States is home to powerful gay rights groups as well as large and highly organized conservative organizations.

In the case of Israel, this argument is correct. We believe that several important organizational and cultural differences distinguish the Israeli and American cases. To begin, many American citizens do not regard service in the armed forces as a necessary rite of passage. In Israel, on the other hand, the prevalence of security issues and the system of near-universal conscription have made participation in the IDF the primary rite of passage into Israeli citizenship and a necessary precondition for consideration as a full member of society. Although the military's prestige has declined somewhat in recent years, full participation in the armed forces by gays and lesbians still is seen by many as the fulfillment of a shared responsibility to defend the nation rather than as a threat to military stability. According to Walzer, "the IDF has been a unifying, uniform experience for Israeli Jews; those who escape service, namely the ultra-Orthodox, are highly resented by most Israeli Jews. That gays and lesbians seek to contribute to their country through military service is an affirmation of what the IDF tries to represent itself as: an institution that brings the diverse strata of Israeli society together."[60] Because almost all Israelis serve in the armed forces, unit counselors who confront problems involving adjustment to military life and interpersonal relations emphasize flexibility and mutual accommodation. In the American armed forces, by contrast, the system of voluntary enlistment forces the military to compete with private sector employers who might offer more promising career options to potential recruits.

Another distinction between the two cases is that Israeli society does not have a longstanding tradition of anti-gay violence or hatred of

homosexuals, although observers have spoken of "a strong heterosexist outlook, in which one is presumed to be straight."[61] In the military context, IDF commanders do not use negative images of homosexuality as a motivator in basic training and they do not use the Hebrew equivalent of "faggot" to humiliate soldiers who perform poorly. While the term "homo" gets used, it is primarily employed by soldiers teasing each other.[62]

Finally, unlike sexual minorities in the United States, homosexuals in Israel did not begin to develop a semi-autonomous culture or organized political movement until the late 1980s and early 1990s. Walzer says that until recently, the Israeli gay and lesbian community was not mobilized to demand its rights and that legislative victories such as the repeal of the sodomy law resulted from top-down elite action rather than grassroots political pressure. Conversely, anti-gay forces are not organized into social movements in Israel. For example, in the early 1990s GAO researchers who attempted to contact organizations that oppose homosexual participation in the military were told that none exist.[63]

Despite organizational and cultural differences, we do not believe that the Israeli experience is irrelevant for determining whether American military effectiveness would suffer if known homosexuals were allowed to serve in the U.S. armed forces. For example, organizational structure does not seem to play an important role in determining whether the lifting of a gay ban undermines military performance. No two militaries are exactly the same and the twenty-three armed forces that have lifted their gay bans include different organizational configurations.[64] Some militaries, such as the Canadian Forces, are volunteer organizations that are not central to national identity while others such as the Israel Defense Forces are conscript militaries that play a more prominent role in the nation's consciousness. In the 27 years since the Dutch military became the first to lift its ban in 1974, no countries that have decided to allow known homosexuals to serve have reported a decrease in military performance.[65] Given that organizational particularities do not determine whether the lifting of a gay ban undermines the armed forces, the institutional differences that distinguish the Israeli and American militaries do not support the argument that IDF experiences are irrelevant for determining what would happen if the U.S. allowed known homosexuals to serve.

With respect to cultural differences, the Israeli public is not completely accepting of homosexuality and American society is not completely intolerant. Under traditional Jewish law, sex between two men

is considered unclean, and a 1983 study found Israelis to be considerably less tolerant of homosexuality than Americans.[66] Although Israeli culture has become more tolerant since 1983, religious parties continue to oppose gay rights and gay and lesbian soldiers in the IDF continue to serve in the context of a macho organizational culture that promotes a masculinity oriented to heterosexuality and bonding through jokes about women and homosexuals. While Israeli commanders do not use the Hebrew equivalent of the word "faggot," poor combat performance often is equated with childishness and femininity and "...images of combat soldiers as masculine, tough and team oriented are often contrasted with stereotypes of homosexuality as characterized by effeminacy, mental illness, promiscuity, loneliness and insecurity."[67] A study by Sion and Ben-Ari of the humor used in two elite combat units found that jocularity about sexuality was explicitly heterosexual and included jokes and stories about homosexuals.[68] Discussions of women and sex continue to be a uniting factor for unit personnel, even as the strong bond created in small units permits expressions of affection that would generally be avoided in all-male groups.[69] Just as Israeli culture is not completely tolerant, American culture is not completely intolerant. For example, a recent Gallup poll shows that 70 percent of Americans believe that gays should be allowed to serve in the military, and a recent Harris poll shows that 48 percent of Americans believe that *known* gays should be allowed to serve in the military.[70]

More importantly, tolerant national climates are not necessary for maintaining cohesion, readiness, morale, and performance after the integration of a minority group into the military. Among the twenty-three nations that allow known gays and lesbians to serve, many include powerful social and political groups that oppose gay rights.[71] It would not be possible for the numerous American police and fire departments that include known homosexuals to continue to function smoothly if a fully tolerant national climate were necessary for the maintenance of organizational effectiveness. Without equating the experiences of sexual and racial minorities, the U.S. military allowed African American soldiers to serve on an equal basis when 63 percent of the American public opposed integration.[72] We do not equate the experiences of sexual and racial minorities but we do believe that the racial example shows that tolerant cultural climates are not necessary for maintaining organizational effectiveness when minority groups are integrated into the military. According to a recent study, "if the military services are eventually ordered to cease excluding homosexuals who engage in homosexual behavior, they will do so quite effectively and without

Armed Forces & Society/Summer 2001

major incidents, provided that the leadership...clearly communicate[s] support for the change."[73]

## Conclusion

In our comprehensive search for published evidence and our interviews with all known experts on homosexuality in the IDF, we were not able to find any data suggesting that Israel's decision to lift its gay ban undermined operational effectiveness, combat readiness, unit cohesion, or morale. In this security-conscious country, where the military is considered to be essential to the continued existence of the nation, the decision to include sexual minorities has not harmed IDF effectiveness. In addition, although no official statistics are available for harassment rates of sexual minorities in the IDF, scholars, military officials, and representatives of gay organizations alike assert that vicious harassment is rare. Despite the facts that the majority of gay combat soldiers do not disclose their sexual orientation to peers, that some gay soldiers receive special treatment, and that important organizational and cultural differences distinguish the Israeli and American cases, we believe that the Israeli experience supports the claim that American military effectiveness would not decline if known homosexuals were allowed to serve.

Professor Laura Miller has argued that although straight soldiers' reactions to open gays could undermine unit cohesion in the U.S. military, merely lifting the gay ban would not undermine cohesion, morale, readiness, or performance.[74] Miller, whose conclusions are based on interviews she conducted over the past ten years with thousands of American soldiers, reasons that few gays or lesbians would come out of the closet in units where hostility and homophobia prevail. Rather, she believes that American gay and lesbian soldiers would disclose their sexual orientation to peers only when they believed it was safe to do so. In other words, she draws a sharp distinction between the effect of the decision to lift a gay ban and the effect of the presence of known gays and lesbians in the military. The Israeli case seems to us to confirm her distinction.

## Notes

AUTHORS' NOTE: We are grateful to the numerous individuals who helped us conduct our research. In particular, we offer deepest thanks to the service members, officials, scholars, and experts who generously allowed us to interview them. And we are very

Belkin and Levitt                                                                                559

*grateful to three anonymous reviewers from* Armed Forces & Society, *as well as Stuart Cohen, Eva Etzioni-Halevy, Aeyal Gross, Danny Kaplan, Mary Katzenstein, Ruth Linn, Laura Miller, David R. Segal, and Lee Walzer for their helpful reactions to earlier drafts of the manuscript. Most importantly, we thank Rhonda Evans and Jason McNichol.*

1.  The longest case study on the impact of the lifting of a gay ban is Rosemary E. Park, "Opening the Canadian Forces to Gays and Lesbians: An Inevitable But Improbable Reconfiguration," in *Gays and Lesbians in the Military: Issues, Concerns, and Contrasts,* eds. Wilbur J. Scott and Sandra C. Stanley (New York: Aldine de Gruyter, 1994), 165-181. Also see the brief case studies in Gregory Herek, Jared Jobe, and Ralph Carney, eds., *Out in Force: Sexual Orientation and the Military* (Chicago: University of Chicago Press, 1996); National Defense Research Institute, *Sexual Orientation and U.S. Military Policy: Options and Assessment* (Santa Monica, CA: RAND, 1993); General Accounting Office, *Homosexuals in the Military: Policies and Practices of Foreign Countries* (Washington, DC: U.S. General Accounting Office, 1993); and Frank Pond, "A Comparative Survey and Analysis of Military Policies with Regard to Service by Gay Persons," in *Policy Concerning Homosexuality in the Armed Forces.* Hearing held by Senate Armed Services Committee. 103rd Congress, 2nd Session (Washington, DC: U.S. Government Printing Office, 1993). For theoretical analysis see W. Darryl Henderson, *Cohesion, the Human Element in Combat* (Washington, DC: National Defense University Press, 1985); Ronald D. Ray, "Military Necessity & Homosexuality," in *Gays: In or Out? The U.S. Military & Homosexuals-A Sourcebook* (New York: Brassey's, 1993); Charles C. Moskos, "From Citizens' Army to Social Laboratory," *Wilson Quarterly* 17 (Winter 1993), 83-94; Elizabeth Kier, "Homosexuals in the U.S. Military: Open Integration and Combat Effectiveness," *International Security* 23 (1998): 5-39; Robert J. MacCoun, "Sexual Orientation and Military Cohesion: A Critical Review of the Evidence," in *Out in Force,* 157-176.

2.  Reuven Gal, "Gays in the Military: Policy and Practice in the Israeli Defense Forces," in Scott and Stanley, *Gays and Lesbians in the Military,* 181-189; National Defense Research Institute, *Sexual Orientation and U.S. Military Policy,* 85-90; General Accounting Office, *Homosexuals in the Military,* 38-43; Paul Gade, David Segal, and Edgar Johnson, "The Experience of Foreign Militaries," in *Out in Force,* 124-125.

3.  Israel's ground, air, and land forces include approximately 173,500 troops on active duty and 425,000 on reserve. Anthony H. Cordesman, *Middle East Military Balance 2000* (Washington, DC: Center for Security and International Studies, 2000).

4.  Baruch Kimmerling, *The Interrupted System* (New Brunswick, NJ: Transaction Books, 1985); Reuven Gal and Stuart Cohen, "Israel: Still Waiting in the Wings," in *The Postmodern Military: Armed Forces after the Cold War,* ed. Charles C. Moskos, John Allen Williams, and David Segal (New York: Oxford University Press, 2000), 224. For recent changes in the IDF's role in Israeli society, see Stuart Cohen, "Military Service in Israel: From Nation-Binder to Nation-Divider?" Paper prepared for BESA Conference on "Armed Forces in Israel and Other Western Democratic Societies, Bar-Ilan University, 8-10 June 1998.

5.  Israel does not conscript Arabs. Pregnant and married women, those with severe handicaps, and ultra-orthodox Jews also are exempted from service. See Yagil Levy,

"The Right to Fight: Recruitment of Homosexuals in the U.S. and Israel," Unpublished manuscript, 2000; Amia Lieblich, *Transition to Adulthood During Military Service: The Israeli Case* (Albany, NY: State University of New York Press, 1989).

6.  Clyde Haberman, "Homosexuals in Israeli Army: No Official Discrimination, But Keep It Secret," *New York Times*, 21 February 1993, 14.

7.  Knesset Daily Hearings, Discrimination and Hindrances of the Acceptance of Sexual Minorities in the IDF, 13th Knesset, 2nd Session, 10 February 1993, 3202-3208.

8.  Lee Walzer, *Between Sodom and Eden: A Gay Journey Through Today's Changing Israel* (New York: Columbia University Press, 2000), 117-118; Robert Block, "Gay King David Theory Starts Goliath of a Row," *The Independent*, 11 February 1993, 11; *The Associated Press*, "Defense Official Says He Was Fired after Coming Out as Homosexual, 2 February 1993.

9.  Amir Sumakai Fink and Jacob Press, *Independence Park: The Lives of Gay Men in Israel* (Stanford, CA: Stanford University Press, 1999), 11.

10. Amendments to K-31-11-01 *Service of Homosexuals in the IDF, Manpower Division Standing Orders* (Israel Defense Forces, 1993). For the English translation, see Walzer, *Between Sodom and Eden*, 118-119. Professor Aeyal Gross of Tel Aviv University reports in a forthcoming article that the 1993 revisions were canceled quietly in 1998.

11. Stuart Cohen, Personal communication, 10 April 2000.

12. Charles Gibson, anchor, "U.S. Struggling with Issue of Gays in the Military," *ABC News*, 9 March 2000.

13. Anonymous, Personal communication, 18 March 2000.

14. Amir Fink, Personal communication, 11 April 2000.

15. The following section is based on Ma'ayan Zigdon, "Coming out of the Kitbag," *Ba'machne*, 22 October 1999, 21-25.

16. In one case, for example, two (heterosexual) soldiers made a bet to see who would perform oral sex on whom. Gay soldiers present at the time were appalled by the incident. See Walzer, *Between Sodom and Eden*. Approximately three-quarters of our interview subjects mentioned that vicious harassment is rare, although approximately two-thirds had heard negative comments about gay and lesbian people during their military service.

17. Walzer, *Between Sodom and Eden*.

18. Anonymous, Personal communication, 27 March 2000.

19. This paragraph is based on Walzer, *Between Sodom and Eden*, 134 and Walzer, Personal communication, 14 April 2000.

20. For recent problems concerning the sexual harassment of female soldiers in the military, see Stacy Feldman, "The Gender Battlefield," *The Jerusalem Report*, 10 April 2000, 11; Gayil Hareven, "Of Vice and Men," *The Jerusalem Report*, 10 April 2000.

21. Raanan Gabbay, Personal communication, 9 April 2000; Oren Slozberg, Personal communication, 9 April 2000; Dan Yakir, Personal communication; 25 March 2000.

All three are affiliated with gay rights groups in Israel.

22. National Defense Research Institute, *Sexual Orientation and U.S. Military Policy*, 85-90; General Accounting Office, *Homosexuals in the Military*, 38-43.

23. General Accounting Office, *Homosexuals in the Military*, 43.

24. Gal, "Gays in the Military," in *Gays and Lesbians in the Military*, 188.

25. Gabbay, Personal communication, 9 April 2000.

26. Janet Halley, *Don't: A Reader's Guide to the Military's Anti-Gay Policy* (Durham, NC: Duke University Press, 1999); Urvashi Vaid, *Virtual Equality: The Mainstreaming of Gay & Lesbian Liberation* (New York: Anchor Books, 1995).

27. Policy Concerning Homosexuality in the Armed Forces; "The Connection," *National Public Radio* 20 December 1999; Charles C. Moskos and Stacey L. Sobel, "Should Gays Serve," *Salon* 13 June 2000, available at *http://www.salon.com/news/feature/2000/06/13/fight_club/index1.html*

28. *Policy Concerning Homosexuality in the Armed Forces*, 350.

29. Charles C. Moskos, "From Citizens' Army to Social Laboratory," in *Gays and Lesbians in the Military*, 64.

30. "World Affairs Council Weekly Broadcast," *National Public Radio* 1 May 2000; "The Connection," *National Public Radio* 20 December 1999.

31. National Defense Research Institute, *Sexual Orientation and U.S. Military Policy*, 85-90; General Accounting Office, *Homosexuals in the Military*, 38-43.

32. Haberman, "Homosexuals in Israeli Army," 14.

33. Pond, "A Comparative Survey," in *Policy Concerning Homosexuality*.

34. Gal, "Gays in the Military," in *Gays and Lesbians in the Military*, 186.

35. Approximately two-thirds of our interview subjects spoke about the openness or growing openness of the IDF, although not everyone framed the issue this way. For example, one respondent said that she had seen no change over time but that she had always found the IDF to be accepting of gays and lesbians. There was a general consensus among interviewees that negative attitudes about homosexuals persist but that the military, like the rest of Israeli society, is becoming more accepting.

36. Cited in Walzer, *Between Sodom and Eden*, 133.

37. Aeyal M. Gross, "Between the Homosocial and the Homoerotic: Gays/Military in Comparative and International Law—A Summary," Unpublished manuscript, 2000.

38. Cited in Walzer, *Between Sodom and Eden*, 114.

39. Anonymous, Personal communication, 30 March 2000.

40. Zigdon, "Coming out of the Kitbag," 25; 22.

41. Danny Kaplan and Eyal Ben-Ari, "Brothers and Others in Arms: Managing Gay

# Appendix 1

## Personal Communications

Anonymous (Female). Former Soldier, Israeli Defense Forces. 19 March 2000.

Anonymous (Male). Former Captain, Israeli Defense Forces. 22 March 2000.

Anonymous (Female). Major, Military Intelligence, Israeli Defense Forces. 27 March 2000.

Anonymous (Male). Former Soldier. 25 February 2000.

Anonymous (Male). Officer, IDF Mental Health Unit. 28 March 2000.

Asher, Arian. Professor of Political Science, Graduate Center of the City University of New York. 3 March 2000.

Brom, Shlomo. Brigadier-General (ret.) and Research Fellow, Jaffee Center for Strategic Studies, Tel Aviv University. 6 March 2000.

Cohen, Stuart. Professor of Political Studies and Senior Research Fellow, Center for Strategic Studies, Bar-Ilan University. 22 March, 24 March, 2 April, 5 April, 10 April 2000.

Dale, Andrew. Israeli Citizen. 3 February, 13 April, and 15 April 2000.

D. Monica. Shatil Organization, New Israel Fund. 16 March 2000.

Demchak, Chris. Professor of Political Science and Public Administration, University of Arizona. 11 April 2000.

El-Ad, Hagai. U.S. Coordinator for Jerusalem Open House. 7 March 2000.

Drori, Gili. Post-Doctoral Candidate, Center for International Security and Cooperation, Stanford University. 26 March 2000.

Eskenazi, Jean-Marc. Coordinator, Pa-amayim at UC Berkeley. 27 February 2000.

Fink, Amir. Scholar and Co-Author of *Independence Park: The Lives of Gay Men in Israel*. 11 April 2000.

Gabbay, Raanan. Board Member and Chair of the Overseas Relations Committee of Agudaht Zechuyot Ha-ezrach. 25 February, 28 March, 9 April 2000.

Gal, Reuven. Director, Israeli Institute for Military Studies. 5 April 2000.

Galili, Shuly. New Israel Fund, San Francisco Office. 19 February 2000.

Giladi, Eival. IDF Lt. General and Research Fellow, Center for International Security and Cooperation, Stanford University. 29 March 2000.

Gross, Aeyal. Professor of Law, Tel Aviv University. 4, 28, 29 March 2000.

Ben-Eliyahu, Hadass. Behavioral Scientist, Israeli Defense Forces. 8 April 2000.

Belkin and Levitt                                                                                    565

Harel, Alon. Professor of Law, The Hebrew University of Jerusalem. 21 March and 13 April 2000.

Heller, Mark. Research Fellow, Jaffee Center for Strategic Studies, Tel Aviv University. 27 February 2000.

Kaplan, Daniel. Scholar and Author of *David, Jonathan and Other Soldiers*. 19 February, 29 March, 18 July 2000.

Lev, Shai. Deputy Director, Israel Department of Defense. 28 March 2000.

Levy, Yagil. Research Fellow, Hubert Humphrey Institute for Social Research, Ben Gurion University. 4 March and 15 April 2000.

Misrahi, Meytal. Founder, Israel Foreign Lesbos. 20 March 2000.

Molcho, Michal. Former Lieutenant; Organizational Counselor, Israeli Defense Forces. 18 March 2000.

Rimalt, Zvi. Former Soldier, Israeli Defense Forces. 28 February 2000.

Shapir, Yiftah. Research Fellow, Jaffee Center for Strategic Studies, Tel Aviv University. 27 February 2000.

Shachar, Rena. Israeli citizen. 20 March 2000.

Slozberg, Oren. Program Director, LYRIC. 28 February 2000.

Vitemberg, Ilan. Former Soldier, Israeli Citizen. 6 March 2000.

Walzer, Lee I. Author, *Between Sodom to Eden: A Gay Journey Through Today's Changing Israel*. 24 February 2000.

Yakir, Dan. Association for Citizens' Rights in Israel. 25 March 2000.

Copyright of Armed Forces & Society is the property of Transaction Publishers and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

combat groups," Moskos confirmed. And yet, as Senator William Cohen pointed out, they were not barred from military service. In fact, Cohen said, "The one piece of research I am aware of that addresses this issue, a piece of research that has previously been brought to the attention of this committee, throws into question the assertion that homosexual tendencies will necessarily undermine unit cohesion."[59]

Could the Wehrmacht research apply in the United States? No one has replicated the Shils and Janowitz research, and the differences between the U.S. military today and the German army of more than a half century ago are enormous. Yet, though the homoerotic thesis emerged from the specific context of a World War II authoritarian regime, it is surely significant that the reigning study on social cohesion and military performance theorized an erotic foundation for same-sex bonding and combat effectiveness. Cohen's thesis remains sound: The empirical research that was directly responsive to the question of same-sex love and cohesion said the opposite of what the ban's champions were saying: Same-sex desire did not undermine cohesion but strengthened it.

This is not to say that an influx of gay people into the military will increase our chances of winning the war in Iraq. As Moskos and Segal explained, it is repressed homoerotic tendencies that were shown to have helped cohesion in Wehrmacht Germany, not a gaggle of actual homosexuals. But Shils and Janowitz make clear what the real threat is of acknowledging a gay presence in the military: that it could somehow chip away at these repressed feelings and arouse in straight people the kinds of homoerotic tendencies that are typically kept at bay. This means the distinction between conduct and status is immaterial. It is not gay people doing their thing in private that threatens morale, discipline, or cohesion; rather, it is the knowledge by a straight man that a pat on the ass, long considered an expression of innocent bonding, might now be fraught with same-sex desire.

This is why military doctors, during and after World War II, were so concerned with effeminate and showy traits, rather than whether recruits were actually gay or engaging in homosexual conduct. The knowledge that there are gay people in the military could bring straight people face-to-face with same-sex desire, which could trigger insecurities about their own desires.

In the end, one of the few pieces of data that actually spoke to the issue of same-sex love in the military was, like actual gays in the military, acknowledged before Congress but then thoroughly ignored. As strange as it may sound, the Shils and Janowitz literature could have helped focus national attention on what was—and remains—needed to solve the problem of homo-



ban, if that is not what he believed. But the concentration camp analogy is not wholly irrelevant, as the ghosts of Nazi Germany have maintained a strange and persistent presence in the dialogue on homosexuality and the military. A little-discussed section of Shils and Janowitz's famous study on Wehrmacht soldiers sheds unwelcome, but inescapable, light on the need to maintain a regime of sexual repression in the armed forces. Revealing the "dark side of cohesion," this research highlights not only the homosocial bonds of enlisted men but the homoerotic tendencies of military culture.[53]

According to the scholarship, it is the unacknowledged erotic bonds of military men that actually underlay the primary group cohesion achieved in the German army during World War II. In 1948, the noted psychiatrist William Menninger characterized the wartime soldier's bond as one of "disguised and sublimated homosexuality." Some scholars suggested that the popular war song "My Buddy" ("I miss your voice and the touch of your hand, my buddy") helped neutralize fears of unexpected longings, making the military a safe place for same-sex intimacy. As long as there were no homosexuals present, soldiers could have intense same-sex relationships and not worry about being gay.[54]

At the 1993 Senate hearings, the sociologist David Segal, who studied under both Shils and Janowitz, described the World War II research to the frequently befuddled assemblage of silver-haired senators. Cohesion in the Wehrmacht, he explained, was based in part on a "latent homosexual subculture." There was, of course, no sanctioning of actual same-sex sexual activity in the Nazi army. But while the Wehrmacht tolerated no avowed gay soldiers, homoerotic attachments seem to have been quite common. As Segal put it, "there was a hard core of enlisted personnel in the Wehrmacht who were attracted to the company of other men. They did not necessarily behave homosexually; indeed, they probably did not. But they preferred the company of men."[55]

Segal reported to Congress that he had never seen this particular piece of Shils and Janowitz research cited before. "I discovered it by accident," he said, "while I was grading some midterm exams." But its implications were clear. "It basically suggests that what we have more recently called 'male bonding' may well have been in the Wehrmacht this propensity to seek other males as erotic objects, although not acting on that." These conclusions, he explained, "throw into question" the assertion that homosexual tendencies undermine unit cohesion. In fact, rather than undermining unit cohesion, the presence of men with quiet same-sex longing appears to have enhanced it by bringing together groups of people with the propensity for intense bonding. The key to



*134*  UNFRIENDLY FIRE



successfully cohesive fighting units, it turns out, is that homosexual—or at least homoerotic—affection should be present but repressed: that is, unspoken and, if possible, unacknowledged.[56]

Moskos's testimony before Nunn expanded on this theme: "Precisely because there are homoerotic tendencies in all male groups," he explained, referencing the "sexual insecurities" of straight men, "this is exactly why [we need] the ban. Once these homoerotic tendencies are out, the cat is out of the bag, then you have all kinds of negative effects on unit cohesion." But for Moskos, "the point is that in the Nazi army, you could not be a gay." He struggled to reconcile the presence of latent homosexual desire with what he regarded as "probably the most barbaric system toward gays" in human history. "You have these erotic tendencies operating at one level," he concluded, "but at the same time, the system is the most repressive ever known," an arrangement which has historically "worked for a good fighting army."[57]

In other words, the problem with acknowledging the presence of gays in the military is that it could burden with added meaning the low-level homoerotic behavior that is normally operating among all service members. It would force even men who are effectively straight to come face-to-face with buried strands of their own same-sex desire, feelings that do not make them homosexual but whose very presence is nevertheless a threat to their fragile heterosexual identity.

As Moskos put it in interviews, "in a heterosexual environment, you can do a lot of patting people on the ass, hugging, and all that, which might not be possible among open gays." In many Mediterranean and Middle Eastern cultures, which are homophobic by American standards, men stroll down the street kissing and holding hands without fear that their affection has a sexual meaning. It's the homophobic norms that make this possible. "It might even be that the more homoerotic tendencies there are in a group," said Moskos, "the more homophobic they will be." Does this mean the military must ensure that certain emotions are kept repressed? It must ensure, says Moskos, that they "remain subdued."[58]

DURING THE SENATE hearings, talk of the latent homosexual subculture of the Wehrmacht army passed far over the head of Senator Sam Nunn. "How in the world," he asked, "is that applicable to what we are talking about here? It does not seem to me to apply or have any application to America." But the Wehrmacht research was one of the most directly applicable pieces of research to address the relationship between sexuality, cohesion, and military performance. There was "a strong male homoerotic tendency among these

*132*        UNFRIENDLY FIRE

maiming of a unit leader), sexual harassment—these collective acts of insubordination are not products of lax social ties but of ties that bind too much. It is not, then, the *presence* of gay soldiers that threatens military effectiveness but the invitation they represent to get too close. Some advocates of the gay ban, it seems, fear that service members in units with open gays will get along too poorly, while others feel they'll get along just a little bit too well.[50]

This reassessment of the unit cohesion theory, and the more subtle appreciation of the difference between social and task cohesion, was also absorbed by the U.S. military. In fact, despite the military's endless invocation of unit cohesion, the Pentagon has a long history of trying to minimize social cohesion and encourage individualism in its personnel. In 1985, a Rand report prepared for the Pentagon warned against "too much affective cohesion," because it "might interfere with the critical appraisal of performance that is needed to maintain quality output, as members become concerned with supporting each other and raising group morale instead of concentrating on the task at hand." Between the 1950s and the 1980s, the army experimented with a buddy system in which units were trained together and then sent into combat. Evaluations by the Walter Reed Army Institute of Research of the unit manning system, called COHORT, concluded that "military cohesion has not been valued as a combat multiplier in the U.S. Army." They found that cohesion is "a byproduct, not a core goal leaders need be trained to create and maintain," and that "there is as yet no commitment in the Army to building and maintaining group cohesion."[51]

This may be why Moskos's real reasons for opposing an end to the gay ban had nothing to do with unit cohesion—whether task or social. While his public voice continued to emphasize the centrality of unit cohesion to combat performance, his private focus was quite different. "Fuck unit cohesion," he said in a 2000 interview. "I don't care about that." In Moskos's view, the rationale for the double standard was about a discomfort with thinking about sexuality, which, for him, boiled down to the rights of straight soldiers not to be watched with eyes of desire. "I've offered all kinds of arguments against the policy," he said, "but the privacy one is where it breaks down." Indeed, Moskos felt so strongly about the privacy issue that he viewed mandatory gay-straight cohabitation as tantamount to Nazism: "I would not want to fight for a country in which privacy issues are so trampled upon," he said. "Those are the conditions of concentration camps."[52]

One has to wonder why Moskos took the charge he was given as a social scientist and used it to give cover to the assertion by generals and politicians that unit cohesion—not sexual discomfort—was the central basis of the gay



136        UNFRIENDLY FIRE

sexuality in American culture. It is really a problem that straight people must solve (even if, as is most likely, it will come only at the prodding of gays and lesbians). What's needed is for straight people to challenge their reflexive moral opposition to same-sex desire, in others and in themselves. What's so bad about men loving men or women loving women? What would be so horrible about discovering that maybe even you have some love for a same-sex friend that's a bit stronger than friendship? The perspective offered by research into the complex and even discomfiting corners of human psychology was just what the United States needed at the height of the gay service debate. Instead, policy makers and much of the nation dismissed evidence that was difficult and relevant and embraced evidence that was misleading, false, or irrelevant.

WRAPPED IN THE language of individual sacrifice, national security, and the unique conditions of military service, defenders of the military's ban were able to ward off serious scrutiny of the need for reform. They were able to substitute the personal judgment of military leaders for persuasive evidence and cast that judgment as rooted in professional experience rather than personal animus. The courts and the Congress played along willingly, accepting hook, line, and sinker that the risk of flouting military judgment on gay service was too high to brook. And it didn't seem to matter that even trusted military advocates like Charles Moskos acknowledged publicly that the ban was rooted not in genuine concerns over unit cohesion but in "antipathy toward gays"—a "prejudice," the professor added, that has a "rational basis."[60]





# PALM CENTER

## BLUEPRINTS FOR SOUND PUBLIC POLICY

# GAYS IN FOREIGN MILITARIES 2010: A GLOBAL PRIMER

February 2010

by Dr. Nathaniel Frank

With
Dr. Victoria Basham, Geoffrey Bateman, Dr. Aaron Belkin, Dr. Margot Canaday,
Dr. Alan Okros, and Denise Scott

UNIVERSITY OF CALIFORNIA · SANTA BARBARA, CA 93106-9429 · (805) 893-5664 · WWW.PALM



DEFENDANT'S
EXHIBIT
tabbies
2 2
2-26-10

# Contents

Executive Summary...................................................................................2

Introduction..................................................................... 5
      Overview..................................................................... 5
      History..................................................................... 6

Background....................................................................9
      Britain.....................................................................9
      Canada...................................................................13
      Australia.................................................................15
      South Africa..........................................................17
      Israel.....................................................................20

Research on the Impact of Lifting Bans on Service by Gays and Lesbians in Foreign Militaries............................................................24
      Overview.................................................................24
      How Foreign Militaries Implemented Policies of Inclusion...................29
      Case Studies............................................................32
            Britain.............................................................. 32
            Canada.............................................................50
            Australia...........................................................70
            South Africa......................................................81
            Israel...............................................................92

The Relevance of Studying Foreign Militaries...........................................104

Conclusion....................................................................133

Appendix: List of Foreign Militaries that Allow Openly Gay Service ...............136

Contributors....................................................................139

Endnotes....................................................................141

# Executive Summary

1. Twenty-five nations now allow gays and lesbians to serve openly in the military.

2. In many of those countries, debate before the policy changes was highly pitched and many people both inside and outside the military predicted major disruptions. In Britain and Canada, roughly two thirds of military respondents in polls said they would refuse to serve with open gays, but when inclusive policies were implemented, no more than three people in each country actually resigned.

3. Research has uniformly shown that transitions to policies of equal treatment without regard to sexual orientation have been highly successful and have had no negative impact on morale, recruitment, retention, readiness or overall combat effectiveness. No consulted expert anywhere in the world concluded that lifting the ban on openly gay service caused an overall decline in the military.

4. The updated research conducted for this study confirm that early assessments by both military and independent analysts hold across time: none of the successes and gains of transitions to full inclusion were reversed by any of the nations studied, or yielded delayed problems over the years in which these militaries allowed openly gay service.

5. Evidence suggests that lifting bans on openly gay service contributed to improving the command climate in foreign militaries, including increased focus on behavior and mission rather than identity and difference, greater respect for

2

rules and policies that reflect the modern military, a decrease in harassment, retention of critical personnel, and enhanced respect for privacy.

6.  All the countries studied completed their implementations of repeal either immediately or within four months of the government's decision to end discrimination. These experiences confirm research findings which show that a quick, simple implementation process is instrumental in ensuring success. Swift, decisive implementation signals the support of top leadership and confidence that the process will go smoothly, while a "phased-in" implementation can create anxiety, confusion, and obstructionism.

7.  Two main factors contributed to the success of transitions to openly gay service: clear signals of leadership support and a focus on a uniform code of behavior without regard to sexual orientation. Also key are simple training guidelines that communicate the support of leadership, that explain the uniform standards for conduct, and that avoid "sensitivity" training, which can backfire by causing resentment in the ranks.

8.  None of the countries studied installed separate facilities for gay troops, nor did they retain rules treating gays differently from heterosexuals. Each country has taken its own approach to resolving questions of benefits, housing, partner recognition, and re-instatement. Generally, the military honors the status afforded to gay or lesbian couples by that country, and the military rarely gets out in front of the government or other institutions in the benefits offered.

3

9.  Lifting bans on openly gay service in foreign countries did not result in a mass "coming out." Yet gay and lesbian troops serve in all levels of the armed forces of Britain, Canada, Australia, South Africa, and Israel, in both combat and non-combat positions, at both the enlisted level and as high commanders.

10. There were no instances of increased harassment of or by gay people as a result of lifting bans in any of the countries studied.

11. Informal discrimination in treatment and promotions have not been wiped out, but evidence suggests that formal policies of equal treatment for people equally situated helps reduce discrimination and resentment, and helps keep the focus on behavior necessary to complete the mission rather than on group traits that can distract from the mission.

12. The U.S. military has a long tradition of considering the experiences of other militaries to be relevant to its own lessons learned. While there is no doubt that the U.S. military is different from other militaries, such distinctions have not prevented the U.S. military from comparing itself to and learning from foreign armed forces. Using resources like the Foreign Military Studies Office, the U.S. military itself has commissioned research on matters of personnel, health policy, housing, weapons innovation, technology, counterterrorism, and the question of gay service.

4

# Introduction

## I. OVERVIEW

On February 2, 2010, Secretary of Defense Robert Gates and Chairman of the Joint Chiefs of Staff Adm. Mike Mullen told a senate hearing that they support President Barack Obama's plan to end the country's "don't ask, don't tell" policy on gays in the military. "To ensure the Department is prepared" for the ban's end, Secretary Gates announced an eleven-month study period and a military working group that would "thoroughly, objectively, and methodically examine all aspects" of the question of openly gay service "and produce its finding and recommendation in the form of an implementation plan" by the end of 2010. In response to questions from Sen. Susan Collins of Maine, Adm. Mullen said he had spoken to his counterparts in countries that lifted the bans and they told him there had been "no impact on military effectiveness" as a result, and that he was aware of no studies showing that ending "don't ask, don't tell" would harm unit cohesion. Both Adm. Mullen and Sec. Gates, however, called for more study, with the Chairman saying "there's been no thorough or comprehensive work done with respect to that aspect since 1993" and the Secretary saying we need to "address a number of assertions that have been made for which we have no basis in fact."[1]

This study seeks to answer some of the questions that have been, and will continue to be, raised surrounding the instructive lessons from other nations that have lifted their bans on openly gay service. The Palm Center has identified at least twenty-five such countries,

5

including Britain, Canada, Israel, Australia, and South Africa, which constitute the focus of this report. After summarizing the history of research on gay service in foreign militaries, this study chronicles the specific histories of the policy changes in those five countries. It then returns to in-depth analyses of the empirical results of the policy transitions, with an overview of research results; a brief section detailing how the new policies were implemented; and then individual case-studies organized by country. A final section discusses the relevance of the lessons learned from foreign militaries, addressing the limits and applicability of those lessons to the current situation in the U.S.

## II. HISTORY

In the fall of 1992, Canada and Australia lifted their bans on gay service members, and in 1993 Israel followed suit. In 1998, South Africa lifted its ban on gay troops as part of its wholesale reorganization following the fall of Apartheid. And in 2000, Great Britain, the staunchest ally of the U.S., ended its gay ban. Presently 25 nations allow open gays to serve in their militaries, including all the original NATO countries besides Turkey and the U.S. Since 1992, Americans have debated the prospect of lifting their gay ban. President Bill Clinton promised to do so when he entered the White House that fall, but in 1993, he agreed to a compromise when resistance from military, political, and religious opponents began to derail his efforts. The result, a Pentagon policy and federal statute collectively known as "don't ask, don't tell," calls for the separation of service members

6

who are revealed to be gay or who engage in "homosexual acts" while prohibiting the military from asking recruits outright if they are gay, lesbian, or bisexual.

Under the current policy, which was implemented in 1994, over 13,000 service members have been discharged. Republicans have generally opposed lifting the current ban on openly gay service, with party leaders saying the current policy is working. But President Barack Obama, like President Clinton, has promised to lift the ban, and Democrat leaders in Congress have agreed to support the President's efforts. The political leadership, however, has not set a timetable and has not yet moved to halt the discharges either by Presidential order or by legislative repeal, instead simply reiterating its commitment to do so eventually.

Both advocates and proponents of lifting the American ban on openly gay service have said they want to study the experiences of other militaries to inform the debate in the U.S. Over the past twenty years, numerous studies of foreign militaries have been conducted, including studies by the Government Accountability Office, the U.S. Army Research Institute for the Behavioral and Social Sciences, the Rand Corporation, the Palm Center at the University of California, Santa Barbara, and the Defence Ministries of Britain and other nations that transitioned to a policy of full inclusion. The results of each of these studies showed that openly gay service does not undermine unit cohesion, recruitment, retention, morale, or overall combat effectiveness. Until now, however, these results have not been compiled in a single volume or updated to reflect the latest information on the effects of lifting gay bans in the armed forces.

7

This study brings together the results of all the major research on gays in foreign militaries and updates that research to the present, focusing on the experiences of Britain, Canada, and other English-speaking nations with relatively similar cultures to that of the U.S.  The study begins with the historical background of policies on gays in several armed forces.  It then discusses the results of research on the impact of lifting gay bans in these nations, with in-depth focus on American allies such as Britain and Canada.  Finally, a section on the relevance to the U.S. of foreign militaries offers a detailed explanation of the value and limitations of generalizing from foreign experiences when assessing the prospects for a successful transition in the U.S.  The appendix summarizes relevant policies in other nations and includes a list of lessons learned from studying these experiences.

8

# Background

## I. BRITAIN

Like the U.S., Britain banned service by gays throughout the 20th century, just as its civilian laws initially criminalized sexual relations between men (laws did not address female same-sex relationships). Depending on the service branch, the military dealt with homosexuals either by banning them outright or by charging them with "disgraceful conduct of an indecent kind," "conduct prejudicial to good order or discipline" or "scandalous conduct by officers."[2]

Reflecting the similarities of American and British culture, the same rationales were invoked to justify the exclusion rules in Britain as in the U.S. The British Ministry of Defence argued that "Homosexual behavior can cause offence, polarize relationships, induce ill-discipline, and as a consequence damage morale and unit effectiveness." One retired general told the BBC that letting gays serve meant "striking at the root of discipline and morale" since service members had to "live hugger-mugger at most times" and that "the great majority do not want to be brought into contact with homosexual practices."[3] Another retired officer who commanded U.N. forces in Bosnia recalled that when he had two gay soldiers in his battalion, he "had extreme difficulty in controlling the remainder of the soldiers because they fundamentally wanted to lynch them."[4]

9

As in the U.S., the language of homosexual exclusion arguments spoke of "sexual deviancy" and "feminine gestures," and of mental illness and sexually transmitted diseases. The same distinctions between identity and behavior were also made in both nations: in Britain, the rules specified that the admission of homosexuality was grounds for dismissal even if no behavior was involved. And as in the U.S., the history of gays in the British military is replete with surveillance, informants, blackmail, stakeouts, investigations and psychological exams.[5]

By the time the British High Court heard a major challenge to the gay ban in 1995, most of the above rationales had been discredited and abandoned. Although the Court rebuffed the service members' challenge and allowed the military to continue its ban, the Ministry of Defence created the Homosexual Policy Assessment Team to evaluate its policy. The move was a response to a warning by the Court that, despite its current ruling in favor of the military, the gay ban was unlikely to survive a direct challenge in the European Convention on Human Rights which, unlike the British Court, had the authority to force the military's hand.

The assessment team consulted the experiences of other countries, including Canada, Australia and Israel, which had lifted their bans a few years earlier. In their visits, they were repeatedly told by officials that gay service had not undermined military performance. In response, British researchers acknowledged that the ban could be lifted, but that such a change was unlikely not because of a military rationale, but because of political resistance.[6]

10

The team ultimately recommended that the military retain its ban.  Its report made clear that there was no evidence that gays were unsuited to military service and that the assumption that gays were a threat to security and a predatory menace to young troops were unfounded. Rather, the problem was that straight soldiers were uncomfortable around gays, and openly gay service could therefore undermine cohesion and threaten recruitment.  Lifting the ban, said the report, "would be an affront to service people" and lead to "heterosexual resentment and hostility."  Reform at the urging of civilian society would be viewed by military members as "coercive interference in their way of life." As in the American debate, the moral opposition of straights was tied to military needs, prompting senior leaders to argue that military effectiveness justified gay exclusion.[7]

The military did, however, order a relaxation of enforcement of the ban, mindful of the changes in society taking shape throughout the 1990s, and bracing for a heftier challenge in the European Court of Human Rights, which threatened to cost the government billions in wrongful dismissal claims. Military leaders told commanders only to investigate suspected homosexuals if an unavoidable problem arose.  For gays, the change was minimal: they continued to lose their jobs, receive unequal treatment and operate in a climate of discrimination, fear and uncertainty.

On September 27, 1999, the European Court of Human Rights issued its ruling that the British Defence Ministry had violated the European Convention's guarantee of an "equal respect" to "private and family life"[8] and that the policy and the investigations it

11

prompted were "exceptionally intrusive."[9]  The Court rejected the military's claim that the unique circumstances of life in the armed forces justified anti-gay discrimination and ruled that heterosexual bias against gays was no more compelling a reason to ban them than would be animus against groups with a different race or ethnic or national origin.  It also dismissed the military's contention that gay service would endanger morale, saying the foundation of such arguments in opinion polls made them unconvincing.

The Ministry of Defence immediately announced that it accepted the ruling and it ordered a halt to all discharges while it studied how to abide by the court's decision.[10]  It quickly established a policy of zero-tolerance of discrimination on the basis of sexual orientation and drew up a Code of Social Conduct to govern all sexual behavior among personnel, regardless of gender, sexual orientation, rank, or status. This code of behavior, which still informs current policy, applies to heterosexuals and homosexuals alike. It aims to ensure that sexual relations of any kind do not adversely affect operational effectiveness.[11]

The Chief of Defence Staff General, despite expecting some tough scenarios for commanding officers, expressed confidence in the military's ability to make the changes, saying that "times have changed" since the gay ban was first formulated. "I don't believe that the operational efficiency of the Services will be affected," he said, "although I'm not saying we won't have some difficult incidents."  Ultimately, he concluded, "We think we can make it work."[12]

In trying to figure out how to "make it work," the British military considered America's

12

"don't ask, don't tell" policy.  What they found was that it was a "disaster," which "hadn't worked," was "unworkable" and was "hypocritical."[13]  Instead, the British military opted for full repeal and based its new regulations on the Australian model, which simply banned public displays of affection, harassment and inappropriate relationships.  The Ministry of Defence formally lifted its gay ban on January 12, 2000, within four months of the September court ruling, and invited ousted troops to reapply for service.

## II. CANADA

Until 1988, the Canadian Forces had in place an outright ban on gays and lesbians in uniform: they were barred from service and anyone who believed a peer was gay was required to report the suspicion to a superior.  The Canadian ban was relaxed in 1988, as pressure mounted to bring the policy in line with the 1978 Canadian Human Rights Act and the 1985 Canadian Charter of Rights and Freedoms.  The important policy shift dictated that the CF would not knowingly enroll homosexuals but would allow gays who did serve to stay in uniform, albeit with no opportunities for advancement. Generally, enforcement of the restrictions against known gays and lesbians was loosened during this period, but unequal treatment of heterosexual and gay troops remained: known gays and lesbians were routinely denied promotions, security clearances and awards.  The Department of National Defence continued to argue that a formal ban was necessary to

13

protect "cohesion and morale, discipline, leadership, recruiting, medical fitness, and the rights to privacy of other members."[14]

Yet momentum was growing in favor of change. Inspired by other court decisions, five service members sued the Canadian Forces and won an initial ruling that the gay ban violated the Charter of Rights and Freedoms. Ultimately, the Canadian military agreed to settle its case in 1992, acknowledging that it was unlikely to win the case on its merits.

Key to the CF's internal research was a 1986 survey of active-duty CF troops that was interpreted to indicate that heterosexual male members were strongly opposed to the removal of the ban and that the presence of homosexuals could lead to a serious decrease in operational effectiveness.[15] Countering this perspective were several reviews of policies, the outcomes of legal proceedings, and internal assessments of the defensibility of the 1988 interim policy. These reviews culminated in the conclusion by the CF that it could not successfully appeal the finding of the suit by former CF member Michelle Douglas, which in turn resulted in the 1992 decision to repeal the exclusionary 1988 policy rather than continue legal proceedings to justify its retention.

It is sometimes thought that reform in Canada went over without much resistance. In actuality, opposition was intense. Surveys showed that majorities of those in the military would not share sleeping and bathing quarters with known gays, and many said they would refuse to work with gays or accept a gay supervisor. A military task force was formed during the debate, which recommended that gay exclusion remain, on the grounds

14

that "the effect of the presence of homosexuals would [lead to] a serious decrease in operational effectiveness." Even when the military determined it would lose its case in court, the government delayed the change because of vociferous opposition by conservatives in Parliament. The similarities to opposition in the U.S. were striking.[16]

## III. AUSTRALIA

The Australian Defence Forces did not see quite the same fight as did Canada, but there was certainly resistance to equal treatment. The military only formalized its ban on gay troops in 1986. Before that, commanders were given wide discretion to decide when to boot gays, and leaders were able to rely on civilian laws against sodomy and homosexual relations to root them out. Ironically, it was at the very moment when the rest of society was liberalizing its limitations on homosexual behavior that the Australian military tightened its own regulations on gay troops. State and federal laws banning sodomy fell during this decade, as the country brought its laws into conformity with new international human rights accords. Unable to continue to draw on civilian laws against homosexual behavior, the ADF banned homosexual service outright in 1986.[17]

The short-lived Australian gay ban was always weaker than the policies in many of its ally nations. While there were reports of witch hunts and unequal treatment, the policy was often enforced unevenly and the tolerance and inconsistent enforcement extended to commanders throughout the services, who were often aware of gays and lesbians under

15

their command and took no steps to kick them out.  In the years leading up to the ban's formal end, the ADF had been pressed to respond to several cultural trends toward liberalization and to specific complaints that the military was not doing enough to recruit, retain and respect women and racial and ethnic minorities.  Such criticism could not be ignored, as the armed forces were finding it difficult to fill their ranks with capable service members.[18]

It was in this context—one that highlighted the needs of the military as much as the social and cultural pressures for greater tolerance—that the Australian military began to consider formally ending its restrictions on gays and lesbians.  Legal considerations also held sway: in 1980, the Commonwealth had adopted the International Covenant on Civil and Political Rights.  While homosexuality was not explicitly mentioned in the covenant, political leaders interpreted the agreement to mean discrimination on the basis of sexual orientation should be banned.  For instance, when a lesbian soldier complained to the Australian Human Rights and Equal Opportunities Commission that her sexual orientation was the partial basis of her discharge, the ADA agreed to review its policy.

While the military chose to retain its formal ban at that time, political pressure was mounting and the government created a study group to look into the policy and make a formal recommendation.  During the study period, those who opposed gay service made the familiar arguments: the presence of known gays and lesbians would compromise effectiveness by impairing cohesion and driving down morale.  Nevertheless, the study group recommended in 1992 that the gay ban be replaced with a policy of

16

nondiscrimination, and the liberal government of Prime Minister Paul Keating, helped by the health minister's argument that keeping homosexuality a secret exacerbated efforts to fight AIDS, ordered the new policy implemented immediately.[19]

As was the case elsewhere, the changes were vehemently opposed.  The Defence Minister and the Service Chiefs strongly opposed lifting the ban, with a Defence spokesman saying, "The real issue in this debate is not civil liberties, but rather the legitimate concerns of the service chiefs about the need to maintain unit cohesion and discipline in the forces." A representative of the Armed Forces Federation said that 98% of the troops would be "disappointed" with the lifting of the ban, and that they were not anti-gay but simply "not comfortable with the situation." The major veterans' group in Australia insisted that tolerating known gays would undermine cohesion and break the bonds of trust that were essential to an effective military.  Some claimed that the presence of gays would increase the spread of HIV through battlefield blood transfers, even though health officials say the best way to fight this prospect is to be able to identify those with AIDS rather than require them to remain in the closet.[20]

## IV. SOUTH AFRICA

During the apartheid era, the South African military maintained a dual policy on homosexuality. Fully prohibited among members of the permanent force, homosexuality was officially tolerated among the conscript force to prevent malingering.  But official

17

toleration was accompanied by aversion shock therapy, chemical castration, and other human rights abuses against gay and lesbian personnel which have only recently come to light in the new South Africa. When the apartheid regime fell in 1994, the new democratic government committed itself to addressing human rights considerations, including the status of gays and lesbians. After the South African Constitution adopted a provision of non-discrimination on the basis of sexual orientation in 1996, the South African military followed suit. In 1998, the South African National Defence Force (SANDF) implemented an Equal Opportunity and Affirmative Action policy that formally declared that there would no longer be discrimination against gays and lesbians in the armed services and that the military was officially uninterested in the sexual orientation of any of its service members, gay or straight.

The groundwork for the inclusion of a gay rights provision in the Constitution had been laid in 1992, when gay activists persuaded the (then exiled) African National Congress (ANC) to adopt a policy on sexual orientation.[21] The Democratic Party and the Inkatha Freedom party—other major players in South African politics—similarly each took a pro gay rights stance.[22] As a result of this political support, sexual orientation was included in the draft Constitution when the ANC first came to power in 1994.

During this process of constitutional review, the National Party objected to specific mention of sexual orientation in the document.[23] The gay rights provision was opposed most strongly by the African Christian Democratic Party, which argued that homosexuality was anti-family, anti-Christian, and anti-African.[24] In 1996, over the

18

objection of conservatives, the new Constitution was adopted with an equality provision which read that "the state may not unfairly discriminate against anyone on one or more grounds, including race, gender, sex, pregnancy, martial status, ethnic or social origin, colour, *sexual orientation*, age, disability, religion, conscience, belief, culture, language, and birth . . ."[25]  Since the adoption of the Constitution, both state and non-state actors have worked to bring various state policies and laws into line with the Constitution; the South African government has committed itself to "reform economic and social conditions for the majority of South Africans left wanting by the apartheid regime."[26]

In order to bring its governing principles fully into compliance with the new Constitution, the Ministry of Defence embarked on a defense review process in which it invited public input on all facets of its operating procedures and policies.  There was one day during the review process, according to Lindy Heinecken, Deputy Director for the Center for Military Studies, South African Military Academy, "when there was very intense discussion about what the gay rights clause would mean in each and every sector of military life."[27]  The issue of homosexuality in the military had generated little public debate prior to the adoption of the new Constitution. For one thing, according to Graeme Reid, "the terms of the debate were so different because there was so much resistance to being in the military [generally]" during the apartheid era.[28]  And despite some initial concerns, "the Department of Defence considered the [integration of homosexuals] as a fait accompli," according to Evert Knoesen, Director of the Lesbian and Gay Equality Project (formerly the National Coalition for Lesbian and Gay Equality).[29]  Thus, the policy change came from within the Department of Defence itself.  "The DOD decided to

LCR Appendix Page 1148

make its own policy," according to SANDF Colonel Jan Kotze, "taking its cue from the stipulations of the Constitution."[30]

---

The policy on sexual orientation was included as part of the DOD's Equal Opportunity and Affirmative Action policy, which was initially promulgated in 1998, then reviewed and readopted again in 2002.[31]  Under this policy, recruits are not questioned about their sexual orientation and the SANDF is officially unconcerned about lawful sexual behavior on the part of its members.  Instead, behavior by anyone that is considered sexually atypical or immoral, and that is considered a threat to military discipline or effectiveness is subject to punishment. The policy applies to people regardless of their sexual orientation, but leaves considerable discretion in the hands of commanders.[32]

## V. ISRAEL

Like Australia, the state of Israel did not have a longstanding, explicit ban on homosexual service members, but used discretion to determine when commanders believed gay or lesbian troops were problematic and worthy of exclusion. For most of the country's short history, not surprisingly, routine prejudice meant that the Israel Defense Forces dismissed known gays because leaders assumed their sexuality made them unsuitable.  A 1983 regulation made clear that service members were not to be discharged simply because they were gay, but required them to undergo a mental health evaluation and banned them from top secret positions.[33]

20

A decade later, while the U.S. was embroiled in an agonizing discussion about gay service, Israel began its own, more tempered debate.  Ironically, given how the American policy would end up, Israeli officials acknowledged that President Clinton's support for gay service had been influential in driving debate in Israel, where the issue of gay rights had never been discussed at such high levels of government.  The discussion was also prompted by an unusual hearing at the Knesset, the Israeli Parliament, when Uzi Even, the chairman of the Chemistry Department at Tel Aviv University, and a senior weapons development researcher, told the nation he had been stripped of his security clearance when his homosexuality was revealed.  Even had supplied the government with top-notch security research for fifteen years.  He was deemed a security threat even though he had just come out of the closet, thus neutralizing any possibility of blackmail.[34] (In 2002, Even became the first openly gay member of the Knesset, suggesting how far tolerance has grown in Israeli society in a decade.[35])

With the vocal support of Prime Minister Yitzhak Rabin, who stated, "I don't see any reason to discriminate against homosexuals," and the military chief of staff, Lt. Gen. Ehud Barak, a military committee was created to review the policy and make recommendations for change. With no military officials testifying against reform, the review committee recommended new regulations that officially "recognized that homosexuals are entitled to serve in the military as are others."[36] In response, the Israeli military banned any restrictions or differential treatment based on sexual orientation, and

21

ordered that decisions about placement, promotion and security clearances be based on individual aptitude and behavior without regard to orientation.

The absence of official resistance did not mean that Israel had ceased to be a homophobic culture—founded, as it was, on biblical precepts, with a government heavily influenced by religious Jews, and a society enamored of macho men. A study conducted in the 1980s found that Israelis had more negative attitudes toward homosexuals than Americans. Even in the 1990s, Israel's organized gay rights lobby was miniscule compared to its American counterparts, thus limiting the strength of voices pressing for reform. And the military was, like in the U.S., a particularly conservative institution within the larger society. During induction, gays were referred to a psychologist for an evaluation. "Based on the assumption, correct or incorrect, that sometimes along with homosexuality come other behavioral disturbances, we conduct a more in-depth clinical interview," said Dr. Reuven Gal, who was chief psychologist for the IDF.[37]

In the early 1990s, Ron Paran, a psychologist working with gays and lesbians in Israel, found marked homophobia in Israeli society, particularly in the military. "I think there are still a lot of people in the psychiatric profession and in the army who still see homosexuality as a problem," he said, "and this policy is their way of expressing that." Paran said Israel was a "paradox" in which the laws are "much more liberal than the general society." As in society generally, he said the military was instinctually uncomfortable with homosexuality. "I work with a lot of teachers and parents who may

22

cognitively understand homosexuality, but in their emotional response to it are still very backward. The army is the same way."[38]

---

Yet as a nation with compulsory service, which recognized the formative role of that service in creating a sense of citizenship, Israel determined by 1993 that it was unfair, unwise and unnecessary to bar an entire group of people from the military. Its new regulations said that "there is no limit on the induction of homosexuals to the army and their induction is according to the criteria that apply to all candidates to the army."[39]

# Research on the Impact of Lifting Bans on Service by Gays and Lesbians in Foreign Militaries

## Overview

The findings of an overwhelming critical mass of research on the experience of foreign militaries that have lifted their gay bans are that the transition had no negative impact on military effectiveness. Upon further examination, the only effects of lifting gay exclusion rules have been positive ones.  Militaries in Great Britain, Australia, Canada, and Israel and S. Africa have seen increased retention of critical skills, reductions in harassment, less anxiety about sexual orientation in the ranks, greater openness in relations between gays and straights, and less restricted access to recruitment pools, as schools and universities welcomed the military back onto campus for dropping their discriminatory practices.  Above all, none of the crises in recruitment, retention, resignations, morale, cohesion, readiness or "operational effectiveness" came to pass.

In 1993, the U.S. Secretary of Defense, Les Aspin, commissioned the Rand Corporation to conduct a broad study of lessons relevant to lifting the gay ban in the U.S. Rand sent a team of seventy-five multi-disciplinary social scientists from its National Defense Research Institute across the world to study the issue. Sociologists, psychologists, anthropologists, historians, economists, doctors, lawyers and national security experts

studied the scientific literature on a broad range of related topics: group cohesion, the experiences of foreign militaries, the theory and history of institutional change, public and military opinion, patterns of sexual behavior in America, sexual harassment, leadership theory, public health concerns, the history of racial integration in the military, policies on sexuality in police and fire departments, and legal considerations regarding access to military service.

The result was a 500-page study, completed in July 1993. It offered assessments of policies on gay service in Canada, Israel, and Britain, as well as Norway, the Netherlands, France, Germany, and others. At the time, Britain was the only nation of those studied to have a full ban on gay service. Of those that allowed gays to serve, Rand found that "none of the militaries studied for this report believe their effectiveness as an organization has been impaired or reduced as a result of the inclusion of homosexuals." In Canada, where the ban had just ended, Rand found "no resignations (despite previous threats to quit), no problems with recruitment, and no diminution of cohesion, morale, or organizational effectiveness." Rand found roughly identical results for Israel. Its researchers concluded that sexual orientation alone was "not germane" in determining who should serve. The authors stated that the ban could be lifted in the U.S. without major problems, so long as senior leaders got behind the change and clear guidelines were disseminated throughout the chain of command. They also suggested that the Uniform Code of Military Justice's ban on consensual sodomy should be eliminated.[40]

25

In 1992 and 1993, the GAO conducted two in-depth studies of foreign militaries. In the first study, researchers looked at 17 different countries, and eight police and fire departments in four U.S. cities, and reviewed military and non-military polls, studies, legal decisions and scholarly research on homosexual service. The GAO study noted previous studies conducted by the U.S. military, including the 1957 Crittenden Report and the 1988-89 PERSEREC studies. Incorporating these studies and its own new research, GAO recommended in an early draft that Congress "may wish to direct the Secretary of Defense to reconsider the basis" for gay exclusion. The final GAO report, however, deleted this suggestion.[41]

In 1993, GAO reported findings from its second study, this one an assessment of twenty-five foreign militaries. In Australia, GAO found, "Effects on unit cohesiveness have not yet been fully determined. However, early indications are that the new policy has had little or no adverse impact." Research over time confirmed that openly gay service in Australia caused no trouble. Three years later, when Britain was considering lifting its ban, government researchers issued a report on the situation in Australia, which concluded that, despite an early outcry, homosexuality quickly became a non-issue: any challenges in integrating open gays were regarded as "just another legitimate management problem." Research on Israel by both the GAO and the Rand Corporation found the same results.[42]

In 1994, The U.S. Army Research Institute for the Behavioral and Social Sciences also studied the situation in Canada and concluded that anticipated damage to readiness never

26

materialized after the ban was lifted: "Negative consequences predicted in the areas of recruitment, employment, attrition, retention, and cohesion and morale have not occurred" since the policy was changed, the report stated.[43]

In 2000, after Britain lifted its ban, The Palm Center at the University of California, Santa Barbara, conducted exhaustive studies to assess the effects of openly gay service in Britain, Israel, Canada and Australia.  Palm researchers reviewed over 600 documents and interviewed over one hundred international experts, contacting every identifiable professional with expertise on the policy change, including military officers, government leaders, academic researchers, journalists who covered the issue, veterans and nongovernmental observers.  Palm found that not one person had observed any impact or any effect at all that "undermined military performance, readiness, or cohesion, led to increased difficulties in recruiting or retention, or increased the rate of HIV infection among the troops."[44]  Those interviewed—including generals, civilian defense leaders, field commanders, and many officials who had predicted major problems if gays were permitted to serve openly—uniformly reported there had been "no impact."  Researchers repeatedly encountered the same narrative: lifting the ban was "an absolute non-event"; openly gay service was "not that big a deal for us"; open gays "do not constitute an issue [with respect to] unit cohesion" and the whole subject "is very marginal indeed as far as this military is concerned"; whether gays serve openly or not "has not impaired the morale, cohesion, readiness, or security of any unit"; the policy change has "not caused any degree of difficulty."[45]

27

A 2002 report by the British MOD reconfirmed that "there has been no discernible impact on operational effectiveness" as a result of ending the gay ban and that "no further review of the Armed Forces policy on homosexuality" was necessary.[46] In 2006, the MOD reiterated its commitment to welcoming open gays and lesbians, saying "The Armed Forces are committed to establishing a culture and climate where those who choose to disclose their sexual orientation can do so without risk of abuse or intimidation." That year, the service branches began working with gay rights groups to recruit members, and over the next three years dropped rules banning gay service members from marching in gay pride parades in uniform.[47]

A 2003 study of the South African military conducted by Palm scholars found that allowing openly gay service "has had little or no impact on recruitment, retention, morale, unit cohesion, or operational effectiveness." And in 2007 an official and former officer from the Israel Defense Forces confirmed that Israel's policy transition had been a success, saying, "It's a non-issue."[48] In 2009, the *Associated Press* spent two months investigating the experiences of foreign militaries with gay service, and reported that "Israel has had no restrictions on military service," that same-sex partners are welcomed to officer events, and that the new policy of equal treatment is "now considered thoroughly uncontroversial."

The updated investigations into the experiences of foreign militaries with openly gay service corroborates that none of the twenty-five nations that dropped their bans have experienced any detriment to cohesion, recruitment, or readiness. These results do not

28

mean that everybody was happy with openly gay service.  Nor do they mean that such

resistance and resentment were entirely without consequence.  Many people were upset

about the transition.  Male service members, in particular, continued to express concern

that the presence of known gays in a unit might damage morale, and the anti-gay

sentiment sometimes manifested itself in harassment or abuse. But the evidence has been

consistent that these reactions to the policy change did not translate into overall

impairment of military effectiveness.


## How Foreign Militaries Implemented Policies of Inclusion


Recently, attention in the U.S. has focused on how best to implement new policies of

inclusion that do not discriminate on the basis of sexual orientation. Secretary of Defense,

Robert Gates, has said that the Pentagon would require "at least a year" to implement

repeal once the decision was made to lift the ban and that the military would spend

months studying repeal and consulting the troops. Gates said that "trying to impose a

policy from the top without regard for the views of" those directly affected by reform

would be a "stupid" way to implement the change.[49]


Yet research concludes unequivocally that such policy changes are most successful when

implemented quickly. Such research is summarized in the 1993 Rand study, which

Secretary Gates has asked to be updated. According to that report, the two most important

factors in a personnel policy transition of this nature are decisive leadership and a single

29

code of conduct for all personnel. Rand found that a successful new policy must be "decided upon and implemented as quickly as possible" to avoid anxiety and uncertainty in the field. It stated that "fast and pervasive change will signal commitment to the [new] policy," while "incremental changes would likely be viewed as experimental" and weaken compliance. It also concluded that "any waiting period permits restraining forces to consolidate," and that "phased-in implementation might allow enemies of the new policy to intentionally create problems to prove the policy unworkable." Finally, it recommended that any new policy be implemented and communicated "as simply as possible" to avoid piling on confusing changes incrementally that would force service members to endure new rules every few months instead of having to adjust only once.[50]

New reports have also indicated that the study groups would address whether separate facilities, such as barracks and showers, would be needed in order to lift the ban.[51] Yet Rand cautioned against instituting separate facilities for minority groups, citing the resentment and damaging focus on gender distinctions that have resulted from different standards for men and women.[52] This is a point that was echoed recently by retired Marine General Carl Mundy, former Commandant of the U.S Marine Corps, who, despite opposing openly gay service, has said that "the easiest way to deal with it is to make it as simple as possible. The last thing you even want to think about is creating separate facilities or separate groups or separate meeting places or having four kinds of showers — one of straight women, lesbians, straight men and gay men. That would be absolutely disastrous in the armed forces. It would destroy any sense of cohesion or teamwork or good order and discipline."[53] The idea was also rejected by Charles Moskos, widely

30

considered the intellectual architect of "don't ask, don't tell." When President Clinton publicly considered segregated facilities in March 1993, an idea roundly cried down by gay advocates, Moskos mocked the idea: "Not only would there be physical problems, but also the problem of labeling units. What are you going to call these groups? The "Fighting Fags?" Come on, it can't be done."[54]

Rand's research on the importance of a swift implementation has been borne out in foreign militaries that have lifted their bans. In the 1990s, court rulings in Canada and Britain mandated that gay troops be allowed to serve openly; in both cases, the transitions were implemented in a matter of months, and uniformly assessed as successful. The Canadian Forces announced it would accept the court ruling and end the ban immediately. "It does take a commitment from the top," said John de Chastelain, then was Chief of the Canadian Defense Staff. He directed the military to revise its harassment guidelines, institute appropriate training programs, and formulate policies to address complaints and ensure enforcement of the new rules.[55] In Australia, a special committee recommended repeal and the government voted to move forward, with the Prime Minister ordering the policy change be implemented immediately. It was replaced with a general instruction on "sexual misconduct policy" prohibiting any sexual behavior that negatively impacted group cohesion and did not distinguish between homosexuality and heterosexuality. These successful examples suggest the research is correct that swift, simple implementation of a single code of conduct, backed by strong leadership from the top, is the most effective way to ensure a smooth transition to inclusive policies.

**LCR Appendix Page 1160**

**Case Studies**

---

## I. BRITAIN

The earliest research on the impact of openly gay service in Britain came from the British Ministry of Defence. In 2000, six months after lifting its ban, the Ministry of Defence issued a report about the impact of the policy change. The document was intended for internal use only and not for public release, suggesting it represented a candid, accurate assessment of the transition, without risk of being swayed by the requisites of politics or public relations. In addition, it had the benefit of full access to all available data.

The conclusions were definitive. The lifting of the ban was "hailed as a solid achievement" which was "introduced smoothly with fewer problems than might have been expected." The MOD found that all three services "reported that the revised policy on homosexuality had had no discernible impact, either positive or negative, on recruitment."[56] The review concluded that the new Code of Social Conduct had been central to the success of the new policy. Its emphasis on behavior now meant that commanders could make sure that the problematic conduct of any individual, if and when it arose, could be managed, and that operational effectiveness could, as a result, be maintained. Hence, the MOD noted that the code had become "a useful guide for commanding officers in dealing with all issues surrounding personal relationship and behavior, going wider than just homosexual issues."[57] There was "widespread acceptance

32

of the new policy" and military members generally "demonstrated a mature and pragmatic approach" to the change.  There were no reported problems with homosexuals harassing heterosexuals, and there was "no reported difficulties of note concerning homophobic behavior amongst Service Personnel."  The shift to inclusion meant that the military could now access more college recruiting fairs, which were previously off limits because of opposition to the ban from students and educational establishments. The report concluded that "there has been a marked lack of reaction" to the change.[58]

Independent assessments by senior government and military officials in Britain consistently confirmed the military's findings that lifting the gay ban had no negative impact on performance.  "At the end of the day, operational effectiveness is the critical matter, and there has been no effect at all," reported a high-level official.  Just nine months after the new policy was instituted, this official told Palm Center researchers that "homosexuality doesn't even come up anymore—it's no longer an issue."  One lieutenant colonel reported that "there has been absolutely no reaction to the change in policy regarding homosexuals within the military.  It's just been accepted."  He said that emphasis on fair treatment and personal responsibility meant people had ceased to focus on sexual orientation and cared far more about individual performance and responsibility to the team.  Even the very vocal worries about privacy and sharing showers and berths with gays—a perpetual focus of resistance in the U.S.—turned out to be unwarranted.  A press official at the Ministry of Defence said that "the media likes scare stories—about showers and what have you.  A lot of people were worried that they would have to share

33

body heat in close quarters or see two men being affectionate, and they would feel uncomfortable.  But it has proved at first look that it's not an issue."[59]

Experts repeatedly expressed surprise at how little the change had meant, and how much easier the transition had been than what they expected, given the vocal resistance before the ban ended.  The military's director of personnel said, "We've had very few real problems that have emerged, and people seem to have, slightly surprisingly, settled down and accepted the current arrangements. And we don't really have the problems that we thought we'd have."  An official of the Personnel Management Agency said, "The anticipated tide of criticism from some quarters within the Service was completely unfounded."  One commander attributed the smoother-than-anticipated transition to a generation gap, finding that "our youngsters have just taken it in stride."  He concluded that "it's a major non-issue, which has come as a considerable surprise."[60]

In 2002, the MOD revisited its new policy on sexual orientation and the Code of Social Conduct "in light of thirty months' experience since both were introduced." Officials concluded that "there has been no discernible impact on operational effectiveness," that the code had been "well received," and that "no further review of the Armed Forces policy on homosexuality" was necessary.[61] This is not to say that there were no negative outcomes associated with the policy. For example, the Army reported in 2002 that "homosexuals are not readily accepted by all, and this may influence an individual in deciding whether to expose his or her sexual orientation."[62] However, what both of the MOD's initial reviews and the systematic appraisal of the evidence carried out by Belkin

34

and Evans confirm, is that for all three services of the British Military, the transition from exclusion to inclusion had no tangible impact on operational effectiveness. The inclusion of gays and lesbians in the British Armed Forces had no impact on the military's ability to fulfill its function to defend the United Kingdom and its interests.

Recently, some opponents of gay service in both the U.S. and the U.K. cited the 2002 study as evidence that Britain had suffered negative consequences as a result of lifting its gay ban. They referenced an article published in 2007 by the conservative *Daily Mail*, entitled "Lifting Ban on Gays in Armed Forces Caused Resignations, Report Reveals" which claimed that the 2002 study showed that "Britain's armed forces faced a spate of resignations in protest when the government lifted the ban on homosexuals serving in the military." The 2002 report, however, nowhere mentions a "spate of resignations." Here is what the report says:

*Navy*: "When first announced the change in policy was not openly welcomed by many, but reaction was generally muted. Since that it has been widely agreed that the problems initially perceived have not been encountered, and for most personnel sexual orientation is a 'non-issue.'"

*Army*: "The general message from COs [commanding officers] is that there appears to have been no real change since the new policy was announced."

35

**LCR Appendix Page 1164**

*Air Force*: "All COs agreed that there had been no tangible impact on operational effectiveness, team cohesion, or Service life generally."

Regarding the "spate of resignations," what the Ministry report actually says is that, "there remains some disquiet in the Senior Ratings' Messes concerning the policy on homosexuality within the Service. This has manifested itself in a number of personnel electing to leave the Service, although *in only one case* was the policy change cited as the only reason for going. Nonetheless, homosexuality is not a major issue and, to put the effect of the policy change into context, the introduction of Pay 2000 and pay grading caused a far greater reaction."[63] We sought comment from the Directorate of Service Personnel Policy at the British Ministry of Defence about the *Daily Mail* article. In response, we received an email stating: "We were irritated by the article because it put a very negative slant on what was, in reality, a positive outcome."[64]

The Royal Air Force has found its inclusive policy to be so successful that, since 2006, it has worked with Stonewall, the largest gay rights group in England, to help it attract gay and lesbian recruits. The deal means the Air Force was placed on Stonewall's "Workplace Equality Index," a list of Britain's 100 top employers for gays and lesbians, and that Stonewall provides training about how to create an inclusive workplace environment with greater appeal to gays and lesbians. The Air Force also agreed to provide equal survivor benefits to same-sex partners and to become a sponsor of the Gay Pride festival. The MOD endorsed the policy in 2006 saying, "The Armed Forces are

committed to establishing a culture and climate where those who choose to disclose their sexual orientation can do so without risk of abuse or intimidation."[65]

The Air Force action was prompted in part by recruitment shortfalls. But the move also makes clear that the British Forces believe that a climate of inclusivity and equal treatment makes for a superior military, further evidence that the only impact of gay inclusion is a positive one. At the 2007 British gay pride parade, a Royal Navy commander made this point, stressing that what mattered to military effectiveness was teamwork. "If the team is functioning properly, then we're a professional fighting force," he said. "We want individuals to be themselves 100%, so they can give 100% and we value them 100%." Background, "lifestyle" and sexuality were not a part of the equation, he said, adding that the armed forces recruit "purely on merit and ability" and new members become a "member of the team and are valued as such."[66] As the MOD's 2000 internal assessment had suggested, the replacement of a group-specific ban with a policy of equal treatment had helped to shift focus away from sexual identity, precisely the aim of the new policy. Because the British Code of Social Conduct emphasizes good behavior and fair treatment for all, sexuality has come to be regarded as a private matter and service members have been freed to concentrate on the duty of each member to behave in ways that are beneficial to the group. The report indicated that the policy change had produced "a marked lack of reaction. Instead of focusing on sexual identity, discussion is concerned with personal responsibility across the board, and on proper behavior rather than identity politics.

37

The MOD report also indicated that, because colleges no longer banned the military from campus, recruitment prospects were brightened by greater access to potential recruits: "Some areas that had previously closed to the Forces, such as Student Union 'Freshers' Fairs' are now allowing access to the Services because of what is seen to be a more enlightened approach." Indeed, the MOD called recruitment "quite buoyant" in the year after the ban was lifted. After several years of shortfalls, the year both before and after the policy change finally saw recruiting targets filled. [67]

*Recent Evidence*

This section updates research conducted in the early stages of Britain's policy change to provide a more comprehensive assessment of the overall impact of the transition to full equality for gays and lesbians. It adds recent testimonies of serving military personnel and experts on the transition and its long-term implications. The additional research shows that the British Military's post-2000 measures on sexual orientation have been successful for one reason above all: instead of building policy around assumptions about what impact the presence of sexual minorities in the military could have, the MOD prioritized the impact of actual behavior on operational effectiveness. Though sexual behavior has always been important to British Military judgment on sexual orientation, the recognition that anyone can engage in behavior that could harm unit cohesion is highly significant. Moreover, it more accurately reflects the situation on the ground where the older notion that unit cohesion requires soldiers to develop deep interpersonal

38

bonds has been replaced by the recognition that soldiers bond through shared commitment to tasks. As such, *all* soldiers are now judged on their behavior, on their commitment to unit tasks, priorities, and discipline, irrespective of sexual orientation.

All the evidence indicates that the conclusion of the British Military's own internal reviews of the new policy, conducted both six months and 30 months after enactment, still applies: the transition has been characterized by a "marked lack of reaction" throughout the ranks.[68] A spokesman for the Ministry of Defence reiterated in 2010 that ending the gay ban in Britain had "absolutely no impact at all on operational effectiveness."[69] In 2006, the Navy became the first to allow troops to march in uniform at the annual Gay Pride parade in London in, and the Royal Air Force and Army followed suit in 2007 and 2008 respectively.[70]

This is not to conclude, of course, that no one reacted negatively to the change; some members of the force complained about the new policy. But according to all available evidence, the transition has had no negative impact on the overall effectiveness of the British military. Because the policy change has had no perceptible impact on unit cohesion, morale, or operational effectiveness, it is widely regarded as an overwhelming success. In addition, there is no indication that the policy change has had any effect on recruiting, training completion, or resignation rates. There have been no widespread or endemic problems with harassment or sexual misconduct associated with the new policy. In short, the transition from inclusion to exclusion has been a smooth one. The section

39

concludes with a short discussion of the implications of the British experience for the United States Military.

---

The Code of Social Conduct does not offer an exhaustive list of unacceptable conduct, and it does give military commanders some discretionary authority in determining the detriment of a given incident to operational effectiveness. However, it targets behaviors that could undermine trust and cohesion, rather than members of a specific social group. These include unwelcome sexual attention, whether physical or verbal, over-familiarity with the spouses or partners of other service personnel, overt displays of affection which might cause offense to others, behavior that could damage the marriage or personal relationships of service personnel or civilian colleagues within the wider defense community, and taking sexual advantage of subordinates. While lesbian and gay personnel could behave in ways that breach the code, none of these behaviors are exclusive to them. The code could equally be breached by heterosexual personnel. That the code applies to all service personnel calls attention to the fact that there is no clear correlation between a person's sexuality and how he or she behaves. Indeed, the amount of time and resources that the MOD has spent tackling endemic sexual harassment of servicewomen by servicemen in recent years suggests that sexual relations between heterosexual personnel may be far more problematic for operational effectiveness than those between homosexuals, and that the social code is an important tool for commanders faced with such difficulties.[71]

40

Militaries have long regarded cohesion among soldiers as integral to maintaining operational effectiveness. The nature of that cohesion is still disputed[72] but among the two most well-established positions that have emerged, it is task cohesion rather than social cohesion that overwhelmingly reflects the realities 'on the ground' among soldiers serving in Western Armed Forces.[73] Following World War II, many argued that "social cohesion" was the key determinant of military readiness, and that effectiveness is facilitated by "intimate interpersonal relationships" between military recruits.[74] Nonetheless, the second position, which arose from doubts over the reliability of social factors as a causal indictor of cohesion, suggests that "task cohesion"—a "shared commitment among members to achieving a goal that requires the collective efforts of the group"—is a much more reliable indicator of military readiness.[75] As we have noted elsewhere,[76] while the *idea* of social cohesion is still promoted in some British military doctrine, research with members of the British Armed Forces (2003- 2006) supports the claim that "military performance depends on whether service members are committed to the same professional goals."[77] Consequently, task cohesion is far more important than interpersonal relationships for developing relationships of trust with fellow service personnel. The Code of Social Conduct reflects this fact by acknowledging that it is the *conduct* of individuals that can undermine the cohesion of tight-knit groups, not the identity of individuals *per se*. Thus in their 2000 review of the initial transition from exclusion to inclusion, Belkin and Evans found that behavior, rather than sexual orientation, is what ultimately matters to the men and women in the Armed Services:

> As long as people do their jobs and contribute effectively to the teamwork
> of their units, individual differences in opinion or in their personal lives

**LCR Appendix Page 1170**

are not considered relevant. The new policy's focus on behavior rather than on personal attributes has allowed heterosexual and homosexual soldiers alike to maintain their focus on the jobs at hand.[78]

Evidence seems to suggest that ending gay exclusion policies may be the best way to move beyond the worrisome focus on sexual identity and its effects on military cohesion. This is certainly true for the gay and lesbian service members themselves, who generally "breathed a sigh of relief"[79] when they learned they no longer had to lie to serve their countries. But the effects of liberalization go beyond just the obvious impact on gays, to impact straight people too because they reach to the heart of heterosexual anxiety about their own role in the military, about how they should behave with respect to homosexuality and how they should interact with those they suspect or know to be gay.

Chief Petty Officer Rob Nunn was discharged from the Royal Navy in 1992 for being gay, and re-joined the British Forces after the ban was lifted in 2000. The response from his comrades was overwhelmingly positive when he came out, and he was even asked casually if his partner would be accompanying him to the Christmas Ball. But what's most instructive about Nunn's experience is the impact of the new transparency not on him but on his straight comrades. Immediately after his re-instatement, Nunn found his colleagues were unsure how to respond to him. "It's the old, 'I don't know quite what to say,'" he explained in an interview. With one other service member, in particular, Nunn decided to guide him to a place of greater comfort, now that he could take advantage of the option to speak freely. This "one guy that I talked to who couldn't sort of talk to me, I said, 'Right, I'm going to ask the questions that you want to ask, and answer them.' So I did." Nunn reported that the greater openness, whether it came from him or from

42

others, allowed any remaining discomfort to evaporate, and gave him the chance to counter stereotypes, expose friends to greater understanding and put people at ease.  After helping his reticent comrade out of his shell, the person became "nice as pie."[80]

Patrick Lyster-Todd agreed that strong military leadership was essential to the success of Britain's policy reform.  An officer in the Royal Navy before the ban was lifted, Lyster-Todd later became head of Rank Outsiders, a group dedicated to lifting the ban.  "Our MOD and serving Chiefs take Equality & Diversity issues—including the rights of serving gay personnel, whether out or not— incredibly seriously," he said.  "Their approach is that if you want to be a capable force for good in the 21st century, then you need to be of that century and its people."[81]  Again, this observation is corroborated by research showing that controversial new rules are most effective when top leaders make their genuine support absolutely clear, so that the next layer of leaders, those who actually must implement the new rules, come to identify their enforcement of the new policy with their own self-interest as leaders of the institution.[82]

Recent accounts of the transition of military policy on sexual orientation further attest to the importance of focusing on the impact of behavior on operational effectiveness, rather than assumptions about sexual identity. In recent correspondence with the MOD's Diversity Team, officials made it clear that "the change of policy was achieved with no tangible impact on operational effectiveness, team cohesion or service life" and that service personnel "accepted the change in policy and business continued as normal." They also emphasized that, within the British Armed Forces, "an individual's

43

sexuality is considered to be a private life matter" and that sexuality alone is not viewed as something that inherently undermines trust and cohesion among service personnel.[83] Commander Debbie Whittingham, the commandant of the military's Joint Equality and Diversity Training Center, described the policy change as a "non-event." In her assessment, any concerns over operational effectiveness were quickly allayed by the fact that service personnel were aware that they may have served with gay and lesbian soldiers for some time, with or without knowledge of their orientation, and that disclosures by close colleagues of their sexual orientation after the policy change had little effect. Sexual identity in no way undermined those service members' history of commitment to their units.[84]

It is important to emphasize that the cultural context of the British Forces prior to the policy change was characterized by the exclusion and removal of lesbian and gay personnel from the armed forces. Perhaps for this reason, initial indications of the likelihood of a policy change were met with hostility by some in the armed forces. Lieutenant Commander Mandy McBain worked at this transitional time in the Directorate of Naval Manning.[85] Tasked with addressing the views and concerns of personnel on the impact of lifting the ban, she reported that she initially encountered "a general assumption amongst my seniors that they did not work with any gay people and therefore their homophobic comments were acceptable."[86] She found it exhausting to conceal her true identity. "It's quite incredible to look back and see how much time and energy I spent leading a double life," she recalls. She even had to process the paperwork of homosexual discharges for peers.[87] Echoing McBain's remarks, Craig Jones, a retired lieutenant

44

commander in the Royal Navy, recalled in 2009 that "the Ministry of Defence fought the European Court of Human Rights to the bitter end." Yet he noted that "as the smoke cleared on the battleground," what followed was "silence."[88] For him, the introduction of the Code of Social Conduct in the House of Commons in January 2000 "ended overnight twenty years of pointless rhetoric-fueled arguments" because from that point on, "admirals, generals and air marshals dusted themselves down and returned to the important business of national defense and the men and women of our armed forces returned to their daily lives freed from almost daily vacuous discussions about 'gays in the military.'"[89] Indeed, Jones pointed out that in his experience the 1990's debate over service by gays and lesbians was perceived by many of his fellow colleagues, regardless of their personal views, as "an unwelcome distraction from the important business of ensuring fighting effectiveness." It felt, at times, "as though politicians and military leaders were more concerned with the sexual orientation of their troops" than with ensuring that military personnel "were well motivated and well equipped to do their jobs."[90] It was the political debate over the issue of gays in the military that served as a distraction to the focus on mission, not the actual presence of gay or lesbian personnel.

After the policy change, personnel involved in tracking, investigating, and dismissing sexual minorities "turned their attention to retaining and recruiting talent rather than searching it out and dismissing it," according to Jones. He also said that the "U.K. inclusive policy characterized by the Armed Forces Code of Social Conduct gave back to our servicemen and women the freedoms of life which they may one day be asked to lay down their lives to protect."[91] Where anxieties have arisen, such as recent concerns over

45

how to manage applications for married quarters from same-sex couples who have entered into civil partnerships, these have been overcome through clearer guidance and implementation training. The MOD's approach to the provision of Service Family Accommodation (SFA) has been to treat same-sex couples in civil partnerships in the same way as married couples on the grounds that, like marriage, civil partnerships constitute the legal recognition of a relationship. Accordingly, SFA is not available to unmarried heterosexual couples or to same-sex couples who are not in civil partnerships because those relationships are not legally recognized. The MOD has also made it clear that while personnel are entitled to decline the provision of SFA on the grounds that they might end up living next door to a same-sex couple, they have no legal right to demand alternative accommodation. By clarifying their position in clear guidelines for commanders and personnel, the MOD has thus tried to ensure that all its personnel have the right to a private life.[92] The British military has been so pleased with the success of the transition that it has taken steps to promote its new policy and demonstrate its success publicly.[93] According to Commander Whittingham of the military's Joint Equality and Diversity Training Center, all three services are now part of the "Diversity Champions" program run by the lesbian, gay, bisexual and transsexual rights group, Stonewall. All permit their soldiers to march at gay pride events in uniform, and various forums and focus groups supported by the military have been established for serving gay and lesbian service personnel.[94] As Jones put it, "the minor transitional bumps of implementation had ten times less impact than defending against this policy."[95]

46

British military experts uniformly continue to pronounce the inclusive policy a success. Lord Alan West was head of the Royal Navy and is now terrorism minister for the U.K. West served both before and after the ban was lifted, and reports that "It's much better where we are now. For countries that don't [allow openly gay service], I don't believe it's got anything to do with how efficient or capable their forces will be. It's to do with other prejudices, I'm afraid." Peter Tatchell, a London-based gay-rights activist often critical of the government, praises the military's handling of the change. "Since the ban has been lifted, there hasn't been a word of complaint from senior military staff," he said. "They've said that having gay and lesbian people in the services has had no damaging effect at all."[96]

Military expert and veteran Amyas Godfrey now works for the Royal United Services Institute, a think tank in Britain. When the British forces lifted their ban, he was serving in Northern Ireland, and he recalls: "I remember our commanding officer at the time called the entire battalion together and said, 'This is how it is going to be now. We are not going to discriminate. We are not going to bully. If someone in your group says that he is gay, you treat them as normal.' And that, really, was the implementation of it. For all the years I served after that, it was never an issue."[97]

47

**LCR Appendix Page 1176**

*Conclusion*

Important lessons arise from the British experience for other militaries considering a transition from exclusion to inclusion of sexual minorities. As with any transition, there is scope for improvement. For example, an overemphasis on sexuality as a "private matter," taken from the ECHR ruling, may reaffirm, rather than displace, the idea that sexual orientation is important when actually it is behavior that matters to operational effectiveness.[98] In the British case, this issue has been tackled to some extent through the development of support networks for sexual minorities and the endorsement of these networks by senior officers, as well as through task cohesion on the ground. Soldiers have quickly come to realize that their colleagues are no less effective than they were prior to the policy change and that being gay, lesbian, or bisexual does not affect a person's ability to focus on, commit to, and complete the mission at hand. In the event of a shift to inclusion in the U.S. armed forces, it will be vital to emphasize that calling sexual orientation a "private matter" does not mean that "telling" is considered inappropriate or threatening to unit cohesion. It will be essential to focus on actual behavior and to draw links between behavior and military capability rather than identity and military capability.

Another issue is that the initial success of the Code of Social Conduct depended in part "on the leadership style and view of the officer or officers delivering the message."[99] What this means is that "strong leadership is absolutely vital" along with "a deeper understanding by those delivering the message" that "may enhance understanding" such

48

as information on "why the rules have changed, the cost to the military for additional

training, recruiting and administration to replace those dismissed," and so forth.[100]

Making what might be called the "business case" for inclusion will help soldiers to see

the benefits of a policy change. Similarly, senior military personnel need to be very clear

about how, and whether, entitlements and allowances applied to heterosexual service

personnel such as family housing, travel warrants, and schooling for children, apply to

personnel in same-sex partnerships.[101] The British approach has been to offer such

incentives to those in civil partnerships. But the federalist system in the U.S. differs in

important ways from that of the U.K. and currently the American Defense of Marriage

Act bans federal recognition of same-sex couples. Finally, a zero-tolerance approach to

bullying and harassment, in addition to training on this approach, would be necessary in

the U.S., although it is important to note that the current "don't ask, don't tell"

regulations already provide for this, despite uneven enforcement.[102] Any accommodation

of such discrimination based on status instead of conduct could send the message that

identity continues to be the main focus instead of behavior. A uniform code of conduct

for all service members, along with sufficient training, guidance, and leadership about

that code, is the most effective way to ensure that behavior is the proper focus of both

policy and practice.


The original ECHR ruling about the U.K. policy did not suggest that homosexual

behavior could not, or would never be, a possible source of tension among military

personnel. However, it did find that by assuming that all lesbian and gay soldiers—or

potential soldiers—would undermine unit cohesion, regardless of how they behaved, the

49

military had violated the rights that lesbians and gays have to a private life,[103] as well as their right to be judged on their merits. The most important lesson from the British experience of transitioning from a policy of exclusion to one of inclusion is the importance of focusing on the problematic behavior of any service person, that which has the most impact on operational effectiveness. By addressing behavior rather than relying on assumptions about how a member of a specific social group might behave, all behavior that poses a threat to military readiness and capability can be managed effectively without having to exclude specific members of the forces who may be contributing to operational effectiveness in significant ways. The above testimonies demonstrate a clear consensus within the British military, shared by the wider British society, that the policy change has had no clear impact on military effectiveness. A systematic study of the impact of the policy change, rather than a focus on military judgment, would still be valuable,[104] but all available evidence supports the conclusion that the policy change was a success: allowing open lesbians and gays in the military has had no adverse impact on military capability, and the new focus on a uniform code of conduct appears to enhance the professional climate of the armed forces.

## II. CANADA

The earliest comprehensive assessment of the impact on the Canadian Forces of full inclusion was conducted by the Palm Center in 2000. The key conclusion reached by

50

Palm researchers was that the 1992 decision was seen as a "non-event," with neither increased departures by heterosexual members nor significant numbers of complaints filed by gay members concerning harassment or other overt acts of discrimination. According to their report, "Lifting of restrictions on gay and lesbian service in the Canadian Forces has not led to any change in military performance" and GLBT personnel "who have served since the ban was lifted describe good working relationships with peers in supportive institutional environments where morale and cohesion are maintained."[105] Palm researchers identify three key factors that likely contributed to this success. The first was the CF's decision to focus on behaviors rather than attempt to shift attitudes. The second was the decision to address behaviors through broad harassment training that neither singled out sexual orientation nor ignored it as a potential source of conflict. The third was the clear leadership exercised by the CF Chief of Defence Staff and the most senior leadership cadre in announcing and implementing the policy change.

In 1986, six years before the Canadian Forces lifted the gay ban, a survey of 6,500 male service members found that 62% would refuse to share quarters with gay soldiers and 45% would not work with gays. But by several accounts following the transition, the change had no overall impact on the effectiveness of the military. "The nine months since a court case induced Canada's military leaders to open the ranks to gays have been virtually casualty-free," according to a 1993 *Washington Post* investigation. "No resignations, violence or harassment have been reported. Gay soldiers, while remaining discreet about their private lives, say they feel more comfortable now. And straight soldiers—not only those who have concerns about gays, but also those who do not—say

51

they have accepted the new regime."[106] More than two years after gay exclusion ended, according to a Canadian Forces assessment, there was no mass exodus and no indication of any impact on cohesion, morale, readiness, recruitment or retention.[107] A review by a bureau of the Canadian military found that, "despite all the anxiety that existed through the late 80s into the early 90s about the change in policy, here's what the indicators show—no effect."[108]

This section provides additional commentary regarding the context of the 1992 decision, and then provides an overview of subsequent developments in CF policies, doctrine and programs, including consideration of the two key issues that are implied but not examined in the 2000 study regarding changes in attitudes over time and combat effectiveness. In addition to reviewing the 2000 study by the Palm Center about the successful transition by CF to full inclusion, this section offers additional information that can help explain the "non-event," and particularly to help observers understand why the problems predicted in the 1986 survey did not occur. In particular, we address two fundamental questions that arise out of the experience of the CF. Given the negative attitudinal findings of the 1986 survey, the first question pertains to whether, by choosing to focus on behaviors and not attempting to influence attitudes, the CF has allowed the dominant culture to remain strongly heterosexist, thus diminishing the opportunities for gay members to integrate their personal and professional lives to the degree that their straight colleagues can. The second question arises from the central argument previously presented by the military regarding the possible impacts on morale, cohesion, combat readiness and operational effectiveness. That argument went as follows: although the CF

52

was engaged in a number of complex missions in the 1990s including in the Balkans, Somalia, Rwanda and East Timor, the Canadian military had not been tested in the heat of battle to the level that the U.S. military has been; thus, the full effects of the 1992 decision had not been assessed where it counted the most. Skeptics of full inclusion used this reasoning to argue that the data on lifting the ban was insufficient to pronounce it a success.

### 1986-1995: A Decade of Social Evolution in the CF

In order to fully appreciate the policy changes implemented in 1992 regarding gays serving in the military and the perceived "non-event" in the years immediately following, it is necessary to consider the other policies and programs that were also under challenge, review or amendment during the period from 1986 to 1995.[109] As with many other militaries, the CF had faced a number of calls to amend existing policies and rules due to changes in broad government legislation and evolutions in societal norms. Further, the military was going through significant shifts in understanding its role and missions given the end of the Cold War and the emergence of new forms of conflict.[110] Finally, the CF had received marked negative publicity because of an incident during its 1993 mission in Somalia in which soldiers beat to death a Somali youth taken into custody; the event served to focus external public and political attention as well as CF senior leadership.[111]

LCR Appendix Page 1182

*Employment of Women*: In the context of concurrent changes, the most important development pertains to the employment of women in the military.  The CF had been continuously evaluating or amending policies regarding the employment of women since the early 1970s.[112]  Following the enactment of the Canadian Human Rights Act in 1978, a series of research trials and suits against the CF culminated in a landmark Canadian Human Rights Tribunal decision in 1989. The Tribunal stated, "The issue is: does 'operational effectiveness' constitute a bona fide occupational requirement of such a nature that the exclusion of women from combat-related occupations is justified, even though it is, on its face, a discriminatory practice."  It found that the CF had not made the case to retain the exclusionary policy and directed the CF to achieve full and complete gender integration in all occupations and all roles except submarines by 1998.[113]

In contrast to the relatively low-key approach taken in 1992 to amend the policy for gays in the military, the issue of the employment of women, particularly in combat roles, was of high visibility across the CF from 1979 through to the mid-90s, with commensurate visible leadership from the top to set the tone and ensure success.  The changes incurred the same core concerns as the 1992 policy change for gays in uniform, that is, concern over erosion of cohesion and diminution of operational effectiveness.

*Employment Equity Act*: A further catalyst for proactive programs in the military was the passage by the Canadian Parliament of the Employment Equity Act (EE Act) in 1986. This legislation requires that federal government agencies take steps to address the historical marginalization of four designated groups: women, Aboriginal peoples, visible

54

minorities and persons with disabilities, with the goal of achieving equitable representation in all areas and at all levels of employment.

*Religious Accommodation*: Although it pre-dated the EE Act, another major focus of policy change pertained to initiatives to update or amend policies regarding religious accommodation. Starting with the amendment of dress regulations to enable members of the Sikh faith to wear a turban as military headdress, changes have been implemented to enable minority members of the CF to dress, eat, and pray in accordance with their religious beliefs.[114] As a major supporting initiative, the CF Chaplaincy Branch adopted a policy of multi-faith service with all Chaplains to minister to members of all faiths to the best of their ability in as open a manner as possible.[115]

*Defence Ethics Program*: The final program development that occurred concurrently in the 1988-1992 period was the implementation of the Defence Ethics Program (DEP). The DEP presents a values-based framework centered around three ethical obligations: respect the dignity of all persons; serve Canada before self; and obey and support lawful authority. The perception that the lifting of the ban on gays in the military in 1992 was a "non-event" is rooted in some part in the first prong of the DEP focus: respecting the dignity of all persons.

A key component of DEP was the development and implementation of broad-based professional development programs as both stand-alone workshops and as modules incorporated into professional military education (PME) across the CF. A series of

55

surveys was conducted during the 1990s to assess the ethical climate in the CF and a range of resource materials were made available.

***Somalia and Canada's 'Blue Beret' Image***: No summary of the evolution of CF policies, programs or culture during the 1990s can be complete without a consideration of the events surrounding the deployment of the Canadian Airborne Regiment to Somalia in 1992-93. On the night of March 16, 1993, a small number of Canadian soldiers beat to death Shidane Abukar Arone, a 16-year-old who had been taken into custody when found in the Canadian compound. The subsequent outcry among Canadians and criticism of senior military leadership by politicians led to the disbanding of the Airborne Regiment in disgrace and to the firing of the Chief of the Defence Staff, General John Boyle. Some years later, in 1997, the Minister of National Defence directed a series of sweeping changes to be implemented by the CF in order to regain the trust and confidence of Canadians.[116]

Among other concerns, the events surrounding the Airborne Regiment prior to and during the deployment to Somalia highlighted concerns regarding racism, prejudice, and a "rogue" culture that was at odds with the more respectful and ethics-focused norms of the Canadian military and society. The death of Shidane Arone struck a deep chord with Canadians as the vast majority of the citizenry had viewed their military as "Blue Berets" conducting random acts of kindness in far-off places.[117] While Canadians are not naïve and most recognize Canada's war fighting contributions in the First and Second World Wars and the Korean conflict, the dominant view among citizens is that Canada should

56

use its military primarily to project values, not to project force.  It is for this reason that the Somalia incident had far greater consequences for Canadians and the CF than appears to have been the case in the US with events such as Abu Ghraib.

This overview of changes occurring in the CF around the time of the 1992 decision to remove the ban on gays serving in uniform reveals that the institution was engaged in addressing a number of concurrent issues related to changes in civilian culture.  To some extent, the observed "non-event" was due to the fact that the decision to lift the ban on gays was seen as a rather minor issue in comparison to these other concurrent changes. While Palm researchers identified the role of senior leadership and the decision to address behaviors using broad programs rather than implementing initiatives to change attitudes or single out gay members, there are two more fundamental explanations as to how the CF was able to implement the wide range of policy changes needed to address all of the social evolution.  The first was that the senior leadership recognized that the central issue in all cases pertained to culture and identity and, in particular, the requirement to ensure that key aspects of the CF culture reflected that of Canadian society.  The second was to articulate the requirements, objectives, and desired ends using shared, key principles that underpinned how the military (collectively) served the nation and how each individual served the military.  A fairly consistent message was that the role of leaders has been, is today, and always will be, to take well-trained, highly motivated, talented individuals who want to serve their country in uniform and transform them into cohesive, effective teams.

It should also be noted that, when taken together, the issues presented in this section compelled the CF to examine two myths that the military had been telling itself: first, that military culture was fine as it was and senior leadership needed no outside assistance to create a more dynamic, adaptive culture; and second, that the military alone should be the final arbiter of balancing operational effectiveness with individual rights- a view the Canadian Human Rights Tribunal clearly dismissed when it concluded that "the risk to individual rights is high when women are excluded from any occupations, and the risk to national security is, by comparison, low."[118]

Finally, while this update confirms that the cancelation of the previous policy was a non-event from the perspective of the CF, not all agreed. A minority of politicians was opposed to some of the related policy changes and clearly dismissed the legitimacy of, or need for, the CF to address the requirements of gay communities.

### *1996-2009: Recent Changes within Canadian Society and the CF*

Until recently, no systematic research had been conducted to specifically examine the experiences of gays in uniform after the ban was lifted. Following is an update on the impact of changes in Canadian society and the CF on the experiences of gays in uniform.

*Same-sex Marriage*: The legal recognition of marriage between same-sex partners occurred over the course of several years as provincial governments amended statutes, and culminated with the federal government doing so in 2005. This measure has

generally had broad support as illustrated in a September 2009 public opinion poll in which 61% of Canadians supported same-sex marriage and only 11% indicated that same-sex couples should have no legal recognition. As legislation was passed, the CF moved quickly to amend a host of related policies including those regarding pay, pensions, married quarters, relocation benefits etc. As an example, Interim Guidelines for CF Chaplains for same-sex marriages were issued in September 2003 and the first publicly acknowledged same-sex marriage of two service members took place in May 2005.[119] These guidelines address key principles, and clearly highlight the importance of the Defence Ethics Program's focus on the obligation to respect the dignity of all persons.

***Outreach and Community Engagement***: Over the last few years, the CF has also developed more proactive approaches to engage with the gay community. One example is the creation of a Facebook site for the Canadian Forces Gay, Lesbian, Bi and Heterosexual Group.[120] Although the posting states it is not an official CF site, the presence of the CF logo, the use of military ranks, and the identification of both a Group Harassment Advisor and Bilingualism Officer (common CF unit-level secondary duties) are all indicators of an implicit acknowledgement and endorsement of this site by the institution. While this site provides an accessible means of social support, members of the gay community have requested that the CF appoint a formal senior "champion" (at the LGen or MGen level) as has been done for the four EE designated groups. To date, this effort has been unsuccessful.

59

**LCR Appendix Page 1188**

A clearer example of formal outreach to the gay community pertains to participation in Pride Parades. These events are now held in many Canadian cities with Toronto Pride Week estimated to draw 1 million participants. At the request of gay and straight members of the CF, permission was given in 2008 for CF members to participate in Pride Parades in uniform. In 2009, this was extended to a more formal outreach program which is intended to raise awareness of, and garner the support of Canadians for the CF by showcasing the men and women of the CF. This initiative is seen to support recruiting and diversity efforts with clear statements of the principle that "embracing diversity contributes to the relevance of the CF as a national institution in that Canadians see themselves when looking at the CF… Moreover, diversity is an operational imperative because it acts as a force multiplier as we conduct more operations in non-traditional theatres."[121] For a number of Pride Parades this year, volunteers from across the CF were on duty participating in the parades in uniform handing out promotional items to those in attendance and at an official recruiting booth.

*Research*: As mentioned, relatively little research has been conducted in the CF that is specifically focused on issues related to the inclusion of gays in the military. One area that has been examined pertains to legal proceedings. In an update to a comprehensive analysis of CF cases, the author of that work confirmed that, as of summer 2009, there have not been any courts martial since 2000 for either sexual misconduct involving gay members or for inappropriate behaviors directed at gay members.[122]

60

To return to one of the original areas of research, little has been done to re-examine the 1986 survey that was interpreted to reveal strong opposition to removing the ban on gays serving in uniform. As the CF had focused on regulating behaviors, rather than changing attitudes, a major question that remained unanswered in the 2000 report was whether the opinions expressed particularly by heterosexual males in 1986 have persisted. Research conducted in both the U.S. in 1998 and 1999 and in Canada between 2001 and 2004 provides a partial answer and, with some time lag, a partial cross-national comparison. As part of a comprehensive research program examining the "civil-military gap" in the U.S., a team led by Dr. Peter Feaver analyzed attitudes of mid- to senior-level officers which was replicated in Canada.[123] 215 senior CF officers (Major to Colonel) attending Canadian Forces College (U.S. Staff and War College equivalent of Professional Military Education) completed a detailed survey of attitudes and opinions.[124] The following three paragraphs were presented in the report comparing the responses of the senior CF Officers to their U.S. colleagues of the same ranks:

> The two groups [Canadian and American] provided rather different perspectives on a number of items related to diversity and gender roles. Only a minority (21%) of Canadian survey respondents embraced the idea that "the military should remain basically masculine, dominated by male values and characteristics" whereas 41% of their American peers had agreed. Very few believed that military effectiveness was greatly hurt when women entered the workplace (3%), due to the military becoming less male-dominated (3%) or due to bans on language and behavior that encouraged traditional patterns of camaraderie (7%).

> The divergent views of the two militaries were evident in responses on the roles of women in uniform. 78% of Canadians agreed that women should be allowed to serve in combat jobs while only 38% of Americans supported such a policy… 81% of Canadians reported that they would be equally confident with a female as they would with a male Commanding Officer (CO) (vs. 67% in the US).

> The differences between Canadian and American respondents in openness were even more marked regarding the employment of gays and lesbians in uniform. While 68% of the Canadian respondents agreed with the CF policy allowing gay men and lesbian women to serve openly in the military, only 18% of their American colleagues supported adopting such a policy. Although only 28% of Canadians indicated that they would be more comfortable with a straight CO than with a gay CO, 65% in the US preferred a commander who was straight.

Although the sample is small and clearly not representative of all ranks, it is seen as an indicator of a significant shift in attitudes and opinions regarding both gays and women in uniform since the 1986 study that was reported to reveal strong opposition. Further, in comparison to the general CF population, this sample over-represented older males, operational occupations (MOS), and those on a command career path, all factors that would predict a more conservative outlook than expected from a broader cross-section of the CF.[125] Not all of the attitudinal responses of this cohort of senior CF Officers were seen as positive, however. Note, for instance:

> In particular, although this group did not oppose the inclusion of individuals on the basis of gender or sexual orientation, they were somewhat complacent in assessing that the CF had achieved what is required to fully accommodate these groups. Some of their responses represented a latent resistance with perceptions that standards were easier for women and that the initiatives to integrate women had eroded military performance. Of more importance, the assessment of the CF's progress was rather optimistic and over-stated… Thus, while there were not signs of overt resistance, there appeared to be a 'perception gap' between what these military leaders believe had been accomplished and what may actually be required to achieve CF diversity objectives.

***Doctrine and the prototype "Combat Male Warrior"***: One of the initiatives that came directly out of Somalia but was also informed by the other events identified in the previous section's decade of social evolution was a significant effort to establish and update CF Doctrine. The most important of the doctrine manuals produced was the 2003

62

publication, *Duty with Honour:  The Profession of Arms in Canada.*[126] This manual "presents the theoretical and philosophical underpinnings of the profession, shows how in practice it serves Canada and Canadian interests, and, codifies, for the first time, what it means to be a Canadian military professional."[127]  Key in this articulation was the view that the CF should predominantly project values rather than force, and its military ethos should reflect both martial/war-fighting values and broader Canadian values of acceptance and inclusion.  Martial values, uniquely emphasized in the military to ensure technical success, include such concepts as service before self, self-sacrifice/unlimited liability, fighting/warrior spirit, teamwork, and self-discipline.  Civil values that were given prominence included notions of rights and freedoms and the obligation to respect the dignity of all persons.

The language chosen and the symbols used to communicate the intent of the manual were selected so as to carefully balance the fundamental role, character, and nature of the profession of arms as responsible to the state for the defense of the nation with the evolving, broader, and more complex expectations particularly for the CF as a partner with allies and other agencies in achieving integrated security solutions under comprehensive approaches.

The related doctrinal change was the subsequent publication of *Leadership in the Canadian Forces:  Conceptual Foundations*.  Drawing on the central concepts in *Duty with Honour, Conceptual Foundations* presents a values-based leadership model that emphasizes transformational leadership approaches and, under the concept of "leading

the institution," highlights the individual and collective responsibilities of leaders at all levels to set the conditions for small unit/team success in operations. The unifying theme of respecting the dignity of all persons is highlighted in this manual along with other key messages about drawing on the strengths of diverse teams.[128]

Together, these two doctrine manuals are intended to establish an appropriate philosophical, sociological, and ethical framework to enable the CF to evolve to meet both emerging societal expectations and to achieve complex (human) security missions. Of particular relevance for this review, *Duty with Honour* strove to retain the concept of the "warrior's honor" while shifting away from the dominant prototype of the "combat male warrior."[129] The (gradual) acceptance of a redefined model soldier- one who values a range of characteristics and behaviors- is key to achieving broadly defined diversity objectives, particularly for gays in uniform.

***Combat and Operational Settings***: This brief section addresses continued reservations by those who consider the 2000 report to be an inadequate assessment of the CF's 1992 transition to full inclusion since it had not yet been engaged in major combat missions at the time. Since taking a significant role in southern Afghanistan as well as engaging in naval interdiction and counter-piracy off the Horn of Africa, the CF certainly believes it has answered the general question of its collective combat capabilities on land, in the air, at sea, and in special forces contexts. In doing so, the CF has sustained significant losses (relative to the size of the CF) as well as standing its ground in the face of a rather determined insurgency. Our observation, based on extensive discussions with military

64

leaders, is that the CF believes that soldier-for-soldier, man or woman, gay or straight, it is capable of punching above its weight.  Although there has not been any systematic research to specifically examine the consequences of fielding combat units containing women or gays, Dr Anne Irwin, an anthropologist who studies the CF, recently spent several weeks with combat solders in Afghanistan.  Extending the key conclusion reached by Belkin and McNichol, she stated:

> My intuitive feeling was that it was a non-issue. Sexuality to a large degree is irrelevant; what matters is whether someone is reliable, loyal and hardworking. Good sense of humor, a joiner, rather than a loner. Beyond that, I don't think anyone really cares.[130]

***Voices and Perspectives***: Key themes that emerge from Canadian scholars' work on the perspectives of gays in uniform[131], as well as from service members' comments to the authors of this study, are as follows:

1. Invisible Identity.  Several academics and some serving members have commented that one of the effects of the decision to cancel the previous policy in 1992 was that it made gendered and sexual identities invisible.[132]  By adopting an approach of "benign neglect," the CF has prevented members of the gay community in uniform from engaging in meaningful dialogue about their identities. This issue appears to be of significant importance for those who are transgender, as was indicated in the legal proceedings by Micheline Montreuil.

2. "1 of 1."  The combination of invisible identities and small numbers in uniform leads to a sense by some of being "1 of 1." There is a feeling of isolation and frustration that

each person has to deal with the issues that confront them on their own, with little or no institutional support.  This experience contrasts with that of others in uniform who have had to deal with issues that were either not common or not formally acknowledged, but for which programs were developed to provide them with support, such as single parenthood, elder care, learning differences, PTSD, and mental illness.

3. Procedure.  The sense of isolation and lack of institutional supports impair full access to the available procedures such as filing formal complaints in the event of wrongdoing. Individuals must have confidence in both the results of filing complaints and the processes used to adjudicate them for such procedures to accomplish their stated goals of justice.  One service member commented, "Most queer people do not believe that going through the harassment complaint process is anything but a way of painting a big rainbow target on our heads."  One result of the absence of complaints is that leaders wrongly conclude that all is well or that the CF is doing as much as is needed.

4. Career Implications.  The input received suggests mixed results about the effects that open homosexuality can have on one's career. Some feared that declaring their identity would indirectly have career consequences while others perceived and experienced no problems.  From the background research and some comments received, it is plausible that a differentiating factor may be the role that different individuals take on or the degree to which they make their identity visible.  Several of the comments received indicated that some of those who were open about their identity felt an obligation to put in extra

66

effort, achieve higher standards of proficiency, or demonstrate greater commitment to pass the "dedication" test before their presence and performance were accepted.

5. Ignorance and Prejudice vs. Acceptance and Belonging.  From comments received, it is evident that the time period during which individuals joined the CF shapes how gays in uniform experience daily life: those who joined pre-1988 still recall the "witch hunts" and need for secrecy, while those who joined more recently did not experience this treatment.  An additional theme that emerged from respondents was frustration with the degree of ignorance demonstrated by a minority of their military colleagues.  The misunderstanding of key facets of the gay community, conflation of gender identity with sexual identity, and assumptions about gender or sexual identity based on certain behaviors clearly lead to actions or statements that are received as harmful or prejudicial, with the sense that better education could prevent such problems.  Conversely, several respondents commented on growing acceptance by their CF colleagues as gay members have "earned" the right to serve through their performance and professionalism.

In their 2000 review of the perspectives of gays in uniform, Palm researchers quote a comment by CF member Michelle Douglas that "gay people have never screamed to be really, really out.  They just want to be really safe from being fired."[133]  This update would suggest that their perspectives have evolved to the point that gays in uniform would appreciate greater factual knowledge and understanding if and when they choose to come out.  Above all, they want to be judged on their performance, not their identity.  Thus, the main shift noted among gays in uniform is that their expectation has grown

from merely hoping to hold onto their job to aspiring to have a full career, which allows them the same balance of work and personal lives as their heterosexual counterparts.

*Conclusion*

This report, which updates previous research on gays in the Canadian Forces, confirms that the transition to full inclusion remains a non-event, and it supports the finding that effective leadership, a focus on behaviors, and the use of a comprehensive program to prevent personal harassment contributed to the smooth transition. It also provides some additional contextual factors that help explain the social evolution of the CF throughout the 1990s and 2000s, including effecting policy and program changes to address employment of women in combat roles; increasing representation of women, Aboriginal Peoples, and visible minorities at all ranks; accommodating a range of religious belief systems and associated practices; and confronting the fallout from criminal behaviors during the Airborne deployment to Somalia.  Underlying these changes were the beliefs that the central issues pertained to culture and identity, key principles mattered more than rule changes, and leadership would play a strong role in realigning existing military culture.

Culture, principles, and leadership have retained their central importance as the CF has continued to evolve from 2000 to 2009 in response to broader social trends and internal expectations.  A significant illustration of the development of CF institutional approaches

68

toward its gay members can be seen in the formal outreach initiatives with gay and straight members in uniform representing the CF in Pride Parades. Research about current attitudes suggests a significant shift from those reported 15 years earlier, with general acceptance of both the policy and gay members in uniform, although a degree of perhaps premature complacency was noted among some older CF members.

The final updated information provides some glimpses into the views and perspectives of the gay community within the CF. The issues that were raised were related to: dealing with identities that the institution has made invisible; feeling isolated as a minority that does not have the same status or supports afforded other sub-groups; lacking confidence in the current mechanisms of procedure for complaints in the event of wrongdoing; and difficulties confronting the minority of colleagues who do not, will not, or cannot understand the nuances of gender or sexual identity or the privilege given to the dominant heterosexual community to define what is "normal." Conversely, there are indicators that some are having success in their careers, and there were no significant indications that the CF was lagging behind society as a whole. While some are still reluctant or cautious in bringing their personal life into their professional domain, the comments by researchers and some gays in uniform suggest there is an expectation that all individuals should be judged solely on competence and performance and that identity should not be a factor. Using a common model for assessing inter- and intra-group relations, this expectation reflects a desire by gays in uniform to move from marginalization to integration rather then assimilation (loss of meaningful personal identity) or separation (loss of meaningful institutional role).[134]

In assessing the continued evolution of the CF, it would appear that the institution is currently in a phase of engaging gays but demanding their conformity; ultimately, it may progress to a phase in which it embraces a range of worldviews and appreciates the strengths and benefits of such a position.  Whether or not it does so depends on four factors: the continued evolution of broader social norms and expectations within Canadian society; the scarcity of talent and need to be more proactive in recruitment and outreach; the implications of new security missions in nations such as Afghanistan; and the continued redefinition of the ideal soldier, from "combat male-warrior" to "soldier-diplomat," "soldier-scholar," and "soldier-Samaritan."

## III. AUSTRALIA

In June 1993, seven months after the Australian ban on homosexual service was lifted, the U.S. General Accounting Office conducted interviews with ADF officials to document early outcomes associated with the change.[135] The short overview of the policy change concludes with a summary statement based on comments from an Australian official who stated that, "although it is too early to assess the results of the revised policy, no reported changes have occurred in the number of persons declaring his or her sexual preference or the number of recruits being inducted. Effects on unit cohesiveness have

not yet been fully determined. However, early indications are that the new policy has had little or no adverse impact."[136]

In February 1996, the U.K. Ministry of Defence completed a report documenting the findings of its "Homosexuality Policy Assessment Team" that investigated homosexual personnel policies of a number of foreign militaries. A research team was sent to Australia to meet with representatives of the Royal Australian Air Force, Royal Australian Army, and Royal Australian Navy, as well as with Dr. Hugh Smith of the ADF Academy, and service psychologists at ADF headquarters in Canberra. The British team reported that service staffs believed the change had not resulted in any notable problems for military functioning.  Following an initial outcry, said the report, homosexuality became a "non-issue" and the difficulties of integrating open homosexuals were described as "just another legitimate management problem."[137]

In 2000, the Palm Center reviewed all available data pertaining to the lifting of the ban in Australia. It found that the transition did not lead to "any identifiable negative effects on troop morale, combat effectiveness, recruitment and retention, or other measures of military performance."[138] Some evidence suggested that the policy change may have contributed to improvements in productivity and working environments for service members. Key findings included the following:

- Prior to the lifting of the ban, ADF service chief argued that allowing homosexuals to serve openly would jeopardize recruitment, troop cohesion, and

71