# Appendix of Evidence in

# Support of Log Cabin Republican's

# Opposition to Defendants'

# Motion for Summary Judgment

## LCR Appendix Pages 1201-1329

## (Part 12 of 19)

combat effectiveness while also spreading AIDS and encouraging predatory behavior

- Senior officials, commanders, and military scholars within the ADF consistently appraise the lifting of the ban as a successful policy change that has contributed to greater equity and effective working relationships within the ranks.

- Senior officials, commanders and scholars report that there has been no overall pattern of disruption to the military. Recruitment and retention rates have not suffered as a result of the policy change. Some individual units have reported disruptions that were resolved successfully through normal management procedures.

- While the lifting of the ban was not immediately followed by large numbers of personnel declaring their sexual-orientation, by the late 1990s significant numbers of officers and enlisted personnel had successfully and largely uneventfully come out to their peers.

- Gay soldiers and commanders successfully served in active deployments in East Timor. Many of them describe good working relationships in an environment that emphasizes capable and competent job performance under uniform rules of conduct for all personnel.

- Complaints regarding sexual orientation issues comprise less than 5% of the total complaints received by the ADF of incidents of sexual harassment, bullying, and other forms of sexual misconduct. Of 1,400 calls received by an anonymous "Advice Line" maintained by the ADF to help personnel and commanders manage potential misconduct issues since this service was initiated in August

72

**LCR Appendix Page 1201**

1998, 17 (1.21%) related to sexual orientation issues. To the degree that harassment issues continue to exist in the Australian Forces, most observers believe that problems faced by women soldiers are more serious than those faced by gay personnel.

Consulting experts in Australia offers evidence that cohesion and morale are enhanced by the transition to equal treatment. Australia's human rights commissioner said he believed his country's termination of the ban had positive effects on the military. "It's bad for morale to have your guys snooping on others of your guys," he concluded.[139] This conclusion is borne out by evidence from gay service members, who reported after the ban ended that the liberalized policy allowed them to spend less energy monitoring what they and others said and more focusing on their work. One Army captain, Squadron Leader Chris Renshaw, who later became Senior Marketing Officer for Defence Force Recruiting, said that under Australia's new policy, "you can be more honest. That's one of the key things about being in the military—honesty and integrity. Because you haven't got to worry about if someone's saying something behind your back, or is someone gossiping or something, because if they gossip, I don't care. So I'm more focused on my job, I'm more focused on what I'm achieving here, and less worried about [rumors] and what people think. In terms of productivity, I'm far more productive now… Everything's out in the open, no fear, no nothing, no potential of blackmail, no security implications... nothing."[140] Renshaw spoke of the positive impact of the new opportunity for casual banter, so much a part of the military bonding experience. Planning to take his male partner to the Christmas party, he told his superior as a courtesy. "He just looked at

73

me with a bit of a pained expression and said, 'I expect you to behave.' And I just sort of looked at him and said, 'Look, knowing the other people that work on this floor and how they behave with booze, you're worried about me?'"[141]

An enlisted member of the Royal Australian Navy echoed the importance of teasing as a form of bonding, and the positive role of joking even about sexual orientation: "I'm quite open about my sexuality. Sometimes the boys decide to give me a bit of a ding-up with a joke or something like that, but that doesn't bother me. We work really well together, and I'm sure it's the same for other gay and lesbian soldiers and sailors who are out, and they're accepted by their peers. O.K.—they're the object of ridicule sometimes, but everybody is." Military experts must surely understand how central it is for young people in the armed forces to navigate their relationships, in part, through playful insults and one-upmanship, at times becoming caustic or even aggressive. It's no secret that the military functions as a proving ground, both as part of the training process and apart from it. Yet many of these experts have cherry-picked instances of gay-straight tension and cast them as dangerous examples of social strife, when in fact it is part and parcel of the military bonding experience.[142]

The director of the ADF's Defence Equity Organisation, Bronwen Grey, reported that despite early fears of deleterious consequences, the lifting of the gay ban had no adverse effects on the capability or functioning of the Defence Forces. Following implementation, she said, "Nothing happened. I mean, people were expecting the sky to fall, and it didn't. Now, a number of gay people probably didn't come out at that point, but we've had an

X.O. of a ship come out and say to the ship's company, 'I'm gay,' and, quite frankly, no one cared. There was no increase in complaints about gay people or by gay people. There was no known increase in fights, on a ship, or in Army units" and the "recruitment figures didn't alter." She said that Commanders "were watching out for problems" but "they didn't identify any. Now that doesn't mean there weren't any, but they didn't identify any. Grey summed up the transition this way: "All I can say is, from the organizational point of view, while we were waiting for problems, nothing happened. There were no increased complaints or recruiting [problems] at all. I mean nothing happened. And it's very hard to document nothing."[143] An openly gay squadron leader, Michael Seah, said that he served actively in what is widely considered to be one of Australia's most successful military deployments in recent years—the United Nations peacekeeping operation in East Timor.[144] Another gay soldier commented, "Looking at the current operation in East Timor, I've got a number of gay and lesbian friends in an operational situation. I have served in Bougainville, and there is no problem."[145]

Some indication of the success of the ADF's transition comes from an interview with Commodore R.W. Gates, a senior warfare officer with substantial command experience and widespread familiarity with deployments. At the time of the interview in 2000, Gates had been in the Royal Australian Navy for twenty-nine years, having commanded a number of frigates and served in policy positions in the personnel division at Defence Headquarters in Canberra. He was subsequently promoted to Commodore in the Joint Personnel area in Career Management Policy, and later became Director General of Career Management Policy. Like other observers, the Commodore described mixed

75

opinions and strong emotions within the Forces at the prospect of allowing homosexuals to serve openly: while nobody would deny that homosexuals existed in the ADF, whether they should "declare" their orientation was another matter. When the policy did change, serious protests all but disappeared, and formerly closeted personnel stepped forward successfully and largely uneventfully. "I must admit," said Gates, "after it happened, it's been an absolute non-event. We've had some major cases of people declaring. Probably the most that I recall... would be one of our executive officers of a destroyer, the second-in-command. He declared. And, I'll be frank, it created a bit of a stir. We're talking about a mid-rank lieutenant commander in an absolute critical position on board a major warship, one heartbeat from command... That person under the new policy was certainly not removed from the ship, and in fact completed his full posting." The Commodore attributes the largely successful transition to a broader effort on the part of top officials in the Navy and the ADF to develop aggressive new training protocols to minimize harassment and maximize equality of opportunity.[146]

Dr. Hugh Smith, a professor at the University of New South Wales at the Australian Defence Force Academy, echoed Gates' judgment. A leading academic authority on military personnel policy, Professor Smith said that the lifting of the ban did not lead to any significant effects on military performance, combat effectiveness, or unit cohesion. Like other respondents, he characterized the outcome of the policy change as a virtual "non-issue," with little remaining salience in government, media, or military circles. The lack of quantitative empirical data regarding the policy change constituted, in his opinion, a form of evidence. In Professor Smith's words, "This is not a subject that has troubled

76

the Defence Force to the extent that they have felt that studies have needed to be done on it. The lack of evidence is evidence."[147] He explained that when government ordered the military to lift the ban, some officers said, "Over my dead body, if this happens I'll resign." However, Smith said that there were no departures and that the change was accepted in "true military tradition." To the degree that problems of sexual misconduct and harassment continue in the ADF, Professor Smith indicated that they are mostly related to the treatment of women in the ranks and incidents of hazing (referred to as "bastardization") in the Academy.[148]

In 2000, retired Major General Peter Philips was president of the Returned and Services League (RSL) of Australia, a major veterans group similar to the American Legion. In 1993, the RSL was an ardent opponent of proposals to lift the ban, arguing that doing so would jeopardize morale, unit cohesion, performance, and decency in the Armed Forces and would hasten the spread of AIDS. Asked whether any of these problems had come to pass, he told researchers that openly gay service has "not been a significant public issue. The Defence Forces have not had a lot of difficulty in this area."[149] Probed for evidence suggesting that allowing homosexuals to serve impaired military performance, combat effectiveness, or unit cohesion, he replied, "If the issue had arisen, it would have in [peacekeeping operations in] East Timor. I haven't heard of any gay issues in that."[150]

Major General Philips acknowledged that some gay personnel had come out to peers but disagreed with assertions made by some groups that there were significant numbers in combat units. Journalist David Mills, who interviewed service members for several

stories dealing with same-sex partner benefits and combat service in East Timor, gave a conflicting account. For his investigation of East Timor, Mr. Mills spoke with gay soldiers who had served actively. He was aware of seven or eight active duty soldiers serving in East Timor who self-identify as gay, and he interviewed an enlisted Army soldier who worked as a firefighter. In 2000 he reported, "I spoke with a guy who is serving in the Army, a six-month stint in East Timor, speaking about his experiences. He was an interesting guy who said there is a lot less homophobia in the Armed Forces than you might think, although he was pretty selective about who he was open about his sexuality with... He said he didn't have any problem with that [coming out] whatsoever, although there was an element of surprise when he told people."[151]

By 2009, the RSL had withdrawn its opposition to openly gay service. Retired Major General Bill Crews, its former president, said that year that concerns about morale and AIDS had not panned out. "I was there in the early days of it," he said. "I thought there'd be a continuing problem because of prejudice that exists in parts of the community." He said, "I don't see any evidence now that homosexuals are in any way discriminated against. A homosexual can be just as effective a soldier as a heterosexual."[152]

In the spring of 2009, 100 active-duty service members, including at least one general, marched in Sydney's Gay and Lesbian Mardi Gras Parade holding an ADF banner. Chief Petty Officer Stuart O'Brien, who has served in the navy for nearly 20 years, reported that he worked shoulder to shoulder with U.S. military personnel in Baghdad in 2006, and that being openly gay was not an issue in those or other operations. "They valued the

work that I did and that's all that it comes down to at the end of the day," O'Brien told the Associated Press in 2009. "Sexuality has nothing to do with anything any more within the services."[153]

Neil James is executive director of the Australian Defence Association, a non-partisan, independent national security think tank. He is a graduate of the Royal Military College, served in the Australian Army for more than thirty years, and is the author of numerous ADF and Army operational manuals and journal articles on the Australian military. James' 2009 assessment of the ADF policy change was that it was uneventful besides some surprising disclosures of the sexuality of high-level officers. "Everyone said, 'Good heavens, that's a bit of a surprise,' and after five minutes the conversation reverted back to football," he said. "After a while it was met with a collective yawn."[154]

Currently the ADF recognizes a range of same-sex relationships on generally equal footing with married relationships.  As of December 2005, the military agreed to grant same-sex couples in recognized "interdependent partnerships" the same rights and privileges afforded to members with other types of dependants, such as a spouse or children.  To gain ADF recognition of an interdependent partnership, members must prove they maintain a common household with their partner (who may be of the same or opposite sex but is someone to whom they are not legally married), and that they have lived together on a permanent basis for at least 90 continuous days.[155]  Once a service member has proven the existence of such an interdependent partnership, the couple are entitled to receive the same benefits as legally married couples, including income support

79

and relocation, housing, education, and/or travel assistance.[156] Recently Australia's largest community-based LGBT health organization partnered with other groups to launch "Pride in Diversity," a not-for-profit program created to assist Australian employers with the inclusion of LGBT employees.  The Department of Defence joined with a number of other prestigious Australian employers, including the Australian police force, to become a foundation member of the program.[157]

*Conclusion*

In 1992 when a government committee recommended the ADF drop its gay ban, the full government voted to end the policy and Prime Minister Paul Keating ordered that the policy change be implemented immediately across all services of the ADF. In place of the previous ban, the government issued a more general instruction on "sexual misconduct policy." Among other provisions, the new instruction referred to unacceptable conduct without making a distinction between homosexuality and heterosexuality. Rather than define what was unacceptable based upon sexual orientation, the new instruction prohibited any sexual behavior that negatively impacted group cohesion or command relationships, took advantage of subordinates, or discredited the ADF, and provided commanders with latitude to judge whether a certain behavior was acceptable or not in a certain context.

Assessments by the U.S. General Accounting Office, the British Ministry of Defence, and the ADF itself all found that the change in policy has been successful and has not led to

80

any perceptible decline in operational effectiveness, morale, unit cohesion, retention, or attrition. In fact, ADF officials and independent observers believe that changes associated with the policy have contributed to a working environment that is freer from the burdensome and unproductive consequences of mistrust, misunderstanding, and misjudgment that at times compromised the integrity of units in the past.

In the decade following the policy change, some concerns remained about uneven and partial implementation of the policy, and about isolated instances of discrimination and harassment, which also disproportionately affected heterosexual women. More recently, however, the fact that the debate over gays in the military has shifted away from the question of whether homosexual soldiers undermine military performance and toward a practice of treating all members according to a single standard also stands as a testament to the success of the inclusive policy.

## IV. SOUTH AFRICA

In 2000 the South African Department of Defence undertook a major study to fully assess the environment for gay and lesbian personnel in the military. An in-depth survey was completed by 2,648 regular force members. The survey report noted that many respondents were undecided on many survey questions, and that there was often a large disparity between the attitudes of various subgroups within the SANDF regarding gays and lesbians. On many issues, officers, whites, personnel from the military medical

81

service (SAMHS), and personnel in the Office of the Secretary for Defence held more pro-gay attitudes than Africans, members of the Army, and members with lower ranks (Results N.D.).[158]

Overall the results suggested that the transition had proceeded with great success despite military opinion remaining mixed. Only a quarter of the respondents agreed with the statement, "I feel good about the integration of gays in the military" while nearly a half disagreed. Just over a quarter were "undecided." The question leaves unclear whether those who did not feel good about the integration of gays were opposed to service by gays or felt the climate for gays in uniform was simply not positive. However, half of respondents agreed with the statement, "I do not mind my co-worker being a gay or a lesbian" while only a third disagreed. More respondents were opposed to having a gay commanding officer than were in support (43% to 41%) even though a larger number disagreed with the statement, "Gays and lesbians as leaders do not command the same respect and obedience from subordinates as heterosexual leaders" than agreed with it (40% to 34%). Interestingly, a plurality of respondents agreed that gays in uniform would "undermine social cohesion. Only a third thought gays and lesbians were "morally weaker" than heterosexuals, while nearly two fifths disagreed with this statement.[159]

While these opinion polls are inconclusive, this fact in itself is illuminating, since the overall research indicates a successful transition to openly gay service. In 2003, the Palm Center conducted a study that found that the integration of gay and lesbian personnel into SANDF had been achieved without any significant impact on effectiveness. The study,

82

based on interviews with over two dozen experts and a comprehensive review of all

relevant government documents, newspaper articles, academic studies, and other

materials, found the following:

- The integration of gays and lesbians in the SANDF has had little or no impact on recruitment, retention, morale, unit cohesion, or operational effectiveness.

- Some gays and lesbians who served in the apartheid era military (pre-1994) were subject to aversion shock therapy, chemical castration, hormonal and drug therapy, and other forms of abuse and torture.

- While anti-gay attitudes still exists at the level of the unit and in more rural areas, there has been a steady improvement in attitudes towards gays and lesbians in the SANDF. When expressed, anti-gay sentiment has been subtle in its expression and has not involved overt acts of harassment, discrimination, or anti-gay violence.

- There is no significant public opposition to the policy of integration.

- There has been no mass coming-out as a result of the policy change, but gays and lesbians within the SANDF report an increased level of comfort and are increasingly viewing the SANDF as a career option.

- The SANDF initially included a statement of non-discrimination against sexual minorities in its policy on Equal Opportunity and Affirmative Action, but is now in the process of adopting a separate, stand-alone, and much more detailed policy on sexual orientation in the SANDF.

83

- The SANDF is in the process of eliminating all residual bias against sexual minorities in subsidiary policies. Same-sex "life-partners" now have equal access to health benefits.

- Racial integration occurred at the same time as the integration of the sexual minorities within the SANDF. Racial integration has been a far more difficult process than the integration of sexual minorities.

**Effect of Integration on Anti-Gay Attitudes**: Numerous military officials reported that there is now "zero discrimination" in the SANDF against gays and lesbians. "No incidents of blatant harassment or discrimination based on sexual orientation . . . or violence against gays and lesbians… have been reported to Equal Opportunities Chief Directorate since the Equal Opportunities policy was adopted," according to Colonel Jan Kotze.[160] This sentiment was echoed by those outside of the military who monitor these issues. Thandi Modise is the Chairwoman of the Portfolio Committee on Defence in the South African Parliament. "You just don't hear the stories that we used to hear before 1994 of the levels of intolerance for gays," Modise says. "If there are incidents, they are very few and far between… because I don't hear about them."[161] Advisor to the Defence Minister, Sue Rabkin, reported that anti-gay discrimination "certainly hasn't affected anyone I've heard about, and usually these things travel. I get quite a lot of information and I haven't heard a peep."[162] Evert Knoesen monitors discrimination complaints both in his position on the Minister's Advisory Board and as director of the Equality Project. Since integration, the only complaints he is aware of have dealt with residual discrimination in employment policies—pensions or health benefits, for example. "These

issues have all been cleared away," Knoesen states.  While he thinks it is possible that gay or lesbian personnel might not report harassment or violence easily, he concludes "that if people are prepared to complain about [pensions or health benefits], then if they had been physically assaulted or something like that we probably would have heard about it, or at least some of it."[163]

Generally the law remains ahead of social attitudes in South Africa.  The policy enjoys very strong support among military and governmental leaders, but there is still a residue of anti-gay sentiment.  That sentiment seems to be concentrated in the following locations: 1) among an older cadre of soldiers.  "You do have people from the old school who have trouble accepting the sexuality of other people," M.P. Thandi Modise concedes[164]; 2) among lower level management and at the level of the unit.[165]  If there is still a problem, Evert Knoesen concludes, "it is among the lower ranks"[166]; 3) in rural areas and among commanding officers from rural homeland armies.  How much the culture of the military has changed since integration, according to archivist Anthony Manion of the Gay and Lesbian Archives, "depends a lot on where you are in the country at the time."[167]  Evert Knoesen concurs:  "Most of the people who serve in the defence force are from rural and impoverished areas, and they have very little exposure to lesbian and gay issues."[168]

*Effect of Integration on Operational Effectiveness*: Overall, informants agreed that the integration of gay and lesbian personnel has not had a negative impact on recruitment and retention, morale, unit cohesion or operational effectiveness in the SANDF.  Heinecken

reports that in the SANDF (as in the United States) commanders found that gay service members conducted themselves professionally and "their sexual preference did not detract from their ability to perform their work successfully."[169] Thandi Modise, who is a Member of Parliament with considerable expertise on military issues as the Chair of the Parliament's Portfolio Committee on Defence, asserts that "the effect on morale has only been positive because members of the defence force do not have to hide."[170] Colonel Jan Kotze concurs, stating that "diversity contributes towards increased morale, unit cohesion, and ultimately mission readiness."[171] Colonel Rocklyn Williams, Director of the Defence Program for SAFER-Africa, a South African think-tank, and a former SANDF commander, simply concludes that the integration of gays and lesbians into the SANDF has had "no impact whatsoever" on operational effectiveness.[172]

Military experts and outside experts commonly asserted that the integration of gay and lesbian personnel has been more or less a non-issue, dwarfed by challenges of much greater magnitude. The integration of several different forces has proved hugely difficult, as has racial and gender integration.[173] All of this has had an impact on mission readiness for the SANDF, "but this is not related to lesbian and gay people," says Evert Knoesen.[174] "When the SANDF was formed there were so many other issues," concurs Heinecken, "integrating seven different forces into one, the end of conscription, racial transformation, and all of these things override the issue of gays and lesbians in the military." She concludes: "This has not been a major issue."[175] Democratic Party MP and Defence Committee member Hendrik Schmidt states: "Operational effectiveness has been affected by a number of other factors, but I wouldn't isolate [the integration of gays and lesbians]

86

as being one of them."[176]  Rocklyn Williams concurs: "Gay and lesbian issues are the least of people's worries," he says.  "The force has had to rise up to the most monumental challenges."[177]

Democratic Party MP James Selfe, is a former member of the Portfolio Committee on Defence. While he agrees that there are some soldiers who are unhappy about gays in their units, he states that these attitudes have no impact on mission readiness or operational effectiveness:

> I happen to know that there is an old Guard within the SANDF . . . who have what might be called an attitude problem with regard to integrating gays and lesbians into the defence force.  I think these people disapprove of the policy, they find it irritating or offensive.  But I don't think that this would affect the operational effectiveness of the defence force.  It is a disciplined environment.  Your personal feelings are less important than might be the case in other organizations.  Orders are orders and you have to make the best job of it.[178]

Other research subjects stated that gay integration had very little impact on mission readiness or operational effectiveness because of the relatively small number of soldiers involved.  (As a point of contrast, the South African military has gone from being a predominantly white to a predominantly black force in a matter of a few years.)  Colonel Rocklyn Williams concludes that "because most gays in uniform keep their sexual orientation to themselves, it is not something that surfaces very often."[179]  Henry Boshoff concurs that the integration of gays and lesbians in the SANDF "has had almost no impact because it is a small group of people."  Similarly, Colonel Raymond Marutle, the Military Attaché at the South African Embassy in Washington D.C., assesses the impact of the new policy on gays and lesbians on the SANDF as "none whatsoever," and attributes that to the fact that the "percentage of gays and lesbians [in the SANDF] is

87

low."  Boshoff further argues that the integration of gay and lesbian service members has not been disruptive because the policy "has been implemented in a very professional and discrete manner."[180]  Marutle says similarly that "there is no overall negative picture that one could paint of this policy" and that both "non-gays and gays are happy with this policy."[181]

As a result, there is virtually no public opposition to the policy integrating gays and lesbians into the SANDF.  Even the African Christian Democratic Party, which spearheaded opposition to the inclusion of sexual orientation in the Constitution and has been vocal in the past in its opposition to gays in the SANDF, has retreated from this position.  "We don't have a problem with gays and lesbians in the SANDF," says Mighty Madasa, Member of Parliament and Defence spokesperson for the ACDP, "everyone has a right to work."[182]  Asked to identify other political actors in South African who oppose the open service of gays and lesbians in the military, Madasa stated: "there aren't any."[183]

It is noteworthy that most of the people interviewed for this study stressed the homophobic nature of South African society. Opponents of openly gay service in the U.S. frequently maintain that successes in other nations are irrelevant to the U.S. because other countries have more pro-gay climates. But as sociologist Jacklyn Cock writes, "homophobia is intense and widespread in post Apartheid South Africa," despite the Constitution. "Gays and lesbians continue to be denied cultural recognition and are subject to shaming, harassment, discrimination, and violence."[184]  Nevertheless, the policy of openly gay service has been broadly deemed a success, a conclusion borne out

88

by other research showing that prejudice, whether against racial minorities or sexual minorities, does not need to be abolished in order for policies of integration to work effectively.[185]

Jody Kollapen, Director of the South African Human Rights Commission, states that the policy has been successful in that it has "aligned the military's policy with the Constitution," and that it provides a clear, understandable benchmark "against which acts of discrimination can be judged."[186]  Graeme Reid concurs that the policy "has changed the parameters" such that "it is not okay to be overtly discriminatory."[187]  Further, Kollapen credits the new policy with creating an atmosphere were issues of gay and lesbian equality can be taken up within the SANDF.  "Previously there wasn't even room for this discussion," Kollapen asserts.[188]

Moreover, while more can be done to increase tolerance within the SANDF, major inroads have been made.  "A significant number of Defence Force members are now willing to serve with lesbian and gay personnel," says Knoesen, "and the majority of the officer core has accepted this change."[189]  Perhaps most significantly, the policy has made a difference in the lives of gay and lesbian personnel.  "I think that the policy has had a strong impact," Reid asserts, "having official protection makes all the difference."[190]  Evert Knoesen emphasizes not only the magnitude of the transformation the military has undergone, but in how short a time span:

> Eight years ago it was illegal to be in the Defence Force and be a homosexual.  Now it is illegal to discriminate against someone who is homosexual in the Defence Force. The kind of impact that this has on the emotional experience of a homosexual in the Defence Force is very

89

significant. It takes you from the experience of being unwanted to the experience of self-validation.[191]

*Conclusion*

The SANDF, along with South African society generally, have undergone massive transformation since 1994, and the integration of gays and lesbians in the military has been a relatively easy part of that transformation. This report concludes that the integration of sexual minorities has been achieved without any negative consequences for the South African military. There has been a significant decrease in violence, harassment, and discrimination directed towards sexual minorities. The policy of integration has achieved the support of military and governmental leaders and the officer core, and is steadily gaining in acceptance among lower ranks.

In contrast to the situation in the United States, in South Africa laws pertaining to gay and lesbian people are far ahead of social attitudes. "Homosexuality is permitted by law," Lindy Heinecken concludes, "rather than accepted."[192] Because of this, the South African case is a striking example of how leadership at the highest levels can transform a military culture that is much more hostile to gays and lesbians than our own. As recently as the 1970s and 1980s, the SADF permitted human rights abuses against some gay and lesbian service members—including shock treatments, chemical castration, drug therapy, and even gender reassignment surgeries. Today, while certainly not all vestiges of anti-gay attitudes have been eliminated within the military, the DOD has taken major strides

90

towards creating an environment within the military in which gay and lesbian personnel feel safe and want to work. This dramatic transformation has been achieved both by sending a message of "zero tolerance" for anti-gay harassment, discrimination, and violence throughout the command structure, and where possible, putting a few key gay and lesbian leaders both inside and outside the military in a position to monitor the policy.

It is also important to note that the integration of gays and lesbians has been made at no cost to the military in terms of operational effectiveness. Both gender and racial integration have been vastly more difficult for the SANDF. Indeed, that racial integration has been so much more problematic for the SANDF than the integration of gays and lesbians raises some interesting historical comparisons. When the U.S. military integrated racially in the 1940s, the U.S. was one of the most racist societies in the world—more so than South Africa at that time, with Jim Crow in the South every bit as severe as apartheid would later become. Despite the fact that the U.S. military was far ahead of social attitudes regarding race relations, racial integration was and continues to be a huge success. (Indeed, members of the SANDF now attend training at the U.S.'s Defense Equal Opportunity Management Institute.)

The racial integration of U.S. forces after World War II is of course parallel to what the SANDF is now undertaking. But the SANDF is also undertaking the integration of sexual minorities *at the same time*. By all accounts, this latter project has been far less difficult for the SANDF—even in a country where social attitudes regarding

91

homosexuality are far from progressive.  All of this suggests that the integration of gays and lesbians into the U.S. armed forces—after that institution has already achieved dramatic success in terms of racial integration, and in a society where, *in sharp contrast to South Africa,* social attitudes are in many ways more progressive than the law—could be carried out relatively easily, without significant cost in terms of military readiness or operational effectiveness.

## V. ISRAEL

In 1993, U.S. government and academic researchers studied the Israel Defense Forces by reviewing data and conducting interviews with embassy and IDF officials, active and reserve military personnel, scholars, Israeli lawmakers, and civil rights groups.  The researchers from GAO and Rand found that Israel's long-standing informal inclusion of homosexuals in the military had neither created internal problems nor jeopardized combat units.  Officials interviewed for the GAO report stated that homosexual soldiers performed as well as heterosexual soldiers.  Based on the officials' experience, homosexual soldiers had not adversely affected "unit readiness, effectiveness, cohesion, or morale."  Security personnel noted that homosexual soldiers were able to hold security clearances without posing an unnecessary security risk.[193]

Reuven Gal, the director of the Israeli Institute for Military Studies, wrote in a 1994 assessment of the policy transition that, "According to military reports, [homosexuals']

92

presence, whether openly or clandestinely, has not impaired the morale, cohesion, readiness, or security of any unit.  Perhaps the best indication of this overall perspective is the relative smoothness with which the most recent June 1993 repeal of the remaining restrictions on homosexuals was received within the IDF and in Israeli society as a whole."[194]  Even, or perhaps especially, in the context of a country continuously at war, unrestricted participation in the military by sexual minorities serves to bolster the core Israeli value of common defense of the nation rather than threaten military cohesion or morale.

A 1999 article on gays in the military published in the IDF news magazine *Bamahane* includes comments from seventeen heterosexual soldiers about their attitudes toward having a gay commander.[195]  Two of the seventeen soldiers interviewed for the *Bamahane* article felt that serving under a homosexual commander would constitute a problem for them.  One soldier explained that "The truth is it would be a bit strange for me.  Not that I am primitive or homophobic, but among my friends there aren't any gays.  I would try to get used to the idea and if I did not succeed I would request a transfer.  I do not think that gays are less good, but it would be a bit difficult or strange for me."  The rest of the respondents stated that the sexual orientation of their commanding officer would not make a difference to them.  For instance, one respondent said, "I respect gays a lot.  There is no problem with their service in the Army.  It is none of my business if my commanding officer is gay.  If he has already decided to participate this does not have to interfere with work."[196]

93

Three soldiers expressed some concern about showering with a homosexual solider, although they stated that in general they did not have a problem with gay soldiers. Second Lieutenant Gal in Human Resources explained his feelings: "I don't have anything against homosexuals in the army. They're citizens of Israel like you and me. The sexual orientation of the workers around me doesn't interest me. It does interest me if his output suffers from it, maybe if it bothers him and he needs help. I wouldn't shower with him. There are cubicles here [at the officer's training base]." Eight of the respondents stated that they have no problems showering with sexual minorities. Dima, an officer, expressed the prevailing view of the respondents who brought up the issue: "They're citizens of the state, like all the other citizens. I think that even if they have a different sexual orientation, that doesn't have anything to do with hateful feelings. I don't have a problem showering with [homosexuals]. It seems to me that it wouldn't be a problem."[197]

In 2000, the Palm Center conducted a literature review, bolstered by interviews with three dozen experts on all sides of the debate over gay service in the IDF. None of the experts located could recount any indication that the lifting of the gay ban compromised military effectiveness. Several remarks from the experts interviewed make this case. Professor Stuart Cohen, a Professor and Senior Research Fellow at the Center for Strategic Studies at Bar-Ilan University who has written extensively on the Israeli military, reported that, "as far as I have been able to tell, homosexuals do not constitute an issue [with respect to] unit cohesion in the IDF. In fact, the entire subject is very marginal indeed as far as this military is concerned".[198]

94

One female soldier who served in the IDF between 1993 and 1996 was asked if she had experienced any problems because of her sexual orientation.  She stated: "I was quite amazed to find out that people either thought that my sexual orientation was 'cool' or were indifferent to it."[199]  That experience was echoed in an ABC News interview with Israeli Brigadier-General Oded Ben, when he commented that Israelis show "a great tolerance" with respect to homosexual soldiers in the military.[200]

Amir Fink, the co-author of *Independence Park: The Lives of Gay Men in Israel,* argues that the IDF policy changes, among larger societal changes, have resulted in a more open attitude in the military. Fink believes that, "after the 1993 change in regulations there are more soldiers who are aware of the fact that there are gays in the unit and [that] they should treat them decently."[201]

Available evidence suggests that many homosexual soldiers choose not to disclose their sexual orientation while in the IDF. This is consistent with research from other nations showing that, even when gay bans are lifted, they do not result in a mass coming out. Danny Kaplan is a cultural psychologist at Ben Gurion University and Bar Ilan University in Israel, whose expertise is Israeli military culture and sexuality.  His 2003 book, *Brothers and Others in Arms: The Making of Love and War in Israeli Combat Units,* explores military culture in Israel through the prism of the dozens of gay veterans he interviewed. Kaplan states that, "although some [homosexual service members] came out to close friends in their unit, as a whole they did not disclose their dispositions

95

**LCR Appendix Page 1224**

publicly in the context of their combat platoon."[202]

The impact of ending gay bans has nevertheless been shown to have positive impacts on gay and straight troops, as it relieves people of the burden of concealment, suspicion, and distrust. A woman who decided to bring her partner to one of her base's social events in 1997 explains that "the decision was preceded by consultations with my professional commander… He recommended to me quite warmly not to hide my sexual orientation and promised to support me professionally if there were any problems following my revelation."[203] One scholar found that military personnel generally reported positive responses to their coming out. In a 1997 interview with a uniformed soldier at a gay pride march, he was told that appearing in uniform did not cause problems with military officials: "Not at all. I can come here in uniform. The military command is accepting of [gay and lesbian soldiers]"[204]

A tank corps soldier reported in 1999 that "I have not had any problems being gay. On the contrary, in my base we had a large gay contingent. You would come to the base, and you know one other gay person, who knows another gay person, etc… In my basic training, people knew that I was gay and it was enough that there was one homophobe in my unit… After that, I had nothing to be afraid of.[205] A June 2000 Israeli television broadcast that was sanctioned by the IDF featured homosexual active-duty and reserve soldiers discussing their experiences of being gay in the military.[206] Another officer said she had no problems rising through the ranks as an out lesbian. When asked how overall attitudes had changed from before the 1993 policy change, the major replied: "I have felt

a change for the better, mainly in the attitude of security officers, but not as big a change (because not as big a change was needed) as it seems by the change in army regulations."[207]

These and other sources indicate growing openness. Although many homosexuals in IDF combat and intelligence units do not acknowledge their sexual orientation to peers, some known gays do serve in such units. Indeed, some IDF combat and intelligence units have developed a reputation as particularly welcoming to gay and lesbian soldiers.

The IDF does not conduct any special education or sensitivity training related to sexual orientation issues.  In contrast, the Israeli military provides training on sexual abuse of women and harassment of new immigrants and Mizrachim, Israelis of North African or Middle Eastern origin.[208]  One board member of Agudaht Zechuyot Ha-ezrach, Israel's primary gay-rights group, expressed overall approval of the military's policies toward sexual minorities but other scholars and representatives of gay rights groups have declared that the IDF could do more to address the concerns of sexual minorities in the military and that many soldiers are not aware of official policy.[209] The Israeli army currently recognizes the partners of gay officers and offers them benefits including next-of-kin rights.

In 2000, seven years after the ban was lifted, two scholars conducted in-depth interviews with 21 self-identified gay IDF combat soldiers and found that five of them (23.8%) were known to be homosexual by at least one other member in their combat unit.[210]  The same

97

year, the Palm Center administered a survey to 194 combat soldiers in the Israel Defense

Forces that included the following question: "Do you know (or have known in the past) a

homosexual or lesbian soldier in your unit"? The findings showed that 21.6% of

respondents knew a gay peer in their unit, and an additional 19.6% may have known a

gay peer in their unit. Even in combat and intelligence units with known gay soldiers,

however, we found no evidence of deterioration in cohesion, performance, readiness or

morale.  Generals, ministry officials, scholars, and NGO observers all have claimed that

their presence has not eroded cohesion, performance, readiness or morale.[211] As Kaplan

stated in his 2003 book, Israeli soldiers "served on the frontline" and were "full

participants in the military enterprise and were seen as such by their peers."[212]


In 2007 an official and former IDF officer re-confirmed that the policy transition had

been smooth and uneventful.  "It's a non-issue," said IDF veteran David Saranga, Israel's

American consul for media and public affairs. "There is not a problem with your sexual

tendency. You can be a very good officer, a creative one, a brave one, and be gay at the

same time."[213]


In 2009, the *Associated Press* spent two months investigating the experiences of foreign

militaries with gay service.  The ensuing article concluded that today "Israel has had no

restrictions on military service," that officers are accompanied by their same-sex partners

at ceremonies and promotions, and that the policy of inclusion is "now considered

thoroughly uncontroversial."  It reported that "gays and lesbians—among them several

senior officers—serve in all branches of the military, including combat duty."  Yagil

98

Levy, a respected Israeli sociologist said that, "In this regard, Israel has one of the most liberal armies in the world."[214]  It is important to note that this openness exists despite the fact that Israeli society remains largely homophobic.  Despite legal protections for gay, lesbian and bisexual citizens, and despite the absence of a robust "culture war" involving religious and cultural conservatives, the culture continues to frown on homosexuality as falling outside the mainstream of national and religious expectations for the state of Israel.

How far Israeli (military) culture has come in acceptance of homosexuality is evident in the case of the Israeli military magazine *Bamahane*.  Nine years ago, in 2001, the topic of homosexuality was so controversial that when the magazine ran a front-page article about a gay colonel, the commander of the education corps ordered it shut down.  The magazine survived following an appeal to the defense minister.  Today, in contrast, the editor of the magazine, Major Yoni Schoenfeld, is an openly gay officer.  In addition, in honor of gay pride month in June of last year, the magazine published a series of features on gay officers, including a cover photograph of two male soldiers in an embrace.  No negative responses were received, nor were any subscriptions cancelled in response; in fact, the article received many positive responses.[215]  Criticism *was* leveled, however, by IDF Chief Rabbi Brigadier General Avichai Ronski, who wrote to the army's personnel department and education corps to say he found the topic of homosexuality inappropriate for a magazine whose purpose is to express the IDF way of life.[216]  Both the IDF and the magazine immediately distanced themselves from Ronski's position.  An IDF spokesperson stated, "The IDF assigns soldiers to posts based on military needs and the

99

soldiers' personal abilities, not based on their sexual orientation or their gender. Any statement to the contrary represents personal opinion and not official IDF policy."[217] *Bamahane* issued an official response saying that its magazine covers- and would continue to cover- the way of life of all IDF soldiers, including gay and lesbian officers; off the record, its staff was more blunt, saying they were simply "unfazed" by the rabbi's request.[218]

Schoenfeld reports that the difference in reactions across the eight years between the two incidents reflects increased tolerance that was partly a result of the more open policy. He reports that there is negligible friction in the armed forces stemming from the presence of open gays. He said his orientation was known when he served as a combat soldier and commander of a paratrooper company, and that it never became a problem. He described joking around the issue, but said it was generally not hostile. Acceptance of gays is smoother for people who conform to traditional notions proper gender roles, while "those who are more feminine in their speech and appearance have a harder time fitting in." His overall conclusion was that difference in sexuality is a natural occurrence and that once the presence of gays is allowed and acknowledged, "it's not a problem anymore."[219]

In a 2010 article published in *Foreign Policy* magazine, Danny Kaplan, the Israeli psychologist who studies military culture, writes that gay officers have been serving in the Israeli military for 17 years and their country is safer as a result.[220] The example of Israel, Kaplan writes, is particularly instructive as the Pentagon begins to consider the repeal of "don't ask, don't tell" in the U.S.

Kaplan begins his article by noting that the experiences of Israel and other countries allowing openly gay service show that the participation of gay soldiers poses no risk to military effectiveness.  He further makes the point that, "Policies restricting the participation of gay soldiers paradoxically make sexuality a more salient [and hence disruptive] issue" than when there is no restriction.  Many gay soldiers in combat units opt not to reveal their sexual orientation, whether or not restrictions are in place, and those who do often only do so when they are preparing to leave the force.  When gay soldiers are allowed to serve but not allowed to identify themselves as gay, anyone can be suspected of being gay, creating a climate of suspicion, paranoia, and harassment, as was seen to be the case in the U.S. military after implementation of "don't ask, don't tell."  In contrast, when gay soldiers can serve openly, most do not choose to disclose their sexual identity, and instead find ways to separate their personal and social identities amid an amalgamated military culture, in much the same way as soldiers of different ethnic and religious backgrounds do.  "They simply are what they are and find ways to function together," says Kaplan.[221]

According to Kaplan, the case of Israel can be instructive for the U.S. in numerous ways. For one, as is already well-established, "the mere participation of gays in combat units of the Israel Defense Forces has had no bearing on military performance and unit cohesion, whether or not soldiers come out."  Secondly, Israel's experience shows that casting the debate as a dilemma over how to accept "open gays" is misguided.  Sexual orientation has not become a source of disruption in the Israeli military because military authorities

101

**LCR Appendix Page 1230**

have treated it matter-of-factly rather than giving it special attention as a problem needing to be explicitly addressed.  The Israeli military has chosen a strategy to "officially acknowledge the full participation of gays and at the same time ignore them as a group that may require special needs." As a result, gays become integrated into military units by virtue of not being singled out, and all soldiers can focus on their common mission of defeating the enemy rather than on questioning their fellow soldiers.  If the U.S. were to chart a similar course, argues Kaplan, "it could enjoy not only a more liberal military, but also, perhaps, a more combat-effective one."[222]

### Conclusion

In comprehensive reviews of published evidence and interviews with all known experts on homosexuality in the IDF, no data emerged to suggest that Israel's decision to lift its gay ban undermined operational effectiveness, combat readiness, unit cohesion or morale.  In this security-conscious country, in which the military is considered essential to the continued existence of the nation, the decision to include sexual minorities has not harmed IDF effectiveness.  In addition, while no official statistics are available for harassment rates of sexual minorities in the IDF, scholars, military officials and representatives of gay organizations alike assert that vicious harassment is rare.  Despite the fact that the majority of gay combat soldiers do not appear to disclose their sexual orientation to peers, the Israeli experience supports the proposition that American military effectiveness would not decline if known homosexuals were allowed to serve.

102

Professor Laura Miller of the Rand Corporation has argued that although straight soldiers' reactions to open gays could undermine unit cohesion in the U.S. military, merely lifting the gay ban would not undermine cohesion, morale, readiness or performance.[223]  Miller, whose conclusions are based on interviews she conducted with thousands of American soldiers, reasons that few gays or lesbians would come out of the closet in units where hostility and homophobia prevailed.  Rather, Miller believes that American gay and lesbian soldiers would disclose their sexual orientation to peers only when they believed it was safe to do so.  In other words, Miller draws a sharp distinction between the effect of the decision to lift a gay ban and the effect of the presence of known gays and lesbians in the military.  The Israeli case seems to confirm Miller's distinction.

103

## The Relevance of Studying Foreign Militaries

Those who oppose allowing openly gay service in the U.S. often claim that the U.S. military cannot be compared to foreign armed forces. For instance, Lt. Gen. Calvin Waller, U.S. Army, deputy commander of allied forces in the Persian Gulf War, testified before the Senate in 1993 that "when we allow comparisons of smaller countries to this great nation of ours, the comparison between these countries with their policies regarding known homosexuals serving in their country, it is my belief that we do a grave disservice to our fellow American citizens."[224] Charles Moskos, a principal architect of "don't ask, don't tell," cautioned that "no neat and tidy lessons can be drawn from one country to another."[225] Moskos acknowledged that many foreign militaries formally allowed gays to serve, but he disputed their relevance to the U.S., saying other militaries had different cultures or lesser combat obligations or that their practices regarding gay troops were actually less tolerant than their formal policies would suggest. Of the Dutch and Scandinavian militaries, Moskos said, "these aren't real fighting armies like the Brits, the Israelis and us. If a country has a security threat," he argued, that country would be likely to implement "a policy that makes it very tough for gays."[226]

Critics of gay service continued to dismiss the relevancy claims throughout the 2000s. Lt. Gen. John Lemoyne, former Deputy Chief of Staff of the U.S. Army, said during a 2003 debate over gays in the military that "I do not accept the argument that the studies of foreign militaries are necessarily valid to the U.S. military. Different context. Different roles and missions."[227] And John Allen Williams, President of the Inter-University

104

Seminar, commented during a 2005 discussion of "don't ask, don't tell" that the "American military tends not to want to learn from other militaries on any subject. It's just a fact. We see ourselves as *sui generis*."[228] In short, these opponents claim, because the U.S. military is different, it does not and cannot learn from, or compare itself to, foreign armed forces.

Some take this argument further, mischaracterizing the relevance that the experience of foreign militaries could hold for the debate in the U.S. They suggest that any discussion of foreign militaries is moot because the fact that another country follows a certain policy is not a reason for the U.S to do the same. The implication is that proponents of gay service support repeal only because other nations have done it. This, of course, is not the actual basis of the argument in favor of openly gay service in the U.S. The relevancy claim simply states that the successful transition experiences of foreign militaries which share sufficiently similar variables to the U.S. military suggests that, *if* the U.S. were to lift its ban, American military performance would similarly not decline. The experiences, in other words, lend plausibility to a predictive causal claim—that eliminating "don't ask, don't tell" will not harm the military—but they do not, in and of themselves, constitute an argument that the U.S. ought to lift the ban.

The claim that the U.S. military does not, or should not, compare itself to other militaries is important because it has played a prominent role in debates about gays in the military since President Clinton tried to compel the Pentagon to eliminate its gay ban in 1993. As Lawrence J. Korb, Assistant Secretary of Defense under President Reagan, concluded,

"The first thing the military says when the gay issue is brought up... is that the U.S. military is different."[229]  The argument even plays a role in popular discourse when media figures such as Bill O'Reilly echo such sentiments.  Responding to research suggesting that foreign militaries have lifted their gay bans without any detriment to their effectiveness, O'Reilly remarked, "But just remember the different cultures in Britain, Israel, Australia, and the United States. Different cultures."[230]

This section addresses the question of how different the U.S. military is from its allied forces, and how relevant the experiences of those forces are to the U.S. It assesses the plausibility of the claim that the U.S. military does not compare itself to or learn from foreign forces. We consider several specific studies that reflect a wide variety of issue-areas, historical periods, and national cultures. All of them show that the U.S. military itself repeatedly has commissioned research that invites such comparisons, at times incorporating the lessons learned from these other militaries. While there is no doubt that the U.S. military is different from other militaries, such distinctions have not prevented the U.S. military from comparing itself to and learning from foreign armed forces. Ironically, one such issue-area in which the Pentagon has drawn lessons from foreign forces is gays in the military, as military spokespersons have argued that the U.S. should not lift its ban because certain foreign militaries have failed to do so.

*Use of Other Militaries as Sources of Relevant Information for the U.S. Military*

In 1986 the U.S. Army created the Foreign Military Studies Office (FMSO) to "research, write, lecture and publish from unclassified sources, in both English and original languages, about the military establishments, doctrine and operational and tactical practices of selected foreign armed forces."[231] The FMSO, which expanded its work after the fall of the Soviet Union, studies not only technological, strategic, and tactical operations of foreign militaries, but those relating to cultural aspects of service, such as housing, healthcare and personnel policy.[232]

Others have also noted the relevance of foreign militaries. In 1993, Rand thus explained its rationale for studying foreign militaries as part of its assessment of the gay troops issue in the U.S.: "Policy implementation difficulties in other countries can serve as warning flags if the United States attempted similar strategies, and successes in other countries may provide guidelines for U.S. policy formulations."[233] As analogues, in other words, these countries' experiences are not necessarily meant for imitation, but as suggestive models to inform U.S. policy by illustrating the consequences of decisions to eliminate gay bans. Paul Gade, Chief of the Research and Advanced Concepts Office at the U.S. Army Research Institute for the Behavioral and Social Sciences, agreed in remarks made in 2000, arguing that foreign militaries "are the best analogues we have for the U.S. case."[234]

107

Indeed, for decades the U.S. military has explicitly compared itself to foreign militaries in the area of personnel policy including, ironically, comparisons to foreign armed forces that ban gays and lesbians. Indeed, prominent observers have drawn on the experiences of foreign armed forces that prevent homosexuals from serving openly to justify their opposition to integration in the U.S. Lt. Gen. Waller, for example, cited Korea and its policy of "no toleration of known homosexuals in their ranks" during his 1993 Senate testimony, and concluded surprisingly (given his argument, mentioned above, about the irrelevance of foreign military forces) by invoking a comparison to other countries that maintain gay bans: "And finally in all my dealing with the many nations who provided military forces to Operations Desert Shield and Desert Storm," he said, "the vast majority of those nations, as you have heard here today, did not allow known homosexuals to serve in their military units, who were part of the Persian Gulf forces."[235]

In making her case for banning gays from the U.S. military, Major Melissa Wells-Petry, who consulted the 1993 Military Working Group that wrote the blueprint for the current "don't ask, don't tell" policy, argued that U.S. personnel policies should be sensitive to the cultural attitudes of countries in which we deploy troops. "The way in which a host nation views the United States Armed Forces is critical indeed," she wrote.[236] She cited the British ban on gay service personnel, which was in effect when she was writing, as part of her case for banning gays in the U.S. military, using their rationale that, because gays are likely to be targeted for blackmail, they are unsuitable to serve in the U.S. military. Drawing an analogy between the U.S. and Britain and France, she wrote that "A relationship between blackmail and homosexuality is acknowledged in other national

108

cultures as well."[237]  Col. Ronald Ray of the U.S. Marine Corps relied on similar logic when he argued for maintaining the ban, and referred to the British ban on homosexual service members to support his argument.  He cited a British military expert who argued that "homosexuality in [a British army] regiment would be 'devastating to unit cohesion.'"[238]

These arguments date from before Britain lifted its ban. Clearly, opponents of allowing gays and lesbians to serve openly in the U.S. military do learn lessons from foreign armed forces, including on the subject of service by gays and lesbians. To the extent that the U.S. military does tend to learn from foreign forces, the British armed forces often serve as the most relevant comparison case.[239]  The comparison of the U.S. to British forces during the period when the latter banned gay service raises the concern that opponents of gay service only invoke other nations when it supports their position, but cry foul when doing so undercuts their position.

Following are case studies of specific instances in which the U.S. military draws lessons from foreign militaries.

*Military Innovation and Diffusion in Theory*: Drawing lessons from other militaries has been the norm rather than the exception throughout much of modern history.  In the context of emerging nationalism in Europe in the eighteenth and nineteenth centuries, for example, competition among nations for security led countries to focus on the military capabilities of their rivals and imitate those aspects that they deemed necessary for

109

survival.  Such developments prompt Barry Posen to argue that "states will be concerned about the size and effectiveness of their military organizations relative to their neighbors. As in any competitive system, successful practices will be imitated.  Those who fail to imitate are unlikely to survive."[240]  For those nations that aspire to greater political power and influence, looking to the most successful rival country with the strongest military has been a common strategy, resulting in "contending states [imitating] the military innovations contrived by the country of greatest capability and ingenuity."[241]  An example of this process is Prussia's transformation of its military during the mid-seventeenth and early eighteenth centuries, during which time Prussian officials studied France as a successful military model.  As Posen describes, "Innovations that produce vast increases in the combat power of the French Army, both of a narrow tactical nature and of a more diffuse political nature, [were] closely studied by Prussian professionals. Imitation [was] recommended, and to a considerable extent achieved, including political reforms."[242]  As this example illustrates, throughout history, militaries, even those that are extremely different, have looked to each other for ways to improve themselves.  As he explores "whether states consciously imitate the successful practice of others," Posen concludes that "states might argue their own national uniqueness and the complete 'non-importability' of foreign models, but instead imitate the military institutions and practices of those who have defeated them, repackaged with a veneer of indigenousness."[243]  Thus, it has not been uncommon for militaries to incorporate the practices of other militaries while at the same time denying the source of such innovations.

As powerful as Posen's model of competition and imitation may be for explaining how militaries have evolved over time and explicitly imitated each other, it fails to account fully for the complicated and culturally inflected process of innovation and diffusion that militaries actually experience. Challenging Kenneth Waltz's argument that "diffusion is a uniform and efficient process driven by the threat of defeat by a superior power," Leslie Eliason and Emily Goldman argue that a "look at the historical record reveals far more variation in adoption and emulation across states and cultures than conventional international relations theory assumes. The process of diffusion appears far less deterministic and much more vulnerable to local conditions than the systemic view suggests."[244] Emphasizing the "contingent nature of the diffusion process," Eliason and Goldman urge scholars to explore more fully the cultural or organizational context within which new technologies or practices are considered and adopted.[245]

Three of the most relevant themes that emerge from their overview reveal how attending to such "local conditions" subverts our understanding that the diffusion of military innovation proceeds solely from major to minor powers. Even when smaller militaries on the periphery adopt core military technology, as was the case in the Middle East during much of the Cold War, Eliason and Goldman note that "indigenous culture shapes diffusion," reinforcing the idea that some level of adaptation and adjustment occurs any time one military imitates another.[246] They also observe that "cultural affinity allows transmission of military expertise far exceeding identifiable security requirements," as is the case between the U.S., the U.K., Canada, Australia, and New Zealand, their common cultural and linguistic background effectively facilitating a range of innovations.[247] Last,

111

they emphasize that "innovation can also originate in the periphery," as was the case when the U.S. adopted Israeli-designed remotely piloted vehicles, discussed below.[248] Ultimately, these insights reflect a consensus that military innovation moves in many directions, suggesting that major powers like the U.S. do not simply innovate and get imitated, but rather they are engaged in a more complicated process in which they carefully consider the experience of smaller, less powerful militaries and even learn important lessons from them.

In his examination of the unique relationship between the ABCA countries, which include Australia, Britain, Canada, the United States, and New Zealand, Thomas-Durell Young considers how cultural similarities between these countries influence patterns of innovation. He notes that, "despite the end of the Cold War, and the end of a common threat, [the] relationship among these five countries has actually grown closer, particularly among the five armies."[249] This is not to say that important differences between these militaries do not continue to exist and pose challenges to the interoperability that they aspire to. But as Young makes clear, the militaries of all these countries, including the U.S., share a common cultural heritage and political history. Such similarities have helped create a context in which they desire and are able to share information effectively among each other. The four case studies presented below indicate that across a wide range of issue areas and historical periods the U.S. military has compared itself to and learned from foreign militaries. Indeed, the American armed forces have even learned from the militaries of nations that do not share close cultural affinity with the U.S.

112

***Technological Innovation***: While many armed forces have adopted U.S. technological innovations and advances, the U.S. has learned from foreign militaries as well. As Timothy D. Hoyt argues, "The peripheral experience demonstrates that not all diffusion flows from the industrialized core to the developing periphery."[250] Israel's political relationship with the U.S., for example, as well as its recent history of military engagement, has allowed it to serve as a useful example for the U.S. military. From 1956 to 1973, the Israeli Navy developed a series of fast missile-armed attack craft (FACMs), in response to technology that Arab navies had adapted from the Soviet Union. These "indigenously developed and produced antiship missiles" were the "first deployed by a Western power."[251] As Hoyt notes, these innovations "proved decisive in the 1973 conflict" between Israel and Arab states, and the "antiship missile currently constitutes one of the most important weapons in naval arsenals," including that of the United States.[252] Unlike the traditional neorealist view that sees only minor powers imitating major powers, this example illustrates an alternative route of diffusion, for "Israeli innovation spurred countermeasures in the core countries."[253] And after Israel showed the effectiveness of these new weapons in 1973, countries like the U.S. responded with their own similar innovations. Because the "use of sea-skimming missiles, in particular, posed a particular threat," it "prompt[ed] the development of automated point defense systems such as PHALANX (United States) and NULKA (Russia)."[254]

In the 1980s, the U.S. more directly adopted another facet of Israeli military technology: remotely piloted vehicles (RPVs) and unmanned aerial vehicles (UAVs). According to

Hoyt, Israel's 1982 war in Lebanon confirmed the utility and effectiveness of such devices, which "provid[ed] near-real time battlefield and operational intelligence."[255] Both the U.S. and Israel had been experimenting with such technology since at least 1973, but a private firm in Israel succeeding in perfecting RPVs before the U.S. managed to. As Hoyt writes, at this time the "United States looked on RPV technology as an area of considerable promise. Nevertheless, U.S. RPV projects were languishing by 1982: out of 986 RPVs built in the 1960s and 1970s, only 33 remained in U.S. inventory and all those were in storage."[256] For the U.S., part of Israel's success was reflected in its ability to develop RPVs much more cheaply and efficiently than it had attempted to do, and lead to its adoption of the technology in the U.S. military. According to Hoyt, "within several years after the Lebanon conflict, the United States was purchasing and fielding Israeli-designed RPVs and was involved in joint efforts to develop new systems and integrate existing systems into ground, naval, and amphibious units of the U.S. military."[257] Directly adopting models like the Mazlat Pioneer and developing new RPVs, like the Hunter drone, from existing Israeli technology, the U.S. military eagerly embraced another country's technological innovation, which clearly demonstrates not only the relevance, but also the utility of looking to a foreign military.[258]

Clearly, it is not simply the case that the U.S. only shares its advances with the smaller militaries of its allies. Even with its highly advanced technology, it still pays close attention to the other countries, allowing their capabilities to inform their own decisions about military tactics and procedures. According to Young, "the U.S. armed forces are not unaware of this important problem [allies' concern with U.S. advances] and are

endeavoring to maintain their ability to operate alongside forces that are less technically advanced—both allies and their own reserve components."[259]  Although not the typical kinds of lessons we might expect our military to learn from others, such considerations underscore the relevance of foreign militaries for the U.S., especially since the end of the Cold War when the U.S. has found itself working increasingly more closely in multinational engagements.[260]  Thus, the U.S. military strives to create and maintain "intellectual interoperability" with these allies through the "standardization of tactics, techniques, and procedures," further underscoring the relevance of their experiences.[261]

*Privatization*: In recent years, the U.S. military and government have attempted to privatize various aspects of military operations, and in the cases of military housing and ammunitions production, the U.S. military has looked to both Britain and Canada for ideas on how to implement change.[262]  In April 2000, the Assistant Secretary of the Army for Installations and Environment "convened a conference to compare the United States and United Kingdom experiences with privatizing military installation assets, operations, and services."[263]  Held in the U.K., the "purpose of the conference was to bring together U.S. and U.K. defense officials, U.S. Army leaders, and commercial contractors from both countries to discuss the British experience with privatization and explore its applicability to the U.S. Army"[264]  Co-chairs of the conference were the Hon. Dick Cheney, former U.S. Secretary of Defense, and Field Marshall The Lord Vincent, former Chief of Defence Staff for the U.K. Ministry of Defence.  As the conference organizers acknowledged, both countries and their militaries have turned increasingly to the private sector since the 1980s, but "the U.K. has pursued privatization of defense activities and

support services much more aggressively than the U.S."[265]  Because of this, U.S. officials repeatedly looked to their British counterparts throughout the conference for advice and suggestions on possible ways to improve their efforts at privatizing certain military services.  In his opening remarks, U.S. Co-Chairman, Cheney observed, "My general impression is that… our British colleagues are far ahead of us in the U.S. in the extent to which they have adopted changes in culture, attitude, and style of operation that are required for privatization efforts."[266]  As much as he recognized the political differences between the countries that could prevent the U.S. from imitating exactly measures taken by the U.K, Cheney urged his U.S. colleagues to listen closely to their British counterparts, for this conference allowed them a "tremendous opportunity for us to share experiences, and to learn how the U.S. might take advantage of the concepts and principles that are embodied in the U.K. experience."[267]

The Honorable Mahlon Apgar IV, then Assistant Secretary of the Army for Installations and Environment, appeared equally optimistic that the U.S. could learn from the British model.  Acknowledging their common experiences, Apgar notes that the "U.S. Department of Defense, or DOD, and the U.K. Ministry of Defence, or MOD, have faced similar challenges in recent years," including significant downsizing and restructuring and modernizing military forces.[268]  As eager as he was to learn from the U.K., Apgar emphasized the important differences between the countries, most pressing being the different nature of each country's government and the different levels of power over the military that is granted to the British Parliament and the U.S. Congress.  But in spite of such differences, his interest in privatization clearly outweighed these differences.

116

According to Apgar, "We face enormous obstacles to privatization in the U.S., and I've been intrigued to learn that our British colleagues have not found it much easier. Fortunately, you in Britain have had far more recent success in this area than we have, and you have already tackled many of the difficulties we are just now addressing. In this conference, we hope that we can learn from your experience and that you'll help us leapfrog some of the barriers that we face."[269]

Overall, the general tone of Apgar's keynote address reflected a hopeful certainty that possible answers to the U.S.'s challenges would emerge from the conference discussions. Concluding his talk, Apgar emphasized that one of the most important lessons that U.S. could learn from the U.K. involves an attention to their process of transition and transformation. As he said, reflecting on the U.K.'s system of change, "We in the U.S. could save years by adopting [their] model."[270]

After these opening remarks, conference attendees participated in working groups that allowed them to share information and ask questions of each other's experiences. Repeatedly, these groups reflected an interest on the part of the U.S. participants to glean applicable lessons for their efforts to privatize military housing and base operations. In the Housing Working Group, participants agreed that the "U.S. and the U.K. share some basic military housing problems."[271]  And even though a "stark difference in attitude" regarding definitions of privatization "informed much of the group's discussion about the merits of transferring ownership and management of residential housing facilities," U.S. Army groups members continued to solicit advice from the U.K., resulting in "industry

117

**LCR Appendix Page 1246**

and U.K. group members offer[ing] concrete advice about building contracts with incentives that reach all the way through the lease."[272]  Thus, the differences between the two countries did not prohibit U.S. group members from drawing possible lessons from the British and applying their experiences were they deemed it appropriate.  Together the participants in this working group concluded that "successfully privatizing military housing requires changing cultural attitudes.  Improving education for all players—public and private sector—is essential to effect that change."[273]  Such exchanges and conclusions were common for all the working groups of this conference, and the dialogue between the representatives of each country was so fruitful that it prompted the U.S. Army participants to "establish a permanent, ongoing forum, such as this Conference, for continued U.S.-U.K. exchanges.  The forum should meet at least annually, and organize visits to installations in the U.K. and U.S. where public-private partnerships are in force."[274]  As the U.S. continues to pursue its privatization of these parts of its military, the relevance of the British experience is, according to the U.S. military, undeniable.

Such relevance has even more recently extended to include Canada's experience with privatizing ammunitions production.  In 2004, the National Defense Research Institute published a report on Canada's privatization of its "domestic ammunition-manufacturing base" that "was done at the request of the U.S. DOD to determine what lessons, if any, the Canadian experience might offer should the U.S. Army consider privatizing its government-owned plants."[275]  Even though the study authors recognize that "Canada differs from the United States along many dimensions," including the size of its military, its focus and commitments, and differences in political structure and internal divisions of

118

power, they concluded that such differences should not "render the Canadian example moot."[276]  In fact, their research prompts them to argue that not only could the "deliberate process Canada employed... also work in the United States," but also that the "Canadian experience offers numerous useful insights into the privatization process.  If the United States decides to pursue a similar course, it would do well to study the Canadian experience in detail."[277]  In the summary of their report, the study authors list no fewer than twelve points that offer insight from the Canadian experience, insights that emphasize the process that Canada followed to achieve successful privatization.  As was the case in the privatization conference, the lessons learned from foreign militaries have less to do with what the U.S. military should do, but how it should proceed once it has concluded that a particular innovation or change is a productive course to take.  Regardless of the U.S. military's ultimate decision with regard to this report, it is not unreasonable to conclude that Canada's experience will at least be considered as the U.S. military decides its future course with regard to this issue.

***Counterterrorist Strategy***: More recently the war in Iraq and the ongoing insurgency has provided the U.S. Military an opportunity to learn tactical lessons from the Israel Defense Forces and improve its fight against terrorism, especially with regard to urban warfare.  According to the Jewish Institute for National Security Affairs, "Army and Marine Corps forces that battled terrorist insurgents in the Iraqi cities of Fallujah and Mosul employed urban warfare tactics gleaned from the combat experience of the Israel Defense Forces."[278]  These lessons were learned at Israel's Adam counter insurgency urban warfare training facility, at which "in the last two years, hundreds of U.S. military

119

personnel have trained."[279]  The lessons learned that U.S. forces have adopted include

maintaining surprise when infantry "advance in an Arab urban environment," using air

platforms to "target enemy combatants during street battles," and using a "multi-pronged

advance on insurgency strongholds in an urban area."[280]  As a military official told

reporters, "We have learned a lot regarding urban warfare tactics in the Middle East from

our allies… Yes, this includes Israel."[281]  In a letter to *Army Magazine*, Brig. Gen.

Michael Vane, Deputy Chief of Staff at the U.S. Army's Training and Doctrine

Command (TRADOC) concurred.  Responding to an earlier article about urban warfare,

Vane elaborated on the development of recent Army doctrine in this area, stressing the

importance of considering the IDF's experiences.  "Experience continues to teach us

many lessons," he writes, "and we continue to evaluate and address those lessons,

embedding and incorporating them appropriately into our concepts, doctrine and training.

For example, we recently traveled to Israel to glean lessons learned from their

counterterrorist operations in urban areas.  To a degree, we are already executing in Basra

and Baghdad the information age sieges that Col. Leonhard describes."[282]


Subsequently, on December 6, 2004, the Department of Defense "chartered a blue-ribbon

panel to explore ways to improve the military defenses against urban guerrilla attacks

such as the ones occurring daily in Iraq."[283]  The director of defense research and

engineering, Ronald Sega "directed the task force to draw on lessons that other nations

have learned in adapting their traditional military forces to deal with asymmetrical

threats, including Britain's experience in Northern Ireland, Israel's with the Palestinians,

Russia's with Chechnya and Australia's with East Timor."[284]  As all of these examples

120

show, at many levels, the U.S. military recognizes that valuable lessons can be drawn from other countries experiences, especially as the U.S. enters into a new type of strategic and tactical environment, with which the military has less experience than some U.S. allies.

***Medical and Sanitary Policy***: The U.S. military's tradition of learning from foreign militaries is not new. In the nineteenth and early twentieth centuries, for example, the U.S. searched for ways to improve the care of wounded soldiers. In 1862, with the U.S. in the midst of its bloody civil war, Stephen H. Perkins traveled to Europe to survey the pension and care systems for disabled soldiers of the continent's major powers, including France, Prussia, Austria, Russia, and Italy. Under the direction of the U.S. Sanitary Commission, Perkins was instructed to "study the military pension and invalid systems of the principal European nations... and to report his observations to the Commission," with the hope that his evaluation of these countries' systems would guide U.S. policy on this matter.[285] As Henry W. Bellows, the President of the Sanitary Commission, makes clear in his letter of instruction included in the final report, addressing this issue was of the utmost importance, considering the extraordinary number of men—Bellows cites nearly 200,000—whose lives were devastated by the war and the U.S.'s limited experience in dealing with such matters. As he writes, "the subject will need careful guidance," and "the principle sources of light are, first, general principles, and next, the experience of other nations—for we have next to none in our own country."[286]

121

During World War I, the U.S. again turned to a European power, this time Germany, to improve its military medical care. Prior to the U.S. entry into the war, Dr. John R. McDill, an officer in the Medical Reserve Corps of the U.S. Army, temporary resigned his commission in the Medical Reserve Corps of the U.S. Army to direct a hospital service unit organized by the American Physicians' Expeditions Committee of New York. In his capacity as a medical relief worker, McDill was able to gain access to a number of German army sanitary organizations and collect data for his medical war manual, *Lessons from Enemy: How German Cares for Her War Disabled* (1918), a volume that was authorized by the U.S. Secretary of War and supervised by the Surgeon-General and the Council of National Defense. Impressed with the organizational efficiency of the German military medical system, McDill hoped that his account "might furnish something of use to our service."[287] Because "the Germans claim that through their system they have been enabled to return 95% of their wounded to either military duty of to a self-supporting civic or industrial usefulness," McDill believed that that the U.S. and its allies should learn from Germany's experiences.[288] Although he was aware of the dissimilarities between the two countries, McDill concluded by emphasizing the larger good that could come of learning lessons from the enemy: "Aside from the question of the irreconcilable differences between autocracy and democracy, if we will look back of the phenomenon of the tremendous power of Germany we can see the great fact of community life organized for health for both peace and for war. If we overlook this and fail to learn this great lesson from the enemy… we will have missed one of the most valuable lessons of the great conflict."[289]

122

*Fielding Other Claims of Irrelevancy*

In a related effort to dismiss the relevance of foreign militaries to the U.S., some opponents of openly gay service claim that even when formal policies allow open gays to serve, such service is rarely or never actually open. Charles Moskos told Congress that gay troops in the Israeli military did not fight in elite combat units, did not serve in intelligence units or hold command positions, and did not serve openly in high positions. "I can categorically state that no declared gay holds a command position in a combat arm anywhere in the IDF," he stated.  Open gays, he said, "are treated much in the manner of women soldiers," in that they are excluded from real fighting and serve primarily in support roles from "open bases" where they can go home at night.[290]  He repeated these assertions in a companion essay and op-ed,[291] and in radio broadcasts as late as 2000, saying there were no open gays in combat or intelligence positions in the Israeli military.[292]

But according to Dr. Reuven Gal, former chief psychologist for the IDF and later director of the Israeli Institute for Military Studies, even before Israel liberalized its policy in 1993, gay soldiers in the IDF did serve in "highly classified intelligence units" and, even when their sexuality was revealed to their commanders, they were allowed to keep serving.[293]

The Palm Center's study on the IDF found repeated instances of openly gay service in combat and intelligence positions, while noting that cultural norms continue to encourage

123

most gays and lesbians to keep their sexual orientation private. According to Palm, "some IDF combat and intelligence units have developed a reputation as particularly welcoming to gay and lesbian soldiers and some have developed a gay culture." One tank corps soldier said his base had "a large gay contingent" and that it was sometimes "even easier" to come out of the closet in the military "because you are protected from society. You don't have friends from the same town so you can be more open in the Army." The Palm study also reported interviewing over 20 gay IDF soldiers who served in combat units, several of whom said they were known by others in their combat unit.[294] A related study, published in 2003 in *Parameters*, the professional journal of the U.S. Army War College, found that at least one fifth of IDF combat soldiers knew of a gay peer in their unit, with roughly another fifth saying they "might" have known a gay peer. This suggests that hundreds of Israeli service members were serving openly.[295]

The Palm study concluded that the Israeli case is, indeed, relevant to the situation in the U.S., even though many Israelis choose to keep their sexual identity private. In fact, such voluntary discretion is a reminder that lifting a ban on openly gay service is not likely to result in a mass coming-out or in any notable change in the core culture of the military apart from enhancing respect for those who serve. "The fact that many gay Israeli soldiers choose not to reveal their orientation does not indicate that the Israeli experience is irrelevant for determining what would happen if the U.S. lifted its gay ban," concluded the Palm study. "On the contrary, the evidence shows that both Israelis and Americans come out of the closet only when it is safe to do so." The 2003 article in *Parameters* discussed the oft-cited fear among ban defenders that ending discrimination would result

124

in a mass coming out in the military, suggesting the fear was not based in fact.  "This belief is premised on the flawed assumption that culture and identity politics are the driving forces behind gay soldiers' decisions to disclose their homosexuality," says the article.  "What the evidence shows is that personal safety plays a much more powerful role than culture in the decision of whether or not to reveal sexual orientation."[296] Thus the fact that many or most troops remain discreet even when a new policy allows them to serve openly is an argument for lifting the ban, not against it: it suggests that formally ending a ban will not create disruptions to a fighting force, while other evidence suggests that allowing gays to serve honestly improves their readiness and morale.

Critics of openly gay service have also suggested that foreign militaries are irrelevant to the U.S. because their cultures are more tolerant of homosexuality than American culture. Yet this assertion is not borne out by evidence. In Britain, a law was passed in 1987 banning any discussion in schools that promoted the acceptability of homosexuality. Even in the 1990s, a majority of the British, according to polls, believed sex between members of the same sex was always wrong.[297]  In Canada, in the years preceding the admission of open gays, polls showed strong moral disapproval of homosexuality.[298] Military researchers at the U.S. Army Research Institute for the Behavioral and Social Sciences regard the Anglo-American nations (the U.K., Canada, Australia, New Zealand and Ireland), as sharing "a more-or-less common cultural heritage" with the U.S.  The researchers pointed to a 1992 study in Germany that found that respondents viewed homosexuals as less acceptable neighbors than foreigners, Hindus, racial minorities and Jews, and equated gays and lesbians with criminals, AIDS patients and the mentally

handicapped.  According to military sociologists, France tolerated "deviant behavior" because, as a Catholic country, the possibility of forgiveness for sin was always available. Data also suggest that Israel was slightly more homophobic than the U.S. in the 1990s.[299]

*Evidence of Successful Combat and Joint Operations Involving Openly Gay Troops*

While some of the skepticism of the relevance of foreign militaries was expressed before 2001, the international landscape following the Al Qaeda attacks of that year has dramatically changed the analytical context for assessing claims of irrelevancy. The wars in Afghanistan and Iraq have thrown into combat the militaries of numerous countries that American commentators formerly dismissed as non-combat forces. Indeed, in many documented cases, U.S. troops have served in these military campaigns shoulder-to-shoulder with troops who belong to militaries that allow openly gay service. These facts have considerably weakened claims from before 2001 that those nations with openly gay troops cannot offer combat experiences that are relevant to the major combat operations of the U.S. around the world.

In the first five years of military operations in Iraq, the U.K. sent a total of forty-five thousand troops to Iraq, mostly stationed in the south.[300] Thirty other countries also joined the coalition, many of which allowed open gay service.  The coalition included two thousand troops provided by Australia, along with submarines and other naval support from Denmark.[301]  In Afghanistan, the number of countries contributing troops or

126

support was even higher, numbering nearly fifty at one time.  As NATO forces took over the occupation, troops from these countries took on greater combat roles.

In 2006, American, Canadian, British and Afghan troops led the charge against a resurgent Taliban in Operation Mountain Thrust, the largest offensive to root out Islamic radicals since 2001.  Insufficient water meant some troops had to give each other IVs to survive.  Enduring heavy mortar attacks, suicide bombings, regular ambushes, and scorching desert temperatures, over ten thousand troops worked together to lug more than seven thousand pounds of supplies from the bottom of a rocky mountain range to its peak, where they had their greatest chance to best the Taliban.  The powerful artillery and targeted airstrikes of the coalition took its toll on enemy forces, and by the end of the offensive, over 1,500 Taliban fighters had been killed or captured.[302]

Afterward, a NATO International Security Assistance Force, consisting of troops from nearly forty countries, took over operations in some of the most dangerous regions of southern Afghanistan, with Britain, Australia, Canada, Denmark and the Netherlands doing the heavy lifting.[303]  That fall, Canadian forces led American, British, Dutch and Danish troops in a bloody battle in which five hundred suspected Taliban fighters were surrounded and killed.  The defeat prompted complaints by the Taliban that so many of its forces had been wiped out that it was having trouble finding sufficient leadership.[304]

The Canadian and Australian experiences with open gays was now fourteen years old but Canada, Australia, and even the Netherlands, were certainly not "irrelevant."  Their

127

combat-tested fighting forces, replete with gays and lesbians serving openly, were critical

partners in America's national defense strategy, and the U.S. was eager to enlist their fire

power in the wars in the Middle East.  Charles Moskos had given his original testimony

about the limited relevance of Britain seven years before it lifted its ban in 2000. Late the

following year, in 2001, its armed forces became the chief partner to the U.S. in the war

in Afghanistan and, in 2003, in Iraq. It thus became far less tenable to claim that other

militaries were "not real fighting armies." Many had not seen major combat in 1993, but

by 2006, even the smallest of these militaries were proving themselves in combat so

much so that the U.S. was reliant on their firepower and the U.S. president, George Bush,

was touting their capacities as "the coalition of the willing."


Many of these military operations were not only reliant on the presence of smaller forces

that allow openly gay service, but were fought together with those forces. The presence

of openly gay service members in multinational military units offers first-hand evidence

that serving with known gays does not undermine effectiveness.


Since the end of the Cold War, multinational forces have mushroomed.  The U.S. has

participated in at least forty joint military operations, with half involving direct

deployment with foreign service members.  Many of these participating countries allow

open gay service, from Canada to Britain and beyond.[305]


British Lieutenant Rolf Kurth of the Royal Navy was one example.  Discharged from the

Royal Navy in 1997 for homosexuality, he was invited to re-enlist after the U.K. lifted its

ban in 2000. During the War in Iraq, Kurth was deployed to the Persian Gulf aboard the Royal Navy's largest amphibious ship. As it happened, American sailors also served on his ship, and Kurth worked closely with them, serving as a principle liaison for the American team. Kurth served as an openly gay man in this multi-national force, and said it was "fairly well-known around the entire ship" that he was gay. His sexual orientation was "common knowledge," a fact he confirmed by the banter of his colleagues, who playfully told him, when several men convened to discuss an attractive woman, that Kurth was clearly "not the best person to judge!" He characterized his relationship with the American sailors as "great," saying he "got along very well with them." He added that the Americans "didn't behave any differently from British colleagues" toward him, even though he was known as a gay sailor.[306]

Lieutenant Kurth's service in a multinational force in the Iraq War is only one example of documented evidence that openly gay foreign troops are actually serving right alongside Americans—without causing the kinds of disruptions that critics predicted would result from gay service. Others come from training operations on foreign ships deployed in the Middle East, NATO and UN peacekeeping missions around the world, joint operations at the North American Aerospace Defense Command in Canada and the U.S., the Multinational Force and Observers in Sinai, the Multinational Force in Lebanon, U.S. and foreign war colleges, training grounds and military and diplomatic centers of operations, including NATO headquarters in Belgium. In some cases, U.S. troops are directly under the command of foreign military personnel, some known to be gay. And these cases

129

suggest that coming out of the closet can help improve the working climate in the armed forces.

---

In one example, Colonel René Holtel of the Royal Netherlands Army commanded American service members, including a U.S. tank battalion, in NATO and UN missions. In 2001, he served as chief military observer and chief liaison officer at the headquarters of the United Nations Mission in Ethiopia and Eritrea.  UNMEE was tasked with monitoring the ceasefire between the two nations in the demilitarized security zone running along their mutual border.  Six American service members served with him as military observers.  Holtel found that when others in his unit knew he was gay, it caused "some relaxation in the unit," reducing the guesswork and allowing people to focus on their jobs.  "They are not having questions anymore about who or what their commander is," he said.  By telling them who you are, "you pose a clear guideline and that is, 'don't fuck around with gays, because I'm not going to accept that.'"[307]

The use of multinational forces is also a reminder that armed services worldwide are trending toward what experts call "the postmodern military."  In an age of terrorist threats, where "rogue" attacks are more likely than traditional acts of war, the term refers to the blurring of several kinds of boundaries, including national borders, as well as fading distinctions between the different branches of the military and even between the military and civilian society.[308]  Nothing has demonstrated this evolution more grimly than the Iraq War.  Rocket-propelled grenades, snipers and suicide bombers do not distinguish between civilians and designated fighters, between combat Marines and

130

female supply clerks riding in the rear of a convoy, between uniformed military personnel and field intelligence agents. As it becomes harder and harder to tell who is a civilian and who is a combatant, and to distinguish which jobs fall into the intelligence sphere and which are uniformed, it becomes less and less rational to maintain a policy that draws lines around groups that simply don't exist in the same ways as they did in the past. This is a fact about not only the postmodern military but the postmodern world—it's hard to contain people and restrict behavior by resorting to familiar lines of exclusion when these old categories have a totally different meaning, or none at all.

### Conclusion

The U.S. has long studied other militaries to learn relevant lessons for its own military, including about the topic of homosexuality in the force. Government, military, and academic leaders are quite capable of using sound social science techniques to assess the relevancy of different lessons to the context at hand, making the suggestion that other nations have nothing to offer the U.S. in studying gays in the military seem naïve at best, and dishonest at worst.

Opponents of gays in the military have routinely exaggerated the arguments for studying the experiences of foreign countries, implying that supporters of open service who point to other militaries are asking the U.S. to blindly follow those policies and lift the gay ban simply *because* foreign militaries have done so. In fact, however, the principle claim of

131

supporters of learning from foreign militaries is that, while no single case is decisive, the combined weight of the evidence from the 25 countries which allow gays and lesbians to serve shows that if the U.S. were to lift its ban, American military performance would not decline. According to this perspective, the relevance of foreign experiences is not that they indicate that the U.S. should eliminate "don't ask, don't tell," but rather that they illustrate that if the U.S. does decide to integrate, military performance will not decline.

Those who support eliminating "don't ask, don't tell" acknowledge that important differences distinguish the U.S. military from other armed forces, but suggest that the relevant question is not whether differences exist, but whether they render foreign military experiences irrelevant for determining whether military effectiveness would decline if gays and lesbians were allowed to serve openly in the U.S. Indeed, scholars have already explained why such differences do not diminish the relevance of these lessons, but opponents of gays in the military have not responded.[309] Rather, they robotically repeat the point that the U.S. military cannot be compared to or learn from the experiences of other militaries. In short, although the U.S. has more international obligations than other countries and its culture is unique, the question is not how similar our missions or culture are to those of other nations but whether the United States is any less capable than other nations of integrating gays into its military.

# Conclusion

The experiences of foreign nations with openly gay service offer highly instructive lessons into nearly all the issues that the U.S. faces as it considers lifting its current ban on known gay and lesbian troops. While many consider the U.S. and its military to be unique among world fighting forces, and while each culture is distinct in important ways, scholars and the U.S. military itself view foreign militaries as valuable sources of information about warfare and military policy, including on the topic of openly gay service. Other countries, particularly Britain, Canada, and Israel, experienced very similar cultural and political debates on this issue prior to lifting their bans. Opponents raised concerns that an inclusive policy would undermine morale, recruitment, retention, cohesion and discipline, and pointed to polls suggesting that service members would leave if bans were lifted. Yet the reality was far different from the scenario painted by opponents, and consistent research by those militaries, as well as by independent scholars and observers, found that the new policies were uniformly successful, and in many cases improved the climate in their armed forces.

The research is also clear on what made these transitions successful: clear signals of leadership support from the top levels of the military; a focus on a uniform code of behavior to which all service members are subject, without regard to sexual orientation; and a quick, simple implementation process that does not retard the transition. This latter is deemed critical to avoid anxiety, confusion, and obstructionism both by military

133

members and political forces outside the military. These three lessons are mutually reinforcing, as strong leadership, consistent standards, and decisive execution of policies combine to make expectations clear and to communicate them effectively throughout the chain of command.

The research on the importance of decisive implementation is borne out by the experiences of foreign militaries, which generally followed civilian mandates to lift their bans and completed the transition process in under six months. In nearly all cases, these militaries replaced their gay bans with codes of conduct that did not discriminate based on sexual orientation, and helped shift focus from group traits which have been shown to be irrelevant to performance, to behavior and capacity that are performance-related.

In no case did a formal change in policy result in a mass "coming out." Yet, contrary to some assertions, gay and lesbian troops do serve in all levels of the armed forces of Britain, Canada, Australia, and Israel, in both combat and non-combat positions, at both the enlisted level and as high commanders. While gays and lesbians continue to face pockets of discrimination in these militaries, the new policies contribute to a decrease in such discrimination, by allowing knowledge and familiarity to replace fear with facts. There were no instances of increased harassment by gay people as a result of lifting bans in any of the countries studied.

Each country has taken its own approach to resolving questions of benefits, housing, partner recognition, re-instatement, etc. Generally, the military honors the status afforded

134

to gay or lesbian couples by that country, and the military rarely gets out in front of the government or other institutions in the benefits offered; in some cases the military has joined other institutions in outreach to gay and lesbian populations to convey that it is now a welcoming employer of all people.

Finally, none of the countries studied saw fit to install separate facilities of any kind for gay and heterosexual troops, or to retain any regulations or procedures that would continue to treat gays differently from their straight peers. While episodes of informal discrimination in treatment and promotions have not been wiped out, evidence suggests that formal policies of equal treatment for people equally situated helps reduce discrimination and resentment, and helps keep the focus on behavior necessary to complete the mission rather than on group traits that can distract from the mission.

135

# Appendix

### List of Foreign Militaries that Allow Openly Gay Service

Note: Several countries, particularly in Asia, are difficult to codify since they do not have a formal policy governing gay service, often not acknowledging their existence at all. We have taken a conservative approach to listing nations that allow openly gay service, including only those nations that we could confirm allow openly gay service without formal restrictions. For this reason, our list may be smaller than others.

1. Australia
2. Austria
3. Belgium
4. Canada
5. Czech Republic
6. Denmark
7. Estonia
8. Finland
9. France
10. Germany
11. Ireland
12. Israel
13. Italy
14. Lithuania
15. Luxembourg
16. Netherlands
17. New Zealand
18. Norway
19. Slovenia
20. South Africa
21. Spain
22. Sweden
23. Switzerland
24. United Kingdom
25. Uruguay

### Documentation on Contested Cases

**Czech Republic**: Homosexuality is not considered a liability for enlistment. All citizens are required to serve, regardless of sexual orientation.  Act No. 1 218/1999 Coll. (Military Act) stipulates military service "for all citizens of the Czech Republic, regardless of sexual orientation."  In an email from PhDr. J. Vereov of the Public Relations Department of the Ministry of Defense, he writes, "In general these issues fall in the competence of psychological personnel appointed at individual units. There is a special facility available - the ACR Open Line, where people can make phone calls to have their

136

**LCR Appendix Page 1265**

problems dealt with."

**Estonia**: There has never been a ban on sexual minorities in the Estonian military.  The Public Relations Department writes that, "according to the Estonian legislation all sexual minorities have the same rights and duties compared with the others.  In respect to the army it means that all males have the duty to serve in the army and all females have the right to do so."

**Ireland**: According to Denise Croke of OUThouse, a support service for gays and lesbians in Ireland, there is no gay ban in the Irish military. Cathal Kelly, International Secretary of the National Lesbian and Gay Foundation, which implements recent equality legislation in Ireland, says that the Employment Equality Act of 1998 applies to the Irish military.  This act is available online at http://www.gov.ie/bills28/acts/1998/default.htm and is item #21 on the list.

**Italy**: Arcigay, the gay and lesbian rights organization in Italy, responded to inquiries by saying the legally there is no precedent of barring gays and lesbians from the military, but in reality this is not necessarily the case.  If the presence of a gay service member disrupts military discipline, it appears he or she can be dismissed. Additionally, a law exists in Italy that allows gay people to avoid military service based on their homosexuality.  More information is available at: www.gay.it/noi, which offers a link to the home page of NOI, Notizie Omosessuali Italiane.

**Lithuania**: Gays and lesbians are not legally regulated in Lithuania's armed forces.  The Ministry of Defense writes that, "Theoretically they can serve openly but there is no practical case like this in Lithuania so far. Officially, no bans exist or have ever existed on service of sexual minorities in Lithuanian military."

**Slovenia**: There is no ban in the Slovenian military, but homosexuality is still listed among psychiatric diseases.  Yet the "Rules for establishing medical capability for serving in the military" stipulate that "recruits are capable of serving in the military unless it is predicted that they will be disturbing to military unit."  The Slovenian Queer Resources Directory writes, "In practice it means that gay men can avoid being drafted if they state on the draft that they are gay and that they do not want to serve." There is no known case of a professional military personnel being fired for his homosexuality.

**Switzerland**: Gays and lesbians are allowed to serve and there is no ban. Their ability to serve is only questioned if their sexual orientation somehow interferes with their service.  (Both the Swiss Military and its gay and lesbian organization agree on this matter.)

**Germany**: Germany no longer has a ban on gays and lesbians, nor does it allow any form of discrimination against gays and lesbians in the military. In January of 2001, the General Inspector of the Federal Army, Harald Kujat, published a code of conduct entitled "Dealing with Sexuality" that established within the army "an equal treatment for gay lesbian members of the army" that is considered "a binding antidiscrimination measure" (from Klaus Jetz of the Lesbian and Gay Federation in Germany).

**Uruguay**: A 2009 email from Mauricixo Coitiño, Institutional Relations Secretary of Uruguay, confirms that discrimination against gays and lesbians in the armed forces of Uruguay is forbidden. He cites a law that "penalizes the commission of acts of violence, humiliation or disrespect against people because of their sexual orientation or gender identity," and another law that "declares that the fight against all kinds of discrimination is of national interest." He also states that "there are no restrictions whatsoever for the participation of gay, lesbian and transgender people in our army."

138

# Contributors

Dr. Victoria Basham is an Assistant Professor in Politics at the University of Exeter and a research associate of the Centre for International and Security Studies at York University, Toronto. Her research explores the politics of soldiering, militarization, and gender, sexuality and race. She has published articles on diversity and equality issues in the British military and on British civil-military relations. She is currently writing a book entitled *War, Identity and the Liberal State*, to be published next year by Routledge.

Geoffrey Bateman is co-editor of the book, *Don't Ask, Don't Tell: Debating the Gay Ban in the Military* and teaches in the Writing Program and the Gender and Women's Studies Program at the University of Denver.  He is completing his Ph.D. in English at the University of Colorado at Boulder, where he is writing his dissertation on "The Queer Frontier: Placing the Sexual Imaginary in California, 1868-1915."

Dr. Aaron Belkin is Director of the Palm Center, and Associate Professor of Political Science at the University of California, Santa Barbara. He has published in the areas of civil-military relations, social science methodology, and sexuality and the armed forces. His recent studies include analyses of aerial coercion and strategic bombing, the conceptualization of coup risk, and the relationship between coup-proofing strategies and international conflict. His publications have appeared in *International Security, Armed Forces and Society,* the *Journal of Conflict Resolution, Parameters,* and elsewhere, and he has given presentations on gays in the military at the Army War College, National Defense University, Naval Postgraduate School, and U.S. Military Academy at West Point.

Dr. Margot Canaday is Assistant Professor of History at Princeton University and author of *The Straight State: Sexuality and Citizenship in Twentieth Century America.* She received the Louis Pelzer Memorial Award from the Organization of American Historians, and her work has been supported by grants and fellowships from the OAH, the American Historical Association, the Palm Center, and the Social Science Research Council. She holds a B.A. from the University of Iowa and an M.A. and Ph.D. from the University of Minnesota.

Dr. Nathaniel Frank is Senior Research Fellow at the Palm Center and author of *Unfriendly Fire: How the Gay Ban Undermines the Military and Weakens America* (St. Martin's Press).  He teaches on the adjunct faculty at New York University.  His scholarship and writing on gays in the military and other topics have appeared in the *New York Times, Washington Post, The New Republic, USA Today, Los Angeles Times, Newsday, Slate, Huffington Post* and others, and he has been interviewed on numerous television and radio programs including "The Daily Show" and "The Rachel Maddow Show." He holds a Masters and Ph.D. in History from Brown University.

Dr. Alan Okros is Deputy Chair of the Department of Command, Leadership and Management at the Canadian Forces College. He holds a Masters and Ph.D. in Industrial/Organizational Psychology from the University of Waterloo and retired

from the Canadian Forces in 2004 at the rank of Captain) with 33 years service. Dr. Okros has engaged in policy development and applied research on a range of military personnel topics including projects regarding: the employment of women in combat occupations; advancing diversity objectives; and assessing military attitudes, culture, and behaviors.  He was responsible for the CF doctrinal publications *Duty with Honour: The Profession of Arms in Canada* and *Leadership in the Canadian Forces: Conceptual Foundations.*

Denise Scott is a student in the Graduate Program in Interdisciplinary Studies at York University.  Her focus of studies includes sexuality studies, queer theory, sub-cultural studies, youth, identity, and auto-ethnography. In conjunction with Dr. Alan Okros, she has conducted research on the application of sociological theories and models of gender, sexuality, social inequality, and identity to the military context.  Her thesis research examines the intersections of age, queerness, and punk sub-culture.

The authors would like to thank Nina Agrawal, Research Assistant at the Palm Center, and Indra Lusero, Assistant Director of the Palm Center, for their invaluable research and administrative assistance.

140

# Endnotes

[1] *"Don't Ask, Don't Tell": Hearings before the Committee on Armed Services*, United States Senate, 111th Congress, February 2, 2010.

[2] Aaron Belkin and R. L. Evans, "The Effects of Including Gay and Lesbian Soldiers in the British Armed Forces: Appraising the Evidence," White paper, Palm Center, University of California, Santa Barbara, 2000.

[3] Sue Leeman, "European Court Ruling Reopens British Debate on Gays in Forces," Associated Press, September 27, 1999.

[4] Helen Branswell, "U.K.'s Ban on Gays in Army Discriminatory," *Toronto Star*, September 28, 1999.

[5] Edmund Hall, *We Can't Even March Straight: Homosexuality in the British Armed Forces* (London: Vintage, 1995).

[6] Edmund Hall, "Gay Ban is Based on Bias Alone," *The Independent*, March 5, 1996.

[7] Ibid.

[8] Sarah Lyall, "European Court Tells British to Let Gay Soldiers Serve," *The New York Times,* September 28, 1999.

[9] Leeman, "Court Ruling Reopens British Debate."

[10] "Britain to Act after Ruling on Gays in Military," *Irish Times*, September 28, 1999.

[11] Misconduct as defined by this code includes, but is not limited to, sexual harassment, sexual contact with subordinates, and overt displays of affection between service members.

[12] Belkin and Evans, "British Armed Forces."

[13] Michael Codner, Royal United Services Institute, Personal communication, September 26, 2000.

[14] Aaron Belkin and Jason McNichol, "Effects of the 1992 Lifting of Restrictions on Gay and Lesbian Service in the Canadian Forces: Appraising the Evidence," White paper, Palm Center, University of California, Santa Barbara, 2000.

[15] This report was criticized by three academics asked to conduct external reviews.  In particular, Dr. C.M. Kristiansen suggested the report likely overstated the degree of resistance or probable impacts on operational effectiveness. Her evaluation "suggested that the methods, findings and interpretation of the data in the Zuliani study were 'strongly biased.'" (Dr. C.M. Kristiansen, Personal communication, October 13, 2009.) For summaries of the three external reviews conducted, see Franklin C. Pinch, "Perspectives on Organizational Change in the Canadian Forces" (U.S. Army Research Institute for the Behavioral and Social Sciences, Alexandria, VA, 1994).

[16] Belkin and McNichol, "Canadian Forces."

[17] Aaron Belkin and Jason McNichol, "The Effects of Including Gay and Lesbian Soldiers in the Australian Defence Forces: Appraising the Evidence," White paper, Palm Center, University of California, Santa Barbara, 2000.

[18] Ibid.

[19] Ibid.

[20] Tina Diaz, "Forces Told It's OK to be Gay," *Syndey Morning Herald*, November 24, 1992.

[21] Jacklyn Cock, "Engendering Gay and Lesbian Rights: The Equality Clause in the South African Constitution," *Women's Studies International Forum* 26:1 (2003): 36.

[22] Currently, there are twelve parties represented in the assembly, which has 400 members. The African National Congress achieved 66.36% of the vote in 1999 and has 266 MPs. The official opposition party is the Democratic Alliance. In 1999, the Democratic Alliance got 9.55% of the vote and 38 MPs. The official opposition prior to 1999 was the more conservative New National Party, which grew out of the old National Party. The NNP gained 6.87% of the vote and 28 seats in 1999. The Inthaka Freedom Party has a history of being conservative and anti-ANC, but is now a high level partner in the government. In 1999, the party achieved 8.59% of the vote and 34 seats. The African Christian Democratic Party is more of a minor player in national politics, but represents the Christian right. (A.J.G.M Sanders, "Homosexuality and the Law: A Gay Revolution in South Africa," *Journal of African Law* 41:1 (1997): 105; Daniel Conway, Ph.D. candidate in Department of Political Studies at Rhodes University, Grahamstown, South Africa, Personal communication, Fall 2002).

[23] "Rights of Homosexuals Protected in Military," *Daily Report* (Johannesburg), November 29, 1995.

[24] Cock, "Gay and Lesbian Rights," 38.

141

[25] Lindy Heinecken, "The Silent Right: Homosexuality and the Military," *African Security Review* 8:5 (1999): 44.

[26] Report of the Special Rapporteur on Racism, Racial Discrimination, Xenophobia and All Forms of Discrimination, South African Commission on Human Rights (Johannesburg, 1999).

[27] Lindy Heinecken, Personal communication, 2002.

[28] Graeme Reid, Personal communication, 2002.

[29] Evert Knoesen, Director, The Lesbian and Gay Equality Project (South Africa), Member, Defence Minister's Advisory Board on Employment Equity and Affirmative Action, Yeosville, South Africa, Personal communication, Fall 2002.

[30] Colonel Jan Kotze, Senior Staff Officer for Equal Opportunities in the Chief Directorate Equal Opportunities, South African Department of Defence, Pretoria, South Africa, Personal communication, Summer 2001.

[31] This was the South African military's first policy on Equal Opportunity and Affirmative Action (Lindy Heinecken, "Managing Diversity in an Unequal Society: The Challenges Facing the South African National Defence Force," in Joseph Soeters and Jan van der Meulen, eds., *Managing Diversity in the Armed Forces: Experiences from Nine Countries* (Tilburg: Tilburg University Press, 1999), 191; Colonel Jan Kotze, Personal communication, Spring 2003).

[32] Heinecken, "The Silent Right," 44.

[33] Aaron Belkin and Melissa Levitt, "Homosexuality and the Israel Defense Forces: Did Lifting the Gay Ban Undermine Military Performance?" *Armed Forces and Society* 27:4 (2001): 541-565.

[34] Jay Bushinsky, "Gays in Israeli Military Take U.S. Cue," *Chicago Sun-Times*, February 8, 1993; Dan Izenberg, "Gays Speak Out for Equality at Knesset Meeting," *Jerusalem Post*, February 3, 1993.

[35] Chris McGreal, "Gay Israeli MP Faces New Battle in Knesset," *The Guardian*, November 5, 2002.

[36] Ethan Bronner, "Israeli Army Move to End Gay Bias Hailed," *Boston Globe*, June 12, 1993.

[37] Reuven Gal, "Gays in the Military: Policy and Practice in the Israel Defense Forces," in Wilbur Scott and Sandra Carson Stanley, eds., *Gays and Lesbians in the Military: Issues, Concerns, and Contrasts* (New York: Aldine De Gruyter, 1994), 182-183; Emily Bazelon, "Gay Soldiers Leave Their Uniforms in the Closet," *Jerusalem Post*, March 16, 1994.

[38] Bazelon, "Gay Soldiers Leave Their Uniforms."

[39] Bronner, "Israeli Army Move Hailed."

[40] National Defense Research Institute, *Sexual Orientation and U.S. Military Personnel Policy: Options and Assessments* (Santa Monica: Rand Corporation, 1993).

[41] U.S. General Accounting Office (GAO), "Defense Force Management: DOD's Policy on Homosexuality," June 12, 1992.

[42] U.S. General Accounting Office (GAO), "Homosexuals in the Military: Policies and Practices of Foreign Countries," June 25, 1993; Belkin and McNichol, "Australian Defence Forces" citing Ministry of Defence, United Kingdom, "A Review of the Armed Forces Policy on Homosexuality," October 31, 2000; Belkin and Levitt, "Israel Defense Forces"; Rand, *Sexual Orientation*.

[43] Rand, *Sexual Orientation*; Belkin and McNichol, "Canadian Forces"; Pinch, "Organizational Change in the Canadian Forces."

[44] Aaron Belkin, "Don't Ask, Don't Tell: Is the Gay Ban Based on Military Necessity?" *Parameters* (Summer 2003): 110.

[45] Ibid.

[46] Ministry of Defence, United Kingdom, "Tri-Service Review of the Armed Forces Policy on Homosexuality and Code of Social Conduct," December, 2002.

[47] Sean Rayment, "Air Force Enlists Stonewall in Drive for Gay Recruits," *Sunday Telegraph*, December 31, 2006.

[48] Susan Taylor Martin, "Will Israeli Army Success Sway U.S. Policy on Gays?" *St. Petersburg Times*, January 8, 2007.

[49] Anne Gearan, "Gates: Don't Rush to Lift Ban on Gays in Military," *Associated Press*, February 4, 2010; Donna Miles, "'Don't Ask, Don't Tell' Repeal Demands Study, Gates Says," *American Forces Press Service*, February 10, 2010.

[50] Rand, *Sexual Orientation*, 380-82.

[51] Kevin Whitelaw, "What Would it Take to End 'Don't Ask, Don't Tell?'" NPR, February 5, 2010.

[52] Rand, *Sexual Orientation*, 381.

---

[53] Whitelaw, "What Would it Take."

[54] Daryl Lindsey, "Should Gays Serve?" *Salon*, June 9, 2000.

[55] Anne Swardson, "Canada: No Problem with Gays in Ranks," *Washington Post*, July 6, 1993.

[56] Ministry of Defence, United Kingdom, "Armed Forces Policy on Homosexuality," 2000, 2.

[57] Ibid.

[58] Ministry of Defence, United Kingdom, "Armed Forces Policy on Homosexuality," 2000; Belkin and Evans, "British Armed Forces"; Belkin, "Is the Gay Ban Based on Military Necessity?" (2003), 111.

[59] Belkin and Evans, "British Armed Forces."

[60] Ibid.

[61] Ministry of Defence, United Kingdom, "Tri-Service Review of the Armed Forces Policy on Homosexuality," 2002.

[62] Ibid., 4.

[63] Ibid, 2.

[64] Caroline Reynolds, Directorate of Service Personnel Policy at the British Ministry of Defence, Personal communication, September 24, 2009.

[65] Sean Rayment, "Air Force Enlists Stonewall in Drive for Gay Recruits," *Sunday Telegraph*, December 31, 2006.

[66] *Ask Not*, directed by Johnny Symons (Oakland, CA: Persistent Visions, 2008); citation is to an early version of the film, viewed on February 15, 2008.

[67] Ministry of Defence, United Kingdom, "Armed Forces Policy on Homosexuality," 2000; Belkin and Evans, "British Armed Forces"; Belkin, "Is the Gay Ban Based on Military Necessity?" (2003), 111.

[68] Ministry of Defence, United Kingdom "Armed Forces Policy on Homosexuality," 2000, 2.

[69] Tom Coghlan, "The Fuss of Ten Years Ago Seems Somewhat Bizarre," *Times of London*, January 16, 2010.

[70] Ibid.

[71] Sarah Rutherford, Robin Schneider, and Alexis Walmsley, *Ministry of Defence/Equal Opportunities Commission Agreement on Preventing & Dealing Effectively with Sexual Harassment: Quantitative & Qualitative Research into Sexual Harassment in the Armed Forces* (Andover: Schneider-Ross, 2006); Ministry of Defence, United Kingdom, "*Agreement Between the Ministry Of Defence and the Equal Opportunities Commission on an Action Plan to Prevent and Deal Effectively with Sexual Harassment in the Armed Forces*" (London: Ministry of Defence, 2005). See also Victoria Basham, "Effecting Discrimination: Operational Effectiveness and Harassment in the British Armed Forces", *Armed Forces & Society,* 35:4 (2009): 728-744. The issue of misconduct between heterosexuals as presenting more of a challenge for the British Forces was also raised in a personal communication on October 19, 2009 with an anonymous source from the British Army. This source also believed that the Code of Social Conduct had been "a success at every level" because it helped commanders deal with both trivial and major behavioral problems without any lasting damage to unit effectiveness.

[72] Compare, for example, Leonard Wong, "Combat Motivation in Today's Soldiers," *Armed Forces & Society*, 32:4 (2006): 659-663 and Robert J. MacCoun, Elizabeth Kier, and Aaron Belkin, "Does Social Cohesion Determine Motivation in Combat? An Old Question with an Old Answer," *Armed Forces & Society*, 32:4 (2006): 646-654.

[73] R.J. MacCoun, "What Is Known about Unit Cohesion and Military Performance," Rand, *Sexual Orientation*, 291; MacCoun, Kier, and Belkin, "Does Social Cohesion Determine Motivation?" Others have also considered how different forms of cohesion are mutually reinforcing- see Charles Kirke, *Social Structures in the Combat Arms Units of the British Army* (Defence Fellowship Report, 1994)- or have demonstrated how cohesive principles are largely pragmatic considerations for soldiers- see Charles Moskos, "The Military," *Annual Review of Sociology*, 2 (1976): 55-77. The idea of social cohesion as a determinant of military cohesion has been disputed by those who suggest that other factors such as command are vital. See, for example, Anthony King, "The Word of Command: Communication and Cohesion in the Military," *Armed Forces & Society*, 32:4 (2006): 493-512.

[74] See, for example, S.L.A. Marshall, *Men against Fire: The Problem of Battle Command in Future War* (New York: William Morrow, 1947); Edward Shils and Morris Janowitz, "Cohesion and Disintegration in the Wehrmacht in World War II," *Public Opinion Quarterly*, 12 (1948): 280-315. See also Morris Janowitz and Roger W. Little, *Sociology and the Military Establishment*, 3rd ed. (London: Sage, 1974), 96.

143

[75] For a comprehensive review see MacCoun, "What Is Known about Unit Cohesion."
[76] Basham, "Effecting Discrimination."
[77] MacCoun, Kier, and Belkin, "Does Social Cohesion Determine Motivation," 652. See also Victoria Basham, *An Analysis of Social Diversity in the British Armed Forces*, unpublished PhD thesis (Bristol: University of Bristol, 2006).
[78] Belkin and Evans, "British Armed Forces," 41.
[79] Edmund Hall quoted in Belkin and Evans, "British Armed Forces."
[80] Robb Nunn, Personal communication, May 11, 2007.
[81] Patrick Lyster-Todd, Personal communication, April 11, 2007.
[82] Gregory M. Herek and Aaron Belkin, "Sexual Orientation and Military Service: Prospects for Organizational and Individual Change in the United States," in Thomas W. Britt, Amy B. Adler, and Carl Andrew Castro, eds., *Military Life: The Psychology of Serving in Peace and Combat* (Westport, CT: Praeger Security International, 2005), Vol. 4:119-42.
[83] Ministry of Defence Diversity Policy Team, Personal communication, October 19, 2009.
[84] Commander Debbie Whittingham, Royal Navy and Commandant of the Joint Equality and Diversity Training Center (JEDTC), Personal communication, October 16, 2009. As Commandant of the JEDTC, Commander Whittingham is in an ideal position to access the views of service personnel that pass through the JEDTC and to hear about views 'on the ground.'
[85] Lieutenant Commander McBain is the chair of the Naval Service Lesbian, Gay, Bisexual and Trans Forum and the Royal Navy Equality & Diversity Policy Officer for Sexual Orientation.
[86] Lieutenant Commander Mandy McBain, Royal Navy, Personal communication, October 18, 2009.
[87] David Crary, "U.S. Allies Embrace Gay Military Personnel," Associated Press, July 12, 2009.
[88] (Retired) Lieutenant Commander Craig Jones, Lieutenant Commander, Royal Navy 1989-2008, Personal communication, October 20, 2009.
[89] Ibid.
[90] Ibid.
[91] Ibid.
[92] Ministry of Defence, United Kingdom, *A Guide to Living in Service Family Accommodation* (London: Ministry of Defence, 2007).
[93] Cdr. Whittingham, Personal communication, 2009.
[94] Ibid.
[95] Lt. Cdr. Jones, Personal communication, 2009.
[96] Crary, "U.S. Allies Embrace Gay Military Personnel."
[97] Ibid.
[98] Lt. Cdr. McBain, Personal communication, 2009. See also Basham, "Effecting Discrimination" and "Gay Soldiers Celebrate Diversity of Modern British Army," *Soldier Magazine*, July 2009. Available at: http://www.mod.uk/DefenceInternet/DefenceNews/PeopleInDefence/GaySoldiersCelebrateDiversityOfModernBritishArmy.htm.
[99] Lt. Cdr. McBain, Personal communication, 2009.
[100] Ibid.
[101] Ibid.
[102] Ibid; Cdr. Whittingham, Personal communication, 2009.
[103] Anonymous, British Army, Personal communication, October 19, 2009.
[104] Professor Christopher Dandeker, King's College London, Personal communication, October 16, 2009. Professor Dandeker has been researching personnel issues in the Armed Forces for several years. He has also served as an advisor to the House of Commons Defence Committee.
[105] Belkin and McNichol, "Canadian Forces."
[106] Swardson, "Canada: No Problem with Gays in Ranks."
[107] Richard A. Zuliani, "Canadian Forces Survey on Homosexual Issues," Charter Task Force (Ottawa: Department of National Defence, 1986).
[108] National Defence Headquarters, Canadian Forces, "Briefing Note for Director of Personnel Policy: Effects of Cancellation of Canadian Forces Policy Restricting Service of Homosexuals," August 1995.
[109] The central catalyst for these evolutions was the Canadian *Charter of Rights and Freedoms* and, in particular, equality rights which came into effect in 1985.

144

[110] Defence reductions occurred in 1995-1997 with greater reductions, in relative terms, for the CF in personnel, equipment and budgets than in the U.S. Services.

[111] For a more detailed treatment of the CF during this period, see Franklin C. Pinch, "Canada: Managing Change with Shrinking Resources," in Charles C. Moskos, John Allen Williams, and David R. Segal, eds., *The Postmodern Military: Armed Forces after the Cold War*, (New York: Oxford University Press, 2000), 156-182.

[112] The original catalyst was the 1970 Royal Commission on the Status of Women in Canada, which included initial policy amendments, first, to cease dismissing women once they married, and second, to cease dismissing women once they had children.

[113] The restriction on employment in submarines was subsequently cancelled when the CF acquired new submarines that were deemed to address adequately the privacy concerns identified by the Tribunal. For the presentation of the Tribunal's decision, see *Isabelle Gauthier, Joseph G. Houlden, Marie-Claude Gauthier, Georgina Ann Brown vs. Canadian Armed Forces* (Ottawa: Canadian Human Rights Tribunal Decision 3/89, February 20, 1989).

[114] For example, aboriginal members were permitted to grow ceremonial braids, various groups could wear beards, and Muslim women could wear specific, loose fitting uniforms that conformed to Islamic requirements for modesty. Certain restrictions on turbans, beards and loose fitting clothing were put in place to meet safety requirements; however, the underlying philosophy was one of accommodation and consultation among the chain of command, service member and religious authorities to achieve satisfactory outcomes.

[115] For a comprehensive review of the rationale and implications for both Chaplains and members of the CF, see Joanne Benham Rennick, *Religion in the Ranks: Religion in the Canadian Forces in the 21st Century* (Vancouver: University of British Columbia Press, *in press*).

[116] The Canadian military has generally not been subject to the same degree of oversight or direction by politicians as is the case in the U.S. The only previous instance prior to the 1997 MND Doug Young report to the Prime Minister was the decision to integrate and then unify the CF in the mid-1960s.

[117] As an example, in a September 2009 poll, fully half of Canadians indicated that the CF should engage only in a peacekeeping role. See Murray Brewster, "Go back to peacekeeping; Canadians tell DND in increasing numbers: poll," Canadian Press, September 20, 2009.

[118] *Gauthier et. al. vs. Canadian Armed Forces*, 67.

[119] The guidelines for Chaplains are accessible at: http://www.cmp-cpm.forces.gc.ca/cfcb-bsafc/pd/ssmbr-bmuepms-eng.asp

[120] Accessible at: http://www.facebook.com/group.php?gid=2215599900&ref=mf

[121] Quotes are from the June 2009 Operation Order for CF Participation at the 29th Toronto Pride Parade cited with permission from the originating office –J3 Joint Task Force (Central).

[122] Dr. Chris Madsen, Personal communication, October 14, 2009. Dr. Madsen reviews and summarizes military legal procedures to produce case studies for senior PME programs in Canada and the U.S.

[123] For the original U.S. research, see Peter D. Feaver and Richard H. Kohn, eds., *Soldiers and Civilians: The Civil-Military Gap and American National Security* (Cambridge: MIT Press, 2001). For the Canadian replication, see Alan Okros, Sarah Hill, and Franklin C. Pinch, *Between 9/11 and Kandahar: Attitudes of Canadian Forces Officers in Transition, Vol. 8 of Claxton Papers* (Kingston: School of Policy Studies, Queen's University in cooperation with the Centre for Security, Armed Forces and Society, Royal Military College of Canada, 2008).

[124] 195, or 90.7%, of the participants were male.

[125] Conversely, however, they had higher levels of education, which tends to correlate with more accepting attitudes.

[126] *Duty with Honour: The Profession of Arms in Canada* (Ottawa, ON: Chief of the Defence Staff, 2003). The first author led the team that produced both *Duty with Honour* and the leadership manual *Conceptual Foundations*, to be discussed next.

[127] *Duty with Honour*, 2.

[128] *Leadership in the Canadian Forces: Conceptual Foundations* (Ottawa, ON: Chief of the Defence Staff, 2003).

[129] *Duty with Honour* draws the concept of the Warrior's Honour from the work of that name by Michael Ignatieff, which emphasizes the values used in military conduct rather than the ends achieved. The concept of the Combat Male Warrior has been presented in a number of academic publications and is examined in

145

the Canadian context in Karen D. Davis and Brian McKee, "Women in the Military: Facing the Warrior Framework" in Franklin C. Pinch, Allister T. MacIntyre, Phyllis Browne, and Alan C. Okros, eds., *Challenge and Change in the Military: Gender and Diversity Issues* (Kingston, ON: Canadian Defence Academy Press, 2004), 52-75.

[130] Dr. Anne Irwin, Personal communication, October 14, 2009.

[131] In particular, see Paul Jackson, *The Military Closet: Sexual Orientation and the Canadian Forces* (Kingston, ON: Canadian Forces Leadership Institute, 2003) and Paul Jackson, *The Experience of Military Service for Lesbians and Gay Men* (Kingston, ON: Canadian Forces Leadership Institute, 2003).

[132] See Rosemary Park, "Opening the Canadian Forces to Gays and Lesbians: An Inevitable Decision but Improbable Reconfiguration" in Scott and Stanley, *Gays and Lesbians in the Military*, 165-175 and Jackson, *The Military Closet* for discussion.

[133] Belkin and McNichol, "Canadian Forces," 37.

[134] See John D. Berry and David L. Sam, "Acculturation and Adaptation" in John W. Berry, Marshall H. Segall, and Cigdem Kagicibaci, eds., *Handbook of Cross-Cultural Psychology: Vol. 31, Social Behaviour and Application (*Boston: Allyn & Bacon, 1997), 291-326 for a presentation of the model, which considers whether two groups a) work together and b) seek to preserve key elements of identity and culture.

[135] GAO, "Policies and Practices of Foreign Countries," 1993.

[136] GAO, "Policies and Practices of Foreign Countries," 1993, 19.

[137] Ministry of Defence, United Kingdom, "Report of the Homosexual Policy Assessment Team" (London: Ministry of Defence, 1996).

[138] Belkin and McNichol, "Australian Defence Forces," 2.

[139] Chris Sidoti, Australian Human Rights Commissioner, Personal communication, August 18, 2000.

[140] Squadron Leader Chris P. Renshaw, Senior Marketing Director, Defence Force Recruiting Organization, Personal communication, August 31, 2000.

[141] Ibid.

[142] Andrew Stuht, enlisted personnel, Royal Australian Navy, Personal communication, August 25, 2000.

[143] Bronwen Grey, Director, Defence Equity Organisation, Personal communication, August 17, 2000.

[144] Squadron Leader Michael Seah, Senior Medical Officer, RAAF Base Pearce, Personal communication, September 13, 2000.

[145] Sergeant Scott McClennan, Medical Corps, Personal communication, August 31, 2000.

[146] Commodore R.W. Gates, Royal Australian Navy, Personal communication, September 13, 2000.

[147] Hugh Smith, Associate Professor, School of Politics, University of New South Wales, Australian Defence Force Academy, Canberra, Australia, Personal communication, August 20, 2000.

[148] Ibid.

[149] (Retired) Major General Peter Phillips, Former President, Returned and Services League of Australia, Personal communication, August 8, 2000.

[150] Ibid.

[151] David Mills, reporter for the *Sydney Star-Observer*, Personal communication, September 12, 2000.

[152] Crary, "U.S. Allies Embrace Gay Military Personnel."

[153] Ibid.

[154] Ibid.

[155] Australian Government, Department of Defence, Defence Instruction (General) Personnel 53-1, "Recognition of Interdependent Partnerships," December 2005.

[156] Australian Government, Department of Defence, Pay and Conditions Manual (PACMAN), Vol. 2, Chapter 8, "Members and their dependants."

[157] Pride in Diversity, "Leading Employers Sign Up to Create Gay-Friendly Workplaces," press release, February 10, 2010, http://www.prideindiversity.com.au/media/leading-employers-sign-up-to-create-gay-friendly-workplaces.html.

[158] The SANDF is comprised of four branches: Army, Navy, Air Force, and South African Military Health Service (SAMHS).

[159] Margot Canaday, "Assessing the Integration of Gays and Lesbians into the South African National Defence Force," White paper, Palm Center, University of California, Santa Barbara, March 2003.

[160] Colonel Kotze, Personal communication, 2003.

[161] Thandi Modise, Member of Parliament (African National Congress) and Chairperson of Portfolio Committee on Defence, Capetown, South Africa, Personal communication, Fall 2002.

[162] Sue Rabkin, Special Advisor to the Minister of Defence, Capetown, South Africa, Personal communication, Fall 2002.

[163] Knoesen, Personal communication, 2002.

[164] Modise, Personal communication, 2002; Dr. Hussein Solomon, Head, Unit for African Studies at the Center for International Political Studies, University of Pretoria, Pretoria, South Africa, Personal communication, Fall 2002.

[165] Reid, Personal communication, 2002.

[166] Knoesen, Personal communication, 2002.

[167] Anthony Manion, Archivist, Gay and Lesbian Archives, University of the Witwatersrand, Johannesburg, South Africa, Personal communication, Fall 2002.

[168] Knoesen, Personal communication, 2002

[169] Heinecken, "The Silent Right," 43-55.

[170] Modise, Personal communication, 2002.

[171] Colonel Kotze, Personal communication, 2003.

[172] Dr. Rocklyn Williams, Director of Defence Program for SAFER-Africa and former Colonel in SANDF, Pretoria, South Africa, Personal communication, Fall 2002.

[173] Lindy Heinecken reports that the DOD's policy of "fast-tracking" women, blacks, and persons with disabilities has been controversial. Further, Heinecken reports that while "formally there is full racial integration in training and posts, there is still a high degree of social segregation among the different racial groups" (Heinecken, "Managing Diversity," 194-5).

[174] Knoesen, Personal communication, 2002.

[175] Heinecken, Personal communication, 2002.

[176] Hendrik Schmidt, Member of Parliament (Democratic Party) and member of Portfolio Committee on Defence, Capetown, South Africa, Personal communication, Spring 2003.

[177] Williams, Personal communication, 2002.

[178] James Selfe, Member of Parliament. (Democratic Party) and former member of Portfolio Committee on Defence, Capetown, South Africa, Personal communication, Spring 2003.

[179] Williams, Personal communication, 2002.

[180] Henry Boshoff, Military Analyst, Institute for Security Studies, Pretoria, South Africa, Personal communication, Fall 2002.

[181] Colonel Raymond Marutle, Military Attache at the South African Embassy, Washington, D.C., Personal communication, Fall 2002.

[182] Mighty Madasa, Member of Parliament (African Christian Democratic Party) and Defence Spokesperson for the African Christian Democratic Party, Capetown, South Africa, Personal communication, Fall 2002.

[183] Madasa's conclusion confirmed the study's own attempts to solicit opinions from those who opposed the policy. Informants were asked to identify potential interviewees who publicly opposed the policy. Most commonly, informants could not identify parties opposed to gay or lesbian service. In a few cases (and in the print media) the ACDP was identified as advocating anti-gay policies.

[184] Cock, "Gay and Lesbian rights," 40-1.

[185] David R. Segal, Paul A. Gade and Edgar M. Johnson, "Social Science Research on Homosexuals in the Military," in Scott and Stanley, *Gays and Lesbians in the Military*, 1994, 33-51; see also Nathaniel Frank, *Unfriendly Fire: How the Gay Ban Undermines the Military and Weakens America* (New York: St. Martin's Press, 2009), 152-4, 161-3.

[186] Jody Kollapen, Chairperson, South African Human Rights Commission, Johannesburg, South Africa, Personal communication, Fall 2002.

[187] Reid, Personal communication, 2002.

[188] Kollapen, Personal communication, 2002.

[189] Knoesen, Personal communication, 2002.

[190] Reid, Personal communication, 2002.

[191] Knoesen, Personal communication, 2002.

[192] Heinecken, "The Silent Right," 54.

[193] GAO, "Policies and Practices of Foreign Countries," 43.

[194] Gal, "Gays in the Military," 188.

[195] Ma'ayan Zigdon, "Coming out of the Kitbag," *Bamahane*, October 22, 1999, 21-25.

147

[196] Ibid.

[197] Ibid.

[198] Stuart Cohen, Personal communication, April 10, 2000.

[199] Anonymous, Personal communication, March 18, 2000.

[200] Brigadier-General Oded Ben, interview by Charles Gibson, "U.S. Struggling with Issue of Gays in the Military," *ABC News*, March 9, 2000.

[201] Amir Fink, Personal communication, April 11, 2000.

[202] Danny Kaplan, *Brothers and Others in Arms: The Making of Love and War in Israeli Combat Units* (Binghamton, NY: Harrington Park Press, 2003), 3.

[203] Lee Walzer, *Between Sodom and Eden: A Gay Journey Through Today's Changing Israel* (New York: Columbia University Press, 2000), 133.

[204] Walzer, *Between Sodom and Eden*, 114.

[205] Ma'ayan Zigdon, "Coming out of the Kitbag," 21-25.

[206] Aeyal M. Gross, "Between the Homosocial and the Homoerotic: Gays/Military in Comparative and International Law- A Summary," Unpublished manuscript, 2000.

[207] Anonymous, Personal communication, March 30, 2000.

[208] For recent problems concerning the sexual harassment of female soldiers in the military, see Stacy Feldman, "The Gender Battlefield," *The Jerusalem Report*, April 10, 2000, 11; Gayil Hareven, "Of Vice and Men," *The Jerusalem Report*, April 10, 2000.

[209] Raanan Gabbay, Personal communication, April 9, 2000; Oren Slozberg, Personal communication, April 9, 2000; Dan Yakir, Personal communication, March 25, 2000. All three are affiliated with gay rights groups in Israel.

[210] Danny Kaplan and Eyal Ben-Ari, "Brothers and Others in Arms: Managing Gay Identity in Combat Units of the Israeli Army," *Journal of Contemporary Ethnography* 29:4 (2000): 396-432; Danny Kaplan, Personal communication, July 18, 2000. Interviewees reflected a broad range of social backgrounds and served in elite infantry brigades, the armored corps, artillery units, combat engineering units, navy attack ships, submarines and pilots' school. Interviewees served 3 to 4 years from 1980 to 1996. While most were sergeants, two were officers.

[211] Belkin, "Is the Gay Ban Based on Military Necessity?" (2003), 108-119.

[212] Kaplan, *Brothers and Others in Arms*, 2003, 3.

[213] Taylor Martin, "Will Israeli Army Success Sway U.S. Policy."

[214] Crary, "U.S. Allies Embrace Gay Military Personnel."

[215] Daniel Edelson, "Military Magazine 'Unfazed' by Rabbi's Anti-Gay Sentiments," ynetnews.com, August 10, 2009, http://www.ynetnews.com/articles/0,7340.L-3759919,00.html.

[216] Anshel Pfeffer and Jonathan Lis, "IDF Chief Rabbi: Army Magazine Shouldn't Cover Gays," *Haaretz.com*, August 10, 2009, http://haaretz.com/hasen/spages/1106488.html

[217] Ibid.

[218] Pfeffer and Lis, "Army Magazine Shouldn't Cover Gays"; Edelson, "Military Magazine 'Unfazed.'"

[219] Crary, "U.S. Allies Embrace Gay Military Personnel."

[220] Danny Kaplan, "They're Here, They're Queer, It's No Big Deal," *Foreign Policy*, February 3, 2010.

[221] Ibid.

[222] Ibid.

[223] Laura Miller, "Are Open Gays a Threat to Cohesion?" Lecture presented at the Palm Center, University of California, Santa Barbara, April 21, 2000.

[224] *Policy Concerning Homosexuality in the Armed Forces: Hearings before the Committee on Armed Services*, United States Senate, 103rd Congress, Second Session, March 29, 31; April 29; May 7, 10, 11; July 20, 21, 22, 1993, (Washington, D.C.: U.S. Government Printing Office, 1994), 400.

[225] Eric Schmidt, "Gay Soldiers No Problem Elsewhere, Experts Say," *The New York Times*, April 30, 1993. Also see the influential Pentagon report on gays in the military, which says, "Extended deployments and berthing/billeting privacy are not significant issues for most foreign militaries.  Additionally, no country has as high a proportion of its servicemembers billeted/berthed together on military installations and deployed aboard ships or overseas at any given time as does the United States. Most importantly, no other country has the global responsibilities, operational tempo, or worldwide deployment commitments of the Armed Forces of the United States." Office of the Secretary of Defense, *Summary Report of the Military Working Group* (Washington, D.C.: U.S. Department of Defense, 1993), 10.

[226] Chris Reidy, "Just Saying No," *Boston Globe*, January 31, 1993.

[227] Lt. Gen. John Lemoyne, "Social Norms in Military Institutions: A Look to the Future," U.S. Army War College Debate, December 16, 2002.

[228] *Front and Center with John Callaway: Gays in the Military: A Policy Review*, Pritzer Military Library, Chicago, IL, June 30, 2005; available at http://www.pritzkermilitarylibrary.org/events/2005/06-30-front-and-center.jsp.

[229] Aaron Belkin and Geoffrey Bateman, eds., *Don't Ask, Don't Tell: Debating the Gay Ban in the Military* (Boulder: Lynne Rienner, 2003), 118.

[230] "The O'Reilly Factor," *Fox Television*, June 18, 2003.

[231] See *Foreign Military Studies Office*, http://fmso.leavenworth.army.mil (accessed June 3, 2004): Since the collapse of the Soviet Union, the FMSO has "expanded its research mission to encompass a broad range of transnational issues affecting U.S. military policy, strategy, and doctrine." Since this study was started, the FMSO's website has been updated, reflecting subtle changes in it mission. Now, according to its website, the "FMSO manages and operates the Ft. Leavenworth Joint Reserve Intelligence Center (JRIC) and conducts analytical programs focused on emerging and asymmetric threats, regional military and security developments, and other issues that define evolving operational environments around the world. Joint Reserve Component personnel and units–operating at the Ft. Leavenworth JRIC and in distance drilling analytical teams around the U.S. and abroad--make substantial contributions to all FMSO production efforts." See *Foreign Military Studies Office*, http://fmso.leavenworth.army.mil (accessed May 23, 2005).

[232] Geoffrey Bateman, "Is the U.S. Military Unique? 'Don't Ask, Don't Tell' and the (Ir)relevance of Foreign Military Experiences," White paper, Palm Center, University of California, Santa Barbara, 2005.

[233] Rand, *Sexual Orientation*, 65.

[234] Belkin and Bateman, *Don't Ask, Don't Tell*, 2003, 121.

[235] Waller was cited above as saying that the U.S. should not compare itself to smaller militaries. See *Policy Concerning Homosexuality in the Armed Forces: Hearings before the Committee on Armed Services*, United States Senate, 1993, 399.

[236] Melissa Wells-Petry, *Exclusion: Homosexuals and the Right to Serve* (Washington, D.C.: Regnery Gateway, 1993), 76.

[237] Ibid., 121.

[238] John Keegan, "NATO Acceptance of Gays Run Full Spectrum," *Army Times*, January 11, 1993, 20; cited in Ronald Ray, "Military Necessity and Homosexuality," in *Gays: In or Out* (Washington, D.C.: Brassey's, 1993), 98.

[239] John Allen Williams confirms that, "If we're going to compare ourselves with anyone it would be the British military, the ones most like us, because we've patterned ourselves after the British military." See *Front and Center with John Callaway: Gays in the Military*, Pritzker Military Library, June 30, 2005.

[240] Barry R. Posen, "Nationalism, the Mass Army, and Military Power," *International Security* 18:2 (1993), 82.

[241] Kenneth Waltz, *Theory of International Politics* (Reading, Mass.: Addison-Wesley, 1979), 127. See also Charles Tilly, ed., *Formation of National States in Western Europe* (Princeton: Princeton University Press, 1975) and Stanislav Andreski, *Military Organization and Society* (Berkeley: University of California Press, 1971).

[242] Posen, "Nationalism, the Mass Army, and Military Power," 99.

[243] Ibid., 87, 89.

[244] Leslie C. Eliason and Emily O. Goldman, "Introduction: Theoretical and Comparative Perspectives on Innovation and Diffusion," in Emily O. Goldman and Leslie C. Eliason, eds., *The Diffusion of Military Technology and Ideas* (Stanford: Stanford University Press, 2003), 8.

[245] Ibid.

[246] Ibid., 25.  For a full discussion of this argument, see Michael J. Eisenstadt and Kenneth M. Pollack, "Armies of Snow and Armies of Sand: The Impact of Soviet Military Doctrine on Arab Militaries," in Goldman and Eliason, *Military Technology and Ideas*, 63-92.

[247] Eliason and Goldman, "Introduction," in Eliason and Goldman, *Military Technology and Ideas*, 26.

[248] Ibid., 27.

[249] Thomas-Durell Young, "Cooperative Diffusion through Cultural Similarity: The Postwar Anglo-Saxon Experience," in Goldman and Eliason, *Military Technology and Ideas*, 95.

149

[250] Timothy D. Hoyt, "Revolution and Counter-Revolution: The Role of the Periphery in Technological and Conceptual Innovation," in Goldman and Eliason, *Military Technology and Ideas*, 180.

[251] Ibid., 181.

[252] Ibid.

[253] Ibid., 185.

[254] Ibid.

[255] Ibid., 186.

[256] Ibid., 186.

[257] Ibid., 187.

[258] See *The Future Security Environment, Report of the Future Security Environment Working Group, submitted to the Commission on Integrated Long-Term Strategy* (Washington, D.C.: Pentagon, 1988), 27; cited in Hoyt, "Revolution and Counter-Revolution," 187.

[259] Young, "Cooperative Diffusion through Cultural Similarity," 112-113.

[260] For a discussion of the changing nature of the military in our current era, see Moskos, Williams, and Segal, *The Postmodern Military*, and Harry Bondy, "Postmodernism and the Source of Military Strength in the Anglo West," *Armed Forces & Society* 31:1 (2004): 31-61. For an overview to the U.S.'s involvement in multinational military operations, see Geoffrey Bateman and Sameera Dalvi, "Multinational Military Units and Homosexual Personnel," White paper, Palm Center, University of California, Santa Barbara, 2004.

[261] Young, "Cooperative Diffusion through Cultural Similarity," 98-99.

[262] For an overview of the issue of privatization in the post-Cold War era, see Robert Mandel, "The Privatization of Security," *Armed Forces & Society* 28:1 (2001): 129-151.

[263] Ellen M. Pint, *Public-Private Partnerships: Proceedings of the U.S.-U.K. Conference on Military Installation Assets, Operations, and Services, April 14-16, 2000* (Santa Monica: Arroyo Center, Rand Corporation, 2001), 1. Prior to the conference, Rand scholars also prepared a number of background papers that gave participants an overview to the prior experiences with privatization of both countries. See Ellen M. Pint, et al., *Public-Private Partnerships: Background Papers for the U.S.-U.K. Conference on Military Installation: Assets, Operations, and Services* (Santa Monica: Arroyo Center, Rand Corporation, 2001).

[264] Pint, *Public-Private Partnerships: Proceedings*, 1.

[265] Ibid., 2.

[266] Ibid., 5.

[267] Ibid., 3.

[268] Ibid., 8.

[269] Ibid., 13.

[270] Ibid., 23.

[271] Ibid., 32.

[272] Ibid., 33-34.

[273] Ibid., 31.

[274] Ibid, 63.

[275] W. Michael Hix, Bruce Held, and Ellen M. Pint, *Lessons from the North: Canada's Privatization of Military Ammunition Production* (Santa Monica: Rand Corporation, 2004), xv, xvi.

[276] Ibid., xvii.

[277] Ibid., xviii, xxiv.

[278] Jonathan Howland, "Israel Assists U.S. Forces, Shares Lessons-Learned Fighting Terrorists: Fallujah Success Capitalized on IDF Know-How," *JINSA Online*, Jewish Institute for National Security Affairs, December 27, 2004, http://jinsa.org/articles/view.html?documentid=2774 (accessed May 18, 2005).

[279] Ibid.

[280] "Officers at Fallujah Were Trained in Israeli Urban Warfare Tactics," *WorldTribune.com*, November 10, 2004, http://www.worldtribune.com/worldtribune/ (accessed 18 May 2005).

[281] Ibid.

[282] Brig. Gen. Michael A. Vane, "Urban Warfare," *Army Magazine*, Letters, July 2003.

[283] Jason Sherman, "Pentagon Panel to Boost Urban Defenses," *DefenseNews.com*, December 6, 2004, http://defensenews.com (accessed 18 May 2005).

[284] Ibid.

LCR Appendix Page 1279

[285] Stephen H. Perkins, *Report on the Pension Systems and Invalid Hospitals of France, Prussia, Austria, Russia and Italy, with Some Means upon the Best Means of Disposing of our Disabled Soldiers* (New York: W.C. Bryant & Co., 1863), 9.

[286] Ibid., 7.

[287] John R. McDill, *Lessons from the Enemy: How Germany Cares for Her War Disabled* (Philadelphia: Lea & Febiger, 1918), vii.

[288] Ibid.

[289] Ibid., 256.

[290] See *Policy Concerning Homosexuality in the Armed Forces: Hearings before the Committee on Armed Services*, United States Senate, 1993, 349-352.

[291] Charles Moskos, "From Citizens' Army to Social Laboratory," in Scott and Stanley, *Gays and Lesbians in the Military*.

[292] "World Affairs Council Weekly Broadcast," *National Public Radio*, May 1, 2000; "The Connection," *National Public Radio*, December 20, 1999.

[293] Gal, "Gays in the Military," 181-189.

[294] Belkin and Levitt, "Israel Defense Forces."

[295] Belkin, "Is the Gay Ban Based on Military Necessity?" (2003).

[296] Belkin and Levitt, "Israel Defense Forces"; Belkin, "Is the Gay Ban Based on Military Necessity?" (2003).

[297] Belkin and Evans, "British Armed Forces."

[298] Hix, Held, and Pint, *Lessons from the North*, 74.

[299] David R. Segal, Paul A. Gade and Edgar M. Johnson, "Social Science Research on Homosexuals in the Military," in Scott and Stanley, *Gays and Lesbians in the Military*, 33-51.

[300] Nile Gardiner, "Great Britain and the International Coalition in Iraq," The Heritage Foundation, June 6, 2007.

[301] Ivo H. Daalder, "The Coalition That Isn't," The Brookings Institution, March 24, 2003.

[302] Jason Straziuso, "Heat Becomes Enemy in Afghanistan," Associated Press, June 23, 2006; Matthew Pennington, "NATO Gears Up for Mission in Afghanistan," Associated Press, July 29, 2006; "More Dutch Troops for Afghanistan," *BBC News*, February 3, 2006; "Australia Outlines Afghan Force," *BBC News*, May 8, 2006.

[303] Straziuso, "Heat Becomes Enemy"; Pennington, "NATO Gears Up."

[304] "Canada at a Glance," Resource News International, November 16, 2000; Jim Garamone, "NATO Commander Says Troops Proved Toughness over Summer," American Forces Press Service, October 17, 2006.

[305] Bateman and Dalvi, "Multinational Military Units"; Moskos, Williams, and Segal, *The Postmodern Military*.

[306] Bateman and Dalvi, "Multinational Military Units."

[307] Ibid.

[308] Ibid.

[309] See Belkin and Levitt, "Israel Defense Forces."

LCR Appendix Page 1280

Armed Forces &amp; Society OnlineFirst, published on October 29, 2009 as doi:10.1177/0095327X09352960

# Attitudes of Iraq and Afghanistan War Veterans toward Gay and Lesbian Service Members

Armed Forces & Society
XX(X) 1–23
© The Author(s) 2009
Reprints and permission: http://www.
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0095327X09352960
http://afs.sagepub.com
⑤SAGE

**Bonnie Moradi**[1] **and Laura Miller**[2]

## Abstract

U.S. policy banning openly gay and lesbian personnel from serving in its military rests on the belief that heterosexual discomfort with lesbian and gay service members in an integrated environment would degrade unit cohesion and readiness. To inform this policy, data from a 2006 survey of Iraq and Afghanistan war veterans are analyzed in this study. Views of these war veterans are consistent with prior surveys of military personnel showing declining support for the policy: from about 75 percent in 1993 to 40 percent in this survey. Among the demographic and military experience variables analyzed, comfort level with lesbian and gay people was the strongest correlate of attitudes toward the ban. War veterans indicated that the strongest argument against the ban is that sexual orientation is unrelated to job performance and that the strongest argument in favor of the ban is a projected negative impact on unit cohesion. However, analyses of these war veterans' ratings of unit cohesion and readiness revealed that knowing a gay or lesbian unit member is not uniquely associated with cohesion or readiness; instead, the quality of leaders, the quality of equipment, and the quality of training are the critical factors associated with unit cohesion and readiness.

## Keywords

don't ask, don't tell, lesbian, gay, military cohesion, military readiness, sexual orientation

Key justifications for banning openly gay and lesbian service members from the U.S. military have rested on the beliefs that heterosexual service members' discomfort around openly lesbian and gay personnel would undermine cohesion, readiness, and

[1]University of Florida, Gainesville
[2]RAND Corporation, Arlington, VA

**Corresponding Author:**
Bonnie Moradi, University of Florida, Department of Psychology, P.O. Box 112250, Gainesville, FL 32611-2250
Email: moradib@ufl.edu

DMDC - 000011

At that time, no scientific evidence existed to support or challenge the claim that combat effectiveness in any previous conflicts or in any exercises at the Combat Training Centers (the military's training proxy for war) was diminished in any units because of the presence of open gays or lesbians. Yet this presumption has led to discharges of thousands of military personnel.

At the center of the rationale for DADT, then, are the perceived attitudes of military personnel: their morale, their cohesion, their desire or need for individual privacy, and the perceived impact of those attitudes on combat performance. Either implicitly or explicitly, these arguments tend to rest on the perceived attitudes of *heterosexual men* toward *gay men*, with men composing about 85 percent of the service overall (from 82 percent in the Air Force up to 94 percent in the Marine Corps in 2008) and 100 percent by policy and/or law in most ground combat units such as armor, infantry, and special operations units.[5] Individual morale and unit cohesion ("bonding") are believed to be key for combat motivation and success, which in turn affect overall military readiness for war and, when put into practice, affect effectiveness as well. Anything that lowers morale significantly or prohibits bonding within units is treated as harmful to military operations and thus viewed as a risk to national security.[6] DADT aims to keep lesbian and gay service members "in the closet" so that presumably negative peer attitudes toward same-sex sexual orientation do not harm unit cohesion and military effectiveness.

## DADT in War

Despite the policy justification that openly gay and lesbian military personnel would harm unit cohesion and effectiveness, enforcement of the policy in the form of discharges typically drops during times of war.[7] This pattern has held during the wars in Iraq and Afghanistan, with discharges dropping from peak rates of 1,241 and 1,273 in 2000 and 2001, respectively, to 612 in 2006.[8] For the years 2002 to 2006 combined, available data suggest that 3,715 service members have been discharged under the exclusionary policy.[9] This reduced enforcement of the policy during wartime calls into question whether military commanders agree with the policy that the impact of lesbian and gay service members outweighs the contributions those service members make to their units' mission.

There is a substantial cost, even in peacetime, for discharging personnel who have been recruited, trained, and assigned to posts in which they have performed their jobs at least satisfactorily; but this cost is even more dramatic in times of war when the demand for military personnel is not met by the supply and service members are also lost because of wartime injury or death. The Army, in particular, has faced recruiting challenges since the "Global War on Terror" began, causing them to increase enlistment bonuses and lower quality standards for entrants (e.g., increasing the number of waivers to admit recruits with prior criminal activity).[10] The demand for scarce and critical skills such as Arab language capability raises the question of which has the higher negative impact on military effectiveness when Arab linguists are discharged

DMDC - 000012

Case 2:04-cv-08425-VAP-E    Document 156-1    Filed 04/05/10    Page 84 of 130    Page ID #:2853

and gay service members, knowledge of the presence of gay or lesbian unit members, ratings of leadership, training, and equipment quality, and perceptions of unit cohesion and readiness. Specifically, to provide empirical evidence that can inform military policy and practice, this study uses the Zogby data to examine the following research questions and hypotheses:

1. What are Iraq and Afghanistan war veterans' attitudes toward allowing gay and lesbian individuals to openly serve in the military? To answer this question, descriptive data from the Zogby poll are interpreted within the context of prior polls indicating decreasing support for the ban since 1993.
2. What arguments do Iraq and Afghanistan war veterans view as the strongest for and against allowing lesbian and gay individuals to openly serve? Descriptive data from the Zogby poll are expected to parallel arguments made in the public debates on DADT, namely, the potential impact on unit cohesion versus the civil rights of sexual minorities.
3. Do attitudes toward allowing gay and lesbian individuals to openly serve differ across war veterans of different demographic (i.e., age, gender, race/ethnicity, religious affiliation, political party) and military experience (i.e., duty status, service branch, years of service, rank or grade, unit type, shower privacy, prior training on prevention of antigay harassment) backgrounds? Prior analyses have yielded mixed results regarding demographic differences in attitudes toward lesbian and gay people, with the exception that women tend to report more affirmative attitudes than men.[20] Given limited research with military populations, however, we test the hypotheses that war veterans' attitudes toward allowing open service will differ across demographic and military experience factors, for example, that those who live in closer proximity to one another with little privacy (e.g., those in ground combat units or those who routinely have to use group showers) will be more likely to support the ban than their counterparts.
4. Do attitudes toward allowing gay and lesbian individuals to openly serve differ according to war veterans' comfort with lesbian and gay people and knowledge of a gay or lesbian unit member? Based on prior research indicating that contact with lesbian and gay people is associated with more affirmative attitudes toward these populations,[21] we test the hypothesis that those who are comfortable with gay and lesbian people and know a lesbian or gay unit member support open service more so than those who are not comfortable with and do not know a gay or lesbian unit member.
5. Is knowing a lesbian or gay unit member associated with differences in perceived unit cohesion and readiness, when other general unit quality predictors (i.e., quality of officers, NCOs, equipment, training) are accounted for? The military invests billions of dollars annually in recruiting, selecting, educating, and developing its leaders; in training both individuals and units for combat operations; and in developing, procuring, and maintaining military equipment—all in the name of improving military effectiveness. For this reason, we hypothesize that quality of officers,

DMDC - 000013

**Table 1.** Polls of Military Personnel Regarding the "Don't Ask, Don't Tell" Policy

| Source | Date | Question | Support Open Service (%) | Oppose Open Service (%) | Unsure, Neutral, No Opinion (%) | Method |
|---|---|---|---|---|---|---|
| Miller/Moskos[a] | February 1992– June 1993 | Gays and lesbians should be allowed to enter and remain in the military. | 20 | 70 | 9 | Nonrandom stratified sample administered at stateside and overseas posts to 3,543 soldiers. Reported results have been adjusted to reflect gender balance in the military. |
| Los Angeles Times[b] | February 1993 | How do you feel about lifting the ban on gays in the armed forces? | 18 | 74 | 8 | Poll sampled 2,346 enlistees. Administered in commercial areas and residential housing near 38 military installations across the United States. Results weighted to reflect age, race, gender, service, marital status, and education of this population. |
| Triangle Institute for Security Studies[c] | Fall 1998– Spring 1999 | Do you think gay men and lesbians should be allowed to serve openly in the military? | 18 | 73 | 9 | Survey administered to 2,901 military officers at military educational institutions. The sample includes active-duty and reserve officers who are likely to be promoted and emerge as top military leaders. |

*(continued)*

DMDC - 000014

7

openly serve in the military (up to three arguments for and up to three arguments against). As summarized in Table 2, among possible reasons against allowing open service, the argument endorsed most frequently was the publicized rationale for the ban that "open gays and lesbians would undermine unit cohesion" (42 percent). This may reflect service members' backing of the current military position or their personal views and experience; but as we note below, analyses of respondents' actual ratings of unit cohesion challenge this rationale for the ban. The second and third most frequently endorsed arguments against integration reflected concerns about harassment and abuse of gay and lesbian service members (27 percent) and moral or religious objections to homosexuality (26 percent). Among possible reasons in support of allowing open service, war veterans most frequently selected "sexual orientation has nothing to do with job performance" (38 percent), that "it is wrong to discriminate based on sexual orientation" (30 percent), and that every qualified individual is needed during wartime (24 percent). Thus, with regard to the second research question, the top arguments for and against integration reflected arguments articulated in public debates on DADT, with the top arguments for integration prioritizing performance and qualifications over exclusionary practices.

## Demographic and Military Experience Factors and Attitudes toward Lesbian and Gay Service Members

Analysis of variance (ANOVA) was used to test the third research question and hypotheses that demographic and military experience factors would account for differences in attitudes toward allowing gay and lesbian individuals to openly serve.[24] Table 3 shows that, of the general demographic variables, age group and racial/ethnic status (categorized as majority or minority) were not associated significantly with attitudes about allowing lesbian and gay personnel to openly serve. By contrast, significant but small main effects emerged for gender, religious affiliation, and political party affiliation. Consistent with previously observed gender differences in attitudes toward sexual minorities,[25] women expressed significantly more support for open service than did men. Also, those who identified as atheist, realist, or humanist agreed with allowing gay and lesbian personnel to openly serve significantly more so than those who identified as Protestant or Muslim. These comparisons should be interpreted with caution, however, because there were only eighteen and four individuals in the atheist, realist, or humanist and Muslim groups, respectively. Finally, those who identified as Democrat, Independent or minor party, or "not sure" agreed with allowing open service significantly more so than those who identified as Republican. Effect sizes indicated that the significantly associated demographic variables (i.e., gender, religious affiliation, and political party) each explained about 4 percent to 6 percent of the variance in attitudes.[26]

Of the military experience variables, duty status (veteran, active duty, reserves), service branch, unit type (combat, combat support, combat service support), and shower privacy level were not significantly associated with attitudes about allowing

DMDC - 000015

*Moradi and Miller*                                                                11

**Table 3.** Comparisons of General Demographic Groups on Agreement with Allowing Lesbian and Gay Personnel to Openly Serve in the Military

| Independent variable | % | n | Level of Agreement[a] | | df | F | Effect Size $\eta_p^2$ |
|---|---|---|---|---|---|---|---|
| | | | M | SD | | | |
| Age group | | | | | 2,536 | 2.53 | .009 |
| 18–29 | 22 | 119 | 3.03 | 1.21 | | | |
| 30–49 | 68 | 364 | 3.33 | 1.26 | | | |
| 50–64 | 10 | 56 | 3.23 | 1.35 | | | |
| Gender | | | | | 1,529 | 24.51*** | .044 |
| Male | 78 | 413 | 3.39$_a$ | 1.21 | | | |
| Female | 22 | 118 | 2.75$_a$ | 1.31 | | | |
| Race/ethnicity | | | | | 1,515 | 6.38 | .012 |
| Majority (white) | 79 | 408 | 3.33 | 1.29 | | | |
| Minority (all others) | 21 | 109 | 2.98 | 1.16 | | | |
| Religious affiliation | | | | | 6,512 | 3.98*** | .045 |
| Atheist, realist, humanist | 3 | 18 | 2.39$_{ab}$ | 1.24 | | | |
| Catholic | 30 | 157 | 3.27 | 1.22 | | | |
| Jewish | 1 | 7 | 3.00 | 1.00 | | | |
| Latter-day Saints | 2 | 8 | 3.75 | 1.58 | | | |
| Muslim | 1 | 4 | 4.75$_b$ | 0.50 | | | |
| Protestant | 40 | 208 | 3.42$_a$ | 1.27 | | | |
| Other, no affiliation | 23 | 117 | 3.02 | 1.25 | | | |
| Political party | | | | | 3,483 | 10.44*** | .061 |
| Democrat | 18 | 90 | 2.82$_a$ | 1.24 | | | |
| Republican | 53 | 256 | 3.54$_{abc}$ | 1.19 | | | |
| Independent, minor party | 23 | 112 | 3.08$_c$ | 1.38 | | | |
| Not sure | 6 | 29 | 2.76$_b$ | 0.91 | | | |

Note: Means with same subscripts are significantly different at $p < .05$.
a. Lower means indicate greater support for open service.
***$p < .005$.

the ban than low- and midgrade enlisted personnel. Finally, respondents who reported no training on the prevention of antigay harassment agreed with integration more so than those who reported receiving training. Effect sizes suggested that the significantly associated military experience variables (i.e., years of service, rank, antigay harassment prevention training) each explained about 2 percent to 3 percent of the variance in attitudes.

Further study is necessary to investigate possible explanations for some of these patterns. For example, the significant effects for years of service and grade cannot be explained by their covariation with age since age was not associated with attitudes toward allowing open service. Thus, research is needed to explore potential explanatory factors underlying the effect for years of service and grade. For instance, those

DMDC - 000016

**Table 4 (continued)**

| Independent Variable | % | n | Level of Agreement[a] M | Level of Agreement[a] SD | df | F | Effect Size $\eta_p^2$ |
|---|---|---|---|---|---|---|---|
| Always or almost always group | 3 | 18 | 3.00 | 1.53 | | | |
| Antigay harassment prevention training | | | | | 2, 542 | 6.32*** | .023 |
| Yes | 56 | 305 | 3.42$_a$ | 1.24 | | | |
| No | 34 | 184 | 3.01$_a$ | 1.28 | | | |
| Not sure | 10 | 56 | 3.20 | 1.12 | | | |

Note: Means with same subscripts are significantly different at *p* < .05.
a. Lower means indicate greater support for open service.
b. The composition of service members ever deployed to Iraq or Afghanistan for these wars as of 2007 is as follows: 49 percent Army, 19 percent Navy, 20 percent Air Force, and 13 percent Marine Corps. Compared to this composition, the Zogby sample is roughly representative of Army and Navy personnel but overrepresentative of Air Force personnel and underrepresentative of Marines. As seen in this table, however, service branch was not associated with attitudes toward lesbian and gay service members and did not warrant sample weighting. The 5 Coast Guard members were excluded from this analysis because of their small number and because the Coast Guard falls under the Department of Homeland Security (and, before that, the Department of Transportation) and not under the Department of Defense. For the deployed force composition statistics, see Terri L. Tanielian and Lisa Jaycox, *Invisible Wounds of War* (Santa Monica, CA: RAND, 2008), 22.
c. This set of unit distinctions is most commonly used in ground forces. *Combat* includes infantry, armor, artillery, fighter aircraft, aircraft carriers, submarines, and special operations; *combat support* includes engineers, intelligence, communications, military police, and civil affairs; *combat service support* includes transportation, personnel, finance, medical, maintenance, and food service.
***p < .005.

with more years of experience and higher ranks may have greater awareness of the attitudes of other military personnel and greater understanding of how the military and its units function. Similarly, acculturation to military policy and practice in the officer and enlisted ranks or the impact of the added responsibility for the behavior of subordinates (which falls most heavily on the senior NCOs) may shape the attitudes of more experienced and higher ranking groups toward the ban. Additional research is also necessary to explain why military personnel who received training on the prevention of antigay harassment expressed less support for open service compared to those who did not receive such training. One possibility worth exploring is whether the content of antigay harassment training teaches or reinforces the premise of DADT, that is, the presumption that open gay and lesbian service members are harmful to the military. Another possibility is that the training increases concern that integration will be accompanied by harassment of lesbian and gay service members.

The present findings regarding some of the military experience variables also address questions about whether those with limited privacy would be more opposed to

DMDC - 000017

**Table 5.** Comparisons of Lesbian and Gay-Related Attitude and Experience Groups on Attitudes toward Allowing Lesbian and Gay Personnel to Openly Serve in the Military

| Independent Variable | % | n | Level of Agreement[a] | | df | F | Effect Size $\eta_p^2$ |
|---|---|---|---|---|---|---|---|
| | | | M | SD | | | |
| "Personally, how comfortable are you in the presence of gays and lesbians?" | | | | | 2, 542 | 22.94** | .078 |
| Very, somewhat comfortable | 74 | 405 | 3.07$_a$ | 1.25 | | | |
| Uncomfortable, very uncomfortable | 18 | 96 | 4.00$_{ab}$ | 1.22 | | | |
| Not sure | 8 | 44 | 3.32$_b$ | 0.71 | | | |
| "Do you know for certain that someone is gay or lesbian in your unit?" | | | | | 2, 542 | 9.95** | .035 |
| Yes | 20 | 108 | 2.81$_a$ | 1.41 | | | |
| No | 66 | 358 | 3.41$_a$ | 1.21 | | | |
| Not sure | 15 | 79 | 3.15 | 1.08 | | | |
| "Is the presence of gays or lesbians in the unit well-known by others?" | | | | | 2, 105 | 0.55 | .010 |
| Yes | 53 | 57 | 2.95 | 1.44 | | | |
| No | 22 | 24 | 2.63 | 1.35 | | | |
| Not sure | 25 | 27 | 2.70 | 1.41 | | | |
| Lesbian or gay person told you | | | | | 1, 106 | 0.07 | .001 |
| Yes | 56 | 60 | 2.78 | 1.37 | | | |
| No | 44 | 48 | 2.85 | 1.47 | | | |

Note: Means with same subscripts are significantly different at $p < .05$.
a. Lower means indicate greater support for open service.
**$p < .02$.

comparisons revealed that those who indicated being very or somewhat comfortable in the presence of gay or lesbian people and those who were not sure of their level of comfort agreed with allowing open service more so than those who reported being uncomfortable or very uncomfortable. Follow-up comparisons also indicated that those who knew a lesbian or gay unit member agreed with allowing open service more so than those who did not know a gay or lesbian unit member (see Table 5). Effect sizes for these significant associations suggested that personal comfort accounted for about 8 percent and knowing a lesbian or gay unit member accounted for about 4 percent of variance in attitudes. As noted previously, political affiliation and rank—the demographic and military experience factors that yielded the biggest differences in

DMDC - 000018

**Table 6.** Operationalization and Descriptive Statistics for Criterion Variables and Covariates

| Variable and Survey Question | Rating Scale | | *M* | *SD* |
|---|---|---|---|---|
| **Attitudes toward open service** | | | | |
| "Do you agree or disagree with allowing gays and lesbians to serve openly in the military?" | 1 = *strongly agree* | to  5 = *strongly disagree* | 3.26 | 1.26 |
| **Leadership quality** | | | | |
| "The NCOs in my unit are good leaders." | 1 = *strongly agree* | to  5 = *strongly disagree* | 1.78 | 0.75 |
| "The officers in my unit are good leaders." | 1 = *strongly agree* | to  5 = *strongly disagree* | 2.08 | 0.93 |
| **Instrumental quality** | | | | |
| "How would you rate your unit's level of training for its wartime mission?" | 1 = *very well trained* | to  5 = *very poorly trained* | 1.84 | 0.84 |
| "How would you rate the equipment your unit has for its wartime mission?" | 1 = *very well equipped* | to  5 = *very poorly equipped* | 2.24 | 0.95 |
| **Cohesion** | | | | |
| "There is a lot of teamwork and cooperation in my unit." | 1 = *strongly agree* | to  5 = *strongly disagree* | 1.86 | 0.83 |
| **Readiness** | | | | |
| "How would you rate the readiness of your unit for its wartime mission?" | 1 = *very high* | to  5 = *very low* | 1.92 | 0.86 |

Next, we examined whether the extent of knowledge within the unit and personal disclosure of sexual orientation were associated with perceptions of cohesion and readiness. Specifically, with those participants who reported knowing a lesbian or gay unit member, we conducted two auxiliary MANCOVAs to examine whether ratings of cohesion and readiness differed depending on (1) whether the presence of a gay or lesbian unit member was well known by others in the unit (yes, no, unsure) and (2) whether the lesbian or gay unit member personally disclosed to the respondent (yes, no). Again, ratings of officers, NCOs, training, and equipment were included as covariates. As in the previous analysis, multivariate effects were significant for each of the covariates but not for whether the presence of the gay or lesbian person was well known or whether the lesbian or gay person personally disclosed to the respondent. Follow-up univariate results were similar to the previously described findings with the full sample; that is, ratings of officers and NCOs were associated with perceptions of cohesion, ratings of training were associated with perceptions of readiness, and ratings of equipment were associated with both cohesion and readiness (details available from the first author). By contrast, neither the well-known presence of a lesbian or gay unit

DMDC - 000019

may represent inefficient and ineffective uses of resources. The problematic nature of such efforts is further supported by the notable known presence of gay and lesbian personnel. Importantly, neither the well-known presence of lesbian or gay unit members nor personal disclosure to the respondent was associated with ratings of cohesion or readiness beyond the aforementioned unit quality indicators. The links of a well-known presence and a personal disclosure with personal and unit morale were also generally nonsignificant or reflected trends that gay or lesbian individuals' personal disclosure to the respondent was actually associated with more positive perceptions of impact on personal morale. Taken together, these findings are inconsistent with the assumptions underlying DADT, that the presence of lesbian or gay unit members, their open service, or their personal disclosure would harm unit cohesion, readiness, or morale.

## Conclusions and Future Directions

The present study can inform discussions about the impact of gay and lesbian service members within the U.S. military by offering empirical data about the perspectives of military personnel who have served in war under DADT. Specifically, the present data build on other recent evidence showing declining support for the policy since its inception; 28 percent of the war veterans surveyed in this study opposed the ban, and 33 percent were neutral or not sure. These war veterans' views of the strongest arguments for and against the ban mirror arguments prominent in the public debates. The top endorsed argument in support of integration considered sexual orientation to be unrelated to job performance (38 percent), and the top endorsed argument against integration was the view that open gays and lesbians would harm unit cohesion (42 percent). Age group, racial/ethnic status, duty status (veteran, active duty, reserves), service branch, unit type (combat, combat support, combat service support), and shower privacy level were not significantly associated with attitudes toward allowing gay and lesbian personnel to openly serve; by contrast, gender, religious affiliation, political affiliation, years of service, rank, and prior training on the prevention of anti-gay harassment yielded small but significant effects.

About three-quarters of respondents indicated that they were personally comfortable in the presence of gays and lesbians. About 20 percent reported knowing a gay or lesbian person in their unit, and over half of these respondents indicated that the presence of the lesbian or gay person was well known by others in the unit. Feeling personally comfortable around gay and lesbian people and knowing a lesbian or gay unit member both were associated with opposing the ban. Analyses of these war veterans' ratings of unit cohesion and readiness revealed that knowing a gay or lesbian unit member was not uniquely associated with cohesion or readiness, but the quality of leaders, equipment, and training was. Thus, these data challenge the contention that openly serving lesbian and gay service members are detrimental to unit cohesion and readiness. Instead, the data point to the importance of leadership, training, and equipment quality for perceptions of unit cohesion and readiness. Fortunately, unlike the sexual orientation of service members, which the military cannot control, the military is well equipped to shape the quality of leadership, training, and equipment across its units.

DMDC - 000020

its prior pathologized status, the American Psychological Association recommends use of the terms *lesbian* and *gay* rather than the term *homosexual* when referring to individuals or groups of people. See Committee on Lesbian and Gay Concerns, American Psychological Association, "Avoiding Heterosexual Bias in Language," *American Psychologist* 46 (1991): 973-74.

4. Office of the Secretary of Defense, "Memorandum."

5. Select demographic data on the armed forces are routinely posted by the Defense Equal Opportunity Management Institute on its Web site, http://www.deomi.org/EOEEORes-ources/DemographicReports.cfm.

6. For more in-depth discussions of the literature on the role of cohesion in military opera-tions, see James Griffith, "Multilevel Analysis of Cohesion's Relation to Stress, Well-Being, Identification, Disintegration, and Perceived Combat Readiness," *Military Psychology* 14 (2002): 217-39; James Griffith and Mark Vaitkus, "Relating Cohesion to Stress, Strain, Dis-integration, and Performance: An Organizing Framework," *Military Psychology* 11 (1999): 27-55; Robert J. MacCoun, "Sexual Orientation and Military Cohesion: A Critical Review of the Evidence," in *Out in Force: Sexual Orientation and the Military*, ed. Gregory M. Herek, Jared B. Jobe, and Ralph M. Carney (Chicago: University of Chicago Press, 1996), 157-76; Robert J. MacCoun, Elizabeth Kier, and Aaron Belkin, "Does Social Cohesion Determine Motivation in Combat? An Old Question with an Old Answer," *Armed Forces & Society* 32 (2006): 646-54; Guy L. Siebold, "Small Unit Dynamics: Leadership, Cohesion, Motivation, and Morale," in *Reserve Component Soldiers as Peacekeepers*, ed. Ruth. H. Phelps and Beatrice J. Farr (Alexandria, VA: U.S. Army Research Institute for the Behavioral and Social Sciences, 1996); Guy L. Siebold, "The Essence of Military Group Cohesion," *Armed Forces & Society* 33 (2007): 286-95; Guy L. Siebold and Twila J. Lindsay, "The Relation between Demographic Descriptors and Soldier-Perceived Cohesion and Motivation," *Military Psy-chology* 11 (2000): 109-28; Guy L. Siebold, "The Evolution of the Measurement of Cohe-sion," *Military Psychology* 11 (1999): 5-26; Guy L. Siebold, "Military Group Cohesion," in *Military Life: The Psychology of Serving in Peace and Combat*, vol. 1, ed. Thomas W. Britt, Amy B. Adler, and Carl Andrew Castro (Westport, CT: Praeger, 2005), 185-201.

7. Rhonda Evans, "U.S. Military Policies Concerning Homosexuals: Development, Implemen-tation and Outcomes" (white paper, University of California, Santa Barbara, Palm Center, 2001).

8. Service Members Legal Defense Network, "Fact Sheets: Total 'Don't Ask, Don't Tell' Discharges 1994–2006," http://www.sldn.org/pages/about-dont-ask-dont-tell-fact-sheets (accessed October 12, 2009).

9. Ibid.

10. Bryan Bender, "Stepped-up Army Recruiting Enlists Many with Problems," *Boston Globe*, November 27, 2007; Aamer Madhani, "Army Defends Standards for Recruits," *Chicago Tribune*, October 11, 2007.

11. U.S. Government Accountability Office, "Military Personnel: Financial Costs and Loss of Critical Skills Due to DOD's Homosexual Conduct Policy Cannot Be Completely Estimated" (2005), http://www.gao.gov/new.items/d05299.pdf (accessed April 25, 2007). For a discussion of the expulsion of Arab linguists because of their sexual orientation, see Nathaniel Frank, *Unfriendly Fire: How the Gay Ban Undermines the Military and Weakens America* (New York: St. Martin's, 2009).

DMDC - 000021

Jr. and Sarah E. Lee, "The Relationship of Authoritarianism and Related Constructs to Attitudes toward Homosexuality," *Journal of Applied Social Psychology* 30 (2006): 144-70.

21. Gregory M. Herek, "Why Tell If You're Not Asked? Self-Disclosure, Intergroup Contact, and Heterosexuals' Attitudes toward Lesbians and Gay Men," in *Out in Force*, 197-225; Herek and Glunt, "Interpersonal Contact."

22. Miller, "Fighting for a Just Cause"; Estrada, "Attitudes of Military Personnel"; Bicknell, "Study of Naval Officers' Attitudes"; Miller and Williams, "Do Military Policies on Gender and Sexuality Undermine Combat Effectiveness?"; Belkin, "'Don't Ask, Don't Tell'"; Bonnie Moradi, "Perceived Sexual Orientation-Based Harassment in Military and Civilian Contexts," *Military Psychology* 18 (2006): 39-60; Department of Defense, Office of the Inspector General, "Military Environment with Respect to the Homosexual Conduct Policy," Report D-2000-101 (Washington, DC: Department of Defense, 2000).

23. We cannot directly interpret the meaning of the third of the sample who selected the "neutral" option: they might not care about the issue either way, they might be unable to decide, or they might not feel they know enough about the issue to make a decision.

24. Alpha for these analyses was adjusted to .005 (.05/12) to control for Type I error. Tukey's honestly significant difference follow-up comparisons were used to evaluate group differences underlying significant main effects. In the case of political party, the Games–Howell (GH) follow-up comparison was used because Levene's test of equality of error variances was significant, indicating unequal error variances across groups for this variable.

25. Kerns and Fine, "Relation between Gender and Negative Attitudes"; Kite and Whitley, "Do Heterosexual Women and Men Differ in Their Attitudes towards Homosexuality?"; LaMar and Kite, "Sex Differences"; Schope and Eliason, "Thinking versus Acting."

26. Effect sizes throughout this study reflect partial eta-squared $\eta_p{}^2$, which is an indicator of the unique variance accounted for by a factor, while partialling out other factors included in the equation from the total nonerror variance. Charles A. Pierce, Richard A. Block, and Herman Aguinis, "Cautionary Note on Reporting Eta-Squared Values from Multifactor ANOVA Designs," *Educational and Psychological Measurement* 64 (2004): 916-24.

27. Charles Moskos, Jr., "From Citizen's Army to Social Laboratory," in *Gays and Lesbians in the Military*, 64.

28. Alpha for these tests was adjusted to .02 (.05/4) to control for Type I error. The GH follow-up comparison was used for comfort with gay and lesbian persons and for personal knowledge of gay and lesbian unit members because Levene's test of equality of error variances indicated unequal error variances across groups for these two variables.

## Bios

**Bonnie Moradi**, PhD, is an associate professor of psychology at the University of Florida in Gainesville, FL. Her research focuses on minority stress experiences and mental health of women, racial/ethnic minority populations, and sexual minority populations.

**Laura Miller**, PhD, is a military sociologist at the RAND Corporation in Arlington, VA. Her research interests include military culture and organization, civil-military relations, service members' deployment experiences, and social inequality in the military.

DMDC - 000022

3D823



THE UNDER SECRETARY OF DEFENSE

WASHINGTON, D. C. 20301-2000

POLICY

1 8 JAN 1989

MEMORANDUM FOR DIRECTOR DOD PERSONNEL SECURITY RESEARCH AND
                   EDUCATION CENTER

SUBJECT:    PERS-TR-89-002, "Nonconforming Sexual Orientations
            and Military Suitability"

   We, together with other DoD staff elements, have reviewed
subject draft study and believe you missed the target.  More-
over, you exceeded your authority by extending the research
effort beyond the personnel security arena, and into another
area entirely, namely suitability for military service.

   Wholly aside from PERSEREC's lack of authority to conduct
research into the military suitability area, we found PERS-TR-89-
002 to be technically flawed, to contain subject matter (Judeo-
Christian precepts) which has no place in a Department of Defense
publication, to reflect significant omissions with respect to
relevant court decisions concerning personnel security, and to
suggest a bias which does justice neither to PERSEREC nor the
Department.

   There is an immediate and important need to conduct research
in the personnel security area.  I want you to concentrate on
that need.  You are advised to carefully review the directions set
forth in my memorandum, subject: Initial Research Plan, dated 13
June 1986, addressed to the Director, Personnel Security Research
and Education Center (Attachment 1).  You will find that your
authority to conduct initial research in the sexual misconduct
area is rather narrowly set forth in TAB 2-1, item 19, of the
Initial Research Plan.  We supplemented this direction to you by
means of the Assistant Deputy Under Secretary of Defense (Counter-
intelligence and Security) memorandum, subject: PERSEREC and
Homosexuality Research, dated 26 October 1987 (Attachment 2).
You should review these two documents carefully.  I want you to
renew your effort to develop a positive response to this latter
memorandum.  In this connection, you should work closely with
Mr. Anderson's staff.

   With respect to other ongoing research, you must concentrate
on Priority I tasks as I directed in my 13 June 1986 memorandum.

C F from Bill Peter (54913/

DoD LA 2-6  042450

2

Additionally, please identify any ongoing research efforts which I have not approved in writing, other than support requested by the Marine Security Guard Battalion, and provide me with a copy of the existing Statement of Work in each instance, together with your rationale as to why these efforts should not be discontinued in favor of the approved Priority I tasks.

You will note that in my 13 June 1986 memorandum, I directed you to coordinate with my office before any Priority II or other research efforts were pursued. I have been advised that some of your efforts and resources are being devoted, on a top priority basis, to "Prescreening for Security Positions." I have never specifically approved "Prescreening" as a Priority I research topic. We do not believe it is worth the effort. Accordingly, please submit by 31 January 1989 a schedule for an orderly, but early, termination of the "Prescreening" research (except for that already underway in support of the Marine Guard Force). If, at a later date, it is determined that "Prescreening" research should be re-initiated, you will be advised.

Lastly, I must ask that you coordinate in advance, as well as seek appropriate guidance, prior to initiating any PERSEREC research in areas which are questionable or have not been approved by my office. All of us want PERSEREC to succeed. The key to success is to ensure that materials are produced which are relevant, useful, and timely.

Craig Alderman, Jr.
Deputy

Attachments
As Stated

DoD LA 2-6  042451




**UNDER SECRETARY OF DEFENSE**
4000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-4000

SEP 21 2006

PERSONNEL AND
READINESS

The Honorable Ron Wyden
United States Senate
Washington, DC 20515

Dear Senator Wyden,

     I am responding to your letter to Secretary Rumsfeld regarding the Department's homosexual conduct policy in the military.

     You reference the 2005 General Accountability Office (GAO) report. I assume you are referring to United States Government Accountability Office, GAO February 2005, GAO-5-299, Military Personnel, "Financial Costs and Loss of Critical Skills Due to DOD's Homosexual Conduct Policy Cannot Be Completely Estimated". That report shows 800 specialists with critical skills have been discharged for violating the policy. You highlight the linguists, 54 of whom specialized in Arabic. The GAO report explains the majority of these linguists scored below limited working proficiency in their language. Of the 54 discharged service members who studied Arabic, the GAO report states they were able to match 42 with an occupation that utilizes a foreign language. However, these 42 members had limited experience in their occupation, with 36 service members listed as "helpers" or "apprentices", or had the lowest skill level associated with the occupation (page 22). The GAO documents that those discharged were capable of making a limited contribution in the critical roles of human intelligence collectors, cryptologic linguists or communication interceptors, because the majority of those discharged held speaking and listening proficiency below the midpoint proficiency standard.

     You mention the disparity between the above GAO report and another conducted by the University of California Blue Ribbon Commission for costs of discharges due to violation of the homosexual conduct policy. The difference in cost was addressed in a GAO letter to Senator Kennedy dated July 13, 2006. The GAO stated that 90% of the difference in the studies was due to the Blue Ribbon Commission's use of a different methodology to calculate enlistee training costs. We view the GAO methodology as a more exact analysis. Further, if one compares the number of individuals discharged under the provisions of Title 10 United States Code, Section 654, the number represents a very small per cent of military discharges over all—.3 percent for 2004 and 2005. As reported in the 2005 GAO report, those numbers are far smaller than the number of members discharged for pregnancy and missing weight standards (page 42). It is important to remember, as noted in your letter, that all of these separated members who



13 LC 057312

violated the homosexual conduct policy have the opportunity to continue to serve their nation by putting their abilities to use as civilian employees with other Federal agencies, the Department of Defense, or in the private sector.

As to the policies of our allies and current public opinion, the Department's Homosexual Conduct Policy implements the law cited above – a law enacted by Congressional members elected to represent the citizens of the United States. The Department will, of course, follow Congressional direction on homosexual conduct, but at this time we see no need to change the current statute.

As always, thank you for your interest in the men and women of the Department of Defense.

Sincerely,
REDACTED PURSUANT TO PROTECTIVE ORDER

Principal Deputy

PRODUCED SUBJECT TO PROTECTIVE

13 LC  057313

# DOD/GC
# Homosexual Conduct
# Implementation
# Memo
## (8 Dec 93)

## and

# Service/GC
# Responses

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013347

# CONTENTS

**TAB**

**A**   DoD Service Coordination (Working Level)

**B**   8 Dec 93 memo from DoD/GC to Service Secretaries and Chiefs of Staff, "Implementation of New DoD Policy on Homosexual Conduct"

**C**   Service GC responses to DoD/GC 8 Dec 93 memo
C   Army
1   Navy
2   Air Force

**D**   Draft Service SJA comments to their respective GCs
D   Army
3   Navy
4   Air Force
5   Marines

**F**   MEPCOM fax concerning appeals by civilian applicants found permanently disqualified for service

E  Technical changes
E  Army
6  Navy
7  A.F.

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013348

DOD HOMOSEXUAL CONDUCT POLICY
SERVICE COORDINATION BRIEFING
WORKING LEVEL

INSPECTOR GENERAL and CRIMINAL INVESTIGATORS

DoD IG:                            REDACTED PURSUANT TO PROTECTIVE ORDER
Army CID:
Navy NCIS:
Air Force OSI:
Coast Guard

SECURITY POLICY

ASD C3I:
DIS:
Army:
Navy:
Air Force:
Coast Guard:

PERSONNEL
            Separations
OSD:

J-1:
Army:

Navy:
Air Force:
Marine Corps:
Coast Guard:
Navy Secretariat

            Accessions
OSD:

J-1:
Army:

Navy:
Air Force:
Marine Corps:
Coast Guard:

JAGs                                      TRAINING
                            REDACTED PURSUANT TO PROTECTIVE ORDER
OSD:
JCS:
Army:
Navy:
Air Force:
Marine Corps:
Coast Guard:
PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013349

DISTRIBUTION:

ASSISTANT SECRETARY OF DEFENSE FOR COMMAND, CONTROL,
    COMMUNICATIONS AND INTELLIGENCE
ASSISTANT SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS
ASSISTANT SECRETARY OF DEFENSE FOR RESERVE AFFAIRS
INSPECTOR GENERAL
DIRECTOR OF DEFENSE INVESTIGATIVE SERVICE
DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR
    COUNTERINTELLIGENCE, SECURITY COUNTERMEASURE AND
    SPECTRUM MANAGEMENT
DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR MILITARY MANPOWER
    AND PERSONNEL POLICY
DIRECTOR OF DEFENSE CRIMINAL INVESTIGATIVE SERVICE
ASSISTANT SECRETARY OF THE ARMY (MANPOWER RESERVE AFFAIRS)
ASSISTANT SECRETARY OF THE NAVY (MANPOWER AND RESERVE AFFAIRS)
ASSISTANT SECRETARY OF THE AIR FORCE (MANPOWER, RESERVE AFFAIRS,
    INSTALLATIONS, & ENVIRONMENT)
DEPUTY CHIEF OF STAFF FOR PERSONNEL, U.S. ARMY
CHIEF OF NAVAL PERSONNEL, U.S. NAVY
DEPUTY CHIEF OF STAFF FOR MANPOWER & RESERVE AFFAIRS,
    U.S. MARINE CORPS
DEPUTY CHIEF OF STAFF FOR PERSONNEL, U.S. AIR FORCE
DIRECTOR FOR MANPOWER AND PERSONNEL (J-1)
CHIEF, OFFICE OF PERSONNEL AND TRAINING, DEPARTMENT OF
    TRANSPORTATION
COMMANDER, U.S. ARMY CRIMINAL INVESTIGATION COMMAND
COMMANDER, NAVAL INVESTIGATIVE SERVICE COMMAND
COMMANDER, AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS
THE JUDGE ADVOCATE GENERAL, U.S. ARMY
THE JUDGE ADVOCATE GENERAL, U.S. NAVY
STAFF JUDGE ADVOCATE TO THE COMMANDANT, U.S. MARINE CORPS
THE JUDGE ADVOCATE GENERAL, U.S. AIR FORCE
LEGAL COUNSEL TO THE CHAIRMAN, JOINT CHIEFS OF STAFF
DIRECTOR, COUNTERINTELLIGENCE AND SECURITY MEASURES, U.S. ARMY
    DEPUTY CHIEF OF STAFF FOR INTELLIGENCE
DIRECTOR OF NATIONAL SECURITY, NAVAL INVESTIGATIVE SERVICE
ADMINISTRATIVE ASSISTANT TO THE SECRETARY OF THE AIR FORCE


cc: Director of Administration and Management

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013350



GENERAL COUNSEL OF THE DEPARTMENT OF DEFENSE

WASHINGTON, D.C. 20301-1600

December 8, 1993

MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS
CHAIRMAN OF THE JOINT CHIEFS OF STAFF
CHIEF OF STAFF, ARMY
CHIEF OF NAVAL OPERATIONS
CHIEF OF STAFF, AIR FORCE
COMMANDANT, U.S. MARINE CORPS
SEE DISTRIBUTION

SUBJECT: Implementation of New DoD Policy on Homosexual Conduct

On July 19, 1993, the Secretary of Defense issued a new policy on homosexual conduct in the Armed Forces. On November 20, Congress passed legislation consistent with the new policy, and the President signed the legislation last Tuesday. We would like to implement the new policy as soon as possible.

Draft implementing directives have been available for review since November 10 and have been reviewed by many officials within both the Office of the Secretary of Defense and the Services. Additionally, a series of meetings has been held with representatives of each of the Services, the Joint Staff, and selected offices within OSD. Many helpful comments and suggestions were received. These have been incorporated into the draft documents and related materials to the extent practicable.

One copy of the directives is being transmitted to each Service Secretary, to the Chairman, to each Service Chief and the Commandant who will be responsible for their safekeeping. No copies may be made. The directives will also remain available for review through my office.

It is anticipated that there will be a meeting shortly -- for which you need to be prepared -- to ensure that we are all in agreement on the substance of these directives. Toward that end, we need the comments of each Department and the Joint Chiefs by 0900 Monday, December 13. I have asked each General Counsel to be responsible for consolidating any comments that his Department may have and I would ask that comments be focused on major issues.

If you would like to be briefed by my staff, or to have others review the proposed directives, call CAPT        REDACTED PURSUANT TO
PROTECTIVE ORDER

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013351

**LCR Appendix Page 1301**

The final documents are the first step in implementing the policies set out by the Secretary of Defense in his July 19 memorandum and by Congress in the new legislation.  Additional time will be required for the preparation, coordination, and distribution of Service-specific implementing regulations.  It is therefore essential that we move quickly to complete the process.  Thank you for your help.

REDACTED PURSUANT TO PROTECTIVE
ORDER

Attachment:
As stated

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013352

DISTRIBUTION:

ASSISTANT SECRETARY OF DEFENSE FOR COMMAND, CONTROL,
    COMMUNICATIONS AND INTELLIGENCE
ASSISTANT SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS
ASSISTANT SECRETARY OF DEFENSE FOR RESERVE AFFAIRS
INSPECTOR GENERAL
DIRECTOR OF DEFENSE INVESTIGATIVE SERVICE
DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR
    COUNTERINTELLIGENCE, SECURITY COUNTERMEASURE AND
    SPECTRUM MANAGEMENT
DEPUTY ASSISTANT SECRETARY OF DEFENSE FOR MILITARY MANPOWER
    AND PERSONNEL POLICY
DIRECTOR OF DEFENSE CRIMINAL INVESTIGATIVE SERVICE
ASSISTANT SECRETARY OF THE ARMY (MANPOWER RESERVE AFFAIRS)
ASSISTANT SECRETARY OF THE NAVY (MANPOWER AND RESERVE
AFFAIRS)
ASSISTANT SECRETARY OF THE AIR FORCE (MANPOWER, RESERVE AFFAIRS,
    INSTALLATIONS, & ENVIRONMENT)
DEPUTY CHIEF OF STAFF FOR PERSONNEL, U.S. ARMY
CHIEF OF NAVAL PERSONNEL, U.S. NAVY
DEPUTY CHIEF OF STAFF FOR MANPOWER & RESERVE AFFAIRS,
    U.S. MARINE CORPS
DEPUTY CHIEF OF STAFF FOR PERSONNEL, U.S. AIR FORCE
DIRECTOR FOR MANPOWER AND PERSONNEL (J-1)
CHIEF, OFFICE OF PERSONNEL AND TRAINING, DEPARTMENT OF
    TRANSPORTATION
COMMANDER, U.S. ARMY CRIMINAL INVESTIGATION COMMAND
COMMANDER, NAVAL INVESTIGATIVE SERVICE COMMAND
COMMANDER, AIR FORCE OFFICE OF SPECIAL INVESTIGATIONS
THE JUDGE ADVOCATE GENERAL, U.S. ARMY
THE JUDGE ADVOCATE GENERAL, U.S. NAVY
STAFF JUDGE ADVOCATE TO THE COMMANDANT, U.S. MARINE CORPS
THE JUDGE ADVOCATE GENERAL, U.S. AIR FORCE
LEGAL COUNSEL TO THE CHAIRMAN, JOINT CHIEFS OF STAFF
DIRECTOR, COUNTERINTELLIGENCE AND SECURITY MEASURES, U.S. ARMY
    DEPUTY CHIEF OF STAFF FOR INTELLIGENCE
DIRECTOR OF NAVAL SECURITY, NAVAL INVESTIGATIVE SERVICE
ADMINISTRATIVE ASSISTANT TO THE SECRETARY OF THE AIR FORCE

cc: Director of Administration and Management

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013353





**DEPARTMENT OF THE ARMY**
OFFICE OF THE GENERAL COUNSEL
WASHINGTON, DC 20310-0104

December 13, 1993

MEMORANDUM FOR THE GENERAL COUNSEL OF THE
DEPARTMENT OF DEFENSE

SUBJECT: New DoD policy on Homosexual Conduct

The proposed directives on accessions and separations each contain the statement that "homosexual orientation is not a bar to entry or continued service." We strongly believe that this language is surplusage and that it will create confusion in efforts to follow the directives. More importantly, the language may well prove to be the *Achilles' heel of the entire policy* in future litigation. Finally, the language appears to be inconsistent with Congressional intent.

The accessions and separations directives make it clear that homosexual conduct is the relevant factor in determining whether an individual is barred from service. Thus, even without specific mention of it, it is clear that homosexual orientation, without conduct, is not a bar to service. The language in question is never operative in deciding whether a person is barred, and so it is surplusage. (It may serve a political purpose, but that would be an inappropriate reason for retaining it in the directives.)

The language is not harmless surplusage, either. Imagine the confusion it will create for a commander in the field consulting the separation directive for guidance in dealing with a soldier who says, "I have a homosexual orientation." Logically, the commander might conclude that the soldier should not be separated merely for admitting something that the directive specifically states is NOT a basis for separation in the first place. Yet, we know (though the commander may not) that that very statement creates a presumption which, if unrebutted, is a basis for separation (Senate Report, p. 294).

The commander's dilemma carries over to the litigation arena should the soldier who made the statement fail to rebut the presumption and be separated for "homosexual conduct." We will then be in the position of trying to reconcile how it is acceptable for a member to HAVE a homosexual orientation, but not for him to SAY

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013354

- 2 -

he has.  We believe this inconsistency will be the focus of the judicial challenges we know will come.  It will be extremely difficult to defend these challenges.  Even under the "old" homosexual policy, where such a statement was an admission of something that was itself a ground for separation, *some courts found a First Amendment issue.*

The fact that the language in question not only is unsupported *by the statute but, indeed, may be inconsistent with it,* will do nothing to bolster our litigation position.  It is clear from the legislative history and the DoD General Counsel's testimony before the Senate Armed Forces Committee that, if a soldier or prospective soldier states, "I have a homosexual orientation," we may presume that person at least has a propensity to engage in homosexual conduct.  The provision in the proposed accessions and separations directives that "homosexual orientation is not a bar to entry or continued service" is, in effect, saying, contrary to Congressional intent, that having a homosexual orientation does NOT give rise to a presumption that the person "engages in, attempts to engage in, has a propensity to engage in, or intends to engage in impermissible conduct."  (Senate Report, p. 294.)

It is entirely unnecessary to expose ourselves to these disadvantages because, as noted above, the "homosexual orientation" language in the directives is surplusage and has no operative effect.  Accordingly, we make the following recommendations:

1.  Delete the "sexual orientation" *sentence from the* accessions directive and both separation directives.  This is clearly the most prudent alternative.

2.  If #1 is not adopted, delete the "sexual orientation" sentence from both separation directives.  This is where *the language is most likely to be an issue in litigation.*

3.  If neither #1 or #2 is adopted, revise the first two sentences of the "Homosexual Conduct" paragraph of both separation directives to read:  "Homosexual conduct is grounds for separation from the military services. (Sexual orientation, however, is considered a personal and private matter, and homosexual orientation, without homosexual conduct, is not a bar to service entry or

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013355

- 3 -

continued service.)" The "sexual orientation" language should not come first, and it should be set off by parentheses, because it is not operative language. It is, at best, an aside in a paragraph which is entitled, and supposed to deal, only with homosexual conduct.

4.  Regardless of whether any of the foregoing are adopted, add a hypothetical to Tab F.15 to make it clear that the statement, "I have a homosexual orientation," gives rise to a rebuttable presumption. A suggested hypothetical is attached (Tab 1).

In an effort to be as supportive as possible of the new policy, we are proposing three alternatives (#1, #2, #3) for dealing with our primary concern. A memorandum from The Judge Advocate General addressing  this issue is attached for your further consideration (Tab 2).

REDACTED PURSUANT TO PROTECTIVE ORDER

Deputy General Counsel
(Military & Civil Affairs)

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013356

14.  <u>Situation</u>:  A Marine lance corporal requests permission to see his company commander. Upon reporting the Marine says to his commander, "Sir, I think you should know that I have a homosexual orientation." The commander advises the corporal of the military's policy on homosexual conduct and that he intends to initiate administrative discharge procedures.

<u>Issues</u>:  *Was the commander's response appropriate?*

<u>Proposed Resolution</u>:  Yes. A servicemember's statement that he or she is a homosexual, <u>or any words to that effect,</u>* create a rebuttable presumption that the member is engaging in homosexual acts or has the intent or propensity to do so. It is the commander's responsibility to make an assessment as to what the words spoken were intended to convey. If the commander determines that the servicemember intended to convey that he is a homosexual, then the commander may initiate administrative discharge procedures. During the administrative proceeding, it will be up to the servicemember to demonstrate that he is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.

* Some examples of words to the effect that a person is a homosexual include: "I am gay," "I am a lesbian," "I have a homosexual orientation," or "I am sexually attracted to a person of the same sex."

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013357



**DEPARTMENT OF THE ARMY**
OFFICE OF THE JUDGE ADVOCATE GENERAL
2200 ARMY PENTAGON
WASHINGTON, DC 20310-2200



REPLY TO
ATTENTION OF

DAJA-ZA                                            13 December 1993

MEMORANDUM FOR ACTING GENERAL COUNSEL

SUBJECT: Proposed DOD Homosexual Conduct Policy

1.  I am providing this memorandum in response to the DOD General Counsel's request for Army comments on the draft implementing directives for the New DOD Policy on Homosexual Conduct in the Armed Forces.

2.  The most serious issue I have with the draft policy concerns the language which appears in several locations in the directives to the effect that "...homosexual orientation is not a bar to entry or continued service...." The purpose and intent of the recent legislation on Policy Concerning Homosexuality in the Armed Forces and these draft implementing directives is to make clear that homosexual conduct -- as well as the propensity to engage in such conduct -- is the policy basis for denying entry or continuing in service. The legislation focuses exclusively on that point and does not attempt to describe any category, class, or group not affected by the policy. The above-quoted language in the draft implementing directives suggests a protected class (i.e. those with a homosexual orientation). I believe this language is inconsistent with other provisions of the policy and the legislation, undercuts the ability of commanders in the field to administer an already complex policy, and creates a *significant and unnecessary increase in the litigation risk*.

3.  For there to be any suggestion of a protected class encompassed by the policy is inconsistent with other provisions of the policy and the legislation. Both the policy and the legislation define "homosexuals", to include "gays" and "lesbians", as *persons who engage in or have a propensity to engage in homosexual acts*. By definition, these persons would be denied entry or continued service.

4.  With respect to the term "homosexual orientation" in particular, it is clear from the legislative history and the *DOD General Counsel's testimony before the Senate Armed Services Committee* that the statement, "I have a homosexual orientation," would be enough to support the presumption the the person so stating engages in or has a propensity to engage in homosexual conduct. If the presumption remains unrebutted, that person would be denied entry or separated. The inconsis-

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013358

DAJA-ZA
SUBJECT:  Proposed DOD Homosexual Conduct Policy

tency between the language that "homosexual orientation is not
a bar" and this adverse presumption permitted under the policy
and the legislation will cause unnecessary confusion for
commanders in the field who must implement this policy.

5.  Further, this language creates significant unnecessary
litigation risk.  Inevitably, if any language suggesting a
protected class is included, we will be required to define who
is included in that class.  This will be a difficult proposi-
tion at best, in light of the definitions we begin with in the
policy and the legislation.  In effect, if persons who call
themselves "homosexuals, gays, or lesbians" demonstrate that
they do not engage in or have a propensity to engage in
homosexual acts, they will have shown themselves not to be
"homosexuals, gays, or lesbians", within Congress' and DOD's
definitions.  This will be so no matter what label they place
upon themselves or status they claim.

6.  The inherent difficulties created by these apparent
contradictions can be avoided by eliminating the language
about "homosexual orientation" and remaining consistent with
the legislation.  We must focus on the policy basis --
homosexual conduct or the propensity to engage in such
conduct.  In the implementation of other separation policies,
we focus on the condition or action which is the basis for
separation.  We should do the same here, and not be diverted
by classes, groups, or categories that may not be subject to
separation.  By doing so, we will not need to explain to a
court who or what groups constitute exceptions.  Our only
burden in defending this policy will be to show that we had
sufficient information from which to conclude that the person
denied entry or separated engaged in or had a propensity to
engage in homosexual conduct.

7.  For these reasons, I strongly recommend that we advise the
DOD General Counsel to remove the above-quoted language from
the draft implementing directives.

REDACTED PURSUANT TO PROTECTIVE<br>ORDER

Major General, USA
The Judge Advocate General

PRODUCED  SUBJECT  TO  PROTECTIVE

OSD OEPM 013359



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20350-1000

13 December 1993

MEMORANDUM FOR THE GENERAL COUNSEL, DEPARTMENT OF DEFENSE

Subj:  IMPLEMENTATION OF NEW DOD POLICY ON HOMOSEXUAL CONDUCT

    This is in response to your memorandum of December 8, 1993, requesting comments on proposed DOD directives relating to homosexual conduct in the Armed Forces.  The Department of the Navy concurs with the proposed directives.

    As a result of our review, we have developed Departmental comments and recommendations, enclosed at Tab A, that we feel will strengthen the directives and assure consistency in implementation of the new policy throughout the military departments.  The Departmental comments fully incorporate the comments provided by the Chief of Naval Operations and the Commandant of the Marine Corps with respect to the substance of the proposed directives, but to maximize communication on these points, I am also enclosing the comments from these Service Chiefs (see Tabs B and C).

    Your proposed directives implement changes in military personnel policy that have been unusually intensively and extensively debated over the past year.  The implementation of these changes cannot be free from differences of opinion.  We hope that the attached comments will be read in this light. Under any conditions, we are impressed with the balance, clarity and precision that is achieved in these regulations.  Your efforts and those of your staff are commendable.

REDACTED PURSUANT TO PROTECTIVE ORDER

Secretary of the Navy
Acting

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013360

**DEPARTMENT OF THE NAVY COMMENTS
ON PROPOSED DOD DIRECTIVES RELATING
TO HOMOSEXUAL CONDUCT IN THE ARMED FORCES**

1.  Accession Policy:  <u>DOD Dir. 1304.26, Par. B.8.b(1)</u>.

<u>Comment</u>:  Revise subparagraph (1) as follows:

An applicant shall be rejected for entry into the Armed Forces if, in the course of the accession process, evidence is received demonstrating that the applicant engaged in<u>, attempted to engage in, or solicited another to engage in</u> a homosexual act unless ~~the circumstances indicate that the applicant does not have a current propensity or intent to engage in homosexual acts (e.g., when the homosexual acts were remote in time).~~ <u>there is a further determination that (a) such conduct is a departure from the applicant's usual and customary behavior, (b) such conduct, under all the circumstances, is unlikely to recur, (c) such conduct was not accomplished by the use of force, coercion, or intimidation, (d) under the particular circumstances of the case, the applicant's presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order and morale, and (e) the applicant does not have a propensity or intent to engage in homosexual acts.  Such a determination will be made based solely upon the evidence obtained through normal accession processing.</u>  ~~A homosexual act means (a) any bodily contact, actively or undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires, and (b) any bodily contact that a reasonable person would understand to demonstrate a propensity or intent to engage in an act described in subparagraph (a).~~

<u>Reason</u>:  These changes are necessary to bring the directive into compliance with the statute.  In particular, the draft directive omits the language "has engaged, attempted to engage in, or solicited another to engage" in homosexual acts; omits the five criteria for retention prescribed by the statute when there is evidence of homosexual acts; and, inserts the term "current" with respect to whether the applicant has a propensity to engage in homosexual acts.  The suggested changes bring this subparagraph into line with the language of the statute and, consistent with the statute, applies the same criteria to both preservice and in service homosexual acts.

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013361

2.  Accession Policy:  <u>DOD Dir. 1304.26, Par. B.8.b(2)</u>.

<u>Comment</u>:  Revise subparagraph (2) as follows:

An applicant ~~may~~ <u>shall</u> be rejected for entry if he or she makes a statement that ~~demonstrates that the applicant has a propensity or intent to engage in homosexual acts,~~ <u>he or she is a homosexual or bisexual, or words to that effect,</u> unless there is a further determination that the applicant has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.  <u>Such a determination will be made based solely upon evidence obtained through normal accession processing.</u>  ~~A statement by the applicant that he or she is homosexual or bisexual, or words to that effect, creates a rebuttable presumption that the applicant engages in homosexual acts or has a propensity or intent to do so.  However, the applicant shall be advised of this presumption and given the opportunity under procedures prescribed by the Secretary concerned to rebut the presumption by presenting evidence sufficient to demonstrate that he or she does not engage in homosexual acts and does not have a propensity or intent to do so.  In determining whether an applicant has successfully rebutted the presumption that he or she engages in or has a propensity or intent to engage in homosexual acts some or all of the following may be considered.~~

~~(a)  whether the applicant has engaged in homosexual acts;~~

~~(b)  the applicant's credibility;~~

~~(c)  testimony from others about the applicant's past conduct, character, and credibility;~~

~~(d)  the nature and circumstances of the applicant's statement;~~

~~(e)  any other evidence relevant to whether the applicant is likely to engage in homosexual acts.~~

~~This list is not exhaustive, any other relevant evidence may also be considered.~~

<u>Reason</u>:  The proposed directive is inconsistent with the statute in that it uses the word "may" in lieu of "shall" in the first sentence.  It also incorporates at the accession stage the procedural scheme for dealing with the rebuttable presumption.  This procedural scheme is not required by the statute at the accession stage and would be too cumbersome to apply.  The proposed change brings this provision back into line with the

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013362

statute and allows for the "propensity determination" to be made as part of normal accession processing. The definition of propensity is set out elsewhere in Enclosure 2 and need not be repeated here.

3. Accession Policy: <u>DOD Dir. 1304.26, Par. B.8.b(3)</u>.

<u>Comment</u>: Revise subparagraph (3) as follows:

> An applicant shall be rejected for entry if, in the course of accession process, evidence is received demonstrating that the applicant has ~~engaged in a~~ ~~homosexual marriage or attempted marriage, unless the~~ ~~circumstances indicate the applicant does not have a~~ ~~current propensity or intent to engage in homosexual~~ ~~acts (e.g., where the homosexual marriage or attempted~~ ~~marriage was remote in time). A homosexual marriage or~~ ~~attempted marriage occurs when an applicant has married~~ ~~or attempted to marry a person know to be of the same~~ ~~biological sex (as evidenced by the external anatomy of~~ ~~the persons involved).~~ <u>married or attempted to marry a</u> <u>person known to be of the same biological sex.</u>

<u>Reason</u>: This change brings the directive into line with the statute and deletes the requirement that a person's "current propensity" be considered when they have entered into or attempted to enter into a homosexual marriage.

4. Separation Policy: <u>DOD Dir. 1332.14, Enclosure 1, Par.</u> <u>H.b(1) and (2)</u>.

<u>Comment</u>: Delete the phrase "During a period of military service," from the first sentence of H.b(1) and delete H.b(2) in its entirety.

<u>Reason</u>: This change would treat in service and preservice acts the same and allow retention when the five criteria prescribed by the statute for retention are met. Recommend the same change to the corresponding provision of DOD Dir. 1332.30, Separation of Regular Commissioned Officers.

5. Separation Policy: <u>DOD Dir. 1332.14, Enclosure 1, Par.</u> <u>H.b(4)</u>.

<u>Comment</u>: Revise subparagraph (4), concerning separation for actual or attempted homosexual marriages, in the manner set out at paragraph 3, above.

<u>Reason</u>: This change brings the directive into line with the statute and deletes the requirement that a member's "current propensity" be considered when they have entered into or attempted to enter into a homosexual marriage. Recommend the same change to the corresponding provision of DOD Dir. 1332.30, Separation of Regular Commissioned Officers.

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013363

6. Separation Policy:  <u>DOD Dir. 1332.14, Enclosure 1, Par. H.1.b(3)(b) and (e)</u>.

<u>Comment</u>:  Include the following at H.1.b(3)(e):

<u>To rebut the presumption that a member is engaging, or has a propensity to engage, in homosexual acts created by a member's own statements, the member must establish, by a preponderance of the evidence, that he or she neither has engaged in homosexual acts nor has a propensity to engage in homosexual acts.</u>

<u>Reason</u>:  Par. H.1.b(3)(b) states that guidance on the burden of proof is contained in subparagraph b(3)(e), but no guidance is provided.  This change provides the needed guidance.  Recommend the same change to the corresponding provision of DOD Dir. 1332.30, Separation of Regular Commissioned Officers.

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013364



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
WASHINGTON, DC 20350-2000

IN REPLY REFER TO
13 December 1993

MEMORANDUM FOR THE GENERAL COUNSEL, DEPARTMENT OF DEFENSE

Via:   General Counsel, Navy Department

Subj:  IMPLEMENTATION OF NEW DEPARTMENT OF DEFENSE POLICY ON
       HOMOSEXUAL CONDUCT

Ref:   (a) Your memo of 8 Dec 93
       (b) 10 U.S.C. § 654
       (c) Draft DoD Directive 1304.26

1.  The draft implementing directives forwarded by reference (a)
have been reviewed.  There are four major issues upon which we
need to reach consensus.

2.  First, with respect to accessions, there is an inconsistency
between the controlling statute (reference (b)) and draft DoD
Directive 1304.26 (reference (c)) regarding the opportunity to
rebut the implication of a homosexual marriage or attempted
homosexual marriage.  Subsection (c) of the statute requires that
standards for enlistment/appointment reflect the policies in
subsection (b).  Those policies permit rebuttal of acts
(subsection (b)(1)) and statements (subsection (b)(2)), but make
no provision for rebuttal of homosexual marriage/attempted
marriage (subsection (b)(3)).  Department of Defense (DoD) and
Department of the Navy directives and instructions should state
clearly that rejection for entry based upon homosexual
marriage/attempted homosexual marriage is not subject to
rebuttal.  The DoD Directive should not create an exception not
provided in the statute.

3.  As a related matter, paragraph B.8.b.(1) of enclosure (2)
reference (c), in referring to acts, uses the language "engaged
in a homosexual act or acts."  The corresponding statutory
language is:  "has engaged in, attempted to engage in, or
solicited another to engage in a homosexual act or acts."  This
broader statutory language should be used in the directive.

4.  My second concern also relates to the relationship between
the statute and accession policy/procedures.  Paragraph B.8.b.(2)
of enclosure (2) to reference (c) tasks the Secretary concerned
with prescribing procedures to allow an applicant to rebut the
presumption created by a statement.  Such procedures, according
to the statute, must reflect the policies governing separation,
but need not be identical to them.  There is no need to provide
the array of procedures that exist in separation directives.
Rather, an applicant who makes a statement "shall" (vice "may")

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013365

Subj: IMPLEMENTATION OF NEW DEPARTMENT OF DEFENSE POLICY ON HOMOSEXUAL CONDUCT

be denied enlistment/appointment unless, in accordance with the normal recruiting practices of the Secretary concerned, the applicant demonstrates that he or she is not a "person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts." With this change, the directives will track the requirements and the language of the statute. Similar procedures should be applied to members in the Delayed Entry Program.

5. Third, Navy has processed several cases under current guidelines. Additional cases are ongoing. Upon completion of processing, these members have been transferred to the Stand-By Reserve to await a decision as to their discharge. Air Force also may have cases in the pipeline. The services must have uniform guidance to make final disposition of these cases. An option short of complete reprocessing should be approved.

6. Finally, an implementation date should be determined to allow at least 60 days from signing of DoD action. This is the minimum required for proper staffing, inter-service coordination and, where required, approval by DoD.

7. In addition to these comments on major issues, an errata sheet has been provided to Navy General Counsel.

8. Thank you for the opportunity to comment on these important policy changes.

REDACTED PURSUANT TO PROTECTIVE
ORDER

*2*

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013366



DEPARTMENT OF THE NAVY
HEADQUARTERS UNITED STATES MARINE CORPS
WASHINGTON, D.C. 20380-0001

IN REPLY REFER TO:
5800
JA
1 3 DEC 1993

MEMORANDUM FOR THE GENERAL COUNSEL, DEPARTMENT OF DEFENSE

Via:    General Counsel, Navy Department

Subj:    IMPLEMENTATION OF NEW DEPARTMENT OF DEFENSE POLICY ON HOMOSEXUAL CONDUCT

Ref:    (a) Your memo of 8 Dec 93
        (b) 10 U.S.C. § 654

Encl:    (1) SJA to CMC Comment 5800 JAR1 of 10 Dec 93

1.    The draft directives forwarded by reference (a) have been reviewed.

2.    As we have previously discussed, I am commited to drafting a new policy that does not burden our recruiters with legal procedures, but that accomplishes the goal of fairness, both to the services and to the individual applicant or servicemember.

3.    Enclosure (1) contains the recommendations of my Staff Judge Advocate.  I believe that the changes proposed therein fully comply with the letter and the intent of the legislation set forth in reference (b).  I request that you carefully review his suggestions.  I am hopeful that we can accomplish the desired result.

REDACTED PURSUANT TO PROTECTIVE ORDER

Commandant of the Marine Corps

OSD OEPM 013367




**DEPARTMENT OF THE AIR FORCE**
WASHINGTON DC

DEC 1 3 1993

OFFICE OF THE GENERAL COUNSEL

MEMORANDUM FOR THE GENERAL COUNSEL, DEPARTMENT OF DEFENSE

SUBJECT: Implementation of New DOD Policy on Homosexual Conduct

    The Air Force has reviewed the proposed policy and implementing documents provided to the Secretary and the Chief of Staff with your memorandum of December 8, 1993. We view the policy and procedures prescribed by those documents as being generally acceptable, capable of being effectively carried out and successfully defended. Several specific recommendations for improvements are discussed in the attachment.

    The Secretary and the Chief of Staff are in agreement with these views.

    Thank you for the opportunity to provide you the Air Force's views on this important matter.

REDACTED PURSUANT TO PROTECTIVE ORDER

*General Counsel*

Atch: a/s

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013368

**AIR FORCE COMMENTS**

Effective date:  The documents provided specify no effective date.  The Air Force recommends that the effective date of the new policy be at least 60 days after its publication, to allow sufficient time for coordination and publication of necessary Service implementing documents.

Accession standards:  The proposed accessions directive does not sufficiently distinguish between the policy considerations governing accession decisions (which by law must "reflect" the policy governing separations) and the procedures for implementing those policy considerations.  The procedural protections for the member necessary in separation actions are neither required nor desirable in the accession decision.  The Services should make accession decisions based upon the information obtained during normal accession processing, applying the same policy considerations used to separate persons for homosexual conduct.  Procedures relating to the "rebuttable presumption" therefore should be removed from the accessions directive.

Propensity:  The definition of "propensity" that appears in the accessions and separations directives is troubling because it appears to set up an evidentiary standard - that it is more likely than not that the member engages or will engage in homosexual acts - not intended by the statute and difficult to meet in practice.  The Air Force views this definition as unnecessary.  If it is to be retained, we suggest that the reference in it to "likelihood" be replaced by "circumstances from which a reasonable inference may be drawn," or words to that effect.

Personnel security:  The materials provided for review modify the investigative standards in DIS Manual 20-1-M to conform to the new policy, but do not address the adjudication guidelines in DOD 5200.2-R and DCID 1/14.  Conforming changes to DOD 5200.2-R are needed to ensure that sexual orientation alone is not a determining factor in the adjudication process.  Changes in DCID 1/14, regarding SCI access, require the approval of the DCI.  We understand it is currently under revision.

Training scenarios:  The hypothetical training scenarios should be clearly labeled to indicate that they are for training purposes only and do not represent approved solutions for certain fact patterns.

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013369

703 695 5111 PAGE:003                                    DEC 13 '93 9:54

5800
JAR1
10 Dec 93

**SJA TO CMC COMMENT on DoD OGC memo of 8 Dec 93**

Subj:  IMPLEMENTATION OF NEW DOD POLICY ON HOMOSEXUAL CONDUCT

1.  **Issue.**  You asked us to review and comment on the draft DoD regulations implementing the subject policy.

2.  **Opinion**

    a.  The accession procedures described in proposed DoDD 1304.26 need not implement the procedural protections of the rebuttable presumption, but instead, should merely reflect the policies described in the separation provision of the new statute.  Neither case law, nor due process, requires any procedural rights upon accession.  This directive should be amended to permit the military services to make its accession determination based solely upon information obtained during normal accession processing, while basing its decision upon the same policy considerations used to separate persons for homosexual conduct.  Finally, portions of the suggested changes are necessary to give the Services the wide latitude intended by Congress in the statute.

    b.  The separation procedures described in proposed DoDD 1332.14 and DoDD 1332.30 add an element of proof to the marriage basis for homosexual discharge that is not present in the statute.  This language should be deleted.

3.  **Recommendations**

    a.  The following changes, and accompanying analyses, are recommended to Enclosure 2 of proposed DoDD 1304.26:

        (1)  At pg 2-5, para B8b(1) -- Delete subparagraph (1) in its entirety and replace with the following:

        An applicant shall be rejected for entry into the Armed Forces if, in the course of the accession process, evidence is received demonstrating that the applicant engaged in, attempted to engage in, or solicited another to engage in a homosexual act unless there is a further determination that (a) such conduct is a departure from the applicant's usual and customary behavior, (b) such conduct, under all the circumstances, is unlikely to recur, (c) such conduct was not accomplished by use of force, coercion, or intimidation, (d) under the particular circumstances of the case, the applicant's presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale, and (e) the applicant does not have a

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013370

703 695 5111 PAGE.004                                                    DEC 13 '93 9:55

Subj:  IMPLEMENTATION OF NEW DOD POLICY ON HOMOSEXUAL CONDUCT

propensity or intent to engage in homosexual acts.  Such
a determination will be made based solely upon the
evidence obtained through normal accession processing.

Analysis:  The draft regulation omits bases for rejection
that the statute permits, e.g., attempts and solicitations to
engage in homosexual acts.  Congress certainly intended that such
acts form a basis for both separation and denial of accession.
Further, the addition of the word current is redundant.  The
statute already requires the applicant to "have" such a
propensity.  Use of the present tense already requires currency
without adding a term not in the statute.  We'll be litigating
the issue of currency unnecessarily.  Same argument for
parenthetical.

    (2)  At pg 2-6, para B8b(2) -- Delete the entire
subparagraph (2) and replace with the following:

    An applicant shall be rejected for entry if he or she
    makes a statement that he or she is a homosexual or
    bisexual, or words to that effect, unless there is a
    further determination that the applicant has demonstrated
    that he or she is not a person who engages in, attempts
    to engage in, has a propensity to engage in, or intends
    to engage in homosexual acts.  Such a determination will
    be made based solely upon the evidence obtained through
    normal accession processing.

Analysis:  Upon accession, the statute does not require any
procedural due process, nor does it require procedural
application of a rebuttable presumption standard.  We are
burdening the military services with a procedural scheme, upon
accession, that was not intended by Congress or the Service
Chiefs.  Use of the word "may" instead of "shall" is inconsistent
with the other paragraphs and the zero tolerance envisioned by
the policy.

    (3)  At pg 2-6, para B8b(3) -- Delete the entire
subparagraph (3) and replace with the following:

    An applicant shall be rejected for entry if, in the
    course of the accession process, evidence is received
    demonstrating that an applicant has married or attempted
    to marry a person known to be of the same biological sex.

Analysis:  This change tracks the statute precisely, and
evidences Congress' intent that the Services need only determine
the person has married or attempted to marry another person of
the same sex.  The statute does not add a propensity requirement
to this proven act.  Why should we saddle ourselves with such a
burden.  It can be safely assumed that anyone whose relationship
with another person of the same sex has evolved to the point of
marriage has clearly demonstrated such a propensity.

PRODUCED SUBJECT TO PROTECTIVE          2

OSD OEPM 013371

Subj:  IMPLEMENTATION OF NEW DOD POLICY ON HOMOSEXUAL CONDUCT

   b.  Make the following change, at pg 1-11, para H1b(4) of Enclosure 3 to proposed DoDD 1332.14 -- Delete beginning at line 3 the words "member does not engage in or have a propensity or intent to engage in homosexual acts, and that the."

   Analysis:  See the analysis immediately above.

   c.  Make the following change, at pg 2-3, para C1d of Enclosure 2 to proposed DoDD 1332.30 -- Delete beginning at line 3 the words "officer is not a homosexual or bisexual and that the."

   Analysis:  This paragraph is inconsistent with the same paragraph in the enlisted regulation (even as currently written), and the purpose for the above amendment is as stated in the analysis above.

4.  Conclusions

   a.  Make the above corrections for the reasons stated.

   b.  I believe the staffing of these proposed regulations has the potential to haunt us in the future.  Since each service was given only one copy of these numerous regulations, with instructions that they will not be copied, and because we are required to have our input to DoD only three working days later, it is exceedingly difficult to give these regulations the proper scrub they deserve.  We will be bound by these regulations for some considerable time to come.  The statute gives DoD 90 days to implement these regulations.  What is the rush?  In the short time we have had to review these regulations, we have discovered 1) what appears to be the unintentional omission of the word "shall" vice "may" (this error does not convey the statutory intention), 2) the omission in the accession directive of the statutory bases to attempt to or solicit another to engage in homosexual acts (a very important omission), and 3) the inconsistent language between the officer separation regulation and the enlisted separation regulation regarding homosexual marriages.  Their may be other inadvertant, but critical mistakes in these regulations.

   c.  Finally, I feel compelled to state that I have reservations about the practical aspects of implementing the "rebuttable presumption."  I recognize that we are required to develop a regulation that distinguishes between "sexual orientation" and "conduct," the former not resulting in a disqualification to retain military status.  My concern stems from a belief that, although this legal concept is understandable by attorneys who have studied the underlying rationale of these regulations as well as how the "presumption" is to  apply, it is not readily understandable by our military community as a whole and it is capable of misinterpretation.  I do not have a proposal for a more easily understood alternative.  I am quite prepared,

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013372

703 695 5111  PAGE.006            DEC 13 '93 9:56

Subj: IMPLEMENTATION OF NEW DOD POLICY ON HOMOSEXUAL CONDUCT

however, to rely on the common sense and the integrity of those within the military community who will, as members of discharge boards, be called upon to make decisions in these matters.

REDACTED PURSUANT TO PROTECTIVE
ORDER

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013373

## RECOMMENDED CHANGES TO ACCESSION POLICY

Reference Enclosure 2 of proposed DoD Directive 1304.26.  Strike out paragraph B8b(1) and insert in lieu thereof the following:

"An applicant shall be rejected for entry into the Armed Forces if, in the course of the accession process, evidence is received demonstrating the applicant engaged in, attempted to engage in, or solicited another to engage in a homosexual act unless there is a further determination that (a) such conduct is a departure from the applicant's usual and customary behavior; (b) such conduct, under all circumstances, is unlikely to recur; (c) such conduct was not accomplished by use of force, coercion, or intimidation; (d) under the particular circumstances of the case, the applicant's presence in the armed forces is consistent with the interests of the armed forces in proper discipline, good order, and morale; and (e) the applicant does not have a propensity or intent to engage in homosexual acts.  Such a determination will be made based solely upon the evidence obtained through normal accession processing."

Reference Enclosure 2 of proposed DoD Directive 1304.26.  Strike out paragraph B8b(2) and insert in lieu thereof the following:

"An applicant shall be rejected for entry if he or she makes a statement that he or she is a homosexual or bisexual, or words to that effect, unless there is a further determination that the applicant is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.  Such a determination will be made based solely upon the evidence obtained through normal accession processing."

Reference Enclosure 2 of proposed DoD Directive 1304.26.  Strike out paragraph B8b(3) and insert in lieu thereof the following:

"An applicant shall be rejected for entry if, in the course of the accession process, evidence is received demonstrating that an applicant has married or attempted to marry a person known to be of the same biological sex."

## RECOMMENDED CHANGES TO SEPARATION POLICY

PURPOSE:  Conform policy with statutory provision on homosexual marriage.

Reference Enclosure 3 to DoD Directive 1332.14, at page 1-11, paragraph H1b(4):  Strike out beginning at line 3 the words "member does not engage in or have a propensity or intent to engage in homosexual acts, and that the".

Reference Enclosure 2 to DoD Directive 1332.30, at page 2-3, paragraph C1d.  Strike out beginning at line 3 the words "officer is not a homosexual or bisexual and that the".

PRODUCED SUBJECT TO PROTECTIVE

*Air Force Draft*
OSD OEPM 013374

**RECOMMENDED REVISION TO HYPOTHETICAL TEACHING SCENARIOS**

Reference Tab 15 of the Implementation Book.  Suggest adding the following under the heading of the front page of the teaching scenarios.

"The following scenarios are intended merely for an instructional, training purpose and do not represent the only solutions to the hypothetical facts."

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013375





**DEPARTMENT OF THE ARMY**
OFFICE OF THE GENERAL COUNSEL
WASHINGTON, DC 20310-0104
December 13, 1993

REDACTED PURSUANT TO PROTECTIVE
ORDER

MEMORANDUM FOR CAPTAIN          OFFICE OF THE DEPARTMENT OF
                    DEFENSE, GENERAL COUNSEL

SUBJECT:  Proposed DoD Homosexual Conduct Policy

    We have the following technical recommendations concerning
the proposed documents.

    SECDEF Memorandum (Redbook, Tab A).  The failure to clearly
include or exclude the use of Inspectors General in connection
with the proposed policy, particularly in investigations that may
or may not involve criminal activity remains a concern.
Recommend that the SECDEF Memorandum (Redbook, Tab A) include a
statement that it in no way alters the mission or authority of
the Inspector General.  Further recommend that DODI 5505.8,
*Subject: Investigations of Sexual Misconduct by the Defense
Criminal Investigative Organizations and Other DoD Law
Enforcement Organizations* (Redbook, TAB D-9) Enclosure,
Definitions, 4. "Other DoD Law Enforcement Organizations" be
changed by adding:  This definition does not include the
Inspectors General.

    SECDEF Memorandum (Redbook, Tab A).  The language in the
fourth paragraph, lines 6-8, " and specifies the information
. . . commander," is a misleading description of what DODI 5505.8
requires.  It is inconsistent with paragraph F.3 and should be
deleted.  *The SECDEF memorandum should not go into such fine
detail in any event.*

    Redbook, Tab D-9, DODI 5505.8, page 2-3, paragraph F.3. The
proposed policy provides ample guidance concerning the conduct of
investigations.  The requirement for DCIO Commander/principal
deputy approval to initiate an investigation creates an
unnecessary administrative burden and should be reduced to a
lower level of DCIO command.  For Army purposes, the CID Region
Commander (usually a colonel) would provide more than adequate
policy oversight.  The present approval process may result in
field personnel labeling high-level approval as "too tough to do"
when there is a legitimate need for more investigative skill.
Past experience indicates that we are more likely to be faulted
for failing to use professional investigative resources in
complex cases than to be accused of witch-hunting.

    Redbook, Tab C-7, page 4-3, paragraph D.3.  Guidelines for
Fact-Finding Inquiries into Homosexual Conduct.  Recommend the
deletion of anything indicating a right to silence that is not
based upon UCMJ, Article 31b.   Matters involving possible

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013376

-2-

criminal conduct are adequately addressed by UCMJ Article 31b. The addition of a new warning requirement with an accompanying right to silence needlessly clouds both the homosexual policy and potential military justice cases.  To correct this, the last sentence in paragraph D.3, Guidelines for Fact-Finding Inquiries into Homosexual Conduct (Redbook, Tab C-7) should be deleted. Hypotheticals 2 and 6 (Redbook, Tab F-15) should also be altered to reflect this change.

Redbook, Tab B-1, page 2-6.  In Enclosure 2, DODD 1304.26 , paragraph B.8.b.(2)(c), recommend replacing "testimony" with "evidence" or "written statements."  There has been an understanding within the working groups that an applicant seeking to rebut the presumption was not entitled to a hearing.  The use of "testimony" confuses the issue by creating at least an inference that the applicant was entitled to an actual appearance of witnesses on his or her behalf in lieu of a paper hearing.

Redbook, Tab C-5, page 1-12.  Recommend that the term "probable cause" in Enclosure 3 (Standards and Procedures), DODD 1332.14 , paragraph H.3.a, be replaced with "reasonable basis" or a similar concept.  Probable cause is a term of art borrowed from criminal law practice that will unnecessarily complicate administrative boards.

Redbook, Tab C-5, page 1-16.  Recommend that Enclosure 3, DODD 1332.14 , paragraph K.1.a.(4)c., be changed as follows:  "c. Related Separations. ~~Misconduct involving~~ [H]omosexual conduct shall be processed under section H."  The use of "misconduct" confuses the issues of misconduct versus unsuitability.  The two concepts are not co-equal.

Redbook, Tab C-7, page 4-3.  In the draft Guidelines For Fact-Finding Inquiries Into Homosexual Conduct , paragraph E. 2., insert "unsubstantiated" before "opinions".

Redbook, Tab D-8.  In the "Synopsis of Procedures For Criminal Investigations of Adult Private Consensual Misconduct" paragraph 3, line 2, delete "offense triable a by court-martial" and substitute "criminal offense" to avoid confusion and remain within the scope of the policy.

Redbook, Tab D-8,  Paragraph four misstates the commander's required action in homosexual conduct cases by conveying the impression that he or she has discretion to take no action.  DODD 1332.14 and 1332.30 require processing of such cases.

-3-

Redbook, Tab F-13.  Recommend that the Memorandum, Assistant Secretary of Defense, Personnel and Readiness, Subject: Training Guidance For DoD Policy On Homosexual Conduct in the Armed Forces be revised to cite 10 U.S.C. § 654 or, as a minimum, the SECDEF Memorandum implementing the new policy.  The 19 July Memorandum should not be cited.  Our current litigation posture relies, in part, on distinguishing the old policy from the new one.

Redbook, Tab F-14.  Similarly, the DoD Policy On Homosexual Conduct Training Plan should be revised to reflect the statutory authority through DOD policy and directives, not the other way around.  Recommend that the first four paragraphs of the "Background" section of the training plan simply be deleted.

Redbook, Tab F-15.  Hypothetical #1 is too simplistic for useful training.  As written, the audience might conclude there is only one acceptable outcome.  The facts supplied do not lead to this conclusion.  Recommend it be restated to the effect of "If the commander believes X, then Y; if the commander believes A, then B; if the commander remains uncertain, then take the following action...."

Redbook, Tab F-15.  Hypothetical #3  should be modified to note that an accumulation of otherwise insufficient evidence may give rise to a reasonable belief that the member is making a nonverbal statement that he is a homosexual.

Redbook, Tab F-15.  Hypothetical 13 incorrectly applies the policy as understood by the House and Senate Reports.  The Senate noted specifically that any rebuttal would go to the proper understanding of the intent or seriousness of the statement and not to the nature of a respondent's present or future sexual conduct or orientation; it noted that "a member cannot rebut the presumption simply through a promise to adhere to military standards of conduct in the future; nor can the member rebut the presumption by a statement to the effect that he or she has a propensity towards homosexuality but has not acted upon it." (Senate Report, page 294).

REDACTED PURSUANT TO PROTECTIVE ORDER

Deputy General Counsel
(Military and Civil Affairs)

PRODUCED SUBJECT TO PROTECTIVE

OSD OEPM 013378

10 February 1989

MEMO FOR:        REDACTED PURSUANT TO PROTECTIVE ORDER

THROUGH:

SUBJECT:        PERSEREC Draft Report,  Nonconforming Sexual Orientations

Thank you. I wanted to read the entire draft report, carefully and thoughtfully, and away from the heightened atmosphere of a few weeks back.

The basic work is fundamentally misdirected, as evidenced from the statement of objectives on page ii. Actually,  the most explicit statement of our objective is indirectly set out in the sentence in the middle of page 22 which begins, "If there were a connection between being a homosexual and potential for security violation..." The existence or non-existence of that connection is precisely what we expected the analysis to address. This analysis would have presupposed that homosexuals were suitable for military service.

The study also wholly ignores the fact that a substantial part of our personnel security investigations involve persons in the private sector.

This entire effort, at least to date, is unfortunate.

- It has expended considerable government resources, and has not assisted us one whit in our personnel security program.

- It will be seized upon by critics of PERSEREC as evidence of the ineffective performance of that institution.

- It most probably will cause us in Washington to expend even more time and effort satisfying concerns in this whole issue area both in Congress and the media, and within the Department itself.

The actions we have directed recently may yield some usefulness yet;  they will not, however, undo the above effects.

If it were not for all of the above,  the situation could be humorous. It is as if Consumers' Reports commissioned research on the handling characteristics of the Suzuki Sammurai, and received instead a report arguing that informal import quotas for Japanese automobiles were not justified.

cc:

REDACTED PURSUANT TO PROTECTIVE ORDER

PRODUCED  SUBJECT  TO  PROTECTIVE

DoD LA 2-6  042466