**Appendix of Evidence in**

**Support of Log Cabin Republican's**

**Opposition to Defendants'**

**Motion for Summary Judgment**

**LCR Appendix Pages 1330-1400**

**(Part 13 of 19)**

$Fil\dot{o} \dot{i} Pon serve$ 

**PERS-TR-89-004**



# PRESERVICE ADJUSTMENT OF HOMOSEXUAL AND HETEROSEXUAL MILITARY ACCESSIONS:

## IMPLICATIONS FOR SECURITY CLEARANCE SUITABILITY

Michael A. McDaniel

January 1989

# DRAFT

**DEFENSE
PERSONNEL SECURITY
RESEARCH AND EDUCATION CENTER**
99 Pacific Street, Building 455-E

DoD LA 2-6  042467



PERS-TR-89-004

January 1989

**Preservice Adjustment of Homosexual
and Heterosexual Military Accessions:
Implications for Security Clearance Suitability**

Prepared by
Michael A. McDaniel

Reviewed by
Carson Eoyang
Director

Defense Personnel Security Research and Education Center
Monterey, California 93940-2481

DoD LA 2-6  042468



## Preface

The differences between homosexuals and others in society have long been subjects of great debate. More often than not, the controversy has suffered from a paucity of scientific research that could illuminate and inform the issues. This study is a limited effort to address the question: How do homosexuals differ from non-homosexuals in preservice adjustment characteristics? By exploring these differences, which may have direct security implications, this research helps increase our knowledge base pertaining to the suitability of homosexuals for positions of trust. This technical report is a revision of an earlier draft report entitled "The Suitability of Homosexuals for Positions of Trust" (November, 1987).


Carson K. Eoyang
Director

i

DoD LA 2-6  042469



PERS-TR-89-004                                           January 1989

### Preservice Adjustment of Homosexual and Heterosexual Military Accessions: Implications for Security Clearance Suitability

Prepared by
Michael A. McDaniel

## Summary

Problem

    Homosexuality is a topic of considerable debate and litigation in the national security community.  The debate centers around the suitability of homosexuals for positions that require national security clearances.


Objective

    The objective of the present study was to determine whether homosexuality is an indicator that a person possesses characteristics, separate from sexual orientation, that make one unsuitable for positions of trust.  Specifically, this paper attempts to answer the question:    How do homosexuals differ from heterosexuals in background characteristics relevant to security suitability?


Approach

    To answer this question, background data were drawn from the Educational and Biographical Information Survey (EBIS) (Means & Perelman, 1984).  This self-report inventory contains questions regarding educational experiences, drug and alcohol use, criminal activities, and driving record.  Military accessions who were discharged from the service for homosexuality were compared with other military accessions on preservice background characteristics relevant to security suitability.

ii

DoD LA 2-6  042470



Results

 The data indicate that the suitability of homosexuals relative to heterosexuals depends upon the background area examined and the sex of the comparison group:

o In general, homosexuals showed better preservice adjustment than heterosexuals in areas relating to school behavior.

o Homosexuals also displayed greater levels of cognitive ability than heterosexuals.

o Homosexuals, however, showed less preservice adjustment than heterosexuals in the area of drug and alcohol use.

o With the exception of drug and alcohol use, homosexuals resemble those who successfully adjust to military life more so than those who are discharged for unsuitability.

o Although male homosexuals tend to be better than or as equally adjusted as male heterosexuals with respect to the indices examined, female homosexuals tend to score lower on preservice adjustment indices than female heterosexuals. However, females as a whole tended to show better preservice adjustment than males, and female homosexuals tended to have  better preservice adjustment than most heterosexual male accessions.


Conclusion

 The discussion section of this report lists several limitations of this study. Although these limitations should be carefully considered, the preponderance of the evidence presented in this study indicates that homosexuals show preservice suitability-related adjustment that is as good or better than the average heterosexual.

iii

DoD LA 2-6  042471



## Table of Contents

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    i

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ii

List of Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    v

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Approach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    3

Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
    Results for the Major School Problems Scale  . . . . . . . . . . . . . . . . . . . . . .    7
    Results for the Drug and Alcohol Scale . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9
    Results for the Employment Experience Scale . . . . . . . . . . . . . . . . . . . . . .    11
    Results for the Felonies Scale  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11
    Results for the Minor School Problems Scale  . . . . . . . . . . . . . . . . . . . . . .    14
    Results for the Drunk and Disorderly Scale . . . . . . . . . . . . . . . . . . . . . . . .    16
    Results for the AFQT Percentile  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

Discussion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
    Limitations of the Present Study . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

References  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

iv

DoD LA 2-6  042472



## List of Tables

| | | |
|---|---|---|
| 1. | Major School Problems Background Scale. . . . . . . . . . . . . . . . . . . . . . . . | 8 |
| 2. | Drugs and Alcohol Background Scale . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |
| 3. | Employment Experience Background Scale . . . . . . . . . . . . . . . . . . . . . . | 12 |
| 4. | Felonies Background Scale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
| 5. | Minor School Problems Background Scale . . . . . . . . . . . . . . . . . . . . . . | 15 |
| 6. | Drunk and Disorderly Background Scale . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| 7. | AFQT Percentile. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |

v

DoD LA 2-6  042473



## Introduction

Homosexuality is a topic of considerable debate and litigation in the national security community (National Security Institute, 1987). Questions in the national security/homosexuality debate include:

1. Does the homosexuality of a security clearance holder present an exploitable vulnerability for hostile intelligence agencies?

2. Does the presence of a homosexual in a military or nonmilitary work group cause the group work performance or security climate to decay?

3. Is homosexuality an indicator that a potential security clearance holder possesses characteristics, separate from sexual orientation, that make one unsuitable for positions of trust?

This paper primarily addresses the third question. Specifically, this paper attempts to answer the question: How do homosexuals differ from heterosexuals in background characteristics relevant to security suitability? Thus, this paper has a narrow focus and does not address all questions concerning the suitability of homosexuals for employment in positions that require national security clearances.

A major problem in resolving the issue of the suitability of homosexuals for positions of trust is the paucity of research available on this topic. Recently, Ellis and Ames (1987) reviewed the literature on the origins of sexual orientation. After reviewing the literature on experiential, social-environmental, genetic, and physiological explanations of the causal determinants of sexual orientation, they concluded that the evidence best supports the position that sexual orientation is largely determined by genetic, neurological, hormonal, and environmental factors prior to birth. However, regardless of the origin of sexual orientation, there is little research addressing the suitability of homosexuals for positions of trust. This report is an attempt to address this research gap.

1

DoD LA 2-6  042474



2

DoD LA 2-6  042475



## Approach

This study focuses on the question, "With reference to the types of background data normally collected in security-related background investigations, how do homosexuals and heterosexuals differ?" To answer this question, background data were drawn from the Educational and Biographical Information Survey (EBIS) (Means & Perelman, 1984). This self-report inventory contains questions regarding educational experiences, drug and alcohol use, criminal activities, and driving record. The EBIS data differ from most background investigation data, such as that collected by the Defense Investigative Service, in that the information was collected in a structured format (i.e., multiple choice questions), does not contain interview data or data from official sources such as police departments or credit agencies (i.e., all information was self reported), and contains more school adjustment questions than is obtained in most background investigations. However, the data set does tap the most common data domains in background investigations, and thus appears well suited for the present inquiry.

During the spring of 1983, the EBIS was administered to approximately 34,000 military applicants and 40,000 new recruits from all four services. The applicants who did not enter the military were categorized by gender. The military personnel were classified by gender, education, military career changes, and level of security clearance. Military discharge data on the EBIS respondents were obtained from the Defense Manpower Data Center. For this analysis, all military personnel who were discharged for homosexuality were separated from all other military accessions. The definition for all analysis groups in this study are:

Homosexuals:

> Military personnel who were discharged for homosexuality. This group was further divided by gender.

Applicants Not Entering Service:

> Military applicants who did not enter the military service. These persons took the EBIS as military applicants and either declined service entry or were refused admission. This group was divided by gender.

All Other Accessions:

> All military accessions, except those discharged as homosexuals. Separate analyses were conducted by gender, education (high school diploma or not), military career changes, and level of security clearance. The categories of military career change were:

3

DoD LA 2-6  042476



1) those discharged for unsuitability for reasons other than homosexuality,
2) those released from service,
3) those who sought immediate reenlistment in the military service,
4) those enlisted personnel who were granted entry into officer training programs,
5) those who received medical discharges, and
6) those who were still in the military, but who did not fit any of the above categories (these were labelled "not separated").

For the clearance level categorization, the military personnel were divided into those without a Secret or higher clearance (these were labelled "no clearance"), those with a Secret clearance, those with a Top Secret clearance but no SCI access, and those with a Top Secret clearance with SCI access or eligibility for SCI access.

Statistical methods were used to cluster the EBIS background data into meaningful clusters. The EBIS data formed seven clusters of background data that provided a useful summary of the recruits' preservice behavior. Six clusters are described below. The seventh background area, Grades and Socio-Economic Status, was not examined in this paper since it is not an area that is normally examined in security-related background investigations. For the remaining six categories, the items in each cluster were summed to yield six scale scores.

The scale contents were:

1.    Major School Problems:

Suspension from school, fighting in school, trouble in schools for being disorderly, using bad language, and smoking.

2.    Drugs and Alcohol:

Use of marijuana, stimulants, depressants, cocaine, heroin, other narcotics, other drugs, alcohol, cigarettes.

3.    Job Experience:

Reasons for leaving past jobs. Length of past full-time and part-time work.

4.    Criminal Felonies:

Adult and juvenile arrests and convictions.

5.    Minor School Problems:

Missing school, missing class, thoughts about quitting school.

4

DoD LA 2-6  042477



6.    Drunk & Disorderly:

Problems with alcohol, disorderly conduct, drunk driving, drug-related arrest,
assault, misdemeanors.

The six background scales were standardized and expressed as percentiles. The
higher the percentile for a group of persons the more favorable is the group's past life
experience. The scales were standardized so that the average male military accessions
are at the 50th percentile. Those groups with a percentile of greater than 50 had fewer
preservice difficulties than the average male military accession. Those groups with a
percentile of less than 50, on the average, had more preservice adjustment problems
than the average male military accession. In each military group examined, there is
considerable variability around each group's mean percentile. Thus, for example, if
homosexuals are at the 45th percentile in a background domain, it means that on the
average the homosexuals had more preservice adjustment problems than the male
accessions. However, there will be substantial overlap in the distribution of the two
groups such that some homosexuals will be more suitable than most of the male
recruits.

In addition to the six background scales, the analysis groups were compared on
Armed Forces Qualification Test (AFQT) percentiles. The AFQT is a measure of
cognitive ability. The AFQT percentile reflects the scaling of the AFQT determined by
DoD and was not normed so that all male accessions were at the 50th percentile.

In these analyses, the percentile standing of homosexuals on a given background
scale is compared with the percentile standings of various other groups. In these com-
parisons, a difference of five percentile points was considered a meaningful difference.
While this is a somewhat arbitrary decision rule, it appears to be a reasonable one.
Those who wish to adopt a different decision rule may easily do so by examining the
percentiles presented in the tables.

5

DoD LA 2-6  042478

6

DoD LA 2-6  042479



## Results

The six background scales appear to be relatively independent. The Major and Minor School Problems scales are the most similar item clusters. The Major School Problems scale appears to tap more serious problems in school, while the Minor School Problems scale is composed of less serious indicators of school adjustment.

The Drugs and Alcohol scale is distinguished from the Drunk and Disorderly scale in that the Drugs and Alcohol scale measures frequency of drug use, while the Drunk and Disorderly scale taps the amount of trouble one gets into as a result of drug and alcohol use. Both the Drunk and Disorderly scale and the Drugs and Alcohol scale have moderate correlations with all other scales. Since the six background scales were relatively distinct, it is most meaningful to compare the homosexuals and other groups on each of the six scales.

### Results for the Major School Problems Scale

Table 1 displays the results for the background scale "Major School Problems." This scale reflects serious school problems including suspension from school, fighting in school, trouble in school for being disorderly, using bad language, and smoking. Those with SCI clearances showed better adjustment than the Top Secret clearance holders without SCI access, who in turn showed better adjustment than the Secret clearance holders, who in turn showed better adjustment than those with no clearance. This monotonic relationship between level of adjustment and clearance level supports the hypothesis that the Major School Problems scale is a relevant background scale for accessing preservice adjustment.

In accordance with the 5-percentile definition of a meaningful difference, only differences of that magnitude or larger are noted. Given that male and female homosexuals showed meaningfully different levels of preservice adjustment in this area, they are discussed separately.

On the whole, the homosexuals showed better preservice adjustment on the Major School Problems scale than most other comparison groups. On the average, male homosexuals showed better preservice adjustment (59th percentile) on the Major School Problems scale than did the group of male military accessions (50th percentile). Male homosexuals on the average displayed substantially greater preservice adjustment on this dimension than the average heterosexual person discharged for unsuitability (40th percentile), and those without high school diplomas (32nd percentile). The male homosexuals had fewer major school problems than heterosexuals who were discharged for unsuitability, released from service, and who received medical discharges. Male homosexuals (59th percentile) also had better levels of preservice

7

DoD LA 2-6 042480



## TABLE 1

Major School Problems Background Scale.
Comparison of Homosexuals with Other Groups.
Higher Scores Indicate Better Adjustment.

| Comparison Groups[1] | N | Percentile |
|---|---|---|
| Homosexuals | 166 | 61 |
| Males | 113 | 59 |
| Females | 53 | 66 |
| | | |
| Applicants Not Entering Service[2] | 16,357 | 56 |
| Males | 12,525 | 52 |
| Females | 3,720 | 71 |
| | | |
| All Other Accessions | 48,302 | 53 |
| Males | 42,095 | 50 |
| Females | 6,207 | 73 |
| High School Graduate | 43,233 | 56 |
| GED and Nongraduates | 5,069 | 32 |
| | | |
| Military Career Changes[3] | | |
| Unsuitability Discharges | 8,468 | 40 |
| Release From Service | 6,855 | 53 |
| Immediate Reenlistment | 4,023 | 57 |
| Officer | 277 | 75 |
| Medical | 1,838 | 49 |
| Not Separated | 24,970 | 57 |
| | | |
| Clearance Category | | |
| No Clearance | 27,347 | 50 |
| Secret | 18,181 | 56 |
| Top Secret (no SCI) | 1,152 | 64 |
| SCI | 1,622 | 68 |

[1]Homosexuals were defined as those released from military service for homosexuality. Applicants not entering service were those military applicants who completed the EBIS but did not join the service.
[2]The gender of 112 military applicants who did not enter service is unknown.
[3]A total of 1,871 persons had military career changes which are not one of those in the table.

8

DoD LA 2-6  042481



adjustment than those without clearances (50th percentile), and showed no meaningful difference in preservice adjustment from those holding Secret clearances. Male homosexuals, however, showed meaningfully less preservice adjustment on the Major School Problems dimension than enlisted personnel who entered officer training, and Top Secret and SCI clearance holders.

Regardless of sexual orientation, females showed better levels of preservice adjustment on Major School Problems scale than males. Female accessions were at the 73rd percentile, while female applicants not entering the service were at the 71st percentile. However, in contrast to the male homosexuals who had fewer preservice adjustment problems in this area than the average male accession, female homosexuals had more preservice adjustment problems than the average female accession (66th percentile vs. 73rd percentile). Although female homosexuals showed poorer preservice adjustment on the Major School Problems scale than heterosexual females, the homosexual females showed better adjustment than most other comparison groups including those with Top Secret and SCI clearances.

Results for the Drug and Alcohol Scale

Table 2 displays the results for the background scale "Drugs and Alcohol." This scale primarily measures admissions concerning the quantity of drugs and alcohol consumed by the respondent. The higher the clearance level the greater the preservice adjustment on the drug and alcohol scale. This monotonic relationship between level of adjustment and clearance level supports the belief that the Drug and Alcohol scale is a relevant background scale for accessing preservice adjustment.

In contrast to the Major School Problems scale, homosexuals showed worse preservice adjustment on the Drugs and Alcohol scale than most other comparison groups. The difference between male and female homosexuals on the Drugs and Alcohol scale was small (43rd vs. 45th percentile). The homosexuals appear to use about as much drugs and alcohol as the non-high school graduates (41st percentile) and the unsuitability discharges (43rd percentile).

Homosexuals showed meaningfully less preservice adjustment on the Drugs and Alcohol dimension than all male accessions, all female accessions, high school graduates, those released from the service, those who sought immediate reenlistment, those who entered officer training, medical discharges, and those who did not separate. All levels of clearance holders showed better levels of preservice adjustment on the Drugs and Alcohol scale than did the homosexuals.

9

DoD LA 2-6  042482



## TABLE 2

Drugs and Alcohol Background Scale.
Comparison of Homosexuals with Other Groups.
Higher Scores Indicate Better Adjustment.

| Comparison Groups[1] | N | Percentile |
|---|---|---|
| Homosexuals | 166 | 44 |
|     Males | 113 | 43 |
|     Females | 53 | 45 |
| | | |
| Applicants Not Entering Service[2] | 16,357 | 58 |
|     Males | 12,525 | 55 |
|     Females | 3,720 | 64 |
| | | |
| All Other Accessions | 48,302 | 51 |
|     Males | 42,095 | 50 |
|     Females | 6,207 | 58 |
|     High School Graduate | 43,233 | 52 |
|     GED and Nongraduates | 5,069 | 41 |
| | | |
|     Military Career Changes[3] | | |
|         Unsuitability Discharges | 8,468 | 43 |
|         Release From Service | 6,855 | 51 |
|         Immediate Reenlistment | 4,023 | 57 |
|         Officer | 277 | 58 |
|         Medical | 1,838 | 51 |
|         Not Separated | 24,970 | 53 |
| | | |
|     Clearance Category | | |
|         No Clearance | 27,347 | 50 |
|         Secret | 18,181 | 52 |
|         Top Secret (no SCI) | 1,152 | 53 |
|         SCI | 1,622 | 57 |

---

[1]Homosexuals were defined as those released from military service for homosexuality.
Applicants not entering service were those military applicants who completed the EBIS but did not join the service.
[2]The gender of 112 military applicants who did not enter service is unknown.
[3]A total of 1,871 persons had military career changes which are not one of those in the table.

10

DoD LA 2-6  042483



<u>Results for the Employment Experience Scale</u>

Table 3 displays the results for the background scale "Employment Experience." This scale primarily measures the amount of one's job experience and the conditions under which one terminated employment. The level of preservice adjustment on this scale does not monotonically covary across clearance levels. This suggests that this scale may have less relevance for security suitability than other scales.

Whereas male homosexuals showed a meaningfully lower level of preservice adjustment on the Employment Experience scale than female homosexuals, the two homosexuals groups are discussed separately.

The male homosexuals showed less preservice adjustment on this scale (48th percentile) than those who sought immediate reenlistment and those who did not separate. Male homosexuals were not, however, meaningfully different from any of the groups holding security clearances. In general, there was little differentiation in employment experience adjustment among any of the comparison groups. This was probably due to the limited amount of job experience for those who enter the military.

Female homosexuals (58th percentile) showed the same level of preservice adjustment on the employment experience scale as heterosexual females. Females, regardless of their sexual orientation, showed better levels of preservice adjustment on this scale than most other comparison groups, including those with Secret clearances, Top Secret clearances and those with SCI access.

<u>Results for the Felonies Scale</u>

Table 4 displays the results for the background scale "Felonies." This scale measures the number of felony arrests and convictions. Those with SCI clearances showed better adjustment than the Top Secret clearance holders without SCI access, who in turn showed better adjustment than the Secret clearance holders, who in turn showed better adjustment than those with no clearance. This monotonic relationship between level of adjustment and clearance level supports the hypothesis that the Felonies scale is a relevant background scale for accessing preservice adjustment.

Since male homosexuals showed meaningfully lower levels of preservice adjustment than female homosexuals on the Felonies scale, the comparison is discussed separately.

DoD LA 2-6  042484



## TABLE 3

Employment Experience Background Scale.
Comparison of Homosexuals with Other Groups.
Higher Scores Indicate Better Adjustment.

| Comparison Groups[1] | N | Percentile |
|---|---|---|
| Homosexuals | 166 | 51 |
| Males | 113 | 48 |
| Females | 53 | 58 |
| | | |
| Applicants Not | | |
| Entering Service[2] | 16,357 | 59 |
| Males | 12,525 | 56 |
| Females | 3,720 | 66 |
| | | |
| All Other Accessions | 48,302 | 51 |
| Males | 42,095 | 50 |
| Females | 6,207 | 58 |
| High School Graduate | 43,233 | 52 |
| GED and Nongraduates | 5,069 | 46 |
| | | |
| Military Career Changes[3] | | |
| Unsuitability Discharges | 8,468 | 46 |
| Release From Service | 6,855 | 52 |
| Immediate Reenlistment | 4,023 | 53 |
| Officer | 277 | 50 |
| Medical | 1,838 | 44 |
| Not Separated | 24,970 | 53 |
| | | |
| Clearance Category | | |
| No Clearance | 27,347 | 51 |
| Secret | 18,181 | 51 |
| Top Secret (no SCI) | 1,152 | 49 |
| SCI | 1,622 | 52 |

---

[1]Homosexuals were defined as those released from military service for homosexuality.
Applicants not entering service were those military applicants who completed the EBIS but did not join the service.
[2]The gender of 112 military applicants who did not enter service is unknown.
[3]A total of 1,871 persons had military career changes which are not one of those in the table.

12

DoD LA 2-6  042485



## TABLE 4

Felonies Background Scale.
Comparison of Homosexuals with Other Groups.
Higher Scores Indicate Better Adjustment.

| Comparison Groups[1] | N | Percentile |
|---|---|---|
| Homosexuals | 166 | 51 |
|     Males | 113 | 47 |
|     Females | 53 | 59 |
| | | |
| Applicants Not Entering Service[2] | 16,357 | 48 |
|     Males | 12,525 | 46 |
|     Females | 3,720 | 58 |
| | | |
| All Other Accessions | 48,302 | 51 |
|     Males | 42,095 | 50 |
|     Females | 6,207 | 59 |
|     High School Graduate | 43,233 | 52 |
|     GED and Nongraduates | 5,069 | 44 |
| | | |
|     Military Career Changes[3] | | |
|         Unsuitability Discharges | 8,468 | 46 |
|         Release From Service | 6,855 | 51 |
|         Immediate Reenlistment | 4,023 | 52 |
|         Officer | 277 | 56 |
|         Medical | 1,838 | 50 |
|         Not Separated | 24,970 | 52 |
| | | |
|     Clearance Category | | |
|         No Clearance | 27,347 | 49 |
|         Secret | 18,181 | 53 |
|         Top Secret (no SCI) | 1,152 | 57 |
|         SCI | 1,622 | 58 |

---

[1]Homosexuals were defined as those released from military service for homosexuality.
Applicants not entering service were those military applicants who completed the EBIS but did not join the service.
[2]The gender of 112 military applicants who did not enter service is unknown.
[3]A total of 1,871 persons had military career changes which are not one of those in the table.

13

DoD LA 2-6  042486



Male homosexuals (47th percentile) showed worse preservice adjustment than high school graduates, those who obtained immediate reenlistment, those who entered officer training, and those who did not separate. Male homosexuals also showed lower levels of preservice adjustment than those who held clearances.

In contrast to the male homosexuals, female homosexuals had better levels of adjustment on the Felonies dimension than most comparison groups. Female homosexuals showed better adjustment on the Felonies scale than high school graduates, non-high school graduates, unsuitability discharges, those released from service, those who received immediate reenlistment, medical discharges, those not separated, and those with Secret clearances. There was no meaningful difference in preservice adjustment on the Felonies dimension between female homosexuals and Top Secret and SCI clearance holders.

Results for the Minor School Problems Scale

Table 5 displays the results for the Minor School Problems background scale. This scale measures minor school problems such as missing class and thoughts about quitting school. The higher the clearance level the greater the preservice adjustment on the Minor School Problems scale. This monotonic relationship between level of adjustment and clearance level supports the contention that the Minor School Problems scale is a relevant background scale for accessing preservice adjustment.

Because male homosexuals showed lower preservice adjustment on this dimension than female homosexuals, the comparisons are discussed separately.

Male homosexuals (52nd percentile) showed little difference from most comparison groups including those with Secret clearances. Homosexuals had lower levels of preservice adjustment than high school graduates, those who entered officer training, and Top Secret (nonSCI) and SCI clearance holders. Male homosexuals had higher levels of preservice adjustment on the Minor School Problems dimension than non-high school graduates, heterosexual unsuitability discharges, and medical discharges.

Females, regardless of sexual orientation, showed higher levels of preservice adjustment on the Minor School Problems scale than most other comparison groups, with female homosexuals (58th percentile) showing less preservice adjustment than female accessions (63rd percentile). Female homosexuals had fewer preservice adjustment problems in this area than non-high school graduates, unsuitability discharges, those released from service, medical discharges, and those without clearances.

14

DoD LA 2-6  042487



## TABLE 5

Minor School Problems Background Scale.
Comparison of Homosexuals with Other Groups.
Higher Scores Indicate Better Adjustment.

| Comparison Groups[1] | N | Percentile |
|---|---|---|
| Homosexuals | 166 | 54 |
| Males | 113 | 52 |
| Females | 53 | 58 |
| | | |
| Applicants Not | | |
| Entering Service[2] | 16,357 | 50 |
| Males | 12,525 | 47 |
| Females | 3,720 | 61 |
| | | |
| All Other Accessions | 48,302 | 52 |
| Males | 42,095 | 50 |
| Females | 6,207 | 63 |
| High School Graduate | 43,233 | 59 |
| GED and Nongraduates | 5,069 | 9 |
| | | |
| Military Career Changes[3] | | |
| Unsuitability Discharges | 8,468 | 37 |
| Release From Service | 6,855 | 51 |
| Immediate Reenlistment | 4,023 | 55 |
| Officer | 277 | 89 |
| Medical | 1,838 | 47 |
| Not Separated | 24,970 | 56 |
| | | |
| Clearance Category | | |
| No Clearance | 27,347 | 48 |
| Secret | 18,181 | 55 |
| Top Secret (no SCI) | 1,152 | 64 |
| SCI | 1,622 | 68 |

---

[1]Homosexuals were defined as those released from military service for homosexuality.
Applicants not entering service were those military applicants who completed the EBIS but did not join the service.
[2]The gender of 112 military applicants who did not enter service is unknown.
[3]A total of 1,871 persons had military career changes which are not one of those in the table.

15

DoD LA 2-6  042488



## Results for the Drunk and Disorderly Scale

Table 6 displays the results for the Drunk and Disorderly scale. This scale includes items regarding drunk driving arrests, drug-related arrests, and misdemeanors. Those with SCI clearances showed better adjustment than the Top Secret clearance holders without SCI access, who in turn showed better adjustment than the Secret clearance holders, who in turn showed better adjustment than those with no clearance. This relationship between level of adjustment and clearance level supports the contention that the Drunk and Disorderly scale is a relevant background scale for accessing preservice adjustment.

Male and female homosexuals showed approximately equal levels of preservice adjustment on this scale. When homosexuals showed meaningful differences with other comparison groups, the differences typically indicated that the homosexuals had higher levels of preservice adjustment.

## Results for the AFQT Percentile

Table 7 presents the results for the AFQT analyses. The AFQT can be viewed as a measure of general cognitive ability. The AFQT has a DoD-dictated norming standard which was used in this analysis. Consequently, the male accession percentile is not 50. The higher the clearance level, the greater the average AFQT percentile. Although cognitive ability is not a topic explored in the typical background investigation, this monotonic relationship between AFQT and clearance level supports the contention that the AFQT Percentile is a relevant background characteristic for accessing preservice adjustment.

Male and female homosexuals showed similar levels of AFQT scores which tend to be higher than those for other comparison groups. Female homosexuals showed greater cognitive ability than unsuitability discharges, those released from service, those who received immediate reenlistment, and medical discharges. Male homosexuals showed greater cognitive ability than all these groups and also showed greater cognitive ability than male and female accessions, accessions regardless of educational status, and Secret clearance holders. Those enlisted personnel who entered officer training and SCI clearance holders, however, showed greater levels of cognitive ability than homosexuals.

16

DoD LA 2-6  042489



## TABLE 6

Drunk and Disorderly Background Scale.
Comparison of Homosexuals with Other Groups.
Higher Scores Indicate Better Adjustment.

| Comparison Groups[1] | N | Percentile |
|---|---|---|
| Homosexuals | 166 | 56 |
| Males | 113 | 56 |
| Females | 53 | 55 |
| | | |
| Applicants Not | | |
| Entering Service[2] | 16,357 | 51 |
| Males | 12,525 | 48 |
| Females | 3,720 | 63 |
| | | |
| All Other Accessions | 48,302 | 52 |
| Males | 42,095 | 50 |
| Females | 6,207 | 62 |
| High School Graduate | 43,233 | 53 |
| GED and Nongraduates | 5,069 | 45 |
| | | |
| Military Career Changes[3] | | |
| Unsuitability Discharges | 8,468 | 46 |
| Release From Service | 6,855 | 50 |
| Immediate Reenlistment | 4,023 | 55 |
| Officer | 277 | 59 |
| Medical | 1,838 | 52 |
| Not Separated | 24,970 | 53 |
| | | |
| Clearance Category | | |
| No Clearance | 27,347 | 49 |
| Secret | 18,181 | 55 |
| Top Secret (no SCI) | 1,152 | 58 |
| SCI | 1,622 | 61 |

---

[1]Homosexuals were defined as those released from military service for homosexuality. Applicants not entering service were those military applicants who completed the EBIS but did not join the service.
[2]The gender of 112 military applicants who did not enter service is unknown.
[3]A total of 1,871 persons had military career changes which are not one of those in the table.

17

DoD LA 2-6  042490



## TABLE 7

AFQT Percentile.
Comparison of Homosexuals with Other Groups.
Higher Scores Indicate Higher Ability.

| Comparison Groups[1] | N | Percentile |
|---|---|---|
| Homosexuals | 164 | 63 |
| Males | 111 | 64 |
| Females | 53 | 62 |
| | | |
| Applicants Not Entering Service[2] | --- | --- |
| Males | --- | --- |
| Females | --- | --- |
| | | |
| All Other Accessions | 48,055 | 58 |
| Males | 41,863 | 58 |
| Females | 6,192 | 60 |
| High School Graduate | 43,028 | 58 |
| GED and Nongraduates | 5,027 | 58 |
| | | |
| Military Career Changes[3] | | |
| Unsuitability Discharges | 8,441 | 55 |
| Release From Service | 6,708 | 53 |
| Immediate Reenlistment | 4,022 | 54 |
| Officer | 273 | 85 |
| Medical | 1,833 | 56 |
| Not Separated | 24,917 | 61 |
| | | |
| Clearance Category | | |
| No Clearance | 27,173 | 56 |
| Secret | 18,122 | 59 |
| Top Secret (no SCI) | 1,144 | 66 |
| SCI | 1,616 | 72 |

---

[1]Homosexuals were defined as those released from military service for homosexuality.
[2]AFQT data for applicants not entering service were not available.
[3]A total of 1,861 persons had military career changes which are not one of those in the table.

18

DoD LA 2-6  042491



## Discussion

This study indicates that the suitability of homosexuals relative to heterosexuals depends upon the preservice background area examined and the sex of the comparison group. In general, homosexuals showed better preservice adjustment than heterosexuals in areas relating to school behavior. Homosexuals also showed greater levels of cognitive ability than heterosexuals. Homosexuals, however, showed less adjustment than heterosexuals in the area of drug and alcohol use. Male homosexuals also showed less adjustment than several comparison groups on the Felonies scale. Except for preservice drug and alcohol use (and homosexual males adjustment on the Felonies scale), homosexuals more closely resemble those who successfully adjust to military life than those who are discharged for unsuitability. While male homosexuals appeared to have better or equal preservice adjustment patterns than male heterosexuals, female homosexuals tended to have somewhat poorer preservice adjustment patterns than female heterosexuals. However, females as a whole tended to show higher levels of preservice adjustment than males, and female homosexuals tended to have higher levels of preservice adjustment than most heterosexual male accessions.

One may question the appropriateness of the background scales used in this analysis. It could be argued that one or more of these background areas are irrelevant to suitability for positions of trust. For example, the Defense Investigative Service no longer devotes extensive investigative resources to collecting school-related background information. Two lines of evidence, however, support the relevance of these background areas for employment suitability. First, with the possible exception of the school adjustment clusters, the background areas have similar content to those used by DoD background investigators. Second, the results for these background scales showed a meaningful pattern of relationships across comparison groups. Those enlisted personnel who entered officer training had higher levels of preservice adjustment than other successful accessions who had higher levels of preservice adjustment than heterosexuals discharged for unsuitability. Except for the Employment Experience scale, those with SCI access had higher levels of preservice adjustment than those with non-SCI Top Secret clearances, who had fewer preservice adjustment problems than Secret clearance holders, who had higher levels of preservice adjustment than those who did not have a Secret or higher clearance.

### Limitations of the Present Study

While this report makes a significant contribution to understanding homosexual suitability for positions of trust, the study suffers from several limitations. Five caveats are offered:

19

DoD LA 2-6  042492



o    First, the paper has a limited focus.  It does not address the issue of homosex-uality as a vulnerability that may be exploitable by hostile intelligence agencies.  Nor does it address the consequences of mixing homosexual and heterosexual persons in the same work group.

o    Second, the definitions used in this study for homosexual and heterosexual are not perfect.  Some of those who received discharges for homosexuality may be heterosexuals who falsely professed to homosexuality to gain a prompt release from military service.  Also, it is very likely that some members of the heterosexual group examined in this analysis were homosexuals.  Only those homosexuals who were discharged from the military service for homosexuality were counted as homosexuals for this analysis.  In addition, the homosexuality/heterosexuality dichotomy used in this study is an arbitrary one.  Many people are neither exclusively homosexual nor exclusively heterosexual.

o    Third, homosexuals who choose to join the military may be very different from the population of young adult homosexuals who are potential military accessions and may be very different from civilian homosexuals who seek national security clear-ances.

o    Fourth, the calculation of the percentiles presented in the tables implicitly assumes that the background scales scores are normally distributed.  All of the background scales showed at least some departures from a normal distribution.

o    Fifth, relative to all other comparison groups in this analysis (viz., 42,095 male military accessions), the number of homosexuals was small (113 males and 53 females).  Less confidence should be placed in conclusions drawn from smaller samples.  Data collected on another group of homosexuals and heterosexuals will likely be somewhat different from the results in this study solely due to random sampling error.

20

DoD LA 2-6  042493



### Conclusion

In summary, this report has provided limited but cogent evidence regarding the preservice suitability of homosexuals who may apply for positions of trust. Although this study has several limitations, the preponderance of the evidence presented indicates that homosexuals show preservice suitability-related adjustment that is as good or better than the average heterosexual. Thus, these results appear to be in conflict with conceptions of homosexuals as unstable, maladjusted persons. Given the critical importance of appropriate policy in the national security area, additional research attention to this area is warranted.

21



22

DoD LA 2-6  042495



## References

Ellis, L., & Ames, M. A. (1987).  Neurohormonal functioning and sexual orientation: A theory of homosexuality-heterosexuality.  Psychological Bulletin, 101, 233-258.

Means, B., & Perelman, L. S. (1984).  The development of the Educational and Background Information Survey.  FR-PRD-84-3.  Alexandria, VA: Human Resources Research Organization.

National Security Institute (1987).  Court rules for gays.  NSI Advisory, 3, 4.

23

DoD LA 2-6  042496

PERS-TR-91-008



# HOMOSEXUALITY AND PERSONNEL SECURITY

Theodore R. Sarbin

September 1991

Approved for Public Distribution: Distribution Unlimited

**DEFENSE**
**PERSONNEL SECURITY**
**RESEARCH AND EDUCATION CENTER**
99 Pacific Street, Building 455-E
Monterey, California 93940-2481

PERSEC 007818



PERSEC 007819

SECURITY CLASSIFICATION OF THIS PAGE

## REPORT DOCUMENTATION PAGE

Form Approved
OMB No. 0704-0188

| 1a. REPORT SECURITY CLASSIFICATION | 1b. RESTRICTIVE MARKINGS |
|---|---|
| UNCLASSIFIED | |

| 2a. SECURITY CLASSIFICATION AUTHORITY | 3. DISTRIBUTION / AVAILABILITY OF REPORT |
|---|---|
| 2b. DECLASSIFICATION / DOWNGRADING SCHEDULE | |

| 4. PERFORMING ORGANIZATION REPORT NUMBER(S) | 5. MONITORING ORGANIZATION REPORT NUMBER(S) |
|---|---|
| PERS-TR-91-008 | |

| 6a. NAME OF PERFORMING ORGANIZATION | 6b. OFFICE SYMBOL (If applicable) | 7a. NAME OF MONITORING ORGANIZATION |
|---|---|---|
| PERSEREC (Personnel Security Research & Education Center) | | |

| 6c. ADDRESS (City, State, and ZIP Code) | 7b. ADDRESS (City, State, and ZIP Code) |
|---|---|
| 99 Pacific Street, Building 455-E Monterey, CA 93940-2481 | |

| 8a. NAME OF FUNDING / SPONSORING ORGANIZATION | 8b. OFFICE SYMBOL (If applicable) | 9. PROCUREMENT INSTRUMENT IDENTIFICATION NUMBER |
|---|---|---|
| | | |

| 8c. ADDRESS (City, State, and ZIP Code) | 10. SOURCE OF FUNDING NUMBERS | | | |
|---|---|---|---|---|
| | PROGRAM ELEMENT NO. | PROJECT NO. | TASK NO. | WORK UNIT ACCESSION NO. |

11. TITLE (Include Security Classification)
Homosexuality and Personnel Security

12. PERSONAL AUTHOR(S)
Theodore R. Sarbin, PhD

| 13a. TYPE OF REPORT | 13b. TIME COVERED | 14. DATE OF REPORT (Year, Month, Day) | 15. PAGE COUNT |
|---|---|---|---|
| Technical Report | FROM ___ TO ___ | 1991, September | 46 |

16. SUPPLEMENTARY NOTATION

| 17. COSATI CODES | | | 18. SUBJECT TERMS (Continue on reverse if necessary and identify by block number) |
|---|---|---|---|
| FIELD | GROUP | SUB-GROUP | Personnel security; Secrets; Homosexuality; Morally suspect class |
| | | | |

19. ABSTRACT (Continue on reverse if necessary and identify by block number)

This study examines the relationship between homosexuality and personnel security. It reviews legal, biological and social science literature on homosexuality. The study concludes that there are few data to support the premise that all homosexuals represent a security risk. It affirms the current guidelines that call for examination of individual security clearance decisions on a case-by-case basis. The author notes that homosexuals are often seen to constitute a morally suspect class and have been the target of discriminatory policies. The aim of the paper is to provide context for personnel security professionals as they weigh all appropriate variables in making security clearance determinations.

| 20. DISTRIBUTION / AVAILABILITY OF ABSTRACT | 21. ABSTRACT SECURITY CLASSIFICATION |
|---|---|
| ☒ UNCLASSIFIED/UNLIMITED  ☐ SAME AS RPT.  ☐ DTIC USERS | UNCLASSIFIED |

| 22a. NAME OF RESPONSIBLE INDIVIDUAL | 22b. TELEPHONE (Include Area Code) | 22c. OFFICE SYMBOL |
|---|---|---|
| Roger P. Denk, Director, PERSEREC | (408) 646-2448 | |

DD Form 1473, JUN 86      Previous editions are obsolete.      SECURITY CLASSIFICATION OF THIS PAGE

S/N 0102-LF-014-6603

PERSEC 007820

SECURITY CLASSIFICATION OF THIS PAGE



**DD Form 1473, JUN 86** (Reverse)

SECURITY CLASSIFICATION OF THIS PAGE

PERSEC 007821

PERS-TR-91-008                                              September 1991

# HOMOSEXUALITY AND PERSONNEL SECURITY

Prepared by
Theodore R. Sarbin, Ph.D.

Released by
Roger P. Denk
Director

Defense Personnel Security Research and Education Center
Monterey, California 93940-2481

PERSEC 007822

PERSEC 007823

## Preface

In 1987 the Office of the Secretary of Defense (Policy) invited PERSEREC to reevaluate the current adjudicative guidelines contained in DoD's *Personnel Security Program* (5200.2-R) concerning sexual behavior and personnel security. In particular, PERSEREC was given the task of examining the relationship between homosexuality and personnel security.

This report poses two major questions: (1) Are homosexuals security risks by virtue of membership in the class *homosexual*? and (2) Are homosexuals vulnerable to blackmail if their homosexuality is kept a secret? The author, after an examination of various social constructions of homosexuality, a brief exploration of the scientific status of homosexuality, and a discussion of the concept of personal secrets, concludes that homosexuals, provided that their homosexuality can be safely disclosed, are no more security risks than heterosexuals. He suggests that security personnel continue to use the case-by-case approach in deciding whether to grant clearances, but that they be given special training to help eliminate any possible bias against homosexuals.

This report is intended for security professionals and all those interested in personnel security matters. We hope it will be a vehicle for stimulating discussion which will eventually lead to the ultimate goal of improving personnel security.

This work does not deal with the Department of Defense policy that excludes homosexuals from military service. The exclusion policy is separate from those policies that apply to a civilian being investigated for a clearance.

We are grateful to Michael A. Sterlacci, Assistant General Counsel, Office of General Counsel, DoD, for invaluable assistance and advice on legal issues.

Roger P. Denk
Director

i

PERSEC 007824

Results

    Few data have been put forward to support the belief that being homosexual predisposes a person to unreliability, disloyalty, or untrustworthiness. Scores of studies have made clear that large individual differences in moral beliefs are to be found among heterosexuals and homosexuals. It is invalid to generalize from sexual orientation to trustworthiness. Life styles of homosexuals are as varied as the life styles of heterosexuals.

Conclusions/Recommendations

    Homosexuals have been targets of discriminatory policies. The residues of earlier constructions of homosexuality (sin, crime, or illness) may influence personnel security specialists to treat homosexuals as a morally suspect class. Given that homosexuals (like heterosexuals) are a diverse group, fairness and personnel efficiency require a case-by-case policy.

    The current case-by-case policy is appropriate to the task of determining eligibility for security clearance. However, the implementation of the policy needs to be examined in light of the fact that investigators, adjudicators and other personnel security specialists are drawn from the general population and large segments of the population continue to view homosexuality as sin, crime, or illness, constructions that might bias eligibility decisions. The work of investigators and adjudicators should be monitored to ensure that practice follows policy.

PERSEC 007825

# Table of Contents

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    i

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1
    The Construction of Morally Suspect Classes  . . . . . . . . . . . . . . . . . . . . . . . . .    2
    Cognitive Processes in Premise Formation  . . . . . . . . . . . . . . . . . . . . . . . . . .    8
        Induction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
        Construction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8

Social Construction of Homosexuality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11
    The Morality Construction--Good and Evil as Fundamental Categories . . . . .    11
    The Legal Construction--Sexual Deviance as Criminal Behavior  . . . . . . . . . .    13
    The Sickness Construction--The Medicalization of Deviance . . . . . . . . . . . .    14
    The Minority Group Construction--Homosexuals as a Non-Ethnic Minority
        Group . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

Scientific Status of the Homosexuality Concept . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
    Biological Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
    Psychological Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23
    Sociological Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

Implications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

Personal Secrets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

Concluding Remarks  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    33

Appendix  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

PERSEC 007826

PERSEC 007827

## Introduction

Who can be entrusted with the nation's secrets? This overarching question guides the activities of governmental agencies charged with selecting trustworthy personnel. The primary operating assumption in efforts to answer this question is that not all persons are equally trustworthy: some are more likely to breach a trust than others.

The objective of this study is to explore whether homosexual men and women are at greater risk for engaging in espionage or other security violations than persons not so identified. The problem is complex. We must consider not only the character of persons who might engage in treasonous acts but also the contexts which influence such acts. Does the potential spy respond to inducements offered by foreign intelligence agents? What is the evidence that supports the claim that homosexuals are likely targets for blackmail by foreign agents? Are recruitment efforts of foreign intelligence agents directed specifically toward homosexual men and women? Are homosexual men and women more likely than heterosexuals to volunteer their services as spies? What are the facts that would support the hypothesis that being homosexual implies emotional instability and, therefore, unreliability and high risk for betrayal?

In the absence of systematically gathered data to answer these and related questions, it has been the practice to generalize from anecdotes. In the scientific arena, anecdotes play an important part: they provide the raw material for constructing hypotheses. Like anecdotes, hypotheses have no truth value until subjected to empirical test. In situations where anecdotes and untested hypotheses are employed as the basis for action, there is ordinarily a tacit recognition of the limited utility of anecdotes as sources of generalizations. Additional anecdotes may alter generalizations coined on the basis of earlier anecdotes.

In an effort to throw some light on these matters, I have organized the inquiry by attempting to answer two separate but related questions:

1) Is a person a security risk by virtue of membership in the class *homosexual?*\*

---

\*I am using the term *homosexual* in the conventional way as if persons could be sorted into two non-overlapping classes *heterosexual* and *homosexual*. In a later section of this essay, I point to the observations of scientists that *heterosexual* and *homosexual* are not exclusive categories and that gradations or dimensions of sexuality are more valid descriptors. A more complete historical and sociological account would consider the multiple referents for the word *homosexual*--does the word refer to gender orientation, to sexual practice, to identity, to role, to atypical social categories, etc? The multiple referents serve to create a criterial distinction for personnel security specialists. For purposes of adjudication, the distinction is sometimes drawn between homosexual *acts* and homosexual *identity*. A person who engages in homosexual acts as a result of immaturity or intoxication is not necessarily assigned to a morally suspect class. A person who describes his/her sexual orientation as homosexual--even in the absence of evidence that he/she engaged in homosexual acts--is suspect.

1

PERSEC 007828

2)  Is a person with same-gender orientation a security risk because he or she is vulnerable to coercion and blackmail?

To address the first question, I employ as a general framework the construction of judgmental or suspect classes.  To address the second question, I locate the answer in the general context of personal secrets and attendant risks associated with disclosure or discovery.

I shall first examine the basis for the hypothesis that membership in certain socially defined classes renders a person more likely to engage in trust-violating conduct. Examples of such socially defined classes are the following:  persons with unsatisfactory credit histories; persons with psychiatric histories; and persons with alcohol or drug abuse problems. The justifications for constructing such categories come from many sources: among them, generalizations about irresponsibility based upon unsatisfactory or problematic performances in nonsecurity-related settings.  Membership in the class *homosexual* has also been employed with various justifications as a criterion for unsuitability in employment and ineligibility in security screening.

To develop our study, it is necessary first to describe the nature of the socially defined class.  Subsequently, we can ask if membership in the class *homosexual* is predispositional to untrustworthiness.

## The Construction of Morally Suspect Classes

Trust and trustworthiness are complex features of human life.  Even a casual consideration of what constitutes trustworthiness reveals its complexity.  Immediately, we think of family, occupational, or other social conflict situations where the actors must choose between betraying and honoring a trust, and the risk of potential negative consequences for choosing one rather than another line of action. The fact that trust is central to some social interactions and peripheral to others adds to the complexity.

Although traditional psychometric theory would direct us to seek a character trait, a disposition, or a personality element located within the brain or the psyche, efforts to measure trustworthiness and related characteristics have yielded very little.  Tests have been constructed to assess a related characteristic *honesty*, but they are of little value.  In most cases, they fail to meet acceptable standards of validity and reliability (Sackett, Burris, & Callahan, 1988).  Because of the ambiguity in defining trust and trustworthiness, as well as the contextual nature of acts that meet the requirements of trustworthiness, a useful psychological test is not likely to be devised.  Without objective,

---

In a purely sociological analysis, I would discuss male and female homosexuality separately.  Public attitudes toward gay men are not the same as public attitudes toward lesbians.  In this personnel security analysis, separate discussions of male and female homosexuals are unnecessary.

2

PERSEC 007829

quantitative procedures for sorting persons, we are forced to make use of qualitative methods.

Taxonomic sorting, i.e., sorting people into classes or taxonomies, is a universal human activity. We sort individuals into men and women, tall and short, fast and slow, hostile and benign, good and bad, and so forth. Efficient functioning, if not survival, depends upon creating and using taxonomies that are useful. Without constructing and using classes, we would be adrift in a sea of unsorted, meaningless stimulus-events. Almost from the cradle, human beings acquire the skill to sort persons into classes based on gender, kinship, age, school grade, size, race, ethnicity, physique, and so forth. The criteria for such classes are public and communicable. In addition, human beings make use of a subset, *morally suspect classes*, that have as their defining attribute the presence of morally undesirable characteristics.

> I am using the term *suspect class* as a *psychological* concept. It should not be confused with the technical meaning of the term as used in constitutional law. The juridical use of *suspect class* is that of a class of persons whose rights are at risk in virtue of membership in classes the current criteria for which are race, alienage, national origin, gender, and illegitimacy. Governmental actions affecting such suspect classes are subject to heightened or strict scrutiny by the courts. Whether or not homosexuals make up a suspect or quasi-suspect class has been a contested issue in the courts. Although some courts have been willing to grant the status of suspect or quasi-suspect class to homosexuals, higher courts have regularly reversed such actions. To repeat, in this inquiry I am using *suspect class* in a *psychological* sense. Where there is the possibility of confusing the two meanings, I have added the qualifier, "morally," to indicate the psychological meaning. The meaning is quite different from the meaning of *suspect class* in legal briefs.

Assignment to a morally suspect class carries the attribution of negative traits such as dishonesty, unreliability, untrustworthiness, cowardice, etc. For example, persons who violate propriety norms regarding aggression against children are assigned to a legally defined class *child abusers*. Because of the severity of societal and moral rules about beating children, any person who publicly violates such rules is likely to be assigned not only to the class *child abusers* but to a wider class, not necessarily articulated, the defining characteristics of which reflect *generalized badness*. Thus, assignment to the class *child abusers* renders the person a member of a morally suspect class, i.e., he/she would be suspected of other moral deviations, among them, untrustworthiness. It is important to note that the criteria for suspect classes are not constant. At one time, being assigned to the class *left-handed* resulted in the concurrent assignment to the class *evil*. Residues of this folk belief remain in our language--*sinister* may serve as a reference for left-handedness or as a term to denote a moral judgment.

3

PERSEC 007830

In the selection of men and women for certain tasks, efficiency is sought by assigning potential job-holders to occupational classes. Classes such as clerical workers, mechanics, computer-operators, administrators, and so on, are commonplace. The defining characteristics of such classes are skills and aptitudes. The selection process is governed by procedures designed to assess skills and aptitudes. When selecting personnel for jobs that involve access to government secrets, the selection process has an additional dimension. A different kind of class is created, the defining characteristics of which are not skills and aptitudes, but *moral* descriptors such as honesty, reliability, and trustworthiness. Selecting personnel who can be entrusted with the nation's secrets, then, calls for taxonomic sorting on moral dimensions. Actual or potential members of the work force who are presumed to be morally flawed make up a suspect class: *not trustworthy*. In this sense, a suspect class is a class whose members are objects of suspicion. A concrete example of the use of suspect class in making inferences about a person would be the following. A bearded, unkempt, leather-jacketed, booted motorcyclist enters a middle-class restaurant. Some patrons and staff would automatically look upon the person with suspicion, expecting that his conduct would violate conventional or moral rules. Such an inference follows from assigning the person to a previously formulated suspect class *motorcycle gangs* with the implication that membership in such gangs renders one morally suspect.

Nonconforming sexual orientation, in some places and during certain historical periods, has served as the criterion for assigning persons to a morally suspect class. Certain forms of nonconforming sexual conduct have been incorporated into criminal statutes and/or psychiatric vocabularies. Not only legal and psychiatric attributions of badness, but folk attributions of generalized moral deviation, including untrustworthiness, are commonly noted. That is to say, folk beliefs arising from historical and cultural antecedents attribute generalized moral deficiencies to persons whose sexual orientations are nonconforming. I should add quickly, however, not all nonconforming sexual conduct leads to the assignment of persons to suspect classes. For example, in certain subcultures male promiscuity is not taken as the basis for assigning persons to morally flawed suspect classes.

In recent years, the folk belief has been challenged. Men and women who identify themselves as homosexual have raised the question whether they should be assigned to a suspect class. The civil rights movement, changing folkways, and some legal decisions have supported efforts to modify or eliminate the assignment of homosexuals to a morally suspect class (Barnett, 1973).* Among the legal decisions that may have

---

*This analysis is not intended to follow the form of a Law Review article in which all pertinent cases and legal precedents are examined. Rather, I identify a few noteworthy cases to illustrate the complexity of the constitutional issues. The complexity is reflected in the fact that the legal codes of half the States contain no prohibition against consensual sodomy. The U.S. Supreme Court apparently regarded this issue as a state's rights issue when it refused to invalidate a Georgia law prohibiting consensual sodomy (*Bowers v. Hardwick*, 478 U.S. 186 (1986)).

4

PERSEC 007831

influenced the softening of discriminatory practices in public employment is the case of
*Norton v. Macy* (417 F.2d 1161 (D.C. Cir. 1969)). The plaintiff had been fired on the
grounds of "immorality" because he had engaged in homosexual conduct. The court
ruled that alleged or proven immoral conduct is not grounds for separation from public
employment unless it can be shown that such behavior has demonstrable effects on job
performance. Judge David Bazelon's decision included a statement that may have
influenced recent employment and security policies in government service. He said (in
part):

> The notion that it could be an appropriate function of the federal bureaucracy to enforce
> the majority's conventional codes of conduct in the private lives of its employees is at war
> with elementary concepts of liberty, privacy, and diversity.

Another case that has received wide attention was tried in 1987 in the United
States District Court for the Northern District of California. The case was filed in 1984
on behalf of an organization of Silicon Valley (California) employees known as High
Tech Gays. Three members of the group had been denied security clearance because of
the policy of intensive and expanded scrutiny of homosexuals. According to DoD policies
at the time, identification as homosexual of a prospective employee was sufficient reason
for expanded clearance investigations. The ruling handed down by Judge Thelton E.
Henderson declared that the DoD policy was founded on prejudice and stereotypes, the
basis for the policy being the unwarranted claim that homosexual men and women were
emotionally unstable and, therefore, potential targets for blackmail. Judge Henderson
ruled that homosexuals were a "quasi-suspect class" (in the juridical sense) and that
government policies violated the constitutional guarantee of equal protection under the
law (*High Tech Gays v. DISCO*, 668 F.Supp. 1361 (N.D.Cal. 1987)).

The complexities of the juristic concept *suspect class* is illustrated in the contrary
opinions of the District Court and the Appeals Court. On appeal, the Ninth Circuit
Court of Appeals heard arguments and decided in favor of the Department of Defense.
The opinion, written by Circuit Judge Melvin Brunetti, rejected Judge Henderson's
conclusions that homosexuals are a "quasi-suspect" class and that claims of discrimination
must be examined with "heightened scrutiny" or "strict scrutiny." In rejecting Judge
Henderson's conclusions, Judge Brunetti argued that heightened or strict scrutiny could
be applied only to government actions that discriminated against persons based on race,
gender, alienage, national origin, or illegitimacy. The opinion goes on to say that in
order to be perceived as a suspect or quasi-suspect class, homosexuals must (1) have
suffered a history of discrimination, (2) exhibit obvious or immutable characteristics that
define them as a discrete class, and (3) show that they are a minority or politically
powerless. Judge Brunetti held that the first criterion was met, that homosexuals have
suffered a history of discrimination. The other two criteria were not met, according to
the ruling. In the court's opinion, homosexuality is not an immutable characteristic, and
homosexuals are not powerless as witnessed by numerous anti-discrimination statutes.

5

PERSEC 007832

Cognitive Processes in Premise Formation

Making judgments about people requires cognitive work. Judgments are not automatic and immediate, they are the end result of silent actions by human beings who are accustomed to using the logic of the syllogism. They begin from a major premise (not usually articulated), then assign the case under review to the minor premise. The conclusion follows from the joining of the two premises. In the simplest case, the major premise could be: All shifty-eyed persons are liars. The minor premise, based on observation, is: Jones is a shifty-eyed person. The conclusion follows: Jones is a liar. The logic is valid. Whether or not Jones is a liar is dependent on the truth-value of the major premise. Was the major premise derived from observation and was it empirically checked? Or was the major premise constructed out of unconfirmed beliefs, hypotheses, speculations, analogies, etc.? Human beings who are faced with the task of forming inferences about others make use of two general methods for formulating major premises: induction and construction (Sarbin, Taft, & Bailey, 1960).

Induction

Observation and experience, the basis of induction, is the empirical method for constructing classes that would be useful in ordinary decision-making. It is the method that has advanced science and technology. Connections are established between classes of events. For example, amorphous clouds can be sorted into classes: nimbus, stratus, and cumulus. The utility of the classes has been established by correlating the presence of classes with wind and weather patterns. Mariners, aviators, and farmers make predictions from inductively derived premises that connect classes of clouds with other meteorological conditions. Research on personality and character by and large attempts to establish inductions that would allow predictions of future conduct from measurements taken from past or present assessments. Except for gross classifications, such as *psychopathic inferiority*, *sociopathy*, and *undersocialized*, we have few empirically tested generalizations that would be helpful in making predictions about a person's moral choices. It would be most practical if adjudicators (or anyone) could make inferences about a particular person from reliable inductions of the form: all church-going persons are honest, or all Cretans are liars. Such inductions are not available. Unless we are to avoid all decision-making until we can create inductively derived premises, we are constrained to employ premises that do not have the benefit of empirical confirmation.

Construction

Most of our judgments about others (and ourselves) flow only partly from inductive generalizations and mostly from constructions. The beliefs we hold about human nature are more theory-driven than data-driven. Human beings, having the gift of language and the talent to use syllogisms, can and do construct all manner of beliefs

8

PERSEC 007833

about human behavior. When combined into an informal system, the beliefs can serve as an implicit theory of character.

The constructed beliefs that comprise a person's theory of character develop from two main sources: (1) deductive statements that reflect the implicit fashioning of beliefs, imaginings, and attitudes, and (2) authority.

(1) Beliefs that serve as the basis for an individual's theory of character may come from immersion in scientific or folk theories of personality. An investigator or adjudicator might absorb some of the elements of psychoanalytic theory and hold beliefs about the structure of character disorders. He or she would then be prepared to employ premises derived from psychoanalysis. Others might advance premises based on unsophisticated folk theories, e.g., people who appear to fit the prevailing stereotypes of "criminals" are unreliable; a weak handshake betokens a weak character; a tidy desk denotes a well-ordered mind. Needless to say, some individuals borrow premises, often absurd, from the contents of astrological charts. Many persons hold beliefs that scientifically inclined observers would label superstitions.

Some premises are constructed as the result of analogical reasoning. Mr. Smith has a theory of character derived from an analogy. A fellow worker who had a "weak lower jaw" was fired for embezzling funds. From this experience, Smith constructed the premise: people with weak jaws are predisposed to dishonesty. The fellow-worker was used as a model in Smith's silent construction of a premise: if a person has one characteristic in common with the model, then he will have all the other characteristics of that model. Research on judging personality makes clear that human beings, in the absence of confirmed inductions, construct and employ implicit theories of personality (Rosenberg, 1977). Incorporated into such implicit theories are theories of character. Many characterological assumptions can be traced to immersion in codes of morality that are contained in religious beliefs. In a later section, I indicate the content of beliefs arising from theological sources and I suggest that such beliefs, acquired before the age of reflection, may be grounds for an individual's theory of character, a theory that would generate premises about the character of persons identified as homosexual.

(2) The other source for the construction of a theory of character is authority. Teachers, supervisors, political leaders, and other figures in positions of authority may impart to a novice a ready-made theory of character. The authority's theory may be a mix of inductions and constructions.

Authorities often support their theories of character by referring to tradition as a form of validity. "It's always been done this way" is used as an argument to support a particular premise for making character judgments when empirical support is lacking. Another strategy employed to justify a particular theory of character is to claim that it is supported by "professional judgment."

9

PERSEC 007834

I have presented the foregoing discussion in the interest of establishing that investigators, adjudicators, and case controllers, in common with people generally, do not process information in a mechanical way but engage in the practice of clinical inference. The inferences they make about homosexuals or heterosexuals flow from premises generated by their belief systems. Such belief systems do not arise in a vacuum; they are influenced by hard facts when available, and by creative imaginations when hard facts are not available. To help understand the source of beliefs that assign homosexuals to a suspect class, an exposition of the various social constructions of homosexuality is in order.

10

PERSEC 007835

## Social Construction of Homosexuality

A word about the notion of *social construction*. Meanings are not given in nature. Meanings are assigned to events by human beings who communicate with each other. The construction or interpretation of any phenomenon is influenced by concurrent historical contexts: political, economic, religious, and scientific.

The observations of historians (see, for example, Bullough, 1976) and the reports of ethnographers (see, for example, Ford and Beach, 1951; Marshall & Suggs, 1971; and Devereaux, 1963) support the notion that the constructions placed on same-gender sexuality are social. As Kinsey remarked, "only the human mind invents categories." At certain times, and in many societies, most variations in the expression of sexuality have been regarded as normal. It is the application of moral rules and legal statutes that determines whether same-gender orientation and conduct is classified as acceptable, tolerable, offensive, or criminal. Such rules and statutes are the products of custom, supported by the power vested in authority. As the historical record shows with abundant clarity, forms of authority change. In early times, moral rules were enforced by men and women enacting priestly roles. Later, ruling classes imposed their own fluctuating standards on the enforcement of moral rules. In western democracies, rules are constructed through consensus or legislation, and rules favoring the majority are tempered so that rights of minorities are not obliterated.

How has this variability been construed? Tracing the history of social constructions of deviant conduct points unmistakably to the influence of beliefs prevailing at any particular time. A full historical account is beyond the scope of this paper, but for our purposes it is sufficient to demonstrate that observed variability in sexual conduct has been construed differently at different times in Western history. My point of departure is influenced by the position of contemporary science: that observations ("facts") are raw materials for constructing meanings (Spector & Kitsuse, 1987). The construction of meanings is not given in the observations, but is the product of cognitive work, taking into account political, social and religious contexts. In the past several hundred years, four constructions have been offered to account for variations in sexual orientation. Evidence of these constructions is abundant in contemporary life, although each construction was initially formulated in a different historical period.

### The Morality Construction--Good and Evil as Fundamental Categories

Moral rules as represented in religious writings are the source of the long-held construction of prohibition of nonprocreative sexual conduct. Masturbation, lascivious conduct, and nonprocreative sex were proscribed. "You shall not lie with a man as with a woman, that is an abomination" (Leviticus 18:22). "Neither the immoral, nor idolaters,

11

PERSEC 007836

nor adulterers,  nor abusers of themselves with mankind, will inherit the Kingdom of God" (I Corinthians 6:9).

The history of religious attempts to control sex makes clear the notion of variability in attitudes. Struggles between advocates of different theological doctrines have been reflected in attitudes toward sex. In the formation of attitudes, two ideas stand out in the literature; first, the inferior status of women, and, second, child-bearing as a requirement for maintaining a collectivity. In a far-reaching review, Law (1988) provides evidence and argument to support the proposition that the condemnation of homosexuality is more an unwitting reaction to the violation of traditional gender norms than to nonconforming sexual practices. When a man adopts the female role in a sexual relationship, he gives up his masculinity for the inferiority that is supposed to be associated with being a woman. This constituted, for some Church authorities, an abomination, a sin against nature (Bullough 1976). The negative judgments originally associated with men adopting female roles have diffused to all homosexual roles.

According to Bullough (1976), early doctrine held that sex served only one purpose: procreation. This doctrine was supported by the claim that such was God's intention in creating the world of nature. Therefore, sex for pleasure was suspect, especially same-gender sex, since this is obviously nonprocreational. The appellation *sins against nature* appears frequently in doctrinal arguments (Bullough, 1976). Since same-gender sex was nonprocreative, it was classified as a sin against nature.

In western religious traditions, Good and Evil are the categories that provide the background for declaring value judgments on sexual nonconformity. Arising from primitive taboos, the powerful image of "sin" was employed to define the unwanted conduct. Certain religious leaders who take the Bible as the unquestioned moral authority are contemporary advocates of the belief that nonconforming sexual behavior is sinful. The attribution of sinfulness carries multiple meanings: among some groups, sin is explained as voluntary acceptance of Satanic influence; among others sin is believed to produce a flawed or spoiled identity. Societal reactions to sin include ostracism, corporal punishment, imprisonment and, in more draconian times, torture, stoning, hanging, burning at the stake, and even genocide.

Sin is an attribution, a construction made by others or by oneself. Its force lies in its attachment to entrenched religious doctrine. Like taboos, the concept of sin is acquired by people before they reach the age of reflection. The argument that sin is a social construction is nowhere better illustrated than in the debates of theologians about the doctrine of original sin and in how to establish criteria for sinful conduct: under what conditions should an action be regarded as a venial sin or as a mortal sin?

12

PERSEC 007837

## The Legal Construction--Sexual Deviance as Criminal Behavior

Arising from religious precepts, legislative acts were introduced to control nonprocreative sexual behavior. The creation of the vocabulary for anal intercourse, for example, brought together a set of concepts that interwove law and morality. Ruse (1988), referring to the relationship of religious teaching to laws designed to control sexual behavior, commented:

"Sodomy" obviously comes from the name of the doomed city of the plain, and "buggery" is a corruption of "bougrerie," named after so-called "Bulgarian" heretics... . They believed that physical things are evil, and thus refused to propagate the species, turning, therefore, to other sexual outlets. Hence banning buggery struck a two-fold blow for morality: against unnatural vice and against heretical religion (p. 246).

As early as 1533 in England, buggery, which had been established in religion as a sin against nature, was declared a crime. In the ensuing three decades, the statute was repealed and reenacted several times. In 1563, in the reign of Elizabeth I, the law against buggery became firmly established. Criminal codes provided severe punishment for persons accused of nonconforming sexual conduct (Bullough, 1976). The language of such statutes is not uniform. *Buggery, sodomy, lewdness, perversion, lasciviousness*, and even *immorality* are terms that have been employed in different statutes and at various times to denote the proscribed criminal conduct.

The underlying categories of the legal construction of nonconforming sexuality are continuous with those of the religious construction: good and evil. With the secularization of morality, sin was no longer an appropriate descriptor for unwanted conduct. The transition from *sins against nature* to *crimes against nature* was an accomplishment of the secularization and attempted legalization of morality. Crime, the secular equivalent of sin, became the preferred descriptive term.

To make rational the use of the crime concept in the context of sexual behavior, it had to be consonant with accepted legal usage, as in crimes against the person, crimes against property, crimes against the Crown, etc. The linguistic formula "crimes against..." presupposes a victim. In following this logic, early practitioners of jurisprudence created *crimes against nature* as the label for unwanted sexual conduct. In so doing, they implied that "nature" was the victim.

In most of the criminal codes, and in the Uniform Code of Military Justice, the concept of *crimes against nature* appears frequently when sexual behavior is proscribed. The concept is sometimes rendered by the employment of language which includes the adjective *unnatural*. Clearly, the authors of statutes that proscribe *crimes against nature* were not using "nature" as a descriptor for flora and fauna, mountains and valleys, oceans and deserts. When "nature" is the victim, something else is intended.

13

PERSEC 007838

The statutory language, as we mentioned before, is derived from the religious idiom *sins against nature*. "Nature" is employed in the sense used by the early Greek philosophers, as the force or essence that resides within things. Thus, it is in the nature of a hen's egg to develop into a chicken, for water to run downhill, etc. This concept of nature served as the main explanatory principle, employed as an all-purpose answer for causality questions. With the development of empirical science, such all-purpose answers became superfluous, they gave way to questions directed toward uncovering how events influenced each other, and answers were formulated according to laws and principles constructed through observation and experiment. At the present time, the legal concept *crimes against nature* has no scientific status. It is a rhetorical device to control nonpro-creative sex.


## The Sickness Construction--The Medicalization of Deviance

The nineteenth century witnessed the social construction of deviant conduct as sickness. Although the medical model of deviance had its origins in the sixteenth century, it was not until the growth and success of technology and science in the nineteenth century that medical practitioners created elaborate theories to account for unwanted conduct. Many of the fanciful early theories of crime and craziness were given credibility because they were uttered by physicians and, therefore, presumed to be scientific. The prestige conferred upon the practitioners of science and technology blanketed the medical profession. It was during the latter half of the century that medical scientists initiated the movement to medicalize not only poorly understood somatic dysfunctions, but all human behavior. Conduct that in the past had been assigned to moralists or to the law now came under the purview of medical authority. Deviant conduct of any kind became topics of interest for doctors. The brain had already been given its place as the most important coordinating organ of the body, and the "mind" was somehow located in the brain. Therefore, any item of behavior that was nonconformant with current norms could be attributed to faulty brain apparatus, flawed mental structures, or both. In the absence of robust psychological theories, the observation and study of nonconforming behavior led physicians to assimilate theories of social misconduct to theories of somatic disease. The creation and elaboration of disease theories was based upon the all-encompassing notion that every human action could be accounted for through the application of the laws of chemistry and physics. In this context, homosexuality and other nonprocreative forms of sexual conduct were construed as sickness. To be sure, the medicalization of nonconforming sexual conduct failed to replace entirely the older moral and criminal constructions, and in many cases persons suffering from such "illnesses" continued to be punished.

It is interesting to note that the term *homosexuality* itself did not appear in English writings until the 1890s. Like most medical terms, it was created out of Greek and Latin roots. Prior to that time, labels for nonconforming sexual conduct in the English language had been free of medical connotations, as, for example, the words *sodomy,*

14

PERSEC 007839

*buggery, perversion, corruption, lewdness,* and *wantonness.* One outcome of the medicaliza-tion of nonconforming sexual conduct was the inclusion of homosexuality in textbooks of psychiatry and medical psychology. Homosexuality was officially listed as an illness in the 1933 precursor to the 1952 Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-I). In the 1930s and 1940s any person who admitted being homosex-ual was likely to be referred to a psychiatrist for diagnosis and treatment, the goal of the treatment being the elimination of the homosexual interest. But even during this period the father of psychoanalysis, Freud, expressed the opinion that homosexuality was not an illness. In 1935 Freud wrote a letter to the troubled mother of a homosexual which is worth quoting in its entirety (Bieber et al., 1962), as it anticipates and eloquently sum-marizes the prevailing current scientific and medical views on homosexuality.

April 9, 1935

Dear Mrs. _____

   I gather from your letter that your son is a homosexual. . . . Homosexuality is assuredly no advantage, but it is nothing to be ashamed of, no vice, no degradation, it cannot be classified as an illness; we consider it to be a variation of the sexual function produced by a certain arrest of sexual development....By asking me if I can help, you mean, I suppose, if I can abolish homosexuality and make normal heterosexuality take its place. The answer is, in a general way, we cannot promise to achieve it. In a certain number of cases we succeed in developing the blighted germs of heterosexual tendencies which are present in every homosexual, in the majority of cases it is no more possible. It is a question of the quality and the age of the individual. The result of treatment cannot be predicted.

   What analysis can do for your son runs in a different line. If he is unhappy, neurotic, torn by conflicts, inhibited in his social life, analysis may bring him harmony, peace of mind, full efficiency, whether he remains a homosexual or gets changed.

Sincerely yours with kind wishes,

Freud

   Homosexuality as a social construction is nowhere better illustrated than in the arbitrary manner in which it was included and ultimately excluded from the medical lexicon. In 1974, the diagnosis of homosexuality was deleted from the Diagnostic Manual of the American Psychiatric Association under pressure from many psychiatrists who argued that homosexuality was more correctly construed as a nonconforming life style rather than as a mental disease.

   Although the mental health professions do not speak with one voice, the currently prevailing view was advanced by Marmor (1975), at that time president of the American

15

PERSEC 007840

Psychiatric Association:  "...there is no reason to assume that there is a specific psychody-namic structure to homosexuality anymore than there is to heterosexuality" (p. 1514).

The American Psychological Association passed a resolution in 1975 declaring that:

> Homosexuality per se implies no impairment in judgment,
> stability, reliability or general social or vocational capabilities..
> ..The Association deplores all public and private discrimina-
> tion in such areas as employment, housing, public accom-
> modation, and licensing....The Association supports and urges
> the enactment of civil rights legislation...that would offer
> citizens who engage in homosexuality the same protections
> now guaranteed to others on the basis of race, creed, color,
> etc.

Substantially the same resolution was enacted by the American Psychiatric Association in 1976.

The available data on the psychological functioning of persons identified as homosexuals lead to an unambiguous conclusion:  that the range of variation in personal adjustment is no different from that of heterosexuals (Ohlson, 1974).  A review of 14 major studies, beginning with Hooker's in-depth investigations (1957, 1965), gave no support to the hypothesis that same-gender orientation was a sickness (Freedman, 1976). Employing various adjustment criteria, the studies uncovered no correlations that would support a mental illness construction.  Siegleman (1978, 1979), in two studies comparing psychological adjustment of homosexual men and women and heterosexual men and women in Britain, found no significant difference between the homosexual and heterosex-ual groups, substantially replicating the results of earlier studies in the U.S.  The conclusion had been stated earlier in the famous Wolfenden Report of 1957, the basis for the repeal of sodomy statutes in England:

> Homosexuality cannot legitimately be regarded as a disease
> because in many cases it is the only symptom and is compati-
> ble with full mental health (p. 32).

## The Minority Group Construction--Homosexuals as a Non-Ethnic Minority Group

The civil libertarian movements of the 1960s and 1970s paved the way for an alternative construction of homosexual conduct.  I have already noted that the earlier work of Kinsey and his associates (1948) had received wide publicity.  This work helped to strengthen the notion that sexual status and behavior could not be sorted into a simple two-valued model of normal and abnormal.  The recognition that perhaps at least 10

16

PERSEC 007841

percent of the adult population consistently adopted nonconforming sexual roles (i.e., homosexual behavior) was instrumental in formulating a construction of same-gender sexuality as the defining property of a non-ethnic, nonracial minority group. Individuals came together to support each other in their choice of life style. They comprised a group. They shared with other minority groups experiences of discrimination, harassment, and rejection (Sagarin, 1971).

The model for conceptualizing homosexuals as a minority group was provided first by ethnic and racial minorities, later by non-ethnic minorities: women, the aged, and physically disabled or handicapped persons. Another development that encouraged the use of the minority construction arose from claims that homosexual men and women could satisfactorily perform an infinite variety of occupational and recreational roles: one could have nonconforming sexual attitudes and still meet high performance standards as teachers, physicians, fire fighters, novelists, professional athletes, movie actors, policemen, politicians, judges and so on.

It would be instructive to review the features that define a minority group. It is obvious that *minority* in this context carries no quantitative meaning. Women make up more than 50 percent of the population, yet they meet the criteria of a minority group. The most useful shorthand definition of minority group is: people who share the experience of being the objects of discrimination on the basis of stereotypes, ethnocentric beliefs, and prejudice held by members of the nonminority group. Well-known examples are mid-nineteenth century Irish immigrants in Boston, American Indians for nearly four centuries, Black soldiers and sailors prior to the 1948 anti-segregation orders, Asian-Americans before the repeal of the exclusion acts, Mexican-Americans in California and the Southwest, Jews in Nazi Germany and elsewhere.

Similarities to more widely recognized minority groups are not hard to find. Prejudice against persons with nonconforming sexual orientations is like racial prejudice in that stereotypes are created. Such stereotypes are often exaggerations of social types that feature some unwanted conduct, style of speech, manner, or style that purportedly differs from the prototype of the majority. The personality of an individual identified as a member of a minority group is construed not from his acts, but from his suspected or actual membership in the minority group. Racial and ethnic slurs help to maintain the partition between the minority group and the majority. *Wops, Guineas, Japs, Spics, Kikes, Beaners, Polacks, Sambos*, and other pejoratives have only recently been discouraged as terms to denote the supposed social and moral inferiority of selected minority groups. *Fag, fairy, queer, homo*, and *pervert* serve similar functions for persons who want to communicate that the homosexual is "inferior." At the same time, the slur is intended to characterize a social type that exemplifies a negatively valued prototype--the feminized male.

To recapitulate: The fact that at least four constructions can be made of the same phenomenon is evidence that the particular value placed on nonconforming sexual

17

PERSEC 007842

orientation is influenced by historical forces. The same act may be construed as sin, as crime, as sickness, or as an alternate form of being.

The belief systems of governmental agents charged with adjudicating security clearances are like those of the general population--the belief systems are dependent on which construction the agents employ in establishing premises. If they choose the construction that emphasizes sin, crime, or sickness, then they will likely assign homosexual men and women to a morally suspect class.[*] If they choose the construction that homosexuality is an alternate form of being and that homosexuals comprise a minority group, then it is indeterminate whether any specific candidate will be assigned to such a morally suspect class.

Belief systems may be sharpened, modified, or rejected as a result of efforts to take into account new information. Such information may be drawn from findings reported by biological and social scientists. In many governmental areas, for example public health, nuclear energy, agriculture, and defense, policy formulations take into account the findings of research scientists. A synoptic review of recent and contemporary research may provide information that could help clarify public policy in regard to the granting or withholding of security clearances to persons identified as homosexual.

---

[*]The adjudicator's task is complicated by the fact that sodomy is no longer in the criminal codes of half the States. In this connection, a recent (Colasanto, 1989) Gallup Poll indicated increasing support for decriminalizing consensual homosexual activity. Eighty-three percent of a national sample expressed an opinion. Of these, 56 percent favored decriminalization, 44 percent were opposed. In taking into account an alleged act of sodomy, the adjudicator must determine whether or not to regard the act as an unprosecuted felony. Further complicating the decision process is the fact that consensual sodomy is seldom, if ever, prosecuted in civilian courts. In fact, sodomy laws are virtually unenforceable against persons, homosexual or heterosexual, who discreetly practice consensual sodomy. In a 5 to 4 decision, the Supreme Court refused to strike down a Georgia statute prohibiting consensual sodomy (*Bowers v. Hardwick*, 478 U.S. 186 (1986)).

18

PERSEC 007843

### Scientific Status of the Homosexuality Concept

In the past two decades, with advances in biotechnology, psychology, ethnology, and methods of social analysis, numerous systematic researches have yielded findings relevant to the formulation of law and public policy.

Advances in methodology stimulated a renewed interest in genetic research. The study of twins has been a fruitful source of genetic hypotheses. Kallman (1952) reported a concordance rate of 100 percent for homosexuality for 40 pairs of identical twins. That is, when one of a pair of identical twins was identified as homosexual, the other was also found to be homosexual. This occurred even when the twins had been raised apart. The author of the study cautioned that the data are not conclusive in supporting the genetic hypothesis--the twins may have responded to the same socializing influences. In this connection, Marmor (1975), a well-known psychiatrist, claimed that the "most prevalent theory concerning the cause of homosexuality is that which attributes it to a pathogenic family background."

Perhaps the most thorough research undertaken to advance the frontiers of knowledge about sexuality was that of Alfred Kinsey (Kinsey, Pomeroy, & Martin, 1948; Kinsey, Pomeroy, Martin, & Gebhard, 1953). A zoologist, Kinsey organized his research program along ethological and epidemiological lines. The variable of interest for Kinsey was frequency of sexual acts. The raw data for his studies were obtained through structured intensive interviews. In contemporary scientific fashion, quantitative analysis guided his work and influenced his conclusions. He employed a rating scale that allowed him to rate subjects from 0 to 6 on a dimension: heterosexual-homosexual. (A category "x" was used to identify persons with no "socio-sexual" response, mostly young children.) From the interview data, he compiled ratings for a large sample of respondents. The rating of 0 was assigned to men who were exclusively heterosexual, and 6 to men who were exclusively homosexual. The rating 1 was assigned to men who were predominantly heterosexual, and 5 to men who were predominantly homosexual, and so on.

Kinsey reported many significant findings, among them that 50 percent of the white male population were exclusively heterosexual and 4 percent were exclusively homosexual throughout adult life, but 46 percent had some homosexual experience throughout adult life. Between the ages of 16 and 65, 10 percent of the men met Kinsey's criterion of "more or less exclusively homosexual (rating 5 and rating 6)."

The process of gathering data on the prevalence of homosexuality is replete with many technical difficulties. Fay et al (1989) point to these difficulties and review survey data gathered in 1970 and 1988. They conclude that Kinsey's studies may have overestimated the prevalence of homosexual behavior. "...our analyses indicate that roughly one fifth of adult American males (in 1970) had at least one homosexual experience...." They

19

PERSEC 007844

go on to qualify this 20 percent prevalence rate   "...given the response bias that one can reasonably assume to operate, this new figure might be taken as a lower bound."

In the fashion of ethological research, Kinsey was primarily concerned with presenting prevalence statistics. Whether the dimension was based on nature or nurture, or a combination of these, was not an important concern.

Biological Studies

During the past 30 years, increasing knowledge in molecular biology, endocrinology, embryology, and developmental neurology has made it possible to state with confidence that male and female brains are structurally different in certain areas concerned with glandular and sexual functions, especially in the hypothalamus and related subcortical systems (Kelly, 1985). The actions of the various sex hormones in the differentiation of male and female anatomy have been charted. Developmentally, there is a built-in bias toward differentiating an organism into a female, i.e., nature makes females. On the basis of extensive research, Money and Erhardt (1972) concluded: "...in the total absence of male gonadal [sex] hormones, the fetus always continues to differentiate the reproductive anatomy of the female." This process takes place regardless of the basic masculinity (XY chromosomes) or femininity (XX chromosomes) of the fetus. The bias is counteracted approximately 50 percent of the time by the action of male hormones. The discovery of this built-in mechanism toward femaleness sparked additional research that ultimately illuminated the phenomenon of same-gender attraction. It has been recognized for some time that parts of the brain are glandular and secrete neurohormonal substances that have far-reaching effects. Not unlike the better-known sex hormones, the androgens and estrogens, these brain neurohormonal substances also appear to have profound effects on development.

From a review of ethnographic reports, historical sources, biographies, and literary works, it is apparent that some same-gender orientation is universally observed (Bullough, 1976; Howells, 1984; Marshall & Suggs, 1971). The world-wide prevalence of *exclusive* same-gender orientation is estimated as three to five percent in the male population, regardless of social tolerance, as in the Philippines, Polynesia and Brazil, intolerance as in the United States, or repression as in the Soviet Union (Mihalek, 1988). This constancy in the face of cultural diversity suggests that biological factors should not be discounted as a fundamental source of homosexual orientation.

From these observations, as well as intensive analysis of more than 300 research reports, Ellis and Ames (1987) have advanced a multi-factorial theory of sexuality, including same-gender attraction. They conclude that current scientific findings support the view that hormonal and neurological variables operating during the gestation period are the main contributors to sexual orientation. For the ultimate formation of sexual

20

PERSEC 007845

identity, the Ellis-Ames theory does not exclude psychosocial experience as a potential modifier of the phenotypical expression of biological development.

From their review of current research, Ellis and Ames propose that sexuality be studied through the consideration of five dimensions. These are: *genetic* (the effects of sex chromosomes, XX and XY, and various anomalous karyotypes); *genital* (effects of internal and external genitalia, the male-female differentiation, which begins in the first month of embryonic life); *nongenital morphological* (effects of secondary sex characteristics--body build, voice, hair distribution); *neurological* (male and female brain differentiation and associated sex-typical actions--including social influences and the formation of sex-typed roles). Most of the events shaping the developing organism's sexuality along these dimensions occur between the first and fifth months of intrauterine life. These events are controlled by the interaction of delicate balances between the various male and female hormones and their associated enzyme systems. Development of the embryo can be influenced by several factors affecting the internal environment of the mother, such as genetic hormonal background, pharmacological influences and immunological conditions, not to mention the psycho-physiological effects arising from the social environment. Disturbances in any one or any combination of these factors can result in alterations in sexual development called inversions. These inversions are failures of the embryo to differentiate fully in any of the other sexual dimensions (genital, morphological, neurological, or behavioral) according to chromosomal patterns. These anomalies of embryonic development are central to the later development of sexual orientation and behavior such as same-sex attraction, bisexuality, and other nonconforming patterns. As support for their theory, Ellis and Ames cite various experiments with animals in which permanent changes in sexual behavior have been induced by glandular and other treatments. The changes noted in these experimental animals are similar to those in humans with known anomalies of endocrine and enzyme systems.

Adult sexual orientation, then, has its origins, if not its expression, in embryonic development. Ellis and Ames conclude that:

> Complex combinations of genetic, hormonal, neurological, and environmental factors operating prior to birth largely determine what an individual's sexual orientation will be, although the orientation itself awaits the onset of puberty to be activated, and may not entirely stabilize until early adulthood (p. 251).

The conclusions are consistent with those of John Money (1988), a leading researcher on the psychobiology of sex. According to Money, in his recent review and summary of current knowledge on homosexuality, data from clinical and laboratory sources indicate that:

21

PERSEC 007846

In all species, the differentiation of sexual orientation or status as either bisexual or monosexual (i.e., exclusively heterosexual or homosexual) is a sequential process. The prenatal state of this process, with a possible brief neonatal extension, takes place under the aegis of brain hormonalization. It continues postnatally under the aegis of the senses and social communication of learning (p.49).

This brief overview of scientific findings from biological sources instructs us that the phenomena that we label sexuality are complex, and that we must assign credibility to the notion that overt and fantasy expressions of sexuality are influenced by multiple antecedents. Of special importance is the recognition of the interplay of biological and social factors. The leading scientific authorities agree that these expressions are best described in terms of gradations or dimensions, rather than by the rigidly bound, mutually exclusive categories, *heterosexual* and *homosexual*.

Because in daily speech we employ *heterosexual* and *homosexual* without qualifiers, it requires sustained cognitive effort to consider gradations and overlap. If we were to adopt policies that took scientific findings into account, we would be required to modify the use of a two-category system and incorporate the idea of continuous dimensions. To use an overworked metaphor, black and white are anchoring points for an achromatic color dimension, and between these anchoring points are innumerable shades of grey. Other dimensions come into play when considering chromatic stimuli, such as hue, saturation, brightness and texture. Similarly, the multidimensional concept of sexuality is contrary to the assertions of earlier generations of theologians, moralists, and politicians whose construal of sexuality was achieved under the guidance of two-valued logic in which narrowly defined heterosexual orientation and conduct were assigned to the category *normal* and any departures from the customary were assigned to the category *abnormal*.

In this connection, after detailed analysis of the sexual histories of thousands of people, Kinsey (1948) concluded that the class *human beings* does not represent two discrete populations, *heterosexual* and *homosexual*, and that the world:

> is not to be divided into sheep and goats....It is a fundamental of taxonomy that nature rarely deals with discrete categories. Only the human mind invents categories and tries to force facts into separate pigeonholes. The living world is a continuum in each and every one of its aspects. The sooner we learn this concerning human sexual behavior the sooner we shall reach a sound understanding of the realities of sex (p. 639).

22

PERSEC 007847

Psychological Studies

Scores of studies have been reported in the literature on the adjustment of homosexual men and women.  To be sure, none of the studies attempted to answer the specific question: are homosexuals greater security risks than heterosexuals?  On various psychological tests, including the well-known Minnesota Multiphasic Personality Inventory, the Adjective Check List, and the Rorschach test, among others, the range of variation in personal adjustment is the same for heterosexuals and homosexuals.  None of the carefully controlled studies concluded that homosexuals were suffering from a "mental illness."  Gonsoriak (1982) and Siegelman (1987) independently reviewed the available research literature and concluded that good adjustment and poor adjustment are unrelated to sexual orientation.

Can any inferences be drawn from the massive volume of research generated in the effort to discover whether homosexuals are different from heterosexuals on adjustment criteria?  Although definitions of adjustment vary from study to study, one element appears common to most, if not all, definitions: social maturity.  This concept embraces a number of features.  Socially mature people are likely to be caring, to have stable interpersonal relations, to be concerned with maintaining an acceptable social and moral identity.  Caring for persons with whom one is bonded is probably related to caring for others who make up relevant collectivities, including one's country.  The research is unequivocal that identifying oneself as heterosexual or homosexual carries no implication of social maturity.

Sociological Studies

A number of studies have been reported that lead to the inference that many undisclosed homosexuals have served in the military and received good proficiency ratings and honorable discharges (Bell, 1973; Williams & Weinberg, 1971; Harry, 1984).  It is reasonable to assume that civilians who have not disclosed their homosexual status also perform their jobs efficiently and, if they have security clearances, do not violate the trust.

The broad categories *heterosexual* and *homosexual* conceal multiple types.  At the conclusion of an extensive sociological investigation, Bell and Weinberg (1978) commented that persons identified as homosexual are "a remarkably diverse group."  After studying intensive protocols on a large number of adults, these investigators concluded:

...we do not do justice to people's sexual orientation when we refer to it by a singular noun.  There are "homosexualities" and there are "heterosexualities" each involving a variety of interrelated dimensions.  Before one can say very much about a person on the basis of his or her sexual orientation, one must make a comprehensive appraisal of the relationships among a host of features pertaining

23

PERSEC 007848

to the person's life and decide very little about him or her until a more complete and highly developed picture appears.[*]

The data in the Bell and Weinberg study lead to the conclusion that the concepts *homosexuality* and *heterosexuality* are too broad to be worthwhile. When subjected to statistical reduction, the data yielded five types. The typology is not too different from one that could be constructed for heterosexuals. The five types are labeled: Close-coupleds, Open-coupleds, Functionals, Dysfunctionals, and Asexuals. The Close-Coupleds were similar to what might be called happily married among heterosexuals. Partners of this type look to each other for their interpersonal and sexual satisfactions. They are not conflicted about being members of a minority group. They would fit the usual criteria of social maturity. The Open-Coupleds preferred a stable couple relation-ship, but one of the partners sought sexual gratification outside of the couple relation-ship. In most cases, Open-Coupleds accepted their homosexual identity, but had qualms about seeking other outlets. In terms of their general adjustment, they were not unlike most homosexuals or most heterosexuals. The Functionals are more like the stereotype of the swinging singles. Their lives are oriented around sex. They are promiscuous and open, frequenting gay bars and bathhouses, and have been arrested for violating "homo-sexual" ordinances. They are self-centered and give the impression of being happy and exuberant. The Dysfunctionals fit the stereotype of the tormented homosexual. They have difficulties in many spheres, social, occupational, sexual. This type displayed the poorest adjustment. Among the males, there were more instances of criminal activity such as robbery, assault, and extortion. The Asexuals are characterized by lack of involvement with others. They are loners and describe themselves as lonely. They lead quiet, withdrawn, apathetic lives.

To recapitulate: In this section of the report I have presented a synopsis of contemporary research drawn from biological, psychological, and sociological sources. One conclusion stands out: knowing that a person is homosexual tells very little about his or her character. It is worth adding: knowing that a person is heterosexual tells very little about his or her character.

---

[*]The use of the background investigation (BI) is consistent with this conclusion.

PERSEC 007849

## Implications

The official guides for personnel security specialists are Director of Central Intelligence Directive (DCID 1/14) (1986) and the *Personnel Security Program*, (5200.2-R) already mentioned, issued by the Department of Defense and revised in January, 1987. In both of these documents, the criteria for granting or denying clearances are spelled out. The main thrust of these guidelines is that every candidate for a clearance is handled on a case-by-case basis. An implication of this policy is that information referring to sexual orientation by itself would not be systematically employed as a criterion to withhold security clearance.

Adjudicators, like everyone else, do not put aside their belief systems when they engage in clinical inference on the basis of ambiguous and incomplete cues. Under conditions where a criterion is stated in clear and unambiguous terms, there is little room for the operation of personal bias or social prejudice. For example, in following the rule that no convicted felon should be granted a security clearance, the adjudicator's personal beliefs about the rehabilitation effects of imprisonment are irrelevant. When criteria are stated in language that is the least bit ambiguous or value-laden, then opportunities arise for interpretation according to personal belief systems. In Appendix E of DoD 5200.2-R, the following appears: "Background Investigation (BI) and Special Background Investigation (SBI) shall be considered as devoid of significant adverse information unless they contain information listed below: ....(2) All indications of moral turpitude, heterosexual promiscuity, aberrant, deviant, or bizarre sexual behavior...." A later section of the *Personnel Security Program*, in considering "sexual misconduct" as a basis for denying security clearances, contains the following: "Acts of sexual misconduct or perversion indicative of moral turpitude, poor judgment, or lack of regard for the laws of society."

Although the term *homosexual* is meticulously avoided in DoD 5200.2R (heterosexual but not homosexual promiscuity is included as adverse information), the ambiguity of language such as "moral turpitude," "sexual misconduct," and "aberrant, deviant, or bizarre," would allow a reader of the guidelines a considerable degree of discretion in interpreting homosexual orientation as being an instance of "moral turpitude," "sexual misconduct," or "aberrant deviant, or bizarre." The value-laden term *perversion* also makes possible the assignment of homosexual men and women to a suspect class. *Perversion* is no longer employed as a diagnostic term in medical or psychological vocabularies. At one time, it was used as a catch-all for any nonprocreative sexual activity, including masturbation, oral-genital contact between husband and wife, and attending sexually explicit movies, among other behaviors.

The effectiveness of the case-by-case approach to security determinations is dampened if attention is not given to the fact that adjudicators are practicing the art of clinical inference. They acquire skills in converting masses of data to a two-valued determination *satisfying guidelines* and *not satisfying guidelines*. By extension, these two

PERSEC 007850

outcomes lead to the ultimate inference *trustworthy* and *untrustworthy*. Ambiguous and value-laden language, as indicated above, allows for the importation of private belief systems into the mix of major premises that guide the inference process. *Moral turpitude* is a prime exemplar. It has no standard reference other than that derived from social constructions that regard nonconforming sexual orientation as sin, crime, or sickness.

Most of us in the general population have been socialized by parents, teachers, peers, and religious leaders to interpret nonconforming sexual orientation as sinful, criminal, or sick. Investigators and adjudicators are drawn from the general population. It is reasonable to suppose that incorporated into their personal theories of character are belief systems that would lead to identifying homosexuals as members of a suspect class, such identification being derived from sin, crime, or sickness constructions. The minority-group construction, for a long time privately advocated by individuals, has been presented to the public as a result of increased consciousness about civil rights. A person who subscribes to the construction of homosexuality as an alternate life style practiced by a minority group, would not consider homosexual identity or homosexual acts as indicative of the vague and value-laden category *moral turpitude*. This does not mean that he or she would downgrade the moral significance of such acts as incest, child molestation, rape, or other acts involving violence or coercion, acts that are sometimes included in the general descriptor *moral turpitude*.

A personal theory of character, like any theory, is not an incidental or ornamental feature of an individual's psychological make-up. A theory, whether in science or in daily life, is organized to facilitate understanding, to simplify, to reduce confusion, to provide guidance until data are gathered and converted into hard facts. A personal theory of character also has purposes, one of which is to facilitate, in the absence of facts, the sorting of individuals into moral categories. The use of theories to express personal prejudice may influence the practitioners of the art of clinical inference to make decisions in which information irrelevant to trustworthiness is given significant status. We are reminded of the theories of character advocated during various historical periods; theories designed to establish the superiority of a particular race or ethnic group.

In DoD 5200.2-R, under the heading, Criteria for Application of Security Standards, the general instruction to personnel security officials and practitioners is that the ultimate decision must be based on "an overall common sense determination based upon all available facts." In DCID 1/14, the same formula appears: "The ultimate determination of whether the granting of access is clearly consistent with the interest of national security shall be an overall common sense determination based on all available information" (p. 5). As I mentioned before, in the absence of empirically derived correlations, judgments are theory-driven rather than fact-driven. Common sense could mean the employment of commonly held theories of character which could influence decisions in which homosexuality was included in the compendium of "facts." The hypothesis could be entertained that under such conditions common sense could be interpreted as common prejudice.

26

PERSEC 007851

Not only in the interest of fairness, but also in the interest of efficiency, attention should be directed to improving the inferential skills of adjudicators and other specialists so that in applying guidelines they can recognize and delimit the contribution of personal theories of character to their judgments.

At the beginning of this report, I pointed to two sets of problems:  (1) Is a person a security risk by virtue of membership in the class homosexual?  (2) Is a person of homosexual orientation a security risk because he or she is vulnerable to coercion and blackmail?  The previous pages have focused on the first question.  The remainder of the report is directed to the issue of vulnerability to blackmail.  To illuminate the problem of blackmail, I make use of the concept *personal secrets*.

27

PERSEC 007852

## Personal Secrets

The previous discussion centered on the problem of determining whether a homosexual man or woman should be granted a security clearance. I did not consider the observation that trustworthiness is a characteristic that is subject to contextual influences. Blackmail--the threat of disclosure of a personal secret--sometimes leads a trustworthy person to betray a trust. The risk of exposure is central to understanding the conduct of any person whose adjustment, achievements, and career advancements are dependent on maintaining secrets about the self. Such secrets cover a much wider field than sexual orientation. Secrets about the self are maintained to avoid making public one's inferiority, stupidity, or moral weakness. Persons hold secret such autobiographical items as unprosecuted felonies, illegal drug use, problem drinking, prior bankruptcies, race or ethnic origins, and spouse abuse. Many people employ secrecy to conceal from others certain disapproved psychological characteristics such as obsessions, phobias, compulsions, fetishism, and other behaviors that appear not to be under self-control. Actions that authority figures might label sexual misconduct become part of the secret self. Most adults conceal from public scrutiny such facts as fornication with a minor, adulterous relationships, bigamy, illicit sexual liaisons, compulsive masturbation, impotence and other sexual dysfunctions, and so on.

Self secrets of the kind listed above have one element in common: the person is open to the possibility of being stigmatized, of being forced to display a symbolic brand for all to see.

To be vulnerable (in the sense of being vulnerable to coercion by agents of a foreign power) is to risk disclosure of a personal secret. The power of the potential blackmailer who is privy to another's personal secrets is generated because of the extraordinary sanctions that follow the disclosure. Shame, dishonor, disgrace, ostracism, imprisonment or other legal penalties, and loss of employment are the outcomes that the secret-holder must consider.

The strategy of secrecy may be augmented by other strategies to avoid the degradation of identity, the loss of self. Disinformation, masking and disguise, and outright lying help maintain the secret self.

If a homosexual person makes public, or is ready to make public, his or her sexual orientation, then vulnerability virtually disappears. In civilian settings, the sanctions for disclosure of sexual status are no longer draconian; in fact, in many instances, sanctions are absent. Thus, publicly announced homosexuals are not likely to be targets of blackmail. Whether concealing adultery, personal failings, or a criminal or immoral past, the degree of the threat of coercion is related to the quality of the protection a person gives his or her personal secrets. Where homosexuality is officially taboo, the person is at risk if his or her secrecy strategy is not airtight.

28

PERSEC 007853

Being homosexual no longer carries the automatic risk of vulnerability save in situations where it is expressly forbidden.

Counterintelligence sources report that foreign intelligence agencies make inquiries regarding homosexuals in order to exploit vulnerability. SGT Clayton Lonetree told investigators that his Soviet handler, "Uncle Sasha," made inquiries about embassy staff who were potentially vulnerable to exploitation in order to maintain their personal secrets. The handler included homosexuals in his shopping list.

John Donnelly, Director of the Defense Investigative Service (1987), reported an anecdote in which foreign agents attempted to coerce into espionage a woman who was an undisclosed lesbian. The coercion involved disclosing her homosexuality. She refused to cooperate and reported the attempt to appropriate authorities, thus revealing her personal secret.[*]

A review of a KGB training manual (1962) does not single out homosexuals as persons to be cultivated for exploitation. Rather, the manual identifies occupational types as potential targets: government officials, scientists, engineers, businessmen, etc. The perception of Americans as reflected in the manual is that they can be exploited through ideology or money. Ideology in this context does not necessarily mean subscribing to Marxist doctrine. A person is said to be ideologically compatible if he or she is sympathetic to the Soviet bloc or harbors resentment against the American economic or political system. Americans are perceived to be greedy capitalists, so money is expected to be the major motivator in recruitment operations.

A declaration in a legal brief by John F. Donnelly (1987) suggests that hostile intelligence agencies are interested in *any person who might be vulnerable*--not only homosexuals. "Hostile intelligence agencies, with great consistency, consider sexuality to be a potentially exploitable vulnerability. This does not mean that hostile intelligence agencies always seek out homosexuals to target. Rather, they usually spot individuals with the desired access and then assess them in order to determine the most effective approach. They then attempt to segregate those with alcohol or drug problems, financial problems, a known disregard for security, and/or those who can be exploited sexually" (p.11).

No statistics are available to demonstrate the degree of success in recruiting spies through the threat of exposure of personal secrets. In developing a data bank on known spies, PERSEREC found that most Americans who attempt to sell government secrets are not recruited, they are volunteers.

---

[*] The anecdote was reported in the context of the KGB's practice of exploiting homosexuals who had not publicly acknowledged their sexual identity. The anecdote could also be employed to illustrate the claim that homosexuals are patriotic.

29

PERSEC 007854

The PERSEREC data bank currently includes 117 cases of American citizens who between 1945 and the present committed or attempted to commit espionage. Only six have been identified as homosexual.[*] Their motives appear to be the same as for persons not identified as homosexual: primarily money, secondarily, resentment. All were volunteers except one, who was recruited as an accomplice by a heterosexual friend. None was a target of blackmail, although one offender claimed to have been coerced.

---

[*]Brief resumes of these cases are in the Appendix.

30

PERSEC 007855

## Concluding Remarks

In preparation for this report, I reviewed approximately 100 books and journal articles. My conclusion is that the concept *homosexuality* is not very useful. Persons who are labeled homosexuals are, as Bell and Weinberg put it, a diverse group. No generalizations are possible in regard to life style, personality type, or character development.

Are men and women identified as homosexual greater security risks than persons identified as heterosexual? Certainly in civilian contexts, there is no basis for holding the belief that homosexuals as a group are less trustworthy or less patriotic than heterosexuals. The fear of the secret being exposed makes one a potential target for blackmail. I should add that homosexuals, in this respect, are no different from heterosexuals who fear exposure of adultery or other illegal or moral lapses.

In considering the relationship of homosexuality to security, it would be appropriate to look for the origins of the discriminatory policies. In the 1940s, in wartime and thereafter, the government undertook the task of identifying and removing men and women from government positions who were considered disloyal. That the concept of loyalty was abused is a matter of historical record. Note the disciplinary action of the Senate in regard to the irresponsible conduct of Senator Joseph McCarthy. Loyalty programs were targeted to identify men and women who were sympathetic to communist ideology. The FBI, the government agency principally responsible for enforcing the loyalty screening program, broadened nonloyalty criteria to include nonconforming sexual orientation. In 1953, FBI Director J. Edgar Hoover ordered his operatives to enforce the newly created Federal Employee Security Program which included as adverse information such ostensibly nonloyal items as derogatory personal habits, conditions and acts (Hoover, 1954-55). "Sexual perversion" was included as an item of "nonsubversive derogatory character." Even before the publication of the new program, Hoover reported that the FBI had identified numerous "sex deviates in government service." Without citing evidence, Hoover declared that homosexuals are security risks and should be separated from government service. Over 600 "security separations" were reported for a 16-month period beginning in 1953. The charge was "perversion" and included employees from such nonsensitive government agencies as the Post Office and the Department of Agriculture (New York Times, 1955).

Once begun, bureaucratic policies and procedures are resistant to change. Although no empirical data have been developed to support any connection between homosexuality and security, it is reasonable to assume that Hoover's beliefs have continued to influence more recent personnel security practice. As I pointed out in the body of this report, homosexuality *per se* is not explicitly mentioned in the directives. Other categories, among them moral turpitude, are provided and they are sufficiently ambiguous to allow investigators and adjudicators to read homosexuality as disloyalty. Whatever the basis of Hoover's beliefs, he was not privy to the wealth of scientific

31

PERSEC 007856

information currently available. Such information (a digest of which is included in earlier pages) raises serious questions about the validity of including homosexuals in a morally suspect class. It is true that most people, including investigators, adjudicators, and policy-makers, have not been exposed to contemporary biological, psychological, and sociological research findings. In the absence of such knowledge and influenced by the legacy of Hoover's combining homosexuality and disloyalty, some personnel security practitioners are likely to persist in the practice of lumping all homosexuals into one morally suspect class. The practice entails employing premises that flow from the adoption of social constructions of homosexuality that emphasize sin, crime, or sickness.

Policy-makers might give thought to endorsing and expanding training programs in which adjudicators and other personnel security specialists receive instruction in current scientific information about sexual orientation, and also in recognizing the sources of their premises and inference strategies. Prior to 1988, adjudicators were trained on the job by other adjudicators. They were drawn from the general population. It is not unreasonable to suppose that the belief-systems of adjudicators reflect the variety of belief-systems of the general population. [An interesting research project might be undertaken to assess beliefs and attitudes of adjudicators. This would provide empirical data on prior beliefs about the trustworthiness of homosexuals.] Adjudicators now receive uniform training. It would be helpful to know to what extent the uniform training reduces or eliminates bias. It is important to note that adjudicators have some degree of choice in examining and interpreting data. Even with concrete guidelines, the variability of human personality makes it necessary to add a human factor. If adjudicators were to operate as computers programmed to follow guidelines and did not employ clinical judgment, then they would be superfluous to the whole enterprise. A computer could be programmed with an algorithm that would weight the data and churn out expert judgments.

I have made the point that the current policy of reviewing every applicant for clearance on a case-by-case basis meets the requirements of fairness and efficiency. The wide variation in homosexual life styles, like the wide variation in heterosexual life styles, demands a case-by-case approach. The policy is not sufficient, however, to ensure fairness in practice. As I have argued before, the effects of long-standing bias against homosexuals may bypass the intent of the case-by-case policy. In addition to providing instruction to investigators and adjudicators as indicated above, it would be wise to issue memoranda at regular intervals emphasizing the basis of the case-by-case approach, even providing examples, heterosexual and homosexual, of personnel who would be considered security risks. The educational impact would be strengthened if the memoranda included empirical data that supported the risk classifications.

A final word. The review and analysis of the literature on homosexuality leads to one conclusion: sexual orientation is unrelated to moral character. Both patriots and traitors are drawn from the class *American citizen* and not specifically from the class *heterosexual* or the class *homosexual*.

32

PERSEC 007857

# References

Barnett, W. (1973). *Sexual freedom and the Constitution*. Albuquerque, NM: U. of New Mexico Press.

Bell, A. P. (1973). Homosexualities: Their range and character. *Nebraska Symposium on Motivation, 21*, 1-26.

Bell, A. P., & Weinberg, M. S. (1978). *Homosexualities*. New York: Simon & Schuster.

Ben Shalom v. Marsh. 703 F. Suppl. 1372 (E. D. Wisc. 1989).

Berube, A. (1990). *Coming out under fire*. New York: Free Press.

Bieber, I., Dain, H. J., Dince, P. R., Drellich, M. G., Grand, H. G., Gundlach, R. H., Kremer, M. W., Rifkin, A. H., Wilbur, C. B., & Bieber, T. B. (1962). *Homosexuality, a psychoanalytic study*. New York, NY: Basic Books.

Bullough, V. L. (1976). *Sexual variance in society and history*. Chicago, IL: University of Chicago Press.

Colasanto, D. (1989, Oct. 25). In reversal, public increases support for gays' civil rights. *San Jose Mercury News*.

Department of Defense. (1987). *Department of Defense personnel security program regulation* (DoD 5200.2-R). Washington, DC: Office of the Deputy Under Secretary of Defense for Policy.

Devereaux, G. (1963). Institutionalized homosexuality of the Mohave Indians. In H. Ruitenbeck (Ed.), *The problem of homosexuality*. New York: Dutton.

Director of Central Intelligence. (1986). Directive No. 1/14, *Minimum Personnel Security Standards and Procedures Governing Eligibility for Access to Sensitive Compartmented Information*. Washington, DC: Author.

Donnelly, John F. Declaration filed September 2, 1987. High Tech Gays et al. v. Defense Industrial Security Clearance Office, 56 U.S. L.W. 2144 (1987).

Donnelly, John F. High Tech Gays et al. v. Defense Industrial Security Clearance Office, 56 U.S. L.W. 2144 (1987), p. 4.

Dubbs v. CIA, 866 F.2d 1114 (1989).

33

PERSEC 007858