**Appendix of Evidence in**

**Support of Log Cabin Republican's**

**Opposition to Defendants'**

**Motion for Summary Judgment**


**LCR Appendix Pages 1701-1800**

**(Part 17 of 19)**

## FY 97 Separations due to Homosexual Conduct
### Date of Current Enlistment or
### Date of Commission by
### Date of Separation

| Service | Rank | Current Enlist Date/ Commission Date | Separation Date |
|---|---|---|---|
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9704 | 9706 |
| USAF | ENL | 9703 | 9704 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9709 | 9709 |
| USAF | ENL | 9704 | 9706 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9610 | 9610 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9703 | 9705 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9707 | 9709 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9703 | 9704 |
| USAF | ENL | 0 | 9701 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9701 | 9703 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9704 | 9707 |
| USAF | ENL | 9709 | 9709 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9611 | 9611 |

OSD P&R Plans 007279

## FY 97 Separations due to Homosexual Conduct
### Date of Current Enlistment or
### Date of Commission by
### Date of Separation

| Service | Rank | Current Enlist Date/ Commission Date | Separation Date |
|---|---|---|---|
| USAF | ENL | 9612 | 9612 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9702 | 9704 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9610 | 9610 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9706 | 9708 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9701 | 9703 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9610 | 9610 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9705 | 9705 |
| USAF | ENL | 9702 | 9704 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9610 | 9610 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9703 | 9704 |
| USAF | ENL | 9611 | 9612 |

OSD P&R Plans 007280

**FY 97 Separations due to Homosexual Conduct**
**Date of Current Enlistment or**
**Date of Commission by**
**Date of Separation**

| Service | Rank | Current Enlist Date/ Commission Date | Separation Date |
|---|---|---|---|
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9702 | 9704 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9611 | 9611 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9609 | 9611 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9701 | 9703 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9607 | 9610 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9612 | 9701 |

Page 20

OSD P&R Plans 007281

## FY 97 Separations due to Homosexual Conduct
### Date of Current Enlistment or
### Date of Commission by
### Date of Separation

| Service | Rank | Current Enlist Date/ Commission Date | Separation Date |
|---------|------|--------------------------------------|-----------------|
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9608 | 9611 |
| USAF | ENL | 9705 | 9707 |
| USAF | ENL | 9308 | 9610 |
| USAF | OFF | 9306 | 9612 |
| USAF | ENL | 9503 | 9704 |
| USAF | ENL | 9503 | 9611 |
| USAF | ENL | 9502 | 9612 |
| USAF | ENL | 9605 | 9706 |
| USAF | ENL | 9410 | 9612 |
| USAF | ENL | 9411 | 9612 |
| USAF | ENL | 9609 | 9706 |
| USAF | ENL | 9605 | 9705 |
| USAF | ENL | 9612 | 9707 |
| USAF | ENL | 9412 | 9704 |
| USAF | ENL | 9512 | 9708 |
| USAF | ENL | 9602 | 9702 |
| USAF | ENL | 9405 | 9612 |
| USAF | ENL | 9611 | 9708 |
| USAF | ENL | 9604 | 9708 |
| USAF | ENL | 9509 | 9610 |
| USAF | ENL | 9408 | 9611 |
| USAF | ENL | 9611 | 9707 |
| USAF | ENL | 9605 | 9708 |
| USAF | ENL | 9509 | 9703 |
| USAF | ENL | 9203 | 9705 |
| USAF | ENL | 9301 | 9704 |
| USAF | ENL | 9512 | 9706 |
| USAF | ENL | 9609 | 9702 |
| USAF | ENL | 9411 | 9612 |
| USAF | ENL | 9511 | 9612 |
| USAF | ENL | 9508 | 9706 |
| USAF | ENL | 9712 | 9706 |
| USAF | ENL | 9605 | 9706 |
| USAF | ENL | 9310 | 9707 |
| USAF | ENL | 9402 | 9709 |
| USAF | ENL | 9602 | 9612 |
| USAF | ENL | 9510 | 9707 |
| USAF | ENL | 9509 | 9709 |
| USMC | ENL | 9610 | 9708 |
| USMC | ENL | 9306 | 9704 |
| USMC | ENL | 9506 | 9709 |
| USMC | ENL | 9512 | 9704 |
| USMC | ENL | 9504 | 9708 |

OSD P&R Plans 007282

## FY 97 Separations due to Homosexual Conduct
### Date of Current Enlistment or
### Date of Commission by
### Date of Separation

| Service | Rank | Current Enlist Date/ Commission Date | Separation Date |
|---------|------|--------------------------------------|-----------------|
| USMC | ENL | 9610 | 9708 |
| USMC | ENL | 9308 | 9701 |
| USMC | ENL | 9607 | 9703 |
| USMC | ENL | 9307 | 9705 |
| USMC | ENL | 9503 | 9611 |
| USMC | ENL | 9704 | 9706 |
| USMC | ENL | 9610 | 9707 |
| USMC | ENL | 9702 | 9704 |
| USMC | ENL | 9707 | 9708 |
| USMC | ENL | 9703 | 9704 |
| USMC | ENL | 9612 | 9704 |
| USMC | ENL | 9705 | 9708 |
| USMC | ENL | 9705 | 9706 |
| USMC | ENL | 9706 | 9707 |
| USMC | ENL | 9706 | 9707 |
| USMC | ENL | 9703 | 9704 |
| USMC | ENL | 9707 | 9708 |
| USMC | ENL | 9607 | 9707 |
| USMC | ENL | 9708 | 9709 |
| USMC | ENL | 9606 | 9703 |
| USMC | ENL | 9608 | 9704 |
| USMC | ENL | 9610 | 9705 |
| USMC | ENL | 9603 | 9702 |
| USMC | ENL | 9603 | 9703 |
| USMC | ENL | 9704 | 9709 |
| USMC | ENL | 9606 | 9612 |
| USMC | ENL | 9607 | 9705 |
| USMC | ENL | 9511 | 9610 |
| USMC | ENL | 9609 | 9704 |

OSD P&R Plans 007283

LCR Appendix Page 1705

*042298*

## SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
## FY 1997
## ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| SERVICE | GRADE | ENLISTMENT/ COMMISSION DATE | SEPARATION DATE |
|---|---|---|---|
| ARMY | ENL | 9401 | 9704 |
| ARMY | ENL | 9606 | 9708 |
| ARMY | ENL | 9308 | 9705 |
| ARMY | ENL | 9310 | 9702 |
| ARMY | ENL | 9605 | 9702 |
| ARMY | ENL | 9601 | 9610 |
| ARMY | ENL | 9409 | 9701 |
| ARMY | ENL | 9605 | 9702 |
| ARMY | ENL | 9411 | 9610 |
| ARMY | ENL | 9512 | 9612 |
| ARMY | ENL | 9501 | 9708 |
| ARMY | ENL | 9606 | 9703 |
| ARMY | ENL | 9111 | 9703 |
| ARMY | ENL | 9608 | 9704 |
| ARMY | ENL | 9111 | 9704 |
| ARMY | ENL | 9603 | 9611 |
| ARMY | ENL | 9307 | 9610 |
| ARMY | ENL | 9207 | 9706 |
| ARMY | ENL | 9502 | 9706 |
| ARMY | ENL | 9605 | 9708 |
| ARMY | ENL | 9602 | 9610 |
| ARMY | ENL | 9508 | 9707 |
| ARMY | ENL | 9305 | 9610 |
| ARMY | ENL | 9701 | 9706 |
| ARMY | ENL | 9406 | 9703 |
| ARMY | ENL | 9605 | 9702 |
| ARMY | ENL | 9507 | 9702 |
| ARMY | ENL | 9607 | 9705 |
| ARMY | ENL | 9610 | 9704 |
| ARMY | ENL | 9610 | 9704 |
| ARMY | ENL | 9609 | 9704 |
| ARMY | ENL | 9701 | 9706 |
| ARMY | ENL | 9610 | 9708 |
| ARMY | ENL | 9611 | 9709 |
| ARMY | ENL | 9411 | 9708 |
| ARMY | ENL | 9312 | 9707 |
| ARMY | ENL | 9505 | 9702 |
| ARMY | ENL | 9510 | 9701 |
| ARMY | ENL | 9401 | 9705 |
| ARMY | ENL | 9402 | 9702 |
| ARMY | ENL | 9403 | 9704 |
| ARMY | ENL | 9504 | 9705 |
| ARMY | ENL | 9405 | 9612 |
| ARMY | ENL | 9409 | 9703 |
| ARMY | ENL | 9707 | 9709 |

C:XLDATA/SEPARATION HC/FY97LIST.XLS

**OSD P&R Plans 007284**

**LCR Appendix Page 1706**

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|------|-----|------|------|
| ARMY | ENL | 9707 | 9708 |
| ARMY | ENL | 9704 | 9705 |
| ARMY | ENL | 9611 | 9612 |
| ARMY | ENL | 9609 | 9611 |
| ARMY | ENL | 9212 | 9701 |
| ARMY | ENL | 9610 | 9702 |
| ARMY | ENL | 9704 | 9705 |
| ARMY | ENL | 9705 | 9706 |
| ARMY | ENL | 9611 | 9702 |
| ARMY | ENL | 9611 | 9612 |
| ARMY | ENL | 9610 | 9611 |
| ARMY | ENL | 9701 | 9702 |
| ARMY | ENL | 9609 | 9611 |
| ARMY | ENL | 9611 | 9612 |
| ARMY | ENL | 9705 | 9706 |
| ARMY | ENL | 9707 | 9708 |
| ARMY | ENL | 9704 | 9709 |
| ARMY | ENL | 9606 | 9612 |
| ARMY | ENL | 9310 | 9706 |
| ARMY | ENL | 9609 | 9702 |
| ARMY | ENL | 9611 | 9705 |
| ARMY | ENL | 9608 | 9612 |
| ARMY | ENL | 9703 | 9708 |
| ARMY | ENL | 9704 | 9709 |
| ARMY | ENL | 9505 | 9611 |
| ARMY | ENL | 9409 | 9705 |
| ARMY | ENL | 9412 | 9704 |
| ARMY | ENL | 9602 | 9702 |
| ARMY | ENL | 9501 | 9706 |
| ARMY | ENL | 9405 | 9610 |
| ARMY | ENL | 9609 | 9708 |
| ARMY | ENL | 9610 | 9703 |
| ARMY | ENL | 9602 | 9702 |
| ARMY | ENL | 9706 | 9708 |
| ARMY | ENL | 9508 | 9708 |
| ARMY | ENL | 9701 | 9704 |
| ARMY | ENL | 9610 | 9611 |
| ARMY | ENL | 9705 | 9706 |
| ARMY | ENL | 9701 | 9703 |
| ARMY | ENL | 9607 | 9611 |
| ARMY | ENL | 9609 | 9702 |
| ARMY | ENL | 9506 | 9612 |
| ARMY | ENL | 9702 | 9703 |
| ARMY | ENL | 9608 | 9610 |
| ARMY | ENL | 9708 | 9709 |
| ARMY | ENL | 9708 | 9709 |
| ARMY | ENL | 9610 | 9611 |
| ARMY | ENL | 9607 | 9610 |

OSD P&R Plans 007285

LCR Appendix Page 1707

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| ARMY | ENL | 9701 | 9702 |
| ARMY | ENL | 9608 | 9610 |
| ARMY | ENL | 9701 | 9703 |
| ARMY | ENL | 9609 | 9612 |
| ARMY | ENL | 9701 | 9703 |
| ARMY | ENL | 9611 | 9703 |
| ARMY | ENL | 9707 | 9709 |
| ARMY | ENL | 9707 | 9709 |
| ARMY | ENL | 9706 | 9708 |
| ARMY | ENL | 9609 | 9709 |
| ARMY | ENL | 9601 | 9708 |
| ARMY | ENL | 9605 | 9708 |
| ARMY | ENL | 9608 | 9708 |
| ARMY | ENL | 9503 | 9705 |
| ARMY | ENL | 9701 | 9703 |
| ARMY | ENL | 9611 | 9612 |
| ARMY | ENL | 9611 | 9702 |
| ARMY | ENL | 9702 | 9707 |
| ARMY | ENL | 9608 | 9611 |
| ARMY | ENL | 9703 | 9705 |
| ARMY | ENL | 9707 | 9708 |
| ARMY | ENL | 9701 | 9704 |
| ARMY | ENL | 9610 | 9611 |
| ARMY | ENL | 9610 | 9611 |
| ARMY | ENL | 9705 | 9706 |
| ARMY | ENL | 9609 | 9610 |
| ARMY | ENL | 9706 | 9708 |
| ARMY | ENL | 9701 | 9704 |
| ARMY | ENL | 9609 | 9611 |
| ARMY | ENL | 9707 | 9709 |
| ARMY | ENL | 9706 | 9708 |
| ARMY | ENL | 9706 | 9708 |
| ARMY | ENL | 9706 | 9708 |
| ARMY | ENL | 9507 | 9611 |
| ARMY | ENL | 9608 | 9610 |
| ARMY | ENL | 9611 | 9702 |
| ARMY | ENL | 9702 | 9704 |
| ARMY | ENL | 9610 | 9611 |
| ARMY | ENL | 9611 | 9704 |
| ARMY | ENL | 9705 | 9706 |
| ARMY | ENL | 9706 | 9707 |
| ARMY | ENL | 9704 | 9705 |
| ARMY | ENL | 9706 | 9707 |
| ARMY | ENL | 9610 | 9709 |
| ARMY | ENL | 9505 | 9708 |
| ARMY | ENL | 9601 | 9708 |
| ARMY | ENL | 9510 | 9703 |
| ARMY | ENL | 9501 | 9703 |

OSD P&R Plans 007286

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|------|-----|------|------|
| ARMY | ENL | 9501 | 9705 |
| ARMY | ENL | 9603 | 9707 |
| ARMY | ENL | 8911 | 9702 |
| ARMY | ENL | 9506 | 9705 |
| ARMY | ENL | 9605 | 9704 |
| ARMY | ENL | 9405 | 9704 |
| ARMY | ENL | 9611 | 9708 |
| ARMY | ENL | 9701 | 9708 |
| ARMY | ENL | 9610 | 9704 |
| ARMY | ENL | 9610 | 9704 |
| ARMY | ENL | 9704 | 9706 |
| ARMY | ENL | 9702 | 9706 |
| ARMY | ENL | 9305 | 9704 |
| ARMY | ENL | 9603 | 9611 |
| ARMY | ENL | 9610 | 9703 |
| ARMY | ENL | 9609 | 9612 |
| ARMY | ENL | 9701 | 9709 |
| ARMY | ENL | 9408 | 9706 |
| ARMY | ENL | 9607 | 9703 |
| ARMY | ENL | 9501 | 9708 |
| ARMY | ENL | 9403 | 9706 |
| ARMY | ENL | 9207 | 9612 |
| ARMY | ENL | 9610 | 9702 |
| ARMY | OFF | 9105 | 9611 |
| ARMY | ENL | 9605 | 9705 |
| ARMY | ENL | 9610 | 9706 |
| ARMY | ENL | 9408 | 9703 |
| ARMY | ENL | 9607 | 9703 |
| ARMY | ENL | 9606 | 9612 |
| ARMY | ENL | 9308 | 9703 |
| ARMY | ENL | 9606 | 9702 |
| ARMY | ENL | 9603 | 9704 |
| ARMY | ENL | 9311 | 9611 |
| ARMY | ENL | 9510 | 9704 |
| ARMY | ENL | 9510 | 9706 |
| ARMY | ENL | 9604 | 9704 |
| ARMY | ENL | 9410 | 9704 |
| ARMY | ENL | 9307 | 9703 |
| ARMY | ENL | 9412 | 9610 |
| ARMY | ENL | 9403 | 9702 |
| ARMY | ENL | 9605 | 9703 |
| ARMY | ENL | 9511 | 9612 |
| ARMY | ENL | 9410 | 9703 |
| ARMY | ENL | 9511 | 9703 |
| ARMY | ENL | 0 | 9610 |
| ARMY | ENL | 9708 | 9709 |
| ARMY | ENL | 9601 | 9611 |
| ARMY | ENL | 9610 | 9707 |

OSD P&R Plans 007287

LCR Appendix Page 1709

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| ARMY | ENL | 9601 | 9612 |
| ARMY | ENL | 9610 | 9704 |
| ARMY | ENL | 9707 | 9708 |
| ARMY | ENL | 9412 | 9611 |
| ARMY | ENL | 9605 | 9706 |
| ARMY | ENL | 9406 | 9708 |
| ARMY | ENL | 9405 | 9702 |
| ARMY | ENL | 9511 | 9706 |
| NAVY | ENL | 9506 | 9705 |
| NAVY | ENL | 9411 | 9705 |
| NAVY | ENL | 9705 | 9709 |
| NAVY | ENL | 9507 | 9703 |
| NAVY | ENL | 9605 | 9702 |
| NAVY | ENL | 9606 | 9702 |
| NAVY | ENL | 9607 | 9708 |
| NAVY | ENL | 9606 | 9701 |
| NAVY | ENL | 9603 | 9611 |
| NAVY | ENL | 9606 | 9702 |
| NAVY | ENL | 9605 | 9702 |
| NAVY | ENL | 9605 | 9708 |
| NAVY | ENL | 9604 | 9703 |
| NAVY | ENL | 9611 | 9707 |
| NAVY | ENL | 9605 | 9701 |
| NAVY | ENL | 9605 | 9702 |
| NAVY | ENL | 9602 | 9610 |
| NAVY | ENL | 9507 | 9702 |
| NAVY | ENL | 9605 | 9612 |
| NAVY | ENL | 9510 | 9612 |
| NAVY | ENL | 9509 | 9611 |
| NAVY | OFF | 9405 | 9610 |
| NAVY | ENL | 9402 | 9610 |
| NAVY | ENL | 9405 | 9709 |
| NAVY | ENL | 9412 | 9611 |
| NAVY | ENL | 9306 | 9611 |
| NAVY | ENL | 9306 | 9610 |
| NAVY | ENL | 9601 | 9612 |
| NAVY | ENL | 9402 | 9701 |
| NAVY | ENL | 9610 | 9703 |
| NAVY | ENL | 9601 | 9709 |
| NAVY | ENL | 9610 | 9703 |
| NAVY | ENL | 9601 | 9708 |
| NAVY | ENL | 9601 | 9703 |
| NAVY | ENL | 9607 | 9703 |
| NAVY | ENL | 9602 | 9702 |
| NAVY | ENL | 9512 | 9705 |
| NAVY | ENL | 9507 | 9610 |
| NAVY | ENL | 9410 | 9705 |
| NAVY | ENL | 9611 | 9706 |

OSD P&R Plans 007288

LCR Appendix Page 1710

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| NAVY | ENL | 9510 | 9610 |
| NAVY | ENL | 9511 | 9707 |
| NAVY | ENL | 9302 | 9612 |
| NAVY | ENL | 9504 | 9708 |
| NAVY | ENL | 9606 | 9707 |
| NAVY | ENL | 9406 | 9610 |
| NAVY | ENL | 9502 | 9702 |
| NAVY | ENL | 9406 | 9703 |
| NAVY | ENL | 9611 | 9707 |
| NAVY | ENL | 9505 | 9612 |
| NAVY | ENL | 9612 | 9703 |
| NAVY | ENL | 9505 | 9709 |
| NAVY | ENL | 9608 | 9702 |
| NAVY | ENL | 9507 | 9704 |
| NAVY | ENL | 9406 | 9611 |
| NAVY | ENL | 9411 | 9708 |
| NAVY | ENL | 9404 | 9610 |
| NAVY | ENL | 9312 | 9612 |
| NAVY | ENL | 9202 | 9611 |
| NAVY | OFF | 8507 | 9702 |
| NAVY | ENL | 9611 | 9708 |
| NAVY | OFF | 9406 | 9612 |
| NAVY | ENL | 9511 | 9706 |
| NAVY | ENL | 9602 | 9706 |
| NAVY | ENL | 9401 | 9708 |
| NAVY | ENL | 9606 | 9707 |
| NAVY | ENL | 9605 | 9704 |
| NAVY | ENL | 9601 | 9701 |
| NAVY | ENL | 9601 | 9708 |
| NAVY | ENL | 9702 | 9704 |
| NAVY | ENL | 9508 | 9708 |
| NAVY | ENL | 9507 | 9610 |
| NAVY | ENL | 9506 | 9701 |
| NAVY | ENL | 9308 | 9704 |
| NAVY | ENL | 9309 | 9703 |
| NAVY | ENL | 9611 | 9707 |
| NAVY | ENL | 9311 | 9611 |
| NAVY | ENL | 9602 | 9703 |
| NAVY | ENL | 9610 | 9703 |
| NAVY | ENL | 9610 | 9704 |
| NAVY | ENL | 9611 | 9705 |
| NAVY | ENL | 9701 | 9705 |
| NAVY | ENL | 9611 | 9706 |
| NAVY | ENL | 9612 | 9707 |
| NAVY | ENL | 9607 | 9706 |
| NAVY | ENL | 9609 | 9705 |
| NAVY | ENL | 9610 | 9707 |
| NAVY | ENL | 9609 | 9704 |

OSD P&R Plans 007289

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| NAVY | ENL | 9412 | 9705 |
| NAVY | ENL | 9702 | 9707 |
| NAVY | ENL | 9606 | 9706 |
| NAVY | ENL | 9505 | 9705 |
| NAVY | ENL | 9512 | 9610 |
| NAVY | ENL | 9506 | 9610 |
| NAVY | ENL | 9602 | 9705 |
| NAVY | ENL | 9603 | 9703 |
| NAVY | ENL | 9607 | 9703 |
| NAVY | ENL | 9603 | 9703 |
| NAVY | ENL | 9407 | 9704 |
| NAVY | ENL | 9509 | 9610 |
| NAVY | ENL | 9605 | 9707 |
| NAVY | ENL | 9507 | 9702 |
| NAVY | ENL | 9606 | 9612 |
| NAVY | ENL | 9501 | 9706 |
| NAVY | ENL | 9601 | 9705 |
| NAVY | ENL | 9407 | 9704 |
| NAVY | ENL | 9412 | 9706 |
| NAVY | ENL | 9606 | 9703 |
| NAVY | ENL | 9507 | 9611 |
| NAVY | ENL | 9305 | 9612 |
| NAVY | ENL | 9609 | 9704 |
| NAVY | ENL | 9607 | 9701 |
| NAVY | ENL | 9702 | 9704 |
| NAVY | ENL | 9701 | 9704 |
| NAVY | ENL | 9703 | 9705 |
| NAVY | ENL | 9703 | 9705 |
| NAVY | ENL | 9611 | 9703 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9701 | 9703 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9607 | 9610 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9703 | 9705 |
| NAVY | ENL | 9703 | 9705 |
| NAVY | ENL | 9706 | 9708 |
| NAVY | ENL | 9705 | 9708 |
| NAVY | ENL | 9611 | 9703 |
| NAVY | ENL | 9703 | 9705 |
| NAVY | ENL | 9607 | 9611 |
| NAVY | ENL | 9612 | 9703 |
| NAVY | ENL | 9701 | 9703 |
| NAVY | ENL | 9706 | 9708 |
| NAVY | ENL | 9607 | 9610 |
| NAVY | ENL | 9612 | 9703 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9607 | 9610 |

OSD P&R Plans 007290

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|------|-----|------|------|
| NAVY | ENL | 9702 | 9704 |
| NAVY | ENL | 9701 | 9703 |
| NAVY | ENL | 9610 | 9612 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9706 | 9708 |
| NAVY | ENL | 9611 | 9701 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9706 | 9708 |
| NAVY | ENL | 9608 | 9611 |
| NAVY | ENL | 9701 | 9703 |
| NAVY | ENL | 9701 | 9704 |
| NAVY | ENL | 9610 | 9701 |
| NAVY | ENL | 9611 | 9702 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9704 | 9705 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9605 | 9611 |
| NAVY | ENL | 9607 | 9611 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9704 | 9707 |
| NAVY | ENL | 9607 | 9610 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9705 | 9708 |
| NAVY | ENL | 9607 | 9611 |
| NAVY | ENL | 9703 | 9705 |
| NAVY | ENL | 9704 | 9707 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9703 | 9705 |
| NAVY | ENL | 9612 | 9704 |
| NAVY | ENL | 9610 | 9702 |
| NAVY | ENL | 9703 | 9704 |
| NAVY | ENL | 9705 | 9707 |
| NAVY | ENL | 9706 | 9707 |
| NAVY | ENL | 9605 | 9611 |
| NAVY | ENL | 9610 | 9703 |
| NAVY | ENL | 9610 | 9705 |
| NAVY | ENL | 9702 | 9704 |
| NAVY | ENL | 9701 | 9704 |
| NAVY | ENL | 9608 | 9612 |
| NAVY | ENL | 9611 | 9701 |
| NAVY | ENL | 9609 | 9612 |
| NAVY | ENL | 9608 | 9704 |
| NAVY | ENL | 9612 | 9709 |
| NAVY | ENL | 9608 | 9705 |
| NAVY | ENL | 9512 | 9611 |
| NAVY | ENL | 9702 | 9706 |

OSD P&R Plans 007291

LCR Appendix Page 1713

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| NAVY | ENL | 9605 | 9610 |
| NAVY | ENL | 9408 | 9705 |
| NAVY | ENL | 9609 | 9706 |
| NAVY | ENL | 9603 | 9703 |
| NAVY | ENL | 9509 | 9707 |
| NAVY | ENL | 9609 | 9705 |
| NAVY | ENL | 9608 | 9705 |
| NAVY | ENL | 9702 | 9708 |
| NAVY | ENL | 9610 | 9703 |
| NAVY | ENL | 9604 | 9705 |
| NAVY | ENL | 9606 | 9705 |
| NAVY | ENL | 9610 | 9704 |
| NAVY | ENL | 9603 | 9610 |
| NAVY | ENL | 9603 | 9703 |
| NAVY | ENL | 9601 | 9705 |
| NAVY | ENL | 9701 | 9709 |
| NAVY | ENL | 9509 | 9701 |
| NAVY | ENL | 9509 | 9702 |
| NAVY | ENL | 9305 | 9612 |
| NAVY | ENL | 9612 | 9709 |
| NAVY | ENL | 9603 | 9612 |
| NAVY | ENL | 9509 | 9701 |
| NAVY | ENL | 9601 | 9703 |
| NAVY | ENL | 9606 | 9707 |
| NAVY | ENL | 9503 | 9610 |
| NAVY | ENL | 9601 | 9611 |
| NAVY | ENL | 9503 | 9705 |
| NAVY | ENL | 9509 | 9610 |
| NAVY | ENL | 9606 | 9705 |
| NAVY | ENL | 9606 | 9706 |
| NAVY | ENL | 9610 | 9705 |
| NAVY | ENL | 9608 | 9707 |
| NAVY | ENL | 9407 | 9706 |
| NAVY | ENL | 9605 | 9610 |
| NAVY | ENL | 9512 | 9703 |
| NAVY | ENL | 9308 | 9708 |
| NAVY | ENL | 9512 | 9705 |
| NAVY | ENL | 9505 | 9612 |
| NAVY | ENL | 9609 | 9707 |
| NAVY | ENL | 9510 | 9610 |
| NAVY | ENL | 9608 | 9708 |
| NAVY | ENL | 9503 | 9702 |
| NAVY | ENL | 9512 | 9706 |
| NAVY | ENL | 9507 | 9701 |
| NAVY | ENL | 9502 | 9610 |
| NAVY | ENL | 9303 | 9610 |
| NAVY | ENL | 9509 | 9610 |
| NAVY | ENL | 9408 | 9610 |

C:XLDATA/SEPARATION HC/FY97LIST.XLS

OSD P&R Plans 007292

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| NAVY | ENL | 9405 | 9701 |
| NAVY | ENL | 9511 | 9701 |
| NAVY | ENL | 9512 | 9612 |
| NAVY | ENL | 9406 | 9707 |
| NAVY | ENL | 9411 | 9709 |
| NAVY | ENL | 9310 | 9611 |
| NAVY | ENL | 9509 | 9701 |
| NAVY | OFF | 9302 | 9610 |
| NAVY | ENL | 9309 | 9708 |
| NAVY | ENL | 9510 | 9706 |
| NAVY | ENL | 9311 | 9703 |
| NAVY | ENL | 9512 | 9707 |
| NAVY | ENL | 9512 | 9709 |
| NAVY | ENL | 9510 | 9702 |
| NAVY | ENL | 9604 | 9612 |
| NAVY | ENL | 9510 | 9702 |
| NAVY | ENL | 9309 | 9703 |
| NAVY | ENL | 9312 | 9612 |
| NAVY | ENL | 9606 | 9707 |
| NAVY | ENL | 9410 | 9708 |
| NAVY | ENL | 9604 | 9708 |
| NAVY | ENL | 9511 | 9702 |
| NAVY | ENL | 9508 | 9707 |
| NAVY | ENL | 9505 | 9707 |
| NAVY | ENL | 9508 | 9707 |
| NAVY | ENL | 9512 | 9708 |
| NAVY | ENL | 9702 | 9709 |
| NAVY | ENL | 9611 | 9705 |
| NAVY | ENL | 9610 | 9702 |
| NAVY | ENL | 9312 | 9612 |
| NAVY | ENL | 9601 | 9706 |
| NAVY | ENL | 9507 | 9708 |
| NAVY | ENL | 9604 | 9707 |
| NAVY | ENL | 9602 | 9610 |
| NAVY | ENL | 9309 | 9612 |
| NAVY | ENL | 9505 | 9612 |
| NAVY | ENL | 9411 | 9611 |
| NAVY | ENL | 9506 | 9702 |
| NAVY | ENL | 9604 | 9612 |
| NAVY | ENL | 9304 | 9704 |
| NAVY | ENL | 9409 | 9704 |
| NAVY | ENL | 9408 | 9709 |
| NAVY | ENL | 9601 | 9706 |
| NAVY | ENL | 9507 | 9611 |
| NAVY | ENL | 9406 | 9611 |
| NAVY | ENL | 9611 | 9707 |
| NAVY | ENL | 9611 | 9707 |
| NAVY | ENL | 9506 | 9705 |

OSD P&R Plans 007293

LCR Appendix Page 1715

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| NAVY | ENL | 9604 | 9701 |
| NAVY | ENL | 9406 | 9704 |
| NAVY | ENL | 9504 | 9702 |
| NAVY | ENL | 9701 | 9707 |
| NAVY | ENL | 9602 | 9708 |
| NAVY | ENL | 9506 | 9612 |
| NAVY | ENL | 9606 | 9704 |
| NAVY | ENL | 9609 | 9707 |
| NAVY | ENL | 9509 | 9612 |
| NAVY | ENL | 9606 | 9704 |
| NAVY | ENL | 9412 | 9610 |
| NAVY | ENL | 9406 | 9701 |
| NAVY | ENL | 9312 | 9708 |
| NAVY | ENL | 9612 | 9708 |
| NAVY | ENL | 9405 | 9707 |
| NAVY | ENL | 9611 | 9705 |
| NAVY | ENL | 9407 | 9707 |
| NAVY | ENL | 9608 | 9709 |
| NAVY | OFF | 9005 | 9706 |
| NAVY | ENL | 9309 | 9702 |
| NAVY | ENL | 9406 | 9612 |
| NAVY | ENL | 9503 | 9611 |
| NAVY | ENL | 9608 | 9704 |
| NAVY | ENL | 9503 | 9612 |
| NAVY | ENL | 9410 | 9709 |
| NAVY | ENL | 9603 | 9709 |
| NAVY | ENL | 9303 | 9705 |
| NAVY | ENL | 9601 | 9704 |
| NAVY | ENL | 9609 | 9707 |
| NAVY | ENL | 9610 | 9611 |
| NAVY | ENL | 9511 | 9707 |
| NAVY | ENL | 9603 | 9707 |
| NAVY | ENL | 9608 | 9709 |
| NAVY | ENL | 9503 | 9707 |
| NAVY | ENL | 9309 | 9705 |
| NAVY | ENL | 9509 | 9610 |
| NAVY | ENL | 9308 | 9705 |
| NAVY | ENL | 9302 | 9611 |
| NAVY | ENL | 9302 | 9702 |
| NAVY | ENL | 9504 | 9703 |
| NAVY | ENL | 9607 | 9701 |
| NAVY | ENL | 9511 | 9612 |
| NAVY | ENL | 9602 | 9701 |
| NAVY | ENL | 9610 | 9703 |
| NAVY | ENL | 9607 | 9611 |
| NAVY | ENL | 9607 | 9705 |
| NAVY | ENL | 9411 | 9703 |
| NAVY | ENL | 9602 | 9703 |

C:\XLDATA/SEPARATION HC/FY97LIST.XLS

OSD P&R Plans 007294

LCR Appendix Page 1716

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| NAVY | ENL | 9607 | 9701 |
| NAVY | ENL | 9602 | 9701 |
| NAVY | ENL | 9311 | 9612 |
| NAVY | ENL | 9501 | 9704 |
| NAVY | ENL | 9409 | 9704 |
| NAVY | ENL | 9508 | 9703 |
| NAVY | ENL | 9304 | 9701 |
| NAVY | ENL | 9507 | 9610 |
| NAVY | ENL | 9607 | 9701 |
| NAVY | ENL | 9507 | 9703 |
| NAVY | ENL | 9502 | 9701 |
| NAVY | ENL | 9605 | 9611 |
| NAVY | ENL | 9501 | 9612 |
| NAVY | ENL | 9506 | 9706 |
| NAVY | ENL | 9302 | 9612 |
| NAVY | ENL | 9601 | 9706 |
| NAVY | ENL | 9610 | 9705 |
| NAVY | ENL | 9609 | 9705 |
| NAVY | ENL | 9602 | 9704 |
| NAVY | ENL | 9612 | 9706 |
| NAVY | ENL | 9605 | 9708 |
| NAVY | ENL | 9607 | 9704 |
| NAVY | ENL | 9106 | 9702 |
| NAVY | ENL | 9405 | 9708 |
| NAVY | ENL | 9601 | 9703 |
| NAVY | ENL | 9605 | 9708 |
| NAVY | ENL | 9506 | 9703 |
| NAVY | ENL | 9409 | 9701 |
| NAVY | ENL | 9402 | 9610 |
| NAVY | ENL | 9501 | 9702 |
| NAVY | ENL | 9508 | 9704 |
| NAVY | ENL | 9508 | 9707 |
| NAVY | ENL | 9510 | 9708 |
| NAVY | ENL | 9607 | 9708 |
| NAVY | ENL | 9506 | 9610 |
| NAVY | ENL | 9409 | 9612 |
| NAVY | ENL | 9504 | 9702 |
| NAVY | ENL | 9411 | 9701 |
| NAVY | ENL | 9306 | 9610 |
| NAVY | ENL | 9602 | 9611 |
| NAVY | ENL | 9512 | 9709 |
| NAVY | ENL | 9507 | 9707 |
| NAVY | ENL | 9406 | 9707 |
| NAVY | ENL | 9404 | 9709 |
| NAVY | ENL | 9310 | 9706 |
| NAVY | ENL | 9407 | 9705 |
| NAVY | ENL | 9509 | 9709 |
| NAVY | ENL | 9406 | 9707 |

OSD P&R Plans 007295

LCR Appendix Page 1717

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|------|-----|------|------|
| NAVY | ENL | 9603 | 9611 |
| NAVY | ENL | 9605 | 9611 |
| NAVY | ENL | 9602 | 9611 |
| NAVY | ENL | 9605 | 9704 |
| NAVY | ENL | 9308 | 9610 |
| NAVY | ENL | 9611 | 9708 |
| NAVY | ENL | 9608 | 9705 |
| NAVY | ENL | 9302 | 9612 |
| NAVY | ENL | 9606 | 9707 |
| NAVY | ENL | 9509 | 9611 |
| NAVY | ENL | 9701 | 9707 |
| NAVY | ENL | 9312 | 9701 |
| NAVY | ENL | 9505 | 9701 |
| NAVY | ENL | 9601 | 9703 |
| NAVY | ENL | 9606 | 9709 |
| NAVY | ENL | 9703 | 9707 |
| NAVY | ENL | 9611 | 9708 |
| NAVY | ENL | 9503 | 9707 |
| NAVY | ENL | 9604 | 9706 |
| NAVY | ENL | 9504 | 9612 |
| NAVY | ENL | 9403 | 9612 |
| NAVY | ENL | 9605 | 9708 |
| NAVY | ENL | 9503 | 9610 |
| NAVY | ENL | 9609 | 9703 |
| NAVY | OFF | 9206 | 9704 |
| NAVY | ENL | 9606 | 9707 |
| NAVY | ENL | 9603 | 9702 |
| NAVY | ENL | 9505 | 9709 |
| NAVY | ENL | 9510 | 9707 |
| NAVY | ENL | 9403 | 9705 |
| NAVY | ENL | 9409 | 9707 |
| NAVY | ENL | 9510 | 9705 |
| NAVY | ENL | 9606 | 9703 |
| NAVY | ENL | 9401 | 9611 |
| NAVY | ENL | 9408 | 9701 |
| NAVY | ENL | 9504 | 9610 |
| NAVY | ENL | 9406 | 9705 |
| USAF | ENL | 9604 | 9707 |
| USAF | ENL | 9409 | 9611 |
| USAF | ENL | 9508 | 9708 |
| USAF | ENL | 9509 | 9705 |
| USAF | ENL | 9402 | 9703 |
| USAF | ENL | 9502 | 9705 |
| USAF | ENL | 9604 | 9703 |
| USAF | ENL | 9412 | 9706 |
| USAF | ENL | 9402 | 9612 |
| USAF | ENL | 9605 | 9704 |
| USAF | ENL | 9403 | 9706 |

OSD P&R Plans 007296

LCR Appendix Page 1718

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| USAF | OFF | 9506 | 9705 |
| USAF | OFF | 7909 | 9610 |
| USAF | ENL | 9512 | 9703 |
| USAF | ENL | 9401 | 9706 |
| USAF | ENL | 9512 | 9703 |
| USAF | ENL | 9505 | 9705 |
| USAF | ENL | 9408 | 9708 |
| USAF | ENL | 9509 | 9709 |
| USAF | ENL | 9510 | 9705 |
| USAF | ENL | 9607 | 9706 |
| USAF | ENL | 9603 | 9610 |
| USAF | ENL | 9605 | 9701 |
| USAF | ENL | 9704 | 9709 |
| USAF | ENL | 9603 | 9708 |
| USAF | ENL | 9702 | 9706 |
| USAF | ENL | 9610 | 9705 |
| USAF | ENL | 9704 | 9708 |
| USAF | ENL | 9602 | 9704 |
| USAF | ENL | 9511 | 9709 |
| USAF | ENL | 9508 | 9704 |
| USAF | ENL | 9507 | 9704 |
| USAF | ENL | 9702 | 9705 |
| USAF | ENL | 9611 | 9705 |
| USAF | ENL | 9605 | 9707 |
| USAF | ENL | 9408 | 9706 |
| USAF | ENL | 9412 | 9611 |
| USAF | ENL | 9501 | 9709 |
| USAF | ENL | 9511 | 9612 |
| USAF | ENL | 9405 | 9610 |
| USAF | OFF | 9607 | 9707 |
| USAF | ENL | 9409 | 9705 |
| USAF | ENL | 9602 | 9704 |
| USAF | ENL | 9705 | 9708 |
| USAF | ENL | 9611 | 9703 |
| USAF | ENL | 9604 | 9612 |
| USAF | ENL | 9608 | 9611 |
| USAF | ENL | 9607 | 9705 |
| USAF | ENL | 9704 | 9708 |
| USAF | OFF | 9406 | 9703 |
| USAF | ENL | 9501 | 9612 |
| USAF | ENL | 9507 | 9703 |
| USAF | ENL | 9407 | 9704 |
| USAF | ENL | 9702 | 9702 |
| USAF | ENL | 9308 | 9610 |
| USAF | ENL | 9607 | 9612 |
| USAF | ENL | 9607 | 9610 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9706 | 9706 |

OSD P&R Plans 007297

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9709 | 9709 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9703 | 9705 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9701 | 9705 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9709 | 9709 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9701 | 9703 |
| USAF | ENL | 9704 | 9705 |

OSD P&R Plans 007298

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| USAF | ENL | 9704 | 9705 |
|------|-----|------|------|
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9706 | 9708 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9709 | 9709 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9611 | 9702 |
| USAF | ENL | 9709 | 9709 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9611 | 9701 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9704 | 9706 |
| USAF | ENL | 9703 | 9704 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9709 | 9709 |
| USAF | ENL | 9704 | 9706 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9610 | 9610 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9703 | 9705 |
| USAF | ENL | 9609 | 9610 |

OSD P&R Plans 007299

LCR Appendix Page 1721

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9707 | 9709 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9703 | 9704 |
| USAF | ENL | 0 | 9701 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9701 | 9703 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9704 | 9707 |
| USAF | ENL | 9709 | 9709 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9611 | 9611 |
| USAF | ENL | 9612 | 9612 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9702 | 9704 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9610 | 9610 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9706 | 9708 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9704 | 9705 |

C:XLDATA/SEPARATION HC/FY97LIST.XLS

OSD P&R Plans 007300

LCR Appendix Page 1722

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9701 | 9703 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9610 | 9610 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9705 | 9705 |
| USAF | ENL | 9702 | 9704 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9610 | 9610 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9703 | 9704 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9704 | 9704 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9704 | 9705 |
| USAF | ENL | 9702 | 9704 |
| USAF | ENL | 9610 | 9611 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9706 | 9706 |
| USAF | ENL | 9611 | 9611 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9707 | 9708 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9611 | 9612 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9704 | 9704 |

OSD P&R Plans 007301

LCR Appendix Page 1723

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9707 | 9707 |
| USAF | ENL | 9609 | 9611 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9708 | 9709 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9701 | 9703 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9609 | 9610 |
| USAF | ENL | 9607 | 9610 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9705 | 9706 |
| USAF | ENL | 9702 | 9703 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9706 | 9707 |
| USAF | ENL | 9612 | 9701 |
| USAF | ENL | 9701 | 9702 |
| USAF | ENL | 9608 | 9611 |
| USAF | ENL | 9705 | 9707 |
| USAF | ENL | 9308 | 9610 |
| USAF | OFF | 9306 | 9612 |
| USAF | ENL | 9503 | 9704 |
| USAF | ENL | 9503 | 9611 |
| USAF | ENL | 9502 | 9612 |
| USAF | ENL | 9605 | 9706 |
| USAF | ENL | 9410 | 9612 |
| USAF | ENL | 9411 | 9612 |
| USAF | ENL | 9603 | 9706 |
| USAF | ENL | 9603 | 9705 |
| USAF | ENL | 9612 | 9707 |
| USAF | ENL | 9411 | 9704 |
| USAF | ENL | 9512 | 9708 |
| USAF | ENL | 9602 | 9702 |
| USAF | ENL | 9405 | 9612 |
| USAF | ENL | 9611 | 9708 |
| USAF | ENL | 9604 | 9708 |
| USAF | ENL | 9509 | 9610 |
| USAF | ENL | 9406 | 9611 |
| USAF | ENL | 9603 | 9707 |
| USAF | ENL | 9607 | 9708 |
| USAF | ENL | 9510 | 9703 |
| USAF | ENL | 9203 | 9705 |
| USAF | ENL | 9310 | 9704 |
| USAF | ENL | 9512 | 9706 |
| USAF | ENL | 9606 | 9702 |

C:XLDATA/SEPARATION HC/FY97LIST.XLS

OSD P&R Plans 007302

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| USAF | ENL | 9408 | 9612 |
| USAF | ENL | 9505 | 9612 |
| USAF | ENL | 9508 | 9706 |
| USAF | ENL | 9704 | 9706 |
| USAF | ENL | 9605 | 9706 |
| USAF | ENL | 9310 | 9707 |
| USAF | ENL | 9412 | 9709 |
| USAF | ENL | 9602 | 9612 |
| USAF | ENL | 9505 | 9707 |
| USAF | ENL | 9509 | 9709 |
| USMC | ENL | 9610 | 9708 |
| USMC | ENL | 9306 | 9704 |
| USMC | ENL | 9506 | 9709 |
| USMC | ENL | 9512 | 9704 |
| USMC | ENL | 9504 | 9708 |
| USMC | ENL | 9606 | 9704 |
| USMC | ENL | 9406 | 9709 |
| USMC | ENL | 9512 | 9705 |
| USMC | ENL | 9611 | 9709 |
| USMC | ENL | 9410 | 9702 |
| USMC | ENL | 9312 | 9610 |
| USMC | ENL | 9605 | 9610 |
| USMC | ENL | 9605 | 9612 |
| USMC | ENL | 9609 | 9702 |
| USMC | ENL | 9607 | 9612 |
| USMC | ENL | 9409 | 9707 |
| USMC | ENL | 9611 | 9701 |
| USMC | ENL | 9610 | 9701 |
| USMC | ENL | 9611 | 9701 |
| USMC | ENL | 9608 | 9611 |
| USMC | ENL | 9607 | 9610 |
| USMC | ENL | 9611 | 9701 |
| USMC | ENL | 9610 | 9612 |
| USMC | ENL | 9607 | 9610 |
| USMC | ENL | 9702 | 9704 |
| USMC | ENL | 9701 | 9703 |
| USMC | ENL | 9702 | 9703 |
| USMC | ENL | 9611 | 9612 |
| USMC | ENL | 9702 | 9703 |
| USMC | ENL | 9608 | 9610 |
| USMC | ENL | 9609 | 9611 |
| USMC | ENL | 9703 | 9704 |
| USMC | ENL | 9703 | 9704 |
| USMC | ENL | 9701 | 9704 |
| USMC | ENL | 9406 | 9709 |
| USMC | ENL | 9411 | 9707 |
| USMC | ENL | 9606 | 9707 |
| USMC | ENL | 9606 | 9705 |

OSD P&R Plans 007303

SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
FY 1997
ENLISTMENT/COMMISSION DATE BY SEPARATION DATE

| | | | |
|---|---|---|---|
| USMC | ENL | 9504 | 9708 |
| USMC | ENL | 9606 | 9706 |
| USMC | ENL | 9511 | 9709 |
| USMC | ENL | 9612 | 9708 |
| USMC | ENL | 9311 | 9701 |
| USMC | ENL | 9604 | 9702 |
| USMC | ENL | 9506 | 9703 |
| USMC | ENL | 9508 | 9703 |
| USMC | ENL | 9606 | 9612 |
| USMC | ENL | 9609 | 9610 |
| USMC | ENL | 9608 | 9708 |
| USMC | ENL | 9610 | 9708 |
| USMC | ENL | 9308 | 9701 |
| USMC | ENL | 9607 | 9703 |
| USMC | ENL | 9307 | 9705 |
| USMC | ENL | 9503 | 9611 |
| USMC | ENL | 9704 | 9706 |
| USMC | ENL | 9610 | 9707 |
| USMC | ENL | 9702 | 9704 |
| USMC | ENL | 9707 | 9708 |
| USMC | ENL | 9703 | 9704 |
| USMC | ENL | 9612 | 9704 |
| USMC | ENL | 9705 | 9708 |
| USMC | ENL | 9705 | 9706 |
| USMC | ENL | 9706 | 9707 |
| USMC | ENL | 9706 | 9707 |
| USMC | ENL | 9703 | 9704 |
| USMC | ENL | 9707 | 9708 |
| USMC | ENL | 9607 | 9707 |
| USMC | ENL | 9708 | 9709 |
| USMC | ENL | 9605 | 9703 |
| USMC | ENL | 9608 | 9704 |
| USMC | ENL | 9610 | 9705 |
| USMC | ENL | 9603 | 9702 |
| USMC | ENL | 9603 | 9703 |
| USMC | ENL | 9703 | 9709 |
| USMC | ENL | 9606 | 9612 |
| USMC | ENL | 9607 | 9705 |
| USMC | ENL | 9511 | 9610 |
| USMC | ENL | 9609 | 9704 |

OSD P&R Plans 007304

LCR Appendix Page 1726

042298

## LACKLAND AIR FORCE BASE
### SEPARATIONS DUE TO HOMOSEXUAL CONDUCT
### BY UNIT

| | FY 93 | FY 94 | FY 95 | FY 96 | FY 97 | TOTAL |
|---|---|---|---|---|---|---|
| 0059 MEDICAL WG | 0 | 0 | 3 | 1 | 1 | 5 |
| 0319 TRAINING SQ | 3 | 3 | 2 | 6 | 1 | 15 |
| 0320 TRAINING SQ | 13 | 29 | 26 | 33 | 35 | 136 |
| 0321 TRAINING SQ | 15 | 17 | 39 | 34 | 40 | 145 |
| 0322 TRAINING SQ | 17 | 21 | 33 | 34 | 36 | 141 |
| 0323 TRAINING SQ | 17 | 19 | 34 | 44 | 47 | 161 |
| 0331 TRAINING SQ | 16 | 15 | 23 | 33 | 56 | 143 |
| 0342 TRAINING SQ | 0 | 1 | 0 | 0 | 0 | 1 |
| 0343 TRAINING SQ | 1 | 1 | 0 | 4 | 2 | 8 |
| 0344 TRAINING SQ | 0 | 0 | 0 | 1 | 0 | 1 |
| 0345 TRAINING SQ | 0 | 0 | 0 | 2 | 2 | 4 |
| TOTAL | 82 | 106 | 160 | 192 | 220 | 760 |

Page 1

**OSD P&R Plans 007305**

**LCR Appendix Page 1727**



**DEPARTMENT OF THE NAVY**
OFFICE OF THE JUDGE ADVOCATE GENERAL
200 STOVALL STREET
ALEXANDRIA, VA 22332-2400

IN REPLY REFER TO

MEMORANDUM FOR VICE CHIEF OF NAVAL OPERATIONS

FROM:    RADM JOHN D. HUTSON
         Judge Advocate General
         Prepared by: LCDR Barry J. Goehler, Code 131,
                      604-8219

SUBJECT: Homosexual Conduct Policy - INFORMATION
         MEMORANDUM

PURPOSE: To outline the legal basis for the requirement
         that separation based upon a finding that a
         member engaged in homosexual acts is mandatory
         unless there are additional findings that the
         member has demonstrated certain factors.

DISCUSSION: The legal basis for current policy concerning
            homosexual conduct in the military is
            statutory. 10 U.S.C. § 654 details
            Congressional findings and applicable policy.
            With respect to homosexual acts, the statute
            compels separation from the armed forces if
            there is an approved finding that the member
            engaged in, attempted to engage in, or
            solicited another to engage in a homosexual
            act or acts.  Separation shall occur unless
            there is an additional finding that the member
            has demonstrated the following five factors:

            - such conduct is a departure from the
            member's usual and customary behavior;

            - such conduct, under all the circumstances,
            is unlikely to recur;

            - such conduct was not accomplished by use of
            force;

            - retention is consistent with the interests
            of the armed forces in proper discipline, good
            order, and morale; and

            - the member does not have a propensity or
            intent to engage in homosexual acts.

            The burden is on the member to demonstrate all
            of these factors.  If the member does not meet
            the burden, he must be separated.

**Navy 058930**

Liaison with BUPERS indicated that there were nine cases, in FY97, and seven cases, in FY98 to date, in which members failed to meet this burden and were separated by reason of commission of homosexual acts. This represents 3.8% and 3.0% respectively of the total number of separations for homosexual conduct. Statistics regarding success of members in demonstrating the existence of the listed factors are unavailable; however, it is reasonable to conclude that the number of cases is not statistically significant.

RECOMMENDATION: None. Provided for information only.

Attachment:
(1) 10 U.S.C. § 654

Navy 058931



Memorandum for Bob Wisher

Subject:  Review of Dr. Pinch's report entitled "Perspectives on organizational change in the Canadian forces."

1.   This is a very well written report that gives a very nice chronology of the evolution of the Canadian position regarding homosexuals in the military service.  It also provides an up-to-date look at the impact of lifting the ban last fall.  The distinction between the operational and social imperative views of military service that Dr. Pinch draws are particularly useful for framing the opposing views of homosexuals in military service.  His review of the relevant research and the court system's reaction to it are particularly useful for estimating the kind of reactions we in the U.S. may face in the future.  I have made notes in the text and margins of the paper of several minor changes I think are needed.  The last part of paragraph two on page 26 and continuing on to page 27 needs some re-writing.  As it stands, it is unclear – – for example, the sentence that begins "As to point(2),... is not a complete sentence.  The ideas here need to be more clearly presented.

2.   Recommend that this report be published as a research report with the minor revisions I have previously noted.

Paul A. Gade
Chief, LOCTA

6/28/93

ARI 060755



Research Note 93-17

# Comparative International Military Personnel Policies

Gwyn Harries-Jenkins
University of Hull,
editor

for

European Research Office of the U.S. Army

May 1993



**U.S. ArmyResearch Institute for the Behavioral and Social Sciences**
**5001 Eisenhower Avenue, Alexandria, VA 22333-5600**

Approved for public release; distribution is unlimited.

Restricted
See SF298

ARI 060756

| REPORT DOCUMENTATION PAGE | | Form Approved OMB No 0704-0188 |
|---|---|---|

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503

| 1. AGENCY USE ONLY (Leave blank) | 2. REPORT DATE 1993 APRIL | 3. REPORT TYPE AND DATES COVERED FIRST PHASE JAN 93 - APRIL 1993 |
|---|---|---|

| 4. TITLE AND SUBTITLE | 5. FUNDING NUMBERS |
|---|---|
| Comparative Military Personnel Policies | R&D 7077-RB-01 |

| 6. AUTHOR(S) |
|---|
| Harries-Jenkins G |

| 7. PERFORMING ORGANIZATION NAME(S) AND ADDRESS(ES) | 8. PERFORMING ORGANIZATION REPORT NUMBER |
|---|---|
| University of Hull<br>Hull  HU6 7SZ<br>United Kingdom | - |

| 9. SPONSORING/MONITORING AGENCY NAME(S) AND ADDRESS(ES) | 10. SPONSORING/MONITORING AGENCY REPORT NUMBER |
|---|---|
| US Army Research Institute<br>223 Old Marylebone Road<br>London  NW1 5TH | RN 93-17 |

| 11. SUPPLEMENTARY NOTES |
|---|
| Task was peformed under the European Research Office Broad Agency Announcement (BAA) of September 1992 regarding research in the behavioural and social sciences. R&D 7077-RB-01 |

| 12a. DISTRIBUTION/AVAILABILITY STATEMENT | 12b. DISTRIBUTION CODE |
|---|---|
| May not be released by other than sponsoring organization without approval of US Army Research Institute | - |

| 13. ABSTRACT (Maximum 200 words) |
|---|
| This report looks at the problems associated with the recruitment and employment of military personnel in Western industrialized society.  It is particularly concerned with issues relating to the recruitment and retention within the military of homosexuals, that is, those individuals who have a sexual propensity for persons of their own gender.  After reviewing the legal definitions of homosexuality, homosexual acts and homosexual offences, the Report concentrates on issues of policies, practices and problems.  These are analysed in the context of seven cases studies (Belgium, France, Germany, Italy, the Netherlands, Scandinavia and the United Kingdom). |

| 14. SUBJECT TERMS | | 15. NUMBER OF PAGES 101 |
|---|---|---|
| Military manpower.  Homosexuality.  Military personnel. Comparative military systems. | | 16. PRICE CODE - |

| 17. SECURITY CLASSIFICATION OF REPORT | 18. SECURITY CLASSIFICATION OF THIS PAGE | 19. SECURITY CLASSIFICATION OF ABSTRACT | 20. LIMITATION OF ABSTRACT |
|---|---|---|---|
| Unclassified | Unclassified | Unclassified | Unlimited |

NSN 7540-01-280-5500

Standard Form 298 (Rev. 2-89)
Prescribed by ANSI Std Z39-18
298-102

i

# TABLE OF CONTENTS

Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii
Gwyn Harries-Jenkins, University of Hull

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Gwyn Harries-Jenkins, University of Hull

Homosexuality and the British Armed Forces: Official Policy in Recent Years . . 21
Christopher Dandeker, King's College, London

Homosexuality and the Military: the German Standpoint . . . . . . . . . . . . 29
Berhhard Fleckstein

Homosexuality and the Belgian Military . . . . . . . . . . . . . . . . . . . 45
Philippe Mangiart, Ecole Royale Militaire

Homosexuality and Armed Forces in the Netherlands . . . . . . . . . . . . . . 57
Marion Andersen-Boers and Jan van der Meulen
Sticting Maatschappij en Krijgsmacht, The Hague

Homosexuals in the Armed Forces in Scandanavia . . . . . . . . . . . . . . . 75
Henning Sørensen, Institut for Sociologisk Forskning, Copenhagen

Appendix A: Biographies . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Appendix B: Conference Attendees . . . . . . . . . . . . . . . . . . . . . . 99

iii

ARI 060758

# FOREWORD

This research was begun in response to the proposal to lift the ban on homosexuals in the U.S. military. The research is being conducted by Professor Gwyn Harries-Jenkins of Hull University to systematically examine the policies, practices, and problems of selected nations who had lifted bans against homosexuals in their military services or who were beginning to consider doing so. In this way, we hope to gain insights into policies and practices that might be useful to the Army in meeting whatever challenges of National policy toward homosexuals in the U.S. military services.

The approach selected by Professor Harries-Jenkins was to ask noted military social scientists from selected countries to prepare case studies of their own countries. during phase one of this effort, each scientist prepared a paper outlining the policies and practices in use today in their respective countries. Each paper also provided a social-historical review of the development of those policies and practices. In addition, each scientist described problems associated with the development and implementation of current policies. Each of these papers was then presented and discussed at a conference in Beverly, U.K., during April 2-4, 1993.

This phase one report comprises the papers from the conference in Beverly and focuses on the development of the case study taxonomy for delineating policies and practices in the countries of the United Kingdom, Germany, Belgium, Denmark (with some coverage of Sweden and Norway as well), and the Netherlands. Italy was added too late for the phase one report but will be included in the phase two and final reports. The phase two report will focus on describing problems and their solutions where available. The phase one and phase two reports will then be integrated into a final report in which policies and practices will be related to problems and their potential solutions within the case study format and taxonomies.

EDGAR M. JOHNSON,
Acting Director

v

ARI 060759

# PREFACE

**Professor Gwyn Harries-Jenkins**
**University of Hull**

This research project sets out to look at the problems which are associated with the recruitment and employment of military personnel in Western industrialised society. It forms part of a long ongoing research programme concerned with comparative international military personnel practices (CIMPP).

This particular project is concerned with the recruitment and retention of homosexuals of both sexes within military organisations. The adopted research methodology is based on the comparative analysis of three major variables:

- Policies
- Practices
- Problems

Each of these three variables is analytically distinct but in combination they form part of an overall concept. To effect this research, an adopted methodological strategy considers the general background to the problem, presents data derived from a number of case studies and postulates certain conclusions and recommendations. It is envisaged that the specific case studies will embrace the following countries:

- Belgium
- France
- German
- Italy
- The Netherlands
- Scandinavia
- United Kingdom

Additionally, information has been requested from specialist consultants with regard to the contemporary situation in Israel, Chile, Nigeria and New Zealand. These four countries have been selected at random to provide a non-Western commentary upon the adopted research structure.

vii

ARI 060760

# Introduction

1.  Traditionally, military socialisation has been linked to the development and maintenance of an occupational culture, the symbols, rituals and values of which have constituted an idealised self-image. In Western industrialised society, the latter has stressed the importance of such qualities as toughness, aggressiveness endurance and controlled deviancy. These, irrespective of the logic of the arguments which have been put forward, have been perceived as <u>masculine</u> traits; inadequate or poor performance, on the other hand, has been equated with a <u>femininity</u> which is the antithesis of effective soldiering. To maintain and develop the military self-image, armed forces have established complex personnel policies and practices. Almost without exception, these have emphasised the notion of conformity, and from the moment of recruitment through induction and advanced training, military personnel have been conditioned to believe that these male traits and this concept of masculinity are desirable qualities. Hockey[1] comments,

    This self-image is one which combines traditional masculine values with a competence in the techniques of survival and liquidation. Recruits perceive themselves very much in the same fashion as the Corporal who saw that "soldiers should be young and fit, rough and nasty, not powder puffs".

2.  One long-standing effect of this interpretation of the desired qualities of the traditional military image, has been the opposition within armed forces to any demonstration of homosexual tendencies. Those service personnel who have shown a sexual propensity for persons of their own gender, have been thought to exhibit a pattern of behaviour which contradicts the conventional identification of the idealised self-image. They have been seen to be deviants and the military has persistently taken draconian steps to ensure that such individuals do not form part of the military organisation. For many years, this military preference fitted closely with national legislation and the military was always able to justify its stance on the grounds that armed forces, as the mirror of the parent society, simply reproduced in their military legislation, attributes of normal national legal practice. This is not to deny that homosexuals were always found within military organisations. Winston Churchill, many years ago, in a famous quotation, argued that one of the defining characteristics of the Royal Navy in Napoleonic times was the manner in which it was representative of 'rum, sodomy and the lash'. Nevertheless, deviant behaviour on discovery was always punished and there is little doubt that the military, in common with other parts of the parent society, traditionally enforced a legal system designed to punish homosexuals.

1

ARI 060761

*Comparative International Military Personnel Policies*

3.    In contemporary western military organizations , changes in national legislation have materially affected the status and position of homosexuals.  In general, as US Government Document, <u>Nonconforming Sexual Orientations and Military Suitability</u>, notes, "a public admission of homosexuality under prevailing social conditions, carries less stigma than in earlier times, and is no legal bar to most employment"[2].  A similar comment is made by the British <u>Select Committee on the Armed Forces Bill (1991)</u>.

> "Society outside the Armed Forces is now much more tolerant of differences in sexual orientation than it was".

4.    The position in armed forces, however, is far from uniform since national policy differs radically.  This ranges from the tolerance of Norway to the absolute prohibition of countries such as Greece, Turkey, Italy and Ireland.  For Norway it is said that,

> "Homosexuality in the Armed Forces has not represented any problem of significance.  It is not on record in Norway that any disciplinary action has been taken against a military serviceman for his homosexual behaviour"[3]

Norwegian military sources have repeatedly stressed that homosexuality in the military is not an issue.  This contrasts markedly to strict legislation such as that of the United Kingdom.  Here, the <u>Sexual Offences Act</u> of 1967 which legalised certain homosexual acts in private between adult men over the age of 21, specifically stated that it did not prevent an act from constituting a military offence.  Accordingly, 39 service personnel were dismissed between 1988-1992 following conviction for an offence involving homosexual activity (Royal Navy:  9;  Army:  22;  Royal Air Force:  8).  A further 296 were discharged as a result of administrative action, that is, no formal disciplinary charges were made.  Of those discharged on administrative grounds from the Army during this period, over half were women.[4]

5.    Irrespective, however, of change in national and military legislation, national <u>practices</u> vary considerably.  When these are examined in greater detail, together with the many <u>problems</u> which occur, it can be concluded that in reality there are three major areas of uncertainty and controversy.

2

ARI 060762

- ❑   Policies
- ❑   Practices
- ❑   Problems

Although these three distinctive facets of the overarching issue can be distinguished, it is evident that in reality all three merge together to constitute a major variable in military staffing and management decision-making.  Even so, it is desirable to identify specifically the characteristics of each component and to consider these in more detail.

5.1     "Policies", in this context, refers to the declared aims and objectives of the military organization which govern the employment of personnel within national armed forces.  Such aims and objectives are not static and they change over time.  The term also relates to the rules and regulations which, in the guise of "military law", govern the behaviour of individual service personnel.

5.2     "Practices", equally refers to the employment of personnel.  Specifically, the term acknowledges that the culture of military organisations in reflecting an amalgam of symbols, rituals, heroes and values, provides a set of operational criteria.  These may imply accord with declared 'policies'; they may enlarge upon them through the provision of examples and rules of good practice.  They will in some situations provide an alternative to formal rules and regulations.

5.3     "Problems" are the garbage can of decision-making.  Notwithstanding legislative provision and an acknowledgement of the impact of culture on management practice, the military, in common with other large complex organisations, is consistently faced with the existence of major operational problems.  Minor issues can be readily solved;  major questions require more consideration and deliberation.

6.     **The Background**

We are concerned in this first phase report on comparative military personnel practices, with a general enquiry into the recruitment to and retention of homosexuals in the military.  In this enquiry, any lengthy or detailed study of the nature or origins of homosexuality falls outside our remit.  It is, however, difficult to gather and make available factual information about this issue.  A considerable body of literature exists[5] but much of that which is written presents value-based

3

ARI 060763

*Comparative International Military Personnel Policies*

comments both in support of and in opposition to the practice. These polemics represent entrenched positions which inhibit rational analysis.

7.    It is important to begin with a clear distinction between <u>homosexuality</u>, <u>homosexual acts</u> and <u>homosexual offences</u>. The dictionary definition of the first states simply that,

> homosexuality is having a sexual propensity for persons of one's own sex[6]

Such a definition is not universally accepted. The <u>Diagnostic and Statistical Manual</u> of the American Psychiatric Association listed <u>homosexuality</u> in the Second Edition from 1968-73 (DSM-11) as one of the "sexual deviations". During 1973, the Nomenclature Committee of the APA under pressure from many professionals, especially gay activist groups, recommended to the general membership the elimination of the category, "homosexuality" and the substitution of "sexual orientation disturbance". For this Report, however, the dictionary definition is used.

8.    This definition, as is pointed out in the 1957 British <u>Report of the Committee on Homosexual Offences and Prostitution</u> (the Wolfenden Report), "involves the adoption of some criteria for its recognition"[7]. As in other psychological fields, the conclusion that such a propensity exists has to be derived from both subjective and objective data. The former will reflect what is <u>felt</u> by the person concerned; the latter, what is <u>done</u>. The use of such data as the determinant of the presence or absence of the sexual propensity has to be treated with caution, for its use is subject to the strict rules of evidence. This is particularly so where subjective data is the basis of evaluation.

8.1    Individual service personnel may not be aware of either the existence or strength of a feeling or propensity. "Rationalisation and self-deception can be carried to great lengths and in some cases lying is also to be expected".[8]

8.2    There exists in certain persons a homosexual propensity which varies quantitively at different periods of life.

8.3    It is argued by the psycho-analytic school, that a homosexual component, either conscious or not, exists in all of us.

4

ARI 060764

8.4    Homosexuals differ in the degree to which they are aware of the propensity within themselves. Where service personnel are quite unaware of it, their homosexuality is latent, its existence being inferrred from the individual's behaviour in spheres not clearly sexual. The Wolfenden Report notes:

> Although there is room for dispute as to the extent and variety of behaviour of this kind which may legitimately be included in the making of this inference, there is general agreement that the existence of a latent homosexual is an inference validly to be drawn in certain cases.[9]

9.    In civil society, any debate about the validity or otherwise of this subjective data has limited consequences. Legally, discussion about the status of homosexuality as "a disease"; "an illness", "an abnormality", "a demonstrable pathological condition", "a natural deviation", "a social problem" and so on, is of limited relevance. Homosexuality, in this context, is a state or condition, and, as such it does not constitute an offence in criminal law in Western industrialized society.

10.    The position within military organizations in that society, however, is more complex. The point will be discussed more fully at paragraph 17 below in an examination of the policies adopted by national armed forces. At this juncture, it can be noted that at the point of recruitment, an admission of homosexuality will, in some countries, debar an individual from enlistment. Subsequently, an admission of homosexuality ("coming-out of the closet") or the inference that an individual has a sexual propensity for persons of the same sex, will, in some countries, constitute an offence under military law. This is so even when such a propensity does not otherwise come within the purview of the civil criminal law.

11.    Whereas homosexuality, by definition, is a state or condition the existence of which has to be determined from primarily subjective data, homosexual acts are evidenced by objective data. A latent homosexuality may be influenced from behaviour which is not overtly sexual. It may thus be inferred from an individual's outlook or expression of opinion or preference for a certain mode of conduct. Homosexual acts, in contrast, are overtly sexual. They are, for example, defined in current US Army Regulations as:

> bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires. (AR 135-175, Separation of Offices; AR 135-178, Separation of Enlisted Personnel).

5

ARI 060765

*Comparative International Military Personnel Policies*

12.    The concept of homosexual offences extends by definition the identification of homosexuality as a state or condition, and the identification of homosexual acts as a form of sexual behaviour. Homosexual offences are those overt acts which because they are contrary to law, renders the perpetuating individual or individuals liable to prosecution. On conviction, the offender is punished, the severity of that punishment varying in accordance with the dictates of national practice.

13.    What constitutes a homosexual offence varies from country and has changed over time. There are no absolute homosexual offences. Notwithstanding the prescriptions of a Judaeo-Christian tradition, it is in actuality contemporary legislators who define the legality or otherwise of a specific homosexual act. Contemporary national legislation in Western industrialized socieites commonly follows three precepts:

    ❑    there is a need for laws to safeguard those in need of protection by reason of their youth or mental incapacity

    ❑    a major function of law is the preservation of order and decency in public places

    ❑    there is a requirement to regulate conduct seen to be contrary to the public good.

To these determinants of civil legislation, military legislation usually adds:

    ❑    the need to regulate conduct prejudicial to good order and discipline.

14.    Within this legal framework, the attribution of illegality to a given sexual act, will vary over time. An example of this is the debate in the 1950s about the extent to which it was proper for national legislation to concern itself with what consenting adults did in private. Prior to the debate, the offence of buggery or sodomy existed irrespective of whether the act was committed in private or public. After the debate, many countries determined that homosexual behaviour between consenting adults in private should no longer be a criminal offence. Given this reservation, the following list of current homosexual offences can be deduced from national legislation:

6

ARI 060766

## Offence

- ❏ Buggery [see note (a) ]
- ❏ Attempted buggery
- ❏ Indecent assault on a male by a male
- ❏ Indecent assault on a female by a female
- ❏ Acts of gross indecency between males
- ❏ Procuring acts of gross indecency between males
- ❏ Attempting to procure acts of gross indecency between males
- ❏ Assaults with intent to commit buggery
- ❏ Persistent soliciting or importuning of males by males for immoral purposes (where the "immoral purposes" involve homosexual behviour)

## Note

(a)    The offence of buggery consists of sexual intercourse (i) per anum between man and man or (ii) between man and woman or (iii) in any manner between man and woman and beast.  In some countrires the offence of buggery is divided into sodomy and bestiality.

(b)    This list represents an extreme position.  As has been noted, changes in national legislation over time will confirm or reject the status of individual offences.  In general, acts which involve behaviour would, irrespective of the sexual connotation, be contrary to the law, eg assault, will be illegal.

15.    The amendment to various national laws to decriminalize homosexual acts committed in private between consenting adults, was not necessarily followed by military law.  The rationale for this was provided in the British Wolfenden Report.

### Offences in Disciplinary Services and Establishments

144.    We recognise that within services and establishments whose members are subject to a disciplinary régime it may be necessary, for the sake of good management and the preservation of discipline and for the protection of those of subordinate rank or position, to regard homosexual behaviour, even by consenting adults in private, as an offence.  For instance, if our recommendations are accepted, a serving soldier over

7

ARI 060767

*Comparative International Military Personnel Policies*

twenty-one who commits a homosexual act with a consenting adult partner in private will cease to be guilty of a civil offence or of an offence against Section 70 (1) of the Army Act, 1955 (which provides that any person subject to military law who commits a civil offence shall be guilty of an offence under that section, and hence liable to be dealt with by court-martial). The service authorities may nevertheless consider it necessary to retain Section 66 of the Act (which provides for the punishment of, inter alia, disgraceful conduct of an indecent or unnatural kind) on the ground that it is essential, in the services, to treat as offences certain types of conduct which may not amount to offences under the civil code. Similar problems may arise in relation to other services and establishments.

16.     It is the complexity of law and the variations which exist in national armed forces, that make it necessary to examine in more detail the policies and practices of the military. To effect this anlaysis, our approach distinguished two issues:

  ❑     the policy of the military at the point of recruitment

  ❑     policies and practices governing employment in the armed forces.

**Policies at the Point of Recruitment**

17.     The simple distinction is between open and closed entry:

| **Open Entry** | **Closed Entry** |
|---|---|
| Belgium | Greece |
| Denmark | Ireland |
| France | Italy |
| Germany | Turkey |
| Israel | United Kingdom |
| Luxembourg | |
| Netherlands | |
| Norway | |
| Spain | |
| Sweden | |

8

ARI 060768

In those countries which favour open entry, applicants are not questioned about their sexual orientations. A policy statement from the Netherlands Ministry of Defence (Directorate-General Personnel) [see Annex A] summarises what is common practice:

> During the medical examination and upon entering the Service no questions are asked relating to the sexual orientation of the conscript/applicant. In the event that the sexual orientation is brought up by the conscript/applicant, it will not be recorded. For that reason the number of homosexuals in the armed forces is unknown.

The generally expressed rationale for this approach is that sexual orientation is considered to be a purely personal issue.

18.    The outlined distinction has been discussed with respect to other national armed forces. In Canada, for example, there has been open entry to the military following the ruling of the Federal Court of Canada that the military's previous policy on sexual orientation violated the 1985 <u>Charter of Rights and Freedom</u>. The Charter gives to Canadians civil right guarantees similar to those found in the Constitution of the United States, but it also contains legislation on sex discrimination which was considered and rejected in the United States during debates over the Equal Rights Amendment: the 1970s and 1980s. In Australia, legislation excluding homosexuals from the armed forces was amended on 23 November 199

19.    <u>Policies and Employment</u>

The policies adopted by national armed forces with regard to the employment of personnel vary considerably. Policies can be most readily evaluated against a continuum which recognises that national policies range from the rejection of homosexuals to an almost indifference to their employment. Contemporary national policies can be grouped under three headings on this continuum.

> Status Equality
> Limited Tolerance
> Absolute Prohibition

9

ARI 060769

*Comparative International Military Personnel Policies*

19.1    **Status Equality**

The personnel and recruitment policy adopted by most European governments accepts that full membership of the armed forces is open to individuals irrespective of their sexual preferences. There are, however, a number of conditions which affect this general principle. These are readily identified in national administrative and legislative provisions:

**Belgium**

Under the Belgian Criminal Law, homosexuality as such is not a criminal offence. The Military Penal Code contains no specific provisions concerning homosexuality. During recruitment of forces personnel, no distinction is made between candidates on grounds of sexuality. Neither conscripts nor volunteers are questioned about their sexual orientations and preferences. Accordingly, homosexuality, in itself, does not exempt Belgian male citizens from the obligations of the draft unless there are psychological reasons for such exemption. Homosexual conduct between consenting adults of military personnel off duty is not a punishable offence. However, as in other countries, inappropriate behaviour whether of homosexual or heterosexual origin <u>may</u> constitute a disciplinary offence.

**Denmark**

From February 1979, homosexuals have been able to enlist and become professional soldiers, NCOs or officers. There are no penal or administrative measures affecting homosexuals in Danish military legislation, except where a homosexual military employee uses his/her authority to coerce a more junior military employee to have sex. The same rules apply to heterosexuals. Individual sexual orientation is seen to be a personal, private matter.

**France**

There is no military law against sexual acts between members of the armed forces which take place in a private place. Homosexuality is not considered a security risk, nor is there exemption from military service for homosexuals. Seemingly,

10

ARI 060770

there is no problem, socially or collectively, with regard to the employment of homosexuals in the army. Their activities are neither forbidden, neither protected, nor sympathised with. If homosexuals discreetly keep themselves to themselves then they can serve within the military. The critical issue is whether homosexuals harass other members of their unit.

## Luxembourg

Homosexuals are not banned from service in the military. The latter is a voluntary obligation and enlistees are not questioned about their sexual orientation. As in Belgium, *inter alia*, improper conduct, however, continues to be a punishable offence.

## Netherlands

The civil law of the Netherlands grants equal status to homosexuality and heterosexuality for the Basic Law prohibits discrimination for any reason. There are no separate articles in Military Laws and Regulations which affect homosexuals. Dutch law permit members of the armed services to engage in consensual homosexual relationships when off duty and away from military premises, be it with a civilian, or a member of the armed services of same or another rank. Not only does a union exist to represent homosexuals in the armed forces but legislation is pending which will extend specific benefits to homosexual partners. Courses in human resource management (HRM) for commanding officers are designed to consider the problems faced by homosexuals within the organization.

## Norway

As long as homosexual behaviour does not involve sexual acts against minors, Norwegian Civil Laws and Military Laws and Regulations do not make it a criminal offence to be a homosexual or to indulge in homosexual behaviour. Homosexuality is not considered a security risk. Homosexuality within the military is also considered not to be a relevant issue (vide France) and recruits are not questioned about their sexual orientation. As elsewhere (vide Belgium, Luxembourg, The Netherlands) improper behaviour in either homosexual or heterosexual situations is considered to be contrary to good order and discipline. The status of homosexuals in the military, however, is far from certain for discussions continue to take place about the extension of such personnel benefits

11

ARI 060771

*Comparative International Military Personnel Policies*

as living allowances and military housing allowances to homosexual partnerships. Sexual orientation is considered to be a purely personal issue.

### Spain

The Spanish Parliament has approved the repeal of article 352 of the Military Justice Code, so decriminalising homosexual acts by military personnel (28 December 1984). The consequent absence of legislation governing the employment of homosexuals in armed forces reflects the belief that sexual preference is a matter of individual choice.

19.2    <u>Limited Tolerance</u>

For some countries, liberal policies which allow homosexuals to serve openly within the armed forces without any constraints are not acceptable. In particular, full equality of treatment is rejected. At the same time this rejection is not extended to the point where homosexuals in the military are proscribed. "Limited tolerance" accordingly represents a middle position in which although homosexuality is not a civilian offence, the full integration of homosexuals into the armed forces does not occur. The position is clearly seen in the <u>Bundeswehr</u>.

### Germany

Membership of the armed forces is open to homosexuals and homosexuality cannot be advanced as a reason for avoiding the draft. Potential gay conscripts, however, who claim that service would be psychologically harmful are boarded and may be given alternative forms of mandatory national service. Yet whilst it is claimed that homosexuals and heterosexuals are treated equally, the former are either barred from serving as officers or find that promotion is blocked. This discrimination also extends to access to information with the highest security classifications. As in other countries, sexual harassment is a disciplinary offence irrespective of the sexuality of individuals.

### Israel

Although Judaism considers homosexuality to be an aberration, no conscript is asked about sexual preferences. Under a 1983 military order, those who acknowledge or are suspected of homosexual tendencies are referred for psychological testing. This is aimed at determining whether an individual's sexual

12

ARI 060772

orientation is an isolated phenomenon or whether it is indicative of a pattern of behaviour which would constitute a security or operational risk. For those identified as a risk, limitations are placed on their employment. Reuven Gal, director of the Israeli Institute of Military Studies, notes that

> "there will be an indicator in his file that limits him from serving with specific units, such as intelligence - or in small units where the closeness of living accommodation is so tight and limited it may create problems."[10]

19.3   **Absolute Prohibition**

Although gay and lesbian support organisations and pressure groups argue that homosexuality should no longer be a bar to membership of the armed forces, there are still some instances where governments refuse to acknowledge that the military should accept homosexuals or homosexual activity. The reasons why such activity is thought to be acceptable or unacceptable have been discussed at some length and it is not the intention of this Report to rehearse these arguments. What can be concluded, nevertheless, is that there are a number of countries in which it is accepted as a matter of policy that homosexual activity is not compatible with service in the armed forces. In some instances this is a total ban which is accompanied by criminal prosecution for a breach of national legislation or derived military law; in a few cases, the military has been forced to accept that the decriminalisation of homosexual activity between consenting adults has equally amended military law.

**Ireland**

Homosexuals are prohibited from serving in the military.

**Italy**

The ban on the recruitment or retention of homosexuals in the military on the grounds that they are unfit for service seemingly reflects a religious tradition (vide Ireland). Homosexual behaviour is also seen to be a psychiactric problem.

13

ARI 060773

*Comparative International Military Personnel Policies*

### United Kingdom

On the repeal of the special provisions of Section 1(5) of the <u>Sexual Offences Act</u> 1967, military law in the United Kingdom came into line with civil law which stipulated that homosexual acts undertaken in private between two consenting males over the age of 21 shall not be a criminal offence.

- ❑    Homosexual acts where one party is under the age of 21 continue to be a criminal offence under both military and civil law.

- ❑    Lesbian acts did not and do not constitute a criminal offence.

It remains, however, the policy of the Ministry of Defence not to accept homosexual activity within the armed forces. Service personnel who are involved in homosexual activcity will continue as previously, to be administratively discharged, irrespective of whether any criminal offence has taken place.[11]

20.     **<u>Practices</u>**

The policies which apply to the status of homosexuals within armed forces in Western industrialized society are complemented by a complex set of <u>practices</u>. The latter, as have been noted are a reflection of the culture of both the military and the parent society. Practices can be grouped under three headings:

- ❑    Negative practices

- ❑    Positive practices

- ❑    Neutral practices

In addition, they may be <u>formal</u> or <u>informal</u>.

21.     The relationship of these <u>practices</u> to <u>policies</u> is shown in Figure 1.

**<u>Figure 1</u>**

14

ARI 060774

POLICES

|  | PROHIBITION | TOLERANCE | EQUALITY |
|---|---|---|---|
| NEGATIVE |  |  |  |
| POSITIVE |  |  |  |
| NEUTRAL |  |  |  |

PRACTICES

The problems which are faced by contemporary military organizations can be located within the interaction of these variables.

22.    Negative practices constrain the employment of homosexuals in the military. They are essentially prohibitory although they can be distinguished from the implementation of a legal process which criminalizes homosexuality.

22.1    Formal negative practices revolve around the use of administrative or medical sanctions. The latter as in the case of Italy, start from the premise that homosexuality is a form of psychological deviancy. Homosexuals are deemed medically unsuitable for military service. On the basis of a medical examination, conscripts, for example, will be found illegible for service if they are found to have "behavioural anomalies" resulting from their sexual orientation. In Belgium, where homosexuality does not in itself exempt Belgians from the draft, accompanying psychological disorder as determined by clinical evaluation will exclude homosexuals from the military.

22.2    Administrative sanctions are particularly used in the United Kingdom

15

ARI 060775

*Comparative International Military Personnel Policies*

where notwithstanding the amendment of the <u>Sexual Offences Act 1967</u>, it is still held that homosexual activity is incompatible with service in the armed forces. Although criminal proceedings will not be taken against servicemen and women for homosexual acts that are not criminal offences in civilian law, such individuals are discharged from the military. There is, however, no question of their having a criminal record on account of their homosexuality.

22.3    Administrative discharge may also be the practice where improper conduct is deemed to be a breach of service discipline. Offences such as coercion or harassment irrespective of whether the associated sexual relationship is homosexual or heterosexual, continue to be punished as "conduct prejudicial to good order and discipline". The latter term can have a wider interpretation to include conduct such as a sexual relationship between service personnel of different ranks although such a relationship would not be an offence in a civilian organization. The United Kingdom also stipulates that major breaches of these rules on conduct will constitute offences punishable by court-martial as an alternative to administrative discharge.

22.4    <u>Informal</u> negative practices reflect directly the culture of the group or sub-group within the military. They include such behaviour on the one hand as a mild form of hazing to "gay-bashing" on the other. They include the exercise of other forms of peer pressure such as exclusion from the group to enforce a cultural norm on group members. The crux of this norm is the aim of maintaining of a sense of group solidarity which sees homosexual activities as a source of difficulties for the community and a threat to the military masculine self-image.

23.    <u>Positive practices</u> are the steps taken by military organizations to facilitate the employment of homosexuals within armed forces. The primary objective is to attain a position of status equality for homosexuals and heterosexuals. Pressure to promote such practices stems initially from three quarters:

23.1    The effect of changes in military legislation consequent upon changes to national legislation designed to promote equal rights for individuals irrespective of race, gender or sexual preferences.

23.2    The insistence by interest groups that discrimination against homosexuals in the military should end.

16

**ARI 060776**

23.3    As a reaction to homophobic violence. Since this can be disruptive within military units, positive practices are considered to be a means of maintaining a sense of group cohesiveness.

24.    A clear example of positive practices is the provision in the Netherlands of courses in human relations for commanding officers; these are designed inter alia to provide guidance in coping with homosexual issues (see paragraph 23.3 supra). A second instance is the extension to homosexual partnerships of the material advantages enjoyed by heterosexuals. In Norway, for instance, the ruling minority government proposes to allow gay and lesbian couples to marry and to extend to them such benefits as living allowances and military housing allowances.[12] This accords very closely with the pressure which is noted at paras 22.1 and 22.2 supra. Additionally, for the Netherlands, a political philosophy which in the past encouraged the creation of trade unions to represent the interest of members of the armed forces, has been extended to facilitate the establishment of a union to represent homosexuals in the military. [See Annex A]

25.    For some armed forces, a critical issue continues to be the extent to which homophobia violence, either explicit or implicit, is indicative of a lessening of group cohesiveness of a military formation. A traditional evaluation of the problem argues that such violence is a reflection of the degree to which the presence of homosexuals in a military formation will, as the US Secretary of the Navy commented in 1981 in another context, adversely affect discipline, order, morale, trust, and confidence among service members or impair the system of rank and command.[13] Positive practices in this context are accordingly designed to reduce the degree of tension which occurs. They also provide the basis for an alternative evaluation of the effect upon group cohesiveness of the presence within a military unit of a number of homosexuals.

26.    Neutral practices recognise, and are a reflection of, a culturally determined position in which homosexuality in armed forces is not seen to be a major issue. A major feature of these neutral practices is the absence within the military of any legislation or written codes which govern the status of homosexuals within armed forces. This is the position in Denmark, as well as in France, Portugal and Spain where the national legal code reflects the rejection in the nineteenth century of traditional laws of governing homosexuality.[14] It is to be noted that in the Netherlands, this departure from a long-standing legal tradition has led to the Basic Law which prohibits discrimination for any reason. In this instance, however, as in Norway where the freedom within the military of heterosexual relationships has been extended to homosexual, the concept of neutral practices merges with

17

ARI 060777

*Comparative International Military Personnel Policies*

<u>positive</u> practices.

26.1    Neutral practices are also to be seen in those countries such as Norway, Denmark, Luxembourg and Belgium where no one entering the armed forces is asked about their sexual orientation.  This reflects the belief that sexuality is a personal, private matter.

27.    In summary, it is evident that the practices of military organizations in Western industrialized society can be located along a continuum which ranges from the negative practices designed to exclude homosexuals to positive practices aimed at facilitating their integration into the military.  For the majority of national armed forces, the exercise of neutral practices reflects a position in which homosexuality in the military is not seen to be an issue.

18

ARI 060778

# References

1    Hockey, John, Squaddies: portrait of a subculture. Exeter: Exeter University
     Press, 1986, pp37-8. Hockey suggests that the qualities demanded changed little
     over forty years (HMSO, Physical and Recreational Training; London, 1941).
     The perceived link or negative association between inadequate military
     performance on a femininity is discussed in Eisenhart R Wayne, "You can't Hack it
     Little Girl: A Discussion of the Covert Psychological Agenda of Modern Combat
     Training", Journal of Social Issues (1975: 31, 412-32).

2    'Nonconforming Sexual Orientations and Military Suitability'. US Government
     Document PERS-TR-89-002 (December, 1988).

3    Evidence from Commodore Bjarne Eia, Attache, Royal Norwegian Embassy,
     London, Annex A to the Select Committee on the Armed Forces Bill (United
     Kingdom, 1992).

4    Army Times, January 11, 1993, p16.

5    Annex B to the Report of the Select Committee on the Armed Forces Bill (1992),
     para 38.

6    Navy Times, January 11, 1993, p14.

7    Quoted: Navy Times, January 11, 1993, p12. Dr Gal confirms this in a personal
     communication of 1 April 1993. He notes that officially homosexuals are not
     exempted from service in the IDF. But they might (not always and not in all cases)
     be limited in their placements.

8    See, for example, the bibliography in Humphrey MA My Country, My Right to
     Serve, New York: Harper Collins, 1990.

9    Report of the Select Committee on the Armed Forces Bill (1992), Hansard 17 June
     1992, para 989.

10   Op cit  para 992.

19

ARI 060779



FUTURE ORGANIZATIONAL CHANGE - U.S. ARMY

FOCUS ARMY TASK FORCE

DOCUMENTATION BOOK

BACKGROUND

The purpose of this book is to provide a central reference for the work performed by the FOCUS Army Task Force from January - July 1993.  The purpose of the task force was to provide a rapid response to requirements from the Chief of Staff, US Army concerning the proposal, by President Clinton, to lift the ban on homosexuals from serving openly in the Armed Forces.

The Army Research Institute, under the direction of Dr. Edgar Johnson, quickly assembled a task force, headed by Dr. Michael Sanders of the ARI Fort Gordon Field Unit, in preparation for planned focus groups, surveys, literature surveys, etc., as required by the CSA.  Dr. Robert Wisher served as deputy task force leader.  The task force was under the operational control of Dr. Zita Simutis.    Dr. Paul Gade played a key role in coordinating technical support, and Drs. Morris Peterson and Jacqueline Mottern provided technical expertise in the development of a survey.    A complete list of task force members is provided in Tab C.

Due to decisions at senior levels, ARI was never given the "green light" to pursue the tasking to the full extent.  In particular, there were stringent restrictions on seeking attitudes and opinions, through surveys or discussion groups, from service members.  Although the task force was not able to pursue its planned objectives, there was a subtantial investment in plans, literature reviews, and reports that deserve being unified in a singular souce.

This book was assembled by Ms. Lisa Drexler, a research fellow with the Consortium of Universities of the Washington Metropolitan Area, under the direction of Dr. Robert Wisher.  Dr. Michael Sanders provided a thorough review of the documents.

ARI 062124

Active Duty Separations
By Service & ISC
As of: FY 2008

| Grade | ISC | Sep Reason | Army | Navy | Marine Corps | Air Force | Total |
|---|---|---|---|---|---|---|---|
| | | | | | Service | | |
| Enlisted | 1 | Expiration of term of service | 20,403 | 17,745 | 15,265 | 12,145 | 65,558 |
| | 2 | Early release, insufficient retainability | 38 | 0 | | 18 | 56 |
| | 3 | Early release, to attend school | 515 | 853 | 276 | 123 | 1,767 |
| | 5 | Early release, in the national interest | 34 | 22 | 1 | 894 | 951 |
| | 8 | Early release, other, incl. RIF, VSI, & SSB | 4 | 536 | 3 | 70 | 613 |
| | 10 | Condition existing prior to service | 312 | 107 | 89 | 102 | 610 |
| | 11 | Disability, severance pay | 4,541 | 658 | 724 | 762 | 6,685 |
| | 12 | Permanent disability retirement | 674 | 27 | 34 | 386 | 1,121 |
| | 13 | Temporary disability retirement | 1,685 | 628 | 602 | 802 | 3,717 |
| | 14 | DISAB, no condtn exstng prior SVC no sev pay | 4 | 4 | 30 | 0 | 38 |
| | 16 | Unqualified for active duty, other | 2,818 | 2,263 | 1,418 | 1,069 | 7,568 |
| | 17 | Failure to meet weight or body fat standards | 3,793 | 504 | 68 | 125 | 4,490 |
| | 22 | Dependency or hardship | 345 | 108 | 40 | 168 | 661 |
| | 30 | Death, battle casualty | 264 | 12 | 33 | 0 | 309 |
| | 31 | Death, non-battle, disease | 43 | 0 | 5 | 0 | 48 |
| | 32 | Death, non-battle, other | 351 | 188 | 135 | 0 | 674 |
| | 33 | Death, cause not specified | 0 | 0 | 0 | 98 | 98 |
| | 40 | Officer commissioning program | 4,615 | 1,096 | 1,153 | 494 | 7,358 |
| | 42 | Military service academy | 0 | 206 | 25 | 174 | 405 |
| | 50 | Retirement, 20 to 30 years of service | 6,934 | 7,760 | 1,389 | 6,070 | 22,153 |
| | 51 | Retirement, over 30 years of service | 0 | 4 | 133 | 892 | 1,029 |
| | 52 | Retirement, other | 45 | 0 | 14 | 0 | 59 |
| | 60 | Character or behavior disorder | 633 | 964 | 397 | 1,196 | 3,190 |
| | 64 | Alcoholism | 201 | 500 | 23 | 56 | 780 |
| | 65 | Discreditable incidents, civiln or military | 1,926 | 906 | 312 | 110 | 3,254 |
| | 67 | Drugs | 2,278 | 1,551 | 1,191 | 486 | 5,506 |
| | 71 | Civil court conviction | 125 | 75 | 6 | 23 | 229 |
| | 72 | Security | 4 | 0 | 2 | 0 | 6 |
| | 73 | Court-martial | 206 | 257 | 875 | 270 | 1,608 |
| | 74 | Fraudulent entry | 79 | 1,269 | 1,454 | 348 | 3,150 |

DMDC - 000003

| | | | | | |
|---|---|---|---|---|---|
| 51 | Retirement, over 30 years of service | 13 | 113 | 39 | 581 | 746 |
| 52 | Retirement, other | 107 | 25 | 36 | 7 | 175 |
| 53 | Retirement, failure of selection 4 promotin | 0 | 1 | 49 | 0 | 50 |
| 60 | Character or behavior disorder | 0 | 15 | 1 | 7 | 23 |
| 61 | Motivational problems (apathy) | 32 | 6 | 3 | 3 | 44 |
| 63 | Failure of course of instruction | 19 | 1 | 7 | 0 | 27 |
| 64 | Alcoholism | 0 | 1 | 1 | 0 | 2 |
| 65 | Discreditable incidents, civilian or military | 0 | 1 | 0 | 0 | 1 |
| 67 | Drugs | 0 | 3 | 0 | 1 | 4 |
| 71 | Civil court conviction | 2 | 0 | 0 | 0 | 2 |
| 72 | Security | 3 | 0 | 0 | 0 | 3 |
| 73 | Court-martial | 6 | 13 | 10 | 8 | 37 |
| 74 | Fraudulent entry | 3 | 0 | 0 | 0 | 3 |
| 76 | Homosexuality | 2 | 1 | 2 | 8 | 13 |
| 77 | Sexual perversion | 0 | 2 | 0 | 0 | 2 |
| 79 | Failure of selection for promotion | 44 | 96 | 32 | 68 | 240 |
| 81 | Unfitness or unacceptable conduct, other | 97 | 51 | 20 | 5 | 173 |
| 84 | Commission of a serious offense | 0 | 15 | 0 | 21 | 36 |
| 90 | Secretarial authority | 0 | 16 | 4 | 6 | 26 |
| 94 | Pregnancy | 1 | 0 | 0 | 23 | 24 |
| 96 | Conscientious objector | 2 | 0 | 1 | 1 | 4 |
| 97 | Parenthood | 0 | 3 | 0 | 0 | 3 |
| 99 | Other | 2 | 0 | 0 | 6 | 8 |
| | Total | 6,380 | 4,126 | 1,511 | 4,898 | 16,915 |
| | Total | 70,750 | 47,794 | 30,405 | 35,981 | 184,930 |

DMDC - 000004

LCR Appendix Page 1757

## HYPOTHETICAL TEACHING SCENARIOS FOR COMMANDERS AND PERSONNEL INVOLVED IN RECRUITING, ACCESSION PROCESSING, CRIMINAL INVESTIGATIONS, AND ADMINISTRATIVE SEPARATIONS

The following hypothetical scenarios are for training purposes only. They are not meant to prescribe "correct" outcomes, but to illustrate how relevant personnel should approach issues that may arise under the DoD policy on homosexual conduct in the Armed Forces. The scenarios do not establish any evidentiary standards or create any substantive or procedural rights.

1. Situation: During a commander's "open-door" period, a young Service member comes into the commander's office and states that he believes he may be homosexual. The commander advises the Service member of the military's policy on homosexual conduct, and the Service member replies, "Maybe I shouldn't say anything else." The commander advises him he might wish to discuss the matter with the chaplain.

Issues: The commander wonders whether he should initiate separation action on the basis of the Service member's statement that he believes he may be a homosexual. Should he refer the case to a Military Criminal Investigative Organization (MCIO) for an investigation to determine if the Service member has committed any homosexual acts since entering the service? Should he initiate a commander's inquiry to determine if grounds for administrative separation exist?

Discussion: While the Service member's commander may initiate a commander's inquiry based on the Service member's statement that he believes he may be a homosexual, he probably would not at this time. The statement, by itself, is ambiguous and quite possibly could indicate a young Service member's confusion over some aspect of his sexual identity. It is not at all clear that the Service member intended to make a statement that he is homosexual.

Since the Service member has not indicated that he has committed any criminal act, this case should not be referred to any military law enforcement agency. Had the Service member stated he had engaged in a homosexual act or acts, the commander would also advise the Service member of his rights under Article 31b of the UCMJ.

Navy 058969

2. <u>Situation</u>: An officer observes two male junior enlisted Service members walking and holding hands while off-duty and on liberty. The Service members are wearing civilian clothes and are in an isolated wooded public park and, except for the officer, they are alone. He reports the incident to the commanding officer (CO) and adds that he is surprised to find out they appear to be homosexuals. He asks the CO what he proposes to do about the incident. The CO decides he will call the two Service members into his office, separately, and ask them about the officer's observations.

     <u>Issue</u>: Was the CO's action appropriate? If not, what action should he have taken?

     <u>Discussion</u>: The officer's observation of the two enlisted Service members walking and holding hands in the park constitutes credible information of homosexual conduct if the officer is someone the CO otherwise trusts and believes. The two Service members' hand-holding in these circumstances indicates a homosexual act and therefore the commanding officer may follow-up and inquire further. Probably, the extent of the inquiry will be two confidential one-on-one conferences between the CO and the two Service members to inquire into the incident.

     Before the Service members are asked to discuss or explain the incident, the CO should advise them of the military's policy on homosexual conduct. Should they decline to discuss the matter, the questioning should stop. At that point, the CO may consider other relevant information and decide whether to initiate administrative separation actions based on the information he possesses.

Navy 058970

3. <u>Situation</u>:  A Service member has been observed entering, leaving, and generally "hanging around" a downtown gay bar.  The commander is notified of the observations but isn't sure what action, if any,  she should take.


    <u>Issues</u>:  What should the commander do?  Can the commander administratively discharge the Service member for going to a gay bar?  Should she conduct a commander's inquiry?

    <u>Discussion</u>:  Given the absence of any information, credible or otherwise, of the occurrence of either a crime or otherwise proscribed conduct, the commander should not begin an inquiry into this matter.  Going to a gay bar is not a crime, nor does it, in itself, constitute a "nonverbal statement" by the Service member that he is a homosexual.  A commander may begin an inquiry, however, if a member engages in behavior that a reasonable person would believe is intended to convey the statement that the member is a homosexual or bisexual.  The commander in this case may wish to point out to her subordinate that his favorite club is known to be an establishment catering to homosexuals.

4. <u>Situation</u>: A Service member tells his commanding officer (CO) that he is a homosexual. Based on the Service member's statement of his homosexuality, his CO begins immediately to process the Service member for separation from the service . Three days later, the Service member complains that he has been receiving both written and spoken threats from unidentified Service members who are apparently aware of his homosexuality, and who have stated they are going to beat him up.

   <u>Issue</u>: What actions should the Service member's CO take?

   <u>Discussion</u>: The CO should ask for investigative assistance from the Military Criminal Investigative Organization with respect to the threat and take all reasonable means to protect the safety of the Service member, as he would any other Service member under his command. The CO should initiate a criminal investigation into the threats received by the Service member.

   The Service member's statement that he is a homosexual should not be investigated by the MCIO because a statement that a member is a homosexual does not, by itself, constitute credible information of a crime. The CO is appropriately initiating action under the Service's administrative separation procedures.

   The CO may consider transferring the Service member to another location. His final decision on this matter would depend on the nature of the threats and the investigative findings.

5. <u>Situation</u>: A metropolitan area publication, oriented to the activities and interests of the area's homosexual community, prints a story under the headline, "Gays in Government," purporting to list government workers believed to be homosexuals. The story contains the names of two enlisted Service members stationed at a nearby military installation. The Service members' commander receives an anonymous letter containing a copy of the article "Gays in Government" and after reading it wonders whether he should conduct an inquiry into the matter or begin administrative separation action on the two Service members for homosexuality. He has never before seen a copy of the publication that printed the article and the story gives no supporting documentation for why any of the individuals listed were believed to be homosexual.

     <u>Issue</u>: What action should the commander take in regard to the purported "outing" of the two enlisted Service members?

     <u>Discussion</u>: The commander should not initiate any inquiry based on the article. The article purports to identify the two Service members as homosexuals, but does not allege any criminal or otherwise proscribed homosexual conduct. A commander should begin an inquiry only if he has credible information indicating proscribed homosexual conduct.

     The commander might call the two Service members into his office separately, advise them of the article, and remind them of the DoD policy regarding homosexual conduct. He should advise them that he is conducting no further inquiry into the matter at this time and will consider the matter closed, unless he receives credible information of proscribed homosexual conduct.

**Navy 058973**

6. <u>Situation</u>:  A noncommissioned officer (NCO) is watching the local TV news coverage of the gay rights parade when he notices a female Service member assigned to his unit marching in the parade in civilian clothes, carrying a handmade placard.  As the television camera zooms in on the Service member's sign, the NCO can clearly read the handwritten words "Lesbians in the military say, 'Lift the Ban!'"  The next morning, the NCO reports the incident to his commander.

<u>Issue</u>:  Should the commander inquire into what meaning his Service member had intended to convey by carrying that particular sign in the gay rights parade?

<u>Discussion</u>:  A Service member's carrying of a banner or sign in a gay rights activity would not in and of itself constitute credible information indicating proscribed homosexual conduct.  In this case, however, the Service member chose to carry a sign that could reasonably be interpreted as making a statement that she is a homosexual.  It would be reasonable for her commander to inquire whether the Service member's actions were intended to inform the public that she was a "lesbian Service member."

A Service member's statement that he or she is a homosexual, or words to that effect, is evidence that the Service member engages in homosexual acts or has an intent or propensity to do so.  Therefore, the commander may inquire into the incident further.  Before questioning his subordinate about the incident, the commander should advise her of the military's policy on homosexual conduct.  Should the Service member choose not to discuss the matter further, the discussion should end.  The commander would then decide whether to initiate administrative discharge procedures based on the information provided by the NCO.

Navy 058974



THE SECRETARY OF DEFENSE

WASHINGTON, THE DISTRICT OF COLUMBIA

August 26, 1993

Honorable Richard Shelby
U.S. Senate
509 Hart Senate Office Building
Washington, D.C. 20510

Dear Richard:

With this letter I am transmitting copies of the Summary Report of the Military Working Group and the Rand report on its research and analysis entitled "Sexual Orientation and U.S. Military Personnel Policy: Options and Assessments."

These documents formed the basis for the new policy giving the opportunity to serve to those who, as the President put it, " are willing to play by the rules, able to serve and make a contribution."

As is generally known, the recommendations of the Military Working Group provided the basic approach to the issue from which the specifics of this new policy on homosexuals in the military were developed. Less well known is the role of the work done by Rand that is now recorded in its final report.

What Rand's systematic research and analysis showed was that a policy change could be successfully implemented. That research and analysis was available to policy makers in the form of briefings prior to formulation of the new policy. Here are some of the pertinent points we drew from Rand's work during our deliberations:

o    "[T]here is ample reason to believe that heterosexual and homosexual military personnel can work together effectively."

o    Task cohesion in a unit, the ability to work together to accomplish a mission, is a more important factor in mission success than social cohesion, which relates to personal friendship and association.

o    There is no reason to expect a reduction in enlistments following a change in the policy regarding service by homosexuals.

There were many more, of course. For the future, Rand's proposal for a code of conduct may have broader application than the issue of homosexuals in the military. Changes in gender status and relations going on now in the armed services suggest that a clear, fair set of rules on conduct could benefit everyone.

Sincerely,

OSD P&R 007428



OFFICE OF THE SECRETARY OF DEFENSE

WASHINGTON. DC  20301·1000

MEMORANDUM FOR THE SECRETARY OF DEFENSE

SUBJECT:  Recommended DoD Homosexual Policy

Reference:  OSD Working Group memorandum, 8 June 1993, "Recommended DoD
Homosexual Policy Outline"

On 8 June, we forwarded a recommended policy outline (reference) describing, in our judgement, the only option that complies with the President's direction to end discrimination while maintaining high standards of combat effectiveness and unit cohesion.  The attachment provides a more in-depth explanation of the policy detailing the process and explaining the findings and conclusions that led to our recommendation.

JOHN P. OTJEN
Major General, USA
Member, OSD Working Group

JOHN SCOTT REDD
Rear Admiral, USN
Member, OSD Working Group

WILLIAM B. DAVITTE
Major General, USAF
Member, OSD Working Group

JAMES M. LOY
Rear Admiral, USCG
Member, OSD Working Group

GERALD L. MILLER
Brigadier General, USMC
Member, OSD Working Group

Attachment

OSD P&R 007429

# OFFICE OF THE SECRETARY OF DEFENSE

# SUMMARY REPORT OF THE MILITARY WORKING GROUP



# 1130 1 JULY 1993

OSD P&R 007430

# CONTENTS

SECTION:                                                    PAGE:

I.   Background                                               1

II.  Process                                                 3

III. Findings                                                5

IV.  Conclusions                                            12

V.   The Recommended Policy                                 13

OSD P&R 007431

# I. BACKGROUND

## A. Guidance

1. On 29 January 1993, the President directed the Secretary of Defense to develop a policy "ending discrimination on the basis of sexual orientation in determining who may serve in the Armed Forces of the United States." The President further directed that the policy be implemented in a manner that is "practical, realistic, and consistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain."

2. On 5 April 1993, the Secretary of Defense directed that a Military Working Group (MWG) be formed to develop and assess alternative policy options to meet the President's requirements.

## B. Perspective in formulating this policy.

Although the all volunteer military is drawn from civilian society, and generally reflects society's norms, the military institution differs in several important ways. These differences were an essential part of MWG's perspective in formulating this policy.

1. *Military mission.* Ultimately, the military's mission is to fight and win the nation's wars.

   a. The "terms of employment" for an individual servicemember include the real possibility that he or she will be called upon to make the ultimate sacrifice in service to our country. For military leaders, the moral imperative is to accomplish the mission with the least loss of life possible. Accordingly, any change to the military institution must be weighed in light of this responsibility.

   b. Similarly, there is no "right to serve" in the Armed Forces. Military service is clearly a privilege afforded only to those who are qualified. There are many features that are disqualifying, such as height, weight, prior conduct record, membership in groups with certain objectives, or mental category. These disqualifying factors are directly related to combat effectiveness and apply whether the force is all-volunteer or conscript.

2. *Institutional values.* Values are important to any institution, but they

1

OSD P&R 007432

# II. PROCESS

**A. Composition and organization.** The MWG, composed of a general or flag officer from each Service and a support staff of approximately 50 officers, enlisted personnel, and civilian employees convened on 6 April 1993. To facilitate examination of various options, the staff was organized into four functional panels: military operations, service life, personnel policy, and legal.

**B. Policy boundaries.** The MWG worked within specific limitations which were confirmed with the Office of the Secretary of Defense. Returning to the pre-29 January 1993 policy of "asking the question" was not an option; nor was changing the Uniform Code of Military Justice. These limitations defined the boundaries within which the MWG developed its recommended options.

**C. Deliberations.** Fairness and objectivity were major aims of the MWG's process. In pursuit of those aims, the MWG met with individuals and groups holding a broad spectrum of views on the subject. This included meetings with uniformed and civilian experts from inside and outside the Department of Defense (DoD), including the soldiers, sailors, airmen, Marines, and Coast Guardsmen who would be most affected by the policy. To broaden understanding of the issue, the MWG also compared experiences of the militaries of other countries, researched available literature, and performed statistical analyses of military separation data obtained from the Services.

**D. Results.** Several policy options were developed and assessed. After extensive review and consultation, the MWG ultimately focused on a single policy recommendation and a plan to implement that policy. This policy, discussed in detail below, meets the President's guidance, maintains combat effectiveness, and is sustainable for the foreseeable future.

**E. Definitions.** The public debate over homosexuals in the military has often been further confused by a lack of a common usage of terms. For clarity, the MWG used the following definitions:

   1. *Bisexual.* A person who engages in, desires to engage in, or intends to engage in both homosexual and heterosexual acts. (DoDDir 1332.14 of 28 January 1982)

OSD P&R 007433

## III. FINDINGS

Following extensive review, the MWG made the following findings:

**A. Combat effectiveness.** The Armed Forces of the United States serve an important role in our society by furthering our national interests abroad, defending our borders, and protecting the American way of life. To accomplish this unique mission, the military must be fully combat effective. Combat effectiveness is the *sine qua non* of any armed force and any prospective change must be assessed first and foremost in light of its effect on the military's ability to fight. High combat effectiveness embodies a synergistic mix that can be best expressed as the product of unit cohesion and readiness.

   *1. Unit cohesion.* Unit cohesion encompasses a number of factors which, although often intangible, are fundamental to combat effectiveness. These include:

      **a. Bonding.** The essence of unit cohesion is the bonding between members of a unit which holds them together, sustains their will to support each other, and enables them to fight together under the stress and chaos of war. The MWG found that the presence of open homosexuals in a unit would, in general, polarize and fragment the unit and destroy the bonding and singleness of purpose required for effective military operations. This phenomenon occurs whether or not homosexual acts are involved. By simply stating that he or she is a homosexual, the individual becomes isolated from the group and combat effectiveness suffers.

      **b. Leadership.** In addition to tactical and technical competency, effective leadership depends on mutual respect, fairness, and concern for the well-being of subordinates. If the values and lifestyle of a leader are perceived as contrary to those of the unit, the leader will be, at best, ineffective. That ineffectiveness would be further undermined by perceptions of unfairness or fraternization. The MWG found it would be extremely difficult for an open homosexual to exercise authority or serve effectively as a leader in the Armed Forces of the United States.

      **c. Good order and discipline.** Good order and discipline refers to behavior based on respect for authority, other servicemembers, established laws, and regulations and is critical for the effectiveness of leadership and the ability of the unit to carry out its mission. Information presented to the

OSD P&R 007434

AIDS could create the perception of an "enemy within" which has the potential to harm not only other servicemembers, but family members as well.

b. Recruiting. Open homosexuality in the military would likely reduce the propensity of many young men and women to enlist due to parental concerns, peer pressure, and a military image that would be tarnished in the eyes of much of the population from which we recruit.

c. Retention. Discharges for homosexual conduct account for only about one-third of one percent of all United States military discharges. Conversely, recent surveys indicate a significant number of servicemembers say they would not reenlist if open homosexuals were allowed to serve. These views were supported by military personnel who appeared before the MWG. Of note, the members most likely to leave the service would be those with the best options for employment elsewhere -- i.e., the most skilled -- and those with strong moral beliefs.

3. *All homosexuality is incompatible with military service.* The effect on combat effectiveness is not limited to known homosexuals.

a. Even if officially unknown, individuals who engage in homosexual conduct can undermine combat effectiveness through, for example, high risk behavior and the formation of "sub-cultures" outside the chain of command. Further, they may not remain unknown over the course of several years of an enlistment or for a full military career. For example, an "unknown" homosexual can become "known" overnight as a result of a police blotter entry or any other incident by which his or her homosexuality becomes officially known. The resultant effect on readiness can thus manifest itself quickly and without warning.

b. Currently unknown and non-practicing homosexuals are also cause for concern. Homosexual activist groups argue that the productivity of individual homosexuals is reduced by virtue of having to hide their true orientation. While the immediate impact on combat effectiveness for those individuals is limited, it nonetheless exists. Further, by definition, even non-practicing homosexuals either intend to engage in homosexual acts or desire to engage in homosexual acts. Some may remain celibate for a time, but it is reasonable to presume that, over a period of years, many will engage in homosexual conduct.

c. The salient point is that what the military doesn't know can -- and over time will -- negatively impact combat effectiveness. While the

7

OSD P&R 007435

overall combat effectiveness associated with assigning open homosexuals to units that require higher degrees of cohesion (e.g., combat units, special forces) or close quarters berthing. On the other hand, restricting their assignments would cause resentment among those who must serve in their place while tending to concentrate open homosexuals into a narrow selection of skill fields. Since assignment to combat skills and combatant vessels is career enhancing, excluding homosexuals from these duties would inhibit their promotion and advancement opportunities and bring a new set of problems.

c. Berthing/billeting. The presence of known homosexuals in a unit will create tension which may require them to be berthed/billeted and segregated from the remainder of the unit in order to maintain good order and discipline. This would entail additional and unbudgeted costs. On the other hand, segregating certain members of the group will isolate those individuals, possibly highlighting them as a special class, and further degrade unit cohesion. Additionally, there are situations where separate berthing/billeting -- such as aboard ships -- is not practical at any cost.

3. *Investigations*

a. DoD has no written, uniform policy guidelines for investigating cases involving allegations of homosexuality. This lack of policy may have contributed to a misperception that the military's investigative agencies conduct "witch hunts" to weed out suspected homosexuals.

b. Commanders must have the discretion to inquire and investigate when there is credible information of misconduct or basis for discharge. However, a balance must be struck. While servicemembers set aside certain individual rights while they serve, they still retain freedom from unwarranted intrusion into their private lives.

4. *Military family issues.* Service life is all encompassing. While spouses and children obviously do not serve in the Armed Forces, military policies and personnel touch every aspect of family life. Servicemembers, both single and married, are often involved as leaders in military youth activities -- for example, scouting, little league, church youth groups, and social clubs. Indeed, most Morale, Welfare, and Recreation programs rely almost exclusively on these volunteers. Many military families would object to the participation of open homosexuals in these programs -- programs to which they entrust their children. Additionally, family members are worried about the same issues that concern their military sponsors -- such as, encumbered privacy during deployments, medical risks, and the breakdown

o

OSD P&R 007436

(b)  Of those discharged for administrative or punitive reasons, only 1.5 percent were for homosexuality.

(c)  Drug and alcohol abuse discharges were nine times greater than those for homosexuality.  Overweight discharges were five times greater.

(d)  Of all discharges for homosexuality, at least 79 percent clearly involved homosexual conduct.  There was insufficient documentation to determine whether conduct was involved in the remaining 21 percent.

(2)  Similarly, a review of 1,141 military courts-martial involving Article 125 (sodomy) indicated that heterosexual sodomy cases outnumbered homosexual sodomy cases by a 4 to 1 ratio.

11

OSD P&R 007437

# V. THE RECOMMENDED POLICY

**A. Overview.** After extensive research and assessment of several options, the MWG submitted the following policy for consideration by the Secretary of Defense on 8 June 1993. In the judgement of the MWG, the policy represented the only option which complied with the President's guidance to end discrimination while maintaining high standards of combat effectiveness and unit cohesion.

**B. Key policy features**

1. Sexual orientation will be considered a personal and private matter. The Armed Forces won't ask and servicemembers will not be required to reveal their sexual orientation.

2. The presence in the Armed Forces of persons who engage in homosexual acts, who state they are homosexual or bisexual, or marry or who attempt to marry persons of the same gender remains inconsistent with the requirement to maintain high standards of combat effectiveness and unit cohesion.

3. Sexual orientation alone is not a bar to service entry or continued service unless manifested by homosexual acts, statements, or marriages.

4. Neither commander's inquiries (normally for minor offenses) nor military criminal law enforcement investigations (normally for criminal violations) will be conducted absent credible information. Commanders will continue to initiate inquiries or investigations, as deemed necessary, when credible information that a basis for discharge or disciplinary action exists.

5. Servicemembers will be discharged if they are found to have engaged in homosexual conduct.

6. An education plan will be developed to inform servicemembers, commanders, and military investigators about this policy so as to reinforce the principle that all service-members can serve without fear of unwarranted intrusion into their personal lives.

OSD P&R 007438

elements of the offense or basis for discharge. There will be no stake-outs, sting operations, or round-ups absent specific allegations of proscribed conduct.

3. *Discharge policy.* Homosexual conduct is inconsistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain. Servicemembers will be discharged if they engage in homosexual conduct. Homosexual conduct is evidenced by any act involving bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of sexual gratification, and attempts or solicitations to engage in such acts; a statement by the member that he or she is a homosexual or bisexual; or homosexual marriage or attempted homosexual marriage. Normally, administrative separations involving homosexual conduct will be under honorable conditions, unless there are aggravating circumstances -- such as acts with a minor.

4. *Education policy.* Each Service will provide training to their personnel, at every level, to explain the new policy regarding homosexuals. The DoD will provide an education plan for the Services to use as a guideline in their separate training programs. The education package will focus on the changes to the DoD policy and will not be an attempt to change any deeply held religious and ethical beliefs; that is, sensitivity training.

OSD P&R 007439

# I. BACKGROUND

## A. Guidance

1. On 29 January 1993, the President directed the Secretary of Defense to develop a policy "ending discrimination on the basis of sexual orientation in determining who may serve in the Armed Forces of the United States." The President further directed that the policy be implemented in a manner that is "practical, realistic, and consistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain."

2. On 5 April 1993, the Secretary of Defense directed that a Military Working Group (MWG) be formed to develop and assess alternative policy options to meet the President's requirements.

## B. Perspective in formulating this policy.

Although the all volunteer military is drawn from civilian society, and generally reflects society's norms, the military institution differs in several important ways. These differences were an essential part of MWG's perspective in formulating this policy.

*1. Military mission.* Ultimately, the military's mission is to fight and win the nation's wars.

a. The "terms of employment" for an individual servicemember include the real possibility that he or she will be called upon to make the ultimate sacrifice in service to our country. For military leaders, the moral imperative is to accomplish the mission with the least loss of life possible. Accordingly, any change to the military institution must be weighed in light of this responsibility.

b. Similarly, there is no "right to serve" in the Armed Forces. Military service is clearly a privilege afforded only to those who are qualified. There are many features that are disqualifying, such as height, weight, prior conduct record, membership in groups with certain objectives, or mental category. These disqualifying factors are directly related to combat effectiveness and apply whether the force is all-volunteer or conscript.

*2. Institutional values.* Values are important to any institution, but they

1

OSD P&R 007440

are critical to the military of a democratic nation.

a.  The nation calls upon its military to be prepared to kill and destroy -- acts which, in any other context, would be immoral.  The shared moral values of the institution -- the collective sense of right and wrong -- provide the foundation which ensures that license will not be abused.  This foundation is the essential difference between a professional armed force and a mercenary force.  It also provides to individual servicemembers the moral basis for personal service, commitment, and sacrifice in a profession which is demanding in the extreme.

b.  As citizen soldiers, military members bring their values with them when they enter the Service.  Whether based on moral, religious, cultural, or ethical considerations, those values and beliefs are often strongly held and not amenable to change.  While we indoctrinate and train recruits, leadership and discipline cannot -- and generally should not -- attempt to counter the basic values which parents and society have taught.  Indeed, efforts to do so will likely prove counter-productive.

3.  *Military environment.*    Military operations are team operations -- units win wars, not individuals.

a.  The rights and needs of the group are emphasized while individual rights and needs are often set aside or sacrificed for military necessity.  For example, if military members aren't satisfied with the conditions of their environment, they have no right to quit and, in fact, are subject to prosecution if they do.  Similarly, members of the military often are not able to separate their private lives from their working environment.  They may be required to work, eat, recreate, sleep, and bathe in cramped spaces for prolonged periods of time, sometimes in the most remote parts of the world.  Indeed, separation of the sexes is often the only concession to privacy.

b.  In the short term, the military is facing a number of issues -- budget reductions, early retirements, reorganizations, health care worries, base closures, reductions in force -- that have had a severe negative impact on morale.  Any change in policy which would further exacerbate this "misery squeeze" must be carefully weighed.

2

OSD P&R 007441

## II. PROCESS

**A. Composition and organization.** The MWG, composed of a general or flag officer from each Service and a support staff of approximately 50 officers, enlisted personnel, and civilian employees convened on 6 April 1993. To facilitate examination of various options, the staff was organized into four functional panels: military operations, service life, personnel policy, and legal.

**B. Policy boundaries.** The MWG worked within specific limitations which were confirmed with the Office of the Secretary of Defense. Returning to the pre-29 January 1993 policy of "asking the question" was not an option; nor was changing the Uniform Code of Military Justice. These limitations defined the boundaries within which the MWG developed its recommended options.

**C. Deliberations.** Fairness and objectivity were major aims of the MWG's process. In pursuit of those aims, the MWG met with individuals and groups holding a broad spectrum of views on the subject. This included meetings with uniformed and civilian experts from inside and outside the Department of Defense (DoD), including the soldiers, sailors, airmen, Marines, and Coast Guardsmen who would be most affected by the policy. To broaden understanding of the issue, the MWG also compared experiences of the militaries of other countries, researched available literature, and performed statistical analyses of military separation data obtained from the Services.

**D. Results.** Several policy options were developed and assessed. After extensive review and consultation, the MWG ultimately focused on a single policy recommendation and a plan to implement that policy. This policy, discussed in detail below, meets the President's guidance, maintains combat effectiveness, and is sustainable for the foreseeable future.

**E. Definitions.** The public debate over homosexuals in the military has often been further confused by a lack of a common usage of terms. For clarity, the MWG used the following definitions:

   *1. Bisexual.* A person who engages in, desires to engage in, or intends to engage in both homosexual and heterosexual acts. (DoDDir 1332.14 of 28 January 1982)

3

OSD P&R 007442

2. *Homosexual.* A person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts. (DoDDir 1332.14 of 28 January 1982)

3. *Homosexual act.* Bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of satisfying sexual desires. (DoDDir 1332.14 of 28 January 1982) (This includes sodomy and acts other than sodomy, such as kissing and dancing between members of the same sex for the purpose of satisfying sexual desires.)

4. *Homosexual conduct.* Evidenced by homosexual acts and attempts or solicitations to engage in such acts, statements by a member that he or she is homosexual or bisexual, or homosexual marriage or attempted homosexual marriage. (OSD MWG)

5. *Homosexual marriage.* When a member has married, or attempted to marry, a person he or she knows to be of the same biological sex (as evidenced by external anatomy). (OSD MWG)

6. *Homosexual statement.* The member has stated that he or she is homosexual or bisexual. (DoDDir 1332.14 of 28 January 1982)

7. *Homosexuality.* The quality, condition, or fact of being a homosexual. (OSD MWG)

8. *Sexual orientation.* A sexual attraction to individuals of a particular gender. (OSD MWG)

4

OSD P&R 007443

# III.  FINDINGS

Following extensive review, the MWG made the following findings:

**A.  Combat effectiveness.**  The Armed Forces of the United States serve an important role in our society by furthering our national interests abroad, defending our borders, and protecting the American way of life.  To accomplish this unique mission, the military must be fully combat effective.  Combat effectiveness is the *sine qua non* of any armed force and any prospective change must be assessed first and foremost in light of its effect on the military's ability to fight.  High combat effectiveness embodies a synergistic mix that can be best expressed as the product of unit cohesion and readiness.

*1.  Unit cohesion.*  Unit cohesion encompasses a number of factors which, although often intangible, are fundamental to combat effectiveness.  These include:

a. <u>Bonding</u>.  The essence of unit cohesion is the bonding between members of a unit which holds them together, sustains their will to support each other, and enables them to fight together under the stress and chaos of war.  The MWG found that the presence of open homosexuals in a unit would, in general, polarize and fragment the unit and destroy the bonding and singleness of purpose required for effective military operations.  This phenomenon occurs whether or not homosexual acts are involved.  By simply stating that he or she is a homosexual, the individual becomes isolated from the group and combat effectiveness suffers.

b. <u>Leadership</u>.  In addition to tactical and technical competency, effective leadership depends on mutual respect, fairness, and concern for the well-being of subordinates.  If the values and lifestyle of a leader are perceived as contrary to those of the unit, the leader will be, at best, ineffective.  That ineffectiveness would be further undermined by perceptions of unfairness or fraternization.  The MWG found it would be extremely difficult for an open homosexual to exercise authority or serve effectively as a leader in the Armed Forces of the United States.

c. <u>Good order and discipline</u>.  Good order and discipline refers to behavior based on respect for authority, other servicemembers, established laws, and regulations and is critical for the effectiveness of leadership and the ability of the unit to carry out its mission.  Information presented to the

OSD P&R 007444

MWG clearly indicated that the introduction of individuals identified as homosexuals into the military would severely undermine good order and discipline. Moral and ethical beliefs of individuals would be brought into open conflict. Leadership priorities would, of necessity, be reoriented from training for combat to preventing internal discord. Additionally, the military would be perceived as "turning a blind eye" to conduct proscribed by the Uniform Code of Military Justice and regulations, thereby undermining the very basis for good order and discipline.

    d. <u>Privacy</u>. Sexual orientation alone is, and should remain, a personal and private matter. However, once an individual's homosexual orientation becomes known, privacy becomes a significant issue. Military members give up many rights -- including the right to free association -- upon joining the military. When deployed on ships or overseas, members often work, eat, relax, bathe, and sleep together in close proximity 24 hours a day. Further, the space individuals can call their own -- their personal sanctuary -- may be only slightly larger than a coffin. For many members, the presence of openly homosexual individuals in that environment constitutes a major and unacceptable invasion of what little privacy remains.

    e. <u>Morale</u>. Lifting the ban on homosexuals serving in the military would be perceived by many servicemembers as the imposition of a political agenda by a small group -- an agenda which is seen as having no military necessity and as being, in fact, destructive to the finest fighting force in the world. Morale would suffer accordingly.

    f. <u>Core values</u>. The core values of the military profession would be seen by many to have changed fundamentally if homosexuals were allowed to serve. This would undermine institutional loyalty and the moral basis for service, sacrifice, and commitment for those members.

    2. *Readiness*. Readiness includes traditional hardware areas such as technology, equipment, and spare parts as well as the training, education, and fitness of quality personnel. The presence of homosexuals in the military would impact readiness in several ways.

    a. <u>Medical</u>. The readiness of the military to deploy and perform its combat mission is directly linked to the medical well-being of the force. The homosexual lifestyle has been clearly documented as being unhealthy. Due to their sexual practices, active male homosexuals in the military could be expected to bring an increased incidence of sexually transmitted diseases and other diseases spread by close personal contact. Additionally, the association of the homosexual lifestyle as a high risk behavior in contracting

OSD P&R 007445

AIDS could create the perception of an "enemy within" which has the potential to harm not only other servicemembers, but family members as well.

b. Recruiting. Open homosexuality in the military would likely reduce the propensity of many young men and women to enlist due to parental concerns, peer pressure, and a military image that would be tarnished in the eyes of much of the population from which we recruit.

c. Retention. Discharges for homosexual conduct account for only about one-third of one percent of all United States military discharges. Conversely, recent surveys indicate a significant number of servicemembers say they would not reenlist if open homosexuals were allowed to serve. These views were supported by military personnel who appeared before the MWG. Of note, the members most likely to leave the service would be those with the best options for employment elsewhere -- i.e., the most skilled -- and those with strong moral beliefs.

3. *All homosexuality is incompatible with military service.* The effect on combat effectiveness is not limited to known homosexuals.

a. Even if officially unknown, individuals who engage in homosexual conduct can undermine combat effectiveness through, for example, high risk behavior and the formation of "sub-cultures" outside the chain of command. Further, they may not remain unknown over the course of several years of an enlistment or for a full military career. For example, an "unknown" homosexual can become "known" overnight as a result of a police blotter entry or any other incident by which his or her homosexuality becomes officially known. The resultant effect on readiness can thus manifest itself quickly and without warning.

b. Currently unknown and non-practicing homosexuals are also cause for concern. Homosexual activist groups argue that the productivity of individual homosexuals is reduced by virtue of having to hide their true orientation. While the immediate impact on combat effectiveness for those individuals is limited, it nonetheless exists. Further, by definition, even non-practicing homosexuals either intend to engage in homosexual acts or desire to engage in homosexual acts. Some may remain celibate for a time, but it is reasonable to presume that, over a period of years, many will engage in homosexual conduct.

c. The salient point is that what the military doesn't know can -- and over time will -- negatively impact combat effectiveness. While the

7

OSD P&R 007446

immediate effect on combat readiness varies depending on whether a homosexual is known or unknown, and whether or not the servicemember engages in homosexual conduct, it is nonetheless true that all homosexuality is incompatible with military service and has some measure of negative impact.

B. Practical considerations. In addition to the direct effects on combat effectiveness described above, a number of practical considerations were examined in assessing policy options.

1. Longevity of the policy. One of the tests for an effective policy is that it withstand the test of time.

a. A key element is the likelihood of surviving challenge in the courts. A central finding of the MWG is that statements that one is a homosexual are inextricably linked to homosexual acts. To suggest otherwise is contrary to logic, MWG research, and the publicly expressed view of homosexual advocates. Authorities on military law expressed concern that drawing an artificial distinction between homosexual statements and homosexual acts would undercut the legal precedent upholding the military's homosexual policy. Conversely, a policy which correctly includes as its underlying premise the linkage between homosexual statements and homosexual acts can draw from established precedent and is therefore likely to endure.

b. Any policy that condones homosexual conduct would require congressional action to change the Uniform Code of Military Justice. Failure to do so would establish an untenable situation, creating a perceived conflict between stated policy and military law. This would, in turn, create leadership and legal problems and ultimately would have to be resolved.

2. Personnel policies. Military personnel policies are designed by necessity to manage large groups or categories of people, as opposed to individuals, for the purpose of achieving maximum combat effectiveness. During its deliberations, the MWG found that current DoD policy, directives, and regulations regarding homosexuality generally are not well understood.

a. Accessions. The questions formerly asked during the accession process regarding an applicant's sexual orientation appear to have been ineffective either in deterring homosexuals from entering the military or in articulating DoD policy on homosexuality.

b. Assignments. The issue of assignment restrictions poses a particular dilemma. On the one hand, there are significant problems with

OSD P&R 007447

overall combat effectiveness associated with assigning open homosexuals to units that require higher degrees of cohesion (e.g., combat units, special forces) or close quarters berthing. On the other hand, restricting their assignments would cause resentment among those who must serve in their place while tending to concentrate open homosexuals into a narrow selection of skill fields. Since assignment to combat skills and combatant vessels is career enhancing, excluding homosexuals from these duties would inhibit their promotion and advancement opportunities and bring a new set of problems.

      c. <u>Berthing/billeting</u>. The presence of known homosexuals in a unit will create tension which may require them to be berthed/billeted and segregated from the remainder of the unit in order to maintain good order and discipline. This would entail additional and unbudgeted costs. On the other hand, segregating certain members of the group will isolate those individuals, possibly highlighting them as a special class, and further degrade unit cohesion. Additionally, there are situations where separate berthing/billeting -- such as aboard ships -- is not practical at any cost.

   3. *Investigations*

      a. DoD has no written, uniform policy guidelines for investigating cases involving allegations of homosexuality. This lack of policy may have contributed to a misperception that the military's investigative agencies conduct "witch hunts" to weed out suspected homosexuals.

      b. Commanders must have the discretion to inquire and investigate when there is credible information of misconduct or basis for discharge. However, a balance must be struck. While servicemembers set aside certain individual rights while they serve, they still retain freedom from unwarranted intrusion into their private lives.

   4. *Military family issues.* Service life is all encompassing. While spouses and children obviously do not serve in the Armed Forces, military policies and personnel touch every aspect of family life. Servicemembers, both single and married, are often involved as leaders in military youth activities -- for example, scouting, little league, church youth groups, and social clubs. Indeed, most Morale, Welfare, and Recreation programs rely almost exclusively on these volunteers. Many military families would object to the participation of open homosexuals in these programs -- programs to which they entrust their children. Additionally, family members are worried about the same issues that concern their military sponsors -- such as, encumbered privacy during deployments, medical risks, and the breakdown

o

OSD P&R 007448

of the unit -- because they are perceived as a threat to their loved ones.

5. *Common misperceptions concerning homosexuals and the military*

  a. Foreign militaries

    (1) The policy and practice of foreign militaries regarding homosexuals actively serving do not always match. In countries where policies are "accepting," practice typically involves exclusion of homosexuals for medical/psychological reasons. Even where policy and law allow homosexuals to serve, few servicemembers openly declare their homosexuality due to fears of baiting, bashing, and negative effects to their careers.

    (2) Extended deployments and berthing/billeting privacy are not significant issues for most foreign militaries. Additionally, no country has as high a proportion of its servicemembers billeted/berthed together on military installations and deployed aboard ships or overseas at any given time as does the United States. Most importantly, no other country has the global responsibilities, operational tempo, or worldwide deployment commitments of the Armed Forces of the United States.

  b. Police/Fire departments. Parallels cannot be accurately drawn between the experiences of police and fire departments and the Armed Forces. While there are some organizational similarities, there are also some very fundamental differences in the areas of mission and related training, deployments, work environment, authority of the commander over subordinates, living conditions, and personal privacy.

  c. Discharge and discipline of homosexuals in the Armed Forces. Incorrect perceptions exist that the military discharges large numbers of personnel for homosexuality and that most of those discharges are for reasons of homosexual "status" only -- i.e., statements alone that one is a homosexual, with no homosexual acts involved. Additionally, some believe the military prosecutes homosexual sodomy cases but does not prosecute heterosexual sodomy cases.

    (1) Analysis of Armed Forces separations over the four-year period of fiscal years 1989 through 1992 reveals:

      (a) Only one-third of one percent (0.3 percent) of all separations were for homosexuality.

10

OSD P&R 007449

(b)  Of those discharged for administrative or punitive reasons, only 1.5 percent were for homosexuality.

(c)  Drug and alcohol abuse discharges were nine times greater than those for homosexuality.  Overweight discharges were five times greater.

(d)  Of all discharges for homosexuality, at least 79 percent clearly involved homosexual conduct.  There was insufficient documentation to determine whether conduct was involved in the remaining 21 percent.

(2)  Similarly, a review of 1,141 military courts-martial involving Article 125 (sodomy) indicated that heterosexual sodomy cases outnumbered homosexual sodomy cases by a 4 to 1 ratio.

11

OSD P&R 007450

# IV. CONCLUSIONS

After extensive research and prolonged deliberations, the MWG concluded the following:

A.  Since it is impossible to determine an individual's sexual orientation unless he or she reveals it, sexual orientation alone is a personal and private matter.

B.  Homosexuality is incompatible with military service.  The presence in the military of individuals identified as homosexuals would have a significantly adverse effect on both unit cohesion and the readiness of the force -- the key ingredients of combat effectiveness.  If identified homosexuals are allowed to serve, they will compromise the high standards of combat effectiveness which must be maintained, impacting on the ability of the Armed Forces to perform its mission.

C.  For practical reasons, servicemembers should be discharged only when their homosexuality is manifested by objective criteria -- homosexual acts, homosexual statements, or homosexual marriages.

D.  Applicants for military service should be clearly advised of the military's policy regarding homosexuals prior to their entering active duty.  Specifically, applicants should be briefed and acknowledge in writing that they understand:  (1)  homosexuality is incompatible with military service; (2) they may be denied enlistment or separated if they have engaged in homosexual conduct (acts, statements, or marriage); or (3)  they are not required to reveal their sexual orientation, even if asked, but if they do, it is of their own free will and can be used as a basis for separation from the Armed Forces.

E.  A single, clear investigative policy should be adopted to provide uniform guidance to the Services for conducting inquiries and investigations into allegations of homosexual conduct.

F.  All serving members should be educated on the military's policy on homosexuals.  This education should be factual in nature and should not include sensitivity training or attempt to change deeply held moral, ethical, or religious values.

OSD P&R 007451

# V. THE RECOMMENDED POLICY

**A. Overview.** After extensive research and assessment of several options, the MWG submitted the following policy for consideration by the Secretary of Defense on 8 June 1993. In the judgement of the MWG, the policy represented the only option which complied with the President's guidance to end discrimination while maintaining high standards of combat effectiveness and unit cohesion.

**B. Key policy features**

1. Sexual orientation will be considered a personal and private matter. The Armed Forces won't ask and servicemembers will not be required to reveal their sexual orientation.

2. The presence in the Armed Forces of persons who engage in homosexual acts, who state they are homosexual or bisexual, or marry or who attempt to marry persons of the same gender remains inconsistent with the requirement to maintain high standards of combat effectiveness and unit cohesion.

3. Sexual orientation alone is not a bar to service entry or continued service unless manifested by homosexual acts, statements, or marriages.

4. Neither commander's inquiries (normally for minor offenses) nor military criminal law enforcement investigations (normally for criminal violations) will be conducted absent credible information. Commanders will continue to initiate inquiries or investigations, as deemed necessary, when credible information that a basis for discharge or disciplinary action exists.

5. Servicemembers will be discharged if they are found to have engaged in homosexual conduct.

6. An education plan will be developed to inform servicemembers, commanders, and military investigators about this policy so as to reinforce the principle that all service-members can serve without fear of unwarranted intrusion into their personal lives.

OSD P&R 007452

C. Discussion of the policy

1.  Military personnel policies are designed by necessity to manage large groups or categories of people for the purpose of achieving maximum combat effectiveness.  The basis for our personnel policy regarding homosexuals has been and remains that homosexuality is incompatible with service in the Armed Forces.

2.  For practical reasons, we implement that policy by discharging servicemembers only when their homosexuality is manifested by objective criteria -- homosexual acts, statements, or marriage.  As a practical result of the implementation of this policy, homosexuals who keep their sexual orientation private have served and will continue to serve.

3.  While maintaining the *de jure* basis of the previous policy, this policy acknowledges the *de facto* situation that some homosexuals have served, and presumably will continue to serve, in the Armed Forces under the unique constraints of military life.  These constraints require members of the Armed Forces to keep certain aspects of their personal life private for the benefit of the group.

D. Implementation

1.  *Accessions policy.*  Applicants for service in the Armed Forces will not be required to declare their sexual orientation or answer questions about their orientation.  They will be briefed on departmental policies governing conduct proscribed for members of the Armed Forces.  All applicants will sign a statement acknowledging they understand these policies.  Additionally, homosexual behavior will no longer be listed as a mental disorder in the DoD Physical Standards directive.

2.  *Investigative policy.*  Commanders may initiate investigations or inquiries into homosexual conduct as defined by DoD policy.  However, no investigations or inquiries will be conducted solely to establish an individual's sexual orientation, nor will servicemembers be required to answer questions concerning their sexual orientation.  This provision does not create a protected class.  Acknowledgement by a member that he or she is a homosexual -- even in reply to a question asked in error -- continues to be a basis for separation.  No investigations or inquiries will be conducted absent credible information of the commission of a crime or basis for discharge or disciplinary action.  Military investigative agencies, at the direction of a commander, may investigate misconduct and violations of the Uniform Code of Military Justice.  Investigations will not go beyond establishing the

14

OSD P&R 007453

elements of the offense or basis for discharge. There will be no stake-outs, sting operations, or round-ups absent specific allegations of proscribed conduct.

3. *Discharge policy.* Homosexual conduct is inconsistent with the high standards of combat effectiveness and unit cohesion our Armed Forces must maintain. Servicemembers will be discharged if they engage in homosexual conduct. Homosexual conduct is evidenced by any act involving bodily contact, actively undertaken or passively permitted, between members of the same sex for the purpose of sexual gratification, and attempts or solicitations to engage in such acts; a statement by the member that he or she is a homosexual or bisexual; or homosexual marriage or attempted homosexual marriage. Normally, administrative separations involving homosexual conduct will be under honorable conditions, unless there are aggravating circumstances -- such as acts with a minor.

4. *Education policy.* Each Service will provide training to their personnel, at every level, to explain the new policy regarding homosexuals. The DoD will provide an education plan for the Services to use as a guideline in their separate training programs. The education package will focus on the changes to the DoD policy and will not be an attempt to change any deeply held religious and ethical beliefs; that is, sensitivity training.

OSD P&R 007454

MEMORANDUM FOR

FROM:

SUBJECT:  Gays and Lesbians at War:  Military Service in Iraq and Afghanistan Under "Don't Ask Don't Tell"


You asked me to review and comment on the attached study, conducted by Dr. Nathaniel Frank, Senior Research Fellow at the Center for the Study of Sexual Minorities in the Military at the University of California, Santa Barbara.

This is a field study of 30 gay and lesbian service members who are currently or have been deployed to service in OIF or OEF.  They either self-identified as a result of advertisements through advocacy publications or internet sites, or were referred by friends.  Dr. Frank acknowledges the limitations of this "non-random" sample on the ability to generalize findings, and thus supplements the findings with related research, surveys, or sources of information.

It is a thoughtful study, which offers a unique view of the experiences of gay and lesbian service members.  Some interesting observations:

- The policy interferes with their bonding and social cohesion, particularly in a deployed environment where the unit becomes family.  They were unable to talk about their lives and loved ones even when queried.  When not deployed, they felt unable to participate in normal unit social events.  Some described having to change their personalities and become hard and aloof to avoid uncomfortable questioning.  They believe this inhibits the formation of trust so important to a deployed unit.
- The interviewees reported restricted access to support service normally there for deployed members (such as family support groups).  In preparing for deployment they were uncomfortable naming their partners as beneficiaries or using their names for Next of Kin notification.  When a partner gets sick or needs surgery, they do not feel free to ask for leave to support them.
- There is a long discussion of privacy and showers.  For the most part, the interviewees did not encounter group showers, even under primitive conditions.
- Some of the interviewees admitted their orientation to friends or leaders with no adverse consequences.  Many had positive experiences doing this.  In some cases leadership did not enforce the Homosexual Conduct Policy when members admitted being gay.  They found the policy described as "don't ask, don't tell" ambiguous – what if someone asks if you are married?
- The study points out that living under the policy gets more difficult as you rise in rank and get older – when you are expected to have a spouse and family.
- The interviewees did not indicate that their behavior would radically change if the policy were reversed.  The study states, page 31:

" Indeed, most respondents said that, while some or most of their peers knew they were gay, they did not wish to announce the fact publicly, and they had no intention of doing so if the policy were changed to allow it. Rather, such a policy change would reduce their stress, remove impediments to productive work and allow them to stop taking proactive steps to misrepresent and isolate themselves."

- This quote, from the conclusion on page 44, is also of interest:

  "Evidence from this study suggests that the "don't ask, don't tell" policy increases gay troops' stress levels, lowers their morale, impairs their ability to forma trusting bonds with their peers, restricts their access to medical care, psychological services and religious consultations, and limits their ability to advance professionally and their willingness to join and remain the services. The detrimental effects of the policy on gay service are heightened during deployment for Operation Enduring Freedom and Operation Iraqi-Freedom, when alternative sources of support are less available than when stateside, and when military effectiveness is at its most critical."

- Overall, I believe it is a thoughtful look at this subject that demonstrates some of the difficulties that service members encounter with this policy. It is, however, limited by the number of interviewees, the method of selection, and the fact that responses were not available from the heterosexual service members as well. .

**LCR Appendix Page 1790(B)**



# *Joint Chiefs of Staff*

## JCS Speech

**Testimony Regarding DoD 'Dont Ask, Dont Tell' Policy**
*As Delivered by Secretary of Defense, Robert M. Gates and Adm. Mike Mullen, chairman of
the Joint Chiefs of Staff , Dirksen Senate Office Building, Washington, D.C. Tuesday, February 02, 2010*

SEN. LEVIN: (Strikes gavel.) The committee is now going to receive testimony from our
senior leadership in the Department of Defense as we begin the task of addressing the
"don't ask, don't tell" policy on gays in the military.

I believe that ending the policy would improve our military's capability and reflect our
commitment to equal opportunity. I do not find the arguments that were used to justify
"don't ask, don't tell" convincing when it took effect in 1993, and they are less so now. I
agree with what President Obama said in his State of the Union Address, that we
should repeal this discriminatory policy.

In the latest Gallup poll, the American public overwhelmingly supports allowing gays
and lesbians to serve openly in the military. Sixty-nine percent of Americans are
recorded as supporting their right to serve, and many in fact are serving. As former
chairman of the Joint Chiefs, Gen. John Shalikashvili, said – and he supports ending
the policy – a majority of troops already believe that they serve alongside gay or lesbian
colleagues. One recent study estimated that 66,000 gays and lesbians are serving
today, at constant risk of losing their chance to serve.

Other nations have allowed gay and lesbian service members to serve in their militaries
without discrimination and without impact on unit cohesion or morale. A comprehensive
study on this was conducted by RAND in 1993. RAND researchers reported on the
positive experiences of Canada, France, Germany, Israel, and The Netherlands and
Norway, all of which allowed known homosexuals to serve in their armed forces. Sen.
McCain and I have asked the Department of Defense to update the 1993 report.

Ending this discriminatory policy will contr bute to our military's effectiveness. To take
just one example, dozens of Arabic and Farsi linguists have been forced out of the
military under "don't ask, don't tell," at a time when our need to understand those
languages has never been greater. Thousands of troops – 13,000, by one estimate –
have been forced to leave the military under the current policy. That number includes
many who could help the military complete some particularly difficult and dangerous
missions.

I have long admired the merit-based system of advancement employed by the U.S.
military that allows servicemen and women of varied backgrounds to advance to
positions of high leadership. An Army is not a democracy; it is a meritocracy, where
success depends   not on who you are, but on how well you do your job. Despite its
necessarily undemocratic nature, our military has helped lead the way in areas of
fairness and anti-discrimination. It has served as a flagship for American values and
aspirations, both inside the United States and around the world.

We will hold additional hearings to hear from various points of view and approaches on
this matter. This committee will hold a hearing on February 11th, when we will hear
from an independent panel. The service secretaries and service chiefs will all be
testifying before this committee during the month of February on their various budgets,
and they of course will be open to questions on this subject as well during their
testimony.

My goal will be to move quickly but deliberatively to maximize the opportunity for all
Americans to serve their country, while addressing any concerns that may be
raised. We should end "don't ask, don't tell," and we can and should do it in a way that
honors our nation's values while making us more secure.

My entire statement will be made part of the record. A statement of Sen. Gill brand will
also be inserted in the record following the statement of Sen. McCain.

Sen. McCain.

SEN. MCCAIN: Thank you very much, Mr. Chairman. And I want to thank Secretary
Gates and Adm. Mullens (sic) (for what's ?) turning into a very long morning for them,
and we appreciate your patience and your input on this very, very important issue.

We meet to consider the "don't ask, don't tell" policy, policy that the president has made
clear, most recently last week in his State of the Union Address, that he wants
Congress to repeal. This would be a substantial and controversial change to a policy

**LCR 03452**

that has been successful for two decades. It would also present yet another challenge to our military at a time of already tremendous stress and strain.

Our men and women in uniform are fighting two wars, guarding the front lines against a global terrorist enemy, serving and sacrificing on battlefields far from home, and working to rebuild and reform the force after more than eight years of conflict.

At this moment of immense hardship for our armed services, we should not be seeking to overturn the "don't ask, don't tell" policy.

I want to make one thing perfectly clear up front. I'm enormously proud of and thankful for every American who chooses to put on the uniform of our nation and serve at this time of war. I want to    encourage more of our fellow citizens to serve and to open up opportunities to do so. Many gay and lesbian Americans are serving admirably in our armed forces, even giving their lives so that we and others can know the blessings of peace. I honor their sacrifice, and I honor them.

Our challenge is how to continue welcoming this service amid the vast complexities of the largest, most expensive, most well-regarded and most critical institution in our nation, our armed forces.

   This is an extremely difficult issue, and the Senate vigorously debated it in 1993. We heard from the senior uniformed and civilian leaders of our military on eight occasions before this committee alone. When Congress ultimately wrote the law, we included important findings that did justice to the seriousness of the subject. I would ask without objection, Mr. Chairman, that a copy of the statute including those findings be included in the record.

SEN. LEVIN: It will be.

SEN. MCCAIN: I won't quote all those findings. But three points must be made. First, Congress found in the law that the military's mission to prepare for and conduct combat operations requires service men and women to accept living and working conditions that are often spartan and characterized by forced intimacy with little or no privacy.

Second, the law finds that civilian life is fundamentally different from military life, which is characterized by its own laws, rules, customs and traditions, including many restrictions on personal conduct that would not be tolerated in civil society.

Finally, the law finds that the essence of military capability is good order and unit cohesion, and that any practice which puts those goals at unacceptable risk can be restricted.

These findings were the foundation of "don't ask, don't tell." And I'm eager to hear from our distinguished witnesses what has changed since these findings were written, such that the law they supported can now be repealed.

Has this policy been ideal? No, it has not. But it has been effective. It has helped to balance a potentially disruptive tension between the desires of a minority and the broader interests of our all-volunteer force. It is well understood and predominantly supported by our fighting men and women. It reflects, as I understand them, the preferences of our uniformed services. It has sustained unit cohesion and unit morale while still allowing gay and lesbian Americans to serve their country in uniform. And it has done all of this for nearly two decades.

Mr. Chairman, there – this is a letter signed by over 1,000 former general and flag officers who have weighed in on this issue. I think that we all in Congress should pay attention and benefit from    the experience and knowledge of over a thousand former general officers and flag officers, and which – where they say: We firmly believe that the – this law, which Congress passed to protect order – good order, discipline and morale in the unique environment of the armed forces, deserves continued support.

And so I think we should also pay attention to those who have served, who can speak more frankly on many occasions than those who are presently serving.

I know that any decision Congress makes about the future of this law will inevitably leave a lot of people angry and unfulfilled. There are patriotic and well-meaning Americans on each side of this debate. And I've heard their many passionate concerns. Ultimately though, numerous military leaders tell me that "don't ask, don't tell" is working, and that we should not change it now. I agree.

I would welcome a report done by the Joint Chiefs of Staff – based solely on military readiness, effectiveness and needs and not on politics – that would study the "don't ask, don't tell" policy, that would consider the impact of its repeal, on our armed services, and that would offer their best military advice on the right course of action.

**LCR 03453**

We have an all-volunteer force. It is better trained, more effective and more professional than any military in our history. And today, that force is shouldering a greater global burden than at any time in decades.

We owe our lives to our fighting men and women. And we should be exceedingly cautious, humble and sympathetic when attempting to regulate their affairs. "Don't ask, don't tell" has been an imperfect but effective policy. And at this moment when we're asking more of our military than at any time in recent memory, we should not repeal this law.

Thank you, Mr. Chairman.

SEN. LEVIN: Thank you, Sen. McCain.

Secretary Gates.

SEC. GATES: Mr. Chairman, last week during the State of the Union Address, the president announced he will work with Congress this year to repeal the law known as "don't ask, don't tell." He subsequently directed the Department of Defense to begin the preparations necessary for a repeal of the current law and policy. I fully support the president's decision.

The question before us is not whether the military prepares to make this change but how we must – how we best prepare for it. We  have received our orders from the commander in chief and we are moving out accordingly. However we can also take this process only so far, as the ultimate decision rests with you, the Congress.

   I am mindful of the fact, as are you, that unlike the last time this issue was considered by the Congress more than 15 years ago, our military is engaged in two wars that have put troops and their families under considerable stress and strain. I am mindful, as well, that attitudes toward homosexuality may have changed considerably, both in society generally and in the military, over the intervening years.

To ensure that the department is prepared should the law be changed, and working in close consultation with Adm. Mullen, I have appointed a high-level working group within the department that will immediately begin a review of the issues associated with properly implementing a repeal of the don't ask, don't tell policy. The mandate of this working group is to thoroughly, objectively and methodically examine all aspects of this question, and produce its finding and recommendations in the form of an implementation plan by the end of this calendar year.

A guiding principle of our efforts will be to minimize disruption and polarization within the ranks, with special attention paid – a special attention paid to those serving on the front lines. I am confident this can be achieved.

The working group will examine a number of lines of study, all of which will proceed simultaneously. First, the working group will reach out to the force to authoritatively understand their views and attitudes about the impact of repeal. I expect that the same sharp divisions that characterize the debate over these issues outside of the military will quickly seek to find their way into this process, particularly as it pertains to what are the true views and attitudes of our troops and their families. I am determined to carry out this process in a way that establishes objective and reliable information on this question, with minimal influence by the policy or political debate. It is essential that we accomplish this in order to have the best possible analysis and information to guide the policy choices before the department and the Congress.

Second, the working group will undertake a thorough examination of all the changes to the department's regulations and policies that may have to be made. These include potential revisions to policies on benefits, base housing, fraternization and misconduct, separations and discharges, and many others.

We will enter this examination with no preconceived views, but a recognition that this will represent a fundamental change in personnel policy, one that will require that we provide our commanders with the guidance and tools necessary to accomplish this transition successfully and with minimum disruption to the department's critical missions.

Third, the working group will examine the potential impacts of a change in the law on military effectiveness, including how a change might affect unit cohesion, recruiting and retention, and other issues crucial to the performance of the force. The working group will develop ways to mitigate and manage any negative impacts.

These are, generally speaking, the broad areas we have identified for study under this review. We will, of course, continue to refine and expand these as we get into this

**LCR 03454**

**LCR Appendix Page 1793**

process or engage in discussion with the Congress and other sources. In this regard, we expect that the working group will reach out to outside experts with a wide variety of perspectives and experience. To that end, the department will, as requested by the committee, ask the RAND Corporation to update their study from 1993 on the impact of allowing homosexuals to serve openly in the military.

We also have received some helpful suggestions on how this outside review might be expanded to cover a wide swath of issues. This will be a process that will be open to views and recommendations from a wide variety of sources, including, of course, members of Congress.

Mr. Chairman, I expect that our approach may cause some to wonder why it will take the better part of the year to accomplish the task. We've looked at a variety of options, but when you take into account the overriding imperative to get this right and minimize disruption to a force that is actively fighting two wars and working through the stress of almost a decade of combat, then it is clear to us we must proceed in a manner that allows for the thorough examination of all issues.

An important part of this process is to engage our men and women in uniform and their families over this period since, after all, they will ultimately determine whether or not we make this transition successfully.

To ensure that this process is able to accomplish its important mission, Chairman Mullen and I have determined that we need to appoint  the highest-level officials to carry it out. Accordingly, I am naming the Department of Defense general counsel, Jay Johnson, and Gen. Carter Ham, commander of U.S. Army Europe, to serve as the co-chairs for this effort.

   Simultaneous with launching this process, I have also directed the department to quickly review the regulations used to implement the current don't ask, don't tell law, and within 45 days present to me recommended changes to those regulations that within existing law will enforce this policy in a fairer manner.

You may recall that I asked the department's general counsel to conduct a preliminary review of this matter last year. Based on that preliminary review, we believe that we have a degree of latitude within the existing law to change our internal procedures in a manner that is more appropriate and fair to our men and women in uniform. We will now conduct a final, detailed assessment of this proposal before proceeding.

Mr. Chairman, Sen. McCain, members of the committee, the Department of Defense understands that this is a very difficult, and in the minds of some controversial policy question. I am determined that we in the department carry out this process professionally, thoroughly, dispassionately, and in a manner that is responsive to the direction of the president and to the needs of the Congress as you debate and consider this matter.

However, on behalf of the men and women in uniform and their families, I also ask you to work with us to, insofar as possible, keep them out of the political dimension of this issue. I am not asking for you not to do your jobs fully and with vigor, but rather, as this debate unfolds, you keep the impact it will have on our forces firmly in mind.

Thank you for this opportunity to lay out our thinking on this important policy question. We look forward to working with the Congress and hearing your ideas on the best way ahead.

SEN. LEVIN: Thank you.

Adm. Mullen.

ADM. MULLEN: Thank you, Mr. Chairman, Sen. McCain. And thank you for giving me the opportunity to discuss with you this very important matter.

The chiefs and I are in complete support of the approach that Secretary Gates has outlined. We believe that any implementation plan for a policy permitting gays and lesbians to serve openly in the armed forces must be carefully derived, sufficiently through – sufficiently thorough, and thoughtfully executed.

Over these last few months, we have reviewed the fundamental premises behind don't ask, don't tell, as well as its application in practice over the last 16 years. We understand perfectly the president's desire to see the law repealed, and we owe him our best military advice about the impact of such a repeal and the manner in which we would implement a change in policy.

   The chiefs and I have not yet developed that advice, and would l ke to have the time to do so in the same thoughtful, deliberate fashion with which the president has made it

**LCR 03455**

**LCR Appendix Page 1794**

clear he wants to proceed. The review – the review group Secretary Gates has ordered will no doubt give us that time and an even deeper level of understanding. We look forward to cooperating with and participating in this review to the maximum extent poss ble, and we applaud the selection of Mr. Johnson and Gen. Ham to lead it. Both are men of great integrity, great experience, and have our complete trust and confidence.

Mr. Chairman, speaking for myself and myself only, it is my personal belief that allowing gays and lesbians to serve openly would be the right thing to do. No matter how I look at this issue, I cannot escape being troubled by the fact that we have in place a policy which forces young men and women to lie about who they are in order to defend their fellow citizens. For me personally, it comes down to integrity – theirs as individuals and ours as an institution. I also believe that the great young men and women of our military can and would accommodate such a change. I never underestimate their ability to adapt.

But I do not know this for a fact, nor do I know for a fact how we would best make such a major policy change in a time of two wars. That there will be some disruption in the force I cannot deny. That there will be legal, social, and perhaps even infrastructure changes to be made certainly seem plausible. We would all like to have a better handle on these types of concerns, and this is what our review will offer.

We would also do well to remember that this is not an issue for the military leadership to decide. The American people have spoken on this subject through you, their elected officials, and the result is the law and the policy that we currently have.

We will continue to obey that law, and we will obey whatever legislative and executive decisions come out of this debate. The American people may yet have a different view. You may have a different view. I think that's important, and it's important to have that discussion.

Frankly, there are those on both sides of this debate who speak as if there is no debate; as if there's nothing to be learned or reflected upon. I hope we can be more thoughtful than that. I expect that we will be more thoughtful than that.

The chiefs and I also recognize the stress our troops and families are under, and I have said many times before, should the law change, we need to move forward in a manner that does not add to that stress. We've got two wars going on, a new strategy in Afghanistan, and remaining security challenges in Iraq. We're about to move forward under a new Quadrennial Defense Review. We still have budget concerns in a struggling economy. And we have a host of other significant security commitments around the globe. Our plate is very full. And while I believe this is an important issue, I also believe we need to be mindful as we move forward of other pressing needs in our military.

What our young men and women and their families want – what they deserve – is that we listen to them and act in their best interests. What the citizens we defend want to know – what they deserve to know – is that their uniformed leadership will act in a way that absolutely does not place in peril the readiness and effectiveness of their military.

I can tell you that I am 100 percent committed to that. Balance, Mr. Chairman – balance and thoughtfulness is what we need most right now. It's what the president has promised us, and it's what we ask of you in this body.

Thank you.

SEN. LEVIN: Thank you very much, Admiral.

So that everyone has a chance within a reasonable period of time, we're just going to have a three-minute first round.

SEN. MCCAIN: Mr. Chairman, we need more than three minutes. We need more than three minutes.

SEN. LEVIN: We'll have a – try to have a second round, then. We have to also have a schedule here. So we'll go to a second round if we can fit that into Secretary Gates' schedule. If not, we will pick this up at a later time.

The secretary – well, now, this schedule was shared with everybody here now, and so –

SEN. MCCAIN (?): Not with me.

SEN. LEVIN: It was indeed shared.

SEN. MCCAIN: You're the chairman.

**LCR 03456**

SEN. LEVIN: Mr. Secretary, The Washington Post I think this morning reported that the military services will not pursue any longer disciplinary action against gays and lesbian servicemembers whose orientation is revealed by third parties. Is that one of the – is that one of the degrees of latitude within existing law that you're looking at?

SEC. GATES: Mr. Chairman, a preliminary assessment is that – and this fits within this 45-day review that I mentioned in my prepared statement – the preliminary assessment is that we can do the following within the confines of the existing law. We can raise the level of the officer who is authorized to initiate an inquiry. We can raise the level of the officer who conducts the inquiry. We can raise the bar on what constitutes credible information to initiate an inquiry. We can raise the bar on what constitutes a reliable person on whose word an inquiry can be initiated.

Overall, we can reduce the instances in which a servicemember who is trying to serve the country honorably is outed by a third person with a motive to harm the servicemember. And we also have to devise new rules and procedures in light of the appeals court decision in Witt versus the Department of the Air Force for the areas of the country covered by the appellate court.

So I would say all of these matters are those that will be reviewed within this 45-day period. So it's a little more complicated than The Washington Post conveyed.

SEN. LEVIN: All right. But all of those are possibilities?

SEC. GATES: Yes, sir.

SEN. LEVIN: Now, would you, assuming it – even if it requires a – legislation, would you support a moratorium on discharges under don't ask, don't tell during the course of this up to year-long assessment that the department is going to be making?

SEC. GATES: I would have to look into that because the problem – the problem that we have is that all of the issues that both Adm. Mullen and I described in terms of what we have to look into in terms of the effect on the force, in terms of everything else, is what we need to examine before I could answer that question.

    SEN. LEVIN: All right. Well, you're going to be examining the other points that you're looking at, the other flexibilities.

SEC. GATES: Yes.

SEN. LEVIN: Would you add this to the questions you're going to look at and let us know promptly –

SEC. GATES: Sure.

SEN. LEVIN: – as to whether you would support the – a moratorium pending this period on discharges. That doesn't mean you couldn't discharge at the end of the period, but there would be a moratorium.

SEC. GATES: We will look at it, Mr. Chairman. I would tell you that the advice that I have been given is that the current law would not permit that, but –

SEN. LEVIN: I'm saying would you support a change in the current law, if necessary, in order to permit that? That's what we need to hear from you on.

Sen. McCain.

SEN. MCCAIN: I'm deeply disappointed in your statement, Secretary Gates. I was around here in 1993 and was engaged in the debate. And what we did in 1993 is we looked at the issue and we looked at the effect on the military, and then we reached a conclusion, and then we enacted it into law.

Your statement is, the question before us is not whether the military prepares to make this change, but how we best prepare for it. It would be far more appropriate, I say with great respect, to determine whether repeal of this law is appropriate, and what effects it would have on the readiness and effectiveness of the military, before deciding on whether we should repeal the law or not. And fortunately, it is an act of Congress, and it requires the agreement of Congress in order to repeal it. And so your statement obviously is one which is clearly biased, without the view of Congress being taken into consideration.

Adm. Mullen, you're the principal military adviser to the president. Do you – and you have to consult with and seek the advice of the other members of the Joint Chiefs of Staff and the combatant commanders. What, in your view, are the opinions of the other

**LCR 03457**

members of the Joint Chiefs and combatant commanders about changing this policy?

ADM. MULLEN: Sen. McCain, as the chairman indicated earlier, they will obviously be out in their posture hearings in the near future, and I would certainly defer to them in terms of exactly how they're going to –

SEN. MCCAIN: Well, in the near future – in the near future I'd like you to ask them and we could have it on the record what their position is.

ADM. MULLEN: Yes, sir.

SEN. MCCAIN: In the near future.

ADM. MULLEN: Yes, sir.

SEN. MCCAIN: I would like it as soon as possible.

ADM. MULLEN: I've – actually, I've worked very closely with them over the last months in terms of understanding what their – what their concerns and what our overall concerns are, and I would summarize them by saying it's really important for us – to us – for us to understand that if this policy changes, if the law changes, what's the impact, and how we would implement it.

And Secretary Gates' point about the study is to really understand objectively the impact on our – on our troops and on their forces, and that is their biggest concern.

SEC. GATES: And I would say, Sen. McCain, I absolutely agree that the – how the Congress acts on this is dispositive.

SEN. MCCAIN: Well, I hope you will pay attention to the views of over a thousand retired flag and general officers.

What kind – Mr. Secretary, what kinds of partnerships or unions would the military be prepared to recognize by law in the event that this don't ask, don't tell is repealed?

SEC. GATES: That's one of the many issues that I think we have to look at, Senator.

SEN. MCCAIN: So again, you are embarking on saying it's not whether the military prepares to make the change, but how we best prepare for it, without ever hearing from members of Congress, without hearing from the members of the Joint Chiefs, and of course without taking into considerations – consideration all the ramifications of this law. Well, I'm happy to say that we still have a Congress of the United States that would have to – would have to pass a law to repeal don't ask, don't tell despite your efforts to repeal it in many respects by fiat.

Thank you, Mr. Chairman.

SEN. LEVIN: Thank you, Sen. McCain.

Sen. Udall.

SEN. UDALL: Thank you, Mr. Chairman. Thank you for holding this very important hearing.

I want to acknowledge, Secretary Gates, the work you've done to put a plan in place. And Adm. Mullen, I think the centerpiece of your statement will be long remembered for the courage and the integrity with which you outlined your own personal beliefs and how we can proceed.

I'm proud to hail from a region of the country – the Rocky Mountain West – where we have a live-and-let-live attitude. Some people would call it small-L l bertarianism. People's personal lives, the choices that people make, are not the government's business.

And I can't help but think about the great Arizonan. I grew up in Arizona. My father was an Arizonan, my mother was a Coloradan. I have the great honor to represent Colorado now. But Barry Goldwater once said, "you don't have to be straight to shoot straight." And that's the opportunity that we have here today as the Congress and the Pentagon moves forward.

I've got a few concerns I'd like to share in the couple of minutes that I have, and I'll pepper my comments with questions, and hopefully there will be time for you all to respond.

There have been a lot of studies done, Mr. Secretary – RAND, and there's a recent

LCR 03458

study in the Joint Force Quarterly. It's not clear to me that the study group needs a full year to study implementation and transition. I want to just put that out there.

I want to ensure that the focus of the group is on how to implement repeal of the policy, not whether. And I want to ask you to assure me that the endpoint of the study would be a road map to implementing repeal, and that the Congress would then be in a position to take legislative action that the Pentagon as a whole could support.

And then, before you answer, I'd l ke your reaction to a legislative proposal that you may have seen. It would be to write and to repeal legislation for the period of time you suggest you need – say, one year – while legislating that at the end of that time we would have finality – in other words, a complete end to don't ask, don't tell. During the year-long transition, the DOD would have full authority and discretion with respect to don't ask, don't tell investigations and discharges. Language l ke this would certainly make me much more comfortable, since I want, and so many others, a clear path to full repeal, and I'm not sure I see finality in the study.

Again, thank you, gentlemen, and hopefully there's a little bit of time left for you to answer.

SEC. GATES: Well, I think the purpose of the examination that we're undertaking, frankly, is to inform the decision-making of the Congress and the nature of whatever legislation takes place. It's   also, frankly, to be prepared to begin to implement any change in the law. We obviously recognize that this is up to Congress, and my view is, frankly, that it's critical that this matter be settled by a vote of the Congress.

    The study is intended to prepare us along those lines, so that we understand all of the implications involved. Frankly, there have been a lot of studies done, but there has not been a study done by the military of this, and this is the kind of thing that Adm. Mullen was talking about.

And I would just say, with respect to your second point, that I think we would regard, if legislation is passed repealing don't ask, don't tell, we would feel it very important that we be given some period of time for that implementation, at least a year.

ADM. MULLEN: Senator if I may, just the only thing I would comment about, all the studies and all the polls, I would just urge that everybody isn't going to be involved in this look at those studies and polls deliberately and what they actually looked at specifically. And so just reemphasize what the secretary said: there really hasn't been any significant – statistically significant and objective survey of our people and their families. And that gets to the Chiefs' concern and mine as well, which really is engaging them in a way that we really understand their views on this, and that just hasn't been done. And as urgently as some would like this to happen, it's just going to take some time to do that.

SEN. LEVIN: Thank you, Sen. Udall.

Sen. Sessions.

SEN. JEFF SESSIONS (R-AL): Thank you, Mr. Chairman. And I know this is an important issue. We need to think it through, and every American is entitled to fairness and justice as we deliberate these issues, and I do think we should do it at a high level.

I would note, however, a bit of a concern that arises from something Sen. McCain suggested, and that is that the president, as the commander in chief, has announced a decision, and the secretary of Defense apparently supports that decision. Adm. Mullen now has declared that he personally believes in this decision. And so then presumably someone below you will do some work on the policy, whether this is a good policy or not. So I guess it's – if it was a trial, we would perhaps raise the undue command influence defense.

And I think we need an open and objective and a fair evaluation of this. A lot of things that have been said I would note that are not accurate, at least in my view, at least misrepresent certain   things. One of them is 10,000 people have been dismissed from the military or voluntarily left from the military under these – under this provision, but that's over 10 years. It would be 1 percent, maybe, if it was one year, less than that maybe – (audio break) – so there will be costs.

I noticed – and I give the military credit. A lot of people don't know this, Adm. Mullen, how open the debate and discussion are. There's an article in the Joint Forces Quarterly that basically supports this change. It was an award-winning article, and they raised a lot of different issues, both for and against, and the military welcomed that. And I salute that. I think that's healthy.

But the – one of the points it made is that Charles Moskos, one of the original authors of

**LCR 03459**

the don't ask, don't tell policy, points out that the number of discharges for voluntary statements by servicemembers – presumably they come forward and say that they are homosexual – accounts for 80 percent of the total. And the number of discharges for homosexual acts have declined over the years. Do you think that's approximately correct?

ADM. MULLEN: Sen. Sessions, I think it is approximately correct. But it does go to, again sort of a fundamental principle with me, which is everybody counts. And part of the struggle back to the institutional integrity aspect of this, and –

SEN. SESSIONS: Well, I know. I appreciate your view.

ADM. MULLEN: – and putting individuals in a position that every single day they wonder whether today's going to be the day, and devaluing them in that regard just is inconsistent with us as an institution.

I have served with homosexuals since 1968. Sen. McCain spoke to that in his statement. Everybody in the military has, and we understand that. So it is a number of things which cumulatively for me, personally, get me to this position.

But I also want to reemphasize what I said, is I am not all-knowing in terms of the impact of what the change would have, and that's what I want to understand. And it's – and any impact, and understanding readiness and effectiveness, is absolutely critical.

SEN. SESSIONS: Well, it's pretty clear what your view is. And that will be – that will be clear on all your subordinates. Every single servicemember in uniform would be – qualify for that. And I don't think it – that they are required to lie about who they are; I think that's an overstatement, although I think the rule of don't ask, don't tell has seemed to work pretty well. And I would note from the Christian Science Monitor here that the chiefs of the services met   with the chairman, M ke Mullen – I'm quoting from the article – "and the consensus seemed to be that the military, fighting two wars and now responding to a new mission in Haiti, now is not the time to make such a big change to military policy."

And that's my understanding of the status of things. And I just hope that, as we discuss it, you'll recognize, first, that Congress has made the decision – it's not yours to make, and we'll have to change it if we do change it; and second, you shouldn't use your power to in any way influence a discussion or evaluation of the issue.

   SEC. GATES: Senator I would just say that we can't possibly evaluate the impact on unit cohesion, on morale, on retention, on recruitment and so on unless we encourage people to tell us exactly what they think and exactly what their views are, honestly and as forthrightly as possible. Otherwise, there's no use in doing this at all.

And again, I just can't emphasize enough we understand from the beginning of this that this must be an act of Congress.

SEN. LEVIN: Thank you –

ADM. MULLEN: Sen. Sessions, for me, this is about – this is not about command influence, this is about leadership. And I take that very seriously.

SEN. LEVIN: Thank you.

Sen. Hagan.

SEN. HAGAN: Thank you, Mr. Chairman.

Secretary Gates, I want to say that I applaud your efforts in commissioning a thorough evaluation of the don't ask, don't tell policy, and how to implement a repeal of the policy in order to minimize disruption in military readiness. And I was just wondering, within this study, how will you study – how will this study take into account the views of the combatant commanders in theater in order to minimize any disruption in the military readiness?

SEC. GATES: The combatant commanders, the service chiefs will all have a part in this.

The one thing that I have asked is that, as we go through this process, we try to – try not to disrupt or impact the deployed forces, and particularly those in Afghanistan and Iraq.

They have enough on their minds, and it seems to me we can get the answers that we need to the questions that need to be asked by not adding to their burden. And so the one limitation I've put on this, which obviously does not apply to the combatant

**LCR 03460**

commanders, is that we and have as little impact on the deployed force as possible.

SEN. HAGAN: And, Mr. Secretary and Adm. Mullen, as we move to end discriminatory practices within our armed forces, is there any reason to believe that the dedication and professionalism of our leaders in uniform is based in any way upon their sexual orientation, and that the morale fitness of our men and women in uniform should be based upon their sexual orientation? And if not, then on what grounds do you believe that there remains a need to discriminate based on a servicemember's sexual orientation?

ADM. MULLEN: Well, I – Sen. Hagan, I personally don't think sexual orientation, again, has a place for these kinds of decisions. Actually, I think there's a gap between that which we value as a military, specifically the value of integrity, and what our policy is. But again, that's personally where I am.

I think it's really in the review that would take place over the course of the next – by the end of this year that I would look to certainly understand it much more fully and understand the impact, and if – you know, if and when the policy changes, the impact on our people.

And that's really – rather than at the end of this, we're to some degree at the beginning of really trying to understand that. And that's – in light of many other opinions on this, including the opinions of those who have retired, all those things, but it really is – what I need to understand is to get it from our people and their families. And incorporating that, in addition to all the other requirements that are here, will be the goal of the review over the next – better part of this year.

SEN. HAGAN: Thank you, Mr. Chairman.

    SEN. LEVIN: Thank you, Sen. Hagan.

Sen. Wicker.

SEN. WICKER: Thank you, Mr. Chairman.

I too am disappointed with this decision by the administration, but I'll say this for our two witnesses. They understand the chain of command. I think we understand that elections have consequences, and these two gentlemen see their charge as moving forward with the directives of their commander.

I think Secretary Gates said it explicitly in his statement: quote, "We have received our orders from the commander in chief, and we are moving out accordingly." Unquote. So we'll have a debate about this, and we will appreciate the information that the department gathers for us.

Sen. McCain referenced in his statement more than a thousand retired flag and general officers – actually, I think it's upwards of 1,160 retired flag and general officers from all the armed services who have come out against a change in this policy. For my colleagues, their statement urging continued support for the 1993 law is contained at www.flagandgeneralofficersforthemilitary.com.

I would commend to the members of this committee an op-ed written by Carl E. Mundy, Jr., a retired four-star general and former commandant of the U.S. Marine Corps, who points out – who mentions the strong support for the current policy by this overwhelming number of retired flag and general officers, and points out that certain findings were made by Congress in support of the 1993 law to ensure clarity concerning the rationale behind the current statute.

Key findings included that the primary purpose of the armed forces is to prepare and to prevail in combat – not to promote civil rights or social justice or compassion or individual fairness, but to prepare for and prevail in combat.

Further findings include that success in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion; and further, that one of the most critical elements in combat capability is unit cohesion – that is, the bonds of trust among individual servicemembers.

I would ask, Mr. Chairman, that this op-ed, dated January 12th, 2010, by Gen. Mundy, be included in the record at this point.

SEN. LEVIN: It will be made part of the record.

SEN. WICKER: So I appreciate the situation that our two witnesses find themselves in, and I look forward to the debate, and hope that the policy remains. Thank you.

**LCR 03461**