DAN WOODS (SBN 78638)
FERNANDO AENLLE-ROCHA (SBN 129515)
DEVON MYERS (SBN 240031)
WHITE & CASE LLP
633 W. Fifth Street, Suite 1900
Los Angeles, CA  90071-2007
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329
Email:      dwoods@whitecase.com
Email:      faenlle-rocha@whitecase.com
Email:      dmyers@whitecase.com

Attorneys for Plaintiff
Log Cabin Republicans

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOG CABIN REPUBLICANS, a non-profit corporation,<br><br>             Plaintiff,<br><br>    vs.<br><br>UNITED STATES OF AMERICA and ROBERT M. GATES, SECRETARY OF DEFENSE, in his official capacity,<br><br>             Defendants. | Case No.  CV04-8425 VAP (Ex)<br><br>**DECLARATION OF DAN WOODS IN SUPPORT OF LOG CABIN REPUBLICANS' OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE CERTAIN OF PLAINTIFF'S PROPOSED EXHIBITS**<br><br>**DATE: June 28, 2010**<br><br>**Time: 2:30 p.m.**<br><br>**Place: Courtroom of Judge Phillips** |

1      I, Dan Woods, declare:

2      I am an attorney admitted to practice in the State of California.  I am a

3 partner of the firm White & Case LLP, counsel of record for plaintiff Log Cabin

4 Republicans ("Log Cabin").  I submit this declaration in support of Log Cabin's

5 Opposition to Defendants' Motion *In Limine* to Exclude Certain of Plaintiff's

6 Proposed Exhibits.  I have personal knowledge of the facts stated herein or know of

7 such facts from my review of the file in this case, and, if called upon to do so, could

8 competently testify as follows:

9      1.    Attached as Exhibit A is a true and correct copy of Defendants' letter

10 to Log Cabin dated May 18, 2010.

11      2.    Attached as Exhibit B is a true and correct copy of the signed

12 Custodian Declaration and a copy Zogby Poll it authenticates.

13      I declare under penalty of perjury under the laws of the United States of

14 America that the foregoing is true and correct.

15      Executed this 22nd day of June 2010, at Los Angeles, California.

16

17                        */s/ Dan Woods*

18                        Dan Woods

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DAN WOODS IN OPPOSITION TO MOTION IN LIMINE
TO EXCLUDE CERTAIN OF PLAINTIFF'S PROPOSED EXHIBITS

LOSANGELES 870528 (2K)

**EXHIBIT A**



**U.S. Department of Justice**

Civil Division

---

*Washington, D.C. 20530*

May 18, 2010

**VIA ELECTRONIC MAIL &
REGULAR MAIL**

Patrick O. Hunnius
White & Case LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071-2007
Tel. (213) 620-7714

Re:    **Log Cabin Republicans v. United States of America, et al.**
       **Case No. 04-CV-8425 (C.D. Cal.)**

Dear Mr. Hunnius:

This letter follows-up on our email correspondence of yesterday regarding the Rule 16 conference.

**Date for Pretrial Conference**

You questioned why this conference cannot be deferred until later this week. As I explained in my email yesterday, the parties have both proposed that the pretrial conference be held on June 28, 2010. If that date is adopted by the Court, all motions *in limine* must be filed no later than May 28, 2010 so that such motions can be noticed for argument at the pretrial conference. Local Rule 7-3 requires that the meet and confer be held no later than 10 days before the date of filing, which is today (May 18th). You are correct that we suggested May 19th as the date for the meeting in the proposed order submitted to the Court, but you will also note that we requested that the Court enter an **order** granting an exception to the 10-day meet and confer rule. Absent an order from the Court granting such an exception to L.R. 7-3, therefore, the parties must otherwise comply with the local rules that govern this case.

We also acknowledge that the Court has not yet entered any schedule for the remaining pretrial activities. However, should the Court enter the parties' agreed-to pretrial conference date after today, plaintiff runs the risk of non-compliance to the extent it has failed to meet its obligations under the Federal Rules of Civil Procedure and the local rules (particularly L.R. 16).

EXHIBIT A

-2-

**Plaintiff Has Failed to Cooperate In The Conference**

The Rule 16 conference thus must occur today.  We understand that you and Mr. Woods are unavailable to meet today during the normal business hours of counsel for the parties. Accordingly, we are left with no choice other than to meet our obligation to confer through the submission of this letter.

In response to our request, you provided certain information regarding witnesses and exhibits last night.  But the information you provided is wholly deficient.

First, plaintiff has failed to properly serve signed disclosures pursuant to the FRCP 26(a)(4).

Second, with respect to exhibits, FRCP 26(a)(3)(A)(iii) requires plaintiff to identify each document that plaintiff intends to offer and each document that plaintiff may offer if the need arises.  Plaintiff's stated intention to introduce as exhibits all the documents included in the appendix to plaintiff's opposition to defendants' motion for summary judgment and "other documents defendants produced" is insufficient under the rules.  The failure to comply with the rules makes it difficult to understand precisely what documents will be offered at trial and thus lodge all appropriate objections under the time frame prescribed by the rules.  Indeed, plaintiff states that it intends to introduce documents from defendants' production.  Defendants produced over 50,000 documents and defendants are not required to guess as to which of those documents plaintiff plans to introduce.

Third, plaintiff has failed to properly disclose witnesses in accordance with FRCP 26 and L.R. 16-2.4.  Specifically, plaintiff has failed to identify, prior to last night, of its proposed witnesses (many of whom had never previously been disclosed) and still has not disclosed the subjects upon which these late-identified witnesses will testify.  *See* Fed. R. Civ. P. 26(a)(1)(A)(i); 26(e); & 26(a)(3)(A)(i).

Fourth, plaintiff's deposition designations are procedurally deficient in at least two respects.  As to the four deponents from whom plaintiff intends to designate deposition testimony, it is insufficient at this point in the case to say merely that plaintiff "intend[s] to designate testimony from four transcripts (Dr. MacCoun and the 3 30(b)(6) witnesses)."  A party "intending to present any evidence by way of deposition testimony" shall, in connection with the meeting of counsel, "[i]dentify on the original transcript the testimony the party intends to offer by bracketing the questions and answers in the margins."  *See* L.R. 6-2.7(a).  This is necessary, for among other reasons, to allow the defendants to make their counter-designations.  Moreover, as to the purported designation of Dr. MacCoun, plaintiff has not explained the basis for presenting his testimony by deposition rather than in person.  FRCP 32 does not seem to apply, as it speaks of using a deposition "against a party" on certain conditions.  As you know, the courts generally prefer live testimony at trial over deposition testimony and, unlike fact

EXHIBIT A

-3-

witnesses, a party chooses its own experts and is generally responsible for bringing them to trial. Thus, a party bears the burden of demonstrating that its expert is unavailable for trial, and cannot satisfy that burden simply by showing that the expert does not reside within 100 miles of the courthouse. *See Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 164-65 (3d Cir. 1995).

## Defendants' Contemplated Motions *in Limine*

Notwithstanding plaintiff's refusal to participate in today's conference as required and plaintiff's failure to otherwise comply with its obligations under the rules (to the extent the Court adopts the date the parties proposed for the pretrial conference), we intend to file at least four motions *in limine* to preclude the (1) introduction of plaintiff's exhibits; (2) testimony of plaintiff's experts; (3) introduction of the deposition testimony plaintiff seeks to designate; and (4) testimony of fact witnesses that plaintiff intends to call at trial who were not properly disclosed pursuant to FRCP 26 or otherwise made known in discovery and whose testimony is irrelevant and immaterial to plaintiff's facial challenge. Below are the grounds for each motion.

### A. Motion *in Limine* Regarding Plaintiff's Exhibits

Defendants plan to move *in limine* to exclude many of plaintiff's proposed exhibits. Our motion will include several grounds for exclusion. Because plaintiff's challenge is subject to rational basis review, its proposed exhibits are not relevant to the issue before the Court. Documents that post-date enactment of the "Don't Ask, Don't Tell" (DADT) statute are particularly irrelevant under rational basis review. As set forth in defendants' response to the exhibits plaintiff submitted in opposition to defendants' motion for summary judgment, moreover, many of plaintiff's proposed exhibits contain inadmissible hearsay and are not subject to any of the hearsay exceptions. Based upon the witnesses identified by plaintiff, it appears that plaintiff will be unable to lay a proper foundation for or authenticate many of these documents.

### B. Motion *in Limine* Regarding Plaintiff's Experts

Defendants also intend to move *in limine* to exclude the introduction of testimony from plaintiff's seven expert witnesses on a number of grounds. As with the other extrinsic evidence plaintiff seeks to admit in this case, expert testimony is inappropriate in a facial due process challenge subject to rational-basis review. The proposed testimony from plaintiff's seven experts is not helpful to the Court and, accordingly, is inadmissible under Federal Rules of Evidence 702 and 402. These opinions include those challenging the motivations of individual legislators who enacted DADT (Drs. Frank, Hillman & Korb); opinions regarding issues previously presented to Congress, such as those concerning unit cohesion (Belkin, MacCoun, Ember-Herbert, Korb, Hillman & Frank); the experience of foreign militaries (Okros, Korb, MacCoun, Belkin & Frank); Dr. Korb's legal opinion regarding the constitutionality of DADT; and opinions regarding the purported lack of empirical evidence in support of DADT (Drs. Hillman, Frank, Korb & Belkin).

-4-

Plaintiff has no basis to offer expert testimony regarding the alleged disparate treatment of lesbians under DADT because it has failed to identify any female member who could have brought such a challenge in her own right. Even if plaintiff could overcome this threshold bar, opinion testimony regarding this issue is not helpful to the Court in light of the fact that plaintiff's equal protection claim has been dismissed.

Plaintiff's experts' proposed testimony concerning the "continuing rationality" of DADT is inadmissible under Rule 702 and 402, as it is not helpful to the trier of fact in resolving the sole issue under a facial challenge subject to rational-basis review.

Many of plaintiff's experts' opinions are unreliable under Rule 702, as they lack any discernable methodology; this includes the opinions of Drs. Korb, Hillman, Embser-Herbert and Belkin. In addition, Dr. Belkin's "revised" report, in which he opines upon the privacy rationale underlying DADT, is inadmissible because it is untimely under Rule 26, and also because it lacks any identification of facts or data relied upon, in violation of Rule 702.

Finally, the opinions of plaintiff's experts are needlessly cumulative under Rule 403. For example, LCR seeks to introduce testimony from *six* of its experts on the issue of unit cohesion (Belkin, MacCoun, Embser-Herbert, Korb, Hillman and Frank); *five* of its experts on the issue of foreign military experiences regarding the service of openly homosexual servicemembers (Belkin, MacCoun, Korb, Okros, and Frank); *four* of its experts regarding the claim that DADT was enacted out of animus towards homosexuals (Frank, Hillman, and Korb); *three* of its experts on the claim that DADT lacks "empirical" support (Hillman, Frank, and Korb); *two* of its experts on the issue of the current polling of civilians and servicemembers regarding their attitudes towards the service of open homosexuals in the military (Frank and Korb); and *two* of its experts on the purported disparate impact of DADT on lesbian servicemembers (Hillman and Embser-Herbert). To the extent the Court determines that these opinions are otherwise admissible under FRE 702 and 402, it should limit plaintiff to one expert witness per topic.

## C.   Motion *in Limine* Regarding Designation of Deposition Testimony

Defendants also intend to move to exclude plaintiff's contemplated designations of deposition testimony. As with the live testimony of plaintiff's experts and exhibits, no evidence outside the statute and legislative history is appropriate in adjudicating a facial constitutional challenge subject to rational basis review. To the extent that the designated testimony relates to (a) any question answered during the deposition that expressly states the personal views of the witness, or (b) any question that was outside the scope of the areas that the Court permitted plaintiff to explore in its 30(b)(6) depositions, moreover, such designated testimony is objectionable. And there is no basis for accepting the deposition testimony of plaintiff's own expert witness, Dr. MacCoun, rather than hearing Dr. MacCoun's live testimony at trial (to the extent the Court concludes his testimony is otherwise admissible in the first instance).

EXHIBIT A

-5-

**D.    Motion *in Limine* Regarding Undisclosed Fact Witnesses**

Of the fact witnesses plaintiff now advises it apparently intends to call at trial, all but Messrs. Hamilton and Nicholson were not properly disclosed under FRCP 26 or otherwise made known during discovery.  Defendants will move to exclude those witnesses who were not properly disclosed in plaintiff's disclosures and/or discovery.  Where a party fails to provide information or identify a witness under Rules 26(a) or (e) or otherwise in discovery, as here, that party is prohibited from using that witness at trial. *See* FRCP 37(c)(1).  To the extent these individuals will be called to testify as to the merits, moreover, none appear to have testimony relevant to plaintiff's facial challenge.

Sincerely,

Paul G. Freeborne
Federal Programs Branch
Civil Division

EXHIBIT A

**EXHIBIT B**

## DECLARATION OF CUSTODIAN OF RECORDS

☑  I HEREBY DECLARE, under penalty of perjury, that the following statements are true to the best of my knowledge and belief.

I am the duly authorized custodian of records of the below named and certify that the accompanying records are true and complete copies of records maintained in the regular course and scope of business of my employer and were prepared by authorized personnel at or near the time of the acts, conditions or events which they intend to convey. No documents, records or other materials have been withheld except as noted below.

Certain records were omitted because:  *n/a*

_____

_____

OR, IN THE ALTERNATIVE

☐  I HEREBY DECLARE, under penalty of perjury, that I have NO RECORDS on the patient, employee, or subject in request.

Please explain if you have no records:  _____

_____

_____

Records Subpoenaed From:
Zogby International, 1600 K Street, Suite 600, Washington, D.C. 20006 Tel: (202) 429-0022

Re:
2006 Report entitled "Opinions of Military Personnel on Gays in the Military."  Format is specified as electronic (pdf) and paper hard copies.

on *Feb. 19  2010*

*Samuel B Rodgers II*
_____
Signature of Custodian

File Number          _____

W.C.A.B. No.        _____

Case Number        _____

# EXHIBIT B

American LegalNet, Inc.
www.FormsWorkflow.com

LCR ZOG 01051

## ZOGBY INTERNATIONAL

**Opinions of Military Personnel on Gays in the Military**

Submitted to:
Aaron Belkin, Director
Michael D. Palm Center

Submitted by:
**Zogby International**
John Zogby, President and CEO
John Bruce, Vice President and Systems Administrator
Rebecca Wittman, Vice President and Managing Editor

Sam Rodgers, Writer

December, 2006

© 2006 Zogby International

# EXHIBIT B

## Table Of Contents

| Subject | Page |
|---|---|
| I. Methodology and Sample Characteristics | 2 |
| II. Executive Summary | 5 |
| III. Narrative Analysis | 8 |

| Tables | |
|---|---|
| 1. Intra-Unit Leadership And Cooperation | 12 |
| 2. Impact Of Gay/Lesbian Presence On Unit Morale | 17 |
| 3. Assumed Impact Of Gay/Lesbian Presence On Unit Morale | 18 |
| 4. Arguments For Keeping Gays/Lesbians From Serving | 23 |
| 5. Arguments For Allowing Gays/Lesbians To Serve | 24 |

# EXHIBIT B

## I. Methodology and Sample Characteristics

**Methodology**

     Zogby International conducted online interviews of 545 U.S. Military Personnel who have served in Iraq and Afghanistan (or in combat support roles directly supporting those operations), from a purchased list of U.S. Military Personnel. The online poll ran from 10/24/06 through 10/26/06.  The margin of error is +/- 4.3 percentage points. Margins of error are higher in sub-groups. Slight weights were added to age and race to more accurately reflect the population.  Data used in weighting was obtained from official Department of Defense (DOD) resources.

     The panel used for this survey is composed of over 1 million members and correlates closely with the U.S. population on all key profiles.  The panel uses a double opt-in format through an invitation only method.  Panelists are sourced through a variety of commercial enterprises and all recruitment methodologies fully comply with CASRO guidelines.  Each panelist is defined by over 400 variables, therefore making the panel highly segmented and fully representative of the US and military population.

EXHIBIT B

| Sample Characteristics | Frequency | Valid Percent* |
|---|---|---|
| Sample size | 545 | 100 |
| East | 69 | 13 |
| South | 223 | 43 |
| Central/Great Lakes | 101 | 20 |
| West | 123 | 24 |
| Did not answer state | 29 | -- |
| Veteran | 88 | 16 |
| Active | 353 | 65 |
| Reserve/Guard, mobilized | 35 | 6 |
| Reserve/Guard, non-mobilized | 69 | 13 |
| Air Force | 160 | 29 |
| Army | 251 | 46 |
| Marines | 35 | 7 |
| Navy | 92 | 17 |
| Coast Guard | 5 | 1 |
| 18-29 | 296 | 55 |
| 30-49 | 221 | 41 |
| 50-64 | 22 | 4 |
| Did not answer age | 6 | -- |
| White | 375 | 73 |
| Black/African American | 62 | 12 |
| Spanish/Hispanic/Latino | 47 | 9 |
| American Indian/Alaska Native | 5 | 1 |
| Asian | 13 | 3 |
| Hawaiian/Pacific Islander | 5 | 1 |
| Other/Mixed | 10 | 2 |
| Did not answer race | 28 | -- |
| Baptist | 85 | 17 |
| Church of Christ | 22 | 4 |
| Episcopal | 6 | 1 |

# EXHIBIT B

LCR ZOG 01055

| Sample Characteristics (continued) | Frequency | Valid Percent* |
|---|---|---|
| Jewish | 6 | 1 |
| Lutheran | 35 | 7 |
| Methodist | 26 | 5 |
| Mormon | 6 | 1 |
| Muslim | 5 | 1 |
| Pentecostal | 16 | 3 |
| Presbyterian | 11 | 2 |
| Roman Catholic | 148 | 29 |
| Seventh Day Adventist | 1 | 0 |
| Atheist/Realist/Humanist | 17 | 4 |
| Other/no affiliation | 120 | 24 |
| Did not answer religion | 36 | -- |
| Democratic | 101 | 21 |
| Republican | 241 | 51 |
| Independent/Minor party | 103 | 22 |
| Not sure of party | 32 | 7 |
| Did not answer party | 68 | -- |
| Male | 451 | 85 |
| Female | 80 | 15 |
| Did not answer gender | 15 | -- |

**\* Numbers have been rounded to the nearest percent and might not total 100.**

# EXHIBIT B

LCR ZOG 01056

## II. Executive Summary

This survey of current and recent military service personnel who have served in Iraq or Afghanistan (or in combat support roles directly supporting those operations) sought to explore the issue of gays and lesbians in the United States military, specifically within the context of three key areas – the size and characteristics of the gay and lesbian population in the military, the views of service personnel regarding the subject, and finally, the impact of gays and lesbians on the military.

## Population Within Service Unit

By interviewing military personnel who have served in Iraq or Afghanistan (both those who have served and are serving currently), we were able to capture a snapshot of the current military environment with respect to this issue. Our survey included respondents from all service branches as well as Active Duty Personnel, Veterans and Reservists. The sample also included combat and non-combat units as well as enlisted men and officers.

The overall attitude of these service members was optimistic. Large majorities report being well-trained, well-equipped and battle ready. Additionally, most respondents believe that their leadership (both Non-Commissioned Officers and Commissioned Officers) was excellent and they report feeling a high level of teamwork exists within their unit.

Regarding the presence of gays and lesbians in their units, a near majority (45%) states that they *suspect* a member of their unit is homosexual. Roughly one-third (31%) does not suspect a member of their unit. Higher rates of suspicion were found among Reservists (60%), Navy Personnel (59%) and Females (56%). The lowest rates were found among Air Force Personnel (38%) and Officers (33%). When asked how many unit members they suspected, two-thirds of respondents (68%) said less than three.

Respondents were also asked if the *knew* of any members within their unit who were gay or lesbian. Here, less than one quarter (23%) said they were definitely aware. Of those who were, three-in-five (59%) report having been directly told by the individual. When asked how many they *knew* within their unit, the vast majority (75%) reported knowing two or less. A majority (55%) also notes that the presence of gays and lesbians is well-known within their unit.

## Opinions On Homosexuality

Asked whether they agree that gays and lesbians should be allowed to serve in the military, respondents were closely split with a plurality (37%) disagreeing with the idea, and 26 percent agreeing they should be allowed.

# EXHIBIT B

LCR ZOG 01057

Of those agreeing with their inclusion, certain demographic groups represented higher than average support. Among those were Independents, African-Americans, Women, those aged 25-34, and Women. These subgroups were largely more supportive of gays and lesbians in every question, with Democrats and Hispanics also frequently representing more open views toward gays in the military.

Within military subgroups, veterans and those having served less than 4 years were also more likely to support the idea of inclusion within the military, while Active Duty Personnel, Officers, and those having served 15 or more years were less likely to agree. There was slight variance among service branches, and this variance has been noted where applicable.

Three-quarters of those surveyed stated that they felt comfortable around gays and lesbians and four-in-five (78%) noted that they would join the military regardless of their open inclusion. Additionally, a majority (52%) reports having received some form of anti-gay harassment training, with Air Force personnel representing the highest level of training (62%) and the Marine Corps the lowest (34%).

**Perceived Impact**

Of those who were certain that a member of their unit was gay or lesbian, two-thirds did not believe that their presence created an impact on either their personal morale (66%) or the morale of their unit (64%). Approximately one-quarter of that group believed there to be a negative impact to both.

In contrast, of those who do not suspect the presence of gays or lesbians within their unit, only half (49%) perceive no impact on personal morale, and only less than one-third (26%) feel there would be no impact on their unit's morale. Regarding their unit's morale, a majority of this group (58%) believes if there were gays or lesbians within their unit, there would be a negative impact.

Given a set of arguments both for and against allowing gays in the military, respondents were asked to choose those that were the strongest. The most widely selected arguments for keeping gays and lesbians from serving centered on the threat of their presence undermining the unit (40%) or the threat of harm befalling them (28%).

When given the arguments in support of allowing their inclusion, the two most selected arguments were the irrelevance of sexual orientation to job performance (39%) and the morality of discriminating based on sexual orientation (30%). Additionally, one-in-five respondents (21%) believed there to be no strong arguments for the exclusion of homosexuals, while one-in-five (19%) believe there to be no strong arguments in their favor.

## EXHIBIT B

LCR ZOG 01058

Overall, this survey paints a mixed picture for the future of gays and lesbians in the military. While overwhelming majorities of those responding display tolerance and understanding of the rights and issues involved in the argument, there are still large obstacles that must be overcome.

EXHIBIT B

EXHIBIT B

## III. Narrative Analysis

*1. What is your current status?*

| | |
|---|---|
| Active | 65% |
| Veteran | 16 |
| Reserve/Guard, non-mobilized | 13 |
| Reserve/Guard, mobilized | 6 |

    A majority of those surveyed (65%) indicated that they were currently classified as Active Duty.  Almost one-in-five (19%) identified themselves as being in the Reserves – 13 percent non-mobilized, 6 percent mobilized.  The reaming 16 percent noted their status as Veterans.

*2. In which branch of the military do you serve?* **(Vets: In which branch of the military did you serve?)**

| | |
|---|---|
| Army | 46% |
| Air Force | 29 |
| Navy | 17 |
| Marines | 7 |
| Coast Guard | 1 |

    Respondents serving (or having served) in the Army composed almost half (46%) of the sample size.  Three-in-ten (29%) noted their service in the Air Force, with another 17 percent affiliated or having been affiliated with the Navy.  The remaining respondents were either members of the Marines (7%) or the Coast Guard (1%).

*3. **(Veterans only)** How many years ago did you leave the service?*

| | |
|---|---|
| One | 35% |
| Two | 24 |
| Three | 17 |
| Four | 6 |
| Five | 19 |

    More than two-in-three veteran respondents (59%) stated that they had left the military within the past two years.  The remaining 42 percent left within the past five years.  All took part in operations in either Iraq and/or Afghanistan or were involved in combat support operations related to those two operations.

# EXHIBIT B

*4. How many years have you served in the U.S. military?* **(Vets: How many years did you serve in the U.S. military?)**

| | |
|---|---|
| Less than four | 11% |
| Four | 9 |
| Five | 12 |
| Six | 8 |
| 7 to 10 | 20 |
| 11 to 20 | 27 |
| 21 to 30 | 12 |

Roughly one-third (32%) of those surveyed have (or did) serve 5 or fewer years. More than a quarter served between either 6 to 10 years (28%) or between 11 to 20 years (27%).   Little more than one-in-ten (12%) served longer than 20 years.

*5. What is or was the highest grade you achieved?*

| | |
|---|---|
| E2 – E9 | 66% |
| O1 – O8 | 31 |
| W1 – W5 | 3 |

Nearly two thirds of respondents (66%) achieved their highest rank as an enlisted man/woman.  An additional third (31%) reached their highest rank as an officer, with the remaining 3 percent identifying themselves as warrant officers.

*The following are questions about your current unit. If you just arrived at a new unit, please answer for your last unit.* **(Vets: First we'd like to ask some questions about the last unit you served in.)**

*6. Is your unit a combat, combat-support, or combat service support unit?* **(Vets: Was the last unit in which you served a combat, combat-support, or combat service support unit?)**

| | |
|---|---|
| Combat | 29% |
| Combat support | 32 |
| Combat service support | 18 |
| Other | 19 |
| Not sure | 2 |

Nearly equivalent numbers of respondents were currently in (or had last been in) combat units (29%) and combat support units (32%).  A slightly smaller number, one-in-five (18%), listed their current or last unit as a designated combat service support unit.

## EXHIBIT B

The remaining respondents were either in units under another designation (19%) or were unsure about their unit's designation (2%).

Among service branches, more than one-third of respondents from the Navy (39%) and the Army (34%) classified their units as combat units. A little fewer than one-in-five of those surveyed (19%) from both the Air Force and the Marines listed themselves as part of combat units. Air Force members were more likely to be part of units designated as combat support (39%) than under any other designation. Similarly, respondents from the Marine Corps were most likely to be in combat service support designated units (42%) than in any other such designated unit.

*7. How would you rate your unit's level of training for its wartime mission? (Vets: How would you rate your unit's level of training for its wartime mission? If it varied, think generally about the last year you served in it.)*

| | | | |
|---|---|---|---|
| Very well trained | 43% | | |
| Well trained | 39 | **Above Average** | **83%** |
| Adequately trained | 13 | | |
| Poorly trained | 3 | | |
| Very poorly trained | 1 | **Below Average** | **4** |
| Not sure | 1 | | |

The overwhelming majority of survey respondents (83%) rate their current or former unit as well or very well trained. Only one-in-twenty (4%) list their unit as being poorly or very poorly trained for their wartime mission.

When viewed by service branches, some disparities emerge. Among Air Force and Marine respondents, nine-in-ten (89 and 90 percent, respectively) rate their unit as having above adequate training. On the other hand, four-in-five (80%) of Army and Navy respondents each lists their units as above average.

The only subgroup that presents a below average rating above 5 percent are Reservists, whose net below average rating is 8 percent. Across Veterans, Active Duty Personnel, Enlisted men and Officers, these ratings hold within the sample error.

## EXHIBIT B

LCR ZOG 01063

*8. How would you rate the equipment your unit has for its wartime mission? (Vets: How would you rate the equipment your unit had for its wartime mission? Consider overall the last year you served.)*

| Very well equipped | 23% | | |
| Well equipped | 39 | **Above Average** | **62%** |
| Adequately equipped | 28 | | |
| Poorly equipped | 7 | | |
| Very poorly equipped | 2 | **Below Average** | **9** |
| Not sure | 1 | | |

Three-out-of-five survey respondents (62%) rated their unit's equipment as well equipped (39%) or very well equipped (23%).  Less than one-in-ten (9%) rated their equipment for their wartime mission as below average.  The remaining respondents either stated that their unit was adequately equipped (28%) or were uncertain (1%).

Within the service branches, respondents from the Air Force rated their unit's equipment readiness the highest (76%), while members of Army gave their unit's the lowest rating (53%).  Approximately three-in-five respondents in both the Navy (61%) and the Marine Corps (62%) designated their units as having an above average equipment readiness.

Only the Army and Navy had below average ratings – 13 and 12 percent, respectively.  Among other significant subgroups, the highest above average rating emerged from officers (73%), while the highest below average rating came from reservists (17%).

*9. How would you rate the readiness of your unit for its wartime mission? (Vets: How would you rate the readiness of your last unit for its wartime mission? Again, think generally about the last year you served.)*

| Very High | 40% | | |
| High | 39 | **Above Average** | **79%** |
| Medium | 17 | | |
| Low | 3 | | |
| Very Low | 1 | **Below Average** | **4** |
| Not sure | 1 | | |

Three-in-four respondents (79%) rated their unit's overall readiness as above average, with only 4 percent designating their unit as below average.  Members of three service branches – the Navy, Air Force and Marine Corps – rated their readiness higher than the overall above average rating, with 82 percent, 86 percent and 90 percent respectively. Slightly less than three quarters of Army respondents (73%) rated their units the same.

## EXHIBIT B

Among other sub groups, only Officers (85%) and Active Duty Personnel (82%) gave their units higher ratings than the overall average.  The overall results held across all other subgroups.

*10 – 12. Do you agree or disagree with the following statements?*

**Table 1. Intra-unit Leadership and Cooperation**

| | Agree | | | Neutral | Disagree | | | Not sure |
|---|---|---|---|---|---|---|---|---|
| | Overall | Strongly agree | Agree | | Overall | Disagree | Strongly Disagree | |
| The NCOs in my unit are good leaders. (Vets: The NCOs in my last unit were good leaders.) | **85** | 36 | 49 | 11 | **3** | 3 | <1 | 1 |
| There is a lot of teamwork and cooperation in my unit. (Vets: There was a lot of teamwork and cooperation in my unit.) | **82** | 32 | 50 | 12 | **6** | 5 | 1 | 1 |
| The officers in my unit are good leaders. (Vets: The officers in my last unit were good leaders.) | **72** | 25 | 47 | 19 | **8** | 6 | 2 | 1 |

Both Non-Commissioned Officers (NCOs) and Commissioned Officers received high marks for leadership.  NCOs did fare better in the overall ratings, as more than four-in-five respondents (85%) agreed that their NCOs were good leaders.  Among Marine Corps respondents, agreement reached almost complete unanimity (95%), while among Army service members that rate dropped to 82 percent.

When asked about their officers, more than two-in-three (72%) agreed that they were good leaders.  Navy members were far less likely to believe that their officers were good leaders, as just over half (58%) agreed with that statement.  Again, Marine Corps respondents gave their officers the highest vote of confidence among service groups, with almost all (93%) agreeing their officers were good leaders.

Four-in-five survey respondents (82%) agreed with the statement that there is a lot of teamwork and cooperation in their unit.  Four subgroups had higher agreement rates with the statement – Active Duty Personnel (86%), Officers (87%), the Air Force (88%) and the Marine Corps (92%).  All other subgroups were within the sampling error.

# EXHIBIT B

LCR ZOG 01065

*13. Do you agree or disagree with allowing gays and lesbians to serve openly in the military?*

| | | | |
|---|---|---|---|
| Strongly Agree | 9% | | |
| Agree | 17 | **Agree** | **26%** |
| Neutral | 32 | | |
| Disagree | 16 | | |
| Strongly Disagree | 21 | **Disagree** | **37** |
| Not sure | 5 | | |

Slightly more than one-in-three respondents (37%) disagree that gays should be allowed to serve openly in the military, while almost three-in-ten (28%) believe they should. Of those remaining, an almost equivalent amount holds a neutral opinion (32%), while just 5 percent are unsure.

Along political lines, Democrats and Independents/Moderates (Independents) are far more likely to agree with the statement. One-in-three Democrats (35%) and Independents (36%) hold this opinion, while only one-in-five Republicans (22%) holds the same. One-quarter of Democrats (28%) disagreed with the statement, while Independents (41%) held close to the overall average, and almost half of Republicans (45%) expressed their disagreement.

A further divide was present along racial lines, as Whites (26%) and Hispanics (26%) held to the average agreement rate, while more than a third of African-Americans (37%) agreed. Only one-in-five Hispanics (17%) and a quarter of African-Americans (28%) disagreed with the statement, but among Whites the rate rose to more than two-in-four (43%).

There also exists a gender divide with women far more likely than men to express agreement with the idea of gays and lesbians in the military. Four-in-nine women (44%) believe gays and lesbians should be allowed to serve, while more than a quarter of women (27%) disagree. Among men, the rates are almost reciprocal with a quarter of men (24%) expressing agreement and two-in-five (40%) voicing their disapproval.

The only remaining non-military subgroup results to display significant findings were the disapproval rates among Baptists (41%), those between the age 35-54 (46%), and those living in both the Central/Great Lakes (45%) and Western U.S. (48%). Among Easterners, the rates were highly favorable toward the statement with more than two-in-five (39%) agreeing and less than one-in-five (15%) disagreeing.

Within military subgroups, the highest agreement rates were found among Veterans (35%) and those having served less than four years (37%). The lowest acceptance rates were among Active Duty Personnel (23%), officers (23%), those serving between 10 and 14 years (22%) and those serving more than 20 (19%). Active Duty Personnel were also among those with the highest disapproval rates (39%), as were those

## EXHIBIT B

LCR ZOG 01066

serving between 15 and 19 years (40%), those serving more than 20 (49%), and officers (47%).

Among the service branches, the Army had the lowest agreement rate – less than a quarter (23%) – as compared with the Marine Corps (25%), The Air Force (29%) and the Navy (31%). The highest disapproval ratings were found amongst the Air Force (40%) and the Army (37%), followed closely by the Navy (33%) and the Marine Corps (32%).

*14. In your unit, are there people you suspect are gay or lesbian, but don't know for sure? (Vets: In your last unit, were there people you suspected were gay or lesbian, but didn't know for sure?)*

| | |
|---|---|
| Yes | 45% |
| No | 31 |
| Not Sure | 25 |

Almost half of all service members (45%) stated that they suspect there are members of their unit who are gay or lesbian. Three-in-ten (31%) said they did not suspect a unit member, while a quarter of all respondents (25%) said they were unsure.

Females were much more likely than males to suspect a member of their unit, with nearly three-in-five females (56%) believing a member of their unit to be gay or lesbian, while little more than two-in-five (43%) males held the same belief.

Three-in-five Reservists (60%) and more than half of all Veterans (54%) responded that they suspected a member of their unit, as opposed to approximately two-in-five (38%) active duty personnel. Higher than average rates were also found among Enlisted men (50%), Marines (51%) and Navy Personnel (59%). Roughly two-in-five members of the Air Force (38%) and the Army (43%) suspected members of their unit, as did only one-third (33%) of officers.

*15. (Asked only of those who suspect gays/lesbians in their unit.) How many people do you suspect are gay or lesbian? (Vets: How many people did you suspect were gay or lesbian?)*

| | |
|---|---|
| One | 13% |
| Two | 26 |
| Three | 29 |
| Four | 12 |
| Five | 12 |
| Six or More | 9 |

# EXHIBIT B

Of those who responded that they suspect a member of their unit is gay or lesbian, respondents were asked how many individuals they suspected. Two-thirds of respondents (68%) said they suspected three or fewer individuals in their unit were gay or lesbian. A little more than one-third (39%) suspected two or fewer unit members. The remaining third (32%) suspected that four or more members of their unit were gay or lesbian. These numbers held across all military subgroups.

*16. Do you know for certain that someone is gay or lesbian in your unit? (Vets: In your last unit, did you know for certain that someone was gay or lesbian?)*

| | |
|---|---|
| **Yes** | **23%** |
| No | 61 |
| Not sure | 17 |

Sixty-one percent of respondents surveyed stated that they were certain that a member of their unit was not gay or lesbian, as compared to 23 percent who were certain. Among women, nearly three-in-ten (29%) expressed certainty that a member of their unit was gay or lesbian. Only one-in-five males (22%) had the same degree of confidence.

When compared among service branches, those in the Navy were the most likely to be certain regarding the presence of gays and lesbians in their unit. Thirty-one percent of Navy personnel responded as such, while a quarter of Marines (26%) and those in the Army (25%) had the same level of certainty. Members of the Air Force were the least likely to be certain of a unit member's homosexuality, with only 13 percent holding this view. Enlisted men were more than twice as likely as officers to know for certain, with more than a quarter (27%) noting this, as opposed to the 12 percent of officers.

**(Questions 17-21 were asked only of those who know for certain that someone in their unit is gay/lesbian.)**

*17. How many people do you know for certain are gay or lesbian? (Vets: How many people did you know for certain were gay or lesbian?)*

| | |
|---|---|
| One | 37% |
| Two | 38 |
| Three | 14 |
| Four | 3 |
| Five | 2 |
| Six or More | 5 |

Three quarters of respondents (75%) who were certain about the presence of gays or lesbians within their unit knew of two or less people. Fourteen percent were aware of three members, while a further 10 percent knew of four or more. Among males, more

## EXHIBIT B

than two-in-five (42%) were aware of only one individual.  Females, on the other hand, were less likely to know of just one individual (17%), but much more likely to know of the presence of four or more (37%).  Only 4 percent of males were aware of four or more within their unit.

*18. How do you know for certain? (Vets: How did you know for certain?) (Choose all that apply.)*

| | |
|---|---|
| The individual told me | 59% |
| Somebody else told me about the person | 32 |
| I could tell by the person's speech, behavior, or appearance | 25 |
| I observed the person being romantic with someone of the same sex | 24 |
| I observed the person attending a gay club, bar, parade, political activity, etc. | 8 |
| Other | 12 |
| Not sure | 3 |

A majority of those who know about a unit member being gay or lesbian (59%) report as to having been made aware by the individual themselves.  Additionally, a third (32%) say that they were told by another person.  One quarter also report their certainty as being based either on the person's behavior (25%) and/or having observed the person engaged in homosexually romantic activity (24%).

When broken down by gender, women were more likely than men to have been told by the individual (74 percent to 55 percent).  Men, on the other hand, were twice as likely than women to have been told by another individual (36 percent to 17 percent).  Enlisted men were also twice as likely as officers to have been told by the individual themselves (63% to 30%).

*19. Is the presence of gays or lesbians in the unit well-known by others? (Vets: Was the presence of gays or lesbians in the unit well-known by others?)*

| | |
|---|---|
| Yes | 55% |
| No | 25 |
| Not sure | 21 |

More than half (55%) of those knowing with certainty about the presence of gays or lesbians within their unit state that such a presence is well known by others.  More than a quarter (25%) claim that the presence is not well-known.  Between males and females, males are more likely to agree that the presence of gays and lesbians within the unit is well known (56%), while less than half of women (47%) report the same.  The overall averages hold constant across all other subgroups.

# EXHIBIT B

*20. How does the presence of gays or lesbians in your unit impact your <u>personal</u> morale?*
**(Vets: How did the presence of gays or lesbians in your last unit impact your <u>personal</u> morale?)**
*21. How does the presence of gays or lesbians in your unit impact your <u>unit's overall</u> morale? (Vets: How did the presence of gays or lesbians in your last unit impact your <u>unit's overall morale?</u>) (All responses skip to 24)*

**Table 2. Impact of Gay/Lesbian Presence on Unit Morale**

|  | Personal morale | Unit's morale |
|---|---|---|
| Very negative impact | 8 | 8 |
| Somewhat negative impact | 20 | 19 |
| **Negative** | **28** | **27** |
| **No impact** | **66** | **64** |
| Somewhat positive impact | 1 | 1 |
| Very positive impact | 4 | 2 |
| **Positive** | **6** | **3** |
| Not sure | 1 | 6 |

When those who were certain of the presence of gays or lesbians within their unit were asked what impact this presence had on both their personal morale and their unit's morale, responses were consistent across the board. Roughly one quarter of all respondents said that the presence of gays or lesbians had a negative impact on either their personal morale (28%) or their unit's morale (27%). The overwhelming majority of respondents stated their belief that the presence of gays or lesbians had little or no impact on either. Less than one out of every ten respondents noted a positive impact with personal morale (6%) or their unit's morale (3%).

Men were twice as likely as women to view gays and lesbians within their unit as having a negative impact on personal morale. Three-in-ten men (31%) voiced this opinion, while only one-in-ten women (14%) did the same. Eleven percent of women noted a positive impact created by gays and lesbians, as compared to 4 percent of men. Among other subgroups, the only significant variation was found with Active Duty Personnel, of whom more than a third (36%) listed a negative impact on personal morale created by gays and lesbians within the unit.

Opinions regarding the impact on the unit's morale were even more consistent. Here, the only significant variations were found among women – 10 percent of whom believe in a positive impact of unit morale. This is starkly contrasted by the 1 percent of men who hold the same belief. Among Active Duty Personnel, negative impact rating is also higher than average, with one-third (33%) believing it to have a negative impact.

## EXHIBIT B

*(Questions 22-23 were asked only of those who do not know for certain that someone in their unit is gay/lesbian.)*

*22. How do you think the presence of gays or lesbians in your unit would impact your personal morale?*
*23. How do you think the presence of gays or lesbians would impact the overall morale of your current unit? (Vets: How do you think the presence of gays or lesbians would impact the overall morale of your last unit?)*

**Table 3. Assumed Impact of Gay/Lesbian Presence on Unit Morale**

|  | Personal morale | Unit's morale |
|---|---|---|
| Very negative impact | 9 | 15 |
| Somewhat negative impact | 29 | 43 |
| **Negative** | **38** | **58** |
| **No impact** | **49** | **26** |
| Somewhat positive impact | 1 | -- |
| Very positive impact | 2 | 2 |
| **Positive** | **2** | **2** |
| Not sure | 11 | 14 |

Respondents who had previously stated that they were not certain about the presence of gays or lesbians within their unit were asked about the hypothetical impact if such a presence existed. The result was a higher negative impact rating than is seen among respondents who are certain of gays or lesbians in their units.

More than one-third (38%) of these individuals believe there would be a negative impact on personal morale, and more than half (58%) believe such presence would have a negative impact on the unit's morale. The percentage of those voicing the opinion that the presence of gays or lesbians would have no impact fell significantly from the percentages of those who are certain of gays or lesbians in their units, as did the percentage of those perceiving a positive impact.

Across the gender divide, men again saw the presence of gays and lesbians as having a more negative impact, with more than two-in-five (42%) holding this opinion regarding personal morale, and more than three-in-five (62%) regarding the unit's morale. Only one-in-five women (22%) believed gays and lesbians in their unit would have a negative impact on their own morale, while twice that number (45%) believe in a negative impact for the unit.

Older respondents were also more likely to perceive a negative impact – the highest such rating coming from those between the ages of 35 to 54, as 46 percent believe in a negative impact on personal morale and two thirds (68%) in a negative impact on the unit.

## EXHIBIT B

For impact on personal morale among military subgroups, the lowest negative ratings emerged among those having served less than four years (27%) and between 10 and 14 years (29%), and those in the Navy (29%). In contrast the highest negative ratings emerged from those having served between 15-19 years (43%) or more than 20 years (49%), Officers (42%), and those in the Marine Corps (43%). All subgroup positive ratings were well within the sampling error.

The negative impact of gays and lesbians regarding unit morale also presented several significant subgroup variations. Among the service branches, personnel in the Navy (51%) and Air Force (54%) have the lowest negative opinion, while the Army (61%) and the Marine Corps (69%) have the highest.

The data also shows that the longer one serves in the military, the more likely they are to believe in a negative impact. Such ratings were lowest among those serving less than 4 years (50%) and highest among those serving either between 15 and 19 years (63%) or more than 20 (68%). Two-thirds of officers (66%) also held a negative opinion, compared to 53 percent of enlisted men. Still, net negative impact ratings were above 50 percent for every subgroup.

*24. Personally, how comfortable are you in the presence of gays and lesbians?*

| | | | |
|---|---|---|---|
| Very Comfortable | 29% | **Comfortable** | **73%** |
| Somewhat Comfortable | 44 | | |
| Somewhat Uncomfortable | 15 | **Uncomfortable** | **19** |
| Very Uncomfortable | 5 | | |
| Not Sure | 8 | | |

When asked whether they were comfortable in the presence of gays and lesbians, three-quarters (73%) of those surveyed said they were either somewhat comfortable (44%) or very comfortable (29%). Less than one-in-five (19%) stated that were uncomfortable, and of that group, only 4 percent identified themselves as being very uncomfortable.

Comfort rates were consistent across both Democrats (73%) and Republicans (72%), but spiked among Independents (81%). Among Independents, very comfortable rates were the highest of any subgroup, with more than one third (37%) stating their high degree of comfort with gays and lesbians. The highest discomfort rate was found amongst Republicans – nearly a quarter of whom (24%) held this opinion.

Females were also more likely to express comfort among gays and lesbians, as nearly nine-in-ten (88%) held this opinion, as compared to seven-in-ten males (71%). Males were three times more likely to be uncomfortable (22%) than were women (6%).

## EXHIBIT B

**LCR ZOG 01072**

Among other subgroups, African-Americans (71%), Catholics (78%) and those between the ages of 25-34 (75%) displayed the highest rates of comfort. Baptists (26%) and those between the ages of 18 and 24 (24%) presented the highest discomfort rates.

Within military subgroups, Veterans (81%) were more likely than Active Duty Personnel (70%) to be comfortable in the presence of gays and lesbians. Also, more than four-in-five (85%) of those who have served between 10 and 14 years expressed being comfortable, while two-thirds (66%) of those having served more than 20 years feel the same.

Additionally, roughly four-in-five members of the Navy (79%) and Marine Corps (82%) stated that they felt comfortable around gays and lesbians – the highest rates among the service branches. This compared with less than three quarters of Air Force members (73%) and Army members (69%). Air Force personnel displayed the highest discomfort rate (23%) of any service branch.

*25. In your current unit, how often do you take showers privately, such as in a single-stall shower rather than an open group shower? (Vets: During the last year of your military service, how often did you take showers privately, such as in a single-stall shower rather than an open group shower)*

| | |
|---|---|
| Almost Always Privately | 49% |
| Usually Privately | 22 |
| About Half and Half | 17 |
| Usually Group Showers | 5 |
| Always or Almost Always Group Showers | 3 |
| Not sure | 4 |

Just less than half of all respondents (49%) stated that they almost always shower privately. An additional fifth (23%) note that they usually shower privately, which aggregates to nearly three quarters (71%) of service personal surveyed who at the minimum usually shower privately. A further 17 percent shower privately approximately half the time, leaving only 8 percent who usually or almost always shower in groups.

Women were more likely than men to shower privately, with three-fifths (61%) responding that they almost always shower privately and at least three quarters (78%) who usually do so. Less than half of all men (47%) said they always shower privately, and more than two-thirds (70%) at least usually do so.

Among the service branches, those in the Navy (88%) and Air Force (79%) were most likely to at least usually shower privately. Within the Navy, almost two-thirds (64%) noted that they almost always shower privately – the highest such rate. Roughly three-in-five Army personnel (60%) and Marine Corps members (63%) report at least usually showering privately. Only 37 percent of Army personnel said that they always shower privately – the lowest such rate.

## EXHIBIT B

*26. Which of the following were important in your decision to join the military? **(Choose all that apply.)***

| | |
|---|---|
| Duty/service to the country | 78% |
| Benefits (such as retirement, health care) | 62 |
| Funds for college or vocational school | 54 |
| Job skills/experience for a civilian job | 51 |
| Military values/ethics | 50 |
| Interesting/meaningful work | 44 |
| Challenges of military life (such as mental, physical) | 39 |
| Salary/cash bonuses | 35 |
| Family tradition of military service | 28 |
| Knowing that gays are not allowed to serve openly | 2 |
| Other/None of the above | 6 |
| Not sure | 1 |

Asked to choose which reasons were most important in their decision to join the military, an overwhelming majority of respondents (78%) stated that their decision was a product of a sense of duty and a desire to serve their country. Approximately three-in-five said that their reason for joining was either for non-wage benefits (62%) or for funds for college tuition (54%).

Half noted their reasons as being either for military values (50%), Job skills and experience (51%) or for interesting and meaningful work (44%). Only 2 percent noted that the inability of gays to serve in the military was a reason behind their decision to serve.

*27. Would you have still joined the military if gays and lesbians were allowed to serve openly?*

| | | | |
|---|---|---|---|
| Definitely Yes | 42% | **Yes** | **78%** |
| Probably Yes | 35 | | |
| Probably Not | 7 | **No** | **10** |
| Definitely Not | 3 | | |
| Not Sure | 13 | | |

Four-out-of-five respondents (78%) report that they would have joined the military, regardless of whether gays and lesbians would be allowed to serve. One-in-ten (10%) would not have joined if gays and lesbians were allowed to serve openly. Thirteen percent of respondents remain uncertain about their decision to this hypothetical.

# EXHIBIT B

LCR ZOG 01074

Eighty-nine percent of female respondents report they would have joined the military regardless of the presence of gays and lesbians, as compared to 77 percent of their male counterparts who hold the same opinion. All other subgroups' responses remained within the sampling error, including all military subgroups.

*Do you agree or disagree with the following statement?*

**28. Compared with my peers, I consider myself more tolerant on the issue of homosexuals in the military. (Vets: Compared with the peers I served with, I considered myself more tolerant on the issue of homosexuals in the military.)**

| | | | |
|---|---|---|---|
| Strongly Agree | 16% | | |
| Agree | 36 | **Agree** | **52%** |
| Neutral | 31 | | |
| Disagree | 8 | | |
| Strongly Disagree | 3 | **Disagree** | **11** |
| Not sure | 7 | | |

A majority of respondents (52%) believes they are more tolerant than their peers on the issue of homosexuals in the military. Only one-in-ten (11%) feels they are less tolerant, with 31% claiming neutrality on the issue.

Several subgroups present significantly higher than average agreement rates, including Democrats (69%), Independents (62%), Females (68%), Hispanics (64%) and African-Americans (55%). Conversely, male respondents and Republicans were less likely to agree that they were more tolerant than their peers, with 50 percent and 46 percent, respectively, holding that opinion.

Within military subgroups, Veterans (62%), those having served less than 4 years (62%), Marine Corps members (78%) and Navy personnel (61%) were more likely to agree that they were more tolerant than their peers. The lowest rates of agreement were found among Active Duty Personnel (29%), those serving between 5 and 9 years (42%), Air Force Personnel (48%) and Army Personnel (48%).

## EXHIBIT B

*29. What are the strongest arguments for keeping gays from openly serving in the military?* **(Please choose up to three of the most convincing options below)**

**Table 4. Arguments for Keeping Gays/Lesbians from Serving**

|  | % |
|---|---|
| Open gays and lesbians would undermine unit cohesion | 40 |
| Open gays and lesbians would get beat up or abused | 28 |
| Straights would not respect gay or lesbian leaders | 26 |
| Homosexuality violates religious / moral beliefs | 25 |
| Straights should not have to share foxholes, showers, etc. with open gays and lesbians | 22 |
| Open gays and lesbians would be more likely to pursue one another than they do now | 7 |
| Gays and lesbians would increase the spread of HIV/AIDS | 6 |
| Open gays and lesbians would be more likely to pursue straights | 5 |
| More gays and lesbians would join or remain in the military | 3 |
| Gays and lesbians cannot perform their military jobs as well as heterosexuals | <1 |
| Other reason | 9 |
| There are no strong arguments for keeping gays from serving openly | 21 |
| Not sure | 14 |

When asked to identify which are the strongest reasons for keeping gays and lesbians from serving openly in the military, the top two responses were concern for unit cohesion (40%) and for the individuals themselves (28%). The next tier of responses, each being selected by approximately one fourth of respondents, pertained to concern over the violation of moral or religious beliefs (25%), lack of respect for gay or lesbian leaders (26%), and a concern over sharing personal space (22%).

An almost equivalent number (21%) stated they believed there were no strong arguments for keeping gays and lesbians from serving openly.

# EXHIBIT B

*30. What are the strongest arguments for allowing gays and lesbians to serve openly in the military? (Please choose up to three of the most convincing options below)*

**Table 5. Arguments for Allowing Gays/Lesbians to Serve**

|  | % |
|---|---|
| Sexual orientation has nothing to do with job performance | 36 |
| It is wrong to discriminate based on sexual orientation | 30 |
| During wartime, the armed forces need every qualified service member regardless of sexual orientation | 25 |
| Discharging service members for being gay is a waste of recruiting, education and training dollars | 22 |
| Gays already make valuable contributions to the military | 17 |
| No one should be able to avoid a service obligation by claiming to be gay | 11 |
| No one should be forced to lie about who they are as a condition of military service | 11 |
| The government should not pry into people's private lives | 11 |
| Discharging service members for being gay undermines military readiness | 7 |
| Other reason | 2 |
| There are no strong arguments for allowing gays and lesbians to serve openly | 19 |
| Not sure | 13 |

Given potential arguments for allowing gays and lesbians to serve in the military, the two most frequently selected options were that sexual orientation has no impact on job performance (36%) and the ethical concern for discriminating based on sexual orientation (30%).

The next three most selected options involved the implications for service, especially during wartime. Respondents noted that in a state of war, the military needs access to every qualified individual (25%), discharging based on sexual orientation is a waste of resources (22%) and that individuals gays already make valuable contributions to the military (17%). Nearly one-in-five (19%) of respondents stated that they believe there are no strong arguments for allowing gays and lesbians to serve openly in the military.

# EXHIBIT B

LCR ZOG 01077

*31. Have you had training on the prevention of anti-gay harassment in the past three years? **(Vets: During the last three years of your military service, did you have any training on the prevention of anti-gay harassment?)***

| | |
|---|---|
| Yes | 52% |
| No | 37 |
| Not sure | 11 |

A majority of those surveyed (52%) report having received anti-gay harassment training within the past three years. Approximately one-third (37%) say they have not received such training, while one-in-ten (11%) is not sure.

Within military subgroups, Active Personnel were more likely than Veterans to have received such training – 56 percent compared to 44 percent. Also, 64 percent of those having served 15 to 19 years report having received training, while less than half of those having served less than 4 years (47%) or between 5 and 9 years (48%) report the same.

Among the service branches, the Air Force had the highest percentage of respondents having received training (62%), while those in the Army (51%), Navy (44%) and Marine Corps (34%) reported far lower levels of anti-gay harassment training.

# EXHIBIT B