1  DAN WOODS (SBN 78638)
   FERNANDO L. AENLLE-ROCHA (SBN 129515)
2  DEVON A. MYERS (SBN 240031)
   PATRICK HAGAN (SBN 266237)
3  WHITE & CASE LLP
   633 W. Fifth Street, Suite 1900
4  Los Angeles, CA  90071-2007
   Telephone:  (213) 620-7700
5  Facsimile:   (213) 452-2329
   Email: dwoods@whitecase.com
6  Email: faenlle-rocha@whitecase.com
   Email: dmyers@whitecase.com
7  Email: phagan@whitecase.com

8  Attorneys for Plaintiff
   Log Cabin Republicans
9

10              UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12

13  LOG CABIN REPUBLICANS, a non-        Case No. CV 04-8425-VAP (Ex)
    profit corporation,
14                                        **PLAINTIFF'S OPPOSITION TO
                    Plaintiff,            DEFENDANTS' MOTION *IN
15                                        LIMINE* REGARDING
           v.                             PLAINTIFF'S EXPERT
16                                        WITNESSES**
    UNITED STATES OF AMERICA and
17  ROBERT M. GATES, SECRETARY            [Declarations of Rachel Feldman and
    OF DEFENSE, in his official capacity, Patrick Hagan, and Exhibits Thereto
18                                        Filed Separately]
                    Defendants.
19                                        Date: June 28, 2010
                                          Time: 2:30 p.m.
20                                        Judge: Hon. Virginia A. Phillips

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page(s)**

I.   Introduction...................................................................................................1

II.  Factual Background ........................................................................................2

III. Argument .......................................................................................................8

    A.   The Government's Motion in Limine to Exclude All Expert
    Witnesses is Overly Broad and Violative of the Court's
    Limiting Order .......................................................................................8

    B.   Log Cabin's Expert Testimony Should Be Admitted At Trial ...........11

        1.   The Federal Rules of Evidence Liberally Admit Expert
        Testimony ...................................................................................11

        2.   Log Cabin's Experts Will Be Helpful to the Trier of Fact..........11

        3.   Log Cabin's Experts are Highly Qualified.................................14

        4.   Log Cabin's Experts are Demonstrably Reliable ........................14

            a.   Log Cabin's Expert Testimony is Based on Sufficient
            Data................................................................................15

            b.   Log Cabin's Expert Testimony is the Product of Reliable
            Principles and Methodology..........................................15

            c.   Log Cabin's Experts Have Applied their Expertise
            Reliably to the Facts ......................................................16

        5.   Log Cabin's Expert Testimony Is Not Cumulative, but Rather
        Provides a Wide Range of Evidence on Several Broad Topics ...17

    C.   Log Cabin's Expert Testimony Is Legally Relevant and Highly
    Probative .............................................................................................18

        1.   Evidence Is Not Restricted to Legislative History ......................18

        2.   Expert Testimony Regarding the Prejudices and Biases of
        Congress Is Admissible to Show Animus ...................................24

        3.   Expert Testimony Regarding the Disproportionate Impact on
        Female Servicemembers Is Relevant and Admissible ................24

IV. Conclusion....................................................................................................25

LOSANGELES 870245 (2K)

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

4

## <u>FEDERAL CASES</u>

5   Able v. United States,
         88 F. Supp. 968 (E.D.N.Y 1995)...................................................6, 8, 12

6

7   Annex Books, Inc. v. City of Indianapolis,
         581 F.3d 460 (7th Cir. 2009)..................................................................19

8   Beech Aircraft Corp. v. Rainey,
         488 U.S. 153, 109 S. Ct. 439, 102 L. Ed. 2d 445 (1988)...................11

9

10   Bowers v. Hardwick,
         478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986)......................20

11   Cammermeyer v. Aspin,
         850 F. Supp. 910 (W.D. Wash. 1994).....................................................6

12

13   City of Cleburne v. Cleburne Living Center,
         473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)......................20

14   City of Renton v. Playtime Theatres,
         475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)............................24

15

16   Daubert v. Merrell Dow Pharmaceuticals, Inc.,
         43 F.3d 1311 (9th Cir. 2005)...................................................................15

17   Daubert v. Merrell Dow Pharmaceuticals, Inc.,
         509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)....................11, 15, 16

18

19   De Anda v. City of Long Beach,
         7 F.3d 1418 (9th Cir. 1993)....................................................................17

20   Domingo v. T.K.,
         289 F.3d 600 (9th Cir. 2002)..................................................................16

21

22   EEOC v. Sears, Roebuck & Co.,
         628 F. Supp. 1264 (N.D. Ill. 1986)........................................................11

23   Federal Comm'ns Commission v. Beach Comm'ns, Inc.,
         508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)....................21

24

25   Goldman v. Weinberger,
         475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986)................21, 22

26   Gulf States Util. Co. v. Ecodyne Corp.,
         635 F.2d 517 (5th Cir. 1981)..................................................................10

27

28   Hamdan v. Rumsfeld,
         548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006)................22, 23

LOSANGELES 870245 (2K)

Hamdi v. Rumsfeld,
542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) ............................ 22, 23

Indiana Ins. Co. v. Hussey Seating Co.,
176 F.R.D. 291 (S.D. In. 1997) ........................................................... 13

Kumho Tire Co. v. Carmichael,
526 U.S. 137, 119 S.Ct. 1167, 143 L. Ed. 2d 238 (1999) ..................... 15

Lawrence v. Texas,
539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) .................... 20

Luce v. United States,
469 U.S. 38, 105 S. Ct. 460, 83 L.Ed.2d 443 (1984) ........................... 8

McEwen v. City of Norman,
926 F.2d 1539 (10th Cir. 1991) .......................................................... 8

Meinhold v. United States Dep't of Defense,
808 F. Supp. 1455 (C.D. Cal. 1993) .................................................... 6

Perry v. Schwarzenegger,
Case No. 09-CV-2292-VRW (N.D. Cal.) .......................................... 12

Planned Parenthood of Southeastern Pa. v. Casey,
505 U.S. 833, 112 S. Ct. 2791, 120 L.Ed.2d 674 (1992) .................... 21

Romer v. Evans,
517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) .................... 24

Scott v. Ross,
140 F.3d 1275 (9th Cir. 1998) ................................................ 12, 14, 16

Sperberg v. Goodyear Tire & Rubber Co.,
529 F.2d 708 (6th Cir. 1975) ............................................................. 9

Thomas v. Newton Int'l Enterprises,
42 F.3d 1266 (9th Cir. 1994) ............................................................ 14

United States v. Abonce-Barrera,
257 F.3d 959 (9th Cir. 2001) ............................................................ 14

United States v. Brownlee,
454 F.3d 131 (3d Cir. 2006) ............................................................. 16

United States v. Cohen,
510 F.3d 1114 (9th Cir. 2007) .......................................................... 11

United States v. Dailide,
227 F.3d 385 (6th Cir. 2000) ............................................................ 16

United States v. Heller,
551 F.3d 1108 (9th Cir. 2009) ............................................................ 9

LOSANGELES 870245 (2K)

United States v. Lileikis,
  929 F. Supp. 31 (D. Mass. 1996)...................................................................... 12

United States v. O'Brien,
  391 U.S. 367 (1968) ......................................................................................... 24

Washington v. Davis,
  426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ...................................... 24

Witt v. Dep't of the Air Force,
  527 F.3d 806 (9th Cir. 2008) ........................................................................... 18

Witt v. Dep't of the Air Force,
  No. C06-5195 RBL (W.D. Wash. 2010) ............................................................ 2

## **FEDERAL RULES**

Fed. R. Civ. P. 7(b)(1) .......................................................................................... 9

Fed. R. Civ. P. 26(e) ............................................................................................. 5

Fed. R. Civ. P. 26(e)(1)(A) ................................................................................... 5

Fed. R. Evid. 403 ................................................................................................. 17

Fed. R. Evid. 702 ..................................................................................... 11, 14, 15

Fed. R. Evid. 703 ................................................................................................... 3

L.R. 11-3.1.1 ....................................................................................................... 10

L.R. 11-3.9.3 ....................................................................................................... 10

L.R. 11-6 ............................................................................................................. 10

L.R. 11-9 and 83-7 .............................................................................................. 10

- iv -

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Log Cabin proffers the testimony of seven highly educated, experienced, and accomplished witnesses who are prepared to provide unique insight and expert opinions in support of Log Cabin's constitutional challenge to Defendants' (the "government") "Don't Ask, Don't Tell" policy ("DADT").  These seven experts are among the most knowledgeable individuals regarding the history, implementation, and effects of DADT: four have served in the armed services; three have provided or will provide expert testimony in other federal actions challenging the legality of DADT; two have authored books on DADT; two have provided research and/or testimony to Congress on DADT; three frequently provide commentary to major news outlets regarding DADT; one is a former Assistant Secretary of Defense in charge of manpower and logistics; and all seven have Ph.D.'s in their respective fields.

The government objects to the testimony *in whole* of *all* seven witnesses.  In doing so, the government repeats worn arguments already heard and rejected by this Court.  The government's Motion in limine (the "Motion") omits, mischaracterizes, and minimizes all seven experts' qualifications, methodologies, and testimony in yet another attempt to resurrect its failed motion for summary judgment, prevent Log Cabin from presenting critical evidence at trial, and  avoid trial on the merits.

Among the objections included in its Motion, the government repeatedly claims that Log Cabin's experts generally "seek to question the wisdom of Congress in enacting [and maintaining] DADT," and provide nothing more than their subjective and personal recommendations as to how the government could better treat its homosexual servicemembers.  Motion at 1.  In reality, Log Cabin proffers its experts to testify not to the wisdom of DADT, but rather to the myriad facts surrounding DADT's development, adaptation, legislation, and

- 1 -

1  implementation.  The experts will not offer conclusory opinions of law, but
2  nuanced and exhaustively researched testimony on the history and impact of
3  DADT.
4        As set forth below, the Motion must be denied.
5
6              **II.    FACTUAL BACKGROUND**
7        The qualifications and proffered testimony of Log Cabin's expert witnesses
8  are summarized as follows:
9        **1.    Nathaniel Frank:**  Dr. Nathaniel Frank is the author of Unfriendly
10 Fire: How the Gay Ban Undermines the Military and Weakens America (St.
11 Martin's Press 2009).  Ex. 2 to Motion at 22.  Dr. Frank is a Senior Research
12 Fellow at the Palm Center at the University of California, Santa Barbara, and
13 teaches history as an adjunct professor at New York University's Gallatin School.
14 Id.  Dr. Frank's publications on DADT and other topics have appeared in the New
15 York Times, Washington Post, New Republic, Slate, USA Today, Los Angeles
16 Times, Huffington Post, Newsday, Philadelphia Inquirer, and Lingua Franca,
17 among others.  Id.  Dr. Frank has been interviewed on numerous nationally
18 broadcast television and radio programs concerning his research on DADT.  Id.  Dr.
19 Frank's research and opinions on DADT have been cited on the Congressional
20 floor.  Id.  Dr. Frank earned his Ph.D. and M.A. in history at Brown University.  Id.
21       Dr. Frank testified as an expert in United States v. Boldware regarding the
22 relationship between DADT and false accusations of nonconsensual sex in the
23 military.  Frank Dep. at 47-51, Feb. 26, 2010.  Dr. Frank is also expected to testify
24 as an expert concerning the history of DADT at the upcoming trial of Witt v. Dep't
25 of the Air Force, No. C06-5195 RBL (W.D. Wash. 2010).  In addition, before Dr.
26 Frank associated himself with this action, a Department of Defense ("DOD")
27 official tasked with reviewing and commenting on one of Dr. Frank's studies
28 regarding DADT described Dr. Frank's research as "a thoughtful look that

- 2 -

1   demonstrates some of the difficulties that service members encounter with this

2   policy."  Ex. A to Hagan Decl.

3        Based upon the principles and methodology acquired during his training and

4   experience as a historian, Dr. Frank is prepared to testify regarding, *inter alia*, the

5   history, development, and impact of racial, sexual, and other minority personnel

6   policies in the United States military and the social contexts of those policies,

7   including DADT, the record of prejudices exhibited by prominent military and

8   political figures before, during, and after the enactment and implementation of

9   DADT, and the ignorance or absence of social scientific evidence supporting

10  DADT, including evidence from foreign countries.

11       Log Cabin will not rely on Dr. Frank to provide opinions as to the

12  constitutionality or wisdom of DADT.  Moreover, the purported "anecdotes,

13  hearsay, and others' non-peer reviewed research" the government identifies as the

14  evidentiary support underlying Dr. Frank's opinions, Motion at 2, include party-

15  opponent admissions, first-hand interviews with the authors of DADT, and reports

16  commissioned or written by the government -- all crucial data collected and studied

17  in accordance with the principles and methodology employed by a highly

18  accomplished professional historian, and the type of evidence experts may rely

19  upon under Fed. R. Evid. 703 when testifying.

20       **2.    Melissa Sheridan Embser Herbert, J.D., Ph.D.:**  Dr. Embser-

21  Herbert, a veteran of the U.S. Army and Army Reserve, is a Professor of Sociology

22  at Hamline University in Saint Paul, Minnesota.  Ex. 7 to Motion at 15.  Dr.

23  Embser-Herbert authored The U.S. Military's "Don't Ask, Don't Tell" Policy: A

24  Reference Handbook (Praeger Security International 2007), among several other

25  books on sexuality, gender, and the military.  Id. at 16.  Additionally, Dr. Embser-

26  Herbert has published dozens of articles, book chapters, and book reviews in peer-

27  reviewed publications on the topic of gender, sexuality, women, and the military.

28  Id. at 16-19.  Dr. Embser-Herbert received her M.A. in sociology from the

- 3 -

1    University of Massachusetts at Amherst, her Ph.D. in sociology from the University
2    of Arizona, and her J.D. from Hamline University School of Law.  Id.

3          Based upon the principles and methodology acquired during her training and
4    experience as a sociologist and member of the U.S. Army and Army Reserve, Dr.
5    Embser-Herbert is prepared to testify regarding, *inter alia*, the disproportionate
6    impact on female servicemembers generally and women of color in particular, the
7    inapplicability of the purported goals of DADT to lesbians, the physical and
8    emotional trauma caused by DADT, and the harassment-tolerant environment
9    created by DADT.

10         **3.     Aaron Belkin, Ph. D.:**  Dr. Belkin is an associate professor of political
11   science at the University of California, Santa Barbara.  Ex. 4 to Motion at 12;
12   Belkin Dep. at 110:2-8, Mar. 5, 2010.  Dr. Belkin has published in the areas of
13   civil-military relations, social science methodology, and sexuality in the armed
14   forces.  Ex. 4 to Motion at 12.  His publications have appeared in *International*
15   *Security, Armed Forces and Society,* the *Journal of Conflict Resolution, Parameters*
16   (the official journal of the U.S. Army War College), among others.  Id.
17   Additionally, Dr. Belkin has made presentations on the impact of homosexual
18   servicemembers in the military at the Army War College, National Defense
19   University, Naval Postgraduate School, and U.S. Military Academy at West Point.
20   Id.  Dr. Belkin received his M.A. and Ph.D. in political science from the University
21   of California, Berkeley.  Id.

22         Based upon the principles and methodology acquired during his training and
23   experience as a political scientist, Dr. Belkin is prepared to testify regarding, *inter*
24   *alia*, homosexual personnel policies in the Israeli Defense Forces, the British
25   Armed Forces, and the Australian Armed Forces, and domestic analogous
26   institutions, such as police and fire departments, as well as evidence surrounding
27   the impact of identified homosexuals on unit cohesion and privacy in the military.
28         The government incorrectly claims that Dr. Belkin's updated report

- 4 -

1    submitted on March 25, 2010, violates Fed. R. Civ. P. 26(e)(1)(A) and this Court's

2    July 24, 2009 scheduling order by adding an opinion on the subject of privacy in

3    the military after the deadline for expert witness reports had passed.  Motion at 3-4

4    n. 2.  In reality, Dr. Belkin created an updated report only after the government

5    questioned him extensively on the subject of privacy during his deposition on

6    March 5, 2010 – eliciting highly detailed answers – which, in turn, implicated Log

7    Cabin's Rule 26(e) duty to amend information to its initial disclosures.  Declaration

8    of Rachel Feldman ¶¶ 2-5 ("Feldman Decl.").  Moreover, Dr. Belkin's initial expert

9    report was comprehensive and provided adequate notice of his expected testimony

10   on the matter, as evidenced by the government's examination during his deposition.

11   Id. at ¶ 2; Ex. 3 to Motion at 7, 12, 14.

12        **4.**      **Lawrence J. Korb, Ph.D.**:  Dr. Korb is a Senior Fellow at the Center

13   for American Progress.  Ex. 1 to Motion at 1.  Dr. Korb served as Assistant

14   Secretary of Defense (manpower, reserve affairs, installations, and logistics) from

15   1981 through 1985, where he administered approximately 70 percent of the DOD

16   budget.  Ex. 1 to Motion at 1.

17        Dr. Korb served on active duty for four years as a Naval Flight Officer, and

18   retired from the Naval Reserve with the rank of captain.  Id.  Dr. Korb received his

19   Ph.D. in political science from the State University of New York at Albany and has

20   held full-time teaching positions at the University of Dayton, the Coast Guard

21   Academy, and the Naval War College.  Korb Dep. at 19:9-11, Apr. 9, 2010.

22        Dr. Korb has authored, co-authored, edited, or contributed to more than 20

23   books.  Ex. 1 to Motion at 1.  He has over one hundred articles and editorials on

24   national security issues, and has made over 1,000 television appearances on

25   nationally broadcast shows to speak about national security.  Id.

26        Dr. Korb has testified before Congress regarding the impact of homosexual

27   servicemembers on the military's ability to fight effectively.  Ex. 13 to Motion.  Dr.

28   Korb has previously offered expert testimony regarding the purpose of the

- 5 -

1   military's homosexual personnel policy that was in effect before enactment of

2   DADT in <u>Cammermeyer v. Aspin</u>, 850 F. Supp. 910, 920 (W.D. Wash. 1994), and

3   <u>Meinhold v. United States Dep't of Defense</u>, 808 F. Supp. 1455, 1458 (C.D. Cal.

4   1993), and generally regarding DADT in <u>Able v. United States</u>, 88 F. Supp. 968

5   (E.D.N.Y 1995), <u>vacated and remanded on other grounds</u>, 88 F.3d 1280 (2nd Cir.

6   1996).  Korb Dep. at 26:16-19.

7          Based on the principles and methodology acquired during his training as a

8   political scientist and experience as Assistant Secretary of Defense in charge of

9   manpower and logistics, Dr. Korb is prepared to testify regarding, *inter alia*: the

10  impact of DADT on the personnel and logistical needs of the United States

11  military; the history and development of bans on homosexual conduct and

12  homosexual servicemembers in the United States military, including DADT; and

13  the relationship or lack thereof between the stated or acted-upon sexual orientation

14  of United States servicemembers and the mission of the United States military.  <u>Id.</u>

15  at 3-11.  Log Cabin will not rely on Dr. Korb to provide legal opinions as to the

16  constitutionality or wisdom of DADT.  <u>Id.</u>; Ex. 9 to Motion at 23.

17         **5.     Elizabeth L. Hillman, J.D., Ph.D.**:  Dr. Hillman is a Professor of Law

18  at the University of California Hastings College of the Law.  Ex. 6 to Motion at 1.

19  Upon receiving her B.S. in electrical engineering from Duke University, she served

20  in the U.S. Air Force as a space operations officer at Cheyenne Mountain Air Force

21  Base, and later as an instructor in American, military, world, and women's history

22  at the U.S. Air Force Academy.  <u>Id.</u> at 1-2.  While serving as an officer, Dr.

23  Hillman received an M.A. in history from the University of Pennsylvania.  <u>Id.</u>

24  After completing her service, Dr. Hillman received her J.D. and Ph.D. in history

25  from Yale University.  <u>Id.</u>  Dr. Hillman has published numerous book chapters and

26  articles in peer-reviewed publications on such subjects as the law and politics of

27  strategic bombing, sexual violence in the military, and the experience of women in

28  the military.  <u>Id.</u> at 2-4.

LOSANGELES 870245 (2K)

Based upon the principles and methodology acquired during her training and experience as a historian and Air Force officer, Dr. Hillman is prepared to testify regarding, *inter alia*, the history of the unique impact of DADT on female servicemembers.

**6. Alan C. Okros, Ph.D.:** Dr. Okros is a Professor in the Department of Academics and the Deputy Chair of Command, Leadership and Management at Canadian Forces College. Ex. 8 to Motion at 17. Dr. Okros has lectured on military human resources throughout the world, including at the Swedish Folke Bernadotte Academy, the U.S. Air War College, and the Singapore Command and Staff College. Id. at 19. Dr. Okros served for 33 years in the Canadian Forces, retiring in 2004 with the rank of Captain (Navy). Id. at 1. From 1983 to 2004, Dr. Okros served as a Personnel Selection Officer, the military occupation that draws on the behavioral sciences to promote group organizational effectiveness though scientific research. Id. at 17. Dr. Okros received his M.A. and Ph.D. in industrial/organizational psychology from the University of Waterloo. Id.

Based upon the principles and methodology acquired during his training and experience as a military psychologist and member of the Canadian Forces, Dr. Okros is prepared to testify regarding, *inter alia*, the history, development, and impact of the Canadian Forces' personnel policies on homosexuals, as well as the comparability between the Canadian and U.S. Armed Forces' personnel policies.

**7. Robert J. MacCoun, Ph.D.**: Dr. MacCoun is a co-author of the 1993 RAND report on homosexual personnel policies that was presented to Congress before the adoption of DADT. Ex. 5 to Motion at 2. As part of the RAND report, Dr. MacCoun analyzed the link between unit cohesion and performance, along with the effects of non-discrimination policies in American police and fire departments. Id. Dr. MacCoun is a research psychologist with over 100 publications, including numerous empirical studies on small group behavior and the behavioral responses of citizens to public policy interventions. Id. Dr. MacCoun is a Professor of Law,

1   Professor of Public Policy, and Affiliated Professor of Psychology at the University

2   of California at Berkeley.  Id.  Dr. MacCoun received his M.A. and Ph.D. in

3   psychology from Michigan State University.  Id.; MacCoun Dep. 12:8-15, Mar. 2,

4   2010.

5        Based upon the principles and methodology acquired during his training and

6   experience as a psychologist, Dr. MacCoun is prepared to testify regarding, *inter*

7   *alia*, the links or lack thereof between unit cohesion, social cohesion, and task

8   performance in the military context.  Dr. MacCoun has previously qualified as an

9   expert witness and provided expert testimony on the aforementioned issues in Able

10   v. United States, 88 F. Supp. 968 (E.D.N.Y 1995), vacated and remanded on other

11   grounds, 88 F.3d 1280 (2nd Cir. 1996).  MacCoun Dep. at 33-34.

12   ### III.   ARGUMENT

13   **A.   The Government's Motion in Limine to Exclude All Expert Witnesses is
        Overly Broad and Violative of the Court's Limiting Order**

14

15        A motion in limine is intended "to exclude anticipated prejudicial evidence

16   before the evidence is actually offered."  Luce v. United States, 469 U.S. 38, 40,

17   105 S. Ct. 460, 83 L.Ed.2d 443 (1984).  Its purpose is to avoid having to "unring

18   the bell" when otherwise inadmissible prejudicial evidence is offered at trial.

19   McEwen v. City of Norman, 926 F.2d 1539, 1548 (10th Cir. 1991).  The need to

20   prevent the introduction of prejudicial evidence, however, is less acute when the

21   trier of fact is a judicial officer instead of a lay jury.

22        The term "in limine" means "at the outset."  Black's Law

23   Dictionary 803 (8th ed.2004).  A motion in limine is a

24   procedural mechanism to limit in advance testimony or

25   evidence in a particular area.  In the case of a jury trial, a

26   court's ruling "at the outset" gives counsel advance notice

27   of the scope of certain evidence so that admissibility is

28   settled before attempted use of the evidence before the

- 8 -

1    jury.  Because the judge rules on this evidentiary motion,

2    in the case of a bench trial, a threshold ruling is generally

3    superfluous.  It would be, in effect, "coals to Newcastle,"

4    asking the judge to rule in advance on prejudicial

5    evidence so that the judge would not hear the evidence.

6    For logistical and other reasons, pretrial evidentiary

7    motions may be appropriate in some cases.  But here, once

8    the case became a bench trial, any need for an advance

9    ruling evaporated.

10   United States v. Heller, 551 F.3d 1108, 1111-12 (9th Cir. 2009) (internal

11   citations omitted), cert. denied, Heller v. United States, 129 S.Ct. 2419, 173

12   L.Ed.2d 1323, 77 USLW 3634 (2009).

13        Moreover, given the tailored nature of motions in limine, orders granting

14   motions "which exclude broad categories of evidence should rarely be employed"

15   with the better practice being "to deal with questions of admissibility of evidence as

16   they arise."  Sperberg v. Goodyear Tire & Rubber Co., 529 F.2d 708, 712 (6th Cir.

17   1975).  Indeed, like any other motion, under Fed. R. Civ. P. 7(b)(1), motions in

18   limine must "state with particularity" the grounds on which they are made and the

19   relief or order sought.

20        By bringing a single motion in limine to exclude all testimony of all Log

21   Cabin expert witnesses (along with separate motions to exclude all lay witnesses

22   and nearly all documentary evidence), the government seeks to achieve what it

23   could not accomplish through its motion for summary judgment: the de facto

24   dismissal of Log Cabin's case-in-chief before a single witness testifies.  In

25   attempting to do so, the government has defied this Court's June 3, 2010 Order

26   (limiting the parties to three motions in  limine) and brought multiple motions to

27

28

1    exclude seven witnesses and varying topics under the guise of a single motion.[1]

2            Furthermore, the relief the government seeks is undermined by the reality

3    that Log Cabin's claims will be tried by the Court, not a jury.  As alluded to in the

4    June 3 Order, the Court is more than capable of assessing the qualifications,

5    reliability, and need for each expert witness when each testifies, and ruling on

6    objections regarding the admissibility of their testimony as each is proffered.

7    Moreover, to the extent the Court hears evidence it later decides not to admit into

8    evidence, it will be free to disregard such evidence before reaching a final

9    judgment.  Gulf States Util. Co. v. Ecodyne Corp., 635 F.2d 517, 519 (5th Cir.

10   _____

11           [1] The government's failure to comply with the June 3, 2010 Order, is yet
     another example of its unwillingness to conform to the rules of this District.  At the

12   November 16, 2009 hearing, after the government failed to meet and confer before
     filing a motion, the Court told the government that it "expect[ed] in the future in

13   this case to have full compliance with the spirit as well as the letter of the Local
     Rule about meet and confer."  Tr. of Oral Argument, Nov. 16, 2009, at 21:4-6.

14   Despite this admonition, the government has continued its practice of disregarding
     the Local Rules.  See Opp. to Mot. for Summ. J. at 3, n.2 (explaining how

15   government's Motion for Summary Judgment violated Local Rules 56 and 11, and

16   subparts thereto).  In addition, the government's Supplemental Brief filed on June
     9, 2010 (docket no. 172) only fit within the 25-page limit required by L.R. 11-6 by

17   omitting parallel citations to Supreme Court cases, which are required by L.R. 11-
     3.9.3.  Similarly, the government's moving and reply briefs in connection with its

18   summary judgment motion included footnotes that did not comply with the

19   typeface requirement of L.R. 11-3.1.1, thereby shortening the papers.

20           Now, the government squeezes additional motions in limine into the three
     motions allowed by the Court.  In its letter dated May 18, 2010, the government

21   informed Log Cabin that it would file at least four motions in limine to exclude: (1)

22   plaintiff's exhibits; (2) plaintiff's experts' testimony; (3) plaintiff's deposition
     designations; and (4) plaintiff's allegedly late disclosed lay witness testimony.  Ex.

23   B to Hagan Decl.  Intent on seeking exactly the same relief regardless of the

24   Court's order to the contrary, the government has filed the equivalent of at least
     four motions in limine under the guise of three.  Each motion in limine seeks to

25   strike multiple forms of evidence and, in the case of the instant motion, again fails

26   to include parallel citations for Supreme Court cases and incorporates footnotes that
     do not comply with the typeface requirement – all in order to fit within the 25-page

27   limit.  Failure to comply with Court rules is sanctionable under L.R. 11-9 and 83-7.

28

1    1981).

2          The government's failure to comply with the June 3 Order and its overly

3    broad request requires denial of its Motion.

4    **B.    Log Cabin's Expert Testimony Should Be Admitted At Trial**

5          **1.    The Federal Rules of Evidence Liberally Admit Expert Testimony**

6          A witness may provide expert opinions on issues at trial if the opinion is

7    helpful to the trier of fact, if the witness is sufficiently qualified, and if the opinion

8    is reliable.  Fed. R. Evid. 702.  Expert testimony is liberally admissible under the

9    Federal Rules of Evidence.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509

10   U.S. 579, 588, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (Rule 702 is a function of

11   the "liberal thrust" of the Federal Rules of Evidence and their "general approach of

12   relaxing the traditional barriers to 'opinion' testimony'") (quoting Beech Aircraft

13   Corp. v. Rainey, 488 U.S. 153, 169, 109 S. Ct. 439, 102 L. Ed. 2d 445 (1988)).

14         Although the proponent of expert testimony bears the burden of establishing

15   by a preponderance of the evidence that the testimony is admissible, "the rejection

16   of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702

17   advisory committee's note.  The post-Daubert amendment to Rule 702 is "not

18   intended to provide an excuse for an automatic challenge to the testimony of every

19   expert."  Id.

20         **2.    Log Cabin's Experts Will Be Helpful to the Trier of Fact**

21         Qualified, reliable expert testimony is admissible if it helps the trier of fact

22   understand the evidence or determine a fact in issue.  Fed. R. Evid. 702; United

23   States v. Cohen, 510 F.3d 1114, 1123-25 (9th Cir. 2007).

24         Expert testimony frequently helps the trier of fact in cases where context

25   matters.  Where the case involves issues of history, historians provide crucial

26   context and analysis for the trier of fact.  E.g., EEOC v. Sears, Roebuck & Co., 628

27   F. Supp. 1264, 1308 (N.D. Ill. 1986) (qualified women's historian provided insight

28

- 11 -

1  into gender preferences in the context of commission selling), aff'd, 839 F.2d 302

2  (7th Cir. 1988).  Where the interactions of members of a society are at issue,

3  sociologists have similarly provided invaluable assistance.  E.g., Scott v. Ross, 140

4  F.3d 1275, 1286 (9th Cir. 1998).  When human psychology is relevant,

5  psychologists can assist.  E.g., Able, 88 F. Supp. 968; MacCoun Dep. at 33-34

6  (expert testimony of Dr. MacCoun regarding DADT and unit cohesion).  Indeed,

7  the government proffers its own expert testimony, including that of historians,

8  when it is convenient to do so.  E.g., United States v. Lileikis, 929 F. Supp. 31, 37

9  (D. Mass. 1996) (in action to revoke former Nazi collaborator's citizenship,

10 government proffered affidavit of historian who had studied Lithuanian Jewish

11 ghettos).

12      Log Cabin's expert testimony is essential to a complete understanding of the

13 facts and issues in this action, where, as in the cases described above, historical,

14 sociological, and psychological context matters.  DADT constitutes a nationwide

15 policy resulting in the separation of homosexual servicemembers from the U.S.

16 military for any act or statement made at any time or place in accordance with their

17 sexual orientation.  Since 1993, DADT has authorized the separation of nearly

18 14,000 homosexual servicemembers.  Ex. 1 to Motion at 3.  Many of the effects of

19 this policy appear entirely incongruous with its stated goals, as well as the goals of

20 the armed forces.  Thousands of books, articles, studies, reports, letters, and

21 memoranda detail its history, implementation, and effects.  Log Cabin proffers the

22 opinions of seven experts – historians, sociologists, psychologists, and military

23 logisticians – to assist the Court in understanding these historical facts and to help

24 the Court put those facts in context.  Each expert adds a distinct piece to the whole

25 that, in concert, provide a better understanding of the facts and claims at issue.[2]

26 ―――――――――――――
   [2] Over the course of a recent 12-day bench trial, 13 expert witnesses testified – 11
   for plaintiffs (2 via deposition excerpts) and 2 for defendants – in Perry v.
27 Schwarzenegger, Case No. 09-CV-2292-VRW (N.D. Cal.), where a constitutional
   challenge is being made to California Proposition 8, which amended the state
28 Constitution to prohibit marriage between homosexuals.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE
REGARDING PLAINTIFF'S EXPERT WITNESSES

LOSANGELES 870245 (2K)

1    For instance, Dr. Frank's expert opinions on various aspects of the history of

2    DADT will assist the trier of fact in assessing, *inter alia*, the presence or absence of

3    empirical evidence marshaled in support of DADT at the time of its legislation, as

4    well as any animus exhibited during the legislative process.  Dr. Korb's expert

5    opinion on the relationship between sexual orientation and the military mission, as

6    well as Dr. MacCoun's expert opinion on the relationship between unit cohesion

7    and task performance, will assist the trier of fact in determining, *inter alia*, the

8    nexus between DADT's stated goals and its restrictions.[3][4]  Dr. Embser-Herbert's

9    expert opinion on the uniquely deleterious effects of DADT on women can assist

10   the trier of fact to determine the impact of the policy on female servicemembers'

11   due process and First Amendment rights.  Dr. Okros' expert opinion on the

12   Canadian Forces' homosexual personnel policies and Dr. Belkin's expert opinion

13   on the experiences of the British, Israeli, and Australian militaries will assist the

14   trier of fact in determining, *inter alia*, the actual impact of homosexuals in

15   comparable militaries and the credibility of information presented to Congress

16   about the dangers of homosexuals within the ranks.  Dr. Hillman's expert opinion

17   on the unique history of DADT's impact on women further evidences its lack of a

18   rational basis.

19        Because this action implicates numerous issues of historical and other

20   contexts, the opinions of these seven experts are helpful – indeed, crucial – to the

21   Court's full understanding of the facts.

22

23   [3] The government mistakenly contends that Dr. Korb's testimony constitutes a legal
     opinion, and is therefore inadmissible.  Motion at 16.  Log Cabin proffers Dr. Korb
24   for his expert opinion on the nexus between homosexuality and the military
     mission, based on his extensive education and experience as Assistant Secretary of
25   Defense for manpower and logistics.  That he has a personal opinion on the ultimate
     issue at trial does not render his expert testimony inadmissible, and the government
26   has not cited any authority for such a proposition.
     [4] The government also seeks to discredit Dr. Korb's testimony by highlighting Log
27   Cabin's role editing his extant monograph into the format of an expert report,
     Motion at 23, n. 14, which is of no legal consequence.  <u>Indiana Ins. Co. v. Hussey</u>
28   <u>Seating Co.</u>, 176 F.R.D. 291, 293 (S.D. In. 1997).

### 3.    Log Cabin's Experts are Highly Qualified

Specialized knowledge, skill, experience, training, or education qualifies a witness as an expert.  Fed. R. Evid. 702.  Rule "702 . . . contemplates a broad conception of expert qualifications."  <u>Thomas v. Newton Int'l Enterprises</u>, 42 F.3d 1266, 1269 (9th Cir. 1994).  Extensive education in a relevant field, along with years of experience working with the applicable subject matter provide more than adequate qualifications.  <u>United States v. Abonce-Barrera</u>, 257 F.3d 959, 964-65 (9th Cir. 2001).  Historians, sociologists, and psychologists with far less relevant and impressive resumes have been found qualified in other actions.  <u>E.g.</u>, <u>Scott</u>, 140 F.3d at 1286 (sociologist permitted to opine on social group she had never studied prior to litigation).

Drs. Korb, MacCoun, Frank, Belkin, Hillman, Embser-Herbert, and Okros are superbly qualified.  Each expert has written or lectured on the subject of homosexual personnel policies in the military over a sustained period.  Three – Drs. Korb, MacCoun, and Frank – have testified before or had their research cited by Congress.  Two – Drs. Frank and Embser-Herbert – have written books on DADT. All have Ph.D.'s in their relevant fields.  Several have previously qualified in other district courts as expert witnesses in actions involving constitutional challenges to the U.S. military's ban on homosexual servicemembers.  In short, these expert witnesses are among the most qualified individuals available to opine on the subject of DADT.

### 4.    Log Cabin's Experts are Demonstrably Reliable

Fed. R. Evid. 702 considers expert testimony reliable if it is (a) based on sufficient facts or data, (b) the testimony is the product of reliable principles and methods, and (c) the witness has applied the principles and methods reliably to the facts of the case.  The opinions of Log Cabin's proffered experts satisfy each of these requirements.

- 14 -

### a.   Log Cabin's Expert Testimony is Based on Sufficient Data

The purpose of requiring that expert testimony be based on sufficient facts or data is to exclude testimony based solely on conjecture or supposition.  Fed. R. Evid. 702.  In determining whether an expert's testimony is based on sufficient facts or data, courts consider factors such as whether the expert proposes to testify based on matters growing naturally out of research the expert has conducted independent of the litigation, or whether the expert has developed an opinion solely and expressly for the purpose of testifying.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 2005).

Here, each expert can cite to large bodies of evidence underlying their opinions, and each conducted that research long before they were asked to testify in this action. Additionally, each expert's report describes in detail the bases for their respective opinions.

### b.   Log Cabin's Expert Testimony is the Product of Reliable Principles and Methodology

Expert opinions developed using reliable principles and methods satisfy the second prong of Rule 702's reliability requirement.  Evidence of reliability includes: whether the technique or theory can be or has been tested; whether the theory has been subject to peer review and publication; the known or potential error rate; the existence and maintenance of standards and controls; and whether the technique or theory has been generally accepted by the relevant academic community.  Id. at 1316-17.

These factors apply variably to the reliability of non-scientific expert testimony, depending upon "the particular circumstances of the case at issue." Fed. R. Evid. 702 advisory committee's note, citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L. Ed. 2d 238 (1999).  As with other aspects of the Rule 702 analysis, courts take a broad view as to the reliability of principles and methodology.  Daubert, 509 U.S. at 580 (reliability inquiry is "flexible").

- 15 -

As mentioned, Drs. Korb and MacCoun have previously testified as experts in other federal actions involving similar issues. Moreover, the principles and methodologies on which all of the experts rely – including psychology, history, and sociology – have proven reliable in numerous cases before the Ninth Circuit and elsewhere. E.g., United States v. Brownlee, 454 F.3d 131, 144 (3d Cir. 2006) (psychologist's testimony); United States v. Dailide, 227 F.3d 385, 387 (6th Cir. 2000) (historian's testimony), cert. denied, 540 U.S. 876 (2003); Scott v. Ross, 140 F.3d 1275, 1286 (9th Cir. 1998) (sociologist's testimony). While these methodologies may not be analogous to that of a "hard" science like physics or chemistry, the numerous publications, nationwide media appearances, and years of peer review sufficiently demonstrate the reliability of Log Cabin's expert witnesses.

### c. Log Cabin's Experts Have Applied their Expertise Reliably to the Facts

An expert's testimony must permit a court to reasonably conclude that the opinion follows from the analysis: the expert is prevented from making wholly subjective and unfounded extrapolations. Domingo v. T.K., 289 F.3d 600, 606-07 (9th Cir. 2002). The Rules impose no requirement that the expert opinion be 100% certain beyond any doubt; reasonable interpretations and conclusions based on the facts are admissible. Daubert, 509 U.S. at 590 ("it would be unreasonable to conclude that the subject of scientific testimony be 'known' to a certainty; arguably, there are no certainties in science.").

Here, the experts' reports and their previous publications demonstrate that their conclusions are not the result of subjective whimsy or unfounded extrapolations. Each expert has dedicated years of study to the subject of homosexual personnel policies, and studied and published extensively on the subject. While the government may dispute the import of their respective conclusions, it has no bearing on the experts' ability to apply the relevant principles and methodologies to the facts of the case.

- 16 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**5.     Log Cabin's Expert Testimony Is Not Cumulative, but Rather Provides a Wide Range of Evidence on Several Broad Topics**

The government also contends that Log Cabin's proposed expert testimony is cumulative.  Motion at 24.  The claim is meritless.

Under Fed. R. Evid. 403, evidence may be excluded where it is minimally relevant, relates to no issue of fact, and would waste the court's time.  The exclusion of non-cumulative crucial evidence, however voluminous, may constitute a manifest error.  De Anda v. City of Long Beach, 7 F.3d 1418, 1423 (9th Cir. 1993).

The government here – and elsewhere – conflates the proffered evidence with the ultimate conclusions of law it will support.  Thus, while a determination of animus underlying the legislation of DADT finds support in several experts' historical testimony, this does not mean that each expert will testify to the same events.  Dr. Frank, for instance, will testify regarding the government's willful ignorance of domestic research on the link between sexual orientation and military suitability, while Dr. Belkin will testify regarding the government's willful ignorance of research from various countries on the same issue.  Their opinions are distinct from one another, yet both will provide crucial evidence of animus or irrationality.

Moreover, the government's assertion that six of Log Cabin's experts will opine on unit cohesion, five on foreign military experiences, four on the lack of empirical support, three on animus, two on polling, and two on the disparate impact of DADT on female servicemembers, misconstrues their testimony.  Indeed, it reflects only the questions the government asked each during their respective depositions, and not the purposes for which Log Cabin has proffered these witnesses.  Admittedly, Log Cabin's experts are well-versed on the subject of DADT and will provide a wide variety of evidence on many subjects relating to the policy.  Nonetheless, Log Cabin proffers them for limited purposes with as minimal

- 17 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*
REGARDING PLAINTIFF'S EXPERT WITNESSES

1    overlap as possible.

2    Finally, the government cites no authority for the "one subject – one expert"

3    rule cited in its Motion.  Motion at 25.  For that reason, and the reasons described

4    above, this Court should reject the government's contention that Log Cabin's

5    experts are cumulative.

6    **C.    Log Cabin's Expert Testimony Is Legally Relevant and Highly Probative**

7    The government objects to any expert testimony regarding: (1) the absence of

8    empirical evidence supporting DADT as inappropriate in a facial challenge, Motion

9    at 8, 18; (2) unit cohesion and foreign militaries on the ground that no evidence

10   outside the Congressional record is relevant, Motion at 12, 14; (3) the continuing

11   rationality of DADT today as legally irrelevant, Motion at 20; (4) the motivations

12   of Congress in enacting DADT as legally impermissible, Motion at 10; and (5) the

13   "disproportionate impact of DADT on lesbians" as beyond the scope of Log

14   Cabin's standing in this case.  The government's claims as to each point are

15   meritless.

16   **1.    Evidence Is Not Restricted to Legislative History**

17   Neither the facial nature of Log Cabin's challenge, nor principles of

18   deference to the military restricts the evidence Log Cabin may introduce at trial.

19   Evidence is not limited in substance or by time period to the Congressional record.

20   In its July 24, 2009 Order, this Court previously rejected this argument.

21   Specifically, the Court ruled that Log Cabin was "entitled to conduct discovery in

22   this case to develop the basis for its facial challenge," even if only rational basis

23   review applied.  Doc. 91 at 3.  That discovery has resulted in substantial evidence

24   demonstrating the irrationality of DADT.  Moreover, under the intermediate

25   scrutiny standard articulated in <u>Witt v. Dep't of the Air Force</u>, 527 F.3d 806, 819

26   (9th Cir. 2008), the same evidence will show that DADT does not significantly

27   further the governmental interests identified in the statute.  Consistent with its July

28

- 18 -

1   24, 2009 Order, the Court should now rule that the evidence Log Cabin collected

2   through discovery is admissible.

3       The government also repeats its argument that only evidence existing at the

4   time of a statute's enactment may be considered in a rational basis review.  This is

5   incorrect even if rational basis review applied, as Log Cabin demonstrated in

6   opposing the government's motion for summary judgment.  <u>See</u> Mem. of Points

7   and Authorities in Opp. to Defendant's Mot. for Summary Judgment at 14-17.

8       In any case, where a higher level of scrutiny applies, such as that required by

9   <u>Witt</u>, the government must prove, through evidence, a tight fit between the statute

10  and its stated goals.  <u>Annex Books, Inc. v. City of Indianapolis</u>, 581 F.3d 460 (7th

11  Cir. 2009), is instructive given the Court's application of intermediate scrutiny.

12  <u>Annex Books</u> arose out of a First Amendment challenge to an ordinance regulating

13  adult book and video stores.  The Seventh Circuit held that when a legislative body

14  – a municipality in that case – promulgates a regulation subject to intermediate

15  scrutiny, it must marshal evidence supporting the need for the policy.  <u>Id.</u> at 462,

16  464.  The Court stated:

17          Indianapolis [assumes] that any empirical study of morals

18          offenses near any kind of adult establishment in any city

19          justifies every possible kind of legal restriction in every

20          city.  That might be so if the rational-relation test

21          governed, for then all a court need do is ask whether a

22          sound justification of a law may be imagined.  …  But

23          because books (even of the "adult" variety) have a

24          constitutional status … the public benefits of the

25          restrictions must be established by evidence, and not just

26          asserted.  …  [L]awyers' talk is insufficient.

27  <u>Id.</u> at 463 (citations omitted).

28

- 19 -

1       Even if the "active rational basis" standard were to apply here, <u>City of</u>

2  <u>Cleburne v. Cleburne Living Center</u>, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313

3  (1985), demonstrates the relevance of evidence outside the legislative record.  In

4  <u>Cleburne</u>, the Supreme Court examined evidence of the many other uses to which

5  the subject property could be put without the special use permit required by the city

6  council to house mentally retarded individuals.  <u>Id.</u> at 449-50.  The Court confirmed

7  that when some heightened scrutiny applies – as it did in <u>Cleburne</u> and as it does

8  here – "judgment [must be] suspended until the facts are in and the evidence [is]

9  considered."  <u>Id.</u> at 471-72 (Stevens, J., concurring).

10       <u>Lawrence v. Texas</u>, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003),

11  also demonstrates that evidence beyond the Congressional record is relevant.  As in

12  <u>Cleburne</u>, the Supreme Court in <u>Lawrence</u> investigated the factual context behind

13  Texas' enactment of an anti-sodomy law and went far beyond the legislative

14  history.  539 U.S. at 572, 576-77.  <u>Lawrence</u> examined, *inter alia*, foreign treatment

15  of sodomy laws, evolution of sodomy laws throughout the United States, and the

16  pattern of actual enforcement of such laws since its decision in <u>Bowers v.</u>

17  <u>Hardwick</u>, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).  <u>Id.</u> at 570-73.

18  Importantly, <u>Lawrence</u> looked to these external sources in the context of a facial

19  challenge.  <u>See</u> Dkt. 140 at 10-12.

20       Moreover, <u>Lawrence</u>, 539 U.S. at 578-79, recognized that the judiciary's

21  duty often is to subject a statute once viewed as constitutionally sound to deeper

22  examination:

23

24          Those who drew and ratified the Due Process Clauses …

25          knew times can blind us to certain truths and later

             generations can see that laws once thought necessary and

26          proper in fact serve only to oppress.  As the Constitution

27          endures, persons in every generation can invoke its

28

1          principles in their own search for greater freedom.

2   Limiting admissible evidence to the frozen-in-time Congressional record would

3   forever shield enactments from exposure to such truths.

4          Similarly, <u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 U.S. 833,

5   112 S. Ct. 2791, 120 L.Ed.2d 674 (1992), on which <u>Lawrence</u> relied to affirm the

6   substantive due process right at issue here, further exposes the weakness in the

7   government's position.  In deciding whether various aspects of Pennsylvania's

8   abortion statute passed the undue burden intermediate scrutiny standard, the

9   Supreme Court had several occasions to consult evidence beyond the legislative

10  history – evidence developed *at trial*.  <u>Id.</u> at 845, 884-86 (considering, for example,

11  practical effect of 24-hour waiting period, including distances many women would

12  have to travel, exposure of women to harassment, and the effect on low-income

13  women).

14         Additionally, the government's authorities do not support their arguments

15  here.  <u>Federal Comm'ns Commission v. Beach Comm'ns, Inc.</u>, 508 U.S. 307, 113

16  S.Ct. 2096, 124 L.Ed.2d 211 (1993), applied a rational basis standard to a challenge

17  to economic legislation.  The cable television statute at issue was not entitled to any

18  form of heightened scrutiny.  <u>Id.</u> at 314-15.  <u>Beach</u> also involved Congressional

19  line-drawing and judicial resistance to second-guessing where Congress drew such

20  lines, also under rational basis review.  <u>Id.</u> at 315-16.  In enacting the cable

21  television statute at issue, Congress exempted certain private institutions from the

22  regulatory scheme and defined the private entities that would qualify for the

23  exemption.  Unlike statutes governing cable television, DADT does not involve

24  issues of interstate commerce.

25         <u>Goldman v. Weinberger</u>, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478

26  (1986), is likewise inapposite.  <u>Goldman</u> concerned a military regulation that

27  applied to military dress which, by its terms, applied to servicemembers <u>only</u>

28  "while performing their military duties."  <u>Id.</u> at 508.  Unlike DADT, <u>Goldman</u>

- 21 -

permitted expression in a private setting and was far less invasive of servicemembers' constitutional rights.  DADT, of course, regulates servicemembers' private intimate behavior – the very conduct protected by <u>Lawrence</u>.

Additionally, <u>Goldman</u> admitted expert testimony that was offered to demonstrate that religious exceptions to dress code were "desirable and [would] increase morale by making the Air Force a more humane place."  <u>Id.</u> at 509.  The experts Log Cabin will present at trial will not merely demonstrate that an end to DADT would further the military's stated objectives.  Log Cabin's expert historians, social scientists, and psychologists will demonstrate that DADT does nothing to further the military's goals and actually undermines those goals, revealing DADT as a policy born solely of animus.  <u>Goldberg</u> involved no allegation that the religious headwear ban arose from animus.

Lastly, the government's claim that <u>Goldman</u> stands for the proposition that special deference must be given to any statute concerning military matters is equally flawed.  <u>Goldman</u> involved a military regulation, not a statute.  While military considerations may have influenced Congress' passage of DADT, its enactment was also the result of political calculation and compromise.  Such political decisions are not entitled to immunity from constitutional review or an evidentiary bar.

The government also ignore the mandates of <u>Hamdi v. Rumsfeld</u>, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004), and <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006).  In both cases, the Supreme Court affirmed the traditional role of courts in safeguarding individual rights, even when military affairs were at issue.

> While we accord the greatest respect and consideration to
> the judgments of military authorities in matters relating to

- 22 -

1       the actual prosecution of a war, and recognize that the

2       scope of that discretion necessarily is wide, it does not

3       infringe on the core role of the military for the courts to

4       exercise their own time-honored and constitutionally

5       mandated roles of reviewing and resolving claims.

6 Hamdi, 542 U.S. at 535.

7      In Hamdi, the Supreme Court rejected the executive branch's attempt to

8 subject enemy combatant incarcerations to a low "some evidence standard,"

9 mandating instead that detainees were entitled to a fact-finding process.  Id. at 537-

10 39.  Likewise, Hamdan, 548 U.S. at 588, reaffirmed the duty of the courts "in time

11 of war as well as in time of peace, to preserve unimpaired the constitutional

12 safeguards of civil liberty."  Notably, the Hamdan Court looked to several sources

13 of evidence beyond legislative history, including foreign laws and the total lack of

14 evidence supporting the executive branch's assertion that application of court-

15 martial rules would be impracticable.  Id. at 610, 623.  Judicial review of military

16 action, as ensured by these important decisions, would amount to an empty promise

17 were the courts barred from hearing evidence beyond the Congressional record.

18 While courts apply a deferential standard of review to the military, its "interests do

19 not always trump other considerations."  Winter v. Natural Resources Defense

20 Council, Inc., ___ U.S. ___, 129 S.Ct. 365, 378, 172 L.Ed.2d 249 (2008).

21      As a final matter, expert testimony in this case cannot be limited to DADT's

22 legislative history because Log Cabin's challenge arises out of the due process

23 rights recognized by the Supreme Court in Lawrence ten years after DADT's

24 enactment.  Until 2003, Congress had no reason to deliberate over the impact of

25 DADT upon individual rights because Bowers affirmatively held that no such

26 individual rights existed under the due process clause.  Congress, therefore, could

27 not have fully appreciated the constitutional issues presented in this case.  For this

28 Court to fully understand the impact of DADT upon homosexual servicemembers'

rights, as recognized in <u>Lawrence</u>, evidence outside the Congressional record must be admitted.  <u>See</u> <u>Rostker</u>, 453 U.S. at 71 (upholding gender based statute only because Congress fully considered the constitutional issues it raised).

### 2.    Expert Testimony Regarding the Prejudices and Biases of Congress Is Admissible to Show Animus

The government relies on <u>United States v. O'Brien</u>, 391 U.S. 367 (1968), to claim that expert testimony of Congressional prejudice, bias, or animus in enacting DADT is irrelevant.  In doing so, the government ignores well established constitutional law that regularly authorizes judicial inquiry into Congressional motives and purposes.  <u>E.g.</u>, <u>Washington v. Davis</u>, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (requiring proof of a discriminatory purpose to justify heightened scrutiny); <u>City of Renton v. Playtime Theatres</u>, 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (question of whether law is content-based or content-neutral depends on whether purpose of law is to restrict speech or its secondary effects).

Judicial inquiry into Congress' motives is not prohibited; in fact, it is often required.  Log Cabin must be permitted to present expert testimony regarding Congress' reasons for enacting DADT, as well as the nexus between the justifications offered for DADT and the breadth of its restrictions.  <u>See</u> <u>Romer v. Evans</u>, 517 U.S. 620,  632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (Where a law's "sheer breadth is so discontinuous with the reasons offered for it that [it] seems inexplicable by anything but animus toward the class it affects[,] it lacks a rational relationship to legitimate state interests.").

### 3.    Expert Testimony Regarding the Disproportionate Impact on Female Servicemembers Is Relevant and Admissible

In another attempt to re-argue the issue of standing, the government asserts that the "testimony concerning alleged disproportionate impact of DADT on lesbians is inadmissible" because Log Cabin has failed to identify a female

- 24 -

1   servicemember with standing to sue.  Motion at 19.  Here, too, the Court has

2   already decided the matter: Log Cabin has standing to sue not just on behalf of the

3   named plaintiffs but also on behalf of its members, some of whom are lesbians.

4   Mar. 27, 2010 Order at 15; Ex. B to Dkt. 47 (survey demonstrating, at a minimum,

5   that Log Cabin membership includes lesbians).

6           Log Cabin has satisfied the <u>Hunt</u> associational standing elements, one of

7   which permits associations to sue on behalf of its members when "neither the claim

8   asserted nor the relief requested requires the participation of individual members in

9   the lawsuit."  Mar. 27, 2010 Order at 12, citing <u>Hunt v. Wash. State Apple Adver.</u>

10  <u>Comm'n</u>, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).  The

11  government's approach to associational standing under <u>Hunt</u> appears to require that

12  a servicemember of every race, gender, age, height, or other classification stand up

13  and be counted for Log Cabin's claims to be heard.  This approach would

14  effectively collapse the distinction between association and individual standing, and

15  must be rejected.

16                          **IV.   CONCLUSION**

17          For the reasons stated herein, this Court should deny the government's

18  Motion in its entirety.

19

20  Dated:    June 22, 2010                    Respectfully submitted,

21                                             WHITE & CASE LLP

22

23                                             By: /S/ Fernando L. Aenlle-Rocha
                                               _____
24                                                  Fernando L. Aenlle-Rocha
                                               Attorneys for Plaintiff Log Cabin
25                                             Republicans

26

27

28

LOSANGELES 870245 (2K)