1
2
3                                                          O
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10
11   LOG CABIN REPUBLICANS, a          )   Case No. CV 04-08425-VAP (Ex)
     non-profit corporation,           )
12                                      )
                    Plaintiff,          )   MEMORANDUM OPINION
13                                      )
          v.                           )   **[Filed concurrently with Findings of**
14                                      )   **Fact & Conclusions of Law]**
     UNITED STATES OF AMERICA           )
15   and ROBERT M. GATES,               )
     SECRETARY OF DEFENSE, in           )
16   his official capacity,             )
                                        )
17                  Defendants.         )
     _____        )
18
19
20
21
22
23
24
25
26
27
28

1    Plaintiff Log Cabin Republicans attacks the constitutionality of the

2  statute known as the "Don't Ask, Don't Tell" Act ("the Act" or "the Policy"),

3  found at 10 U.S.C. § 654, and its implementing regulations.[1]  Plaintiff's

4  challenge is two-fold: it contends the Act violates its members' rights to

5  substantive due process guaranteed by the Fifth Amendment to the United

6  States Constitution, and its members' rights of freedom of speech,

7  association, and to petition the government, guaranteed by the First

8  Amendment.[2]

9

10    The Court finds Plaintiff Log Cabin Republicans (sometimes referred to

11  in this Order as "Log Cabin," "LCR," or "Plaintiff"), a non-profit corporation,

12  has established standing to bring and maintain this suit on behalf of its

13  members.  Additionally, Log Cabin Republicans has demonstrated the Don't

14  Ask, Don't Tell Act, on its face, violates the constitutional rights of its

15  members.  Plaintiff is entitled to the relief sought in its First Amended

16  Complaint: a judicial declaration to that effect and a permanent injunction

17  barring further enforcement of the Act.

18

19

20

21

22    _____

23    [1] The Act, described in greater detail below, provides that any member
of the U.S. Armed Forces who engages in homosexual conduct is subject to
discharge unless the servicemember is able to demonstrate that he or she
24  has no propensity to engage in "homosexual conduct."  Under the Act,
homosexual conduct includes sexual acts with persons of the same sex,
25  admissions that one is homosexual or bisexual, and attempts to marry a
person of the same sex.

26

27    [2] The Court dismissed Plaintiff's claim for violation of the Equal
Protection Clause in an Order dated June 9, 2009 ("June 9, 2009, Order").
28  (Doc. No. 83.)

# I.  PROCEEDINGS

This case was tried to the Court on July 13 through 16 and July 20 through 23, 2010.  After conclusion of the evidence and closing arguments on July 23, 2010, both sides timely submitted supplemental post-trial briefing on the admissiblility of a pretrial declaration submitted by Log Cabin Republicans member John Doe,[3] and the matter stood submitted.

# II.  STANDING

Plaintiff Log Cabin Republicans is a non-profit corporation founded in 1977 and organized under the laws of the District of Columbia.  (Trial Exs. 109 [Bylaws], 110 [Articles of Incorporation].)  Defendants challenge LCR's standing to bring and maintain this action on behalf of its members.

Plaintiff bears the burden of establishing its standing to invoke federal jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  To bring suit on behalf of its members, an association must establish the following: "(a) [at least one of] its members would otherwise have standing to sue in [his or her] own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).  To satisfy the first element of associational standing, a organization must demonstrate constitutional standing as to at least one member of the

---

[3] The Court overrules Defendants' objections to Exhibit 38, the April 27, 2006 Declaration of John Doe, and considers the statements contained therein regarding Doe's then-present state of mind for the limited purpose for which they were offered, i.e., Doe's state of mind with respect to whether the Act chilled his speech and ability to petition the government for a redress of grievances.  See Fed. R. Evid. 803(3).

1   organization, as follows: (1) injury in fact; (2) caused by the defendants; (3)

2   which likely will be redressed by a favorable decision by the federal court.

3   Lujan, 504 U.S. at 560-61; see also Elk Grove Unified Sch. Dist. v. Newdow,

4   542 U.S. 1, 12 (2004).

5

6       Turning first to the associational standing requirements, Plaintiff

7   established at trial that the interests it seeks to vindicate in this litigation are

8   germane to LCR's purposes, satisfying the second requirement for

9   associational standing.  Plaintiff's mission includes "assist[ing] in the

10  development and enactment of policies affecting the gay and lesbian

11  community . . . by [the] federal government[]. . . and advocat[ing] and

12  support[ing] . . . activities or initiatives which (i) provide equal rights under law

13  to persons who are gay or lesbian, [and] (ii) promote nondiscrimination

14  against or harassment of persons who are gay or lesbian . . . ."  (Trial Ex. 109

15  [Mission Statement, attached as Ex. A to Bylaws].)  The relief sought here,

16  i.e., the ability of homosexual servicemembers to serve openly in the United

17  States Armed Forces through repeal of the Don't Ask, Don't Tell Act, relates

18  to both aspects of Log Cabin's mission.

19

20      Plaintiff also has satisfied the third requirement of associational

21  standing, "that the suit not demand the participation of individual members."

22  Associated Gen. Contractors of Cal. v. Coal. for Econ. Equity, 950 F.2d 1401,

23  1408 (9th Cir. 1991) (citations omitted).  Plaintiff seeks only declaratory and

24  injunctive relief in its First Amended Complaint; when "the claims proffered

25  and relief requested do not demand individualized proof on the part of its

26  members," such as when only declaratory and prospective relief are sought,

27  the individual members of an association need not participate directly in the

28

1  litigation.  Id.; see also Hunt, 432 U.S. at 343 (citing Warth v. Seldin, 422 U.S.
2  490, 515 (1975)).

3

4      Defendants directed their challenge primarily to the first requirement of
5  associational standing, i.e., whether there exists at least one member of the
6  association who could maintain this suit in his or her own right.  According to
7  Defendant, neither of the two members Plaintiff relies upon to confer
8  associational standing on it meets the requirements for that role, because
9  neither was a member of Log Cabin Republicans continuously from the date
10 of the commencement of this action until the date of trial.

11

12     Plaintiff filed this action on October 12, 2004 (Doc. No. 1); after the
13 Court granted Defendants' motion to dismiss, Plaintiff filed a First Amended
14 Complaint on April 28, 2006.  (Doc. No. 25.)  The Court already has ruled that
15 standing in this case should be examined as of April 28, 2006, the date
16 Plaintiff filed its First Amended Complaint.  (See Doc. No. 170 ["May 27,
17 2010, Order"] at 15.)  For the reasons discussed below, as of that date at
18 least one of Log Cabin's members, John Nicholson, had standing and could
19 have pursued the action individually.  Even if the Court looks to the date the
20 original Complaint was filed as the relevant one for standing purposes,
21 however, Plaintiff still satisfies the associational standing requirements, as
22 Plaintiff proved by a preponderance of the evidence at trial that John Doe
23 was a member in good standing as of October 12, 2004.

24

25

26

27

28

4

**A.    John Nicholson's Standing**

John Alexander Nicholson, III, enlisted in the United States Army in May 2001.  (Trial Tr. 1135:6-12, July 20, 2010.)  As described in more detail below, he received an honorable discharge on March 22, 2002, pursuant to the Don't Ask, Don't Tell Act.  (Trial Tr. 1183:25-1184:3, 1185:22-1187:9, July 20, 2010.)  Nicholson satisfies all three of the requirements for constitutional standing, i.e., "injury in fact" caused by the defendants (his discharge by Defendants pursuant to the Policy), which is redressable by the relief sought in this lawsuit, as he testified he would rejoin the Army if the policy was no longer in effect.  (Trial Tr. 1209:4-5, July 21, 2010.)

Nicholson first became involved with Log Cabin Republicans in August 2005, when he and others embarked on a nationwide speaking tour sponsored by LCR to raise awareness of the movement to repeal the Don't Ask, Don't Tell Act.  (Trial Tr. 1206:15-1207:11, July 21, 2010.)  LCR's national and Georgia state chapter leaders asked Nicholson to join the organization formally after he gave a speech at LCR's national convention on April 28, 2006; he did not pay dues or make a cash contribution at that time, but was told his membership was granted in exchange for his services to the organization.  (Trial Tr. 1207:22-1208:25, 1211:25-1212:15, July 21, 2010.)  Later he was told his was an honorary membership.  (Trial Tr. 1211:10-12, 1214:13-15, July 21, 2010.)

Thus, Nicholson officially joined Log Cabin Republicans on April 28, 2006, and has been a member continuously ever since.  (Trial Tr. 1208:11-15, 1214:24-1215:17, July 21, 2010.)  He testified credibly that he did not complete a paper membership application form that day because he gave the

1  necessary information to an LCR administrative assistant who entered it
2  directly into a computer.  (Trial Tr. 1211:15-1212:15, July 21, 2010.)  Plaintiff
3  maintains an electronic database of its membership which lists Nicholson as
4  a member of Log Cabin Republicans as of April 28, 2006.  (Trial Tr. 1209:20-
5  22, 1212:16-1213:16, July 21, 2010.)  Nicholson testified that he remembered
6  the precise date Log Cabin's Georgia chapter granted him honorary
7  membership because it was the same day he addressed LCR's national
8  convention.  (Trial Tr. 1208:11-15, 1210:11-1212:15, July 21, 2010.)
9
10      The testimony of James Ensley, President of Plaintiff's Georgia chapter
11  since 2006 and a member of LCR's national board of directors since 2008,
12  corroborated Nicholson's testimony regarding the date he became a member
13  of LCR.  (Trial Tr. 68:21-70:21, July 13, 2010.)  Ensley testified that the
14  Georgia chapter conferred honorary membership on Nicholson at the 2006
15  Log Cabin Republicans national convention, in recognition of his
16  "remarkable" efforts on the nationwide speaking tour and on college
17  campuses toward repeal of the Don't Ask, Don't Tell Act.  (Trial Tr. 70:2-16,
18  July 13, 2010.)  Ensley specifically recalled the date the Georgia chapter
19  conferred honorary membership on Nicholson because Ensley's
20  congressman had arranged a private tour of the White House for him on the
21  morning of April 28, 2006, which was the same day Nicholson addressed the
22  convention.  (Trial Tr. 70:17-71:6, July 13, 2010.)  The Court found Ensley to
23  be a candid and credible witness.
24
25      Plaintiff also produced the credible testimony of Terry Hamilton, a 25-
26  year member of Log Cabin Republicans and presently chairman of its
27  national board of directors.  (Trial Tr. 33:11-35:22, July 13, 2010.)  He verified
28

1    that the organization's membership records reflected Nicholson's membership

2    status since April 28, 2006, and also that Nicholson regularly attended and

3    spoke at the organization's annual conventions.  (Trial Tr. 43:14-45:1, July

4    13, 2010.)  Based on these indicia, Hamilton understood Nicholson to be a

5    member of the organization since that date.  (Trial Tr. 38:8-39:3, July 13,

6    2010.)

7

8          Thus, at the time Nicholson was conferred honorary membership, he

9    satisfied the requirements for membership under section 2.02 of the Log

10   Cabin Republican Bylaws, which states:

11        Honorary and Special Members: The Board of Directors may
          establish other criteria for granting an Honorary Membership to Log
12        Cabin Republicans for individuals who have exhibited a unique or
          noteworthy contribution to the Mission of the Corporation or a
13        Special Membership to Log Cabin Republicans for individuals or
          entities that have provided assistance to the Corporation.[4]
14   (Trial Ex. 109.)

15          Accordingly, Log Cabin Republicans has standing through Nicholson,

16   who himself satisfies all the requirements for constitutional standing and has

17   been a member of LCR from the date the First Amended Complaint was filed

18   to the present.

19

20

21        _____

22        [4] Defendants argue Nicholson's honorary membership, pursuant to
     section 2.02 of the Bylaws, did not confer membership on him because LCR's
     Articles of Incorporation refer only to one class of membership.  (See Doc.
23   No. 186 [Defs.' Mem. Cont. Fact & Law] at 3-4.)  The Court rejected this
     argument in its May 27, 2010, Order, noting "Defendants' argument that Mr.
24   Nicholson's honorary membership is insufficient to confer standing on Plaintiff
     fails for two reasons . . . . Defendants have not shown that the bylaw at issue
25   actually conflicts with Plaintiff's articles of incorporation . . . . [, and] [t]he
     District of Columbia Nonprofit Corporation Act (the 'Corporation Act') provides
26   that a nonprofit corporation shall designate its membership class or classes
     and accompanying qualifications 'in the articles of incorporation or the
27   bylaws.' D.C. Code § 29-301.12 (emphasis added)."  (May 27, 2010, Order at
     24-25.)

28

                                         7

1      The Court rejects Defendants' suggestion that LCR "manufactured" its

2  standing for purposes of this lawsuit.  (See Doc. No. 188 [Defs.' Proposed

3  Findings of Fact & Conclusions of Law] at 3.)  The only authority Defendants

4  cite on this point is Washington Legal Foundation v. Leavitt, 477 F. Supp. 2d

5  202, 211 (D.D.C. 2007), holding the manufacture of standing "weakens" an

6  association's ability to maintain a lawsuit on behalf of its members.  The

7  record before the district court in Washington Legal Foundation revealed

8  facts not present here, however.  As that court explained, the Washington

9  Legal Foundation's board of directors explicitly decided to bring suit, and then

10  set about to find and recruit persons who would confer standing on it.  By

11  contrast, Martin Meekins, a member of LCR's national board of directors,

12  testified that the initiative for filing this lawsuit came from the rank and file of

13  the organization; Meekins then interviewed members regarding the viability of

14  a lawsuit and to determine if they met the requirements to confer standing on

15  the organization and wished to bring the lawsuit.  (Trial Tr. 704:8-19, 705:11-

16  707:12, July 16, 2010.)

17

18      Although not explicitly argued, Defendants' only factual basis for

19  contending that Log Cabin Republicans manufactured standing appears to be

20  the identity of dates on which John Nicholson became an LCR member and

21  the First Amended Complaint was filed.  The Court found credible, however,

22  the testimony of the several witnesses who testified about the reason LCR

23  bestowed an honorary membership on Nicholson that day, as explained

24  above.

25

26

27

28

1       <u>Washington Legal Foundation</u> is, of course, not binding authority on this
2 Court, but to the extent it provides guidance, it only holds that "manufacture"
3 of standing weakens but does not destroy an association's ability to maintain
4 its suit.  Furthermore, there is no evidence here that LCR manufactured
5 standing, so <u>Washington Legal Foundation</u> is factually dissimilar.

6

7 **B.    John Doe's Standing**

8       For the reasons set forth in its May 27, 2010, Order, the Court looks to
9 the filing date of the First Amended Complaint to determine standing.  (<u>See</u>
10 May 27, 2010, Order at 15.)  Nevertheless, even accepting Defendants'
11 contention that standing in this case must be established as of October 12,
12 2004, when the original Complaint was filed, Log Cabin Republicans satisfies
13 that requirement through its member John Doe.

14

15       John Doe serves as a lieutenant colonel in the United States Army
16 Reserve.  He joined Log Cabin Republicans in early September 2004 by
17 completing an application form (using a pseudonym) and paying annual dues
18 through Martin Meekins, then a member of Plaintiff's national board of
19 directors.  Meekins accepted the application form and dues payment from
20 Doe and forwarded them to LCR's national headquarters.  Doe arranged to
21 pay his membership dues in this manner because he feared he would be
22 discharged from the Army Reserve pursuant to the Don't Ask, Don't Tell Act if
23 he joined the organization openly, using his true name.  (Trial Ex. 38.)

24
25
26
27
28

To comply with the Don't Ask, Don't Tell Act, Doe must keep his sexual orientation a secret from his coworkers, his unit, and his military superiors, and he may not communicate the core of his emotions and identity to others in the same manner as heterosexual members of the military, on pain of discharge from the Army.  (Doc. No. 212 ["July 6, 2010, Order"] at 16; Trial Ex. 38.)

The Court ruled in its May 27, 2010, Order that Plaintiff raised a triable issue of material fact as to imminent harm related to Doe.  (May 27, 2010, Order at 16-19.)  The Court now finds that Doe has established the three elements of constitutional standing: he faces a concrete injury caused by Defendants – discharge from the Army Reserve – which is likely, not speculative, in nature, given the mandatory language of the Don't Ask, Don't Tell Act, see 10 U.S.C. § 654 (b)(2), and which would be redressed by a favorable decision by the Court in this action.

## C.    Continuity of Standing

Defendants contended for the first time in their closing argument that Plaintiff lacks standing because it had not proven at trial that either of the individual members on whom it relies to confer associational standing upon it had been a member of the organization continuously from the initiation of the action onwards.

Insofar as LCR relies on Nicholson's membership to confer associational standing upon the organization, Defendants' argument fails. Nicholson's membership in Log Cabin Republicans has been uninterrupted and continuous since April 28, 2006, the date Plaintiff's Georgia chapter

10

1  conferred honorary membership upon him and also the date Plaintiff filed its
2  First Amended Complaint.  In light of the Court's May 27, 2010, Order, this is
3  sufficient.

4

5      As Plaintiff relies also on Doe's membership to confer associational
6  standing upon it, the Court examines the continuity of standing question as to
7  him as well.  Doe paid annual membership dues shortly before this action
8  was filed in October 2004, but LCR did not introduce evidence showing Doe
9  paid dues, or otherwise made a financial contribution, to the organization
10  after 2004.  A plaintiff who has established standing must retain his or her
11  "personal stake" in the litigation throughout the proceedings.  See Lewis v.
12  Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990); Williams v. Boeing Co., 517
13  F.3d 1120, 1128 (9th Cir. 2008).  When a plaintiff loses that "personal stake"
14  in the lawsuit, a court loses the ability to grant relief and must dismiss the
15  action on the basis of mootness because the plaintiff no longer satisfies the
16  redressability element of constitutional standing.  See, e.g., Arizonans for
17  Official English v. Arizona, 520 U.S. 43, 68-72 (1997) (mootness); Williams,
18  517 F.3d at 1128 (redressability).

19

20      The cases cited above addressing loss of standing do not arise in an
21  associational standing context, however.  Whether one regards Plaintiff Log
22  Cabin Republicans or John Doe as the party whose standing is at issue,
23  neither lost a "personal stake" in the litigation when Doe's annual period of
24  membership lapsed.

25

26

27

28

11

1    First, there was conflicting evidence regarding the effect of a member's
2  nonpayment of dues.  James Ensley testified that when a member failed to
3  renew his or her annual dues payment, the Log Cabin Republicans viewed
4  the member as a "former" or "inactive" member, but the name would not be
5  stricken from LCR's membership rolls or electronic database simply because
6  of tardiness in paying annual dues.  (Trial Tr. 74:12-75, July 13, 2010.)  Terry
7  Hamilton, another member of the national board of directors, testified that a
8  member who failed to renew his membership timely no longer would be
9  considered a member, but his testimony did not contradict Ensley's testimony
10  regarding the mailing list or membership rolls.  (Trial Tr. 57:5-8, July 13,
11  2010.)

12

13    Nevertheless, neither Log Cabin Republicans nor Doe lost the
14  necessary personal stake in this litigation merely because Doe did not pay
15  dues after the initial year.  Doe still served in the Army Reserve and still was
16  subject to discharge under the Don't Ask, Don't Tell Act.  Thus, he still had a
17  personal stake in the outcome of the case, and his injury – his susceptibility
18  to discharge under the Act – continued to be redressable by favorable
19  resolution of the lawsuit.

20

21    Nor is this a case where standing has been lost because of a change in
22  circumstances rendering the subject matter of the case moot: the Act has not
23  been repealed and the challenged policy is still in effect; Doe is still serving
24  and subject to discharge under it;[5] Nicholson already has been discharged

25

26  _____

27    [5] In fact, Plaintiff agreed to Defendants' request for a stay of this case if
   Defendants would suspend discharges under the Policy, but Defendants
28  refused to do so.

1   under it and cannot re-enlist as he wishes to do.  Finally, the dispute over the
2   constitutionality of the Act has not been resolved.
3
4       Likewise, the redressability aspect of constitutional standing remains
5   alive despite the lapse in Doe's dues-paying membership status.  Doe's
6   imminent injury – the mandatory nature of his discharge under the policy –
7   would be addressed through a favorable ruling in this action.
8
9       Finally, even assuming Defendants were correct that Log Cabin
10  Republicans failed to prove standing through Doe based on the lack of
11  evidence he paid dues after 2005, this would not require a finding that
12  Plaintiff could not maintain its claims.  Plaintiff had standing to file suit based
13  on the undisputed evidence of Doe's membership as of October 12, 2004, the
14  date Log Cabin Republicans filed this action.  Assuming Doe's membership
15  lapsed a year later, in early September 2005, Plaintiff lacked standing
16  temporarily from that time until April 28, 2006, when Nicholson became a
17  member of Log Cabin Republicans.  Courts have recognized that a plaintiff
18  who possesses standing when it brings suit, later loses it, and then regains
19  standing before entry of judgment, may still maintain its claims.  See, e.g.,
20  Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198, 1203 (Fed.
21  Cir. 2005) (finding plaintiff that owned patent at outset of litigation, assigned it
22  to subsidiary, then reacquired it before judgment may maintain an
23  infringement action); see also Caterpillar, Inc. v. Lewis, 519 U.S. 61, 64, 70,
24  73 (2005).  Thus, assuming that Log Cabin Republicans lacked standing at
25  some point between early September 2005 and April 28, 2006, it still may
26  maintain its claims now.
27
28

### III.  EVIDENCE PRESENTED AT TRIAL

**A.**     **Plaintiff's Burden on a Facial Challenge**

In <u>United States v. Salerno</u>, 481 U.S. 739 (1987), the Supreme Court held a plaintiff challenging the validity of a law on its face must establish that "no set of circumstances exists under which the Act would be valid." <u>Id.</u> at 745.  The defendants in <u>Salerno</u> were detained pending trial under the provisions of the Bail Reform Act; they challenged the Act, on its face, claiming it unconstitutionally violated the Fifth and Eighth Amendments. More recently, in <u>Washington State Grange v. Washington State Republican Party</u>, 552 U.S. 442 (2008), the Supreme Court noted the criticisms leveled at the <u>Salerno</u> standard and recognized an alternative the test as follows: "a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" <u>Id.</u> at 449 (citing <u>Washington v. Glucksberg</u>, 521 U.S. 702, 739-740 & n.7 (1997) (Stevens, J., concurring)); <u>see also</u> <u>United States v. Stevens</u>, 559 U.S. ___, ___, 130 S. Ct. 1577, 1587 (2010) (citing <u>Glucksberg</u> and noting the existence of two standards for facial challenges outside the First Amendment context).

The Court considers the evidence presented at trial in this facial challenge not for the purpose of considering any particular application of the Don't Ask, Don't Tell Act, but rather for the permissible purposes described in Section III(B) below.  (<u>See</u> <u>infra</u> Section III(B).)  Plaintiff's evidence, as described below, amply illustrates that the Act does not have a "plainly legitimate sweep."  Rather, Plaintiff has proven that the Act captures within its overreaching grasp such activities as private correspondence between servicemembers and their family members and friends, and conversations between servicemembers about their daily off-duty activities.  Plaintiff also

14

1    has proven that the Act prevents servicemembers from reporting violations of

2    military ethical and conduct codes, even in outrageous instances, for fear of

3    retaliatory discharge.  All of these examples, as well as others contained in

4    the evidence described below, reveal that Plaintiff has met its burden of

5    showing that the Act does not have a "plainly legitimate sweep."

6

7         Finally, the Court notes Defendants' reliance on Salerno and its

8    progeny, particularly Cook v. Gates, 528 F.3d 42 (1st Cir. 2008), in urging the

9    Court to reject Log Cabin's facial challenge. (Defs.' Mem. Cont. Fact & Law at

10   5; Trial Tr. 1670:14-21-1671:23, 1684:12-14, July 23, 2010.)  In Cook, the

11   First Circuit reasoned a facial challenge the Don't Ask, Don't Tell Act failed

12   because Lawrence "made abundantly clear that there are many types of

13   sexual activity that are beyond the reach of that opinion," and "the Act

14   includes such other types of sexual activity" because it "provides for the

15   [discharge] of a service person who engages in a public homosexual act or

16   who coerces another person to engage in a homosexual act."  528 F.3d at 56

17   (citing Lawrence, 539 U.S. at 578).

18

19        The Court is not bound to follow this out-of-Circuit authority, and in any

20   event finds the logic of Cook unpersuasive. First, Cook employed the

21   formulation from Salerno rather than the Supreme Court's more recent

22   articulation of the test for facial challenges set forth in Washington State

23   Grange.  Furthermore, the examples the Cook court cited as grounds for

24   discharge "under the Act" actually are bases for discharge of any

25   servicemember, whether the conduct in question is homosexual or

26   heterosexual.  In fact, the Cook decision provides no citation to any provision

27

28

1    of the Don't Ask, Don't Tell Act specifically listing either of its examples as

2    grounds for discharge under that legislation.

3

4    **B.**    **Evidence Properly Considered on a Facial Challenge**

5       Defendants asserted relevance (and often other) objections to nearly

6    every exhibit Plaintiff sought to introduce into evidence during trial, as well as

7    to nearly all the testimonial evidence offered.  According to Defendants,

8    because Plaintiff challenges the constitutionality of the statute on its face,

9    rather than challenging its application, the only evidence the Court should –

10   indeed may – consider, is the statute itself and the bare legislative history;

11   thus, according to Defendants, all other evidence is irrelevant.[6]

12

13       Defendants further contend that while examining the legislative record,

14   the Court must not pay heed to any illegitimate motivations on the part of the

15   enacting lawmakers.  Defendants cite several cases as authority for these

16   assertions, beginning with United States v. O'Brien, 391 U.S. 367 (1968).  In

17   O'Brien, the government charged and convicted the defendant for burning his

18   draft card; the defendant contended the law under which he was prosecuted

19   was unconstitutional because Congress enacted it for the unlawful purpose of

20   suppressing speech.  Id. at 383.  The Supreme Court rejected this argument,

21   holding "under settled principles the purpose of Congress, as O'Brien uses

22   that term, is not a basis for declaring this legislation unconstitutional.  It is a

23   familiar principle of constitutional law that this Court will not strike down an

24

25

26             ———————

          [6] Defendants maintained this position in their pretrial submissions as

27   well.  (See Defs.' Mem. Cont. Fact & Law at 9-10 ("the only appropriate

     material to consider with respect to plaintiff's due process claim is the statute

28   and its findings, as well as the statute's legislative history . . . .").)

1   otherwise constitutional statute on the basis of an alleged illicit legislative
2   motive."  Id.

3

4       In part, the O'Brien Court founded its reasoning on the difficulty of
5   discerning a unified legislative "motive" underlying any given enactment:
6   "What motivates one legislator to make a speech about a statute is not
7   necessarily what motivates scores of others to enact it . . . ."  Id. at 384.
8   Thus, O'Brien instructs that when "a statute . . . is, under well-settled criteria,
9   constitutional on its face," a court should not void the law based on
10  statements by individual legislators.  Id.

11

12      O'Brien does not stand for the proposition urged by Defendants,
13  however, that when deciding whether a challenged law "is, under well-settled
14  criteria, constitutional on its face," this Court should limit itself to examining
15  only the statute's legislative history.  In fact, in the O'Brien decision the
16  Supreme Court specifically pointed to two cases, Grosjean v. American Press
17  Co., 297 U.S. 233 (1936), and Gomillion v. Lightfoot, 364 U.S. 339 (1960),
18  noting that they "stand, not for the proposition that legislative motive is a
19  proper basis for  declaring a statute unconstitutional, but that the inevitable
20  effect of a statute on its face may render it unconstitutional."  O'Brien, 391
21  U.S. at 394 (emphasis added).  In both Grosjean and Gomillion, the Court
22  noted, the purpose of the law was irrelevant "because [of] the inevitable effect
23  – the necessary scope and operation."  Id. at 385 (citations omitted).
24  Therefore, under these authorities, the court may admit and examine
25  evidence to determine the "scope and operation" of a challenged statute;
26  nothing in O'Brien, Grosjean, or Gomillion limits the Court's discretion to
27  consider evidence beyond the legislative history.

28

1    Defendants also cite <u>City of Las Vegas v. Foley</u>, 747 F.2d 1294 (9th
2  Cir. 1984) as support for their position regarding the inadmissibility of
3  Plaintiff's evidence.  <u>Foley</u> arose out of a discovery dispute in a facial
4  constitutional challenge to a Las Vegas zoning ordinance restricting the
5  location of "sexually oriented businesses."  <u>Id.</u> at 1296.  One of the affected
6  businesses sought to depose city officials regarding their motives in enacting
7  the ordinance; after the city failed in its efforts to obtain a protective order
8  from the District Court, it sought mandamus relief from the Ninth Circuit Court
9  of Appeals.  <u>Id.</u>

10

11    The Ninth Circuit reviewed the case law prohibiting inquiry into "alleged
12  illicit legislative motive," and relying on <u>O'Brien</u>, granted the writ, directing the
13  district court to issue a protective order.  <u>Id.</u> at 1299.  In rejecting the
14  arguments of the party seeking to depose the legislators, the <u>Foley</u> court
15  described the following types of evidence appropriately considered by a court
16  asked to determine a First Amendment challenge:

17        objective indicators as taken from the face of the statute, the effect
18        of the statute, comparison to prior law, facts surrounding enactment
           of the statute, the stated purpose, and the record of the
19        proceedings.

20  <u>Foley</u>, 747 F.2d at 1297 (citations omitted).  And finally, the Ninth Circuit
21  noted, "basic analysis under the First Amendment . . . has not turned on the
22  motives of the legislators, <u>but on the effect of the regulation.</u>"  <u>Id.</u> at 1298
23  (emphasis added).

24

25    As Defendants correctly point out, these authorities do hold that
26  isolated (and in this case, sometimes inflammatory) statements of Senators
27  and House members during the Don't Ask, Don't Tell Act legislative hearings
28  should not be considered by the Court.  Nevertheless, this does not affect,

much less eviscerate, the language in the authorities cited above that
Defendants would have the Court ignore, holding that a court deciding a
facial challenge can and should consider evidence beyond the legislative
history, including evidence regarding the effect of the challenged statute.

Finally, the case now before the Court includes a facial challenge on
substantive due process as well as First Amendment grounds.  Therefore, it
should be noted that although the authorities discussed above dealt with
evidence properly considered by courts in resolving First Amendment facial
challenges, their holdings regarding the admissibility of broad categories of
testimonial and documentary evidence are echoed in the authorities
considering facial challenges on due process grounds.  See, e.g., Lawrence
v. Texas, 539 U.S. 558 (2003); Reno v. Flores, 507 U.S. 292, 309 (1993);
Tucson Woman's Clinic v. Eden, 379 F.3d 531, 556-57. (9th Cir. 2004); Los
Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 707 (9th Cir. 1992); see
generally, Guggenheim v. City of Goleta, 582 F.3d 996 (9th Cir. 2009).

In Lawrence, petitioners pled nolo contendere to charges under a
Texas statute forbidding certain sexual acts between persons of the same
sex.  They then raised a facial challenge to the statute's constitutionality
under the Due Process and Equal Protection clauses of the Fourteenth
Amendment.  In reaching its decision that the Texas statute indeed was
unconstitutional, the Supreme Court's majority reviewed at length the history
of the common law prohibiting sodomy or regulating homosexuality, the effect
of the statute ("The stigma this criminal statute imposes, moreover, is not
trivial . . . . We are advised that if Texas convicted an adult for private
consensual homosexual conduct under the statute here in question the

19

1    convicted person would come within the registration laws of at least four

2    States were he or she to be subject to their jurisdiction. . . ."), facts

3    surrounding enactment of the statute, and comparison with other laws.

4    <u>Lawrence</u>, 539 U.S. at 567-79.

5

6        Accordingly, the following discussion of Plaintiff's substantive due

7    process and First Amendment challenges to the Act refers to evidence

8    properly adduced by Log Cabin Republicans and admitted at trial.  (As noted

9    above, apart from the Act itself and its legislative history, Defendants

10   admitted no evidence and produced no witnesses.)

11

12   **C.    Lay Witness Testimony**

13        **1.    Michael Almy**

14       Michael Almy served for thirteen years as a commissioned officer in the

15   United States Air Force, finishing his service as a major.  (Trial Tr. 726:21-

16   727:11, 728:11-12, July 16, 2010.)  Like several other witnesses, he came

17   from a family with a heritage of military service; his father retired as a colonel

18   in the Air Force, and two uncles served as career military officers as well.

19   (Trial Tr. 728:13-22, July 16, 2010.)

20

21       Almy entered active duty in 1993, after obtaining an undergraduate

22   degree in Information Technology while serving in the Army ROTC program.

23   He did not self-identify as a gay man until a few years later.  (Trial Tr. 726:23-

24   727:2, 819:3-12, July 16, 2010.)  After that, he testified, the Don't Ask, Don't

25   Tell Act created a natural barrier between himself and his colleagues, as he

26   could not reveal or discuss his personal life with others.  (Trial Tr. 820:6-

27   821:4, 821:19-822:9, July 16, 2010.)  While it was common for the officers to

28

1    socialize when off duty, he could not join them.  (Trial Tr. 821:19-822:9, July

2    16, 2010.)  All of this may have contributed to creating an aura of suspicion

3    about him, and a sense of distrust.  (Trial Tr. 820:19-821:4, July 16, 2010.)

4

5         Almy's modest demeanor as a witness and matter-of-fact recitation of

6    his service did not disguise his impressive record in the Air Force.  During his

7    career, Almy was deployed to Saudi Arabia three times and helped enforce

8    the Southern "no fly" zone over Iraq.  Almy set up new communications

9    bases throughout the theaters in Jordan, Saudi Arabia, and Iraq, and was

10   deployed in Saudi Arabia, serving in the Communications Directorate, during

11   the invasion of Iraq in 2003.  (Trial Tr. 742:16-743:11, 746:4-747:20, July 16,

12   2010.)  In 2003, after returning from his second deployment to Saudi Arabia,

13   Almy was promoted to the rank of major and accepted a position as the Chief

14   of Maintenance for the 606th Air Control Squadron in Spangdahlem,

15   Germany.  (Trial Tr. 751:1-20, July 16, 2010.)  In that role, Almy commanded

16   approximately 180 men in the Maintenance Directorate.  (Trial Tr. 751:21-22,

17   753:7-11, July 16, 2010.)  The three flights in the Maintenance Directorate

18   under his command in the 606th Air Control Squadron deployed to Iraq in

19   September 2004.  His squadron was responsible for maintaining and

20   controlling the airspace during the invasion of Fallujah, Iraq, and he was

21   responsible for maintaining control over the vast majority of Iraqi airspace,

22   including Kirkuk, as well as maintaining all satellite links and voice and data

23   communications.  (Trial Tr. 753:7-755:24, July 16, 2010.)  While stationed at

24   Balad Air Base, his flight experienced frequent mortar attacks "usually

25   several times a week, if not daily."  (Trial Tr. 756:1-2, July 16, 2010.)

26

27

28

1    After Almy completed his third deployment to Iraq in January 2005,

2  someone began using the same computer Almy had used while deployed;

3  that person searched Major Almy's private electronic mail message ("e-mail")

4  files without his knowledge or permission.  The search included a folder of

5  Major Almy's personal e-mail messages,[7] sent to his friends and family

6  members, and read messages, including at least one message to a man

7  discussing homosexual conduct.  (Trial Tr. 764:23-766:6-767:2, July 16,

8  2010.)  Almy thought the privacy of his messages was protected; he was very

9  knowledgeable about the military's policy regarding the privacy of e-mail

10  accounts because of his responsibility for information systems.  (Trial Tr.

11  772:20-773:4, 794:6-15, 796:6-798:4, July 16, 2010.)  He knew, for example,

12  that according to Air Force policy, e-mail accounts could not be searched

13  unless authorized by proper legal authority or a squadron commander or

14  higher in the military chain of command.  (Trial Tr. 772:20-773:4, July 16,

15  2010.)

16

17    Almy only learned his private e-mail had been searched when he

18  returned to Germany and his commanding officer confronted him with the

19  messages, read him the Don't Ask, Don't Tell Act, and pressured him to admit

20  he was homosexual.  (Trial Tr. 764:23-766:6, 773:13-20, July 16, 2010.)  At

21  the end of the meeting, Almy was relieved of his duties, and his commanding

22  officer informed the other officers in the squadron of this.  (Trial Tr. 774:7-15,

23  July 16, 2010.)  Almy had attained one of the highest level security

24

25    ───────────────

26    [7] According to Major Almy's uncontradicted testimony on this point, the
Air Force, "for morale purposes," allows servicemembers deployed in combat
zones to use their government e-mail account for personal e-mail.  (Trial Tr.

27  767:3-18, 794:6-15, 796:6-798:4, July 16, 2010.)  Almy separated the
personal e-mail he received in his government e-mail account into a folder

28  titled "Friends."  (Trial Tr. 769:20-770:15, July 16, 2010.)

1  clearances available for military personnel, "top secret SCI[8] clearance;"
2  approximately three months after Almy was relieved of his duties, his security
3  clearance was suspended.  (Trial Tr. 775:8-15, July 16, 2010.)

4

5       Initially, Almy contested his discharge, as he felt he had not violated the
6  terms of the Don't Ask, Don't Tell Act: he had never told anyone in the military
7  he was gay.  (Trial Tr. 775:19-776:9, July 16, 2010.)  Rather, Almy's
8  understanding was that his discharge was based solely on the e-mail
9  discovered on the computer in Iraq.  (Trial Tr. 793:6-9, July 16, 2010.)
10  Accordingly, Almy invoked his right to an administrative hearing and solicited
11  letters of support from those who had worked with him in the Air Force.  (Trial
12  Tr. 775:19-776:9, 777:2-8, July 16, 2010.)   Everyone he asked to write such
13  a letter agreed to do so.  (Trial Tr. 777:17-25, July 16, 2010.)  Colonel Paul
14  Trahan, US Army (Ret.), wrote: "My view is that Major Almy has been, and
15  will continue to be an excellent officer.  As a former Commander and
16  Inspector General I am well aware of the specifics of the Homosexual
17  Conduct Policy.  To my knowledge, Major Almy is not in violation of any of
18  the provisions of the policy.  To the contrary, it appears that in prosecuting
19  the case against Major Almy, the USAF may have violated the 'Don't Ask,
20  Don't Tell Policy,' the Electronic Privacy Act and Presidential directives
21  regarding the suspension of security clearances."  (Trial Ex. 113 [Character
22  Reference Letter from Col. Paul Trahan, U.S. Army (Ret.)].)

23

24       Captain Timothy Higgins wrote about Almy: "Of the four maintenance
25  directorate chiefs I have worked with at the 606th, Major Almy is by far the
26  finest.  During his tenure as the [director of logistics], he had maintenance

27  _____

28       [8]  "SCI" means "Sensitive Compartmented Information."

23

training at the highest levels seen to date . . . . His troops respected him because they believed he had their best interests at heart." (Trial Ex. 117 [Character Reference Letter from Timothy J. Higgins, Capt. USAF].)

Those who served under Almy wrote equally strong praise: "I can say without reservation that Maj. Almy was the best supervisor I have ever had." (Trial Ex. 120 [Character Reference Letter from Rahsul J. Freeman, 1st Lt., USAF]); "I was deployed with him during the NATO Exercise CLEAN HUNTER 2004. His leadership was key to our successful completion of the mission. He was well liked and respected by the enlisted personnel in the unit." (Trial Ex. 122 [Character Reference Letter from Leslie D. McElya, SMSgt, USAF (Ret.)].) Almy's commanding officer while his discharge proceedings were pending, Lt. Col. Jeffrey B. Kromer, wrote that he was convinced "the Air Force, its personnel, mission and tradition remains unchanged and unharmed despite his alleged [violations of the Don't Ask, Don't Tell Act]." (Trial Ex. 114.)

During the course of Almy's discharge proceedings, he was relieved of his command, but remained at Spangdahlem Air Base performing "ad hoc" duties. (Trial Tr. 810:18-811:1, 816:5-16 July 16, 2010.) Almy testified he observed the effect his abrupt removal from his duties had on his former unit: the maintenance, availability, and readiness of the equipment to meet the mission declined. (Trial Tr. 813:19-24, 815:2-18, July 16, 2010.) One officer in the 606th Air Control Squadron observed that the squadron "fell apart" after Major Almy was relieved of his duties, illustrating "how important Maj. Almy was[,] not only to the mission but to his troops." (Trial Ex. 121

24

1  [Character Reference Letter from Bryan M. Zollinger, 1st Lt. USAF, 606th Air

2  Control Squadron].)

3

4      After sixteen months, Almy agreed to drop his request for an

5  administrative hearing and to accept an honorable discharge.  He testified his

6  reasons for doing so were the risks of a less-than-honorable discharge would

7  have had on his ability to obtain a civilian job and on his retirement benefits,

8  as well as his own exhausted emotional state.  (Trial Tr. 798:8-799:13, July

9  16, 2010.)  Almy refused to sign his official discharge papers, however,

10  because they listed the reason for discharge as admitted homosexuality.

11  (See Trial Ex. 112; Trial Tr. 800:1-801:20, July 16, 2010.)

12

13      Major Almy received many awards and honors during his service in Air

14  Force.  For example, while serving at Tinker Air Force Base in the late 1990s

15  with the Third Combat Communications Group, he was selected as "Officer of

16  the Year," chosen as the top performer among his peers for "exemplary

17  leadership, dedication to the mission, and going above and beyond the call of

18  duty."  (Trial Tr. 741:1-11, July 16, 2010.)  In 2001, he was one of six Air

19  Force officers chosen to attend the residential training program for officers at

20  the Marine Corps Quantico headquarters.  (Trial Tr. 744:7-745:20.)  In 2005

21  he was awarded the Lt. General Leo Marquez Award, which is given to the

22  Top Air Force Communications Officer serving in Europe.  (Trial Tr. 760:8-

23  761:1, July 16, 2010.)  Although Almy had been relieved of command, during

24  the pendency of the discharge proceedings, Colonel Goldfein, Almy's wing

25  commander, recommended that Almy be promoted to lieutenant colonel.

26  (Trial Tr. 816:19-818:1, July 16, 2010.)

27

28

1   Almy testified that if the Act were no longer in effect, he "wouldn't
2   hesitate" to rejoin the Air Force.  (Trial Tr. 827:3-5, July 16, 2010.)  The Court
3   found Almy a credible, candid, and forthright witness.

4

5       **2.    Joseph Rocha**

6   Joseph Rocha enlisted in the United States Navy on April 27, 2004, his
7   eighteenth birthday.  (Trial Tr. 473:19-23, July 15, 2010.)  His family, like
8   Major Almy's, had a tradition of military service, and the September 11, 2001,
9   attacks also motivated him to enlist.  (Trial Tr. 474:5-24, July 15, 2010.)  He
10  wanted to be an officer in the United States Marine Corps, but was not
11  admitted to the Naval Academy directly out of high school; so he hoped to
12  enter Officer Training School through diligence as an enlisted man.  (Trial Tr.
13  473:24-474:24, July 15, 2010.)

14

15  After successfully completing basic training, he was promoted to
16  seaman apprentice and received further training in counter-terrorism and
17  force protection.  (Trial Tr. 475:7-476:5, July 15, 2010.)  He then volunteered
18  for deployment on a military mission to Bahrain.  (Trial Tr. 476:6-12, July 15,
19  2010.)  Once he arrived at the Naval Support base there, Rocha sought out
20  the base's canine handler position because he wanted to specialize in
21  becoming an explosive-device handler.  (Trial Tr. 477:12-22, July 15, 2010.)

22

23  The canine group is a very elite and competitive unit, for which
24  qualification is very difficult.  (Trial Tr. 478:11-16, July 15, 2010.)  Rocha
25  volunteered his off-duty time to earn the qualifications to interview and be
26  tested for a kennel-support assignment; during this time, his interactions with
27  members of the canine unit were limited to one or two handlers on the night

28

shift when he volunteered.  (Trial Tr. 478:20-479:13, July 15, 2010.)

Eventually, Rocha took and passed oral and written examinations with Chief

Petty Officer Toussaint, the canine group's commanding officer; Rocha met

the other qualifications and received an assignment in kennel support.  (Trial

Tr. 480:11-19, 481:4-9, July 15, 2010.)  His duties were to ensure the dogs –

who were trained to sniff and detect explosives and explosive devices – were

clean, fed, medicated, and exercised.  (Trial Tr. 481:10-17, July 15, 2010.)

At the same time, Rocha voluntarily participated in additional physical

training exercises with members of the Marine Corps, such as martial arts

and combat operations training, in the belief this eventually would improve his

chances for admission to the Naval Academy.  (Trial Tr. 482:16-483:6, July

15, 2010.)  As Rocha aspired to become a Marine officer, after receiving

permission through the Marine chain of command, Rocha began "more

formal training," eventually earning martial arts, combat, and swimming

qualifications.  (Trial Tr. 482:21-483:12, July 15, 2010.)

Once assigned as kennel support to the canine unit and under Chief

Petty Officer Toussaint's command, Rocha was hazed and harassed

constantly, to an unconscionable degree and in shocking fashion.  When the

eighteen-year-old Rocha declined to participate in the unit's practice of

visiting prostitutes, he was taunted, asked if he was a "faggot," and told to

prove his heterosexuality by consorting with prostitutes.  (Trial Tr. 486:18-

487:2, 488:3-7, July 15, 2010.)  Toussaint freely referred to him as "gay" to

the others in the unit, and others in the unit referred to him in a similar

fashion.  (Trial Tr. 486:11-17, July 15, 2010.)  When Rocha refused to answer

the questions from Toussaint and others in the unit about his sexuality, "it

1  became a frenzy," in his words, and his superiors in the canine unit would

2  gather around him, simulate sexual positions, and ask if the U.S. Marine

3  Corps soldiers performed various sexual acts on him.  (Trial Tr. 487:20-

4  488:7, 488:8-19, July 15, 2010.)  Toussaint ordered all of the other men in the

5  unit to beat Rocha on the latter's nineteenth birthday.  (Trial Tr. 485:16-486:3,

6  July 15, 2010.)

7

8      On one occasion that Rocha testified was especially dehumanizing,

9  Toussaint brought a dozen dogs to the Department of Defense Dependent

10  School for a bomb threat training exercise.  For the "training exercise" he

11  instructed Rocha to simulate performing oral sex on another enlisted man,

12  Martinez, while Toussaint called out commands about how Rocha should

13  make the scenario appear more "queer."  (Trial Tr. 490:13-492:19, July 15,

14  2010.)  On another occasion, Toussaint had Rocha leashed like a dog,

15  paraded around the grounds in front of other soldiers, tied to a chair, force-

16  fed dog food, and left in a dog kennel covered with feces.  (Trial Tr. 521:11-

17  522:1, July 15, 2010.)

18

19      Rocha testified that during this deployment in Bahrain, he never told

20  anyone he was gay because he wanted to comply with the Don't Ask, Don't

21  Tell Act.  (Trial Tr. 487:20-488:2, July 15, 2010.)  He did not report any of the

22  mistreatment, although he believed it violated Navy regulations.  (Trial Tr.

23  488:20-489:14, July 15, 2010.)  Toussaint was his commanding officer to

24  whom he normally would direct such a report and yet was either responsible

25  for the mistreatment or at least present when others engaged in it.  (Id.)

26  Rocha's only other choice was to report the misconduct to the Inspector

27  General, which he did not believe was feasible.  (Trial Tr. 499:6-16, 533:2-19,

28

July 15, 2010.)  He was eighteen to nineteen years old at the time, he testified, far from home in Iraq, and all of the perpetrators were senior to him in rank and led in the misconduct by his commanding officer.  (Trial Tr. 488:20-489:14, July 15, 2010.)

Eventually Rocha received the assignment he had hoped for, returning to the United States and reporting to Lackland Air Force Base for Military Working Dog Training School.  (Trial Tr. 499:20-500:1, July 15, 2010.)  Once he completed that training successfully, he returned to Bahrain, where he found that although he was now a military dog handler himself, the same atmosphere prevailed.  (Trial Tr. 500:2-6, 16-18, July 15, 2010.)  A new petty officer had joined the unit, Petty Officer Wilburn, who declared openly that Rocha was "everything he hated: liberal, [Roman] Catholic, and gay."  (Trial Tr. 501:19-502:11, July 15, 2010.)  Wilburn trailed Rocha regularly as Rocha tried to carry out his duties, taunting and harassing him.  Rocha wrote Wilburn a letter complaining about his conduct; in response, Wilburn left an image of two men engaging in homosexual activity on Rocha's computer with the message that if Rocha complained, "no one will care."  (Trial Tr. 502:12-504:5, July 15, 2010.)

When the Navy undertook an investigation of Toussaint's command (apparently unmotivated by anything Rocha said or did), Rocha was questioned by a captain but at first refused to answer any questions about the mistreatment he was subjected to because he was afraid the investigation might lead to questions about his sexual orientation and an investigation on that subject.  (Trial Tr. 519:16-520:10, July 15, 2010.)  So great was Rocha's fear of retaliation that he responded to an investigating

1    officer's questions regarding Toussaint only after he was threatened with a

2    court martial if he refused to do so.  (Trial Tr. 520:11-15, July 15, 2010.)

3

4        The Navy recognized Rocha with several awards during his service,

5    including the Navy and Marine Corps Achievement Medal for professional

6    achievement that exceeds expectations; the Global War on Terrorism

7    Expeditionary Medal; the National Defense Service Medal; and the Navy

8    Expert Rifleman Medal.  (Trial Tr. 517:23-24, 518:7-8, 14-16, 519:4-7, July

9    15, 2010.)

10

11        Rocha received consistently excellent performance evaluations and

12    reviews while he served in the Navy.  (See Trial Exs. 144, 145.)  In Rocha's

13    review covering February 18, 2005, through July 15, 2005, his supervisors –

14    including Toussaint – described Rocha as "highly motivated" and a

15    "dedicated, extremely reliable performer who approaches every task with

16    enthusiasm."  (Trial Ex. 145; Trial Tr. 494:23-497:13, July 15, 2010.)  Rocha's

17    review also stated that he was a "proven performer" who was "highly

18    recommended for advancement."  (Trial Tr. 496:16-497:3, July 15, 2010.)

19    Rocha's review recommended him for early promotion, which he received

20    shortly thereafter.  (Trial Tr. 497:7-22, July 15, 2010.)  Toussaint signed the

21    review as Rocha's senior reviewing military officer.  (Trial Tr. 495:19-23,

22    498:4-6, July 15, 2010.)

23

24        Despite the ongoing harassment, Rocha continued to receive

25    exemplary reviews from his supervisors in the canine handling unit, including

26    Chief Petty Officer Toussaint.  In a review covering July 16, 2005, through

27    June 16, 2006, then-Petty Officer Rocha is described as an "exceptionally

28

1  outstanding young sailor whose performance, initiative, and immeasurable

2  energy make[ ] him a model Master-At-Arms."  (Trial Ex. 144; Trial Tr.

3  504:23-506,19, July 15, 2010.)  The review also noted that as a military

4  working dog handler, Rocha "flawlessly inspected [over 300 items of military

5  equipment,] increasing the force protection of NSA Bahrain."  (Trial Ex. 144;

6  Trial Tr. 506:10-13, July 15, 2010.)  As a result of his performance as a

7  military working dog handler, Rocha received the Navy and Marine Corps

8  Achievement Medal, which is given when an enlisted member exceeds

9  expectations.  (Trial Tr. 517:15-518:6 July 15, 2010.)

10

11      In 2006, Rocha was chosen to receive the sole nomination from his

12  congressman for entrance into the U.S. Naval Academy, and Rocha chose to

13  apply to the Naval Academy's preparatory school in the event he was not

14  accepted directly into the Naval Academy.[9]  (Trial Tr. 506:1-4; 507:4-23, July

15  15, 2010.)  As required, he received the nomination of everyone in his chain

16  of command for his entry into the academy and was accepted into the Naval

17  Academy's preparatory school.  (Trial Tr. 508:13-509:6, July 15, 2010.)  He

18  described his acceptance as "the most significant moment of [his] life . . . ,

19  [because acceptance into the Naval Academy] was the biggest dream [he'd]

20  ever had."  (Trial Tr. 519:8-15, July 15, 2010.)

21

22      Once he enrolled at the preparatory academy, Rocha testified, he had

23  the opportunity to reflect on his experiences in Bahrain.  (Trial Tr. 522:12-24,

24  July 15, 2010.)  His instructors at the preparatory academy stressed the

25

26      [9] According to Rocha's uncontradicted testimony on this point, the
27  preparatory academy is designed to give extra academic support before entry
    into the Naval Academy at Annapolis.  (Trial Tr. 507:24-508:4, July 15, 2010.)
28  Once admitted into the preparatory academy, acceptance into Annapolis is
    guaranteed.  (Trial Tr. 508:5-12, July 15, 2010.)

1   nature of the fifteen- to twenty-year commitment expected of the officer

2   candidates.  (Id.)  Rocha understood he was gay when he enlisted in the

3   Navy at age eighteen, and had complied fully with the Don't Ask, Don't Tell

4   Act during his service, which he had thought would protect him.  (Id.)  After

5   reflecting on his experiences in the military working dog unit in Bahrain,

6   however, he decided it would be impossible for him to serve under the

7   restraints of the Act and fulfill the commitment expected of him.  He then

8   decided to inform the Navy of his sexual orientation.  (Trial Tr. 522:12-523:15,

9   July 15, 2010.)

10

11      He first sought permission from Ensign Reingelstein to speak to the

12   division commander; Ensign Reingelstein unsuccessfully tried to persuade

13   Rocha to change his mind.  (Trial Tr. 523:14-524:14, July 15, 2010.)  Rocha

14   then was allowed to meet with his commanding officer, Lt. Bonnieuto, who

15   listened and told him to return to his unit.  (Trial Tr. 525:2-19, July 15, 2010.)

16   Eventually, he received an honorable discharge (see Trial Ex. 144), although

17   before accepting Rocha's statement, Lt. Bonnieuto tried to dissuade him,

18   telling him he was being considered for various honors and leadership

19   positions at the preparatory academy, including "battalion leadership."  (Trial

20   Tr. 525:21-526:6, 527:13-528:22, 530:4-25, July 15, 2010.)

21

22      After his discharge, Rocha testified, he was diagnosed with service-

23   related disorders including "post-traumatic stress disorder with major

24   depression."  (Trial Tr. 532:11-19, July 15, 2010.)  He also testified he would

25   rejoin the Navy if the Don't Ask, Don't Tell Act was repealed.  (Trial Tr.

26   533:24-534:2, July 15, 2010.)

27

28

1    Even when recounting the mistreatment endured under Toussaint's
2    command, Rocha testified in an understated and sincere manner.  The Court
3    found him a forthright and credible witness.

4
5    **3.    Jenny Kopfstein**

6    Jenny Kopfstein joined the United States Navy in 1995 when she
7    entered the U.S. Naval Academy; after graduation and further training, she
8    began serving on the combatant ship USS <u>Shiloh</u> on March 15, 2000.    (Trial
9    Tr. 919:12-14, 926:11-927:3, 927:12-19, July 16, 2010.)  She was assigned
10   as the ship's ordnance officer, which means she "was in charge of two
11   weapon systems and a division of [fifteen] sailors."  (Trial Tr. 928:22-929:6,
12   July 16, 2010.)  When assigned to be the "officer of the deck," she was "in
13   charge of whatever the ship happened to be doing at that time," and
14   coordinating the ship's training exercises of as many as twenty to thirty
15   sailors.  (Trial Tr. 929:7-930:4, July 16, 2010.)

16

17   Once assigned to the USS <u>Shiloh</u>, she discovered the Act made it
18   impossible for her to answer candidly her shipmates' everyday questions
19   about such matters as how she spent weekends or leave time; to do so
20   would place her in violation of the Act as she would necessarily be revealing
21   the existence of her lesbian partner.  (Trial Tr. 931:22-932:11, July 16, 2010.)
22   She testified that having to conceal information that typically was shared
23   made her feel as though other officers might distrust her, and that trust is
24   critical, especially in emergencies or crises.  (Trial Tr. 957:6-22, July 20,
25   2010.)  The Don't Ask, Don't Tell Act's prohibition on gay and lesbian
26   servicemembers revealing their sexual orientation affects trust among
27   shipmates, Kopfstein testified, because it causes people to "hide significant

28

1   parts of themselves," making it harder to establish the necessary sense of

2   teamwork.  (Trial Tr. 978:16-979:18 July 20, 2010.)  When she overheard

3   homophobic comments and name-calling by her shipmates, she felt she

4   could neither report them nor confront the offenders, because to do either

5   might call unwanted suspicion upon her.  (Trial Tr. 932:18-933:6, July 16,

6   2010.)

7

8       After serving for four months on the USS Shiloh, Kopfstein wrote a

9   letter to Captain Liggett, her commanding officer, stating she was a lesbian;

10  she wanted Captain Liggett to learn this from her rather than hear it from

11  another source.  (Trial Tr. 933:7-13, 935:8-23, July 16, 2010; Trial Ex. 140

12  ["Memorandum of Record" from Kopfstein to Liggett dated July 17, 2000].)

13  Captain Liggett did not begin any discharge proceedings after Kopfstein

14  wrote this letter; he told her this was because he did not know her well and

15  thought she might have written the letter not because she was a lesbian, but

16  rather as an attempt to avoid deployment to the Arabian Gulf.  (Trial Tr.

17  935:20-937:11, July 16, 2010; 985:5-14, July 20, 2010.)  Kopfstein continued

18  to serve and perform her duties in the same manner she had before writing,

19  but no longer lying or evading her shipmates' questions about her personal

20  life when asked.  (Trial Tr. 950:25-951:11, July 20, 2010.)

21

22      When Liggett was leaving the USS Shiloh, to be replaced by Captain

23  Dewes, Captain Liggett not only invited her to the farewell party at his house

24  for the officers and their spouses, but made a point of telling her she was

25  welcome to bring "any guest she chose" with her.  (Trial Tr. 955:12-956:8,

26  July 20, 2010.)  Kopfstein and her partner attended the party, and Kopfstein

27

28

34

1    testified that Captain Liggett and his wife welcomed them both warmly, as did

2    everyone else present.  (Trial Tr. 956:12-25, July 20, 2010.)

3

4        During the abbreviated course of her service, the Navy awarded

5    Kopfstein many honors.  For example, she was chosen to steer the USS

6    Shiloh in a ship steering competition; after the USS Shiloh won the

7    competition, she received a personal commendation from the Admiral who

8    also ceremonially "gave her his coin," a rare and prized tribute.  (Trial Tr.

9    952:14-953:20, July 20, 2010.)  When she returned from overseas

10   deployment after the bombing of the USS Cole off the coast of Yemen in

11   February 2001, the Navy awarded her the Sea Service Deployment Ribbon,

12   another commendation not routinely awarded.  (Trial Tr. 949:11-22, 954:5-22,

13   July 20, 2010.)  She also was awarded the Naval Expeditionary Medal after

14   the Yemen deployment.  (Trial Tr. 955:5-11.)

15

16       On September 11, 2001, Kopfstein was the ordnance officer on the

17   USS Shiloh, in charge of all the weapons on the ship; the captain chose her

18   to be Officer of the Deck as the ship was assigned to defend the West Coast

19   against possible attack in the wake of the attacks on New York and the

20   Pentagon.  (Trial Tr. 958:17-962:19, 963:22-25, July 20, 2010.)  In October

21   2001, the Navy awarded her the Surface Warfare Officer pin, during a

22   ceremony where her captain took off his pin and pinned it on her chest.  (Trial

23   Tr. 968:8-970:1, July 20, 2010.)

24

25       In evaluations completed before and after Kopfstein revealed her

26   sexual orientation, her commanding officers praised her as the USS Shiloh's

27   "best [o]fficer of [the d]eck," a "[t]op [n]otch performer," "a gifted ship

28

35

1  handler," and the manager of "one of the best ship's led and organized

2  divisions," and a "[s]uperb [t]rainer" with a "great talent for teaching other

3  junior officers."  (Trial Exs. 138, 139.)  Captain W.E. Dewes, who was

4  Kopfstein's commanding officer at the time of her discharge, reported that

5  "[h]er sexual orientation has not disrupted good order and discipline onboard

6  USS SHILOH;" rather, Kopfstein was "an asset to the ship and the Navy" who

7  "played an important role in enhancing the ship[']s strong reputation . . . . She

8  is a trusted Officer of the Deck and best ship handler among her peers.

9  Possesses an instinctive sense of relative motion – a natural Seaman."  (Trial

10  Ex. 139.)  Captain Liggett testified at her discharge proceedings that "it would

11  be a shame for the service to lose her."  (Trial Ex. 138.)

12

13       Kopfstein served in the Navy without concealing her sexual orientation

14  for two years and four months before her discharge; during that time, to her

15  knowledge, no one complained about the quality of her work or about being

16  assigned to serve with her.  (Trial Tr. 984:8-12, 987:6-8, 989:9-17, July 20,

17  2010.)  She did not want to leave the Navy; she enjoyed the company of her

18  shipmates and found her work rewarding.  (Trial Tr. 973:16-24, July 20,

19  2010.)  Two captains under whom she served came to the Board of Inquiry to

20  testify on her behalf during her discharge proceedings.  (Trial Tr. 974:2-

21  977:11, July 20, 2010.)  Nevertheless, she was discharged under the Don't

22  Ask, Don't Tell Act.  (Id.)  Although she appealed the decision to separate her

23  from the Navy, she did not prevail, and on October 31, 2002, she received an

24  honorable discharge.  (Trial Tr. 977:9-20, July 20, 2010.)  She testified she

25  "absolutely" would rejoin the Navy if the Act is repealed.  (Trial Tr. 980:16-22,

26  July 20, 2010.)

27

28

1    The Court found Kopfstein an honest, candid, and believable witness;
2    she testified with modest understatement about her talent and achievements
3    as a Naval Officer and with obvious sincerity about her desire to rejoin to
4    fulfill her original commitment.

5

6           **4.     John Nicholson**

7    John Nicholson enlisted in the United States Army in May 2001.  (Trial
8    Tr. 1135:6-12, July 20, 2010.)  At the time he enlisted, he was fluent in
9    Spanish and "fairly proficient" in Italian and Portuguese.  (Trial Tr. 1129:3-
10   1130:23, 1134:10-23, 1135:13-18, July 20, 2010.)  He underwent testing in
11   the military for foreign language aptitude and qualified for the most difficult
12   level of language training, Category 4.  (Trial Tr. 1151:25-1152:3, 1154:4-9,
13   July 20, 2010.)  While Nicholson served, and especially while he was in basic
14   training at Fort Benning, Georgia, he sometimes heard other soldiers make
15   sexist or homophobic slurs but was afraid to report these violations of military
16   conduct lest suspicion fall on him or he be retaliated against in a manner that
17   would lead to his discharge under the Act.  (Trial Tr. 1138:1-1142:14, 1143:2-
18   24, July 20, 2010.)  Nicholson testified that the Don't Ask, Don't Tell Act
19   prevented him from being open and candid with others in his unit; it kept him
20   under a "cloud of fear," caused him to alter who he was, and made him lie
21   about who he was.  (Trial Tr. 1194:17-1196:20, July 20, 2010.)

22

23   After completing his basic training, Nicholson was assigned to Fort
24   Huachuca, Arizona, to train as a human intelligence collector.  (Trial Tr.
25   1143:25-1144:3, July 20, 2010.)  While completing his intelligence training at
26   Fort Huachuca, Nicholson requested and received a reassignment to
27   counterintelligence, but remained at Fort Huachuca to complete the requisite
28

1  counterintelligence training. (Trial Tr. 1148:5-14, July 20, 2010.)  Nicholson

2  was waiting to start the next cycle of the counterintelligence course when

3  another servicemember started spreading a rumor that Nicholson was gay.

4  (Trial Tr. 1154:12-18, July 20, 2010.)

5

6       The rumor originated because, while off duty one day in January 2002,

7  Nicholson was writing a letter to a man with whom he had a relationship

8  before joining the Army; Nicholson was writing the letter in Portuguese to

9  prevent other servicemembers from reading it, because it contained

10 references that could reveal Nicholson's sexual orientation.  (Trial Tr.

11 1134:10-23, 1161:10-1163:7, July 20, 2010.)  Despite Nicholson's

12 precautions, another servicemember caught sight of the letter while chatting

13 with Nicholson.  (Id.)  After the two had been talking for a few minutes,

14 Nicholson realized she was one of the few persons he knew in the Army who

15 also could also read Portuguese; he gathered up the pages of his letter after

16 he noticed she appeared to be interested in it and reading it.  (Id.; Trial Tr.

17 1163:8-18, July 20, 2010.)

18

19      After this incident, members of Nicholson's unit approached him and

20 told him to "be more careful" with regard to disclosure of his sexual

21 orientation.  (Trial Tr. 1164:3-1165:10, July 20, 2010.)  Nicholson sought his

22 platoon sergeant's assistance to stop the spread of the rumor, but instead the

23 sergeant informed the chain of command.  (Trial Tr.1166:9-1167:19, 1170:9-

24 15, July 20, 2010.)  Nicholson's company commander summoned Nicholson

25 to his office and informed Nicholson that he was initiating discharge

26 proceedings.  (Trial Tr. 1180:21-1182:9, July 20, 2010.)  Upon leaving the

27 meeting, the platoon sergeant, who also had been present at the meeting,

28

1  ordered Nicholson not to disclose why he was being discharged from the

2  Army.  (Trial Tr. 1182:11-1183:15, July 20, 2010.)

3

4      Nicholson testified that after the meeting with his company commander,

5  he was separated from his platoon and placed in a wing of the barracks

6  containing other servicemembers who were being discharged for reasons

7  such as drug use and failing to disclose criminal convictions before

8  enlistment.  (Trial Tr. 1184:11-1185:11, July 20, 2010.)  Two months later,

9  Nicholson was honorably discharged under the Don't Ask, Don't Tell Act.

10 (Trial Tr. 1183:25-1184:10, 1187:10-13, July 20, 2010.)  Nicholson testified

11 he "absolutely" would return to the Army if the Don't Ask, Don't Tell Act were

12 invalidated.  (Trial Tr. 1209:4-5, July 21, 2010.)

13

14     As noted above with respect to his testimony on the standing issue, the

15 Court observed Nicholson to be credible and forthright.

16

17     **5.   Anthony Loverde**

18     Anthony Loverde joined the United States Air Force on February 13,

19 2001, making a six-year commitment and hoping to use his G.I. Bill benefits

20 to obtain a post-graduate degree eventually.  (Trial Tr. 1326:19-24, 1327:16-

21 1328:22, July 21, 2010.)  After completing basic training, he received

22 specialized training in electronics and further training in calibrations, after

23 which he qualified at the journeyman level as a PMEL – Precision

24 Measurement Equipment Laboratory – technician.  (Trial Tr. 1329:5-24, July

25 21, 2010.)  A PMEL technician calibrates the accuracy, reliability, and

26 traceability of all types of equipment, including precision warfare equipment.

27 (Trial Tr. 1335:13-1336:5, July 21, 2010.)

28

1    After completing training in December 2001, Loverde was stationed at
2    the Ramstein Air Base in Germany.  (Trial Tr. 1334:18-21, July 21, 2010.)
3    While at Ramstein, Loverde's flight[10] was responsible for calibrating and
4    ensuring the accuracy and reliability of "various equipment used throughout
5    the Air Force."  (Trial Tr. 1335:13-1336:20, July 21, 2010.)  Loverde was
6    stationed at Ramstein for approximately three years.  (Trial Tr. 1337:5-11,
7    July 21, 2010.)

8

9    After completing his tour at Ramstein Air Base, Loverde was stationed
10   at Edwards Air Force Base in California for approximately two years.  (Trial
11   Tr. 1341:17-1342:2, July 21, 2010.)  While stationed at Edwards, Loverde
12   was deployed to the Al Udeid Air Base in Qatar for four months, where he
13   supported Operations Iraqi Freedom and Enduring Freedom, as well as
14   missions taking place in the Horn of Africa.  (Trial Tr. 1344:8-22, 1345:17-21,
15   July 21, 2010.)

16

17   During his stint in the Air Force, Loverde received frequent promotions;
18   three and one-half years after enlistment, for example, he was promoted to
19   staff sergeant, although the usual length of time to reach that rank is six
20   years.  (Trial Tr. 1337:12-1338:5, 1338:21-1339:12, July 21, 2010.)  After
21   serving his initial enlistment commitment, he reenlisted and received further
22   training to qualify as a loadmaster.  (Trial Tr. 1352:25-1353:15, July 21,
23   2010.)  In that capacity, he flew sixty-one combat missions in Iraq, where he
24   received two Air Medals.  (Trial Tr. 1357:12-17, 1359:17-25, July 21, 2010.)
25
26
27         [10] A "flight" is the Air Force term for a group of airmen, comparable to a
28   "unit" in the Army.  (Trial Tr. 1335:10-12, July 21, 2010.)

1    Loverde testified he was raised in a religious family and his church

2 taught that homosexuality was a sin; he had not realized he was gay at the

3 time he joined the military at age eighteen.  (Trial Tr. 1330:13-25, July 21,

4 2010.)  After he became aware of his sexual orientation, he researched the

5 Don't Ask, Don't Tell Act and found the Servicemembers' Legal Defense

6 Network website.  (Trial Tr. 1332:13-1333:4, July 21, 2010.)  He understood

7 that there were three grounds for discharge under the Act – marriage,

8 conduct, and statements.  (Trial Tr. 1332:17-1333:4, July 21, 2010.)  He

9 resolved to comply with the Act and remain in the Air Force.

10

11    The Air Force's core values are "Integrity First, Service Before Self, and

12 Excellence in All We Do."  (Trial Tr. 1333:5-24, July 21, 2010; 367:20-25, July

13 14, 2010.)  Loverde testified that the Don't Ask, Don't Tell Act effectively

14 made it impossible to honor the "Integrity First" value of the credo, because

15 on occasion, he felt forced to lie rather than violate the Act: Once, when with

16 other servicemembers in a bar off base in Germany, he refused the sexual

17 advances of a German civilian woman, and his colleagues asked him if he

18 was gay; on another occasion, a subordinate airman asked Loverde about

19 his sexual orientation.  (Trial Tr. 1333:5-1334:16, 1349:24-1350:24, July 21,

20 2010.)

21

22    During the time he served as a loadmaster at the Ramstein Air Base in

23 Germany, he also testified that his flight chief often used offensive epithets to

24 refer to gays, as well as racist and sexist slurs.  (Trial Tr. 1364:16-1365:25,

25 July 21, 2010.)  Although Loverde was disturbed by this, he felt he had no

26 recourse and could not report it lest he draw attention to his sexual

27 orientation.  Therefore, during the year he served under this officer, he never

28

1  made any formal or informal complaint about it.  (Id.; Trial Tr. 1366:13-15,

2  July 21, 2010.)

3

4      Loverde also testified that during his combat deployments and during

5  his assignments to bases in Germany and California, he faced the difficulty of

6  having to hide his personal life from his colleagues and avoiding

7  conversations with them about everyday life over meals, for example.  (Trial

8  Tr. 1360:1-1361:17, July 21, 2010.)  He became so skilled at avoiding his

9  fellow airmen that they nicknamed him "vapor" in recognition of his ability to

10  vanish when off duty.  (Id.)

11

12      In April 2008, Loverde decided he was no longer willing to conceal his

13  sexual orientation.  (Trial Tr. 1366:16-20, July 21, 2010.)  At that time, he was

14  deployed to the Ali Al Saleem Air Base in Kuwait, and he delayed formally

15  telling his commanding officer of his decision until his return to Germany, lest

16  his entire flight unit's mission be disrupted and their return from deployment

17  delayed.  (Trial Tr. 1355:18-21, 1366:16-1367:25, July 21, 2010.)  When he

18  returned to Germany from his deployment, Loverde wrote to his first

19  sergeant, stating Loverde wanted to speak to his commanding officer about

20  continuing to serve under the Don't Ask, Don't Tell Act, and that while he

21  wanted to continue serving in the Air Force, he could not do so under that

22  law.  (Id.; Trial Tr. 1368:20-1369:3, July 21, 2010.)

23

24      Loverde's superiors recommended the Air Force retain him and

25  commended him for being "nothing less than an outstanding [non-

26  commissioned officer]" and "a strong asset" to the Air Force.  (Trial Exs. 136,

27  137.)  They praised him for demonstrating an "exceptional work ethic" and

28

42

1   "the highest level of military bearing, honest, and trustworthiness."  (<u>Id.</u>)  One

2   wrote: "If I ever had the opportunity to build my 'dream team' for work, I would

3   take an entire crew of SSgt. Loverde over most other workers. . . ."  (Trial Ex.

4   137.)

5

6        Nevertheless, in July 2008 the Air Force gave Loverde an honorable

7   discharge, citing the Don't Ask, Don't Tell Act.  (<u>See</u> Trial Exs. 129, 134, 136,

8   137; Trial Tr. 1372:20-1377:20, July 21, 2010.)  Loverde testified he would

9   join the Air Force again "without a doubt" if the Don't Ask, Don't Tell Act were

10  repealed.  (Trial Tr. 1389:12-18, July 21, 2010.)  The Court found Loverde a

11  candid and credible witness.

12

13       **6.    Steven Vossler**

14       Steven Vossler's family has a tradition of service in the Army extending

15  back to the Spanish-American War, and he enlisted in the United States

16  Army in November 2000, before graduating high school.  (Trial Tr. 302:19-

17  303:5, July 14, 2010.)  After basic training, the Army sent him to the Defense

18  Language Institute in Monterey, California, because of his exceptional

19  aptitude for foreign languages.  (Trial Tr. 305:5-306:6, July 14, 2010.)  He

20  described the close friendships he developed with other students at the

21  Language Institute, how in general it is important to have "good, open

22  relationships" and to discuss one's personal experiences and life with one's

23  colleagues in the military, and how, if one does not, it is perceived as an

24  attempt to distance one's self.  (Trial Tr. 316:7-317:17, July 14, 2010.)

25

26

27

28

1        Vossler met Jerrod Chaplowski, another soldier and Korean language

2   student, at the Monterey Language Institute, and became friends with him.

3   (Trial Tr. 317:14-20, 318:16-17, July 14, 2010.)  Eventually he heard a rumor

4   that Chaplowski was gay.  (Trial Tr. 318:22-320:24, July 14, 2010.)  Vossler

5   testified that he was initially surprised at this, because "up until that point, [he]

6   still held some very stereotyping beliefs about gays and lesbians," but  also

7   testified that as a heterosexual he had no difficulty sharing living quarters with

8   Chaplowski at any of the several Army bases where they were quartered

9   together; in fact, Chaplowski was a considerate roommate and it was always

10   a "great living situation."  (Trial Tr. 319:16-17, 321:2-10, 327:1-11, 329:20-25,

11   July 14, 2010.)

12

13        The difficulty Vossler did encounter, he testified, was that when he and

14   Chaplowski were with other servicemembers and the conversation turned to

15   general subjects, he had to be excessively cautious lest he inadvertently cast

16   suspicion on Chaplowski and trigger an investigation under the Don't Ask,

17   Don't Tell Act.  (See Trial Tr. 327:12-328:20, July 14, 2010.)  For example, if

18   a group of soldiers was discussing their respective social activities over the

19   previous weekend, Vossler had to refer to Chaplowski's dinner companion as

20   "Stephanie" rather than "Steven;" even this small deception pained Vossler

21   as it violated the Army's code of honor.  (Id.)  Vossler also testified that he

22   observed that the Don't Ask, Don't Tell Act infringed Chaplowski's ability or

23   willingness to enforce the Army's policy banning offensive and discriminatory

24   language.  (Trial Tr. 328:22-329:4, July 14, 2010.)  Homophobic slurs,

25   epithets, and "humor" were commonplace and made Vossler uncomfortable;

26   he noticed that Chaplowski did not confront those who employed them,

27   although Vossler eventually did at times.  (Trial Tr. 329:5-19, July 14, 2010.)

28

1    Vossler chose not to reenlist in the active duty Army after his tour of

2  service expired, instead enlisting in the Army National Guard, which he left in

3  June 2009.  (Trial Tr. 332:21-333:25, July 14, 2010.)  After leaving the

4  military, Vossler became a vocal advocate for the repeal of the Don't Ask,

5  Don't Tell Act because he believes the Act "doesn't seem in line with

6  American values" and he "do[es]n't understand how it's a law in [this] country"

7  because he perceives the Act to be discriminatory.  (Trial Tr. 337:14-338:20,

8  July 14, 2010.)

9

10    The Court found Vossler, in common with the other former military men

11  and women who testified at trial, a credible, candid, and compelling witness.

12

13  **IV.  PLAINTIFF'S CHALLENGE UNDER THE DUE PROCESS CLAUSE**

14    Plaintiff claims the Don't Ask, Don't Tell Act violates its members'

15  substantive due process rights, identified in <u>Lawrence</u> as rights associated

16  with the "autonomy of self that includes freedom of thought, belief,

17  expression, and certain intimate conduct."  <u>Lawrence</u>, 539 U.S. at 562.  (FAC

18  ¶¶ 4, 38-43; Doc. No. 190 [Pl.'s Mem. Cont. Fact & Law] at 32-33.)

19

20    After taking office in 1992, President Clinton directed Secretary of

21  Defense Les Aspin to review his department's policy regarding homosexuals

22  serving in the military.  Congress undertook its own review and, in 1993,

23  enacted the Don't Ask, Don't Tell Act, which regulated the service of

24  homosexual personnel in the United States military.  <u>See</u> National Defense

25  Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, 107 Stat. 1547 §

26  571, 10 U.S.C. § 654.

27

28

1    The Act contains a series of findings that mirror the concerns of then-
2  chairman of the Joint Chiefs of Staff Colin Powell's testimony before
3  Congress: "military life is fundamentally different from civilian life;" "[s]uccess
4  in combat requires military units that are characterized by high morale, good
5  order and discipline, and unit cohesion;" and "the presence in the [A]rmed
6  [F]orces of persons who demonstrate a propensity of intent to engage in
7  homosexual acts would create an unacceptable risk to the high standards of
8  morale, good order and discipline and unit cohesion that are the essence of
9  military capability."  See 10 U.S.C. § 654(a); cf. S. Rep. No. 103-112 at 283
10 (1993).

11

12    The Court begins by examining the provisions of the Act in more detail.

13

14 **A.    The Act**

15    The Act is codified at 10 U.S.C. § 654; under § 654(b), the Secretary of
16 Defense is authorized to formulate the implementing regulations, which are
17 comprised of Department of Defense Directives 1332.14 (1993), 1332.30
18 (1997), and 1304.26 (1993).  The Secretary of Defense recently changed the
19 implementing regulations.  See Department of Defense Instruction ("DoDI")
20 1332.14 (2008) (incorporating March 29, 2010, changes); DoDI 1332.30
21 (2008) (incorporating March 29, 2010, changes).

22

23    The statute provides that a member of the Armed Forces "shall be
24 separated" from military service under one or more of the following
25 circumstances.  First, a servicemember shall be discharged if he or she "has
26 engaged in, attempted to engage in, or solicited another to engage in a
27 homosexual act or acts."  10 U.S.C. § 654(b)(1).  Second, a servicemember

28

1  shall be discharged if he or she "has stated that he or she is a homosexual[11]

2  or bisexual,[12] or words to that effect . . . ."  10 U.S.C. § 654 (b)(2).  Finally, a

3  servicemember shall be discharged if he or she has married or attempted to

4  marry a person "known to be of the same biological sex."  10 U.S.C. § 654

5  (b)(3).

6

7      The first two routes to discharge have escape clauses; that is,

8  discharges via either subsection (b)(1) or (b)(2) create a rebuttable

9  presumption which the servicemember may attempt to overcome.  Through

10  this exception, a servicemember may rebut the presumption by

11  demonstrating the homosexual conduct which otherwise forms the basis for

12  the discharge under the Act meets five criteria, including inter alia, that it is a

13  "departure" from the servicemember's "usual and customary behavior," is

14  unlikely to recur, and was not accomplished by use of force, coercion or

15  intimidation.  10 U.S.C. § 654 (b)(1)(A)-(E).

16

17      An escape route also applies to the second basis for discharge under

18  the Act, the making of a statement that one is a homosexual.  It allows the

19  servicemember to rebut the presumption thus created by demonstrating that

20  "he or she is not a person who engages in, attempts to engage, or has a

21  propensity to engage in, or intends to engage in homosexual acts."  10

22  U.S.C. § 654 (2).

23

24      [11] "The term 'homosexual' means a person, regardless of sex, who

25  engages in, attempts to engage in, has a propensity to engage in, or intends
   to engage in homosexual acts, and includes the terms 'gay' and 'lesbian'."  10

26  U.S.C. § 654 (f)(1).

27      [12] "The term "bisexual" means a person who engages in, attempts to

28  engage in, has a propensity to engage, or intends to engages in homosexual
   and heterosexual acts."  10 U.S.C. § 654 (f)(2).

**B.    The Standard of Review**

As set out more fully in the July 6, 2010, Order, courts employ a heightened standard of review when considering challenges to state actions implicating fundamental rights.   (July 6, 2010, Order at 6-9.)  After the United States Supreme Court's decision in <u>Lawrence v. Texas</u>, recognizing the fundamental right to "an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct," 539 U.S. at 562, the Ninth Circuit in <u>Witt v. Department of Air Force</u>, 527 F.3d 806 (9th Cir. 2008), held the Don't Ask, Don't Tell Act constitutes an intrusion "upon the personal and private lives of homosexuals, in a manner that implicates the rights identified in <u>Lawrence</u>, and is subject to heightened scrutiny."  527 F.3d at 819.  Thus, in order for the Don't Ask, Don't Tell Act to survive Plaintiff's constitutional challenge, it must "[1] advance an important governmental interest, [2] the intrusion must significantly further that interest, and [3] the intrusion must be necessary to further that interest."  <u>Id.</u>  Noting the Act "concerns the management of the military, and judicial deference to . . . congressional exercise of authority is at its apogee" in this context, <u>Witt</u> went on to decide the Act advances an "important governmental interest."  527 F.3d at 821 (citations omitted).  Accordingly, the Court's focus turns to the second and third prongs.

**C.    The Act Does Not Significantly Further the Government's Interests in Military Readiness or Unit Cohesion**

**1.    Defendants' Evidence: The Legislative History and the Statute Itself**

Defendants relied solely on the legislative history of the Act and the Act itself in support of their position that the Act passes constitutional muster.

1 (Defs.' Mem. Cont. Fact & Law at 9-10.)  Despite Defendants' continued

2 citation to the rational basis standard, the Court has ruled that after <u>Witt</u>, the

3 less deferential standard identified by the Ninth Circuit in that decision

4 applies.  (<u>See</u> July 6, 2010, Order at 6-9.)  In any event, careful review and

5 consideration of the Act itself and its legislative history reveals that this

6 evidence fails to satisfy Defendants' burden of proving that the Act, with its

7 attendant infringements on the fundamental rights of Plaintiff's members,

8 significantly furthers the Government's interest in military readiness or unit

9 cohesion.

10

11      Defendants did not specifically identify any item of legislative history

12 upon which they are relying in their Memorandum of Contentions of Law and

13 Fact; Defendants only identified specific items of the legislative history during

14 their closing argument at trial.  These consist of the following: (1) the

15 Crittenden Report; (2) the PERSEREC Report; (3) the Rand Report; and the

16 testimony of the following witnesses during hearings on the proposed Policy:

17 (4) Dr. Lawrence Korb; (5) Dr. David Marlowe; (6) Dr. William Henderson;

18 and (7) General Colin Powell.  Defendants did not include precise citations to

19 any portion of the above-referenced materials to support the constitutionality

20 of the Policy.  Below is a summary of the seven items identified as they relate

21 to the <u>Witt</u> standard.

22

23            **a.    The Crittenden Report (Trial Ex. 4)**

24      The Crittenden Report, formally titled Report of the Board Appointed to

25 Prepare and Submit Recommendations to the Secretary of the Navy for the

26 Revision of Policies, Procedures, and Directives Dealing with Homosexuals,

27 was prepared by that Board in 1957.  U.S. Navy Captain S.H. Crittenden

28

49

1   chaired the Board, which made detailed recommendations regarding the
2   manner in which discipline against homosexual servicemembers should be
3   imposed, including circumstances in which discharge would be appropriate,
4   and whether discharge should be honorable or otherwise.  The Report does
5   not, however, discuss the impact of the presence of homosexuals serving in
6   the Armed Forces on either military readiness or unit cohesion.  Instead, the
7   Board assumed, without investigation, that the presence of homosexuals had
8   a negative effect and their exclusion was desirable, without elaborating on
9   the basis for those assumptions; the Report never made any findings
10  concerning the impact of homosexual servicemembers on military operations.
11
12      Accordingly, the Crittenden Report is not evidence that discharge of
13  homosexual servicemembers significantly furthers government interests in
14  military readiness or troop cohesion, or that discharge is necessary to those
15  interests.  The Report, in fact, is silent on those interests.
16
17      It did conclude, however, that assumptions that homosexuals present
18  security risks and are unfit for military service are not well-supported by
19  evidence.  The Report also generally found homosexuals to be no more or
20  less likely to be qualified to serve in the Armed Forces than heterosexuals
21  according to a number of measures.
22
23          **b.    The PERSEREC Report (Trial Ex. 5)**
24      The PERSEREC Report, formally titled "Nonconforming Sexual
25  Orientation in the Military and Society," was published in 1988 by the
26  Defense Personnel Security Research and Education Center and authored
27  by Theodore R. Sabin and Kenneth E. Karois.  The Report is a broad survey
28

1  of then-prevailing legal trends regarding treatment of homosexuals, scientific

2  views on homosexuality, and the history of social constructions of

3  "nonconforming" sexual behavior.  The Report notes a legal trend toward

4  increasingly recognizing rights of homosexuals, a scientific trend toward

5  recognizing homosexuality both as biologically determined and as a normal

6  condition not necessarily indicating physical or mental disease, and a societal

7  trend towards increasing acceptance of homosexual behavior.

8

9       The PERSEREC Report generally dismisses traditional objections to

10  service by homosexuals in the military as abstract, intangible, and tradition-

11  bound.  The Report cites no evidence that homosexual servicemembers

12  adversely affect military readiness or unit cohesion.  The Report discusses

13  unit cohesion, but only to state that empirical research on the effect of

14  homosexual servicemembers on unit cohesion is important and necessary in

15  the future; it points to no existing empirical data.  In general, the Report

16  suggests the military begin a transition towards acceptance of homosexual

17  servicemembers.

18

19              **c.    The Rand Report (Trial Ex. 8)**

20       The Rand Report was prepared by the Rand Corporation's National

21  Defense Research Institute in 1993 at the request of the Office of the

22  Secretary of Defense, Les Aspin.  This summary of the Rand Report

23  discusses only "Section 10," entitled "What Is Known about Unit Cohesion

24  and Military Performance," as that is the sole section that bears on the issues

25  presented here.

26

27

28

1       Foremost among the Rand Report's conclusions is that no empirical

2   evidence exists demonstrating the impact of an openly homosexual

3   servicemember on the cohesion of any military unit.  In its discussion of unit

4   cohesion, the Report distinguished between social cohesion – "the emotional

5   bongs of liking and friendship of the members of a unit" (Trial Tr. 872:3-4,

6   July 16, 2010) and task cohesion – "a shared commitment to the group's

7   mission or task goals" (Trial Tr. 872:4-6, July 16, 2010); concluded that

8   according to public literature, only task cohesion has an even moderately

9   positive correlation with unit performance; and found after controlling for task

10   cohesion, social cohesion has almost no correlation to unit performance.  The

11   Report further opines that an openly homosexual servicemember is more

12   likely to affect only social cohesion, rather than task cohesion, thus having

13   little to no impact on a unit's military performance.

14

15       The Report also concluded that merely assigning openly homosexual

16   servicemembers to a unit can decrease negative feelings towards

17   homosexuals, as fellow unit members tend to hold positive views of other

18   individuals simply because they have been arbitrarily assigned to the same

19   group.  Moreover, contact with a group towards which negative feelings are

20   held tends to decrease negative feelings towards that group; Professor Belkin

21   described this phenomenon as "familiarity breeds tolerance."  (Trial Tr. 297:9-

22   19, July 14, 2010.)  The Report opined that the relationship between negative

23   feelings toward a group would not necessarily translate into disruptive

24   behavior, and that to the extent it did so translate, such behavior could be

25   influenced and controlled by appropriate institutional attitudes and attitudes of

26   unit leaders.

27

28

1      **d.**    **Testimony of Dr. Lawrence Korb (Trial Ex. 344 at 255)**

2     Dr. Korb testified before the Senate Armed Services Committee on

3 March 31, 1993 concerning the likely impact on unit cohesion if homosexuals

4 were permitted to serve openly.  According to Dr. Korb, there was no

5 empirical research to support the view that homosexual servicemembers

6 would disrupt unit cohesion, and that such evidence could not be obtained

7 without integrating homosexuals into the military.  Dr. Korb did concede,

8 however, that in the short run immediately following integration of

9 homosexual servicemembers, some negative effect on unit cohesion was

10 likely, but did not point to any evidence in support of this view.  Dr. Korb

11 testified concerning the experiences of foreign militaries and domestic law

12 enforcement agencies that had integrated homosexual servicemembers, and

13 stated that their integration had not adversely affected unit cohesion or

14 performance in those entities.

15

16      **e.**    **Testimony of Dr. William Henderson (Trial Ex. 344 at**

17         **248)**

18     Dr. Henderson testified before the Senate Armed Services Committee

19 on March 31, 1993 concerning the significance of unit cohesion.  Dr.

20 Henderson testified that the "human element" is the most important factor in

21 warfare and the only force that motivates a unit to fight rather than flee or

22 take cover.  Dr. Henderson testified that creation of a cohesive unit is

23 "significantly influenced by broad cultural values, norms, and characteristics

24 that are the result of a common socialization process and basic agreement

25 among unit members about cultural values."  Dr. Henderson testified that two

26 types of unit cohesion exist: horizontal cohesion whereby troops identify with

27 each other, and vertical cohesion whereby troops identify with their leaders.

28

1   A member of the unit who refuses to conform to the unit's expectations will be

2   isolated, and will undermine the unit's cohesiveness.  Based on the views of

3   servicemembers surveyed at that time, approximately 80% of whom opposed

4   integration of homosexuals, homosexual servicemembers were so far outside

5   the acceptable range of shared cultural values that they would not be

6   accepted within military units, and would undermine unit cohesion.  Dr.

7   Henderson pointed to no specific empirical study supporting this assertion,

8   however, and measured his testimony by suggesting that a homosexual

9   servicemember who did not disclose his orientation would not disrupt unit

10  cohesion.

11

12              **f.      Testimony of Dr. David Marlowe (Trial Ex. 344 at 261)**

13          Dr. Marlowe testified before the Senate Armed Services Committee on

14  March 31, 1993, concerning the significance of unit cohesion.  He testified

15  similarly to Dr. Henderson in his description of the importance of unit

16  cohesion and of the two types of cohesion, i.e., horizontal and vertical

17  cohesion.  While openly acknowledging that in his scientific opinion, there

18  was no empirical data conclusively deciding the question, he opined that

19  openly serving homosexuals could undermine unit cohesion because

20  homosexuality would not be an accepted cultural value among the other

21  members of the unit.  Dr. Marlowe qualified his opinion more than Dr.

22  Henderson, however, as Dr. Marlowe also opined that a homosexual

23  servicemember who did not "flaunt" his or her homosexuality, acted as a

24  soldier first and foremost, and did not openly discuss his or her

25  homosexuality would not undermine unit cohesion.  Dr. Marlowe foresaw no

26  problem with such a person serving in the Armed Forces.

27

28

1  **g.    Testimony of General Colin Powell (Trial Ex. 344 at 707)**

2  General Powell testified before the Senate Armed Services Committee

3  on July 20, 1993.  General Powell expressed his general support for the

4  Policy as then proposed by President Clinton.  General Powell testified that in

5  his opinion open homosexuality was incompatible with military service and

6  would undermine unit cohesion.  General Powell opined that "behavior too far

7  away from the norm undercuts the cohesion of the group."  He testified to his

8  belief that military training on tolerance could not overcome the innate

9  prejudices of heterosexual servicemembers.  He also testified that the Policy

10  would improve military readiness, but only in that it settled the question of

11  whether or not homosexuals could serve in the military, as the public debate

12  had been a recent distraction to the military.  His testimony implied that any

13  final resolution of the issue, regardless of substance, would improve military

14  readiness.

15

16  General Powell testified that despite the official position of

17  nondiscrimination towards homosexuals in the militaries of countries such as

18  Canada, Germany, Israel, and Sweden, practice does not always match

19  policy, and homosexuals are often subjected to discrimination in those

20  militaries.  General Powell also rejected attempts to draw parallels between

21  exclusion of homosexuals and historical exclusion of African-Americans,

22  because "skin color is a benign nonbehavioral characteristic, while sexual

23  orientation is perhaps the most profound of human behavioral

24  characteristics."

25

26

27

28

**2.    Plaintiff's Evidence:  Reports, Exhibits and Expert and Lay Testimony**

When a governmental enactment encroaches on a fundamental right, the state bears the burden of demonstrating the law's constitutionality.  See Witt, 527 F.3d at 819.  Although Defendants bear this burden here and, as described above, have relied unsuccessfully only on the statute itself and its legislative history to meet it, Plaintiff introduced evidence demonstrating the Act does not significantly advance the Government's interests in military readiness or unit cohesion.  The testimony of former servicemembers provides ample evidence of the Act's effect on the fundamental rights of homosexual members of the United States military.  Their testimony also demonstrates that the Act adversely affects the Government's interests in military readiness and unit cohesion.  In addition to the testimony from the lay witnesses, Plaintiff introduced other evidence, from witnesses in such specialties as national security policy, military sociology, military history, and social psychology, on whether the Act furthered the Government's interests in military readiness or unit cohesion.

**a.    Discharge of Qualified Servicemembers Despite Troop Shortages**

From 1993 through 2009, Defendants discharged, pursuant to the Act, over 13,000 men and women serving in the United States Armed Forces. During the years between 1994 through 2001, Defendants discharged at least 7,856 servicemembers under the Act, according to a General Accounting Office Report entitled "Financial Costs and Loss of Critical Skills." (Trial Ex. 9  [2005 Government Accountability Office ("GAO") Report on the "Financial Costs and Loss of Critical Skills Due to [the] DOD's Homosexual

1   Conduct Policy"].)  The combined branches of the Armed Forces discharged

2   the following numbers of servicemembers from 1994, the first full year after

3   adoption of the Don't Ask, Don't Tell Act, through the calendar year 2001:

4

| Year | Number of Servicemembers Discharged |
|------|-------------------------------------|
| 1994 | 616[13] |
| 1995 | 757[14] |
| 1996 | 858[15] |
| 1997 | 997[16] |
| 1998 | 1,145[17] |
| 1999 | 1,043[18] |
| 2000 | 1,213[19] |
| 2001 | 1,227[20] |
| **Total discharged 1994 2001** | **7,856** |

16

17

18      [13] (Trial Ex. 9, at 8; but see id. at 42 (showing 616 servicemembers
19   discharged).)

20      [14] (Trial Ex. 9, at 8.)

21      [15] (Id.)

22      [16] (Trial Ex. 85, Defs.' Objections and Resp. to Pl's. First Set of Req. for
23   Admis. ("RFA Resp.") No. 33; Trial Ex. 9, at 8.)

        [17] (Trial Ex. 85, RFA Resp. No. 34; Trial Ex. 9, at 8.)

24      [18] (Trial Ex. 85, RFA Resp. No. 35; Trial Ex. 9, at 8; but see id. at 42
25   (showing 1,034 servicemembers discharged).)

26      [19] (Trial Ex. 85, RFA Resp. No. 36; Trial Ex. 9, at 8; but see id. at 42
27   (showing 1,213 servicemembers discharged).)

        [20] (Trial Ex. 85, RFA Resp. No. 37; Trial Ex. 9, at 8; but see id. at 42
28   (showing 1,227 servicemembers discharged).)

Starting in 2002, after the U.S. began fighting in Afghanistan, the number of servicemembers discharged under the Act fell sharply, despite the greater raw number of military personnel.  As but one example, in 2001, Defendants discharged at least 1,217 servicemembers pursuant to the Don't Ask, Don't Tell Act.  In 2002, the number discharged under the Act fell to 885.

| Year | Number of Servicemembers Discharged |
|---|---|
| 2002 | 885[21] |
| 2003 | 770[22] |
| 2004 | 653[23] |
| 2005 | 726[24] |
| 2006 | 612[25] |
| 2007 | 627[26] |
| 2008 | 619[27] |
| 2009 | 275[28] |
| **Total discharged 2002-2009** | **5,167** |

---

[21] (Trial Ex. 85, RFA Resp. No. 38; but see Trial Ex. 9, at 8 (showing 884 servicemembers discharged).)

[22] (Trial Ex. 85, RFA Resp. No. 39; but see Trial Ex. 9, at 8 (showing 769 servicemembers discharged).)

[23] (Trial Ex. 85, RFA Resp. No. 40.)

[24] (Trial Ex. 85, RFA Resp. No. 41.)

[25] (Trial Ex. 85, RFA Resp. No. 42.)

[26] (Trial Ex. 85, RFA Resp. No. 43.)

[27] (Trial Ex. 85, RFA Resp. No. 44.)

[28] (Trial Ex. 85, RFA Resp. No. 45.)

1    The decline in discharges after 2001, according to Dr. Nathaniel Frank,

2    illustrates that during wartime the military retains servicemembers known to

3    be homosexual, despite the Don't Ask, Don't Tell Act requiring discharge,

4    because of the heightened need for troops.  (Trial Tr. 196:5-198:6, 257:21-

5    258:6, July 13, 2010.)

6

7              **b.    Discharge of Servicemembers with Critically Needed**

8                    **Skills and Training**

9    Among those discharged were many with critically needed skills.

10   According to the Government's own data, many of those discharged pursuant

11   to the Act had education, training, or specialization in so-called "critical skills,"

12   including Arabic, Chinese, Farsi, or Korean language fluency; military

13   intelligence; counterterrorism; weapons development; and medicine.  (Trial

14   Tr. 199:24-200:5, 204:23-24, July 13, 2010; Trial Ex. 9.)  Far from furthering

15   the military's readiness, the discharge of these service men and women had

16   a direct and deleterious effect on this governmental interest.

17

18   For example, relying on the 2005 GAO Report on the "Financial Costs

19   and Loss of Critical Skills Due to [the] DOD's Homosexual Conduct Policy"

20   (Trial Ex. 9), Professor Frank pointed out that through fiscal year 2003,

21   several hundred medical professionals had been discharged pursuant to the

22   Act, yet a 2003 Senate report described a lack of medical care for wounded

23   troops returning from the Arabian Gulf and the resulting negative impact on

24   physical health and troop morale.  (Trial Tr. 258:10-259:2, July 15, 2010.)

25   And at the same time that more than one-hundred thousand U.S. troops were

26   deployed to serve in combat in Iraq and Afghanistan, several hundred

27   servicemembers with "critical" language skills, including many qualified as

28

1    Farsi and Arabic speakers and interpreters, were discharged under the Act.

2    (Trial Ex. 9; Trial Tr. 199:24-200:5, 204:23-24, July 13, 2010.)

3

4                    **c.    The Act's Impact on Military Recruiting**

5         Dr. Lawrence Korb, currently a senior fellow at the Center for American

6    Progress, with an extraordinary background in military preparedness and

7    national security issues,[29] including an appointment under President Ronald

8    Reagan as an Assistant Secretary in the Department of Defense, testified

9    before Congress in 2007 about the difficulty the military was experiencing in

10   finding and retaining enough qualified recruits.  The crisis in recruiting

11   qualified candidates became particularly severe after combat began in 2001,

12   he testified.  (Trial Tr. 1027:24-25, 1028:1-2, July 20, 2010.)

13

14        In general, successful military recruiting efforts come with a very high

15   price tag; Dr. Korb pointed to advertisements various branches of the Armed

16   Forces run during the televised Super Bowl football games as an example of

17   an effective but very costly recruiting tool.  Successful recruiting includes not

18   only the costs for sending out military recruiters all around the country, he

19   testified, but also the costs of conducting medical and educational testing on

20   recruits as well as the expense of their basic training.  The size of the

21   financial investment needed to prepare a servicemember for an operational

22   unit can reach "millions of dollars," Dr. Korb testified.  (Trial Tr. 1028:18-

23

24   ─────────────────

25   [29] In addition to the appointments described above, Dr. Korb is on the faculty at Georgetown University.  He also has served as dean of the Graduate School of Public and International Affairs at the University of

26   Pittsburgh, on the Council for Foreign Relations, as Director of the Center for Public Policy Education at the Brookings Institution, and as Director for

27   Defense Policy Studies for the American Enterprise Institute.  This is only a partial list of his appointments and service.  (Trial Ex. 350.)  The Court found

28   Dr. Korb an extraordinarily well-credentialed and powerfully credible witness.

1    1029:13, July 20, 2010.)  Citing a Pentagon study, he opined that for every

2    person discharged after ten years of service, six new servicemembers would

3    need to be recruited to recover the level of experience lost by that discharge.

4    (Trial Tr. 1029:6-23, July 20, 2010.)

5

6         With that background, Dr. Korb opined the Don't Ask, Don't Tell Act

7    negatively affects military recruiting in two ways: its existence discourages

8    those who would otherwise enlist from doing so, and many colleges and

9    universities will not permit military recruiting or Army ROTC programs on

10   campus because the Act's requirements violate their employment

11   nondiscrimination policies.  (Trial Tr. 1030:12-21, July 20, 2010.)

12

13        Dr. Korb estimated that the military loses 5,000 men and women

14   annually due to the Don't Ask, Don't Tell Act, if one includes both those who

15   are discharged under it and those who decide not to re-enlist because of it.

16   He conceded, however, that it is very difficult to quantify the number of those

17   who decide not to enlist because of the Policy.  (Trial Tr. 1030:1-10, July 20,

18   2010.)  Professor Frank also testified on this subject, and based on data from

19   the U.S. Census, the UCLA School of Law Williams Institute, and other

20   sources, opined that if the Act were repealed, the military would gain

21   approximately 40,000 new recruits and approximately 4,000 members would

22   re-enlist every year rather than leave voluntarily.  (Trial Tr. 205:6-17, July 13,

23   2010.)

24

25        The 2005 GAO Report estimated that over the ten-year period after

26   enactment of the Act, "it could have cost the [Department of Defense] about

27   $95 million in constant fiscal year 2004 dollars to recruit replacements for

28

1   service members separated under the policy.  Also the Navy, Air Force, and

2   Army estimated that the cost to train replacements for separated service

3   members by occupation was approximately $48.8 million, $16.6 million, and

4   $29.7 million, respectively."   (Trial Ex. 85, RFA Resp. No. 21.)

5

6              **d.    Admission of Lesser Qualified Enlistees**

7        As discussed above, Defendants discharged over 13,000 members of

8   the Armed Forces under the Don't Ask, Don't Tell Act since 1993.  (Trial Tr.

9   195:5-8, 203:21-204:5.)  Plaintiff introduced evidence that while Defendants

10  continued to enforce the Act by discharging servicemembers under it – albeit

11  in dramatically reduced numbers – after 2001, they also began to admit more

12  convicted felons and misdemeanants into the Armed Forces, by granting so-

13  called "moral waivers"[30] to the policy against such admissions.  (Trial Tr.

14  199:1-17, July 13, 2010; see supra notes 13-28 and accompanying text.)

15

16       In addition to the increased numbers of convicted felons and

17  misdemeanants allowed to join the ranks of the military forces, Professor

18  Frank testified that increased numbers of recruits lacking the required level of

19  education and physical fitness were allowed to enlist because of troop

20  shortages during the years following 2001.  (Trial Tr. 199:1-11, July 13,

21  2010.)  Log Cabin's evidence went uncontradicted that those who are allowed

22  to enlist under a "moral waiver" are more likely to leave the service because

23  of misconduct and more likely to leave without fulfilling their service

24  commitment than others who joined the Armed Forces.  (Trial Tr. 209:2-13,

25

26  _____

27       [30] "Moral waivers" are used to admit recruits who otherwise would not
    have been eligible for admission because of their criminal records, i.e.,
    convictions for felonies and serious misdemeanors, or admitted past
28  controlled substance abuse.  (Trial Tr. 207:7-208:24, July 13, 2010.)

July 13, 2010.)  Dr. Korb testified that eventually the troop shortages after 2001 caused the U.S. Armed Forces to lower educational and physical fitness entry standards as well as increase the number of "moral waivers" to such an extent that, in his opinion, it became difficult for the military to carry out its mission.  (Trial Tr. 1020:22-1021:11, July 20, 2010.)  At the same time, discharging qualified servicemembers under the Don't Ask, Don't Tell Act simply "does not make sense" in terms of military preparedness because, in his words, the military is "getting rid of those who are qualified to serve and admitting those who aren't."  (Trial Tr. 1025:15-20, July 20, 2010.)

### e.    Other Effects of the Policy

Dr. Korb testified about other effects the Don't Ask, Don't Tell Act has on military preparedness.  He opined that in order  for the military to perform its mission successfully, it must mold persons from vastly different backgrounds who join it into a united and task-oriented organization.  He described the military as a meritocracy, but testified that the Don't Ask, Don't Tell Act detracts from the merit-based nature of the organization, because discharges under the Act are not based on the servicemember's failure to perform his or her duties properly, or on the effect of the soldier's presence on the unit's morale or cohesion.  (Trial Tr. 1031:2-1033:10, July 20, 2010.)

### f.    Decreased and Delayed Discharge of Suspected Violators of the Act

LCR also produced evidence demonstrating that Defendants routinely delayed the discharge of servicemembers suspected of violating the Act's provisions until after they had completed their overseas deployments.  In other words, if Defendants began an investigation of a servicemember

1    suspected of violating the Act, the investigation would be suspended if the

2    subject received deployment orders; not until he or she returned from combat

3    – assuming this occurred, of course – would the investigation be completed

4    and the servicemember discharged if found to have violated the Act.  Thus,

5    Defendants deployed servicemembers under investigation for violating the

6    Act to combat missions or, if they were already so deployed, delayed the

7    completion of the investigation until the end of the deployment.  (Trial Tr.

8    196:5-24, July 13, 2010; 573:7-17, July 15, 2010; Brady Dep. 184:13-185:11,

9    188:13-190:9, Apr. 16, 2010.)

10

11   This evidence, in particular, directly undermines any contention that the

12   Act furthers the Government's purpose of military readiness, as it shows

13   Defendants continue to deploy gay and lesbian members of the military into

14   combat, waiting until they have returned before resolving the charges arising

15   out of the suspected homosexual conduct.  If the warrior's suspected violation

16   of the Act created a threat to military readiness, to unit cohesion, or to any of

17   the other important Government objectives, it follows that Defendants would

18   not deploy him or her to combat before resolving the investigation.  It defies

19   logic that the purposes of the Act could be served by suspending the

20   investigation during overseas deployments, only to discharge a

21   servicemember upon his or her return to a non-combat station.

22

23   Taken as a whole, the evidence introduced at trial shows that the effect

24   of the Act has been, not to advance the Government's interests of military

25   readiness and unit cohesion, much less to do so significantly, but to harm

26   that interest.  The testimony demonstrated that since its enactment in 1993,

27   the Act has harmed efforts of the all-volunteer military to recruit during

28

1   wartime.  The Act has caused the discharge of servicemembers in

2   occupations identified as "critical" by the military, including medical

3   professionals and Arabic, Korean, and Farsi linguists.  At the same time that

4   the Act has caused the discharge of over 13,000 members of the military,

5   including hundreds in critical occupations, the shortage of troops has caused

6   the military to permit enlistment of those who earlier would have been denied

7   entry because of their criminal records, their lack of education, or their lack of

8   physical fitness.

9

10   **D.      The Act is Not Necessary to Advance the Government's Interests**

11          The <u>Witt</u> court held that to justify the infringement on the fundamental

12   rights identified in <u>Lawrence</u>, a defendant must satisfy both the requirement

13   that the Act "significantly furthers" the Government's interests and the

14   requirement that it is "necessary" to achieve them.  To the extent that

15   Defendants have made a distinct argument here that the Act is necessary to

16   achieve the Government's significant interest, they have not met their burden

17   as to this prong of the <u>Witt</u> test, either.

18

19          **1.      Defendants' Admissions**

20          In fact, Defendants have admitted that, far from being necessary to

21   further significantly the Government's interest in military readiness, the Don't

22   Ask, Don't Tell Act actually undermines that interest.  President Obama, the

23   Commander-in-Chief of the Armed Forces, stated on June 29, 2009:

24          "Don't Ask, Don't Tell" doesn't contribute to our national security . .
           . preventing patriotic Americans from serving their country weakens
25          our national security . . . . [R]eversing this policy [is] the right thing
           to do [and] is essential for our national security.
26   (Trial Ex. 305; Trial Ex. 85, RFA Resp. Nos. 1, 2, 9.)  President Obama also

27   stated, regarding the Act on October 10, 2009, "We cannot afford to cut from

28

65

1  our ranks people with the critical skills we need to fight any more than we can

2  afford – for our military's integrity – to force those willing to do so into careers

3  encumbered and compromised by having to live a lie."  (Trial Ex. 306; Trial

4  Ex. 85, RFA Resp. No. 12.)

5

6      Admiral Mike Mullen, chairman of the Joint Chiefs of Staff, echoed

7  these sentiments through a verified Twitter account, posted to the Joint

8  Chiefs of Staff website: "Stand by what I said [testifying in the U.S. Senate

9  Armed Services Committee on February 2, 2010]: Allowing homosexuals to

10  serve openly is the right thing to do.  Comes down to integrity."  (Trial Ex.

11  330.)

12

13      **2.      Defendants' Contention that the Act is Necessary to Protect**

14          **Unit Cohesion and Privacy**

15      Defendants point to the Act's legislative history and prefatory findings

16  as evidence that the Policy is necessary to protect unit cohesion and

17  heterosexual servicemembers' privacy.  In particular, they quote and rely on

18  General Colin Powell's statements in his testimony before Congress in 1993.

19

20      General Powell expressed his qualified support for the continued

21  service of gays and lesbians in the Armed Forces and the narrow nature of

22  his concerns.  (Trial Ex. 344 [Policy Concerning Homosexuality in the Armed

23  Forces: Hearings Before the S. Comm. on Armed Servs., 103rd Cong.

24  (statement of General Colin Powell, Chairman, Joint Chiefs of Staff)] at 709).

25  He emphasized his concern that "active military service is not an everyday

26  job in an ordinary workplace . . . . There is often no escape from the military

27  environment for days, weeks and often months on end.  We place unique

28

demands and constraints upon our young men and women not the least of
which are bathing and sleeping in close quarters."  (Id. at 762; 709 ("Our
concern has not been about homosexuals seducing heterosexuals or
heterosexuals attacking homosexuals . . . .").)

First, it must be noted that Plaintiff introduced uncontradicted testimony
that General Powell has changed his views since 1993 on the necessity of
the Policy and agrees with the current Commander-in-Chief that it should be
reviewed.  (Trial Tr. 221:7-11, July 13, 2010.)

More importantly, however, Plaintiff produced powerful evidence
demonstrating that the Act is not necessary in order to further the
governmental interest that General Powell expressed, i.e., unit cohesion and
particularly the concern that cohesion might be eroded if openly homosexual
servicemembers shared close living quarters with heterosexuals.

Michael Almy, who during thirteen years of active service lived in
dozens of different types of military housing on at least three continents,
testified his quarters ranged from a villa in Eskan Village, Saudi Arabia,
where he and the others quartered there each had private bedrooms and
bathrooms, to a dormitory-type facility at the Prince Sultan Air Base in Saudi
Arabia, where at first he had a private room and bath until the troop build-up
before the invasion of Iraq led to several men sharing a room, with a private
bathroom that was used by only one person at a time, to temporary quarters
in a tent at Balad Air Base in Iraq shared by six to eight men who obtained
limited privacy by hanging up sheets.  Almy testified that in his deployments
to Saudi Arabia and Iraq he was never quartered in housing that had open

bay showers, nor did he ever see such housing for enlisted members or officers.  (Trial Tr. 748:3-750:25, July 16, 2010.)  The typical arrangement in Saudi Arabia was for enlisted servicemembers and officers to have the same type of facilities, including bathroom and shower facilities; officers typically did not have to share rooms, and enlisted personnel usually shared a bedroom and bathroom.  (Trial Tr. 750:14-25, July 16, 2010.)  Almy testified that open bay showers are the exception in military quarters and the only time he actually used one was during basic training in Fort Benning, Georgia, in 1992.  (Trial Tr. 759:12-19, July 16, 2010.)

Similarly, John Nicholson testified that while he was in basic training in Fort Benning, the recruits slept in a large open room with sixty bunk beds and shared a large communal bathroom with toilets in individual stalls and semi-private showers.  (Trial Tr. 1154:25-1155:15, July 20, 2010.)  Anthony Loverde testified that only during basic training was he housed in barracks where open bay showers were the only option; he had access to single stall shower facilities even when stationed at Bagram Air Base in Afghanistan and at Balad Air Base in Iraq.  (Trial Tr. 1378:3-15, 1385:18-1386:12, July 21, 2010.)

Other servicemembers confirmed this testimony.  Stephen Vossler testified regarding his living quarters while he served as an enlisted man in the Army; he shared a "not spacious" bedroom and also a bathroom with a roommate.  (Trial Tr. 330:4-11, July 14, 2010.)  Although Vossler learned his roommate was gay, Vossler had no problems sharing quarters with him and thought he was a good roommate.  (Trial Tr. 329:20-330:21, July 14, 2010.)

1        Professor Aaron Belkin confirmed this evidence in his testimony; his

2   research into military architecture revealed that apart from basic training sites

3   and service academies where there are open showers, servicemembers

4   usually have access to single stall showers.  (Trial Tr. 617:21-619:1, July 15,

5   2010.)  According to Professor Belkin, "the army, in recent years, has

6   implemented something called the one-plus-one barracks design standard.

7   What that means is that servicemembers are housed in an arrangement

8   where they each have their own bedroom and there is a bathroom between

9   the two bedrooms that they share."  (Trial Tr. 618:8-13, July 15, 2010.)

10   Three-fourths of the troops quartered in combat zones in Afghanistan and

11   Iraq had access to single stall showers, according to his research.  (Trial Tr.

12   626:3-8, July 15, 2010.)

13

14        Plaintiff's evidence regarding unit cohesion was equally plentiful and

15   persuasive.  The testimony of both its lay and expert witnesses revealed that

16   the Act not only is unnecessary to further unit cohesion, but also harms the

17   Government's interest.

18

19        After Michael Almy was relieved of his command abruptly under the

20   Act, he witnessed firsthand what occurred when an unprepared junior officer

21   was forced to take over.  He testified that "[t]he maintenance of the

22   equipment, the mission overall, the availability – the up time of the

23   equipment, the availability of the equipment to meet the mission suffered"

24   and there was "a huge detrimental effect to the morale" of the troops he

25   commanded after he was relieved of his command.  (Trial Tr. 813:21-25, 814:

26   1-6, July 16, 2010.)  Almy testified, "Virtually every day on my base on

27   Spangdahlem, I would encounter one of my former troops who wanted me

28

1   back on the job as their officer and leader."  (Trial Tr. 814:2-6, July 16, 2010.)

2   His assessment was confirmed by another officer in the squadron, who wrote

3   that the squadron "fell apart" after Major Almy was relieved of his duties,

4   illustrating "how important Maj. Almy was[,] not only to the mission but to his

5   troops."  (Trial Ex. 121 [Character Reference Letter from Bryan M. Zollinger,

6   1st Lt., USAF, 606th Air Control Squadron].)

7

8       Jenny Kopfstein's commanding officer wrote that she was a "hard

9   working and dedicated junior officer who excelled as an Officer of the Deck"

10  who "played an important role in enhancing the ship's strong reputation."

11  (Trial Ex. 139 [Jenny L. Kopfstein Fitness Report and Counseling Record];

12  Trial Tr. 966:14-17.)  He specifically noted that "[h]er sexual orientation has

13  not disrupted good order and discipline on board USS SHILOH."  (Trial Ex.

14  139; Trial Tr. 966:23-24.)  Kopfstein testified that after she stopped

15  concealing her homosexuality while serving on the USS Shiloh, she had

16  many positive responses, and the ability of her fellow crew members to trust

17  her improved, thus aiding the establishment of teamwork.  (Trial Tr. 951:10-

18  11, 979:8-21, 25, 980:1, July 20, 2010.)

19

20      Anthony Loverde's superiors unquestionably felt that his discharge

21  pursuant to the Don't Ask, Don't Tell Act did not further the Government's

22  interest in unit cohesion.  In recommending the Air Force retain Loverde, they

23  commended him for being "nothing less than an outstanding [non-

24  commissioned officer]" and "a strong asset" with "an exceptional work ethic"

25  and "the highest level of military bearing, honesty, and trustworthiness."

26  (Trial Exs. 136 [Letter from Michael Yakowenko, CM Sgt.], 137 Letter from

27  Richard Horn, SM Sgt.].)  One wrote: "If I ever had the opportunity to build my

28

1   'dream team' for work, I would take an entire crew of SSgt. Loverde over

2   most other workers . . . ."  (Trial Ex. 137.)

3

4       Finally, Robert MacCoun, Professor of Law and Public Policy at the

5   University of California, Berkeley, and one of the contributors to the 1993

6   Rand Report on the Don't Ask, Don't Tell Act, testified regarding social and

7   task cohesion.  (Trial Tr. 864:11-866-17, 870:22-875:25, July 16, 2010.)

8   Professor MacCoun holds a Ph.D. in psychology from Michigan State

9   University, was a post-doctoral fellow in psychology and law at Northwestern

10  University, spent seven years as a behavioral scientist at the RAND

11  Corporation,[31] and has a distinguished research and publication record.

12  (Trial Tr. 856:16-864:7, July 16, 2010.)  The Court found his testimony cogent

13  and persuasive.

14

15      According to Professor MacCoun, the RAND working group concluded

16  that task cohesion was paramount; it was a more important predictor of

17  military performance than social cohesion, and service in the Armed Forces

18  by openly homosexual members was not seen as a serious threat to task

19  cohesion.  (Trial Tr. 871:23-872:6, 873:24-875:4, 875:21-25, 876:13-21, July

20  16, 2010.)  Therefore, the recommendation to Secretary of Defense Les

21  Aspin from the RAND Corporation in the1993 Report was that sexual

22  orientation should not be viewed as germane to service in the military; the

23  1993 Report made various recommendations regarding the implementation

24  of this change.  (Trial Ex. 8 [Sexual Orientation and U.S. Military Personnel

25

26

_____

27      [31] The RAND Corporation is a nonpartisan private nonprofit research
    corporation, conducting public policy research.  (Trial Tr. 858:2-3, July 16,
28  2010.)

1   Policy: Options and Assessment] at 368-94; Trial Tr. 865:8-879:9, July 16,
2   2010.)

3

4        Thus, the evidence at trial demonstrated that the Act does not further
5   significantly the Government's important interests in military readiness or unit
6   cohesion, nor is it necessary to further those interests.  Defendants'
7   discharge of homosexual servicemembers pursuant to the Act not only has
8   declined precipitously since the United States began combat in Afghanistan
9   in 2001, but Defendants also delay individual enforcement of the Act while a
10  servicemember is deployed in a combat zone.  If the presence of a
11  homosexual soldier in the Armed Forces were a threat to military readiness
12  or unit cohesion, it surely follows that in times of war it would be more urgent,
13  not less, to discharge him or her, and to do so with dispatch.  The abrupt and
14  marked decline – 50% from 2001 to 2002 and steadily thereafter – in
15  Defendants' enforcement of the Act following the onset of combat in
16  Afghanistan and Iraq, and Defendants' practice of delaying investigation and
17  discharge until after combat deployment, demonstrate that the Act is not
18  necessary to further the Government's interest in military readiness.

19

20       In summary, Defendants have failed to satisfy their burden under the
21  Witt standard.  They have not shown the Don't Ask, Don't Tell Policy
22  "significantly furthers" the Government's interests nor that it is "necessary" in
23  order to achieve those goals.  Plaintiff has relied not just on the admissions
24  described above that the Act does not further military readiness, but also has
25  shown the following:

26

27

28

1    ● by impeding the efforts to recruit and retain an all-volunteer military

2    force, the Act contributes to critical troop shortages and thus harms

3    rather than furthers the Government's interest in military readiness;

4

5    ● by causing the discharge of otherwise qualified servicemembers with

6    critical skills such as Arabic, Chinese, Farsi, and Korean language

7    fluency; military intelligence; counterterrorism; weapons development;

8    and medical training, the Act harms rather than furthers the

9    Government's interest in military readiness;

10

11   ● by contributing to the necessity for the Armed Forces to permit

12   enlistment through increased use of the "moral waiver" policy and lower

13   educational and physical fitness standards, the Act harms rather than

14   furthers the Government's interest in military readiness;

15

16   ● Defendants' actions in delaying investigations regarding and

17   enforcement of the Act until after a servicemember returns from combat

18   deployment show that the Policy is not necessary to further the

19   Government's interest in military readiness or unit cohesion;

20

21   ● by causing the discharge of well-trained and competent

22   servicemembers who are well-respected by their superiors and

23   subordinates, the Act has harmed rather than furthered unit cohesion

24   and morale;

25

26

27

28

1    ● the Act is not necessary to protect the privacy of servicemembers

2    because military housing quarters already provide sufficient protection

3    for this interest.

4

5    The Don't Ask, Don't Tell Act infringes the fundamental rights of United

6    States servicemembers in many ways, some described above.  The Act

7    denies homosexuals serving in the Armed Forces the right to enjoy "intimate

8    conduct" in their personal relationships.  The Act denies them the right to

9    speak about their loved ones while serving their country in uniform; it

10   punishes them with discharge for writing a personal letter, in a foreign

11   language, to a person of the same sex with whom they shared an intimate

12   relationship before entering military service; it discharges them for including

13   information in a personal communication from which an unauthorized reader

14   might discern their homosexuality.  In order to justify the encroachment on

15   these rights, Defendants faced the burden at trial of showing the Don't Ask,

16   Don't Tell Act was necessary to significantly further the Government's

17   important interests in military readiness and unit cohesion.  Defendants failed

18   to meet that burden.  Thus, Plaintiff, on behalf of its members, is entitled to

19   judgment in its favor on the first claim in its First Amended Complaint for

20   violation of the substantive due process rights guaranteed under the Fifth

21   Amendment.

22

23   **V.  PLAINTIFF'S FIRST AMENDMENT CHALLENGE TO THE ACT**

24   Congress shall make no law . . . abridging the freedom of speech,
     . . . or the right of the people peaceably to assemble, and to petition

25   the Government for a redress of grievances.
     U.S. Const. amend. I.

26

27

28

74

1    Plaintiff claims that the Don't Ask, Don't Tell Act violates its members'

2  First Amendment rights to these freedoms.  (FAC ¶¶ 1, 6, 45-49; Pl.'s Mem.

3  Cont. Fact & Law at 32-33.)

4

5  **A.    The Standard of Review in First Amendment Challenges**

6    Plaintiff challenges the Act as overbroad and as an unconstitutional

7  restriction on speech based on its content.  (FAC ¶¶ 47; Pl.'s Mem. Cont.

8  Fact & Law at 35, 40.)

9

10    Laws regulating speech based on its content generally must withstand

11  intense scrutiny when facing a First Amendment challenge:

12    At the heart of the First Amendment lies the principle that each
    person should decide for himself or herself the ideas and beliefs
13    deserving of expression, consideration, and adherence.   Our
    political system and cultural life rest upon this ideal.  Government
14    action that stifles speech on account of its message, or that requires
    the utterance of a particular message favored by the Government,
15    contravenes this essential right.  Laws of this sort pose the inherent
    risk that the Government seeks not to advance a legitimate
16    regulatory goal, but to suppress unpopular ideas or information or
    manipulate the public debate through coercion rather than
17    persuasion.    These restrictions rais[e] the specter that the
    Government may effectively drive certain ideas or viewpoints from
18    the marketplace.  For these reasons, the First Amendment, subject
    only to narrow and well-understood exceptions, does not
19    countenance governmental control over the content of messages
    expressed by private individuals.  <u>Our precedents thus apply the</u>
20    <u>most exacting scrutiny to regulations that suppress, disadvantage,</u>
    <u>or impose differential burdens upon speech because of its content.</u>
21  <u>Turner Broad. Sys. v. FCC</u>, 512 U.S. 622, 641-42 (1994) (emphasis added)

22  (citations omitted).

23

24    In <u>Simon & Schuster, Inc. v. Members of New York State Crime Victims</u>

25  <u>Board</u>, 502 U.S. 105 (1991), the Supreme Court considered whether New

26  York's "Son of Sam" law purporting to strip authors of profits gained from

27  books or other publications depicting their own criminal activities constituted

28

1   content-based regulation.  Holding the law was not content neutral, the Court

2   held that "[i]n order to justify such differential treatment, 'the State must show

3   that its regulation is necessary to serve a compelling state interest and is

4   narrowly drawn to achieve that end.'"  Id. at 118 (citing Arkansas Writers'

5   Project, Inc. v. Ragland, 481 U.S. 221, 231 (1987)).

6

7        Log Cabin Republicans urges the Court to strike down the Don't Ask,

8   Don't Tell Act as an impermissibly content-based statute.  (See Pl.'s Mem.

9   Cont. Facts & Law at 35.)  The Court turns first to the threshold question of

10   whether or not the Act constitutes a content-based restriction on speech.

11

12   **B.**   **Judicial Definitions of Content-Based Regulation**

13        "Deciding whether a particular regulation is content-based or content-

14   neutral is not always a simple task.  We have said that the principal inquiry in

15   determining content-neutrality . . . is whether the government has adopted a

16   regulation of speech because of [agreement or] disagreement with the

17   message it conveys."  Turner, 512 U.S. at 642 (citations omitted).  The

18   Supreme Court in Turner distilled the rule as follows: a law that by its terms

19   "distinguish[es] favored speech from disfavored speech on the basis of the

20   ideas or views expressed [is] content-based."  Id. at 643 (citing Burson v.

21   Freeman, 504 U.S. 191, 197 (1992); Boos v. Barry, 485 U.S. 312, 318-19

22   (1988)).

23

24        Defendants did not address directly the question of content neutrality,

25   but relied instead on authorities that, for various reasons, fail to counter the

26   clear weight of the case law discussed above.  Defendants repeatedly cited

27   the Ninth Circuit's decisions in Witt v. Department of Air Force, 527 F.3d 806

28

1    (9th Cir. 2008), <u>Philips v. Perry</u>, 106 F.3d 1420 (9th Cir. 1997), and <u>Holmes v.</u>

2    <u>California National Guard</u>, 124 F.3d 1126 (9th Cir. 1997), although the

3    plaintiff in <u>Witt</u> brought no First Amendment claim and the Court in <u>Philips</u>

4    expressly declined to reach the First Amendment issue, noting the district

5    court also had stopped short of resolving it.

6

7         In <u>Holmes</u>, the Ninth Circuit disposed of the plaintiffs' free speech

8    claims in summary manner, holding because the plaintiffs "were discharged

9    for their conduct and not for speech, the First Amendment is not implicated."

10   124 F.3d at 1136 (citations omitted).  <u>Holmes</u> relied on the Fourth Circuit's

11   decision in <u>Thomasson v. Perry</u>, 80 F.3d 915 (4th Cir. 1996), which rejected a

12   First Amendment challenge to the Don't Ask, Don't Tell Act on the basis that it

13   "permissibly uses the speech as evidence," and "[t]he use of speech as

14   evidence in this manner does not raise a constitutional issue – the First

15   Amendment does not prohibit the evidentiary use of speech to establish the

16   elements of a crime, or, as is the case here, to prove motive or intent."  <u>Id.</u> at

17   931 (citations omitted).  <u>Holmes</u> also relied on <u>Pruitt v. Cheney</u>, 963 F.2d

18   1160 (9th Cir. 1991), although acknowledging that decision was based not on

19   the Don't Ask, Don't Tell Act but a superseded policy.  <u>See</u> <u>Holmes</u>, 124 F.3d

20   at 1136 (citing <u>Pruitt</u>, 963 F.2d at 1164).

21

22        In other words, <u>Holmes</u> and the cases from other circuits have found

23   the Don't Ask, Don't Tell Act does not raise a First Amendment issue to be

24   analyzed under a content-neutral versus content-based framework.  None of

25   these authorities, however, considered whether there might be any speech,

26   other than admissions of homosexuality subject to being used as evidence in

27   discharge proceedings, affected by the Act.  Furthermore, <u>Holmes</u> was

28

1  decided before Lawrence and was "necessarily rooted" in Bowers v.

2  Hardwick, 478 U.S. 186 (1986), which Lawrence overruled.  See Holmes, 124

3  F.3d at 1137 (Reinhardt, J., dissenting).

4

5      Lawrence struck down a Texas statute making felonious certain sexual

6  acts between two persons of the same sex; the Supreme Court held in part

7  that the Constitution recognized certain substantive due process rights,

8  associated with the "autonomy of self that includes freedom of thought, belief,

9  expression, and certain intimate conduct."  Lawrence, 539 U.S. at 562

10  (emphasis added).  The Holmes decision, finding the Act did not implicate the

11  First Amendment, and the Act's provisions, appear at odds with the Supreme

12  Court's decision in Lawrence.  As Holmes explains:

13      Homosexual conduct is grounds for separation from the Military
        Services under the terms set forth [in the DOD Directives.]
14      Homosexual conduct includes homosexual acts, a statement by a
        member that demonstrates a propensity or intent to engage in
15      homosexual acts, or a homosexual marriage or attempted marriage.
        A statement by a member that demonstrates a propensity or intent to
16      engage in homosexual acts is grounds for separation not because it
        reflects the member's sexual orientation, but because the statement
17      indicates a likelihood that the member engages in or will engage in
        homosexual acts.
18  124 F.3d at 1129 (quoting DOD Directive 1332.30 at 2-1(c) (emphasis

19  added)).

20

21      The Holmes Court found the Act does not punish status, despite the

22  presumption embodied within it that declared homosexual servicemembers

23  will engage in proscribed homosexual conduct, finding the assumption was

24  "imperfect" but "sufficiently rational to survive scrutiny . . . ."  124 F.3d at

25  1135.

26

27

28

1    Thus, <u>Holmes</u>'s foundations – rational basis scrutiny, acceptance of an
2    assumption of sexual misconduct based on admitted homosexual orientation,
3    and the <u>Bowers</u> decision – all have been undermined by <u>Lawrence</u>,
4    particularly in light of its explicit protection of "expression."  <u>See</u> <u>Lawrence</u>,
5    539 U.S. at 562.  Furthermore, if the proscription in subsection (b)(1) of the
6    Act violates substantive due process as set forth above, then the limitation on
7    speech in subsection (b)(2) necessarily fails as well.  "Plainly, a limitation on
8    speech in support of an unconstitutional objective cannot be sustained."  <u>Able</u>
9    <u>v. United States</u>, 88 F.3d 1280, 1300 (2d Cir. 1996).  <u>Holmes</u>, decided before
10   <u>Lawrence</u>, therefore does not shield Defendants from Plaintiff's First
11   Amendment claim.

12

13   **C.    The Don't Ask, Don't Tell Act is Content Based**

14   The Act in subsection (b)(2) requires a servicemember's discharge if he
15   or she "has stated that he or she is a homosexual or bisexual, <u>or words to</u>
16   <u>that effect</u> . . . ."  10 U.S.C. § 654 (b)(2) (emphasis added).  The Act does not
17   prohibit servicemembers from discussing their sexuality in general, nor does
18   it prohibit all servicemembers from disclosing their sexual orientation.
19   Heterosexual members are free to state their sexual orientation, "or words to
20   that effect," while gay and lesbian members of the military are not.  Thus, on
21   its face, the Act discriminates based on the content of the speech being
22   regulated.  It distinguishes between speech regarding sexual orientation, and
23   inevitably, family relationships and daily activities, by and about gay and
24   lesbian servicemembers, which is banned, and speech on those subjects by
25   and about heterosexual servicemembers, which is permitted.

26

27

28

1    The First Amendment's hostility to content-based regulation "extends

2  not only to restrictions on particular viewpoints, but also to prohibition of

3  public discussion of an entire topic.  As a general matter, 'the First

4  Amendment means that government has no power to restrict expression

5  because of its message, its ideas, its subject matter, or its content.'"  Consol.

6  Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 530, 537 (1980)

7  (quoting Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972)).

8

9    In evaluating the constitutionality of such regulations in a military

10  context, however, courts traditionally do not apply the strict scrutiny described

11  above.  Rather, courts apply a more deferential level of review of military

12  restrictions on speech.

> Our review of military regulations challenged on First Amendment
> grounds is far more deferential than constitutional review of similar
> laws or regulations designed for civilian society.  The military need
> not encourage debate or tolerate protest to the extent that such
> tolerance is required of the civilian state by the First Amendment; to
> accomplish its mission the military must foster instinctive obedience,
> unity, commitment, and esprit de corps.

Goldman v. Weinberger, 475 U.S. 503, 507 (1986) (citations omitted).

18

19    Although careful to point out that the "subordination of the desires and

20  interests of the individual to the needs of the service," which is "the essence

21  of military life," does not entirely abrogate the guarantees of the First

22  Amendment, the Supreme Court emphasized the "great deference [courts

23  must afford] to the professional judgment of military authorities concerning

24  the relative importance of a particular military interest."  Id. (citations omitted).

25  The Goldman decision relied in part on Rostker v. Goldberg, 453 U.S. 57

26  (1981), oft-cited for the principle that "judicial deference . . . is at its apogee

27  when legislative action under the congressional authority to raise and support

28

1  armies and make rules and regulations for their governance is challenged."
2  Id. at 70.

3

4       In keeping with this well-established rule of deference, regulations of
5  speech in a military context will survive Constitutional scrutiny if they "restrict
6  speech no more than is reasonably necessary to protect the substantial
7  government interest."  Brown v. Glines, 444 U.S. 348, 348, 355 (1980) (citing
8  Greer v. Spock, 424 U.S. 828 (1976); Procunier v. Martinez, 416 U.S. 396
9  (1974)).

10

11  **D.    The Act Does Not Survive the Level of Constitutional Scrutiny**
12  **Applied to Speech in a Military Context**

13       The Don't Ask, Don't Tell Act fails this test of constitutional validity.
14  Unlike the regulations on speech upheld in Brown and Spock, for example,
15  the sweeping reach of the restrictions on speech in the Don't Ask, Don't Tell
16  Act is far broader than is reasonably necessary to protect the substantial
17  government interest at stake here.  In Brown, the Supreme Court upheld an
18  Air Force regulation that required Air Force personnel first to obtain
19  permission from the base commander before distributing or posting petitions
20  on Air Force bases, 444 U.S. at 348; in Greer, the Court upheld a similar
21  regulation on Army bases, banning speeches, demonstrations, and
22  distribution of literature, without prior approval from post headquarters.  424
23  U.S. at 828.  In both cases, the Court rejected facial challenges to the
24  regulations, holding they protected substantial Governmental interests
25  unrelated to the suppression of free expression, i.e., maintaining the respect
26  for duty and discipline, and restricted speech no more than was reasonably
27  necessary to protect that interest.

28

1          By contrast to the relatively narrow regulations at issue in <u>Brown</u> and

2    <u>Greer</u>, however, the Don't Ask, Don't Tell Act encompasses a vast range of

3    speech, far greater than necessary to protect the Government's substantial

4    interests.

5

6          For example, Michael Almy and Anthony Loverde, as well as other

7    witnesses, described how the Act prevented them from discussing their

8    personal lives or comfortably socializing off duty with their respective

9    colleagues; this in turn created a certain "distance" and perhaps an aura of

10   distrust.  (Trial Tr. 820:6--821:4;821:19-822:9, July 16, 2010 (Almy); Trial Tr.

11   1360:1-1361:17, July 21, 2010 (Loverde).)  Steven Vossler testified that the

12   Act made it difficult for him to spend time off duty with other members of his

13   unit, as the Act prevented him from talking openly about spending time with

14   his friend Jerrod Chaplowski because of the need to disguise the identity of

15   Chaplowski's companion.  (Trial Tr. 327:12-328:20, July 14, 2010.)

16

17         Similarly, Jenny Kopfstein testified that before she decided not to

18   conceal her sexual orientation, the Act made it impossible for her to respond

19   to her shipmates' questions about mundane matters such as how she spent

20   her leisure time, as doing so would necessarily reveal the existence of her

21   lesbian partner.  (Trial Tr. 931:22-932:11, July 16, 2010.)  She testified that

22   having to conceal information that typically was shared made her feel as

23   though others on the ship might distrust her, and that trust is critical,

24   especially in emergencies or crises.  (Trial Tr. 957:6-22, July 20, 2010.)

25

26

27

28

1    In other words, all of these examples demonstrate that the Act's

2    restrictions on speech not only are broader than reasonably necessary to

3    protect the Government's substantial interests, but also actually serve to

4    impede military readiness and unit cohesion rather than further these goals.

5

6    Many of the lay witnesses also spoke of the chilling effect the Act had

7    on their ability to bring violations of military policy or codes of conduct to the

8    attention of the proper authorities.  Joseph Rocha, eighteen years old and

9    stationed in Bahrain, felt restrained from complaining about the extreme

10   harassment and hazing he suffered because he feared that he would be

11   targeted for investigation under the Act  if he did so.  (Trial Tr. 488:20-489:14,

12   July 15, 2010.)  In fact, his fear was so great that he initially refused to

13   answer the questions of an investigating officer.  (Trial Tr. 519:16-510:10-15,

14   July 15, 2010.)  John Nicholson and Anthony Loverde also testified about a

15   similar chilling effect on their speech when overhearing or being subjected to

16   homophobic slurs or taunts.  (Trial Tr. 1138:1-1142:14, 1143:2-24, July 20,

17   2010 (Nicholson), Trial Tr. 1364:16-1365:25, July 21, 2010 (Loverde).)

18

19   The Act prevents servicemembers from openly joining organizations

20   such as the plaintiff in this lawsuit that seek to change the military's policy on

21   gay and lesbian servicemembers; in other words, it prevents them from

22   petitioning the Government for redress of grievances.  John Doe, for

23   example, feared retaliation and dismissal if he joined the Log Cabin

24   Republicans under his true name or testified during trial; thus, he was forced

25   to use a pseudonym and to forgo testifying during trial.  (Ex. 38 [Doc Decl.] ¶¶

26   6-8; see Trial Tr. 88:19-90:15, July 13, 2010; 708:21-709:4, July 16, 2010.)

27

28

1    Furthermore, as discussed above, the Act punishes servicemembers

2    with discharge for writing a private letter, in a foreign language, to a person of

3    the same sex with whom they shared an intimate relationship before

4    volunteering for military service.  It subjects them to discharge for writing

5    private e-mail messages, in a manner otherwise approved, to friends or

6    family members, if those communications might lead the (unauthorized)

7    reader to discern the writer's sexual orientation.  These consequences

8    demonstrate that the Act's restrictions on speech are broader than

9    reasonably necessary to protect the Government's interest.  Moreover, the

10   Act's restrictions on speech lead to the discharge of servicemembers with

11   qualifications in critically-needed occupations, such as foreign language

12   fluency and information technology.  The net effect of these discharges, as

13   revealed not only in the testimony of the lay witnesses but also of the experts

14   who testified and Defendants' own admissions regarding the numbers of

15   servicemembers discharged and the costs of recruiting and maintaining an

16   all-volunteer military force, compel the conclusion that the Act restricts

17   speech more than reasonably necessary to protect the Government's

18   interests.

19

20   Finally, it again must be noted that Defendants called no witnesses, put

21   on no affirmative case, and only entered into evidence the legislative history

22   of the Act.  This evidence, discussed in Section IV(C)(1) above, does not

23   suffice to show the Act's restrictions on speech are "no more than is

24   reasonably necessary" to achieve the goals of military readiness and unit

25   cohesion.  (See supra Section IV(C)(1).)

26

27

28

1    For these reasons, Plaintiff is also entitled to judgment on behalf of its
2  members on its claim for violation of the First Amendment's guarantees of
3  freedom of speech and petition.

4

5                           **VI.  CONCLUSION**

6    Throughout the consideration and resolution of this controversy, the
7  Court has kept well in mind the overriding principle that "judicial deference to
8  such congressional exercise of authority is at its apogee when legislative
9  action under the congressional authority to raise and support armies and
10 make rules and regulations for their governance is challenged." <u>Rostker</u>, 453
11 U.S. at 70.  Nevertheless, as the Supreme Court held in <u>Rostker</u>, "deference
12 does not mean abdication." <u>Id.</u> at 67, 70.  Plaintiff has demonstrated it is
13 entitled to the relief sought on behalf of its members, a judicial declaration
14 that the Don't Ask, Don't Tell Act violates the Fifth and First Amendments,
15 and a permanent injunction barring its enforcement.

16

17    Plaintiff shall submit a Proposed Judgment, including a Permanent
18 Injunction, consistent with the terms of this Memorandum Opinion, no later
19 than September 16, 2010.  Defendants may submit any objections to the
20 form of the Proposed Judgment no later than seven days after Plaintiff
21 submits its Proposed Judgment.

22

23 **IT IS SO ORDERED.**

24

25

26 Dated: _September 9, 2010_                    _Virginia A Phillips_
27                                              VIRGINIA A. PHILLIPS
                                                United States District Judge
28

                                    85