1

2

3                                                              O

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   LOG CABIN REPUBLICANS, a          )   Case No. CV 04-08425-VAP (Ex)
     non-profit corporation,           )
12                                      )
                    Plaintiff,          )   **FINDINGS OF FACT &**
13                                      )   **CONCLUSIONS OF LAW AFTER**
           v.                           )   **COURT TRIAL [Fed. R. Civ. P. 52]**
14                                      )
     UNITED STATES OF AMERICA           )
15   and ROBERT M. GATES,               )
     SECRETARY OF DEFENSE, in           )
16   his official capacity,             )
                                        )
17                  Defendants.         )
                                        )
18   _____        )

19

20        This case was tried to the Court on July 13 through 16 and July 20

21   through 23, 2010.  After conclusion of the evidence and closing arguments on

22   July 23, 2010, both sides timely submitted supplemental post-trial briefing on

23   the admissiblility of a pretrial declaration submitted by Log Cabin Republicans

24   member John Doe,[1] and the matter stood submitted.

25   _____

26        [1] The Court overruled Defendants' objections to Exhibit 38, the April 27,
     2006. Declaration of John Doe, and considers the statements contained
27   therein regarding Doe's then-present state of mind for the limited purpose for
28                                                              (continued...)

                                        1

Having considered all the evidence presented by the parties, as well as the argument and briefing by counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

**FINDINGS OF FACT**[2]

1. Plaintiff Log Cabin Republicans ("Log Cabin," "LCR," or "Plaintiff") is a non-profit corporation founded in 1977 and organized under the laws of the District of Columbia.  (Trial Exs. 109 [Bylaws], 110 [Articles of Incorporation].)

2. Plaintiff's mission includes "assist[ing] in the development and enactment of policies affecting the gay and lesbian community . . . by [the] federal government[]. . . and advocat[ing] and support[ing] . . . activities or initiatives which (i) provide equal rights under law to persons who are gay or lesbian, [and] (ii) promote nondiscrimination against or harassment of persons who are gay or lesbian . . . ."  (Trial Ex. 109 [Mission Statement, attached as Ex. A to Bylaws].)  The relief sought here, i.e., the ability of homosexual servicemembers to serve openly in the United States Armed Forces through repeal of the Don't Ask, Don't Tell Act, relates to both aspects of Log Cabin's mission.

3. Plaintiff filed its Complaint on October 12, 2004.  (Doc. No. 1.)  It filed a First Amended Complaint ("FAC") on April 28, 2006.   (Doc. No. 25.)

---

[1](...continued)
which they were offered, i.e., Doe's state of mind with respect to whether the Act chilled his speech and ability to petition the government for a redress of grievances.  See Fed. R. Evid. 803(3).

[2] To the extent any of the Findings of Fact should more properly be considered Conclusions of Law, they shall be deemed as such.

4.   Plaintiff seeks only declaratory and injunctive relief in its First Amended Complaint; neither its claims nor the relief sought require individualized proof on the part of its members.

**John Doe's Standing**

5.   John Doe serves as a lieutenant colonel in the United States Army Reserve.  He joined Log Cabin Republicans in early September 2004 by completing an application form (using a pseudonym) and paying annual dues through Martin Meekins, then a member of Plaintiff's national board of directors.  Meekins accepted the application form and dues payment from Doe and forwarded them to LCR's national headquarters.  (Trial Ex. 38.)

6.   Doe arranged to pay his membership dues in this manner because he feared he would be discharged from the Army Reserve pursuant to the Don't Ask, Don't Tell Act if he joined the organization openly, using his true name.  Id.

7.   Thus, at the time the Complaint was filed on October 12, 2004,  John Doe was a member in good standing of Plaintiff Log Cabin Republicans.

8.   To comply with the Don't Ask, Don't Tell Act, Doe must keep his sexual orientation a secret from his coworkers, his unit, and his military superiors, and he may not communicate the core of his emotions and identity to others in the same manner as heterosexual members of the military, on pain of discharge from the Army.  (Doc. No. 212 ["July 6, 2010, Order"] at 16; Trial Ex. 38.)

9.   Doe paid annual membership dues shortly before this action was filed in October 2004, but LCR did not introduce evidence showing Doe paid

1   dues, or otherwise made a financial contribution, to the organization
2   after 2004.

3   10.   The evidence was conflicting regarding the effect of a member's
4         nonpayment of dues.  James Ensley testified that when a member
5         failed to renew his or her annual dues payment, Log Cabin Republicans
6         viewed the member as a "former" or "inactive" member, but the name
7         would not be stricken from LCR's membership rolls or electronic
8         database simply because of tardiness in paying annual dues.  (Trial Tr.
9         74:12-75, July 13, 2010.)  Terry Hamilton, another member of the
10        national board of directors, testified that a member who failed to renew
11        his or her membership timely no longer would be considered a member,
12        but his testimony did not contradict Ensley's testimony regarding the
13        mailing list or membership rolls.  (Trial Tr. 57:5-8, July 13, 2010.)

14  11.   Despite the lack of evidence that Doe had paid annual membership
15        dues to LCR after 2004, he still served in the Army Reserve and still
16        was subject to discharge under the Don't Ask, Don't Tell Act.  Thus, he
17        still had a personal stake in the outcome of the case, and his injury –
18        his susceptibility to discharge under the Act – continued to be
19        redressable by favorable resolution of the lawsuit.

20

21  **John Nicholson's Standing**

22  12.   John Alexander Nicholson, III, enlisted in the United States Army in
23        May 2001.  (Trial Tr. 1135:6-12, July 20, 2010.)  As detailed below, he
24        received an honorable discharge from the Army on March 22, 2002,
25        pursuant to the Don't Ask, Don't Tell Act.  (Trial Tr. 1183:25-1184:3,
26        1185:22-1187:9, July 20, 2010.)

27

28

4

13. In August 2005, Nicholson and others embarked on a nationwide speaking tour sponsored by LCR to raise awareness of the movement to repeal the Don't Ask, Don't Tell Act. (Trial Tr. 1206:15-1207:11, July 21, 2010.)

14. LCR's national and Georgia state chapter leaders asked Nicholson to join the organization formally after he gave a speech at LCR's national convention on April 28, 2006; he did not pay dues or make a cash contribution at that time, but was told his membership was granted in exchange for his services to the organization. (Trial Tr. 1207:22-1208:25, 1211:25-1212:15, July 21, 2010.) Later he was told his was an honorary membership. (Trial Tr. 1211:10-12, 1214:13-15, July 21, 2010.)

15. Nicholson testified credibly that he did not complete a paper membership application form on April 28, 2006, because he gave the necessary information to an LCR administrative assistant who entered it directly into a computer. (Trial Tr. 1211:15-1212:15, July 21, 2010.) Plaintiff maintains an electronic database of its membership which lists Nicholson as a member of Log Cabin Republicans as of April 28, 2006. (Trial Tr. 1209:20-22, 1212:16-1213:16, July 21, 2010.) Nicholson testified that he remembered the precise date Log Cabin's Georgia chapter granted him honorary membership because it was the same day he addressed LCR's national convention. (Trial Tr. 1208:11-15, 1210:11-1212:15, July 21, 2010.)

16. The testimony of James Ensley, President of LCR's Georgia chapter since 2006 and a member of its national board of directors since 2008, corroborated Nicholson's testimony regarding the date he became a member of LCR. (Trial Tr. 68:21-70:21, July 13, 2010.) The Georgia

5

chapter conferred honorary membership on Nicholson at the 2006 Log
Cabin Republicans national convention, in recognition of his
"remarkable" efforts on the nationwide speaking tour and on college
campuses toward repeal of the Don't Ask, Don't Tell Act.  (Trial Tr. 70:2-
16, July 13, 2010.)

17.  Ensley specifically recalled the date the Georgia chapter conferred
honorary membership on Nicholson because Ensley's congressman
had arranged a private tour of the White House for Ensley on the
morning of April 28, 2006, which was the same day Nicholson
addressed the convention.  (Trial Tr. 70:17-71:6, July 13, 2010.)  The
Court found Ensley to be a candid and credible witness.

18.  Terry Hamilton is a 25-year member of Log Cabin Republicans and now
serves as chairman of its national board of directors.  (Trial Tr. 33:11-
35:22, July 13, 2010.)  He verified that the organization's membership
records reflected Nicholson's membership status since April 28, 2006,
and also that Nicholson regularly attended and spoke at the
organization's annual conventions.  (Trial Tr. 43:14-45:1, July 13, 2010.)
Based on these indicia, Hamilton understood Nicholson to be a member
of the organization since that date.  (Trial Tr. 38:8-39:3, July 13, 2010.)
The Court found Hamilton a credible and reliable witness.

19.  Thus, Nicholson officially joined Log Cabin Republicans on April 28,
2006, and has been a member continuously since then.  (Trial Tr.
1208:11-15, 1214:24-1215:17, July 21, 2010.)

20.  At the time Nicholson was conferred honorary membership, he satisfied
the requirements for membership under section 2.02 of the Log Cabin
Republican Bylaws, which states:

Honorary and Special Members:  The Board of Directors may
establish other criteria for granting an Honorary Membership to Log

6

Cabin Republicans for individuals who have exhibited a unique or noteworthy contribution to the Mission of the Corporation or a Special Membership to Log Cabin Republicans for individuals or entities that have provided assistance to the Corporation.[3] (Trial Ex. 109.)

21.    Nicholson's membership in Log Cabin Republicans has been uninterrupted and continuous since April 28, 2006, the date Plaintiff's Georgia chapter conferred honorary membership upon him and also the date Plaintiff filed its First Amended Complaint.  In light of the Court's May 27, 2010, Order, this is sufficient.

22.    Martin Meekins testified credibly that the initiative for filing this lawsuit came from the rank and file of the organization; Meekins then interviewed members regarding the viability of a lawsuit and to determine if the members met the requirements to confer standing on the organization and wished to bring the lawsuit.  (Trial Tr. 704:8-19, 705:11-707:12, July 16, 2010.)

### Testimony from Former Servicemembers

**Michael Almy**

23.    Michael Almy served for thirteen years as a commissioned officer in the United States Air Force, finishing his service as a major.  (Trial Tr. 726:21-727:11, 728:11-12, July 16, 2010.)  His family has a heritage of

_____

[3] Defendants argue Nicholson's honorary membership, pursuant to section 2.02 of the Bylaws, did not confer membership on him because LCR's Articles of Incorporation refer only to one class of membership.  (See Doc. No. 186 [Defs.' Mem. Cont. Fact & Law] at 3-4.)  The Court rejected this argument in its May 27, 2010, Order, noting "Defendants' argument that Mr. Nicholson's honorary membership is insufficient to confer standing on Plaintiff fails for two reasons . . . . Defendants have not shown that the bylaw cited actually conflicts with Plaintiff's articles of incorporation . . . . [, and] [t]he District of Columbia Nonprofit Corporation Act (the 'Corporation Act') provides that a nonprofit corporation shall designate its membership class or classes and accompanying qualifications 'in the articles of incorporation or the bylaws.' D.C. Code § 29-301.12 (emphasis added)."  (May 27, 2010, Order at 24-25.)

7

1    military service; his father retired as a colonel in the Air Force, and two
2    uncles served as career military officers as well.  (Trial Tr. 728:13-22,
3    July 16, 2010.)

4    24.    Almy entered active duty in 1993, after obtaining an undergraduate
5          degree in Information Technology while serving in the Army ROTC
6          program.  He did not self-identify as a gay man until a few years later.
7          (Trial Tr. 726:23-727:2, 819:3-12, July 16, 2010.)  After that, he
8          testified, the Don't Ask, Don't Tell Act created a natural barrier between
9          himself and his colleagues, as he could not reveal or discuss his
10         personal life with others.  (Trial Tr. 820:6-821:4, 821:19-822:9, July 16,
11         2010.)  While it was common for the officers to socialize when off duty,
12         he could not join them.  (Trial Tr. 821:19-822:9, July 16, 2010.)  All of
13         this may have contributed to creating an aura of suspicion about him,
14         and a sense of distrust.  (Trial Tr. 820:19-821:4, July 16, 2010.)

15   25.    The Court found Almy a forthright and credible witness whose modest
16         demeanor and matter-of-fact recitation of his service record did not
17         disguise his impressive career in the Air Force.  Almy was deployed to
18         Saudi Arabia three times and helped enforce the southern "no fly" zone
19         over Iraq.  Almy set up new communications bases throughout military
20         theaters in Jordan, Saudi Arabia, and Iraq, and was deployed in Saudi
21         Arabia, serving in the Communications Directorate, during the 2003
22         invasion of Iraq.  (Trial Tr. 742:16-743:11, 746:4-747:20, July 16, 2010.)

23   26.    In 2003, after returning from his third deployment to Saudi Arabia, Almy
24         was promoted to the rank of major and accepted a position as the Chief
25         of Maintenance for the 606th Air Control Squadron in Spangdahlem,
26         Germany.  (Trial Tr. 751:1-20, July 16, 2010.)  In that role, Almy
27         commanded approximately 180 men in the Maintenance Directorate.

28

1    (Trial Tr. 751:21-22, 753:7-11, July 16, 2010.)  The three flights[4] in the
2    Maintenance Directorate under his command in the 606th Air Control
3    Squadron deployed to Iraq in September 2004.  His squadron was
4    responsible for maintaining and controlling the airspace during the
5    invasion of Fallujah, Iraq, and he was responsible for maintaining
6    control over the vast majority of Iraqi airspace, including Kirkuk, as well
7    as maintaining all satellite links and voice and data communications.
8    (Trial Tr. 753:7-755:24, July 16, 2010.)  While stationed at Balad Air
9    Base, his flight experienced frequent mortar attacks "usually several
10   times a week, if not daily."  (Trial Tr. 756:1-2, July 16, 2010.)

11   27.   After Almy completed his third deployment to Iraq in January 2005,
12         someone began using the same computer Almy had used while
13         deployed; that person searched Major Almy's private electronic mail
14         message ("e-mail") files without his knowledge or permission.  The
15         search included a folder of Major Almy's personal e-mail messages,[5]
16         sent to his friends and family members, and read messages, including
17         at least one message to a man discussing homosexual conduct.  (Trial
18         Tr. 764:23-766:6-767:2, July 16, 2010.)

19   28.   Almy thought the privacy of his messages was protected; he was very
20         knowledgeable about the military's policy regarding the privacy of e-
21         mail accounts because of his responsibility for information systems.
22         (Trial Tr. 772:20-773:4, 794:6-15, 796:6-798:4, July 16, 2010.)  He

23   _____

24         [4]  A "flight" is the Air Force term for a group of airmen, comparable to a
      "unit" in the Army.  (Trial Tr. 1335:10-12, July 21, 2010.)

25         [5]  According to Major Almy's uncontradicted testimony on this point, the
26   Air Force, "for morale purposes," allows servicemembers deployed in combat
      zones to use their government e-mail account for personal e-mail.  (Trial Tr.
27   767:3-18, 794:6-15, 796:6-798:4, July 16, 2010.)  Almy separated the
      personal e-mail he received in his government e-mail account into a folder
28   titled "Friends."  (Trial Tr. 769:20-770:15, July 16, 2010.)

1    knew, for example, that according to Air Force policy, e-mail accounts

2    could not be searched unless authorized by proper legal authority or a

3    squadron commander or higher in the military chain of command.  (Trial

4    Tr. 772:20-773:4, July 16, 2010.)

5  29.  Almy only learned his private e-mail had been searched when he

6    returned to Germany and his commanding officer confronted Almy with

7    the messages, read him the Don't Ask, Don't Tell Act, and pressured

8    him to admit he was homosexual.  (Trial Tr. 764:23-766:6, 773:13-20,

9    July 16, 2010.)  At the end of the meeting, Almy was relieved of his

10    duties, and his commanding officer informed the other officers in the

11    squadron of this.  (Trial Tr. 774:7-15, July 16, 2010.)

12  30.  Almy had attained one of the highest level security clearances available

13    for military personnel, "top secret SCI[6] clearance;" approximately three

14    months after Almy was relieved of his duties, his security clearance was

15    suspended.  (Trial Tr. 775:8-15, July 16, 2010.)

16  31.  Initially, Almy contested his discharge, as he felt he had not violated the

17    terms of the Don't Ask, Don't Tell Act: he had never told anyone in the

18    military he was gay.  (Trial Tr. 775:19-776:9, July 16, 2010.)  Rather,

19    Almy's understanding was that his discharge was based solely on the

20    e-mail discovered on the computer in Iraq.  (Trial Tr. 793:6-9, July 16,

21    2010.)

22  32.  Accordingly, Almy invoked his right to an administrative hearing and

23    solicited letters of support from those who had worked with him in the

24    Air Force.  (Trial Tr. 775:19-776:9, 777:2-8, July 16, 2010.)   Everyone

25    he asked to write such a letter agreed to do so.  (Trial Tr. 777:17-25,

26    July 16, 2010.)

27

28       [6] "SCI" stands for "Sensitive Compartmental Information."

33. Colonel Paul Trahan, U.S. Army (Ret.), wrote: "My view is that Major Almy has been, and will continue to be an excellent officer.  As a former Commander and Inspector General I am well aware of the specifics of the Homosexual Conduct Policy.  To my knowledge, Major Almy is not in violation of any of the provisions of the policy.  To the contrary, it appears that in prosecuting the case against Major Almy, the USAF may have violated the 'Don't Ask, Don't Tell Policy,' the Electronic Privacy Act and Presidential directives regarding the suspension of security clearances."  (Trial Ex. 113 [Character Reference Letter from Col. Paul Trahan, U.S. Army (Ret.)].)

34. Captain Timothy Higgins wrote: "Of the four maintenance directorate chiefs I have worked with at the 606th, Major Almy is by far the finest.  During his tenure as the [director of logistics], he had maintenance training at the highest levels seen to date . . . . His troops respected him because they believed he had their best interests at heart."  (Trial Ex. 117 [Character Reference Letter from Timothy J. Higgins, Capt. USAF].)

35. Those who served under Almy wrote equally strong praise: "I can say without reservation that Maj. Almy was the best supervisor I have ever had."  (Trial Ex. 120 [Character Reference Letter from Rahsul J. Freeman, 1st Lt., USAF].)  "I was deployed with him during the NATO Exercise CLEAN HUNTER 2004.  His leadership was key to our successful completion of the mission.  He was well liked and respected by the enlisted personnel in the unit."  (Trial Ex. 122 [Character Reference Letter from Leslie D. McElya, SMSgt. USAF (Ret.)].)

11

36. Almy's commanding officer while his discharge proceedings were pending, Lt. Col. Jeffrey B. Kromer, wrote that he was convinced "the Air Force, its personnel, mission and tradition remains unchanged and unharmed despite [Almy's] alleged [violations of the Don't Ask, Don't Tell Act]."  (Trial Ex. 114.)

37. During the course of Almy's discharge proceedings, he was relieved of his command, but remained at Spangdahlem Air Base performing "ad hoc" duties.  (Trial Tr. 810:18-811:1, 816:5-16 July 16, 2010.)  Almy testified he observed the effect his abrupt removal from his duties had on his former unit:  the maintenance, availability, and readiness of the equipment to meet the mission declined.  (Trial Tr. 813:19-24, 815:2-18, July 16, 2010.)

38. One officer in the 606th Air Control Squadron observed that the squadron "fell apart" after Major Almy was relieved of his duties, illustrating "how important Maj. Almy was[,] not only to the mission but to his troops."  (Trial Ex. 121 [Character Reference Letter from Bryan M. Zollinger, 1st Lt. USAF, 606th Air Control Squadron].)

39. After sixteen months, Almy agreed to drop his request for an administrative hearing and to accept an honorable discharge.  He testified he did so because of his own exhausted emotional state and the risk that a less-than-honorable discharge would affect his ability to obtain a civilian job or receive his retirement benefits.  (Trial Tr. 798:8-799:13, July 16, 2010.)  Almy refused to sign his official discharge papers, however, because they listed the reason for discharge as admitted homosexuality.  (See Trial Ex. 112; Trial Tr. 800:1-801:20, July 16, 2010.)

40.  Major Almy received many awards and honors during his service in the Air Force.  For example, while serving at Tinker Air Force Base in the late 1990s with the Third Combat Communications Group, he was selected as "Officer of the Year," chosen as the top performer among his peers for "exemplary leadership, dedication to the mission, and going above and beyond the call of duty."  (Trial Tr. 741:1-11, July 16, 2010.)  In 2001, he was one of six Air Force officers chosen to attend the residential training program for officers at the Marine Corps Quantico headquarters.  (Trial Tr. 744:7-745:20.)  In 2005, he was awarded the Lt. General Leo Marquez Award, given to the top Air Force communications officer serving in Europe.  (Trial Tr. 760:8-761:1, July 16, 2010.)  Although Almy had been relieved of command during the pendency of the discharge proceedings, Almy's wing commander, Colonel Goldfein, recommended that Almy be promoted to lieutenant colonel.  (Trial Tr. 816:19-818:1, July 16, 2010.)

41.  Almy testified that if the Act were no longer in effect, he "wouldn't hesitate" to rejoin the Air Force.  (Trial Tr. 827:3-5, July 16, 2010.)

**Joseph Rocha**

42.  Joseph Rocha enlisted in the United States Navy on April 27, 2004, his eighteenth birthday.  (Trial Tr. 473:19-23, July 15, 2010.)  His family, like Major Almy's, had a tradition of military service, and the September 11, 2001, attacks also motivated him to enlist.  (Trial Tr. 474:5-24, July 15, 2010.)  He wanted to be an officer in the United States Marine Corps, but was not admitted to the Naval Academy directly out of high school; so he hoped to enter Officer Training School through diligence as an enlisted man.  (Trial Tr. 473:24-474:24, July 15, 2010.)

13

43.   After successfully completing basic training, Rocha was promoted to seaman apprentice and received further training in counter-terrorism and force protection.  (Trial Tr. 475:7-476:5, July 15, 2010.)  He then volunteered for deployment on a military mission to Bahrain.  (Trial Tr. 476:6-12, July 15, 2010.)

44.   Once he arrived at the Naval Support base in Bahrain, Rocha sought out the base's canine handler position because he wanted to specialize in becoming an explosive-device handler.  (Trial Tr. 477:12-22, July 15, 2010.)

45.   The canine group is an elite and competitive unit, for which qualification is very difficult.  (Trial Tr. 478:11-16, July 15, 2010.)  Rocha volunteered his off-duty time to earn the qualifications to interview and be tested for a kennel-support assignment; during this time, his interactions with members of the canine unit were limited to one or two handlers on the night shift when he volunteered.  (Trial Tr. 478:20-479:13, July 15, 2010.)

46.   Eventually, Rocha took and passed oral and written examinations with Chief Petty Officer Toussaint, the canine group's commanding officer; Rocha met the other qualifications and received an assignment in kennel support.  (Trial Tr. 480:11-19, 481:4-9, July 15, 2010.)  His duties were to ensure the dogs – that were trained to sniff and detect explosives and explosive devices – were clean, fed, medicated, and exercised.  (Trial Tr. 481:10-17, July 15, 2010.)

47.   At the same time, Rocha voluntarily participated in additional physical training exercises with members of the Marine Corps, such as martial arts and combat operations training, in the belief this eventually would

14

1    improve his chances for admission to the Naval Academy.  (Trial Tr.
2    482:16-483:6, July 15, 2010.)

3  48.  As Rocha aspired to become a Marine officer, after receiving
4    permission through the Marine chain of command, he began "more
5    formal training," eventually earning martial arts, combat, and swimming
6    qualifications.  (Trial Tr. 482:21-483:12, July 15, 2010.)

7  49.  Once assigned as kennel support to the canine unit and under Chief
8    Petty Officer Toussaint's command, Rocha was hazed and harassed
9    constantly, to an unconscionable degree and in shocking fashion.
10   When the eighteen-year-old Rocha declined to participate in the unit's
11   practice of visiting prostitutes, he was taunted, asked if he was a
12   "faggot," and told he needed to prove his heterosexuality by consorting
13   with prostitutes.  (Trial Tr. 486:18-487:2, 488:3-7, July 15, 2010.)
14   Toussaint freely referred to him as "gay" to the others in the unit, who
15   then began to use derogatory language towards Rocha.  (Trial Tr.
16   486:11-17, July 15, 2010.)

17 50.  When Rocha refused to answer questions about his sexual orientation
18   from Toussaint and others in the unit, "it became a frenzy," in Rocha's
19   words, and his superiors in the canine unit would gather around him,
20   simulate sexual positions, and ask if U.S. Marine Corps soldiers
21   performed various sexual acts on him.  (Trial Tr. 487:20-488:7, 488:8-
22   19, July 15, 2010.)  Toussaint ordered all of the other men in the unit to
23   beat Rocha on the his nineteenth birthday.  (Trial Tr. 485:16-486:3, July
24   15, 2010.)

25 51.  On one occasion that Rocha testified was especially dehumanizing,
26   Toussaint brought a dozen dogs to the Department of Defense
27   Dependents School for a bomb threat training exercise.  For the

28

15

1    "training exercise" he instructed Rocha to simulate performing oral sex
2    on another enlisted man, Martinez, while Toussaint called out
3    commands about how Rocha should make the scenario appear more
4    "queer."  (Trial Tr. 490:13-492:19, July 15, 2010.)

5  52.  On another occasion, Toussaint had Rocha leashed like a dog,
6    paraded around the grounds in front of other soldiers, tied to a chair,
7    force-fed dog food, and left in a dog kennel covered with feces.  (Trial
8    Tr. 521:11-522:1, July 15, 2010.)

9  53.  Rocha testified that during this deployment in Bahrain, he never told
10    anyone he was gay because he wanted to comply with the Don't Ask,
11    Don't Tell Act.  (Trial Tr. 487:20-488:2, July 15, 2010.)  He did not
12    report any of the mistreatment he suffered, although he believed it
13    violated Navy regulations.  (Trial Tr. 488:20-489:14, July 15, 2010.)
14    Toussaint was his commanding officer to whom he normally would
15    direct such a report yet was either responsible for the mistreatment or
16    present when others engaged in it.  (Id.)

17  54.  Rocha's only other choice was to report the misconduct to the Inspector
18    General, which he did not believe was feasible.  (Trial Tr. 499:6-16,
19    533:2-19, July 15, 2010.)  He was eighteen to nineteen years old at the
20    time, far from home, and all of the perpetrators were senior to him in
21    rank and led in the misconduct by his commanding officer.  (Trial Tr.
22    488:20-489:14, July 15, 2010.)

23  55.  Eventually Rocha received the assignment he had hoped for, returning
24    to the United States and reporting to Lackland Air Force Base for
25    Military Working Dog Training School.  (Trial Tr. 499:20-500:1, July 15,
26    2010.)

27

28

56.   Once he completed the training at Lackland successfully, he returned to Bahrain, where he found that although he was now a military dog handler himself, the same atmosphere prevailed.  (Trial Tr. 500:2-6, 16-18, July 15, 2010.)

57.   A new petty officer had joined the unit, Petty Officer Wilburn, who declared openly that Rocha was "everything he hated: liberal, [Roman] Catholic, and gay."  (Trial Tr. 501:19-502:11, July 15, 2010.)  Wilburn trailed Rocha regularly as Rocha tried to carry out his duties, taunting and harassing him.  Rocha wrote Wilburn a letter complaining about his conduct; in response, Wilburn left an image of two men engaging in homosexual activity on Rocha's computer with the message that if Rocha complained, "no one will care."  (Trial Tr. 502:12-504:5, July 15, 2010.)

58.   When the Navy undertook an investigation of Toussaint's command (apparently unmotivated by anything Rocha said or did), Rocha was questioned by a captain but at first refused to answer any questions about the mistreatment he was subjected to because he was afraid the investigation might lead to questions about his sexual orientation and an investigation on that subject.  (Trial Tr. 519:16-520:10, July 15, 2010.)

59.   So great was Rocha's fear of retaliation that he responded to an investigating officer's questions regarding Toussaint only after he was threatened with a court martial if he continued to refuse to respond. (Trial Tr. 520:11-15, July 15, 2010.)

60.   The Navy recognized Rocha with several awards during his service, including the Navy and Marine Corps Achievement Medal for professional achievement that exceeds expectations; the Global War

17

1    on Terrorism Expeditionary Medal; the National Defense Service

2    Medal; and the Navy Expert Rifleman Medal.  (Trial Tr. 517:23-24,

3    518:7-8, 14-16, 519:4-7, July 15, 2010.)

4    61.   Rocha received consistently excellent performance evaluations and

5          reviews while he served in the Navy.  (See Trial Exs. 144, 145.)  In

6          Rocha's review covering February 18, 2005, through July 15, 2005, his

7          supervisors – including Toussaint – described Rocha as "highly

8          motivated" and a "dedicated, extremely reliable performer who

9          approaches every task with enthusiasm."  (Trial Ex. 145; Trial Tr.

10         494:23-497:13, July 15, 2010.)  Rocha's review also stated that he was

11         a "proven performer" who was "highly recommended for advancement."

12         (Trial Tr. 496:16-497:3, July 15, 2010.)  Rocha's review recommended

13         him for early promotion, which he received shortly thereafter.  (Trial Tr.

14         497:7-22, July 15, 2010.)  Toussaint signed the review as Rocha's

15         senior reviewing military officer.  (Trial Tr. 495:19-23, 498:4-6, July 15,

16         2010.)

17   62.   Despite the ongoing harassment, Rocha continued to receive

18         exemplary reviews from his supervisors in the canine handling unit,

19         including Toussaint.  In a review covering July 16, 2005, through June

20         16, 2006, then-Petty Officer Rocha is described as an "exceptionally

21         outstanding young sailor whose performance, initiative, and

22         immeasurable energy make[ ] him a model Master-At-Arms."  (Trial Ex.

23         144; Trial Tr. 504:23-506,19, July 15, 2010.)  The review also noted

24         that as a military working dog handler, Rocha "flawlessly inspected

25         [over 300 items of military equipment,] increasing the force protection of

26         NSA Bahrain."  (Trial Ex. 144; Trial Tr. 506:10-13, July 15, 2010.)

27

28

18

63.  As a result of his performance as a military working dog handler, Rocha received the Navy and Marine Corps Achievement Medal, which is given when an enlisted member exceeds expectations.  (Trial Tr. 517:15-518:6 July 15, 2010.)

64.  In 2006, Rocha was chosen to receive the sole nomination from his congressman for entrance into the U.S. Naval Academy, and Rocha chose to apply to the Naval Academy's preparatory school in the event he was not accepted directly into the Naval Academy.[7]  (Trial Tr. 506:1-4; 507:4-23, July 15, 2010.)

65.  Rocha received the required nomination of everyone in his chain of command for his entry into the Naval Academy and was accepted into its preparatory school.  (Trial Tr. 508:13-509:6, July 15, 2010.)  Hearing of acceptance to the Academy was "the most significant moment of [his] life . . . , [because acceptance into the Naval Academy] was the biggest dream [he'd] ever had."  (Trial Tr. 519:8-15, July 15, 2010.)

66.  Once he enrolled at the preparatory academy, Rocha had the opportunity to reflect on his experiences in Bahrain.  (Trial Tr. 522:12-24, July 15, 2010.)  His instructors at the preparatory scbool stressed the nature of the fifteen- to twenty-year commitment expected of the officer candidates.  (Id.)  Rocha understood he was gay when he enlisted in the Navy at age eighteen, and had complied fully with the Don't Ask, Don't Tell Act during his service, which he had thought would protect him.  (Id.)

---

[7] According to Rocha's uncontradicted testimony on this point, the preparatory school is designed to give extra academic support before entry into the Naval Academy at Annapolis.  (Trial Tr. 507:24-508:4, July 15, 2010.) Once admitted into the Naval Academy's preparatory school, acceptance into Annapolis is guaranteed.  (Trial Tr. 508:5-12, July 15, 2010.)

67.   After reflecting on his experiences in the military working dog unit in Bahrain, however, he decided it would be impossible for him to serve under the restraints of the Act and fulfill the commitment expected of him.  He then decided to inform the Navy of his sexual orientation. (Trial Tr. 522:12-523:15, July 15, 2010.)

68.   He first sought permission from his immediate supervisor, Ensign Reingelstein, to speak to the division commander; Ensign Reingelstein unsuccessfully tried to persuade Rocha to change his mind.  (Trial Tr. 523:14-524:14, July 15, 2010.)  Rocha then was allowed to meet with his commanding officer, Lt. Bonnieuto, who listened and told him to return to his unit.  (Trial Tr. 525:2-19, July 15, 2010.)

69.   Eventually, he received an honorable discharge (see Trial Ex. 144), although before accepting Rocha's statement, Lt. Bonnieuto tried to dissuade him, telling him he was being considered for various honors and leadership positions at the preparatory school, including "battalion leadership."  (Trial Tr. 525:21-526:6, 527:13-528:22, 530:4-25, July 15, 2010.)

70.   After his discharge, Rocha was diagnosed with service-related disorders including "post-traumatic stress disorder with major depression."  (Trial Tr. 532:11-19, July 15, 2010.)

71.   Rocha testified he would rejoin the Navy if the Don't Ask, Don't Tell Act was repealed.  (Trial Tr. 533:24-534:2, July 15, 2010.)

72.   Even when recounting the mistreatment endured under Toussaint's command, Rocha testified in an understated and sincere manner.  The Court found him a forthright and credible witness.

**Jenny Kopfstein**

73.   Jenny Kopfstein joined the United States Navy in 1995 when she entered the United States Naval Academy; after graduation and further training, she began serving on the combatant ship USS <u>Shiloh</u> on March 15, 2000.  (Trial Tr. 919:12-14, 926:11-927:3, 927:12-19, July 16, 2010.)

74.   Kopfstein was assigned as the ship's ordnance officer, which means she "was in charge of two weapon systems and a division of [fifteen] sailors."  (Trial Tr. 928:22-929:6, July 16, 2010.)  When assigned as "officer of the deck," Kopfstein was "in charge of whatever the ship happened to be doing at that time," and coordinating the ship's training exercises of as many as twenty to thirty sailors.  (Trial Tr. 929:7-930:4, July 16, 2010.)

75.   Once assigned to the USS <u>Shiloh</u>, Kopfstein discovered the Act made it impossible for her to answer candidly her shipmates' everyday questions about such matters as how she spent weekends or leave time; to do so would place her in violation of the Act as she would necessarily be revealing the existence of her lesbian partner.  (Trial Tr. 931:22-932:11, July 16, 2010.)  Having to conceal information that typically was shared made her feel as though other officers might distrust her, and that trust is critical, especially in emergencies or crises.  (Trial Tr. 957:6-22, July 20, 2010.)

76.   The Don't Ask, Don't Tell Act's prohibition on gay and lesbian servicemembers revealing their sexual orientation affects trust among shipmates, as Kopfstein testified, because it causes people to "hide significant parts of themselves," making it harder to establish the necessary sense of teamwork.  (Trial Tr. 978:16-979:18 July 20, 2010.)

When she overheard homophobic comments and name-calling by her
shipmates, she felt she could neither report them nor confront the
offenders, because to do either might call unwanted suspicion upon
her.  (Trial Tr. 932:18-933:6, July 16, 2010.)

77. After serving for four months on the USS Shiloh, Kopfstein wrote a
letter to Captain Liggett, her commanding officer, stating she was a
lesbian; she wanted Captain Liggett to learn this from her rather than
hear it from another source.  (Trial Tr. 933:7-13, 935:8-23, July 16,
2010; Trial Ex. 140 ["Memorandum of Record" from Kopfstein to
Liggett, July 17, 2000].)

78. Captain Liggett did not begin any discharge proceedings after Kopfstein
wrote this letter; he told her this was because he did not know her well
and thought she might have written the letter not because she was a
lesbian, but rather as an attempt to avoid deployment to the Arabian
Gulf.  (Trial Tr. 935:20-937:11, July 16, 2010; 985:5-14, July 20, 2010.)

79. Kopfstein continued to serve and perform her duties in the same
manner she had before writing, but no longer lying or evading her
shipmates' questions about her personal life when asked.  (Trial Tr.
950:25-951:11, July 20, 2010.)

80. When leaving the USS Shiloh, to be replaced by Captain Dewes,
Captain Liggett not only invited Kopfstein to the farewell party at his
house for the officers and their spouses, but made a point of telling her
she was welcome to bring "any guest she chose" with her.  (Trial Tr.
955:12-956:8, July 20, 2010.)  Kopfstein and her partner attended the
party, and Kopfstein testified that Captain Liggett and his wife
welcomed them both warmly, as did everyone else present.  (Trial Tr.
956:12-25, July 20, 2010.)

81. During the abbreviated course of her service, the Navy awarded
Kopfstein many honors.  For example, she was chosen to steer the
USS Shiloh in a ship steering competition; after the USS Shiloh won the
competition, she received a personal commendation from the Admiral
who also ceremonially "gave her his coin," a rare and prized tribute.
(Trial Tr. 952:14-953:20, July 20, 2010.)  When she returned from
overseas deployment after the bombing of the USS Cole off the coast
of Yemen in February 2001, the Navy awarded her the Sea Service
Deployment Ribbon, another commendation not routinely awarded.
(Trial Tr. 949:11-22, 954:5-22, July 20, 2010.)  She also was awarded
the Naval Expeditionary Medal after the Yemen deployment.  (Trial Tr.
955:5-11.)

82. On September 11, 2001, Kopfstein was the ordnance officer on the
USS Shiloh, in charge of all the weapons on the ship; the captain chose
her to be officer of the deck as the ship was assigned to defend the
West Coast against possible attack in the wake of the attacks on New
York and the Pentagon.  (Trial Tr. 958:17-962:19, 963:22-25, July 20,
2010.)  In October 2001, the Navy awarded her the Surface Warfare
Officer pin, during a ceremony where her captain took off his pin and
pinned it on her chest.  (Trial Tr. 968:8-970:1, July 20, 2010.)

83. In evaluations completed before and after Kopfstein revealed her
sexual orientation, her commanding officers praised her as the USS
Shiloh's "best [o]fficer of [the d]eck," a "[t]op [n]otch performer," "a gifted
ship handler," and the manager of "one of the best ship's led and
organized divisions," and a "[s]uperb [t]rainer" with a "great talent for
teaching other junior officers."  (Trial Exs. 138, 139.)

23

84. Two captains under whom she served came to the Board of Inquiry to testify on her behalf during her discharge proceedings.  (Trial Tr. 974:2-977:11, July 20, 2010.)  Captain W.E. Dewes, Kopfstein's commanding officer at the time of her discharge, reported that "[h]er sexual orientation has not disrupted good order and discipline onboard USS SHILOH;" rather, Kopfstein was "an asset to the ship and the Navy" and "played an important role in enhancing the ship[']s strong reputation . . . . She is a trusted [o]fficer of the [d]eck and best ship handler among her peers.  Possesses an instinctive sense of relative motion – a natural Seaman."  (Trial Ex. 139.)

85. Captain Liggett also attended her discharge proceedings, where he testified that "it would be a shame for the service to lose her."  (Trial Ex. 138.)

86. Kopfstein served in the Navy without concealing her sexual orientation for two years and four months before her discharge.  During that time, to her knowledge, no one complained about the quality of her work or about being assigned to serve with her.  (Trial Tr. 984:8-12, 987:6-8, 989:9-17, July 20, 2010.)

87. Kopfstein did not want to leave the Navy; she enjoyed the company of her shipmates and found her work rewarding.  (Trial Tr. 973:16-24, July 20, 2010.)

88. Nevertheless, Kopfstein was discharged under the Don't Ask, Don't Tell Act.  (Id.)  Although she appealed the decision to separate her from the Navy, she did not prevail, and on October 31, 2002, she received an honorable discharge.  (Trial Tr. 977:9-20, July 20, 2010.)

89. Kopfstein testified she "absolutely" would rejoin the Navy if the Act were repealed.  (Trial Tr. 980:16-22, July 20, 2010.)

90. The Court found Kopfstein an honest, candid, and believable witness; she testified with modest understatement about her talent and achievements as a naval officer and with obvious sincerity about her desire to rejoin to fulfill her original commitment.

**John Nicholson**

91. John Nicholson enlisted in the United States Army in May 2001. (Trial Tr. 1135:6-12, July 20, 2010.) At the time he enlisted, he was fluent in Spanish and "fairly proficient" in Italian and Portuguese. (Trial Tr. 1129:3-1130:23, 1134:10-23, 1135:13-18, July 20, 2010.) He underwent testing in the military for foreign language aptitude and qualified for the most difficult level of language training, Category 4. (Trial Tr. 1151:25-1152:3, 1154:4-9, July 20, 2010.)

92. While Nicholson served, especially while in basic training at Fort Benning, Georgia, he sometimes heard other soldiers make sexist or homophobic slurs but was afraid to report these violations of military conduct lest suspicion fall on him or he be retaliated against in a manner that would lead to his discharge under the Act. (Trial Tr. 1138:1-1142:14, 1143:2-24, July 20, 2010.)

93. The Don't Ask, Don't Tell Act prevented Nicholson from being open and candid with others in his unit; it kept him under a "cloud of fear," and caused him to lie about and alter who he was. (Trial Tr. 1194:17-1196:20, July 20, 2010.)

94. After completing his basic training, Nicholson was assigned to Fort Huachuca, Arizona, to train as a human intelligence collector. (Trial Tr. 1143:25-1144:3, July 20, 2010.) While completing his intelligence training at Fort Huachuca, Nicholson requested and received a

1   reassignment to counterintelligence, but remained at Fort Huachuca to
2   complete the requisite counterintelligence training. (Trial Tr. 1148:5-14,
3   July 20, 2010.)

4   95.   Nicholson was waiting to start the next cycle of the counterintelligence
5         course when another servicemember started spreading a rumor that
6         Nicholson was gay. (Trial Tr. 1154:12-18, July 20, 2010.)

7   96.   The rumor originated because, while off duty in January 2002,
8         Nicholson wrote a letter to a man with whom he had a relationship
9         before joining the Army.  Nicholson wrote the letter in Portuguese to
10        prevent other servicemembers from reading it, because it contained
11        references that could reveal Nicholson's sexual orientation.  (Trial Tr.
12        1134:10-23, 1161:10-1163:7, July 20, 2010.)

13  97.   Despite Nicholson's precautions, another servicemember caught sight
14        of the letter while chatting with Nicholson.  (Id.)  After the two had been
15        talking for a few minutes, Nicholson realized she was one of the few
16        persons he knew in the Army who also could also read Portuguese; he
17        gathered up the pages of his letter after he noticed she appeared to be
18        interested in it and reading it.  (Id.; Trial Tr. 1163:8-18, July 20, 2010.)

19  98.   After this incident, members of Nicholson's unit approached him and
20        told him to "be more careful" with regard to disclosing his sexual
21        orientation.  (Trial Tr. 1164:3-1165:10, July 20, 2010.)  Nicholson
22        sought his platoon sergeant's assistance to stop the spread of the
23        rumor, but the sergeant instead informed the chain of command.  (Trial
24        Tr.1166:9-1167:19, 1170:9-15, July 20, 2010.)

25  99.   Nicholson's company commander summoned Nicholson to his office
26        and informed Nicholson that he was initiating discharge proceedings.
27        (Trial Tr. 1180:21-1182:9, July 20, 2010.)  Upon leaving the meeting,

28

1   the platoon sergeant, who also had been present at the meeting,
2   ordered Nicholson not to disclose why he was being discharged from
3   the Army.  (Trial Tr. 1182:11-1183:15, July 20, 2010.)
4   100.  After meeting with his company commander, Nicholson was separated
5   from his platoon and placed in a wing of the barracks containing other
6   servicemembers who were being discharged for reasons such as drug
7   use and failing to disclose criminal convictions before enlistment.  (Trial
8   Tr. 1184:11-1185:11, July 20, 2010.)
9   101.  Two months later, Nicholson was honorably discharged under the Don't
10   Ask, Don't Tell Act.  (Trial Tr. 1183:25-1184:10, 1187:10-13, July 20,
11   2010.)
12   102.  Nicholson testified he "absolutely" would return to the Army if the Don't
13   Ask, Don't Tell Act were invalidated.  (Trial Tr. 1209:4-5, July 21, 2010.)
14   103.  As noted above with respect to his testimony on the standing issue, the
15   Court observed Nicholson to be credible and forthright.
16
17   **Anthony Loverde**
18   104.  Anthony Loverde joined the United States Air Force on February 13,
19   2001, making a six-year commitment and hoping to use his G.I. Bill
20   benefits to obtain a post-graduate degree eventually.  (Trial Tr.
21   1326:19-24, 1327:16-1328:22, July 21, 2010.)
22   105.  After completing basic training, he received specialized training in
23   electronics and further training in calibrations, after which he qualified at
24   the journeyman level as a Precision Measurement Equipment
25   Laboratory ("PMEL") technician.  (Trial Tr. 1329:5-24, July 21, 2010.)  A
26   PMEL technician calibrates the accuracy, reliability, and traceability of
27
28

all types of equipment, including precision warfare equipment.  (Trial Tr. 1335:13-1336:5, July 21, 2010.)

106.   After completing training in December 2001, Loverde was stationed at Ramstein Air Base in Germany.  (Trial Tr. 1334:18-21, July 21, 2010.) While at Ramstein, Loverde's flight was responsible for calibrating and ensuring the accuracy and reliability of "various equipment used throughout the Air Force."  (Trial Tr. 1335:13-1336:20, July 21, 2010.) Loverde was stationed at Ramstein for approximately three years. (Trial Tr. 1337:5-11, July 21, 2010.)

107.   After completing his tour at Ramstein Air Base, Loverde was stationed at Edwards Air Force Base in California for approximately two years. (Trial Tr. 1341:17-1342:2, July 21, 2010.)  While stationed at Edwards, Loverde was deployed to Al Udeid Air Base in Qatar for four months, where he supported Operations Iraqi Freedom and Enduring Freedom, as well as missions  in the Horn of Africa.  (Trial Tr. 1344:8-22, 1345:17-21, July 21, 2010.)

108.   During his stint in the Air Force, Loverde received frequent promotions. Three and one-half years after enlistment, for example, he was promoted to staff sergeant, although the usual length of time to reach that rank is six years.  (Trial Tr. 1337:12-1338:5, 1338:21-1339:12, July 21, 2010.)

109.   After serving his initial enlistment commitment, he reenlisted and received further training to qualify as a loadmaster.  (Trial Tr. 1352:25-1353:15, July 21, 2010.)  In that capacity, he flew sixty-one combat missions in Iraq, where he received two Air Medals.  (Trial Tr. 1357:12-17, 1359:17-25, July 21, 2010.)

110.  Loverde testified he was raised in a religious family and his church taught that homosexuality was a sin; he had not realized he was gay at the time he joined the military at age twenty-one.  (Trial Tr. 1327:16-17, 1330:13-25, July 21, 2010.)  After he became aware of his sexual orientation, he researched the Don't Ask, Don't Tell Act and found the Servicemembers' Legal Defense Network website.  (Trial Tr. 1332:13-1333:4, July 21, 2010.)  He understood that there were three grounds for discharge under the Act – marriage, conduct, and statements.  (Trial Tr. 1332:17-1333:4, July 21, 2010.)  He resolved to comply with the Act and remain in the Air Force.

111.  The Air Force's core values are "Integrity First, Service Before Self, and Excellence in All We Do."  (Trial Tr. 1333:5-24, July 21, 2010; 367:20-25, July 14, 2010.)  Loverde testified that the Don't Ask, Don't Tell Act effectively made it impossible to honor the "Integrity First" value of the credo, because on occasion, he felt forced to lie rather than violate the Act.  Once, when with other servicemembers in a bar off base in Germany, he refused the sexual advances of a German civilian woman, and his colleagues asked him if he was gay; on another occasion, a subordinate airman asked Loverde about his sexual orientation.  (Trial Tr. 1333:5-1334:16, 1349:24-1350:24, July 21, 2010.)

112.  During the time he served as a loadmaster at Ramstein Air Base in Germany, Loverde's flight chief often used offensive epithets to refer to homosexuals, as well as racist and sexist slurs.  (Trial Tr. 1364:16-1365:25, July 21, 2010.)   Although Loverde was disturbed by this, he felt he had no recourse and could not report it lest he draw attention to his sexual orientation.  Therefore, during the year he served under this

1      officer, he never made any formal or informal complaint about it.  (Id.;

2      Trial Tr. 1366:13-15, July 21, 2010.)

3  113.  Loverde also testified that during his combat deployments and during

4      his assignments to bases in Germany and California, he faced the

5      difficulty of having to hide his personal life from his colleagues and

6      avoiding conversations with them about everyday life over meals, for

7      example.  (Trial Tr. 1360:1-1361:17, July 21, 2010.)  He became so

8      skilled at avoiding his fellow airmen that they nicknamed him "Vapor" in

9      recognition of his ability to vanish when off duty.  (Id.)

10  114.  In April 2008, Loverde decided he was no longer willing to conceal his

11      sexual orientation.  (Trial Tr. 1366:16-20, July 21, 2010.)  At that time,

12      he was deployed at Ali Al Saleem Air Base in Kuwait, and he delayed

13      formally telling his commanding officer of his decision until his return to

14      Germany, lest his entire flight's mission be disrupted and their return

15      from deployment delayed.  (Trial Tr. 1355:18-21, 1366:16-1367:25, July

16      21, 2010.)

17  115.  When Loverde returned to Germany from his deployment, he wrote to

18      his first sergeant, requesting to speak to his commanding officer about

19      continuing to serve under the Don't Ask, Don't Tell Act, and stating that

20      while he wanted to continue serving in the Air Force, he could not do so

21      under that law.  (Id.; Trial Tr. 1368:20-1369:3, July 21, 2010.)

22  116.  Loverde's superiors recommended the Air Force retain him and

23      commended him for being "nothing less than an outstanding [non-

24      commissioned officer]" and "a strong asset" to the Air Force.  (Trial Exs.

25      136, 137.)  They praised him for demonstrating an "exceptional work

26      ethic" and "the highest level of military bearing, honest, and

27      trustworthiness."  (Id.)  One wrote: "If I ever had the opportunity to build

28

1  my 'dream team' for work, I would take an entire crew of SSgt. Loverde
2  over most other workers. . . ."  (Trial Ex. 137.)

3  117.  Nevertheless, in July 2008 the Air Force gave Loverde an honorable
4  discharge, citing the Don't Ask, Don't Tell Act.  (See Trial Exs. 129, 134,
5  136, 137; Trial Tr. 1372:20-1377:20, July 21, 2010.)

6  118.  Loverde testified he would join the Air Force again "without a doubt" if
7  the Don't Ask, Don't Tell Act were repealed.  (Trial Tr. 1389:12-18, July
8  21, 2010.)  The Court found Loverde a candid and credible witness.

9

10  **Steven Vossler**

11  119.  Steven Vossler's family has a tradition of service in the Army extending
12  back to the Spanish-American War, and he enlisted in the United
13  States Army in November 2000, before graduating high school.  (Trial
14  Tr. 302:19-303:5, July 14, 2010.)  After basic training, the Army sent
15  him to the Defense Language Institute in Monterey, California, because
16  of his exceptional aptitude for foreign languages.  (Trial Tr. 305:5-306:6,
17  July 14, 2010.)

18  120.  Vossler developed close friendships with other students at the
19  Language Institute, and testified that in general it is important to have
20  "good, open relationships" and to discuss one's personal experiences
21  and life with one's colleagues in the military, and if one does not, it is
22  perceived as an attempt to distance one's self.  (Trial Tr. 316:7-317:17,
23  July 14, 2010.)

24  121.  Vossler met Jerrod Chaplowski, another soldier and Korean language
25  student at the Monterey Language Institute, and became friends with
26  him.  (Trial Tr. 317:14-20, 318:16-17, July 14, 2010.)  Eventually
27  Vossler heard a rumor that Chaplowski was gay.  (Trial Tr. 318:22-
28

320:24, July 14, 2010.)  Vossler was initially surprised at this, because "up until that point, [he] still held some very stereotyping beliefs about gays and lesbians," but as a heterosexual, he had no difficulty sharing living quarters with Chaplowski at any of the several Army bases where they were quartered together; in fact, Chaplowski was a considerate roommate and it was always a "great living situation."  (Trial Tr. 319:16-17, 321:2-10, 327:1-11, 329:20-25, July 14, 2010.)

122.  The difficulty Vossler encountered was that when he and Chaplowski were with other servicemembers and the conversation turned to general subjects, Vossler had to be excessively cautious lest he inadvertently cast suspicion on Chaplowski and trigger an investigation under the Don't Ask, Don't Tell Act.  (See Trial Tr. 327:12-328:20, July 14, 2010.)  For example, if a group of soldiers was discussing their respective social activities over the previous weekend, Vossler had to refer to Chaplowski's dinner companion as "Stephanie" rather than "Steven;" even this small deception pained Vossler as it violated the Army's code of honor.  (Id.)

123.  Vossler also observed that the Don't Ask, Don't Tell Act infringed Chaplowski's ability or willingness to enforce the Army's policy banning offensive and discriminatory language.  (Trial Tr. 328:22-329:4, July 14, 2010.)  Homophobic slurs, epithets, and "humor" were commonplace and made Vossler uncomfortable; he noticed that Chaplowski did not confront those who employed them, although Vossler eventually did at times.  (Trial Tr. 329:5-19, July 14, 2010.)

124.  Vossler chose not to reenlist in the active-duty Army after his tour of service expired, instead enlisting in the Army National Guard, which he left in June 2009.  (Trial Tr. 332:21-333:25, July 14, 2010.)

125. After leaving the military, Vossler became a vocal advocate for the repeal of the Don't Ask, Don't Tell Act because he believes the Act "doesn't seem in line with American values" and he "do[es]n't understand how it's a law in [this] country" because he perceives the Act to be discriminatory.  (Trial Tr. 337:14-338:20, July 14, 2010.)

126. The Court found Vossler, in common with the other former military men and women who testified at trial, a credible, candid, and compelling witness.

## The Don't Ask, Don't Tell Act

127. After taking office in 1992, President Clinton directed Secretary of Defense Les Aspin to review his department's policy regarding homosexuals serving in the military.

128. Congress undertook its own review and, in 1993, enacted the Don't Ask, Don't Tell Act, which regulated the service of homosexual personnel in the United States military.  See National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, 107 Stat. 1547 § 571, 10 U.S.C. § 654.

129. The Act contains a series of findings that mirror the concerns of then-chairman of the Joint Chiefs of Staff Colin Powell's testimony before Congress: "military life is fundamentally different from civilian life;" "[s]uccess in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion;" and "the presence in the [A]rmed [F]orces of persons who demonstrate a propensity of intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and

33

discipline and unit cohesion that are the essence of military capability."
See 10 U.S.C. § 654(a); cf. S. Rep. No. 103-112 at 283 (1993).

130. The Act is codified at 10 U.S.C. § 654; under § 654(b), the Secretary of Defense is authorized to formulate the implementing regulations, which are comprised of Department of Defense Directives 1332.14 (1993), 1332.30 (1997), and 1304.26 (1993).  The Secretary of Defense recently changed the implementing regulations.  See Department of Defense Instruction ("DoDI") 1332.14 (2008) (incorporating March 29, 2010, changes); DoDI 1332.30 (2008) (incorporating March 29, 2010, changes).

131. The statute provides that a member of the Armed Forces "shall be separated" from military service under one or more of the following circumstances.

　　a.　First, a servicemember shall be discharged if he or she "has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts."  10 U.S.C. § 654(b)(1).

　　b.　Second, a servicemember shall be discharged if he or she "has stated that he or she is a homosexual[8] or bisexual,[9] or words to that effect . . . ."  10 U.S.C. § 654 (b)(2).

　　c.　Third, a servicemember shall be discharged if he or she has married or attempted to marry a person "known to be of the same biological sex."  10 U.S.C. § 654 (b)(3).

---

[8] "The term 'homosexual' means a person, regardless of sex, who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts, and includes the terms 'gay' and 'lesbian'."  10 U.S.C. § 654 (f)(1).

[9] "The term 'bisexual' means a person who engages in, attempts to engage in, has a propensity to engage, or intends to engages in homosexual and heterosexual acts."  10 U.S.C. § 654 (f)(2).

132.  The first two routes to discharge have escape clauses; that is, discharges via either subsection (b)(1) or (b)(2) create a rebuttable presumption which the servicemember may attempt to overcome. Through this exception, a servicemember may rebut the presumption by demonstrating the homosexual conduct which otherwise forms the basis for the discharge under the Act meets five criteria, including inter alia, that it is a "departure" from the servicemember's "usual and customary behavior," is unlikely to recur, and was not accomplished by use of force, coercion or intimidation.  10 U.S.C. § 654 (b)(1)(A)-(E).

133.  An escape route also applies to the second basis for discharge under the Act, the making of a statement that one is a homosexual.  It allows the servicemember to rebut the presumption thus created by demonstrating that "he or she is not a person who engages in, attempts to engage, or has a propensity to engage in, or intends to engage in homosexual acts."  10 U.S.C. § 654 (2).

**Defendants' Evidence**

134.  Defendants specifically identified only the following items of legislative history as those upon which they rely in support of their contentions that the Act significantly furthers governmental interests in military readiness or troop cohesion, or that discharge is necessary to those interests:  (1) the Crittenden Report; (2) the PERSEREC Report; (3) the Rand Report; and the testimony of the following witnesses during hearings on the proposed Policy: (4) Dr. Lawrence Korb; (5) Dr. David Marlowe; (6) Dr. William Henderson; and (7) General Colin Powell.  Defendants did not include precise citations to any portion of the  above-referenced materials to support the constitutionality of the Policy.

1     **a.    The Crittenden Report (Trial Ex. 4)**

2         The Crittenden Report, formally titled Report of the Board

3 Appointed to Prepare and Submit Recommendations to the Secretary

4 of the Navy for the Revision of Policies, Procedures, and Directives

5 Dealing with Homosexuals, was prepared by that Board in 1957.  U.S.

6 Navy Captain S.H. Crittenden chaired the Board, which made detailed

7 recommendations regarding the manner in which discipline against

8 homosexual servicemembers should be imposed, including

9 circumstances in which discharge would be appropriate, and whether

10 discharge should be honorable or otherwise.  The Report does not,

11 however, discuss the impact of the presence of homosexuals serving in

12 the Armed Forces on either military readiness or unit cohesion.

13 Instead, the Board assumed, without investigation, that the presence of

14 homosexuals had a negative effect and their exclusion was desirable,

15 without elaborating on the basis for those assumptions; the Report

16 never made any findings concerning the impact of homosexual

17 servicemembers on military operations.

18         Accordingly, the Crittenden Report is not evidence that discharge

19 of homosexual servicemembers significantly furthers government

20 interests in military readiness or troop cohesion, or that discharge is

21 necessary to those interests.  The Report, in fact, is silent on those

22 interests.

23         It did conclude, however, that assumptions that homosexuals

24 present security risks and are unfit for military service are not well-

25 supported by evidence.  The Report also generally found homosexuals

26 to be no more or less likely to be qualified to serve in the Armed Forces

27 than heterosexuals according to a number of measures.

28

1

### b.     The PERSEREC Report (Trial Ex. 5)

2          The PERSEREC Report, formally titled "Nonconforming Sexual

3   Orientation in the Military and Society," was published in 1988 by the

4   Defense Personnel Security Research and Education Center and

5   authored by Theodore R. Sabin and Kenneth E. Karois.  The Report is

6   a broad survey of then-prevailing legal trends regarding treatment of

7   homosexuals, scientific views on homosexuality, and the history of

8   social constructions of "nonconforming" sexual behavior.  The Report

9   notes a legal trend toward increasingly recognizing rights of

10  homosexuals, a scientific trend toward recognizing homosexuality both

11  as biologically determined and as a normal condition not necessarily

12  indicating physical or mental disease, and a societal trend towards

13  increasing acceptance of homosexual behavior.

14          The PERSEREC Report generally dismisses traditional objections

15  to service by homosexuals in the military as abstract, intangible, and

16  tradition-bound.  The Report cites no evidence that homosexual

17  servicemembers adversely affect military readiness or unit cohesion.

18  The Report discusses unit cohesion, but only to state that empirical

19  research on the effect of homosexual servicemembers on unit cohesion

20  is important and necessary in the future; it points to no existing

21  empirical data.  In general, the Report suggests the military begin a

22  transition towards acceptance of homosexual servicemembers.

23

24

### c.     The Rand Report (Trial Ex. 8)

25          The Rand Report was prepared by the Rand Corporation's

26  National Defense Research Institute in 1993 at the request of the Office

27  of the Secretary of Defense, Les Aspin.  The submitted summary of the

28

Rand Report discusses only "Section 10," entitled "What Is Known about Unit Cohesion and Military Performance," as that is the sole section that bears on the issues presented here.

Foremost among the Rand Report's conclusions is that no empirical evidence exists demonstrating the impact of an openly homosexual servicemember on the cohesion of any military unit.  In its discussion of unit cohesion, the Report distinguished between social cohesion – "the emotional bonds of liking and friendship of the members of a unit" (Trial Tr. 872:3-4, July 16, 2010) and task cohesion – "a shared commitment to the group's mission or task goals" (Trial Tr. 872:4-6, July 16, 2010); concluded that according to public literature, only task cohesion has an even moderately positive correlation with unit performance; and found after controlling for task cohesion, social cohesion has almost no correlation to unit performance.  The Report further opines that an openly homosexual servicemember is more likely to affect only social cohesion, rather than task cohesion, thus having little to no impact on a unit's military performance.

The Report also concluded that merely assigning openly homosexual servicemembers to a unit can decrease negative feelings towards homosexuals, as fellow unit members tend to hold positive views of other individuals simply because they have been arbitrarily assigned to the same group.  Moreover, contact with a group towards which negative feelings are held tends to decrease negative feelings towards that group; Professor Belkin described this phenomenon as "familiarity breeds tolerance."  (Trial Tr. 297:9-19, July 14, 2010.)  The Report opined that the relationship between negative feelings toward a group would not necessarily translate into disruptive behavior, and that

to the extent it did so translate, such behavior could be influenced and controlled by appropriate institutional attitudes and attitudes of unit leaders.

### d.   Testimony of Dr. Lawrence Korb (Trial Ex. 344 at 255)

Dr. Korb testified before the Senate Armed Services Committee on March 31, 1993, concerning the likely impact on unit cohesion if homosexuals were permitted to serve openly.  According to Dr. Korb, there was no empirical research to support the view that homosexual servicemembers would disrupt unit cohesion, and that such evidence could not be obtained without integrating homosexuals into the military. Dr. Korb did concede, however, that in the short run immediately following integration of homosexual servicemembers, some negative effect on unit cohesion was likely, but did not point to any evidence in support of this view.  Dr. Korb testified concerning the experiences of foreign militaries and domestic law enforcement agencies that had integrated homosexual servicemembers, and stated that their integration had not adversely affected unit cohesion or performance in those entities.

### e.   Testimony of Dr. William Henderson (Trial Ex. 344 at 248)

Dr. Henderson testified before the Senate Armed Services Committee on March 31, 1993, concerning the significance of unit cohesion.  Dr. Henderson testified that the "human element" is the most important factor in warfare and the only force that motivates a unit to fight rather than flee or take cover.  Dr. Henderson testified that creation of a cohesive unit is "significantly influenced by broad cultural

values, norms, and characteristics that are the result of a common socialization process and basic agreement among unit members about cultural values."  Dr. Henderson testified that two types of unit cohesion exist: horizontal cohesion whereby troops identify with each other, and vertical cohesion whereby troops identify with their leaders.  A member of the unit who refuses to conform to the unit's expectations will be isolated, and will undermine the unit's cohesiveness.  Based on the views of servicemembers surveyed at that time, approximately 80% of whom opposed integration of homosexuals, homosexual servicemembers were so far outside the acceptable range of shared cultural values that they would not be accepted within military units, and would undermine unit cohesion.  Dr. Henderson pointed to no specific empirical study supporting this assertion, however, and measured his testimony by suggesting that a homosexual servicemember who did not disclose his orientation would not disrupt unit cohesion.

**f.**     **Testimony of Dr. David Marlowe (Trial Ex. 344 at 261)**

Dr. Marlowe testified before the Senate Armed Services Committee on March 31, 1993, concerning the significance of unit cohesion.  He testified similarly to Dr. Henderson in his description of the importance of unit cohesion and of the two types of cohesion, i.e., horizontal and vertical cohesion.  While openly acknowledging that in his scientific opinion, there was no empirical data conclusively deciding the question, he opined that openly serving homosexuals could undermine unit cohesion because homosexuality would not be an accepted cultural value among the other members of the unit.  Dr. Marlowe qualified his opinion more than Dr. Henderson, however, as

Dr. Marlowe also opined that a homosexual servicemember who did not "flaunt" his or her homosexuality, acted as a soldier first and foremost, and did not openly discuss his or her homosexuality would not undermine unit cohesion.  Dr. Marlowe foresaw no problem with such a person serving in the Armed Forces.

### g.    Testimony of General Colin Powell (Trial Ex. 344 at 707)

General Colin Powell testified before the Senate Armed Services Committee on July 20, 1993.  General Powell expressed his general support for the Policy as then proposed by President Clinton.  General Powell testified that in his opinion open homosexuality was incompatible with military service and would undermine unit cohesion.  General Powell opined that "behavior too far away from the norm undercuts the cohesion of the group."  He testified to his belief that military training on tolerance could not overcome the innate prejudices of heterosexual servicemembers.  He also testified that the Policy would improve military readiness, but only in that it settled the question of whether or not homosexuals could serve in the military, as the public debate had been a recent distraction to the military.  His testimony implied that any final resolution of the issue, regardless of substance, would improve military readiness.

General Powell testified that despite the official position of nondiscrimination towards homosexuals in the militaries of countries such as Canada, Germany, Israel, and Sweden, practice does not always match policy, and homosexuals often are subjected to discrimination in those militaries.  General Powell also rejected attempts to draw parallels between exclusion of homosexuals and

41

historical exclusion of African-Americans, because "skin color is a benign nonbehavioral characteristic, while sexual orientation is perhaps the most profound of human behavioral characteristics."

**Plaintiff's Evidence:  Reports, Exhibits and Expert and Lay Testimony**

135.  Plaintiff introduced evidence demonstrating the Act does not significantly advance the Government's interests in military readiness or unit cohesion.  The testimony of former servicemembers provides ample evidence of the Act's effect on the fundamental rights of homosexual members of the United States military.  Their testimony also demonstrates that the Act adversely affects the Government's interests in military readiness and unit cohesion.  In addition to the testimony from the lay witnesses, Plaintiff introduced other evidence, from witnesses in such specialties as national security policy, military sociology, military history, and social psychology, on whether the Act furthered the Government's interests in military readiness or unit cohesion.

**Discharge of Qualified Servicemembers Despite Troop Shortages**

136.  From 1993 through 2009, Defendants discharged, pursuant to the Act, over 13,000 men and women serving in the United States Armed Forces.  During the years between 1994 through 2001, Defendants discharged at least 7,856 servicemembers under the Act, according to a General Accounting Office Report entitled "Financial Costs and Loss of Critical Skills."  (Trial Ex. 9  [2005 Government Accountability Office ("GAO") Report on the "Financial Costs and Loss of Critical Skills Due to [the] DOD's Homosexual Conduct Policy"].)

137.   The combined branches of the Armed Forces discharged the following numbers of servicemembers from 1994, the first full year after adoption of the Don't Ask, Don't Tell Act, through the calendar year 2001:

| Year | Number of Servicemembers Discharged |
|---|---|
| 1994 | 616[10] |
| 1995 | 757[11] |
| 1996 | 858[12] |
| 1997 | 997[13] |
| 1998 | 1,145[14] |
| 1999 | 1,043[15] |
| 2000 | 1,213[16] |
| 2001 | 1,227[17] |
| **Total discharged 1994 2001** | **7,856** |

---

[10] (Trial Ex. 9, at 8; but see id. at 42 (showing 616 servicemembers discharged).)

[11] (Trial Ex. 9, at 8.)

[12] (Id.)

[13] (Trial Ex. 85, Defs.' Objections and Resp. to Pl's. First Set of Req. for Admis. ("RFA Resp.") No. 33; Trial Ex. 9, at 8.)

[14] (Trial Ex. 85, RFA Resp. No. 34; Trial Ex. 9, at 8.)

[15] (Trial Ex. 85, RFA Resp. No. 35; Trial Ex. 9, at 8; but see id. at 42 (showing 1,034 servicemembers discharged).)

[16] (Trial Ex. 85, RFA Resp. No. 36; Trial Ex. 9, at 8; but see id. at 42 (showing 1,213 servicemembers discharged).)

[17] (Trial Ex. 85, RFA Resp. No. 37; Trial Ex. 9, at 8; but see id. at 42 (showing 1,227 servicemembers discharged).)

138.  Starting in 2002, after the United States began fighting in Afghanistan, the number of servicemembers discharged under the Act fell sharply, despite the greater raw number of military personnel.  As but one example, in 2001, Defendants discharged at least 1,217 servicemembers pursuant to the Don't Ask, Don't Tell Act.  In 2002, the number discharged under the Act fell to 885.

| Year | Number of Servicemembers Discharged |
|---|---|
| 2002 | 885[18] |
| 2003 | 770[19] |
| 2004 | 653[20] |
| 2005 | 726[21] |
| 2006 | 612[22] |
| 2007 | 627[23] |
| 2008 | 619[24] |
| 2009 | 275[25] |
| **Total discharged 2002-2009** | **5,167** |

---

[18] (Trial Ex. 85, RFA Resp. No. 38; but see Trial Ex. 9, at 8 (showing 884 servicemembers discharged).)

[19] (Trial Ex. 85, RFA Resp. No. 39; but see Trial Ex. 9, at 8 (showing 769 servicemembers discharged).)

[20] (Trial Ex. 85, RFA Resp. No. 40.)

[21] (Trial Ex. 85, RFA Resp. No. 41.)

[22] (Trial Ex. 85, RFA Resp. No. 42.)

[23] (Trial Ex. 85, RFA Resp. No. 43.)

[24] (Trial Ex. 85, RFA Resp. No. 44.)

[25] (Trial Ex. 85, RFA Resp. No. 45.)

44

139.  The decline in discharges after 2001, according to Dr. Nathaniel Frank, illustrates that during wartime the military retains servicemembers known to be homosexual, despite the Don't Ask, Don't Tell Act requiring discharge, because of the heightened need for troops.  (Trial Tr. 196:5-198:6, 257:21-258:6, July 13, 2010.)

**Discharge of Servicemembers with Critically Needed Skills and Training**

140.  Among those discharged pursuant to the Act were many servicemembers with critically needed skills.  According to the Government's own data, many of those discharged pursuant to the Act had education, training, or specialization in so-called "critical skills," including Arabic, Chinese, Farsi, or Korean language fluency; military intelligence; counterterrorism; weapons development; and medicine. (Trial Tr. 199:24-200:5, 204:23-24, July 13, 2010; Trial Ex. 9.)  Far from furthering the military's readiness, the discharge of these service men and women had a direct and deleterious effect on this governmental interest.

141.  For example, relying on the 2005 GAO Report on the "Financial Costs and Loss of Critical Skills Due to [the] DOD's Homosexual Conduct Policy" (Trial Ex. 9), Professor Frank pointed out that through fiscal year 2003, several hundred medical professionals had been discharged pursuant to the Act, yet a 2003 Senate report described a lack of medical care for wounded troops returning from the Arabian Gulf and the resulting negative impact on physical health and troop morale. (Trial Tr. 258:10-259:2, July 15, 2010.)  At the same time that more than one-hundred thousand U.S. troops were deployed to serve in combat in Iraq and Afghanistan, several hundred servicemembers with

1
2
3

"critical" language skills, including many qualified as Farsi and Arabic
speakers and interpreters, were discharged under the Act.  (Trial Ex. 9;
Trial Tr. 199:24-200:5, 204:23-24, July 13, 2010.)

4

5

**The Act's Impact on Military Recruiting**

6
7
8
9
10
11
12
13
14

142.   Dr. Lawrence Korb, currently a senior fellow at the Center for American
Progress, with an extraordinary background in military preparedness
and national security issues,[26] including an appointment under
President Ronald Reagan as an Assistant Secretary in the Department
of Defense, testified before Congress in 2007 about the difficulty the
military was experiencing in finding and retaining enough qualified
recruits.  The crisis in recruiting qualified candidates became
particularly severe after combat began in 2001, he testified.  (Trial Tr.
1027:24-25, 1028:1-2, July 20, 2010.)

15
16
17
18
19
20
21
22

143.  In general, successful military recruiting efforts come with a very high
price tag; Dr. Korb pointed to advertisements various branches of the
Armed Forces run during the televised Super Bowl football games as
an example of an effective but very costly recruiting tool.  Successful
recruiting includes not only the costs for sending out military recruiters
all around the country, but also the costs of conducting medical and
educational testing on recruits as well as the expense of their basic
training.  The size of the financial investment needed to prepare a

23

24
25
26
27
28

[26] In addition to the appointments described above, Dr. Korb is on the
faculty at Georgetown University.  He also has served as dean of the
Graduate School of Public and International Affairs at the University of
Pittsburgh, on the Council for Foreign Relations, as Director of the Center for
Public Policy Education at the Brookings Institution, and as Director for
Defense Policy Studies for the American Enterprise Institute.  This is only a
partial list of his appointments and service.  (Trial Ex. 350.)  The Court found
Dr. Korb an extraordinarily well-credentialed and powerfully credible witness.

1    servicemember for an operational unit can reach millions of dollars. Dr.
2    Korb testified.  (Trial Tr. 1028:18-1029:13, July 20, 2010.)  Citing a
3    Pentagon study, Dr. Korb opined that for every person discharged after
4    ten years of service, six new servicemembers would need to be
5    recruited to recover the level of experience lost by that discharge.  (Trial
6    Tr. 1029:6-23, July 20, 2010.)

7  144.  With that background, Dr. Korb opined the Don't Ask, Don't Tell Act
8    negatively affects military recruiting in two ways: its existence
9    discourages those who would otherwise enlist from doing so, and many
10    colleges and universities will not permit military recruiting or Army
11    ROTC programs on campus because the Act's requirements violate
12    their nondiscrimination policies.  (Trial Tr. 1030:12-21, July 20, 2010.)

13  145.  Dr. Korb estimated that the military loses 5,000 men and women
14    annually due to the Don't Ask, Don't Tell Act, if one includes both those
15    who are discharged under it and those who decide not to re-enlist
16    because of it.  He conceded, however, that it is very difficult to quantify
17    the number of those who decide not to enlist because of the Policy.
18    (Trial Tr. 1030:1-10, July 20, 2010.)  Professor Frank also testified on
19    this subject, and based on data from the U.S. Census, the UCLA
20    School of Law Williams Institute, and other sources, opined that if the
21    Act were repealed, the military would gain approximately 40,000 new
22    recruits and approximately 4,000 members would re-enlist every year
23    rather than leave voluntarily.  (Trial Tr. 205:6-17, July 13, 2010.)

24  146.  The 2005 GAO Report estimated that over the ten-year period after
25    enactment of the Act, "it could have cost the [Department of Defense]
26    about $95 million in constant fiscal year 2004 dollars to recruit
27    replacements for service members separated under the policy.  Also
28

47

the Navy, Air Force, and Army estimated that the cost to train
replacements for separated service members by occupation was
approximately $48.8 million, $16.6 million, and $29.7 million,
respectively."  (Trial Ex. 85, RFA Resp. No. 21.)

**Admission of Lesser Qualified Enlistees**

147. Defendants discharged over 13,000 members of the Armed Forces
under the Don't Ask, Don't Tell Act since 1993.  (Trial Tr. 195:5-8,
203:21-204:5.)  Plaintiff introduced evidence that while Defendants
continued to enforce the Act by discharging servicemembers under it –
albeit in dramatically reduced numbers – after 2001, they also began to
admit more convicted felons and misdemeanants into the Armed
Forces, by granting so-called "moral waivers"[27] to the policy against
such admissions.  (Trial Tr. 199:1-17, July 13, 2010; see supra notes
10-25 and accompanying text.)

148. In addition to the increased numbers of convicted felons and
misdemeanants allowed to join the ranks of the military forces,
Professor Frank testified that increased numbers of recruits lacking the
required level of education and physical fitness were allowed to enlist
because of troop shortages during the years following 2001.  (Trial Tr.
199:1-11, July 13, 2010.)  Log Cabin's evidence went uncontradicted
that those who are allowed to enlist under a "moral waiver" are more
likely to leave the service because of misconduct and more likely to

---

[27] "Moral waivers" are used to admit recruits who otherwise would not
have been eligible for admission because of their criminal records, i.e.,
convictions for felonies and serious misdemeanors, or admitted past
controlled substance abuse.  (Trial Tr. 207:7-208:24, July 13, 2010.)

1   leave without fulfilling their service commitment than others who joined
2   the Armed Forces.  (Trial Tr. 209:2-13, July 13, 2010.)
3   149.  Dr. Korb testified that eventually the troop shortages after 2001 caused
4   the U.S. Armed Forces to lower educational and physical fitness entry
5   standards as well as increase the number of "moral waivers" to such an
6   extent that, in his opinion, it became difficult for the military to carry out
7   its mission.  (Trial Tr. 1020:22-1021:11, July 20, 2010.)  At the same
8   time, discharging qualified servicemembers under the Don't Ask, Don't
9   Tell Act simply "does not make sense" in terms of military preparedness
10   because, in his words, the military is "getting rid of those who are
11   qualified to serve and admitting those who aren't."  (Trial Tr. 1025:15-
12   20, July 20, 2010.)

13

14   **Other Effects of the Policy**

15   150.  Dr. Korb testified about other effects the Don't Ask, Don't Tell Act has
16   on military preparedness.  He opined that in order  for the military to
17   perform its mission successfully, it must mold persons from vastly
18   different backgrounds who join it into a united and task-oriented
19   organization.  He described the military as a meritocracy, but testified
20   that the Don't Ask, Don't Tell Act detracts from the merit-based nature
21   of the organization, because discharges under the Act are not based on
22   the servicemember's failure to perform his or her duties properly, or on
23   the effect of the soldier's presence on the unit's morale or cohesion.
24   (Trial Tr. 1031:2-1033:10, July 20, 2010.)

25

26

27

28

**Decreased and Delayed Discharge of Suspected Violators of the Act**

151.  LCR also produced evidence demonstrating that Defendants routinely delayed the discharge of servicemembers suspected of violating the Act's provisions until after they had completed their overseas deployments.  In other words, if Defendants began an investigation of a servicemember suspected of violating the Act, the investigation would be suspended if the subject received deployment orders; not until he or she returned from combat – assuming this occurred, of course – would the investigation be completed and the servicemember discharged if found to have violated the Act.  Thus, Defendants deployed servicemembers under investigation for violating the Act to combat missions or, if they were already so deployed, delayed the completion of the investigation until the end of the deployment.  (Trial Tr. 196:5-24, July 13, 2010; 573:7-17, July 15, 2010; Brady Dep. 184:13-185:11, 188:13-190:9, Apr. 16, 2010.)

152.  This evidence, in particular, directly undermines any contention that the Act furthers the Government's purpose of military readiness, as it shows Defendants continue to deploy gay and lesbian members of the military into combat, waiting until they have returned before resolving the charges arising out of the suspected homosexual conduct.  If the warrior's suspected violation of the Act created a threat to military readiness, to unit cohesion, or to any of the other important Government objectives, it follows that Defendants would not deploy him or her to combat before resolving the investigation.  It defies logic that the purposes of the Act could be served by suspending the investigation during overseas deployments, only to discharge a servicemember upon his or her return to a non-combat station.

153.  Taken as a whole, the evidence introduced at trial shows that the effect of the Act has been, not to advance the Government's interests of military readiness and unit cohesion, much less to do so significantly, but to harm that interest.  The testimony demonstrated that since its enactment in 1993, the Act has harmed efforts of the all-volunteer military to recruit during wartime.

154.  The Act has caused the discharge of servicemembers in occupations identified as "critical" by the military, including medical professionals and Arabic, Korean, and Farsi linguists.

155.  At the same time that the Act has caused the discharge of over 13,000 members of the military, including hundreds in critical occupations, the shortage of troops has caused the military to permit enlistment of those who earlier would have been denied entry because of their criminal records, their lack of education, or their lack of physical fitness.

**The Act is Not Necessary to Advance the Government's Interests**

**Defendants' Admissions**

156.  Defendants have admitted that, far from being necessary to further significantly the Government's interest in military readiness, the Don't Ask, Don't Tell Act actually undermines that interest.  President Obama, the Commander-in-Chief of the Armed Forces, stated on June 29, 2009:

> "Don't Ask, Don't Tell" doesn't contribute to our national security . . . preventing patriotic Americans from serving their country weakens our national security . . . . [R]eversing this policy [is] the right thing to do [and] is essential for our national security.

(Trial Ex. 305; Trial Ex. 85, RFA Resp. Nos. 1, 2, 9.)

157.  President Obama also stated regarding the Act on October 10, 2009,
"We cannot afford to cut from our ranks people with the critical skills we
need to fight any more than we can afford – for our military's integrity –
to force those willing to do so into careers encumbered and
compromised by having to live a lie."  (Trial Ex. 306; Trial Ex. 85, RFA
Resp. No. 12.)

158.  Admiral Mike Mullen, chairman of the Joint Chiefs of Staff, echoed
these sentiments through a verified Twitter account, posted to the Joint
Chiefs of Staff website: "Stand by what I said [testifying in the U.S.
Senate Armed Services Committee on February 2, 2010]: Allowing
homosexuals to serve openly is the right thing to do.  Comes down to
integrity."  (Trial Ex. 330.)

**Defendants' Contention that the Act is Necessary to Protect Unit
Cohesion and Privacy**

159.  Defendants point to the Act's legislative history and prefatory findings
as evidence that the Policy is necessary to protect unit cohesion and
heterosexual servicemembers' privacy.  In particular, they quote and
rely on General Colin Powell's statements in his testimony before
Congress in 1993.

160.  General Powell expressed his qualified support for the continued
service of gays and lesbians in the Armed Forces and the narrow
nature of his concerns.  (Trial Ex. 344 [Policy Concerning
Homosexuality in the Armed Forces: Hearings Before the S. Comm. on
Armed Servs., 103rd Cong. (statement of General Colin Powell,
Chairman, Joint Chiefs of Staff)] at 709).  He emphasized his concern
that "active military service is not an everyday job in an ordinary

1   workplace . . . . There is often no escape from the military environment
2   for days, weeks and often months on end.  We place unique demands
3   and constraints upon our young men and women not the least of which
4   are bathing and sleeping in close quarters."  (Id. at 762; 709 ("Our
5   concern has not been about homosexuals seducing heterosexuals or
6   heterosexuals attacking homosexuals . . . .").)

7   161.  Plaintiff introduced uncontradicted testimony that General Powell has
8         changed his views since 1993 on the necessity of the Policy and now
9         agrees with the current Commander-in-Chief that it should be reviewed.
10        (Trial Tr. 221:7-11, July 13, 2010.)

11  162.  Plaintiff also produced powerful evidence demonstrating that the Act is
12        not necessary in order to further the governmental interest that General
13        Powell expressed, i.e., unit cohesion and particularly the concern that
14        cohesion might be eroded if openly homosexual servicemembers
15        shared close living quarters with heterosexuals.

16  163.  Michael Almy, who during thirteen years of active service lived in
17        dozens of different types of military housing on at least three
18        continents, testified his quarters ranged from a villa in Eskan Village,
19        Saudi Arabia, where he and the others quartered there each had
20        private bedrooms and bathrooms, to a dormitory-type facility at the
21        Prince Sultan Air Base in Saudi Arabia, where at first he had a private
22        room and bath until the troop build-up before the invasion of Iraq led to
23        several men sharing a room, with a private bathroom that was used by
24        only one person at a time, to temporary quarters in a tent at Balad Air
25        Base in Iraq shared by six to eight men who obtained limited privacy by
26        hanging up sheets.

27

28

53

164.  In his deployments to Saudi Arabia and Iraq, Almy was never quartered in housing that had open bay showers, nor did he ever see such housing for enlisted members or officers.  (Trial Tr. 748:3-750:25, July 16, 2010.)  The typical arrangement in Saudi Arabia was for enlisted servicemembers and officers to have the same type of facilities, including bathroom and shower facilities; officers typically did not have to share rooms, and enlisted personnel usually shared a bedroom and bathroom.  (Trial Tr. 750:14-25, July 16, 2010.)  Open bay showers are the exception in military quarters; most service members only use them during basic training.  (Trial Tr. 759:12-19, July 16, 2010.)

165.  Similarly, John Nicholson testified that while he was in basic training in Fort Benning, the recruits slept in a large open room with sixty bunk beds and shared a large communal bathroom with toilets in individual stalls and semi-private showers.  (Trial Tr. 1154:25-1155:15, July 20, 2010.)  Anthony Loverde testified that only during basic training was he housed in barracks where open bay showers were the only option; he had access to single stall shower facilities even when stationed at Bagram Air Base in Afghanistan and at Balad Air Base in Iraq.  (Trial Tr. 1378:3-15, 1385:18-1386:12, July 21, 2010.)

166.  Other servicemembers confirmed this testimony.  Stephen Vossler testified regarding his living quarters while he served as an enlisted man in the Army; he shared a "not spacious" bedroom and also a bathroom with a roommate.  (Trial Tr. 330:4-11, July 14, 2010.)  Although Vossler learned his roommate was gay, Vossler had no problems sharing quarters with him and thought he was a good roommate.  (Trial Tr. 329:20-330:21, July 14, 2010.)

167. Professor Aaron Belkin confirmed this evidence in his testimony; his research into military architecture revealed that apart from basic training sites and service academies where there are open showers, servicemembers usually have access to single stall showers.  (Trial Tr. 617:21-619:1, July 15, 2010.)  According to Professor Belkin, "the army, in recent years, has implemented something called the one-plus-one barracks design standard.  What that means is that servicemembers are housed in an arrangement where they each have their own bedroom and there is a bathroom between the two bedrooms that they share."  (Trial Tr. 618:8-13, July 15, 2010.)  Three-fourths of the troops quartered in combat zones in Afghanistan and Iraq had access to single stall showers, according to his research.  (Trial Tr. 626:3-8, July 15, 2010.)

168. Plaintiff's evidence regarding unit cohesion was equally plentiful and persuasive.  The testimony of both its lay and expert witnesses revealed that the Act not only is unnecessary to further unit cohesion, but also harms the Government's interest.

169. After Michael Almy was relieved of his command abruptly under the Act, he witnessed firsthand what occurred when an unprepared junior officer was forced to take over.  He testified that "[t]he maintenance of the equipment, the mission overall, the availability – the up time of the equipment, the availability of the equipment to meet the mission suffered" and there was "a huge detrimental effect to the morale" of the troops he commanded after he was relieved of his command.  (Trial Tr. 813:21-25, 814: 1-6, July 16, 2010.)  Almy testified, "Virtually every day on my base on Spangdahlem, I would encounter one of my former troops who wanted me back on the job as their officer and leader."

1    (Trial Tr. 814:2-6, July 16, 2010.)  His assessment was confirmed by

2    another officer in the squadron, who wrote that the squadron "fell apart"

3    after Major Almy was relieved of his duties, illustrating "how important

4    Maj. Almy was[,] not only to the mission but to his troops."  (Trial Ex.

5    121 [Character Reference Letter from Bryan M. Zollinger, 1st Lt.,

6    USAF, 606th Air Control Squadron].)

7  170.  Jenny Kopfstein's commanding officer wrote that she was a "hard

8    working and dedicated junior officer who excelled as an [o]fficer of the

9    [d]eck" who "played an important role in enhancing the ship's strong

10   reputation."  (Trial Ex. 139 [Jenny L. Kopfstein Fitness Report and

11   Counseling Record]; Trial Tr. 966:14-17.)  He specifically noted that

12   "[h]er sexual orientation has not disrupted good order and discipline on

13   board USS SHILOH."  (Trial Ex. 139; Trial Tr. 966:23-24.)  Kopfstein

14   testified that after she stopped concealing her homosexuality while

15   serving on the USS Shiloh, she had many positive responses, and the

16   ability of her fellow crew members to trust her improved, thus aiding the

17   establishment of teamwork.  (Trial Tr. 951:10-11, 979:8-21, 25, 980:1,

18   July 20, 2010.)

19  171.  Anthony Loverde's superiors unquestionably felt that his discharge

20   pursuant to the Don't Ask, Don't Tell Act did not further the

21   Government's interest in unit cohesion.  In recommending the Air Force

22   retain Loverde, they commended him for being "nothing less than an

23   outstanding [non-commissioned officer]" and "a strong asset" with "an

24   exceptional work ethic" and "the highest level of military bearing,

25   honesty, and trustworthiness."   (Trial Exs. 136 [Letter from Michael

26   Yakowenko, CM Sgt.], 137 Letter from Richard Horn, SM Sgt.].)  One

27   wrote: "If I ever had the opportunity to build my 'dream team' for work, I

28

1    would take an entire crew of SSgt. Loverde over most other workers . . .

2    ."  (Trial Ex. 137.)

3    172.  Robert MacCoun, Professor of Law and Public Policy at the University

4          of California, Berkeley, and one of the contributors to the 1993 Rand

5          Report on the Don't Ask, Don't Tell Act, testified regarding social and

6          task cohesion.  (Trial Tr. 864:11-866:17, 870:22-875:25, July 16, 2010.)

7          Professor MacCoun holds a Ph.D. in psychology from Michigan State

8          University, was a post-doctoral fellow in psychology and law at

9          Northwestern University, spent seven years as a behavioral scientist at

10         the RAND Corporation,[28] and has a distinguished research and

11         publication record.  (Trial Tr. 856:16-864:7, July 16, 2010.)  The Court

12         found his testimony cogent and persuasive.

13   173.  According to Professor MacCoun, the RAND working group concluded

14         that task cohesion was paramount; it was a more important predictor of

15         military performance than social cohesion, and service in the Armed

16         Forces by openly homosexual members was not seen as a serious

17         threat to task cohesion.  (Trial Tr. 871:23-872:6, 873:24-875:4, 875:21-

18         25, 876:13-21, July 16, 2010.)  Therefore, the recommendation to

19         Secretary of Defense Les Aspin from the RAND Corporation in the1993

20         Report was that sexual orientation should not be viewed as germane to

21         service in the military; the 1993 Report made various recommendations

22         regarding the implementation of this change.  (Trial Ex. 8 [Sexual

23         Orientation and U.S. Military Personnel Policy: Options and

24         Assessment] at 368-94; Trial Tr. 865:8-879:9, July 16, 2010.)

25

26

27         [28] The RAND Corporation is a nonpartisan, private, nonprofit research
     corporation, conducting public policy research.  (Trial Tr. 858:2-3, July 16,
28   2010.)

174. Thus, the evidence at trial demonstrated that the Act does not further significantly the Government's important interests in military readiness or unit cohesion, nor is it necessary to further those interests. Defendants' discharge of homosexual servicemembers pursuant to the Act not only has declined precipitously since the United States began combat in Afghanistan in 2001, but Defendants also delay individual enforcement of the Act while a servicemember is deployed in a combat zone.  If the presence of a homosexual soldier in the Armed Forces were a threat to military readiness or unit cohesion, it surely follows that in times of war it would be more urgent, not less, to discharge him or her, and to do so with dispatch.

175. The abrupt and marked decline – 50% from 2001 to 2002 and steadily thereafter – in Defendants' enforcement of the Act following the onset of combat in Afghanistan and Iraq, and Defendants' practice of delaying investigation and discharge until after combat deployment, demonstrate that the Act is not necessary to further the Government's interest in military readiness.

176. In summary, Defendants have failed to show the Don't Ask, Don't Tell Policy "significantly furthers" the Government's interests or that it is "necessary" in order to achieve those goals.  Plaintiff has relied not just on the admissions described above that the Act does not further military readiness, but also has shown the following:

- by impeding the efforts to recruit and retain an all-volunteer military force, the Act contributes to critical troop shortages and thus harms rather than furthers the Government's interest in military readiness;

- by causing the discharge of otherwise qualified servicemembers with critical skills such as Arabic, Chinese, Farsi, and Korean language fluency; military intelligence; counterterrorism; weapons development; and medical training, the Act harms rather than furthers the Government's interest in military readiness;

- by contributing to the necessity for the Armed Forces to permit enlistment through increased use of the "moral waiver" policy and lower educational and physical fitness standards, the Act harms rather than furthers the Government's interest in military readiness;

- Defendants' actions in delaying investigations regarding and enforcement of the Act until after a servicemember returns from combat deployment show that the Policy is not necessary to further the Government's interest in military readiness or unit cohesion;

- by causing the discharge of well-trained and competent servicemembers who are well-respected by their superiors and subordinates, the Act has harmed rather than furthered unit cohesion and morale;

- the Act is not necessary to protect the privacy of servicemembers because military housing quarters already provide sufficient protection for this interest.

177.  The Don't Ask, Don't Tell Act infringes the fundamental rights of United States servicemembers in many ways, some described above.  The Act denies homosexuals serving in the Armed Forces the right to enjoy "intimate conduct" in their personal relationships.

178. The Act denies them the right to speak about their loved ones while serving their country in uniform; it punishes them with discharge for writing a personal letter, in a foreign language, to a person of the same sex with whom they shared an intimate relationship before entering military service.

179. The Act discharges them for including information in a personal communication from which an unauthorized reader might discern their homosexuality.

180. Michael Almy, Anthony Loverde, and Jenny Kopfstein all testified that the Act prevented them from talking openly with their fellow servicemembers about everyday personal matters or from soliciting after hours with their colleagues. (Trial Tr. 821:19-822:9, July 16, 2010 (Almy); Trial Tr. 1360:1-1361:17, July 21, 2010 (Loverde); Trial Tr. 931:22-932:11, July 16, 2010; Trial Tr. 957:6-22, July 20, 2010 (Kopfstein).) This testimony, as well as that from Steven Vossler (Trial Tr. 327:12-328:20, July 14, 2010), demonstrates that the Act's restrictions on speech not only are broader than reasonably necessary to protect the Government's substantial interests, but also actually impede military readiness and unit cohesion rather than further these goals.

181. Many of the lay witnesses also spoke of the chilling effect the Act had on their ability to bring violations of military policy or codes of conduct to the attention of the proper authorities. Joseph Rocha, eighteen- years-old and stationed in Bahrain, felt restrained from complaining about the extreme harassment and hazing he suffered because he feared that he would be targeted for investigation under the Act if he did so. (Trial Tr. 488:20-489:14, July 15, 2010.) His fear was so great, if fact, that he

1    initially refused to answer the questions of an investigating officer.

2    (Trial Tr. 519:16-510:10-15, July 15, 2010.)

3    182.  John Nicholson and Anthony Loverde also testified about a similar

4    chilling effect on their speech when overhearing or being subjected to

5    homophobic slurs or taunts.  (Trial Tr. 1138:1-1142:14, 1143:2-24, July

6    20, 2010 (Nicholson); Trial Tr. 1364:16-1365:25, July 21, 2010

7    (Loverde).)

8    183.  The Act prevents servicemembers from openly joining organizations,

9    such as the plaintiff in this lawsuit, that seek to change the military's

10   policy on gay and lesbian servicemembers; it also prevents them from

11   petitioning the Government for redress of grievances.  John Doe, for

12   example, feared retaliation and dismissal if he joined the Log Cabin

13   Republicans under his true name or testified during trial; thus, he was

14   forced to use a pseudonym and to forgo testifying during trial.  (Ex. 38

15   [Doe Decl.] ¶¶ 6-8; see Trial Tr. 88:19-90:15, July 13, 2010; 708:21-

16   709:4, July 16, 2010.)

17   184.  Furthermore, as discussed above, the Act punishes servicemembers

18   with discharge for writing a private letter, in a foreign language, to a

19   person of the same sex with whom they shared an intimate relationship

20   before volunteering for military service.  It subjects them to discharge

21   for writing private e-mail messages, in a manner otherwise approved, to

22   friends or family members, if those communications might lead the

23   (unauthorized) reader to discern the writer's sexual orientation.

24   185.  These consequences demonstrate that the Act's restrictions on speech

25   are broader than reasonably necessary to protect the Government's

26   interest.

27

28

1  186.  The Act's restrictions on speech lead to the discharge of

2       servicemembers with qualifications in critically-needed occupations,

3       such as foreign language fluency and information technology.

4  187.  The net effect of these discharges, as revealed not only in the

5       testimony of the lay witnesses but also of the experts who testified and

6       Defendants' own admissions regarding the numbers of servicemembers

7       discharged and the costs of recruiting and maintaining an all-volunteer

8       military force, compel the conclusion that the Act restricts speech more

9       than reasonably necessary to protect the Government's interests.

10

11                         **CONCLUSIONS OF LAW**

12  **Jurisdiction**

13  1.   The Court has jurisdiction over this action pursuant to 28 U.S.C. §§

14       1331, 1346 and 2201.  Venue is properly laid in the Central District of

15       California under 28 U.S.C. § 1391(e)(2) and (3).

16

17  **Standing**

18  2.   Plaintiff Log Cabin Republicans, a non-profit corporation, has

19       established standing to bring and maintain this suit on behalf of its

20       members.

21  3.   Plaintiff bears the burden of establishing its standing to invoke federal

22       jurisdiction.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61

23       (1992).

24  4.   To bring suit on behalf of its members, an association must establish

25       the following: "(a) [at least one of] its members would otherwise have

26       standing to sue in [his or her] own right; (b) the interests it seeks to

27       protect are germane to the organization's purpose; and (c) neither the

28

1    claim asserted nor the relief requested requires the participation of

2    individual members in the lawsuit."  <u>Hunt v. Wash. State Apple Adver.</u>

3    <u>Comm'n</u>, 432 U.S. 333, 343 (1977).

4  5.    To satisfy the first element of associational standing, a organization

5    must demonstrate constitutional standing as to at least one member of

6    the organization, as follows: (1) injury in fact; (2) caused by the

7    defendants; (3) which likely will be redressed by a favorable decision by

8    the federal court.  <u>Lujan</u>, 504 U.S. at 560-61; <u>see also</u> <u>Elk Grove</u>

9    <u>Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 12 (2004).

10  6.    As to the associational standing requirements, Plaintiff established at

11    trial that the interests it seeks to vindicate in this litigation are germane

12    to LCR's purposes, satisfying the second requirement for associational

13    standing.

14  7.    Plaintiff satisfied the third requirement of associational standing, "that

15    the suit not demand the participation of individual members."

16    <u>Associated Gen. Contractors of Cal. v. Coal. for Econ. Equity</u>, 950 F.2d

17    1401, 1408 (9th Cir. 1991) (citations omitted).  Plaintiff seeks only

18    declaratory and injunctive relief in its First Amended Complaint; when

19    "the claims proffered and relief requested do not demand individualized

20    proof on the part of its members," such as when only declaratory and

21    prospective relief are sought, the individual members of an association

22    need not participate directly in the litigation.  <u>Id.</u>; <u>see also</u> <u>Hunt</u>, 432

23    U.S. at 343 (citing <u>Warth v. Seldin</u>, 422 U.S. 490, 515 (1975)).

24  8.    Plaintiff satisfied the first requirement of associational standing as well,

25    <u>i.e.</u>, whether there exists at least one member of the association who

26    could maintain this suit in his or her own right.  Defendants' contention

27    that neither of the two members Plaintiff relies upon to confer

28

1    associational standing on it meets the requirements for that role,

2    because neither was a member of Log Cabin Republicans continuously

3    from the date of the commencement of this action until the date of trial,

4    lacks merit.

5    9.    Standing in this case should be examined as of April 28, 2006, the date

6          Plaintiff filed its First Amended Complaint.  (See Doc. No. 170 at 15.)

7          As of that date, at least one of Log Cabin's members, John Nicholson,

8          had standing and could have pursued the action individually.  See

9          supra Findings of Fact Nos. 12-20.  Nicholson's membership in Log

10         Cabin Republicans has been uninterrupted and continuous since April

11         28, 2006 to the present.

12   10.   Nicholson satisfies all three of the requirements for constitutional

13         standing, i.e., "injury in fact" caused by the defendants (his discharge

14         by Defendants pursuant to the Policy), which is redressable by the relief

15         sought  in this lawsuit, as he testified he would rejoin the Army if the

16         policy was no longer in effect.  (Trial Tr. 1209:4-5, July 21, 2010.)

17   11.   Even if the Court looks to the date the original Complaint was filed as

18         the relevant one for standing purposes, however, Plaintiff still satisfies

19         the associational standing requirements, as Plaintiff proved by a

20         preponderance of the evidence at trial that John Doe was a member in

21         good standing as of October 12, 2004.  See supra Findings of Fact

22         Nos. 12-22.

23   12.   John Doe has established the three elements of constitutional standing:

24         he faces a concrete injury caused by Defendants – discharge from the

25         Army Reserve – which is likely, not speculative, in nature, given the

26         mandatory language of the Don't Ask, Don't Tell Act, see 10 U.S.C. §

27

28

1    654(b)(2), and which would be redressed by a favorable by the Court in
2    this action.

3    13.   A plaintiff who has established standing must retain his or her "personal
4          stake" in the litigation throughout the proceedings.  See Lewis v. Cont'l
5          Bank Corp., 494 U.S. 472, 477-78 (1990); Williams v. Boeing Co., 517
6          F.3d 1120, 1128 (9th Cir. 2008).  When a plaintiff loses that "personal
7          stake" in the lawsuit, a court loses the ability to grant relief and must
8          dismiss the action on the basis of mootness because the plaintiff no
9          longer satisfies the redressability element of constitutional standing.
10         See, e.g., Arizonans for Official English v. Arizona, 520 U.S. 43, 68-72
11         (1997) (mootness); Williams, 517 F.3d at 1128 (redressability).

12   14.   The cases cited above addressing loss of standing do not arise in an
13         associational standing context, however.  Whether one regards Plaintiff
14         Log Cabin Republicans or John Doe as the party whose standing is at
15         issue, neither lost a "personal stake" in the litigation when Doe's annual
16         period of membership lapsed.

17   15.   After the year covered by the initial payment of membership dues, Doe
18         still served in the Army Reserve and still was subject to discharge
19         under the Don't Ask, Don't Tell Act.  Thus, he still had a personal stake
20         in the outcome of the case, and his injury – his susceptibility to
21         discharge under the Act – continued to be redressable by favorable
22         resolution of the lawsuit.

23   16.   Nor has standing been lost in this case because of a change in
24         circumstances rendering the subject matter of the action moot.  The Act
25         has not been repealed and the challenged policy is still in effect; Doe is

26
27
28

1    still serving and subject to discharge under it;[29] Nicholson already has

2    been discharged under it and cannot re-enlist as he wishes to do.

3    Finally, the dispute over the constitutionality of the Act has not been

4    resolved.

5    17.    Likewise, the redressability aspect of constitutional standing remains

6    alive despite the lapse in Doe's dues-paying membership status.  Doe's

7    imminent injury – the mandatory nature of his discharge under the

8    policy – would be addressed through a favorable ruling in this action.

9    18.    Even if Defendants were correct that Log Cabin Republicans failed to

10    prove standing through Doe based on the lack of evidence he paid

11    dues after 2005, it does not follow that Plaintiff could not maintain its

12    claims.  Plaintiff had standing to file suit based on the undisputed

13    evidence of Doe's membership as of October 12, 2004, the date Log

14    Cabin Republicans filed this action.  (See supra Findings of Fact No. 7.)

15    19.    Assuming Doe's membership lapsed a year later, in early September

16    2005, Plaintiff lacked standing temporarily from that time until April 28,

17    2006, when Nicholson became a member of Log Cabin Republicans.

18    Courts have recognized that a plaintiff who possesses standing when it

19    brings suit, later loses it, and then regains standing before entry of

20    judgment, may still maintain its claims.  See, e.g., Schreiber Foods, Inc.

21    v. Beatrice Cheese, Inc., 402 F.3d 1198, 1203 (Fed. Cir. 2005) (finding

22    plaintiff that owned patent at outset of litigation, assigned it to

23    subsidiary, then reacquired it before judgment may maintain an

24    infringement action); see also Caterpillar, Inc. v. Lewis, 519 U.S. 61, 64,

25    70, 73 (2005).

26

27    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[29] In fact, Plaintiff agreed to Defendants' request for a stay of this case if
Defendants would suspend discharges under the Policy, but Defendants
28    refused to do so.

20.   Thus, assuming that Log Cabin Republicans lacked standing at some point between early September 2005 and April 28, 2006, it still may maintain its claims now.

21.   Defendants' suggestion that LCR "manufactured" its standing for purposes of this lawsuit lacks merit.  (See Doc. No. 188 [Defs.' Proposed Findings of Fact & Conclusions of Law] at 3.)  The only authority Defendants cite on this point is Washington Legal Foundation v. Leavitt, 477 F. Supp. 2d 202, 211 (D.D.C. 2007), holding the manufacture of standing "weakens" an association's ability to maintain a lawsuit on behalf of its members.

22.   Washington Legal Foundation was based on facts not present in the record here, however.  As that court explained, the Washington Legal Foundation's board of directors explicitly decided to bring suit, and then set about to find and recruit persons who would confer standing on it. By contrast, the initiative for filing the present action came from the rank and file of the LCR membership.  See supra Findings of Fact No. 22.

23.   Washington Legal Foundation is not binding authority on this Court, but to the extent it provides guidance, it only holds that "manufacture" of standing weakens but does not destroy an association's ability to maintain its suit.  Furthermore, there is no evidence here that LCR manufactured standing, so Washington Legal Foundation is factually dissimilar as well.

### Evidence Considered by the Court

**Plaintiff's Burden on a Facial Challenge**

24.   In United States v. Salerno, 481 U.S. 739 (1987), the Supreme Court held a plaintiff challenging the validity of a law on its face must establish

1    that "no set of circumstances exists under which the Act would be

2    valid." <u>Id.</u> at 745.  The defendants in <u>Salerno</u> were detained pending

3    trial under the provisions of the Bail Reform Act; they challenged the

4    Act, on its face, claiming it unconstitutionally violated the Fifth and

5    Eighth Amendments.

6  25.  More recently, in <u>Washington State Grange v. Washington State</u>

7    <u>Republican Party</u>, 552 U.S. 442 (2008), the Supreme Court noted the

8    criticisms leveled at the <u>Salerno</u> standard and recognized an alternative

9    the test as follows: "a facial challenge must fail where the statute has a

10   'plainly legitimate sweep.'" <u>Id.</u> at 449 (citing <u>Washington v. Glucksberg</u>,

11   521 U.S. 702, 739-740 & n.7 (1997) (Stevens, J., concurring)); <u>see also</u>

12   <u>United States v. Stevens</u>, 559 U.S. ___, ___, 130 S. Ct. 1577, 1587

13   (2010) (citing <u>Glucksberg</u> and noting the existence of two standards for

14   facial challenges outside the First Amendment context).

15  26.  The Court considers the evidence presented at trial in this facial

16   challenge not for the purpose of considering any particular application

17   of the Don't Ask, Don't Tell Act, but rather for the permissible purposes

18   described in Conclusions of Law No.36-41, <u>infra</u>.

19  27.  Plaintiff's evidence, as described above, amply illustrates that the Act

20   does not have a "plainly legitimate sweep."  Rather, Plaintiff has proven

21   that the Act captures within its overreaching grasp such activities as

22   private correspondence between servicemembers and their family

23   members and friends, and conversations between servicemembers

24   about their daily off-duty activities.  (<u>See</u> <u>supra</u> Findings of Fact Nos.

25   27, 28, 75, 93, 96-99, 113.)

26

27

28

28. Plaintiff also has proven that the Act prevents servicemembers from reporting violations of military ethical and conduct codes, even in outrageous instances, for fear of retaliatory discharge.  All of these examples, as well as others contained in the evidence described above, reveal that Plaintiff has met its burden of showing that the Act does not have a "plainly legitimate sweep."  (See supra Findings of Fact Nos. 53, 76, 92, 112.)

29. Defendants rely on Salerno and its progeny, particularly Cook v. Gates, 528 F.3d 42 (1st Cir. 2008), in urging the Court to reject Log Cabin's facial challenge.  (Defs.' Mem. Cont. Fact & Law at 5; Trial Tr. 1670:14-21-1671:23, 1684:12-14, July 23, 2010.)  This reliance is misplaced.

30. In Cook, the First Circuit reasoned a facial challenge the Don't Ask, Don't Tell Act failed because Lawrence "made abundantly clear that there are many types of sexual activity that are beyond the reach of that opinion," and "the Act includes such other types of sexual activity" because it "provides for the [discharge] of a service person who engages in a public homosexual act or who coerces another person to engage in a homosexual act."  528 F.3d at 56 (citing Lawrence, 539 U.S. at 578).

31. The Court is not bound by this out-of-Circuit authority, and furthermore finds the logic of Cook unpersuasive.  First, Cook employed the formulation from Salerno rather than the Supreme Court's more recent articulation of the test for facial challenges set forth in Washington State Grange.  Moreover, the examples the Cook court cited as grounds for discharge "under the Act" actually are bases for discharge of any servicemember, whether the conduct in question is homosexual or heterosexual.  In fact, the Cook decision provides no citation to any

1
2

provision of the Don't Ask, Don't Tell Act specifically listing either of its examples as grounds for discharge under that legislation.

3

4

**Evidence Properly Considered on a Facial Challenge**

5
6
7
8

32.   The Court finds meritless Defendants' contention that because Plaintiff challenges the constitutionality of the statute on its face, rather than challenging its application, the only evidence the Court should – indeed may – consider, is the statute itself and the bare legislative history.

9
10
11
12
13
14
15
16
17
18

33.   In United States v. O'Brien, 391 U.S. 367 (1968), the government charged and convicted the defendant for burning his draft card; the defendant contended the law under which he was prosecuted was unconstitutional because Congress enacted it for the unlawful purpose of  suppressing speech.  Id. at 383.  The Supreme Court rejected this argument, holding "under settled principles the purpose of Congress, as O'Brien uses that term, is not a basis for declaring this legislation unconstitutional.  It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  Id.

19
20
21
22
23
24
25
26
27

34.   In part, the O'Brien Court founded its reasoning on the difficulty of discerning a unified legislative "motive" underlying any given enactment:  "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it . . . ."  Id. at 384.  Thus, O'Brien instructs that when "a statute . . . is, under well-settled criteria, constitutional on its face," a court should not void the law based on statements by individual legislators.  Id.  Thus, while examining the legislative record, the Court must not pay heed to any illegitimate motivations on the part of the enacting lawmakers.

28

70

35. O'Brien does not stand for the proposition urged by Defendants, however, that when deciding whether a challenged law "is, under well-settled criteria, constitutional on its face," this Court should limit itself to examining only the statute's legislative history.  In fact, in the O'Brien decision the Supreme Court specifically pointed to two cases, Grosjean v. American Press Co., 297 U.S. 233 (1936), and Gomillion v. Lightfoot, 364 U.S. 339 (1960), noting that they "stand, not for the proposition that legislative motive is a proper basis for declaring a statute unconstitutional, but that the inevitable effect of a statute on its face may render it unconstitutional."  O'Brien, 391 U.S. at 394 (emphasis added).

36. In both Grosjean and Gomillion, the Court noted, the purpose of the law was irrelevant "because [of] the inevitable effect – the necessary scope and operation."  Id. at 385 (citations omitted).

37. Therefore, under O'Brien, Grosjean, and Gomillion, the court may admit and examine evidence to determine the "scope and operation" of a challenged statute; nothing in any of these authorities limits the Court's discretion to consider evidence beyond the legislative history.

38. Defendants rely in vain on City of Las Vegas v. Foley, 747 F.2d 1294 (9th Cir. 1984), as support for their position regarding the inadmissibility of Plaintiff's evidence.  Foley arose out of a discovery dispute in a facial constitutional challenge to a Las Vegas zoning ordinance restricting the location of "sexually oriented businesses."  Id. at 1296.  One of the affected businesses sought to depose city officials regarding their motives in enacting the ordinance; after the city failed in its efforts to obtain a protective order from the District Court, it sought mandamus relief from the Ninth Circuit Court of Appeals.  Id.

71

39.   The Ninth Circuit reviewed the case law prohibiting inquiry into "alleged illicit legislative motive," and relying on <u>O'Brien</u>, granted the writ, directing the district court to issue a protective order.  <u>Id.</u> at 1299.  In rejecting the arguments of the party seeking to depose the legislators, the <u>Foley</u> court described the following types of evidence appropriately considered by a court asked to determine a First Amendment challenge:  "objective indicators as taken from the face of the statute, the effect of the statute, comparison to prior law, facts surrounding enactment of the statute, the stated purpose, and the record of the proceedings."  <u>Foley</u>, 747 F.2d at 1297 (citations omitted).

40.   The Ninth Circuit also noted in <u>Foley</u> that "basic analysis under the First Amendment . . . has not turned on the motives of the legislators, <u>but on the effect of the regulation.</u>"  <u>Id.</u> at 1298 (emphasis added).

41.   Defendants correctly point out that the authorities discussed above hold that isolated (and in this case, sometimes inflammatory) statements of Senators and House members during the Don't Ask, Don't Tell Act legislative hearings should not be considered by the Court.

42.   Nevertheless, this does not affect, much less eviscerate, the language in the authorities cited above that Defendants would have the Court ignore, holding that a court deciding a facial challenge can and should consider evidence beyond the legislative history, including evidence regarding the effect of the challenged statute.

43.   As this case includes a facial challenge on substantive due process as well as First Amendment grounds, the Court notes that although the authorities discussed above dealt with evidence properly considered by courts in resolving First Amendment facial challenges, their holdings regarding the admissibility of broad categories of testimonial and

1   documentary evidence are echoed in the authorities considering facial

2   challenges on due process grounds.  See, e.g., Lawrence v. Texas,

3   539 U.S. 558 (2003); Reno v. Flores, 507 U.S. 292, 309 (1993); Tucson

4   Woman's Clinic v. Eden, 379 F.3d 531, 556-57. (9th Cir. 2004); Los

5   Angeles County Bar Ass'n v. Eu, 979 F.2d 697, 707 (9th Cir. 1992); see

6   generally, Guggenheim v. City of Goleta, 582 F.3d 996 (9th Cir. 2009).

7   44.   In Lawrence, petitioners pled nolo contendere to charges under a

8   Texas statute forbidding certain sexual acts between persons of the

9   same sex.  They then raised a facial challenge to the statute's

10   constitutionality under the Due Process and Equal Protection clauses of

11   the Fourteenth Amendment.  In reaching its decision that the Texas

12   statute indeed was unconstitutional, the Supreme Court's majority

13   reviewed at length the history of the common law prohibiting sodomy or

14   regulating homosexuality, the effect of the statute ("The stigma this

15   criminal statute imposes, moreover, is not trivial . . . . We are advised

16   that if Texas convicted an adult for private consensual homosexual

17   conduct under the statute here in question the convicted person would

18   come within the registration laws of at least four States were he or she

19   to be subject to their jurisdiction. . . ."), facts surrounding enactment of

20   the statute, and comparison with other laws.  Lawrence, 539 U.S. at

21   567-79.

22   45.   Accordingly, the Court's determination of Plaintiff's substantive due

23   process and First Amendment challenges to the Act refers to evidence

24   properly adduced by Log Cabin Republicans and admitted at trial.  (As

25   noted above, apart from the Act itself and its legislative history,

26   Defendants admitted no evidence and produced no witnesses.)

27

28

## Plaintiff's Challenge under the Due Process Clause

46. Plaintiff claims the Don't Ask, Don't Tell Act violates its members' substantive due process rights, identified in <u>Lawrence</u> as rights associated with the "autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."  <u>Lawrence</u>, 539 U.S. at 562.  (FAC ¶¶ 4, 38-43; Doc. No. 190 [Pl.'s Mem. Cont. Fact & Law] at 32-33.)

## The Standard of Review

47. As set out more fully in the July 6, 2010, Order, courts employ a heightened standard of review when considering challenges to state actions implicating fundamental rights.  (July 6, 2010, Order at 6-9.)

48. After the United States Supreme Court's decision in <u>Lawrence v. Texas</u>, recognizing the fundamental right to "an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct," 539 U.S. at 562, the Ninth Circuit in <u>Witt v. Department of Air Force</u>, 527 F.3d 806 (9th Cir. 2008), held the Don't Ask, Don't Tell Act constitutes an intrusion "upon the personal and private lives of homosexuals, in a manner that implicates the rights identified in <u>Lawrence</u>, and is subject to heightened scrutiny."  527 F.3d at 819.

49. Thus, in order for the Don't Ask, Don't Tell Act to survive Plaintiff's constitutional challenge, it must "[1] advance an important governmental interest, [2] the intrusion must significantly further that interest, and [3] the intrusion must be necessary to further that interest."  <u>Id.</u>

50. Noting the Act "concerns the management of the military, and judicial deference to . . . congressional exercise of authority is at its apogee" in

this context, <u>Witt</u> went on to decide the Act advances an "important governmental interest."  527 F.3d at 821 (citations omitted).  Accordingly, the Court addresses the second and third prongs of the <u>Witt</u> test.

**The Act Does Not Significantly Further the Government's Interests in Military Readiness or Unit Cohesion**

51.  Defendants relied solely on the legislative history of the Act and the Act itself in support of their position that the Act passes constitutional muster.  (<u>See</u> Findings of Fact Nos. 127-34; Defs.' Mem. Cont. Fact & Law at 9-10.)  Careful review and consideration of the Act itself and its legislative history reveals that this evidence fails to satisfy Defendants' burden of proving that the Act, with its attendant infringements on the fundamental rights of Plaintiff's members, significantly furthers the Government's interest in military readiness or unit cohesion**.**

52.  Plaintiff's evidence at trial demonstrated the Act does not significantly advance the Government's interests in military readiness or unit cohesion.  The testimony of former servicemembers provides ample evidence of the Act's adverse effect on the fundamental rights of homosexual members of the United States military.  Their testimony also demonstrated that the Act has a deleterious effect on the Government's interests in maintaining military readiness and unit cohesion.  In addition to the testimony from the lay witnesses, Plaintiff's other evidence, including documentary evidence and testimony from witnesses in such specialties as national security policy, military sociology, military history, and social psychology, provided additional

1   support for this conclusion that the Act harms, rather than furthers, the
2   Government's important interests.

3

**The Act Is Not Necessary to Further the Government's Interests in**
**Military Readiness and Unit Cohesion**

6   53.   The <u>Witt</u> court held that to justify the infringement on the fundamental
7         rights identified in <u>Lawrence</u>, a defendant must satisfy both the
8         requirement that the Act "significantly furthers" the Government's
9         interests and the requirement that it is "necessary" to achieve them.  To
10        the extent that Defendants have made a distinct argument here that the
11        Act is necessary to achieve the Government's significant interests, they
12        have not met their burden as to this prong of the <u>Witt</u> test, either.

13  54.   In order to justify the encroachment on the fundamental rights
14        described above, Defendants faced the burden at trial of showing the
15        Don't Ask, Don't Tell Act was necessary to significantly further the
16        Government's important interests in military readiness and unit
17        cohesion.  Defendants failed to meet that burden.

18  55.   Thus, Plaintiff is entitled to judgment in its favor on the first claim in its
19        First Amended Complaint for violation of the substantive due process
20        rights guaranteed under the Fifth Amendment.

21

**Plaintiff's First Amendment Challenge to the Act**

23  56.   "Congress shall make no law . . . abridging the freedom of speech, . . .
24        or the right of the people peaceably to assemble, and to petition the
25        Government for a redress of grievances."  (U.S. Const. amend. I.)

26

27

28

57. Plaintiff claims that the Don't Ask, Don't Tell Act violates its members' First Amendment rights to these freedoms.  (FAC ¶¶ 1, 6, 45-49; Pl.'s Mem. Cont. Fact & Law at 32-33.)

**The Standard of Review in First Amendment Challenges**

58. Plaintiff challenges the Act as overbroad and as an unconstitutional restriction on speech based on its content.  (FAC ¶ 47; Pl.'s Mem. Cont. Fact & Law at 35, 40.)  Laws regulating speech based on its content generally must withstand intense scrutiny when facing a First Amendment challenge:

> At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.  Our political system and cultural life rest upon this ideal.  Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right.  Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.  These restrictions rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace.   For these reasons, the First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals.  <u>Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content.</u>

<u>Turner Broad. Sys. v. FCC</u>, 512 U.S. 622, 641-42 (1994) (emphasis added) (citations omitted).

59. In <u>Simon & Schuster, Inc. v. Members of New York State Crime Victims Board</u>, 502 U.S. 105 (1991), the Supreme Court considered whether New York's "Son of Sam" law purporting to strip authors of profits gained from books or other publications depicting their own criminal activities constituted content-based regulation.  Holding the law was not

content neutral, the Court ruled that "[i]n order to justify such differential treatment, 'the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.'" Id. at 118 (citing Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 231 (1987)).

60. "Deciding whether a particular regulation is content-based or content-neutral is not always a simple task. We have said that the principal inquiry in determining content-neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." Turner, 512 U.S. at 642 (citations omitted).

61. The Supreme Court in Turner distilled the rule as follows: a law that by its terms "distinguish[es] favored speech from disfavored speech on the basis of the ideas or views expressed [is] content-based." Id. at 643 (citing Burson v. Freeman, 504 U.S. 191, 197 (1992); Boos v. Barry, 485 U.S. 312, 318-19 (1988)).

62. Defendants did not address directly the question of content neutrality, but relied instead on authorities that, for various reasons, fail to counter the clear weight of the case law discussed above. Defendants repeatedly cited the Ninth Circuit's decisions in Witt v. Department of Air Force, 527 F.3d 806 (9th Cir. 2008), Philips v. Perry, 106 F.3d 1420 (9th Cir. 1997), and Holmes v. California National Guard, 124 F.3d 1126 (9th Cir. 1997), although the plaintiff in Witt brought no First Amendment claim and the Court in Philips expressly declined to reach the First Amendment issue, noting the district court also had stopped short of resolving it.

63.    In <u>Holmes</u>, the Ninth Circuit disposed of the plaintiffs' free speech
claims in summary manner, holding because the plaintiffs "were
discharged for their conduct and not for speech, the First Amendment is
not implicated."  124 F.3d at 1136 (citations omitted).

64.    <u>Holmes</u> relied on the Fourth Circuit's decision in <u>Thomasson v. Perry</u>,
80 F.3d 915 (4th Cir. 1996), which rejected a First Amendment
challenge to the Don't Ask, Don't Tell Act on the basis that it
"permissibly uses the speech as evidence," and "[t]he use of speech as
evidence in this manner does not raise a constitutional issue – the First
Amendment does not prohibit the evidentiary use of speech to establish
the elements of a crime, or, as is the case here, to prove motive or
intent."  <u>Id.</u> at 931 (citations omitted).

65.    <u>Holmes</u> also relied on <u>Pruitt v. Cheney</u>, 963 F.2d 1160 (9th Cir. 1991),
although acknowledging that decision was based not on the Don't Ask,
Don't Tell Act but a superseded policy.  <u>See</u> <u>Holmes</u>, 124 F.3d at 1136
(citing <u>Pruitt</u>, 963 F.2d at 1164).  In other words, <u>Holmes</u> and the cases
from other circuits have found the Don't Ask, Don't Tell Act does not
raise a First Amendment issue to be analyzed under a content-neutral
versus content-based framework.

66.    None of these authorities, however, considered whether there might be
any speech, other than admissions of homosexuality subject to being
used as evidence in discharge proceedings, affected by the Act.
Furthermore, <u>Holmes</u> was decided before <u>Lawrence</u> and was
"necessarily rooted" in <u>Bowers v. Hardwick</u>, 478 U.S. 186 (1986), which
<u>Lawrence</u> overruled.  <u>See</u> <u>Holmes</u>, 124 F.3d at 1137 (Reinhardt, J.,
dissenting).

67.   Lawrence struck down a Texas statute making felonious certain sexual acts between two persons of the same sex; the Supreme Court held in part that the Constitution recognized certain substantive due process rights, associated with the "autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct."  Lawrence, 539 U.S. at 562 (emphasis added).

68.   The Holmes decision, finding the Act did not implicate the First Amendment, and the Act's provisions, appear at odds with the Supreme Court's decision in Lawrence.  As Holmes explains:

"Homosexual conduct is grounds for separation from the Military Services under the terms set forth [in the DOD Directives.] Homosexual conduct includes homosexual acts, a statement by a member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage.  A statement by a member that demonstrates a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts."  124 F.3d at 1129 (quoting DOD Directive 1332.30 at 2-1(c) (emphasis added)).

69.   The Holmes court found the Act does not punish status, despite the presumption embodied within it that declared homosexual servicemembers will engage in proscribed homosexual conduct, finding the assumption was "imperfect" but "sufficiently rational to survive scrutiny . . . ."  124 F.3d at 1135.

70.    Thus, <u>Holmes</u>'s foundations – rational basis scrutiny, acceptance of an assumption of sexual misconduct based on admitted homosexual orientation, and the <u>Bowers</u> decision – all have been undermined by <u>Lawrence</u>, particularly in light of its explicit protection of "expression." <u>See</u> <u>Lawrence</u>, 539 U.S. at 562.

71.    Furthermore, if the proscription in subsection (b)(1) of the Act violates substantive due process as set forth above, then the limitation on speech in subsection (b)(2) necessarily fails as well.  "Plainly, a limitation on speech in support of an unconstitutional objective cannot be sustained."  <u>Able v. United States</u>, 88 F.3d 1280, 1300 (2d Cir. 1996).  <u>Holmes</u>, decided before <u>Lawrence</u>, therefore does not shield Defendants from Plaintiff's First Amendment claim.

72.    The Act in subsection (b)(2) requires a servicemember's discharge if he or she "has stated that he or she is a homosexual or bisexual, <u>or words to that effect</u> . . . ."  10 U.S.C. § 654 (b)(2) (emphasis added).  The Act does not prohibit servicemembers from discussing their sexuality in general, nor does it prohibit all servicemembers from disclosing their sexual orientation.  Heterosexual members are free to state their sexual orientation, "or words to that effect," while gay and lesbian members of the military are not.

73.    Thus, on its face, the Act discriminates based on the content of the speech being regulated.  It distinguishes between speech regarding sexual orientation, and inevitably, family relationships and daily activities, by and about gay and lesbian servicemembers, which is banned, and speech on those subjects by and about heterosexual servicemembers, which is permitted.

74.    The First Amendment's hostility to content-based regulation "extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.  As a general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 530, 537 (1980) (quoting Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95 (1972)).

75.    In evaluating the constitutionality of such regulations in a military context, however, courts traditionally do not apply the strict scrutiny described above.  Rather, courts apply a more deferential level of review of military restrictions on speech.  "Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society.  The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps."  Goldman v. Weinberger, 475 U.S. 503, 507 (1986) (citations omitted).

76.    Although careful to point out that the "subordination of the desires and interests of the individual to the needs of the service," which is "the essence of military life," does not entirely abrogate the guarantees of the First Amendment, the Supreme Court emphasized the "great deference [courts must afford] to the professional judgment of military authorities concerning the relative importance of a particular military interest."  Id. (citations omitted).

82

77. The <u>Goldman</u> decision relied in part on <u>Rostker v. Goldberg</u>, 453 U.S. 57 (1981), oft-cited for the principle that "judicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." <u>Id.</u> at 70.

78. In keeping with this well-established rule of deference, regulations of speech in a military context will survive Constitutional scrutiny if they "restrict speech no more than is reasonably necessary to protect the substantial government interest." <u>Brown v. Glines</u>, 444 U.S. 348, 348, 355 (1980) (citing <u>Greer v. Spock</u>, 424 U.S. 828 (1976); <u>Procunier v. Martinez</u>, 416 U.S. 396 (1974)).

79. The Don't Ask, Don't Tell Act fails this test of constitutional validity. Unlike the regulations on speech upheld in <u>Brown</u> and <u>Spock</u>, for example, the sweeping reach of the restrictions on speech in the Don't Ask, Don't Tell Act is far broader than is reasonably necessary to protect the substantial government interest at stake here.

80. In <u>Brown</u>, the Supreme Court upheld an Air Force regulation that required Air Force personnel first to obtain permission from the base commander before distributing or posting petitions on Air Force bases, 444 U.S. at 348; in <u>Greer</u>, the Court upheld a similar regulation on Army bases, banning speeches, demonstrations, and distribution of literature, without prior approval from post headquarters. 424 U.S. at 828.

81. In both cases, the Court rejected facial challenges to the regulations, holding they protected substantial Governmental interests unrelated to the suppression of free expression, <u>i.e.</u>, maintaining the respect for duty and discipline, and restricted speech no more than was reasonably necessary to protect that interest.

82.  By contrast to the relatively narrow regulations at issue in <u>Brown</u> and <u>Greer</u>, however, the Don't Ask, Don't Tell Act encompasses a vast range of speech, far greater than necessary to protect the Government's substantial interests.  <u>See</u> <u>supra</u> Findings of Fact Nos. 27, 28, 53, 75, 76, 92, 93, 96-99, 112,113.)

83.  For these reasons, Plaintiff is also entitled to judgment on its claim for violation of the First Amendment's guarantees of freedom of speech and petition.


Dated:  October 12, 2010

_____
VIRGINIA A. PHILLIPS
United States District Judge

84